## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JARROD STRINGER, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | No. SA-20-CV-46-OG |
| | § | |
| RUTH R. HUGHS, et al., | § | |
| *Defendants.* | § | |

### DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants respectfully request that the Court dismiss the complaint filed by Jarrod Stringer, Nayeli Gomez, John Harms, MOVE Texas Civic Fund ("MOVE Texas"), and League of Women Voters of Texas ("LWVTX"), Dkt. 1 ("Compl.").

### BACKGROUND

The Court is well familiar with the long procedural and factual history of this matter, and Defendants need not recount it in its entirety. *See, e.g.*, Dkts. 36, 56; *see also Stringer v. Whitley* ("*Stringer I*"), 942 F.3d 715 (5th Cir. 2019).

Plaintiffs allege that Defendants violate the National Voter Registration Act ("NVRA"), 52 U.S.C. §§ 20501-11, and the US Constitution based on the handling of driver license renewals and changes of address that occur on the Department of Public Safety ("DPS") website. Defendants have established a process for individuals to register to vote during these transactions in compliance with State law, and Defendants maintain—and have always maintained—that such process is fully

1

compliant with both the NVRA and the Fourteenth Amendment. But for Plaintiffs, the current process is insufficient because it does not satisfy their true aim: the imposition of online voter registration in Texas. The Texas Legislature has thus far declined to provide for online voter registration in the State, and neither the NVRA nor the US Constitution requires Texas to provide for online voter registration. The Court should reject Plaintiffs' attempt to achieve their preferred policy via litigation and dismiss this case.

ARGUMENT AND AUTHORITY

Plaintiffs' complaint should be dismissed for lack of jurisdiction because they have each failed to allege sufficiently that they have standing to proceed. And even if they had standing, Plaintiffs' claims fail on the merits because Texas law and Defendants' processes are compliant with the NVRA and the US Constitution.

## I.      The Court lacks jurisdiction over Plaintiffs' claims.

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject-matter jurisdiction. *E.g.*, *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015). "Subject-matter jurisdiction" refers to "the courts' statutory or constitutional power to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). Subject-matter jurisdiction is "a threshold issue that must be resolved before any federal court reaches the merits of the case before it." *Perez v. United States*, 312 F.3d 191, 194 (5th Cir. 2002); *Steel Co.*, 523 U.S. at 94-95.

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotation omitted).

To establish Article III standing, a plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant (causation); and (3) that is likely to be redressed by a favorable decision (redressability). *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). All three elements are "an indispensable part of the plaintiff's case" and each plaintiff bears the burden to establish them. *E.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

**A.  The Individual Plaintiffs lack standing.**

The Fifth Circuit in *Stringer I* was clear about the burden the Individual Plaintiffs must satisfy in order to meet the three-element test for standing:

> Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements. The redressability requirement limits the relief that a plaintiff may seek to that which is likely to remedy the plaintiff's alleged injuries. Because injunctive and declaratory relief "cannot conceivably remedy any past wrong," plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury. That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact. To be an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'" The purpose of the requirement that the injury be "imminent" is "to ensure that the alleged injury is not too speculative for Article III purposes." For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur.

942 F.3d at 720-21 (footnotes omitted).

But notwithstanding this clear instruction from the Fifth Circuit, the Individual Plaintiffs have failed to allege facts sufficient to demonstrate that they

have suffered a redressable injury-in-fact. Moreover, Plaintiffs also cannot demonstrate that their injuries are traceable to Defendants.

### 1. Jarrod Stringer

Stringer—who failed to demonstrate standing in his earlier lawsuit—has again failed to demonstrate that this Court has jurisdiction over his claims. He alleges two past harms: his failure to update his voter registration address prior to *Stringer I* after he moved from Arlington to San Antonio, and his alleged failure to update his voter registration address again in November 2019 after he moved from San Antonio to Houston. Compl. ¶¶ 49-50. Each of these is "not a continuing or threatened future injury, but a past injury." *Stringer I*, 942 F.3d at 721; *see also, e.g.*, *McGregor v. LSU Bd. of Sup'rs*, 3 F.3d 850, 867 (5th Cir. 1993) ("We must be careful not to confuse continuous violations with a single violation followed by continuing consequences; only continuous unlawful acts can form the basis of a continuous violation."). Accordingly, these alleged past harms cannot form the basis for standing to obtain prospective injunctive relief.

