**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| JARROD STRINGER, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 5:20-cv-00046-OLG |
| | § | |
| RUTH HUGHS, IN HER OFFICIAL | § | |
| CAPACITY AS THE TEXAS SECRETARY OF | § | |
| STATE and STEVEN C. McCRAW, IN HIS | § | |
| OFFICIAL CAPACITY AS THE DIRECTOR OF | § | |
| THE TEXAS DEPARTMENT OF PUBLIC | § | |
| SAFETY | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

TO THE HONORABLE ORLANDO GARCIA JR., CHIEF U.S. DISTRICT JUDGE:

Plaintiffs respectfully submit the following Response in Opposition to the Motion to Dismiss filed by Defendants, Doc. 60 (hereinafter "MTD").

**INTRODUCTION**

The instant dispute concerns Defendants' continued refusal to adhere to longstanding federal voter registration law and the U.S. Constitution. By refusing to offer a simultaneous voter registration application to those who renew or update their driver's licenses online, Defendants intentionally exclude thousands of eligible Texas voters from the democratic process each election cycle. Until Defendants are forced to reform their registration practices, large numbers of Texas voters will continue to remain unregistered and be disenfranchised. Defendants continually attempt to distract the Court from this grave reality with arguments lacking any basis in law and by offering disingenuous descriptions of their own policies and exaggerations of Plaintiffs' proposed

1

remedies. Defendants' arguments in their motion to dismiss are no exception, and have largely been rejected by this Court in a previous iteration of this case. *See* Order Denying Motion To Dismiss, *Stringer v. Pablos*, No. 5:16-cv-00257, Doc. 52 (Mar. 31, 2017). For all the reasons below, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

## BACKGROUND

The central fact of this case has never been disputed: when eligible Texans update their driver's licenses online with the Texas Department of Public Safety ("DPS"), they are not offered a simultaneous application to register to vote or update their voter registration information.[1] As the Court previously held, the NVRA requires that each driver's license application, including any renewal application, simultaneously serve as an application for voter registration, and that each change-of-address form be used to update the voter's registration records. *See Stringer v. Pablos*, 320 F. Supp. 3d 862, 891 (W.D. Tex. 2018), *rev'd and remanded on other grounds*, 942 F.3d 715 (5th Cir. 2019).

DPS operates offices around the state and issues driver's licenses and other state identification cards. DPS's protocol for providing voter registration to applicants who interact with DPS in person and for applicants who utilize DPS's mail-in change-of-address form is in line with NVRA requirements.[2] DPS's online renewal and change-of-address form does not, however, serve as a simultaneous voter registration application.[3] DPS in-person applicants must fill out the

---

[1] As Defendants put it, "[t]he key facts of this case are not disputed." Defs.' Reply in Supp. of Mot. to Dismiss at 6, *Stringer I*, No. 5:16-cv-00257 (Jun. 06, 2016); *see also* Joint Report on Alternative Dispute Resolution at 2, *Stringer I*, No. 5:16-cv-00257-OLG (Sep. 9, 2016) (stating that the parties agree "that their primary dispute is legal, rather than factual").

[2] *See* Doc. 5-1 at 51-53 (Texas Department of Public Safety Implementation Plan, D_00021063 at D_00021065); *Stringer I*, 320 F. Supp. 3d at 872.

[3] Doc. 5-1 at 103 (Excerpts of Mar. 7, 2017 30(b)(6) Deposition of Sheri Gipson, DPS's designee ("Gipson 30(b)(6) Dep.") at 78:1-9); *Stringer I*, 320 F. Supp. 3d at 871.

relevant driver's license form with personal information in order to obtain, update, or renew their driver's license.[4] DPS uses different forms depending on the type of transaction.[5] For each, the driver's license and voter registration process has been combined into one simultaneous transaction so that in order to register or update voter registration information the applicant need only take one additional step related to voter registration—check a single box *on these same forms*:

**DL-14A and DL-43, in-person driver's license forms**



**DL-64, mail-in change-of-address form**



Except for this simple, integrated step of checking a box, in-person and mail-in change-of-address applicants do not have to take any further action to ensure they are registered to vote. The

---

[4] DPS customers are required to renew their driver's license in-person every 16 years. TEX. TRANSP. CODE § 521.271(a)(1); 37 TEX. ADMIN. CODE § 15.59(c) (2018).

[5] DL-14A is an original (in-person) Application for Texas Driver License or Identification Card. Doc. 5-1 at 31-32 (DL-14A (Rev. 1-18)), *see also* Texas Department of Public Safety, Application for Texas Driver License or Identification Card, https://www.dps.texas.gov/internetforms/Forms/DL-14A.pdf (last visited January 14, 2020). DL-43 is an in-person Application for Renewal/Replacement/Change of a Texas Driver License or Identification Card. Doc. 5-1 at 34-35 (DL-43 (Rev. 1-18)), Texas Department of Public Safety, Application for Renewal/Replacement/Change of Texas Driver License or Identification Card, http://www.dps.texas.gov/Internetforms/Forms/DL-43.pdf (last visited January 14, 2020). DL-64 for a mail-in Application for Change-of-address on Valid Texas Driver (DL) & Identification Card (ID) Doc. 5-1 at 37-38 (DL-64 (Rev. 2-17)), *see also* Texas Department of Public Safety, Application for Change-of-address on Valid Texas Driver License (DL) & Identification Card (ID), http://www.dps.texas.gov/Internetforms/Forms/DL-64.pdf (last visited January 14, 2020).

applicant is not required to retrieve, complete, print, and mail a separate voter registration application; instead, DPS transmits the voter's file to SOS upon receipt of a completed mail-in change-of-address form or in-person driver's license application.[6]

Upon receipt of a DPS applicants' voter registration information, SOS then transmits the data to local voter registrars who are responsible for completing the voter registration process.[7] Ultimately, within thirty days after checking "yes" on the relevant in-person or mail-in change-of-address form, the DPS applicant should receive their new or updated voter registration card in the mail.[8] *Notably*, for all mail-in change-of-address transactions, it is the applicant's previously-provided electronic signature—the one provided during the applicant's last *in*-person transaction—that is used for voter registration purposes.[9] In fact, an applicant's electronic signature is used for voter registration purposes for *all* voter registration applications originating at DPS.[10]

---

[6] Doc. 5-1 at 105-106 (Excerpts of Mar. 7, 2017 30(b)(6) Deposition of Sheri Gipson, DPS's designee at 101:24-102:09).

[7] Doc. 5-1 at 137 (SOS's Suppl. Resps. to Jarrod Stringer's First RFAs, No. 13); *see also* Doc. 5-1 at 66 (Ingram 30(b)(6) Dep. at 173:9-10)

[8] *See Id.* at 173:16-174:09.

[9] Doc. 5-1 at 128 (Excerpts of Feb. 17, 2017 30(b)(6) Deposition of John Crawford ("Crawford 30(b)(6) Dep.") 139:10-21) (Q: [T]he mail-in change of address, the current one ... [w]ith regard to the batch that's sent to the Secretary of State at night for the voter registration, if the person answers "yes" on their change of address that's mailed in and that's input into DLS, it's the electronic signature that was previously provided the last time that person went in person. That's the signature that goes to the Secretary of State. Is that right? A: Yes, that's correct); *see also* Doc. 5-1 at 28-29 (DL-14A (Rev. 1-18)); Doc. 5-1 at 34-35 (DL-43 (Rev. 1-18)); *Stringer I*, 320 F. Supp. 3d at 872 (W.D. Tex. 2018).

