UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| JARROD STRINGER, et al.<br><br>        Plaintiffs,<br><br>   v.<br><br>RUTH HUGHS, in her official capacity as Texas Secretary of State and STEVEN C. MCCRAW, in his official capacity as Director of the Texas Department of Public Safety<br><br>        Defendants. | Civil Action Case No. 5:20-cv-00046-OLG |

### TEXAS DEMOCRATIC PARTY, DSCC, AND DCCC'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

I.       INTRODUCTION..................................................................................................... 1

II.      ARGUMENT ........................................................................................................... 2

   A.   This Court has subject matter jurisdiction......................................................... 2

      1.   Intervenors are properly before this Court................................................... 2

      2.   Intervenors have standing. ........................................................................... 2

         a.   Standard of Review for Motions to Dismiss on Standing. ................... 2

         b.   Intervenors have direct organizational standing. ................................. 3

      3.   Intervenors have associational standing. .................................................... 10

      4.   Intervenors have statutory standing. .......................................................... 14

   B.   Intervenors have alleged a cognizable equal protection claim........................... 15

      1.   Legal Standard ............................................................................................ 16

      2.   Defendants are collaterally estopped from denying their conduct  violates equal protection. ............................................................................................... 16

      3.   The *Anderson/Burdick* test applies to the equal protection claims here,  and does not require evidence of intentional discrimination .......................................... 19

      4.   Defendants cannot satisfy the *Anderson-Burdick* test. ............................... 20

III.     CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

**CASES**                                                                                   **PAGE(S)**

*Allee v. Medrano*,
  416 U.S. 802 (1974) ........................................................................................15

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ........................................................................................19

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
  627 F.3d 547 (5th Cir. 2010) ..........................................................................14

*Bay Cty. Democratic Party v. Land*,
  347 F. Supp. 2d 404 (E.D. Mich. 2004) .....................................................4, 12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................16

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ...................................................................................19, 20

*Church of Scientology of Cal. v. Cazares*,
  638 F.2d 1272 (5th Cir. 1981) ........................................................................15

*Crawford v. Marion Cty. Election Bd.*,
  472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) ..........................9, 11

*Danos v. Jones*,
  652 F.3d 577 (5th Cir. 2011) ..........................................................................15

*Democratic Nat'l Comm. v. Bostelmann*,
  No. 20-CV-249-WMC, 2020 WL 1320819 (W.D. Wis. Mar. 20, 2020) .........10, 12

*Democratic Nat'l Comm. v. Reagan*,
  329 F. Supp. 3d 824 (D. Ariz.), *aff'd*, 904 F.3d 686 (9th Cir. 2018), *reh'g en banc granted*, 911 F.3d 942 (9th Cir. 2019) ..................................................10, 12

*Democratic Party of Ga., Inc. v. Crittenden*,
  347 F. Supp. 3d 1324 (N.D. Ga. 2018) .......................................................10, 13

*Democratic Party of the United States v. Nat'l Conservative Political Action Comm.*,
  578 F. Supp. 797 (E.D. Pa. 1983) .....................................................................4

*Democratic Party v. Benkiser*,
  459 F.3d 582 (5th Cir. 2006) ...................................................................3, 4, 11, 13

*Den Norske Stats Oljeselskap As v. HeereMac Vof*,
  241 F.3d 420 (5th Cir. 2001) .........................................................................2, 3

**TABLE OF AUTHORITIES**

CASES                                                                     PAGE(S)

*Fla. Democratic Party v. Hood*,
   342 F. Supp. 2d 1073 (N.D. Fla. 2004)...................................................12

*Fla. Democratic Party v. Scott*,
   215 F. Supp. 3d 1250 (N.D. Fla. 2016)..............................................11, 12

*Fla. State Conference of N.A.A.C.P. v. Browning*,
   522 F.3d 1153 (11th Cir. 2008) .........................................................4

*Fulani v. Krivanek*,
   973 F.2d 1539 (11th Cir. 1992) .........................................................19

*Georgia Republican Party v. Sec. & Exch. Comm'n*,
   888 F.3d 1198 (11th Cir. 2018) .........................................................12

*Hancock Cty. Bd. of Supervisors v. Ruhr*,
   487 F. App'x 189 (5th Cir. 2012) .......................................................12

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)..................................................................4, 8

*Hotze v. Burwell*,
   784 F.3d 984 (5th Cir. 2015) ...........................................................3

*Hunt v. Wash. State Apple Adver. Comm'n*,
   432 U.S. 333 (1977)................................................................11, 14

*Inclusive Communities Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*,
   749 F. Supp. 2d 486 (N.D. Tex. 2010) ................................................15

*Johnson v. United States*,
   576 F.2d 606 (5th Cir. 1978) ..........................................................17

*Jornaleros de Las Palmas v. City of League City*,
   945 F. Supp. 2d 779 (S.D. Tex. 2013) .................................................15

*Langley v. Price*,
   926 F.3d 145 (5th Cir. 2019) ..........................................................16

*Lee v. Va. State Bd. of Elections*,
   188 F. Supp. 3d 577 (E.D. Va. 2016), *aff'd*, 843 F.3d 592 (4th Cir. 2016)............10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014)...................................................................14

*Lujan v. Defs. Of Wildlife*,
   504 U.S. 555 (1992)...............................................................3, 5, 9

iii

## TABLE OF AUTHORITIES

**CASES**                                                                                                                                 **PAGE(S)**

*Miller v. Brown*,
   462 F.3d 312 (4th Cir. 2006) .........................................................................10

*OCA-Greater Houston v. Texas*,
   867 F.3d 604 (5th Cir. 2017) ....................................................................3, 4, 9

