**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| JARROD STRINGER, et al., §<br>    *Plaintiffs*, §<br>§<br>v. §   No. SA-20-CV-46-OG<br>§<br>RUTH R. HUGHS, et al., §<br>    *Defendants*. § | |

### DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

The Democratic Party Intervenors[1] do not have standing to assert their claims and their participation adds nothing to this litigation. They are partisan political organizations whose sole purpose is to see their candidates elected, and they are attempting to use this Court as a platform to achieve a policy outcome, not vindicate a legal right. The Intervenors cannot show any concrete and particularized injury that stems from Defendants' conduct, nor have they presented evidence that any of their members have been aggrieved. Article III Courts are not a forum for the airing of generalized grievances. Accordingly, because the Democratic Party Intervenors lack standing and have failed to state a claim upon which relief may be granted, the Court should grant Defendants' motion to dismiss. *See* ECF No. 56 ("Mot.").

**I.   The Evidence**

    **A.   The Texas Democratic Party ("TDP")**

TDP is a partisan political organization whose singular mission is to elect Democrats to public office—not to register Texas voters who interacted with DPS online. *See* TDP Depo. at

---

[1] "Democratic Party Intervenors" or "Intervenors" means the Texas Democratic Party ("TDP"), the Democratic Congressional Campaign Committee ("DCCC"), and the Democratic Senatorial Campaign Committee ("DSCC"), collectively.

1

22:1-13 (attached hereto as Exhibit A). Although TDP purports to conduct voter registration efforts, it is impossible for TDP to determine what it has spent on these efforts, what it takes to register a new voter, or what activities TDP would be engaging in but-for the complained-of conduct. *See id.* at 45:14-21, 101:1-4. Any funds that it receives are spent at its sole discretion, and nothing that is given by a donor can be earmarked for any particular purpose (voter registration or otherwise). *See id.* at 59:21-60:3. None of TDP's voter registration outreach efforts are targeted toward individuals who may have transacted online with DPS; instead, TDP targets voters that TDP thinks—based on sophisticated data analytics—will vote for Democrats. *See id.* at 57:2-11, 64:6-18. In fact, TDP has no idea whether it has registered even a single person who transacted with DPS online. *See id.* at 101:18-22. And TDP produced no evidence regarding whether any of its members are eligible and intend to interact with DPS online to change their address or renew their driver license. *See id.* at 108:21-109:6.

     **B.**    **DCCC**

DCCC is a national organization whose purpose is to elect Democrats to the U.S. House of Representatives. *See* DCCC Depo. at 6:19-24, 42:16-43:2 (attached hereto as Exhibit B). DCCC cannot specify how much of its political expenditures are used for voter registration efforts during past election cycles. *See id.* at 77:10-18, 78:23-79:20. Although DCCC speculated that some of the expenditures it made this election cycle might have been used for activities related to voter registration, the record shows that those funds were given to TDP and to a vendor to provide consulting and training services. *See id.* at 81:5-14, 82:10-22. DCCC does not know what percentage of its staff's time is spent on voter registration efforts, which are commingled with other organizational objectives targeted to elect democratic congressional candidates, such as voter persuasion. *See id.* at 84:8-10, 85:22-86:23. Nor does DCCC know how much it costs to register a

new voter. *See id.* at 88:8-24. DCCC's sole target group for its voter registration efforts are potential Democratic voters. *See id.* at 89:4-16. DCCC does not even track the number of people it interacts with who transact with DPS online, and it cannot identify any such voters. *See id.* at 98:2-8, 101:17-21. DCCC considers its members to be the Democratic members of the U.S. House of Representatives, *see id.* at 108:2-109:5, and it has produced no evidence regarding whether any of them are eligible and intend to interact with DPS online to change their address or renew their driver license.

