IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JARROD STRINGER, et al.,      *
    Plaintiffs,          *
                   *
v.                            *          No. SA-20-CV-46-OG
                   *
RUTH R. HUGHS, et al.,        *
    Defendants.          *

VIDEOCONFERENCED DEPOSITION OF

THE CORPORATE REPRESENTATIVE OF

THE TEXAS DEMOCRATIC PARTY,

TOMMY GLEN MAXEY

Monday, April 27, 2020


VIDEOCONFERENCED DEPOSITION OF TOMMY GLEN

MAXEY, produced as a witness at the instance of the

Defendants, and duly sworn, was taken in the

above-styled and numbered cause on Monday, April 27,

2020, from 10:03 a.m. to 2:04 p.m., before Debbie D.

Cunningham, CSR, in and for the State of Texas, remotely

reported via Machine Shorthand, pursuant to the Federal

Rules of Civil Procedure.

--ooOoo--

```
 1                     APPEARANCES

 2

 3   FOR PLAINTIFFS:

 4        TEXAS CIVIL RIGHTS PROJECT
          1405 Montopolis Drive
 5        Austin, Texas  78741
          (T) 512.474.5073
 6
          By:  Joaquin Gonzalez, Esq.
 7             joaquin@texascivilrightsproject.org

 8
     FOR PLAINTIFF INTERVENOR:
 9
          PERKINS COIE
10        700 13th Street, NW, Suite 800
          Washington, D.C.  20005-3960
11        (T) 202.654.6200

12        By:  John Geise, Esq.
               jgeise@perkinscoie.com
13                     AND
               Aria C. Branch, Esq.
14             abranch@perkinscoie.com
                       AND
15             Emily Brailey, Esq.
               ebrailey@perkinscoie.com
16

17   FOR DEFENDANTS:

18        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
          General Litigation Division
19        300 W. 15th Street
          Austin, Texas  78701
20        (T) 512.463.2120

21        By:  Anne Marie Mackin, Esq.
               anna.mackin@oag.texas.gov
22                     AND
               Christopher D. Hilton, Esq.
23             christopher.hilton@oag.texas.gov

24
     VIDEOGRAPHER:  Brian Christopher
25
```

3

1                          INDEX

2    APPEARANCES                                  2

3

4    EXAMINATION OF TOMMY GLEN MAXEY:

5     BY MS. MACKIN                               6

6     BY MR. GEISE                                112

7     BY MS. MACKIN                               115

8

9

10    REPORTER'S CERTIFICATION                    117

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          EXHIBIT INDEX

2

3   Exhibit Number      Description                    Page

4
    Exhibit 1      Defendants' Notice of Oral            9
5                  Deposition Pursuant to
                   Federal Rule of Procedure 30
6
    Exhibit 2      Plaintiffs' Production in            17
7                  Response to Subpoena

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    (Monday, April 27, 2020, 10:03 a.m.)

2                         P R O C E E D I N G S

3                    THE REPORTER:  Today is April 27th, 2020.

4    This is the deposition of the Texas Democratic Party

5    Representative, Glen Maxey, in the matter of Jarrod

6    Stringer, et al. versus Ruth R. Hughes, et al.  We are

7    remotely situated due to COVID-19 and are appearing via

8    Zoom conference.  We are now on the record at

9    10:03 a.m., Central time.

10                   My name is Debbie Cunningham; and my

11   business address is P.O. Box 245, Manchaca, Texas.

12                   Would all persons present please

13   introduce themselves for the record?

14                   MS. MACKIN:  This is Anna Mackin with the

15   Texas Office of the Attorney General on behalf of the

16   Defendant.

17                   MR. GEISE:  This is John Geise from the

18   law firm of Perkins Coie, LLP, on behalf of Plaintiff

19   Intervenor Texas Democratic Party.

20                   MS. BRANCH:  This is Aria Branch from

21   Perkins Coie on behalf of the Plaintiff Intervenor,

22   Texas Democratic Party.

23                   MS. BRAILEY:  This is Emily Brailey also

24   from Perkins Coie on behalf of the Plaintiff Intervenor,

25   Texas Democratic Party.
```

1          THE WITNESS:  I'm Glen Maxey from the

2   Texas Democratic Party.

3          MR. GONZALES:  This is Joaquin Gonzales

4   on behalf of Plaintiffs, Jarrod Stringer, et al.

5          (Witness sworn by the reporter.)

6          MS. MACKIN:  And I'd just like to note on

7   the record that the parties have stipulated that that

8   oath can be taken remotely.

9                  GLEN MAXEY,

10  having taken an oath to tell the truth, the whole truth,

11  and nothing but the truth, was examined and testified as

12                  follows:

13                EXAMINATION

14  BY MS. MACKIN:

15     Q.   All right.  Good morning, Mr. Maxey.

16     A.   Good morning.

17     Q.   Please speak and spell your name for the

18  record.

19     A.   Tommy Glen Maxey, T-O-M-M-Y G-L-E-N M-A-X-E-Y.

20     Q.   Thank you.

21          My name is Anna Mackin.  I represent the

22  Defendants in this case, and I'm going to be asking you

23  some questions today.  You have been deposed before; is

24  that right?

25     A.   That's correct.

1      Q.    Okay.  So you're probably familiar with what

2   we're about to cover; but I want to briefly go over some

3   ground rules, which are especially important given that

4   we're remotely situated and using this videoconference

5   technology to take your deposition today.

6              Please try to give a verbal answer to my

7   questions.  "Yes" or "no" works a lot better than

8   "uh-huh" or "huh-uh" because it makes sure that the

9   record is clear and Ms. Cunningham is writing down

10   everything that we say.  Okay?

11      A.    All right.

12      Q.    Okay.  And please try to let me finish a

13   question before you begin your answer.  I will also

14   endeavor to allow you to finish your answer before I

15   ask my next question.  This is, again, so that

16   Ms. Cunningham can get an accurate record of everything

17   that is said.  Okay?

18      A.    Okay.

19      Q.    And if you don't understand one of my

20   questions today, will you please tell me so that I can

21   rephrase it?

22      A.    Yes, ma'am.

23      Q.    Thank you.

24              And if you do answer, I will assume that

25   you have understood the question.  Is that fair?

1      A.    That's fair.

2      Q.    Okay.  A reminder:  You are under oath, sworn

3  to tell the truth as if testifying at a courthouse in

4  front of judge and a jury under penalty of perjury if

5  you do not tell the truth.  Do you understand that?

6      A.    I do.

7      Q.    Okay.  And this is not an endurance contest.

8  You are the talent here.  So if you ever need a break,

9  need to stretch your legs, use the restroom, please just

10 let me know; and we'll take a break.  I'll just ask that

11 you answer any question that is pending before we go on

12 break.  Okay?

13     A.    All right.

14     Q.    All right.  Is there any reason that you might

15 not be able to answer my questions honestly, completely,

16 and accurately today?

17     A.    Nothing at all.

18     Q.    Okay.  So during today's deposition I'm going

19 to show you some documents by publishing them on the

20 screen.  If you have trouble seeing a document, just let

21 me know.  I can zoom in or out, scroll up or down

22 however you need me to.  Just let me know that I need to

23 do that.  Okay?

24     A.    All right.  Let me just say that I learned

25 last time that with my progressive glasses, sometimes

1   I'm going to have to move the screen to see.  So I

2   might -- my picture might go out of the frame while I'm

3   tilting the computer.

4       Q.   Okay.  Understood.  And we also have a way to

5   send around a little link.  If it's not really working

6   for me to publish the document on the screen, I can

7   share a link in the chat box; and that will allow

8   everybody to download whatever document we're talking

9   about.  So we can explore what we need to do to make

10  sure that you're seeing the documents clearly.

11      A.   Thank you.

12      Q.   Of course.  So let's go ahead and practice

13  with what's going to be Exhibit 1 to this deposition.

14           MR. GEISE:  Can we actually just send

15  around the chat links as a matter of course so that

16  counsel can download them as well?

17           MS. MACKIN:  Sure, sure.  That's fine.

18  Let me stop this share, and I will circulate...

19           MR. GEISE:  Yeah, we've had these hiccups

20  before; and it just ended up being easier.

21           MS. MACKIN:  Not a problem.  We are all

22  learning on the job a little bit when it comes to these

23  depositions.

24           MR. GEISE:  I was in a deposition where

25  Debbie got cut out because she -- her house got struck

 1 | by lightening, so that was a particular --

 2 |                 MS. MACKIN:  Oh my gosh.  Are you all

 3 | right?

 4 |                 THE REPORTER:  Yes.

 5 |                 MR. GEISE:  That was particularly

 6 | different.

 7 |                 MS. MACKIN:  Yeah.

 8 |                 All right.  So I've sent around the

 9 | document in the chat box.

10 |                 MR. GEISE:  Yeah, I got it.  It worked

11 | for me.  Thank you.  Appreciate it.

12 |                 MS. MACKIN:  Sure.

13 |                 (Exhibit 1 marked.)

14 |     Q    (BY MS. MACKIN)  Mr. Maxey, are you able to

15 | view that document?

16 |     A.   Yes.

17 |     Q.   Okay.  And have you seen this document before?

18 |     A.   Yes.

19 |     Q.   What is it?

20 |     A.   It's the Defendants' Notice of Oral Deposition

21 | pursuant to Federal Rule of Civil Procedure 30, in

22 | Jarrod Stringer versus Ruth Hughs.

23 |     Q.   And do you understand that you are here today

24 | giving this deposition pursuant to this Notice of

25 | Deposition?

1     A.   Yes.

2     Q.   And that your testimony today is on behalf of

3  the Texas Democratic Party, and your answers will bind

4  the Texas Democratic Party?

5     A.   That's correct.

6     Q.   Okay.  And throughout this conversation today

7  when I say "TDP," I'm going to be referring to the Texas

8  Democratic Party, just to be clear about that; and if

9  you say "TDP," I'll also understand you to be referring

10  to the Texas Democratic Party unless you tell me

11  otherwise.  Okay?

12     A.   All right.

13     Q.   All right.  So I'd like to -- before we jump

14  into the substance, I'd like to go over the seven topics

15  for this corporate representative deposition.  So if I

16  could have you please scroll down to page 5 of this

17  notice.

18     A.   All right.

19     Q.   So Topic 1 is your mission, "your" meaning

20  that of TDP.  Are you designated to testify on this

21  topic?

22     A.   Yes.

23     Q.   Okay.  And Topic 2, "Your organization,

24  including your organizational structure, employees,

25  physical assets, parent and sibling entities, tax

1   status, and history; the services that you provide and

2   the activities that you perform."  Are you designated to

3   testify on this topic?

4        A.   Yes.

5        Q.   And Topic 3, "Your funding sources, funding

6   amounts, operational expenses, operational budget, and

7   funding activities between January 1st, 2014 and the

8   present."  Are you designated to testify on this topic?

9        A.   Yes.

10       Q.   Topic 4, "All activities on which you have

11  spent funds or to which you have dedicated resources in

12  Texas between January 1st, 2014 and the present."  And

13  then it lists, "including," several subtopics.  Are you

14  designated to testify on Topic 4?

15       A.   To the level that they are not protected under

16  our organizational First Amendment rights.

17       Q.   And what do you mean by that?

18       A.   Well, it's my understanding that, as an

19  entity, that we have the ability to not disclose our

20  day-to-day operational things; but I can, to the level

21  my attorney tells me, answer this question -- these

22  questions in Number 4.

23       Q.   And there isn't another person who would be

24  designated to testify on Topic Number 4, is there?

25       A.   No.  I am it.

1   Q.   You are it.   All right.

2              Topic 5, "All activities on which you

3   plan to spend funds or to which you plan to dedicate

4   resources in Texas between the present and January 1st,"

5   2014 [sic.]   Mr. Maxey, are you designated to testify on

6   this topic?

7   A.   Well, it's 2024, not 2014, but --

8   Q.   Correct.   Apologies.

9   A.   Yes, I am.

10   Q.   Thank you for keeping me honest.   I appreciate

11   it.

12              Topic 6, "The allegations in your

13   Complaint and the factual bases therefor."   Are you

14   designated to testify on this topic?

15   A.   I am.

16   Q.   And the word "Complaint" as used in Topic 6,

17   do you understand that to mean the Complaint that your

18   attorneys filed on behalf of the Texas Democratic Party,

19   the DSCC and the DCCC in this lawsuit?

20   A.   Yes.

21   Q.   Okay.   Thank you.

22              And then Topic 7, "Your members who are

23   eligible to use the DPS website for a driver license

24   renewal or change-of-address transaction and intend to

25   do so."   Are you designated to testify on this topic?

1    A.   Yes.

2    Q.   All right.  And, finally, Number 8, "The

3  documents produced in response to the subpoena duces

4  tecum," described and attached to the Deposition Notice.

5  Are you designated to testify on this topic?

6    A.   I have no idea what those words mean, but I

7  suppose I am.

8    Q.   Okay.  Is it your understanding that some

9  documents have been produced to the Defendants by your

10  attorneys --

11    A.   Yes.

12    Q.   -- and that we can talk about them today?

13    A.   Absolutely.

14    Q.   All right.  Sounds good.

15         All right.  So how did you prepare for

16  today's deposition, Mr. Maxey?

17    A.   I reviewed all of the documents that were

18  shared to me by my attorney.  I had conversations with

19  my attorney about the general scope of what we would

20  discuss today.

21    Q.   And which documents did you review?

22         MR. GEISE:  Objection, attorney-client

23  privilege.  I think he said he reviewed documents

24  provided to him by counsel.  So I would instruct the

25  witness only to answer any documents that were not

1    provided by counsel.

2              MS. MACKIN:  Is it your position that

3    we're going --

4              (Simultaneous speakers.)

5              MS. MACKIN:  -- document is that that's

6    privileged because I'm not asking him about advice of

7    counsel.  I'm simply asking which documents he relied

8    upon to prepare to testify on the topics.

9              MR. GEISE:  I think that if he was

10   provided documents by counsel, then which documents he

11   was provided to review in preparation for the deposition

12   is attorney work product and goes to the mental

13   impressions of counsel.

14             So if you reviewed any documents outside

15   of those provided by counsel, I would -- you can answer

16   that.  If the only documents you reviewed were documents

17   which counsel provided you to review, I would instruct

18   you not to answer.

19             I think he's allowed to answer how many

20   documents he reviewed, but -- or the general topics of

21   documents he reviewed.

22             But I think that specific documents you

23   reviewed, I would instruct you not to answer.  So with

24   that instruction, you can answer the number of documents

25   you reviewed and the general scope of the documents you

1    reviewed.

2                 MS. MACKIN:  I'd just like to note on the

3    record that I don't think that's correct.  Of course,

4    the witness is able to answer to the extent that he

5    feels is appropriate; but the mere fact of reviewing a

6    document and the nature of what the document is is not

7    protected.

8                 MR. GEISE:  And, again, I would instruct

9    the witness that I believe that reviewing specific

10   documents selected by counsel goes to the mental

11   impressions and work product of counsel.  And I would

12   instruct the witness to answer a summary, a general

13   summary of the documents -- well, a general summary of

14   the documents you reviewed at a high level and the

15   number.  And that's what I would instruct the witness to

16   answer.

17        A.   So I reviewed approximately, I would say,

18   maybe about 50 documents that were sent to me by counsel

19   that all appeared to be the filings in this case alone.

20   I have not looked at any document, done any research

21   outside of my general knowledge about the Texas

22   Democratic Party in response to doing this deposition.

23   I have not looked at anything outside of what came that

24   appeared all to be things that have already been

25   produced into the record or will be produced into the

17

1    record in this lawsuit.

2         Q.   So you did not search any files for documents

3    in preparation for today's deposition?

4         A.   No.  My brain is it.

5         Q.   Did you bring any documents with you today?

6         A.   Nope.

7         Q.   Your attorneys have produced 55 PDF files to

8    us as a response to the subpoena attached to this

9    Notice.  I'm going to make all of those files Exhibit 2

10   to this deposition.

11             (Exhibit 2 marked.)

12        Q.   (BY MS. MACKIN)  We will pull up a few of them

13   later on to look at them, but the documents that were

14   produced to us all appear to be e-mails sent by the

15   Texas Democratic Party to, be it -- well, it was not

16   clear who they were sent to; but they appeared to be

17   externally- sent e-mails, not within the Party, but sent

18   outside of TDP.  Did you review any of those documents

19   in preparation for your deposition?

20        A.   I did.  I went through each one of them

21   opened.  There were some of them that were garbled that

22   I couldn't read, but they seemed to be in the same vein

23   as the previous ones; and historically every one of

24   those e-mails I also received in my inbox when they were

25   originally sent.

1           MS. MACKIN:  Okay.  And I'm just going to

2    memorialize, again, on the record our objection to

3    withholding documents that the witness reviewed in

4    preparation for today's deposition, and we do request a

5    supplementation of that production to ensure --

6           THE WITNESS:  I --

7           (Simultaneous speakers.)

8           MR. GEISE:  Well, Glen, you don't --

9    Glen, you don't have to answer.

10          We can discuss that after the deposition

11   or off the record of the deposition.  We are happy to

12   discuss our -- we maintain that the Texas Democratic

13   Party has publicly available financial records and that

14   anything that is an internal Party document is subject

15   to the First Amendment privilege, is not critical to the

16   needs of this case or critical to establishing the Texas

17   Democratic Party's standing and that --

18          MS. MACKIN:  I think, Counsel, we can

19   discuss --

20          MR. GEISE:  We can discuss that off the

21   record.  We don't need to have that discussion now.

22          MS. MACKIN:  I'm just preserving our

23   objection on the record.

24          MR. GEISE:  Yes, understood.  And I'm

25   preserving our response; but, yes, we can talk after.

Texas Democratic Party - 4/27/2020

1      Q    (BY MS. MACKIN)  All right.  Mr. Maxey, did

2  you meet with anyone at TDP to prepare for today's

3  deposition?

4      A.   No, ma'am.

5      Q.   And how many times did you meet with counsel

6  to prepare for today's deposition?

7      A.   Once.

8      Q.   And how long did you meet with counsel?

9      A.   I think approximately an hour.

10     Q.   Okay.  And are you adequately familiarized

11 with the facts to testify as TDP's representative today?

12     A.   I believe so.

13     Q.   Okay.  Just a brief discussion of your

14 background, Mr. Maxey.  You are currently employed by

15 TDP; is that correct?

16     A.   That's correct.

17     Q.   What is your job title?

18     A.   Currently my job title is Primary Director.

19     Q.   How long have you held that position?

20     A.   Well, I work for the Texas Democratic Party

21 year round; and I use different titles depending on the

22 time of the election cycle.  For instance, during the

23 legislative session, I am the Legislative Director.  I

24 lobby for the Party and election issues before the Texas

25 Legislature.  So during the primary season, which begins

1  approximately September 1st of the odd year, through the

2  month after the runoff election, which is now going to

3  be August, I have the title of Primary Director because

4  we're in the period of having our Democratic primary and

5  primary runoff.

6        Q.   Do you report to anyone in your role with the

7  Texas Democratic Party?

8        A.   I report to the chairman of the Party,

9  Gilberto Hinjosa and Manny Garcia.

10        Q.   And does anyone report to you?

11        A.   I'm -- I do not have general employees

12  reporting to me.  I am a senior advisor.  So many of the

13  employees come to me for advice about election law, job

14  descriptions, things that I am knowledgeable of, since

15  I've been doing this over 50 years and most of them are,

16  you know, in their twenties.  And Luke Warford, who is

17  the Director of Voter Registration -- or Voter

18  Expansion, which is voter registration and vote by mail

19  and those kind of programs, reports directly to me.

20        Q.   Okay.  So Luke Warford is your direct report;

21  and then for others, you are a wealth of institutional

22  knowledge, so to speak?

23        A.   Yes.

24        Q.   Okay.  Who made the decision that the Texas

25  Democratic Party would join this lawsuit?

1          MR. GEISE:  Objection.  I think that that

2    goes to attorney-client privilege as well as the First

3    Amendment privilege.  I would instruct the witness not

4    to answer.

5          MS. MACKIN:  To be clear, I'm not asking

6    why the Texas Democratic Party decided to join this

7    lawsuit.  I'm simply, under the topic of the

8    organizational structure, seeking to understand those

9    lines of authority.

10          MR. GEISE:  I don't think that how the

11   Texas Democratic Party makes strategic litigation

12   decisions -- I think that's First Amendment privileged

13   and not relevant to this lawsuit.  I would instruct the

14   witness not to answer.

15          MS. MACKIN:  And I'll note again I didn't

16   ask how that decision was made.  I asked for the

17   identity of the individual with the decision rights to

18   make it.

19          MR. GEISE:  Understood.  I would still

20   instruct the witness not to answer.

21      A.   Therefore, I will not answer under the advice

22   of counsel.

23      Q.   (BY MS. MACKIN)  You're following the advice

24   of your counsel.  Okay.

25          All right.  I want to jump into Topic 1.

1  What is the mission of the Texas Democratic Party?

2      A.   The mission of the Texas Democratic Party is

3  to elect people who call themselves Democrats to public

4  office at all levels, from president to public offices,

5  such as city councils and school boards, that are

6  non-partisan.  But anybody who believes in the

7  Democratic philosophy, agrees with our platform.  We

8  educate voters.  We register voters so that they are

9  capable of casting a ballot.  We inform voters about

10  issues and candidates.  We run coordinated campaigns to

11  elect those Democrats.  There are literally thousands of

12  different pieces of all of that, but generically it's

13  electing Democrats to public office.

14      Q.   Okay.  Has the mission of the Texas Democratic

15  Party changed over time?

16      A.   No.  I mean, the fundamental mission, you

17  know, began when the Party was formed in the early 1800s

18  to be the mission of electing people of our Party, with

19  our general philosophy and support our platform, to

20  public office.  That's always been our mission.  I don't

21  think we've deviated very far with that.  How we do

22  that, methodologies, have changed radically over time;

23  and certainly radically just in the last decade,

24  radically in the last months because of the pandemic.

25  So methodologies have changed, but mission has not.

