IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JARROD STRINGER, et al.,      *
     Plaintiffs,          *
                        *
v.                            *   No. SA-20-CV-46-OG
                        *
RUTH HUGHS, et al.,           *
     Defendant.           *


VIDEOTAPED VIDEOCONFERENCED

ORAL DEPOSITION

OF

THE DEMOCRATIC CONGRESSIONAL

CAMPAIGN COMMITTEE REPRESENTATIVE,

JACQUELINE NEWMAN

Tuesday, April 28, 2020


VIDEOTAPED VIDEOCONFERENCED DEPOSITION OF

JACQUELINE NEWMAN, produced as a witness at the instance

of the Defendant, and duly sworn, was taken in the

above-styled and numbered cause on Tuesday, April 28,

2020, from 10:09 a.m. to 2:05 p.m. Central Time, before

Debbie D. Cunningham, CSR, in and for the State of

Texas, remotely reported via Machine Shorthand, pursuant

to the Federal Rules of Civil Procedure.

--ooOoo--

2

1                        APPEARANCES

2

3   FOR PLAINTIFF INTERVENORS:

4        PERKINS COIE
         700 13th St NW
5        Washington, DC 20005
         (T) 202.654.6200

6
         By:  Aria Branch, Esq.
7             abranch@perkinscoie.com
                      AND
8             Emily Brailey, Esq.
                      AND
9             Rachel Jacobs, Esq.

10
    FOR DEFENDANT THE TEXAS SECRETARY OF STATE:
11
         OFFICE OF THE ATTORNEY GENERAL OF TEXAS
12       Special Counsel for Civil Litigation
         300 W. 15th Street
13       Austin, Texas  78701
         (T) 512.463.4139
14
         By:  Christopher D. Hilton, Esq.
15            christopher.hilton@oag.texas.gov

16

17  VIDEOGRAPHER:

18       Amanda Christopher
         Brian Christopher
19
                      --ooOoo--
20

21

22

23

24

25

1                          INDEX

2    APPEARANCES                                    2

3

4   EXAMINATION OF JACQUELINE NEWMAN:

5    BY MR. HILTON                                   6

6

7

8    CHANGES AND SIGNATURE                         131

9    REPORTER'S CERTIFICATION                      133

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                        EXHIBIT INDEX

2    Exhibit Number        Description                    Page

3

4    Exhibit 1      Defendants' Notice of Oral            24
                    Deposition Pursuant to Federal
5                   Rule of Civil Procedure 30

6    Exhibit 2      Intervenor-Plaintiffs Texas           25
                    Democratic Party, DSCC, and
7                   DCCC's Complaint for Declaratory
                    and Injunctive Relief
8
     Exhibit 3      Alexander Edelman Declaration         26
9
     Exhibit 4      DCCC's Production in Response         29
10                  Subpoena Duces Tecum

11   Exhibit 5      Jacqueline Newman LinkedIn page       14

12   Exhibit 6      FEC Form 1, Statement of              43
                    Organization for DCCC
13
     Exhibit 7      DCCC Amended Year-End                 56
14                  Report Summary

15   Exhibit 8      Excel spreadsheet                     45

16

17

18

19

20

21

22

23

24

25

```
 1                    (Tuesday, April 28, 2020, 10:10 a.m.)

 2                         P R O C E E D I N G S

 3                    THE REPORTER:  Today is April 28th, 2020.

 4  This is the deposition of the Corporate Representative

 5  of DCCC, Jacqueline Newman, in the matter of Jarrod

 6  Stringer, et al. versus Ruth R. Hughs, et al.  We are

 7  situated remotely and are on the record at 10:09 a.m.,

 8  Central Standard Time.

 9                    My name is Debbie Cunningham, and my

10  business address is P.O. Box, Manchaca, Texas 78652.

11                    Would all persons present please

12  introduce themselves for the record?

13                    MR. HILTON:  Chris Hilton for the

14  Defendants.

15                    MS. BRANCH:  Aria Branch for the

16  Plaintiff Intervenor DCCC.  That's "D" and then three

17  "Cs."

18                    MS. BRAILEY:  Emily Brailey, also for the

19  Plaintiff Intervenor, DCCC.

20                    THE WITNESS:  Jacqueline Newman with the

21  DCCC.

22                                    *

23                                    *

24                                    *

25                    JACQUELINE NEWMAN,
```

1   having taken an oath to tell the truth, the whole truth,

2   and nothing but the truth, was examined and testified as

3   follows:

4                           EXAMINATION

5   BY MR. HILTON:

6        Q.   Good morning, Ms. Newman.

7        A.   Hi.

8        Q.   Could you please state and spell your name one

9   more time for the record?

10       A.   Sure.  It's Jacqueline Newman,

11  J-A-C-Q-U-E-L-I-N-E N-E-W-M-A-N.

12       Q.   And you're here on behalf of DCCC to testify

13  as their representative today, right?

14       A.   I am.

15       Q.   Before starting to prepare for this, I

16  truthfully didn't know a whole lot about the DCCC and

17  what it does.  I think I'm still pretty murky on the

18  details, and I'm hoping you can explain for me so I can

19  kind of understand more today.  Can you just start me

20  off with kind of an overview about what the DCCC is,

21  what its purpose is, what it does?

22       A.   Sure.  The DCCC is the national party tasked

23  with electing Democrats to the U.S. House of

24  Representatives.

25       Q.   You said it's a party?

1    A.    Yes.

2    **Q.    Is it separate from, like, the Democratic**

3  **Party; or how does that work?**

4    A.    Yes.  I mean, we are part of the Democratic

5  Party.  We are separate from the Democratic National

6  Committee, which is often what people think of when they

7  think of the National Democratic Party.

8    **Q.    So you're separate from the Democratic**

9  **National Committee.  Is it a subordinate role, is it a**

10  **partnership; or what's the relationship there?**

11    A.    I would say we're affiliated, but we are

12  not -- we are not interlinked in any way.  And we are

13  also not their subordinate.

14    **Q.    Okay.  And, I mean, I just didn't know.  Do**

15  **you have a separate Party platform, or how does that**

16  **work?**

17    A.    Yes, I mean, we don't necessarily have a

18  platform as the DCCC.

19    **Q.    Okay.  And why is that?**

20    A.    That's just not something we set out to do.

21    **Q.    So what do you set out to do?  I mean, is it**

22  **primarily fundraising; or just what is, you know?**

23    A.    We -- again, we're trying to elect Democrats

24  to the U.S. House of Representatives; and so we support

25  campaigns in a variety of ways and functions.

1     Q.   Okay.  Well, we'll go through some of the

2   details of some of that later.  I guess I would like to

3   start, also, with understanding a little bit more about

4   you and your background.  So you're currently employed

5   by the DCCC; is that right?

6     A.   I am.

7     Q.   And what's your role?

8     A.   I'm the Deputy Executive Director and Chief

9   Operating Officer.

10    Q.   Okay.  And what are the responsibilities for

11  those roles?

12    A.   I oversee all the administrative and

13  operations functions for the building -- or for the

14  committee, that includes the building itself, our Human

15  Resources functions, our budgets, our legal activity,

16  just making sure everything is functioning as it should.

17    Q.   How many employees does DCCC have?

18    A.   Right now we are roughly at about 265

19  employees.

20    Q.   So these are folks that receive a paycheck

21  from DCCC?

22    A.   Yes.

23    Q.   And where are they located, and what kind of

24  work do they engage in?  I'm trying to get a sense of,

25  you know, who's out there.

9

1       A.   Sure.   They -- our employees are located

2   across the country.  The majority are based in DC.  We

3   have several employees that are on the ground in Texas

4   as it relates to this case.

5       **Q.   Uh-huh.  And as far as your job, Deputy**

6   **Executive Director -- did I get that right?**

7       A.   Yes.

8       **Q.   How long have you had that role?**

9       A.   I think I've had this title since September.

10  I've been with the committee in some fashion since 2014,

11  and I was previously with the committee in 2012.

12      **Q.   And what about the COO title, how long have**

13  **you had that?**

14      A.   About two and a half years.

15      **Q.   Okay.  Who -- what's the reporting -- what's,**

16  **I guess, the leadership structure?  You're the Deputy**

17  **Executive Director, so I assume you report to an**

18  **Executive Director.  Is there anyone else you report to,**

19  **other folks that report to you?  Can you give me a sense**

20  **of that?**

21      A.   Yes, you're right.  There's an Executive

22  Director who oversees all the day-to-day functions of

23  the committee; and then we also have a Chair of the

24  committee, Congresswoman Cheri Bustos.

25      **Q.   Anyone else that you report to?**

1       A.   No.

2       Q.   **And then who reports to you?**

3       A.   I have a team below me, a Chief Administrative

4  Officer, IT Director.

5       Q.   **Is that it, there's two people that report to**

6  **you?**

7       A.   Oh, I'm sorry.  Then there's some junior-level

8  staffers below them who are kind of the senior team and

9  then HR and Administration Manager.

10      Q.   **Okay.  How many people would you say report to**

11 **you directly?**

12      A.   I think it's about eight or nine people.

13      Q.   **Okay.  Are there any other deputy executive**

14 **directors, or are you the only one?  Like, a lot of**

15 **agencies have, like, multiple deputy commissioners in**

16 **charge of certain things.**

17      A.   Sure.  There are two other deputy executive

18 directors.

19      Q.   **What are their names, and what are their**

20 **responsibilities?**

21      A.   One is Ryan Hedgepeth, and he is our Deputy

22 Executive Director for Member Engagement.  He works

23 directly with members of our caucus, members of

24 Congress.  And Mike Smith is also a Deputy Executive

25 Director, and he oversees our fundraising operations.

1    Q.   Has there been any change to that structure in

2    the time that you've been with the DCCC?

3        A.   The Deputy Executive Director structure?

4        Q.   Yes, yeah.

5        A.   Yes, there has.

6        Q.   So what were the changes and when did they

7    occur, again, just kind of focusing on this top-level

8    structure?

9        A.   Sure.  So I'm sorry.  Could you -- did you say

10   this year or during my entire time at the DCCC?

11       Q.   Just since you've been at DCCC.

12       A.   Sure.  So each cycle, which is a two-year

13   election period, the DCCC goes through the process of --

14   at one point it was appointing and now it's electing a

15   Chair of the committee.  And each Chair that comes in is

16   able to kind of re-image the structure as they see

17   necessary in order to carry out their goals for the

18   cycle.  And so with that, I would say each cycle there

19   has been a slightly different leadership structure.

20       Q.   Can you give me some examples, maybe?  Maybe

21   if it changes every two years regularly, we don't have

22   to go through every one; but if you could, kind of give

23   me a sense of what type of changes that there are.

24       A.   Sure.  So usually -- I think in the past few

25   cycles there has been a Deputy Executive Director, at

1  least one or a few.  And last cycle there was one Deputy

2  Executive Director, and they reported to the Executive

3  Director.  In other cycles there have been a few deputy

4  executive directors that kind of oversee a few key

5  functions of the building and then report back to the

6  Executive Director.  Again, it just kind of depends on

7  the Executive Director and the Chair at the time.

8       **Q.   How are the Executive Director and the Chair**

9  **chosen?**

10      A.   Currently -- and this is a somewhat recent

11  change -- the Chair of the committee is elected by the

12  Democratic Caucus, and the Executive Director is hired

13  by the Chair.

14      **Q.   Okay.  And so you've been with DCCC since 2014**

15  **and then another stint before then.  Is it typical to**

16  **have a long tenure, you know, for employees to be**

17  **tenured that length of time; or is there a lot of**

18  **turnover with these two-year cycles?**

19      A.   Yeah, it's definitely more common that people

20  work a cycle and then they move on to another

21  opportunity.  There's a lot of turnover usually.

22      **Q.   Is some of that top down?  I mean, does the**

23  **Executive Director bring in their own people every year**

24  **or...**

25      A.   No.  I think it's more just the nature of

1  campaigns that every two years people are moving on to

2  something else.  I think you would see -- and this

3  partially explains why I've been here longer than most

4  people, but the administrative functions are the people

5  who tend to stay cycle to cycle.  And the people who

6  work kind of in different parts of the committee are

7  often moving on to other campaigns or other

8  organizations.

9      Q.   So that would be more typical of the folks who

10 do the fundraising or the -- I forget how you put it --

11 the direct interfacing with the caucus members?

12     A.   Yes.

13     Q.   Okay.  You've been here, you know, at DCCC

14 quite a while.  I take it you enjoy your job?

15     A.   I do.

16     Q.   What do you enjoy about your job?

17     A.   I think the work we do is important, and I

18 like the values we represent.

19     Q.   Okay.  What values?

20     A.   I think electing Democrats to the U.S. House

21 of Representatives -- you know, the House, I think,

22 impacts a lot of change within this country; and it's

23 important that we expand and protect our majority.

24     Q.   You've mentioned that a couple of times

25 already and we're going to talk -- you know, one of the

DCCC - 4/28/2020

14

1   missions of DCCC and we're going to talk more about that

2   throughout; but is that the best statement of the

3   mission, to elect Democrats?

4        A.   Definitely.

5        Q.   Is there any other component of that, or is

6   that really what it's all about?

7        A.   I think everything ties back to electing

8   Democrats.

9        Q.   Okay.

10             MR. HILTON:  I'm going to send out

11   through the chat what's actually -- I'm going a little

12   out of order.  I kind of prenumbered some of these.  So

13   I'm going to send out Exhibit 5 now, and then we'll come

14   back to the other ones.

15             (Exhibit 5 discussed.)

16        Q   (BY MR. HILTON)  So let me know if you're able

17   to access Exhibit 5; and once you've had a chance to

18   pull it up and review it, let me know.

19        A.   Okay.  I have it open.

20        Q.   Is that your LinkedIn page, at least part of

21   it?

22        A.   Yes.

23        Q.   And I should say -- I forgot to mention this

24   before -- other than the documents that I send you and

25   then the Bates numbered documents that your counsel

1  provided to you that were the DCCC's production, do you

2  have any other documents in front of you, with you?  Are

3  you referring to any other documents?

4       A.   No, I don't.

5       Q.   Okay.  I'll ask for you to continue not to do

6  that; and if you do refer to another document, please

7  let me know.  And I think the same thing goes with

8  talking to other people, including by e-mail, text, you

9  know, anything like that.  Please refrain from doing

10  that, you know, until the deposition is over.  And if

11  you do do that, I'd ask that you please, you know, let

12  me know.

13             All right.  So turning to Exhibit 5,

14  which is at least a portion of your LinkedIn page, it

15  has employment history for you going back to May 2008.

16  I was kind of hoping you could walk me through each of

17  these positions, starting with May 2008, and explain to

18  me -- obviously, we don't have to go into a huge amount

19  of detail for all of these; but if you could, explain to

20  me just kind of generally what the company was or what

21  the organization was, what your role was, and kind of

22  give me a sense of the evolution of your career.  That's

23  my goal here.

24             So if you could just kind of start from

25  GIS Specialist at the Timmons Group and work your way

16

 1   **through, I think that's the most efficient way to go**

 2   **about it.**

 3       A.   Okay.  Sure.  So in 2008 I worked with the

 4   Timmons Group, which is an engineering firm.  I was a

 5   GIS Specialist at the time, Geographic Information

 6   Systems.

 7       **Q.   What is a Geographic Information System?**

 8       A.   It's like a lot of building kind of digital

 9   maps.  That's what I did, usually, for local governments

10   that were hoping to convert to a modern era, if you

11   will.

12       **Q.   In what sense?**

13       A.   Like, the work I did was taking, like, paper

14   documents, land parcels, and I was digitizing them.

15       **Q.   Oh, I see.  So any kind of, you know, records**

16   **or whatever, just trying to make it into a modern**

17   **electronically-accessible system?**

18       A.   Yeah, yeah, basically.

19       **Q.   Got it.  Any particular projects that stand**

20   **out from that time?  I don't mean to make you go all the**

21   **way back through your career.**

22       A.   Oh, sure.  No, no.  So most of the work I

23   specialized in, we worked with a lot of rural, I guess,

24   counties and locations; and they were in the process of

25   trying to basically get up and running a system that --

1  where people in their location can call 9-1-1 and it

2  would be linked to their home, which I think is

3  something that, especially in urban and suburban areas,

4  people take for granted that you call 9-1-1 and they

5  know where you're calling from.  So that required

6  digitizing all of the maps and then linking each, like,

7  land parcel to the phone information we had for people

8  living there.  That was the majority of the work I did

9  at Timmons.

10      **Q.   Okay.  And I'm sorry to dwell on this, but it**

11  **looks like your career kind of takes a more political --**

12  **or politically-oriented turn from here.  Did you do any**

13  **political type work or redistricting or anything like**

14  **that when you were with Timmons Group?**

15      A.   I didn't do any political work with Timmons.

16  I was involved through my school; and while I was

17  working at Timmons, I took on a side project, which is a

18  strong majority the role I did above it.  And so I was

19  kind of doing that in my spare time.

20      **Q.   All right.  Well, I know I asked you to just**

21  **kind of walk me through this and let you explain it; and**

22  **then I immediately interrupted you.  So sorry about**

23  **that, but maybe you can pick it up from there and**

24  **continue to walk me through the rest of your career.**

25      A.   Sure.  So for a strong majority, I was their

1  Compliance Director.  I basically oversaw their

2  bookkeeping and was responsible for accounting and

3  reporting through the Virginia State Board of Elections,

4  just maintaining their compliance.

