# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JARROD STRINGER, et al., § | | |
| *Plaintiffs,* § | | |
| § | | |
| v. § | No. SA-20-CV-46-OG | |
| § | | |
| RUTH R. HUGHS, et al., § | | |
| *Defendants*. § | | |

## DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' AND PLAINTIFF-INTERVENORS' REQUEST FOR PRELIMINARY INJUNCTION

Plaintiffs and Plaintiff-Intervenors[1] lack standing, and their claims are meritless. Plaintiffs' supplemental briefing ("Supp. Br.") (ECF No. 69) does not present any new facts to alter this conclusion: they lack standing and their claims fail on the merits, they do not face irreparable harm, the harm to the State from an expanded injunction would be substantial, and the public interest would be disserved by granting Plaintiffs' request.[2] Accordingly, Defendants maintain that the Court should not have entered the limited preliminary injunction that it did, and the Court should refuse to entertain any further requests for injunctive relief, vacate its previous preliminary injunction, and grant Defendants' motions to dismiss as to all claims by all parties.

---

[1] The Intervenors' supplemental brief only addresses the issue of their standing. *See* ECF No. 70. Defendants have already filed a brief in support of their motion to dismiss which sets forth the evidence demonstrating that Intervenors should be dismissed. *See* ECF No. 73. Accordingly, this supplemental brief is directed to the evidence regarding the original Plaintiffs' standing and their request for preliminary injunction.

[2] *See, e.g.*, *Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005) (listing the four preliminary injunction factors).

1

### I. The Evidence

#### A. The Individual Plaintiffs

John Harms had no plans to change his residence at the time he filed his declaration in this matter or at the time of his deposition. *See* Harms Depo. at 34:2-7, 34:22-35:4 (attached hereto as Exhibit A). He is currently registered to vote, and he has never been denied the ability to vote due to a registration issue. *See id.* at 19:12-16, 35:21-24.

Nayeli Gomez lives in a home that she owns, after having lived with family for over a decade, and she has no plans to move. *See* Gomez Depo. at 13:13-15:6, 34:20-23 (attached hereto as Exhibit B). She is registered to vote at her current address. *See id.* at 29:23-30:10, 33:12-15.

Jarrod Stringer is also currently registered to vote. *See* Stringer Depo. at 21:17-18 (attached hereto as Exhibit C). But when he moved to Houston, he did not personally attempt to register to vote; rather, his wife did so for both of them. *See id.* at 27:21-28:4. Stringer had no knowledge of what his wife read or did during that process. *See id.* at 28:13-15, 30:21-24. Although Stringer says that he intends to move, he has not yet given notice of terminating his lease at his current residence, and has not made any definite plans. *See id.* at 35:3-20. Though he does not know whether he or his wife will update their voter registrations if they do ultimately move, Stringer will do whatever is necessary to register himself to vote. *See id.* at 37:5-7, 37:16-24.

#### B. League of Women Voters of Texas ("LWVTX")

Voter registration is a "vital part" of LWVTX and permeates every activity that the organization conducts. *See* LWVTX Depo. at 114:23-115:11 (attached hereto as Exhibit D). LWVTX's budget does not separately reflect voter registration costs, and LWVTX cannot separately account for what it spends on its voter registration activities. *See id.* at 115:13-23, 130:22-131:22. LWVTX's outreach events are designed to have LWVTX volunteers interact with

as many potential voters as possible, and volunteers will talk to anyone who approaches them, with no pre-screening or targeting of any kind—and no particular focus on individuals who may have transacted with DPS online. *See id.* at 140:11-143:1. LWVTX does not track the method by which individuals registered or attempted to register, *see id.* at 159:11-23, and therefore cannot quantify how often its volunteers interact with someone who transacted with DPS online. Although LWVTX purports to have members, *see, e.g.*, *id.* at 33:17-36:16, 44:24-48:20, it produced no evidence that suggests any of their members face a substantial risk of future injury from the complained-of conduct.[3]

### C. MOVE Texas

One of MOVE's primary aims is to engage in voter registration activities, and its volunteers and employees will help anyone who approaches them. *See* MOVE Texas Depo. at 111:19-22, 138:20-139:1, 139:21-140:5, 142:19-143:5 (attached hereto as Exhibit E). MOVE does not track whether the people that it registers to vote have recently moved (between counties or otherwise). *See id.* at 88:15-23. It also does not separately track the amounts that it spends on voter registration activities or the resources that it dedicates to registering individuals who may have transacted with DPS online. *See id.* at 37:14-21, 38:8-15, 39:8-21, 40:1-41:1, 123:24-124:3. And it has no record of ever assisting an individual who transacted with DPS online in registering to vote. *Id.* at 135:25-136:12. MOVE Texas does not purport to be a membership organization.

