IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JARROD STRINGER, et al.,      *
     Plaintiffs,          *
                         *
v.                            *          No. SA-20-CV-46-OG
                         *
RUTH R. HUGHS, et al.,        *
     Defendants.          *

VIDEOCONFERENCED DEPOSITION

OF

JOHN HARMS

Tuesday, April 14, 2020

VIDEOCONFERENCED DEPOSITION OF JOHN HARMS,

produced as a witness at the instance of the Defendants,

and duly sworn, was taken in the above-styled and

numbered cause on Tuesday, April 14, 2020, from

10:02 a.m. to 10:48 a.m., before Debbie D. Cunningham,

CSR, in and for the State of Texas, remotely reported

via Machine Shorthand, pursuant to the Federal Rules of

Civil Procedure.

--ooOoo--

```
 1                          APPEARANCES

 2


 3    FOR PLAINTIFFS AND DEPONENT:

 4          TEXAS CIVIL RIGHTS PROJECT
            1405 Montoplis Drive
 5          Austin, Texas  78741
            (T) 512.474.5073
 6
            By:  Rebecca Harrison Stevens, Esq.
 7               beth@texascivilrightsproject.org
                              AND
 8               Hani Miraz, Esq.
                 Joaquin Gonzalez, Esq.
 9


10

11    FOR DEFENDANTS:

12          OFFICE OF THE ATTORNEY GENERAL OF TEXAS
            General Litigation Division
13          300 W. 15th Street
            Austin, Texas  78701
14          (T) 512.463.2120

15          By:  Christopher Hilton, Esq.
                 christopher.hilton@oag.texas.gov
16

17
      VIDEOGRAPHER:
18          Brian Christopher

19
                         --ooOoo--
20

21

22

23

24

25
```

1                              INDEX

2        APPEARANCES                                    2

3

4      EXAMINATION OF JOHN HARMS:

5        BY MR. HILTON                                  6

6

7

8        CHANGES AND SIGNATURE                         39

9        REPORTER'S CERTIFICATION                      41

10

11                          --ooOoo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

John Harms - 4/14/2020

4

1                          EXHIBIT INDEX

2      Exhibit Number        Description                Page

3        Exhibit 1     Defendants' Notice of Oral       16
                       Deposition
4
         Exhibit 2     Plaintiffs' Original Complaint   17
5
         Exhibit 3     A collection of DPS website      26
6                      screenshots

7        Exhibit 4     Declaration of John Harms        32

8

9                          --ooOoo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 (Tuesday, April 14, 2020, 10:11 a.m.)
 2                      P R O C E E D I N G S
 3                 THE REPORTER:  Today is April 14th, 2020.
 4   This is the deposition of John Harms in the matter of
 5   Jarrod Stringer, et al. versus Ruth R. Hughes, et al.
 6   We are remotely situated due to COVID-19 and are
 7   appearing via Zoom conference.  We are now on the record
 8   at 10:02 a.m., Central time.
 9                 My name is Debbie Cunningham; and my
10   business address is P.O. Box 245, Manchaca, Texas 78652.
11                 Would all persons present please
12   introduce themselves for the record?
13                 THE WITNESS:  John Harms.  Do you need
14   more?
15                 THE REPORTER:  No, that's good.  Thank
16   you.
17                 MR. HILTON:  Chris Hilton with the
18   Attorney General's Office for the Defendants.
19                 MS. STEVENS:  Beth Stevens on behalf of
20   Mr. Harms.
21                 THE REPORTER:  Mr. Harms, will you raise
22   your right hand, please?
23                 Oh, I'm sorry.  Counsel, did you want to
24   go ahead and make your announcements?
25                 MR. MIRZA:  Yes.  My name is Hani Mirza.
```

1  I'm here on behalf of John Harms as well.

2                  MR. GONZALES:  Joaquin Gonzales with

3  Texas Civil Rights Project on behalf of John Harms.

4                        JOHN HARMS,

5  having taken an oath to tell the truth, the whole truth,

6  and nothing but the truth, was examined and testified as

7  follows:

8                        EXAMINATION

9  BY MR. HILTON:

10      Q.   Good morning, Mr. Harms.  Can you please

11  state -- state, again, your name for the record and

12  spell it, please?

13      A.   John Harms, H-A-R-M-S.

14                  MR. HILTON:  And before I forget, we're

15  proceeding without the Intervenors.  We received an

16  e-mail from them saying that they don't intend to join.

17  I just wanted to make that clear for the record.

18      Q.   (BY MR. HILTON)  Mr. Harms, my name is Chris

19  Hilton.  I work for the Attorney General's Office.  I

20  represent the Defendants in this case.

21           I want to begin just by asking you if you

22  can tell me in your own words what your case is about.

23      A.   Well, what brought me into this was that I

24  had -- when I moved from Smithville, which is in Bastrop

25  County, into Austin last year, I changed my driver's

John Harms - 4/14/2020

1  license address, as required by law, and thought at the

2  same time I was changing my voter registration address

3  and subsequently found out that that had not happened.

4         And somebody suggested I contact Joaquin

5  because he was familiar with this, and then I joined the

6  lawsuit because I think that needs to be changed.  I

7  think when you're -- it needs to be simplified so that

8  people can register when they move into the county just

9  automatically.  And that didn't happen, so it kind of

10 ticked me off.

11     Q.   Fair enough.

12          You said somebody suggested you talk to

13 Joaquin.  Who was that?

14     A.   A friend of mine knows Joaquin's mother, and

15 so I called Joaquin and --

16     Q.   And just to be clear, I'm not asking you to

17 divulge any privileged conversations that you've had

18 with your attorneys.

19     A.   Yeah.  No.  Anyway, that was how I got

20 involved.  I didn't realize there was a lawsuit and --

21 but after talking to Joaquin, I decided that I wanted to

22 be a part of it because I think this is wrong.  I think

23 you need to -- the regis- -- voter registration process

24 needs to be very simple and straightforward; and with

25 technology these days, it can be that way.

