IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JARROD STRINGER, et al.,          *
     Plaintiffs,              *
                      *
v.                                *          No. SA-20-CV-46-OG
                      *
RUTH R. HUGHS, et al.,            *
     Defendants.              *

VIDEOCONFERENCED DEPOSITION

OF

NALYELI GOMEZ

Friday, April 10, 2020

VIDEOCONFERENCED DEPOSITION OF NALYELI GOMEZ,
produced as a witness at the instance of the Defendants,
and duly sworn, was taken in the above-styled and
numbered cause on Friday, April 10, 2020, from
10:11 a.m. to 11:03 a.m., before Debbie D. Cunningham,
CSR, in and for the State of Texas, remotely reported
via Machine Shorthand, pursuant to the Federal Rules of
Civil Procedure.

--ooOoo--

                                                                    2

1                              APPEARANCES

2

3    FOR PLAINTIFFS AND DEPONENT:

4        TEXAS CIVIL RIGHTS PROJECT
         1405 Montoplis Drive
5        Austin, Texas  78741
         (T) 512.474.5073
6
         By:  Ryan Cox, Esq.
7             ryan@texascivilrightsproject.org
                          AND
8             Hani Miraz, Esq.
              Rebecca Harrison Stevens, Esq.
9             Joaquin Gonzalez, Esq.

10
     FOR INTERVENORS:
11
         PERKINS COIE
12       700 13th Street, NW, Suite 800
         Washington, D.C.  20005-3960
13       (T) 202.654.6200

14       By:  Aria C. Branch, Esq.
              abranch@perkinscoie.com
15

16   FOR DEFENDANTS:

17       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
         General Litigation Division
18       300 W. 15th Street
         Austin, Texas  78701
19       (T) 512.463.2120

20       By:  Anne Marie Mackin, Esq.
              anna.mackin@oag.texas.gov
21

22
     VIDEOGRAPHER:
23       Brian Christopher

24
                         --ooOoo--
25

Nayeli Gomez - 4/10/2020

3

1                     INDEX

2    APPEARANCES                              2

3

4   EXAMINATION OF NAYELI GOMEZ:

5    BY MS. MACKIN                            6

6

7

8    CHANGES AND SIGNATURE                   38

9    REPORTER'S CERTIFICATION                40

10

11                    --ooOoo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          EXHIBIT INDEX

2    Exhibit Number        Description                  Page

3     Exhibit 1      Defendants' Notice of Oral         8
                     Deposition
4
      Exhibit 2      Plaintiffs' Original Complaint     22
5
      Exhibit 3      A collection of DPS website        23
6                    screenshots

7     Exhibit 4      Declaration of Nayeli Gomez        30

8

9                          --ooOoo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Friday, April 10, 2020, 10:11 a.m.)
 2                       P R O C E E D I N G S
 3                    THE REPORTER:  Today is April 10th, 2020.
 4   This is the deposition of Nayeli Gomez in the matter of
 5   Jarrod Stringer, et al. versus Ruth R. Hughes, et al.
 6   We are remotely situated due to COVID-19 and are
 7   appearing via Zoom conference.  We are now on the record
 8   at 10:11 a.m., Central time.
 9                    My name is Debbie Cunningham; and my
10   business address is 11309 Pickard Lane, Austin, Texas
11   78748.
12                    Would all persons present please
13   introduce themselves for the record?
14                    MS. MACKIN:  Anna Mackin with the Texas
15   Office of the Attorney General on behalf of the
16   Defendants.
17                    MR. COX:  Ryan Cox with the Texas Civil
18   Rights Project, attorney for the witness, Nayeli Gomez.
19                    MS. BRANCH:  This is Aria Branch on
20   behalf of the Intervenors in this case, the Texas
21   Democratic Party, the Democratic Congressional Campaign
22   Committee, and the Democratic Senatorial Campaign
23   Committee.
24                    THE REPORTER:  Is that everyone?
25                    MR. COX:  Nayeli, you can go.
```

Nayeli Gomez - 4/10/2020

6

1             THE WITNESS:  Nayeli Gomez.  I'm the

2   witness.

3                   NALYELI GOMEZ,

4   having taken an oath to tell the truth, the whole truth,

5   and nothing but the truth, was examined and testified as

6   follows:

7                   EXAMINATION

8   BY MS. MACKIN:

9       Q.   **Good morning, Ms. Gomez.**

10      A.   Good morning.

11      Q.   **Will you please speak and spell your name for**

12  **the record?**

13      A.   Yes.  Nayeli Gomez, N-A-Y-E-L-I, Gomez,

14  G-O-M-E-Z.

15      Q.   **My name is Anna Mackin.  I work for the Texas**

16  **Attorney General, and I represent the Defendants in this**

17  **lawsuit.  I'm going to be asking you some questions**

18  **today.**

19              **Have you ever been deposed before?**

20      A.   No, I haven't.

21      Q.   **Okay.  So I'm going to go over some ground**

22  **rules to help keep us organized, and they are especially**

23  **important since we are using this videoconference means**

24  **of taking your deposition.  Please make sure that you**

25  **give me a verbal answer to my questions, so "yes" or**

