# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | |
|---|---|
| JARROD STRINGER, et al. <br><br> Plaintiffs, <br><br> v. <br><br> RUTH HUGHS, in her official capacity as Texas Secretary of State and STEVEN C. MCCRAW, in his official capacity as Director of the Texas Department of Public Safety <br><br><br> Defendants. | Civil Action Case No. 5:20-cv-00046-OLG <br><br> **ORAL ARGUMENT REQUESTED** |

## TEXAS DEMOCRATIC PARTY, DSCC, AND DCCC'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................... 1

II.  FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 2

III. RELEVANT LEGAL STANDARDS ........................................................................ 4

    A.   Summary Judgment Standard ............................................................... 4

    B.   Equal Protection Clause ....................................................................... 5

IV.  ARGUMENT ....................................................................................................... 5

    A.   Intervenors have standing. .................................................................. 6

        1.   Intervenors have direct organizational standing. ....................... 7

        2.   Intervenors have associational standing .................................. 13

        3.   Intervenors' injuries are directly traceable to Defendants' conduct. ....... 15

        4.   Intervenors' injuries can be redressed by a favorable decision. .............. 15

    B.   The doctrine of collateral estoppel precludes Defendants from relitigating the merits of this case ........................................................................ 16

    C.   Intervenors are entitled to summary judgment for the reasons detailed in Plaintiffs' previous motion for summary judgment ............................................. 18

V.   CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

CASES                                                                                                   PAGE(S)

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983)................................................................................18

*Bay Cty. Democratic Party v. Land*,
   347 F. Supp. 2d 404 (E.D. Mich. 2004)................................................14

*Burdick v. Takushi*,
   504 U.S. 428 (1992)........................................................................5, 18, 19

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...................................................................................4

*Crawford v. Marion Cty Election Bd.*,
   472 F.3d 949 (7th Cir. 2007) ................................................................13

*Crawford v. Marion Cty. Election Bd.*,
   553 U.S. 181 (2008)...................................................................................5

*Democratic Nat'l Comm. v. Bostelmann*,
   No. 20-CV-249-WMC, 2020 WL 1320819 (W.D. Wis. Mar. 20, 2020) ................................14

*Democratic Nat'l Comm. v. Reagan*,
   329 F. Supp. 3d 824 (D. Ariz. 2018), *aff'd*, 904 F.3d 686 (9th Cir. 2018),
   *reh'g en banc granted*, 911 F.3d 942 (9th Cir. 2019), *rev'd on other grounds
   and remanded*, *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir.
   2020) .........................................................................................12, 14

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
   No. 20-1538 (7th Cir. Apr. 3, 2020) ......................................................14

*Democratic Party of Ga., Inc. v. Crittenden*,
   347 F. Supp. 3d 1324 (N.D. Ga. 2018) ..................................................12

*Fla. Democratic Party v. Hood*,
   342 F. Supp. 2d 1073 (N.D. Fla. 2004)..................................................14

*Fla. Democratic Party v. Scott*,
   215 F. Supp. 3d 1250 (N.D. Fla. 2016)..............................................13, 14

*Fla. State Conference of N.A.A.C.P. v. Browning*,
   522 F.3d 1153 (11th Cir. 2008) ...............................................................8

*Friends for the Earth, Inc. v. Chevron Chem. Co.*,
   129 F.3d 826 (5th Cir. 1997) ................................................................13

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
   528 U.S. 167 (2000)...................................................................................6

# TABLE OF AUTHORITIES

CASES                                                                                      PAGE(S)

*Ga. Republican Party v. Sec. & Exch. Comm'n*,
  888 F.3d 1198 (11th Cir. 2018) ..................................................14

*Green Party of Tenn. v. Hargett*,
  767 F.3d 533 (6th Cir. 2014) ......................................................7

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)....................................................................7

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977)...............................................................7, 13

*Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*,
  946 F.3d 649 (5th Cir. 2019) ....................................................15

*Langley v. Price*,
  926 F.3d 145 (5th Cir. 2019) ....................................................18

*LaRoque v. Holder*,
  650 F.3d 777 (D.C. Cir. 2011) ...................................................7

*Lee v. Va. State Bd. of Elections*,
  188 F. Supp. 3d 577 (E.D. Va. 2016), *aff'd*, 843 F.3d 592 (4th Cir. 2016)...........................12

*Lujan v. Def. of Wildlife*,
  504 U.S. 555 (1992)................................................................6, 7

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)................................................................4, 5

*Norman v. Reed*,
  502 U.S. 279 (1992)....................................................................5

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ......................................................8

*Ohio Org. Collaborative v. Husted*,
  189 F. Supp. 3d 708 (S.D. Ohio 2016), *rev'd sub nom. on other grounds*, *Ohio
  Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016)....................................12

*Owen v. Mulligan*,
  640 F.2d 1130 (9th Cir. 1981) ....................................................7

*Parklane Hosiery Co., Inc., v. Shore*,
  439 U.S. 322 (1979)..................................................................16

*Pye v. Oil States Energy Servs., LLC*,
  233 F. Supp. 3d 541 (W.D. Tex. 2017)........................................5

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
   140 S.Ct. 1205 (2020) ........................................................................................14

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ..............................................................................................1

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
   547 U.S. 47 (2006) ................................................................................................6