Stringer's standing, then, must come from an alleged "substantial risk" that the injury will recur. *See Stringer I*, 942 F.3d at 721 ("Standing also does not follow from the conclusion that the injunctive relief sought by a plaintiff would prevent the plaintiff from suffering the same injury in the future, which is always true when a plaintiff seeks an injunction prohibiting a defendant from repeating an action that injured the plaintiff in the past."). Perhaps aware of this problem, Stringer's complaint adds the following allegations:

> Mr. Stringer plans to move residences again in 2020. Specifically, Mr. Stringer and his wife plan to move out of their rental apartment into a new residence by August 25, 2020 at the latest. When he moves to his new address, Mr. Stringer intends to use the online DPS system to update his driver's license address.

Compl. ¶ 50. But this is not sufficient to constitute a "substantial risk." As an initial matter, "standing is not created by a declaration in court pleadings." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008). Stringer's allegations regarding his "substantial risk" of reinjury amount to nothing more than his own *ipse dixit*, and without any supporting facts, cannot establish standing.

Moreover, Stringer does not allege that he intends to move out of Harris County. A voter who moves within the same county—i.e., within the jurisdiction of the same voter registrar—can update their address online through Texas.gov. *See* Tex. Elec. Code § 15.021(d). If the voter fails to make this change within 30 days of an election, the voter can still vote "in the election precinct in which the voter is registered if the voter resides in the county in which the voter is registered and, if applicable: (1)  resides in the political subdivision served by the authority ordering the election if the political subdivision is other than the county;  or (2)  resides in the territory covered by the election in a less-than-countywide election ordered by the governor or a county authority." Tex. Elec. Code § 63.0011(b); *see also* Did You Change Something?, https://www.votetexas.gov/register-to-vote/did-you-change-something.html (last visited March 15, 2020). Accordingly, without the allegation that Stringer intends to leave his life in Harris County behind and move to the jurisdiction of another voter registrar—and that there is no suggestion that he

5

intends to do so—Stringer cannot demonstrate that he faces any future harm whatsoever, must less a "substantial risk" of future harm that is necessary for him to demonstrate Article III standing. Accordingly, Stringer fails to satisfy both the injury-in-fact and the redressability prongs of the standing test.

Stringer also fails to demonstrate that any alleged injury to his right to vote is traceable to any conduct by either Defendant. The cause of any failure to have his voter registration reflect his current address—a failure which does not impact his right or ability to vote, as described above—was his own inaction, and not the action of Defendants. If Stringer's address was not updated as a result of the alleged November 23, 2019 online driver license transaction, it was because he failed to follow the plain instructions on the website upon completion of his driver license update: submit a signed application to update their voter registration information. *See, e.g.*, *Stringer I*, 942 F.3d at 719. Accordingly, Stringer has failed to meet any of the three elements of the standing inquiry.

### 2.  Nayeli Gomez

Gomez fails to demonstrate that she has standing for substantially the same reasons that Stringer fails to do so. Her alleged injury, if any, is a past injury, and there is no suggestion that she will be injured again in the future; like the plaintiffs in *Stringer I*, she only alleges that she plans to interact with DPS online again in the future, *see* Compl. ¶ 51 ("Next time she changes addresses or needs to renew her driver's license and is eligible, Ms. Gomez intends to do so through the DPS online system."), which does not constitute "a substantial risk that [she] will attempt to

update [her] voter registration[] using the DPS System and be injured by [her] inability to do so." *Stringer I*, 942 F.3d at 723. Gomez therefore fails to allege facts sufficient to demonstrate either an injury in fact or redressability.

Moreover, Gomez has suffered no injury because she alleges only that she moved *within* Bexar County. *See* Compl. ¶ 51. Thus, like Stringer, Gomez is both eligible to change her voter registration address online and eligible to vote in her former precinct. *See* Tex. Elec. Code §§ 15.021(d), 63.0011(b); *see also* Did You Change Something?, https://www.votetexas.gov/register-to-vote/did-you-change-something.html (last visited March 15, 2020). Gomez's right and ability to vote is simply unaffected by Defendants' conduct.