[10] Doc. 5-1 at 108 (Gipson 30(b)(6) Dep. at 203:19-204:-7); Doc. 5-1 at 65 (Ingram 30(b)(6) Dep. at 97:04-14). Notably, although DPS obtains a handwritten signature on the in-person and mail change-of-address forms, those signatures are not transmitted to SOS for voter registration purposes, nor are they compared for identity-verification purposes except in the rare case of suspected fraud or theft. Doc. 5-1 at 118, 119 (Excerpts of Jan. 31, 2017 Deposition of Sheri Gipson ("Gipson Dep.") at 234:11-237:15, 254:04-07); *see also* Doc. 5-1 at 126-27 (Crawford 30(b)(6) Dep. at 73:22-74:14), Doc. 5-1 at 62 (Ingram 30(b)(6) Dep. 50:01-11).

In stark contrast to the ease with which an applicant may simultaneously apply to register to vote or update his voter registration information via in-person or mail transactions, an applicant transacting with DPS online must retrieve, complete, print, and mail an entirely *separate* voter registration application—which requires that he again provide information already collected by DPS—in order to register or update his voter registration information.

DPS's Driver License Renewal and Change-of-Address website page provides a single online portal for qualified holders of a Texas driver's license to renew their driver's license, update the address listed on their driver's license, or both.[11] For DPS purposes, updating or renewing a driver's license online comports with state law, and does not require a new signature.[12] An applicant wishing to renew or update his driver's license online must first provide his driver's license number, date of birth, driver's license audit number, and the last four digits of his social security number, which DPS's vendor uses to check against DPS's system in real time to verify the applicant's eligibility to transact online with DPS.[13] If eligible, the applicant must then enter additional personal information.[14]

---

[11] Doc. 5-1 at 152 (Ex. 20, DPS's Suppl. Resps. to Benjamin Hernandez's First RFAs, No. 5 ("the [Texas.gov] website provides a single online process for qualified applicants to renew their driver's license, update the address listed on their driver's license, or complete both processes in a single online transaction."); *Stringer I*, 320 F. Supp. 3d at n.10 (W.D. Tex. 2018).

[12] Doc. 5-1 at 109 (Ex. 16, Gipson 30(b)(6) Dep. at 215:21-216:7).

[13] *Id.* at 217:21-219:16, 223:17-224:05. These four data points required for online transactions with DPS are also required by the Texas Online Authentication System (TOAS), which is used by various state agencies to authenticate customers' identity, and "may be used by the state agency or local government as an alternative to requiring a notarized document, a document signed by a third party, or an original signature on a document." Tex. Gov't Code § 2054.271; *see also* Tex. Gov't Code § 2054.252; *see also Stringer I*, 320 F. Supp. 3d at nn.7–8

[14] Doc. 5-1 at 5 (Texas Department of Public Safety Driver License Renewal and Change-of-address webpage, D_00021840). Only United States citizens are allowed to renew or update their driver's licenses online. *See also* Texas Department of Public Safety, Online Services Eligibility, https://txapps.texas.gov/tolapp/txdl/eligibility.dl?locale=en_US (last visited January 15, 2020); *Stringer I*, 320 F. Supp. 3d at n.6 (W.D. Tex. 2018).

From 2010 to February 2016, when users reached Step 5 of the online process, DPS prompted the applicant to choose "yes" or "no" in response to the statement, "I want to register to vote."[15] After February 27, 2016, Step 5 of the online process was changed to prompt the applicant to select "yes" or "no" to answer the question "Do you want to request a voter application?"[16]

From 2010 to the present, checking "yes" to the voter registration question at Step 5 does one thing only—it prompts the system to provide a link on the applicant's receipt to an entirely different website, where applicants must download or request a physical voter registration form.[17] To complete the voter registration process following an online DPS transaction, the applicant must download a voter registration form, print the form, fill out the form, and mail it in.[18]

Much of the information on the voter registration form duplicates information the applicant already provided during the online DPS transaction. In fact voter registration forms and the relevant DPS online transactions both require: date of birth, Texas driver's license number, residence address, residence city, residence zip code, residence county and, if it differs from

---

[15] Doc. 5-1 at 153 (Ex. 20, DPS's Suppl. Resps. to Benjamin Hernandez's First RFAs, Nos. 7-8); *see also* Doc. 5-1 at 158-59 (DPS's Suppl. Resps. to Totysa Watkins' First RFAs, Nos. 26-28). Shockingly, until September 2016, the "yes"/"no" radio buttons from which a customer had to choose automatically defaulted to "no." SOS knew of this problem as early as 2012 but allowed four years to pass before it was corrected. Doc. 5-1 at 64 (Ingram 30(b)(6) Dep. at 84:24-85:3); *see also Stringer I*, 320 F. Supp. 3d at 875 (W.D. Tex. 2018).

[16] Doc. 5-1 at 153 (DPS's Suppl. Resps. to Hernandez's First RFAs. Nos. 10-11).

[17] Doc. 5-1 at 102-103, 104 (Gipson 30(b)(6) Dep. 77:23-78:9 and 94:1-4); Doc. 1, Ex. C at 10 (Screenshot of "Driver License Renewal Receipt and Temporary License"); *see also Stringer I*, 320 F. Supp. 3d at 876 (W.D. Tex. 2018).

[18] Doc. 5-1 at 82-83 (Deposition of B. Schonhoff (SOS), at 157:19-158:18 (noting they would have to fill the same information out twice)); App'x 9 (Screenshot of Voter Registration Application from  https://webservices.sos.state.tx.us/vrapp/index.asp (last visited January 15, 2020)); Doc. 5-1 at 55-56 (Texas Voter Registration Application). The customer may also request to receive a blank application in the mail; *see also* Doc. 1 Ex. C (Driver License Renewal and Change of Address screen shots).

residence, mailing address, mailing city, and mailing zip code.[19] Although online driver's license transactions require *this exact same information*, DPS fails to transfer this voter registration data to the Secretary of State.[20] And until this Court recently ordered it to do so, DPS did not even record the answer to the online voter registration question.[21] This means, in order for a Texan who renews or changes his address online with DPS to become registered to vote, he must, in addition to providing or confirming at least six data points to DPS during the online transaction, *also* fill out a separate voter registration form and provide six of those *same* data points.

It is undisputed that under Texas's current online driver's license renewal and change-of-address system, Defendants do not treat online driver's license renewals and change-of-address submissions as simultaneous voter registration applications.[22] Instead, eligible applicants who indicate they wish to register to vote or update their voter registration during an online transaction must take several additional steps after submitting their information online, including completing and mailing an entirely separate form; otherwise, Texas does not register them to vote.

## ARGUMENT

### I. Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Bell Atlantic Corp. v. Twombley*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). While "[t]hreadbare recitals of the elements

---

[19] Compare *Id.* to Doc. 5-1 at 111 (Gipson 30(b)(6) Dep. at 223:17-224:05) and Doc. 5-1 at 5 (Texas Department of Public Safety Driver License Renewal and Change-of-address).

[20] Doc. 5-1 at 108 (Ex. 16, Gipson 30(b)(6) Dep. at 204:17-21).