*Ohio Org. Collaborative v. Husted*,
   189 F. Supp. 3d 708 (S.D. Ohio 2016), *rev'd sub nom. on other grounds*, *Ohio
   Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016).....................................10

*Owen v. Mulligan*,
   640 F.2d 1130 (9th Cir. 1981) ........................................................................4

*Parklane Hosiery Co., Inc., v. Shore*,
   439 U.S. 322 (1979).............................................................................16, 19

*Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*,
   123 F.3d 111 (3d Cir. 1997)..........................................................................11

*Republican Party of Ark. v. Faulkner Co.*,
   49 F.3d 1289 (8th Cir. 1995) ........................................................................19

*Richardson v. Tex. Sec'y of State*,
   No. SA-19-cv-00963-OLG (W.D. Tex. Dec. 23, 2019) .....................................3, 12

*Rogers v. Corbett*,
   468 F.3d 188 (3rd Cir. 2006) ........................................................................19

*Rosen v. Brown*,
   970 F.2d 169 (6th Cir. 1992) ........................................................................19

*Sandusky County Democratic Party v. Blackwell*,
   387 F.3d 565 (6th Cir.2004) ........................................................................12

*Schulz v. Williams*,
   44 F.3d 48 (2d Cir.1994)..............................................................................4

*Sierra Club v. Morton*,
   405 U.S. 727 (1972)...................................................................................15

*Smith v. Boyle*,
   144 F.3d 1060 (7th Cir. 1998) ........................................................................4

*Stringer v. Pablos*,
   320 F. Supp. 3d 862 (W.D. Tex. 2018), *rev'd and remanded sub nom. Stringer
   v. Whitley*, 942 F.3d 715 (5th Cir. 2019) ...............................................15, 17, 18, 20

# TABLE OF AUTHORITIES

**CASES**                                                                                                                                         **PAGE(S)**

*Stringer v. Pablos*,
   Civil No. SA-16-CV-257-OG, 2020 WL 532937 (W.D. Tex. Jan 30, 2020)........................20

*Stringer v. Pablos*,
   No. SA-16-CA-257-OG ....................................................................................... passim

*Stringer v. Whitley*,
   942 F.3d 715 (5th Cir. 2019) (Ho, J., concurring) ............................................1, 16

*Turner v. Pleasant*,
   663 F.3d 770 (5th Cir. 2011) ....................................................................16

*Veasey v. Perry*,
   29 F. Supp. 3d 896 (S.D. Tex. 2014) .........................................................15

*White Glove Staffing, Inc. v. Methodist Hosps. of Dallas*,
   947 F.3d 301 (5th Cir. 2020) ....................................................................14

*Winters v. Diamond Shamrock Chem. Co.*,
   149 F.3d 387 (5th Cir. 1998) ..............................................................17, 18

**STATUTES AND OTHER AUTHORITIES**

28 U.S.C. § 752..........................................................................................15

42 U.S.C. § 1983...................................................................................14, 15

Restatement (Second) of Judgments § 27, cmt. j................................................18

Rule 12(b)(1)..............................................................................................12

Rule 12(b)(6)..............................................................................................16

## I.    INTRODUCTION

Defendants the Texas Secretary of State and the Director of the Department of Public Safety ("DPS") have brazenly refused to bring their illegal voter registration practices into compliance with the National Voter Registration Act ("NVRA") and the Equal Protection Clause, despite this Court's orders on the motions for summary judgment in *Stringer v. Pablos*, No. SA-16-CA-257-OG, ("*Stringer I*"), and the Fifth Circuit's express acknowledgement that Defendants' conduct disenfranchised the *Stringer I* plaintiffs in the 2018 elections, taking from them "a right they will *never* be able to recover." *Stringer v. Whitley*, 942 F.3d 715, 726 (5th Cir. 2019) (Ho, J., concurring) (emphasis in original). The Texas Democratic Party ("TDP"), DCCC, and DSCC (collectively, "Intervenors") filed this action to ensure that Texans are not denied the right to vote in a single additional election as a result of Defendants' illegal conduct. And while resolution of this case has always been critically important to protect Texans' right to vote, it has particular relevance now because even more Texans are likely to update their driver's license information online in light of the COVID-19 global pandemic and be disenfranchised by Defendants' conduct.[1]

Defendants continue to try to delay this litigation by recasting, in their motion to dismiss, arguments that this Court has already grappled with and decided in favor of Intervenors. Contrary to Defendants' claims, Intervenors have established that they have standing and that their equal protection claim has merit—indeed, it has already been deemed meritorious once before by this Court. This Court should deny Defendants' motion to dismiss (ECF No. 56 ("Mot." or "MTD"))

---

[1] In fact, the DPS website currently states that, due to COVID-19, "all Driver License Offices will be closed effective immediately" and instructs Texans to renew their driver's licenses or update their addresses online. *See* Tex. Dep't of Public Safety, "Restricted Driver License Office Services and Closures," https://www.dps.texas.gov/DriverLicense/covid-19.htm (last visited May 12, 2020).

and grant Intervenors' pending motion for leave to file for summary judgment, ECF Nos. 41, 43, 54 ("MSJ") so that the merits of this case may be expeditiously resolved.

## II.      ARGUMENT

### A.      This Court has subject matter jurisdiction.

#### 1.      Intervenors are properly before this Court.

Defendants begin by pressing an argument that this Court has considered numerous times, in each case deciding it in favor of Intervenors. For the reasons discussed in Intervenors' briefing on the Motion to Intervene (ECF Nos. 16, 26), Defendants' Motion to Sever (ECF No. 49), and Intervenors' MSJ, Defendants' arguments that Intervenors were incorrectly permitted to intervene in *Stringer I*, have no merit. *See Stringer I*, No. 16-cv-00257-OLG (ECF Nos. 133, 142, 161). And given that the Court has clarified that the Motion to intervene was construed as a request to intervene in *Stringer II* and granted on that basis, this argument is now moot and need not be addressed any further.