### C.   DSCC

DSCC's sole mission is to elect Democratic candidates to the U.S. Senate. *See* DSCC Depo. at 21:6-14 (attached hereto as Exhibit C). DSCC accomplishes this mission by, among other things, transferring funds to state-level democratic party organizations, who may use that money however they wish. *Id.* at 30:2-13. DSCC did not transfer any funds to TDP in past election cycles. *Id.* at 39:23-40:8. And it provided no evidence that any funds invested in Texas in past election cycles were used for voter registration efforts. *See id.* at 39:23-40:8, 41:8-12. DSCC has made three investments in Texas this election cycle, but there is no evidence that any of those funds were used for voter registration efforts. *See id.* at 39:13-21. Instead, DSCC supported polling efforts unrelated to voter registration, *id.* at 38:24-39:3, and contributed the maximum amount to the MJ Hegar campaign, to be used at the campaign's discretion, *id.* 30:17-31:3. It did not contribute anything to TDP until *after* filing this lawsuit, *id.* at Ex. 5, and it cannot show that any of those funds were used to register voters (let alone how much), *id.* at 30:2-13. Moreover, DSCC produced no evidence regarding whether it has any members at all, and certainly has not identified any members who are eligible and intend to interact with DPS online to change their address or renew their driver license.

## II.   The Democratic Party Intervenors Cannot Demonstrate Standing

Nothing that the Democratic Party Intervenors produced during discovery was sufficient to demonstrate that they have standing to bring their claims. Defendants continue to maintain their challenge to all aspects of the Intervenors' assertion of standing, on which Intervenors bear the burden of proof at all stages of the litigation. But the Intervenors' evidence with respect to organizational and associational standing is particularly lacking, as described below, and this alone provides ample basis for the Court to dismiss their claims.

### A.   Organizational Standing

As explained in Defendants' motion to dismiss, the Democratic Party Intervenors failed to allege facts sufficient to constitute an injury-in-fact. *See* Mot. at 6-10. After discovery, it is clear that they cannot demonstrate any legally cognizable injury. Accordingly, the Democratic Party Intervenors lack standing to proceed in their own right.

The Democratic Party Intervenors are required to prove to this Court that they have suffered a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources [that] constitutes far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). "Not every diversion of resources to counteract [a] defendant's conduct, however, establishes an injury in fact." *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010). The alleged injury must be in some way "different from the plaintiffs' daily operations." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (citing *City of Kyle*, 626 F.3d 233); *see also Common Cause/Ga. v. Billups*, 554 F.3d 1350 (11th Cir. 2009) (holding that an organization can show standing if it demonstrates that it "will divert resources from its regular activities" to counteract defendants' allegedly illegal conduct). And, importantly, a plaintiff must have standing

not only throughout the life of the litigation, but at they time they filed suit. *See, e.g.*, *Pluet v. Frasier*, 355 F.3d 381, 386 (5th Cir. 2004); *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1288 (5th Cir. 1992).[2]

Courts are "not responsible for vindicating generalized partisan preferences." *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018). "Frustration of an organization's objectives is the type of abstract concern that does not impart standing." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161-62 (D.C. Cir. 2005) (quotation omitted). Mere "hope of achieving a Democratic majority in the legislature . . . is a collective political interest, not an individual legal interest," and does not constitute an injury-in-fact for standing purposes. *Gill*, 138 S. Ct. at 1932. "Harm to an organization's generalized partisan preferences describes only 'a setback to [its] abstract social interests,' which is insufficient to establish a concrete injury in fact." *Jacobson v. Fla. Sec'y of State*, No. 19-14552, 957 F.3d 1193, at *8 (11th Cir. Apr. 29, 2020) (quoting *Havens Realty*, 455 U.S. at 379). "An organization's general interest in its preferred candidates winning as many elections as possible is still a 'generalized partisan preference[]' that federal courts are "not responsible for vindicating[.]'" *Id.* (quoting *Gill*, 138 S. Ct. at 1933). Each of the Democratic Party Intervenors is clear that their sole mission is to elect Democratic candidates, as discussed above. Accordingly, the sole interest they seek to vindicate constitutes a mere "generalized partisan preference" that cannot form the basis of an injury-in-fact for standing purposes.