```
 1        Q.   And when you say methodologies have changed,
 2   how have those methodologies changed?
 3        A.   Well, there was not a -- when I started in
 4   this business doing Democratic Party work, there were
 5   no computers.  I started out on a manual typewriter
 6   without -- not even with white-out or a corrective
 7   ribbon.  So the access to cellphones versus land lines
 8   versus party lines over the 50 years I've been doing
 9   this, access to whether you could do -- you know, I have
10   been from hand address the envelope, to stick on the
11   adhesive label, to laser printing at a mail shop over
12   the 50 years that I've been doing this.
13             So, I mean, all kinds of technology, all
14   kinds of communications, the fact that you can now talk
15   to tens of thousands of people simultaneously through
16   an e-mail is radically different than when we had to
17   phone each individual voter one by one when I started a
18   mere -- in the 1980s, you know.  So the methodologies of
19   communicating and the fact that we have a voter
20   registration system where a person has to fill out the
21   paper form and put a wet signature on it that has
22   changed over the years to the ability of people who can
23   be registered to vote when they get their driver's
24   license renewed or registered or get a driver's license
25   for the first time, which brings us all the way to this
```

24

```
 1   lawsuit.  The State of Texas is refusing to follow

 2   federal law in registering a person to vote when they

 3   change their driver's license address.

 4              MS. MACKIN:  I'm going to object to the

 5   last sentence as nonresponsive to the question.

 6        Q.   (BY MS. MACKIN)  I would like to ask you,

 7   Mr. Maxey, you mentioned that in the past few months,

 8   even, methodologies have changed in light of the

 9   pandemic.  Can you tell me a little bit about how that

10   has changed?

11        A.   Well, I would have had right now literally

12   dozens upon dozens of TDP employees knocking on doors

13   and being in the living rooms of voters or on their

14   porch having conversations about registering to vote.