5          And then I found myself in Indiana, where

6  I was hired as the Deputy Director of Compliance and

7  Operations; and in that role -- you will sense a theme

8  here -- but I oversaw the HR, the operations and the

9  bookkeeping budgets and compliance for the Indiana

10  Democratic Party.

11      Q.  And I'm sorry to interrupt you one more time,

12  at least.  I should have started with this, but I

13  forgot.  What was your -- what education did you have

14  that led you into all these roles?  Like, I think you

15  mentioned you were still in school when you started with

16  Timmons.  Now, what were you in school for?  What

17  degree, if any, did you attain?

18      A.  Sure.  I went to school, and I received a

19  bachelor's degree in geography.

20      Q.  And I know as a component of that, there's a

21  lot of, you know, technical and software and all sorts

22  of stuff like that that kind of led you to be able to do

23  the more technical side of things that you're doing?

24      A.  Yes.

25      Q.  Okay.  All right.  I interrupted you again.

19

1   **I'm sorry.  Let's try it again.**

2          A.   No problem.  So I was in Indiana briefly.  I

3   stayed through the end of the election cycle and moved

4   back to Virginia.  In April of 2011 I started with

5   Protect Your Care and Know Your Care as their Director

6   of Operations.  Again, I kind of oversaw the budget

7   aspects, the compliance, HR.  After --

8          **Q.   I'm sorry.  What is that group?**

9          A.   It was a 501(c)(3) and (c)(4) organized around

10  educating people on Obamacare --

11         **Q.   Okay.**

12         A.   -- and the Affordable Care Act.

13         **Q.   Okay.**

14         A.   In 2012 I took a job with the DCCC as their

15  Director of Operations on their 2012 Independent

16  Expenditure Program; and in that role, I managed the

17  administrative functions for the IE, which is a large

18  paid media campaign.

19         **Q.   And when you say a paid media campaign, can**

20  **you elaborate a little bit on that?**

21         A.   Sure.  It's mostly a bunch of TV ads that the

22  DCCC puts out.

23         **Q.   And what was the nature of the ads?  What was**

24  **the purpose?**

25         A.   To elect Democrats to the U.S. House.

DCCC - 3

4/28/2020

20

1      Q.    Anywhere in particular?  Any particular type

2  of ad; or was it just, you know, all House members?

3      A.    It was certainly focused in our targeted

4  races.  I don't know how much that was off the top of my

5  head; but I would say, ballpark, it probably covered

6  about 30 races across the country.

7      Q.    And -- okay.  I think that's enough for now.

8  I'll let you continue.

9      A.    Following 2012 I took a job with Terry

10 McAuliffe's campaign for governor in Virginia; and I

11 operated largely in the same capacity for that roll,

12 overseeing all the operations functions, HR, budgets,

13 legal.

14     Q.    Was that a successful campaign?

15     A.    It was a successful campaign.

16     Q.    He's still governor, right?  Did he get re-

17 elected since then or...

18     A.    He is not still governor --

19     Q.    Oh, okay.

20     A.    -- but he is always around.

21     Q.    Okay.

22     A.    So you feel like he's still governor.

23           And then, following his successful

24 campaign, after his inauguration I returned to the DCCC

25 as Deputy Chief Operating Officer and over the years

1 | have slowly progressed.

2 |     Q.   You've stayed around and stayed in a couple

3 | different roles, and I know how it goes when you stay at

4 | a place for a long time.

5 |             I guess the only other one I wanted to

6 | ask you about specifically was Interim Executive

7 | Director from July of 2019 to September 2019.  How did

8 | you come to have that role, and the way you're

9 | describing -- I guess my other question is, as your

10 | primary viewpoint, you know, if it goes in two-year

11 | election cycles, is that a down period since the 2018

12 | election had just been over?

13 |             What was -- I guess I was saying all of

14 | that to say -- I'll give you an actual question that you

15 | can answer.  How did you come to get that role, what did

16 | you do during that period, and how did that relate to

17 | the cyclical nature of DCCC's work?

18 |     A.   Sure.  So we had a leadership transition in

19 | the middle of our cycle this year, which actually isn't

20 | common.  Usually an Executive Director would be hired in

21 | December or January and stay for two years or longer in

22 | some cases.  So there was a leadership transition.  In

23 | that moment I stepped up to be the Interim Executive

24 | Director, and largely I ran the entire process to find a

25 | permanent Executive Director.

1      Q.   And you say there was a leadership transition.

2  I'm assuming that someone had signed up to do the role

3  and then moved on to take another opportunity

4  unexpectedly?

5      A.   Yes.

6      Q.   Okay.  And you may have mentioned this.  I

7  just don't recall.  Where did you say you went to, got

8  your bachelor's?

9      A.   I went to the University of Mary Washington in

10  Fredericksburg, Virginia.

11      Q.   Well, I appreciate all that.  It's always

12  helpful to know.  Even though you're a representative on

13  DCCC's behalf, it's extremely helpful to know your

14  perspective, your background, and your expertise.  So I

15  appreciate you walking me through that.  I know talking

16  about the full length of one's career is not necessarily

17  the most exciting, but I appreciate it.

18              I would like to turn now to talk a little

19  bit about how you -- you know, about the depo itself and

20  how you prepared for this deposition today.  So I guess

21  start there.  What did you do to prepare for the

22  deposition today?

23      A.   Sure.  Well, I discussed with my counsel.  I

24  reviewed the Complaint that we had filed and reviewed

25  the Deposition Notice topics.  I also reviewed a

23

```
 1  declaration that a member of my team had submitted in
 2  response to this.
 3       Q.   Any other documents?
 4       A.   I gathered information related to the
 5  deposition topics, but that was it.
 6       Q.   How did you gather information?
 7       A.   I guess searching through DCCC documents.
 8       Q.   Okay.  Did you search through e-mails or some
 9  other source of documents?
10       A.   I think mostly just documents that are on our
11  drive, like on --
12       Q.   Did you use search terms, or did you just
13  browse through them?
14            MS. BRANCH:  I want to just object to the
15  extent that it calls for attorney-client privileged
16  information.
17            But you can answer as long as you're not
18  revealing any of the content of our conversations.
19       Q.   (BY MR. HILTON)  Yeah.  And particularly in
20  this prep area it gets kind of close to that.  I am not
21  asking you for content of any conversations with your
22  attorneys.  So please do not provide that information.
23  I don't want it.  It is privileged, so.
24            All right.  So you said that you were
25  just browsing through files, I guess, based on your
```

1  knowledge and familiarity with the files of the

2  organization?

3       A.   Yes, that's correct.

4       Q.   Did you speak to anyone other than your

5  attorneys?

6       A.   Just our -- yes, with our attorneys.

7       Q.   But no other employees of DCCC or anyone else

8  other than your attorneys?

9       A.   Right.

10                (Exhibit 1 discussed.)

11      Q.   (BY MR. HILTON)  Okay.  I'd like to turn to

12  Exhibit 1, which I had sent out previously via the Zoom

13  chat.  And do you recognize Exhibit 1?

14      A.   Yes.

15      Q.   And what is it?

16      A.   These are the deposition topics you sent in a

17  Notice for this role.

18      Q.   Right.  And so let's turn to page 5 of

19  Exhibit 1.  The heading is 30(b)(6) Corporate

20  Representative Deposition Topics?

21      A.   Yes.

22      Q.   Are you prepared to testify as to all these

23  topics today?

24      A.   I am.

25      Q.   And then I'd like to go to page 6.  The

DCCC - 4/28/2020

25

1    heading is Attachment B.  These are the document

2    requests that we sent in connection with this Notice; is

3    that right?

4         A.   Yes.

5         Q.   And it sounds like you searched for documents

6    that were responsive to these requests?

7         A.   I worked with my counsel on this.

8         Q.   Okay.  Did DCCC produce documents responsive

9    to these requests?

10        A.   Yes.

11        Q.   So did DCCC comply with these requests?

12        A.   Yes.

13             (Exhibit 2 discussed.)

14        Q.   (BY MR. HILTON)  Okay.  The next one is going

15   to be Exhibit 2, which, hopefully, is the Complaint in

16   this matter.

17        A.   Yes.

18        Q.   So you have Exhibit 2 in front of you?

19        A.   I do.

20        Q.   And have you seen this document before?

21        A.   I have.

22        Q.   Did you review it before it was filed?

23        A.   Yes.

24        Q.   How much time did you spend reviewing it,

25   before it was filed, I mean?

1      A.   Before it was filed?

2      Q.   **Yes.**

3      A.   Probably -- to be clear, you mean the

4  Complaint itself or in preparation for the Complaint?

5      Q.   **I'm breaking it into two parts.  So the first**

6  **part is:  How much time did you spend reviewing the**

7  **Complaint before it was filed?  And then the next part**

8  **will be:  Did you review it again for this deposition,**

9  **and how much time did you spend reviewing it?**

10     A.   I probably spent about 30 minutes reviewing

11  the Complaint before it was filed.

12     Q.   **Okay.  And you said you reviewed it again to**

13  **prepare for the deposition today.  How much time did you**

14  **spend then?**

15     A.   Probably about an hour.

16     Q.   **Okay.  I'm going to send out the next exhibit,**

17  **Exhibit 3, hopefully.**

18               (Exhibit 3 discussed.)

19     A.   Okay.

20     Q    **(BY MR. HILTON)  Do you recognize what I'm**

21  **marking as Exhibit 3 to the deposition?  It says**

22  **Exhibit B on the first page of it, but I'm going to**

23  **refer to it as Exhibit 3.**

24     A.   Yes.

25     Q.   **Okay.  And what is Exhibit 3?**

DCCC - 4/28/2020

27

```
 1        A.    This is a Declaration from Alexander Edelman
 2   in support of the Plaintiff's motion.
 3        Q.    Who is he?
 4        A.    He's DCCC's National Field Director.
 5        Q.    Do you know Mr. Edelman?
 6        A.    I do.
 7        Q.    And how do you know him?
 8        A.    He's my colleague at the DCCC.
 9        Q.    And can you describe exactly what a National
10   Field Director does?
11        A.    Sure.  The National Field Director oversees
12   the entire field program for the DCCC.
13        Q.    What is a field program?
14              MS. BRANCH:  I'm going to object to the
15   extent that this calls for information that would be
16   protected by the First Amendment.
17              But you may answer at a high level.
18        A.    Sure.  Our field program is geared at
19   mobilizing and persuading voters, usually directly on
20   the ground in our targeted districts.
21        Q.    (BY MR. HILTON)  And how does the field
22   program go about accomplishing that?
23        A.    We usually work with coordinated campaigns,
24   which is a collaboration between national parties and
25   state parties to elect Democrats up and down the ballot.
```

1   So in Texas we work with the Texas Democratic Party,

2   along with the other national party committees and, you

3   know, each state sometimes looks a little bit different;

4   but usually we are running Get-Out-the-Vote programs,

5   voter registration programs, engaging our voters

6   directly on the ground through canvasses.

7        **Q.   And how does the DCCC's support for that kind**

8   **of program play out in practice?  I mean, I guess, is it**

9   **just providing funding?  Do you provide manpower as**

10  **well, or what other resources do you provide?**

11       A.   Yeah, so it's all of the above.  We provide

12  funding.  We transfer money to the State Party to be

13  used for the Coordinated Campaign.  We also have our own

14  direct investments in people on the ground in some

15  cases.  In Texas, for example, we have four offices

16  opened; and we have staff in those offices.

17       **Q.   All right.  Well, I'm getting a little ahead**

18  **of myself.  We'll get into more details of that later,**

19  **but I realize I forgot to ask:  You said -- you**

20  **mentioned you reviewed a declaration in connection with**

21  **this matter to prepare for the deposition today.  Was**

22  **this the declaration you were referring to?**

23       A.   Yes, it was.

24       **Q.   All right.  So we'll leave that to the side**

25  **for now and come back to it.**

DCCC - 4/28/2020

29

```
 1              (Exhibit 4 discussed.)
 2      Q.   (BY MR. HILTON)  The next group of documents
 3  that I'm going to designate as Exhibit 4 to the
 4  deposition is going to be the DCCC's production in
 5  response to our subpoena duces tecum.  So that's Bates
 6  Numbers DCCC 000001 through 805.  Do you have those
 7  documents available to you?
 8      A.   Yes, I do.
 9      Q.   And are you familiar with those documents?
10      A.   I am.
11      Q.   Okay.  Did you review all of them before the
12  deposition today?
13      A.   Yes.
14      Q.   How much time did you spend reviewing them?
15      A.   Probably about an hour.
16      Q.   Who gathered these documents?
17              MS. BRANCH:  I'm going to object to the
18  extent that this calls for conversations between
19  attorney and client or attorney work product.
20              MR. HILTON:  It does not.  I'm asking for
21  an identity of the person who collected the documents.
22              MS. BRANCH:  You can answer that, Jacqui.
23      A.   This specific group of documents?
24      Q    (BY MR. HILTON)  Yeah, Bates Number 1 through
25  805, the entire production.
```

DCCC - 4/28/2020

30

1      A.    These came from my counsel.

2      **Q.    But who collected them?**

3      A.    Initially in this process?

4      **Q.    Yeah, who at DCCC gathered the documents for**

5  **production?**

6      A.    Staff.  And, I mean, I think several people

7  collected documents related to this production based

8  on -- based on the request and the search terms guided

9  by our counsel.

10      **Q.    What were the search terms?**

11            MS. BRANCH:  Objection, attorney-client

12  privilege.

13      **Q.    (BY MR. HILTON)  You can answer.**

14            MS. BRANCH:  I'm instructing you not to

15  answer that.

16            It's clearly search terms that we worked

17  with them and communicated with them to find the

18  documents.  If there's specific documents you want to

19  ask about, I think we can do that; but...

20            MR. HILTON:  I would like to know the

21  search terms.  Will you provide them to me, Aria?

22            MS. BRANCH:  We can talk off the record

23  about that.

24            MR. HILTON:  I would like an answer now

25  because I feel like I'm entitled to what the search

31

1  terms are.

2           MS. BRANCH:  I don't have them in front

3  of me, but we can discuss that.  They are search terms

4  that were created based on the subpoena.

5           MR. HILTON:  I just want to know if

6  you'll give me the search terms later.

7           MS. BRANCH:  And I'm happy to discuss

8  that.

9      Q.  (BY MR. HILTON)  I'm sorry.  I feel like I

10 have to ask my question again, Ms. Newman.  What were

11 the search terms that were used?

12          MS. BRANCH:  And I'm going to assert the

13 same objection and instruct the witness not to answer.

14     Q   (BY MR. HILTON)  Are you going to abide by

15 that instruction?

16     A.  Yes, I am.

17     Q.  Do you know what the search terms are?

18     A.  Not off the top of my head.

19     Q.  Did you at one point know what they were?

20     A.  Yes.

21     Q.  Did you refer to something else and refresh

22 your memory as to what the search terms are?

23     A.  I could refer to my conversations with my

24 counsel.

25     Q.  So you could give me the search terms if you

1  were required to do so?

2       MS. BRANCH:  They're privileged.

3       MR. HILTON:  I understand that that's

4  your assertion.  I disagree with that assertion.  And

5  I'm trying to question the witness, and you cannot

6  answer for the witness.

7       Q.   (BY MR. HILTON) So, Ms. Newman, if you were

8  required to tell me what the search terms are by a Court

9  or someone else, would you be able to do so?

10      A.   I believe I could.

11      Q.   Okay.  Who ran the search terms?

12      A.   A combination of our staff and our IT

13 Director.

14      Q.   And you mentioned earlier as well that several

15 people assisted in gathering the documents.  Did I

16 understand your testimony correctly?

17      A.   Yes.

18      Q.   What are the names of each person who assisted

19 in gathering these documents?

20      A.   I don't know that information.  I would have

21 to check.

22      MR. HILTON:  Aria, will you provide me

23 that information?

24      MS. BRANCH:  Again, I think this calls

25 for privileged information and that these are

33

1   discussions that we, the attorneys, had with staff at

2   the DCCC to advise them on how to respond to the

3   subpoena.

4               MR. HILTON:  I'm not asking about the

5   discussions.  I'm asking for the identity of the

6   individuals who ran the search terms and collected the

7   documents.  I believe your document production is

8   insufficient.  I'm entitled to understand what you did

9   to produce these documents, and I'm entitled to this

10  which is not privileged.  So I'm going to ask --

11              MS. BRANCH:  I think we can have that

12  conversation.  I don't think that Jacqui knows; and I

13  also think that it infringes on the privilege, so.

14       **Q    (BY MR. HILTON)  Well, Ms. Newman, do you know**

15  **the identities of the individuals who ran these search**

16  **terms?**

17       A.   It's a wide group, I think.

18       **Q.   Okay.  Do you know the identity of those**

19  **individuals in that wide group?**

20       A.   I have it somewhere.  I do not know right now.

21       **Q.   But you could get me that information if you**

22  **were required to do is?**

23       A.   I believe so.

24       **Q.   And you mentioned that several people helped**

25  **gather the documents.  Were you referring to just**

1  running the search terms, or was there some other way in

2  which documents were gathered?

3         MS. BRANCH:  Again, I think this calls

4  for attorney-client privileged information in that it

5  goes to the communications we had on how to formulate

6  the search for documents.