---

[3] LWVTX produced a document that purports to show the number of members who have moved. *See* LWVTX Depo. at 168:3-170:25; *see also id.* at Ex. 7 (Bates no. LWV-000327). This information did not originate from LWVTX, and LWVTX cannot provide any additional information about any of these moves, such as the name of the member or where they moved. *See id.* And LWVTX offered no evidence whatsoever about the likelihood that any of its members will move again in the future, be eligible to transact online with DPS, and choose to do so. *See id.*; *see also id.* at 163:13-164:5.

## II. Plaintiffs Cannot Demonstrate a Substantial Likelihood of Success

As explained in Defendants' motion to dismiss, incorporated herein as if restated in full, *see* ECF No. 60, this Court lacks jurisdiction over Plaintiffs' claims and Plaintiffs have failed to state a claim upon which relief may be granted. The evidence developed since that motion was filed further supports Defendants' position, particularly as it relates to Plaintiffs' lack of standing.

### A. The Individual Plaintiffs Lack Standing

The Fifth Circuit in *Stringer I* described the burden that the Individual Plaintiffs bear in order to demonstrate their standing: "Because injunctive and declaratory relief 'cannot conceivably remedy any past wrong,' plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." *Stringer v. Whitley* (*Stringer I*), 942 F.3d 715, 720 (5th Cir. 2019) (footnote omitted). "[W]hether compliance with the NVRA would prevent future injury to others is irrelevant; plaintiffs seeking injunctive relief must show a continuing or threatened future injury to themselves." *Id.* at 721. The fact that the Individual Plaintiffs were not *previously* registered to vote when they transacted with DPS online to change their address or renew their driver licenses is irrelevant to their standing,[4] because that alleged injury "was not a continuing or threatened future injury, but a past injury." *Id.* And "evidence that Plaintiffs moved in the past" such that they needed to update their voter registration "does not establish a substantial risk that they will do so in the future." *Id.* at 722.

Harms and Gomez have not expressed any intention to move in the future, as discussed above, and they certainly did not have any such intention at the time they initiated this lawsuit.

---

[4] And it is registering to vote—not the right to vote itself—that is at issue in this litigation. Nothing about the process of interacting with DPS online prevents anyone from voting or from registering to vote in accordance with Texas law, and the Individual Plaintiffs' *right* to vote is not impacted in any way by Defendants' process for handling online DPS interactions.

4

Accordingly, for the same reasons that the plaintiffs in *Stringer I* did not have standing, Harms and Gomez also lack standing. *See id.* ("Notably, no Plaintiff has expressed any intention to move in the future."). With respect to Stringer, he does say that he intends to move again, but he has no concrete plans to do so and has not yet given notice to terminate his lease. Moreover, Stringer does not know whether he "will attempt to update [his] voter registrations using the DPS System and be injured by [his] inability to do so." *Id.* at 723. As he explained in his deposition, his wife may be the one to interact with DPS online, as with their most recent move; he or his wife may choose to register by some other means; or he may be ineligible to transact with DPS online, if and when he does change his residence. In light of this uncertainty, it cannot be said that Stringer has "established a substantial risk" that he will be injured again in the future, and therefore he has "not established an injury in fact sufficient to confer standing to pursue the declaratory and injunctive relief that [he] seek[s]." *Id.* And all three Individual Plaintiffs are now registered to vote. Accordingly, each Individual Plaintiff should be dismissed from this litigation for lack of standing.