```
 1        Q.   And you said that you thought that your
 2   registration had been updated when you did the driver's
 3   license transaction and that you later found out that
 4   that wasn't the case.  Am I understanding that
 5   correctly?
 6        A.   Yes.
 7        Q.   Okay.  How did you later find out that your
 8   voter registration hadn't been updated?
 9        A.   Well, I didn't receive a new card in the mail;
10   and it went way longer than I normally -- than normally
11   it would have.  So I started wondering what had
12   happened.  I thought maybe -- I didn't know what had
13   happened.
14        Q.   Okay.  Fair enough.
15             And kind of about the deposition today,
16   what did you do to prepare for the depo today?
17        A.   What did I do to prepare?
18        Q.   Yes, sir.
19        A.   I talked to Beth and to Joaquin.
20        Q.   And did you speak to anyone else?
21        A.   No.
22        Q.   Did you review any documents to prepare for
23   your deposition?
24        A.   The only documents were the original documents
25   that we had filed, I guess.  What do they call it?  The
```

1  Declaration, I just reviewed that.  I just read that --

2  reread that.

3      **Q.   The Declaration that you signed?**

4      A.   Yes, uh-huh.

5      **Q.   And it seems that you have a copy of that**

6  **there with you?**

7      A.   I do.

8      **Q.   And do you have any other documents there with**

9  **you?**

10     A.   I do.  I have my resume in case I'm asked

11  questions about my work history, and that's it.

12     **Q.   Well, you will be asked questions about that**

13  **so that will come in handy.**

14         MR. HILTON:  And I'll just ask:  Beth,

15  I'd like to make sure that I get copies of the documents

16  that Mr. Harms has in front of him.  I think I know

17  which Declaration it is.  I think I have it myself, and

18  we're going to talk about it.  I'd like a copy of the

19  resume as well.

20         And, Mr. Harms, that's just because you

21  brought them with your deposition -- brought them with

22  you to the deposition.

23         Beth, is that going to be an issue?  Do

24  you mind giving us those?

25         MS. STEVENS:  Oh, sorry.  I nodded.  I

1  nodded.

2          MR. HILTON:  Oh, sorry.  You're on video.

3  I appreciate that.

4      Q   (BY MR. HILTON)  Do you have any other

5  materials related to the case in the room with you or

6  anyone else in the room with you right now, Mr. Harms?

7      A.   No.

8      Q.   Okay.  Thank you.

9              Other than this lawsuit, have you ever

10  sued anyone?

11      A.   No -- oh, no, that's not true.  I sued -- in

12  Small Claims Court I sued a dry cleaners once, who lost

13  my shirts.

14      Q.   Were you successful?

15      A.   I was.

16      Q.   Not to get the shirts back, though, I'm sure?

17      A.   I didn't get the shirts back.

18      Q.   Which dry cleaner?

19      A.   I don't remember.  It was a long time ago.

20      Q.   Okay.  It wasn't in Austin, though?

21      A.   (No audible response.)

22      Q.   Have you ever been sued?

23      A.   No.

24      Q.   Are you married?

25      A.   I'm not.

1      Q.   Have you ever been married?

2      A.   Yes.

3      Q.   And what was your former spouse's occupation?

4      A.   I'm sorry?

5      Q.   What was your spouse's occupation?

6      A.   She was a Montessori teacher.

7      Q.   Do you have any children?

8      A.   I do.  I have a son and a daughter who both

9  live in Austin.

10      Q.   And what are their ages?

11      A.   My daughter's 46.  My son is 42.

12      Q.   And what do they do?

13      A.   My daughter was a waitress until recently, and

14  my son was a -- worked at a nightclub until recently.

15      Q.   Sorry to hear that.  I hope they're doing

16  okay.

17      A.   Yeah.

18      Q.   Mr. Harms, what -- can you just give me an

19  overview of any education that you've had?

20      A.   Standard Texas education through high school.

21  Graduated from Irving High School, came to the

22  University of Texas in 1966 to study journalism.  And

23  then I switched over to radio, TV, and film, with a

24  concentration in film production.

25      Q.   And did you obtain a degree?

1    A.    No.

2         Q.    And are you currently employed?

3    A.    Yes, I am.  I have a small business.  It's a

4    Subchapter S Corporation, and I employ myself.  I work

5    as a consultant in film and video production.

6         Q.    And I'm curious about the rest of your career,

7    and you mentioned you have your resume.  Would you mind

8    just running down and giving me the highlights?

9    A.    Well, because it's in the creative fields,