```
 1  "no."  And try to avoid saying "uh-huh" or "huh-uh"
 2  because, as Debbie's taking that down, sometimes it's
 3  not clear in the record whether it was a "yes" or a
 4  "no."
 5      A.   Okay.
 6      Q.   Please let me finish my question before you
 7  start your answer, and I will also do my best to let you
 8  finish your answer before I ask another question.  This
 9  is, again, especially important so that Debbie can take
10  down everything that we say.
11           If you don't understand one of my
12  questions, will you please tell me so that I can
13  rephrase it?
14      A.   Okay.
15      Q.   Thank you.
16           And if you answer my question, I'm going
17  to assume that you understood it.  Is that fair?
18      A.   Yes.
19      Q.   Okay.  And just a reminder:  The oath you just
20  took, you are sworn to tell the truth as if you were
21  testifying in a courthouse in front of a judge and a
22  jury.  You understand that, right?
23      A.   Yes, I do.
24      Q.   Okay.  If you need to take a break or use the
25  restroom at any time, just let me know.  I will, though,
```

Nayeli Gomez - 4/10/2020

8

1    have you answer any question that I have asked before we

2    go on that break.  Okay?

3         A.   Okay.

4         Q.   And is there any reason that you would not be

5    able to answer my questions completely and accurately

6    today?

7         A.   No.

8         Q.   And you also understand that during this

9    deposition, while we're on the record, you can't

10   communicate with your attorneys off the record, like, in

11   a text message or an e-mail.  Okay?

12        A.   Okay.

13        Q.   So during today's deposition I'm going to be

14   showing you some documents by putting them on the

15   screen.  If you have trouble seeing the documents, just

16   let me know; and I can zoom in or zoom out as needed.

17   Okay?

18        A.   Okay.

19        Q.   And if you are looking at a document that's

20   more than one page and you'd like me to scroll up or

21   down, just let me know that, too.  Okay?

22        A.   Okay.

23        Q.   And just to practice, I'm going to show you

24   Exhibit 1.

25                   (Exhibit 1 discussed.)

1       Q.   (BY MS. MACKIN)  So I am placing on the screen

2   what will be Exhibit 1 to this deposition.  Ms. Gomez,

3   do you recognize this document?  Let me see if I can

4   zoom out.

5       A.   Yes, I do.

6       Q.   And what is it?

7       A.   It is either the Complaint or the Declaration.

8       Q.   Okay.  It's actually -- I'll zoom in.  You'll

9   see it says Defendants' Notice of Oral Deposition.

10      A.   Oh, okay.

11      Q.   So this is just the Notice pursuant to which

12  we are here today.

13      A.   Okay.

14      Q.   So I don't have any questions about that

15  document.  I just always like to make it an exhibit, and

16  it gave us a chance to practice the screen share.

17      A.   Okay.

18      Q.   So I'm going to exit out of that.

19           And so when I show you a document, I'm

20  going to assume that you can see it clearly on your

21  screen unless you tell me otherwise.  Okay?

22      A.   Okay.

23      Q.   All right.  What did you do to prepare for

24  today's deposition?

25      A.   I just went over the two documents, the

Nayeli Gomez - 4/10/2020

10

1  Complaint and deposition -- I mean, the Declaration.

2       Q.   And by "the Declaration," you mean the

3  Declaration that you signed in this case that your

4  attorneys filed?

5       A.   Yes, that's right.

6       Q.   Other than your attorneys, did you speak to

7  anybody to prepare for your deposition?

8       A.   No.

9       Q.   Other than -- I'm going to go into some

10 general background questions.  Other than this

11 deposition, have you ever sued someone before -- sorry.

12 Other than this lawsuit, not this deposition, have you

13 ever sued someone before?

14      A.   No, I haven't.

15      Q.   Have you ever been sued?

16      A.   No.

17      Q.   Are you married?

18      A.   No.

19      Q.   Do you have any children?

20      A.   No.

21      Q.   What is your educational background?

22      A.   What do you mean by that, like up to what

23 level am I?

24      Q.   Uh-huh.

25      A.   I have my bachelor's.

1     Q.    And what is that in?

2     A.    It's in mathematics.

3     Q.    And where did you get your mathematics degree?

4     A.    From Texas A&M University in San Antonio.

5     Q.    And are you currently employed?

6     A.    Yes, I am.

7     Q.    What is your job?

8     A.    I'm the statewide data manager for a

9  nonprofit.

10     Q.    What nonprofit is that?

11     A.    It's the Texas Organizing Project.

12     Q.    And how long have you had that job?

13     A.    I've been there for about five months.

14     Q.    And before that, what was your job?

15     A.    Before that I was a college access advisor.

16     Q.    And was that also with the Texas Organizing

17  Project, or was that for another employer?

18     A.    It was for another employer.

19     Q.    And who was that?

20     A.    It was the San Antonio Education Partnership

21  with Cafe College.

22     Q.    And how about before that?  Did you have any

23  other positions since college?

24     A.    I did.  I had temporary jobs before that.

25     Q.    How many?

1    A.   After graduating two, two more jobs.

2         Q.   **And what were those?**

3    A.   Before that -- I forgot the name of the

4  company, but it was a call center.  And before that, I

5  was the data director for the Texas Democratic Party.