*Sandusky Cty. Democratic Party v. Blackwell*,
   387 F.3d 565 (6th Cir. 2004) ..............................................................................14

*Schiaffo v. Helstoski*,
   492 F.2d 413 (3d Cir. 1974) ..................................................................................7

*Schulz v. Williams*,
   44 F.3d 48 (2d Cir. 1994) ......................................................................................7

*Smith v. Boyle*,
   144 F.3d 1060 (7th Cir. 1998) ..............................................................................7

*Stringer v. Pablos*,
   320 F. Supp. 3d 862 (W.D. Tex. 2018) ........................................................ passim

*Stringer v. Whitley*,
   942 F.3d 715 (5th Cir. 2019) .......................................................................1, 3, 11

*Tex. Democratic Party v. Benkiser*,
   459 F.3d 582 (5th Cir. 2006) ....................................................................7, 13, 14

*Tex. Indep. Party v. Kirk*,
   84 F.3d 178 (5th Cir. 1996) ..................................................................................5

*Texas v. United States*,
   945 F.3d 355 (5th Cir. 2019) ................................................................................6

*Winters v. Diamond Shamrock Chem. Co.*,
   149 F.3d 387 (5th Cir. 1998) ........................................................................16, 17

**OTHER AUTHORITIES**

Fed. R. Civ. P. 24(a)(2) ..............................................................................................3

Fed. R. Civ. P. 24(b) ..................................................................................................3

Fed. R. Civ. P. 56(a) ..................................................................................................4

Fed. R. Civ. P. 56(b) ..................................................................................................4

## TABLE OF AUTHORITIES

CASES                                                                          PAGE(S)

Federal Rule of Civil Procedure 56 .................................................................................2

Restatement (Second) of Judgments § 27, cmt. j.........................................................17

# I.       INTRODUCTION

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). This Court has already determined that Defendants' refusal to treat online driver's license transactions the same as those undertaken in person or by mail—where in-person and mail interactions offer the opportunity for simultaneous voter registration, but online interactions do not—restricts the right to vote in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. *See Stringer v. Pablos*, 320 F. Supp. 3d 862, 900-901 (W.D. Tex. 2018) ("*Stringer I*"). That holding was based on a robust factual record wherein "the key facts of th[e] case [were] undisputed," and Defendants' justification for the difference in treatment unfounded. *Id*. at 868. On appeal, the Fifth Circuit reversed because it found that the original individual voter plaintiffs lacked standing, but in doing so, it expressly did not reach the merits. *See Stringer v. Whitley*, 942 F.3d 715, 726 (5th Cir. 2019) ("*Stringer I*").[1]

Rather than taking the opportunity to voluntarily correct their unconstitutional conduct, Defendants have persisted in maintaining this unlawful voter registration regime, which unjustifiably treats similarly situated voters differently, with resulting injuries to countless Texans' most fundamental constitutional rights. Intervenors are political party organizations that have both direct organizational and associational standing to proceed with this action, and which sought and were granted leave to participate in this action as Plaintiffs, in order to cure the standing issue. Nothing has changed regarding the merits of this case since it was previously before the Court on

---

[1] The individual voter plaintiffs who originally brought this action, and whose injuries were the subject of the Fifth Circuit's decision are referred to throughout this brief as the "Original Plaintiffs."

plaintiffs' motion for summary judgment in *Stringer I*, and the relevant facts remain undisputed. Specifically, it is not in dispute that Defendants *still* do not provide simultaneous updates to voter registration information for voters who update their driver's license information with the Texas Department of Public Safety ("DPS") online. And Defendants' justifications for their actions also remain the same: they continue to erroneously assert that compliance with a handwritten signature requirement under state law justifies their illegal conduct, even though they admittedly still rely on electronically captured signatures for driver's license transactions and voter registration applications.[2] It also remains true that providing a simultaneous voter registration application to online driver's license customers would be a simple and cost-effective task for Defendants.

With the standing issue now addressed, Intervenors are entitled to judgment as a matter of law under Federal Rule of Civil Procedure 56. Because the Fifth Circuit's decision did not address the merits of Intervenors' Equal Protection claim, which were already fully and fairly litigated in *Stringer I*, Defendants are barred by the doctrine of collateral estoppel from relitigating the question of whether their conduct violates equal protection. In the alternative, Intervenors move for summary judgment based on the record before this Court in *Stringer I* and the record developed in this litigation (referred to as *Stringer II*) thus far.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

On May 10, 2018, following more than two years of litigation, this Court granted summary judgment for Plaintiffs, holding that Defendants' failure to provide simultaneous voter registration for voters who updated their driver's license information online violated the National Voter

---

[2] *See* Defs.' Supp. Br. in Opp. to Pls.' & Pl.-Intervenors' Req. for Prelim. Inj. ("Defs.' Supp. Br."), ECF No. 74 at 11 (arguing Plaintiffs and Intervenors are trying to "force the State to accept online transactions that are not themselves done under the signature of the voter registration applicant").

Registration Act ("NVRA") and the Equal Protection Clause of the Fourteenth Amendment. *Stringer I*, 320 F. Supp. 3d at 900-901, *rev'd and remanded sub nom. Stringer I*, 942 F.3d at 715. This Court's ruling was based on an extensive and robust record, which is incorporated in the 204-page appendix filed by Plaintiffs in support of their motion for summary judgment and adopted and incorporated herein. *See* Appx. 1-204, Ex. A.