Finally, Gomez's alleged injury, if any, is not traceable to Defendants; she chose not to register when given the opportunity to do so using the process provided during her online driver license transaction. The website was clear about what she needed to do to register, and she simply failed to do it. Accordingly, and for the same reasons as Stringer, Gomez fails to satisfy each of the three elements of the standing test.

### 3. John Harms

Harms fails to demonstrate standing for similar reasons. Like Gomez and the *Stringer I* plaintiffs, Harms only alleges that he plans to interact with DPS online again in the future, *see* Compl. ¶ 51 ("Next time he changes addresses or needs to renew her [sic] driver's license and is eligible, Mr. Harms intends to do so through the DPS online system."), which does not constitute "a substantial risk that [he] will

attempt to update [his] voter registration[] using the DPS System and be injured by [his] inability to do so." *Stringer I*, 942 F.3d at 723. Harms has therefore failed to demonstrate a redressable injury in fact. Likewise, Harms has failed to demonstrate that any alleged injury is traceable to Defendants, as explained above. Accordingly, Harms has also failed to establish any of the three elements of standing.

### B. The Organizational Plaintiffs lack standing.

MOVE Texas and LWVTX (collectively, "Organizational Plaintiffs") lack Article III standing to sue in their own right because they have not pleaded an injury in fact, and lack standing to sue on behalf of their members because they have not alleged individuals among their membership who are subject to an injury in fact, or that such individuals' participation is not required to maintain this case. And even if they had Article III standing, their claims in Count III should still be dismissed because they lack statutory standing.

### 1. Organizational Standing

An organization has standing to sue if it satisfies the same Article III requirements of injury in fact, causation, and redressability applicable to individuals. *NAACP v. City of Kyle, Texas*, 626 F.3d 233, 237 (5th Cir. 2010) (citing *Lujan*, 504 U.S. at 560-61). "[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to" conduct its routine "'activities—with the consequent drain on the organization's resources[.]'" *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

"Not every diversion of resources to counteract [a] defendant's conduct, however, establishes an injury in fact." *Id.* at 238. Rather, any "[s]uch injury must be 'concrete and demonstrable.'" *Id.*

Thus, to establish standing, "an organizational plaintiff must explain how the activities it undertakes in response to the defendant's conduct differ from its 'routine [] activities,'" and must "identify 'specific projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendant's conduct." *Def. Distributed v. U.S. Dep't of State*, No. 1:15-CV-372-RP, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238); *see also, e.g., ACORN v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999) (holding that organization's expenditures must be "caused by an[] action by" the defendant that the organization "claims is illegal, as opposed to part of the normal, day-to-day operations of the group" to confer standing) (citing *Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78 & n.5 (3d Cir. 1998)).[1]

The Organizational Plaintiffs do not meet this standard. MOVE Texas alleges that

- it "is a grassroots nonpartisan, nonprofit organization building power in underrepresented youth communities through civic education, leadership development, and issue advocacy," Compl. ¶¶ 21, 58;

- it "conducts voter registration in multiple counties in Texas, including on college campuses, where MOVE Texas employees and volunteers offer college students and other would-be voters the opportunity to

---

[1] *See also, e.g., Advocacy Ctr. v. La. Tech Univ.*, No. CV 18-0934, 2019 WL 1303212, at *4 (W.D. La. Mar. 6, 2019) ("[A]lthough an organization conceivably could have standing if it incurred [] costs [], the organization still must show that it would not have incurred these costs in the absence of defendant's illegal conduct."), report and recommendation adopted, 2019 WL 1301983 (W.D. La. Mar. 21, 2019) (citing *ACORN v. Fowler*, 178 F.3d at 357-58).

register to vote" and "conducts get-out-the-vote efforts . . . [d]uring and in the lead up to federal, state and local elections," Compl. ¶¶ 21, 58;

- it "is forced to divert resources to register people to vote," Compl. ¶ 59;

- it "must divert resources to educate voters who use the online DPS system and mistakenly believe they are registered to vote," Compl. ¶ 59;