[21] Compare Order, *Stringer v. Whitley*, No.: 5:16-cv-00257-OLG, Doc. 158 at 3 (W.D. Tex. Feb. 3, 2020 and Doc. 5-1 at 117 (Gipson Dep. at 136:10-19).

[22] Doc. 5-1 at 153 (DPS's Suppl. Resps. to Hernandez's First RFAs. Nos. 10-11); Doc. 5-1 at 158-59 (DPS's Suppl. Resps. to Watkins' First RFAs. Nos. 20-25).

of a cause of action, supported by mere conclusory statements" will not suffice at the pleading stage, *Iqbal*, 556 U.S. at 678, a court considering a motion to dismiss must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009) (internal quotations omitted).

Defendants move for dismissal under Rules 12(b)(1) and 12(b)(6). First, the Court should only grant a motion to dismiss for lack of subject matter jurisdiction "if it appears certain that the plaintiff cannot prove any set of facts in support of his [or her] claim that would entitle plaintiff to relief." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir.1998)). Second, motions to dismiss under Rule 12(b)(6) are generally "viewed with disfavor and [are] rarely granted." *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013). Where a defendant challenges a plaintiff's statutory standing, courts apply the Rule 12(b)(6) standard, which requires the defendant to show that the plaintiff failed to state a claim upon which relief can be granted. *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011).

## II. The Court has jurisdiction.

### a. Individual Plaintiffs have standing.

Defendants are correct that standing requires (1) an actual or imminent, concrete, particularized injury-in-fact that is (2) fairly traceable to Defendants' conduct and (3) redressable by plaintiffs' requested relief. MTD at 3 (citing *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). They collapse the injury-in-fact and redressability components, claiming that Individual Plaintiffs' injuries are not redressable because they were suffered in the past and are not ongoing or imminent. This stems from Defendants' mischaracterization of Plaintiffs' injuries. Further, they claim Plaintiffs' injuries are not traceable

to Defendants because Plaintiffs could have found alternative means for registering to vote—an argument this Court has already considered and soundly rejected.

Defendants mischaracterize Individual Plaintiffs injuries by failing to recognize that "[t]he existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed*." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (emphasis in original). The crucial fact establishing a redressable injury is that "it is undisputed that Plaintiffs Stringer, Gomez, and Harms were not simultaneously registered to vote (i.e., their voter registration was not updated) at the time of their online transactions with DPS, a designated voter registration agency[, and it] is undisputed that they [were] still unregistered to vote [at the time of filing] and [would] be disenfranchised on March 3 if they [were] not registered to vote by the deadline - February 3." Order, *Stringer v. Whitley*, No.: 5:16-cv-00257-OLG, Doc. 156 at 14–15 (W.D. Tex.  Jan. 30, 2020); *see also* Doc.1 at ¶¶ 49-53. Defendants entirely elide this fact because it is prima facie clear that not being properly registered to vote constitutes a concrete, continuing injury sufficient to confer standing. *See generally Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) ("[Plaintiff's] alleged injuries flow directly from the denial of her registration form."); *Common Cause of Colorado v. Buescher*, 750 F. Supp. 2d 1259, 1271 (D. Colo. 2010). ("Any burden on the right to vote, even if it is no more than the cancellation of a voter's records in violation of the NVRA, constitutes an injury-in-fact for standing purposes."). Simply having to jump through an extraneous hoop to register to vote, *in contravention of the NVRA*, itself constitutes an injury-in-fact. *See Warth v. Seldin*, 422 U.S. 490, 514 (1975) (noting that "Congress may create a statutory right . . . the alleged deprivation of which can confer standing to sue . . . ."); *Williams v. Salerno*, 792 F.2d 323, 328 (2d Cir. 1986) (holding that applying "more vigorous registration requirements than are generally applied" constituted judicially cognizable injury).

In *Stringer I*, the Fifth Circuit held that the past circumstance of having transacted with DPS online without a simultaneous opportunity to register to vote did not suffice to confer standing *when plaintiffs had already cured their situation by registering to vote at their correct address before filing suit. See Stringer v. Whitley*, 942 F.3d 715, 719-21 (5th Cir. 2019). That decision underscores that Plaintiffs here have proper standing, as they were still not properly registered at the time of filing their suit due to Defendants' illegal conduct. Further, Plaintiffs have standing because, when they filed suit, they faced the immediate threat of complete or partial disenfranchisement in the March 3, 2020 Primary Election. *See Stringer v. Whitley*, 942 F.3d 715, 720-21 (5th Cir. 2019) ("[P]laintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement . . . by demonstrating a . . .threatened future injury. . . . For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur.").[23]

Further, Individual Plaintiffs' injuries are directly traceable to Defendants' conduct, because "but for Defendants failure to comply with the NVRA, and the unjustified burden on Plaintiffs' constitutional rights, Plaintiffs would already [have been] registered to vote in the

---

[23] Though Defendants do not raise the issue, it should be noted that Plaintiffs have not lost standing to pursue a permanent injunction for a complete systemic fix simply because this Court, subsequent to the filing of this suit, ordered Defendants' to register them to vote; nor is their case moot. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The necessary determination [to continue for consideration of a permanent injunction] is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."); *Turner v. Rogers*, 564 U.S. 431, 439–40 (2011) ("A dispute falls into th[e capable of repetition yet evading review] category, and a case based on that dispute remains live, if "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again."). These standards are lower than the "substantial risk" standard for initiating a suit. Each Individual Plaintiff alleged (and later declared) they intend to use the Texas online driver's license system to change their address or renew their driver's license in the future and would use the system to update their voter registration or re-register should their registration have become ineffective. Plaintiff Stringer has concrete plans to move again within the year. Doc. 1 at ¶ 50.

county and precinct where they reside." *Stringer v. Whitley*, Doc. 156 at 14–15 (W.D. Tex. Jan. 30, 2020) (order). Defendants contend that they did not cause Plaintiffs' injuries because Plaintiffs could have registered to vote through alternative means. However, this Court previously made clear:

> The mandates of the NVRA dictate exactly the opposite of what Defendants now suggest Plaintiffs should do to avoid being disenfranchised on March 3: engage in a second transaction with another agency, which requires a separate application with duplicate information and the burden of mail, postage, and/or personal delivery. Congress lifted these burdens to make voter registration easier, not more confusing and difficult.

*Id.* at 10. For these same reasons, the fact that Plaintiffs' future moves might be within the same county, *see* MTD at 6–7, is of no consequence because they will still have to take extra measures—including visiting a separate website, printing out a form, filling it out, and mailing it at their own expense—to register to vote at their correct address or be forced to vote in the wrong precinct (which would likely result in voting in electoral contests for candidates who do not represent them).

Finally, Defendants attempt to cast doubt on the sufficiency of Plaintiffs' evidence as it relates to establishing individual standing. *See, e.g.*, MTD at 5 (quoting *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008) ("'[S]tanding is not created by a declaration in court pleadings.' Stringer's allegations regarding his 'substantial risk' of reinjury amount to nothing more than his own *ipse dixit*, and without any supporting facts, cannot establish standing."). Even at a later stage of litigation, the undisputed facts would suffice to establish standing; but here, at the pleading stage a court assumes the facts alleged in the Complaint as true. *See supra* Section I.