#### 2.      Intervenors have standing.

Intervenors have alleged facts sufficient to demonstrate that they, and their members and constituents, have suffered and will suffer legally cognizable injuries as a result of Defendants' conduct, such that they have standing to pursue this action in this Court. Intervenors have satisfied Article III's requirements for both organizational standing and associational standing. Defendants' arguments to the contrary—including their assertions regarding statutory standing—have no merit.

##### a.      Standard of Review for Motions to Dismiss on Standing

On a motion to dismiss, the Court must accept the plaintiffs' allegations of fact as true, including as related to the plaintiffs' standing. *See Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420, 424 (5th Cir. 2001) (citing *Barrera-Montenegro v. United States*, 74 F.3d 657,

659 (5th Cir. 1996)); *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992); *see also Hotze v. Burwell*, 784 F.3d 984, 992 (5th Cir. 2015) (finding "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing). The Court may consider "(1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Den Norske Stats Oljeselskap As*, 241 F.3d at 424.

A plaintiff must satisfy three criteria to establish a case or controversy sufficient to give a federal court standing over their claims: (1) that they have suffered or are about to suffer an "injury in fact"; (2) that there exists "a causal connection between the injury and the conduct complained of"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560. These requirements apply when a plaintiff alleges standing on their own behalf, and they similarly apply when a plaintiff brings a case based on associational standing. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 609–10 (5th Cir. 2017); *see also* Order at 9, *Richardson v. Tex. Sec'y of State*, No. SA-19-cv-00963-OLG (W.D. Tex. Dec. 23, 2019).

**b.    Intervenors have direct organizational standing.**

With respect to Intervenors' organizational standing, Defendants challenge only the first of Article III's requirements—whether Intervenors have sufficiently alleged an injury in fact. They do not challenge either the causation or redressability requirements. *See* Mot. at 6. Defendants' arguments on this score are easily rebutted.

First, as the Fifth Circuit recognized in *Democratic Party v. Benkiser*, 459 F.3d 582, 587 & n.4 (5th Cir. 2006), "[v]oluminous persuasive authority" holds that political party organizations have standing to challenge state laws that threaten the electoral prospects of their candidates. *See*

3

*also id*. at 586 (finding TDP had "direct standing" based on "harm to its election prospects"); *Smith v. Boyle*, 144 F.3d 1060, 1061–63 (7th Cir. 1998); *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir.1994); *Owen v. Mulligan*, 640 F.2d 1130, 1132–33 (9th Cir. 1981); *Democratic Party of the United States v. Nat'l Conservative Political Action Comm*., 578 F. Supp. 797, 810 (E.D. Pa. 1983); *Bay Cty. Democratic Party v. Land*, 347 F. Supp. 2d 404, 423 (E.D. Mich. 2004)). In this case, Defendants' continuing illegal conduct directly threatens the electoral prospects of the candidates that the Intervenors support for a very simple reason: it makes it exponentially harder for voters who would support them to register to vote.

Second, an organization suffers an Article III injury when it must divert resources from its usual activities to lessen the harm caused by an act that causes injury to the organization's mission or members. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The Fifth Circuit has made clear that the impact to an organization's activities or resources does not need to be large to establish standing; an organization can establish standing by demonstrating a slight impairment to its activities. *See OCA-Greater Houston*, 867 F.3d at 610-12 (explaining that the injury requirement is "qualitative, not quantitative, in nature," and that the injury need not be large). Furthermore, "an organization suffers an injury in fact when a statute 'compel[s]' it to divert more resources to accomplishing its goals," and "'[t]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury.'" *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) (internal citation omitted).

Here, Intervenors easily clear these bars. All three Intervenors in this case have demonstrated injuries in the form of diversion of resources that clearly distinguish them as organizations "with a direct stake in the outcome of [this] litigation . . . from [organizations] with

4

a mere interest in the problem." Mot. at 10 (citation omitted). Intervenors' Complaint plainly states that the TDP, DCCC, and DSCC have been directly injured by Defendants' conduct because, to be successful in their efforts to elect Democratic candidates in Texas, they must expend more resources and divert resources from other uses to specifically combat Defendants' failure to permit simultaneous updates to registration information for voters who update their driver's license information online. *See* ECF No. 28 at ¶¶ 11-13. At the pleading stage, these allegations alone are sufficient to establish Intervenors' standing. *Lujan*, 504 U.S. at 560-61. And here, the specific facts bear out Intervenors' allegations. *See*, *e.g.*, ECF No. 43-1 ¶ 10-11 (TDP); ECF No. 43-3 ¶ 7 (DSCC); ECF No. 43-2 ¶ 11 (DCCC); DCCC Decl. ¶¶ 7-8, 10, 13; DSCC Decl. ¶¶ 5-6; TDP Decl. ¶¶ 11-12; TDP Tr. 30:17-21.

TDP has significantly expanded its voter registration efforts in preparation for the 2020 elections in large part because of Defendants' failure to comply with the NVRA and equal protection. Indeed, this year TDP is engaging in the largest voter registration program in the history of the state of Texas, ECF No. 43-1 ¶ 11, with a goal of registering about 2.6 million unregistered, eligible Democratic voters, TDP Decl. ¶ 14. TDP understands that Defendants' conduct has caused and is likely to cause confusion and disenfranchisement among Texas voters, because when an eligible voter changes their address online with DPS, the webpage will eventually ask the voter if they want to register to vote. If the person answers, "yes," then the website directs the eligible voter to a *new* website that the eligible voter must navigate to complete the process. But this new website does not simply allow the eligible voter to register. Instead, the eligible voter must request that the state mail a voter registration application for the eligible voter to complete, affix their own stamp, and return. Prelim. Inj. Tr. 6:12-17, 8:24-9:5; 14:15-25, 32:5-11 ECF No. 57. Despite this Court's previous decision, this process has not changed. *Id*. at 5:20-25; 17:5-6 (Defendants admit

that "[t]he process has been the same since 2015.").