Moreover, the Democratic Party Intervenors must show an explicit connection between the challenged practice and the alleged injury. For example, in *ACORN v. Fowler*, 178 F.3d 350 (5th

---

[2] *See also, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 191 (2000) (recognizing that, unlike mootness, "[s]tanding admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum")

Cir. 1999), the plaintiff organization brought three claims challenging Louisiana's voter registration practices on the theory that they violated the NVRA. ACORN demonstrated that it "engages in voter registration drives in Louisiana, that it provides voter registration applications to unregistered potential members, and that it makes voter registration applications available at housing fairs that it attends throughout the year." *Id.* at 359. ACORN also demonstrated that it "hired staff" to conduct voter registration training, "coordinated voter registration drives," and supervised staff, among other similar activities. *Id.* And ACORN claimed "that its efforts registering voters in Louisiana counteract the appellees' failure to properly implement the NVRA." *Id.* at 360.

The Fifth Circuit found that with respect its first two claims, ACORN had not demonstrated an injury. The court discounted much of ACORN's evidence regarding its staff hiring and supervision because ACORN did not show that these activities were "a direct result of Louisiana's alleged failure to properly implement the NVRA." *Id.* at 360. The court also doubted "ACORN's allegations of injury due to including voter registration applications with its membership applications or 'set[ting] up' a voter registration table at housing fairs that it already attends," and found that such activities did not constitute a perceptible impairment caused by the "purported failure to implement the NVRA." *Id.* (citing *Havens Realty*, 455 U.S. at 379). None of these activities were shown to have the requisite connection to the challenged activity that is necessary to demonstrate organizational standing. *See id.*

ACORN was found to have raised a genuine issue of material fact regarding its third claim because it "concentrated" one voter registration drive to specifically target "a population directly affected by one of the NVRA requirements that ACORN claims Louisiana has failed to implement." *Id.* at 361. The court found that ACORN was injured by having to conduct this highly

targeted voter registration effort because those resources were expended to register voters in a way that specifically "counteract[ed] Louisiana's alleged failure to implement the [NVRA]." *Id.* This was the only injury that the court found to be "concrete and demonstrable." *Id.* at 362. But with respect to all of ACORN's other voter registration efforts, "[t]here is simply no suggestion in the record that anyone it has registered through its voter registration drives would already have been registered to vote if Louisiana implemented the NVRA requirements that form the basis of its first two claims." *Id.*

The Democratic Party Intervenors' evidence does not demonstrate that *any* of their voter registration activities are conducted specifically to counteract Defendants' alleged practices. Unlike ACORN's evidence regarding its third claim, which suggested that it may have been injured to the limited extent that some of its efforts were "concentrated" to reach a specific group, *see id.* at 361, the Democratic Party Intervenors do not target voter registration activities directed at individuals who transacted with DPS online. Instead, as discussed above, the evidence demonstrates that any voter registration efforts they undertake are carefully calculated to reach voters likely to vote for Democrats. Accordingly, their efforts are not specifically connected to the challenged practices.

To the extent any Intervenor has evidence that it engages in voter registration efforts in Texas, those are activities that they would have engaged in regardless of Defendants' alleged conduct, and the Intervenors have not shown that any of their activities are "a *direct result* of [Texas's] alleged failure to properly implement the NVRA." *Id.* at 360 (emphasis added). None of the materials that they produced in discovery discuss any particular efforts directed at those who transacted online with DPS. Indeed, none of the Democratic Party Intervenors can offer proof showing how many individuals—if any at all—"would already have been registered to vote if

7

[Texas] implemented the NVRA requirements that form the basis of its . . . claims." *Id.* at 362; *see supra*, Part I.

The Democratic Party Intervenors essentially argue that because they engage in some voter registration efforts, they have standing to challenge any voter registration practice with which they disagree or which does not align with their preferred policy. But this is not the law. The Democratic Party Intervenors must show a "concrete and demonstrable" injury, *Havens Realty*, 455 U.S. at 379, yet they cannot identify even one dollar that was spent or one voter that was registered as a result of their efforts to counteract this *particular* practice. None of their purported activities constitute anything other their routine "daily operations." *OCA-Greater Hous.*, 867 F.3d at 612. Accordingly, the Democratic Party Intervenors have not shown that they have suffered a concrete and demonstrable injury as a result of Defendants' practices, and they do not have standing to bring their claims.