15   Because of the COVID-19 those person-to-person

16   interactions are not happening.  So now we're having to

17   do things in a different way of e-mail and phone calling

18   and other kinds of things, sort of a throwback to what

19   we did 50 years ago.  So person-to-person communications

20   are not possible in social-distancing situations or at

21   least not advisable.  We're not putting people at risk

22   to even put people in the situation that they have to be

23   6 foot apart.  We don't want anybody to -- until the

24   governor and the president say it's all clear, we won't

25   be doing that kind of door-to-door campaigning.
```

25

1    Q.   Okay.  I want to talk about TDP's

2  organizational structure.  Can you explain to me how TDP

3  is structured?

4    A.   How it's structured governance-wise?

5    Q.   Yes, sir.

6    A.   The Texas Democratic Party has an Executive

7  Committee that's elected at our quadrennial state

8  conventions by delegates that are elected that consist

9  of a chairman and a vice chair and then 62 people, 31 --

10  two from each of the 31 state Senate districts, a man

11  and a woman.  So it's a 64-member Executive Committee

12  that's outlined in the Texas Election Code statutorily,

13  membership of that committee.  They make the policy.

14  The Executive Director hires -- I mean, the State Chair

15  hires an Executive Director.  The Executive Director

16  hires a staff.  The staff reports to the Executive

17  Director.  The Executive Director reports to the State

18  Chair.

19    Q.   And within that structure, would you fall

20  under the staff category?

21    A.   Yes.

22    Q.   Okay.  And how many other staff members does

23  TDP have right now?

24    A.   As reported in our staff meeting last week, we

25  had 61 staffers.

1      Q.   And how are TDP staff members paid?  I'm not

2  asking how much, just where the funds come from.

3      A.   They come from donations that are made legally

4  and through federal and state law from donors,

5  individuals, organizations, political action committees.

6      Q.   Okay.  I'm going to jump ahead to Topic 4.

7  And as you were alluding to earlier, Mr. Maxey, I

8  understand that there are various permutations of how

9  TDP furthers its mission and sort of engages in its

10  activities; but I would like to understand kind of the

11  main buckets of activity, the main categories of

12  activity, that TDP is engaged in.

13           From what you said earlier, I wrote down:

14  Elect Democrats, educate voters, and register voters.

15  But I don't want to sort of pin you to that if there's

16  kind of a better way to describe the main categories of

17  activity that TDP engages in.

18      A.   Sure.  Let me just run down sort of job titles

19  of the 61 people, and that will give you an idea.

20      Q.   Cool.  Perfect.

21      A.   We have a comptroller who receives and expends

22  the funds, who makes all the reports to the Federal

23  Election Committee and Texas Election Committee.  She

24  has two assistants that also deal with HR and hiring and

25  doing Human Relations kind of hiring and removing

1    employees.

2              We have a data team that works on the

3    voter files, targeting, preparing lists for phone

4    banking, voter contact all through technology systems.

5    It's basically data work.

6              We have a fundraising team that consists

7    of four people that raise money from individual donors

8    and major donors and organizations.

9              As I said, we have an Executive Director.

10   We have an Assistant Executive Director who also does

11   sort of the political work of the organization.

12             We have a political team that has two

13   people that work directly with candidate services, two

14   people who work directly with volunteers for the

15   candidates, two people who work directly with the county

16   parties, with their plans, funding plans, coordinated

17   plans, training county chairs and county executive

18   committees and volunteers at the county level.

19             I'm sort of going around my office.

20             We have a five-member voter protection

21   team that deal with voter laws and educating people to

22   comply with all election laws and assist where we find

23   voters who have had problems casting their ballot or

24   getting registered, to make sure that everybody is

25   legally able to participate.

1                    There's the voter expansion team, Luke

2        Warford, who does voter registration, vote by mail.  I

3        work a lot in that program.

4                    We have a communications staff, typical

5        communication directors, research director, digital

6        team, people who do all of our online, whether it's

7        e-mails, Instagram, Facebook, Twitter, all of those kind

8        of programatic things.

9                    And we have an organizing team that works

10       in the field.  We have constituency organizers for

11       allied groups within the Party, African-Americans,

12       Hispanic, disability community, LGBT community, the

13       women's community, Asian Pacific Islanders community.  I

14       might be missing one of those groups, but there's a

15       staffer there.

16                    And then there are literally -- there

17       will be by November approximately a thousand people in

18       the field talking to voters all over the state of Texas.

19                    And that's how we do it.

20       Q.    That's how the sausage is made.

21                    Okay.  So I appreciate that rundown.  And

22       it sounds, from what you've said, like some of those

23       apparatuses are necessary to engage in a variety of

24       activities, like, it's not like you just have a -- like,

25       for example, your comptroller, that's sort of

1  infrastructure that's, like, necessary for the whole

2  organization to run, right?

3      A.   Well --

4           MR. GEISE:  I'm just going -- I think

5  it's -- I'm just going to object to preserve the First

6  Amendment objection and just instruct the witness.  I

7  think this is all fine.  You can continue to answer at a

8  high level.  I just -- you know, if we start getting

9  into more and more detail, I just wanted to preserve

10  that objection for the record.

11           THE WITNESS:  I understand.

12      A.   So let me just say that nothing's siloed.

13  Everybody on our staff is trained to register a voter.

14  Everybody on our staff is trained to answer a voter's

15  questions so that no matter where -- what department

16  you're in, we're all supportive; and we're cross-

17  trained.  Nothing is -- I mean, there are some people

18  who do just the same thing every day; but I work in

19  pretty much all of those areas.

20           I'm the author of many of the

21  communication e-mails we send out, perhaps, on voter

22  registration.  And I think that's the whole nut of where

23  we're going with this is that we are having to move

24  money from all of those departments to deal with voter

25  registration because the State, in this case, is not

 1   doing its work in registering people appropriately.

 2       Q.   (BY MS. MACKIN)  Okay.  And so I'm trying to

 3   get a list of the main activities of the Texas

 4   Democratic Party.  And so based on what you've said, it

 5   sounds like there is fundraising.  There is candidate

 6   services.  There is county services, voter protection,

 7   voter expansion, and maybe organizing.  I mean, if you

 8   had to break it down into categories of activity, how

 9   would you do that, because I appreciate the explanation

10   of kind of the departments and the structure?

11       A.   Every day we communicate with voters.  We

12   educate voters.  We help Texans who are not registered

13   get them registered in myriads of ways to make sure that

14   we expand the voting pool.  We educate them how to cast

15   a vote, when to cast a vote, where to cast a vote, and

16   who to cast a vote for, pure and simple.

17            Our main goal right now is to register

18   approximately 2.6 million people to vote, which we're

19   spending lots of money on doing because the State of

20   Texas is not following the federal law in registering

21   people when they change their driver's license.

22       Q.   And just to be clear on the record, Mr. Maxey,

23   are you an attorney?

24       A.   No, and I never claimed to be one.

25       Q.   Okay.  And --

1    A.    But let me just say this, though:  I'm not an

2  attorney, but I was a legislator for 12 years.  I have

3  drafted in the last four election cycles more than 150

4  pieces of election law.  I have gotten legislators to

5  file them.  I have testified on behalf of those bills,

6  and I have rewritten major sections of the Election Code

7  through things that I have drafted.  So I am not an

8  attorney, but I understand the law.

9    Q.    Okay.  And I appreciate that.

10          I want to come back to what I'm trying

11 to understand with this question about TDP's activities.

12 So TDP engages in communications, right?  You

13 mentioned -- when I just tried to get a list the last

14 time, you said communication, education, and voter

15 registration; but that doesn't seem to capture

16 everything that you talked about.

17    A.    Please ask something specifically about what

18 you want to know, and I'll answer it.

19    Q.    Sure.  So what are the main categories of

20 activities that TDP is engaged in?  And I think I did

21 ask that already, but I'll ask it again.

22          MR. GEISE:  Objection to the form.

23          You can answer.

24    A.    I'll answer it yet again.  Our mission is to

25 educate voters to vote for Democratic candidates.  In

1    order to do that, we must register them to vote.  We

2    must educate them when, where, and how to vote.  That's,

3    pure and simple, everything that we do.  Candidates,

4    training, it's all about getting them elected.  We train

5    them how to campaign, but our overarching goal is to

6    have more votes for Democrats than for Republicans,

7    Green Parties or Libertarian candidates or Write-in

8    candidates.  That's our goal, pure and simple:  Elect

9    Democrats.  Number 1 on that is to have more Democrats

10   registered to vote, and that's the problem we're having

11   here is that we have impediments to doing that.  We're

12   having to move funds into --

13       Q.   (BY MS. MACKIN)  Okay.  But I'm not hearing an

14   answer to my question.

15       A.   Sorry.  Don't interrupt me.  You told me I

16   could answer a question before you would interrupt.

17            So our goal is to register voters to

18   vote, and there is an impediment by the State of Texas

19   not registering voters when they update their driver's

20   license.

21            MS. MACKIN:  Okay.  Objection,

22   nonresponsive.

23       Q    (BY MS. MACKIN)  Mr. Maxey, what are the main

24   categories of activities that TDP is engaged in?

25            MR. GEISE:  Objection, asked and

1    answered.

2              MS. MACKIN:  I didn't hear an answer to

3    my question.

4         A.   The main activities are voter registration,

5    voter education, candidate recruitment, candidate

6    education, and telling people when, where, and how to

7    cast a ballot.  That's it in a nutshell.  Whether we

8    raise money, whether we do data work, whether we do

9    communication, it's all about registering people to

10   vote, getting them to go vote for Democratic candidates.

11   Answered.

12        Q.   (BY MS. MACKIN)  And so is there a difference

13   between -- I just want to make sure I have the list

14   correct.  I have as the main activities:  Communication,

15   voter education, voter registration, candidate

16   recruitment, and candidate education.  Do I have that

17   right?

18        A.   Well, I don't know if it's limited to that.

19   I've been talking for 15 minutes here about the mission

20   of the Party and what we do and named every staffer with

21   a job description title.  I think any logic is that all

22   of those things go back to having an educated electorate

23   of Democrats who know when an election is, where to go

24   vote, how to cast a ballot, how to do it legally, how to

25   do it, whether in person or by mail.  All of that stuff

1   is our mission to get to the goal of electing Democrats

2   to office, pure and simple.

3           Please be specific because I've answered

4   that five times now.

5       Q.   The thing that I'm struggling with, though --

6       A.   You want me to give you a tick-tock of hours

7   from 8:00 to 5:00 every day of what I do?  Is that what

8   you --

9       Q.   No, sir.

10      A.   Okay.  Then think of a question other than the

11  one you've asked five times now, that I've answered.

12      Q.   But respectfully, sir, it's a fair question;

13  and I'm just trying to make sure that I have the answer

14  clear because I'm a little bit confused by the way that

15  it's being answered.

16          So the list I have of the main activities

17  that TDP is engaged in, the list that I have of the main

18  activities -- I understand your mission is to elect

19  Democratic candidates, pure and simple.  I've heard

20  that.  I appreciate that.  In terms of the specific

21  activities in which TDP is engaged, the main

22  activities -- I'm not asking for each granular thing;

23  but if you kind of divide it up, the work that TDP does,

24  I have five categories based on what you've said.  And I

25  want to make sure that I understand that right and that

1   I have everything down as a list.  So the list that I

2   have --

3       A.   (Inaudible.)

4       Q.   Go ahead.

5       A.   I'm not -- you've not asked a question.  Ask a

6   question.

7       Q.   Okay.  You started speaking, so I wanted to

8   give you an opportunity to do so.

9            The list that I have for the main

10  activities that TDP is engaged in includes:

11  Communication, voter education, voter registration,

12  candidate recruitment, and candidate education.  Is that

13  an accurate and complete list of the main categories of

14  activities that TDP is engaged in?

15           MR. GEISE:  Objection, mischaracterizes

16  the testimony.

17           But you can answer.

18      A.   I don't think -- when you say is it a complete

19  list -- because I don't want to -- you know, it sounds

20  like a trick question here.  If you want me to add on to

21  it, we raise money to do those activities.  We do data

22  work to do those activities.  We do work with county

23  parties and candidates and volunteers and activists and

24  voters to do those activities.  It seems like I'm in a

25  circular question here.

1    Q.   I'm not trying to --

2    A.   We want voters to cast ballots.  The main --

3  the only mission we have is for voters to vote for

4  Democratic candidates and for those Democratic

5  candidates to win.  Anything more than that is getting

6  into granular things of how we do that.  And I can talk

7  for hours if we want to do that; but you keep saying, "I

8  want to just go at the top level of stuff."  So let's

9  stay at the top level.  We educate voters.  We register

10  them to vote.  We educate them again about when the

11  election is, how to vote, where to vote to cast a vote

12  for a Democrat.  That is the mission of TDP, pure and

13  simple; and that is it.

14          You might have five things on your list.

15  There's one thing on the list:  Educate voters, register

16  voters, turn them out to vote.  And I don't know what

17  else you're trying to get to.  Be more specific.

18    Q.   So does TDP participate in any activities that

19  don't fall into either communication, voter education,

20  voter registration, candidate recruitment, candidate

21  education, or fundraising?

22          MR. GEISE:  I'm going to object, asked

23  and answered.

24          But you can answer.

25    A.   Sure.  We just had a staff party.  None of

1   that was about voter education or voter registration or

2   turning out a vote.

3              I mean, we're a big institution.  We do a

4   lot of things.  I don't think any activities that are

5   officially done in a job description of an employee of

6   the Texas Democratic Party is outside of the goals of

7   educating voters, registering voters, and getting them

8   to cast a ballot for Democratic candidates.  So, no, I

9   don't think we do anything outside of that mission.

10        Q.   (BY MS. MACKIN)  Educating, registering,

11  getting them to cast a ballot for Democratic candidates?

12        A.   If you know something you only answer "yes" or

13  "no" when you do it, please ask me; but I can't think of

14  anything that's outside of that mission that the

15  employees of the Texas Democratic Party or its Executive

16  Committee or Chair does.

17        Q.   Okay.  Thank you.

18              All right.  How would you describe TDP's

19  efforts to educate voters?

20        A.   We communicate by e-mail, by text message, by

21  Twitter, by direct mail, by speeches by various

22  candidates, party officers, staffers.  We go door to

23  door.  We make phone calls.  Any kind of communications

24  that humans possibly have, we do to talk about

25  Democratic values, registering to vote, how to get

1 registered to vote, when to go vote, and how to vote for

2 Democrats.  So we communicate in all of those ways.

3      Q.   And have you produced documents that reflect

4 those communications?

5      A.   There are documents of e-mails that we have

6 sent to voters that were produced.

7      Q.   Is there documentation of those other types of

8 communications that you mentioned?

9           MR. GEISE:  Objection on the basis of the

10 First Amendment privilege.

11           I think you can answer "yes" or "no"

12 whether other types of communication with voters exist;

13 but other than that, I'm going to object on the basis of

14 the First Amendment privilege and instruct you not to

15 answer other than whether or not other types of

16 communications exist.

17           MS. MACKIN:  And just to be clear, have

18 you-all produced a privilege log of documents responsive

19 to the subpoena that are being withheld?

20           MR. GEISE:  Not -- well, no.  I don't

21 think that a privilege log would need to hold every

22 communication that the Texas Democratic Party has with

23 voters because that would be millions, and that wasn't

24 what the subpoena requested.  But, again, I don't think

25 that that needs to be a discussion for this deposition.

1          I would instruct the witness:  You can

2     answer "yes" or "no" whether there are communications

3     outside of e-mails that the Texas Democratic Party has

4     with voters.

5          MS. MACKIN:  And we can talk offline

6     about the scope of the objection; but based upon what

7     we've heard so far today, it appears that the response

8     to the subpoena's incomplete and that we have some

9     issues to resolve with respect to that.

10          MR. GEISE:  Well, I don't know that

11     that's a topic for the witness; but you can answer "yes"

12     or "no" --

13          MS. MACKIN:  I --

14          MR. GEISE:  All right.  So you can answer

15     "yes" or "no" whether or not there are communications

16     other than e-mails that the Texas Democratic Party has

17     with voters.

18      A.   Can you be more specific what you mean by

19     that?

20      Q    (BY MS. MACKIN)  The question I asked --

21          MS. MACKIN:  Ms. Cunningham, would you

22     mind reading back my last question?

23          THE REPORTER:  Okay.

24          MS. MACKIN:  Thank you.

25          (The requested material was read as

```
 1   follows:

 2                "QUESTION:  Is there documentation of

 3   those other types of communications that you

 4   mentioned?")

 5        A.   Generically in my answer I was talking -- you

 6   said what kind of communications do we have with voters,

 7   I think was the original question; and I said we have

 8   direct mail.  That would be the glossy kind of mail that

 9   you send a candidate -- to voters about issues or

10   candidates and giving voter information.  I suppose we

11   have those laying around from the past election cycle.

12   We've not done those this election cycle yet.

13                But there's -- if we're asking if there's

14   communication about this case, no, I don't know of

15   anything that we have.  I have no knowledge of anything

16   like that being in existence.

17                I was talking about generically what a

18   volunteer -- an organizer would -- how they would

19   communicate -- you asked how do we communicate, and so

20   that's what I was saying.  The LGBT organizers talking

21   to LGBT voters could be passing out literature or hand

22   them a palm card or something that says about getting

23   ready to vote or passing out voter registration cards.

24   That's the kind of communication I was talking about.

25                You seem to be talking about
```

1  communications about this lawsuit; and, no, I don't have

2  any of those, never have seen any of those.

3      Q.   (BY MS. MACKIN)  Okay.  How much did TDP spend

4  on voter education in 2014?

5      A.   You know, I don't know that I can break out

6  voter education.  I mean, the staff salaries for all of

7  the people we had in 2014, whether they're the data

8  person or the fundraising person or the comptroller's

9  salary or the executive director's salary or my salary,

10  I know that generically in 2014, we spent around

11  $2 million, raised and spent.

12      Q.   Total?

13      A.   Total.

14      Q.   So not limited to voter education, but

15  overall?

16      A.   Well, there's -- I don't have any knowledge

17  about how to pull that out of my brain about what was

18  voter education and what was just institutional

19  organizational payroll and things.  We could ferret out

20  that the comptroller is doing voter education if she's

21  processing the money that we pay for voter education.

22  So I don't know how you find -- I don't know the details

23  of how much was voter education versus any other

24  mission -- part of the mission.  Approximately

25  $2 million -- all of this is public record at the FEC

1 and TEC.

2      Q.   So you couldn't tell me --

3      A.   What we spent I cannot tell you, no, not

4 today, not from my memory how much of the $2 million was

5 specific on voter communication, however nebulous that

6 is.

7      Q.   How about voter registration efforts in 2014,

8 could you tell me how much TDP spent on voter

9 registration efforts in 2014?

10     A.   No, ma'am.

11     Q.   Okay.  What about in 2015?

12     A.   No.  I mean, because --

13     Q.   What about in 2016?

14     A.   You're asking me --

15          MR. GEISE:  Objection, asked and

16 answered.  I think the witness has answered that it

17 would be impossible to calculate those numbers.

18          But you can answer to the extent of your

19 ability.

20     A.   Well, I will just say that, you know, we

21 passed out a lot of voter registration applications,

22 most of those provided to us by the Secretary of State

23 at no cost.  We did online voter registration.  There's

24 a cost to maintaining that and staffing that.  We mailed

25 out voter registration applications when people

Texas Democratic Party -

43

```
1   requested them.  We did rallies with voter registrars,

2   volunteer voter registrars.  So to ferret out exactly

3   how much generally educating a volunteer how to do voter

4   registration and how much that time of training cost

5   down to the cent, I can't do.  I cannot ferret it out.

6   It's impossible for us to even do that.

7              So part of -- part of our budget went to

8   voter registration; but figuring it out to the penny or

9   even a gross amount -- because, like I said, everybody

10  on our staff in almost every department, whether the

11  digital people are sending out links to go fill out a

12  voter registration application, whether an organizer's

13  standing at a door, whether an organizer is door

14  hanging, whether a college student is tabling on the

15  university campus, all of which are things that we

16  organize and train volunteers to do, the cost of that is

17  impossible to ferret out because everybody in our

18  department is somehow touching that.  So I can't tell

19  you a number.  It's impossible.

20       Q.   (BY MS. MACKIN)  And is that true for every

21  year between 2014 and 2020?