7      Q.  (BY MR. HILTON)  I am not asking about the

8  content of any communication that you or anyone at DCCC

9  had with your counsel, Ms. Newman.  I want to be very

10  clear about that.  But I would like to know the method

11  by which these documents were gathered, and I want

12  clarity on your earlier testimony.  Earlier you said

13  that several people helped gather the documents.  Do I

14  have that correct?

15      A.  Yes.

16      Q.  And you also mentioned that there was a wide

17  group of people who ran search terms.  Do I have that

18  correct?

19      A.  I believe so.  Like I said, I would have to

20  check.

21      Q.  Okay.  And I want to know:  Is that the same

22  group you were referring to, or are there two different

23  groups of individuals that you're referring to in your

24  testimony?

25         MS. BRANCH:  Same objection.  I think

1  asked and answered.  She's answered the question.

2            MR. HILTON:  With respect, Aria, it has

3  not been answered.  I want to understand who searched

4  for what and how, and I'm entitled to that information.

5    **Q.   (BY MR. HILTON)  So Ms. Newman, who -- was**

6  **there another method of gathering documents other than**

7  **running search terms?**

8            MS. BRANCH:  Again, it's privileged.  I

9  mean, these -- what you're asking -- I understand where

10  you're coming from, but what you're asking is asking for

11  the content of the communications we had with them in

12  terms of how to comply with the subpoena.

13            MR. HILTON:  Can you read back my

14  question?

15            MS. BRANCH:  I'm going to instruct the

16  witness not to answer, and I'm hopeful that we can maybe

17  move on to another topic.

18            MR. HILTON:  Can you read back the

19  question, Debbie, that I asked?  I'd like you to read

20  the question.

21            THE REPORTER:  Yes.

22            (The requested material was read as

23  follows:

24            "QUESTION:  Okay.  And I want to know:

25  Is that the same group you were referring to, or are

1   there two different groups of individuals that you are

2   referring to in your testimony?")

3              MS. BRANCH:  Objection, vague.

4              You may answer if you are able to.

5      A.   I don't really understand the question.

6      Q    (BY MR. HILTON)  Well, I don't really

7   understand your testimony.  You said earlier that there

8   was a group of -- that there were several people who

9   gathered documents, correct?  That's what you first

10  said?

11     A.   Well -- and I would like to clarify.  We might

12  have asked several people.  That does not mean several

13  people had documents to gather, and I do not know that

14  information right now.

15     Q.   All right.  I'm going to ask you one more

16  time:  Who collected the documents for DCCC?

17             MS. BRANCH:  Objection, asked and

18  answered.

19             You can repeat the same answer.

20             MR. HILTON:  I would appreciate it, Aria,

21  if you didn't instruct your witness how to answer my

22  questions.  Okay?  That's a speaking objection.  It's

23  not permitted.  You can state the basis of your

24  objection, and you can either instruct her to answer or

25  not.

1          MS. BRANCH:  I think I've done that now.

2          MR. HILTON:  Debbie, can you please read

3  back my question?

4              (The requested material was read as

5  follows:

6              "QUESTION:  I'm going to ask you one more

7  time:  Who collected the documents for DCCC?")

8      A.   We would have requested documents from a group

9  of staff and our IT Director.

10     **Q    (BY MR. HILTON)  What's the name of your IT**

11 **Director?**

12         MS. BRANCH:  Objection.

13         MR. HILTON:  What is the basis of your

14 objection?

15         MS. BRANCH:  I think this is -- we're

16 getting into attorney-client privileged discussions in

17 terms of preparing for the -- for this.

18     **Q    (BY MR. HILTON)  Ms. Newman, my question is:**

19 **What is the name of DCCC's IT Director?**

20     A.   David Winston.

21         MR. HILTON:  I just want to, again, make

22 clear on the record that I think this document

23 production is insufficient.  We're going to reserve all

24 rights to pursue whatever remedies we think we need to.

25             I'm asking questions that clearly are not

1   calling for any privileged information, and you're

2   instructing the witness not to answer.  That's improper.

3   I believe I'm entitled to the answers to these questions

4   to understand whether this document collection effort

5   was sufficient.  Clearly it was not.

6        **Q    (BY MR. HILTON)  Ms. Newman, I apologize.**

7   **I've gotten a little heated during this part of the**

8   **questioning.  I want you to understand I have no quarrel**

9   **with you whatsoever.  I'm just trying to get the**

10  **information that I need to represent my clients.  And so**

11  **I'm trying --**

12               MS. BRANCH:  And I'm happy -- sorry.  I

13  didn't mean to cut you off.

14               MR. HILTON:  Go ahead.

15               MS. BRANCH:  Well, I'm happy to have, you

16  know, a further conversation about the document

17  production.  I do think that several of the requests

18  infringe upon the First Amendment privilege.  We've

19  produced documents responsive to the requests to the

20  extent they're not privileged.  And the client has

21  stated that they undertook efforts to respond to the

22  subpoena.

23               If you want to meet and confer, have a

24  separate conversation about that, we can off the record.

25  It's probably not as fruitful to do with Ms. Newman,

1  given that she doesn't have vision over the entire

2  process.  And I do think that some of the questions,

3  when you're talking about search terms, do infringe upon

4  communications that we've had with our client.

5              MR. HILTON:  Sorry.  Well, if you can

6  find a case that says the search terms are going to be

7  privileged in this context, I'd love to see it.

8              And I think Ms. Newman testified that she

9  could answer all these questions if you had properly

10  prepared her; and clearly, you didn't.  So, anyway...

11      **Q.   (BY MR. HILTON)  And, again, Ms. Newman,**

12  **that's no point against you.  I just think your**

13  **counsel's not done what they should have done with**

14  **respect to the document production, but we'll move on.**

15              MS. BRANCH:  I think that she's prepared

16  for this deposition.  She's prepared on the topics; and,

17  you know, we've produced her here to answer the

18  questions on the topics.  And we produced documents

19  responsive to the extent that they were not privileged.

20      **Q    (BY MR. HILTON)  Did you review any other**

21  **documents other than the ones that we've already**

22  **discussed today in preparation for your deposition,**

23  **Ms. Newman?**

24      A.   I don't believe so.

25      **Q.   Okay.  You mentioned that you met with counsel**

1  to prepare for this deposition, correct?

2       A.   Yes.

3       Q.   When?

4            MS. BRANCH:   Just -- I'm going to just

5  assert the objection.

6            This particular question is not

7  privileged; but I just want to be clear, Jacqui, that

8  you don't have to disclose anything that we discussed.

9  But you may answer the question.

10           MR. HILTON:   Ms. Branch, again, please

11 refrain from speaking objections.   You just spoke

12 without an objection, and that's improper.

13      Q    (BY MR. HILTON)   Ms. Newman, when did you meet

14 with your attorneys?

15           MS. BRANCH:   The objection, just for the

16 record, is attorney-client privilege.

17           But you may answer to the extent that

18 you're not disclosing our communications.

19      A.   I met with counsel regarding this deposition

20 yesterday and last week.

21      Q.   (BY MR. HILTON)   So on two occasions?

22      A.   Yes.

23      Q.   How long were those meetings, again, without

24 disclosing the content?

25      A.   I think roughly about an hour each.

1      Q.    Who was in attendance at those meetings?

2      A.    My counsel, Aria and Rachel.

3      Q.    And yourself.  Anyone else?

4      A.    Yeah, myself.  We met with another member of

5  my team, too, Alex Edelman.

6      Q.    That's the same person who signed that

7  Declaration that's Exhibit 3?

8      A.    Yes.

9      Q.    Okay.

10              MR. HILTON:  All right.  I'd like to take

11  a short break if that's all right.  I will need about

12  five minutes; but if y'all want to take a longer break,

13  that's fine.

14              THE WITNESS:  Can we have ten minutes?

15              MR. HILTON:  Sure.

16              THE WITNESS:  Thank you.

17              THE REPORTER:  Going off the record at

18  11:02 a.m.

19              (Off the record from 11:02 to 11:14 a.m.)

20              THE REPORTER:  We're back on the record

21  at 11:14 a.m.

22              MR. HILTON:  And as we've done in the

23  other depositions, I'm fine waiving the additional read-

24  on every time we go back on, as long as y'all are fine

25  with that.

1          MS. BRANCH:   I'm good.   Thank you.

2     Q.   (BY MR. HILTON)   Ms. Newman, I, again, just

3  wanted to, you know, apologize that you had to get

4  dragged into that discussion between counsel and I.   I

5  hate to do that kind of stuff in depositions; sometimes

6  it happens.   But just, you know, I'm going to try and

7  move on and get through the substance of what I have to

8  ask you about kind of as painlessly as possible as I

9  can.

10          You know, I just want to, again, make

11  clear that I'm not asking for you to reveal any

12  privileged information with any of my questions.   Of

13  course, your counsel will instruct you or object, you

14  know, as necessary.   But I just want to make that clear.

15  I'm not intending to ask for privileged information.

16          So I want to turn back to the DCCC and

17  just talking about the organization's background and

18  activities and that kind of thing.   And I can't remember

19  if I asked you this or not before:   When was the DCCC

20  first established?

21     A.   It was established over 150 years ago.   I

22  think it's 1866.

23     Q.   Wow.   And has its mission changed over time?

24     A.   I don't believe so.

25     Q.   But electing Democrats is the name of the game

1  since 1866?

2      A.   I think that's about right.

3      Q.   We talked a little bit earlier about the

4  relationship between DCCC and the DNC, and I kind of

5  want to explore similar issues in relation to an exhibit

6  that I just sent out in the Zoom chat.  This is

7  something I found on the FEC's website.  That's the

8  Federal Election Commission.  Are you familiar with the

9  FEC?

10     A.   Yes, I am.

11     Q.   I would imagine that you would be.

12          (Exhibit 6 discussed.)

13     Q.   (BY MR. HILTON)  Do you have Exhibit 6 in

14  front of you?

15     A.   Yes, I do.

16     Q.   And do you recognize Exhibit 6?

17     A.   Yes, I do.

18     Q.   And what is it?

19     A.   This is a Statement of Organization filed with

20  the FEC.

21     Q.   And I guess before we dig into it, I'm

22  curious:  Are you responsible for, you know, making sure

23  that the FEC filings get done?

24     A.   I am not responsible for those.

25     Q.   Who has that responsibility?

44

1      A.   Our Chief Financial Officer.

2      Q.   And who is that?

3      A.   Jackie Forte-Mackay.

4      Q.   Yeah, her name pops up on some of this stuff,

5  I think.  She's on this one.

6           Are you familiar with FEC filings for the

7  DCCC?

8      A.   Yes, I am.

9      Q.   Do you review them before they get filed?

10     A.   I do not.

11     Q.   How are you familiar with them, then?

12     A.   I have an awareness -- a top-line awareness of

13 our filings before they are filed; and if there's any

14 questions or concerns, sometimes I am a part of those

15 conversations.

16     Q.   So just in the course of your job, you have

17 occasion to refer to them and work with them?

18     A.   Yes.

19     Q.   Did you review any FEC filings before the

20 deposition today?

21     A.   I reviewed some of our FEC filings that show

22 our work in Texas.

23     Q.   Which filings?

24     A.   I believe Aria shared these with you; but,

25 basically, the money that we sent to the Texas

1   Democratic Party.

2       Q.   Well, let's skip ahead so I don't lose the

3   thread of this.   I'm going to send out what I'm marking

4   as Exhibit 8 to the deposition.   This is an Excel

5   spreadsheet.

6               (Exhibit 8 discussed.)

7       Q    (BY MR. HILTON)   And this was, you know, my

8   attempt to export the data from the FEC link that your

9   counsel provided.   So let me know once you have the

10  spreadsheet open.

11      A.   Okay.   I have this open.

12      Q.   I hesitate to ask:   Do you recognize what you

13  are looking at here in Exhibit 8?

14      A.   Yes, I do.

15      Q.   Okay.   And what is this?

16      A.   This appears to be a document showing

17  transfers from the Democratic -- or from the DCCC to the

18  Texas Democratic Party, dating back to 2014.

19      Q.   Is this the FEC filings that you were

20  referring to when you said you reviewed some FEC

21  information prior to the deposition?

22      A.   Yes, this looks like it.

23      Q.   There's another version on the web page that

24  looks a little better.   I prefer to use this version if

25  you can manage to work with it because this is the

1   version that you get when you export the data from the

2   FEC; but if it just becomes unworkable, we have that as

3   an option.  And I can try to do a little screen share.

4   But, again, this is the data from the link that your

5   counsel provided to me last night; and is that what it

6   appears to be to you as well?

7        A.   Yes.

8        Q.   Okay.  I think you already said that, but I

9   just wanted to make that clear.

10            Since we're here, I might as well ask you

11  the questions I have on this document.  What information

12  can I glean about what the purpose of these funds was

13  from Exhibit 8?

14            MS. BRANCH:  Objection, vague.

15            You may answer the question.

16       A.   You can learn how much money we transferred to

17  the Texas Democratic Party and on what dates.

18       Q.   (BY MR. HILTON)  Can I learn what the funds

19  were for?

20       A.   No.

21       Q.   I can't learn which activities they supported?

22            MS. BRANCH:  Objection.

23       A.   No.

24       Q    (BY MR. HILTON)  Is there another document

25  that I could refer to that would allow me to determine

1  what these fund transfers were used for?

2      A.   No.

3      Q.   So no document exists that would allow me to

4  determine what any of these fund transfers were used for

5  in the possession of DCCC?

6      A.   I mean, our internal budgets and plans may

7  share information -- or have information related to

8  these transfers.

9      Q.   And were those documents produced?

10             MS. BRANCH:  Objection.  This is

11  attorney-client privilege, and you're asking questions

12  that call for information protected by the First

13  Amendment privilege.

14      Q.   (BY MR. HILTON)  I'm not intending to call for

15  privileged information.  I just want to understand if

16  the documents that you were just referring to,

17  Ms. Newman, were included in the production which I've

18  marked as Exhibit 4 to this deposition, Bates Number

19  DCCC 1 through 805.

20             MS. BRANCH:  And I think those documents

21  were privileged.  So whatever she's referring to, that

22  would be the reason why they were not produced.

23             MR. HILTON:  Ms. Branch, I'm sorry.  I'd

24  like to hear the answer from the witness.

25      Q.   (BY MR. HILTON)  Ms. Newman, were those

48

1   documents that you were just referring to included in

2   Bates Number DCCC 1 through 805?

3      A.   I'm not sure.

4      Q.   Well, you have those documents in front of

5   you.  If you want to look through that and see if

6   they're in there, you can do that.

7      A.   Oh, sorry.  They are not in Exhibit 4.

8      Q.   Okay.  So those documents that would show me

9   what activities these funds were spent on, those have

10   not been produced?

11      A.   That's my understanding.

12      Q.   Okay.  And, again, I want you to be sure.  You

13   have all the documents that were produced in front of

14   you.  So I would kind of like a definitive answer to

15   that.

16          MS. BRANCH:  Objection, asked and

17   answered.

18      A.   I don't believe that they are included in that

19   document.  They are strategic information and documents

20   related to our work.

21      Q   (BY MR. HILTON)  Okay.  So they were not

22   produced?

23      A.   Right.

24      Q.   All right.  I think we are done with

25   Exhibit 8.

1          Can we turn back to Exhibit 6, which is

2   where I think this digression started?  Do you still

3   have that in front of you, Ms. Newman?

4          A.   Yes, I do.

5          Q.   Had you seen Exhibit -- when was the last time

6   you've seen Exhibit 6, or have you seen Exhibit 6

7   before?

8          A.   Yes.  It's probably been several months since

9   I've seen this.

10         Q.   Okay.  So you didn't review it to prepare for

11  the deposition?

12         A.   I did not.

13         Q.   And it has a list of what I'll refer to as

14  affiliated committees/organizations.  And each of those

15  appear to have an affiliated relationship code that

16  describes them as a joint fundraising representative.

17  Do I have that about right?

18         A.   Yes.

19         Q.   And so can you explain to me what an

20  affiliated relationship code is and what a joint

21  fundraising representative is?

22         A.   Again, I don't file these reports.  So I'm not

23  deeply familiar, but I believe an affiliated

24  relationship code is an FEC term to qualify the

25  relationship here.  And a joint -- and these are all

1  committees that we have joint fundraising committees

2  with.

3      Q.   Is that what joint fundraising representative

4  means?  It means you do joint fundraising activities?

5      A.   Yes.

6      Q.   Which of these listed groups relates to

7  activities in Texas?

8      A.   The Blue Texas Fund is related to Texas.  It

9  is possible the New Wave Women's Fund -- I believe that

10  also has a Texas connection.

11      Q.   Any others?

12      A.   I believe that's it.  There's also a chance

13  the Red to Blue Victory Fund may have a connection to

14  Texas, but I'm not aware of that at this time.

15      Q.   Okay.  So sitting here today, you don't know

16  for sure whether Red to Blue Victory Fund has a Texas

17  connection?

18      A.   Correct.

19      Q.   But Blue Texas Fund, I assume, does.  And New

20  Wave Women, you also think has a Texas connection.  Do I

21  have that about right?

22      A.   Yes.

23      Q.   Okay.  Let's start with Blue Texas Fund.  What

24  is it?

25      A.   This is a joint fundraising agreement with

51

1  campaigns in Texas.

2      Q.   Any campaigns in particular?

3      A.   I believe the Fletcher campaign in Texas 7 and

4  the Allred campaign in Texas 32.