### B. The Organizational Plaintiffs Lack Standing

#### 1. Neither Organization Has Standing in Its Own Right

The Organizational Plaintiffs are required to prove to this Court that they have suffered a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources [that] constitutes far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). "Not every diversion of resources to counteract [a] defendant's conduct, however, establishes an injury in fact." *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010). The alleged injury must be in some way "different from the plaintiffs' daily operations." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (citing *City of Kyle*, 626 F.3d 233); *see also Common Cause/Ga. v.*

*Billups*, 554 F.3d 1350 (11th Cir. 2009) (holding that an organization can show standing if it demonstrates that it "will divert resources from its regular activities" to counteract defendants' allegedly illegal conduct). Mere "[f]rustration of an organization's objectives is the type of abstract concern that does not impart standing." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161-62 (D.C. Cir. 2005) (quotation omitted).

Moreover, Plaintiffs must show an explicit connection between the challenged practice and the alleged injury. For example, in *ACORN v. Fowler*, 178 F.3d 350 (5th Cir. 1999), the plaintiff organization brought three claims challenging Louisiana's voter registration practices on the theory that they violated the NVRA. ACORN demonstrated that it "engages in voter registration drives in Louisiana, that it provides voter registration applications to unregistered potential members, and that it makes voter registration applications available at housing fairs that it attends throughout the year." *Id.* at 359. ACORN also demonstrated that it "hired staff" to conduct voter registration training, "coordinated voter registration drives," and supervised staff, among other similar activities. *Id.* And ACORN claimed "that its efforts registering voters in Louisiana counteract the appellees' failure to properly implement the NVRA." *Id.* at 360.

The Fifth Circuit found that with respect its first two claims, ACORN had not demonstrated an injury. The court discounted much of ACORN's evidence regarding its staff hiring and supervision because ACORN did not show that these activities were "a direct result of Louisiana's alleged failure to properly implement the NVRA." *Id.* at 360. The court also doubted "ACORN's allegations of injury due to including voter registration applications with its membership applications or 'set[ting] up' a voter registration table at housing fairs that it already attends," and found that such activities did not constitute a perceptible impairment caused by the "purported failure to implement the NVRA." *Id.* (citing *Havens Realty*, 455 U.S. at 379). None of these

activities were held to have the requisite connection to the challenged activity that is necessary to demonstrate organizational standing. *See id.*

ACORN was found to have raised a genuine issue of material fact regarding its third claim because it "concentrated" one voter registration drive to target specifically "a population directly affected by one of the NVRA requirements that ACORN claims Louisiana has failed to implement." *Id.* at 361. The court found that ACORN was injured by having to conduct this highly targeted voter registration effort because those resources were expended to register voters in a way that specifically "counteract[ed] Louisiana's alleged failure to implement the [NVRA]." *Id.* This was the only injury that the court found to be "concrete and demonstrable" for standing purposes. *Id.* at 362. But with respect to all of ACORN's other voter registration activities, "[t]here is simply no suggestion in the record that anyone it has registered through its voter registration drives would already have been registered to vote if Louisiana implemented the NVRA requirements that form the basis of its first two claims." *Id.*

The evidence does not demonstrate that *any* of the Organizational Plaintiffs' voter registration activities are conducted specifically to counteract Defendants' alleged practices. Unlike ACORN's evidence regarding its third claim, which suggested that it may have been injured to the limited extent that some of its efforts were "concentrated" to reach a specific group, *see id.* at 361, neither LWVTX nor MOVE Texas conduct targeted voter registration activities directed at individuals who transacted with DPS online. Instead, as discussed above, the evidence demonstrates that any voter registration activities the Organizational Plaintiffs undertake are designed to reach as many people as possible, and nobody who wants to engage with LWVTX's or MOVE Texas's volunteers or employees is ever turned away. Accordingly, their activities are not specifically connected to the challenged practices.

Voter registration activities are a key aspect of all of LWVTX's and MOVE Texas's activities. Accordingly, the Organizational Plaintiffs cannot show that any of their activities are "a *direct result* of [Texas's] alleged failure to properly implement the NVRA." *Id.* at 360 (emphasis added). None of the evidence shows any voter registration activities directed at those who transacted online with DPS. Indeed, neither LWVTX nor MOVE Texas can offer proof showing how many individuals—if any at all—"would already have been registered to vote if [Texas] implemented the NVRA requirements that form the basis of its . . . claims." *Id.* at 362; *see supra*, Part I. Nor can they state in any "concrete and demonstrable" way what resources they have devoted to counteracting Defendants' conduct.