10   typically there's a lot of jobs over the years.

11        Q.    I understood that, and I'm not going to ask

12   you to explain every single one.  But maybe, if you

13   could, tell me generally what you've done over your

14   career and maybe give me a couple of representative

15   matters.

16   A.    Yeah, typically it's -- I've been involved in

17   marketing and sales work and production work.  So I've

18   gone back and forth, depending on what the employer

19   needed and what the job was at the time.

20             I've been involved in online marketing.

21   I've been involved in creative production of film and

22   video projects and TV commercials.  I've been involved

23   in -- let's see -- quite a few years in that; and

24   sometimes the -- I've been involved in the sales of

25   television production equipment, cameras, lighting, that

John Harms - 4/14/2020

13

1  sort of thing, editing equipment.  I've taught

2  television editing.

3        I was involved in the production of

4  motion pic- -- in Dallas in the production of motion

5  pictures and television shows.  I was involved with the

6  TV series "Dallas" and started off with Shelter Records

7  many, many years ago, working for Leon Russell.

8        And that's kind of it.  That's the

9  highlights.

10     Q.   Did you get a credit on "Dallas"?

11     A.   I didn't get a credit on "Dallas."

12     Q.   Have you gotten a credit on anything, or is

13  that not commonly done for the type of work that you do?

14     A.   Typically not for what I do.

15  █   ████████████████████

16  ███████████████

17  █   ██

18  █   █████████

19  █   ████   ███████████

20  ██████████   █████████

21  ████   █████████

22  ████████████████

23  ███████████   ████

24  ██████████████

25  ████████████   ███

1  ████████████████████████████████████████

2  ████████████████████

3       Q.   Mr. Harms, you mentioned you lived in

4  Smithville before you moved to Austin.  How long had you

5  lived there?

6       A.   Five years.

7       Q.   And how about, before that, where did you

8  live?

9       A.   Austin, for -- going all the way back to 1966.

10  I came to Austin in 1966.

11       Q.   So since you came to Austin to go to UT,

12  you've lived here except for five years in Smithville;

13  is that accurate?

14       A.   Yes.

15       Q.   How many different houses in Smithville did

16  you live in?

17       A.   Just one.

18       Q.   And in Austin over the decades how many

19  different places have you lived?

20       A.   Twenty.

21       Q.   Twenty.  Is that an exact number, or is that a

22  ballpark?

23       A.   That's a ballpark.

24       Q.   Okay.  And that's fair.  I'm not going to ask

25  for exact.

1      A.   Most of those when I was a student.

2      Q.   **Fair enough.**

3           **And you've lived in your current place**

4   **since last July; is that correct?**

5      A.   Yes.

6      Q.   **Okay.  Have you ever owned a home, or have you**

7   **always rented or --**

8      A.   No.  My wife and -- my first wife and I owned

9   a home in Austin, and we lived there together for 12

10  years.

11     Q.   **Okay.  Is that the only home that you've**

12  **owned?**

13     A.   Yes.

14     Q.   **Do you know whether you intend to buy another**

15  **residence or if you intend to keep renting?**

16     A.   If I could afford it, I'd buy a house in

17  Austin these days.

18     Q.   **I have the same problem, so I get that.**

19           **All right.  I'm going to shift gears a**

20  **little bit.  If I say NVRA, does that mean anything to**

21  **you?**

22     A.   I'm sorry?

23     Q.   **NVRA.**

24     A.   No.

25     Q.   **Those letters together don't mean anything to**

16

1    you?

2         A.    Huh-uh.

3         Q.    Okay.  If I say National Voter Registration

4    Act, does that mean anything to you?

5         A.    Well, I can -- I'm not familiar with the act

6    itself, but I can imagine what that would represent.

7         Q.    But other than the name, you don't have any

8    independent knowledge of what that is?

9         A.    Right.

10        Q.    Do you have a printer, like a computer

11   printer?

12        A.    Yes.

13        Q.    All right.  We're going to try and do some --

14   since we are doing the deposition remotely, we're going

15   to do exhibits via a screen share.  And so if it doesn't

16   work, it's my fault for my inability to use the

17   technology properly; but, hopefully, our technical team

18   is on the depo to help me out.  So I'm going to try and

19   share with you what we're going to mark at Exhibit 1.

20              (Exhibit 1 discussed.)