6         Q.   **How long were you the data director for the**

7  **Texas Democratic Party?**

8    A.   I don't remember exactly.  It was a few

9  months.

10        Q.   **Okay.  Focusing on your job today with the**

11  **Texas Organizing Project, what are your job duties?**

12   A.   So I manage their data -- well, the database.

13  That's what I do.

14        Q.   **Can you tell me a little bit more about what**

15  **that entails?**

16   A.   It's a long list, but basically making sure

17  that the data is being entered correctly into the

18  database and I decide what goes in there and what

19  doesn't.  Yeah, that's like a basic summary.

20        Q.   **And so what sort of data are you working with?**

21   A.   It is -- so we have members and supporters, so

22  data about them.  Like, whoever contacted them, we keep

23  track of that, any other details.  Maybe if there's an

24  election going on, people go canvas or phone bank.  So

25  any data we collect from there -- or from that.

Nayeli Gomez - 4/10/2020

13

1    **Q.   And how do y'all use that data?**

2         A.   So it depends.  We can use it -- if we're

3    working on a campaign and we want to speak to certain

4    people, we'll use the data for that to target those

5    people.

6         **Q.   Like, "Get Out the Vote" type efforts or --**

7         A.   Sometimes it is.  Like, right now with the --

8    it depends on what's going on at the moment.  Right now

9    with the COVID-19, we're just trying to contact our

10   members and supporters and seeing what their needs are

11   right now.  It just depends on what's going on at the

12   moment.

13        **Q.   Okay.  And so you currently live in**

14   **San Antonio, correct?**

15        A.   Yes.

16        **Q.   And what is your address?**

17        A.   It is 4035 Coral Sunrise.

18        **Q.   And that's in Bexar County?**

19        A.   Yes, it is.

20        **Q.   And when did you move there?  Do you remember**

21   **the month or the exact date?**

22        A.   So I signed the paperwork June 14th, but I

23   moved in here in July.

24        **Q.   Okay.  And before the Coral Sunrise address,**

25   **where did you live?**

Nayeli Gomez - 4/10/2020

14

1      A.    I lived at 6423 Pelican Coral.

2      Q.    And when did you move there?

3      A.    I moved there -- I don't remember the exact

4  year; but I think it was 14 years ago, around there.

5      Q.    Okay.  And that's also in Bexar County?

6      A.    Yes, that's right.

7      Q.    And how many different addresses have you had

8  before that?

9      A.    That has been my permanent address since then.

10      Q.    So you have the Coral Sunrise address and the

11  Pelican Coral address.  Have you had any other addresses

12  during your life?

13      A.    Not particularly.  So, like, when I was in

14  school, I was, you know, in a dorm and then in and out;

15  but Pelican Coral was always my permanent address

16  because -- yeah.

17      Q.    And why did you move from Pelican Coral to

18  Coral Sunrise?

19      A.    Because I bought a house, so.

20      Q.    Oh, congratulations.

21      A.    Thank you.

22      Q.    And did you live with anyone else at the Coral

23  Sunrise [sic] address?

24      A.    Yes, I did.

25      Q.    And who's that?

Nayeli Gomez - 4/10/2020

15

1       A.    It changed at different times; but it was

2   always, like, my parents and my siblings, two of my

3   siblings.

4       Q.    And then do you live with anyone at Coral

5   Sunrise?

6       A.    No, I don't.

7       Q.    That's a nice change, having your own place.

8             Okay.  But you have always lived in Bexar

9   County your whole life?

10      A.    Not my whole life.

11      Q.    Not your whole life.  Okay.  Where else have

12  you lived?

13      A.    I lived in California, in Los Angeles County.

14      Q.    And when was that?

15      A.    That was since birth until I moved to Pelican

16  Coral.

17      Q.    And what's your birthday?

18      A.    It's November 5th, 1992.

19      Q.    You make me feel so old.

20            Okay.  So I want to jump into some

21  questions about this lawsuit.  What is your

22  understanding of what this case is about?

23      A.    I understand that the State is being sued

24  because there's a federal law that requires states to be

25  able to let people change or update their voter

1  registration address online with the -- wherever they

2  change their driver's license information, it should be

3  able to be changed electronically.

4       Q.   And what are your expectations for the outcome

5  of this lawsuit?

6       A.   Do you mean my -- what do you mean by

7  "expectations"?

8       Q.   Sure.  What -- in an ideal world, what do you

9  get out of this lawsuit?

10      A.   Oh, okay.  I hope that that does happen here

11 in the state of Texas, that we're able to do that

12 electronically.

13      Q.   And when you say "that," what are you

14 referring to?

15      A.   So right now, when I -- like, when I went to

16 update my address on my license, I couldn't update my

17 voter registration online.  I had to print out a form

18 and mail it in.  So being able to do it electronically

19 on the Internet without having to print anything out.

20      Q.   And how did you meet your lawyers in this

21 case?  I'm not asking for any legal advice they've given

22 you or anything like that, just:  How did you get

23 acquainted with them?

24      A.   I was referred to them by someone.

25      Q.   By who?

Nayeli Gomez - 4/10/2020

17