The Fifth Circuit's reversal of this Court's order in *Stringer I* was based entirely on its conclusion that the Original Plaintiffs lacked standing; the panel expressly did not reach the merits. *See* 942 F.3d at 720-23. The Fifth Circuit's mandate was issued on December 5, 2019, returning the case to this Court. Appx. 268-283, Ex. C. Because Defendants have since refused to bring their voter registration practices into compliance with the requirements of the U.S. Constitution and the NVRA, a combination of some Original Plaintiffs and new plaintiffs ("*Stringer II* Plaintiffs") commenced this litigation and moved for a preliminary injunction. Intervenors moved to intervene in this litigation, and this Court granted their motion on January 21, 2020. *See* ECF No. 27 (granting intervention under both Fed. R. Civ. P. 24(a)(2) and 24(b)). One week later, the Court granted Intervenors' motion to join Plaintiffs' motion for a preliminary injunction. ECF No. 40. That same day, the Court heard argument on that preliminary injunction motion, and Intervenors moved for leave to file a motion for summary judgment, which Defendants opposed in large part because they had not yet conducted discovery on Intervenors' standing. *See* Defs.' Resp. in Opp. to Intervenors' Mot. for Leave to File Mot. for Summ. J., ECF No. 50.

During the Court's January 28th hearing on the preliminary injunction motion, Defendants admitted that their conduct has not changed since this Court decided *Stringer I*, but they again conjured up imaginative difficulties and impediments to swiftly bringing their voter registration activities into compliance. Further, Defendants' counsel repeatedly conceded that none of the

material facts have changed, stating: "Your Honor, I don't think that the facts have changed materially or relevantly since Stringer One, and I think as [Plaintiffs] laid them out, overall we don't have an objection to their characterization of the process," Appx. at 688. Defense counsel reiterated this repeatedly. *See id*. at 741 ("There have been no material changes with our practices with respect to online driver's license renewal and DPS."); *id*. at 742 ("The practices and law hasn't changed.").

Subsequently, at Plaintiffs' request, the Court ordered the parties to engage in discovery on a timeline for Defendants to implement a remedy. ECF No. 14. The Court also permitted Defendants to conduct discovery on Intervenors' standing. *Id*. The expedited discovery period ended nearly a month ago on April 30. Because there are no material facts in dispute, and Defendants have now had the opportunity to take that discovery, Intervenors submit that there is no reason to delay consideration of their motion for summary judgment in accordance with Fed. R. Civ. P. 56(b).

## III.    RELEVANT LEGAL STANDARDS

### A.    Summary Judgment Standard

A court must grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has met its initial burden of proving that no genuine issue of material fact exists, the burden shifts to the opposing party to establish otherwise. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). To avoid summary judgment, the opposing party must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In so doing, the opposing party "must do more than simply show that there is some metaphysical doubt

as to the material facts." *Matsushita*, 475 U.S. at 586. In other words, "[m]ere allegations of a factual dispute between the parties will not defeat an otherwise proper motion for summary judgment." *Pye v. Oil States Energy Servs., LLC*, 233 F. Supp. 3d 541, 548 (W.D. Tex. 2017).

### B.    Equal Protection Clause

When a state election law is challenged on First or Fourteenth Amendment grounds, courts apply the *Anderson-Burdick* balancing test. *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996). That standard requires the Court to "weigh 'the character and magnitude of the asserted injury to the rights . . . the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). It is a "flexible" sliding scale, where "the rigorousness of [the court's] inquiry . . . depends upon the extent to which [the challenged law] burdens [voting rights]." *Id*. When a law subjects voting rights to a "severe" restriction, it "must be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 280 (1992). Less severe burdens must be balanced: "[h]owever slight" the burden on voting rights "may appear," "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd*., 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman*, 502 U.S. at 288-89).

### IV.    ARGUMENT

Intervenors have standing and are entitled to summary judgment because, by Defendants' own admission,[3] just as in *Stringer I*, there are no real genuine issues of material fact in dispute.

---

[3] *See* Jan. 30 Order, ECF No. 46 at 1 ("The facts are uncontested and neither side challenges the admissibility of the preliminary injunction evidence."); *see also* Appx. at 688, 741, 742.

Defendants still engage in the *same* illegal conduct for the *same* illegitimate reasons, in violation of equal protection. *Stringer I*, 320 F. Supp. 3d at 900-901. This time, they are barred by the doctrine of collateral estoppel from arguing otherwise. But even if the Court were to decline to apply the doctrine of collateral estoppel, Intervenors are entitled for summary judgment based on the *Stringer I* and *Stringer II* records, as set forth herein and in the Appendix to the Motion.

### A.   Intervenors have standing.

Intervenors have briefed the arguments and authorities in support of their standing multiple times before this Court. Rather than repeat those arguments again here, Intervenors incorporate by reference their briefing in support of their Motion for Preliminary Injunction (ECF Nos. 40, 70, 76) and in opposition to Defendants' Motion to Dismiss (ECF No. 71) herein. For the avoidance of doubt, however, Intervenors briefly summarize their standing arguments below.