- it "provides training which includes cautioning voters about the fact that online voter registration does not exist in Texas and the DPS online driver's license system does not register customers to vote," Compl. ¶ 59;

- its "mission" is "frustrate[d]" and its "get-out-the-vote efforts are thwarted when a voter whom they convinced to show up to the polls is denied the chance to cast a ballot that counts because they were not registered to vote," Compl. ¶ 59; and

- the "time and resources" spent engaging in the above "would otherwise be spent on MOVE Texas activities including registering more voters, building leadership in underrepresented youth communities, issues advocacy, and getting out the vote." Compl. ¶ 60.

Similarly—using much substantially identical language—LWVTX alleges that

- its "mission includes empowering voters, defending democracy, and envisioning a democracy where every person has the desire, the right, the knowledge, and the confidence to participate," Compl. ¶¶ 22, 61;

- it "registers eligible individuals to vote across Texas," "has members and chapters across the state," and "also conducts voter education and get-out-the-vote efforts . . . [d]uring and in the lead up to federal, state and local elections," Compl. ¶¶ 22, 61;

- it "is forced to divert resources to register people to vote," Compl. ¶ 62;

- it "must divert resources to educate voters who use the online DPS system and mistakenly believe they are registered to vote," and "must check those voters' registration status with the voters and register those voters anew," Compl. ¶ 62;

- it "provides public trainings that include cautioning voters about the fact that the DPS online driver's license system does not register customers to vote," Compl. ¶ 62;

10

- the "time and resources" spent engaging in the above "would otherwise be spent on LWVTX activities including registering other voters, educating voters on issues and candidates, and getting out the vote," Compl. ¶ 63;

- its "mission" is "frustrate[d]" and its "get-out-the-vote efforts are thwarted when a voter whom they convinced to show up to the polls is denied the chance to cast a ballot that counts because they were not properly registered to vote," Compl. ¶ 64; and

- it is a "membership organization" and "has [individual] members across the state and is harmed when those members seek to simultaneously register to vote or update their voter registration while renewing and/or updating the address on their driver's license during an online DPS transaction," Compl. ¶¶ 65, 66.

Additionally, MOVE Texas and LWXTV offer a smattering of generic allegations on behalf of both the "Organizational Plaintiffs" which are conclusory (and duplicative of the allegations above). *See* Compl. ¶¶ 54-57.

Even if these allegations were true, they do not demonstrate that any Organizational Plaintiff "diverted ***significant*** resources to counteract the defendant's conduct" such that any "defendant's conduct ***significantly*** and '***perceptibly*** impaired' the organization's ability to" conduct its routine "'activities—with the consequent drain on the organization's resources[.]'" *City of Kyle*, 626 F.3d at 237 (quoting *Havens*, 455 U.S. at 379) (emphasis added). As explained in *City of Kyle*, "[n]ot every diversion of resources to counteract [a] defendant's conduct [] establishes an injury in fact." *City of Kyle*, 626 F.3d at 238 (quoting *Havens*, 455 U.S. at 379). Rather, any "[s]uch injury must be 'concrete and demonstrable.'" *Id.*

The Organizational Plaintiffs fail to meet this standard. Instead, voter registration, education, and outreach are already central to these organizations'

"routine activities." *Id.*; Compl. ¶¶ 21, 22, 58, 61. Engaging in GOTV and voter education efforts in Texas in which they would participate *regardless* of Defendants' allegedly unlawful conduct does not amount to "concrete and demonstrable" injury to MOVE Texas or LWVTX. *Havens*, 455 U.S. at 379; *City of Kyle*, 626 F.3d at 238. And both MOVE Texas and LWVTX fail to "identify '***specific*** projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendant's conduct." *Def. Distributed*, 2018 WL 3614221, at *4 (quoting *City of Kyle*, 626 F.3d at 238). Although each generically states that it would pursue other activities absent the alleged conduct, those other activities are of the very same kind and character that each Organizational Plaintiff routinely engages in. *See* Compl. ¶¶ 60, 63. Put differently, neither Organizational Plaintiff claims that voter outreach efforts fall outside the "normal, day-to-day operations of the group." *Cf. ACORN v. Fowler*, 178 F.3d at 358. Thus, neither of the Organizational Plaintiffs has alleged an injury-in-fact as required to show standing.