**b. MOVE Texas Civic Fund and the League of Women Voters of Texas (collectively "Organizational Plaintiffs") Have Organizational Standing.**

**i. Organizational Plaintiffs Satisfy the Injury-in-Fact Requirement for Their Claims.**

Plaintiffs MOVE Texas Civic Fund ("MOVE") and the League of Women Voters of Texas ("LWVTX") allege an injury-in-fact on their own behalf as to their NVRA and constitutional claims against Defendants. "[T]he injury in fact requirement under Article III is qualitative, not quantitative, in nature." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (citing *Ass'n of Cmty. Organizations for Reform Now v. Fowler*, 178 F.3d 305, 357–58) (5th Cir. 1999)) (internal quotation marks and brackets omitted). So while an injury-in-fact must be (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical, "it need not measure more than an 'identifiable trifle.'" *OCA-Greater Houston*, 867 F.3d at 612 (quoting *Fowler*, 178 F.3d at 358). Applying this understanding in the context of organizational standing, the Fifth Circuit has explained that "an organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices." *Fowler*, 178 F.3d at 360. If a defendant's actions perceptibly impair an organization in such a way, "there can be no question that the organization has suffered injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Thus, in *OCA-Greater Houston*, the Fifth Circuit held that an advocacy organization—the Organization for Chinese Americans (OCA)—had standing to challenge a Texas law restricting the "interpretation assistance that English-limited voters may receive." 867 F.3d at 606, 612. The court held that the organization had suffered an injury-in-fact, even though the "injury was not large," because the Texas statute at issue "'perceptibly impaired' [the organization's] ability to 'get out the vote'" when the organization "went out of its way to counteract the effect of Texas's allegedly unlawful" statute by educating voters on how to avoid being negatively impacted by the statute. *Id*. at 612. And in *Ass'n of Cmty. Organizations for Reform Now v. Fowler*, the Fifth Circuit held that an advocacy and voter registration organization—the Association of Community

Organizations for Reform Now (ACORN)—had standing to challenge the state's violation of Section 7 of the NVRA. 178 F.3d at 360-62. The court held that ACORN had suffered an injury-in-fact because

> ACORN . . . presented evidence that it . . . expended resources registering voters in low registration areas who would have already been registered if the [state] had complied with the requirement under the NVRA that [the state] must make voter registration material available at public aid offices.

*Id*. at 360.

Just like the organizational plaintiffs in *OCA-Greater Houston* and *Fowler*, Plaintiffs have standing to challenge Defendants' actions. As alleged in the Complaint, Organizational Plaintiffs have gone "out of [their] way to counteract Texas's allegedly unlawful [voter registration restriction on online DPS customers]," by diverting resources from their activities toward "educat[ing] DPS customers who update the address on and/or renew their driver's license through the DPS website and mistakenly believe their online DPS transaction simultaneously registered them to vote that they are not in fact registered to vote." Compl. ¶¶ 56, 59, 60, 62, 63;[24] *See OCA-Greater Houston*, 867 F.3d at 606, 612 ([Plaintiff] undertook to educate voters about Texas's [violations]—an undertaking that consumed its time and resources in a way they would not have been spent absent the Texas law.).  Organizational Plaintiffs identify other specific ways they directly address this issue, including, *inter alia*, dedicating public training time and other resources to warning voters about Defendants' violations. Compl. ¶¶ 56, 59, 60, 62, 63.[25] If Defendants complied with the NVRA and Constitution and provided simultaneous voter registration applications to online DPS customers, Organizational Plaintiffs would not need to expend

---

[24] *See also* Doc. 5-1 at 166-68 ¶¶ 11, 12, 15, 168-70 ¶¶ 4, 5, 7, 8, 10, 12, 173-179 ¶¶ 11, 12, 18; 192-95 ¶¶ 4, 5, 8-10, 12, 15, 18, 20, 22-24.
[25] *See also* Doc. 5-1 at 166-68 ¶¶ 11, 12, 15, 168-70 ¶¶ 4, 5, 7, 8, 10, 12, 173-179 ¶¶ 11, 12, 18; 192-95 ¶¶ 4, 5, 8-10, 12, 15, 18, 20, 22-24.

resources correcting online DPS customers who mistakenly believe their online driver's license transaction registered them to vote and educating these DPS customers on the currently available ways to register to vote. Compl. ¶¶ 56, 59, 60, 62, 63.[26] Organizational Plaintiffs have had to counteract and will continue to counteract to the best of their abilities Defendants' unlawful restrictions on online DPS customers. Compl. ¶¶ 56, 59, 60, 62, 63.[27]

Similar to ACORN's registration efforts that conferred standing in *Fowler*, Organizational Plaintiffs' efforts "register[ing] people to vote who would have otherwise been able to register to vote or to update their voter registrations through the DPS's online driver's license system" also confer standing. Compl. ¶¶ 55, 59, 60, 62, 63;[28] *See Fowler*, 178 F.3d at 360-62. If Defendants complied with the NVRA and Constitution and provided simultaneous voter registration applications to online DPS customers during driver's license transactions, Organizational Plaintiffs would not need to expend resources registering customers who should have already been properly registered by Defendants. Compl. ¶¶ 55, 59, 60, 62, 63.[29] Organizational Plaintiffs have had to counteract and will continue to counteract to the best of their abilities Defendants' unlawful restrictions on online DPS customers. Compl. ¶¶ 55, 59, 60, 62, 63.[30]

### ii. Defendants Misinterpret the Injury-in-Fact Requirements for Organizational Standing.

Defendants mischaracterize the Fifth Circuit's decision in *N.A.A.C.P. v. City of Kyle* as requiring that an organizational plaintiff must identify "'specific projects that [it] had to put on

---

[26] *See also* Doc. 5-1 at 168 ¶ 12, 175-76 ¶ 18; 182 ¶ 12, 192 ¶ 24.
[27] *See also* Doc. 5-1 at 165-68; 170-73; 175-79, 191-96.
[28] *See also* Doc. 5-1 at 166-68 ¶¶ 10, 11, 15; 171-73 ¶¶ 5, 7, 9, 12; 176-82 ¶¶ 10, 11, 18; 193-95 ¶¶ 10, 19, 24.
[29] *See* Doc. 5-1 at 168 ¶ 12; 178-79 ¶ 18; 182 ¶ 12; 195 ¶ 24.
[30] *See* Doc. 5-1 at 165-68; 170-73;175-79; 191-96.

hold or otherwise curtail in order to respond to' the defendants conduct" to establish standing. *See* MTD at 9 (quoting 626 F.3d 233, 238 (5th Cir. 2010)) (citation omitted)). Indeed, the Fifth Circuit in *OCA-Greater Houston* disagreed with this very interpretation of the language from *City of Kyle* and clarified that the court's "remark [in *City of Kyle*] . . . was not a heightening of the *Lujan* standard, but an example of how to satisfy it by pointing to a non-litigation-related expense." 867 F.3d at 612. Defendants also incorrectly claim that *City of Kyle* requires an organizational plaintiff to divert "significant resources to counteract the defendant's conduct such that any defendant's conduct significantly . . . impaired the organization's ability to conduct its routine activities." MTD at 11 (quoting *City of Kyle*, 626 F.3d at 237) (emphasis, quotation marks, and citation omitted). However, the *OCA-Greater Houston* panel explained that "the Supreme Court has commanded that, in determining whether an organization has organizational standing, 'we conduct the same inquiry as in the case of an individual,'" which requires that an "injury alleged as an Article III injury-in-fact need not be substantial." 867 F.3d at 612 (quoting *Havens Realty Corp.*, 455 U.S. at 378; citing *Fowler*, 178 F.3d at 358) ("to the extent that Texas would read *City of Kyle* as imposing a higher burden on organizations seeking to establish standing, we must disagree.").