To combat voter confusion and disenfranchisement as a result of Defendants' unconstitutional practices described above, TDP is devoting significant funds and personnel time to preemptively mass mail voter registration applications to voters who may have attempted to register online through DPS, TDP Tr. 68:20-69:10, and educate voters on the confusing pitfalls of Texas's voter registration requirements. Defendants' assertion that TDP "does not allege diversion of any resources at all," Mot. at 9, is clearly wrong. TDP views of all of its activities as focused on electing Democratic candidates in Texas, but TDP is clear that its voter registration program has required more resources than it would have if Defendants' voter registration practices were constitutional. ECF No. 28 ¶¶ 11-12; TDP Decl. ¶¶ 11-13,15; *see also* TDP Tr. 82:7-9 ("And most of this we wouldn't have to do if people could update their registration when people got their driver's license updates."). This is because Defendants' conduct limits the effectiveness of TDP's registration program, as TDP must try to register more voters than it would otherwise due to its valid concern that registered individuals will be disenfranchised due to Defendants' conduct. ECF No. 28 ¶ 12.

Defendants' conduct has similarly caused DCCC and DSCC to divert resources from other efforts to elect Democrats to the U.S. House of Representatives and U.S. Senate, respectively. Both directly and through their support of the TDP, DCCC will have to divert resources from its other work to increasing its voter registration and GOTV efforts in Texas. Moreover, DCCC is spending more money in Texas on voter registration and GOTV efforts than it otherwise would. For example, DCCC has already spent nearly $400,000 this election cycle to compensate a consultant, Sisneros Strategies, to conduct a robust program to register voters in Texas Congressional District 23. DCCC Decl. ¶ 7; DCCC Tr. 82:10-83:22. DCCC has opened four offices in Texas, DCCC Tr.

28:15-16, and hired staff on the ground to both engage with and register voters. *Id*. 82:14-22; 83:14-17 ("And then we also have staff on the ground who work directly for the DCCC whose roles involve a lot of community engagement and help with voter registration."). DCCC anticipates ultimately spending millions of dollars to register and mobilize voters in Texas in advance of the 2020 elections. ECF No. 43-2 ¶ 6; DCCC Decl. ¶ 11. Neither DCCC nor DSCC have unlimited funds, and because both are national party committees, they have had to, and will continue to have to, divert resources from other states to voter registration and GOTV programs in Texas because "voter registration's going to have to be a higher priority than it might be in another state where it's easier to register folks." DSCC Tr. 23:9-17; DCCC Tr. 100:1-9 (explaining the importance of voter registration in Texas). DCCC, for example, could have spent the $400,000 (or some portion thereof) that it paid to Sisneros Strategies on digital voter persuasion efforts to protect swing districts within Texas and nationwide.

In addition, DCCC and DSCC actively support TDP's voter registration and GOTV efforts through financial and staffing resources, ECF No. 43-2 ¶ 9. Through a program called the "coordinated campaign," DCCC and DSCC each plan to transfer a significant amount of funds to TDP to support Democratic candidates in Texas in races up and down the Democratic ticket. This election cycle especially, DCCC and DSCC will transfer funds to the coordinated campaign to help fund TDP's voter education and voter engagement programs on the ground. DCCC has already transferred over $145,000 to TDP for voter registration this election cycle, DCCC. Tr. 81:10-14, 83:10-13 ("We have – with the money that we have sent to the Texas Democratic Party, I believe at least two people who have been hired with the express purpose of assisting voter registration efforts."). And, DCCC anticipates transferring more, given its need to help support TDP's voter registration program to achieve its mission. DCCC Decl. ¶ 9. In advance of the 2020

elections, DSCC intends to give significant sums to TDP to spend on its field program, which will necessarily involve, among many things, voter registration efforts, to help elect Democratic candidates from Texas to national office. DSCC Tr. 37: 10-13, 37:21-24 45:20-22, 57:20-59:5. Thus far this election cycle, DSCC has transferred $25,000 to the TDP. DSCC Tr. 37:10-13. DCCC and DSCC support TDP's field programs because they increase the number of registered Democratic voters in Texas and the number of voters who support DCCC's and DSCC's endorsed candidates. *See id*. DCCC Tr. 79:6-9; 100:2-9.

DCCC and DSCC have diverted funds to spend on voter registration in Texas because they recognize that voters in Texas are not given the opportunity to update their voter registration information at the same time that they update their driver's license information. ECF No. 43-2 ¶ 11; DCCC Decl. ¶¶ 7-8; DSCC Tr. 23:9-17. DCCC and DSCC are injured in the same way that TDP is injured: they must spend additional funds and allocate more resources to educate and register those who mistakenly believe they registered to vote through DPS's website and are denied the right to vote at the polls, like the original plaintiffs in this action. They must also persuade additional voters to turn out to vote in order to compensate for voters who are disenfranchised due to Defendants' conduct. ECF No. 43-3 ¶ 7; DSCC Decl. ¶ 5; DSCC Tr. 35:25-36:8, 37:21-24.