### B.     Associational Standing

To the extent that the Democratic Party Intervenors claim standing to vindicate their members' injuries, they also fail. "'Standing,' [the Supreme Court has] said, 'is not 'an ingenious academic exercise in the conceivable' . . . [but] requires . . . a factual showing of perceptible harm.'" *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 566 (1992)). The Supreme Court "has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm." *Id.* at 499. The Democratic Party Intervenors have not identified any such member or demonstrated facts that show how even one of their members has been aggrieved by the Defendants' conduct. Accordingly, the Democratic Party Intervenors do not have standing.

The Democratic Party Intervenors rely on *Hancock County Board of Supervisors v. Ruhr*, 487 F. App'x 189 (5th Cir. 2012), for the proposition that they do not need to identify a specific aggrieved member. *See* ECF No. 71 at 12 ("Opp."). But whatever the relevance of *Hancock*— neither it nor the Intervenors cite or discuss the clear pronouncement in *Summers* on the issue— the lessened pleading standard that it describes is both irrelevant in this case because the parties have now conducted discovery, and legally untenable because the Supreme Court recently reaffirmed that "the essential elements of a claim remain constant through the life of a lawsuit." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1014 (2020). The Democratic Party Intervenors' failure to demonstrate with evidence that any of its members would have standing is therefore fatal to their assertion of associational standing.

The Democratic Party Intervenors alternatively rely on the expansive argument that any voter who casts a ballot for a Democrat is one of their members for standing purposes. *See* Opp. at 11. Even if Intervenors were not required to allege and demonstrate a formal membership structure, they must show that their constituents "possess all of the indicia of membership in an organization," such as electing the organization's members, serving in the organization, and financing its activities. *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 344-45 (1977). The evidence here falls well short of this standard. And in any event, Intervenors have failed to demonstrate that any one of their members would have standing in their own right, even under this expansive definition. Accordingly, any assertion of associational standing fails.

### III. Collateral Estoppel is Inapplicable

Defendants have explained in their motion to dismiss why the Democratic Party Intervenors' equal protection claim is without merit, and their opposition adds nothing of substance. *See* Opp. at 20. Instead, the Intervenors rely solely on the Court's prior rulings in

*Stringer I*—a case which did not involve them—and assert that collateral estoppel precludes Defendants from even mounting a defense. *See* Opp. at 16-19. But the Democratic Party Intervenors egregiously misconstrue the doctrine of collateral estoppel, also known as issue preclusion, which has no application to this litigation whatsoever.

"[A] civil judgment generates issue preclusion only when it's 'valid and final.'" *Langley v. Price*, 926 F.3d 145, 164 (5th Cir. 2019) (quoting Restatement (Second) of Judgments § 27 (Am. Law Inst. 1982)). "[O]nce a civil judgment is reversed on appeal, it's obviously no longer 'valid' and retains *zero* preclusive effect." *Id.* The Fifth Circuit reversed and vacated the judgment in *Stringer I* in its entirety due to the plaintiffs' lack of standing; no part of that order survived. *See Stringer v. Whitley* (*Stringer I*), 942 F.3d 715 (5th Cir. 2019). Accordingly, that prior judgment "retains *zero* preclusive effect." *Langley*, 926 F.3d at 164. The Democratic Party Intervenors waste this Court's time in suggesting otherwise.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/Christopher D. Hilton*
CHRISTOPHER D. HILTON
Texas Bar. No. 24087727
ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorneys General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov
christopher.hilton@oag.texas.gov

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I certify that on May 21, 2020, the foregoing document was filed electronically via the Court's CM/ECF system causing electronic service upon all counsel of record.

*/s/Christopher D. Hilton*
CHRISTOPHER D. HILTON
Assistant Attorney General