22       A.   Yes.

23       Q.   Okay.

24       A.   Now, if you asked -- you know, at some point

25  in time, a person -- if we had done a mailing and I had
```

1   time to go research it, I could probably find out some

2   things; but I don't know that -- anything from memory

3   that I could pull out and give you a cost on.

4        Q.   But you were designated to testify on Topic

5   4(d) in the Deposition Notice, were you not?

6        A.   Yes, ma'am.

7        Q.   Okay.

8        A.   And I did not go and do ten years of stuff and

9   have it in my brain for this deposition this morning.

10  So, no, I don't know the details.

11            MS. MACKIN:  So to that extent, then,

12  we're going to have to object to the preparedness of the

13  witness.

14            MR. GEISE:  I think the witness -- I

15  think the witness said that it would be -- and I can

16  clean this up with some questions after; that's fine.

17  I'll wait to do that.  But I think the witness testified

18  that it would be impossible to determine those numbers,

19  and he gave a top-line number for the question you

20  asked.  So he can testify top line how much was spent.

21  He's indicated that all of the Texas Democratic Party's

22  spending is publicly available on both the FEC and the

23  Texas Ethics Communication website and is happy to

24  testify about any specifics of those that you want to

25  provide him for and ask him about.

Texas Democratic Party - 4/27/2020

45

1              And I don't think that the witness needs

2    to be prepared to do something which is impossible.

3    He's testified that he can give top-level amounts.  He's

4    prepared to talk about programatic aspects of every one

5    of those years, the programs they did; and I think that

6    top-line amounts and programs is, from the witness'

7    testimony, the only level of detail that would be

8    possible for anyone to testify to.  So I don't know how

9    we would prepare anyone to do more than that.  Having

10   said that --

11              MS. MACKIN:  I think that this --

12              MR. GEISE:  Again, this is a discussion I

13   suppose should be offline.

14        Q.   (BY MS. MACKIN)  Just to make sure everything

15   is perfectly clear, all activities on which TDP has

16   spent funds or to which TDP has dedicated resources in

17   Texas between January 1st, 2014 and the present

18   including, total funds spent on voter registration

19   efforts, that number is not -- is it your testimony,

20   Mr. Maxey, that that number is not knowable?

21        A.   It is not knowable.

22        Q.   Okay.  How does the Texas Democratic Party

23   track the success of its voter education efforts -- or

24   let me ask that better.

25              Does the Texas Democratic Party track the

1    success of its voter education efforts?

2         A.    I think that's a broad question.  We do

3    metrics, you know.  We know when we send an e-mail how

4    many people open the e-mail.  We don't know if they read

5    it or not.  We know that they opened it.

6              We know that -- studies are done over

7    time that there are areas of Texas where we do door-

8    to-door activities or have done series of mailings to

9    voters to persuade them or educate them; and after an

10   election, we do analysis of are the turnout patterns

11   bigger where we did those efforts or didn't.

12             We make a phone call to a voter.  We tell

13   them to go vote.  We then look at daily, during early

14   vote, whether that voter has cast a ballot or not.  If

15   we had done a million of those calls and nobody that we

16   called voted, we would probably stop making the phone

17   calls.

18             So, yes, we track all of this stuff to

19   the best of our abilities using technology, pen and

20   paper, you know, marks on a walk sheet about who we

21   talked to, whether that person then went to vote.  And

22   whether in those precincts where we have done activities

23   we won the precinct or didn't win the precinct tells us

24   a lot about activities.  So yes, yes, we do.

25        Q.    And so does TDP adjust -- I mean, I think you

 1    said this; but I want to make sure it's clear.  Does TDP

 2    adjust its activities based on the success rate?

 3        A.    Sure.  I mean, let me just say that, you know,

 4    in my world of asking the Legislature to do things, I've

 5    asked the Legislature to pass bills allowing people to

 6    go online and register to vote.  If that were the case

 7    in Texas, we would not be spending the time and effort

 8    to go door to door, to table, to mail out voter

 9    registration applications to newly -- new arrivals in

10    Texas or people who moved in.  We wouldn't be doing all

11    that activity, expending that money, expending that

12    staff time if we had more accessible voter registration

13    in Texas.  So, yes, we are changing our programatic

14    stuff in response to the voter suppression in Texas day

15    by day.

16              So that is our mission is to educate

17    voters.  We have big impediments in Texas for voter

18    registration, the most restrictive state in the nation

19    for registering people to vote.  And so we spend a

20    myriad amount of money and adjust our budget accordingly

21    to all of the impediments that are put in front of us.

22              MS. MACKIN:  Objection, nonresponsive.

23        Q.   (BY MS. MACKIN)  I don't think my question was

24    very clear.  I apologize.

25              We've talked about registering voters.

1  Are TDP's voter registration efforts focused on

2  targeting Democratic voters?

3              MR. GEISE:  I'm just going to object on

4  the basis of the First Amendment privilege.  I think the

5  question is fine.

6              But I would instruct the witness again

7  that based on the First Amendment privilege, all these

8  things going into specific strategy of the Texas

9  Democratic Party, I would instruct the witness you can

10  answer at a high level.

11              So I think that specific question is

12  fine, but I just want to continue to note that objection

13  for the record.

14              MS. MACKIN:  If we could please limit the

15  speaking objections, to keep objections to the rules and

16  an instruction not to answer, I would appreciate it.

17       A.   Yes.

18       Q    (BY MS. MACKIN)  Okay.  The Texas Democratic

19  Party began a new voter registration campaign in January

20  of 2020; is that correct?

21       A.   That's correct.

22       Q.   Okay.  I am going to show you some

23  documents -- actually, rather than show you, I will send

24  around a link so that you can view them.  And these

25  documents were produced by your counsel in response to

49

1  the subpoena duces tecum related to this deposition.

2              If you received that file, if you would,

3  please pull it up for me, Mr. Maxey; and let me know

4  when you're ready to discuss it.

5      A.   I got it.

6      Q.   Okay.  And do you recognize this document?

7      A.   Yes, it's an e-mail that was sent out by our

8  digital department from me to people on our e-mail list,

9  asking for donations to do voter registration and vote

10 by mail.  I guess this one is a vote-by-mail thing.

11     Q.   And how does the Texas Democratic Party --

12 well, strike that.

13             You mentioned your e-mail list.  Who

14 would be on that e-mail list?

15     A.   Anybody who has requested to be on the list.

16 People who give us an e-mail at events, at our

17 convention, asking to be on our list.

18     Q.   And a little ways down on this e-mail it talks

19 about a contribution to our vote-by-mail fund.  Do you

20 see that?

21     A.   Yes.

22     Q.   What is the vote-by-mail fund?

23             MR. GEISE:  I'm going to object on the

24 basis of the First Amendment.

25             You can talk generally -- actually, no.

1  You can answer that question.  To the extent it doesn't

2  implicate internal strategic matters of the Democratic

3  Party, you can answer that question at a high level.

4      A.   It's a euphemism for money we would like

5  people to give to us that we might use for sending out

6  applications for seniors, disabled, and people out of

7  the county to vote by mail.

8      Q.   (BY MS. MACKIN)  And do you know if the funds

9  that were raised in response to this e-mail went

10  directly to the vote-by-mail fund?

11              MR. GEISE:  I'm going to object on the

12  basis of the First Amendment privilege.  I think that

13  the internal financial matters of a political

14  organization are core First Amendment protected.  And I

15  would instruct the witness not to answer.  I think he's

16  answered at the level that is adequate under a First

17  Amendment privilege.

18              MS. MACKIN:  The Protective Order entered

19  in this case allows you to designate any portion of this

20  transcript as confidential if you wish, so --

21              MR. GEISE:  There's case law on a

22  privilege -- on a Protective Order still not infringing

23  or not requiring the infringement of the First Amendment

24  privilege.  So I would still instruct the witness not to

25  answer on the basis of the First Amendment privilege

1  that the internal financial matters of a political

2  organization are core First Amendment protected.  I

3  would instruct the witness not to answer.

4          MS. MACKIN:  I'm not asking about

5  internal financial matters.  I'm asking a question that

6  appears on the face of this document which was produced

7  to us.

8          MR. GEISE:  He answered what the

9  vote-by-mail fund was.  I think that asking the next

10  question, which is what I objected to -- I think that

11  asking the next question beyond that about internal

12  financial decisions of the Texas Democratic Party is

13  core First Amendment protected.  I would instruct the

14  witness not to answer.

15          MS. MACKIN:  I'm not inquiring into

16  internal financial decisions of the Texas Democratic

17  Party.  The issue of spending -- okay.

18      Q  (BY MS. MACKIN)  Are you going to decline to

19  answer my question on the advice of your counsel,

20  Mr. Maxey?

21      A.  I do.

22      Q.  Okay.  So down here it also says, "Can you

23  make a $7 contribution to our vote-by-mail fund so we

24  can send 21 Texans their application?"  Did I read that

25  correctly?

1      A.   That's what it says.

2      Q.   And so how much does it cost to send one Texan

3  a vote-by-mail application?

4      A.   Do you want to know the postage?

5      Q.   I want to know how much it costs the Texas

6  Democratic Party.

7      A.   Well, approximately -- I mean, if you're doing

8  the math here, you can divide $7 by 21; and you'll sort

9  of get what the cost is.  There is the actual postage.

10  There's the printing.  There's the lasering.  There's

11  paying of the mail house.  There is the cost of the

12  paper.  There is all of that.  I would have to have a

13  calculator to do the math here, but I'm thinking it's

14  around about 30 to 33 cents.

15           It's different in each county, depending

16  on whether I am sending a hundred thousand into a postal

17  zone or whether I'm sending fifty, because it's a

18  different postage rate.  So I cannot tell you

19  definitively the cost of a single piece.  On average

20  they're probably about 32 cents.

21      Q.   Are you aware that Texans can request a

22  vote-by-mail application be mailed to them for free on

23  the Texas Secretary of State's website?

24      A.   Do what?

25      Q.   Are you aware that on the Texas Secretary of

1  State's website Texans have an ability to request that a

2  vote-by-mail application form be mailed to them for

3  free?

4       A.   Yes.

5       Q.   I'm going to show you another document which

6  is part of Exhibit 2 and begins at TDP 33.

7                 THE REPORTER:  Excuse me, Ms. Mackin.

8  I'm sorry.

9                 MS. MACKIN:  Yes.

10                THE REPORTER:  That last document that

11 you displayed, did you want that marked as an exhibit?

12                MS. MACKIN:  So all of these documents

13 that begin with the TDP preface, they're all going to be

14 Exhibit 2.

15                THE REPORTER:  Okay.  Thank you.

16                MR. GEISE:  Is now a good -- I know we've

17 been going for a little over an hour.  Is now a good

18 time for a break?

19                Glen, I don't know if you want one.  I

20 could use a five-minute break.

21                THE WITNESS:  I need to use the restroom.

22                MS. MACKIN:  Sure.

23                MR. GEISE:  I figured.  All right.

24                MS. MACKIN:  Come back at 11:25.

25                MR. GEISE:  Great.

1          THE REPORTER:  We're going off the record

2    at 11:18 a.m.

3          (Off the record from 11:18 to 11:27 a.m.)

4          THE REPORTER:  We are back on the record

5    at 11:27 a.m.

6          MR. GEISE:  We can't see you, Glen.  I

7    don't know if you can bring us back up.

8          There you go.

9          THE WITNESS:  The technician must have

10   turned my camera off.

11         MR. GEISE:  Yeah.  Just fire that guy.

12         MS. MACKIN:  All right.

13         THE WITNESS:  Are we talking about a

14   document?

15         MS. MACKIN:  TDP 33.

16         THE WITNESS:  Okay.  Got it.

17         MR. GEISE:  Sorry.  Did you -- is it in

18   the -- it's not in the -- oh, there it is.  It just came

19   up for me.

20    Q    (BY MS. MACKIN)  Do you recognize this

21   document, Mr. Maxey?

22    A    It's an e-mail sent by the Texas Democratic

23   Party, yes.

24    Q    And it looks to me that there's a box that

25   says, "What we did this year," colon, and that there is

1  no text underneath that.  Do you know if that's how the

2  e-mail went out to your Listserv?

3     A.   I expect that this is a technical thing of it

4  not showing on this thing.  I'm sure it had things that

5  we had did -- we had done that year.

6     Q.   Okay.

7          MS. MACKIN:  And I guess we'll just

8  request a supplementation with a legible copy.

9          MR. GEISE:  Yes, I will make a note of

10 that.

11         MS. MACKIN:  And I don't think I need to

12 show it to the witness.  I'll just let you know,

13 Counsel, the same issue was present in TDP 37 as well.

14         MR. GEISE:  Okay.  Okay.

15    Q    (BY MS. MACKIN)  Okay.  I'm going to circulate

16 the document marked TDP 43.  Mr. Maxey, please take a

17 look at that and let me know when you're ready to

18 discuss it.

19    A.   All right.

20    Q.   Do you recognize TDP 43?

21    A.   It's an e-mail from Cliff Walker that went out

22 to our e-mail list.

23    Q.   Okay.  And it looks like it's a forward of an

24 e-mail from Representative Gina Calanni; is that right?

25    A.   Yes.

1    Q.    And down on the page marked TDP 44, about

2    25 percent of the way down the page --

3    A.    Uh-huh.

4    Q.    -- it says, "Texas Democrats' vote-by-mail

5    program made the difference between my victory and my

6    defeat.  Without their vote-by-mail initiative, I

7    wouldn't be where I am today."  Did I read that

8    correctly?

9    A.    Yes.

10   Q.    And how did TDP know that

11   Representative Calanni's 113-vote margin of victory was

12   attributable to Texas Democrats' ballot-by-mail program?

13   A.    I mean, this is like everything in an

14   election.  If you win by a small margin, most any

15   program you did is that margin.  We do know in this

16   district -- I don't know the numbers offhand -- but we

17   do know that several thousand seniors voted by mail as a

18   result of the application we mailed them because we

19   track the senior getting the application through the

20   mail and mailing it back to their clerk.  So because we

21   did a vote-by-mail program, several thousand seniors

22   voted in her district; and that number of voters is more

23   than her margin of victory by a long shot.

24   Q.    How do you know that all those voters voted

25   Democrat -- well, specifically, how do you know that all

1  those voted for Representative Calanni?

2      A.   We don't.  But I'll elaborate:  The chances

3  are that if you send an application to a person who's

4  voted in multiple Democratic primaries and then they

5  vote in a general election, they -- more than likely,

6  there is probably a high percentage -- in the 85

7  percentile or above -- that they voted for a Democrat.

8              Parties don't send stuff to opposing

9  voters.  We target and, therefore, the people we sent

10  the application to almost entirely are people who voted

11  in the Democratic primaries.

12      Q.   And then down at the bottom, the last sentence

13  says, "Can you make a $7 contribution to the Texas

14  Democratic Party so we can send 21 Texans their

15  application?"  Were all of the funds generated by this

16  e-mail used to send Texans applications to vote a ballot

17  by mail?

18              MR. GEISE:  I'm going to, again, object

19  on the internal use of fundraising of a political party

20  as core First Amendment protected and instruct the

21  witness not to answer on the internal use of funds on

22  the basis of the First Amendment.

23      A.   I decline to answer on advice of counsel.