5      Q.   Any others?

6      A.   I would need to confirm.

7      Q.   Do you know if that information is reflected

8  in any of the documents that were produced to us?

9      A.   Yes, I believe it is.

10      Q.   All right.  I think -- I think that we will

11  get there later.  So I think we can leave that for now.

12          But what activities does the Blue Texas

13  Fund engage in specifically?

14      A.   Fundraising.

15      Q.   And how is that conducted?

16      A.   I'm sorry.  Could you repeat the question?

17      Q.   You said Blue Texas Fund, the only activity

18  you said was fundraising; is that right?

19      A.   Yes.

20      Q.   Okay.  No other purpose for Blue Texas Fund?

21  Nothing else that it does?

22      A.   Correct.

23      Q.   And so how does Blue Texas Fund go about its

24  fundraising activities?

25              MS. BRANCH:  And I'm just going to object

52

1  to the extent that this calls for a legal conclusion

2  based on how joint fundraising works.

3           But you may answer to the extent that you

4  know.

5       A.   It's mostly a direct mail fundraising

6  campaign.

7       Q.   **(BY MR. HILTON)  So sending mail solicitations**

8  **to people for donations?**

9       A.   Yes.

10      Q.   **And you said "mostly."  Are you aware of any**

11  **other fundraising activities that the Blue Texas Fund**

12  **engages in?**

13      A.   No.  I believe it's direct mail.

14      Q.   **And what's DCCC's involvement in those**

15  **activities?**

16      A.   We help facilitate the direct mail, the copy,

17  getting it out.

18      Q.   **I don't think I understand what you mean by**

19  **facilitate and help getting it out.  Can you describe**

20  **that a little more specifically?**

21      A.   Sure.

22           MS. BRANCH:  I'm going to object to the

23  extent that is calls for information privileged by the

24  First Amendment.

25           You may answer at a high level.

1                THE WITNESS:  Sure.

2        A.    We -- we work with, you know, whoever else is

3   in the fund and work on the creative printing and direct

4   mailing of the mail solicitations.

5        Q.    (BY MR. HILTON)  And when you say "work on,"

6   do you mean -- does that just mean you're providing

7   funds; or do you also provide actual, you know,

8   manpower, labor?

9        A.    Actual manpower.

10       Q.    I'm sorry.  Go ahead.

11       A.    Oh, no.

12       Q.    And you said you worked with whoever else is

13   in the fund.  Is that the two campaigns you referred to

14   earlier?

15       A.    Yes.

16       Q.    And then whoever else you can't recall, but

17   it's in the documents?

18       A.    Yes.

19       Q.    And the direct mail Blue Texas Fund engages

20   in, is that purely a solicitation for donations; or is

21   there anything else that these, you know, mailers are

22   trying to accomplish?

23       A.    It's just for fundraising.

24       Q.    Okay.  Does Blue Texas Fund engage in any

25   voter registration efforts?

1      A.   No.

2      Q.   And how about New Wave Women, what is -- you

3  know, what is that?

4      A.   It's very similar to the Blue Texas Fund

5  except it is a joint fundraising agreement highlighting

6  our frontline women candidates.

7      Q.   And who is that fundraising agreement with?

8  Is it also with campaigns in Texas?

9      A.   Again, I would need to check on who that

10  agreement is with.  I believe it's broader than Texas.

11      Q.   Understood.  You did say that earlier.  You're

12  right.

13          Do you know who the participants from

14  Texas in the New Wave Women group are?

15      A.   Again, I would need to check.

16      Q.   Is that in the document that was produced?

17      A.   If it is related to Texas, I think it would be

18  in the production.

19      Q.   I'm going to pull up a document that I had

20  prepared to talk about with you, and I want to see if

21  this is going to show me the information that we're kind

22  of circling around here.  So I'm going to send it out

23  again through the group chat.  This is a portion of

24  Exhibit 4, which is the document production that was

25  given to us.  This is a file labeled DCCC 661.  That's

1  the beginning Bates number.  It's a two-page document.

2  Let me know when you have that in front of you.

3       A.   Okay.  I have it open.

4       Q.   **What is this document?**

5       A.   This is a release of our House Majority

6  Battlefield and the first twelve candidates named to the

7  DCCC's Red to Blue program.

8       Q.   **Does this document show the participants in**

9  **the Blue Texas Fund or New Wave Women?**

10      A.   No, it does not.

11      Q.   **Okay.  Well, maybe let's do this, because I**

12  **would like to know who in Texas is involved with those**

13  **funds.  I'd like to understand the relationships that**

14  **DCCC has with affiliates who work in Texas.  And so**

15  **maybe the next time that we take a break would be an**

16  **appropriate time for you to look through Exhibit 4 and**

17  **find those documents that you're referring to.**

18      A.   Okay.

19           MS. BRANCH:  Yes, I think we did produce

20  information on the Blue Texas Fund.  So we can pull up

21  those documents after the break for sure.

22           MR. HILTON:  Yeah.  Let's -- if that's

23  all right with y'all, let's just do that on the next

24  break.  I'm going to make a note real quick to come back

25  to that.

1    Q.   (BY MR. HILTON)  And, Ms. Newman, if you

2  happen to, you know, as we're going through other

3  stuff -- if you happen to come across these documents as

4  we're going through stuff, you know, holler at me; and

5  we can take care of it right then so we don't have to

6  come back to it.

7    A.   Will do.

8    Q.   I think that's all I have for Exhibit 6.

9         I'm going to move now to Exhibit 7.

10         (Exhibit 7 discussed.)

11    Q    (BY MR. HILTON)  I've just sent it out via

12  Zoom chat.  I gave this a file name that I thought it

13  was, but I actually really don't know what I'm looking

14  at here.  So please let me know once you have this in

15  front of you.  And once you do, if you know, if you

16  could, tell me what is that we're looking at here.

17    A.   Sure.  This appears to be the summary page for

18  an amended year-end report from the DCCC.

19    Q.   And are you familiar with these year-end

20  reports?

21    A.   Yes.

22    Q.   Did you review any year-end reports in

23  preparation for your deposition?

24    A.   I did not.

25    Q.   What is your familiarity with these reports?

1    Is it similar to the first one we looked at where it

2    just comes up in the course of your work?

3         A.   Yes, it is.

4         Q.   And I don't mean to speak for you, but any

5    other differences compared to what we looked at before?

6    Anything else I should know about your familiarity with

7    this report?

8         A.   No.  I mean, we talked about it from a high

9    level; but I do not review the reports.

10        Q.   Got it.  And you said this is just a summary

11   page.  Do you know what other information is included

12   with these forms, these reports?

13        A.   Yes.  So this is the summary, the overview of

14   mostly cash on hand, total money in, and total money

15   out.  And then on the FEC website itself, you would be

16   able to click through these filings and see all of the

17   receipts and disbursements itemized.  And at least with

18   the disbursements, that also shows, like, the vendor and

19   a purpose.

20        Q.   So on page 1 of Exhibit 7, there are some

21   links there.  It says, "Summary Page, Detailed Summary

22   Page."  And then describes Schedule A, B, and D filings.

23   Are those the attachments to the schedules that you're

24   referring to?

25        A.   Yes.

1       Q.   And I did not include those in Exhibit 7.

2   That's not my normal practice; but when I tried to

3   download them all, it was something like almost 50,000

4   pages.  So I don't intend to go through 50,000 pages

5   with you today; but, you know, what I'm -- I'm hoping

6   maybe you can tell me if I were to look at the itemized

7   disbursements in Schedule B, you mentioned that it

8   included the description of the purpose for the

9   disbursement.  Did I hear you correctly?

10      A.   Yes.

11      Q.   And what -- can you give me an example of what

12  that might look like?

13      A.   Yes.  So for all the disbursements, it usually

14  shows who the expense is disbursed to, what the vendor

15  name is, the date of the disbursement; and then there is

16  an amount related to that expense, as well as a

17  description for the expense itself.

18      Q.   Well, what kind of information will be

19  contained in the description field or maybe --

20           MS. BRANCH:  I'm going to object on the

21  basis that this is all public, and the documents speak

22  for themselves.

23           You may answer to the extent that you can

24  describe this.

25      A.   Sure.  I mean, it depends on the expense; but

1   it's usually a general descriptor.  So if it's office

2   space, it might say "rent."  If it's, you know,

3   staples.com, it would say "office supplies."

4        Q.   (BY MR. HILTON)  But -- okay.  That's helpful.

5   That's what I assumed that it was going to be, kind of a

6   high level of detail; and that's what it sounds like

7   you're describing.  It sounds like if I look at those

8   Schedule B filings, it will not tell me, you know,

9   "Funds spent in Bexar County related to voter

10  registration efforts in Precinct 3"?  It won't be that

11  level of detail; is that right?

12              MS. BRANCH:  Objection, public

13  information.  The document speaks for itself.

14              You may answer.

15       A.   Yes, I would agree with that.

16       Q    (BY MR. HILTON)  Okay.  I'd like to focus

17  on -- turn back to Exhibit 7.  I'd like to focus on

18  page 2 in the disbursements section.

19       A.   Yes.

20       Q.   What I was hoping you could do for me is

21  explain to me what each of these types of disbursements

22  are.  It sounds like, you know, dealing with these

23  filings and putting them together is not your primary

24  job duty.  So, you know, to the extent that you can, if

25  you have an understanding of any of these categories,

1  **I'd like to know what your understanding is.**

2                MS. BRANCH:  And I'm just going to object

3  to the extent that this calls for a legal conclusion

4  since some of these are legal terms.

5                Jacqui, you may answer.

6                MR. HILTON:  And, again, I think it's

7  going to go smoother if you could just limit the

8  speaking objections.  I'd appreciate it.

9        A.   Yeah, I'm happy to share my non-expert opinion

10  on these.  So each line item the FEC calls for relates

11  to a slightly different kind of expenditure.  Line 21 is

12  our operating expenditures; 22 are transfers to

13  affiliated or other party committees.  So, actually,

14  what you see in Column A, the 45,360 number, that is

15  money that we transferred to Texas at the end of the

16  year, to the Texas Democratic Party.  And any money we

17  transfer to party committees would show up on that line

18  item.  Twenty-three is contributions to federal

19  candidates or other party -- or other political --

20        Q.   (BY MR. HILTON)  I'm sorry.  I had a question

21  **for you on 22 there.**

22        A.   Sure.

23        Q.   **I'm looking at Column A.  It's 45,360.  You**

24  **said that represented funds transferred to the Texas**

25  **Democratic Party?**

DCCC - 3
4/28/2020

61

1      A.   Yes.

2           Q.   And how do you know that?

3      A.   Well, it's -- usually, we don't transfer a lot

4  of money in the off year.  And so I'm aware that we had

5  transferred money to Texas in December, and I also came

6  across that again in preparation for that -- for this

7  deposition.

8           Q.   Okay.  And so there are two columns here.  One

9  of them says, "Column A, This Period."  And that's where

10 the 45,360 appears.  There's also Column B that says,

11 "Calendar Year."  And that number's quite a bit higher,

12 885,821.16.  Do you see that?

13     A.   Yes.

14          Q.   What's the difference between those two

15 numbers?

16     A.   Column B refers to amounts that were filed in

17 previous reports.  So it's the total amount that we

18 transferred that calendar -- in 2019.  And we had

19 transferred the 45,360, I believe, in December, which

20 was the report filing in question for this time.

21          Q.   Oh, okay.  So this is -- what I've given you,

22 I think, is the second amended year-end report.  I

23 guess -- tell me if I have this correctly -- Column B

24 would be the total of transfers to affiliated or other

25 party committees that appear on all of the year-end

1    reports then?

2        A.   Yes.  It's the total we transferred to other

3    party committees in the year 2019.

4        Q.   Okay.  Okay.  And you just happen to know that

5    this 45,360 was the Texas Democratic Party because of

6    the timing, and you just happen to know?

7             MS. BRANCH:  Objection.  This is all

8    public.

9        A.   Yes.  And in Exhibit 8 that you shared

10   earlier, you can see that transfer as well.

11       Q.   (BY MR. HILTON)  Okay.  Great.  That's

12   helpful.

13            But I wouldn't be able to tell that from

14   the face of Exhibit 7?

15       A.   No.

16            MS. BRANCH:  Objection.  Vague.

17       Q    (BY MR. HILTON)  Let's go down to -- all

18   right.  Well, let's -- sorry to interrupt you again

19   there; but that was helpful to help me understand the

20   difference between Column A and Column B here.

21            Can you -- I guess we were on Line 23

22   then; and maybe you could pick back up with, you know,

23   explaining to me what these -- your categories of

24   disbursement are.

25       A.   So Line 23 is contributions to federal

1    candidates or other political committees.

2              Twenty-four would show any disbursements

3    we made that are considered to be independent

4    expenditures.

5         Q.   And what does that mean?

6         A.   An independent expenditure is an expenditure

7    that's made kind of without any coordination.  So those

8    are expenses that would not be working directly with a

9    campaign or another party.

10        Q.   Could it be an expenditure related to a

11   campaign?

12        A.   Yes.

13             MS. BRANCH:  Objection to the extent

14   these questions call for legal conclusions.

15             But, Jacqui, you may answer based on your

16   knowledge.

17        Q    (BY MR. HILTON)  So if you -- this is a

18   hypothetical example; I don't know whether it's

19   happened -- but if DCCC wanted to run ads in support of,

20   you know, Wendy Davis in her campaign and didn't

21   coordinate with that campaign prior to running the ads,

22   just kind of did it on its own, would that be an

23   independent expenditure?

24             MS. BRANCH:  Objection to the extent that

25   this calls for a legal conclusion.

DCCC - 4/28/2020

64

```
 1              But you may answer.
 2       A.   In a very simple view, yes.  It's a little bit
 3  more complicated than that because it requires us to
 4  meet certain standards to prove that we haven't
 5  coordinated with the campaign.  We're not using any
 6  campaign information.
 7       Q    (BY MR. HILTON)  Yeah, understood.  When
 8  lawyers are involved, it's never going to be that
 9  simple.  So I get that.  But that's helpful to help me
10  kind of understand what we're looking at.
11              All right.  So that was 24, independent
12  expenditures.  How about 25?
13       A.   This is coordinated expenditures made by a
14  party committee, so that's almost the opposite of an
15  independent expenditure.
16       Q.   Sure.
17       A.   Twenty-six is loan repayments made.
18  Twenty-seven is --
19       Q.   Is that 16 million on loan repayments made?
20       A.   Yes.
21       Q.   And what was that payment?
22              MS. BRANCH:  Objection to the extent that
23  this calls for information privileged by the First
24  Amendment.
25              But if you can answer that without
```

1    revealing strategic information, you may do so.

2        A.   As you can see in the publicly available

3    findings -- or filings, the DCCC took a line of credit

4    for $16 million.

5        Q.   **From who?**

6        A.   Bank of America.

7        Q.   **And what were those funds used for?**

8             MS. BRANCH:   Objection, same one.

9             You can answer at a high level.

10       A.   Our expenditures.

11       Q    **(BY MR. HILTON)   Which expenditures?**

12       A.   Just generally.

13       Q.   **Can you give me an example?**

14       A.   Well, this loan was taken in the 2018 cycle,

15   so it was for expenditures that occurred in 2018.

16       Q.   **So, like what?**

17            MS. BRANCH:   Objection to the extent that

18   this calls for strategic information.  I don't know the

19   relevance.  Is there a specific relation to this case on

20   this question?

21            MR. HILTON:   I would like to know an

22   example of what this money was spent on in the 2018

23   campaign.

24            MS. BRANCH:   Okay.  I think the fact that

25   they took out a loan is public, but I instruct the

1  witness not to answer specific information about what

2  the loan was used for.

3            MR. HILTON:  On what basis?

4            MS. BRANCH:  The First Amendment.

5            MR. HILTON:  I'm not asking for any

6  strategic information.

7            MS. BRANCH:  I think you can answer at a

8  high level, Jacqui.

9            I think she's already done that, but...

10       **Q    (BY MR. HILTON)  I just want to know an**

11  **example of an expenditure that came from the $16 million**

12  **during the 2018 campaign.**

13       A.   Yeah, we -- I definitely can't point to, like,

14  "This expense was paid for by this loan."  It's kind of

15  all of our activities and expenditures grouped together.

16       **Q.   I don't understand.**

17            MS. BRANCH:  Is there a question?

18       **Q.   (BY MR. HILTON)  Can you please elaborate on**

19  **your answer because I don't understand?**

20       A.   I would just say the loan generally applied to

21  our activities in the 2018 cycle.

22       **Q.   So --**

23       A.   There's not a specific expense.

24       **Q.   So it was a 16-million-dollar line of credit,**

25  **you said?**

67

1    A.    Yes.

2    Q.    And my understanding of how lines of credit

3 work -- maybe this one is different -- is that you have

4 to make the decision to draw down on that line of

5 credit, correct?

6    A.    Yes.

7    Q.    It's not like Bank of America just handed you

8 a check for $16 million; and it got thrown into a common

9 account, correct?

10    A.    Correct.

11    Q.    Okay.  So can you give me an example of when

12 the DCCC -- let's do it this way:  How about an example

13 from an expenditure that was made in Texas from this

14 line of credit?

15              MS. BRANCH:  Again, same objection on the

16 First Amendment.

17              But, Jacqui, you can talk about the 2018

18 spending in Texas at a high level.