The Organizational Plaintiffs essentially argue that because they engage in voter registration activities generally, they have standing to challenge any voter registration practice with which they disagree or which does not align with their preferred policy. But this is not the law. LWVTX and MOVE Texas must each show a "concrete and demonstrable" injury, *Havens Realty*, 455 U.S. at 379, yet they cannot identify even one dollar that was spent or one voter that was registered as a result of their efforts to counteract this *particular* practice. None of their purported activities constitute anything other their routine "daily operations," *OCA-Greater Hous.*, 867 F.3d at 612, and they will continue to engage in these voter registration activities regardless of whether Defendants change their conduct. Accordingly, the Organizational Plaintiffs have not shown that they have suffered a concrete and demonstrable injury as a result of Defendants' practices, and they do not have standing to bring their claims.

### 2. LWVTX Does Not Have Associational Standing

To the extent that LWVTX claims standing to vindicate its members' injuries, it also fails. "'Standing,' [the Supreme Court has] said, 'is not 'an ingenious academic exercise in the

conceivable' . . . [but] requires . . . a factual showing of perceptible harm.'" *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 566 (1992)). The Supreme Court "has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm." *Id.* But LWVTX cannot identify any such member. The evidence it produced shows, at most, that it has some members in Texas who have moved residences in the past. It is not enough for LWVTX to speculate that because its members have moved in the past, they may move in the future. *See Stringer I*, 942 F.3d at 722. LWVTX does not possess the required substantial risk of harm, because even if it is "possible—perhaps even likely—that one individual will meet all of these criteria, that speculation does not suffice." *Summers*, 555 U.S. at 499. Without an identified or identifiable member that has standing, LWVTX's assertion of associational standing must fail.

**III.   Plaintiffs Have Not Shown Irreparable Harm**

As explained in Defendants' opposition to Plaintiffs' motion for preliminary injunction, ECF No. 36 ("PI Opp."), any eligible Texan who wishes to vote has ample time and means to register, and this Court's declination to enter an unmerited preliminary injunction will not disenfranchise any voter. LWVTX even explains on its website that "[v]oters who move to a new address within the same county or changed your name while remaining in the same county . . . can update your information online," and "[y]ou may fill out a voter registration application and have it mailed to you at register2vote.org or from the Secretary of State." "Register to Vote," LWV.org, https://my.lwv.org/texas/voting-elections/register-vote (last visited May 22, 2020).

MOVE Texas's assertion that it is "forced to expend money to mail voter registration applications," Supp. Br. at 11, is therefore patently false, because anyone can request from the Secretary of State a postage-paid voter registration application, free of charge. *See* "Where to Get

an Application," VoteTexas.gov, https://www.votetexas.gov/register-to-vote/where-to-get-an-application-2.html (last visited May 22, 2020); "Request for Postage-Paid Voter Registration Form," Texas Secretary of State, https://webservices.sos.state.tx.us/vrrequest/index.asp (last visited May 22, 2020).

Moreover, Plaintiffs' substantial delay in pursuing this supposedly "emergency" relief has only been magnified over the four months since they first moved for a preliminary injunction, eliminating any pretense that Plaintiffs will be irreparably injured if they are forced to litigate their claims in the normal course. *See* PI Opp. at 9-12. The extraordinary relief of a mandatory preliminary injunction against the officials of a sovereign state is not warranted here, where the status quo has been in place for years and where individuals have ample means and opportunity to register to vote. *See, e.g.*, *Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015); *Roark v. Individuals of the Fed. Bureau of Prisons, Former and Current*, 558 F. App'x 471, 472 (5th Cir. 2014). Accordingly, Plaintiffs cannot satisfy their burden with respect to demonstrating irreparable harm.

## IV. The Other Relevant Factors Weigh Against Preliminary Injunctive Relief

The harm to the State that would be caused by an expanded preliminary injunction outweighs any alleged harm to Plaintiffs (none of which is legally cognizable, as described above), and the public interest would be disserved by granting Plaintiffs' requested relief.[5] The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct.