21        Q    (BY MR. HILTON)  And I think that these

22   exhibits are also going to be provided in the chat

23   feature via Zoom.  So that's more helpful for the

24   lawyers, I think, than for you, Mr. Harms.

25              Mr. Harms, for you, I'm going to show you

1    the relevant portions of the document that I want to ask

2    you about; but if you want to see the rest of the

3    document, if you want to take the time to read it, if

4    you want me to scroll up or down or manipulate the

5    document in any way, I'm happy to do that for you.  Just

6    tell me, and I'll attempt to do that for you.  Does that

7    make sense?

8        A.    Okay.  Thank you.

9        Q.    So the first one is what I've marked as

10   Exhibit 1.  Do you recognize this document, Mr. Harms?

11       A.    No.

12       Q.    Okay.  This is the Notice of Deposition for

13   your deposition here today.

14       A.    Okay.

15       Q.    Do you know whether you were provided that

16   before the deposition today?

17       A.    I think I probably was, but I don't remember

18   it exactly.

19       Q.    Okay.  That's fine.

20             All right.  Now, I've pulled up what

21   we're going to mark as Exhibit 2.

22             (Exhibit 2 discussed.)

23       Q    (BY MR. HILTON)  And this is the -- I'm

24   showing on the screen the first two pages of Exhibit 2.

25   Mr. Harms, do you recognize this document?

1      A.    Yes.

2      Q.    And what is it?

3      A.    I remember -- I haven't reviewed it in some

4    time, so I don't know what -- the content in specific.

5      Q.    But, just generally, can you tell me what it

6    is?

7      A.    Let me take a minute and read it.

8      Q.    Of course.  It's quite lengthy.  It's 23

9    pages.

10      A.    Ah, then I won't do that.

11      Q.    You're welcome to if you'd like.

12            Why don't we do this:  I'll represent to

13    you that it is the Original Complaint that was filed on

14    your behalf in this action by your attorneys.  Is that

15    consistent with what --

16      A.    Yeah.  It was some months ago, so I don't

17    recall all the content.

18      Q.    Fair enough.

19            Did you review it before it was filed?

20      A.    Yes, I did.

21      Q.    Okay.  And how much time do you think you

22    spent reviewing it?

23      A.    Not much.  I scanned it.

24      Q.    Okay.  How much time, total, do you think that

25    you've spent on this case?

1      A.   Well, I did drive to San Antonio for the

2  hearing and so another few hours for this sort of thing.

3  So I would say probably ten hours.

4      Q.   Okay.  And I'm going to scroll down in this

5  document.  Well, you know what, just let me just do it

6  this way:  Do you know Nayeli Gomez?

7      A.   I do not.

8      Q.   And do you know Jarrod Stringer?

9      A.   I do not.

10      Q.   Okay.  I think that's enough of Exhibit 2 for

11  now.

12           Are you currently registered to vote?

13      A.   Yes.

14      Q.   And you're registered to vote at your current

15  address?

16      A.   Yes.

17      Q.   When was the last time you registered to vote?

18      A.   Well, the last time that I registered was --

19  it would have been when I tried -- when I changed my

20  driver's license and thought that I was also registering

21  to vote in Travis County.  So that would have been back

22  in October of 2019.

23      Q.   And how about the time before that?

24      A.   Well, that's when I changed my voter

25  registration to vote in Smithville.  And so that would

1  have been five or six years ago.  I guess six years ago

2  now.

3      Q.   And do you remember how you updated your voter

4  registration?

5      A.   How I updated it --

6      Q.   Yes, sir.

7      A.   -- or how you tried to update it?

8      Q.   When you moved to Smithville and became

9  registered to vote there, how did you apply to be

10  registered to vote?

11      A.   I went to the -- to a branch of the Bastrop

12  County Courthouse.  It was just down the street from me

13  in Smithville.

14      Q.   And they had voter registration applications

15  there?

16      A.   Yes.

17      Q.   And so you filled it out and handed it over?

18      A.   It was very convenient because it was just

19  down on the main street.  I'd driven by it every day, so

20  I registered there.

21      Q.   Okay.  And do you remember any other times in

22  your life that you've registered?

23      A.   No, I don't remember specifically because I

24  had been in Travis County for 40 years.

25      Q.   Sure.  You did register to vote before you

1    moved to Smithville then?

2         A.   I'm sorry?