```
 1        A.    By my sister.

 2        Q.    And what's her name?

 3        A.    It's Selene Gomez-Garcia.

 4              (Reporter requests spelling.)

 5              THE WITNESS:  S-E-L-E-N-E Gomez,

 6   G-O-M-E-Z, hyphen G-A-R-C-I-A.

 7        Q.    (BY MS. MACKIN)  Why did your sister refer you

 8   to your attorneys?

 9        A.    Can you repeat that?

10        Q.    Why did your sister refer you to your

11   attorneys?

12        A.    She -- she knew that I hadn't updated my

13   address in my voter -- for my registration card, and she

14   knew that they had a case going on about that.

15        Q.    Do you know how she knew that they had a case

16   going on about it?

17        A.    No, I don't.

18              MR. COX:  Object to form.

19        Q    (BY MS. MACKIN)  Do you remember going to the

20   courthouse for a hearing in this case on January 28th of

21   this year?

22        A.    Yes, I do.

23        Q.    Do you remember my colleague, Chris Hilton,

24   represented the Defendants at that hearing?  I know

25   there were a lot of lawyers, so I'm sure it won't hurt
```

1  his feelings if you don't remember him specifically; but
2  I'm wondering if you do.
3       A.   I don't remember any names, so.
4       Q.   Okay.  And what is your understanding of --
5  strike that.
6            When I say NVRA, do you have an
7  understanding of what I mean?
8       A.   No.
9       Q.   Okay.  That's fine.
10           All right.  What is your understanding of
11  the options that are available for registering to vote?
12      A.   From my experience, you'd have to print out a
13  form and mail it in, or you could do it through someone
14  who's been deputized.  That's all I know.
15      Q.   Are you familiar with the option to go into a
16  DPS office; and while you are applying for a license or
17  renewing your license, you can also register to vote?
18      A.   Yes.
19      Q.   Okay.  Have you ever registered to vote that
20  way or updated your voter register information that way?
21      A.   With DPS in the office --
22      Q.   Yes.
23      A.   -- is that what you're asking?
24      Q.   Yes, ma'am.
25      A.   No, I haven't.

1       Q.   Okay.  Have you ever gone into a DPS office to

2  get a license or change your license?

3       A.   Yes.

4       Q.   How many times?

5       A.   I don't remember the exact times.

6       Q.   Okay.  How about the most recent time, do you

7  remember when that was?

8       A.   No, I don't.

9       Q.   Okay.  All right.  This is not a memory

10  competition.  So don't worry if you don't remember

11  exactly, but I want to try to get a list of every time

12  that you have either registered to vote or updated your

13  voter registration information.  So do you -- do you

14  remember the last time that you registered to vote or

15  updated your voter registration information?

16       A.   Me, myself, or --

17       Q.   Yes.

18       A.   I don't remember.  I -- did you ask when?

19       Q.   Well, just the last time that it happened, do

20  you have a recollection of that?  Maybe you don't know a

21  specific date.

22       A.   No.

23       Q.   Do you remember the first time you registered

24  to vote?

25       A.   Yes.

1    Q.   Tell me about that.

2    A.   That -- I don't remember many details, but I

3 know it was right after I turned 18.  I don't remember

4 the process.

5    Q.   Do you remember if you did it in person?

6    A.   I did do it in person.

7    Q.   Do you remember whether you had to fill out a

8 form or write anything down?

9    A.   I know I did have to fill out a form.

10    Q.   Do you remember whether you had to sign

11 anything?

12    A.   No, I don't remember.

13    Q.   After that first time you registered to vote,

14 did you do anything to make sure that your registration

15 had gone through and become effective?

16    A.   I waited for my card in the mail, and I did

17 get it eventually.

18    Q.   All right.  Do you remember the last time you

19 voted?

20    A.   Yes.  Yes, I do.

21    Q.   When was that?

22    A.   It was for the primaries, these past

23 primaries.

24    Q.   The March 3rd, 2020 primary?

25    A.   Yes.

Nayeli Gomez - 4/10/2020

1    Q.   Do you remember the time before that that you

2 voted?

3    A.   No.

4    Q.   Do you vote regularly?

5    A.   I -- what do you mean by "regularly"?

6    Q.   Would you say that if you're aware of an

7 election going on, you try to make sure you cast a

8 ballot, in general?

9    A.   Yes.

10    Q.   Would you describe yourself as politically

11 active?

12    A.   What do you mean by that?

13    Q.   Well, I guess whatever that term means to you.

14         MR. COX:  Object to form.

15         You can answer, Nayeli.

16         THE WITNESS:  Okay.

17    A.   I would say yes, and that means that I vote

18 regularly.



Nayeli Gomez - 4/10/2020

22



 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14     Q.   Okay.