Intervenors satisfy Article III's requirements for both organizational standing and associational standing. Defendants' previous arguments to the contrary—including their assertions regarding statutory standing—have no merit.[4] To establish Article III standing, a plaintiff must show (1) an "injury in fact" that is concrete, particularized, and actual or imminent; (2) that the injury is "fairly traceable" to the challenged conduct of the defendant; and (3) that it is likely, not merely speculative, that the injury can be redressed by a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000). It is, of course, axiomatic that "one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *Texas v. United States*, 945 F.3d 355, 377–78 (5th Cir.

---

[4] Defendants argued in their Motion to Dismiss that Intervenors lacked statutory standing. Intervenors fully addressed that baseless argument in their Opposition to Defendants' Motion to Dismiss, ECF No. 71 at 14-15, and do not address it further here.

2019) (quotation and citation omitted). Here, all three Intervenors easily meet this bar.

### 1.  Intervenors have direct organizational standing.

First, as the Fifth Circuit recognized in *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 & n.4 (5th Cir. 2006), "[v]oluminous persuasive authority" holds that political party organizations have standing to challenge state laws that threaten the electoral prospects of their candidates. Intervenors' missions are to elect Democratic candidates, and one of the ways they achieve that is by increasing the number of eligible Democratic voters who are registered to vote, particularly in the upcoming 2020 elections. *See* Appx. at 447-448 (explaining TDP has a goal of registering the 2.6 million unregistered voters in Texas who are likely to vote Democratic); *id.* at 575-76 (DCCC identifies voters who are likely to vote Democratic and seeks to register them to increase the number of voters who "are likely to support Democratic candidates or vote for Democrats"); *id.* at 677-79 (DSCC anticipates transferring significant sums to TDP to spend on field programs, which will involve voter registration efforts to help elect Democratic candidates to national office). Intervenors have standing to challenge Defendants' continuing illegal conduct, which makes it exponentially harder for voters who would support them to register to vote, and thus directly threatens the electoral prospects of the candidates they support. *See Green Party of Tenn. v. Hargett*, 767 F.3d 533, 543-44 (6th Cir. 2014); *LaRoque v. Holder*, 650 F.3d 777, 786 (D.C. Cir. 2011); *Smith v. Boyle*, 144 F.3d 1060, 1061–63 (7th Cir. 1998); *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994); *Owen v. Mulligan*, 640 F.2d 1130, 1132–33 (9th Cir. 1981); *Schiaffo v. Helstoski*, 492 F.2d 413, 417 (3d Cir. 1974).

Second, Intervenors satisfy Article III because Defendants' conduct forces them to divert resources from their usual activities to lessen the harm caused by their conduct, which causes injury to Intervenors' missions, as well as their members or constituencies. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Hunt v. Wash. State Apple Adver. Comm'n*,

432 U.S. 333, 345 (1977). The Fifth Circuit has made clear that the impact to an organization's activities or resources does not need to be large to establish standing; even a slight impairment to its activities is sufficient to establish standing. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 610-12 (5th Cir. 2017). Furthermore, "an organization suffers an injury in fact when a statute 'compel[s]' it to divert more resources to accomplishing its goals," and "'[t]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury.'" *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) (citation omitted). Moreover, the activities undertaken by an organization to counteract a challenged state action need not fall outside the scope of the organization's mission or central initiatives to constitute a diversion of resources sufficient to establish standing. *See OCA-Greater Houston*, 867 F.3d at 610 (finding OCA's primary mission is voter outreach and civic education, and the challenged laws forced OCA to expend more resources on those activities to educate voters about Texas's restrictions on interpretation assistance for English-limited voters).

Here, the evidence demonstrates that Intervenors have diverted resources in the past to counter Defendants' unconstitutional actions. And without an injunction, Intervenors will be forced to divert more resources in the future. *See*, *e.g.*, ECF No. 43-1 at ¶ 10-11 (TDP); ECF No. 43-2 at ¶ 7 (DSCC); ECF No. 43-2 at ¶ 11 (DCCC). Intervenors are spending more money than ever before on voter registration and get-out-the-vote ("GOTV") efforts in Texas, in order to counteract the difficulties imposed by Defendants' illegal conduct. *See* Appx., Exs. G, H, I. TDP, for example, is engaging in the largest voter registration program in the history of the state of Texas, with a goal of registering about 2.6 million unregistered, eligible Democratic voters, in large part because of Defendants' failure to comply with the NVRA and equal protection. ECF No. 43-1 ¶ 11, Appx. at 351, ¶ 16 (TDP).

In addition to making it substantially (and unjustifiably) harder for a significant number of these people to be registered to vote, Defendants' conduct has caused and is likely to continue to cause confusion that itself will result in disenfranchisement among Texas voters who have interacted with DPS online. In response, TDP is devoting significant funds and personnel time to preemptively mass mail voter registration applications to voters who may have attempted to register online through DPS, Appx. at 436-37, and to educate voters on the confusing pitfalls of Texas's voter registration requirements. TDP's voter registration program has required more resources than it would have if Defendants' voter registration practices were constitutional. *See also id*. at 450 ("And most of this we wouldn't have to do if people could update their registration when people got their driver's license updates."). This is because Defendants' conduct limits the effectiveness of TDP's registration program, as TDP must try to register more voters than it would otherwise due to its valid concern that registered individuals will be disenfranchised. ECF No. 28 ¶ 12.