Indeed, the "injury-in-fact" element of standing "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973). Because the Organizational Plaintiffs have at most alleged that they are interested in what they view as "the problem" in *Stringer I*, this Court should dismiss them from this case for failure to allege injury-in-fact in their own right.[2]

---

[2] Moreover, as with the Individual Plaintiffs, the Organizational Plaintiffs fail to demonstrate traceability because the alleged harm here—"frustration" of their "missions" and "thwarting" of their

## 2. Associational Standing

Under the doctrine of associational standing, an association may have standing to bring suit on behalf of its members when: "[1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191 (5th Cir. 2012) (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir.2010)) (citation omitted). The Organizational Plaintiffs do not allege facts to establish any of these factors.

As to the first prong, a plaintiff cannot have associational standing unless one of its members would have standing to sue individually. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019). Thus, each Organizational Plaintiff must "identify members who have suffered the requisite harm" for injury-in-fact. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *United Food & Comm. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996) (An "association 'can establish standing only as representatives of those of their members who have been injured in fact, and thus could have brought suit in their own right.'") (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

---

"efforts"—is not the result of Defendants' conduct, but rather a result of voters' failure to follow the process and instructions presented to them as they transact online regarding their driver license.

The Organizational Plaintiffs do not allege the existence of *specific* members—let alone specific members who would have standing in their own right. MOVE Texas does not allege that it has members at all, which is fatal to any assertion of associational standing. *See* Compl. ¶¶ 21, 58-60; *see also Hunt*, 432 U.S. at 344 (requiring "indicia of membership in an organization" for associational standing); *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267-68 (D.C. Cir. 2002).

For LWVTX, the failure to identify any member *with specificity* is equally fatal to an assertion of associational standing. *See, e.g., Summers v. Earth Island Inst.*, 555 U.S. at 498 (requiring "specific allegations establishing that at least one *identified* member had suffered or would suffer harm" if all members would not be harmed) (emphasis added); *City of Kyle*, 626 F.3d at 237 (requiring evidence of "a specific member"); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (dismissing under Rule 12(b)(1) because plaintiff did not identify a member affected by the challenged regulation); *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 26 (D.C. Cir. 2006).

And even if the Organizational Plaintiffs had alleged any specific member, they have not pleaded "a continuing or threatened future injury" as required to establish standing here. *Cf. Stringer I*, 942 F.3d at 721. As the Fifth Circuit explained in *Stringer I*, to establish standing, a plaintiff "must demonstrate a sufficient probability that [they] will use" the challenged "driver's license services again." *Id.* at 722. Where "Plaintiffs do not point to any Plaintiff-specific evidence suggesting that they will become unregistered and eligible to renew their driver's licenses using the DPS

System," they "have not established a substantial risk that they will attempt to update their voter registrations using the DPS System and be injured by their inability to do so." *Id.* at 723. "As a result," such "Plaintiffs have not established an injury in fact sufficient to confer standing to pursue the declaratory and injunctive relief that they seek." *Id.*

To be sure, *Stringer I* was an appeal from cross-motions for summary judgment after the development of an evidentiary record. But even at the pleading stage, a litigant must at least *allege* facts which would demonstrate standing if true. *See, e.g., Lujan*, 504 U.S. at 561. And here, MOVE Texas does not allege that it has members at all, and LWVTX merely alleges having members who have interacted online with DPS. Thus, even if all their factual allegations were proven, the Organizational Plaintiffs still could not "establish[] a substantial risk that" any member "will attempt to update their voter registrations using the DPS System and be injured by their inability to do so." *Id.* at 723.