Defendants additionally claim that because "voter registration, education, and outreach are already central to these organizations' 'routine activities,'" Organizational Plaintiffs' activities do "not amount to a 'concrete and demonstrable' injury." MTD at 12. But Organizational Plaintiffs' efforts need not fall outside the scope of their mission or central initiatives to be actions that counteract Defendants' unlawful conduct. *See, e.g., Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) (quoting *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) ("[A]n organization suffers an injury in fact when a statute 'compel[s]' it to divert more resources to accomplishing its goals" and "'[t]he fact that the added cost has not

been estimated and may be slight does not affect standing, which requires only a minimal showing of injury.'"). For instance, even though in *Havens Realty Corp. v. Coleman* the organizational plaintiff HOME's "activities included the operation of a housing counselling service[] and the investigation and referral of complaints concerning housing discrimination," HOME sufficiently alleged an injury-in-fact because the defendant's actions "frustrated . . . [HOME's] efforts to assist equal access to housing through counseling and other referral services," requiring HOME to make "duplicative efforts"[31] to "identify and counteract the defendant's" actions. 455 U.S. at 368, 379; *see also Martin v. Kemp*, 341 F. Supp. 3d 1326, at 1335 (holding that plaintiffs met their burden under the organizational standing rubric where they had to "divert more resources towards warning voters about the risk of a signature mismatch" when officials reviewed their mail ballots).

Furthermore, the injury in *OCA-Greater Houston* is especially similar to the injury suffered by Organizational Plaintiffs, particularly in how it relates to OCA's mission and central initiatives. Even though "[o]ne of [OCA's] primary missions [was] to promote civic participation and provide civic education, which it carrie[d] out through a 'Get Out the Vote' initiative," the Fifth Circuit found it alleged an injury-in fact because, through its educational efforts, OCA had to advise voters on how to "reduce the chance" of denial of their choice of interpreter due to the existence of the Texas law at issue. *OCA-Greater Houston*, 867 F.3d at 609, 612. Here, although Organizational Plaintiffs generally participate in voter registration, education, and outreach, were Defendants to comply with the law, Organizational Plaintiffs would not have to educate and correct DPS customers who mistakenly think they registered through their online driver's license transactions.

---

[31] "In order to compensate for the misinformation it received from Havens, HOME was forced to employ its white staff in duplicative efforts in order to determine whether the information given by Havens to HOME's black staff was accurate and complete." Br. for Resp'ts at 36, *Havens Realty Corp.*, 455 U.S. 363 (1982) (No. 80–988).

Likewise, the injury that conferred standing in *Fowler* is similar to the injury suffered by Organizational Plaintiffs here as it relates to organizational mission and central initiatives. Even though voter registration was one of ACORN's central initiatives, the Fifth Circuit found that it alleged an injury-in fact because it "expended resources registering voters . . . who would have already been registered if the [state] had complied with the requirement under the NVRA that [the state] must make voter registration material available at public aid offices." 178 F.3d at 361. Specifically, ACORN's registration drives focused on "registering people at 'welfare waiting rooms, unemployment offices, and on Food Stamp lines'" and ACORN

> concentrated [its] voter registration campaign in areas where the percentages of all food stamp participant households registered to vote, a population directly affected by one of the NVRA requirements that ACORN claims Louisiana has failed to implement, are among the lowest in Louisiana.

*Id.* at 360-61. Similarly, Organizational Plaintiffs frequently have to register and will continue to have to register online DPS customers who should have been registered by Defendants pursuant to Section 5 of the NVRA; and Organizational Plaintiffs target voter registration activities toward populations with large numbers of people who move frequently or have recently moved, such as students and people living in localities experiencing growth.[32] Although Organizational Plaintiffs all generally participate in voter registration, education, and outreach, none would have to register online DPS customers to vote absent Defendants' unlawful conduct. *Id.* at 361 ("It is . . . wasted resources [counteracting the state's violation], which ACORN could have put to use registering voters that the NVRA, even properly implemented, would not have reached (or which ACORN could have put toward any other use it wished), that provide ACORN with standing").

---

[32] *See* Doc. 5-1 at 165-68; 170-73;175-79; 191-96.

If DPS complied with the law, Organizational Plaintiffs could spend the time and resources they currently spend registering, educating, and reaching out to online DPS customers on registering, educating, and reaching out to eligible Texans who are not online DPS customers. Accordingly, it is clear that Organizational Plaintiffs sufficiently allege an injury-in-fact as to each of their claims.[33]

### c.   Plaintiff LWVTX[34] has associational standing.

In addition to the organizational standing described above, LWVTX also has "associational standing" on behalf of its members who were being harmed by Defendants' unlawful actions at the time this suite was filed, and who will continue to be harmed.  LWVTX has alleged that

> as a membership organization, [it] has individual members who are harmed by Defendants' violations because they transact with DPS's online driver's license system and are not provided a simultaneous voter registration application, nor a simultaneous update to their voter registration address when they change their driver's license address through the system.

Compl., Doc. 1 at ¶ 66.

Defendants are correct that to maintain a cause of action based on associational standing a plaintiff association must allege facts to show that:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c)

---

[33] In their motion to dismiss, Defendants make a conclusory claim that: "Organizational Plaintiffs fail to demonstrate traceability because the alleged harm here . . . is not the result of Defendants' conduct, but rather a result of voters' failure to follow the process and instructions presented to them as they transact online regarding their driver license." *See* Def.s' Mot. to Dismiss n.2 12-13. As explained above, "[b]ut for Defendants failure to comply with the NVRA [these customers] would already [have been] registered to vote in the county and precinct where they reside."  Order, *Stringer II*, No.: 5:16-cv-00257-OLG, Doc. 156 at 14–15.

[34] Defendants correctly point out that MOVE has not alleged that it is a membership organization or that its members are harmed by Defendants' conduct, *see* MTD at 14, 15. MOVE does not claim to have associational standing. Rather, MOVE's claims are based on direct injury caused to the organization itself, as opposed to any "members," as described in the sections above.  LWVTX is the only Plaintiff that has associational standing deriving from injury to its individual members.

neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Defendants contend that LWVTX has failed to plead sufficient facts to satisfy the first and third requirements for associational standing outlined above.[35] *See* MTD at 13–16.

First, Defendants contend that LWVTX was required to identify a specific member with standing at the time the suit was filed.  However, this proposition—that an association must "name names" to demonstrate associational standing at the pleading stage—was squarely rejected by the Fifth Circuit in *Hancock County Bd. of Supervisors v. Ruhr*, where the court considered a similar argument:

> [A]ppellees offer no authority for the proposition that an [association] must identify a particular [association] member at the *pleading stage*. We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing.