Defendants are incorrect to assert that the activities undertaken by an organization to counteract a challenged state action must fall outside the scope of the organization's mission or central initiatives to constitute a diversion of resources sufficient to establish standing. *See Havens Realty Corp.*, 455 U.S. at 379 (finding organizational plaintiff HOME sufficiently alleged injury-in-fact where defendant apartment complex's racial steering practices made it more difficult for HOME to achieve its mission of providing "equal access to housing through counseling and other referral services" even though providing such services were within the scope of HOME's regular

8

activities); *see also OCA-Greater Houston*, 867 F.3d at 610 (finding OCA's primary mission is voter outreach and civic education, and the challenged laws forced OCA to expend more resources on those activities to educate voters about Texas's restrictions on interpretation assistance for English-limited voters).

Nor is an organization is not required to quantify the exact cost or resources expended to establish standing. *See, e.g.*, *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) ("The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury."). Defendants incorrectly cite *N.A.A.C.P. v. City of Kyle* as standing for the proposition that an organizational plaintiff must identify "specific projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendant's conduct" in order to establish standing. Mot. at 7. In doing so, Defendants attempt to heighten the standard for organizational standing, an argument that the Fifth Circuit expressly rejected in *OCA Greater Houston*, when it clarified that by asking the lobbying organization plaintiff in *City of Kyle* to show that it put specific projects on hold, the court "was not . . . heightening . . . the *Lujan* standard, but [merely offering] an example of how to satisfy it by pointing to a non-litigation-related expense." 867 F.3d at 612. In fact, the Fifth Circuit expressly dismissed any notion of "imposing a higher burden on organizations seeking to establish standing." *Id*.

Especially relevant to Intervenors' standing, courts have repeatedly held that political party committees, which have a direct and particular interest in the outcome of elections, have direct organizational standing when they divert resources to educate their supporters and constituents about how to overcome laws that will make it more difficult for them to access their right to the franchise. *See*, *e.g.*, *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz.), *aff'd*,

904 F.3d 686 (9th Cir. 2018), *reh'g en banc granted*, 911 F.3d 942 (9th Cir. 2019) (finding plaintiffs DNC, DSCC, and Arizona Democratic Party have direct organizational standing to challenge election laws that will require them "to retool their GOTV strategies and divert more resources to ensure that low-efficacy voters are returning their early mail ballots . . . [and] to educate their voters" on those laws); *Lee v. Va. State Bd. of Elections*, 188 F. Supp. 3d 577, 584 (E.D. Va. 2016), *aff'd*, 843 F.3d 592 (4th Cir. 2016) (finding Democratic Party of Virginia "has shown sufficient injury primarily in the form of diversion of time, talent, and resources to educate their voters and implement the requirements of the Virginia voter identification law"); *see also*, *e.g.*, *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1337 (N.D. Ga. 2018); *Ohio Org. Collaborative v. Husted*, 189 F. Supp. 3d 708, 726 (S.D. Ohio 2016), *rev'd sub nom. on other grounds*, *Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016); *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1320819, at *3 (W.D. Wis. Mar. 20, 2020). To satisfy standing, political parties can show either past or future diversion of these resources. *See, e.g., Miller v. Brown*, 462 F.3d 312, 317-18 (4th Cir. 2006) ("Knowing that voters wholly unaffiliated with the plaintiffs' party will participate in their primary dramatically changes the plaintiffs' decisions about campaign financing, messages to stress, and candidates to recruit. Because campaign planning decisions have to be made months, or even years, in advance of the election to be effective, the plaintiffs' alleged injuries are actual and threatened."). Here, Intervenors not only allege, but have proved, both.

### 3. Intervenors have associational standing.

In addition to establishing standing based on injuries sustained by the organizations themselves, Intervenors have standing based on the injuries suffered by their members and constituents. An organization may bring suit on behalf of its members or constituents when: (1) its

members and constituents would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor relief requested requires the participation of individual members or constituents in the suit. *Benkiser*, 459 F.3d at 587 (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 345 (1977)).

Courts have universally rejected Defendants' argument that "[n]ot having members is fatal to associational standing." Mot. at 11. Indeed, that is the clear teaching of the U.S. Supreme Court's decision in *Hunt*. *See* 432 U.S. at 344 (holding organization does not need formal membership structure to have standing); *see also Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc*., 123 F.3d 111, 119 (3d Cir. 1997) (rejecting argument that organizations lacked standing because their charters prohibit them from having members). But in any event, Intervenors have sufficiently alleged that they do have members, whom they generally consider to be Democratic voters and supporters. ECF No. 28 at ¶¶ 11-13; DSCC Tr. 52:9-15; DCCC Tr. 108:8-18; TDP Tr. 98:7-13.

Courts have repeatedly held that political parties like Intervenors have associational standing on behalf of their voter members when they have challenged state laws that would make it more difficult for their members to engage in the political process. *See*, *e.g.*, *Crawford*, 472 F.3d at 951 (finding the "Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new [photo ID] law"); *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1254 (N.D. Fla. 2016) (holding that Florida Democratic Party had standing on behalf of voters "who intend[ed] to register as Democrats and who will be barred from voting" given the state's closure of voter registration).[2] Indeed, in a voting case brought recently to address

---

[2] *See e.g.*, *Reagan*, 329 F. Supp. 3d at 831*; Georgia Republican Party v. Sec. & Exch. Comm'n,* 888 F.3d 1198, 1203 (11th Cir. 2018); *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 573-74 (6th Cir.2004); *Bay County Democratic Party v. Land*, 347 F.Supp.2d 404, 422 (E.D.

burdens imposed on voters by Wisconsin state election laws particularly in light of the current public health crisis, a federal district court found that both the DNC and the Democratic Party of Wisconsin had standing to sue on behalf of their members who would face undue burdens on their right to vote in elections held during the public health emergency of the COVID-19 pandemic. *Bostelmann*, 2020 WL 1320819.