24              MS. MACKIN:  Okay.  And so to the extent

25  that I have anymore questions about the e-mails that

1   were produced that were asking for contributions and

2   then what those contributions were ultimately used

3   for --

4                    MR. GEISE:  Yeah, we're -- the witness is

5   going to -- I mean, I'm going to instruct the witness

6   not to answer on the internal financial decisions of the

7   Texas Democratic Party on the basis of the First

8   Amendment privilege as going to the core of the First

9   Amendment.

10                   He can talk generally -- the witness --

11  just so we're clear, I think that if you ask general

12  questions about how the Texas Democratic Party makes

13  funding decisions, how they decide where to allocate

14  funds, the witness can answer at a high level, that that

15  does not go into specific internal strategy or a

16  specific use of specific funds.

17                   I think the First Amendment protects the

18  core; but if you want to ask the witness high level, how

19  does the Texas Democratic Party decide to allocate

20  funds, how do they decide to allocate funds, even in a

21  specific year, at a high level, I think that you're

22  entitled to inquire into that.  It's just I think the

23  specific use of specific funds is core First Amendment

24  protected by numerous decisions, and I would instruct

25  the witness not to answer.

1          MS. MACKIN:  And is it your position that

2    the e-mails that were produced which make a specific ask

3    for a contribution fall within that category?

4          MR. GEISE:  Well, I don't think -- I

5    think that asking once someone sent the Texas Democratic

6    Party specific funds in response to a specific e-mail,

7    where did those funds go is core First Amendment

8    protected by numerous decisions that would go to -- and

9    even with a Protective Order, a Protective Order in

10   multiple cases does not entitle you -- it's the same way

11   it doesn't inquire [sic] you to entitle [sic] into the

12   attorney-client privilege.  It doesn't entitle inquiry

13   into things that are protected by the core of the First

14   Amendment.  So I would instruct the witness not to

15   answer.

16        A.   Let me answer a general answer so that we're

17   clear.  All fundraising that the Texas Democratic Party

18   asks donors to make is done in the context of --

19   typically of:  Help us pay for a program, which is what

20   this is.  Help us send out vote-by-mail applications.

21   By law we cannot dedicate -- if a donor gives us a

22   hundred dollars and says spend this only on vote by

23   mail, a donor may not do that.  We cannot target their

24   donation.  The Party must and does make decisions on all

25   of its funds coming in on how to spend.  It cannot be

1    directed by the donor to go for a specific candidate or

2    a specific program.  They can donate toward it, and we

3    can then choose to use it for that program or not.

4                    In this particular issue on the specific

5    question you asked about the $7 for 21 applications, in

6    all of these vote-by-mail programs, the cost of the

7    program is considerably larger than what the individual

8    donors donate.  And it comes from county parties.  They

9    come from candidates.  It's come from major donors to

10   perhaps raise, you know, a quarter million dollars to do

11   a program like this.  The individual $7 somebody spent

12   may or may not be used exclusively in that program.

13   Typically, because it's less than the program, you could

14   say you give it towards the program; we used it there.

15   But the donor is not ultimately -- the money is not

16   directly for mail-outs.

17                    MS. MACKIN:  Okay.  Thank you for that

18   explanation.

19                    Just to make sure that we are clear, to

20   the extent that I would inquire about other e-mails

21   produced and about what the funds generated in response

22   to that e-mail were used for, you would object and

23   instruct the witness not to answer, Counsel; is that

24   right?

25                    MR. GEISE:  Yes.  And I would instruct

1   him to answer in the manner that he just did, which is,

2   I think, that the funds can't be -- even if the donor

3   wanted to, funds are not, by law, allowed to be put to

4   X, Y, or Z, which I think he's answered.  So I think

5   he's provided an answer to the question at the level

6   that we believe Counsel is entitled to inquire into.

7       Q.   (BY MS. MACKIN)  And, Mr. Maxey, again, just

8   to be clear, if I were to inquire into the use of funds

9   in response to a specific e-mail produced today, you

10  would follow your attorney's instruction not to answer

11  such questions; is that right?

12      A.   That is correct.

13      Q.   Okay.  Thank you.

14      A.   My answer about targeting funds would apply.

15           MS. MACKIN:  Okay.  I'm going to share

16  a document with everyone on the chat function marked

17  TDP 63.

18      Q.   (BY MS. MACKIN)  Mr. Maxey, please let me know

19  when you've had a chance to open up that document and

20  are ready to discuss it.

21      A.   All right.

22      Q.   Do you recognize this document?

23      A.   It's an e-mail from Manny Garcia to our e-mail

24  list.

25      Q.   And this e-mail discusses -- the second

 1  sentence of the e-mail reads, "There are about

 2  2.6 million unregistered voters in Texas who are likely

 3  to vote Democratic if registered."  Did I read that

 4  correctly?

 5       A.   That's correct.

 6       Q.   And what is the source of that statistic?

 7       A.   There are many groups that do analytics on the

 8  population of the state of Texas.  The Texas Legislative

 9  Council does such work, how many people are in Texas,

10  how many are registered to vote, how many are voting age

11  population or not.  So you take the number, which is

12  around, I think -- well, I don't know it off the top of

13  my head -- but there is a bigger number than 2.6 million

14  people who are unregistered in Texas who are legal

15  citizens who could register.  You can apply a simple

16  algorithm to it of how many people in the general

17  population did have similar characteristics of income,

18  geography, ethnicity, age, those kinds of analytics to

19  come up with that there's 2.6 million unregistered

20  Texans who are likely to vote Democratic.

21       Q.   And so did TDP come up with this 2.6-million

22  figure?

23            MR. GEISE:  I'm going to object and

24  instruct the witness to not answer to the extent it's

25  internal strategic information.  I think the witness has

1   provided a broad overview of how that number could be

2   arrived at -- well, I guess the witness -- you can

3   answer "yes" or "no."  But I think any inquiry other

4   than that would be prohibited by the First Amendment.

5        Q.   (BY MS. MACKIN)  To be clear, I'm just trying

6   to determine the source of this statistic that is

7   provided in this e-mail.  I'm not asking how it was

8   calculated.

9        A.   To my knowledge, this is a number that's come

10  from a source outside of TDP's staff.  We did not crunch

11  the numbers to get here.  This was something that's been

12  published along the way, and I don't have memory of

13  where it was published.

14       Q.   Fair enough.

15       A.   If the Legislative Council comes up with a

16  number of unregistered Texans and then we -- our data

17  team could come up with a demographic about what

18  percentage of those people were likely to be Democrats,

19  I would expect; but I'm not fully aware.

20       Q.   Okay.  So this e-mail describes -- well, the

21  third sentence says, "That's why we're launching a voter

22  registration program unlike any other in Texas history

23  by" and then it lists -- there's five bullets underneath

24  that.  The first one says, "Investing in cutting-edge

25  data programs to turn out new voters."  Can you tell me

1    at a high level about those programs, not going into

2    anything --

3         A.    Sure.

4         Q.    -- internally sensitive or First Amendment

5    protected?

6         A.    For instance, there's approx- -- there are

7    tens of thousands of new people moving into Texas every

8    day from around the country.  We know by data source of

9    where they were registered to vote before they got here,

10   what their demographics of being a Democrat were, their

11   sort of data score being Democratic.  And so we know

12   they're in Texas.  We know their name and their address

13   from the post office.  And so using cutting-edge data,

14   we can figure out approximately 30,000 Democrats move to

15   Texas each month that we need to get registered to vote.

16   That's one example of using cutting-edge data to target

17   people who are likely to be Democrats who are

18   unregistered who need to be registered.

19             We have the same kind of technology to

20   figure out that when somebody moves from Dallas to

21   Houston, they are no longer able to vote in general

22   elections unless they get registered in Harris County

23   unless they vote a limited ballot, which is highly

24   difficult to do; and then they won't be able to vote in

25   down-ballot races.  So we use cutting-edge data programs

 1   to identify those improperly registered Texans, to get

 2   them registered in their appropriate county.

 3              That's it.

 4        Q.   Okay.  Thank you for that.

 5              And then the second bullet point says,

 6   "Deploying 1,000 field organizers and canvassers on the

 7   ground to register voters in person."  I think we've

 8   talked about this.  I think that seems pretty clear on

 9   its face what that is.

10              The third bullet, "Adopting a digital

11   approach to voter registration through our online hub

12   MyTexasVotes.com."  What is MyTexasVotes.com?

13        A.   It's a website maintained by the Texas

14   Democratic Party that gives basic voting information.

15   You can look up your precinct on the early vote

16   locations nearest you, find your voting center or

17   precinct for election day, get a map to that location,

18   find out the hours of early voting or hours of voting on

19   election day.  You can check your voter registration.

20   You can request a mail ballot application.  You can

21   request a voter registration application, or you can

22   fill out an application online and print it out through

23   the system that is provided.  It's a voter education --

24   it's an activation website.

25        Q.   And where does the data on MyTexasVotes.com

1  come from?

2       A.   The Texas Secretary of State, local county

3  elected officials of polling places.

4       Q.   And are you aware that an individual can

5  request a postage-paid voter registration application be

6  mailed to them on the Texas Secretary of State's

7  website?

8       A.   When the website works.

9       Q.   So are you aware that an individual can --

10      A.   Yes, but we are making it -- this is making it

11  convenient to our voters.  A person in Texas can

12  register to vote by handwriting it out on a napkin and

13  putting it in an envelope and mailing it in.  You don't

14  have to use the Texas Secretary of State's website.

15            So, yes, you can do it on the Secretary

16  of State's website.  You can do it at MyTexasVotes.com.

17  You can do it at Vote.org, Register2Vote.com [sic.]

18  There's lots of places you can register to vote.

19      Q.   And you mentioned that MyTexasVotes.com makes

20  it more convenient or -- I don't remember specifically

21  what your words were -- but that it can make it more

22  convenient for some folks.  Can you explain that to me a

23  little more?  How does it make it more convenient?

24      A.   Well, every -- during an election season,

25  every piece of e-mail, every mail-a-candidate-across-

1  Texas, a thousand Democratic candidates, everything on

2  it says, "For voter information, go to MyTexasVotes."

3           So they go there.  They find everything

4  they might need to know in one location.  They're not

5  searching a very unfriendly website at the Secretary of

6  State or in -- let's just say -- I passed legislation

7  this last session -- I got legislation passed, drafted

8  and then lobbied it, to require election clerks to

9  actually have a website with their voting locations

10 because approximately a third of the counties in Texas

11 didn't post that information.

12          So MyTexasVotes is a way for us to tell

13 anybody that we come in contact with during an election

14 season, "If you need any of this information, where to

15 vote, when to vote, click on MyTexasVotes; and you can

16 find it there."

17      Q.   Okay.  And then the fourth bullet says,

18 "Mailing hundreds of thousands of voter registration

19 cards."  What do you mean -- what does the phrase "voter

20 registration cards" mean in this context?

21      A.   Voter applications.  A hard-copy piece of

22 paper that a person signs, puts in a postage-paid

23 envelope, and sends to their voter registrar.

24      Q.   And how does the Texas Democratic Party

25 determine whom to mail a voter registration application

1  to?

2      A.   People who we believe are not registered at

3  their current address.

4      Q.   Based on your data analytics?

5      A.   Yes.

6      Q.   And why not just go on the Secretary of

7  State's website and request that the State send a voter

8  registration application to their -- to those folks?

9      A.   Obviously, because, A, the voter would have to

10 find that SOS link, print out the paper -- and many

11 voters don't own a printer or print --

12     Q.   No, no, no, no.  I'm talking about the link on

13 the Secretary of State's website where one can request

14 that a postage-paid application be mailed --

15     A.   A, have the computer to do that.  But when you

16 get there, you can ask them, yes, to send you a form.

17 It is a laborious process.  It takes a week or more for

18 people to get that piece of paper.  Then they have to

19 fill it out and mail it in.

20              Often, we -- most people register -- I

21 mean, a considerable amount of people register in the

22 last weeks before the registration deadline.  And asking

23 the Secretary of State to send a blank piece of paper to

24 you for you to fill out and then send back in, to get it

25 in before that deadline often causes, let's say, tens of

69

1   thousands of people not to make the deadline.

2           So we make a decision of sending a

3   registration card in August to people that we know are

4   not registered to vote already, for them to have

5   convenience to fill it out.  That's what you call "how

6   you win an election."  We don't wait for people to

7   figure it out.  We make it available to them so that

8   they can take advantage of it by just filling in their

9   personal data, signing it, putting it in a postage-paid

10  envelope coming with the application.

11          In other words, we're not waiting for

12  people to ask.  We are sending people who are unaware

13  that they need to register to vote because they have not

14  been educated.  Remember that voter education project?

15  "Hey, you have to get on a registration list.  We're not

16  a state with automatic voter registration.  I'm sure you

17  vote -- you moved here from Washington, but you're not

18  going to automatically be on the voter registration

19  roles.  So you need to fill out a piece of paper."

20          That's why we mail it to them and not

21  just wait for people.  If we waited for people, then the

22  voter registration would be sorely lacking in Texas.

23      Q.   So --

24      A.   And, frankly, the majority of people in Texas,

25  just so I can say this again, register when they get

70

1  their driver's license.  That is the Number 1 place that

2  people register to vote for the first time; and they

3  could update their registration if the State of Texas

4  was following the federal law.

5      Q.   How do you know that the majority of people

6  register for the first time in connection with getting a

7  driver's license?

8      A.   The Texas Secretary of State announced that.

9      Q.   You mentioned a moment ago something about how

10  tens or hundreds of thousands of people would miss the

11  voter registration deadline by attempting to request a

12  form be mailed to them from the Secretary of State's

13  office.  Did I understand your testimony correctly?

14      A.   The deadline is 30 days before an election,

15  and we are depending on people to ask the Secretary of

16  State to send them by bulk e-mail a voter registration

17  paper form.  And a person asks for that a week before

18  the deadline.  The Secretary of State takes

19  approximately a week to mail that application to them.

20  They get it.  If they fill it out and drop it in the

21  mail, it will be after the deadline.  And across the

22  state of Texas in every general election, there are

23  thousands upon thousands of people whose application

24  comes in on the 29th, the 28th, the 27th, the 26th day

25  before an election.  They all get a letter saying,

71