19    A.    Sure.  Well, we, the DCCC, invested over

20 $6.7 million in Texas in the 2018 cycle.  Again, I can't

21 point to any expense that this loan went directly to

22 fund other than to say it allowed us to complete all of

23 our activities in 2018.

24    Q.    (BY MR. HILTON)  Who would know how this line

25 of credit was used?

68

1              MS. BRANCH:  Objection, First Amendment.

2              Do not answer is my instruction.

3       Q.   (BY MR. HILTON)  Are you going to abide by

4   that instruction?

5       A.   Yes, I am.

6       Q.   You mentioned DCCC has a CFO?

7       A.   Yes.

8       Q.   What's that person's name?

9              MS. BRANCH:  Objection, First Amendment.

10   This is -- some of this is public information, but I'm

11   just not sure what the purpose of this line of

12   questioning is.

13              MR. HILTON:  Ms. Branch, please limit

14   your speaking objections.

15       Q.   (BY MR. HILTON)  I would like to know the name

16   of the CFO of the DCCC.

17       A.   Jackie Forte-Mackay.

18       Q.   Would she know how this expenditure was used,

19   how this line of credit was used?

20              MS. BRANCH:  Objection, First Amendment.

21   Vague.  I'm going to instruct the witness not to answer.

22   Again, the strategic decisionmaking of the DCCC and use

23   of that loan is protected by the First Amendment; and

24   the witness is not going to answer further questions on

25   that.

69

1          So we can keep objecting and you can take

2   offense to my speaking objections, but I'm going to put

3   that on the record and I want that to be clear.  I also

4   want to make clear on the record that your tone earlier

5   with respect to my objection and then cutting me off has

6   been hostile.  So I want that to be reflected.

7          But, again, I'm going to continue to make

8   that objection; and we can kind of do that all day.  I

9   don't think it's directly relevant to the DCCC's

10  standing, but we can proceed.

11          MR. HILTON:  Well, I disagree with your

12  characterization of my tone; and I disagree that this

13  information is privileged.

14      **Q.   (BY MR. HILTON)  Ms. Newman, are you going to**

15  **follow your counsel's instructions not to answer?**

16      A.   I am.

17      **Q.   Okay.**

18          MR. HILTON:  And, Ms. Branch, again, I'm

19  not offended by your speaking objections; but they're

20  not permissible under the rules.  And so I'd just ask

21  you to limit them.

22          MS. BRANCH:  I'm trying to limit them as

23  much as possible, and I understand.  I don't want to

24  testify.  Jacqui's here to testify.

25          MR. HILTON:  Thank you.

1      Q    (BY MR. HILTON)  How much money did you say

2   was spent in Texas in the 2018 election cycle?

3      A.   Over 6.7 million.

4      Q.   Is that reflected on Exhibit 7?

5      A.   No.  No, because Exhibit 7 is showing our 2019

6   year-end report.

7      Q.   If we were to look at the same form for 2018,

8   the year-end, you know, report, would that show the

9   expenditures in Texas?

10            MS. BRANCH:  Objection.  Public.

11            But you can answer to the extent that you

12   know.  It's all published information.

13      A.   It would show all of the money that we

14   transferred to State Party committees and other

15   expenditures made at a general level.

16      Q.   (BY MR. HILTON)  Would I have to look at the

17   Schedule B to that 2018 year-end report to find the

18   disbursements related to Texas?

19      A.   Yes, and you would have to look at all of the

20   reports, probably.

21      Q.   Okay.  Did you look at any of those reports in

22   preparation for your deposition?

23      A.   I did not.

24      Q.   And I'm so sorry.  This is like the fourth

25   time I've asked you:  What was that number, again, that

DCCC - 4/28/2020

71

1    was spent in the 2018 election cycle in Texas?

2              MS. BRANCH:  Objection, asked and

3    answered.

4              You may answer.

5        A.   It was over 6.7 million.

6        Q.   (BY MR. HILTON)  And what was that money used

7    for?

8        A.   It was used for persuasion and mobilization of

9    voters in support of our campaigns in Texas.

10       Q.   Voter persuasion and mobilization of

11   campaigns?

12             MS. BRANCH:  Objection, mischaracterizes

13   the testimony.

14             You may answer.

15       Q.   (BY MR. HILTON)  Voter persuasion and

16   mobilization of voters?

17       A.   Yes.

18       Q.   Is that what you said?

19       A.   Yes.

20       Q.   Is that what you said?  I just didn't hear it.

21       A.   Yes.

22       Q.   Anything else that it was used for?

23       A.   I think that encompasses a lot of activities,

24   but...

25       Q.   Are there any other types of activities that

1  that doesn't encompass?

2              MS. BRANCH:  Objection, vague.

3              You may answer.

4       A.   You know, again, I think everything is --

5  everything we do is to an end of mobilizing and

6  persuading voters.

7       Q    (BY MR. HILTON)  I'm going to ask you to pull

8  up Exhibit 1, which was sent out earlier.  It's the

9  Deposition Notice, and I'd like to turn to page 5 of the

10  Notice.

11      A.   Okay.

12      Q.   And I'm looking at Topic 4, section --

13  subsection (b).  And starting with the year 2014, what

14  were the total funds spent on voter persuasion efforts

15  in Texas during the year 2014?

16      A.   So I looked into our spending in the past

17  cycles and I can share with you what we've spent in

18  Texas, but this doesn't necessarily align with how we

19  track or know our spending.

20      Q.   How do you track your spending?

21      A.   It's more general than this because, again,

22  we're kind of thinking of everything in terms of

23  everything is a voter persuasion effort or GOTV effort.

24      Q.   So the entirety of the 6.8 million, or

25  whatever the number was that you spent in Texas in 2018,

1   for example, that was all spent on voter persuasion and

2   Get Out the Vote?

3        A.   Yes.

4        Q.   What about voter registration efforts, can you

5   break that out?

6        A.   For past cycles I cannot.

7        Q.   That relates to 2014 through 2019, I suppose?

8        A.   Through 2018.  I can speak to our voter

9   registration efforts this cycle.

10        Q.   Well, let's leave this cycle aside for a

11   second; and let's stick on the past ones then.  So what

12   were the total funds spent on all activities in Texas in

13   the year 2014?

14        A.   It was just over $3.1 million.

15        Q.   And that was all spent on voter persuasion and

16   Get-Out-the-Vote efforts?

17        A.   Yes.

18        Q.   And you can't tell me what portion was spent

19   on voter registration efforts?

20        A.   Correct.

21             MS. BRANCH:  Objection.  She's asked and

22   answered.  To the extent that these questions call for

23   strategic information, I'm going to object on the basis

24   of the First Amendment.

25             But you may answer at a high level.

74

1      Q.   (BY MR. HILTON)  Are there any activities

2   other than voter persuasion, Get Out the Vote, or voter

3   registration activities on which DCCC spent money in

4   2014?

5      A.   In Texas?

6      Q.   In Texas.

7      A.   Not to my knowledge.

8      Q.   How about the year 2015, what was the total

9   amount of funds spent on all activities in Texas?

10                 MS. BRANCH:  Same objection.

11                 But you may answer at a high level.

12                 First Amendment.

13                 MR. HILTON:  I'm sorry.  What's the

14   objection?

15                 MS. BRANCH:  First Amendment.

16                 You may answer at a high level.

17                 I think the witness --

18      Q.   (BY MR. HILTON)  The question is the total

19   funds spent on all activities in Texas in the year 2015.

20      A.   So we -- and I apologize if I didn't mention

21   this earlier.  We look at all of our spending on a

22   cyclical basis.  So the years 2015 and 2016 would be

23   grouped together.  So I don't know exactly how much we

24   spent in 2015.  I would actually guess it's little to

25   nothing, just because it's the off year; and most of our

75

1  spending is in the on year.  But I can tell you in 2016

2  the DCCC spent just over $6 million in Texas.

3      **Q.   And you did mention the two-year cyclical**

4  **nature earlier, and now it's starting to make a little**

5  **more sense.  What kind of activities and expenditures do**

6  **occur in the off year?**

7            MS. BRANCH:  Objection to the extent it

8  calls for First Amendment privileged information.

9            You may answer at a high level.

10     A.   It's generally limited; but if coordinated

11 campaigns are beginning to get set up, there might be

12 Coordinated Campaign expenses we're transferring to the

13 Party.  Voter registration may begin in an off year.

14 That is usually it.  The bulk of our spending takes

15 place in the on year, usually, as we get closer in to

16 the election.

17     **Q.   (BY MR. HILTON)  Are you withholding**

18 **information in your answer based on your instruction**

19 **from counsel?**

20            MS. BRANCH:  Objection.

21            You may answer.

22            MR. HILTON:  What's the basis?

23            MS. BRANCH:  Attorney-client privilege.

24 I mean, she answered on the record.  You asked her

25 earlier.

1      Q.   (BY MR. HILTON)  Let me explain my question a

2  little more.  Your counsel instructed you -- objected on

3  the basis of a First Amendment privilege and stated that

4  you could answer to the extent it doesn't reveal

5  privileged information and that you could answer at a

6  high level.

7              MR. HILTON:  Is that a fair

8  characterization of your objection, Ms. Branch?

9              MS. BRANCH:  It is.

10     Q.   (BY MR. HILTON)  Okay.  You heard that

11  objection, Ms. Newman?

12     A.   I did.

13     Q.   And did your answer change on the basis of

14  that objection?

15     A.   It did not.

16     Q.   So you would have given me the same answer

17  regardless of whether your counsel objected?

18     A.   Yes.

19     Q.   Okay.  That's all I'm asking.  I just want to

20  know if there actually is something being withheld when

21  your counsel makes these objections, or not.  So that's

22  all I was trying to ask.  Thank you for clarifying that.

23              All right.  So let's go back to the

24  questions from the topics, and we're dealing with this

25  is in the two-year cycles; that's how y'all account for

1  it.  And so in the 2016 election cycle, you spent just

2  over 6 million on all activities in Texas.  Do I

3  remember that correctly?

4       A.  Yes, that's correct.

5       Q.  What was the total amount spent on voter

6  persuasion efforts in that election cycle?

7       A.  Similar to what I said before.  It is all kind

8  of part of the same bucket of voter persuasion/GOTV

9  efforts.

10      Q.  And how much was spent on voter registration

11  efforts?

12      A.  I can't speak to that.

13      Q.  Is that because you don't know?

14      A.  Yes.

15      Q.  And that's because DCCC doesn't track that

16  information?

17      A.  Yes, it has not been tracked like this in the

18  past.

19      Q.  Are there any other, you know, broad

20  categories or buckets of activities other than voter

21  persuasion, Get Out the Vote, and voter registration

22  efforts on which DCCC spent money in the 2016 election

23  cycle?

24      A.  Spent money in general or spent money in

25  Texas?

1        Q.   I'm sorry.  In Texas.

2        A.   No, it's just this.

3        Q.   Okay.  How about the 2018 election cycle?  So

4   I understand that to mean from the -- you know, the

5   presidential election in 2016 to the presidential

6   election in or -- I'm sorry -- for the federal election,

7   the congressional election in 2016, to the congressional

8   election in 2018.  That's how I'm thinking of the

9   two-year cycle.  Is that how y'all measure it as well?

10       A.   Yeah, more or less.  I mean, we kind of

11  started at January 1st.

12       Q.   Okay.  So it would be -- it's really the

13  calendar years 2017 and 2018?

14       A.   Yeah.

15       Q.   Okay.  So for that period, 2017 to 2018, or

16  the 2018 election cycle, what was the total amount spent

17  on all activities in Texas?

18       A.   It was over $6.7 million.

19       Q.   And how much of that was spent on voter

20  persuasion efforts?

21       A.   Again, it's -- that 6.7 covers all of our

22  voter persuasion and GOTV efforts in the 2018 cycle.

23       Q.   And how much of that just over 6.7 million, I

24  think you said, was spent on voter registration efforts?

25       A.   I don't know.

1       Q.    And that's because DCCC doesn't have that

2   information?

3       A.    Yeah.  And I'm not being deliberately vague

4   here.  It's most likely -- you know, we kind of see it

5   all as one bucket of money that is going towards this

6   cause; and we are, as mentioned before, transferring

7   money to the Texas Democratic Party for the Coordinated

8   Campaign where a lot of those voter registration efforts

9   are taking place.

10      Q.    And I'm not making a judgment as to whether

11  you should or should not have this information or how

12  you track it.  I understand, you know, how y'all view

13  it.  It seems like it's all one bucket of activity that

14  goes towards electing Democrats for the House, right?

15              MS. BRANCH:  Objection, mischaracterizes

16  the testimony.  I think you should let the witness

17  testify, so.

18      Q.    (BY MR. HILTON)  Is that a fair

19  characterization of your testimony?

20      A.    Yes, I think generally that's it.

21      Q.    Okay.  So I think we've finished 2018.

22              How about the current election cycle,

23  what's the total amount that's been spent so far in the

24  current election cycle?

25      A.    So, so far this cycle, we've spent -- and you

1  can see this in -- I think, it's Exhibit 8, our

2  transfers to the Texas Democratic Party.  We've

3  transferred over $145,000 to the Texas Democratic Party.

4  The DCCC has spent directly in Texas over $1.1 million,

5  and I believe over $550,000 of that is directly related

6  to voter registration in Texas.

7       **Q.    $550,000 of what has been spent so far is**

8  **related to voter registration?**

9       A.    Yes.

10      **Q.    And how do you know that?**

11      A.    Because we have been working with the Texas

12  Democratic Party on voter registration, and we have --

13  directly, the DCCC has engaged in voter registration on

14  the ground.  And I believe there -- I believe we have

15  produced documents showing that commitment, but...

16      **Q.    So I guess my question is:  In previous**

17  **election cycles, DCCC can't separate out exactly what**

18  **was spent on voter registration; but for the current**

19  **election cycle, you can.  And I'm trying to understand**

20  **why that's the case.**

21      A.    Sure.  Well, I mean, one, I think there is a

22  large voter registration effort in Texas right now in

23  particular; and so it's easy for us to identify that.

24  You know, as I mentioned earlier, we have a lot of

25  turnover each cycle; and so a lot of the people behind

1   spending decisions from past cycles aren't here to speak

2   to how we spent money in the past.  And, you know, I've

3   directly been involved with some of these transactions

4   and expenses, so I can speak to them.

5       Q.  And how are you able to get such a precise

6   number for this year's expenditures on voter

7   registration efforts?

8       A.   On the voter registration efforts?

9       Q.   Yes.

10      A.   Well, the 145K that we have transferred to the

11  Texas Democratic Party to date, that has all been to the

12  Coordinated Campaign to support voter registration and

13  then what we -- what I know we have spent on voter

14  registration.

15      Q.  Do you make any other transfers to any

16  other -- does DCCC make any other transfers to any other

17  groups for voter registration activities?

18      A.   To other state parties?

19      Q.   Any other groups in Texas.  I'm sorry.  And

20  I'm doing a poor job of clarifying that, so I appreciate

21  you noting that.  I'm trying to ask about activities in

22  Texas.

23      A.   To my knowledge, we have transferred the money

24  to the Texas Democratic Party's Coordinated Campaign for

25  voter registration and, again, we have engaged a vendor

1  ourselves to do voter registration efforts on the ground

2  in Texas.

3       Q.   I think that was mentioned in your colleague's

4  Declaration, the vendor, if I remember that correctly.

5  That's Exhibit 3.

6       A.   Yes.

7       Q.   And it looks like that's Paragraph 7 of the

8  Declaration in Exhibit 3?

9       A.   Yes.

10       Q.   Agreement for nearly $400,000 for a consultant

11  to provide voter registration services in Texas

12  Congressional District 23.  That's what you're referring

13  to?

14       A.   Yes.

15       Q.   And so what services is that consultant going

16  to provide?

17            MS. BRANCH:  Objection to the extent that

18  this calls for strategic party information.

19            You may answer at a high level.

20       A.   They help us go through our process of

21  training staff on the ground to try to learn how to

22  register people to vote in Texas.

23       Q.   (BY MR. HILTON)  And what does that training

24  look like?

25       A.   I am not very familiar on the details, but I

1  know that all -- anyone who is registering voters in

2  Texas needs to be trained and deputized in order to do

3  so.

4      **Q.   And who are the staff that you are training,**

5  **like staff of whom?**

6      A.   So it depends, I think.  You know, we hired a

7  consultant who ran some of these efforts that's laid out

8  in Exhibit 3.  In that case the consultant has employees

9  who are helping this effort in Texas.

10         We have -- with the money that we have

11  sent to the Texas Democratic Party, I believe at least

12  two people have been hired with the express purpose of

13  assisting voter registration efforts.

14         And then we also have staff on the ground

15  who work directly for the DCCC whose roles involve a lot

16  of community engagement and help with voter

17  registration.

18      **Q.   Do you know what -- so community engagement**

19  **and voter registration, are those two different things?**

20      A.   I think so.  I think maybe community

21  engagement is an overarching bucket that could involve

22  voter registration.

23      **Q.   What are the other types of buckets of**

24  **activities that your direct staff in Texas are engaging**

25  **in this cycle?**

1      A.   They're organizing events.   They are meeting

2  with our constituents in the districts.   They are

3  following events of our challengers, as well, and

4  reporting back to the team on what's happening on the

5  ground in Texas.

6      Q.   Anything else?

7      A.   I think that's the bulk of it.

8      Q.   Do you know what percentage of their time is

9  devoted to voter registration efforts?