---

[5] The two factors of "assessing the harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Accordingly, it is appropriate for the Court to consider these factors together, as Defendants are officials acting in their official capacities as agents of the State.

1205, 1207 (2020). "Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4-5. This Court has already recognized, at least implicitly, that the proximity to an election—now the July primary runoff elections, *see* Supp. Br. at 16—weighs in favor of exercising restraint. *See* ECF No. 46 at 7. Particularly after Plaintiffs' extended and unjustifiable delay in even bringing their claims, Plaintiffs' request for this Court to enter systemic relief in the midst of a presidential election cycle ignores the Supreme Court's measured warning.

The State and its citizens also have a weighty interest in the enforcement of Texas law. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977)). The "inability [for a State] to enforce its duly enacted [laws] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) (recognizing that, when a duly enacted law cannot be enforced, "the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws"). This interest cannot be discounted simply because Plaintiffs read the NVRA to require something Texas law does not contemplate, particularly because Texas law and practice fully comport with the NVRA and the U.S. Constitution. *See, e.g.*, ECF No. 60 at 17-25.

Forcing the State to accept online transactions that are not themselves done under the signature of the voter registration applicant—a requirement that exceeds the State's obligations under the NVRA—undermines the will of the people as expressed through their duly elected legislators. Especially where, as here, the current laws and system have been in place for years,

the Court should not disregard Texas law and risk injecting more turmoil into an election cycle that is already presenting immense and unprecedented challenges resulting from the COVID-19 pandemic. Accordingly, the equitable factors also weigh against the entry of a preliminary injunction.

## V.     Plaintiffs' Requested Relief

Even if the Court were to entertain the possibility of expanding its previous preliminary injunction—which it should not—the relief requested by Plaintiffs continues to be problematic. Thankfully they have abandoned their expensive, time-consuming, and unworkable request for court-ordered, pre-populated mailings. *See, e.g.*, Supp. Br. at 2. But Plaintiffs still are under the impression that Defendants can register someone to vote. *See id.* at 18-19 ¶ 3 (requesting an order that Defendants "ensure" individuals are "properly registered"). Defendants cannot comply with this proposed requirement—registering voters is an authority entrusted solely to local voter registrars under state law. *See* Tex. Elec. Code. §§ 12.001, 13.071; *see also* ECF No. 36-3 ¶ 8 (Ingram Decl.). Defendants were previously ordered only to provide information and instruction to the county voter registrars, *see* ECF No. 46 at 17, and that is what Defendants did, *see* ECF No. 48. But Defendants cannot compel a county voter registrar to accept a voter registration application.

Similarly, Plaintiffs continue to ignore uncertainties and minimize work that would need to be performed to achieve what they ask. For example, Plaintiffs allude vaguely to "a not-fully-automatic process" without any explanation of what is meant, *see* Supp. Br. at 17, and Plaintiffs seek to impose a June 5, 2020 deadline without any explanation of how that could be accomplished, *see id.* at 19 ¶ 4. Defendants have in good faith provided explanations and information to Plaintiffs and to the Court about their projections regarding what work may be required for Plaintiffs'

proposed modifications and about estimations of the time needed to perform that work. But uncertainty nonetheless remains, and Defendants have been forthcoming about known areas of uncertainty. *See, e.g.*, Supp. Br. at 6 & n.16 (noting SOS has explained that additional changes to a database may be necessary depending on the scope of any relief that may be ordered). If the Court does decide to expand its preliminary injunction—which it should not—then it should at least order only relief that is possible, based on an achievable timeframe and recognizing that the unexpected may arise.

## CONCLUSION

For the foregoing reasons, the Court should refuse to entertain any further requests for injunctive relief, vacate its previous preliminary injunction, and grant Defendants' motions to dismiss as to all claims by all parties.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Christopher D. Hilton*
CHRISTOPHER D. HILTON
Texas Bar. No. 24087727
ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorneys General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov
christopher.hilton@oag.texas.gov

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I certify that on May 22, 2020, the foregoing document was filed electronically via the Court's CM/ECF system causing electronic service upon all counsel of record.

*/s/ Christopher D. Hilton*
CHRISTOPHER D. HILTON
Assistant Attorney General