3         Q.   **You had been registered to vote before the**

4    **time you just described when you registered in**

5    **Smithville?**

6         A.   Yes, I had been registered in Travis County.

7         Q.   **Okay.  How long do you think you've been**

8    **registered to vote?**

9         A.   Since I was 18.

10        Q.   **And how often do you vote?**

11        A.   I vote almost every time that I can, you know.

12   I think it's a right and it's a privilege.  And so I

13   honor that.  I try to be up to date on what the issues

14   are and who the candidates are.  And so almost every --

15   I suppose every vote in Travis County since I came here

16   to go to school.

17        Q.   **Do you vote in federal elections?**

18        A.   Yes.

19        Q.   **Do you vote in state elections?**

20        A.   Yes.

21        Q.   **There are lots of different kinds of local**

22   **elections, and they tend to happen more frequently.  Do**

23   **you vote in every local election or certain kinds, or**

24   **what's your engagement with local -- voting locally?**

25             MS. STEVENS:  Objection to form.

1          THE WITNESS:  I'm sorry?

2          MS. STEVENS:  I objected to the form of

3  the question, but you can answer.

4      **Q.   (BY MR. HILTON)  Yeah.  It was a very**

5  **poorly-worded, rambling question.  But if you understand**

6  **what I'm getting at, you can try and answer.**

7      A.   Yeah, I try to -- I always try to vote; and I

8  always try to be up on what the issues are, whether

9  it's -- whatever they happen to be.  You know, I

10  consider it a privilege and a right to vote.



John Harms - 4/14/2020

23



John Harms - 4/14/2020





15          You said it was the -- which commission
16   did you say you served with, and when was that?
17          A.   Building Standards Commission.  And it would
18   have been the mid to late Seventies.
19          Q.   And how did you come to be appointed to that
20   commission?
21          A.   Well, I knew the mayor, Jeff Friedman; and I
22   went to complain to him about some substandard housing
23   in my neighborhood, to help the neighborhood that we
24   owned a home in.  And he said, "Great.  We're putting
25   together a group to study that, and we'll put you on

1  that group."

2            I was a part of that group for a year and

3  a half; and as part of that, we recommended changes in

4  the code, the City Code, and changes in the department

5  itself.  And those things passed the Council.  They

6  formed the new Building Stand- -- what's now the

7  Building Standards Commission, and I was appointed to

8  that and served on that for two years.

9      Q.   Have you ever served in any other similar

10  capacity on any other commission or other sort of, you

11  know, governmental groups?

12      A.   No.  Professional groups, but nothing

13  political.

14      Q.   Understood.

15            And I apologize for the silence.  I'm

16  looking at my notes, Mr. Harms.  The silence means I'm

17  skipping things so hopefully we can get done a little

18  quicker than I had intended.

19            All right.  I'm going to pull up what

20  we'll mark as Exhibit 3.

21            (Exhibit 3 discussed.)

22      Q    (BY MR. HILTON)  Exhibit 3 are -- contain some

23  pages from an attachment to the Complaint that was filed

24  on your behalf that we looked at earlier.  This is the

25  first page of that exhibit.  It's Exhibit C to the

1    Complaint.  Does this look familiar to you?

2        A.   I don't know about the text up here; but what

3    looks familiar, I think I've seen this part down here of

4    the -- on the driver's license before.  I've seen that.

5    I recognize that.

6        Q.   And you're talking about the pictures of the

7    driver's licenses?

8        A.   Yes, uh-huh.

9        Q.   And you recognize them because they're Texas

10   driver's licenses?

11       A.   Uh-huh.

12       Q.   Do you recall seeing this screen when you

13   changed your -- when you updated your driver's license

14   information when you moved from Bastrop County to Travis

15   County?

16       A.   Well, I probably saw it at -- you know, if I

17   did it, the process was pretty quick as I went through

18   this; and -- you know, you know how you do when you fill

19   out so many forms all the time.  So it looks like

20   something I would have, you know, used.  I don't know

21   how recent this is.  That was sometime ago.  This may

22   have been updated since I filed; but I would have gone

23   online to this, yeah, probably.

24       Q.   And I'll represent to you --

25            MR. HILTON:  Beth, I think we agree on

1   this.

2       Q.   (BY MR. HILTON)  -- that this is what the