15          All right.  I am showing you a document

16   that will be marked Exhibit 2.

17               (Exhibit 2 discussed.)

18     Q    (BY MS. MACKIN)  And I've pulled it up in a

19   two-page view to try to get more of it on the screen;

20   but if you need me to zoom in more to read it, just let

21   me know.

22     A.   I can read it.

23     Q.   Do you recognize this document?  I'll just go

24   ahead and scroll through it.

25     A.   Yes.

1      Q.    And what is it?

2      A.    The Complaint.

3      Q.    In this lawsuit?

4      A.    Yes.

5      Q.    And you've seen this document before?

6      A.    Yes, I have.

7      Q.    Did you review a draft of this document before

8  your attorneys filed it?

9      A.    Yes.

10      Q.    How much time would you say you've spent on

11  this case?

12      A.    I don't know.  I'd have to take time and think

13  back and calculate.

14      Q.    Okay.  Do you know a gentleman named John

15  Harms, another Plaintiff in this lawsuit?

16      A.    Not personally, no.

17      Q.    What about Jarrod Stringer?

18      A.    I don't know him personally, either.

19      Q.    Okay.  That's all on Exhibit 2.

20            All right.  Now, I am showing you a

21  document that will be Exhibit 3 to this deposition.

22            (Exhibit 3 discussed.)

23      Q    (BY MS. MACKIN)  This is a collection of

24  screenshots that your attorneys filed with the Complaint

25  in this lawsuit.  Do you recognize this screenshot that

1  I'm showing you here?

2        A.    Yes, I do.

3        Q.    And what is it?

4        A.    It's the website to update the address on your

5  driver's license.

6        Q.    And so do you recall going through this screen

7  when you changed your address back in November?

8        A.    Yes, I do.

9        Q.    I'm going to scroll down to page 5.  And I

10  want to direct your attention to about halfway down the

11  page where it says, "To request a voter registration

12  application."  Do you see that?

13        A.    Yes, I do.

14        Q.    Please read the text below that into the

15  record.

16        A.    Read the text right under the title, is that

17  what you mean?

18        Q.    Yes, ma'am.

19        A.    Do you want me to read it out loud?

20        Q.    Yes, please.

21        A.    Okay.  "Required.  Do you want to request a

22  voter application?  You will receive a link to a voter

23  application on your receipt page."

24        Q.    And then below that?

25        A.    "Yes (This does not register you to vote)" or

1 "No."

2    Q.   Sitting here today, what does that language

3 mean to you, "This does not register you to vote"?

4    A.   It means that by clicking on there, it won't

5 register you to vote.

6    Q.   Do you recall seeing that language in

7 November 2019 when you updated your address online?

8    A.   I mean, I don't have it all memorized, like,

9 what I clicked on.  So I'm assuming it was there.

10    Q.   Do you recall seeing that language when you

11 reviewed the Complaint your attorneys filed in this

12 case?

13    A.   Yes.

14    Q.   I'm going to scroll now to page 11.  Do you

15 recall seeing this screen when you changed your address

16 online in November 2019?

17    A.   I don't remember seeing that.

18    Q.   Okay.  Do you see that there's a tool that

19 allows you to see whether you are registered to vote?

20    A.   No.

21    Q.   Do you see in the gray box there's a link you

22 can click that says, "Am I registered to vote"?

23    A.   Yes, I see that.

24    Q.   Have you ever used that tool?

25    A.   I don't think I have.

Nayeli Gomez - 4/10/2020

1    Q.    And then at the bottom there's a link --

2  sorry.   I have to stop moving my mouse so you can see

3  it.   Okay.   At the bottom do you see the text that says,

4  "You may request a postage-paid application by filling

5  out this form so that a voter registration application

6  can be mailed to you"?   Did I read that right?

7    A.    Uh-huh.

8    Q.    Did you request a prepaid application when you

9  changed your address in November 2019?

10    A.    I don't remember.   No, I didn't.   I think I

11  clicked on "no."

12    Q.    Why not?

13    A.    Because I didn't want to change my address --

14  or my voter registration that way.

15    Q.    Why not?

16    A.    Because I knew that I should be able to do it

17  electronically, like, fully electronically.

18    Q.    And how did you know that?

19    A.    Because I was already aware of the law when I

20  was filling out the form on the DPS website.

21    Q.    And when you say "the law," what are you

22  referring to?

23    A.    The one that we're talking about today that

24  requires states to be able to provide that for people.

25    Q.    Why did you care about how you changed your

1  address?

2      A.    Because I didn't want to take an extra step