Defendants' conduct has similarly caused DCCC and DSCC to divert resources from other efforts to elect Democrats to the U.S. House of Representatives and U.S. Senate, respectively. Both directly and through its support of the TDP, DCCC will have to divert resources from its other work to increasing its voter registration and GOTV efforts in Texas. Moreover, DCCC is spending more money in Texas on voter registration and GOTV efforts than it otherwise would. *See* Appx. 580 (DCCC stating that Defendants' violations "will inevitably lead us to have to spend more money on voter registration and more time making sure we are educating voters, that they know that they might not have been registered to vote or had their address updated if they changed any information online through the DPS website"). For example, DCCC has already spent nearly $400,000 this election cycle to compensate a consultant, Sisneros Strategies, to conduct a robust

program to register Texas voters. Appx. at 363, ¶ 6; *id*. at 568-69. DCCC has opened four offices in Texas, *id*. at 514, and hired staff on the ground to both engage with and register voters. *Id*. at 568-69. DCCC anticipates ultimately spending millions of dollars to register and mobilize voters in Texas in advance of the 2020 elections. ECF No. 43-2 ¶ 6; Appx. at 363, ¶ 7. Neither DCCC nor DSCC have unlimited funds, and because both are national party committees, they have had to, and will continue to have to, divert resources from other states to voter registration and GOTV programs in Texas because "voter registration's going to have to be a higher priority than it might be in another state where it's easier to register folks." Appx. at 643; *id*. at 586 (DCCC explaining the importance of voter registration in Texas). DCCC, for example, could have spent the $400,000 (or some portion thereof) that it paid for voter registration to Sisneros Strategies on digital voter persuasion efforts to protect swing districts within Texas and nationwide.

In addition, DCCC and DSCC actively support TDP's voter registration and GOTV efforts through financial and staffing resources, ECF No. 43-2 ¶ 9. Through a program called the "coordinated campaign," DCCC and DSCC each plan to transfer a significant amount of funds to TDP to support Democratic candidates in Texas in races up and down the Democratic ticket. This election cycle especially, given the difficulties caused by Defendants' conduct, DCCC and DSCC will transfer funds to the coordinated campaign to help fund TDP's voter education and voter engagement programs on the ground. DCCC has already transferred over $145,000 to TDP for voter registration this election cycle, Appx. at 567, 569 ("We have – with the money that we have sent to the Texas Democratic Party, I believe at least two people who have been hired with the express purpose of assisting voter registration efforts."). And, DCCC anticipates transferring more, given its need to help support TDP's voter registration program to achieve its mission, which, as explained, is substantially more costly because of Defendants' illegal conduct. Appx. at 363, ¶ 8.

In advance of the 2020 elections, DSCC intends to give significant sums to TDP to spend on its field program, which will necessarily involve, among many things, voter registration efforts, to help elect Democratic candidates from Texas to national office. Appx. at 657, 665, 677-79. Thus far this election cycle, DSCC has transferred $25,000 to the TDP. *Id.* at 657. DCCC and DSCC support TDP's field programs because they increase the number of registered Democratic voters in Texas and the number of voters who support DCCC's and DSCC's endorsed candidates. Appx. at 565, 586.

DCCC and DSCC are injured by Defendants' conduct in the same way that TDP is injured: their voter registration and GOTV efforts are rendered ineffective when a voter they convinced to show up to the polls to vote is denied the right to cast a ballot that will be counted because the voter was not registered to vote during their online driver's license transaction. That voters will be disenfranchised by Defendants' violation is a certainty at this point; indeed, it already happened with the original plaintiffs in this case. *See Stringer I*, 942 F.3d at 726 (Ho, J., concurring) (noting that Original Plaintiffs were injured by Defendants' conduct because "[t]hey were unable to exercise their right to vote in past election cycles. And it is a right they will *never* be able to recover.") (emphasis in original). The only reason that the parties are not able to identify the precise number of voters who have indicated they wish to apply to register to vote while transacting with DPS online is because DPS (which is the only entity that could potentially identify all of those voters) had not ascertained that number during discovery. ECF. No. 69-1 at 20, 64-65. Intervenors must spend additional funds and allocate more resources to educate and register those who mistakenly believe they registered to vote through DPS's website and are denied the right to vote at the polls. They must also persuade additional voters to turn out to vote in order to compensate for voters who are disenfranchised due to Defendants' conduct. ECF No. 43-3 ¶ 7; Appx. 367, ¶

5; *id.* at 655-56, 657.

These examples of ways in which Intervenors have been forced to divert resources to combat and address Defendants' actions are more than sufficient to satisfy Article III's standing requirement for political party entities like Intervenors in a case such as this. *See, e.g.*, *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018), *aff'd*, 904 F.3d 686 (9th Cir. 2018), *reh'g en banc granted*, 911 F.3d 942 (9th Cir. 2019), *rev'd on other grounds and remanded*, *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) (finding plaintiffs DNC, DSCC, and Arizona Democratic Party had direct organizational standing to challenge election laws that will require them "to retool their GOTV strategies and divert more resources to ensure that low-efficacy voters are returning their early mail ballots . . . [and] to educate their voters" on those laws); *Lee v. Va. State Bd. of Elections*, 188 F. Supp. 3d 577, 584 (E.D. Va. 2016), *aff'd*, 843 F.3d 592 (4th Cir. 2016) (finding Democratic Party of Virginia "has shown sufficient injury primarily in the form of diversion of time, talent, and resources to educate their voters and implement the requirements of the Virginia voter identification law"); *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1337 (N.D. Ga. 2018) (holding Democratic Party of Georgia's "diversion of resources from preparation for the upcoming runoff elections to assisting individuals impacted by the handling of absentee and provisional ballots is all the injury needed to meet the injury-in-fact requirement"); *Ohio Org. Collaborative v. Husted*, 189 F. Supp. 3d 708, 726 (S.D. Ohio 2016), *rev'd sub nom. on other grounds*, *Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016) (holding Ohio Democratic Party had shown injury-in-fact because "the challenged provisions will force [it] to divert resources from ensuring their members and constituents vote to counteracting the negative effects of the challenged provisions.").