As to the second prong, Defendants do not concede that either Organizational Plaintiff has satisfied or can satisfy the second element of associational standing, and reserve all rights to seek dismissal on that basis. Finally, as to the third prong, the Organizational Plaintiffs also fail because the participation of individual members *is* required to obtain the relief they request. It is not enough to allege the existence of members eligible to transact with DPS online. They still must bring a claim that is "not particular to any individual" and "thus properly resolved in a group context." *Gulf Restoration Network, Inc. v. Salazar*, 683 F.3d 158, 168 (5th Cir. 2012). They

cannot do so where, as here, individual voter registrations are at the heart of their challenge. *Cf.*, *e.g.*, *Church of Scientology v. Cazares*, 638 F.2d 1272, 1276-80 (5th Cir. 1981) (individual participation not required where "the claim asserted and the relief requested affect the membership as a whole"); *Familias Unidas v. Briscoe*, 619 F.2d 391, 398 n. 2 (5th Cir. 1980) ("[T]he declaratory relief sought, inuring as it would to the benefit of all members, is ideally suited to allowing 'associational standing.'") (citation omitted). Accordingly, the Organizational Plaintiffs cannot establish associational standing.

### 3.  Statutory Standing

Even if the Organizational Plaintiffs had Article III standing, they would still lack statutory standing to bring their claim for a constitutional violation under Count III of their complaint. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) (explaining statutory standing). Section 1983 provides a cause of action only when *the plaintiff* suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the violation of a *third party's* rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights."); David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45.

Thus, § 1983 follows the general rule that a plaintiff "must assert [her] own legal rights and interests, and cannot rest [her] claim to relief on the legal rights or

interests of third parties." *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)) (alterations original). When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory standing, regardless of Article III standing. *Id.*; *see also Conn v. Gabbert*, 526 U.S. 286, 292-93 (1999) (lawyer "clearly had no standing" to bring § 1983 claim for injury suffered as a result of "the alleged infringement of the rights of his client" because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.")

The Organizational Plaintiffs do not have voting rights. *See, e.g.*, *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 91 (2d Cir. 2015) ("Plaintiffs—five corporations and a not-for-profit trade organization—are not entitled to vote and have no right to equal representation in the legislature."); *see also Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D. Pa. 2002) ("It goes without saying that political parties, although the principal players in the political process, do not have the right to vote."). The Organizational Plaintiffs are necessarily asserting the rights of third parties, and lack statutory standing to sue under § 1983.

## II. Plaintiffs have failed to state a claim upon which relief may be granted.

Federal Rule of Civil Procedure 12(b)(6) "authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. William*, 490 U.S. 319, 326 (1989) (citations omitted). "This procedure, operating on the assumption that the factual allegations in the complaint are true, streamlines litigation by dispensing with needless discovery and factfinding." *Id.* at 326-27. Thus, the issue under Rule 12(b)(6)

17

is whether the Complaint alleges "enough facts to state a claim to relief that is plausible on its face," assuming that the allegations are true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notably, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

Plaintiffs assert violations of the NVRA and the US Constitution. As set forth *supra*, not one of the Plaintiffs has standing to pursue such claims in their own right or as an association representing its members. But even if standing could be established, such claims would fail on the merits.

## A. Online driver license renewal procedures in Texas comply with the NVRA (Count I).

Plaintiffs claim that Texas violates the NVRA by not treating online driver's license renewals or changes of address as "simultaneous" voter registration transactions. *See* Compl. ¶¶ 67-73. But this claim is defeated by the NVRA's plain language. A driver's-license renewal must permit voter registration "*unless the applicant fails to sign the voter registration application.*" 52 U.S.C. § 20504(a)(1) (emphasis added). And the NVRA expressly requires that "[t]he voter registration application portion of an application for a State motor vehicle driver's license," which includes any renewal request, "shall include a statement that . . . requires the signature of the applicant, under penalty of perjury." *Id.* § 20504(c)(2)(C)(iii). The State cannot obtain a written signature in an online transaction, and nothing in the

statutory text forbids the State to collect the necessary signature by providing for the "voter registration application portion" of the transaction on paper.

The NVRA does not require that the State accept electronic signatures related to different documents (here, the driver's-license application, which also required a separate written signature) in lieu of a signature on the voter-registration application. The plain language suggests just the opposite—the statute expressly requires not only that the voter-registration application be signed, but that the voter-registration portion of any driver's-license application or renewal require a signature under penalty of perjury. 52 U.S.C. § 20504(a)(1), (c)(2)(C)(iii). Nothing in the text compels the States to accept electronic signatures, and given that the NVRA was enacted in 1993, before the ubiquity of the Internet, it is likely that Congress envisioned what Texas requires—a writing.