487 F. App'x 189, 198 (5th Cir. 2012) (citing *Church of Scientology v. Cazares*, 638 F.2d 1272, 1279 (5th Cir.1981)) (emphasis in original); *see also Richardson v. Texas Secretary of State*, No. SA-19-cv-00963-OLG at 12-13 (W.D. Tex. Dec. 23, 2019) (order) (holding pleadings sufficient for associational standing where the "organization[] is comprised in significant part by individuals

---

[35] As to the second requirement of associational standing relating to organizational purpose, Defendants' motion states merely that "Defendants do not concede that either Organizational Plaintiff has satisfied or can satisfy the second element of associational standing, and reserve all rights to seek dismissal on that basis," but Defendants make no argument about specific deficiencies in Plaintiffs allegations that would indicate a failure to plead facts relating to organizational purpose, nor do Defendants cite any authority or make any specific argument that Plaintiffs' claims should be dismissed on this basis. *See* MTD at 15.  LWVTX has clearly pled that its mission relates to the subject matter of its claims and this is sufficient for purposes of associational standing.  *See Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Board*, 627 F.3d 547, 550 n.2 (5th Cir. 2010) ("[T]he germaneness requirement [for associational standing] is 'undemanding' and requires 'mere pertinence' between the litigation at issue and the organization's purpose.").

who are likely to be impacted by the relevant policies at issue").  This standard is not contradicted by any authority cited in Defendants' motion, the majority of which involve determinations on standing after discovery, evidentiary hearings, and/or fact development was completed.  *See, e.g.*, *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 188, 191 (5th Cir. 2012); *NAACP v. City of Kyle*, 700 F.3d 185, 188, 191 (5th Cir. 2012); *Summers v. Earth Island Institute*, 555 U.S. 488, 491-492 (2009); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 585 (5th Cir. 2006).  Only two cases cited by Defendants actually address sufficiency of allegations at the pleading stage.  First, in *Fund Democracy, LLC v. S.E.C.*, the court affirmed a dismissal because the plaintiff organization did not actually have members at all, so could not possibly name a member with standing at any later stage.  278 F.3d 21, 26 (D.C. Cir. 2006).  Second, in *Draper v. Healey*, the court's ruling was premised on submitted affidavit evidence, as well as the plaintiff-association's failure to plead that an individual member with standing existed at all, not just that the pleading failed to identify that member by name. 827 F.3d 1, 3 (1st Cir. 2016). Neither of these cases applies here, where LWVTX is a membership organization and has specifically alleged the existence of one or more members injured by Defendants' conduct and the specific ways they are injured.[36]

Additionally, LWVTX need not ever identify an individual member with standing if identifiable portions of its membership are necessarily injured by the Defendants' conduct.  In *Nat'l Rifle Ass'n of Am., Inc*., the Fifth Circuit explained that the plaintiff established associational standing simply by showing that specific segments of the organization's membership would

---

[36] Though not necessary at this stage, and in hearsay form, it is worth noting that LWVTX actually has identified an individual member with standing as part of the preliminary injunction proceedings. *See* App'x to Plaintiffs' Reply at 160-61, No. 5:16-cv-00257, Doc. 154-1 (Supplemental Declaration of Grace Chimene).

necessarily be injured by the defendants' actions, and the plaintiff was therefore not required to identify any individual members with standing. *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191–92 & n.5 (5th Cir. 2012). The Fifth Circuit's holding is consistent with Supreme Court precedent excusing associations from identifying individual members, but effectively expands the doctrine to cases in which merely *identifiable subsets* of members are necessarily injured. *Compare Summers v. Earth Island Institute*, 555 U.S. 488, 498–99 (2009) ("This requirement of naming the affected members has . . . been dispensed with . . . where *all* the members of the organization are affected by the challenged activity." (emphasis in original)), *with Nat'l Rifle Ass'n of Am., Inc.* 700 F.3d at 191–92 & n.5 (holding the NRA had satisfied associational standing requirements because otherwise-unidentified "18-to-20-year-old NRA members have standing to sue in their own right"). In this case, LWVTX has identified a subset of its members—those that interact with DPS online—that both exist and are necessarily injured by Defendants failure to provide a simultaneous opportunity to submit a voter registration application with their DPS transaction.

Notwithstanding all of this, the evidence in the record in this case already identifies the following: (1) "With more than 3000 members statewide, LWVTX constantly has members who are relocating or need to update their drivers licenses," and (2) "LWVTX has at least one member who has updated their driver's license online but was unable to update their voter registration address and remains unregistered to vote at the correct address." *See* Pl.s' Emergency App. for Prelim. Inj., Doc. 5, Ex. 23 (Declaration of Grace Chimene). Unlike the Plaintiffs in *Stringer I*, upon which Defendants' motion focuses, LWVTX has sufficiently alleged the existence of a member that had interacted with DPS and had not subsequently submitted a voter registration application at the time the suit was filed.

Finally, Defendants argue that LWVTX has not alleged facts sufficient to meet the third requirement for associational standing—that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See Hunt*, 432 U.S. at 343.   For this contention, Defendants argue that the claims and/or relief requested by LWVTX are not suitable for "group relief" because "individual voter registrations are at the heart of their challenge."   However, LWVTX requests declaratory and injunctive relief that subsumes any relief that could be requested by an LWVTX member. A systemic fix to the online driver's license system would necessarily prevent all future injuries to LWVTX's individual members. Nor does LWVTX seek money damages for individual injuries caused to individual members that would require the type of fact development contemplated in *Hunt*.   The Supreme Court recognized in *Hunt* that these were appropriate circumstances for "group relief":

> If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.

*Hunt*, 432 U.S. at 343; *see also Texas Democratic Party v. Benkiser*, 459 F.3d 582, 588 (5th Cir. 2006) (citing *Int'l Union v. Brock*, 477 U.S. 274, 287–88 (1986)).   Additionally, the questions in this case are primarily legal, about the meaning of the NVRA as it relates to Defendants' statewide procedures, and therefore do not require direct participation of LWVTX members. Each LWVTX member's injury derives from the identical conduct of the Defendants and is redressed by  identical relief requested by LWVTX.

### d.  Organizational Plaintiffs have standing to bring their constitutional claims.

Next, Defendants' contend that Organizational Plaintiffs lack standing because their claims derive from "third parties." They are wrong. It is well settled that an organizational plaintiff meets

all standing requirements so long as the violations by the state injure an organizational plaintiff's voting-related resources or capabilities and/or an association's members (who are not considered "third parties"). Third party standing, as that phrase is used in Supreme Court precedent, is not applicable here, and instead is utilized when a plaintiff brings a claim on behalf of a third person, not, as here, where the plaintiff themselves have suffered their own cognizable injury. *See Kowalski v. Tesmer*, 543 U.S. 125, 125–126 (2004). The Supreme Court has long permitted organizations to bring civil rights claims if the organization suffers a separate, but concrete injury resulting from the violations. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("[C]oncrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."). And the Fifth Circuit has explicitly rejected the proposition that associations cannot bring claims under civil rights statutes on behalf of their members, recognizing that the standard for associational standing outlined in *Hunt* determines whether "group relief" is appropriate. *See Church of Scientology v. Cazares*, 638 F.2d 1272, 1279–80 (5th Cir. 1981); *Memphis Am. Fed'n of Teachers v. Board of Educ.*, 534 F.2d 699 (6th Cir. 1976); 1 Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses § 201[C][3] (2020-1 Supp.) ("[I]f an organization satisfies the Supreme Court's test for organizational standing, it should be allowed to maintain suit under § 1983 to redress the rights of its members.").