Defendants' argument that Intervenors must identify a specific member to establish associational standing is legally erroneous under Fifth Circuit precedent. *See Hancock Cty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012) ("We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing."); *see also* Order at 12-13, *Richardson*, No. SA-19-cv-00963-OLG (holding pleadings sufficient for associational standing where the "organization[] is comprised in significant part by individuals who are likely to be impacted by the relevant policies at issue"). It is enough that Intervenors can broadly identify the fact that there are eligible voters in Texas who will update their driver's license information online and attempt to update their voter registration information at the same time, but who will be denied updated registration due to Defendants' illegal voter registration practices. *Fla. Democratic Party*, 215 F. Supp. 3d at 1254 ("Plaintiff need not identify specific aspiring eligible voters who intend to register as Democrats and who will be barred from voting; it is sufficient that some inevitably will. Plaintiff thus has standing."); *see also Democratic Party of Ga., Inc.*, 347 F. Supp. 3d at 1337. If anything, the likelihood that Intervenors' members and constituents will update their driver's license information online as opposed to leaving their homes to travel to a

---

Mich.2004); *Georgia Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1203 (11th Cir. 2018); *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004); *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1254 (N.D. Fla. 2016).

DPS office is even higher given the health risks associated with exposure to the public during the COVID-19 public health crisis. Any of these voters could sue in their own right, and Intervenors have standing to carry this lawsuit forward to protect their interests. In fact, Intervenors have gone beyond their minimal burden to show standing because at least one of the named plaintiffs in this case is a constituent of Intervenors.

Defendants' final arguments regarding Intervenors' associational standing are easily dismissed, once they are untangled. Defendants begin with a headscratcher, asserting: "[Intervenors] have not identified any interest germane to their purpose that is to be served by this litigation." Mot. at 12. To get here, Defendants contort this litigation into something unrecognizable: to hear Defendants tell it, the lawsuit is not about Defendants' refusal to allow eligible voters to register online when they update their driver' licenses, but rather about voters' records. *See* Mot. at 13. To be clear, this lawsuit *is* about eligible voters' inability to simultaneously register to vote when they update their driver's licenses online when these same voters *would* be able to simultaneously register to vote had they updated their licenses in person with DPS. Intervenors' interest in ensuring that its members and constituents have equal opportunities to register to vote is clear and germane to their missions: increasing the number of registered Democratic voters in Texas will mean that more voters can turn out to vote for Democratic candidates.

Finally, Intervenors have associational standing because neither the declaratory relief nor the injunction they seek requires individual voters to participate in this lawsuit. *Benkiser*, 459 F.3d at 588 (finding TDP has associational standing on behalf of its members, which is proven in part by the type of relief sought, i.e. an injunction, which benefits the whole group). Intervenors seek systemic changes to the online driver's license system so that *all* eligible voters who update their

driver's licenses online will have an opportunity to simultaneously register to vote. Intervenors' requested relief is in no way tied to individual voters and therefore does not require their individual participation. *Hunt*, 432 U.S. at 343 ("Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been [declaratory or injunctive relief].").

### 4.  Intervenors have statutory standing.

Defendants' final argument on standing, that 42 U.S.C. § 1983 does not permit Plaintiffs to challenge Defendants' actions burdening the right to vote because organizations are third parties that do not have the right to vote, Mot. at 13-15, has been previously rejected by the Fifth Circuit, and for good reason. The statutory standing inquiry asks courts "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 127 (2014). In other words, statutory standing requires that the plaintiff bringing suit under a statute establish that it is "within the class of plaintiffs whom Congress has authorized to sue." *Id*. at 127-28; *see also White Glove Staffing, Inc. v. Methodist Hosps. of Dallas*, 947 F.3d 301, 307–08 (5th Cir. 2020) (noting the zone of interests test with respect to claims brought pursuant to 42 U.S.C. § 1981 is "not especially demanding") (quotation marks and citation omitted).

The Fifth Circuit has expressly interpreted Section 1983 to allow suits by organizations that have established organizational or associational standing. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd*., 627 F.3d 547, 551 (5th Cir. 2010) (holding nonprofit had standing to assert § 1983 claims on behalf of its members in seeking prospective declaratory and injunctive relief); *Church of Scientology of Cal. v. Cazares*, 638 F.2d 1272, 1278 (5th Cir. 1981); *see also Allee v. Medrano*, 416 U.S. 802, 819 n.13 (1974); *Jornaleros de Las Palmas v. City of League*

14

*City*, 945 F. Supp. 2d 779, 800 (S.D. Tex. 2013) (finding organization was authorized to sue under § 1983 on behalf of its members); *Inclusive Communities Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs,* 749 F. Supp. 2d 486, 496 (N.D. Tex. 2010) (finding organizational plaintiff suffered an injury to its resources, and this was enough to establish standing to bring a claim under 42 U.S.C. § 1983); 1 Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses § 2.01[C][3] (4th Ed. 2020-1 Supp.) ("[I]f an organization satisfies the Supreme Court's test for organizational standing, it should be allowed to maintain suit under § 1983 to redress the rights of its members."). Defendants rely on cases that merely illustrate the general prohibition on individual, third-party standing; but all are inapposite because they do not involve organizations that assert associational or organizational standing.[3]

> **B.     Intervenors have alleged a cognizable equal protection claim.**

This Court has held that Defendants' conduct, which remains unchanged from *Stringer I*, violates the Equal Protection Clause. The Court denied Defendants' motion to dismiss the same claim in *Stringer I*, 5:16-cv-00257-OLG, ECF No. 52, and then found for the plaintiffs on the merits of the claim at summary judgment, *Stringer v. Pablos*, 320 F. Supp. 3d 862, 897-900 (W.D. Tex. 2018), *rev'd and remanded sub nom. Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019). None of these rulings were disturbed on appeal. *Stringer*, 942 F.3d 715. This claim has not changed, and neither have Defendants' defenses. The Court should again deny Defendants' motion.