```
1    "Sorry.  You're not registered to vote because you

2    didn't hit the magic 30-day deadline."

3         Q.   And how do you know that?

4         A.   How do I know that?

5         Q.   Yes.

6         A.   Because the election -- every -- I hear

7    anecdotally, as somebody who deals with voter protection

8    on our hotline, we have hundreds of people calling us

9    and say, "Well, I mailed my application."

10              And we investigate with the registrar,

11   "Did you receive an application from Joe Smith?"

12              And they say, "Yes, we received it 28

13   days before the election.  It was after the deadline."

14              So I've been doing this for 50 years.

15   Every election cycle there are people who are rejected

16   because their application comes in too late.

17              It is a known fact.  Any election

18   administrator talks about this problem.  If we had

19   automatic voter registration and online voter

20   registration, we wouldn't have this problem; but, you

21   know, that's an argument that we've made to the

22   Legislature and others about depending on people mailing

23   a signed piece of paper.

24        Q.   Is it your testimony that if Texas had online

25   voter registration, people would not submit their voter
```

Texas Democratic Party - 4/27/2020

72

1  registration applications after the deadline?

2      A.   No.  I'm going to say that the problem of the

3  U.S. Post Office delaying delivering an application

4  would go away.

5      Q.   How does the U.S. Post Office delay delivery

6  of a voter registration application?

7      A.   Because it takes -- it's not instantaneous.

8  If you could register online, when you hit submit, you'd

9  be registered to vote.  If I have to take a piece of

10 paper on three days before the deadline and drop it in

11 the mail -- and in rural Texas, it typically takes

12 something that's mailed in Taylor, Texas to go to

13 Georgetown, 5 miles away or 8 miles away, it has to go

14 first to Dallas and back to Georgetown; and it takes

15 three days.  So that person mailing it two days before

16 the deadline won't get registered because the post

17 office process of delivering mail takes more than

18 instantaneous.  Online voter registration is

19 instantaneous.  People --

20      Q.   Where?

21      A.   Huh?

22      Q.   Where?

23      A.   Thirty-eight states where people register

24 online.

25      Q.   It's instantaneous?

1        A.   As soon as you fill it in and hit "submit,"

2    you are registered to vote -- well, I mean, let me be

3    technical.  As soon as you do it, your application has

4    met the deadline.  The clerk then makes sure that you

5    are who you say you are and does all of the required

6    stuff, but you have met the 30-day deadline when you

7    submit it.

8        Q.   Do all of those states have a 30-day deadline?

9        A.   No, some of them have automatic registration.

10   You're on the list when you submit it to vote.  Texas is

11   the most archaic voter registration state in the United

12   States.  It has more impediments than any other state

13   imposed by Republicans for voter suppression.

14       Q.   What is the basis for that statement?

15       A.   Fifty years of personal knowledge.  Going back

16   to almost 50 years ago when I was turned away from being

17   a deputy voter registrar because I was a college

18   student, a federal lawsuit was filed by university

19   students at Prairie View.  I was at Sam Houston State.

20   I go back 50 years knowing about the problems of voter

21   registration in Texas that people in the other -- at

22   least another 40 states don't have, including --

23       Q.   This is based on your anecdotal experience in

24   the state of Texas, right?

25       A.   My personal.  Not anecdotal, my personal

1   experience.

2        Q.   Sure.

3        A.   You don't have to be deputized to register

4   someone to vote in almost any state in the country other

5   than Texas.  I've trained thousands of people to be

6   deputy voter --

7        Q.   Okay.  Mr. Maxey, I appreciate it.  I haven't

8   asked a question.  So if you could please just let me

9   ask a question and then answer, I would appreciate that.

10       A.   Glad to.

11       Q.   Thank you.

12            MS. MACKIN:  All right.  I am going to

13   share with everyone TDP 73.

14       Q.   (BY MS. MACKIN)  And please take the time you

15   need to review it and let me know when you're ready to

16   discuss it.

17       A.   Okay.

18       Q.   Do you recognize this document?

19       A.   An e-mail from me to our e-mail list.

20       Q.   Okay.  Dated February 7th, 2020?

21       A.   Yes.

22       Q.   Okay.  And this e-mail says, "We kicked off

23   our Voter Protection Fund so we can expand Texas voters

24   access to the ballot box."  Can you please tell me at a

25   high level what the Texas Democratic Party's Voter

1 Protection Fund is?

2     A.   It is a generic way to -- euphemistic way to

3 talk about money that we expend to do what is commonly

4 called "voter protection" being done by campaigns and

5 candidates and parties everywhere.  Voter protection

6 includes having things like a hotline where a voter can

7 call in and say, "I'm not on the voter registration

8 list.  Can you help me figure out why I'm not registered

9 to vote?"  And we then do the investigation and assist

10 that voter.

11        And so voters call in.  They call in and

12 ask about where their polling place is, hours of voting.

13 All of the information that we have on MyTexasVotes we

14 answer orally by phone call.

15        We have lawyers stationed around Texas

16 during voting periods that can go in person to a polling

17 place or to a clerk's office and assist a voter in

18 making sure their right to vote is not infringed upon.

19        We train volunteers in every county to

20 talk to voters, perhaps standing outside of polling

21 places, even, to give people information; or if they're

22 having problems, make sure that we rectify those

23 problems while the polls are still open.

24        All those things are generically called

25 voter protection; and that's why we raise money, to have

1   a staff of people.

2       Q.   Okay.  Thank you.  That's all I have on that

3   document.  I'm going to close out of that.

4               MS. MACKIN:  And then I'm going to share

5   with everyone the document marked TDP 139, still a part

6   of Exhibit 2, just as all of these documents are.

7   Actually you know what?  Rather than -- there we go.

8       Q.   (BY MS. MACKIN)  Mr. Maxey, please feel free

9   to take your time to review the document and let me know

10  when you're ready to discuss it.

11      A.   It's taking forever to load.

12      Q.   It's a bigger one than some of the previous

13  ones.

14      A.   It's about halfway.

15           Okay.

16      Q.   All right.  And if I can direct your attention

17  to the page marked TDP 140, there's a bit of white text

18  that's offset by a shadow of a ballot box behind it that

19  says, "Looking forward to 2020.  There remains 2.6 [sic]

20  unregistered voters in Texas who are likely to vote

21  Democrat if registered."  Just to clarify, that's based

22  on the same information as the e-mail we talked about

23  earlier that provided that 2.6-million figure?

24      A.   Yes.

25      Q.   Okay.  And then a little ways down the page,

1  right under that graphic, actually, it says, "During the

2  2018 midterm elections, thanks to our voter registration

3  initiatives, we helped 133,000 Democratic Texans

4  register shortly before the registration deadline and

5  120,000 of those who registered voted."  Did I read that

6  correctly?

7      A.   You did.

8      Q.   How did the Texas Democratic Party help

9  133,000 Democratic Texans register shortly before the

10  registration deadline in the 2018 midterms?

11      A.   We mailed out approximately a half million

12  voter registration applications to unregistered Texans

13  and tracked that 133,000 of those people returned those

14  applications to their voter registration clerk.  And

15  after the election, we checked the voter rolls to see

16  how many of the 133 people voted; and 120,000 of them

17  actually cast a ballot.

18      Q.   And in order to track who returned an app- --

19  well, how does the Texas Democratic Party track which

20  voters returned an application that the TDP sent the

21  voter to the county registrar?

22      A.   We use a program called Intelligent, I think,

23  of the U.S. Postal Service, by putting a bar code on the

24  application.  And the Post Office tells us when the

25  voter has mailed that application to their clerk.  It's

78

1  a business application that almost any direct mail

2  company -- I mean, direct mail that a business does uses

3  to track whether somebody has returned a payment or, in

4  our case, returned a voter registration application.

5      Q.   And so I know that after the election, it's

6  publicly available to find out whether somebody voted in

7  that election.  Is there a way to determine -- TDP can

8  determine that the application they sent was then sent

9  on to the county registrar.  Can they determine whether

10 or not the registrar accepted the application and

11 registered the voter?

12     A.   Yes.  We can -- we get a list of newly

13 registered voters.

14     Q.   Okay.

15     A.   And those that have been processed, we buy

16 those weekly -- or pay the fee to get them from the

17 Secretary of State weekly, put them in our file so we

18 can know that they're on the list.  If they're not on

19 the list, we inquire -- if there's time left.  Typically

20 this is happening right at the election.  But if we're

21 doing this long term, if the registration application,

22 we have tracked that it was returned but they don't show

23 up on the roll, then we can inquire with the voter

24 and/or the registrar the reason the application was

25 rejected and get that person re-registered correctly.

1    Q.    And I apologize if we've already covered this.

2  I just want to make sure I understand.  And it's getting

3  a little close to lunch, so my blood sugar is a little

4  lower; but before you send out the voter registration

5  applications, how do you determine whether an individual

6  is already registered?  Where does that information come

7  from?

8    A.    It's simple data analytics.  You take the list

9  you're going to mail to and you plop it against the

10 people who are on the list; and if they're on the list,

11 you remove them.  And the people left are the people

12 that are not registered.

13   Q.    Okay.  Thank you.

14         All right.  Let's scroll down to the next

15 page, TDP 141.

16   A.    Okay.

17   Q.    So this mentions, at the very top, that an

18 estimated 2.6 million Texans are likely to vote

19 Democratic if they are registered.  How does the Texas

20 Democratic Party intend to try to register those folks?

21         MR. GEISE:  And, again, I'm just going to

22 instruct the witness to answer at a high level without

23 infringing on anything that's First Amendment protected.

24   A.    We will (inaudible.)

25         (Reporter requests repeat.)

1          THE WITNESS:  Sorry.  I had a pillow on

2   my lap, and it probably covered up the...

3        A.   We will train tens of thousands of deputy --

4   or get trained through their clerk tens of thousands of

5   deputy registrars who will register people in their

6   communities.  We will have tabling on college campuses.

7   We do a program right on the deadline tabling in

8   probably 5- or 6,000 locations around Texas all day

9   long.  We will mail probably during this cycle close to

10  a million voter registration cards or applications out

11  to people we perceive that are unregistered in the

12  program we just talked about.  We will direct people

13  through social media, online digital ads to

14  RegisterTexas.com, a voter registration app that we

15  have.

16          We will have people phoning -- or

17  organizers going where -- you know, our LGBT organizer

18  will go to LGBT events; our Muslim organizer will go to

19  Muslim events and ask people to register to vote.

20          So there are literally dozens upon dozens

21  of voter contact ways.  Any and everything that we do,

22  there will be a voter registration component to it

23  between now and the 30-day deadline before the November

24  election.

25       Q.   What is RegisterTexas.com?  You mentioned it's

1  a voter registration application, but can you tell me a

2  little bit more about it?

3      A.   It's an online system where a person goes and

4  fills out their voter registration information, their

5  name, their address; and it will then -- when they

6  submit it, we will mail them a pre-populated voter

7  registration application with the information they have

8  given us.  When they get it, they sign it, put it in a

9  postage-paid envelope and drop it in the mail.  It's

10  already addressed to their voter registrar.

11              It's a shortcut for those people who

12  don't either own a printer, an envelope, or a stamp

13  because the biggest impediment for people to registering

14  on their own without a postage-paid envelope is the

15  inability to have a postage stamp.  People just don't

16  regularly have those in this day and age or have an

17  envelope, even, in this day and age, especially younger

18  voters.  So this is a way to:  Give us your information.

19  We will send you the application filled out.  You just

20  have to add in the personal information, like your

21  driver's license number that we don't have, those kinds

22  of things, IDing things, sign it, date it, put in the

23  postage-paid envelope.

24      Q.   About how long does that process take?  Like,

25  if I went on RegisterTexas.com and filled it out, how

82

1  long, approximately, would it be until I got my

2  application in the mail to sign and then forward along

3  in the postage-paid envelope?

4       A.   We're mailing them out weekly.  We will do

5  that all the way up until a week before the election.

6       Q.   Okay.

7       A.   And most of this we wouldn't have to do if

8  people could update their registration when people got

9  their driver's license updated.

10           MS. MACKIN:  I'm going to object to the

11 last sentence as nonresponsive to a question that I've

12 asked.

13      Q    (BY MS. MACKIN)  Lower down on page TDP 141 --

14           MR. GEISE:  Does it make sense to take a

15 break after we're done with this document?

16           MS. MACKIN:  Sure, yes.

17           MR. GEISE:  Okay.

18           MS. MACKIN:  Good idea.  And I've only

19 got ten minutes, maximum, left on it, maybe less.

20           MR. GEISE:  Okay.

21      Q    (BY MS. MACKIN)  So it mentions that -- sorry.

22           MS. MACKIN:  I'm used to doing this on

23 paper, and the computer is an adjustment.  I know I'm

24 making this, like, inquisitive face into the camera.

25           MR. GEISE:  It's a whole different

1  process.  I got you.

2       Q.   (BY MS. MACKIN)  It's this first full

3  paragraph.  It says, "Through the shifting demographics

4  in Texas, amplified by Texas Democrats' aggressive voter

5  registration initiative, we anticipate the voter rolls

6  will swell to upwards of 18 million registered voters in

7  2020."  And without inquiring into any internal

8  proprietary information, can you tell me the source of

9  that projection?

10      A.   I think it's -- if you read down this page,

11  there's references to TargetSmart, which is an analytics

12  firm --

13      Q.   I see.

14      A.   -- that does data around registration.  You

15  know, they later say that 2.6 [sic] people registered

16  since 2016.  And you can do analysis on how many people

17  were registered at the beginning of this election cycle,

18  how many people are registering per month with the

19  Secretary of State, how many potential people are moving

20  in the state, the growth of population, the number of

21  18-year-old -- people coming onto the rolls who are 18,

22  the number of people who are dying off the roles.  You

23  do all that analysis, and you come up with an estimate

24  that we will move from the approximately 16 million that

25  were registered in 2018 to 18 million by 2020.

84

1    Q.   All right.

2    A.   The hard part of that will be the efforts of

3  the Democratic Party and the Republican Party to add new

4  people to the program, the kind of programs that we run

5  and they run.  Plus, as I said before, the number of

6  people moving into the state or changing address being

7  registered through the DPS.

8    Q.   All right.  I'd like to move down to TDP 142,

9  just the next page.

10   A.   Uh-huh.

11   Q.   What does this show, Mr. Maxey?

12   A.   It's an analysis of legislative districts and

13 those we -- let me make sure I'm doing this -- it's sort

14 of the Democratic voting strength by legislative

15 district and showing that there are 18 districts that

16 have -- potentially can flip to be Democratic districts

17 in the 2020 election if the registration trends and

18 voter turnout (inaudible.)

19           (Reporter requests repeat.)

20           THE WITNESS:  Voter turnout trends are

21 what we hope they are.

22   Q.   (BY MS. MACKIN)  And just to be clear, this

23 refers to State House Districts?

24   A.   Yes.

25   Q.   Okay.  And then scrolling down to the next

85

1  page, TDP 143, what does this page show?

2       A.   The same kind of analysis, potential new

3  Democrats by Congressional Districts.

4       Q.   All right.  And then down to page 1 -- well,

5  actually -- page TDP 147, the second-to-last paragraph.

6       A.   The one, "That's why we're coming together"?

7       Q.   It begins, In January 2020."

8       A.   Okay.  I was on 148.  All right.

9       Q.   So it talks about a lawsuit challenging an

10  unconstitutional electronic signature ban spearheaded by

11  the Texas Secretary of State.  Do you know what that is

12  a reference to?

13      A.   Yes.

14      Q.   And what is that a reference to?

15      A.   The Secretary of State has made a ruling that

16  a person who signs a voter registration application and

17  then scans it and mails it -- e-mails it in has to be

18  rejected (inaudible.)

19                (Reporter requests repeat.)

20                THE WITNESS:  Because it's not wet ink.

21      Q.   (BY MS. MACKIN)  And what ruling is that?  You

22  referenced a ruling by the Secretary of State.

23                MR. GEISE:  And I'm just going to object

24  because it calls for a legal conclusion, but you can

25  answer.

1      A.     In 2018 an organization called Vote.org

2    suggested to Texas voters that they could fill out an

3    application, take a picture of their signature, place

4    that picture on the application, attach it to the

5    application, and e-mail it in, which complied with all

6    state law, as I understood it at this time, that it was

7    an application with a signature on it.  And the

8    Secretary of State issued a ruling at that point in time