10     A.   I don't.

11     Q.   Does anyone at DCCC?

12     A.   I think our field team would.   I also think it

13 probably shifts throughout the cycle.   You know, early

14 on, when there is time to register voters, that is a

15 bigger focus.   I also think that we would be doing a lot

16 of voter registration right now if we were not in the

17 current situation we are in, speaking from our homes.

18     Q.   Yeah.   Yeah, I can only imagine how much that

19 has kind of thrown a wrench in everything.   And so,

20 yeah.

21          Well, let me ask you this:  Turning back

22 to Exhibit 3, Paragraph 6, the last sentence of that,

23 the second sentence of that paragraph, it says, "DCCC

24 uses voter registration not only to expand the pool of

25 individuals who are eligible to vote for Democratic

1    **candidates but also to have important conversations with**

2    **people about the importance of voting and important**

3    **causes to the Democratic Party."  Did I read that**

4    **correctly?**

5         A.   Yes.

6         **Q.   Can you explain what is meant by this?**

7         A.   Sure.  I think in the process of registering

8    people to vote, people who are not currently registered

9    or participating in the voting process, it allows you to

10   start a dialogue about why it's important for people to

11   register and to show up and make a plan about voting on

12   Election Day, which is what getting out the vote is all

13   about.

14        **Q.   And how about important causes to the**

15   **Democratic Party?  How does that piece of it play into**

16   **these voter registration efforts?**

17        A.   I think that usually the important causes tie

18   back to what somebody's motivation might be to vote.

19        **Q.   How do all of these purposes get accomplished**

20   **when you're engaging in efforts to register voters?**

21        A.   I'm sorry.  Could you clarify the question?

22        **Q.   Well, it seems to me there's a few different**

23   **purposes to DCCC's voter registration efforts, as**

24   **explained in Paragraph 6 of Exhibit 3.  And as you're**

25   **explaining to me now, it's to expand the pool of**

1  individuals, to have important conversations with people

2  about the importance of voting, and conversations about

3  important causes to the Democratic Party.  I'm trying to

4  understand how all of those purposes are accomplished.

5  So how do the voter registration activities address all

6  of those purposes?  What do you do to achieve those

7  purposes in the context of your voter registration

8  efforts?

9       A.   I think that this is all part of one

10  conversation that naturally flows together where, you

11  know, it might look something like, "Hey, are you

12  registered to vote?  Would you like to register to vote?

13  And do you know there's an election coming in November?

14  If you register to vote now, you can participate in that

15  or if there's a primary coming up, you can participate

16  in that" and why it might be important to a voter to

17  participate in that election and register at this time.

18  I really think of it as all one conversation, not

19  necessarily three different or a few different goals.

20       Q.   Okay.  So this is -- all of these things are

21  part of every conversation with someone who you're

22  trying to engage with; is that what you're saying?

23       A.   Yes.

24       Q.   Okay.  That is helpful.  Thank you for

25  clarifying that.

1          **Is there -- sorry.  I have a few**

2   **follow-up questions on this, so I was trying to organize**

3   **my thoughts.  How does DCCC track the success of these**

4   **kinds of voter registration efforts?**

5          MS. BRANCH:  Object to the extent this

6   calls for strategic information.

7          But you may answer at a high level.

8      A.   We certainly want to know how many voters

9   we've registered.

10     **Q    (BY MR. HILTON)  So number of voters who get**

11  **registered, how is that tracked?**

12     A.   I am not familiar with the specifics, but

13  usually the people who are tasked with registering

14  voters report back the top-line numbers.

15     **Q.   The top-line number being the total number of**

16  **people who are registered?**

17     A.   Yes.

18     **Q.   Is that tracked for the whole cycle or by**

19  **activity or by location?  What are some of the ways in**

20  **which that's broken down?**

21     A.   Yeah --

22          MS. BRANCH:  Again, I'm going to assert

23  the same objection on First Amendment grounds.

24          You can answer at a high level.

25     A.   I think it depends based on who's in charge of

88

1   the program, but it could be any of those things.  It

2   could be just number of people or by the specific

3   activity, like, "This is how many people got registered

4   today at this event" or in a place.

5        Q    (BY MR. HILTON)  Are there any other ways in

6   which it's tracked?

7        A.   Not that I can think of.

8        Q.   Can DCCC apportion a cost to register each new

9   voter?

10       A.   I guess it's possible.

11       Q.   Is that something that DCCC has already done?

12       A.   No.

13       Q.   That's not data that DCCC has?

14       A.   Correct.

15       Q.   And when you said it was possible, what did

16   you mean by that?

17       A.   I mean, I think you could come up with some

18   metric of how much money we are spending as it relates

19   to how many people we are able to register to vote.

20       Q.   But DCCC does not have any such metric

21   currently?

22            MS. BRANCH:  Objection, asked and

23   answered.

24       A.   No, not to my knowledge.

25       Q    (BY MR. HILTON)  Has DCCC had a metric like

1  that at any time from the beginning of 2014 to the

2  present?

3       A.   Not to my knowledge.

4       Q.   How does the DCCC decide which voters to

5  target?

6             MS. BRANCH:   Objection, First Amendment

7  privilege.

8             You can answer at a high level to the

9  extent you can.   We can't disclose targeting and

10  strategic information.

11      A.   There are ways that we're able to identify

12  voters who are likely to support Democratic candidates

13  or vote for Democrats.

14      Q.   (BY MR. HILTON)   So that's the target group,

15  is folks you expect to vote Democratic?

16      A.   Yes.

17      Q.   How does DCCC decide which types of voter

18  registration efforts to pursue?

19             MS. BRANCH:   Again, same objection.

20             You can answer at a high level.

21             And that's to First Amendment, to

22  clarify.

23      A.   I think it's probably a variety of factors

24  based on where our targeted races are as far as priority

25  districts for the DCCC and where we are able to make an

1  effort and a successful activity out of registering

2  voters.

3      Q.   (BY MR. HILTON)  Does DCCC adjust its

4  activities based on a success rate?

5      A.   Yeah.  I want to be clear that I don't know if

6  there's necessarily, like, a success rate or a

7  definition; but, you know, we certainly aren't going to

8  engage in efforts where -- in voter registration efforts

9  where it's not possible because of, like, geographic or

10 logistics.

11     Q.   Who makes those kinds of decisions?

12          MS. BRANCH:  Objection, First Amendment

13 privilege.  I'm going to instruct the witness not to

14 answer that.

15          MR. HILTON:  And so to be clear, my

16 question is:  Who at the DCCC decides whether to adjust

17 voter registration activities and how they do that.  And

18 you're instructing the witness not to answer?

19          MS. BRANCH:  I mean, I think that you

20 have that information.  If you want to pursue a high-

21 level line of questioning, I'm okay with that; but my --

22 what I think we're doing is going into the strategy of

23 how the D-Trip targets voters for voter registration.

24 And that is protected by the First Amendment.

25          So, Jacqui, if you want to answer that

91

1  question, that's fine.

2              And maybe we can have the court reporter

3  read that back; but beyond that, I'm going to object.

4              MR. HILTON:  I'll restate my question.

5      **Q.   (BY MR. HILTON) Who at DCCC adjusts which**

6  **voter registration efforts that the group is going to**

7  **engage in?**

8      A.   I think that a lot of that responsibility

9  falls on the National Field Director.

10     **Q.   And how are those decisions made?**

11             MS. BRANCH:  Objection.  I'm going to

12  instruct the witness not to answer.

13             Is now maybe a good time to break for

14  lunch?  I don't mean to interrupt.

15             MR. HILTON:  Well, I think now is a good

16  time to take a break.  I need, like, ten minutes; but if

17  y'all want to take longer, that's fine, whatever y'all

18  want to do.

19             MS. BRANCH:  Can we do -- well, can I ask

20  you how long you may have after lunch, if you have a

21  rough estimate?

22             MR. HILTON:  I don't know.  I need the

23  ten minutes to figure out what I'm going to do next.

24             MS. BRANCH:  Okay.  Well, I think we

25  need -- Jacqui, is 30, 45 minutes good for a you?

92

1                    THE WITNESS:  Yeah, 30 minutes should be

2    fine for me.

3                    MS. BRANCH:  Okay.  That will be 1:50.

4                    MR. HILTON:  All right.  We can go off

5    the record.

6                    THE REPORTER:  Going off the record at

7    12:29 p.m.

8                    (Off the record from 12:30 to 1:05 p.m.)

9                    THE REPORTER:  We're back on the record

10   at 1:05 p.m.

11       Q    (BY MR. HILTON)  All right.  Ms. Newman,

12   before we broke we were talking about voter registration

13   activities and expenditures.  And we, I think, had

14   covered most of what I wanted to cover; but I just have

15   a few -- couple of things to make sure I'm tying up all

16   that that I want to discuss with you today.

17                    So for the 2018 cycle, which is the cycle

18   where DCCC has some more insight into specific

19   expenditures on voter registration, I just want to make

20   sure that I have everything that you've told me so far

21   correct.  You've given money to -- DCCC has given money

22   to the Texas Democratic Party that's earmarked for voter

23   registration.  DCCC has hired a vendor to help with

24   voter registration efforts, which we discussed earlier

25   in connection with the Declaration, which I think is

DCCC - 4/28/2020

1  **Exhibit 3.  Is there -- has anything else been spent**

2  **that's been earmarked for voter registration efforts for**

3  **the 2018 election?**

4       A.   Sorry.  To be clear, I think -- I think the

5  money we are talking about right now is for the current

6  cycle, the 2020 cycle.

7       **Q.   Sorry.  Yes, I misspoke.  For the current**

8  **cycle, the 2020 cycle.  So the TDP money that is**

9  **earmarked and then the vendor for the 2020 cycle.  Is**

10  **there anything else at this time?**

11       A.   Specifically on voter registration at this

12  time, I don't believe there is more money I can

13  identify.  I mean, I think I mentioned earlier we've

14  spent up to -- or a little bit over 1.1 million in Texas

15  alone; and that includes our offices and our staff on

16  the ground.  And, of course, you know, our staff is

17  engaging in this, you know, community engagement; and

18  they are out talking to voters and possibly registering

19  voters as part of their daily activities.  And that is,

20  you know, like, wrapped up in their salary.  It's not

21  necessarily identified in the other money I identified

22  for voter registration.

23            And I -- you know, I would say that we

24  are still several months out from the election; and we

25  will continue to make spending decisions as things

1  develop and get closer and that some of the difficulties

2  we face just around, you know, confusion that Texas

3  voters might have around changing their address or

4  renewing their information online and not being able to

5  simultaneously register to vote will inevitably lead us

6  to have to spend more money on voter registration and

7  more time making sure we are educating voters, that they

8  know that they might not have been registered to vote or

9  had their address updated if they changed any

10  information online through the DPS website.

11      Q.   (Inaudible.)

12           THE REPORTER:  I'm sorry.  Something's

13  happened to your audio.

14           MR. HILTON:  (Inaudible.)  Better?

15           THE REPORTER:  Not really.

16           THE VIDEOGRAPHER:  Something has gone

17  wrong with your audio.

18           MR. HILTON:  (Inaudible.)

19           THE VIDEOGRAPHER:  It's a bandwidth

20  issue.  Yeah, it sounds like you're having bandwidth

21  issues.  The audio seems to be cutting out, Chris.

22           MR. HILTON:  Yeah, I don't know.  Nothing

23  has changed on my end (echoing audio.)

24           THE VIDEOGRAPHER:  We had the same

25  problem the other day with Mr. Geise.  Are you using a

 1  headset?

 2                    MR. HILTON:  I am not (echoing audio.)

 3                    THE VIDEOGRAPHER:  So you're just using

 4  your laptop audio?

 5                    MR. HILTON:  Yes, sir.  Should I drop off

 6  and reconnect (echoing audio)?

 7                    THE VIDEOGRAPHER:  Let's try that, yeah,

 8  just kind of an if you restarted your computer type of

 9  situation.  Just log out and then log back in and see if

10  that doesn't correct the issue.

11                    THE REPORTER:  I'm going to take us off

12  the record at 1:10 p.m.

13                    (Off the record from 1:10 to 1:12 p.m.)

14                    THE REPORTER:  We are back on the record

15  at 1:12 p.m.

16      **Q    (BY MR. HILTON)  Ms. Newman, how much more**

17  **time and money will you have to spend?**

18      A.   I think it's hard to say at this point as,

19  again, we're several months out from the election.  I

20  also think, you know, the current COVID-19 crisis we're

21  in may have an outside impact on this because fewer

22  people will be able to go into DPS in person and change

23  their information and update their voter registration.

24                    So I think it's too far out to put a

25  number on it; but given that we've already invested, you

 1 | know, over a half a million dollars to date, you know, I

 2 | do not think that it is a small -- small investment.

 3 | **Q.   How much more do you plan to spend on voter**

 4 | **registration efforts in Texas?**

 5 |             MS. BRANCH:  Objection to the extent that

 6 | this calls for strategic information.

 7 |             If you know, you can answer.

 8 | A.   I -- you know, again, I don't know if that has

 9 | been decided yet.  I think it will depend as things

10 | shape up with the current environment; and as we get

11 | closer to the election, those expenditures are usually

12 | decided.

13 | **Q.   (BY MR. HILTON)  How much money did DCCC spend**

14 | **on voter registration efforts in Texas for this election**

15 | **cycle prior to January 21st, 2020?**

16 | A.   At least 40, $45,000.  $45,630.

17 | **Q.   That was the transfer to TDP that we looked at**

18 | **earlier on one of the exhibits?**

19 | A.   Yes.  And, you know, I would ad that we've had

20 | our staff on the ground in Texas in 2019.  So they were

21 | beginning to engage in these activities.

22 | **Q.   And I appreciate you mentioning that when I**

23 | **was trying to get my arms around all the voter**

24 | **registration activities for the staff.  And we talked**

25 | **about earlier you couldn't really break down what**

1  percentage of their duties were related to voter

2  registration.  Am I remembering that correctly?

3       A.   Yes, that's correct.

4       Q.   Okay.  Are there any other activities for

5  this -- or expenditures of funds for the 2020 election

6  cycle that we haven't touched on yet?

7            MS. BRANCH:  Objection, vague.  Is that

8  related to voter registration or just expenditures

9  generally?

10           MR. HILTON:  I'm sorry.  I thought I said

11  voter registration.

12       A.   No, I think we've basically covered it.

13       Q.   (BY MR. HILTON)  How much of that money has

14  gone to try to register voters who change their address

15  or renew their driver's license online with DPS?

16       A.   I don't know if there's a specific dollar

17  amount associated with that.  I think that's just part

18  of our ongoing voter education effort to make sure when

19  we're talking to voters, "Are you registered to vote?"

20  Making sure they are aware that if they've moved

21  recently, depending on how they conducted that

22  transaction online, that if it was online versus in

23  person, that their information is treated differently

24  than going in person to change that and that they might

25  not, in fact, be registered to vote at their current

DCCC - 4/28/2020

98

```
 1   address.
 2        Q.   Does DCCC keep track of the number of people
 3   who it talks to who change their address or renew their
 4   driver's license online with DPS?
 5                  MS. BRANCH:  Objection to the extent that
 6   this calls for strategic information.
 7                  But you may answer.
 8        A.   Not that I'm aware of.
 9        Q   (BY MR. HILTON)  Do you have any -- does DCCC
10   have any training materials that reflect those kinds of
11   conversations that you were just referring to?
12                  MS. BRANCH:  Objection, vague, First
13   Amendment privilege.
14        A.   Not that I'm aware of.  I think, you know, the
15   information required is part of the reason why we engage
16   a consultant on the ground to run some of this.  You
17   know, it's difficult to register voters in Texas; and it
18   requires a high level of expertise.  I think a lot of
19   these activities also go through the Texas Democratic
20   Party for these reasons.
21        Q.   (BY MR. HILTON)  Okay.  So leaving aside what
22   the Texas Democratic Party might have, DCCC doesn't have
23   any training materials reflecting how to have these
24   conversations beyond what a vendor might have?
25                  MS. BRANCH:  Objection.  I think that's
```

 1  been asked and answered.  I also think that it calls for

 2  internal materials in the content of what's reflected in

 3  those.  So I'm going to instruct the witness not to

 4  answer that question.

 5      **Q.  (BY MR. HILTON)  So my question is:  Does DCCC**

 6  **have any materials that reflect training with respect to**

 7  **how to have these kinds of conversations for voter**

 8  **registration efforts?**

 9      A.   I don't believe we have any public materials.

10      **Q.   Do you have any non-public materials?**

11          MS. BRANCH:  Again, I maintain the

12  objection and instruct the witness not to answer.

13          MR. HILTON:  Okay.  So you won't allow

14  the witness to answer as to the existence of such

15  materials?

16          MS. BRANCH:  She's already answered the

17  question.

18      **Q.   (BY MR. HILTON)  Do such materials exist,**

19  **Ms. Newman?**

20      A.   I'm not going to answer.

21      **Q.   And is that at counsel's instruction?**

22      A.   Yes.

23      **Q.   Okay.  And no such materials were produced to**

24  **us?**

25      A.   Correct.

1      Q.    Why is registering voters in Texas important?

2      A.    Voter registration is important in Texas

3  because we have several priority targeted races.  We

4  have two -- we call them frontline districts, as well as

5  a handful of red-to-blue districts, that signify

6  priority within the DCCC.  And registering voters makes

7  sure that we are broadening the people who are turning

8  out to vote for these candidates and members of

9  Congress.

10              MR. HILTON:  All right.  Maybe now is a

11  good time to switch over and talk about -- we had a

12  discussion earlier about the Blue Texas Fund and

13  documents showing DCCC's, you know, relationship

14  involved with something related to the Blue Texas Fund.