3   website would have looked like when you changed your

4   driver's license information online.

5       A.   Okay.  I'll take your word for it.

6       Q.   I'm going to go to page 5 of what we'll mark

7   as Exhibit 3.  Can you read the text on this page,

8   Mr. Harms?

9       A.   Yes.

10      Q.   And do you see the heading where it says

11  Request a voter registration application?

12      A.   Yes.

13      Q.   And below that it says, "Do you want to

14  request a voter application?  You will receive a link to

15  a voter application on your receipt page."  Did I read

16  that correctly?

17      A.   Yes.

18      Q.   Okay.  And what do those words mean to you?

19      A.   Well, if I look at it right now, you know,

20  part of my confusion may have been that I didn't think I

21  was registering to vote.  I just thought I was changing

22  the address of my voter registration, my Texas voter

23  registration.

24      Q.   And so I appreciate that, and I just want to

25  be clear.  I'm asking:  What do those words -- you know,

1  as you're sitting here, reading them today, do you

2  understand what those words mean?  What is that sentence

3  trying to tell you?

4            MS. STEVENS:  Object to form.

5      A.   Once again, I didn't notice.  I thought that I

6  was registered to vote.

7      Q    (BY MR. HILTON)  Well, let's --

8            (Simultaneous speakers.)

9      A.   -- changing my address.

10     Q.   So let's go a little below that.  It says --

11 there's a button that says "yes" and, in parentheses, it

12 says, "(This does not register you to vote.)"  Did I

13 read that correctly?

14     A.   You're reading that correctly.

15     Q.   So would someone -- you know, if I checked

16 that box, should I expect that I'd be registered to

17 vote?

18            MS. STEVENS:  Object to form.

19     A.   It's confusing to me.

20     Q.   (BY MR. HILTON)  It's confusing to you whether

21 or not that option means someone will be registered to

22 vote if they select it?

23     A.   Again, I thought I was registered to vote and

24 I was just changing my address.  I assumed that the

25 information that I'd given on the driver's license to

1  change the address would just automatically apply.  It's

2  a simple enough process.  There's not a lot of code

3  there.  So I assumed that I was already registered to

4  vote and that the Texas driver's license application

5  would automatically change this, as well as my Texas

6  driver's license.  So it's not clear.

7       Q.   So I understand what you thought when you went

8  through this process back on October 8th or whatever the

9  date was, but what I'm asking you is a little bit

10  different; it's -- we're just reading the words on page

11  5 of Exhibit 3.  And what I'm asking you is:  Do you

12  think that by selecting "yes" that someone would be

13  registered to vote?

14       A.   What is the question?

15       Q.   If someone who is going through this process

16  clicks the "yes" option, do you think that person would

17  be registered to vote?

18       A.   I think it's confusing.

19       Q.   Well, let's scroll down to page 11 of

20  Exhibit 3.  This is -- I can't remember if this is from

21  the receipt page or towards the end of this online

22  process.  But this is what you see at the end of

23  updating your driver's license application online.  Do

24  you recall seeing this page?

25            MS. STEVENS:  Wait, wait, Chris.  Chris,

1   I'm going to object to that offer of what this is.

2                    MR. HILTON:  Oh, I'm sorry.

3                    MS. STEVENS:  It's a different website.

4                    MR. HILTON:  Oh, I'm sorry.  This is the

5   link, that's right.  Thanks, I appreciate that.

6       **Q.   (BY MR. HILTON)  So when you complete your**

7   **driver's license application, you're linked to this**

8   **page.  Do you recall ever clicking through to this page**

9   **when you changed your driver's license online?**

10                   **Do you see at the bottom of page 11 --**

11                   THE REPORTER:  I'm sorry.  I missed --

12  excuse me.  I missed the answer.

13                   THE WITNESS:  No.

14      **Q.   (BY MR. HILTON)  Do you see at the bottom of**

15  **page 11 of Exhibit 3 under, "Other voter registration**

16  **application methods" --**

17      A.   Uh-huh.

18      **Q.   -- there's one bullet point down there?  Do**

19  **you see that?**

20      A.   No, you'll have to scroll up.

21      **Q.   Can you see it now?**

22      A.   No, I can't read it now.

23      **Q.   It's too small?**

24      A.   Uh-huh.

25                   MR. HILTON:  Brian, can you help me out