3  that I didn't have to, like, legally.  There were steps

4  that I had to take that were -- that I would have to go

5  out of my way for.

6      **Q.    And why was that important to you?**

7      A.    Why was what important to me?

8      **Q.    The way that you changed your address.**

9      A.    Because if there is a way that I could -- if

10  it was a requirement for me to do it electronically

11  because of the law, I felt that I should be able to do

12  it.  I think that's important.

13      **Q.    Okay.  Fair enough.**

14      A.    Yeah.

15      **Q.    That's all on that.**

16            **Was that more important to you than being**

17  **registered to vote?**

18            MR. COX:  Object to form.

19      A.    I don't know which one was more important.

20      **Q.    (BY MS. MACKIN)  Have you ever tried to change**

21  **your voter registration address online using the Texas**

22  **Secretary of State's website?**

23      A.    I don't think so.

24      **Q.    Why not?**

25      A.    I wasn't aware of it.

1    Q.    So we talked about the January 28th hearing

2  that you attended for this case.  Do you remember one of

3  the attorneys mentioning to the Court that there's an

4  option to update your address within a single county on

5  the Texas Secretary of State's website?

6    A.    I do.  But what I meant was before then, I was

7  not aware of it.

8    Q.    After you were aware of it, did you attempt to

9  change your voter registration address online with the

10  Texas Secretary of State's website?

11    A.    No, I did not.

12    Q.    Why not?

13    A.    Because I was part of this case and if -- the

14  outcome depended on whether I would do that or not.

15                (Reporter requests brief break.)

16                (Off the record from 10:47 to 10:48 a.m.)

17    Q    (BY MS. MACKIN)  All right.  Ms. Gomez, I want

18  to talk about the voter registration that you have sued

19  my clients about when you moved within San Antonio in --

20  was it November -- well, when you changed your address

21  in November of 2019.  So we talked about why you moved.

22  You moved because you bought your own place; is that

23  right?

24    A.    Uh-huh.

25    Q.    And it was in July of 2019, correct?

1    A.   Yes.

2    Q.   Okay.  And then what prompted you to update

3  the address on your driver's license in November?

4    A.   I -- was it in November?

5    Q.   I believe that's what it says in the

6  Complaint; but if that's not right, feel free to correct

7  it now.

8    A.   I did it because I knew that I had to change

9  my address on my driver's license.

10    Q.   Okay.  And when you updated the address on

11  your driver's license, did you sign anything?

12    A.   I don't remember.

13    Q.   And was it your understanding that your voter

14  registration information had been updated by changing

15  that address online?

16    A.   I knew that it didn't change.

17    Q.   Okay.  Since you changed the address on your

18  driver's license -- and I'm sorry.  I just realized I

19  just said November, I think.  And I think it was

20  December; is that right?

21    A.   Yes.

22    Q.   Okay.  I'm sorry.

23         Have you voted in any election since you

24  changed the address on your driver's license in December

25  2019?

1      A.   Yes, I have.

2      Q.   How many?

3      A.   I think only once.

4      Q.   Okay.  Which one?

5      A.   The primaries in March.

6      Q.   In March 2020?

7      A.   Yes.

8      Q.   And were you able to cast a ballot in that

9  election?

10     A.   Yes, I was.

11     Q.   All right.  I am putting what will be

12  Exhibit 4 on the screen.

13               (Exhibit 4 discussed.)

14     Q    (BY MS. MACKIN)  Ms. Gomez, do you recognize

15  this as a Declaration that you signed that your

16  attorneys filed in this lawsuit?

17     A.   Yes.

18     Q.   Okay.  And so you had seen it before?

19     A.   Yes.

20     Q.   And scrolling down to page 2, that is your

21  signature down at the bottom?

22     A.   Yes.

23     Q.   Okay.  Who wrote this Declaration?

24     A.   I don't know exactly who wrote it.

25     Q.   But you reviewed it before you signed it?

1    A.   Yes.

2    Q.   Okay.  And at the time you signed it, it was

3  true and correct, to the best of your knowledge; is that

4  right?

5    A.   Yes, that's right.

6    Q.   Okay.  I want to ask you a couple of specific

7  questions about this Declaration.

8         Looking at Paragraph 3, you state -- let

9  me zoom in a little bit more -- "At the time of my move

10 I was a registered voter at my old address in Bexar

11 County."  How did you know that?

12   A.   I knew that because -- I knew that I voted the

13 last time -- the last time I voted, I didn't have a

14 problem voting; and nothing had changed since then.

15   Q.   And do you remember what election you voted

16 in?

17   A.   I don't remember exactly what election was