12

### 2.      Intervenors have associational standing.

In addition to establishing standing based on injuries sustained by the organizations themselves, Intervenors have standing based on the injuries suffered by their members and constituents. An organization may bring suit on behalf of its members or constituents when: (1) its members and constituents would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor relief requested requires the participation of individual members or constituents in the suit. *Benkiser*, 459 F.3d at 587 (citing *Hunt*, 432 U.S. at 345). An organization is not required to have a formal membership structure in order to assert standing on behalf of its constituents or supporters. *See Hunt*, 432 U.S. at 345 (holding an organization that possessed the indicia of membership and was responsive to those constituents could assert associational standing); *see also Friends for the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997) (finding nonprofit environmental organization had associational standing even though it did not have formal membership requirements). But in any event, Intervenors have sufficiently alleged that they *do* have members, whom they consider to be Democratic voters and supporters. ECF No. 28 at ¶¶ 11-13; App. at 466, 594, 672.

Courts have repeatedly held that political party committees like Intervenors have associational standing on behalf of their voter members when they have challenged state laws that make it more difficult for their members to engage in the political process. *See*, *e.g.*, *Crawford v. Marion Cty Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (finding the "Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new [photo ID] law"); *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1254 (N.D. Fla. 2016) (holding Florida Democratic Party had standing on behalf of voters "who intend[ed] to

register as Democrats and who will be barred from voting" given state's closure of voter registration).[5] Indeed, in a voting case brought recently to address burdens imposed on voters by Wisconsin state election laws in the context of the current public health crisis, a federal district court found that both the DNC and the Democratic Party of Wisconsin had standing to sue on behalf of their voter members who would face undue burdens on their right to vote in elections held during the pandemic. *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1320819, at *3 (W.D. Wis. Mar. 20, 2020).[6]

Here, Intervenors have standing to challenge Defendants' unconstitutional conduct on behalf of Democratic Texas voters (their members and constituents) who are not able to register to vote when they update their addresses or renew their licenses with DPS using its online system, including at least one of the individual *Stringer II* Plaintiffs, John Harms, who voted in the March Democratic primary. ECF No. 74-1 35:5-11. Any of these voters could sue in their own right, and Intervenors have standing to carry this lawsuit forward to protect their interests. Moreover, Intervenors seek systemic changes to the online driver's license system so that *all* eligible voters among their membership who update their driver's licenses online will have an opportunity to simultaneously register to vote. Intervenors' requested declaratory and injunctive relief does not require individual voters to participate in this lawsuit. *Benkiser*, 459 F.3d at 588 (finding

---

[5] *See also, e.g.*, *Reagan*, 329 F. Supp. 3d at 831; *Ga. Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1203 (11th Cir. 2018); *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 573-74 (6th Cir. 2004); *Bay Cty. Democratic Party v. Land*, 347 F. Supp. 2d 404, 422 (E.D. Mich. 2004); *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004); *Scott*, 215 F. Supp. 3dat 1254.

[6] This standing decision was not disturbed by either the Seventh Circuit or the Supreme Court, both of which issued orders in subsequent emergency appellate proceedings. *See Democratic Nat'l Comm. v. Republican Nat'l Comm.*, No. 20-1538 (7th Cir. Apr. 3, 2020), *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205 (2020).

associational standing on behalf of TDP's members, proven in part by the type of relief sought, i.e. an injunction, which benefits the whole group).

### 3.    Intervenors' injuries are directly traceable to Defendants' conduct.

Intervenors easily demonstrate that their injuries are traceable to Defendants. Article III does not "require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation,'" *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). It is satisfied where it is shown that the defendants' conduct has a "determinative or coercive effect upon the action of someone else." *Id*. Here, Defendants' continued violations have already caused the disenfranchisement of the original plaintiffs in this action and are all but certain to cause further disenfranchisement in upcoming elections if Defendants are not forced to comply with the law. The disenfranchisement of Intervenors' members and constituents, and the diversion of their resources to combat this disenfranchisement injures Intervenors as described above, *see supra* at 6-14, and satisfies Article III's requirements.

### 4.    Intervenors' injuries can be redressed by a favorable decision.

An injunction that requires Defendants to take affirmative steps to comply with the Equal Protection Clause would redress Intervenors' injuries. "To satisfy redressability, a plaintiff must show that 'it is *likely*, as opposed to merely *speculative*, that the injury will be redressed by a favorable decision,'" and "[t]he relief sought needn't completely cure the injury . . . it's enough if the desired relief would lessen." *Inclusive Cmtys. Project*, 946 F.3d at 655 (citation omitted). This Court need not search far to determine that a favorable ruling would redress Intervenors' injuries, as the Court's previous Final Order in this litigation would do precisely that. *See* Appx. 285-291, Ex. D. Intervenors have satisfied the standard for redressability under Article III.