Because Texas law complies with § 20504(a), there can be no violation of the duplicate-information requirement of § 20504(c) or the time-period requirements of §§ 20504(e) and 20507, because these requirements are simply not implicated by Texas's process. Accordingly, as Texas law and Defendants' procedures comply fully with the NVRA, Count I should be dismissed.

### B.  Online driver license change-of-address transactions in Texas comply with the NVRA (Count II).

Plaintiffs also claim that Texas violates the NVRA by not allowing online voter registration when an individual changes the address on his or her driver license with DPS online. *See* Compl. ¶¶ 74-79. But this claim too is not supported by the text of the statute, which plainly permits—and in fact requires—a signature on the voter-

registration portion of a driver's-license application or renewal form. *See* 52 U.S.C. §§ 20504(a)(2), (c)(2)(C)(iii). Given that the NVRA explicitly requires a separate signature for a driver's-license application to function as a voter-registration application, there is no basis to infer that Congress intended a mere change-of-address form to have the same effect with no signature at all.

The NVRA was adopted in 1993, when the use of the Internet for such transactions was likely not contemplated. Subsection (d)'s requirement that an individual be able to "state[] on the form" that the change of address is not for voter-registration purposes presents difficulty when the form in question consists of specific fields on an Internet application. *Id.* § 20504(d). Moreover, subsection (d) does not purport to preempt any state law that would require a signature on change-of-address forms. Texas's solution—providing a link to a written application that will comply with state law after explaining that the applicant cannot register to vote online—is a reasonable synthesis of state and federal law in a situation not previously contemplated by Congress.

As with Count I, because Texas law complies with § 20504(d), there can be no violation of the duplicate-information requirement of § 20504(c) or the time-period requirements of §§ 20504(e) and 20507, as these requirements are not implicated by Texas's process. Accordingly, because Texas law and Defendants' procedures comply fully with the NVRA, Count II should be dismissed.

### C.   None of Defendants' alleged conduct violates the U.S Constitution (Count III).

Neither the Organizational Plaintiffs nor the Individual Plaintiffs are being subjected a violation of their constitutional rights under the Fourteenth Amendment, because neither group of plaintiffs is subject to disparate or discriminatory treatment. Defendants address each set of plaintiffs in turn.

#### a.  The Organizational Plaintiffs

Texas's handling of online transactions with DPS does not violate the Equal Protection Clause with respect to the Organizational Plaintiffs. An equal protection claim involving voting rights requires allegation of "intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 955 (4th Cir. 1992) (citation omitted); *see also, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (en banc) (stating that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause" (quoting *Village of Arlington Hts. v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977))). Plaintiffs have not plausibly alleged intentional or purposeful discrimination in which one class is favored over another.

Statutes providing neutral rules, which might benefit any group, are not rendered discriminatory by the fact that they benefit one group when applied in particular circumstances. S*ee Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 10 n.10 (1982) (holding that "a statute providing that all such vacancies [in the legislature] be filled by appointment does not have a special impact on any discrete group of voters or candidates" and thus is not discriminatory for equal-protection

purposes). Here, the Organizational Plaintiffs do not even *allege* that Texas's handling of online driver license and change of address transactions disproportionately impacts them. And they certainly do not allege that it is the result of "intentional discrimination" against any group. *Cf. Republican Party of N.C. v. Martin*, 980 F.2d at 955.

The Organizational Plaintiffs fail to state an equal protection claim.

### b. Individual Voters

Even if any of the Plaintiffs had standing to pursue claims on their own behalf or on behalf of any other individual voter—which they do not—Texas's handling of online driver license transactions does not violate any individual's constitutional rights. This is because Texas's written-signature requirement for new voter-registration applications and requests to update voter-registration information— which prevents online voter-registration transactions—applies equally to everyone and does not impose an unconstitutional burden on the right to vote. *See* TEX. ELEC. CODE §§ 13.002(b), 15.021(a); *see also id.* § 20.066(a)(1).