That use of organizational and associational standing doctrines is the proper analysis is evident in numerous voting rights cases finding organizations had standing, but nowhere addressing the third party doctrine. *See Crawford v. Maryland*, 553 U.S. 181, 180, n.7 (2008) (agreeing with appellate court that political party had standing to challenge state law on constitutional grounds; no discussion of third party standing); *see also ACORN*, 178 F.3d at 360-

61 (organization had standing to assert violations of the NVRA); *Harkless v. Brunner*, 545 F.3d 445, 458-59 (6th Cir. 2008) (organization had standing to assert violations of the NVRA, third party standing not mentioned); *Browning*, 522 F. 3d at 1164-66 (organizations had standing to challenge voter registration procedures; third party standing not mentioned).

### III. Plaintiffs have adequately plead their NVRA and Constitutional claims.

#### a. Plaintiffs' state cognizable claims under the NVRA.

##### i. Renewals

Without citing any support whatsoever, Defendants argue that Texas's online driver's license renewal application complies with the NVRA because the NVRA requires that DPS collect signatures on renewal applications, and "the State cannot obtain a *written* signature in an online transaction[.]" MTD at 18 (emphasis added). Further, the argument goes, because the statute was enacted in 1993, Congress likely intended it to require written, not electronic, signatures. *Id.* at 19. This argument—already rejected by this Court in *Stringer I,* 320 F. Supp. 3d at 895–98—fails for several reasons.

First, the Court need not speculate as to whether Congress envisioned electronic signatures when it enacted the NVRA because the statute's unequivocal language reflects Congress's intent that "*each*" type of renewal application serve as a simultaneous voter registration application. 52 U.S.C. § 20504(a)(1) ("*Each* State motor vehicle driver's license application (*including any renewal application*). . . *shall serve as an application for voter registration*. . . unless the applicant fails to sign the voter registration application.") (emphasis added); *accord Action NC v. Strach*, 216 F. Supp. 3d 597, 622-23 (M.D. N.C. 2016) (holding that the NVRA applies to remote transactions); *Georgia State Conference v. Kemp*, 841. F. Supp. 2d 1320, 1331-32 (N.D. Ga. 2012) (same).

Texas cannot evade this clear requirement by selectively choosing to define "signature" in a way that excludes all online driver's license transactions from the NVRA's reach. Instead, Texas law already recognizes—and Texas already widely uses—electronic signatures in lieu of written ones. *See, e.g.,* TEX. BUS. & COM. CODE § 322.017 (state agencies may accept electronic records and electronic signatures); TEX. BUS. & COM. CODE § 322.007(a), (c), (d) (providing that electronic signatures are enforceable, electronic records satisfy laws requiring them to be "in writing," and electronic signatures satisfy laws requiring a signature). And, of course*, DPS and SOS already use electronic signatures for voter registration*, including mail-in driver license renewal forms. TEX. ELEC. CODE § 20.066(a)(2), (b) (providing that for applicants applying or renewing in person or by mail, the electronic signatures collected during their in-person driver's license transaction are used for submitting voter registration, and that DPS provides the electronic signatures to SOS).

Second, to the extent Defendants object to being required to "accept electronic signatures related to different documents . . . in lieu of a signature on the [online] voter-registration application," Mot. at 19, that is a problem of their own making. As set out above, Texas law allows them to collect and use electronic records and signatures; DPS has simply declined to offer applicants a way to enter an electronic signature on its online renewal application. *See* Screenshots from Online Application, Exhibit C to Complaint, Doc. No. 1-4. In any event, Defendants already use electronic signatures "related to different documents"—those collected during an applicant's previous in-person transaction—to register applicants who change their driver's license address by mail, and could therefore do the same for applicants who renew online.[37] Their refusal to do so for online transactions is without any legal justification, and violates the NVRA.

---

[37] As set out above, in order to be eligible to use the online application system in the first place, the DPS applicant must have previously completed an in-person driver's license application and provided an electronic signature for DPS and SOS to use for voter registration.

### ii.  Change of Address

Incredibly, Defendants claim the NVRA requires DPS to collect a signature for online change-of-address transactions, and that "there is no basis to infer that Congress intended a mere change-of-address form to [function as a voter-registration application] with no signature at all." Mot. 19-20. This is plainly wrong, and confuses change-of-address transactions, during which an already-licensed applicant merely notifies the state of her new address, 52 U.S.C. § 20504(d), with initial and renewal applications, where an applicant seeks to apply for or renew her driver's license. *Id*. at § 20504(a)(1).

Contrary to Defendants' claim, the NVRA clearly only requires signatures for initial and renewal driver's license applications, *not* change-of-address forms. *Id*. at §§ 20504(a)(1), (c)(2)(A), (c)(2)(C). "The NVRA's change of address provision is separate, and does not state that a signature is necessary for a simultaneous driver's license-voter registration change of address." *Stringer I*, 320 F. Supp. 3d at 895 (citing 52 U.S.C. § 20504(d)). Instead, the change-of-address provision clearly states that all driver's license change-of-address forms must also update voter registration information, unless the applicant opts out:

> *Any* change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration . . . *unless the registrant states on the form that the change of address is not for voter registration purposes*.

52 U.S.C. § 20504(d) (emphasis added).

An applicant using Texas's official website to change her driver's license address plainly does so "in accordance with State law." And while Defendants claim that subsection (d) does not preempt any state law that would require a signature on change-of-address forms, MTD at 20, they

neglect to mention that *there is no state law that contains such a signature requirement* for driver's license change-of-address forms.[38]

Finally, Defendants' claim that it "presents difficulty" for DPS to allow online applicants to "state[] on the form that the change of address is not for voter registration purposes" is neither true nor relevant. MTD at 20. There is no reason DPS could not modify the fields on the online application to allow applicants to simply check a box indicating whether their address change is for voter registration purposes. *See, e.g.,* Exhibit C to Complaint, Doc. No. 1-4 at p. 5 (showing current voter registration question asking applicants to select "Yes" or "No" in response to the question "Do you want to request a voter application?"). Because DPS's online change-of-address application fails to allow applicants to update their addresses for voter registration purposes, Defendants' motion to dismiss Count II must be denied.

### iii. Duplicate information and time period requirements

Defendants argue that to the extent Texas's online driver's license renewal and change-of-address application complies with §§ 20504(a) and (d), it also complies with the NVRA's prohibition on requiring duplicative information, § 20504(c)(2)(A), and the requirement that Defendants transmit voter registration information and ensure eligible applicants are registered in a specified time period. *Id.* at §§ 20504(e) and 20507. Mot. at 19-20. They are wrong.

First, as set out above, the online application *does* violate §§ 20504(a) and (d). Second, it directs applicants to complete a second form with duplicative information in order to register themselves to vote or update their voter registration, in violation of Section 20504(c)'s plain language. Doc. 1 at ¶¶ 9, 44; *see also Stringer I*, 320 F. Supp. 3d at 892-93. Third, because DPS

---

[38] Of course, if there was such a state law, the NVRA *would* preempt it. *Stringer I*, 320 F. Supp. 3d at 894-95. Further, each of the millions of online driver's license change-of-address transactions completed each year would violate it.

does not provide simultaneous voter registration with its online application, it does not send SOS any voter registration information in connection with these NVRA-covered transactions, in violation of its obligation to do so within the time period specified at § 20504(e). Likewise, because SOS does not receive this information from DPS, it does not ensure that the online applicants are timely registered as required by § 20507. Accordingly, Defendants' motion to dismiss Plaintiffs' duplicative-information and time-period allegations should be denied.