---

[3] Defendants rely on *Danos v. Jones*, 652 F.3d 577 (5th Cir. 2011), to support their position, but that case considered the standing of an individual seeking to assert third-party standing on behalf of a federal judge under 28 U.S.C. § 752, a statute governing the appointment of law clerks and secretaries. That holding has no application to this case, where Plaintiffs have established direct and associational standing. *See Veasey v. Perry*, 29 F. Supp. 3d 896, 905 (S.D. Tex. 2014) ("Here, the successful assertion of associational standing (both organizational and representational) fulfills prudential standing concerns and obviates the need to apply concepts of third-party standing as to the associations."). Even if *Danos* could support the point Defendants suggest, its "statutory standing" limitation would only apply to the statute at issue in that case. *See Sierra Club v. Morton*, 405 U.S. 727, 732 (1972).

### 1. Legal Standard

A claim should only be dismissed if a court determines that it is "beyond doubt" that the claimant cannot prove a plausible set of facts that support the claim and would justify relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 12(b)(6) motions to dismiss are generally disfavored and rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011).

### 2. Defendants are collaterally estopped from denying their conduct violates equal protection.

Before reaching Defendants' incorrect arguments on the merits, this Court should find that Defendants are precluded from relitigating the equal protection claim under the doctrine of collateral estoppel, which promotes judicial economy by preventing "needless litigation." *Parklane Hosiery Co., Inc., v. Shore*, 439 U.S. 322, 326 (1979). Collateral estoppel applies here despite the Fifth Circuit's reversal in *Stringer I* because the appellate decision did not address the merits and thus does not control the substance of the Court's original judgment. *Langley v. Price*, 926 F.3d 145, 167 (5th Cir. 2019). Defendants are not permitted a second bite at the apple to relitigate issues that have already been thoroughly briefed and examined, and that were not disturbed on appeal.

When determining whether the doctrine of collateral estoppel applies, courts analyze the following four factors: whether "(1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine." *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 391 (5th Cir. 1998). This case easily satisfies each factor.

*First*, Intervenors' Complaint sets forth the exact same equal protection claim that the parties have already litigated. *Compare* ECF No. 28 (Intervenors' Complaint) to *Stringer I*, ECF

No. 1 (Plaintiffs' Original Complaint) at ¶¶ 1, 20-21, 59. Intervenors allege that DPS does not provide simultaneous voter registration with online DPS transactions despite doing so with mail and in-person transactions. ECF No. 28 at ¶ 27. Intervenors allege that "[b]y arbitrarily subjecting eligible voters to disparate voter registration standards, Defendants have denied voters an equal opportunity to participate in federal and state elections in violation of Section 1 of the Fourteenth Amendment." *Id.* at ¶ 33. Plaintiffs alleged the same equal protection violation in their original complaint: "Unlike Defendants' simultaneous voter registration services for license renewal or address update applications submitted in-person at a DPS office, Defendants do not provide for simultaneous voter registration[.]" *Stringer I*, ECF No. 1 at ¶ 39. There can be no doubt that Intervenors satisfied the first factor necessary to apply collateral estoppel.

*Second*, the equal protection claim was fully and vigorously litigated in the previous action. *Johnson v. United States*, 576 F.2d 606, 614 (5th Cir. 1978) ("A party who has had one fair and full opportunity to prove a claim and has failed in that effort, should not be permitted to go to trial on the merits of that claim a second time."). Defendants argued that "state law prevent[ed] them from complying with federal law." *Stringer*, 320 F. Supp. 3d at 868. Defendants consistently justified their conduct by stating that Texas law required "renewal and change of address transactions performed online [to have] a signature on paper for voter registration purposes." *Id.* at 874; *see also id.* at 877. But Defendants did not dispute the underlying facts—if anything, Defendants conceded that eligible voters were renewing their licenses and changing their addresses online and that these transactions did not simultaneously accomplish voter registration. *See id.* at 878 ("This is a very possible thing to do what you're saying if it was legal, and it's not legal . . . So I'm not contesting the logistics of it. We can agree that it's a possible thing to do.").

The Court's order turned squarely on whether Texas law prevented Defendants from

allowing simultaneous registration for online transactions with DPS. The parties vigorously litigated this question and the Court, after extensive analysis, found that Texas must allow for simultaneous registration for online transactions with DPS. *Stringer I*, 320 F. Supp. 3d at 900-901. That Intervenors, as organizations rather than individuals, now carry these claims is of no moment; the arguments are still purely legal ones, and are not dependent on the identity of the plaintiffs.

*Third*, the issues underlying Intervenors' equal protection claim were necessary to support the Court's initial judgment. *Winters*, 149 F.3d at 392 (finding this factor met when the issue "was integrally related to—indeed, it constituted the crux of—the particular judgment"). The issue underlying Intervenors' equal protection claim is whether Texas must allow for simultaneous voter registration when eligible voters complete renewal or change of address applications using DPS's online portal. *See generally* ECF No. 28. This issue was the crux of the Court's decision in *Stringer I*, which found that "[n]either the law nor the facts support Defendants' alleged justification for limiting simultaneous voter applications to in-person and mail motor voter transactions and refusing simultaneous voter applications for motor voters that renew or change their driver's license online." *Stringer I*, 320 F. Supp. 3d at 900. It is indisputable that the determination of the issue—that is, whether Texas must allow for simultaneous online voter registration—was necessary and essential to this Court's resulting judgment. *See* Restatement (Second) of Judgments § 27, cmt. j (1982) (instructing collateral estoppel should be applied when "the issue was actually recognized by the parties as important and by the trier as necessary to the final judgment").