9    or told Vote.org or election administrators not to

10   accept those apps -- voter registrars not to accept

11   applications because there was not wet ink on the paper.

12      Q.   Okay.

13            MS. MACKIN:  All right.  That's all I

14   have on this document.  So if we want to break for

15   lunch, how long do folks need?  I can be flexible.  I

16   think maybe somewhere between one and two hours left for

17   me today on this depo.

18            MR. GEISE:  Okay.  Glen, how long do you

19   want for lunch?  I mean, I can be pretty -- an hour,

20   half an hour, 45?  It's up to you.

21            THE WITNESS:  I can eat a sandwich in 20.

22            MR. GEISE:  So let's do -- half an hour's

23   fine by me if it's fine by everyone else.

24            MS. BRANCH:  Yep, half an hour sounds

25   good.  Is that okay with you, Anna?

1           MS. MACKIN:  Can I add, like, five

2   minutes and we come back at 1:00, just so we make it a

3   round number?

4           MR. GEISE:  Yeah, that's perfect.

5           MS. MACKIN:  I'm ordering my Uber Eats

6   right now.

7           MR. GEISE:  Well, if you need more

8   time -- I mean, if you need more time, that's totally --

9   we can do 45 or whatever you want to do.  1:15?

10          MS. MACKIN:  How about we plan on 1:15

11  just to be safe?

12          MR. GEISE:  Yeah, that works.

13          MS. MACKIN:  Appreciate it.

14          MR. GEISE:  Yeah.

15          THE REPORTER:  We're going off the record

16  at 12:25 p.m.

17              (Off the record from 12:25 to 1:18 p.m.)

18          THE REPORTER:  Going back on the record

19  at 1:18 p.m.

20          MS. MACKIN:  All right.  I'm going to

21  share a document with everyone in the chat box, marked

22  TDP 92.

23     Q    (BY MS. MACKIN) Mr. Maxey, please let me know

24  when you've had a chance to pull up that document and

25  take a look at it.

1     A.   All right.

2     Q.   Do you recognize this document?

3     A.   It's an e-mail sent by Manny Garcia to the TDP

4 e-mail list.

5     Q.   On December 31st, 2019, correct?

6     A.   Correct.

7     Q.   All right.  And down about halfway through the

8 e-mail, underneath Protecting & Expanding the Vote, the

9 last sentence says, "We aren't done yet, but we have big

10 voting rights news to announce soon."  Did I read that

11 correctly?

12    A.   You did.

13    Q.   Okay.  Has that big voting rights news been

14 announced yet?

15    A.   Yes.

16    Q.   And what was that voting rights news?

17    A.   That news was that FairFight.org would be

18 giving the Texas Democratic Party a major grant to hire

19 voter protection staffers.

20    Q.   And what are those voter protection staffers

21 that are funded by the FairFight.org grant working on?

22    A.   All of the voter protection things that we've

23 already put in the record that we do.

24    Q.   And so those would be the hotline?

25    A.   Hotline, poll watchers, working with the

1    county clerks and election administrator on election

2    procedures.  That department is working with election

3    administrators and folks all over the state right now in

4    how to handle the Democratic primary election that I

5    run, but they are working on the logistics to make

6    polling places vote-by-mail accessible during the

7    COVID-19 crisis, those kinds of activities.

8         Q.   All right.  Thank you.  That's all I have on

9    that document.

10              MS. MACKIN:  I'm now going to share a

11   link in the chat box to a document marked TDP 129.

12        Q.   (BY MS. MACKIN)  Please let me know when

13   you've had a chance to pull that up and are ready to

14   discuss it.

15        A.   Okay.

16        Q.   And this is an e-mail dated September --

17              MR. GEISE:  It took me a second to do it,

18   too.

19              MS. MACKIN:  Counting on my fingers.

20        Q.   -- September 24th, 2019 from Kassandra Aleman

21   sent out to the TDP Listserv; is that right?

22        A.   Correct.

23        Q.   Okay.  Down under that signature block, it

24   says in bold text, "Don't forget to register to vote or

25   share this e-mail with friends and family to help them

1  register.  Click here to update your registration today.

2  It only takes two minutes."  Do you know what that

3  "click here" language linked to?

4      A.   I'm going to surmise because I can't click the

5  link to figure that out, but I imagine it goes to our

6  website that links to Register2Vote.org, which is the

7  same kind of system as our RegisterTexas.org -- or dot

8  com that we just talked about where people can fill out

9  an application, print it out, and mail it in.

10                 MR. GEISE:  And, Counsel, we can check.

11  I don't know if it's still live or if I could look and

12  see if there's a way to get back to you on what that

13  was, after.

14                 MS. MACKIN:  Okay.  We'd appreciate that.

15  Thank you.

16      A.   The only thing that we would have had live in

17  September of 2019 is the Register2Vote.org site that's

18  branded to the TDP through an agreement.  And that's

19  where they fill in their information, Register2Vote.org

20  mails them an application, which they sign and put in

21  their personal ID information, put it in a postage-paid

22  envelope and send to the clerk to register.

23      Q.   (BY MS. MACKIN)  And how is Register2Vote.org

24  different from the other site that we were discussing

25  before lunch?  I'm blanking on the URL.  I think it was

1   RegisterMe.com or something like that.

2         A.   Register, the number 2, vote dot org.

3         Q.   Okay.

4         A.   It's an organization that does voter

5   registration kind of work.  We have a contractual

6   agreement as a vendor with them.  So they have a site

7   where people can do this, register.  Anybody can

8   register to vote, Democrats or Republicans.  And we've

9   contracted to have a version of that branded through the

10  Texas Democratic Party through a contractual agreement.

11        Q.   And what is the purpose of having both of

12  these systems?

13        A.   The first one was one we just branded and we

14  wanted to make it something that looked more specific to

15  the Texas Democratic Party and also that we would be

16  able to see the data of who registered through the data

17  agreement and contractual stuff.  So it's a new

18  iteration of the old system that's probably

19  discontinued.

20        Q.   Okay.  And are both systems still in operation

21  today, or is it just Register2Vote.org?

22        A.   Both are in operation today.

23        Q.   And the Texas Democratic --

24        A.   We're pointing people to the new system.  In

25  the past it was going there, and we didn't know who was

1 registering because it was a tool of Register2Vote.org

2 that we were just pushing people to. Now, they're going

3 through our system; and we have a data-sharing agreement

4 by contract to know who has filled in the applications.

5     Q. And what information does the Texas Democratic

6 Party receive about who has filled in those

7 applications?

8          MR. GEISE: I'm just going to -- on the

9 First Amendment -- I mean -- yeah, I guess -- I think

10 you can answer broadly.

11          I'll withdraw the objection. That's

12 fine.

13     A. It's the information that's legally available

14 if I were to go to the Secretary of State and ask for a

15 list of voter registrars, the information they could

16 give us, their name, their address, their date of birth.

17 That's about it on the voter registration.

18     Q. (BY MS. MACKIN) That's it, first and last

19 name, address, and date of birth?

20     A. Yeah. I mean, the Secretary of State does not

21 give us, you know, the driver's license, the last four

22 of Social. Any of that personal ID is prohibited by law

23 to be shared, so we never collect it. We are very

24 careful not to ever collect things that would be

25 prohibited if we asked the Secretary of State to give

1    stuff off of the system.

2        Q.   And so just so I'm clear, under the data-

3    sharing agreement with Register2Vote.org, y'all collect

4    first and last name, address, and date of birth on the

5    individuals and no other information?

6        A.   No.  We get their phone number and e-mail, but

7    that is done prior to the person asking to fill out the

8    form.  We ask, "What's your e-mail?  What's your phone

9    number?"  And then we -- the question is, "Would you

10   like to register to vote?"  So if it had been asked in

11   a different manner, the e-mail and phone number -- or

12   the phone number because the e-mails are not on the

13   registration applications -- I guess phone numbers

14   aren't, either -- they may be; I can't remember.  But if

15   we were getting them after they registered and signed

16   it, then that would be illegal; but we ask up front

17   before they fill it out.

18       Q.   That's all I have on that document.  Thank

19   you, Mr. Maxey.

20            MS. MACKIN:  I am going to share with

21   everyone a file marked TDP 157.

22       Q.   (BY MS. MACKIN)  And, if you could, please let

23   me know when you have been able to pull up that document

24   and are ready to discuss it.

25       A.   Okay.  All right.

1      Q.   Do you recognize this document?

2              MR. GEISE:  I'm sorry, Counsel.  This was

3  meant to -- sorry.  I realize that this document -- we

4  can produce a better version of this, but we can talk

5  about that later.

6              MS. MACKIN:  Thank you.  I wasn't --

7      A.   I recognize it.  It's a screenshot of

8  something that pops up when you go to the page on our

9  website about Democratic leaders.  It's what's called a

10  pop-up.  Its asks people to give some money.

11      Q   (BY MS. MACKIN)  And do the identities of the

12  Democratic leaders appear on this copy?

13      A.   No, because it's a screenshot.  These are all

14  links to our website.

15      Q.   Okay.

16              MR. GEISE:  And I think for maybe three

17  of them -- we can talk after.  I think for three of

18  these we are providing in response to requests things

19  that were meant to be screenshots of the website; and

20  maybe if we provide the address, you guys would know

21  that address and go to it and that will -- rather than

22  trying to figure out a technical way to produce it so it

23  shows, we can just give that to you.  But I have a list

24  of those, and we can figure that out after.

25              MS. MACKIN:  Okay.  Thank you.  I

1    appreciate that.

2              All right.  I'm sharing with everyone a

3    file titled TDP 164.

4         Q    (BY MS. MACKIN) And, Mr. Maxey, please let me

5    know when you have that up on the screen and are ready

6    to discuss it.

7         A.   A very slow download.

8         Q.   It's a lengthier one of the files.

9         A.   I got it.

10        Q.   All right.  Do you recognize this document,

11   Mr. Maxey?

12        A.   A screenshot of our website on the section

13   dealing with our platform.  It has the platform spelled

14   out.

15        Q.   Okay.  Is this the current version of the

16   Texas Democratic Party platform?

17        A.   The version -- the platform adopted at the

18   2018 Democratic State Convention.  We'll adopt a new one

19   in June of this year in our virtual state convention.

20        Q.   You will adopt a new one in June of this year,

21   you said?

22        A.   Every (inaudible.)

23              (Reporter requests repeat.)

24              THE WITNESS:  Every two years at our

25   biennial state convention, we update our platform.

1    Q.   (BY MS. MACKIN)  And so is TDP 164 an accurate

2  reflection of the current Texas Democratic Party

3  platform?

4    A.   (Inaudible.)

5    Q.   I'm sorry.  Did you -- you broke up a little

6  bit.

7         MR. GEISE:  I think he said "verbatim."

8         THE WITNESS:  Verbatim.

9         MS. MACKIN:  Thank you.

10   Q.   (BY MS. MACKIN)  And so it would be a fair and

11  accurate representation of TDP's positions on issues?

12   A.   Our values and positions on legislative and

13  policy issues, yes.

14   Q.   Okay.  Thank you for that.  That's all I have

15  on that document.

16         MS. MACKIN:  I am sharing with everyone

17  TDP 256.

18   Q.   (BY MS. MACKIN)  And please let me know when

19  you have that pulled up and are ready to discuss it.

20   A.   I've got it.

21   Q.   Do you recognize this document?

22   A.   It's an e-mail from Cliff Walker, our Deputy

23  Section Director, to our e-mail list.

24   Q.   And how would you describe this e-mail?  What

25  type of activity by the Texas Democratic Party would you

1  say that this falls under?

2      A.   Organizing.  This is going out from -- to our

3  list about our organizing efforts in the -- when

4  COVID-19 hit, our organizers who were doing door-to-door

5  stuff were sort of sidelined and we've gone into more of

6  an e-mail online organizing, asking people to go into

7  what we call Connect Texas, where there are local people

8  who are working in their communities -- volunteering to

9  work in their communities around educating people about

10  public health, who are doing wellness checks of senior

11  citizens who are Democratic voters and talking to them,

12  all in the mode of checking on them, getting them

13  COVID-19 information, where appropriate, and asking if

14  they're registered to vote or they need a vote-by-mail

15  application, and other kinds of things that we can do in

16  the age of COVID-19, Connect Texas.

17      Q.   Thank you for that.  I think that's all I have

18  on documents.

19          I want to follow up on a couple of more

20  points.  Is TDP a membership organization?

21      A.   Yes.

22          MR. GEISE:  I'm just going to object to

23  legal conclusion.  You can answer.

24      Q.   (BY MS. MACKIN)  And who are TDP's members?

25          MR. GEISE:  Same objection.  You can

1    answer.

2                  THE WITNESS:  And so you say objection; I

3    can't answer?

4                  MR. GEISE:  No, I said you can answer.  I

5    said same objection to a legal conclusion, but you can

6    answer.

7        A.   The Texas Election Code states that members of

8    a political party are the voters who cast a ballot in

9    their primary election or sign an Affidavit of

10   Affiliation with a Party -- it's spelled out in the

11   Election Code -- with a Party officer.  And so our

12   members, in a legal sense, are approximately 2,084,000

13   Texans who voted in the March 3rd Democratic primary.

14       Q.   (BY MS. MACKIN)  Does TDP maintain a list of

15   those members?

16       A.   They are in our voter file as having cast a

17   ballot.  They are -- we don't deal with them as a

18   membership list on a regular basis.  They are legally

19   members.

20                  MR. GEISE:  And I think the question

21   asked whether or not there's a membership list.  I think

22   any further inquiry into membership is core First

23   Amendment protected under a number of the cases.

24   (Inaudible.)

25                  THE WITNESS:  Can I just say that there's

1  feedback when Mr. Geise is speaking?  Are y'all hearing

2  it?

3            MS. MACKIN:  I was hearing it.

4            THE REPORTER:  I'm sorry, Mr. Geise.  I

5  can't hear you now.

6            MR. GEISE:  Can you hear me?

7            THE REPORTER:  It's still very staticky.

8            MS. BRANCH:  Can you try it -- we can't

9  hear you.  Can you try it without the headphones?  Will

10  that help?

11            For what it's worth, I think there was an

12  objection to form, legal conclusion, and --

13            MR. GEISE:  I think I fixed it now.

14            THE WITNESS:  Yeah.

15            MR. GEISE:  You can hear me?

16            THE WITNESS:  Yes.

17            MR. GEISE:  (Inaudible.)  You can't hear

18  me?

19            THE REPORTER:  It's still very staticky

20  on my end.

21            MR. GEISE:  Does this work better?

22            MS. MACKIN:  I'm getting a lot of static,

23  still, as well.

24            MR. GEISE:  Okay.  Well, I can try to

25  change it to --

1          MS. MACKIN:  Well, wait.  That just got a

2   little better.

3          MR. GEISE:  Yeah.  Okay.

4          THE VIDEOGRAPHER:  It's still there in

5   the background.

6          MR. GEISE:  I mean, I can try to use my

7   laptop microphone and see if that would improve it.  Let

8   me try switching to that.

9          Is this better?

10          THE WITNESS:  Yes.

11          MR. GEISE:  Okay.  Well, I will listen in

12   on the headset unless, you know, it kind of breaks up;

13   and I will talk through my PC microphone.  So hopefully

14   you don't hear my cat in the background too much.

15          MS. MACKIN:  That's much better.  You

16   just -- if you could -- I can still hear you, but it's a

17   lot quieter.  So if you want to make a forceful

18   objection, you might speak up a little bit more.

19          MR. GEISE:  All right.  I'll try to --

20   okay.  Well, I will awkwardly be close to the

21   microphone.

22          MS. MACKIN:  There is nothing about this

23   process that is not awkward, so.

24          MR. GEISE:  So, anyways, I'm sorry.

25   Sorry for that interruption.

1    Q    (BY MS. MACKIN)  All right.  Mr. Maxey, can

2    the Texas Democratic Party apportion a specific cost to

3    each new voter that it registers?

4    A.   I think that's an impossibility because it's

5    wrapped up in multiple levels of employee salaries,

6    whether that message went through the technology, the

7    data targeting, who we talked to, the communication

8    method that happened -- it could have been through a

9    text message.  It could have been through a piece of

10   mail.  It could have been through -- you know, so

11   pulling all that apart is just an impossibility.  I

12   mean, to allocate some of my salary, just as Luke

13   Warford, as the voter expansion, the data team's salary,

14   the communications salary, the end cost to mail

15   something, the postage cost if we mailed it.  You know,

16   I guess you could go through and figure out the cost of

17   a particular mailing, but not the overall cost by voter.

18   Q.   When the Texas Democratic Party reaches out to

19   someone to attempt to register them to vote, do you

20   check whether that individual has engaged in an online

21   transaction with DPS?

22   A.   No, we would not know that.

23   Q.   Does the Texas Democratic Party believe that

24   any increase in voter registrations will benefit

25   Democrats?

1      A.    I think that's pretty much a given that the

2   more people that vote, the more likelihood -- I mean,

3   this is my opinion now, if that's what you're asking.

4   If you look at the demographics of the people that we

5   believe are unregistered in Texas, they are

6   overwhelmingly African-American, Hispanic, and Asian.

7   They are overwhelmingly under the age of 35, and they

8   are overwhelmingly in Democratic areas of Texas -- or

9   communities that vote overwhelmingly for Democrats.  So,

10  yes, we believe that gross amount of registration inures

11  to our benefit a lot.