15  And, Ms. Branch, I believe you had a Bates number that

16  we could refer to?

17              MS. BRANCH:  Yes.  Let me just pull that

18  up.

19      Q.    (BY MR. HILTON)  And -- I'm sorry -- one more

20  question I had on the -- going back to the vendor that

21  y'all hired in Texas.

22      A.    Yes.

23      Q.    Did you produce any documents related to what

24  that vendor is going to do for the DCCC?

25              MS. BRANCH:  Objection, those documents

1  are privileged.  This calls for attorney-client

2  privileged conversations regarding our discussions on

3  what we produced in response to the subpoena.

4      Q.   (BY MR. HILTON)  Okay.  I'm not intending to

5  ask for any conversations between you and your counsel,

6  Ms. Newman.  I just want to know if any such documents

7  have been produced.  You have the entire production

8  there in front of you, and you testified earlier that

9  you're familiar with it.  So that's why I asked you.

10     A.   And can you repeat the original question?

11     Q.   Are there any documents that will show what

12 this vendor that you've engaged in Texas is going to do

13 for the DCCC in the production?

14     A.   I don't believe so, other than maybe a press

15 release sharing that we're engaging in voter

16 registration.

17     Q.   Okay.  And can DCCC identify any voters who

18 have been registered to vote after -- by the DCCC, after

19 they changed their address or renewed their driver's

20 license online with DPS?

21     A.   No, not that I'm aware of.

22     Q.   Okay.

23              MR. HILTON:  All right.  And going back

24 to this Blue Texas Fund issue.

25              MS. BRANCH:  So it's Bates Number 665 is

1   one of the Blue Texas Fund mail pieces, and it shows a

2   paid-for-by disclaimer.

3                    MR. HILTON:  665, you said?

4                    MS. BRANCH:  Correct.

5                    MR. HILTON:  Okay.  Great.  Bear with me

6   one second while I pull it up.

7        **Q.   (BY MR. HILTON)  Oh, and, I guess, Ms. Newman,**

8   **the same question:  Could your vendor identify any such**

9   **voters?**

10                   MS. BRANCH:  Objection, First Amendment

11  privilege.  I'm going to instruct the witness not to

12  answer.

13       **Q.   (BY MR. HILTON)  Are you going to follow your**

14  **counsel's instruction, Ms. Newman?**

15       A.   Yes.

16                   MR. HILTON:  Where am I going to find

17  this document?

18                   Gosh, that was on the record, wasn't it?

19  I'm so used to talking to myself while I putz around my

20  computer that it's really gotten me in trouble on this

21  Zoom depo stuff.  Sorry you have to watch my face while

22  I confusedly look through my files here.

23                   All right.  And it was -- I'm sorry --

24  665?

25                   MS. BRANCH:  665 is the page -- one of

103

1   the pages that contains the disclaimer.

2       Q.   (BY MR. HILTON)  All right.  Ms. Newman, can

3   you pull up page 665?

4       A.   Yes.

5       Q.   Let me know once you're there.

6       A.   I'm there.

7       Q.   All right.  What is this -- what is this

8   document?

9       A.   This is a mailing from the Blue Texas Fund;

10  and I guess to confirm what we discussed earlier, this

11  is a joint fundraising committee that is with Colin

12  Allred for Congress, Elizabeth Pannill Fletcher, for

13  Congress, and the DCCC.

14      Q.   Okay.  So those are all the folks who are part

15  of this joint fundraising committee?

16      A.   Yes.

17      Q.   Okay.  I appreciate that.  And I see here

18  there are a couple of other kind of targeted races, I

19  guess, listed in this mailing; but those campaigns are

20  not part of the Blue Texas Fund?

21      A.   Correct.

22      Q.   So the Blue Texas Fund is raising money on

23  their behalf, or what's the relationship to these other

24  campaigns?

25      A.   The Blue Texas Fund currently raises money for

1 | just the committees that are listed in the disclaimer.

2 |     **Q.   Okay.**

3 |     A.   And, you know, again, these are two of our

4 | members of Congress who won in the 2018 election in

5 | Texas; and they are part of our highest priority races

6 | across the country and in Texas.

7 |     **Q.   Okay.  I'd like to turn to another page from,**

8 | **I think, what we marked as Exhibit 4.  It's the**

9 | **production from DCCC.  It's a two-page document starting**

10 | **at Bates DCCC 661.  Please let me know when you have**

11 | **that pulled up.**

12 |             MS. BRANCH:  You say Exhibit 4?

13 |             MR. HILTON:  Yeah, the entire DCCC

14 | production is designated as Exhibit 4 for the purposes

15 | of the deposition.  So I'm just referring to particular

16 | pages out of that.

17 |     A.   I have this pulled up.

18 |     **Q   (BY MR. HILTON)  All right.  661, we had**

19 | **looked at that earlier; it wasn't what I thought it was.**

20 | **So maybe you can kind of explain to me what I'm looking**

21 | **at here.  It's a map of the United States, obviously.**

22 | **And it has a bunch of races listed, and there's a key**

23 | **for certain symbols.  So maybe you can kind of break**

24 | **this down for me.**

25 |     A.   Sure.  This is our House battlefield that

1  highlights our frontline candidates.  These are our, you

2  know, kind of our targeted members who are running for

3  re-election.  And you'll see, again, that includes

4  Lizzie Fletcher and Colin Allred in Texas.

5       **Q.  And so what are each of the categories listed**

6  **here?  Like, it says, Frontline Candidates, Red to Blue,**

7  **Offensive Battlefield Districts, Expanded Battlefield**

8  **Districts, and a bunch of different campaigns or states**

9  **listed under each category.**

10            **Could you go through each of these**

11  **categories and explain to me what they are and how they**

12  **differ from each other?  I understand you're saying**

13  **they're all targeted in some way, but maybe you could**

14  **explain why they're broken out separately on this**

15  **document.**

16       A.  Sure.  So our frontlines are incumbent members

17  of Congress.  Red to Blue are the first tier of targeted

18  challenger races.  So these are people who are hoping to

19  unseat a Republican member of Congress.  And this

20  document actually might be slightly out of date because

21  we have Texas 21 and Texas 23 listed here as red-to-blue

22  districts, but we've also recently added Texas 22 to

23  this list.

24       **Q.  I see -- I'm sorry to interrupt.  I see a date**

25  **at the bottom that's March 5th, 2020.  Would this list**

106

 1  be accurate as of that date?

 2       A.   Yes.  Yes, it is.

 3       Q.   Okay.  You can continue from there.  I

 4  appreciate that.

 5       A.   Well, I think coming out of the recent Texas

 6  primary, we were able to add an additional district to

 7  this.  And then we have our Offensive Battlefield

 8  Districts; and, you know, this is almost like -- if Red

 9  to Blue was our top priority, then this is the next

10  priority.

11       Q.   It looks like you're trying to unseat a

12  Republican incumbent or claim an open seat that was

13  previously held by a Republican?

14       A.   Yes, exactly.  And then our Expanded

15  Battlefield Districts.  It is also a version of that,

16  kind of showing the priority.

17            And then there's just some helpful other

18  information here that may or may not be relevant to

19  Texas, remaining districts that were won by Hillary

20  Clinton but still held by Republicans.  Democrats

21  running in districts that Trump won.  Districts that

22  have Republican retirements this year or this cycle.

23  And then where we have battle stations, which are

24  offices -- that's what we like to call them -- and field

25  managers on the ground.

1        Q.   Okay.   Politics is a full-contact sport.   So

2    you've got to get into the mindset.   I get it.

3             It sounds like these categories are

4    listed in rough order of priority, seem to be.   That was

5    my impression from how you were describing them.   Is

6    that fair?

7        A.   Yeah.   I think, you know, kind of through the

8    expanded battlefield districts; and then those remaining

9    sections are more just information points.

10       Q.   Got it.

11            And I think I have one more document that

12   I wanted to review with you, and that's DCCC 455.   And

13   this is part of Exhibit 4, which is DCCC's document

14   production.   And just let me know when you have that up.

15       A.   455?

16       Q.   Yes.

17       A.   Okay.   I have that up.

18       Q.   All right.   And 455 is the first page of a

19   two-page document.   Can you tell me what this document

20   is, please?

21       A.   Sure.   This is, I guess, a two-page memo, not

22   necessarily a one-pager, that overviews our member

23   programs, our member dues program, in particular.   And

24   this is shared with members within our caucus and speaks

25   to how we recognize members who participate through

1  paying dues to the DCCC.

2        Q.    Who are the members of the DCCC?

3              MS. BRANCH:  Objection to the extent that

4  this calls for a legal conclusion.

5              But you may answer the question.

6        A.   Yeah.  I realize now that there's a very legal

7  definition for the term "member" that I can't

8  necessarily speak to; but in the DCCC's mind, our

9  members are members of -- Democratic members of Congress

10  that are in our caucus.

11             I think that "member" in kind of a

12  broader term, we also think about Democratic voters as a

13  whole who participate in any of our activities, whether

14  it's donating to us or volunteering or supporting and

15  voting Democratic.  You know, those people who we see as

16  our constituents because we represent them also kind of

17  sometimes get thrown around as, like, a member; but,

18  really, it's our members of Congress.

19        Q.   (BY MR. HILTON)  Okay.  And I'm not asking for

20  a legal definition.  I understand you're not an

21  attorney.  I'm trying to understand how DCCC uses that

22  term, I guess.  And I understand that it's the members

23  of Congress and then, in a broader sense, the

24  constituents who are members of the Party.  Which of --

25  which people would participate in the member dues

109

1  program?

2      A.    The majority of our members participate in

3  this.

4      Q.    And by that, you mean the Democratic --

5      A.    Members of Congress.

6      Q.    And then it has, I guess -- this document

7  describes -- like, is this tiers of membership or

8  different types of membership?  Can you explain to me

9  what the DCCC Gavel Society, the Leadership Circle, and

10 Point Guards are?

11            MS. BRANCH:  Objection to the extent that

12 it calls for privileged information.

13            But you can describe at a high level, and

14 you can certainly speak to what the document states.

15            MR. HILTON:  And that's my question.

16     A.    Yeah.  What's laid out here is -- it is

17 basically levels of recognition for participating in

18 this program, yeah.

19     Q.    (BY MR. HILTON)  And how is it -- how do

20 you -- how does a member qualify for the Gavel Society

21 or the Leadership Circle or as a Point Guard?

22     A.    That's a discussion with our member dues team.

23     Q.    Is it based on, like, the amount of

24 fundraising that they contribute?

25            MS. BRANCH:  Objection, First Amendment

 1  privilege.

 2              Jacqui, if this is something that's

 3  publicly available or not internal to the D-Trip, you

 4  can answer it.

 5              But, otherwise, I'm going to instruct the

 6  witness not to answer.

 7       A.   It has been publicly reported that members

 8  generally can earn -- and this is kind of laid out in

 9  the Point Guard section -- earn points for participating

10  in activities with the DCCC or through paying dues and

11  raising money for the committee.

12       Q.   (BY MR. HILTON)  Are you withholding

13  information on the basis of your counsel's objection?

14       A.   No.  That is basically it.

15       Q.   Okay.  I appreciate that.

16              Is there any other way to get a DCCC

17  coffee mug, or do you have to get 150 points in the

18  Point Guard program?

19       A.   Sometimes asking nicely does end in a coffee

20  mug.

21       Q.   I'll keep that in mind.  Do you have a coffee

22  mug?

23       A.   I do.

24       Q.   Do you have it handy?  I'm kind of curious as

25  to what it looks like.

 1       A.   I don't have it handy.  I keep it at work

 2  because it's, like, 24 ounces.

 3       Q.   Oh, I gotcha.  Lots of late nights, I suppose,

 4  at the DCCC, where you need a lot of coffee.

 5            All right.  Bear with me just one second.

 6  Let me look at my notes here.  I think this is about all

 7  I have.

 8            I appreciate your patience with the

 9  technological issues, with going through these

10  documents, with kind of the mechanical nature of my

11  questions, and, you know, again, your patience with your

12  counsel and I while we discussed our disagreements.

13            I hope I've otherwise been professional

14  to you as we've gone through this.

15            And that reminds me, I should have asked:

16  On the two breaks that we took today -- I think it was

17  two, maybe three -- did you discuss the substance of

18  your testimony with anyone during those breaks?

19            MS. BRANCH:  Objection to the extent that

20  this calls for attorney-client privileged information.

21            You can answer as to whether or not you

22  spoke with anyone, but you can't discuss the content of

23  the conversations.

24       A.   I did check in with my counsel on the breaks.

25       Q    (BY MR. HILTON)  And did you discuss the

112

1  substance of your testimony?

2           MS. BRANCH:  Objection, and I'm going to

3  instruct the witness not to answer.

4           MR. HILTON:  Okay.  I'll just note for

5  the record that I believe I'm entitled to that

6  information since the witness has been under oath all

7  this time.

8      Q.   (BY MR. HILTON)  All right.  So I think the

9  last thing we need to do is turn back to Exhibit 1,

10 which is the Deposition Notice.

11     A.   Okay.

12     Q.   And I'd like to go to the last page of

13 Exhibit 1.  That's the document request.

14     A.   Okay.

15     Q.   And I'd like to just kind of go through each

16 of these and make sure I understand -- or just have you

17 confirm again that we've gotten a full production.

18           So Document Request Number 1, did the

19 DCCC produce documents responsive to this request?

20           MS. BRANCH:  Objection to the extent that

21 this calls for attorney-client and attorney work

22 product.

23           But, Jacqui, if you are able to answer,

24 you may.

25     A.   Yes, I believe we've turned over everything

113

1  that we could here.

2      Q.   (BY MR. HILTON)  Okay.  And when you say "we

3  could," I assume you're referring to your counsel's

4  privilege -- her objection related to privilege?

5           MS. BRANCH:  Objection, attorney work

6  product, attorney-client privilege.  I think the record

7  speaks for itself on that.

8           You're inquiring about whether we

9  instructed -- or, you know, how we put together the

10 production and our discussions about asserting the First

11 Amendment privilege, which I think is a conversation

12 itself that is privileged.

13          MR. HILTON:  I'm sorry.  Let me clarify

14 my question.

15     Q.   (BY MR. HILTON)  Ms. Newman, you said that you

16 thought you'd turned over all the documents that you

17 could; and I'm trying to understand what you meant by

18 "you could."  And I'm assuming that it's related to the

19 privilege objection; and if so, I think that's the end

20 of my questioning.  But if there's something else that

21 you're referring to, that's what I was trying to find

22 out.

23          MS. BRANCH:  You may answer that

24 question, Jacqui.

25     A.   Yeah.  Yes.

114

1    Q.   (BY MR. HILTON)  So when you said you turned

2  over all the documents you could, that was in reference

3  to the privilege issues?

4    A.   Yes.

5    Q.   Okay.  That's all I was trying to ask.  And,

6  again, I am not trying to ask for attorney-client

7  privileged information.

8              Were documents withheld that would

9  otherwise be responsive to this request?

10             MS. BRANCH:  Again, I'm going to object

11  on the basis of attorney work product and attorney-

12  client privilege; and I'm going to instruct the witness

13  not to answer that.

14    Q.   (BY MR. HILTON)  Do any other documents exist

15  in the possession of DCCC that would substantiate the

16  factual allegations of Paragraphs 13 and 29 to 35 of

17  your Complaint?

18             MS. BRANCH:  You can answer that,

19  Ms. Newman.

20    A.   Hold on.  I just want to look at the

21  Complaint.

22    Q.   (BY MR. HILTON)  Yeah, of course.  Please take

23  your time.  Of course.

24    A.   Can you remind me which --

25    Q.   Exhibit 2.

1      A.    Thank you.  You said Paragraphs 13 to...

2      Q.    **13 and 29 through 35.  That's what's in the**

3  **document request.  And so I'm just trying to understand**

4  **from you whether there are any documents that exist that**

5  **would substantiate the factual allegations in these**

6  **paragraphs that have not been produced to us.  I'm just**

7  **asking about the existence of such documents.**

8      A.    I believe we've turned over all the documents

9  we could produce here.

10     Q.    **Okay.  Great.**

11           **Number 2.  Number 2 on Exhibit 1, on the**

12 **last page, the second document request, did DCCC produce**

13 **documents responsive to this request?**

14     A.    Yes.

15     Q.    **Okay.  Are any -- do any documents exist that**

16 **would be responsive to this request that were not**

17 **produced?**

18     A.    I'm sorry.  What number are we looking at now?

19     Q.    **This is Document Request Number 2, which is on**

20 **the last page of Exhibit 1, which is the Deposition**

21 **Notice.**

22           **I'm sorry.  I haven't found a better way**

23 **to do this in my career; and it's hard and kind of**

24 **mechanical, but I just need to wrap -- you know, put a**

25 **bow on the document.**

1      A.   To my knowledge, we did not withhold anything

2  related to this.  I believe we've turned over everything

3  we could.  It might shock you to learn that the majority

4  of our conversations are just sending press clips back

5  and forth to one another.