```
 1  here?  I'm just trying to make that last line on this

 2  page legible.

 3              THE VIDEOGRAPHER:  I believe it's because

 4  the menu bar is perhaps obstructing on the witness's

 5  side of things.  And so I would maybe suggest decreasing

 6  the size a little bit and scrolling.

 7              THE WITNESS:  Yeah, I'm afraid that's

 8  unreadable.

 9      Q    (BY MR. HILTON)  Well, let's do it this way:

10  Mr. Harms, this last line says, "You may request a

11  postage-paid application by filling out this form so

12  that a voter registration application can be mailed to

13  you."  Did you ever request a postage-paid application?

14      A.   No, I didn't think I needed to.  I thought

15  that when I did my Texas driver's license change of

16  address that it automatically would change my voter

17  registration to the same address.

18      Q.   And why did you think that?

19      A.   That's what I thought.

20      Q.   Do you recall reading that anywhere or...

21      A.   It's just logical.

22      Q.   I'm going to turn now to what we'll mark as

23  Exhibit 4.

24              (Exhibit 4 discussed.)

25      Q    (BY MR. HILTON)  I'm showing you the first
```

1   page -- well, the first page just says Exhibit 25.  I'm

2   showing you the second page of Exhibit 4.  Do you

3   recognize this document?

4      A.   Yes.

5      Q.   And what is it?

6      A.   I'm sorry?

7      Q.   And what is it?

8      A.   It's my Declaration.

9      Q.   And I'll show you the last page of Exhibit 4.

10   At the bottom there, is that your signature?

11      A.   Yes, it is.

12      Q.   And do you know what this Declaration was

13   attached to?

14      A.   No.  I didn't get copies of all the paperwork,

15   so I don't know what it was attached to.

16      Q.   Okay.  And did you write this Declaration?

17      A.   No.

18      Q.   I want to go to -- I want to zoom in.

19   Hopefully, this will be legible.

20      A.   It is, yes.

21      Q.   Can you read Paragraph 5 out loud, please?

22      A.   "In mid July of 2019, I moved from Bastrop

23   County to Travis County, where I signed a one-year lease

24   on a" home -- "house."

25      Q.   Have you renewed your lease?

1    A.   It's not due for renewal yet.

2    Q.   Okay.  Do you intend to renew your lease?

3    A.   I'm thinking about it.

4    Q.   That's fair enough.  So it's fair to say that

5    you might stay where you currently live, and you might

6    leave?

7    A.   Yes.

8    Q.   Do you know when you have to decide or give

9    notice under your lease?

10    A.   Do I know when?

11    Q.   Yes, sir.

12    A.   I do.

13    Q.   Okay.  What is that date?

14    A.   I'll probably be talking to the owner of the

15    home sometime soon, and we'll negotiate.

16    Q.   I've just scrolled down to the end of

17    Exhibit 4.  It says the Declaration was executed on

18    July 15th, 2020 [sic.]  Is that correct?

19         MS. MS. STEVENS:  Objection, form.  It

20    says "January."

21    A.   It says "January 15th."

22    Q.   (BY MR. HILTON)  Thank you.  January 15th,

23    2020, is that the date that you executed the

24    Declaration?

25    A.   Yes.

1     Q.   And as of that date, you hadn't decided

2    whether you were going to stay at this current residence

3    or move to another one?

4     A.   No.

5     Q.   I think that's it for Exhibit 4.

6              Have you voted in any elections since you

7    moved from Bastrop County to Travis County?

8     A.   Yes, I did.  I voted -- pardon me for just a

9    minute -- in the last Democratic primary.

10    Q.   And that was in March of this year?

11    A.   March.  March of this year, uh-huh.

12    Q.   And you were able to cast a ballot?

13    A.   Yes.  After the hearing in San Antonio, a

14   voter registration card just showed up in my mailbox.  I

15   hadn't done anything to make that happen.  It just

16   showed up.  So I'm assuming that somebody felt I

17   deserved to get a new card.

18    Q.   Do you know who that somebody was?

19    A.   I have no idea.  There was nothing identifying

20   the source.

21    Q.   Have you ever gone to vote in an election and

22   been denied the ability to vote due to a registration

23   issue?

24    A.   No.

25    Q.   Have you ever donated any money to the Texas

1    Civil Rights Project?

2         A.    No.

3         Q.    Have you ever done any work for the Texas

4    Civil Rights Project?  And by that, I mean any of the

5    professional services that you said you've done for

6    political causes.

7         A.    No.  And none of those were professional

8    services in those other causes.  They were all just

9    volunteer efforts, and it didn't involve any of my

10   career.

11        Q.    I understand.  Thank you for that

12   clarification.  I appreciate that.

13                    Have you ever made any social media posts

14   or other posts on the Internet about this lawsuit?

15        A.    No.

16        Q.    Have you given any other statements to any

17   media about this lawsuit?

18        A.    No.

19        Q.    And have you signed any other written

20   statements or made any other recorded statements

21   regarding this lawsuit other than the Declaration we

22   just looked at?

23        A.    No.

24        Q.    And, Mr. Harms, I'm going to check my notes

25   one more time.  I think that's everything I have for

1    **you.**

2                    **I hope I have been courteous and**

3    **professional to you during this deposition.**

4        A.    You have been, yes.

5        **Q.    All right, Mr. Harms.  I think that's all I**

6    **have.**

7                    MR. HILTON:  We'll reserve the remainder

8    of our time.  We'll reserve any further questions, and

9    we'll pass the witness.

10                   MS. STEVENS:  Great.  Thank you.

11                   Just for the record, we're going to have

12   marked as confidential the questions related to, like,

13   political affiliations and that whole line of

14   questioning.

15                   And then we do want to read and sign.

16                   Other than that, we reserve our questions

17   for Mr. Harms.

18                   MR. HILTON:  That's fine by me.  We can

19   quibble about confidentiality, as mentioned, later.  I

20   don't anticipate we'll have an issue over that stuff;

21   but, you know, we have a process for dealing with that,

22   so.

23                   MS. STEVENS:  All right.  Debbie, do you

24   need anything else from us?

25                   THE REPORTER:  Do you need an electronic

John Harms - 4/14/2020

38

1  copy, not just a signing copy, but a regular copy?

2              MS. STEVENS:  Yes, please.

3              THE REPORTER:  All right.  Thank you.

4              MR. HILTON:  I believe that's it.  Thanks

5  for your time, Mr. Harms.  I appreciate it.  I got you

6  out of here in under an hour, so.  That was my goal.

7              MS. STEVENS:  Impressive, Chris.

8  Impressive.

9              All right.  Thanks, Mr. Harms.  Thanks,

10 Chris.  Thanks, Debbie.

11             THE REPORTER:  Thank you.

12             MR. HILTON:  Thanks.  I appreciate your

13 time.  Take care.

14             (Deposition concluded at 10:48 a.m.)

15                   --ooOoo--

16

17

18

19

20

21

22

23

24

25

John Harms - 4/14/2020

39