18 right before that.

19   Q.   Okay.  And scrolling down to Paragraph 5, it

20 says, "I completed the process to change the address on

21 my driver's license to my new address but was unable to

22 simultaneously update my voter registration."

23         You were aware, though, that checking the

24 "yes" box online was not enough to update your voter

25 registration, correct?

 1              MR. COX:  Object to form.

 2        A.   Yes.

 3        Q    (BY MS. MACKIN)  And then in the next sentence

 4   of Paragraph 5 you say, "I do not own a home printer so

 5   it is difficult for me to print and mail in an extra

 6   form."  Is it still true that you do not have a computer

 7   printer?

 8        A.   Yes.

 9        Q.   Have you ever had a computer printer?

10        A.   Yes, I have.

11        Q.   Is there a computer printer at your parents'

12   home at Pelican Coral?

13        A.   There is one now, but they just got it.  So at

14   the time, no, they did not have a printer.

15        Q.   At the time did you have a friend that had a

16   computer printer?

17        A.   No.

18        Q.   Did you have access to one at work?

19        A.   Yes, but it is only supposed to be used for

20   work purposes.

21        Q.   If -- imagining a parallel universe in which

22   we were not all self-quarantining, if you were going to

23   go on vacation tomorrow and you needed to print your

24   boarding pass, how would you do that?

25        A.   I would -- well, now that my parents have a

1  printer, I would use their printer or go to, like, a UPS

2  store or FedEx, something like that.

3      Q.   I'm sorry.  Can you -- I lost the last part of

4  that sentence.  Can you repeat that, please?

5      A.   Yeah.  So I would either -- now that my

6  parents have a printer, I would either go to their house

7  or go to a place that provided printing for a charge,

8  like the UPS store, FedEx.

9      Q.   All right.  I'm going to go down to page 2 of

10 Exhibit 4.  Can you see that clearly?

11     A.   Yes, I can.

12     Q.   Okay.  Paragraph 7 says, "I remain registered

13 at my old, incorrect address at this time."  Is that

14 still the case today?

15     A.   No, that's not.

16     Q.   Okay.  And then Paragraph 8 says, "I realize

17 that if my registration is not updated before

18 February 3rd, 2020, I will not be able to cast a vote at

19 my correct address in the March 2020 primary election."

20          But you were able to cast a vote in the

21 March primary, right?

22     A.   Yes, I was.

23     Q.   Okay.  That's all on Exhibit 4.

24          I want to talk a little bit more about

25 your move and your decision to buy a home.  What

1   motivated you to buy your own house?

2        A.   I wanted to invest in something; and I felt

3   like I could at the moment, so I did.

4        Q.   Yeah, it's a good feeling.  Have you enjoyed

5   home ownership so far?

6        A.   Yes, I have.

7        Q.   Do you live far from your parents?

8        A.   What do you mean by "far"?

9        Q.   How far away from your parents do you live?

10       A.   I don't know the exact distance, but I think

11  about 2 miles.

12       Q.   Okay.  So it's close, but not too close?

13       A.   Uh-huh, yeah.

14       Q.   Have you made any postings on the Internet

15  about this lawsuit?

16       A.   No, I have not.

17       Q.   Have you signed any written statements or made

18  any statements to the media about this lawsuit?

19       A.   No, I haven't.

20       Q.   Do you have any current plans to move from

21  your Coral Summer [sic] house?

22       A.   From my Coral Sunrise home, not at the moment,

23  I don't.

24       Q.   Have I been courteous to you today during this

25  deposition?

1      A.   I think so, yes.

2                  MS. MACKIN:  Pass the witness.

3                  MR. COX:  I think we're going to reserve

4      and read and sign.

5                  THE REPORTER:  All right.  Mr. Cox, do

6      you need other than a signing copy?

7                  MR. COX:  Beth?

8                  MS. STEVENS:  Yeah, we need to read and

9      sign.

10                  And, also, Debbie, should we put the rest

11     of the attorneys' names in the record so that -- just so

12     you have a record of everybody that was here.

13                  THE REPORTER:  Yes, I wasn't aware anyone

14     else joined afterwards.

15                  MS. STEVENS:  Yes.  This is Beth Stevens.

16     I'm with the Texas Civil Rights Project on behalf of

17     Ms. Gomez.

18                  MR. MIRZA:  And this is Hani Mirza,

19     H-A-N-I first name, last name M-I-R-Z-A.  I'm with the

20     Texas Civil Rights Project, an attorney representing

21     Ms. Gomez.

22                  THE REPORTER:  Thank you.  Is there

23     anyone else?

24                  MR. COX:  You got Joaquin Gonzalez at the

25     beginning of this, right, Ms. Cunningham?