**B.** **The doctrine of collateral estoppel precludes Defendants from relitigating the merits of this case.**

Defendants are precluded from relitigating the equal protection claim under the doctrine of collateral estoppel, which promotes judicial economy by preventing "needless litigation." *Parklane Hosiery Co., Inc., v. Shore*, 439 U.S. 322, 326 (1979). It is ironic that Defendants complain that Intervenors waste the Court's time by arguing that the doctrine of collateral estoppel applies, *see* ECF No. 73 at 10, when Defendants have dragged their feet since this litigation commenced. Defendants are not entitled to a second bite at the apple to relitigate issues that have already been thoroughly briefed and examined, and that were not disturbed on appeal. When determining whether the doctrine of collateral estoppel applies, federal courts analyze whether "(1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine." *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 391 (5th Cir. 1998). This case satisfies each factor.

*First*, Intervenors' Complaint sets forth the exact same equal protection claim that the parties have already litigated. *Compare* ECF No. 28 (Intervenors' Complaint), *with Stringer I*, Appx. 293-311, Ex. E at ¶¶ 1, 20-21, 59. There can be no doubt that Intervenors satisfied the first factor necessary to apply collateral estoppel.

*Second*, the equal protection claim was fully and vigorously litigated in the previous action. That Intervenors were not parties in *Stringer I* makes no difference because collateral estoppel applies against Defendants, and Defendants were parties to the prior suit and had a full and fair opportunity to defend their actions. Defendants argued then, as they do now, that "state law prevent[ed] them from complying with federal law." *Stringer I*, 320 F. Supp. 3d at 868. Defendants

never disputed the underlying facts; in fact, they conceded—as they still do—that eligible voters were renewing their licenses and changing their addresses online and that these transactions did not simultaneously accomplish voter registration. *See id.* at 878 ("This is a very possible thing to do what you're saying if it was legal, and it's not legal . . . So I'm not contesting the logistics of it. We can agree that it's a possible thing to do."); *see also* ECF No. 69-1 at 44-45, 53-54 (Secretary of State Division Director, stating "what I said is I don't think it's going to require a change [to the SOS electronic voter registration database]. . . . And [if a change is necessary,] the cost won't be very much, and it will only be a one-time cost, but I just don't know if it's even going to be necessary"). The Court's ultimate order in *Stringer I* turned squarely on whether Texas law prevented Defendants from allowing simultaneous registration for online transactions with DPS, and after extensive analysis, found that Texas must allow for simultaneous registration for online transactions with DPS. *Stringer I*, 320 F. Supp. 3d at 900-901.

*Third*, the issues underlying Intervenors' equal protection claim were necessary to support the Court's initial judgment. *See, e.g.*, *Winters*, 149 F.3d at 392 (finding this factor met when the issue "was integrally related to—indeed, it constituted the crux of—the particular judgment"). The issue underlying Intervenors' equal protection claim is whether Texas must allow for simultaneous voter registration when eligible voters complete renewal or change of address applications with DPS online. *See generally* ECF No. 28. It is indisputable that the determination of the issue—that is, whether Texas must allow for simultaneous online voter registration—was necessary and essential to this Court's resulting judgment. *See* Restatement (Second) of Judgments § 27, cmt. j (1982) (instructing collateral estoppel should be applied when "the issue was actually recognized by the parties as important and by the trier as necessary to the first judgment").

*Finally*, there are no other circumstances that would otherwise make it unfair to apply

collateral estoppel. In particular, collateral estoppel applies here despite the Fifth Circuit's reversal in *Stringer I* because that decision did not address the merits and thus does not control the substance of the Court's original judgment. *See Langley v. Price*, 926 F.3d 145, 167 (5th Cir. 2019) ("When a judgment is partially reversed on appeal, '[t]here is no preclusion as to the matters vacated or reversed.").

### C.  Intervenors are entitled to summary judgment for the reasons detailed in Plaintiffs' previous motion for summary judgment.

Even if the Court declines to apply the doctrine of collateral estoppel, Intervenors are nonetheless entitled to summary judgment for the reasons detailed in Plaintiffs' Motion for Summary Judgment in *Stringer I*. Intervenors expressly adopt Plaintiffs' motion for summary judgment and appendix in support from *Stringer I*, which are included in the Appendix to this Motion. *See* Appx. 1-204, 313-344, Exs. A, F.

As previously noted, Defendants had a full and fair opportunity to litigate on that record and, perhaps even more importantly, have conceded that the facts have *not* changed "materially or relevantly since" *Stringer I*, that Plaintiffs have accurately laid those facts out, and that Texas's "practices" and implementation of the law (as it views it) have not changed. Appx. at 688, 741, 742. Requiring the parties to go through the charade of putting together again what would effectively be the exact same evidentiary record would only serve to waste everyone's—including the Court's—time, entirely unnecessarily. Indeed, even Defendants appear to acknowledge as much. *See* ECF No. 50 (defense counsel conceding it may be "appropriate to rely upon portions of the factual record developed in *Stringer I* in the interests of judicial and party economy").