In evaluating an alleged burden on voting rights, the *Anderson/Burdick* test requires courts to "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) (quoting *Anderson*, 460 U.S. at 789). Then, the Court "must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule." *Id.* (quoting *Anderson*, 460 U.S. at 789). Finally, the Court weighs the

"character and magnitude of the asserted in-jury" against the "precise interests put forward by the State," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 387-88 (quoting *Burdick*, 504 U.S. at 434). When a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the state's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788.

As to the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" at issue, Plaintiffs assert that individuals who choose to transact with DPS online are burdened because—unlike individuals who choose to transact with DPS in person or by mail—online users cannot simply check a box to become registered to vote or change their registration address. *See generally* Compl. Texans can register to vote in several ways: in person, by mail, or by fax. Tex. Elec. Code § 13.002(a). Texas law also permits voter registration in conjunction with a driver's license transaction (either in person or by mail). But because of Texas's written signature requirement, *id.* § 13.002(b), Texas has never permitted online voter registration.

Being treated like everyone else—making a written, signed request to register to vote or update voter-registration information—does not burden any individual's right to equal protection. If an individual desires the simplicity of checking a single box, they may register using a paper registration form. Stated differently, providing multiple options for individuals to register to vote is not a violation of the Equal

Protection Clause even if Plaintiffs consider some options to be less convenient than others.

The interests of the State in requiring written signatures, which necessarily forecloses online registration, include maintaining accurate voting rolls and combatting fraud. It cannot be debated that States have an interest in requiring a signature from voters. *See, e.g.*, 52 U.S.C. § 20504(c). And Texas can use written signatures in cases of fraud, identity theft, and consideration of absentee ballots. *See, e.g.*, *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018) ("It has been estimated that 24 million voter registrations in the United States—about one in eight—are either invalid or significantly inaccurate.") (citation omitted).

The Fifth Circuit has also recognized that preventing voter-registration fraud is a permissible state interest that warrants some limits on voter registration. *Voting for Am.*, 732 F.3d at 394-95. It is not necessary for Defendants to produce specific evidence of fraud to justify preventative measures. *Id.* (citing *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op.)).[3]

A State may act to prevent potential fraud, as "[a]ny corruption in voter registration affects a state's paramount obligation to ensure the integrity of the

---

[3] *See also Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018) (finding "general interest in increasing voter turnout" sufficient to justify experimental use of mail-in ballots in specific counties); *Tripp v. Scholz*, 872 F.3d 857, 866 (7th Cir. 2017) (finding "speculative concern" sufficient to justify ballot-access limitation); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 632 (6th Cir. 2016) (holding that when a regulation is "not unduly burdensome," a State need not *prove* that evidence supports its interest; the court may defer to legislature's findings); *cf. Husted*, 138 S. Ct. at 1847 (cautioning that compliance with the NVRA did not require the State to make "a wise policy judgment" or "have some particular quantum of evidence of a change of residence" before taking steps to verify a voter's address); *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986) ("Legislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively . . . .").

voting process and threatens the public's right to democratic government." *Voting for Am.*, 732 F.3d at 394. Balancing individual voter equal-protection rights against the State's interests reveals no unconstitutional burden on the right to vote. The State has provided several options to register to vote, all of which satisfy the State's written-signature requirement. Whether to permit online registration is a quintessentially state-law function, absent a preemptive federal law requiring it. U.S. CONST. art. I, § 4, cl. 1. No such law exists. The Equal Protection Clause does not require what Plaintiffs demand, and no individual's right to vote is unconstitutionally burdened by Texas's written-signature requirement for voter registration.

CONCLUSION & PRAYER

Plaintiffs' claims should be dismissed for lack of jurisdiction and for failure to state a claim on which relief may be granted.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Christopher D. Hilton*
CHRISTOPHER D. HILTON
Texas Bar. No. 24087727
ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorneys General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov
christopher.hilton@oag.texas.gov

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I certify that on March 16, 2020, the foregoing instrument was filed electronically via the Court's CM/ECF system causing electronic service upon all counsel of record.

*/s/ Christopher D. Hilton*
CHRISTOPHER D. HILTON
Assistant Attorney General