### b. Plaintiffs' state a cognizable Constitutional claim.

Defendants confuse the legal standard required for the Constitutional claim brought in the instant case, first arguing that Plaintiffs must show intentional discrimination in order to prevail and then seemingly acknowledging that the *Anderson-Burdick* test controls. MTD at 21-22. Defendants' argument that Plaintiffs must show intentional discrimination in this case is flat wrong. When assessing a challenge to a state restriction on the right to vote, courts use the standard provided in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Under the *Anderson-Burdick* standard, a court

> must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

In *Crawford v. Marion County Election Bd.*, the Supreme Court explained that, however slight of a burden a state restriction on an individual voter may appear, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" 553 U.S. at 191 (citing *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)). A sufficiently weighty justification is the difference between a reasonable and an unreasonable restriction. *Crawford* at 190 (citing

*Burdick*, 504 U.S. at 434). Defendants do not provide any rational reason—much less a "sufficiently weighty" justification—for the burden they impose on the right to vote in Texas. Therefore, Defendants' treatment of online DPS transactions violates the U.S. Constitution.

### i. Defendants' refusal to treat online driver's license transactions as voter registration applications unduly burdens Plaintiffs' right to vote.

Texas treats some driver's license applications as applications to register to vote, and also *does not* treat other driver's license applications as applications to register to vote. And it refuses to provide a simultaneous voter registration application for people who are similarly situated to in-person or mail-in applicants in every way but one—they completed their transactions online.

Instead of using the information applicants already provide to DPS to register them to vote or update their voter registration information, Texas burdens applicants who transact with DPS online with a requirement that they retrieve, complete, print, and mail an entirely separate voter registration form in order to register or update their voter registration information. This burden is borne exclusively by online applicants; DPS applicants who apply for or change their license information in person, or change their address by mail, are not required to complete a separate, additional voter registration application in order to register or update their voter registration information.

### ii. Defendants' asserted interest in requiring handwritten signatures is insufficient to justify the burdens created by their treatment of online DPS transactions.

Defendants' justification for the burden imposed on online DPS customers "include maintaining accurate voting rolls and combatting fraud." MTD at 24. They further state, "Texas can use written signatures in cases of fraud, identity theft, and consideration of absentee ballots." *Id.* But these justifications ignore a fundamental point: for in-person DPS transactions and mail-in change-of-address transactions, the state *does not even use* handwritten signatures for voter

registration or voter verification purposes. *See, e.g.*, *Stringer I*, 320 F. Supp. 3d at 899 n.54. Instead, DPS collects and SOS and counties use the *electronic signatures* of voters. *Id*. 899-900. These facts remain uncontested now. Indeed, even though a DPS applicant who indicates he wishes to register to vote on a mail-in change-of-address form provides DPS with a handwritten signature on that mail-in form, the signature DPS sends to SOS for voter registration purposes—and the signature SOS transmits to county election officials for voter registration—is the *previously-provided electronic signature* collected during the applicant's most recent in-person transaction.

Although the state has an interest in verifying voter identity *at the polls*, this interest has nothing to do with the handwritten signatures collected by DPS during driver's license transactions, since the state only collects and uses *electronic* signatures on DPS applicants' voter registration applications. Additionally, under state law, an individual can have any number of related persons fill out and sign registration applications on their behalf, TEX. ELEC. CODE § 13.003, undermining the notion that a person's original hand-written signature can or is used as any sort of reliable fraud-prevention measure. This interest is therefore irrelevant and insufficient to justify Defendants' refusal to allow eligible Texans to register to vote during online driver's license transactions.

Defendants also claim that they treat everyone equally because the signature requirement applies to everyone, and that everyone who fails to sign a change-of-address or renewal application is not registered to vote.  MTD at 23-24. First, Defendants do not tell the full truth here since, as noted above, the handwritten signature requirement is not applied to in-person DPS customers and mail-in change-of-address DPS customers. Second, even if Defendants did treat everyone equally, *Anderson-Burdick* requires them to justify the burden they impose on the right to vote. *Burdick*,

504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). Because they cannot do so, their motion to dismiss should be denied.

### iii.    DPS's handwritten signature requirement for online transactions is unreasonable.

As pointed out by the Court previously in *Stringer I*, Defendants have not explained, and cannot explain, how the handwritten signature requirement is necessary. 320 F. Supp. 3d at 899-900. As the Court observed, because DPS collects electronic signatures during every in-person driver's license transaction—including applicants' first applications for a Texas driver's license—DPS already has a signature on file for every person who subsequently renews or changes their driver's license address. *Id*. For both driver's license purposes and voter registration purposes, Defendants simply use and store the signature that was electronically captured in the most recent previous in-person DPS transaction. *Id*. at 899 n.52. Defendants cannot show why handwritten signatures are necessary to confirm voter identity at the polls when collected, stored, and easily-accessible electronically-captured signatures do the same thing just as well, if not more efficiently, and when Texas already uses these electronic signature for this purpose for in-person and mail-in DPS applications. *Anderson*, 460 U.S. at 806 (quoting *Kusper v. Pontikes*, 414 U.S. 51, 59 (1973) ("If the [s]tate has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties.").

Moreover, DPS's online system utilizes a data verification process, which, as Defendants have admitted, requires an online applicant to verify their identity at login, instead of using a handwritten signature. *Stringer I*, 320 F. Supp. 3d at 878 ("Defendants admit that the personal information required for authenticating online transactions is equal to or even more rigorous than the identifying information used for in-person and mail-in transactions"). This verification process ensures that the individual transacting online is the person who previously provided an electronic

signature during his last in-person transaction with DPS and would likewise ensure that the electronic signature used for voter registration and voter verification belongs to the proper individual. With no sufficient justification for Defendants' restrictions on online transactions, the burden on Plaintiffs is unreasonable and Defendants' motion to dismiss Plaintiffs' Constitutional claims should be denied.

## CONCLUSION

For all of these reasons, Plaintiffs request that this Court deny Defendants' motion in full.


Dated: March 30, 2020

Respectfully submitted,

 /s/ Rebecca Harrison Stevens
Mimi Marziani
Texas Bar No. 24091906
mimi@texascivilrightsproject.org
Rebecca Harrison Stevens
Texas Bar No. 24065381
beth@texascivilrightsproject.org
Hani Mirza
Texas Bar No. 24083512
hani@texascivilrightsproject.org
Ryan Cox
Texas Bar No. 24074087
ryan@texascivilrightsproject.org
Joaquin Gonzalez
Texas Bar No. 24109935
Joaquin@texascivilrightsproject.org

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, Texas 78741
Tel. (512) 474-5073
Fax (512) 474-0726

Peter A. Kraus
Texas State Bar No. 11712980
kraus@waterskraus.com
Charles S. Siegel
Texas State Bar No. 18341875

siegel@waterskraus.com
Caitlyn E. Silhan
Texas State Bar No. 24072879
csilhan@waterskraus.com

WATERS & KRAUS, LLP
3141 Hood St., #700
Dallas, Texas 75219
214-357-6244 (Telephone)
214-871-2263 (Facsimile)

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record on March 30, 2020 through the Court's CM/ECF filing system in compliance with the Federal Rules of Civil Procedure and the Local Rules of the Court.

/s/ Rebecca Harrison Stevens