Finally, there are no other circumstances that would otherwise make it unfair to apply collateral estoppel. Intervenors are not seeking to relitigate the issues, but instead are seeking a remedy to their injuries that already exist. *Parklane Hosiery Co.*, 439 U.S. at 330-32 (describing circumstances where applying collateral estoppel would be unfair). Defendants are precluded by

collateral estoppel from contending that their conduct does not violate equal protection.

### 3. The *Anderson/Burdick* test applies to the equal protection claims here, and does not require evidence of intentional discrimination

If the Court were to consider, once again, Defendants' arguments on the merits, Intervenors' equal protection claim is properly evaluated under the legal test derived from *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992).

Defendants appear to contend that the Intervenor political parties are required to prove intentional discrimination and disproportionate impact on Democrats in order to allege a violation of equal protection. *See* Mot. at 16-20. They are incorrect. A claim alleging a violation of equal protection in the voting context is properly evaluated under *Anderson-Burdick*. *See, e.g.*, *Rogers v. Corbett*, 468 F.3d 188, 193-94 (3rd Cir. 2006) ("[T]he *Anderson* test is the proper method for analyzing such equal protection claims due to their relationship to the associational rights found in the First Amendment"); *Republican Party of Ark. v. Faulkner Co.*, 49 F.3d 1289, 1293 n. 2 (8th Cir. 1995) (holding *Anderson* sets out proper method for balancing both associational and equal protection concerns because "[i]n election cases, equal protection challenges essentially constitute a branch of the associational rights tree"); *Fulani v. Krivanek*, 973 F.2d 1539, 1543 (11th Cir. 1992) ("In this circuit, however, equal protection challenges to state ballot-access laws are considered under the *Anderson* test."); *Rosen v. Brown*, 970 F.2d 169, 178 (6th Cir. 1992) ("utilizing the *Anderson* balancing test" in a challenge based on claims of free association and equal protection). Just as this Court considered the equal protection claim in *Stringer I*, Intervenors' claim is appropriately evaluated under *Anderson-Burdick*, despite Defendants' similar protestations. *Stringer I*, 320 F. Supp. 3d at 898.

The *Anderson-Burdick* test requires courts to weigh "the character and magnitude" of the alleged burden, against the "precise interests put forward by the State." *Burdick*, 504 U.S. at 434.

This assessment must "tak[e] into consideration the extent to which those interests make it necessary to burden the [P]laintiffs' rights." *Id*. at 428. Any burden, however slight, "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Stringer v. Pablos*, Civil No. SA-16-CV-257-OG, 2020 WL 532937, at *7 (W.D. Tex. Jan 30, 2020). No part of this assessment requires Intervenors to show intentional discrimination or disproportionate impact.

### 4.   Defendants cannot satisfy the *Anderson-Burdick* test.

As this Court previously determined, Defendants' conduct fails the *Anderson-Burdick* test and violates equal protection. *Stringer*, 320 F. Supp. 3d at 899-901. Defendants repeat the same justifications for the law that they asserted the first time around, but none justify the differential treatment of voters who engage in online transactions with DPS from voters who engage in in-person or mail transactions with DPS. *Id*. at 899-900. As this Court already determined, electronic signatures are "legally recognized and widely used" and "DPS already uses electronic records and previously imaged electronic signatures for every Texan that uses the online system for driver's license renewal or change of address." *Id*. Further, there is no evidence of fraud or potential fraud in any instance where an eligible voter wishes to simultaneously register to vote when they update their driver's license online. This Court came to the correct conclusion previously, and Defendants offer no basis to compel a different ruling on the merits, much less to justify dismissing Intervenors' complaint for failure to state a claim.

### III.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.

Dated: May 14, 2020.                    Respectfully submitted,


                                        /s/ *Emily Brailey*
                                        John Hardin
                                        TX State Bar No. 24012784
                                        PERKINS COIE LLP
                                        500 N. Akard St., Suite 3300
                                        Dallas, TX 75201
                                        Telephone: (214) 965-7743
                                        Facsimile: (214) 965-7793
                                        JohnHardin@perkinscoie.com

                                        Marc E. Elias*
                                        Aria C. Branch*
                                        Emily Brailey*
                                        John M. Geise*
                                        PERKINS COIE LLP
                                        700 Thirteenth St., N.W., Suite 800
                                        Washington, D.C. 20005-3960
                                        Telephone: (202) 654-6200
                                        Facsimile: (202) 654-9959
                                        melias@perkinscoie.com
                                        abranch@perkinscoie.com
                                        ebrailey@perkinscoie.com
                                        jgeise@perkinscoie.com

                                        *Counsel for the Intervenor-Plaintiffs*

                                        Chad W. Dunn
                                        Brazil & Dunn, LLP
                                        4407 Bee Caves Road, Suite 111
                                        Austin, Texas 78746
                                        Telephone: (512) 717-9822
                                        Facsimile: (512) 515-9355
                                        chad@brazilanddunn.com

                                        Robert Leslie Meyerhoff
                                        Texas Democratic Party
                                        314 E. Highland Mall Blvd. #508
                                        Austin, TX 78752
                                        Telephone: 512-478-9800
                                        rmeyerhoff@txdemocrats.org

                                        *Counsel for Intervenor- Plaintiff Texas*
                                        *Democratic Party*

21

*Admitted Pro Hac Vice

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2020, I filed a copy of Intervenors' Response in Opposition to Defendants' Motion to Dismiss (ECF No. 56) with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

 /s/ *Emily Brailey*
Counsel for the Intervenor-Plaintiffs