12      Q.    Okay.  I'd just like to go through -- turning

13  back to Exhibit 1, the Notice of the Deposition -- I

14  think if we scroll up to the chat box, it's still

15  available there.

16      A.    Sorry.  I'm readjusting my water cup.

17      Q.    No problem.

18            And once you are there, please join me on

19  page 7.

20      A.    Of what?

21      Q.    Of the Deposition Notice.

22      A.    Are you sharing it with me?

23      Q.    Oh, it's -- I can share it again; but if you

24  go to the group chat and go all the way to the top, it

25  will be the first document that we're sharing.

1      A.    You're right.   Okay.

2      Q.    All right.   On page 7 this is a list of the

3  categories of documents that Defendants have requested

4  TDP to produce, and I'm just going to go through each

5  one with you.   Category 1 says, "Documents sufficient to

6  substantiate the factual allegations in Paragraphs 11

7  and 29 through 35 of your Complaint."   I'd be happy to

8  pull up the Complaint if that's helpful, but my question

9  is whether you've produced documents responsive to this

10 category.

11             MR. GEISE:   And I'm just going to object.

12 And you can answer any of this other than if -- I mean,

13 you can answer to the extent any of this doesn't

14 implicate conversations or documents that you produced

15 that -- I mean, to the extent it doesn't implicate

16 conversations with counsel, you can answer this; but if

17 your only answer is that you produced documents in

18 consultation with counsel, I think that's the extent of

19 that inquiry.

20             MS. MACKIN:   We are entitled to inquire

21 into compliance with the subpoena.

22             MR. GEISE:   Well, but you can ask -- I

23 mean, yes; and you can ask him if they produced

24 documents, I mean.

25             MS. MACKIN:   And that's what I'm asking.

1          MR. GEISE:  All right.

2      A.   Well, I believe that we have produced

3  documents sufficient to substantiate the allegations.

4      Q.   (BY MS. MACKIN)  Okay.

5          MR. GEISE:  And I'm also going to then

6  object that that calls for a legal conclusion, but you

7  can continue.  Sorry.  I just wanted to get that on

8  record.

9      Q.   (BY MS. MACKIN)  Are there any other documents

10 that I would need to look at to substantiate the factual

11 allegations that TDP is making in this lawsuit?

12     A.   Not that I'm --

13         MR. GEISE:  Objection, calls for a legal

14 conclusion.

15         But you can answer.

16     Q.   (BY MS. MACKIN)  All right.  Moving on to

17 Category 2, "All communications between you, TDP, and

18 any person to assist them in registering to vote or

19 updating their voter registration information after a

20 driver's license renewal or change of address

21 transaction on the DPS website."  Did you produce

22 documents responsive to this category?

23     A.   I'm unaware of any documents that we have in

24 our possession or have ever even created that is a

25 conversation between TDP staffers and voters after

1   they've completed this transaction as far as a document.

2   I mean, most -- everything we know about this process is

3   anecdotal or people reporting us -- to us through oral

4   conversations on our hotline or clerks telling us of

5   these problems of people getting registered after going

6   to the DPS.  We get many, many reports from county

7   clerks and election officials of people who believe they

8   have registered with DPS or when they changed their

9   address, but it didn't happen.  And we've relied on

10  reports from some studies from Battleground Texas about

11  that process.  But us reaching out and finding a voter

12  one by one as they've used DPS -- because we have no

13  knowledge personally of that unless that voter calls us

14  and tells us that they used DPS and didn't get

15  registered to vote.

16      Q.   So is it your understanding that TDP doesn't

17  have anything responsive to this category?

18      A.   Nothing that's e-mail or writing.  Almost all

19  of this conversation -- is conversations between voters

20  and our hotline people or voter protection people or us

21  talking about the problem of it, not with the voter but

22  with the clerks or election administrators.

23      Q.   And would there be any documentation of those

24  conversations that you mentioned?

25      A.   Not that I'm aware of.

1     Q.   All right.  Moving on to Category 3,

2  "Documents sufficient to show all information described

3  and/or requested in Deposition Topic Numbers 2, 3, 4, 5,

4  and 7, as described in Attachment A."  Please join me on

5  the previous page if it's helpful.  Did you produce

6  documents responsive to this category with respect to

7  30(b)(6) Topic 2?

8            MR. GEISE:  And -- well, I guess,

9  Mr. Maxey, you can answer that to the extent you're

10  aware and whether or not you're aware of whether or

11  not Counsel has provided the State with publicly

12  available -- with the locations of publicly available

13  information other than the documents produced.

14     A.   I'm sorry.  Are we talking about Number 2,

15  "Your organization, including your organizational

16  structure, employees, physical assets..."?

17     Q.   (BY MS. MACKIN)  Yes, sir.  I am asking

18  whether you produced documents sufficient to show TDP's

19  "organization, including organizational structure,

20  employees, physical assets, parent and sibling entities,

21  tax status, and history, the services that you provide,

22  and the activities you perform."

23            MR. GEISE:  And I will instruct the

24  witness that you can answer to the extent of your

25  knowledge of whether or not non-privileged, non-First

107

1  Amendment privileged documents were produced in response

2  to that request.

3       A.   I believe they have been.  I don't know if

4  there were any questions or documents about our tax

5  status.  So I can answer that if you want to know our

6  tax status, but I don't know if there's a document

7  anywhere in this about that.

8       Q.   What is your tax status?  Sure, go ahead and

9  provide that.

10      A.   Political parties are an IRS 527, created by

11 the IRS Code; and we are legally established through the

12 Texas Legislature.

13      Q.   All right.  Moving on to 30(b)(6) Topic 4,

14 have you produced documents sufficient to show the

15 activities on which TDP has spent funds or to which it

16 has dedicated resources in Texas between January 1st,

17 2014 and the present?

18           MR. GEISE:  I'm going to just, again,

19 object.  It calls for a legal conclusion.

20           And you can answer to the extent that you

21 believe that non-privileged documents have been produced

22 or indicated to Defendants where they are publicly

23 available.

24      A.   Well, I think all our non-privileged documents

25 have been produced; and all this information is publicly

1  available on the Texas Ethics Commission and the Federal

2  Election Commission websites.

3     Q.  Okay.  Did you -- moving on to Deposition

4  Topic Number 5, did you produce documents sufficient to

5  show the activities on which TDP plans to spend funds or

6  to which it plans to dedicate resources between the

7  present and January 1st, 2024?

8           MR. GEISE:  And, again, I would instruct

9  the witness that you can answer to the extent you are

10  aware of non-privileged, non-public documents regarding

11  Request Number 5.

12     A.  I mean, this whole Number 5, everything would

13  be privileged under our First Amendment.  And I will

14  tell you that we will spend all the money we raise.

15     Q.  But you have not produced documents responsive

16  to -- you have not produced documents sufficient to show

17  the information in Topic 5 on advice of Counsel?

18     A.  I am saying exactly that.  There is nothing on

19  this list that's not protected under our First Amendment

20  organizing rights.

21     Q.  Okay.  And then have you produced -- jumping

22  down to Topic 7, have produced documents sufficient to

23  show your members who are eligible to use the DPS

24  website for a driver's license renewal or change of

25  address transaction and intends to do so?

1        MR. GEISE:  I'm just going to object,

2   asked and answered, to the earlier conversation about

3   whether or not such documents exist.  So to the extent

4   you're aware of whether or not such documents exist, you

5   can answer.

6        A.   We have no such document to produce.  It's

7   just common knowledge that every Texan who's over the

8   age of 16 who might want to get a driver's license or

9   change their address may use the DPS system.  So it is

10  pretty much all of our members and those that have some

11  kind of disability that they cannot drive a car, such as

12  a blind person.

13       Q.   But you haven't identified any specific

14  individual member, have you?

15       A.   Well, there are named Plaintiffs in this

16  lawsuit.  I think that almost all of our members are

17  similarly situated that at some point every six years

18  they will have to go to a DPS office and renew their

19  driver's license unless they use the online system to

20  change their address in between those six-year periods,

21  which doesn't get them registered to vote.  So, no, we

22  don't have a list because it's everybody.

23       Q.   All right.  Back to the categories of

24  documents, Number 4 requests "Documents sufficient to

25  show your organizational structure and employee -- and

110

1   internal employee hierarchy, including an organizational

2   chart and job description of all employees."  Have you

3   produced documents responsive to this category?

4               MR. GEISE:  The same instruction.  You

5   can answer to the extent you're aware of non-privileged

6   responsive documents or to the extent that you don't

7   believe you've testified to this matter.

8               MS. MACKIN:  I don't think it's a valid

9   objection.

10              MR. GEISE:  All right.  You can answer to

11  the extent you are aware of non-privileged responsive

12  documents.

13      A.   I'm aware of not -- I'm not aware of any

14  non-privileged responsive documents to that question.

15  It's all internal to our First Amendment rights.

16      Q.   (BY MS. MACKIN)  And so just to make it

17  perfectly clear --

18      A.   Who our employees are and what we pay them is

19  on the TEC or FEC websites.

20      Q.   And this does not request what your employees

21  are paid.  It requests organizational structure,

22  including an organizational chart and job descriptions.

23  And as I understand your counsel, is it TDP's position

24  that that information is protected under the First

25  Amendment?

1          MR. GEISE:  Yes.  Although, I believe

2   that Mr. Maxey has testified to the public nature of

3   that information.  If you're aware that any -- and that

4   we provided the publicly available organizational chart,

5   which I understand did not come through correctly; and

6   we will supplement the production in that manner with

7   that website.  But I believe that anything other than

8   that is privileged.

9          A.   All of our staff and their job titles, at

10  least, is posted on our website; and the links were in

11  the document that we produced.

12         Q.   All right.  And then the final category, "To

13  the extent not already produced in response to Items 1

14  through 4 above, all documents reviewed in preparation

15  for your deposition."  Have you produced documents

16  responsive to this category?

17         MR. GEISE:  I'm just going to object.  I

18  mean, you are able to answer that question "yes" or

19  "no."  But I believe that any specific documents you

20  reviewed are subject to the attorney-client privilege.

21  You can answer "yes" or "no" whether all documents you

22  reviewed in preparation for this deposition have either

23  been produced or Counsel has been -- or, to your

24  knowledge, whether or not Counsel has been directed to

25  the appropriate publicly available websites.

1        A.    So my answer is:  Every document I reviewed in

2    response to this has been produced or I have told you

3    where to find it on a publicly available website.

4        Q.    Okay.

5                MS. MACKIN:  We'll request

6    supplementation, as was discussed with my colleague,

7    Chris, earlier and was discussed today; and we will hold

8    this deposition open to ask any questions about

9    documents that have been supplemented.  But subject to

10   that, we pass the witness.

11               MR. GEISE:  All right.  And we'll --

12   well, I just have a couple of questions, Mr. Maxey.

13                      EXAMINATION

14   BY MR. GEISE:

15       Q.    Now, Mr. Maxey, without reviewing or

16   discussing any specific documents you reviewed in

17   preparation for this deposition, did you review or come

18   to understand the total expenditures spent by the Texas

19   Democratic Party for every year from 2014 through 2019?

20       A.    Yes, I looked at the documents or the FEC and

21   TEC to get a general understanding of about how much we

22   spent each calendar year during that period.

23       Q.    And now, Counsel asked you about -- and the

24   Deposition Notice provides specific certain breakdowns

25   of those funds, including voter persuasion, Get Out the

1   Vote, voter registration, funds spent on supporting

2   Democratic candidates through fundraising, funds spent

3   on supporting Democratic candidates through organizing.

4   And I believe your testimony -- and correct me if I'm

5   wrong -- was that such numbers are unknowable.  And

6   could you briefly explain why that is?

7        A.   As I stated early on, every employee that

8   comes to the TDP is asked to become a deputy voter

9   registrar.  Every employee has -- every department has

10  some level of educating voters or candidates or

11  activists on how to register somebody or how to get

12  registered for the target registration.  And so every

13  staffer we have at some point during their time with us

14  does voter registration.  I can recall when our

15  comptroller sat at a table registering people to vote at

16  a music festival.  So we are all doing that.

17             The cost of all our technology, our data

18  systems, is done for targeting and voter registration

19  and vote by mail and Get Out the Vote; and so you can't

20  just pull out which -- how much of that -- those

21  computers, those data files, those employees are doing

22  voter registration.

23             The same thing with communication.

24  You're talking about all kinds of topics.  On a regular

25  basis they talk about voter registration.  Pulling out

1    the cost of their technology, their subscriptions, their

2    access to Twitter or Instagram, Facebook, other digital

3    platforms, and e-mail communications, you can't pull out

4    an exact cost of those programs that was used just for

5    voter registration.  It would be impossible to do

6    because it's all in the same -- sort of the same pot.

7                    Everybody's doing voter registration

8    activities.  You know, the closest I could ever get is

9    if somebody wanted to see the cost of a specific

10   mailing; and that is publicly available on the FEC or

11   TEC because it would have been a bill paid to a vendor.

12                   You know, it's the cost of -- I process

13   about -- right now about, through volunteers, about 300

14   vote-by-mail applications and dozens of voter

15   registration applications each week.  They go through a

16   postage meter, and we do not determine which postage

17   stamp went on a voter registration application being

18   mailed out versus a vote by mail versus a Get Out the

19   Vote or a thank you note for fundraising.  It's all in

20   the same pot.  So you can't ferret out these costs.

21                   The same thing with copy machines, making

22   copies of voter registration applications to mail to

23   somebody who asks for one.

24                   You know, hand addressing an envelope.

25   The cost of envelopes, we buy them by the case.  We

1  don't say, "Oh, these five were voter registration."

2            So you cannot ferret it out and cannot

3  give a specific answer.

4            MR. GEISE:  Thank you.

5            No further questions for me.

6            MS. MACKIN:  And I just have one follow-

7  up.

8                    FURTHER EXAMINATION

9  BY MS. MACKIN:

10       Q.   Mr. Maxey, you just talked about how you did

11  review documents to ascertain the Texas Democratic

12  Party's total expenditures for the years 2014 through

13  2020; is that right?

14       A.   I did.

15       Q.   But that those aren't able to be broken down

16  into discreet activities, correct?

17       A.   I looked at the FEC totals and the TEC totals

18  because that was on that list.

19       Q.   On which list?

20       A.   On your list of Depo Notice things that you're

21  going to ask about, total expenditures.  So I looked at

22  FEC and TEC and I jotted those down on a piece of paper,

23  that I'm not reviewing now, because I didn't memorize

24  them totally.  But I did not then scroll through the

25  tens of thousands of entries to see if I could find

1  anything that said "voter registration" because I would

2  have been doing that for the past week.

3          So does that answer the question?  I've

4  sort of forgotten it.

5      Q.  I just wanted to make sure that if I looked at

6  the publicly available filings --

7      A.  You're going to see them.

8      Q.  Okay.  Thank you.

9          And then, yeah, subject to additional

10 document production and the witness being unprepared or

11 improperly instructed to answer, we're holding the

12 deposition open.

13         But I pass the witness at this time.

14         MR. GEISE:  We have no further questions.

15         THE REPORTER:  Going off the record at

16 2:04 p.m.

17         (Deposition recessed at 2:04 p.m.)

18         (Signature was not request on the

19 record.)

20                 --ooOoo--

21

22

23

24

25

Texas Democratic Party - 4/27/2020

117

```
 1   STATE OF TEXAS)

 2

 3                 REPORTER'S CERTIFICATION

 4

 5             I, DEBBIE D. CUNNINGHAM, CSR, hereby

 6   certify that the witness was duly sworn and that this

 7   transcript is a true record of the testimony given by

 8   the witness.

 9             I further certify that I am neither

10   counsel for, related to, nor employed by any of the

11   parties or attorneys in the action in which this

12   proceeding was taken.  Further, I am not a relative or

13   employee of any attorney of record in this cause, nor am

14   I financially or otherwise interested in the outcome of

15   the action.

16             Subscribed and sworn to by me this day,

17   May 3, 2020.

18

19

20

21   _____
     Debbie D. Cunningham
22   Certified Shorthand Reporter
     CSR No. 2065 - Expires 6/30/21
23   INTEGRITY LEGAL SUPPORT SOLUTIONS
     P.O. Box 245
24   Manchaca, Texas 78652
     www.integrity-texas.com
25   512-320-8690; FIRM # 528
```