6      **Q.   That was a little surprising, actually,**

7  **because that was the bulk of the production.  I'm not**

8  **trying to ask for anything privileged or strategic, but**

9  **I'm just kind of curious as to why that is.  I mean,**

10  **it's just such a foreign kind of work flow to me.  I'm**

11  **curious as to why that constitutes most of your**

12  **communications.**

13      A.   I think that is -- you know, press clips are

14  really the best way to guide what our strategy is and

15  what's happening on the ground in all of these

16  districts.  You know, keep in mind, we're kind of

17  looking at a 30,000-foot view of, you know, 30 to 50

18  districts across the country; and so we're constantly up

19  to date on what's happening there, what issues are

20  arising in the districts, and how they might relate to

21  the Congressional campaigns in those districts.

22      **Q.   Okay.  I appreciate that.  It's always**

23  **interesting.  That's one of the things I like about my**

24  **job is I get insight into how other people do their**

25  **jobs.  I appreciate that.**

1          **So if I understand you correctly, you**

2   **have produced documents responsive to Request Number 2**

3   **and that no other documents exist that would otherwise**

4   **be responsive?**

5                MS. BRANCH:  I'm going to object just on

6   the -- you know, the use of the term "responsive" and

7   the legal conclusions and legal background associated

8   with that term.

9                But, Jacqui, to the extent that you can

10  answer based on your knowledge, you may.

11       A.   Yes, I believe so.

12       Q    (BY MR. HILTON)  Number 3.  Has DCCC produced

13  **all the documents responsive to Number 3?**

14       A.   I believe we've produced documents that speak

15  to these topics as long as they don't conflict with our

16  strategy and attorney-client privilege.

17       **Q.   So that was my next question, privilege**

18  **assertions...**

19                MS. BRANCH:  Same objection, attorney

20  work product, attorney-client privilege.  The decision

21  on --

22                THE WITNESS:  Did we just lose him?

23                MS. BRANCH:  Oh, I think we did.

24                THE VIDEOGRAPHER:  It appears that he did

25  drop out of the meeting.

1          THE REPORTER:  We're going off the record
2  at 1:48 p.m.

3          (Off the record from 1:48 to 1:48 p.m.)

4          THE REPORTER:  We're back on the record
5  at 1:48 p.m.

6          MR. HILTON:  All right.  I'm sorry about
7  that.  Literally my last handful of questions, and my
8  Internet connection's going out on me here.

9     **Q    (BY MR. HILTON)  So I think my question was,**
10  **for Number 3, whether documents have been withheld on**
11  **the basis of privilege assertion.**

12          MS. BRANCH:  And I have an objection on
13  that because the decision to withhold is attorney work
14  product, and it was made by us.  So I'm going to
15  instruct the witness not to answer that.

16          MR. HILTON:  Okay.  So I just want to
17  know whether any documents at all have been withheld,
18  and you're instructing Ms. Newman not to answer that
19  question?

20          MS. BRANCH:  Yes.  I think she's also
21  testified to this multiple times throughout the
22  deposition.

23          MR. HILTON:  Be that as it may, with
24  respect to Number 3, you're instructing her not to
25  answer whether any documents are being withheld?

 1              MS. BRANCH:  Correct.

 2              MR. HILTON:  Okay.

 3         **Q.   (BY MR. HILTON)  With respect to Request**

 4   **Number 3, other than what's been included in the**

 5   **production, do any other documents exist that would show**

 6   **the information described or requested in the listed**

 7   **deposition topic numbers?**

 8              MS. BRANCH:  Objection, attorney work

 9   product, attorney-client privilege.

10              You may answer the question if you know

11   the answer.

12         A.   Yes.

13         **Q.   (BY MR. HILTON)  And some documents exist that**

14   **would otherwise be response to Number 3 that have not**

15   **been produced to us?**

16              MS. BRANCH:  Objection.  Same objection.

17   I'm going to instruct the witness not to answer.  I

18   think this is the same question, just kind of in a

19   different phrase.

20              MR. HILTON:  I'm sorry.  I thought it

21   was -- I'm trying to -- I mean, with respect,

22   Ms. Branch, I think that I have the right to know

23   whether documents have been withheld.

24              I'm not, even at this point, asking for a

25   privilege log, which I also think I'm entitled to.  I

120

1  just want to know if other documents exist because if

2  they don't, then I don't think we have anything to

3  quarrel about.

4          So you're instructing the witness not to

5  answer the question of whether documents exist that have

6  not been produced?

7          MS. BRANCH:  So I think that that's a

8  conversation that you and I can have; but I think that

9  whether not documents exist on these topics, like, that

10  reflects -- the answer that she's going to give is going

11  to reflect our conversations.  And so that is my basis

12  for the objection.

13          MR. HILTON:  I'm sorry.  I just don't

14  understand.

15      **Q.  (BY MR. HILTON)  I just want to know if**

16  **documents exist that would be responsive to Number 3.**

17          MR. HILTON:  And I'm asking Ms. Newman.

18  And if you're going to let her answer, I'd like to know

19  the answer; and if not, then we move on.

20          MS. BRANCH:  I am going to instruct the

21  witness not to answer.

22      **Q.  (BY MR. HILTON)  Are you going to follow that**

23  **instruction, Ms. Newman?**

24      A.  Yes.

25      **Q.  With respect to Document Request Number 4, did**

121

1   DCCC produce documents responsive to this request?

2        A.    I believe we did.

3        Q.    Okay.  You can refer to Exhibit 4 and double-

4   check if you are uncertain.

5        A.    I don't know, then.

6        Q.    So you don't know whether documents responsive

7   to Request Number 4 have been produced?

8        A.    I mean, this -- a lot of this is public

9   information that I think you've shown or gone over in

10  other parts of this discussion.

11       Q.    Okay.

12            MR. HILTON:  I'm going to object to that

13  answer as nonresponsive.

14       Q.    (BY MR. HILTON)  I just want to know if it's

15  included in DCCC's production.

16            MR. HILTON:  I'm sorry.  It looks like

17  I'm having a technical issue again.  Was there an

18  answer?

19            THE REPORTER:  There wasn't an answer

20  that I heard.

21       A.    I mean, we've produced what we have.

22       Q.    (BY MR. HILTON)  That's responsive to

23  Number 4?

24       A.    Yes.

25       Q.    Okay.  So no other documents exist that would

122

1  **be responsive to Number 4 other than what we've**

2  **discussed today and that's included in the production?**

3              MS. BRANCH:  Same objection.  And I just

4  want to note, Chris -- and this might be a discussion

5  for offline -- but the subpoena clearly states that it

6  seeks only the minimum number of documents sufficient to

7  show the information.  So the fact that things are being

8  withheld is in compliance with the subpoena.  Whether or

9  not they're being held on the basis of the First

10  Amendment privilege, though, is an attorney work product

11  and a privileged conversation.  So that's my objection

12  to the line of questioning.

13              MR. HILTON:  I appreciate that.  I am

14  trying to ask both things.  Okay?  I'm trying to

15  understand whether documents have been withheld on the

16  basis of privilege and I'm trying to understand whether

17  other documents exist that would otherwise be responsive

18  but have not been produced because they were not

19  necessary to be produced because of how we drafted our

20  subpoena.

21              MS. BRANCH:  I think all of that is

22  attorney work product and strategic decisionmaking on

23  the part of Ms. Newman's attorneys, and I'm going to

24  instruct the witness not to answer.

25              MR. HILTON:  Okay.  And, Ms. Branch, in

DCCC - 4/28/2020

123

 1 | case I'm being unclear, I'm not asking for the substance

 2 | of any communication.  I'm not asking for the substance

 3 | of any documents.  I'm not even asking for how many

 4 | documents at this point.  I'm just asking whether such

 5 | documents exist, and you're claiming that's privileged

 6 | information?

 7 |            MS. BRANCH:  I think she can answer the

 8 | question as to whether additional documents exist, but

 9 | the basis upon which they were withheld is attorney work

10 | product.  That reflects our strategic decisionmaking.

11 | So I don't -- I mean, I don't think that was the

12 | question on the table.  If the question is, "Are there

13 | additional documents that exist within the DCCC on this

14 | topic," she can answer that.  But we can't -- she can't

15 | answer why they were or were not produced.

16 |            MR. HILTON:  Debbie, can you read back my

17 | last question?

18 |            THE REPORTER:  Okay.

19 |            (The requested material was read as

20 | follows:

21 |            "QUESTION:  So no other documents exist

22 | that would be responsive to Number 4 other than what

23 | we've discussed today and in the production?")

24 |            THE REPORTER:  Is that the question you

25 | were looking for?

124

1          MR. HILTON:  That's exactly it.

2          MS. BRANCH:  And that's with respect to

3  Number 4?

4          MR. HILTON:  I think that's what Debbie

5  just read back, yes.

6          MS. BRANCH:  You can answer that, Jacqui.

7     A.   Yes, I think other documents exist; but we've

8  produced what we've needed to to answer this request.

9     Q.   (BY MR. HILTON)  Let me ask you about that,

10 actually.  Currently on the DCCC's website there are a

11 number of job openings posted; is that right?

12    A.   Yes.

13    Q.   And it's dccc.org/jobs, and it has a bunch of

14 jobs listed.  And if you click those jobs, it brings you

15 to a job description.  Are you familiar with what I'm

16 talking about?

17    A.   Yes.

18    Q.   And did you produce job descriptions for

19 current employees?

20    A.   I don't believe so.

21    Q.   Okay.  Do job descriptions for current

22 positions in DCCC exist?

23    A.   Mostly.

24         I'm sorry.  If you were talking, I just

25 heard nothing.

1      Q.   I'm sorry.  Did you produce all documents that

2   you reviewed in preparation for your deposition?

3      A.   I'm sorry.  Can you ask that again?

4      Q.   Did DCCC produce all documents that you

5   reviewed in preparation for this deposition?

6      A.   I believe so.

7      Q.   Would you like to check the production?

8      A.   I mean, I think there are some documents in

9   here that come from...

10              Yes, I believe we did.

11              MR. HILTON:  And, Ms. Branch, you're not

12   going to allow the witness to answer whether documents

13   were withheld on the basis of privilege with respect to

14   any of these requests?

15              MS. BRANCH:  No.  I think that that is a

16   conversation that reflects our privileged discussions;

17   and, frankly, I don't know that she knows.  She's not a

18   lawyer.

19              MR. HILTON:  Well, if that's her answer,

20   then I don't really know why we're fighting about it.

21              MS. BRANCH:  Can we have a discussion

22   about this separately?  I think that Jacqui, Ms. Newman,

23   has answered a lot of the questions related to the

24   production to the best extent of her knowledge; but I

25   don't want to get into a situation where she's talking

1  about strategic decisions that attorneys made.  And she

2  honestly probably can't testify to those, anyway; but

3  they would reflect our conversations, which I think we

4  both agree are privileged.

5            MR. HILTON:  Okay.  I'm not asking about

6  privileged conversations.  I'm not asking about any

7  strategic determinations.  You've put forth Ms. Newman

8  as a 30(b)(6) representative for the DCCC to speak on

9  behalf of the documents produced in response to the

10  subpoena.  And so, you know, I'm just not asking for

11  privileged information.  And she has a duty to be

12  prepared as to these topics.

13            Ms. Newman, this is not a reflection on

14  you at all.

15            But I'm going to object to this witness

16  being insufficiently and inadequately prepared for this

17  deposition today as to a number of topics.  I'm also

18  going to object to insufficient document production.

19  You're not even letting me explore the ways in which it

20  was insufficient, so I don't even know the depth of the

21  insufficiency.

22            I'm going to object to your failure to

23  provide a privilege log, your failure to disclose

24  whether documents have even been withheld on the basis

25  of a privilege.

1              And I'm going to object to your improper

2    instructions not to answer and your improper objections

3    throughout this deposition.

4              On the basis of that, we're going to hold

5    this deposition open.  We reserve the right to seek

6    whatever relief is appropriate.

7              And I truly hope we can work something

8    out offline with each other because I don't think this

9    should be that difficult.  I'm truthfully not trying to

10   get privileged information.  I have no interest in

11   attorney-client privileged information.  And to the full

12   extent that you have a privilege, an associational

13   privilege, you know, you have a privilege; but you're

14   not even giving me the basic information to begin to

15   evaluate it.  And so I just -- I think this entire

16   deposition could have been a lot smoother.

17             And I'm sorry, Ms. Newman, that it was so

18   difficult in spots.

19             But there's a lot of information here

20   that I believe I'm entitled to that you're not allowing

21   the witness to testify to.  So on that basis --

22             MS. BRANCH:  I did want --

23             (Simultaneous speakers.)

24             MR. HILTON:  You can respond; but I'd

25   like to finish, please.

128

1    On that basis, we're going to hold the

2    deposition open.

3    Ms. Newman, I don't have anything else

4    for you.

5    And I pass the witness.

6    MS. BRANCH:  I do want to just respond on

7    the record to counsel's objections.  We have covered

8    each of the 30(b)(6) deposition topics that were Noticed

9    here; and Ms. Newman, I believe, has testified to each

10   one of them.  She was prepared for the deposition.

11   In response to the document request, the

12   subpoena specifically states that it seeks only the

13   documents necessary to substantiate the allegations or

14   to provide the minimum number of documents sufficient to

15   show information responsive to each of the requests; and

16   the DCCC's production has satisfied that.

17   We've also tried to point you to public

18   information related to each of these topics.  Because

19   the DCCC is a national party committee, for instance,

20   they are required to publicly report all of their

21   funding sources, which is -- that was requested in Topic

22   Number 3; and there's a request related to that.  If the

23   DCCC were to produce every single document related to

24   all its funding sources, we would have given you, like,

25   mountains and mountains of paper.

1              So I think that our document production

2    responded to the topics in accordance with the subpoena

3    instructions which asked for the minimum number of

4    documents.  I am happy to discuss whether there are more

5    documents that, you know, we could try to negotiate

6    over; but I'm not going to -- I do not agree with the

7    objection that the witness was inadequately prepared or

8    that the subpoena -- the production in response to the

9    subpoena was inadequate.  I'm happy to meet and confer

10   about that.

11              I've tried to be as open as possible

12   about it; but, you know, you're recognizing the

13   associational privilege that the DCCC has; and we have

14   asserted that.  We've also produced the minimum number

15   of documents on each of the topics that are not

16   privileged.

17              And the witness doesn't know which

18   documents are privileged and which are not.  So I don't

19   think that's an appropriate line of questioning.  My

20   objections were not to block the witness -- or block you

21   from getting information from the witness, but rather,

22   to protect the privilege.

23              MR. HILTON:  I disagree with all your

24   characterizations.  I think we understand each other's

25   positions.  Hopefully, we can work it out; and if not,

```
 1  we'll see what the Court has to say about it.  But my
 2  objection stands.
 3              And, again, Ms. Newman, this is not a
 4  reflection on you.  And I appreciate your time today
 5  answering my questions.
 6              THE REPORTER:  Ms. Branch, do you have
 7  any questions of the witness?
 8              MS. BRANCH:  I do not.
 9              THE REPORTER:  Are you ordering a copy of
10  the transcript?
11              MS. BRANCH:  Yes.
12              THE REPORTER:  All right.  Thank you.
13  We're going off the record at --
14              MS. BRANCH:  And we'd --
15              THE REPORTER:  -- 2:05 p.m.
16              MS. BRANCH:  -- like to read and sign as
17  well.
18              (Deposition recessed at 2:05 p.m.)
19                      --ooOoo--
20
21
22
23
24
25
```

131

1                    CHANGES AND SIGNATURE

2   WITNESS NAME:              DATE OF DEPOSITION:

3   JACQUELINE NEWMAN           April 28, 2020

4   PAGE/LINE     CHANGE              REASON

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

1        I, JACQUELINE NEWMAN, have read the

2  foregoing deposition and hereby affix my signature that

3  same is true and correct, except as noted herein.

4

5        _____

6        JACQUELINE NEWMAN

7

8  THE STATE OF _____   )

9        Before me, _____, on

10  this day personally appeared JACQUELINE NEWMAN, known to

11  me (or proved to me under oath or through

12  _____) (description of identity card or other

13  document) to be the person whose name is subscribed to

14  the foregoing instrument and acknowledged to me that

15  they executed same for the purposes and consideration

16  therein expressed.

17        Given under my hand and seal of office on

18  this _____ day of _____, _____.

19

20

21        _____

22        NOTARY PUBLIC IN AND FOR

23        THE STATE OF _____

24        My Commission Expires:_____

25

1  STATE OF TEXAS     )

2                    REPORTER'S CERTIFICATION

3              I, DEBBIE D. CUNNINGHAM, CSR, hereby

4  certify that the witness was duly sworn and that this

5  transcript is a true record of the testimony given by

6  the witness.

7              I further certify that I am neither

8  counsel for, related to, nor employed by any of the

9  parties or attorneys in the action in which this

10 proceeding was taken.  Further, I am not a relative or

11 employee of any attorney of record in this cause, nor am

12 I financially or otherwise interested in the outcome of

13 the action.

14             Subscribed and sworn to by me this day,

15 May 11, 2020.

16

17

18

19

20             Debbie D. Cunningham,
                Texas CSR 2065
21             Expiration:  6/30/2021
                INTEGRITY LEGAL SUPPORT SOLUTIONS
                P.O. Box 245
22             Manchaca, Texas 78652
                www.integrity-texas.com
23             512-320-8690; FIRM # 528

24

25