```
 1                    CHANGES AND SIGNATURE
 2   WITNESS NAME:              DATE OF DEPOSITION:
 3   JOHN HARMS                    April 14, 2020
 4   PAGE/LINE     CHANGE                REASON
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

1          I, JOHN HARMS, have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted herein.

4

5          _____

6          JOHN HARMS

7

8    THE STATE OF _____   )

9          Before me, _____, on

10   this day personally appeared JOHN HARMS, known to me (or

11   proved to me under oath or through _____)

12   (description of identity card or other document) to be

13   the person whose name is subscribed to the foregoing

14   instrument and acknowledged to me that they executed

15   same for the purposes and consideration therein

16   expressed.

17          Given under my hand and seal of office on

18   this _____ day of _____, _____.

19

20

21          _____

22          NOTARY PUBLIC IN AND FOR

23          THE STATE OF _____

24          My Commission Expires:_____

25

John Harms - 4/14/2020

41

```
1  STATE OF TEXAS      )

2                      REPORTER'S CERTIFICATION

3                      I, DEBBIE D. CUNNINGHAM, CSR, hereby

4  certify that the witness was duly sworn and that this

5  transcript is a true record of the testimony given by

6  the witness.

7                      I further certify that I am neither

8  counsel for, related to, nor employed by any of the

9  parties or attorneys in the action in which this

10 proceeding was taken.  Further, I am not a relative or

11 employee of any attorney of record in this cause, nor am

12 I financially or otherwise interested in the outcome of

13 the action.

14                     Subscribed and sworn to by me this day,

15 April 20, 2020.

16

17

18

19                     _____
                       Debbie D. Cunningham, CSR
20                     Texas CSR 2065
                       Expiration:  6/30/2021
21                     INTEGRITY LEGAL SUPPORT SOLUTIONS
                       P.O. Box 245
22                     Manchaca, Texas 78652
                       www.integrity-texas.com
23                     512-320-8690; FIRM # 528

24

25
```