```
1              MR. MIRZA:  Yeah, he's on mute.

2              THE REPORTER:  I was -- yes, I know that

3    he is here.  He didn't state his appearance on the

4    record.

5              MR. GONZALEZ:  Joaquin Gonzalez with the

6    Texas Civil Rights Project on behalf of Ms. Gomez.

7              THE REPORTER:  Okay.

8              MR. COX:  I think that's all of us.

9              THE REPORTER:  Thank you.

10             I'm not sure I got an answer to my

11   question.  I'm sorry.  Do you only need a reading copy,

12   or do you want an electronic copy of the transcript as

13   well, Mr. Cox?

14             MS. STEVENS:  We --

15             (Simultaneous speakers.)

16             MS. STEVENS:  We would also like a copy

17   of the transcript, please.

18             THE REPORTER:  All right.  Thank you.

19             MS. STEVENS:  And can I just clarify for

20   the record, the Zoom has been recording.  Is that done

21   for the benefit of you, Debbie, to take everything down?

22             THE VIDEOGRAPHER:  No, it was requested.

23   Our understanding was it was requested to be recorded as

24   well.  We will have a copy of the video available if you

25   would like to have a copy of the video distributed to
```

1   you as well.

2                MS. STEVENS:  Okay.  I'm just clarifying:

3   Was the -- the deposition wasn't not Noticed as a video

4   deposition, right, Anna?

5                MS. MACKIN:  It was Noticed as a video

6   conference.

7                MS. STEVENS:  Okay.  We can --

8                MS. MACKIN:  We don't -- yeah.

9                MS. STEVENS:  I don't have anything else.

10  We can talk offline about that.

11               MS. MACKIN:  Okay.  Off the record.

12               (Deposition concluded at 11:02 a.m.)

13                       --ooOoo--

14

15

16

17

18

19

20

21

22

23

24

25

Nalyeli Gomez - 4/10/2020

38

```
 1                 CHANGES AND SIGNATURE

 2    WITNESS NAME:            DATE OF DEPOSITION:

 3    NALYELI GOMEZ              April 10, 2020

 4    PAGE/LINE     CHANGE              REASON

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

```
1            I, NALYELI GOMEZ, have read the foregoing

2  deposition and hereby affix my signature that same is

3  true and correct, except as noted herein.

4

5            _____

6            NALYELI GOMEZ

7

8  THE STATE OF _____  )

9            Before me, _____, on

10 this day personally appeared NALYELI GOMEZ, known to me

11 (or proved to me under oath or through _____)

12 (description of identity card or other document) to be

13 the person whose name is subscribed to the foregoing

14 instrument and acknowledged to me that they executed

15 same for the purposes and consideration therein

16 expressed.

17            Given under my hand and seal of office on

18 this _____ day of _____, _____.

19

20

21            _____

22            NOTARY PUBLIC IN AND FOR

23            THE STATE OF _____

24            My Commission Expires:_____

25
```

1  STATE OF TEXAS     )

2                  REPORTER'S CERTIFICATION

3              I, DEBBIE D. CUNNINGHAM, CSR, hereby

4  certify that the witness was duly sworn and that this

5  transcript is a true record of the testimony given by

6  the witness.

7              I further certify that I am neither

8  counsel for, related to, nor employed by any of the

9  parties or attorneys in the action in which this

10 proceeding was taken.  Further, I am not a relative or

11 employee of any attorney of record in this cause, nor am

12 I financially or otherwise interested in the outcome of

13 the action.

14             Subscribed and sworn to by me this day,

15 April 19, 2020.

16

17

18

19             _____
                Debbie D. Cunningham, CSR
20              Texas CSR 2065
                Expiration:  6/30/2021
21              INTEGRITY LEGAL SUPPORT SOLUTIONS
                P.O. Box 245
22              Manchaca, Texas 78652
                www.integrity-texas.com
23              512-320-8690; FIRM # 528

24

25