Intervenors' equal protection claim is properly evaluated under the legal test derived from *Anderson*, 460 U.S. 780, and *Burdick*, 504 U.S. 428. The *Anderson-Burdick* test requires courts to weigh "the character and magnitude" of the alleged burden, against the "precise interests put

forward by the State." *Burdick*, 504 U.S. at 434. This assessment must "tak[e] into consideration the extent to which those interests make it necessary to burden the [P]laintiffs' rights." *Id*. at 428. Any burden, however slight, "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Stringer I*, 320 F. Supp. 3d at 898.

Defendants' conduct fails the *Anderson-Burdick* test and violates equal protection. *Id*. at 899-901. Eligible voters are unduly burdened by Texas's refusal to allow for simultaneous online voter registration, and these burdens are not outweighed by any state interests. *Id*. The State's purported interest, described in Defendants' Motion for Summary Judgment, *id.* at ECF No. 80, and response to Plaintiffs' Motion for Summary Judgment, *id.* at ECF No. 86, is that the Texas Election Code requires a physical signature. Defendants concede that this remains their justification for not complying with federal law. Appx. at 691 (Defendants argue that "[s]tate law requires that a voter registration application be in writing and signed by the registrant.").

This justification is insufficient to justify the burdens on eligible voters for several reasons. As this Court previously held, "neither federal nor state law limits the signature requirement to physical hand written signatures on paper." *Stringer I*, 320 F.Supp.3d at 899. Moreover, "DPS already uses electronic records and previously imaged electronic signatures for every Texan that uses the online system for driver's license renewal or change of address," and the Secretary of State uses those electronic signatures, admitting "it never uses physical, manual, or wet ink handwritten signatures on paper for voter registration purposes." *Id*.; *see also* Appx. at 39, 42, 45-46. Defendants' use of previously imaged electronic signatures for DPS transactions and voter registration purposes has not changed since *Stringer I. See* Appx. at 698 (defense counsel explaining the signature captured during in-person transactions at DPS is "done on an electronic pad, so an image of that handwritten signature is captured"). Therefore, it remains true that "neither

19

the law nor the facts support Defendants' alleged justification for limiting simultaneous voter applications to in-person and mail motor voter transactions and refusing simultaneous voter applications for motor voters that renew or change their driver's license online." *Stringer I*, 320 F. Supp. 3d at 900.

The additional discovery taken in this case has made clear that Defendants can take the remaining necessary steps to provide a fully simultaneous, non-duplicative voter registration application to voters who update their driver's license information online in a matter of weeks. *See Stringer II*, SA-20-CV-46, ECF No. 69. And, the cost to Defendants to implement this system is negligible or non-existent. ECF No. 69-1 at 44-45, 53-54 (Secretary of State Division Director, stating "what I said is I don't think it's going to require a change [to the SOS electronic voter registration database]. . . . And [if a change is necessary,] the cost won't be very much, and it will only be a one-time cost, but I just don't know if it's even going to be necessary"). This Court should order Defendants to implement a fully compliant system permanently, so that all future Texas motor voters are protected from the disenfranchisement that is presently resulting from and—absent this Court's intervention, will continued to result from—Defendants' long-standing violations.

## V.    CONCLUSION

For the foregoing reasons, Intervenors respectfully ask the Court to grant their Motion for Summary Judgment. A slight modification of the Court's previous injunction would be sufficient here. Plaintiffs have accordingly attached both a proposed final order, Appx. 780-87, Ex. O, as well as a redline comparing their proposal to the Court's previous order. Appx.771-78, Ex. N.

Dated: May 29, 2020.                    Respectfully submitted,

                                        /s/ Emily Brailey
                                        John Hardin
                                        TX State Bar No. 24012784
                                        PERKINS COIE LLP
                                        500 N. Akard St., Suite 3300
                                        Dallas, TX 75201
                                        Telephone: (214) 965-7743
                                        Facsimile: (214) 965-7793
                                        JohnHardin@perkinscoie.com

                                        Marc E. Elias*
                                        Aria Branch*
                                        John M. Geise*
                                        Emily Brailey*
                                        PERKINS COIE LLP
                                        700 Thirteenth St., N.W., Suite 600
                                        Washington, D.C. 20005-3960
                                        Telephone: (202) 654-6200
                                        Facsimile: (202) 654-9959
                                        melias@perkinscoie.com
                                        jgeise@perkinscoie.com
                                        ebrailey@perkinscoie.com

                                        Counsel for the Intervenors

                                        Chad W. Dunn
                                        TX State Bar No. 24036507
                                        Brazil & Dunn, LLP
                                        4407 Bee Caves Road, Suite 111
                                        Austin, Texas 78746
                                        Telephone: (512) 717-9822
                                        Facsimile: (512) 515-9355
                                        chad@brazilanddunn.com

                                        Robert Leslie Meyerhoff
                                        Texas Democratic Party
                                        314 E. Highland Mall Blvd. #508
                                        Austin, TX 78752
                                        Telephone: 512-478-9800
                                        rmeyerhoff@txdemocrats.org

                                        Counsel for Intervenor Texas Democratic Party

21

*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2020, I filed a copy of the foregoing Texas Democratic Party, DSCC, and DCCC's Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Emily Brailey*