**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| JARROD STRINGER, et al.<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>RUTH HUGHS, in her official capacity as Texas Secretary of State and STEVEN C. MCCRAW, in his official capacity as Director of the Texas Department of Public Safety<br><br>　　　　　Defendants. | Civil Action Case No. 5:20-cv-00046-OLG |

**APPENDIX IN SUPPORT OF TEXAS DEMOCRATIC PARTY, DSCC, AND DCCC'S MOTION FOR SUMMARY JUDGMENT**

| Exhibit | Document Description | Page Numbers |
|---|---|---|
| A. | Appendix to Plaintiffs' Motion for Summary Judgment in Stringer v. Pablos, No. SA-16-CA-257-OG (ECF No. 77-1), filed June 30, 2017 | Appendix 1-204 |
| B. | Order granting Plaintiffs' Motion for Summary Judgment and denying Defendants' Motion for Summary Judgment in Stringer v. Pablos, No. SA-16-CA-257-OG (ECF No. 105), filed May 10, 2018 | Appendix 206-266 |
| C. | Certified copy of USCA Judgment/Mandate in *Stringer v. Pablos*, No. SA-16-CA-257-OG (ECF No. 122), filed December 5, 2019 | Appendix 268-283 |
| D. | Final Judgment in *Stringer v. Pablos*, No. SA-16-CA-257-OG (ECF No. 109), filed May 18, 2018 | Appendix 285-291 |

| Exhibit | Document Description | Page Numbers |
|---|---|---|
| E. | Complaint filed by Plaintiffs in *Stringer v. Pablos*, No. SA-16-CA-257-OG (ECF No. 1), filed March 14, 2016 | Appendix 293-311 |
| F. | Motion for Summary Judgment filed by Plaintiffs in *Stringer v. Pablos*, No. SA-16-CA-257-OG (ECF No. 77), filed June 30, 2017 | Appendix 313-344 |
| G. | Declaration of Glen Maxey in support of Intervenor-Plaintiffs' Opposition to Defendants' Motion to Dismiss, filed on May 14, 2020 (ECF No. 71-2) | Appendix 346-360 |
| H. | Declaration of Alexander Edelman in support of Intervenor-Plaintiffs' Opposition to Defendants' Motion to Dismiss, filed May 14, 2010 (ECF No. 71-3) | Appendix 363-364 |
| I | Declaration of Sara Schaumburg in support of Intervenor-Plaintiffs' Opposition to Defendants' Motion to Dismiss, filed on May 14, 2020 (ECF No. 71-4) | Appendix 366-367 |
| J | Deposition Transcript of the Corporate Representative of the Texas Democratic Party, Tommy Glen Maxey, taken on April 27, 2020. The transcript was subscribed and sworn by the court reporter on May 3, 2020. | Appendix 369-485 |
| K | Deposition Transcript of the Corporate Representative of the DCCC, Jacqueline Newman, taken on April 28, 2020. The transcript was subscribed and sworn by the court reporter on May 11, 2020. | Appendix 487-619 |
| L | Deposition Transcript of the Corporate Representative of the DSCC, Sara Schaumburg, taken on April 30, 2020. The | Appendix 621-682 |

| Exhibit | Document Description | Page Numbers |
|---------|---------------------|--------------|
|  | transcript was subscribed and sworn by the court reporter on May 8, 2020. |  |
| M | Transcript of Preliminary Injunction Hearing before the Honorable Orlando L. Garcia, Chief District Court Judge, held on January 30, 2020 (ECF No. 57) | Appendix 684-769 |
| N | Proposed Final Judgment (Redlined) | Appendix 771-778 |
| O | Proposed Final Judgment (Clean) | Appendix 780-787 |

Dated:  May 29, 2020                              Respectfully submitted,


                                                  */s/ Emily Brailey*
                                                  _____
                                                  Respectfully submitted,

                                                  John Hardin
                                                  TX State Bar No. 24012784
                                                  PERKINS COIE LLP
                                                  500 N. Akard St., Suite 3300
                                                  Dallas, TX 75201
                                                  Telephone: (214) 965-7743
                                                  Facsimile: (214) 965-7793
                                                  JohnHardin@perkinscoie.com

                                                  Marc E. Elias*
                                                  Aria Branch*
                                                  Emily Brailey*
                                                  John M. Geise*
                                                  PERKINS COIE LLP
                                                  700 Thirteenth St., N.W., Suite 600
                                                  Washington, D.C. 20005-3960
                                                  Telephone: (202) 654-6200
                                                  Facsimile: (202) 654-9959
                                                  melias@perkinscoie.com
                                                  jgeise@perkinscoie.com
                                                  ebrailey@perkinscoie.com

                                                  Counsel for the Intervenors

                                                  Chad W. Dunn
                                                  TX State Bar No. 24036507
                                                  Brazil & Dunn, LLP
                                                  4407 Bee Caves Road, Suite 111
                                                  Austin, Texas 78746
                                                  Telephone: (512) 717-9822
                                                  Facsimile: (512) 515-9355
                                                  chad@brazilanddunn.com

                                                  Robert Leslie Meyerhoff
                                                  Texas Democratic Party
                                                  314 E. Highland Mall Blvd. #508
                                                  Austin, TX 78752
                                                  Telephone: 512-478-9800
                                                  rmeyerhoff@txdemocrats.org

Counsel for Intervenor Texas Democratic Party

*Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 29, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Emily Brailey*

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JARROD STRINGER, *et. al*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| ROLANDO PABLOS, IN HIS OFFICIAL | § | Civil Action No. 5:16-cv-00257-OLG |
| CAPACITY AS THE TEXAS SECRETARY | § | |
| OF STATE and STEVEN C. McCRAW, IN HIS | § | |
| OFFICIAL CAPACITY AS THE DIRECTOR | § | |
| OF THE TEXAS DEPARTMENT OF PUBLIC | § | |
| SAFETY | § | |
| | § | |
| | § | |
| Defendants. | § | |
| | § | |

## APPENDIX TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

1. May 27, 2015 Notice Letter………………………………………………………………1
2. October 23, 2015 Notice Letter…………………………………………………………22
3. November 18, 2015 Notice Letter………………………………………………………25
4. Texas Department of Public Safety Implementation Plan…….…………………………..28
5. Excerpt, Texas Secretary of State Elections Division 34th Annual Election Law Seminar, "DPS Voter Inquiry Web Portal"…………………………………………….....32
6. Excerpts of 30(b)(6) Deposition of Keith Ingram…………………………………………34
7. DL-14A (Rev. 2-17)………………………………………………………………………49
8. DL-43 (Rev. 2-17)………………………………………………………………………52
9. DL-64 (Rev. 2-17)………………………………………………………………………....55
10. Excerpts of 30(b)(6) Deposition of Sheri Gipson………………………………………58
11. Excerpts of Deposition of Sheri Gipson………………………………………………74
12. Excerpts of 30(b)(6) Deposition of John Crawford………………..……………………...83
13. Secretary of State's Supplemental Responses to Plaintiffs' First Requests for Admission…….…..........................................................................................................................93
14. Excerpt from Secretary of State's 32nd Annual Election Law Seminar, Voter Registration 102 Presentation……………………………………………………………107
15. Department of Public Safety's Supplemental Responses to Plaintiffs' First Requests for Admission…………………………………………………………….....111
16. Texas Department of Public Safety Driver License Renewal and Change-of-Address webpage………………………………………………………...129
17. Screenshot of Driver License Renewal Receipt and Temporary License………………131
18. Screenshot of Voter Registration Application………………………………………134

19. Texas Voter Registration Application……………………………………………………136
20. Driver License Renewal and Change-of-Address screen shots………………………...139
21. Excerpts of Deposition of Benjamin Hernandez……………………………………….148
22. Excerpts of Deposition of Jarrod Stringer……………………………………………...166
23. Excerpts of Deposition of John Woods………………………………………………...187

Dated: June 30, 2017.                                    Respectfully submitted,

                                                        By: /s/ Rebecca Harrison Stevens

                                                        Mimi M.D. Marziani
                                                        Texas Bar No. 24091906
                                                        mimi@texascivilrightsproject.org
                                                        Rebecca Harrison Stevens
                                                        Texas Bar No. 24065381
                                                        beth@texascivilrightsproject.org
                                                        Hani Mirza
                                                        Texas Bar No. 24083512
                                                        hani@texascivilrightsproject.org
                                                        Cassandra Champion
                                                        Texas Bar No. 24082799
                                                        champion@texascivilrightsproject.org

                                                        TEXAS CIVIL RIGHTS PROJECT
                                                        1405 Montopolis Drive
                                                        Austin, Texas 78741
                                                        512-474-5073 (Telephone)
                                                        512-474-0726 (Facsimile)

                                                        Peter A. Kraus (*pro hac vice*)
                                                        Texas Bar No. 11712980
                                                        kraus@waterskraus.com
                                                        Charles S. Siegel
                                                        Texas Bar No. 18341875
                                                        siegel@waterskraus.com
                                                        Caitlyn E. Silhan
                                                        Texas Bar No. 24072879
                                                        csilhan@waterskraus.com
                                                        Rachel A. Gross (*pro hac vice*)
                                                        Texas Bar No. 24073608
                                                        rgross@waterskraus.com

                                                        WATERS & KRAUS, LLP
                                                        3141 Hood Street, Suite 700
                                                        Dallas, Texas 75219
                                                        214-357-6244 (Telephone)

214-871-2263 (Facsimile)

*ATTORNEYS FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of June, 2017, a true and correct copy of the foregoing was served upon counsel of record via the Court's ECF system.

*/s/* Rebecca Harrison Stevens

3

# EXHIBIT 1

**waters**kraus

May 27, 2015

*Sent via email and U.S. mail*

The Honorable Carlos H. Cascos
Secretary of State
Executive Division, Office of the Secretary of State
P.O. Box 12697
Austin, Texas 78711
secretary@sos.texas.gov

Re:   **Failure to Comply with Voter Registration Obligations at Texas
Department of Public Safety**

Dear Secretary Cascos,

We write on behalf of several eligible voters in the State of Texas — Mark Berry,
De'Andre Carter, Donovan Cooper, Wendy Faems, Richard Gates, Cynthia Hawkins,
Benjamin Hernandez, Deidre Miller, Marni Phon, Pedro Rodriguez, and Totysa
Watkins — and others similarly situated, to notify you that, based on our investigation,
the Texas Department of Public Safety ("DPS") is not meeting its voter registration
obligations under Section 5 of the National Voter Registration Act of 1993 (the
"NVRA") and corresponding state law. As a result, large numbers of eligible Texas
voters either did not appear on the voter rolls or appeared with incorrect address
information when they attempted to exercise their franchise in 2014 and 2012. A
fraction of these voters complained to government officials and, in some cases, had
their votes counted. More were disenfranchised.

Under the NVRA, every time an eligible resident obtains, renews, or updates his or her
driver's license with DPS, DPS must simultaneously register that person to vote or
update that person's voter registration file.[1]  As set forth below, there is considerable
evidence that the State is violating these mandates on an ongoing and continuing basis.

Indeed, the experiences of numerous Texans demonstrate that the State is not properly
registering voters when they apply for a driver's license at DPS offices or when they

---

[1] 52 U.S.C. § 20503(a)(1). The only exceptions to this rule are when a voter fails to sign the
registration form or states that the change-of-address information is not for registration
purposes. The NVRA's requirements are described in greater detail below.

PARTNERS
C. Andrew Waters (CA, DC, NC, OR, TX)
Peter A. Kraus (CA, MO, TX, WA)
Charles S. Siegel (PA, TX)
Troyce G. Wolf (NY, PA, TX)
Michael L. Armitage (CA, LA)
B. Scott Kruka (AL, TX)
Leslie C. MacLean (PA, TX)
Paul C. Cook (CA)
Gary M. Paul (CA)
Kyla Gail Cole (PA, TX)
John S. Janofsky (CA, DC)
Michael B. Gurien (CA)
Scott L. Frost (CA, DA, IN, PA, TX)
Loren Jacobson (NY, TX)
Jonathan A. George (CA, PA, TX, WA)
Kevin M. Loew (CA)
Gibbs C. Henderson (TX)
Demetrios T. Zacharopoulos (MO)
Dimitri N. Nichols (PA)
Wm. Paul Lawrence, II (LA, TX, VA, WA)
David Bricker (CA, IL)

ASSOCIATES
Joy Sparling (IL)
Susannah B. Chester-Schindler (LA, TX)
Andrew Seitz (OH)
Louisa O. Krakosian (CA)
Caitlyn Silhan (TX)
Erin M. Wood (TX)
Shawna Forbes-King (CA)
R. Walker Humphrey, II (CO, TX)
Anne N. Izzo (NO)
Lina Chagoya (CA, NY)
Oscar Andres Bustos (CA)
Sara E. Coopwood (TX)
Susan M. Ulrich (CA, MI)
Patrick S. Nagler (CA, NY)
Marcelis E. Morris (CA)
Michael P. Connett (CA, PA)
Laura E. Foody (CA)
David C. Humen (TX)
Matthew K. Jackson (TX)
Rajeev K. Mittal (CA)
Jonathan R. Davis (CA)
Lindsey Ann Thomas (MO)

OF COUNSEL
William Gaferston (IL, TX)
Randall L. Iola (IL, CA, TX)
George G. Tankard, III (DC, AB, MD, PA, TX)
Dan Hargrove (TX)
Ketan U. Kharod (TX)
Scott D. Peebles (CA, LA)
Kay Gunderson Reeves (TX, MN)

**WATERS & KRAUS**, LLP ATTORNEYS AND COUNSELORS

**DALLAS:** 3219 McKINNEY AVENUE  DALLAS, TEXAS 75204  **TEL** 214 357 6244  **FAX** 214 357 7252
**BALTIMORE:** 315 NORTH CHARLES STREET  BALTIMORE, MARYLAND 21201  **TEL** 410 528 1153  **FAX** 410 528 1006
**LOS ANGELES:** 222 NORTH SEPULVEDA BOULEVARD  SUITE 1900  EL SEGUNDO, CALIFORNIA 90245  **TEL** 310 414 8146  **FAX** 310 414 8156

APPENDIX 2

D_00009849

Hon. Carlos Cascos
May 27, 2015
Page 2 of 16

submit a renewal or change-of-address form at DPS offices or online. The voters'
experiences are consistent with other information described in this letter: (a) data
maintained by the Elections Division of the Office of the Secretary of State, which
shows that thousands of voters reported DPS voter registration problems between
September 2013 and February 2015; (b) correspondence within DPS during and shortly
after the 2012 general election, which was provided to us in response to a Public
Information Act request; and (c) the findings of a recent report by Battleground Texas
titled *Voting in Texas in 2014*.[2] When combined with publicly-available data — including
declining rates of voter registration within Texas — the conclusion is clear: DPS' voter
registration failures are widespread and systematically undermining the right to vote in
Texas.

Continued compliance with the NVRA and corresponding provisions of state law is
necessary to ensure that all eligible Texas voters have an equal ability to participate in
our democracy. Ultimate responsibility for enforcing the NVRA rests with the Secretary
of State as the State's chief election officer.[3] Accordingly, this letter provides formal
notice to the State of an NVRA violation under 52 U.S.C. § 20510(b) on behalf of Mark
Berry, De'Andre Carter, Donovan Cooper, Wendy Faems, Richard Gates, Cynthia
Hawkins, Benjamin Hernandez, Deidre Miller, Marni Phon, Pedro Rodriguez, Totysa
Watkins, and similarly situated Texas voters.

One note: Voters continue to contact the undersigned counsel with their problems
registering to vote through DPS. As additional voters come forward, they too may
decide to share their stories with the State.

## OVERVIEW OF THE NVRA AND CORRESPONDING STATE LAW

The NVRA was enacted in 1993 to "establish procedures that will increase the number
of eligible citizens who register to vote in elections for Federal office."[4] To achieve this
goal, the NVRA imposes certain requirements upon state motor vehicle bureaus. These
"Motor Voter" provisions have played a critical role in increasing the number of
registered voters nationwide.[5]

---

[2] Mimi Marziani & James Slattery, VOTING IN TEXAS IN 2014, at 6 (2015), *available at*
http://join.battlegroundtx.com/Voting-In-2014.
[3] *Scott v. Schedler*, 771 F.3d 831, 838-9 (5th Cir. 2014) (holding that the chief election officer is
responsible for enforcement of the NVRA); *see also* Tex. Elec. Code Ann. § 31.001(a) (West 2013)
("The secretary of state is the chief election officer of the state.").
[4] 52 U.S.C. § 20501.
[5] *See e.g.*, B. Drummond Ayres Jr., *Law to Ease Voter Registration Has Added 5 Million to the Rolls*,
NEW YORK TIMES, Sept. 3, 1995, http://www.nytimes.com/1995/09/03/us/law-to-ease-voter-
registration-has-added-5-million-to-the-rolls.html; Ari Berman, *How To Make Voting Easier*, THE

Hon. Carlos Cascos
May 27, 2015
Page 3 of 16

Specifically, every time an eligible resident obtains, renews, or updates his or her driver's license with a state motor vehicle bureau like Texas' DPS, the State must "simultaneously" register that person to vote or update that person's voter registration file (unless he or she fails to sign the registration form or states that the change-of-address information is not for registration purposes).[6] In doing so, with limited exceptions, the State may not "require any information that duplicates information required in the driver's license portion of the form."[7]

Texas law reinforces the NVRA's mandates. Under the Texas Election Code, DPS "shall provide," to every individual obtaining or renewing a driver's license, "an opportunity to complete a voter registration application form," and DPS must use "a form and procedure that combines the department's application form for a license or card with an officially prescribed voter registration application form."[8] If the transaction is by mail, DPS must affirmatively "deliver to the applicant by mail a voter registration application form."[9] DPS must also provide a "change of address form and procedure that combines department and voter registration functions," so that when an individual submits a change of address, that "serves as a change of address for voter registration" as well, unless the individual indicates otherwise.[10] Finally, if driver's

---

NATION, May 20, 2013, http://www.thenation.com/blog/174431/how-make-voting-easier (discussing how over 140 million people have registered to vote through procedures put in place by the NVRA).

[6] 52 U.S.C. § 20503(a)(1). The law further provides, in relevant part,

> Each State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application. . . . Any change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes.

*Id.* at § 20504(a)(1)-(2). These provisions apply not only to driver's licenses, but also to "any personal identification document issued by a State motor vehicle authority." *Id.* § 20502(3). In this letter, the term "driver's license" encompasses personal identification cards issued by DPS as well as driver's licenses.

[7] *Id.* at § 20504(a)(2).
[8] Tex. Elec. Code Ann. § 20.063(a) (West 2013); *id.* at § 20.062(a).
[9] *Id.* at § 20.063(b).
[10] *Id.* at § 20.063(c); *id.* § 20.062(a).

APPENDIX 4

D_00009851

Hon. Carlos Cascos
May 27, 2015
Page 4 of 16

license or address information is missing from a voter's registration application, DPS employees have a duty to correct the voter's application.[11]

## FAILURE TO PROPERLY REGISTER VOTERS AT DPS OFFICES

Available evidence indicates that Texas is systemically failing to register Texas voters when they submit a driver's license application, renewal application or change-of-address form in person at DPS offices.

### The Experiences of Individual Voters

Several individual voters have already contacted the undersigned counsel about DPS' failure to properly register them to vote after they attempted to register at DPS offices across Texas:[12]

- **De'Andre Carter**: Mr. Carter moved to Dallas County in May of 2013 after graduating from Texas A&M University in College Station. He renewed his driver's license at a Dallas DPS location in July of 2014, and recalls checking the "yes" box to register to vote in Dallas. Mr. Carter received a new license in the mail a few weeks later, but did not receive a new voter registration card. In preparation for Election Day in November 2014, Mr. Carter called Dallas County to confirm his polling location, but was told that he was still registered in College Station. Upon explaining his attempt to register at DPS, he was told by election officials that the DPS system "was not caught up." Mr. Carter was told that he could cast a provisional ballot, and later went to a polling location and did so; he does not recall being advised to take any further action to ensure that his vote was counted. Ultimately, Mr. Carter received a letter in the mail advising him that his vote was not counted. He later received a voter registration card listing his current Dallas address.

- **Donovan Cooper**: Mr. Cooper and his wife moved to Dallas County from California in the summer of 2014. They went to the Dallas County DPS location in Grand Prairie in July to obtain Texas drivers' licenses and to register to vote. Mrs. Cooper was told that she needed to obtain additional documentation before she was able to complete her application, which she did two weeks later at another DPS location. Mr. Cooper was able to complete his application that day, and recalls checking the "yes" box to indicate that he

---

[11] *See id.* at § 20.063(d).

[12] The voters included in this letter are, disproportionately, residents of Dallas County. This is a result of our early outreach to affected voters in Dallas County after obtaining their mailing addresses from the Dallas County Elections Administration. There is no evidence that problems occur disproportionately at Dallas County DPS offices. Instead, the Secretary of State's data (described below) shows that problems occur at DPS locations across Texas.

APPENDIX 5

D_00009852

Hon. Carlos Cascos
May 27, 2015
Page 5 of 16

wanted to register to vote. Thereafter, Mrs. Cooper received a voter registration card in the mail; Mr. Cooper did not. They attempted to vote together on Election Day and — while his wife was allowed to cast a ballot — Mr. Cooper was only allowed to cast a provisional ballot. He later received notice that his provisional ballot was counted, and then received two voter registration cards in the mail.

- **Cynthia Hawkins**: After moving to Bexar County from another Texas county, Ms. Hawkins went to DPS' Leon Valley location on September 9, 2014 to renew her license and change her address. The clerk asked her if she also wanted to register to vote, and she said "yes." There was no further discussion about voter registration during the encounter, and Ms. Hawkins assumed that she was in fact registered at her current address. On October 31, 2014, the last day of early voting, Ms. Hawkins attempted to vote at the Tobin Library around 4:30 PM. The election worker with whom she spoke told her that she was not registered in Bexar County and thus was only eligible to cast a limited ballot, which was only available in downtown San Antonio at the main early voting location. By that time of day, however, it was too late for Ms. Hawkins to travel downtown. Because Ms. Hawkins underwent a scheduled surgery on Election Day, she was unable to vote at all in the November 4, 2014 election.

- **Richard Gates**: Mr. Gates moved to Collin County from Massachusetts in July of 2014. He and his husband registered their cars and applied for new drivers' licenses at the Garland DPS location shortly after moving. Both Mr. Gates and his husband indicated that they wanted to register to vote during the driver's license application process. A month or so later, Mr. Gates' husband received his voter registration card in the mail; Mr. Gates did not receive one. They went to the Haggard Library during the early voting period and — while his husband was able to vote — Mr. Gates was told that he was not registered. Eventually, he was offered a provisional ballot. Mr. Gates declined to vote a provisional ballot at that time in order to investigate his registration status. He contacted the Secretary of State's office to discuss his attempt to vote, but was told to contact DPS about the matter; DPS, in turn, told him to contact the Secretary of State. He then went to the Davis Library location later in the early-voting period and, after again confirming that he was not listed as a registered voter in the database, he cast a provisional ballot. Mr. Gates later received a letter indicating that his provisional ballot was counted, as well as two registration cards, one effective as of August 21, 2014 and another effective as of December 3, 2014.

- **Deidre Miller**: Ms. Miller moved to Dallas County from Florida in 2014, and went to a Dallas DPS location to obtain a driver's license, register her car, and register to vote in September of 2014. Ms. Miller never received a voter registration card in the mail, but her husband, who had gone to DPS separately, received one a few weeks after he registered at the another DPS location. Ms.

APPENDIX 6

D_00009853

Hon. Carlos Cascos
May 27, 2015
Page 6 of 16

> Miller and her husband attempted to vote on October 31, 2014 and — while her husband was able to cast a ballot — she was told that her name was not on the rolls. She cast a provisional ballot, but does not know whether it was counted.

- **Marni Phon**: Ms. Phon and her husband moved to Tarrant County in the summer of 2014 from Cincinnati, Ohio, and went to the Brentwood Stair Road DPS location to obtain drivers' licenses on August 20, 2014. They were seated next to each other and went through the process side-by-side, both checking the "yes" box to indicate that they wanted to register to vote. Ms. Phon's husband received a registration card in the mail some time later, but Ms. Phon did not. Ms. Phon attempted to vote at Tanglewood Elementary School on Election Day — where her husband had successfully cast a ballot earlier — but was told by an election worker that her name was not on the rolls. After explaining the foregoing, the election worker told her that "this happens a lot." Ms. Phon cast a provisional ballot, but was told conflicting things by the election workers about whether any follow-up steps were necessary in order for her vote to be counted. Because Ms. Phon was traveling out of town, she was unable to take any additional steps, and does not know if her vote was counted.

### Other Evidence Confirms Widespread Registration Problems

These voters' experiences are not unique. Between September 2013 and February 2015, the Secretary of State's Elections Division confirmed over 1,700 incidents reported by voters who checked "yes" on their drivers' license applications at DPS, indicating they wanted to register to vote at that time, but did not appear on the voter rolls.[13] Indeed, during the 12-day early voting period of the November 2012 general election, DPS personnel reported that:

> DPS has received an approximate average of 100 complaints per day. Staff estimates that about half have been customer error, and about

---

[13] Email from Keith Ingram, Dir., Elections Div., to Mimi Marziani, Legal Dir., Battleground Texas (Dec. 9, 2014 2:30 PM) (on file with Battleground Texas); Letter from Lindsey Wolf, General Counsel, Office of the Sec'y of State, to Mimi Marziani, Legal Dir., Battleground Texas (March 2, 2015) & Attachment (on file with Battleground Texas). In the December 9, 2014 email, Mr. Ingram provided the following explanation of this data:

> The SOS and DPS have created a web portal where counties can upload information from voters who tell the county that they attempted to register to vote at DPS. DPS then researches the information and returns an answer. If the voter did request voter registration and the record was not transmitted by the DPS clerk, then the record is transmitted and the registration is made effective on the date that the voter was at the DPS.

APPENDIX 7

D_00009854

Hon. Carlos Cascos
May 27, 2015
Page 7 of 16

> half have been an error on the part of the Customer Service
> Representative.[14]

Similarly, in October and November of 2014, Battleground Texas received dozens of
calls to its public hotline from voters who attempted to register or to update voter
registration information at a DPS office and yet did not appear on the voter rolls.[15]
Moreover, as part of a coordinated voter protection effort during the 2014 election,
Battleground Texas trained and placed volunteer poll watchers at over 200 polling places
on Election Day. As described in *Voting in Texas in 2014*, several poll watcher
volunteers witnessed pervasive problems with the voter rolls that were linked to DPS.
To illustrate: [16]

- After observing voting at one polling location, one volunteer noted that:
  "DPS's failure to update address changes impacted 10-12 voters."

- Another observed a voter who claimed to have registered at DPS but was not
  on the rolls, and then reported: "Judge called elections office and confirmed he
  was not registered. Per other worker this is a common problem with people
  who register at [DPS]."

- A third reported that: "a fair number of folks seem to have had problems who
  claimed to have registered through DPS when getting new or renewing
  license[.]"

Moreover, for the reasons set forth below, we believe that the reports received by the
Elections Division, DPS and Battleground Texas represent just a fraction of the total
voters affected by DPS' failure to properly process voter registrations.

*First*, the incidents highlighted above capture only those voters who contacted
Battleground Texas, DPS or election officials *and* specifically complained about voter
registration problems at DPS. Countless other instances may have occurred when

---

[14] Email from Gretchen Essell to Marguerite Buster, Customer Relations Coordinator, DPS
Driver License Div. (Nov. 5, 2012, 10:19 AM), pg. 13 of document entitled "DPS Internal
Communication – not voter specific" (on file with Battleground Texas); *accord* Email from Tony
Rodriguez, copying Marguerite Buster, Customer Relations Coordinator, DPS Driver License
Div. (Nov. 5, 2012, 10:40 AM), pg. 14 of document entitled "DPS Internal Communication –
not voter specific" (on file with Battleground Texas) ("HQ has been working for over a week
with the Secretary of State's office to validate these registrations and we are finding that more
than 50% of the errors are on the part of the CSRs entering information incorrectly.").
[15] Marziani & Slattery, *supra* note 2, at 6.
[16] Examples are taken from *Voting in Texas in 2014. See id.* at 7.

D_00009855

Hon. Carlos Cascos
May 27, 2015
Page 8 of 16

voters attempted to vote, but are not captured in these data sets for at least the following reasons:

- The voter did not lodge a complaint or complained to a different entity after experiencing the registration problem.

- The voter attempted to complain to DPS, but the complaint was disregarded. An email from the Elections Divisions to county registrars in October of 2012 states that DPS will *not* investigate a voter's registration status at the request of the voter himself or herself. Instead, DPS policy is that "[t]he request can only come from an official of the county."[17]

- The voter complained to a county election official, but did not specifically report an interaction with DPS.

- The voter complained to a county official *and* reported an interaction with DPS, but that complaint is nonetheless not captured in the Elections Division's data. The data provided by the Elections Division comes from just 123 of the state's 264 counties, strongly suggesting that the data set is incomplete.[18]

*Second*, provisional voting data from the five largest counties in Texas shows that 3,820 voters cast provisional ballots during the 2014 general election that were rejected because those voters did not appear on the voter rolls.[19] DPS may very well be to blame for a significant portion of these omissions. And, of course, provisional ballot data does not capture any voter who checked his or her registration status online[20] and then did not attempt to vote after failing to find his or her name on the rolls due to DPS error.

---

[17] Email from Tony Rodriguez to Marguerite Buster, Customer Relations Coordinator, DPS Driver License Div. (forwarding Email from Judy Knapek, Election Specialist, McLennan County, to Ruth Ladd) (quoting Betsy Schonohoff, Voter Registration Dir., Elections Div.) (Oct. 25, 2012, 1:54 AM), pgs. 7–8 of document entitled "DPS Internal Communication – not voter specific" (on file with Battleground Texas).

[18] *See* Email from Keith Ingram to Mimi Marziani, *supra* note 13. The largest counties excluded from the Elections Division's data are El Paso, Bell, Webb, Randall, and Ector.

[19] Marziani & Slattery, *supra* note 2, at 4-5. Notably, Battleground Texas reported that it "received repeated anecdotal reports of voters being turned away without being offered a provisional ballot during the 2014 election, indicating that compliance with the provisional balloting laws may fluctuate from polling place to polling place." *Id.* at 4 (citation omitted). Accordingly, the provisional voting data may actually represent only a portion of the total voters who showed up at the polls but were not on the voter rolls.

[20] The Secretary of State maintains an online portal for voters to view their registration information at https://team1.sos.state.tx.us/voterws/viw/faces/SearchSelectionVoter.jsp.

D_00009856

Hon. Carlos Cascos
May 27, 2015
Page 9 of 16

***Third***, similar issues with DPS voter registration were publicly reported during the 2012 election cycle.[21] An investigation of voter registration rates by the *Houston Chronicle*, for instance, found "unexplained dips in so-called 'motor voter' registrations" and that "several local election officials and volunteers told the *Chronicle* that Houston area voters have long complained about motor voter problems — sometimes discovered only after a would-be motor voter arrives at the polls."[22]

In addition, the Secretary of State's Office sent at least two mass communications to election officials during the 2012 general election cycle concerning DPS voter registration problems. One, according to the *Houston Chronicle*, warned of interruptions in the system to transfer registration information electronically from DPS during the first week of early voting, and was sent after voters "complained about issues with their attempts to register at DPS offices in Tarrant and Harris counties."[23]

Then, at the end of the early voting period, on November 2, 2012, the Elections Division sent an email with the subject line "MASS E-MAIL ADVISORY — (VR/EA) Confirming Provisional Voters with DPS (604)." Noting that "[m]any of you are working with your local DPS offices in order to resolve a voter's registration status," the Elections Division stated that county officials could submit voter registration inquires to DPS by facsimile.[24] But, the Division warned, DPS' ability to actually investigate reported problems "will depend largely on the volume they receive and the timing in which they are received."[25] DPS internal correspondence from that same day confirms that some voters, despite complaining and casting a provisional ballot, would not even have their complaint investigated:

> SOS (Betsy Schonoff) [sic] is going to send an email to all of the voter registrars to instruct them that they must have their requests for verification for the provisional ballots to us by noon on Thursday,

---

[21] Lise Olsen, '*Motor Voters' Missing on Rolls*, HOUS. CHRON., Oct. 28, 2012, http://www.chron.com/news/houston-texas/houston/article/Motor-voters-missing-on-rolls-3987151.php (last updated Oct. 28, 2012, 11:01 PM); *see also* Jessie Degollado, *Veteran Reports Difficulty with Voter Registration*, KSAT.COM, Nov. 6, 2012, http://www.ksat.com/content/pns/ksat/news/2012/11/06/veteran-reports-difficulty-with-voter-registration0.html (last updated Jan. 22, 2014, 4:05 PM); Michael Handley, *Broken Texas Motor Voter Registration Process*, DEMOCRATIC BLOG NEWS (Nov. 3, 2012, 1:00 PM), http://collindemsnews.blogspot.com/2012/11/broken-texas-motor-voter-registration.html.
[22] Olsen, *supra* note 21.
[23] *Id.*
[24] Email from Betsy Schonhoff, Voter Registration Dir., Elections Div., to VRTeam, re: "MASS E-MAIL ADVISORY - (VR/EA) Confirming Provisional Voters with DPS (604)" (Nov. 2, 2012, 6:50 PM) (on file with Battleground Texas).
[25] *Id.*

D_00009857

Hon. Carlos Cascos
May 27, 2015
Page 10 of 16

> [November 8]. We will do our best to process all of them and return
> them by midnight on Friday, but she is telling them there is no
> guarantee. If we don't get them all done, then we don't and she said
> there is nothing we can do at that point.[26]

Indeed, subsequent correspondence indicates that the complaints of at least 302 voters
were received by DPS after the deadline — which was just days after Election Day —
and were subsequently disregarded.[27]

*Finally*, publicly available data indicates two worrisome registration trends in Texas,
which may be attributable, at least in part, to DPS' failure to comply with the NVRA.

To start, recent data from the Elections Assistance Commission ("EAC") shows that
Texas rejected voter registration applications from DPS offices at a much greater rate
than the national average. The invalidity rate for applications from DPS was 4.2%
during the 2012 election cycle — more than twice the national average and more than 9
times the median state's invalidity rate.[28] This statistic underscores that there are serious
flaws in DPS registration processes, particularly given that DPS staff are obligated by
law to correct errors on voters' registration forms.[29]

In addition, data from the EAC and from the Secretary of State shows that voter
registration as a percentage of the total voting age population has been on the decline

---

[26] Email from Marguerite Buster, Customer Relations Coordinator, DPS Driver License Div., to
Margaret Spinks, Manager, DPS Driver License Div. (Nov. 2, 2012, 4:30 PM), pg. 12 of
document entitled "DPS Internal Communication – not voter specific" (on file with
Battleground Texas). This email incorrectly states that the deadline for voter registrars was noon
on Thursday, November 11, 2012. This date never existed, and subsequent correspondence
makes clear that Ms. Buster was actually referring to Thursday, November 8, 2012.
[27] Email from Margaret Spinks, Manager, DPS Driver License Div., to Marguerite Buster,
Customer Relations Coordinator, DPS Driver License Div. (Nov. 15, 2012, 4:15 PM), pgs. 15-18
of document entitled "DPS Internal Communication – not voter specific" (on file with
Battleground Texas).
[28] *See* U.S. E.A.C., THE IMPACT OF THE NATIONAL VOTER REGISTRATION ACT OF 1993 ON THE
ADMINISTRATION OF ELECTIONS FOR FEDERAL OFFICE 2011–2012, at 41 tbl.2a, 55, tbl.2d
(2013), *available at*
http://www.eac.gov/assets/1/Documents/EAC_NVRA%20Report_lowres.pdf (hereinafter
"EAC 2012 REPORT"). This report contains data on the total number of registration applications
received at each state's motor vehicle offices and the number of invalid and/or rejected
registration applications received at these offices, which we used to calculate and compare
invalidity rates.
[29] Tex. Elec. Code Ann. § 20.063(d) (West 2013).

APPENDIX 11

D_00009858

Hon. Carlos Cascos
May 27, 2015
Page 11 of 16

since 2000.[30]   Similarly, EAC data estimates a decline in voter registration as a percentage of the total *citizen* voting age population.  Indeed, EAC data shows that the percentage of the citizen voting age population that is registered to vote in Texas fell almost 7% between 2008 and 2012 — declining from 89.0% in 2008 to 82.9% in 2012.[31]

## FAILURE TO CREDIT ONLINE TRANSACTIONS

Applications submitted to DPS online to renew a driver's license or to update the address associated with a driver's license are governed by the same Motor Voter provisions of the NVRA, which apply to "*[e]ach* State motor vehicle driver's license application (including *any* renewal application)" and "*[a]ny* change of address form submitted . . . for purposes of a State motor vehicle driver's license"[32] and which prohibit requiring duplicative information.[33]  As defined by the *Oxford Dictionary*, the term "each" is "[u]sed to refer to every one of two or more … things"; similarly, the term "any" is "[u]sed to refer to one or some of a thing or number of things, no matter how much or many."[34]  Accordingly, *every* time an individual submits a renewal application or change-of-address form online to DPS, that information must simultaneously be used to update the voter rolls.

In this regard, the State's policies and practices openly violate the NVRA.  A holder of a Texas driver's license can renew that license or update the address information on that

---

[30] EAC 2012 REPORT, *supra* note 28, at 27 tbl. 1a; TEX. SEC'Y OF STATE, *Turnout and Voter Registration Figures*, http://www.sos.state.tx.us/elections/historical/70-92.shtml (last visited April 14, 2015).

[31] *Compare* EAC 2012 REPORT, *supra* note 28, at 37 tbl.1d *with* U.S. E.A.C., THE IMPACT OF THE NATIONAL VOTER REGISTRATION ACT OF 1993 ON THE ADMINISTRATION OF ELECTIONS FOR FEDERAL OFFICE, at 35 tbl.1d (2009), *available at*

http://www.eac.gov/assets/1/AssetManager/The%20Impact%20of%20the%20National%20V oter%20Registration%20Act%20on%20Federal%20Elections%202007-2008.pdf.

[32] 52 U.S.C. §§ 20504(a)(1) & (d) (emphasis added). *See also* U.S. Dep't of Justice, *The National Voter Registration Act of 1993: Questions and Answers*,

http://www.justice.gov/crt/about/vot/nvra/nvra_faq.php (last visited April 24, 2015) ("[T]o the extent that the State provides for remote applications for driver's licenses, driver's license renewals, or driver's license changes of address, via mail, telephone, or internet or other means, then provision must be made to include the required voter registration opportunity as well"); *Scheidler*, 771 F.3d at 834, 837, 841 (holding that plaintiffs lacked standing to pursue NVRA claim regarding remote transactions without vacating the District Court's conclusion that the NVRA applies to both in-person and online transactions); *Georgia State Conference of N.A.A.C.P. v. Kemp*, 841 F. Supp. 2d 1320, 1332 (N.D. Ga. 2012) (denying portion of motion to dismiss that was based on assertion that remote public assistance transactions, *e.g.*, internet, phone, and mail applications, are not covered by NVRA).

[33] 52 U.S.C. § 20504(a)(2) (emphasis added).

[34] Definitions available through the search function of Oxford Dictionaries: English, http://www.oxforddictionaries.com/us (last visited April 30, 2015).

APPENDIX 12

Hon. Carlos Cascos
May 27, 2015
Page 12 of 16

license at https://txapps.texas.gov/tolapp/txdl/. But, when a voter checks "yes" under the line stating "I want to register to vote" on Step 5 of the process, the voter's registration files are not simultaneously updated. Instead, the voter is told:

> Selecting "Yes" does not register you to vote. A link to the Secretary of State Voter website (where a voter application may be downloaded or requested) will be available on your receipt page.[35]

The Secretary of State's *32nd Annual Election Law Seminar Handbook* confirms that "[i]f the [DPS] transaction was made online, then the person is not registered to vote."[36] While the Secretary maintains that, "[b]y selecting 'yes' when updating information through DPS online renewal [the voter] is merely requesting a link to a voter registration application on the individual's receipt page,"[37] this position cannot be reconciled with the NVRA's clear language. Nor can this approach constitute a single "change of address form and procedure that combines department and voter registration functions" as required by the Texas Election Code.[38]

Even though the State does not use online change-of-address transactions with DPS to properly register voters at their new addresses, that information does affect the voter rolls. Online change-of-address updates are apparently used by counties to *remove* voters from the rolls in their previous county of residence.[39] In other words, the State not only fails to update registration records for a voter who changes her address online with DPS — even though the State has the technical ability to do so — it may cause that voter to be purged from the rolls altogether. This perverse result cannot be reconciled with the NVRA's goal of increasing the number of eligible citizens on the voter rolls.

The State cannot abrogate its voter registration responsibilities by simply notifying voters that new information from online transactions is not being credited. But, even if it could, the notice being provided is insufficient.[40]

---

[35] *See* App'x A, which shows an image of the screen visible to voters at Step 5 in the change-of-address process.

[36] SEC'Y OF STATE, 32ND ANNUAL ELECTION LAW SEMINAR HANDBOOK 1207 (2014) (PDF version on file with Battleground Texas).

[37] *Id.* at 1208.

[38] Tex. Elec. Code Ann. § 20.062(b) (West 2013).

[39] *See* Tex. Elec. Code Ann. § 16.031 (West 2013).

[40] Notably, the portion of the DPS webpage that provides answers to frequent inquires about the online change-of-address process does not indicate that voter registration files are not simultaneously updated. *See generally* DPS, Driver License Div., Driver License Renewal and Change of Address, https://txapps.texas.gov/tolapp/txdl/faq.dl?locale=en_US#question13, attached as App'x B.

D_00009860

Hon. Carlos Cascos
May 27, 2015
Page 13 of 16

Several individual voters have shared their own experience seeking to change their address for both driver's license and voter registration purposes through DPS' website with the undersigned counsel:

- **Mark Berry**: Mr. Berry moved from Missouri to Dallas County on March 1, 2014. Shortly thereafter he bought a new vehicle and registered it at the dealership. He later applied for his driver's license in person at a DPS location, and recalls registering to vote at that time. Approximately one month later, Mr. Berry bought a house in Irving and changed his address online using DPS' website. He received a new license in the mail listing his Irving address, and believed that his voter registration was updated as well. When he attempted to vote in Irving on Election Day, however, the election worker told him that he was not registered at his current address. Mr. Berry cast a provisional ballot and later received a letter confirming that his vote was not counted.

- **Wendy Faems**: Ms. Faems moved from Collin County to Dallas County on February 14, 2014. She changed her driver's license address online shortly thereafter, and assumed that doing so updated her address for voter registration purposes as well. She attempted to vote on Election Day at W.T. White High School, but was told that her name was not on the rolls in Dallas County, and that she was still on the rolls in Collin County. Ms. Faems drove to Collin County and attempted to vote there, but was turned away and told to return to Dallas County to cast a ballot. She returned to the first polling location in Dallas County and cast a provisional ballot. Ms. Faems later received notice that her vote was not counted.

- **Benjamin Hernandez**: Mr. Hernandez moved to Dallas County from Ector County in February 2013. That month, he changed his address and attempted to update his voter registration online through DPS' website. Mr. Hernandez received a new driver's license in the mail, but did not receive a voter registration card. On Election Day 2014, Mr. Hernandez attempted to vote in Dallas County, but was told that his name was not on the rolls. He cast a provisional ballot, but later received notice that his vote was not counted.

- **Totysa Watkins**: Ms. Watkins moved from Denton County to Dallas County in 2011, and changed her address and attempted to update her voter registration online through the DPS website after moving. In September 2013 she moved within Irving, and once again changed her driver's license address and attempted to update her voter registration online through DPS. Ms. Watkins attempted to vote on Election Day in 2014, but was told by an election worker that she was not registered in Dallas County. She cast a provisional ballot. A few weeks later she received a notice indicating that her vote was not counted, and later received two new voter registration cards.

APPENDIX 14

D_00009861

Hon. Carlos Cascos
May 27, 2015
Page 14 of 16

Critically, none of these voters were informed that completing DPS' online change-of-address form could remove their names from the rolls in their former county of residence. Instead, each believed that he or she was properly registered because he or she completed an online transaction with DPS. These voters only learned of DPS' failure to register them to vote or to update their voter registration files when they arrived at the polls.

The Elections Division has received more than 1,800 reports from individuals who completed an online transaction with DPS and mistakenly believed that the voter rolls were updated too. These voters complained to election officials when they attempted to vote but none of their votes were ultimately counted.[41] Plus, for the reasons outlined above, these 1,800 voters represent just a fraction of the total voters statewide who were disenfranchised on these grounds.

Furthermore, although the Elections Division and DPS have been aware of "the confusion" caused by the online policies since at least 2012,[42] no significant reforms have been made. Emails between the Election Division and DPS acknowledge widespread confusion among voters in 2012, but — rather than credit online transactions as required by the NVRA or, at the very least, clarify the notice given on the DPS website — officials chose simply to link "directly to the voter application page instead of the general SOS page" when a voter completes an online renewal or change-of-address transaction.[43] Clearly, this "solution" has been woefully inadequate.

### FAILURE TO TREAT VOTER REGISTRATION AS DEFAULT CHOICE

Pursuant to current policy, a Texas voter must specifically check "yes" when completing their driver's license application in order for their application to simultaneously serve as their voter registration.[44] If a voter leaves that portion of the form blank, or checks both "yes" and "no," that voter will not be registered.[45]

---

[41] *See* Email from Keith Ingram to Mimi Marziani, *supra* note 13.
[42] Email from Margaret Spinks to Marguerite Buster, *supra* note 27 (forwarding email from Betsy Schonhoff, Voter Registration Dir., Elections Div., to Marguerite Buster, Customer Relations Coordinator, DPS Driver License Div.) (Nov. 14, 2012, 4:32 PM)), pgs. 17-18 of document entitled "DPS Internal Communication – not voter specific" (on file with Battleground Texas).
[43] Email from Marguerite Buster, Customer Relations Coordinator, DPS Driver License Div., to Michael Terry (Feb. 25, 2013, 11:27 AM), pgs. 21-23 of document entitled "DPS Internal Communication – not voter specific" (on file with Battleground Texas).
[44] *See* 32ND ANNUAL ELECTION LAW SEMINAR HANDBOOK, *supra* note 36, at 1213.
[45] *Id.*

D_00009862

Hon. Carlos Cascos
May 27, 2015
Page 15 of 16

This practice cannot be reconciled with the clear language of the NVRA, which mandates that every driver's license application "shall serve as an application for voter registration with respect to elections for Federal office *unless the applicant fails to sign the voter registration application.*"[46]   This language, combined with the NVRA's purpose, mandates that the State treat voter registration as the default practice for driver's license applicants. The State cannot instead force voters to opt in.

The Elections Division has identified over 70 voters who believed they had successfully registered while obtaining a driver's license, but who were, in fact, never registered because they either left that portion of the form blank or checked "yes" and "no."[47]

One voter has already come forward with his own experience:

- **Pedro Rodriguez**:  Mr. Rodriguez moved to Williamson County from Bexar County in 2013.  He changed his address in person at DPS, and believed that he was updating his voter registration information at that time as well.  But when Mr. Rodriguez attempted to vote on Election Day in 2014, he was told that he was not on the rolls.  Mr. Rodriguez cast a provisional ballot, but received a letter notifying him that his ballot was not counted; later, he received a voter registration card.  The data provided to Battleground Texas from the Elections Division shows that Mr. Rodriguez unwittingly checked both the "yes" and the "no" box on the voter registration portion of the driver's license application.

<center>******</center>

In sum, every time an eligible resident obtains, renews, or updates his or her driver's license with DPS, DPS must simultaneously register that person to vote or update that person's voter registration file.[48]  Unfortunately, as described above, the State is not complying with these mandates.

We trust that you share our concerns regarding voter registration practices at DPS and will take immediate steps to address the problems highlighted above.  The undersigned counsel are willing to meet with the Secretary of State's office to assist in your development of a comprehensive plan for full compliance.  If, however, the State fails to take steps to remedy its violations of Section 5 of the NVRA, we are prepared to pursue litigation as permitted by 52 U.S.C. § 20510(b).

---

[46] 52 U.S.C. § 20504(a)(1).

[47] *See* Email from Keith Ingram to Mimi Marziani, *supra* note 13.

[48] 52 U.S.C. § 20503(a)(1).

APPENDIX 16

D_00009863

Hon. Carlos Cascos
May 27, 2015
Page 16 of 16

We look forward to your response.

Very truly yours,

Peter A. Kraus
Partner
Waters & Kraus, LLP
3219 McKinney Avenue
Dallas, Texas 75214
(214) 357-6244
pkraus@waterskraus.com

Mimi M.D. Marziani
Legal Director
Battleground Texas
1519 East Cesar Chavez, Suite 100
Austin, Texas 78702
(615) 293-5003
mmarziani@battlegroundtexas.com

cc:     Steven McCraw, Director, Texas Department of Public Safety
        Keith Ingram, Director, Elections Division, Office of the Secretary of State

*Appendices*

APPENDIX 17

D_00009864

# Appendix A

D_00009865

Options and Affirmation

← → C 🔒 https://txapps.texas.gov/tolapp/txdl/selectOptions.dl

THE OFFICIAL WEBSITE OF THE STATE OF TEXAS

Texas Department of Public Safety
Driver License Division
**Driver License Renewal and Change of Address**

## Select Options

Name:

Your DL Number

Your DL Class: C

Complete the information below, then select 'Continue'.

## Options

☐ I want to donate $1.00 to the Glenda Dawson-Donate Life Texas Registry as part of my driver license transaction ⑦

☐ I want to be an organ donor. You must select the box to receive the donor symbol on your new card, even if you've selected it before.

I want to register to vote
Required. Selecting "Yes" **does not** register you to vote. A link to the Secretary of State Voter website (where a voter application may be downloaded or requested) will be available on your receipt page.

○ Yes
◉ No

[Continue]

### Information

**Steps to Complete**
1. Welcome
2. Login
3. Select Services
4. Enter Address
5. Select Options
6. Review Order
7. Submit Payment
8. Receipt

Frequently Asked Questions
Where's My License or ID?
Log Out

**Help**
For technical assistance with this application, please call 1-877-452-9060 or send an email to Texas.gov Help ✉

**Resources**
• Texas Department of Public Safety

**Texas.gov**
Texas.gov Policies
© 2012 Texas.gov

APPENDIX 19

D_00009866

# Appendix B

D_00009867



## How does the online change of address work?

### Step 1: Log In

Log in by entering your

1. Driver license or ID card number,
2. Date of birth,
3. Last four digits of Social Security number, and
4. Audit number (see driver license samples for location of audit number).

### Step 2: Select Your Services

You may be eligible to

1. Renew,
2. Change your address, or
3. Renew **and** change your address.

### Step 3: Select Optional Items and Complete Affirmations

Optional Items

1. Donations to Blindness Education, Screening, and Treatment (BEST) program and the Glenda Dawson-Donate Life Texas Registry
2. Register to vote

Affirmations

1. U.S. citizenship – you must be a U.S. citizen to renew or change your address online
2. Vision and physical/mental condition – you must not have had any changes to your vision or health that affect your ability to drive safely (if renewing a driver license)

### Step 4: Review Order and Make Payment

Review order information, make changes if necessary, and submit payment information.

Your new driver license or ID card will be mailed to you in two to three weeks. If you renewed or changed the address for a driver license, you need to print your temporary driver license (valid for 45 days) from the receipt page.

### Step 5: Invalidate Old Driver License/ID

Texas law says you cannot have more than one valid driver license or ID card. After receiving your new driver license or ID, invalidate your old card by cutting it up.

Return to the Top of Document

APPENDIX 21

D_00009868

# EXHIBIT 2



**waters**kraus

October 23, 2015

*Sent via email and U.S. mail*

Anne Marie Mackin
Assistant Attorney General
Litigation Division
P.O. Box 12548
Austin, Texas 78711
Anne.mackin@texasattorneygeneral.gov

**Re: Supplemental Notice of Texas' Failure to Comply with Voter
Registration Obligations at the Department of Public Safety**

Dear Ms. Mackin,

I write to supplement our May 27th Notice Letter (attached and incorporated herein by
reference) with the name of another Texas voter who attempted to update his voter
registration information when changing his address online at www.txdps.state.tx.us.
This letter provides formal notice to the State of NVRA violations under 52 U.S.C. §
20510(b) on behalf of Jarrod Stringer and others similarly situated.

Mr. Stringer moved from Arlington, Texas to San Antonio, Texas on August 1, 2014.
Mr. Stringer visited DPS' website to update his address within the same week, and
recalls checking "yes" when asked whether he wished to update his voter registration.
Mr. Stringer attempted to vote early in the November 2014 election, but was told by poll
workers at the University of Texas at San Antonio that his name was not on the rolls.
Mr. Stringer then called Bexar County, and was told that he was not registered in Bexar,
and that as a result, he could only vote in the state-wide election there. When he
explained that he had changed his address for voter registration purposes online through
DPS' website, the county employee with whom he was speaking told him that the
county was aware of "problems at DPS."

As set out in our original Notice Letter, every time an eligible resident renews or updates
his or her driver's license with DPS, the NVRA requires that DPS simultaneously
register that person to vote or update that person's voter registration file, unless the
applicant fails to sign the form or indicates that he or she does not wish to update his or
her information for voter registration purposes. Unfortunately, the State is not
complying with the NVRA's mandates.

PARTNERS
Peter A. Kraus (CA, MO, TX, WA)
Charles S. Siegel (PA, TX)
Michael L. Armitage (CA, LA)
Leslie C. MacLean (PA, TX)
Gary M. Paul (CA)
Kyla Gail Cole (PA, TX)
Michael B. Gurien (CA)
Scott L. Frost (CA, GA, HI, KY, TX)
Loren Jacobson (NV, TX)
Jonathan A. George (CA, PA, TX, VA)
Kevin M. Loew (CA)
Gibbs C. Henderson (IL, TX)
David Bricker (CA, IL)

ASSOCIATES
Joy Spering (IL)
Susannah B. Chester-Schindler (LA, TX)
Andrew Seitz (OH)
Louisa O. Kirakosian (CA)
Caitlyn Silhan (CA, TX)
Erin M. Wood (TX)
Shawna Forbes-King (CA)
R. Walker Humphrey (CA, SC)
Anne N. Izzo (MD)
Sara E. Coopwood (TX, WA)
Susan M. Ulrich (CA, WA)
David C. Humen (TX)
Rajeev K. Mittal (CA)

OF COUNSEL
C. Andrew Waters (CA, DC, NC, OR, TX) *
B. Scott Kruka (PA, TX)
Wm. Paul Lawrence (CA, TX, VA, WV)
William Galerston (IL, TX)
Randall L. Iola (IL, OK, TX)
Ketan U. Kharod (TX)
Scott D. Peebles (PA, LA)
Kay Gunderson Reeves (TX, WA)

* Founding Partner 1999-2014



EXHIBIT
8
5-3-17

**WATERS & KRAUS**, LLP ATTORNEYS AND COUNSELORS

**DALLAS:** 3219 McKINNEY AVENUE   DALLAS, TEXAS 75204   **TEL** 214 357 6244   **FAX** 214 357 7252

**LOS ANGELES:** 222 NORTH SEPULVEDA BOULEVARD   SUITE 1900   EL SEGUNDO, CALIFORNIA 90245   **TEL** 310 414 8146   **FAX** 310 414 8156

APPENDIX 23

Anne Mackin
October 23, 2015
Page 2 of 2

We are willing to meet or speak with you to discuss this Supplemental Notice. In any event, please advise as to whether the State maintains the positions articulated in your June 23rd and September 10th letters.

Sincerely yours,

Peter A. Kraus
Partner
Waters & Kraus, LLP
3219 McKinney Avenue
Dallas, Texas 75214
(214) 357-6244
pkraus@waterskraus.com

Mimi M.D. Marziani
Legal Director
Battleground Texas
1519 East Cesar Chavez, Suite 100
Austin, Texas 78702
(615) 293-5003
mmarziani@battlegroundtexas.com

APPENDIX 24

# EXHIBIT 3

**waters**kraus

PARTNERS

Peter A. Kraus (CA, MO, TX, VA)
Charles S. Siegel (PA, TX)
Michael L. Armitage (CA, LA)
Leslie C. MacLean (FL, DX)
Gary M. Paul (CA)
Kyla Gall Cole (RI, TX)
Michael B. Gurien (CA)
Scott L. Frost (CA, GA, IV, NY, TN)
Loren Jacobson (NY, TX)
Jonathan A. George (CA, PA, TX, VA)
Kevin M. Loew (CA)
Gibbs C. Henderson (IL, TX)
David Bricker (CA, IL)

ASSOCIATES

Joy Sparling (AZ)
Susannah B. Chester-Schindler (LA, TX)
Andrew Seitz (CA)
Louisa O. Kirakosian (CA)
Caitlyn Silhan (CA, TX)
Erin M. Wood (TX)
Shawna Forbes-King (CA)
R. Walker Humphrey (CA, DC)
Anna N. Izzo (NY)
Sara E. Coopwood (TX, WA)
Susan M. Ulrich (CA, MA)
Patrick J. Wigle (TX)
David C. Humen (TX)
Rajeev K. Mittal (CA)
Charles P. Stein (DA)

OF COUNSEL

C. Andrew Waters (CA, DC, KC, MS, TN)*
B. Scott Kruka (VA, TX)
Wm. Paul Lawrence (LA, TX, VA, WA)
William Galerston (IL, TX)
Randall L. Iola (IL, MI, TX)
Kevin U. Kharoid (TX)
Scott D. Peebles (CA, LA)
Kay Gunderson Reeves (TX, WA)

* Founding Partner 1999-2014

November 18, 2015

*Sent via email and U.S. mail*

Anne Marie Mackin
Assistant Attorney General
Litigation Division
P.O. Box 12548
Austin, Texas 78711
Anne.mackin@texasattorneygeneral.gov

> Re: **Second Supplemental Notice of Texas' Failure to Comply with Voter Registration Obligations at the Department of Public Safety**

Dear Ms. Mackin,

I write to again supplement our May 27th Notice Letter (attached and incorporated herein by reference) with the name of another Texas voter who attempted to update his voter registration information when changing his address online at www.txdps.state.tx.us. This letter provides formal notice to the State of NVRA violations under 52 U.S.C. § 20510(b) on behalf of John Woods and others similarly situated.

Mr. Woods moved from Travis County to Harris County in June 2015. In September 2015, Mr. Woods changed his driver's license address online, and believed that his voter registration records were updated as well. Shortly thereafter, Mr. Woods went to a local library, where he was offered an opportunity to register to vote. He declined that opportunity, however, because he believed that his voter registration records had already been updated. Mr. Woods called Harris County on Election Day 2015, trying to identify his polling location. Mr. Woods was informed that he was not registered in Harris County, but was still registered in Travis County, and that any provisional ballot cast in Harris County would likely not be counted. Nonetheless, Mr. Woods went to his local polling location and cast a provisional ballot. On November 17, Mr. Woods was informed by the county clerk that his provision ballot was not counted.

As set out in our Original and First Supplemental Notice Letter, every time an eligible resident renews or updates his or her driver's license with DPS, the NVRA requires that



EXHIBIT

_9_

JCR  5-5-17

**WATERS & KRAUS, LLP** ATTORNEYS AND COUNSELORS

DALLAS: 3219 McKINNEY AVENUE   DALLAS, TEXAS 75204   **TEL** 214 357 6244   **FAX** 214 357 7252

LOS ANGELES: 222 NORTH SEPULVEDA BOULEVARD   SUITE 1900   EL SEGUNDO, CALIFORNIA 90245   **TEL** 310 414 8146   **FAX** 310 414 8156

EXHIBIT C, PAGE 171

APPENDIX 26

Anne Marie Mackin
November 18, 2015
Page 2 of 2


DPS simultaneously register that person to vote or update that person's voter
registration file, unless the applicant fails to sign the form or indicates that he or she
does not wish to update his or her information for voter registration purposes. Unfortunately, the
State is not complying with the NVRA's mandates.

We remain willing to meet or speak with you to discuss our First Supplemental Notice Letter, as well
as this Second Supplemental Notice Letter and the state of Alabama's recent agreement to address
NVRA violations, including online-transaction violations. In any event, please advise as to whether
the State maintains the positions articulated in your June 23rd and September 10th letters.

Sincerely yours,


Peter A. Kraus                                  Mimi M.D. Marziani
Partner                                         Legal Director
Waters & Kraus, LLP                             Battleground Texas
3219 McKinney Avenue                            1519 East Cesar Chavez, Suite 100
Dallas, Texas 75214                             Austin, Texas 78702
(214) 357-6244                                  (615) 293-5003
pkraus@waterskraus.com                          mmarziani@battlegroundtexas.com


Attachment: Alabama-DOJ MOU


EXHIBIT C PAGE 172
APPENDIX 27

# EXHIBIT 4

# TEXAS DEPARTMENT OF PUBLIC SAFETY

**5805 N. LAMAR BLVD • BOX 4087 • AUSTIN, TEXAS 78773-0001**
**512/424-2000**
www.dps.texas.gov



STEVEN C. McCRAW
DIRECTOR
DAVID G. BAKER
ROBERT J. BODISCH, SR.
DEPUTY DIRECTORS

COMMISSION
A. CYNTHIA LEON, CHAIR
MANNY FLORES
FAITH JOHNSON
STEVEN P. MACH
RANDY WATSON

September 9, 2015

Keith Ingram
Director of Elections
Texas Secretary of State
P.O. Box 12060
Austin, Texas 78711

Dear Director Ingram:

This is to update you on the voter registration program at the Department of Public Safety. Enclosed you will find the Department's current National Voter Registration Act Implementation Plan regarding the implementation of voter registration procedures under Chapter 20 of the Texas Elections Code. This plan is being provided in accordance with Texas Election Code §20.004(c). The Department will continue to review this plan following each legislative session and make appropriate modifications as necessary.

For the past several years the Department's voter registration program has been overseen by Sheri Gipson, Senior Manager, Driver License Division and other staff members. As Ms. Gipson has retired, the Department has appointed new agency coordinators. Effective immediately, Tony Rodriguez, Senior Manager, Customer Operations and Bob Myers, Training Specialist, Customer Support will be the persons responsible for the coordination of the Department's voter registration program. Mr. Myers is responsible for the training of agency employees in voter registration procedures and policy and Mr. Rodriguez oversees the program in our driver license offices statewide. The contact information for the coordinators can be found in the Implementation Plan.

Please feel free to contact me if you are in need of additional information or have any questions.

Sincerely,

Joe Peters
Assistant Director
Driver License Division

JP:ktmd

Enclosure

EQUAL OPPORTUNITY EMPLOYER
COURTESY • SERVICE • PROTECTION

APPENDIX 29

D_00021063

# Texas Department of Public Safety
## National Voter Registration Act Implementation Plan

1. The National Voter Registration Act (NVRA) coordinators are:

   Tony Rodriguez
   Senior Manager, Customer Operations
   DPS Driver License Division
   5805 North Lamar Blvd.
   Austin Texas 78752
   (512) 424-5657

   Bob Myers
   Training Specialist, Customer Support
   DPS Driver License Division
   5805 North Lamar Blvd.
   Austin Texas 78752
   (512) 424-5538

2. The Texas Department of Public Safety (DPS) will be required to provide voter registration services. This will be accomplished through the driver licensing program managed by the Driver License Division.

3. Basic overview of procedures:

   a. The Department of Public Safety will provide to each person who applies in person at the Department's driver license offices for an original or renewal of a driver license, a personal identification card, a duplicate or corrected license or card or an election identification certificate (EIC) an opportunity to complete a voter registration application form.

   b. The Department will use a form and procedure that combines the department's application form for a license, identification card or EIC with an officially prescribed voter registration application form. The form includes the opportunity for the applicant to indicate whether they desire to register to vote, or if registered, to update their voter information. The form will also inform the applicant that the applicant's electronic signature provided to the department will be used for submitting the applicant's voter registration application

   c. The department will use a change of address form and procedure that combines department and voter registration functions. The change of address form submitted in person will allow a licensee or cardholder to

APPENDIX 30

D_00021064

indicate whether the change of address is also to be used for voter registration purposes.

d. Each weekday the Department is regularly open for business, the Department will electronically transfer to the Secretary of State (SOS) the name and relevant data regarding each applicant who is of voting age and a United States citizen who affirmatively answered the voter registration question. The scope of the information provided and method of data transfer will be established by the Department and SOS.

e. When the Department mails current license or identification card holders notice advising the applicant they are eligible to renew their driver license or identification card by mail the mailing will include an officially prescribed voter registration application form.

f. For applications submitted at driver license offices the customer service representatives:
   i. provide each applicant for an original or renewal of a driver license, a personal identification card, a duplicate or corrected license or card or an EIC the required application form which includes the opportunity for the applicant to indicate whether they desire to register to vote, or if registered, to update their voter information;
   ii. follow Department instructions and training regarding entering applicant data into the Driver License System (DLS) database;
   iii. provide a receipt to the applicant prior to the conclusion of the transaction and have the applicant verify all information, including the applicant's response to the voter registration question.
   iv. Issue a receipt which includes a photographic image to the applicant.

g. Online renewal of driver license or identification card or change of address.
   i. The online renewal and online address change process through Texas.gov will include a link to websites providing information regarding how to register to vote in Texas.

4. Basic overview of training: The DLD NVRA Coordinator from the DLD Training Unit or the DLD training specialists will provide NVRA training during new employee orientation. The DLD will provide additional training as needed during regional and divisional meetings and during regular in-service training provided to DLD employees.

5. Voter registration services are available at all driver license offices during regular business hours. Office hours vary based on location. The hours of operation for each office are available online. The majority of driver license offices are open between 8:00 a.m. to 5:00 p.m., Monday through Friday.

APPENDIX 31

D_00021065

# EXHIBIT 5

## DPS Voter Inquiry Web Portal





ARE YOU INTERESTED TO
VOTER?

---

## About the DPS Web Portal

➤ The DPS Web Portal was developed by the Secretary of State in 2013.

➤ It allows voter registrars to submit their inquiries directly to DPS in an effort to determine if a person attempted to register to vote through DPS.



---

## About the DPS Web Portal

**Texas Law currently does not provide for online registration. The only option for updating a registration within the county is through the Texas Online feature.

By selecting "yes" when updating information through **DPS online renewal,** the person obtains a link to a voter registration application on the individual's receipt page, and the person needs to complete the registration process by printing, signing and delivering the application to the voter registrar in the person's county.

6/7/2016                Texas Secretary of State Elections Division                3



---

APPENDIX 33    1

D_00014211

# EXHIBIT 6

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3   JARROD STRINGER, et al.,        §
                                     §
 4            Plaintiffs,            §
                                     §
 5   v.                              §    Civil Action
                                     §    No. 5:16-cv-00257-OLG
 6   ROLANDO B. PABLOS, IN HIS       §
     OFFICIAL CAPACITY AS THE        §
 7   SECRETARY OF STATE and STEVEN   §
     C. McCRAW, IN HIS OFFICIAL      §
 8   CAPACITY AS THE DIRECTOR OF     §
     THE TEXAS DEPARTMENT OF PUBLIC  §
 9   SAFETY,                         §
                                     §
10            Defendants.            §

11       ***********************************************
                 ORAL AND VIDEOTAPED DEPOSITION OF
12                    BRIAN KEITH INGRAM
                      MARCH 22, 2017
13                       VOLUME 1
         ***********************************************

14

15       ORAL AND VIDEOTAPED DEPOSITION OF BRIAN KEITH

16   INGRAM, produced as a witness at the instance of the

17   Plaintiffs, and duly sworn, was taken in the

18   above-styled and numbered cause on the 22nd day of

19   March, 2017, from 9:33 a.m. to 5:19 p.m., before STEVEN

20   STOGEL, CSR in and for the State of Texas, reported by

21   machine shorthand, at the office of the Attorney

22   General, 300 West 15th Street, Suite 1100, Austin,

23   Texas, pursuant to the Federal Rules of Civil Procedure

24   and the provisions stated on the record or attached

25   hereto.
```

**CERTIFIED TRANSCRIPT**

STRINGER: BRIAN KEITH INGRAM

## Page 2

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4       MS. BETH STEVENS
         MR. HANI MIRZA
 5       TEXAS CIVIL RIGHTS PROJECT
         1405 Montopolis Drive
 6       Austin, Texas 78741
         Phone:  512.474.5073
 7            - and -
         MS. CAITLYN SILHAN
 8       WATERS & KRAUS, LLP
         3141 Hood Street, Suite 700
 9       Dallas, Texas 75219
         Phone:  214.357.6244
10
11   FOR THE DEFENDANTS:
12       MS. ANNE MARIE MACKIN
         OFFICE OF THE ATTORNEY GENERAL
13       General Litigation Division
         P.O. Box 12548, Capitol Station
14       Austin, Texas 78711-2548
         Phone:  512.463.2120
15
16   ALSO PRESENT:
17       MS. LINDSEY ASTON:  General Counsel, Texas
                             Secretary of State
18       MR. JUSTIN TALBOT:  Videographer
19
20
21
22
23
24
25
```

## Page 4

```
 1                     EXHIBITS
 2   EXHIBIT NAME    DESCRIPTION              PAGE
 3   Exhibit 12.     PowerPoint Presentation Entitled  163
                     "34th Annual Election Law Seminar
 4                   Offline County Presentation"
 5   Exhibit 13.     PowerPoint Presentation Entitled  167
                     "TEAM For Online Counties"
 6
     Exhibit 14.     DL Applications - Generate Two    181
 7                   Output Flat Files - Version 8.2
                     Prepared for DPS
 8                   Submission Date:  8/29/07
                     Revision Date:  4/30/14
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                  I N D E X
 2                                          PAGE
 3   Appearances...................................  2
 4   WITNESS:  BRIAN KEITH INGRAM
 5   Examination by Ms. Stevens....................  6
 6   Examination by Ms. Mackin.....................211
 7   Reporter's Certificate........................216
 8
 9                   EXHIBITS
10   EXHIBIT NAME    DESCRIPTION              PAGE
11   Exhibit 1.      Notice of Deposition        14
12   Exhibit 2.      7/22/16 Letter from Joe Peters  33
                     to Keith Ingram with Attachment
13
     Exhibit 3.      Form DL-64 (Rev. 9/13)      40
14
     Exhibit 4.      Form DL-64 (Rev. 3/16)      40
15
     Exhibit 5.      Form DL-14A (Rev. 6/14)     43
16
     Exhibit 6.      Form DL-43 (Rev. 6/14)      43
17
     Exhibit 7.      Texas Voter Registration    48
18                   Application
19   Exhibit 8.      2/8/17 Email String with Attachment  80
20   Exhibit 9.      11/5/12 Email String        83
21   Exhibit 10.     11/15/12 Email from Betsy Schonhoff  86
                     to Beva Kellison with Attachment
22
     Exhibit 11.     DLS Use Case Specification:  Create  115
23                   Voter Registration Extract File
                     Texas DPS - 12/19/14 - Version 6.9
24
25
```

## Page 5

```
 1              P R O C E E D I N G S
 2         THE VIDEOGRAPHER:  Today is Wednesday
 3   March 22nd, 2017.  The time is approximately
 4   8:34 a.m. [sic].  We are located at the Office of the
 5   Attorney General, 300 West 15th Street, Austin, Texas,
 6   78701.  My name is Justin Talbot, video specialist of
 7   Legal Eyes, Incorporated, out of Aubrey, Texas.
 8         This case is Cause No. 5:16-cv-00257-OLG
 9   entitled Jarrod Stringer, et al., versus Rolando B.
10   Pablos, et al., and the deponent is Keith Ingram.  The
11   video deposition was requested by plaintiffs' counsel at
12   Waters Kraus & Paul.
13         Counsel and all present, please identify
14   yourselves for the record.
15         MS. STEVENS:  Beth Stevens on behalf of
16   Jarrod Stringer.
17         MS. SILHAN:  Caitlyn Silhan from Waters &
18   Kraus on behalf of Benjamin Hernandez.
19         MR. MIRZA:  Hani Mirza from the Texas
20   Civil Rights Project on behalf of Totysa Watkins.
21         MS. ASTON:  Lindsey Aston.  I'm with the
22   Secretary of State's Office.  I'm the General Counsel.
23         MS. MACKIN:  Anna Mackin from the
24   Attorney General's Office on behalf of all defendants.
25         And we'd like to request a read and sign
```

STRINGER: BRIAN KEITH INGRAM

Page 6

1  of this deposition on the record, please.
2                BRIAN KEITH INGRAM,
3  having been first duly sworn, testified as follows:
4                   EXAMINATION
5  BY MS. STEVENS:
6     Q.  Good morning, Mr. Ingram.
7     A.  Howdy.
8     Q.  Would you please state and spell your full
9  name?
10    A.  My name is Brian Keith Ingram.  B-R-I-A-N,
11 K-E-I-T-H, I-N-G-R-A-M.
12    Q.  Thank you.  And you go by Keith Ingram.  Is
13 that correct?
14    A.  I do.
15    Q.  Okay.  My name is Beth Stevens.  I'm from the
16 Texas Civil Rights Project.  And we have not met before
17 this morning.  Is that correct?
18    A.  That's correct.
19    Q.  Okay.  You've had your deposition taken
20 before, have you not?
21    A.  I have.
22    Q.  How many times?
23    A.  I was trying to think of that on the way over
24 here.  At least three that I can think of, but maybe one
25 more.

Page 7

1     Q.  Okay.  And the three that you recall, what
2  cases were those in?
3     A.  Twice in voter ID, and once in a redistricting
4  case involving the Edwards Aquifer.  Oh, there was
5  another deposition.  Yes.  A forth one was in a case
6  that Buck Wood filed about our Death Master File
7  process.  I don't remember the name of that case.
8     Q.  You're an attorney.  Is that correct?
9     A.  I am.
10    Q.  So you're pretty familiar with the deposition
11 rules?
12    A.  I am.
13    Q.  Okay.  I'm going to go over just a couple just
14 so we can have it on the record.  I'll ask you to let me
15 finish answer -- excuse me -- asking my question before
16 you start answering, and I'll try to do the same for
17 you.  Is that okay?
18    A.  Sure.
19    Q.  And if you'll answer out loud instead of a nod
20 or a shake of the head, that will make it easier for our
21 court reporter.  Okay?
22    A.  Okay.
23    Q.  And if you need a break, let me know.  I'll
24 just ask you to answer the last question that we've got
25 on -- that I've stated before we take the break.  Okay?

Page 8

1     A.  Sure.
2     Q.  And --
3                THE VIDEOGRAPHER:  Counsel, forgive the
4  interruption, but can we go off the record for a minute?
5                MS. STEVENS:  Sure.
6                (Discussion off the record)
7                (Recess from 9:36 a.m. to 9:37 a.m.)
8                THE VIDEOGRAPHER:  We are back on the
9  record at 9:37 a.m.  I incorrectly announced the start
10 time of the deposition as 8:34, and the camera time was
11 incorrectly set.  It's now correctly set at 9:37 a.m.
12 Thank you.
13    Q.  (By Ms. Stevens)  The last deposition rule I
14 was going to go over is if I phrase a question that is
15 confusing in any way to you, will you please let me know
16 that you don't understand or you'd like me to rephrase?
17 Can you agree to that?
18    A.  I can.
19    Q.  Okay.  Will you agree to that?  Do you agree
20 to that?
21    A.  Certainly.
22    Q.  Okay.  Thank you.  If you -- if you go ahead
23 and answer the question as I posed it, I'm going to
24 assume that you understood the question.  Is that fair?
25    A.  That's fair.

Page 9

1     Q.  Thank you.
2     A.  If I don't understand the question, I'll let
3  you know.
4     Q.  Thank you.  All right.  Mr. Ingram, in the --
5  well, you understand that you're here today to testify
6  in a 30(b)(6) capacity, do you not?
7     A.  Yes.
8     Q.  And have you testified on behalf of the
9  Secretary of State in a 30(b)(6) capacity before?
10    A.  I have.
11    Q.  Would you please indicate which of those
12 depositions you referenced were in a 30(b)(6) capacity?
13    A.  All of them.
14    Q.  Okay.  And you understand that this
15 deposition -- the 30(b)(6) deposition -- is --
16    A.  I take it back.  The two -- the Edwards
17 Aquifer and the Death Master File was whatever the state
18 equivalent of that is.
19    Q.  Those were state court cases?
20    A.  They were.
21    Q.  You understand that a 30(b)(6) deposition is
22 different from an individual deposition.  Is that
23 correct?
24    A.  I do.
25    Q.  Okay.  And you're here today as a

STRINGER: BRIAN KEITH INGRAM

Page 10

1  representative of the Secretary of State of the State of
2  Texas?
3      A.   I'm -- yes, ma'am.
4      Q.   Okay.  You've been offered by the Secretary of
5  State to appear on the Secretary of State's behalf and
6  give testimony for the Secretary of State?
7      A.   Right.
8      Q.   Do you understand that the Secretary of State
9  is bound by the testimony that you give at this
10  deposition?
11     A.   I'm aware.
12     Q.   And do you understand that unless I say
13  otherwise, I'm not asking for your personal opinion;
14  rather, I'm asking for an answer that reflects the
15  position of the Secretary of State's Office?
16     A.   Yes, ma'am.  And if I give my opinion, I'll
17  try to mark it as so.
18     Q.   Thank you.  You've provided verified responses
19  to interrogatories in this case.  Is that correct?
20     A.   That is correct.
21     Q.   Have you provided verified responses to
22  interrogatories in any other cases?
23     A.   I have.
24     Q.   Any besides -- well, did you provide them in
25  the cases that you provided deposition testimony on?

Page 11

1      A.   I don't know if we actually did written
2  interrogatories in the two state cases.  I know we did
3  in the federal cases.  If we gave written interrogatory
4  answers in the two state cases, then I'm the one that
5  verified them.  I just don't know for sure if we did
6  written 'rogs.
7      Q.   And the two federal cases that you referenced,
8  you did provide the verification for those
9  interrogatories?
10     A.   Yes, and I might have in another case, but I
11  don't know if we did interrogatories in not that case
12  either.  It was a Project Vote case on our volunteer
13  deputy registrar program back in 2012.  I just don't
14  know if we did interrogatories in that.  I think we did,
15  but I'm not sure.  It was a preliminary injunction
16  hearing as far as the case went.
17     Q.   And if anyone provided verified
18  interrogatories on behalf of the Secretary of State, it
19  would have been you.  Is that correct?
20     A.   That's correct.
21     Q.   Okay.  And lastly on this sort of preliminary
22  30(b)(6) issue, you understand that even though you may
23  not have personal knowledge of a question that I ask,
24  you can still provide the knowledge relevant to the
25  Secretary of State's Office?

Page 12

1      A.   I will endeavor to do so.
2      Q.   All right.  In preparing for this deposition,
3  did you speak to anyone?
4      A.   Yes.
5      Q.   To whom did you speak?
6      A.   I spoke to my counsel and my general counsel
7  last Friday.
8      Q.   Did you speak to anyone else in preparation
9  for this deposition?
10     A.   I did.
11     Q.   Who did you speak to?
12     A.   I spoke to Ann McGeehan, who was in my job
13  before me, and I spoke to Melanie Best, who is a lawyer
14  in my office.
15     Q.   And Ann McGeehan, she was the former Director
16  of Elections.  Is that right?
17     A.   She was.
18     Q.   And that's your current title.  Is that
19  correct?
20     A.   It is.
21     Q.   Do you know how long Ms. McGeehan was the
22  Director of Elections?
23     A.   I'm not sure exactly when she started.  I
24  think she started in '92 or '93.  She was the legal
25  director before she was the elections director, so I'm

Page 13

1  not sure when that transition occurred.  And she retired
2  in November of 2011 and went to work for the County
3  Retirement System.
4      Q.   Was there a Director of Elections prior to
5  Ms. McGeehan?
6      A.   There was.
7      Q.   And who was that?
8      A.   What's his name?  He's the general counsel of
9  the County Retirement System that Ann McGeehan works for
10  now.  I can't think of his name.
11     Q.   Okay.  Did you -- did you talk to anyone else
12  other than the individuals you've identified in
13  preparation for this deposition?
14     A.   No.
15     Q.   Did you review --
16     A.   Not specifically in preparation for this
17  deposition.  Betsy and I talk all the time.
18     Q.   And the --
19     A.   So we've talked about this case.  We talked
20  about her deposition.  We talked about the fact that my
21  deposition was coming, but I don't think that we talked
22  about anything specifically to prepare for this
23  deposition.
24     Q.   And Betsy is Betsy Schonhoff.  Is that
25  correct?



STRINGER: BRIAN KEITH INGRAM

Page 50

1      Q.   So you identified for me or explained to me
2  why -- what the electronic signature or the keypad
3  signature at DPS is used for.  It's used for the
4  signature that's required in the Texas Election Code.
5  You read me the section.  Is that right?
6      A.   That's right.
7      Q.   What's the ink signature on the DPS's physical
8  forms used for as far as voter registration?
9      A.   I don't know.  I don't know if it's used for
10 anything.  Once they've applied in person at the office,
11 they've signed it electronically.  I guess if there ever
12 was a question, that we'd have to go through the web
13 portal or the 701 email address about whether or not the
14 voter signed it.  If for some reason the electronic
15 version didn't have the signature, they would have to go
16 back and look at the physical application form from DPS
17 to get the signature.
18     Q.   Would the -- in the scenario you just
19 described, would the voter have to provide their
20 signature again so it would be on the actual voter
21 registration form?
22     A.   No.  No.  They've already signed.  They signed
23 the physical form and they signed electronically, and
24 for some reason if we don't get that signature with the
25 application, we'll go back to DPS and get the physical

Page 51

1  application.
2      Q.   And the --
3      A.   The county will.
4      Q.   Sorry.  The physical application you're
5  referencing is the driver's license application.
6  Correct?
7      A.   Right, or the renewal application.
8      Q.   But a DPS form not a -- not a voter
9  registration form?
10     A.   That's right.
11     Q.   And when you say the county will get it, do
12 they actually somehow extract the ink signature or copy
13 the ink signature onto a voter registration form at that
14 point?
15     A.   No.  They get the -- they get the DPS
16 application.
17     Q.   But the DPS application form doesn't have all
18 of the -- all of the fields that are on the voter
19 registration application.  Correct?
20     A.   That's right.  I mean, we can go through and
21 see.  I don't know what it wouldn't have.
22     Q.   Well, we'll get there in a little bit.  That's
23 okay.
24     A.   Okay.  I mean, it's not in the same form, but
25 it's got the same information.

Page 52

1      Q.   Well, on the --
2      A.   Except for maybe city and county of former
3  residence, but I bet whenever they generate one of these
4  from DPS, that's blank, and that's an optional blank, so
5  it doesn't have to be filled in.
6      Q.   The optional field you're referencing is the
7  city and county of former residence, No. 5 on the voter
8  registration application?
9      A.   That's right.
10     Q.   Look for me, if you will, at No. 10 where the
11 person signing confirms that they understand -- well, it
12 says, "I understand that giving false information to
13 procure a voter registration is perjury, and a crime
14 under state and federal law.  Conviction of this crime
15 may result in imprisonment up to 180 days, a fine up to
16 $2,000, or both.  Please read all three" -- three is
17 underlined -- "statements to affirm before signing."
18          And then in bullet points, the first one
19 is, "I am a resident of this county and a U.S. citizen."
20 The second bullet is, "I have not been finally convicted
21 of a felony, or if a felon, I have completed all of my
22 punishment including any term of incarceration, parole,
23 supervision, period of probation, or I have been
24 pardoned."  And third bullet point, "I have not been
25 determined by a final judgment of a court exercising

Page 53

1  probate jurisdiction to be totally mentally
2  incapacitated or partially mentally incapacitated
3  without the right to vote."
4          Did I read all that correctly?
5      A.   You did.
6      Q.   And just below that section that I read is
7  the -- where the signature is required.  Is that
8  correct?
9      A.   That's right.
10     Q.   That section, Section 10, is not on the
11 driver's license application.  Correct?
12     A.   I agree with that.
13     Q.   When your office is asked to provide advice as
14 far as voter registration questions go to the Department
15 of Public Safety, who is your contact at the Department
16 of Public Safety for those issues?
17     A.   Generally if I have a question about anything
18 at DPS I would call Joe Peters, and I guess henceforth
19 it will be Skylor Hearn.
20     Q.   What about DPS contacting your office for
21 voter registration questions?  Are those the only
22 individuals who would contact you about those questions?
23     A.   Well, it depends on the question.  If they had
24 a question, you know, of a more general global sense
25 they would definitely call me.  If they had a question

hg

Page 62

1  of the question on the online DPS application?
2      MS. MACKIN:  Objection; form.
3      A.  I don't know what you mean.
4      Q.  (By Ms. Stevens)  Why is there a voter
5  registration question on the online DPS transaction --
6  application?  Excuse me.
7      A.  Well, I imagine it's because of Section 5 of
8  the National Voter Registration Act of 1993.
9      Q.  Could you elaborate on that a little bit?
10     A.  Sure.  The National Voter Registration Act of
11 1993 required that motor vehicle agencies, in our case
12 the DPS, whenever a person has a driver's license
13 transaction -- driver license transaction, that they
14 should be simultaneously offered the right -- the
15 ability to update their voter registration or register
16 to vote for the first time.  That's why the NVRA is
17 called the Motor Voter law.
18     Q.  And DPS's compliance with that law for
19 in-person transactions is the question that we've looked
20 at on the -- on the DPS forms, "Do you want to register
21 to vote?  I've agreed to provide my electronic
22 signature, and it can be sent to the Secretary of
23 State's Office."
24          Is that right?
25     MS. MACKIN:  Objection; form.

Page 63

1      A.  Yes.
2      Q.  (By Ms. Stevens)  Tell me why there's a
3  difference between the DPS in-person transaction where
4  the information is sent on to the Secretary of State's
5  Office to send to the voter registration authorities
6  versus the online transaction where it merely sends
7  you to a link to the Secretary of State's Office --
8  website?  Excuse me.
9      A.  So I don't know -- why is a hard question.
10 Why is probably a DPS question.
11     Q.  Are you saying that the Secretary of State
12 hasn't provided any advice or counsel on whether those
13 two transactions in person versus online should be the
14 same?
15     A.  No, we certainly haven't.  The NVRA requires a
16 simultaneous opportunity to register to vote.  DPS is
17 providing that in both transactions, so I don't see
18 what -- I don't see what you're getting at.
19     Q.  Well, the in-person transaction is a seamless
20 automated transaction after the person checks that they
21 want to register to vote and provide their electronic
22 signature versus the online transaction where there are
23 multiple other steps.  You have to go to the Secretary
24 of State's website, print out the form, fill it out.
25 I'm trying to understand why there's a distinction

Page 64

1  between the two.
2      A.  Well, the NVRA doesn't require equivalent
3  opportunities to register to vote.  It requires
4  simultaneous opportunities to register to vote.  The
5  automated process didn't come along until 2010.  The
6  NVRA has been in place since 1993.  So there used to be
7  a very similar process in person visits to the DPS as
8  well.  They had to fill out a voter registration
9  application, and the difference was that DPS would
10 deliver it to the voter registrar instead of the voter
11 having to mail it, but it was almost the same except for
12 that.  The fact that they've automated the process at
13 the offices doesn't mean that the process has to be
14 automated online.
15     Q.  Why not?
16     A.  The NVRA does not require that.  Now, whether
17 or not it's a good idea and whether or not -- why, you
18 know, should it happen, that's a DPS question.  That's
19 not our question.
20     Q.  Let me unpack that a little bit.  I've got two
21 questions there.  You said that the NVRA requires the
22 opportunity to register to vote at the time that you
23 transact with the driver's license authority?
24     A.  It requires a simultaneous opportunity to
25 register to vote, yes.

Page 65

1      Q.  So if I -- if I told you that the NVRA doesn't
2  use the word "opportunity," what would you say to that?
3      A.  I understand what you're saying, and the judge
4  can -- can tell us what -- you know, what that means.  I
5  understand it's a simultaneous opportunity to register
6  to vote or update your voter registration information.
7          THE REPORTER:  I'm sorry.  Simultaneous
8  opportunity --
9          THE WITNESS:  To register to vote or
10 update your voter registration information.
11     Q.  (By Ms. Stevens)  Rather than simultaneous
12 update -- well, let me -- you're adding the word
13 "opportunity" in there, and I'm trying to understand the
14 online transactions provide the opportunity to register
15 to vote through the Secretary of State's website and
16 form --
17     A.  And so does the in-person transaction.
18     Q.  But the in-person transaction, you'll agree
19 with me, is an automated process after checking the box
20 and providing an electronic signature.  Correct?
21     A.  The way the application gets to us is
22 different, but it's the same -- the opportunity to
23 register to vote or update your voter registration is
24 offered in both places.
25     Q.  Except the customer -- correct me if I'm



Page 82

1  aware that the -- the answer to the question about voter
2  registration used to default to the no answer?
3           MS. MACKIN:  Objection; form.
4      A.  No.  I had no idea.  I saw that in Betsy's
5  deposition, and that was the first that our office, I
6  think, had heard of that.
7      Q.  (By Ms. Stevens)  When the Department of
8  Public Safety decided to make the change to not default
9  to the no, to require the customer actually make the
10 choice themselves, did the Secretary of State's Office
11 have input in that -- or provide any input on that
12 decision?
13     A.  No.
14     Q.  Were there any discussions with the Secretary
15 of State's Office and DPS about the change from -- from
16 a default to no to no default?
17     A.  It's hard to say.  I don't think so.  But we
18 talked a lot -- you know, we had the meeting here after
19 the notice letter, and then we talked after that about
20 the way they treated, you know, both yes and no being
21 checked for an in-person, and then we talked about what
22 to do if both of them were left unchecked.  And so I
23 don't know if any of those discussions, you know, in
24 DPS's mind also encompassed this.
25           It could be that they were talking about

Page 83

1  this as well as the in-person transactions, and in my
2  mind I only heard it as the in-person transactions, so I
3  don't know for sure.  You know, we could have been part
4  of this conversation and just didn't really realize it.
5      Q.  The discussions you are talking about with
6  the -- checking both boxes on an in-person, checking no
7  box in person, those occurred in 2015.  Is that right?
8      A.  Yeah, or early '16.
9      Q.  Prior to the initiation of this lawsuit?
10     A.  After the notice letter, prior to the lawsuit.
11 I don't remember exactly when this got filed.
12           MS. STEVENS:  If you could mark that as
13 9, please.
14           (Exhibit No. 9 marked)
15     Q.  (By Ms. Stevens)  I'm handing you Exhibit 9,
16 Mr. Ingram.  If you'll just look over that and let me
17 know when you're done.
18     A.  Yes, I saw this.
19     Q.  And this one is marked as confidential, so we
20 won't reference the customer's name, but this is an
21 email string from November of 2012.  Is that correct?
22     A.  It is.
23     Q.  And it -- it looks like initially it's from
24 a -- just a member of the public to the "Elections
25 Internet" is what the to line shows.  Is that an email

Page 84

1  address with the Elections Division?
2      A.  It is.
3      Q.  Okay.  The -- well, let's -- the initial email
4  says, "I just renewed my driver's license online and was
5  dismayed that the 'do you want to register to vote'
6  defaults to 'no.'  In my opinion, it should default to
7  'yes' if you want to encourage people to register to
8  vote - which should be a goal of the State and the
9  Elections Division.  I hope that this changes in the
10 future.  After all, it's not automatic - one does have
11 to take additional steps to actually register.  Thanks."
12           And then up above that is the response
13 email from Brenda Hester -- is she in the Elections
14 Division?
15     A.  She is.
16     Q.  Okay -- to the individual customer, and said,
17 "That is something we can discuss with DPS in the
18 future.  Thank you for your input."
19           Did I read that correctly?
20     A.  Sure.
21     Q.  And Betsy Schonhoff in your office is also
22 copied on that email.  Correct?
23     A.  She is.
24     Q.  Okay.  So in -- back in 2012, the Secretary of
25 State's Office was aware that the answer to the "do you

Page 85

1  want to register to vote" question online was defaulting
2  to no.  Is that correct?
3      A.  Right.
4           MS. MACKIN:  Objection; form.
5      Q.  (By Ms. Stevens)  Was there any -- any
6  discussion at that point with the Department of Public
7  Safety to -- to make that change?
8      A.  Not that I recall.
9      Q.  Well, what about that the Secretary of State's
10 Office recalls, since we're here for a 30(b)(6)?
11     A.  That's what I -- I don't -- I don't think that
12 we had that discussion.  Betsy might have.  You know,
13 you saw her testimony on this topic, and we can read
14 that if you want to.
15     Q.  Well, I think, since you're here on behalf of
16 the entity, that you're required to provide the entity's
17 response.  So did the entity -- did the Secretary of
18 State have any discussions with the DPS back in 2012
19 about changing that default from no to what it is now?
20     A.  I don't know.
21     Q.  Are you able to find out?
22     A.  Betsy would be the one that would know, and
23 you read her testimony on this topic.  So I can ask
24 Betsy, but she'll probably give me the same answers.  I
25 do not believe that we had such discussions.  But again,

STRINGER: BRIAN KEITH INGRAM

Page 94

1    Q.    But we've gone over, have we not, that the
2  driver's license application does not have all of the
3  information or questions that a -- hold on -- a voter
4  registration application has on it.  Is that correct?
5    A.    That's right.
6    Q.    Okay.  So the signature as needed under the
7  Texas Election Code that you keep referencing is needed
8  on the voter registration form, not the driver's license
9  form.  Correct?
10            MS. MACKIN:  Objection; form.
11    A.    No, that is not correct.
12    Q.    (By Ms. Stevens)  Explain why it's not
13  correct.
14    A.    The Texas Election Code requires that an
15  application for voter registration be in writing and
16  signed by the applicant.  That is what happens at DPS.
17          And the voter not only signs once.  They
18  sign twice.  They sign the DL application that says "I
19  want to register to vote," and then they -- that also
20  swears they're a citizen and that they're over 18 and
21  all of the stuff that's contained in that application --
22  and they also sign a signature capture device that has
23  the attestations for the voter registration.
24          Now, when we get a voter registration
25  application from DPS, once in a while the data regarding

Page 95

1  the signature doesn't transmit.  So we can use, in lieu
2  of that signature capture device signature, the physical
3  signature, because that -- it might not be exactly the
4  same, but it's saying, "I want to register to vote," and
5  it's a physical signature.  Right?
6          Whenever somebody does an online
7  transaction at DPS, they don't sign anything.  There is
8  no signature electronically captured or otherwise, and
9  that does not comply with the Texas Election Code.
10  There is nothing for them to sign.  There is no
11  signature captured.  There is no signature.  There is
12  nothing.
13    Q.    On the -- let's backtrack just a little bit.
14  On the driver's license forms that we've looked at -- I
15  think they're Exhibits 4 and 5 -- it says, "By providing
16  my electronic signature, I understand the personal
17  information on my application form and my electronic
18  signature will be used for submitting my voter
19  registration application to the Secretary of State's
20  Office."
21          Correct?
22    A.    That's what it says.
23    Q.    Okay.  And so that's indicating to the
24  prospective voter that the electronic signature is
25  what's used as the signature that's compliant with the

Page 96

1  Texas Election Code?
2    A.    The physical signature that's electronically
3  captured, yes.
4    Q.    Okay.  Back to your point about the online
5  transactions not containing a signature, the DPS does
6  use the prior provided electronic signature that -- for
7  the driver's license that they -- the customer used --
8  provided the last time they were in person.  Correct?
9    A.    Presumably, yes.
10    Q.    The same goes for the mail-in change of
11  address transaction -- are you looking at your driver's
12  license there?
13    A.    Yeah.  Because this one was renewed online,
14  and so I guess that I wrote that signature at their
15  signature capture device quite a while ago.
16    Q.    Okay.  And you're aware that you have to
17  transact in person with DPS every other transaction?
18    A.    Yes.
19    Q.    For the mail-in change of address form that --
20  I think that's an exhibit in front of you -- that DPS
21  receives that has the voter registration question, there
22  is not an electronic signature or a -- use your
23  phrase -- the physical signature provided on a keypad
24  provided for that change of address interaction.
25  Correct?

Page 97

1            MS. MACKIN:  Objection; form.
2    A.    No.  There's a physical signature on the -- on
3  the address change application.
4    Q.    (By Ms. Stevens)  Right.  But the information
5  that gets sent on to the voter registrars through the
6  Secretary of State's Office is the data that's pulled
7  from that form and then the electronic signature that
8  was previously provided by the customer in person at a
9  DPS office?
10    A.    That's my understanding, yes.
11    Q.    Well, is that the Secretary of State's
12  understanding?
13    A.    That is the Secretary of State's
14  understanding.  You bet.
15    Q.    So in that same way, the online transaction
16  could utilize the previously provided electronic
17  signature that was provided in person by the customer
18  for the voter registration application form that gets to
19  the voter registrar in the same way that the change of
20  address mail-in occurs?
21    A.    It could if the law allowed it, but the law
22  doesn't allow it, so it can't.
23    Q.    What portion of the law doesn't allow it?
24    A.    13.002(b).
25            THE REPORTER:  As in boy?

hg

STRINGER: BRIAN KEITH INGRAM

---

Page 170

1  for online counties, and it was presented at our county
2  election seminar on the third day.  I just don't know
3  which year.
4          And it doesn't look like something that
5  Betsy would have done, so probably it's old, but it --
6  you know, this doesn't look like our current VR
7  section's work product, so I would imagine it's from a
8  seminar prior to the 30th Election Law Seminar.
9      Q.  And what year was that?
10     A.  The 30th Election Law Seminar was in 2012.
11     Q.  The -- it looks like the -- I just have a
12  document with the meta data, but it looks like it was
13  from 2013.
14     A.  Okay.  That's conceivable, but -- I mean, I
15  can tell it's old.
16     Q.  Okay.  And can you tell me why entire pages
17  would have been redacted in the production to us?
18     A.  For the same reason as the document
19  Exhibit 12, because it's got technical data information.
20     Q.  In the form of --
21     A.  Screenshots and that sort of thing.
22     Q.  Is there something other than screenshots that
23  would show the technical data information that you're
24  referencing?
25     A.  I don't know.  Sometimes Betsy puts on there

---

Page 171

1  buttons and, you know, pictures of the buttons and the
2  drop-down menus and stuff.  This would have been old
3  TEAM.
4      Q.  And the buttons you're referencing, though,
5  are within the TEAM system?
6      A.  Yes, in the web interface.
7      Q.  If you would turn to Page 10, I'll ask you
8  some questions about that.  Are you there?
9      A.  Yes.
10     Q.  All right.  At the top, it says, "What if I
11  don't finish all DPS pending tasks?"
12          Did I read that correctly?
13     A.  Yes.
14     Q.  And then there are three bullet points.  The
15  first one says, "Your official list of registered voters
16  will not contain all otherwise eligible voters."
17          The second bullet says, "Voters who would
18  otherwise eligible may have to cast a provisional
19  ballot."
20          And the third says, "Reimbursement will
21  be delayed for these records until you complete the
22  tasks."
23          What are the DPS pending tasks that this
24  PowerPoint reference -- or excuse me -- this page
25  references?

---

Page 172

1      A.  So whenever we get the batch file from DPS and
2  send it to the counties, it shows up as a task for them
3  to work.  They've got a new voter registration
4  application from DPS that they need to put through the
5  live check system and get a VUID back.  They've got to
6  finish the process of registering the voter.  The voter
7  is not registered just because they've got an
8  application file out there in the world.  They have to
9  work that file.
10     Q.  And those are the tasks that are referenced
11  here, the -- run it through live check and then --
12     A.  No.
13     Q.  -- what else?
14     A.  No.  The task that's here is you get -- you
15  get -- whenever you turn on your computer for the day
16  and you log onto TEAM, before we had the dashboard, we
17  had tasks to work.  And so you would have 50 DPS
18  application tasks, because that's 50 DPS applications
19  that you need to run through the registration process
20  and get a VUID assigned to them.
21     Q.  Through the new redeveloped TEAM, do they
22  still have to do those tasks even if they're not called
23  that same thing?
24     A.  That's right.  They still show up on their
25  dashboard, and on their dashboard, they've got 50 DPS

---

Page 173

1  registrations to work.
2      Q.  So it says that "voters who would otherwise be
3  eligible may have to cast a provisional ballot."  Why is
4  that?  What --
5      A.  Because they didn't get registered.  If you
6  don't work your DPS tasks, you're not registering the
7  voter.
8      Q.  Okay.
9      A.  The voter is not registered until the voter
10  registrar registers them.
11     Q.  What's the --
12          THE REPORTER:  I'm sorry.  Until the
13  voter registrar --
14          THE WITNESS:  Registers them.
15          THE REPORTER:  Thank you.
16     Q.  (By Ms. Stevens)  What's the timeframe that
17  the voter registrar has between receipt of the voter
18  registration form and when the voter has to be
19  registered?
20     A.  There's not a specific timeframe for that.
21  The voter needs to have a voter registration certificate
22  within 30 days.
23     Q.  And that's generated by the voter registrar?
24     A.  That's right.  Whenever the voter registration
25  is successfully completed, the system kicks out a VR

---



STRINGER: BRIAN KEITH INGRAM

Page 174

1  certificate.
2      Q.   And the 30 days starts running from the time
3  that the voter submits the voter registration
4  application.  Is that correct?
5      A.   That's correct.
6      Q.   Does the Secretary of State's Office --
7      A.   That's for all applications, paper or DPS.
8      Q.   That 30-day timeframe?
9      A.   Yes.
10     Q.   Does the Secretary of State ensure that
11 counties finish their DPS pending tasks before elections
12 so that all eligible -- all eligible voters can cast a
13 regular ballot?
14     A.   We don't -- I don't know what you mean by
15 "ensure."  We don't tell counties what to do.  We
16 strongly encourage them to get their work done.
17     Q.   Okay.
18     A.   There's no ensuring anything by a county.  We
19 have on our TEAM system information about how many are
20 unworked, and we will call the counties that have a
21 substantial number of unworked ones and ask them what
22 the deal is and why aren't they finishing.
23     Q.   And what if they said, "We're just not going
24 to do it"?
25     A.   That never happens, but if it did, we would

Page 175

1  have a 31.005 situation on our hands.  We had something
2  close to that in Harrison County in 2014, and I was
3  close to pulling the trigger on a 31.005 at that point.
4  But that is the only county election official that I've
5  ever encountered who exhibited an attitude similar to
6  that.
7           They almost universally are in this
8  business because they care about the election process,
9  they care about the voters, and they want the process to
10 run properly and well.  They're remarkable, and they
11 work hard.
12     Q.   Would you flip to the next page, which is
13 Page 11 of that PowerPoint?  At the top, it says, "What
14 about the unresolved precinct/jurisdiction tasks?"
15           What task is that referring -- or tasks?
16     A.   So in the old TEAM, you would have some voters
17 who were untethered, and so you would have to make
18 them -- you would have to put them into a precinct
19 physically.  Our current redeveloped system doesn't work
20 like this.
21     Q.   How does it work for the precincts now?
22     A.   So now then the redistricting module you
23 can't -- you can't create a precinct without having the
24 voters associated with it.  In the old TEAM, you would
25 have to create the precinct.  Then you would have to

Page 176

1  associate the voters to the precinct.  And it was a
2  time-consuming, laborious, manual process.  The new TEAM
3  is automated.  When you create the precinct, the voters
4  are in it.
5      Q.   So this slide within the PowerPoint is
6  obsolete now?
7      A.   It is.
8      Q.   Okay.  Turn with me, please, to Page 12.  This
9  says at the top, "What about the," in quotes, "'SC 91
10 from FPCA' tasks?"
11           Is that a -- well, what kind of task is
12 that?
13     A.   So the Federal Post Card Application is what
14 the FPCA stands for, and it is a form that is used by
15 military voters and overseas voters to do two things.
16 The FPCA is both a request for a ballot by mail and a
17 voter registration document.
18     And so whenever -- the early voting clerk
19 is the one who receives the FPCAs.  The early voting
20 clerk will input that FPCA into their system to request
21 a -- to generate a ballot to send to the voter, and then
22 they will send this SC 91 to the voter registrar so that
23 the voter registrar will register the voter or update
24 their voter registration if they're already registered.
25           So there's two pieces of this puzzle that

Page 177

1  have to come together, and the early voting clerk is the
2  one who receives this one.  Normally voter registrations
3  go directly to the voter registrar, but this voter
4  registration goes to the early voting clerk, which can
5  be different in about 130 counties, 140 counties.
6      Q.   And is this still the -- needs to be processed
7  in the same way in new TEAM as in old TEAM?
8      A.   It is still the case that the early voting
9  clerk gets -- the FPCA does what they do with it and
10 sends the SC 91 to the voter registrar, yes.
11     Q.   And the voter registrar works it in the same
12 way that they would work any other voter registration --
13     A.   Yes.
14     Q.   -- application?
15     A.   I -- it is my understanding that the
16 difference now is what the early voting clerk does is a
17 temporary voter registration sufficient to keep that --
18 you know, to keep that ballot request active.  And so
19 it's not as essential that the voter registrar work the
20 91 as fast.  They need to before the next election that
21 the FPCA would be good for, but they don't have to
22 necessarily for this election.  So I don't know for sure
23 if it's exactly the same now as it -- as it was then.
24     Q.   And the temporary voter registration that
25 you've talked about that the early voting clerk creates,



STRINGER: BRIAN KEITH INGRAM

Page 182

1  voter registration field:  'Voter registration was never
2  included in the file due to conversations during DLR
3  requirements.  Since they are not actually registering
4  to vote when they select yes, the DLS application was
5  not to receive this field.  When they select yes to
6  voter reg online, they are merely presented with a link
7  and has no indication of whether or not they actually
8  registered to vote.'"
9          Did I read all that correctly?
10  A.   You did.
11  Q.   The DLR requirements that it's talking about,
12  that's referencing the conversations you were able to
13  confirm with your predecessor and Betsy Schonhoff's
14  predecessor.  Is that right?
15  A.   I -- I don't think so, no.
16  Q.   What do you think it is?
17  A.   I think that's what the driver's license
18  division required from Texas.gov.  Now, I assume the
19  business requirements for this were discussed with our
20  office, and based upon my conversations with Karen and
21  Ann, I believe those conversations occurred, but I do
22  not understand what this means when it says it was
23  "never included in the file due to conversations during
24  DLR requirements."
25          What I think it means is that the actual

Page 183

1  process of taking this information and shipping it
2  through DLS to Secretary of State was never included.
3  Q.   And --
4  A.   And that would be consistent with my
5  conversations with Ann and Karen.
6  Q.   And that -- that's true as far as the
7  Secretary of State is concerned.  That information has
8  never been sent from Texas.gov DPS application to DLS
9  and then on to Secretary of State?
10  A.   That's right.
11  Q.   Okay.  I think you referenced this earlier --
12  or stated this earlier, but the technical requirements
13  for transferring the answer to the voter registration
14  question on a DPS online transaction to DLS on to the
15  Secretary of State's Office, it's technic- --
16  technically feasible?
17  A.   Yeah.  It's my understanding that there would
18  be some cost associated with it, and there would be
19  an -- an issue with making sure you retrieved the proper
20  signature to send with the file, that technically
21  would be a challenge that would have to be overcome
22  and -- so I don't know.  I mean, it's feasible.  It
23  would just cost money.
24  Q.   What's the -- you identified the cost
25  implications but also it might be difficult or --

Page 184

1  A.   The --
2  Q.   -- the signature issue might --
3  A.   Since there's --
4  Q.   -- take some working out?
5  A.   -- not a signature captured contemporaneously
6  with the transaction, retrieving the proper signature
7  from the proper file is a technical thing that Texas.gov
8  or DPS or somebody would have to overcome.
9  Q.   But that signature file is housed within DLS.
10  Right?
11  A.   Presumably.
12  Q.   Well, for the -- going back to the mail-in
13  change of address with DPS, that information goes on to
14  the Secretary of State.  If someone chooses to register
15  to vote, that signature is retrieved from DLS and sent
16  on to the Secretary of State.  Right?
17  A.   It's retrieved from wherever they keep it,
18  yes.
19  Q.   Okay.  And, presumably, that same signature
20  could be sent on if the person answered yes to the voter
21  registration question online?
22  A.   If it was legal to do so.  I've already told
23  you I think that's technically possible.  You bet.
24  Q.   Okay.  And --
25  A.   And I don't think it would cost a lot of

Page 185

1  money.  It would cost something to make that change.
2  Q.   Okay.
3  A.   And I've been told that the technical
4  procedure -- the technical hurdle to overcome is making
5  sure you pull the right signature.
6  Q.   And who told you that?
7  A.   DPS.
8  Q.   Who at DPS?
9  A.   It was in a conversation about online voter
10  registration with many stakeholders in the room.
11  Q.   And when you say it would be an issue to
12  determine which signature to pull, how many signatures
13  are attached to an individual record?
14  A.   Well, that's the issue.  Which individual
15  record are you pulling from, and then which signature?
16  So if somebody has been a driver in Texas, they could
17  have a lot of signatures on file with the DPS.  I don't
18  know how many they keep, and I don't know what form they
19  keep them.
20          But I don't -- I don't know.  This is not
21  our process that I'm talking about.  This is DPS's
22  process.  DPS has expressed that the technical hurdle to
23  doing something like this in a similar situation is
24  retrieving the correct signature.  I don't know why
25  that's difficult.  I don't know anything about the

hg

STRINGER: BRIAN KEITH INGRAM

Page 186

1  details of the difficulty.  That is not my issue.  It is
2  not the Secretary of State's issue.  I just know what
3  they've expressed in an open meeting about online voter
4  registration.
5      Q.   But the Secretary of State does know that DPS
6  is able to pull the proper signature to send on for
7  voter registration purposes to the Secretary of State
8  for mail-in change of address forms?
9      A.   I'm not arguing with you that this is not
10 possible.  That is not my argument at all.  My argument
11 is exactly to the contrary.  This is a very possible
12 thing to do what you're saying if it was legal, and it's
13 not legal.
14     Q.   Okay.  And --
15     A.   So I'm not contesting the logistics of it.  We
16 can agree that it's a possible thing to do.
17     Q.   Okay.  And I'm -- I'm trying to understand,
18 from the Secretary of State's perspective, how possible.
19 Is it --
20     A.   That I don't know.  That's a DPS question.
21     Q.   Okay.  The -- so you've told me about the
22 signature potential issue with DPS.  Tell me about the
23 costs that you are referencing.
24     A.   That's a DPS question.
25     Q.   So the costs are only on the DPS side of this?

Page 187

1      A.   We have put a fiscal note on online voter
2  registration of about $182,000 --
3      Q.   What does that --
4      A.   -- for Secretary of State.
5      Q.   What does that mean?
6      A.   For changes that we would have to make to TEAM
7  if there was an online voter registration option in
8  Texas.
9      Q.   And -- and let's make the distinction very
10 clear.  You're talking about a process that is not the
11 DPS online application that we're talking about.  That
12 is a -- a voter registration application that would run
13 through the Secretary of State's Office.
14     A.   The versions of --
15     Q.   Is that --
16     A.   -- online voter registration that have been
17 proposed in the legislature would be a very similar
18 process to what you're describing from Texas Online,
19 where you would be able to go online, request to
20 register to vote, and DPS would supply the signature
21 from their file.  And those are the only people who
22 would be eligible to register online, are people who
23 have a signature on file with the DPS.  It is a very
24 similar process.
25          This -- this what you're discussing might

Page 188

1  not be as comprehensive as any voter.  It would be just
2  the voters who -- or the customers who are doing a
3  transaction with DPS already, but still it's the same
4  process.
5      Q.   So the $182,000 that you've identified,
6  what -- what does that cost entail?
7      A.   Hours of developer work that it would require
8  to make TEAM able to do this interface.
9      Q.   TEAM already does this interface for DPS
10 applications.  Correct?
11     A.   No.  It does a similar one, and it might not
12 be much of a hurdle to do a different one, but it
13 doesn't do this one yet.
14     Q.   What information would come -- in our
15 scenario -- I'm not talking about online voter
16 registration.
17     A.   Really, I -- do we have to talk about this?
18 This -- I am not arguing the point about whether it's
19 possible.  It is possible and I don't think very
20 difficult.  So why do we need to keep talking about it?
21     Q.   I'm just trying to make sure that it's clear
22 for the Judge in our case --
23     A.   How -- how clear can I make it for the Judge?
24     Q.   Well, I'm trying -- you've -- you've said that
25 it -- when I asked you about cost, you referenced

Page 189

1  $182,000.  I'm just trying to get at what that money
2  covers.
3      A.   The fiscal note on online voter
4  registration bills is available on the Texas legislature
5  online website.  You can go read it at your leisure.
6      Q.   Well, unfortunately, I'm not at my leisure,
7  and I'm here for a deposition.  And so could you please
8  answer my question?
9      A.   I have answered your question.  It is for
10 hours of development work to make TEAM be configured to
11 accept this new interface.
12     Q.   So that's all $182,000 represents?
13     A.   That's right.  Developer hours.
14     Q.   The Secretary of State's Office is not a part
15 of the legislature.  Correct?
16     A.   That is correct.
17     Q.   And thus you are not a legislator.  Is that
18 correct?
19     A.   I am not.
20     Q.   And you're also not a legislative aide.  Is
21 that correct?
22     A.   I am not.
23     Q.   Okay.  And -- and no one in the Department of
24 Elections within the Secretary of State's Office is --
25 is a legislator.  Correct?

STRINGER: BRIAN KEITH INGRAM

**Page 214**

```
 1              CHANGES AND SIGNATURE
 2  PAGE  LINE      CHANGE              REASON
 3  _____
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

**Page 215**

```
 1       I, BRIAN KEITH INGRAM, have read the foregoing
 2  deposition and hereby affix my signature that same is
 3  true and correct, except as noted above.
 4
 5                      _____
 6                      BRIAN KEITH INGRAM
 6
 7  THE STATE OF _____)
 8  COUNTY OF _____)
 9
10       Before me, _____, on this day
11  personally appeared BRIAN KEITH INGRAM, known to me (or
12  proved to me under oath or through _____)
13  (description of identity card or other document) to be
14  the person whose name is subscribed to the foregoing
15  instrument and acknowledged to me that they executed the
16  same for the purposes and consideration therein
17  expressed.
18       Given under my hand and seal of office this the
19  _____ day of _____, 2017.
20
21
22                      _____
                        NOTARY PUBLIC IN AND FOR
                        THE STATE OF _____
23
24
25
```

**Page 216**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              WESTERN DISTRICT OF TEXAS
                  SAN ANTONIO DIVISION
 3  JARROD STRINGER, et al.,        §
                                    §
 4       Plaintiffs,                §
                                    §
 5  v.                              §  Civil Action
                                    §  No. 5:16-cv-00257-OLG
 6  ROLANDO B. PABLOS, IN HIS       §
    OFFICIAL CAPACITY AS THE        §
 7  SECRETARY OF STATE and STEVEN   §
    C. McCRAW, IN HIS OFFICIAL      §
 8  CAPACITY AS THE DIRECTOR OF     §
    THE TEXAS DEPARTMENT OF PUBLIC  §
 9  SAFETY,                         §
                                    §
10       Defendants.                §
11
               REPORTER'S CERTIFICATION
12           DEPOSITION OF BRIAN KEITH INGRAM
                   March 22, 2017
13
14       I, Steven Stogel, Certified Shorthand Reporter in
15  and for the State of Texas, hereby certify to the
16  following:
17       That the witness, BRIAN KEITH INGRAM, was duly
18  sworn by the officer and that the transcript of the oral
19  deposition is a true record of the testimony given by
20  the witness;
21       That the original deposition was delivered to MS.
22  BETH STEVENS.
23       That a copy of this certificate was served on all
24  parties and/or the witness shown herein on
25  _____, 2017.
```

**Page 217**

```
 1       I further certify pursuant to FRCP Rule 30(f)(1)
 2  that the signature of the deponent:
 3       _X_ was requested by the deponent or a party
 4  before the completion of the deposition and that the
 5  signature is to be before any notary public and returned
 6  within 30 days (or ____ days per agreement of counsel)
 7  from date of receipt of the transcript.  If returned,
 8  the attached Changes and Signature Page contains any
 9  changes and the reasons therefore:
10       ____ was not requested by the deponent or a
11  party before the completion of the deposition.
12       That the amount of time used by each party at the
13  deposition is as follows:
14            MS. BETH STEVENS.....................4:48
15            MS. ANNE MARIE MACKIN................0:02
16       That pursuant to information given to the
17  deposition officer at the time said testimony was taken,
18  the following includes counsel for all parties of
19  record:
20  FOR THE PLAINTIFFS:  MS. BETH STEVENS
21  FOR THE DEFENDANTS:  MS. ANNE MARIE MACKIN
22       That $_____ is the deposition officer's charges
23  to the Plaintiffs for preparing the original deposition
24  transcript and any copies of exhibits;
25       I further certify that I am neither counsel for,
```

STRINGER: BRIAN KEITH INGRAM

Page 218

```
1   related to, nor employed by any of the parties or
2   attorneys to the action in which this testimony was
3   taken, and further that I am not financially or
4   otherwise interested in the outcome of this action.
5       Certified to by me this the  5th  day of
6   April         , 2017.
7
8
9   _____
    Steven Stogel
10  CSR 6174
    Expiration Date:  December 31, 2018
11  HG Litigation Services
    Firm No. 69
12  2777 N. Stemmons Freeway, Suite 1025
    Dallas, Texas 75207
13  1-888-656-DEPO
14
15
16
17
18
19
20
21
22
23
24
25
```

APPENDIX 48

# EXHIBIT 7

# APPLICATION FOR TEXAS DRIVER LICENSE OR IDENTIFICATION CARD

**NOTICE:** All information on this application must be in INK.   **Applications held only 90 days.**

**DPS CANNOT REFUND PAYMENT ONCE APPLICATION IS SUBMITTED.**

**FOR DEPARTMENT USE ONLY**
RESTRICTIONS/ENDORSEMENTS

ASSIGNED # _____

**APPLICATION for:** ☐ DRIVER LICENSE    ☐ COMMERCIAL DRIVER LICENSE (CDL)    ☐ LEARNER LICENSE

☐ IDENTIFICATION CARD    ☐ NON-RESIDENT COMMERCIAL DRIVER LICENSE    Class (Circle)  A  B  C  M

## APPLICANT INFORMATION

LAST NAME: _____

FIRST NAME: _____

MIDDLE NAME: _____

SUFFIX: _____

MAIDEN NAME: _____

DATE OF BIRTH (mm/dd/yyyy): ____ ____ ____

SSN: _____

SEX: (Circle One)   MALE   FEMALE

EYE COLOR: _____  HAIR COLOR: _____

RACE/ETHNICITY:  (I) American Indian/Alaska Native
(A) Asian/Pacific Islander  (B) Black  (H) Hispanic  (O) Other  (W) White

HEIGHT: ft. _____ in. _____  WEIGHT: lbs. _____

PLACE OF BIRTH: CITY: _____  COUNTY: _____  STATE: _____  COUNTRY: _____

FATHER'S LAST NAME: _____   MOTHER'S MAIDEN NAME: _____

## CONTACT INFORMATION

HOME PHONE: _____

OTHER PHONE: _____

EMAIL: _____

## ADDRESS INFORMATION

RESIDENCE ADDRESS: _____

CITY: _____  STATE: _____

ZIP CODE: _____  COUNTY: _____

MAILING ADDRESS: _____

CITY: _____  STATE: _____

ZIP CODE: _____  COUNTY: _____

**EXHIBIT**
tabbies® **3 P**

## REQUIRED INFORMATION FROM ALL APPLICANTS

YES  NO

1. ☐ ☐ Are you a citizen of the United States?
2. ☐ ☐ If you are a US citizen, would you like to register to vote? If registered, would you like to update your voter information?
   By providing my electronic signature, I understand the personal information on my application form and my electronic signature will be used for submitting my voter's registration application to the Texas Secretary of State's office. Wanting to register to vote, I authorize the Department of Public Safety to transfer this information to the Texas Secretary of State.
3. ☐ ☐ Do you wish to donate $1.00 to the Blindness Education Screening and Treatment Program?
4. ☐ ☐ Do you want to support the Glenda Dawson Donate Life Texas donor registry? If yes, please indicate a donation amount of $1 or more $_____.00
5. ☐ ☐ Would you like to register as an organ donor?
6. ☐ ☐ Do you want to support Texas Veterans?  If yes, please indicate your donation amount $_____.00
7. ☐ ☐ Do you have a health condition that may impede communication with a peace officer?  If yes, please list
   _____ (physician must complete form DL-101 prior to the issuance of a DL/ID).
8. ☐ ☐ **a)** Do you want a Veteran designator on your driver license or identification card?  (proof of Honorable discharge required; acceptable documents are DD214/5, NGB22, VA disability letter, proof of service/verification of honorable service card)
   ☐ **b)** Are you a 60% disabled Veteran receiving compensation and want to waive the application fee? (see 8a for documents required)
9. ☐ ☐ In the event of injury or death would you like to provide two (2) emergency contacts? If yes, please list:
   **a)** Name _____ Telephone Number _____ Address _____
   **b)** Name _____ Telephone Number _____ Address _____
10. ☐ ☐ Have you ever had a Texas identification card?  Number _____   When? _____
11. ☐ ☐ Have you ever had a driver license or instruction permit in Texas?  Number _____  When? _____
12. ☐ ☐ Have you ever had a license or instruction permit in any other state? List state(s) _____
    Number(s) _____   When? _____

## REQUIRED INFORMATION FROM DRIVER LICENSE APPLICANTS

YES  NO                    **DRIVING HISTORY INFORMATION**

13. ☐ ☐ Are you enrolled in or have you completed an approved driver education course?
14. ☐ ☐ Is your driver license or driver privilege **CURRENTLY** or **EVER** been suspended, revoked, canceled, denied or disqualified in **ANY** state?
    Where? _____  When? _____  Why? _____

**VEHICLE REGISTRATION AND INSURANCE INFORMATION**

15. ☐ ☐ Do you own a motor vehicle which is required to be registered (Texas Transportation Code Section 502.040)?
16. ☐ ☐ Do you own a motor vehicle which is required to have liability insurance OR other proof of financial responsibility in compliance with the Motor Vehicle Safety Responsibility Act (Texas Transportation Code Section 601.051)?

**UNITED STATES SELECTIVE SERVICE**

Any male United States citizen or immigrant who is at least 18 years of age but less than 26 years of age submitting this application consents to registration with the United States Selective Service System. You must be registered to qualify for federal student aid ( to include Pell grant), job training, federal employment, and citizenship if an immigrant. In Texas, you must be registered to qualify for state college student aid or state employment. If convicted, failure to register with the Selective Service is a felony punishable by up to five years in prison and/or a $250,000 fine. If not registered by age 26, you can no longer register and could permanently lose those benefits associated with registration. For alternative options for applicants who object to conventional military service for religious or other conscientious reasons information is available at: http://www.sss.gov/FactSheets/FSaltsvc.pdf.

DL-14A (Rev. 2/17)                    APPLICATION CONTINUED ON BACK                    APPENDIX 50

**DRIVER LICENSE APPLICANTS: Answers to 1 through 7 below are for the confidential use of the Department.**

|  | YES | NO | MEDICAL HISTORY QUESTIONS |
|---|---|---|---|

**1.** ☐ ☐ Do you currently have or have you ever been diagnosed with or treated for any medical condition that may affect your ability to safely operate a motor vehicle?

**EXAMPLES, including but not limited to:** Diagnosis or treatment for heart trouble, stroke, hemorrhage or clots, high blood pressure, emphysema (within past two years) • progressive eye disorder or injury (i.e., glaucoma, macular degeneration, etc.) • loss of normal use of hand, arm, foot or leg • blackouts, seizures, loss of consciousness or body control (within the past two years) • difficulty turning head from side to side • loss of muscular control • stiff joints or neck • inadequate hand/eye coordination • medical condition that affects your judgment • dizziness or balance problems • missing limbs

Please explain and identify medical condition: _____

**2.** ☐ ☐ Do you have a mental condition that may affect your ability to safely operate a motor vehicle?  If yes, please explain: _____

**3.** ☐ ☐ Have you ever had an epileptic seizure, convulsion, loss of consciousness, or other seizure?

**4.** ☐ ☐ Do you have diabetes requiring treatment by insulin?

**5.** ☐ ☐ Do you have any alcohol or drug dependencies that may affect your ability to safely operate a motor vehicle or have you had any episodes of alcohol or drug abuse within the past two years?

**6.** ☐ ☐ Within the past two years have you been treated for any other serious medical conditions? Please explain: _____

**7.** ☐ ☐ Have you **EVER** been referred to the Texas Medical Advisory Board for Driver Licensing?

**NOTICE:**  The information on this application is required by the Texas Driver License Act, Texas Transportation Code Chapter 521. Failure to provide the information is cause for refusal to issue a driver license or identification card, and in some cases, cancellation or withdrawal of driving privileges. False information could also lead to criminal charges with penalties of a fine up to $4,000.00 and/or jail.

**Do not sign below until instructed to do so by Notary Public or Driver License employee.**

---

### CERTIFICATION

I do solemnly swear, affirm, or certify that I am the person named herein and that the statements on this application are true and correct. I further certify my residence address is a (check one): (  ) single family dwelling, (  ) apartment, (  ) motel, (  ) temporary shelter. I agree to immediately report to the Texas Department of Public Safety any changes in my medical condition which may affect my ability to safely operate a motor vehicle. I further understand that I am required by law to report any change of name or address to the Department of Public Safety within thirty days.

X _____

Signature of Applicant                                        Date

---

Texas law requires the Texas Department of Public Safety must provide every minor applicant (under age 18), and cosigner, for a driver license in Texas, educational information concerning state laws relating to driving while intoxicated, driving by a minor with alcohol in the minor's system, and the implied consent law. The minor applicant and the cosigner must acknowledge receipt of that information prior to issuance of any driver license or permit.

I hereby acknowledge receipt of the information concerning DWI, the Zero Tolerance Law and the Implied Consent Law.

_____   _____   _____
Minor Applicant                        Parent/Legal Guardian                   Date of Receipt

---

### PARENTAL AUTHORIZATION

#### Required for all driver license applicants under the age of 18

I do solemnly swear, affirm, or certify that I am the person named herein, that the statements on this application are true and correct, that the above named applicant is my (  ) child (  ) stepchild (  ) ward, and that I have legal custody of the applicant. I authorize the Department of Public Safety to issue a Class (  ) A, (  ) B, (  ) C, or (  ) M license to said minor. The Department can access the said minor's school enrollment records from the Texas Education Agency, and a school administrator or law enforcement officer is authorized to notify the Department if the said minor is absent from school for at least 20 consecutive instructional days.

_____   _____   _____
Usual Written Signature of Parent or Guardian        Driver License Number                   Date

#### WAIVER OF PARENTAL AUTHORIZATION

Parental Authorization waived. _____   _____   _____
                                               Signature of Applicant                   DL Employee                   ACID

---

### VERIFICATION

Sworn to and subscribed before me this _____ day of _____, ____.

_____
Notary Public in and for the State of Texas/Authorized Officer

---

### SOCIAL SECURITY NUMBER COLLECTION DISCLOSURE

Disclosure of your social security account number is mandatory for identification card and driver license applicants. This information is solicited pursuant to 42 U.S.C. 405(c)(2)(C)(i), 42 U.S.C. 666(a)(13)(A); 49 C.F.R. 383.153, Texas Family Code Section 231.302(c)(1) and Texas Transportation Code Sections 522.021 and 521.142. The Department will use social security number information for identification purposes and will only release the number to the Child Support Enforcement Division of the Attorney General's Office, the U.S. Selective Service Administration, the Texas Secretary of State and the Health and Human Services Commission for statutorily authorized purposes pursuant to Texas Transportation Code Section 521.044.

APPENDIX 51

# EXHIBIT 8

## APPLICATION FOR RENEWAL/REPLACEMENT/CHANGE OF A TEXAS DRIVER LICENSE OR IDENTIFICATION CARD

(Replacement also called Duplicate)

DL or ID NUMBER: _____

EXHIBIT

3-0

**APPLICANT INFORMATION**

LAST NAME: _____

FIRST NAME: _____

MIDDLE NAME: _____

SUFFIX: _____

MAIDEN NAME: _____

DATE OF BIRTH (mm/dd/yyyy): _____ – _____ – _____

SSN: _____ – _____ – _____

SEX: (Mark One) ☐ MALE  ☐ FEMALE     WEIGHT: ____ lbs. _____

EYE COLOR: _____  HEIGHT: ____ ft. ____ in. _____

RACE/ETHNICITY: _____  (I) American Indian/Alaska Native
(A) Asian/Pacific Islander  (B) Black  (H) Hispanic  (O) Other  (W) White

**CONTACT INFORMATION**

HOME PHONE: _____

OTHER PHONE: _____

EMAIL: _____

**ADDRESS INFORMATION**

RESIDENCE ADDRESS: _____

CITY: _____  STATE: _____

ZIP CODE: _____  COUNTY: _____

MAILING ADDRESS: _____

CITY: _____  STATE: _____

ZIP CODE: _____  COUNTY: _____

**INFORMATION FORM  (ALL APPLICANTS please answer questions 1 through 9)**

|  | YES | NO |  |
|---|---|---|---|
| 1. | ☐ | ☐ | Are you a citizen of the United States? |
| 2. | ☐ | ☐ | If you are a US citizen, would you like to register to vote? If registered, would you like to update your voter information? |

By providing my electronic signature, I understand the personal information on my application form and my electronic signature will be used for submitting my voter's registration application to the Texas Secretary of State's office. Wanting to register to vote, I authorize the Department of Public Safety to transfer this information to the Texas Secretary of State.

| 3. | ☐ | ☐ | Do you wish to donate $1.00 to the Blindness Education Screening and Treatment Program? |
| 4. | ☐ | ☐ | Do you want to support the Glenda Dawson Donate Life Texas donor registry?  If yes, please indicate a donation amount of $1 or more $_____.00 |
| 5. | ☐ | ☐ | Would you like to register as an organ donor? |
| 6. | ☐ | ☐ | Do you want to support Texas Veterans?  If yes, please indicate your donation amount $_____.00 |
| 7. | ☐ | ☐ | Do you have a health condition that may impede communication with a peace officer? If yes, please list |

_____ (physician must complete form DL-101 prior to the issuance of a DL/ID).

| 8. | ☐ | ☐ | a) Do you want a Veteran designator on your driver license or identification card?  (proof of Honorable discharge required; acceptable documents are DD214/5, NGB22, VA disability letter, proof of service/verification of honorable service card) |
|  | ☐ | ☐ | b) Are you a 60% disabled Veteran receiving compensation and want to waive the application fee? (see 8a for documents required) |
| 9. | ☐ | ☐ | In the event of injury or death would you like to provide two (2) emergency contacts?  If yes, please list: |

a) Name _____ Telephone Number _____ Address _____

b) Name _____ Telephone Number _____ Address _____

**For all Driver License Renewals complete MEDICAL questions 10 to 16.** Answers to the questions below are for the confidential use of the Department.

| 10. | ☐ | ☐ | Do you currently have or have you ever been diagnosed with or treated for any medical condition that may affect your ability to safely operate a motor vehicle? |

**Examples, including but not limited to:** Diagnosis or treatment for heart trouble, stroke, hemorrhage or clots, high blood pressure, emphysema (within past two years) • progressive eye disorder or injury (i.e., glaucoma, macular degeneration, etc.) • loss of normal use of hand, arm, foot or leg • blackouts, seizures, loss of consciousness or body control (within the past two years) • difficulty turning head from side to side • loss of muscular control • stiff joints or neck • inadequate hand/eye coordination • medical condition that affects your judgment • dizziness or balance problems • missing limbs

If you answered **YES** above, has your condition ☐ **IMPROVED** or ☐ **DETERIORATED** since your last application for an original/renewal remake of your driver license?

| 11. | ☐ | ☐ | Do you have a mental condition that may affect your ability to safely operate a motor vehicle?  If yes, please explain: _____ |
| 12. | ☐ | ☐ | Have you ever had an epileptic seizure, convulsion, loss of consciousness, or other seizure? |
| 13. | ☐ | ☐ | Do you have diabetes requiring treatment by insulin? |
| 14. | ☐ | ☐ | Do you have any alcohol or drug dependencies that may affect your ability to safely operate a motor vehicle or have you had any episodes of alcohol or drug abuse within the past two years? |
| 15. | ☐ | ☐ | Within the past two years, have you been treated for any other serious medical conditions? |
|  |  |  | Explain: _____ |
| 16. | ☐ | ☐ | Have you **EVER** been referred to the Texas Medical Advisory Board for Driver Licensing? |

Any male United States citizen or immigrant who is at least 18 years of age but less than 26 years of age **submitting this application consents to registration with the United States Selective Service System.** You must be registered to qualify for federal student aid (to include Pell grant), job training, federal employment, and citizenship if an immigrant. In Texas, you must be registered to qualify for state college student aid or state employment. If convicted, failure to register with the Selective Service is a felony punishable by up to five years in prison and/or a $250,000 fine. If not registered by age 26, you can no longer register and could permanently lose those benefits associated with registration. For alternative options for applicants who object to conventional military service for religious or other conscientious reasons information is available at: http://www.sss.gov/FactSheets/FSaltsvc.pdf.

I do solemnly swear, affirm, or certify that I am the person named herein and that the statements on this information form are true and correct. I further certify my residence address is a (check one):  ( ) single family dwelling, ( ) apartment, ( ) motel, ( ) temporary shelter. I agree to immediately report to the Texas Department of Public Safety any changes in my medical condition which may affect my ability to safely operate a motor vehicle.

DL-43 (Rev. 2/17)     SIGNATURE OF APPLICANT _____   DATE _____

APPENDIX 53

## SOLICITUD PARA RENOVAR, REEMPLAZAR, Ó HACER CAMBIOS EN LA LICENCIA DE CONDUCIR O TARJETA DE IDENTIFICACIÓN DEL ESTADO DE TEXAS

(El reemplazo también es llamado duplicado)

NUMERO DE LICENCIA O DE TARJETA DE IDENTIFICACIÓN: _____

**INFORMACIÓN DEL SOLICITANTE**

APELLIDO: _____
PRIMER NOMBRE: _____
SEGUNDO NOMBRE: _____
SUFIJO: _____
APELLIDO DE SOLTERA: _____
FECHA DE NACIMIENTO (mm/dd/aaaa): _____
NÚMERO DE SEGURO SOCIAL: ____ – ____ – ____
SEXO: (Marque uno) ☐ HOMBRE ☐ MUJER   PESO: en libres. _____
COLOR DE LOS OJOS: _____   ESTATURA: ____ pies ____ pulg. ____
RAZA/ETNIA: _____ (I) Amerindio/Nativo de Alaska (A) Asiático/nativo de las Islas del Pacífico (B) Negro (H) Hispano (O) Otro (W) Blanco

**INFORMACIÓN DE CONTACTO**

NÚMERO DE TELÉFONO: _____
TELÉFONO SECUNDARIO: _____
CORREO ELECTRÓNICO: _____
**SU DOMICILIO**
DOMICILIO DONDE RESIDE: _____
CIUDAD: _____   ESTADO: _____
CÓDIGO POSTAL: _____   CONDADO: _____
DOMICILIO POSTAL (Lugar donde recibe su correspondencia): _____
CIUDAD: _____   ESTADO: _____
CÓDIGO POSTAL: _____   CONDADO: _____

**INFORMACIÓN SOBRE EL SOLICITANTE  (TODOS LOS SOLICITANTES favor de contestar las preguntas 1 a 9)**

|  | SI | NO |  |
|---|---|---|---|
| 1. | ☐ | ☐ | ¿Es usted ciudadano de los Estados Unidos? |
| 2. | ☐ | ☐ | Si usted es ciudadano de los Estados Unidos, ¿le gustaría registrarse para votar? Si ya está registrado, ¿le gustaría actualizar su información de votante? |

Al proporcionar mi firma electrónica, comprendo que la información personal en mi solicitud, junto con mi firma electrónica, se usará para enviar mi solicitud de registro electoral a la oficina de la Secretaría del Estado de Texas. Deseo registrarme para votar; por lo tanto, autorizo al Departamento de Seguridad Pública para transferir esta información a la Secretaría del Estado de Texas.

| 3. | ☐ | ☐ | ¿Desea usted donar $1.00 al Programa de Educación, Evaluación y Tratamiento de la Ceguera? |
| 4. | ☐ | ☐ | ¿Desea apoyar el Programa de Registro de Texas-Glenda Dawson Donar Vida? En caso afirmativo, indicar una cantidad de la donación de $1 o más $____.00 |
| 5. | ☐ | ☐ | ¿Desea registrarse como donador de órganos? |
| 6. | ☐ | ☐ | ¿Desea apoyar los Veteranos de Texas? Si la respuesta es sí, por favor, indique la cantidad de su donación $_____.00 |
| 7. | ☐ | ☐ | ¿Tiene usted alguna afección médica que le pueda impedir la comunicación con un oficial de la policía? En caso afirmativo, por favor indique _____ (el médico debe llenar el formulario DL-101 antes de emitir una licencia de conducir o tarjeta de identificación). |
| 8. | ☐ | ☐ | a) Desea una insignia de Veterano en su licencia de conducir o su tarjeta de identificación? (Se requiere comprobante de baja honorable; los documentos aceptables son DD214/5, NGB22, carta de discapacidad del VA, prueba de servicio/verificación de la tarjeta de servicio honorable) |
|  | ☐ | ☐ | b) ¿Es usted un Veterano que recibe 60% de compensación por discapacidad y desea quedar exento de los derechos de solicitud? (vea el punto 8a para conocer qué documentos se requieren) |
| 9. | ☐ | ☐ | En caso de sufrir lesiones o la muerte, ¿le gustaría proporcionar dos (2) contactos para emergencias?  En caso afirmativo, por favor indique: |

a) Nombre _____ Número telefónico _____ Domicilio _____
b) Nombre _____ Número telefónico _____ Domicilio _____

**Para todas las Renovaciones de Licencia de Conducir, complete las preguntas MÉDICAS 10 a 16.**
Las respuestas a las siguientes preguntas son para uso confidencial del Departamento.

| 10. | ☐ | ☐ | ¿Tiene actualmente o alguna vez ha sido diagnosticado con o tratado por alguna enfermedad que pueda afectar su capacidad de operar un vehículo motorizado de manera segura? |

**Ejemplos, incluyendo pero no limitado a:** Diagnóstico o tratamiento por problemas cardíacos, derrame cerebral, hemorragia o coágulos, presión arterial alta, enfisema (en los últimos dos años) • enfermedad progresiva o lesión de la vista (como glaucoma, degeneración macular, etc.) • pérdida del uso normal de la mano, brazo, pie o pierna • desvanecimientos, ataques, pérdida de la consciencia o control del cuerpo (en los últimos dos años) • dificultad para voltear la cabeza de un lado a otro • pérdida de control muscular • articulaciones o cuello rígidos • coordinación inadecuada de mano/ojo • afección médica que altere su juicio • mareos o problemas de equilibrio • pérdida de algún miembro

Si respondió **SÍ** a la pregunta anterior, ¿su afección ha ☐ **MEJORADO** o ☐ **EMPEORADO** desde su última solicitud de original/renovación de licencia de conducir?

| 11. | ☐ | ☐ | ¿Tiene usted una condición mental que puede afectar su capacidad para operar con seguridad un vehículo motorizado?  Si su respuesta es si, por favor explicar: |
| 12. | ☐ | ☐ | ¿Alguna vez ha tenido un ataque epiléptico, convulsión, pérdida de la consciencia u otro ataque? |
| 13. | ☐ | ☐ | ¿Tiene diabetes que requiera tratamiento con insulina? |
| 14. | ☐ | ☐ | ¿Tiene alguna dependencia del alcohol o de drogas que pudiera afectar su capacidad de operar un vehículo motorizado de manera segura o ha tenido algún episodio de abuso de drogas o alcohol en los últimos dos años? |
| 15. | ☐ | ☐ | En los últimos dos años, ¿ha recibido tratamiento por alguna otra afección médica grave? Explique: |
| 16. | ☐ | ☐ | ¿Alguna vez ha sido remitido al Comité Asesor Médico de Licencias de Conducir de Texas? |

Cualquier hombre ciudadano o inmigrante de los Estados Unidos entre 18 y 26 años de edad **que presente esta solicitud otorga su consentimiento para ser registrado en el Sistema de Servicio Militar Selectivo de los Estados Unidos.** Usted debe estar registrado para tener derecho a recibir ayuda federal estudiantil (incluso la beca Pell Grant), capacitación laboral, empleo federal y la ciudadanía si es inmigrante,. En Texas, usted debe estar registrado para tener derecho a recibir ayuda estudiantil universitaria o empleo con el Estado. No registrarse en el Servicio Militar Selectivo es un delito mayor. Si es declarado culpable de ello, podría ser castigado hasta con cinco años de prisión y/o una multa de 250,000 dólares. Si no se ha registrado antes de cumplir 26 años, ya no se podrá registrar y podría perder permanentemente los beneficios asociados con el registro. Para conocer otras opciones alternativas para solicitantes que se oponen al servicio militar convencional por motivos religiosos u otros motivos de conciencia, podrá encontrar información disponible en: http://www.sss.gov/FactSheets/FSaltsvc.pdf.

Juro solemnemente, afirmo y certifico que soy la persona que se indica en el presente documento y que las declaraciones en esta solicitud son verdaderas y correctas. Además certifico que mi domicilio de residencia es (marque una opción): ( ) casa residencial, ( ) apartamento, ( ) hotel, ( ) sitio de refugio temporal. Estoy de acuerdo en informar inmediatamente al Departamento de Seguridad Pública de Texas cualquier cambio en mi condición médica que pueda afectar mi capacidad para conducir de manera segura un vehículo motorizado.

DL-43 (Rev. 2/17)          FIRMA DEL ASPIRANTE _____          FECHA _____

**APPENDIX 54**

# EXHIBIT 9

## APPLICATION FOR CHANGE OF ADDRESS ON VALID TEXAS DRIVER LICENSE (DL) & IDENTIFICATION CARD (ID)
### Not For Commercial Driver License

DL-64 (Rev. 2/17)

| DO NOT MAIL CASH. Mail check or money order payable to: Texas Department of Public Safety | MAIL COMPLETED FORM AND $10 FEE TO: Texas Department of Public Safety, PO Box 149008, Austin, Texas, 78714-9008 |
| --- | --- |

**Driver License Number**

**Expiration Date**
M M / D D / Y Y Y Y

**Social Security Number**

**I.D. Card Number**

**Date of Birth**
M M / D D / Y Y Y Y

**Suffix (SR., JR., etc.)**

**Last Name**

**First Name**

**Middle / Maiden**

**Residence -** Street Address (Address cannot be a post office box)

Do you want to support the Glenda Dawson Donate Life Texas donor registry? If yes, please indicate a donation amount of $1 or more $_____.00

Yes ☐  No ☐

**City**

**County**                 **State**    **Zip Code**

Would you like to register as an organ donor?

Yes ☐  No ☐

**Mailing -** Street Address

If you are a US citizen, would you like to register to vote? If registered, would you like to update your voter information?

Yes ☐  No ☐

**City**

**County**                 **State**    **Zip Code**

EXHIBIT
3 Q

Date_____  Signature _____

See Important Instructions on Back

APPENDIX 56

## No Waiting in Line! – Change your address online
### Visit our Web site at **www.texas.gov/driver**

I do solemnly swear, affirm, or certify that I am the person named herein and that the statements on this application are true and correct. I further certify my residence address is a: (check one) (   ) single family dwelling, (   ) apartment, (   ) motel, (   ) temporary shelter.

Signature of Applicant _____     Date _____

In the event of injury or death would you like to provide two (2) emergency contacts?  If yes, please list:

**a)** Name _____ Address _____ Telephone Number _____

**b)** Name _____ Address _____ Telephone Number _____

If you currently hold a valid Texas non-commercial driver license or identification card and have not reported your change of address as required by TRC 521.054, you may do so by mail or on the Internet. To report a change of address by mail, complete the reverse side of this form and mail along with the required fee(s) to the Texas Department of Public Safety. To report a change of address online, go to www.texas.gov/driver. A driver license or identification card validating your reported address change will be mailed to you. This form may **ONLY** be used to change your address.

Should you desire a new photo or need to change information other than your address, you must apply at the local driver license office.

**If you are not a US citizen you must apply at the local driver license office to change your address.**

### United States Selective Service

Any male United States citizen or immigrant who is at least 18 years of age but less than 26 years of age submitting this application consents to registration with the United States Selective Service System. You must be registered to qualify for federal student aid (to include Pell grant), job training, federal employment, and citizenship if an immigrant. In Texas, you must be registered to qualify for state college student aid or state employment. If convicted, failure to register with the Selective Service is a felony punishable by up to five years in prison and/or a $250,000 fine. If not registered by age 26, you can no longer register and could permanently lose those benefits associated with registration. For alternative options for applicants who object to conventional military service for religious or other conscientious reasons information is available at: http://www.sss.gov/FactSheets/FSaltsvc.pdf.

**Below is an example of how numbers and letters should be written on front of this form:**

1  2  3  4  5  6  7  8  9  0

A  B  C  D  E  F  G  H  I  J  K  L  M  N  O  P  Q  R  S  T  U  V  W  X  Y  Z

APPENDIX 57

# EXHIBIT 10

STRINGER: SHERI GIPSON

Page 1

1               IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                   SAN ANTONIO DIVISION

3    JARROD STRINGER, ET AL.,    *
                                 *
4        Plaintiffs,             *
                                 *
5    VS.                         * CIVIL ACTION
                                 *
6    ROLANDO PABLOS, IN HIS      * NO.: 5:16-cv-00257-OLG
     OFFICIAL CAPACITY AS THE    *
7    TEXAS SECRETARY OF STATE    *
     and STEVEN C. MCCRAW, IN    *      CERTIFIED
8    HIS OFFICIAL CAPACITY AS    *     TRANSCRIPT
     THE DIRECTOR OF THE TEXAS   *
9    DEPARTMENT OF PUBLIC        *
     SAFETY,                     *
10                               *
         Defendants.             *
11

12   ***********************************************************

13           ORAL AND VIDEOTAPED DEPOSITION OF

14                    SHERI GIPSON

15       DEPARTMENT OF PUBLIC SAFETY'S 30(b)(6)

16                 MARCH 7TH, 2017

17   ***********************************************************

18           ORAL AND VIDEOTAPED DEPOSITION OF SHERI

19   GIPSON, produced as a witness at the instance of the

20   PLAINTIFFS, and duly sworn, was taken in the

21   above-styled and numbered cause on the 7th of March,

22   2017, from 9:36 a.m. to 6:15 p.m., before Tammy Staggs,

23   CSR in and for the State of Texas, reported by machine

24   shorthand, at the offices of Texas Attorney General's

25   Office, 300 West 15th Street, 11th Floor, Austin, Texas,

**hglitigation.com**



Page 2

```
 1   pursuant to the Federal Rules of Civil Procedure and the
 2   provisions stated on the record or attached hereto.
 3   That the deposition shall be read and signed under
 4   penalties of perjury.  That the deposition shall be read
 5   and signed before any notary public.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            A P P E A R A N C E S
 2   FOR THE PLAINTIFF, JARROD STRINGER:
        Cassandra Champion, Esq.
 3      TEXAS CIVIL RIGHTS PROJECT
        1405 Montopolis Drive
 4      Austin, Texas  78741
        512.474.5073
 5      champion@texascivilrighsproject.org
 6
 7   FOR THE PLAINTIFF, JOHN FRITZ:
        Beth Stevens, Esq.
 8      TEXAS CIVIL RIGHTS PROJECT
        1405 Montopolis Drive
 9      Austin, Texas  78741
        512.474.5073
10      stevens@texascivilrighsproject.org
11
12   FOR THE PLAINTIFF, BENJAMIN HERNANDEZ:
        Caitlyn Elizabeth Silhan, Esq.
13      WATERS & KRAUS, L.L.P.
        3141 Hood Street
14      Suite 700
        Dallas, Texas  75219
15      214.357.6244
        csilhan@waterskraus.com
16
17
18   FOR THE DEFENDANTS:
        Anna M. Mackin, Esq.
19      Esteban Soto, Esq.
        ATTORNEY GENERAL'S OFFICE
20      300 West 15th Street
        Floor 11
21      Austin, Texas  78711
        512.463.2120
22      anna.mackin@oag.texas.gov
23      esteban.soto@oag.texas.gov
        Kathleen T. Murphy, Esq.
24      TEXAS DEPARTMENT OF PUBLIC SAFETY
        5805 North Lamar
25      Austin, Texas  78752
        512.424.2890
            Kathleen.murphy@dps.texas.gov
```

Page 4

```
 1            A P P E A R A N C E S
 2   ALSO PRESENT:
 3      Justin Talbot - Videographer
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                    INDEX
                                                  PAGE
 2   Appearances.....................................    3
 3   Exhibit List....................................    6
 4   Stipulations....................................   --
 5   SHERI GIPSON:
 6      EXAMINATION BY MS. CHAMPION...............   11
 7      EXAMINATION BY MS. STEVENS...............  199
 8      EXAMINATION BY MS. SILHAN................  215
 9      EXAMINATION BY MS. MACKIN.................  216
10      FURTHER EXAMINATION BY MS. SILHAN.........  222
11
12   Signature and Changes..........................  234
13
14   Reporter's Certificate.........................  237
15
16
17          REQUESTED DOCUMENTS/INFORMATION
18                  (None)
19
20            CERTIFIED QUESTIONS
21                  (None)
22
23
24
25
```



Page 6

|  |  | EXHIBITS |  |
|---|---|---|---|
| 1 |  |  |  |
| 2 | NO. | DESCRIPTION | PAGE |
| 3 | 1 | Plaintiffs' Fourth Amended Notice of |  |
| 4 |  | Deposition of Defendant Stephen C. |  |
| 5 |  | McCraw, in his official capacity as the |  |
| 6 |  | Director of Texas Department of Public |  |
| 7 |  | Safety, pursuant to Federal Rule of Civil |  |
| 8 |  | Procedure 30(b)(6)..................... | 14 |
| 9 | 2 | Defendants' Deposition Topic Designations |  |
| 10 |  | and Objection to Corporate Representative |  |
| 11 |  | Topics Under Federal Rule of Civil |  |
| 12 |  | Procedure 3i1(b)(6)..................... | 15 |
| 13 | 3A | List of projects scheduled to occur |  |
| 14 |  | through 2019........................... | 16 |
| 15 | 3B | List of the changes that have been made |  |
| 16 |  | to the driver license system since 2012.. | 19 |
| 17 | 3C | Use Case Specification:  Process |  |
| 18 |  | Authentication Request................. | 34 |
| 19 | 3D | Use Case Specification: Process DL |  |
| 20 |  | Duplicates/Renewals Application File..... | 40 |
| 21 | 3E | Use Case Specification: Create Daily |  |
| 22 |  | Update File For SOS.................... | 41 |
| 23 | 3F | Use Case Specification: Create Voter |  |
| 24 |  | Registration Extract File.............. | 43 |
| 25 |  |  |  |

Page 7

| 1 | 3G | Module 10A: Class C and M Renewal Age 18 |  |
| 2 |  | and Above, Customer Operations Handbook.. | 44 |
| 3 | 3H | Screenshots............................. | 45 |
| 4 | 3I | Module 6: Driver License Forms, |  |
| 5 |  | Introduction to Common Non-CDL Forms, |  |
| 6 |  | Customer Operations Handbook............ | 45 |
| 7 | 3J | DL-64 Manual Address Change Processing... | 46 |
| 8 | 3K | Texas Secretary of State Voter Inquiry |  |
| 9 |  | Portal................................. | 48 |
| 10 | 3L | Voter registration paper application |  |
| 11 |  | postcard............................... | 49 |
| 12 | 3M | Texas Driver License and ID Card Renewal |  |
| 13 |  | Notice................................. | 53 |
| 14 | 3N | Texas Commercial Driver License |  |
| 15 |  | Application............................. | 56 |
| 16 | 3O | Application for Renewal/Replacement of a |  |
| 17 |  | Texas Driver License or Identification |  |
| 18 |  | Card................................... | 58 |
| 19 | 3P | Application for Texas Driver License or |  |
| 20 |  | Identification Card as Exhibit.......... | 59 |
| 21 | 3Q | Application for Change of Address on |  |
| 22 |  | Valid Texas Driver License and |  |
| 23 |  | Identification Card.................... | 59 |
| 24 |  |  |  |
| 25 |  |  |  |

Page 8

| 1 | 3R | Application for Change of Address on |  |
| 2 |  | Valid Texas Driver License and |  |
| 3 |  | Identification Card.................... | 59 |
| 4 | 3S | Screenshots............................. | 60 |
| 5 | 3T | Screenshots............................. | 61 |
| 6 | 3U | Texas Department of Public Safety |  |
| 7 |  | Driver's License/ID Card Renewal IVR |  |
| 8 |  | Script, confidential.................. | 61 |
| 9 | 3V | Driver's License Renewal Receipt and |  |
| 10 |  | Temporary License...................... | 62 |
| 11 | 3W | Document titled: Texas Department of |  |
| 12 |  | Public Safety Temporary Identification |  |
| 13 |  | Card................................... | 62 |
| 14 | 3X | Letter dated July 22nd, 2016.......... | 62 |
| 15 | 3Y | 2016 Original, Renewal, Duplicate and |  |
| 16 |  | Modification Issuances for Driver License |  |
| 17 |  | and IDs................................ | 63 |
| 18 | 4 | Organizational chart.................... | 65 |
| 19 | 5 | Application Requirements................ | 82 |
| 20 | 6 | Letter dated September 9th, 2015......... | 113 |
| 21 | 7 | E-mails between Brenda Hester and Kelly |  |
| 22 |  | Walton, dated 11/5/12.  Subject: Voting.. | 129 |
| 23 | 8 | Voter inquiry checklist.................. | 134 |
| 24 | 9 | DR-64 forms processed in fiscal year 2014 |  |
| 25 |  | and 2015............................... | 148 |

Page 9

| 1 | 10 | E-mail string between Sara Sandeen and |  |
| 2 |  | Shea Burch, among others, dated October |  |
| 3 |  | 2013.  Subject: Other DL.  Confidential.. | 151 |
| 4 | 11 | E-mail strong between Rebekah Hibbs and |  |
| 5 |  | Sheri Gipson, among others, dated 8/3/16. |  |
| 6 |  | Subject: DL/ID Renewal - Voter |  |
| 7 |  | Registration INC 2397.................. | 154 |
| 8 | 12 | E-mail from Beva Kellison to Betsy |  |
| 9 |  | Schonhoff, dated 11/27/13.  Subject: DPS |  |
| 10 |  | - Online Registration Attempt, with |  |
| 11 |  | attachment, Confidential............... | 156 |
| 12 | 13 | DPS Module 17C Customer, Operations |  |
| 13 |  | Handbook............................... | 169 |
| 14 | D1 | Plaintiffs' Third Amended Notice of |  |
| 15 |  | Deposition of Defendant Steven C. McCraw |  |
| 16 |  | in his Official Capacity as the Director |  |
| 17 |  | of the Texas Department of Public Safety |  |
| 18 |  | Pursuant to Fed. R. CIV. P 30(b)(6)...... | 216 |
| 19 |  |  |  |
| 20 |  |  |  |
| 21 |  |  |  |
| 22 |  |  |  |
| 23 |  |  |  |
| 24 |  |  |  |
| 25 |  |  |  |



STRINGER: SHERI GIPSON

Page 10

1    P R O C E E D I N G S
2         THE VIDEOGRAPHER:  Today is Tuesday March
3    7th, 2017.  It is approximately 9:36 a.m.  I am -- we
4    are at the Texas Attorney's General Office at 300 West
5    15th Street, Austin, Texas 78701.
6         My name is Justin Talbot, video
7    specialist of Legal Eyes, Incorporated out of Aubrey,
8    Texas.  This case, Cause No. 5:16-CV-00257-OLG entitled
9    Jarrod Stringer, et al. vs. Rolando B. Pablos, et al.
10   And this is Volume 2 of the deposition of Sheri Gipson.
11   Video -- this video deposition was requested by the
12   Plaintiffs' counsel at Waters Kraus & Paul.
13        Will counsel and all present please
14   identify yourselves for the record.
15        MS. CHAMPION:  Cassandra Champion with
16   the Texas Civil Rights Project appearing on behalf of
17   Plaintiff Jarrod Stringer.
18        MS. SILHAN:  Caitlyn Silhan on behalf of
19   the Plaintiffs from Waters & Kraus, appearing on behalf
20   of Benjamin Hernandez.
21        MS. STEVENS:  Beth Stevens from the Texas
22   Civil Rights Project appearing on behalf of John Fritz.
23        MR. SOTO:  Esteban Soto with the Attorney
24   General's Office on behalf of Defendants.
25        MS. MURPHY:  Kathleen Murphy, Texas

Page 11

1    Department of Pubic Safety's Office of General Counsel.
2         MS. MACKIN:  Anna Mackin, Texas Office of
3    Attorney General, on behalf of the Defendants.
4         I would also like to ask a question on
5    the record.  Are we in Volume 2 of Sheri Gipson's
6    deposition or are we in the 30(b)(6) deposition of the
7    Department of Public Safety?
8         MS. CHAMPION:  30(b)(6) of the Department
9    of Public Safety.
10        MS. MACKIN:  Okay.  That's what I
11   thought.
12        THE VIDEOGRAPHER:  I'm sorry.
13        MS. MACKIN:  That's okay.
14        THE VIDEOGRAPHER:  I had the wrong
15   information.
16        MS. MACKIN:  That's okay.  I just wanted
17   to make it clear on the record.
18        MS. CHAMPION:  Thank you.
19             SHERI GIPSON,
20   Having been first duly sworn, testified as follows:
21             EXAMINATION
22   BY MS. CHAMPION:
23        Q.  Thank you.
24        Would you please state and spell your
25   full name for the record?

Page 12

1         A.  Sheri Gipson, S-H-E-R-I, G-I-P-S-O-N.
2         Q.  Thank you.
3         I know you have been deposed before in
4    this case in your individual capacity, but I would just
5    like to review the rules of depositions with you, if
6    that's okay.
7         A.  Okay.
8         Q.  Remember, one of the most important things is
9    that only one of us talk at a time.  I will try to let
10   you completely finish answering a question before asking
11   a new one.  And if you'll let me completely finish the
12   question, that really helps the court reporter.  Is that
13   okay?
14        A.  Yes.
15        Q.  And remember to give verbal answers, "yes" and
16   "no" rather than "uh-huh" and "uh-uh."
17        If you don't understand a question,
18   please let me know; otherwise, if you don't tell me that
19   you haven't understood something, I will assume that you
20   have understood and that the answer you gave was the
21   answer you intended to give.  Does that all make sense?
22        A.  Yes.
23        Q.  Okay.  Do you understand that you're under
24   oath here today?
25        A.  Yes.

Page 13

1         Q.  And are you aware how this deposition is
2    slightly different from the one you gave in your
3    individual capacity?
4         A.  Yes.
5         Q.  So you are here today as a representative of
6    the Department of Public Safety; is that correct?
7         A.  Correct.
8         Q.  And you've been authorized by the republic of
9    partment -- Department of Public Safety to appear on
10   their behalf and give testimony for the Department
11   today; is that right?
12        A.  Correct.
13        Q.  Do you understand that the Department of
14   Public Safety, or DPS, is bound by the testimony that
15   you give as a representative in this matter?
16        A.  Yes.
17        Q.  And do you understand that, unless I say
18   otherwise, I'm not asking for your personal opinions;
19   but instead, I'm asking for the answer that reflects the
20   position of DPS and their subjective beliefs and
21   opinions.
22        A.  Correct.
23        Q.  Is that clear?
24        Have you ever testified as a DPS
25   representative before?



Page 74

1  within those discussions?
2      A.   It is -- it's my understanding, based on
3  discussions, that those were considered -- would be
4  considered online transactions or online voter
5  registration application, and Texas statute does not
6  provide for that.
7      Q.   Mail transactions for driver license renewal
8  were considered the same as online; is that correct?
9           MS. MACKIN:  Objection, form.
10     A.   Correct.
11     Q.   (BY MS. CHAMPION)  Please restate if -- if
12  I've described that inaccurately.
13     A.   Repeat.
14     Q.   Oh, I think I said the wrong thing.  Thank
15  you.  Telephone.
16          Why -- I'm just -- I'm trying to clarify
17  that mail transactions are considered -- no.  Telephone
18  transactions are considered the same as online
19  transactions.
20          MS. MACKIN:  Objection, form.
21          You can answer.
22          THE WITNESS:  I'm sorry.  I didn't hear
23  you.
24          MS. MACKIN:  I said objection, form.
25          You can answer.

Page 75

1          THE WITNESS:  Okay.
2      A.   They use the same process.  So Texas NIC, when
3  they -- the IVR actually inputs the information into our
4  online application file that comes from Texas NIC to
5  DPS.
6      Q.   (BY MS. CHAMPION)  Texas NIC takes the
7  information from IVR.  It collects it; is that right?
8      A.   That's correct.
9      Q.   Do they -- does Texas NIC send the information
10  to DPS?
11     A.   Yes.
12     Q.   And how often do they send it?
13     A.   Nightly.  It comes with all of the
14  transaction -- the transaction information from the IVR
15  comes in the same file as the transaction information
16  from the Web.
17     Q.   Okay.  Are they sent -- is the information
18  from NIC for both telephone and online transactions sent
19  all together?
20     A.   In a single file?
21     Q.   Yes.
22     A.   Yes.
23     Q.   When DPS receives that information from Texas
24  NIC, does it get put into the DLS?
25     A.   Yes.  All transactions that come in from NIC

Page 76

1  for DL or ID renewal or change of address are input into
2  DLS.
3      Q.   Does that require any manual input by a DPS
4  employee or is it automatic?
5      A.   It's automatic.
6      Q.   Can you tell then -- can DPS tell by looking
7  at DLS whether a transaction was completed by phone or
8  online?
9      A.   Yes.
10     Q.   How can they tell?
11     A.   Because the -- and I can't remember the title
12  of the - the field, but it's -- it's designated as
13  TOL.web or TOL.IVR.
14     Q.   Okay.  So what are -- how does DPS carry out
15  its duties related to voter registration when a customer
16  sends in a mail renewal form?  We kind of covered this,
17  but can you tell me generally again.
18     A.   So when a mail renewal application is sent
19  out, it is sent with a voter registration application
20  form prescribed by Secretary of State.  And the
21  individual, if they complete that card, it is mailed
22  directly back to the Secretary of State.  It does not
23  come back to the Department.
24     Q.   How about mail-in change of address forms, how
25  does DPS carry out its voter registration duties when a

Page 77

1  customer sends in a change of address form via the mail?
2      A.   So as of March 16th, the form was revised to
3  allow the customer to indicate that they want to do a
4  change -- a voter registration application.  And when
5  that form is processed, that information is input into
6  the driver license system.  And the voter registration
7  information is updated if they say yes.
8      Q.   I think I skipped an item, via telephone.  We
9  were speaking about renewals.  Is the process any
10  different when a change of address is requested via
11  telephone?
12     A.   You cannot do a change of address application.
13  And just to clarify, so when you do a renewal, you can
14  change your address, but there's a separate transaction
15  that you're not renewing.  You're just changing your
16  address, and that's not allowed on the IVR.  It's not
17  provided for.
18     Q.   Why not?
19     A.   It's just the volume of those is extremely
20  low, and they have -- we've just never increased that
21  opportunity.  They can do it online, through the mail,
22  or in the office.
23     Q.   How does DPS carry out its voter registration
24  duties when a customer goes online to renew a driver
25  license?



Page 78

1    A.   So as they go through the process, the
2  screens, they're given the opportunity to say -- state
3  that they would like to register or submit a voter
4  registration application.  And then on the receipt page,
5  they're provided a link to the Secretary of State where
6  the packet is downloaded, completed, and mailed.
7    Q.   Is this process the same when a customer goes
8  online to change their driver license address?
9    A.   Yes, it is.
10    Q.   What steps has DPS taken to ensure that
11  customers are aware of voter registration opportunities
12  through DPS?
13    A.   So -- I mean, the information is on the form.
14  The question is on each form.  As far as the online, it
15  -- it provides the question and then also on the receipt
16  page, calls attention to the fact that they need to
17  download that application.
18    Q.   Other than having the questions about voter
19  registration on the form or online, has DPS done
20  anything else to increase customer awareness that they
21  can register to vote while completing driver license
22  transactions?
23              MS. MACKIN:  Objection, form.
24              You can answer.
25    A.   As far as like designated information that's

Page 79

1  displayed, things like that, no.
2    Q.   (BY MS. CHAMPION)  When did DPS start
3  performing voter registration functions?
4    A.   It would have been mid-'90s.
5    Q.   Can you be any more specific?
6    A.   I believe it was either 1994 or 1995.
7    Q.   Do you know why they started completing voter
8  registration functions at that time?
9    A.   As a part of the Help America Vote Act or the
10  Motor Voter.
11    Q.   When you say "Motor Voter," is that also
12  referred to as the NVRA?
13    A.   Yes.
14    Q.   Have DPS's voter registration functions
15  changed/evolved since 1995?
16              MS. MACKIN:  Objection, form.
17              You can answer.
18    A.   So they have evolved.  In 1995 the only thing
19  that was available was in-office transaction.  So all
20  individuals went through there.  When the mail-in
21  process was established in, I believe, 1998 -- I might
22  have to confirm that date -- when that was established,
23  the Department worked with the Secretary of State to
24  determine the process and -- that would be followed as
25  far as providing the application -- the registration

Page 80

1  application form.
2              When the online processes were developed
3  in 2000, 2001, again, the Department worked with the
4  depart- -- Secretary of State to determine how those
5  services would be offered.  The most recent change was
6  in 2009/'10 when we went from our previous distributed
7  driver license system to the current driver license
8  system.  The change made there is those applications
9  that were processed in person, instead of them filling
10  out the hardcopy form that was delivered to the local
11  registrar, the Department sent a file daily to the
12  Secretary of State with all of those customer infor- --
13  or with all the customer information indicating that
14  they had requested a registration application in the
15  office.
16    Q.   (BY MS. CHAMPION)  And when was that last
17  change?
18    A.   That change, the going to the electronic file,
19  it began in 2009, but there was a conversion period from
20  two thou-- May of 2009 to May 2010.  So during that
21  time period there was still some offices who were
22  providing the hardcopy to the local registrar.
23    Q.   Okay.  We -- we talked about -- we -- I'm
24  sorry.  We mentioned Motor Voter and the NVRA, which
25  stands for the National Voter Registration Act.  What is

Page 81

1  the National Voter Registration Act?  Can you explain
2  it?
3              MS. MACKIN:  Objection, form.
4              You can answer.
5    A.   To -- to my -- to my limited ability to
6  describe it, it is basically things that are put into
7  place to help ensure that individuals are given the
8  opportunity to register and then -- not only to
9  register, but then to actually vote in -- in elections.
10    Q.   (BY MS. CHAMPION)  What -- so we talked about
11  some of the ways DPS carries out its voter registration
12  duties.  What would you describe as the functions that
13  DPS has under the NVRA?
14              MS. MACKIN:  Objection, form.
15              What topic is this responsive to?
16              MS. CHAMPION:  The...
17              MS. MACKIN:  I mean, we can talk about
18  the policies, practices, and procedures.  But just kind
19  of the broad question about, like, functions --
20              MS. CHAMPION:  Yeah.
21              MS. MACKIN:  -- might be outside.
22              MS. CHAMPION:  Number 1, I suppose, the
23  duties and responsibilities of employees, agents, et
24  cetera, et cetera, and compliance with the NVRA and
25  State laws or regulations.



Page 94

1       Both the online renewal and change of
2  address processes have the question related to voter
3  registration, and then that process provides a link
4  which takes them to Texas Secretary of State.
5       Q.   Why does DPS include a voter registration
6  question during the online renewal and change of address
7  portion?
8       A.   So it is part of the plan between the
9  Secretary of State and Department of Public Safety in
10 compliance with the voter registration question being
11 combined as part of the application process for a driver
12 license or ID.
13      Q.   You said it's part -- part of a plan.  We
14 touched on this earlier also, but who developed that
15 plan?
16      A.   That plan was developed between the Department
17 of Public Safety and Secretary of State.
18      Q.   And who at DPS and the Secretary of State was
19 involved in deciding the way that the online question
20 would -- would function?
21      A.   I would have to go back and see who the --
22 because the -- the original plan was developed in '94
23 for the office transactions and then modified when the
24 mail renewal and online portions were added.  I do not
25 have the exact names of who was in that process.  It

Page 95

1  would have been -- back then they were -- would have
2  been referred to as the Chief of Driver License
3  Division, but I don't have the names of the people at
4  the Secretary of State.
5       Q.   For the online process, when DPS and the
6  Secretary of State decided that a voter registration
7  question should be included online, why did they decide
8  that?
9       A.   Because we are required to include the voter
10 registration opportunity within the driver license and
11 identification card application.
12      Q.   What requires you to do that?
13      A.   The -- and I -- I can't remember the names of
14 all the -- but basically the NVRA and Chapter 20 of the
15 Election Code and Texas Statute.
16      Q.   I'm going to refer back to Exhibit 3M, the
17 mail-in renewal form.  And it's recently been revised,
18 but when did DPS start using mail renewal notice forms?
19      A.   I believe it was in 1998 or '99.
20      Q.   And this version in -- in Exhibit 3M was --
21 was renewed February two -- 2017.  Before that, what was
22 the revision date?  Sorry.  When was it last revised
23 before 2017?
24      A.   I would have to go back and find that
25 information.

Page 96

1       Q.   Is there a voter registration question on the
2  DR-32?
3       A.   No.
4       Q.   Has there ever been a voter registration
5  question on any version of the DR-32?
6       MS. MACKIN:  I'm going to just object to
7  the extent that this is prior to January 1st, 2012, the
8  topics that she's designated on here.
9       But besides that, you can answer.
10      A.   To my knowledge, no, it's always -- we have
11 always included a voter registration application form
12 provided by the Secretary of State within the mail
13 renewal packet.
14      Q.   (BY MS. CHAMPION)  If you look at the back of
15 the form, at the top it says Registration Renewal Guide,
16 Read Carefully.  And there's a box that says, (as read):
17 No waiting in line.  Three easy ways to renew.
18      The first of those is Internet renewal.
19      A.   Uh-huh.
20      Q.   Does DPS want people to renew online rather
21 than by mail?
22      A.   If they're eligible, yes.
23      Q.   Why?
24      A.   It reduces the traffic within the office and
25 reduces overall wait times.

Page 97

1       Q.   Did DPS consult the Secretary of State about
2  this form, about the creation of this form?
3       MS. MACKIN:  I'm going to object to the
4  extent it's before January 1st, 2012.
5       But other than that, you can answer.
6       A.   To my knowledge, not on the actual DR-32 form.
7  They were consulted regarding the process and the
8  information that would be included on the voter
9  registration application card.
10      Q.   (BY MS. CHAMPION)  Did DPS discuss with the
11 Secretary of State the fact that a voter registration
12 application card would accompany this form separately?
13      MS. MACKIN:  And, again, I'm going to
14 object to the extent it's before January 1st, 2012 as
15 designated in the this 30(b)(6) notice.
16      But beyond that, you can answer.
17      THE WITNESS:  Okay.
18      A.   Now, I'm sorry.  Ask the question again.
19      Q.   (BY MS. CHAMPION)  Did DPS discuss with the
20 Secretary of State the fact that a voter registration
21 card would be included separately with this form when it
22 was sent to customers?
23      A.   Yes, there would have been those discussions
24 because they -- they had provided us the approved form
25 that was going to be inserted.



STRINGER: SHERI GIPSON

Page 98

1    Q.   Does DPS transmit customer information it
2    receives from driver license renewal applications to the
3    Secretary of State for purposes of updating an
4    applicant's voter registration status?
5    A.   They do for applications that occur in an
6    office, and then the mail-in address change.
7    Q.   Those are the only two circumstances?
8    A.   Yes.
9    Q.   So not by mail change of address?
10   A.   No, not by mail renewal.  Mail change of
11   address, they do.
12   Q.   Got it.  Got it.
13        Can DPS track the information that it
14   sends to the Secretary of State regarding customers who
15   wanted to register to vote?
16   A.   Do you mean can -- can we look at the record
17   and determine?
18   Q.   Yes.  Can DPS look at any record to see if
19   they have indeed sent the Secretary of State specific
20   information?
21   A.   Yes.  Now, I quantify that because that
22   information is contained in the audit trail, so just
23   someone looking at the screen could not confirm that the
24   information was sent, other than the fact that the voter
25   registration says yes.  So the assumption is that it

Page 99

1    went.  It would require IT to -- to assist us, but it is
2    placed in the audit trail.
3    Q.   Does DPS treat all valid and complete change
4    of address forms submitted to DPS as notices of change
5    of address for voter registration purposes?
6         MS. MACKIN:  Objection, form.
7         You can answer.
8    A.   Are you talking about the ones that are
9    submitted in office? through the mail?
10   Q.   (BY MS. CHAMPION)  All of them, uh-huh.
11   A.   Okay.  So again, the -- the ones that are
12   treated -- or that are submitted to Texas Secretary of
13   State as change of address or for voter application
14   would be those that occur in the office or those that do
15   a mail in.
16   Q.   So not all of them then?
17        MS. MACKIN:  Objection, form.
18        You can answer.
19   A.   Again, clarifying for the change of address
20   application --
21   Q.   (BY MS. CHAMPION)  Correct.
22   A.   -- that would be correct.  The online change
23   of address applications are referred to Texas Secretary
24   of State.
25   Q.   Okay.  Does DPS always transmit all valid

Page 100

1    change of address information that it obtains from
2    customers to the Secretary of State?
3    A.   So in addition to the voter registration
4    extract file, there is a daily file that is sent to the
5    Secretary of State that would contain all applications
6    that had a change of name, date of birth, or address.
7    And that is not sent as a voter extract file.  You would
8    have to talk to the Secretary of State to determine --
9    for them to determine and tell you what they do with
10   that information.
11   Q.   You mentioned that happens with in-person
12   applications.  Does it happen for mail change of address
13   information?
14   A.   So the daily update file contains all
15   transactions, whether they occur either in the office,
16   by mail, or online.
17   Q.   And why does DPS send the Secretary of State
18   that information?
19   A.   That is a process that was established prior
20   to the driver license system.  It was an interface file
21   that was developed prior to DLS, and then was just
22   transferred over.  It was at the request or through the
23   discussion between DPS and Secretary of State.  There
24   was no one who could provide me information as to why it
25   originated.

Page 101

1    Q.   So you, as a representative of DPS, cannot --
2    cannot answer why DPS now transmits all daily file
3    updates to the Secretary of State; is that correct?
4    A.   I can't tell you what Secretary of State does
5    with the information, no.  The -- I can't -- I -- I
6    cannot tell you the exact reasons behind the
7    establishment because there was no one available that
8    could provide me that information.
9    Q.   Does DPS send the Secretary of State these
10   update files because the Secretary of State instructed
11   DPS to do so?
12        MS. MACKIN:  Objection, form.
13        And I'll also note that to the extent
14   that this process was developed before 2012, it's
15   outside the scope of the topics the witness is
16   designated on under 30(b)(6).
17   A.   So I mean it's an assumption that there was a
18   discussion and that they wanted the data.  We -- we
19   wouldn't have just randomly decided to start sending
20   them the data.  There would have been discussions, and
21   Secretary of State would have had a reason for wanting
22   that data.  I can't tell you what that reason is.  That
23   would be Secretary of State.
24   Q.   (BY MS. CHAMPION)  So -- okay.  That was the
25   daily update file.  Does DPS then transmit all valid



Page 102

1   change of address information it obtains from customers
2   to the Secretary of State in the voter registration
3   extract file?
4        A.   The voter registration extract file is only --
5   or the only records obtained in that file are customers
6   who applied in person for any type of transaction or
7   through the mail change of address DL-64 process that
8   indicated that they would like that to serve as a voter
9   registration application.
10       Q.   So you've identified in-person and mail
11  transactions.  So is it true that DPS does not transmit
12  change of address information it obtains from customers
13  to the Secretary of State in the voter -- I'm sorry --
14  in the secr-- -- to the Secretary of State that it
15  collects from online transactions?
16       A.   So in the voter registration extract file --
17       Q.   Yeah.
18       A.   -- the online transactions are not included in
19  that process.
20       Q.   And why aren't they included?
21       A.   Again, that was determined by discussions
22  through -- between the Department and Secretary of State
23  when the -- the processes were being established.
24       Q.   You said the process was established when?
25       A.   Online was established in two -- either --

Page 103

1   either late 2000 or early 2001.
2        Q.   But DPS has made the decision to continue
3   undertaking this process; is that right?
4        A.   Undertaking which process?
5        Q.   I mean, you still transfer -- even though it
6   was established in 2000, 2001 DPS still transfers the
7   voter extract file; is that right?
8        A.   Okay.  I think there's confusion.  So we began
9   the online DL renewal and address change application
10  process in early 2000.  The voter registration extract
11  file was not created until 2009 when we implemented
12  driver license system.  So prior -- those -- those plans
13  were put in place prior to that electronic transfer of
14  data.
15       Q.   But the -- yes, I understand.  Thank you.
16            But the fact that DPS does not transmit
17  change of address information it obtains from customers
18  to the Secretary of State via the voter registration
19  extract file, the fact that it doesn't do that for
20  online transactions currently, I'm asking you to tell me
21  why it currently doesn't do that, not why the decision
22  was made prior to you holding this position within DPS.
23       A.   Because we have not been advised by the
24  Secretary of State that providing that through the
25  online process is permissible at this point.

Page 104

1        Q.   Has DPS consulted the Secretary of State about
2   whether it should be transmitting --
3        A.   It's my understanding that conversations that
4   occurred when the driver license system was being
5   developed and the -- the voter registration extract file
6   was being discussed, it was determined we would not
7   update online to include -- or to be included in that
8   process.
9        Q.   Has the Secretary of State provided DPS with
10  any instructions with respect to whether it should treat
11  valid, completed change of address forms as
12  notifications of change of address for voter
13  registration purposes?
14       A.   To my --
15            MS. MACKIN:  Objection, form.
16            You can answer.
17       A.   To my knowledge, they have not provided us any
18  instruction on changing the procedures that are
19  currently in place, no.
20       Q.   (BY MS. CHAMPION)  You said to -- to your
21  knowledge.  Is that also in the knowledge of DPS?
22       A.   Yes, it is.
23       Q.   Do DPS's change of address forms allow the
24  customer to state on there -- on the form that the
25  change of address is not to be used for voter

Page 105

1   registration purposes?
2            MS. MACKIN:  Objection, form.
3            You can answer.
4        A.   So if -- I mean, the question is a yes-or-no
5   answer.  So if they select "no," then yes, that would
6   indicate they do not want it used as change of address.
7        Q.   (BY MS. CHAMPION)  Looking at Exhibit 3Q, it's
8   a DL-64, the newest version.  The voter registration
9   question states, (as read):  If you are a U.S. citizen,
10  would you like to register to vote?  If registered,
11  would you like update your voter information?
12            Is that correct?
13       A.   Correct.
14       Q.   But that question does not give a customer an
15  option to state that this change of address is not to be
16  used for voter registration purposes; is that correct?
17            MS. MACKIN:  Objection, form.
18            You can answer.
19       A.   So the assumption is by checking "no," that
20  they are not wishing for it to be served as voter
21  registration.
22       Q.   (BY MS. CHAMPION)  If that's the case, does
23  their information, their new address, still get sent to
24  the Secretary of State?
25       A.   Their information would be included in the



STRINGER: SHERI GIPSON

Page 174

1   obtained signature to any entity for any purpose?
2        A.   No, not outside the agency.  The only thing
3   that previous electronic signature is used for in an
4   online transaction is it's placed on the actual
5   identification card or driver license.  So it's used in
6   the card production, but it's not transmitted outside to
7   any outside entities.
8        THE VIDEOGRAPHER:  Forgive the
9   interruption, but is there any way you can move the blue
10  binder down?
11       Q.   (BY MS. CHAMPION)  Does submitting an
12  electronic signature to the Secretary of State for --
13  for voter registration purposes satisfy the obligations
14  of DPS under the NVRA?
15       MS. MACKIN:  Objection, form.
16       A.   So the electronic signature is transferred
17  from an in-office application, and those decisions were
18  made in conversation with general counsel between
19  departmental -- departmental -- Department of Public
20  Safety and Secretary of State.  So for the purposes of
21  those transactions, yes.
22       Q.   (BY MS. CHAMPION)  I can't remember if I asked
23  this specific question.  Why does DPS not require a
24  signature in rela- -- in relation to telephone
25  transactions?

Page 175

1        MS. MACKIN:  Objection, form.
2        A.   Telephone transactions are handled in the same
3   manner as an online transaction.  There is an
4   authentication process they go through.  So you're
5   assuming that you're dealing with the customer
6   themselves.  And the statute requires a signature on an
7   original application, and that's -- the alternative
8   methods of renewal and change of address are only
9   available to established customers who have already
10  provided identity, residency, lawful presence
11  information, as well as a signature on their
12  application.
13       Q.   (BY MS. CHAMPION)  When a customer changes
14  their address over the telephone, does the signature
15  that DPS already have on file stay on the physical face
16  of the driver license?
17       A.   Again, the only transaction type that can be
18  done through IVR is a renewal.
19       Q.   Sorry.  So when a customer renews a driver's
20  license on -- over the telephone, does DPS use the
21  signature that was previously on file to -- to put on
22  the customer's renewed driver's license?
23       A.   Yes.
24       Q.   If DPS were directed to do so, does it have
25  the ability to send the Secretary of State the

Page 176

1   electronic signatures of customers who renew or change
2   their address online?
3        A.   So if the Secretary of State determined that
4   that was acceptable under the statutes and everything
5   that they process under and they directed us, yes, it
6   could be accomplished.  But it would take conversation
7   between Secretary of State and Department of Public
8   Safety and Texas NIC.
9        Q.   Has DPS ever considered taking that action?
10       A.   At this point we have not been -- we have not
11  considered that action because those -- we have never
12  been directed by Secretary of State or advised that
13  that's acceptable.
14       Q.   Has DPS ever consulted the Secretary of State
15  about whether it should send the electronic signatures
16  of customers who complete renewals or change of
17  addresses online --
18       MS. MACKIN:  Objection, form.
19       Q.   (BY MS. CHAMPION)  -- to the Secretary of
20  State?
21       MS. MACKIN:  Objection, form.
22       A.   Again, the only time I'm aware that that
23  became -- or was a small topic of conversation was
24  during the DL reengineering project when the decision
25  was made to electronically transfer the voter

Page 177

1   registration applications from the field offices.  And
2   it was determined at that time that the online process
3   would remain the same.
4        Q.   (BY MS. CHAMPION)  And who was involved in
5   that conversation?
6        A.   It would have been Secretary of State and
7   Department of Public Safety.
8        Q.   Can you identify any individuals from DPS that
9   were involved in that conversation?
10       MS. MACKIN:  I believe this took place in
11  2008, outside the scope of the testimony that Ms. Gipson
12  is here to provide today.
13       Q.   (BY MS. CHAMPION)  Did the driver's license
14  reengineering project take place -- do you know when it
15  took place?
16       A.   It began in 2005 and culminated with a
17  deployment in 2009/2010.
18       Q.   Looking at Exhibit 2, Topic 6 on page 5.  It's
19  the topic designations -- Defendant's Topic Designations
20  for -- for Sheri Gipson.  Topic No. 6 is not bound by a
21  time period, so that DPS should be able to answer
22  questions about policies, practices, and procedures
23  prior to 2012.
24       MS. MACKIN:  Related to which one of
25  these subparts?

Page 202

1    A.   Uh-huh.
2    Q.   Okay.
3    A.   Yes.  I'm sorry.
4    Q.   Thank you.
5         You -- you indicated that the decision
6  was made to modify the in-office -- the way the
7  in-office process would work for the voter registration
8  question, and that the decision was made not to modify
9  the online version of that.  Is that --
10   A.   Correct.
11   Q.   Okay.  Can you tell me why -- or please tell
12 me why the decision was made not to modify the online
13 transaction.
14   A.   The decision was made based on discussions
15 that were -- that occurred.  I was not provided any
16 documentations that outlined those discussions.  But the
17 creation of the new file was conversations that were
18 held with Secretary of State and what would be included
19 in that file.
20   Q.   You say creation of new file.  You're talking
21 about the voter registration daily file --
22   A.   Extract, correct.
23   Q.   Sitting here today, as the representative of
24 DPS for 30(b)(6) on -- on the policy and procedures
25 surrounding this issue, can you tell me why the decision

Page 203

1  was made not to modify the -- the online voter
2  registration part?
3    A.   It is -- it is my understanding that the
4  decision was made based on requirements for voter
5  registration, and the requirements required -- it makes
6  it sound funny -- the requirements of having a signature
7  at the time of application.
8    Q.   So -- so drilling down from that, you said
9  based on the requirements for voter registration.  And
10 particularly, you're saying based on the requirement for
11 a signature for the voter --
12   A.   Right.
13   Q.   -- registration; is that --
14   A.   Right.  The -- the information provided is
15 that Texas statute does not allow for online voter --
16 voter registration.  It requires a signature with the
17 application.  And for the online process, we are not
18 collecting a new signature as part of that process.
19   Q.   I want to see if I can under- -- understand
20 this fully.  So the -- the signature that is sent for an
21 in-person transaction where someone answers "yes" to the
22 voter registration question and -- and similarly when
23 someone changes their address -- excuse me -- address
24 via the mail, the signature that's sent for both of
25 those voter registration applications, that's the

Page 204

1  electronic signature; is that right?
2    A.   That is correct.
3    Q.   And that's sent to the Secretary of State?
4    A.   That is correct.
5    Q.   Okay.  The ink signature is never sent to the
6  Secretary of State, correct?
7    A.   That is correct.
8    Q.   Okay.  If you'll look over the Use Case there
9  you have in front of you, staying on the same exhibit,
10 would you confirm for me that the information regarding
11 the -- well, let me rephrase that.  The information
12 that's provided by a customer in an online transaction
13 with DPS -- you'll agree with me that there's
14 information provided by the customer in those
15 transactions?
16   A.   Correct.
17   Q.   Okay.  The -- looking through the use space,
18 is the only information that's provided by the customer
19 that's not transferred from Texas.gov to DLS the answer
20 to the voter registration question?
21   A.   That's correct.
22   Q.   Turn to me -- turn with me -- excuse me -- to
23 page 9 where it talks about business rules.
24   A.   Okay.
25   Q.   Do you see that?

Page 205

1    A.   Yes.
2    Q.   Okay.  Under the Business Rule 1.1.10 heading,
3  there's Selective Service and DRP, is that right, as
4  kind of subheadings under there?
5    A.   Yes.
6    Q.   Okay.  I want -- I just want to make sure I
7  understand the Use Case correctly.  Under Selective
8  Service if -- if -- if the field is marked "yes" for
9  selective service, then certain information is sent by
10 DLS to some other entity; is that right?
11   A.   Correct.
12   Q.   Okay.  And who -- who -- to whom is that
13 information sent?
14   A.   So the -- the system creates a file that is
15 sent to Selective Service that includes any males that
16 fall within the age range of registration.  So prior to,
17 when Selective Service first began, the person -- the
18 customer could elect whether or not that was sent.
19 Under current statute, we send any male that meets the
20 criteria to the Selective Service.
21   Q.   Okay.  And that -- that -- this is -- the DL
22 is programmed to do this once a person is determined to
23 meet the requirements for Selective Service, DLS
24 automatically sends that information in -- in an update
25 file to Selective Service?



hglitigation.com

Page 214

1   voter registration application process. But I don't --
2   I'm not completely aware of all of the specifics.
3       Q.   (BY MS. STEVENS) Well, describe for me the
4   conversations DPS has had about that period.
5       A.   The only conversations that -- nothing was
6   brought to me when I was asking for information. And
7   the only conversations I've had regarding that is with
8   general counsel.
9       Q.   Okay. And was a policy developed to determine
10  not to do -- not to implement similar -- similar
11  policies?
12      A.   So -- I'm not sure I follow.
13      Q.   Based on the conversations surrounding this
14  change that Alabama's implementing, did Texas then make
15  the decision not to change policy and do something
16  similar?
17           MS. MACKIN:  Objection, form.
18      A.   That's -- it's not a conversation that we've
19  had with the Secretary of State since that decision by
20  Alabama was made.
21      Q.   (BY MS. STEVENS) But did it have -- did you
22  have that discussion internally?
23      A.   No.  There was not a discussion related to us
24  starting that process just because Alabama did.
25      Q.   Okay.

Page 215

1           MS. STEVENS:  We're going to take a
2   three-minute break.
3           THE VIDEOGRAPHER:  Going off the record
4   at 5:45 p.m.
5           (Recess held, 5:45 p.m. to 5:52 p.m.)
6           THE VIDEOGRAPHER:  We are back on the
7   record at 5:52 p.m.
8               EXAMINATION
9   BY MS. SILHAN:
10      Q.   Hi, Ms. Gipson.
11      A.   Hello.
12      Q.   I'm Caitlyn Silhan on behalf of Benjamin
13  Hernandez.  We've met before.  I have just three
14  questions for you now.  So you just testified that DPS
15  decided not to modify the voter registration file with
16  respect to online transactions at one point, at least in
17  part, because Texas law requires a signature at the time
18  of a voter registration application; is that correct?
19           MS. MACKIN:  Objection, form.
20      A.   Correct.
21      Q.   (BY MS. SILHAN)  Does Texas law require that
22  DPS collect a signature for a change of address
23  transaction?
24           MS. MACKIN:  Objection, form.
25      A.   So Texas law does not require it on a change

Page 216

1   of address application processed online because the
2   signature had been previously captured.
3       Q.   (BY MS. SILHAN)  Okay.  So if a customer
4   completes a change of address form online, that is valid
5   for driver license purposes?  It changes their address
6   for driver license purposes; is that correct?
7       A.   Correct.
8           MS. SILHAN:  That is all I have, believe
9   it or not.  So I'll pass the witness.
10          MS. MACKIN:  Thank you.  Before we get
11  started, just on the record, I would like to request a
12  read and sign of this deposition transcript.
13          And I just have one exhibit.
14          (Exhibit D1 marked.)
15              EXAMINATION
16  BY MS. MACKIN:
17      Q.   Ms. Gipson, I'm handing you what's been marked
18  Defendant's Exhibit 1.  Do you recognize this document?
19      A.   Yes.
20      Q.   What is it?
21      A.   This is the Amended Notice No. 3 requesting
22  the 30(b)(6) deposition.
23      Q.   And that's the deposition that's taking place
24  today, correct?
25      A.   Correct.

Page 217

1       Q.   And what date is on this notice?
2       A.   As far as the date of the deposition?
3       Q.   Yes.
4       A.   Sorry.  March 6th at 9:30 a.m.
5       Q.   Did you appear here at the Attorney General's
6   Office yesterday at 9:30 a.m. to sit for this
7   deposition?
8       A.   Yes, ma'am.
9       Q.   And what time did you arrive?
10      A.   Shortly after 9 a.m.
11      Q.   And how long were you here?
12      A.   Until around 11:00 a.m.
13      Q.   And did the deposition take place?
14      A.   No, it did not.
15      Q.   And was that because no court reporter or
16  videographer was scheduled?
17      A.   That's correct.
18      Q.   Okay.  Thank you.
19          Now, I'm going to just go back to a
20  couple of questions that you were asked earlier today.
21  You were asked in several ways about how individuals who
22  transact with the Department of Public Safety online are
23  given the opportunity to register to vote.  Do you
24  remember those questions?
25      A.   Yes.



STRINGER: SHERI GIPSON

Page 218

1    Q.   Can you clarify how that works?
2    A.   So when the customer logs into the online
3  system, they're authorized based on four pieces of
4  identity information.  They then go through several
5  screens where they identify if they want to -- if they
6  need to update their address, organ donor, VAF and
7  veteran assistance fund donations, and voter
8  registration.  That's in the services options.  And if
9  they -- as they progress on, if they select "yes" to the
10 voter registration, it appears again on the review page
11 along with the options that they selected for organ
12 donor, Glenda Dawson donation, VAF donation, and
13 veteran's assistance fund donation.
14           And once they get past that screen, they
15 accept all of those -- the changes or the information
16 that was inputted, they're put to a receipt page.  If
17 they selected "yes" to the register to vote, there is a
18 link that's provided that takes them to the Secretary of
19 State website where they can download -- they have the
20 opportunity to download and sign and send in a
21 registration application.  And then they're also given
22 the option to print the receipt page.
23    Q.   And that registration application, is it your
24 understanding that that's the -- that is the application
25 approved by the Secretary of State's office?

Page 219

1    A.   Yes, it is the -- the one from their website.
2    Q.   Okay.  And the information, just to clarify,
3  that is verified before the customer may begin the
4  transaction -- those four pieces of information that you
5  just talked about -- do those -- does DPS do anything
6  with those pieces of information to verify whether an
7  individual is eligible to register to vote or update
8  voter registration information?
9    A.   No.  Those pieces are not used for that
10 purpose.
11   Q.   The pieces of information are simply used to
12 verify that the individual is eligible to transact with
13 DPS online?
14   A.   Correct.
15   Q.   And to verify their identity?
16   A.   Correct.
17   Q.   Okay.  Thank you.
18           You were asked a couple of questions
19 about how DPS publicizes the availability of certain
20 transactions online, and you testified that DPS wants to
21 reduce wait times and in-office traffic.  Do you recall
22 that testimony?
23   A.   Yes.
24   Q.   Why does DPS want to reduce wait times and
25 in-office traffic in its field offices?

Page 220

1    A.   Because that is one of the main complaints
2  that we have from customers, both directly and through
3  legislators and -- because many times they're expected
4  to wait several hours in order to conduct their
5  business.
6    Q.   And so what complaint is that specifically?
7    A.   The complaint is the amount of time that they
8  have to spend waiting in line to get their driver
9  license or identification card.
10   Q.   Okay.  Thank you.
11           Ms. Champion, also asked you whether a
12 customer could request in some way that their
13 information not be included in the daily update file.
14 And you testified that a customer could not make that
15 request; is that right?
16   A.   That is correct.
17   Q.   Can a customer request that their information
18 not be included in the voter registration file?
19   A.   If they are conducting an in-office
20 transaction, they're making that designation when they
21 select "no" to the voter registration question.
22   Q.   Okay.  Thank you.
23           And now I'm just going to turn your
24 attention back to Plaintiff's Exhibit 13, which is
25 Module 17C.

Page 221

1    A.   Okay.
2    Q.   And if you'll turn to page 6, please.
3    A.   Okay.
4    Q.   Ms. Champion also asked you some questions
5  about the purpose of the signature on the in-office
6  driver license application, the DL-14?
7    A.   Correct.
8    Q.   Now, is this certification on page 6, is that
9  where the signature is provided on the DL-14?
10   A.   Yes.
11   Q.   And could you please read into the record what
12 the applicant is certifying when they provide that
13 signature on the DL-14?
14   A.   (As read):  I do solemnly swear, affirm, or
15 certify that I am the person named herein and that the
16 statements on this application are true and correct.  I
17 further certify my residence address is a -- check one
18 -- single family dwelling, apartment, motel, temporary
19 shelter.  I agree to immediately report to the Texas
20 department of public safety any changes in my medical
21 condition, which may affect my ability to safely operate
22 a motor vehicle.  I further understand that I am
23 required by law to report any change of name or address
24 to the Department of Public Safety within 30 days.
25   Q.   Okay.  Thank you.



STRINGER: SHERI GIPSON

Page 222

1          MS. MACKIN:  We'll pass the witness.
2              FURTHER EXAMINATION
3   BY MS. SILHAN:
4       Q.   Okay.  I will have just a few follow-up
5   questions.  Let's start with the document you were just
6   looking at.
7       A.   Okay.
8       Q.   So this is where a physical signature is
9   required in person, correct?
10      A.   Correct.
11      Q.   And this would be for DL-14; is that right?
12      A.   Correct.
13      Q.   Okay.  Now, it says that -- that by signing,
14  the applicant certifies that their application is true
15  and correct, but also that their residence address is a
16  -- and then they check one -- single-family dwelling,
17  apartment, motel, temporary shelter.  Is that right?
18      A.   That's correct.
19      Q.   How do applicants certify that online?
20      A.   They -- that certification is not online at
21  this time.
22      Q.   Why is that?
23      A.   It -- it is actually in the works.  It's being
24  discussed now because it was pointed out that it was not
25  in that add a station.  That is in -- on that last page

Page 223

1   of the Web page.
2       A.   Okay.
3       A.   So they are in the process of adding that
4   language.
5       Q.   Okay.  Ms. Mackin also asked you about the
6   receipt page for online transactions; is that correct?
7   Do you recall discussing the receipt page here today?
8       A.   Right.
9       Q.   Okay.  So I understand there is some
10  information about voter registration with a link to the
11  Secretary of State's website on the receipt page,
12  correct?
13      A.   Correct.
14      Q.   Now, does the receipt page say anything about
15  changing addresses for voter registration purposes?
16      A.   No, it does not.
17      Q.   Okay.  You mentioned there were four pieces of
18  information that DPS verifies online to determine that
19  maybe the person filling out the form is who they say
20  they are; is that right?
21      A.   Correct.
22      Q.   Can you just remind me what those four pieces
23  of information are?
24      A.   Okay.  They're in the process authentication
25  request.

Page 224

1       Q.   Okay.
2       A.   And it is listed on page 1.
3       Q.   Okay.
4       A.   It's the DL/ID number, the audit number, the
5   last four digits of the social, and the date of birth.
6       Q.   Now, in terms of -- of information that's only
7   requested online and maybe not by other forms -- I'm
8   going to go through this.  So for a driver license
9   identification number, that would be requested on a
10  paper form as well; is that correct?
11      A.   Correct.
12      Q.   Okay.  What about an audit number, is that
13  requested on paper forms?
14      A.   No, it's not.
15      Q.   Okay.  What about the last four numbers of a
16  social security number, is that requested by DPS on
17  paper forms?
18      A.   The social security number is requested.
19      Q.   What about the date of birth, is that
20  requested?
21      A.   It is.
22      Q.   So the only bit of information that a customer
23  provides, in addition to information the customer
24  provides on paper forms, for purposes of online
25  transactions, is the audit number on the face of a

Page 225

1   driver license; is that right?
2       A.   That's correct.
3       Q.   You also discussed customer complaints as part
4   of the reason that DPS is -- is promoting its online
5   transaction; is that correct?
6       A.   Correct.
7       Q.   You mentioned complaints about the amount of
8   time that customers spend waiting in line to get their
9   driver license and ID cards; is that right?
10      A.   That is correct.
11      Q.   But customers don't obtain driver license and
12  ID cards online, right?  They just renew or change their
13  address; is that correct?
14      A.   So when you say "obtain," I mean, they are
15  obtaining a new card because that's part of the renewal
16  or the change of the address process.
17      Q.   Okay.  So I just wanted to clarify that when
18  you said the amount of time they're waiting to get a
19  driver license or ID card, it's only the -- the renewals
20  and change of address that are really, kind of, being
21  directed to online where they're eligible, right?
22      A.   That is correct.  If it's an original
23  issuance, they are required to go into the driver
24  license office.
25      Q.   You also touched on the issue of opting out --



STRINGER: SHERI GIPSON

Page 238

```
1        That pursuant to information given to the
2  deposition officer at the time said testimony was taken,
3  the following includes counsel for all parties of
4  record:
5            FOR THE PLAINTIFF, JARROD STRINGER:
6            Cassandra Champion, Esq.
7
8            FOR THE PLAINTIFF, JOHN FRITZ:
9            Beth Stevens, Esq.
10
11           FOR THE PLAINTIFF, BENJAMIN
12  HERNANDEZ:
13           Caitlyn Elizabeth Silhan, Esq.
14
15           FOR THE DEFENDANTS:
16           Anna M. Mackin, Esq.
17           Esteban Soto, Esq.
18           Kathleen T. Murphy, Esq.
19
20
21
22
23        That $_____ is the deposition officer's
24  charges to the Plaintiffs for preparing the original
25  deposition transcript and any copies of exhibits;
```

Page 239

```
1        I further certify that I am neither counsel
2  for, related to, nor employed by any of the parties or
3  attorneys in the action in which this proceeding was
4  taken, and further that I am not financially or
5  otherwise interested in the outcome of the action.
6        Certified to by me this _____ day of
7  _____, 20____.
8
9  _____
10
          Tammy Lea Staggs
11        CSR  7496
          Expiration Date:  12/31/2017
12        Firm No. Dallas: 69
          1.888.656.DEPO
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 240

```
1  COUNTY OF _____)
2  STATE OF TEXAS)
3        I hereby certify that the witness was notified
4  on _____ that the witness has 30 days
5  or (____ days per agreement of counsel) after being
6  notified by the officer that the transcript is available
7  for review by the witness and if there are changes in
8  the form or substance to be made, then the witness shall
9  sign a statement reciting such changes and the reasons
10  given by the witness for making them;
11       That the witness' signature was/was not
12  returned as of _____, 20____.
13       Subscribed and sworn to on this, the _____ day
14  of _____, 20____.
15
16
17  _____
          Tammy Lea Staggs
18        CSR  7496
          Expiration Date:  12/31/2017
19        Firm No. Dallas: 69
          1.888.656.DEPO
20
21
22
23
24
25
```



# EXHIBIT 11

STRINGER: SHERI GIPSON

Page 1

1          UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF TEXAS
2             SAN ANTONIO DIVISION

3

JARROD STRINGER, et al.,        )
4                               )
                Plaintiffs,     )
5     vs.                       ) C.A. 5:16-cv-00257-OLG
                                )
6     ROLANDO B. PABLOS, IN HIS )
      OFFICIAL CAPACITY AS THE TEXAS )
7     SECRETARY OF STATE; AND STEVEN )
      C. MCCRAW, IN HIS OFFICIAL )
8     CAPACITY AS THE DIRECTOR OF THE )
      TEXAS DEPARTMENT OF PUBLIC )
9     SAFETY,                   )
                                )
10              Defendants.     )

**CERTIFIED TRANSCRIPT**

11                              )

12

13      ORAL VIDEOTAPED DEPOSITION OF SHERI GIPSON

14          TUESDAY, JANUARY 31, 2017

15

16          ORAL VIDEOTAPED DEPOSITION OF SHERI GIPSON,

17   produced as a witness at the instance of the Plaintiffs,

18   and duly sworn, was taken in the above-styled and

19   -numbered cause on the 31st day of January, 2017, from

20   9:44 a.m. to 5:59 p.m., before RABIN´ MONROE, Certified

21   Shorthand Reporter in and for the State of Texas,

22   reported by computerized stenotype machine, at the TEXAS

23   ATTORNEY GENERAL'S OFFICE, 300 West 15th Street, 10th

24   Floor, Austin, Texas 78701, pursuant to any provisions

25   stated on the record or attached hereto.

**hg**

STRINGER: SHERI GIPSON

## Page 2

```
 1                    APPEARANCES
 2
 3  FOR PLAINTIFFS
 4       MS. CAITLYN ELIZABETH SILHAN
         SBOT No. 24072879
 5       csilhan@waterskraus.com
         WATERS & KRAUS, LLP
 6       3141 Hood Street
         Suite 700
 7       Dallas, Texas  75219
         Phone:  (214) 357-6244
 8       Fax:    (214) 357-7252
 9
         MS. MIMI MURRAY DIGBY MARZIANI
10       SBOT No. 24091906
         mimi@texascivilrightsproject.org
11       MS. CASSANDRA LANG "CASSIE" CHAMPION
         SBOT No. 24082799
12       champion@texascivilrightsproject.org
         TEXAS CIVIL RIGHTS PROJECT
13       1405 Montopolis Drive
         Austin, Texas  78741-3438
14       Phone:  (512) 474-5073
15
16
17  FOR DEFENDANTS
18       MS. ANNE MARIE "ANNA" MACKIN
         SBOT No. 24078898
19       anna.mackin@oag.texas.gov
         OFFICE OF THE ATTORNEY GENERAL
20       300 West 15th Street,
         14th Floor
21       Austin, Texas  78701
         Phone:  (512) 463-2004
22
23
24                   continued
25
```

## Page 3

```
 1            A P P E A R A N C E S
                    continued
 2
 3
 4  FOR DEFENDANT TEXAS DEPARTMENT OF PUBLIC SAFETY
 5       MS. KATHLEEN THERESA MURPHY
         SBOT No. 00789507
 6
         kathleen.murphy@dps.texas.gov
 7       TEXAS DEPARTMENT OF PUBLIC SAFETY
         5805 North Lamar Boulevard,
         Suite 4087
 8       Austin, Texas  78752
         Phone:  (512) 424-2420
 9       Fax:    (512) 424-2251
10
11
12  ALSO PRESENT:
13       JUSTIN TALBOT, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                 I N D E X
 2
 3  WITNESS                                    PAGE
 4  Title Page                                    1
 5  Appearances                                   2
 6  Index                                         4
 7  Proceedings Begun                             6
 8  SHERI GIPSON
 9       EXAMINATION BY MS. SILHAN                7
         EXAMINATION BY MS. MARZIANI            287
10       EXAMINATION BY MS. MACKIN              294
         FURTHER EXAMINATION BY MS. SILHAN      306
11
    Deposition Suspended                        310
12
    Changes and Signature                       311
13
    Court Reporter's Certificate                313
14
15            *     *     *     *     *
16
17                   EXHIBITS
18  NO.   DESCRIPTION                          PAGE
19  1     Notice of Deposition                    9
20  2     Screenshot -- Driver License Renewal and 65
          Change of Address
21
22  3     DLS Use Case Specification: Create Daily 152
          Update Log for SOS -- December 22, 2014
23  4     Letter from Joe Peters to Keith Ingram Re: 174
          NVRA Implementation Plan -- July 22, 2016
24
25                   continued
```

## Page 5

```
 1                   EXHIBITS
                     continued
 2
 3  NO.   DESCRIPTION                          PAGE
 4  5     Letter from Joe Peters to Keith Ingram Re: 176
          NVRA Implementation Plan -- August 3, 2016
 5
 6  6     Texas DPS NVRA Implementation Plan     179
 7  7     Email from Susan Stempelmann Re: Customer 192
          Operations Conference Call Notes -- October
 8        19, 2012
 9  8     Email Chain Re: Elections Follow-up    201
10  9     Email Chain Re: Voters registration    205
11  10    Email from Marguerite Buster Re: Voter 209
          registration verification - 2-4-13.doc --
12        2/4/2013
13  11    Metadata                              211
14  12    D_00011099                            211
15  13    Email Chain Re: Other DL              219
16  14    DPS Government Relations Action Sheet  224
17  15    DPS Overview                          246
18  16    Application for Change of Address on Valid 259
          Texas Driver License (DL) & Identification
19        Card (ID)
20  17    The National Voter Registration Act and 269
          Voter Registration Applications . . . an
21        Overview -- 6/12/13
22  18    Letter from Peter A. Kraus and Mimi M. D. 285
          Marziani to Secretary of State Cascos Re:
23        Failure to Comply with Voter Registration
          Obligations at Texas Department of Public
24        Safety -- May 27, 2015
25            *     *     *     *     *     *
```



STRINGER: SHERI GIPSON

Page 6

```
1                    (9:44 a.m.)
2             THE VIDEOGRAPHER:  Today is Tuesday,
3   January 31st, 2017.  Time is approximately 9:45 a.m.
4   We are at the Texas Attorney General's Office, 300 West
5   15th Street, Austin, Texas 78701.
6             My name is Justin Talbot, video specialist
7   at Legal Eyes, Incorporated, out of Aubrey, Texas.
8             This case, Cause Number
9   5:16-cv-00257-0 -- OLG.  Excuse me.  Entitled
10  Jarold [sic] Stringer, et al -- Jarrod Stringer, et al,
11  vs. Rolando B. Pablos, et al.  The deponent is Sheri
12  Gipson.  This video deposition was requested by the
13  Plaintiffs' counsel, Waters Kraus & Paul.
14            Counsel and all present please identify
15  yourselves for the record.
16            MS. SILHAN:  Caitlyn Silhan on behalf of
17  the Plaintiff, Jarrod Stringer.
18            MS. MARZIANI:  Mimi Marziani on behalf of
19  Plaintiff Totysa Watkins.
20            MS. CHAMPION:  Cassandra Champion, counsel
21  for the Plaintiff on behalf of Totysa Watkins.
22            MS. MURPHY:  Kathleen Murphy, Senior
23  General Counsel, DPS.
24            MS. MACKIN:  Anne Marie Mackin with the
25  Attorney General's Office on behalf of all Defendants.
```

Page 7

```
1             THE VIDEOGRAPHER:  Thank you.
2             Will you please swear the witness.
3             THE COURT REPORTER:  Will you raise your
4   right hand?
5             Do you swear or affirm that the testimony
6   you're about to give will be the truth, the whole truth,
7   and nothing but the truth?
8             THE WITNESS:  I do.
9             THE COURT REPORTER:  Thank you.
10                 SHERI GIPSON,
11  having been called as a witness herein, having been
12  first duly sworn, was examined and testified as follows:
13                 EXAMINATION
14  BY MS. SILHAN:
15       Q.   Okay.  Good morning.
16       A.   Morning.
17       Q.   Would you please state and spell your full name
18  for the record?
19       A.   Sheri Lynne Gipson.  S-H-E-R-I.  L-Y-N-N-E.
20  Gipson, G-I-P-S-O-N.
21       Q.   Have you ever been deposed before?
22       A.   Yes.
23       Q.   How many times?
24       A.   Once.
25       Q.   When was that?
```

Page 8

```
1       A.   Oh, goodness.  2014.  '13.
2       Q.   Was that in connection with your employment at
3   the Department of --
4       A.   Y- --
5       Q.   -- Public Safety?
6       A.   Yes, ma'am, it was.
7       Q.   Okay.  Was that -- well, can you tell me the
8   name of the case in which --
9       A.   I --
10      Q.   -- you were deposed?
11      A.   I -- I can't remember the name of the case,
12  but it was over vy- -- voter identification.
13      Q.   Okay.  Did you provide any other testimony in
14  that case?  Any trial testimony?
15      A.   No, ma'am.
16      Q.   Okay.  Okay.  So you've already gone through
17  this before, but I'll maybe give you a little refresher
18  on some of the rules.
19           Only one of us can talk at a time.  And so
20  I'll do my best to let you finish your answer, and if
21  you would m- -- wouldn't mind letting me finish my
22  question before you begin responding, that will help the
23  court reporter and our transcript.
24           And if you would please give verbal
25  responses.  Don't shake your head yes or no; no "uh-uh"
```

Page 9

```
1   or "uh-huh"; so that the record is clear.  That would be
2   great.
3            If you don't understand a question, please
4   just let me know.  If you need me to re-ask it, let me
5   know.  I'd be happy to.  And if you don't ask me to
6   rephrase a question or you don't indicate that you don't
7   understand it, I'll -- I'll go ahead and assume that you
8   do.
9            Does that work?
10      A.   Okay.
11      Q.   'Kay.  Okay.  So you are here pursuant to a
12  deposition notice served by the Plaintiffs in this case;
13  is that correct?
14      A.   That is correct.
15      Q.   Have you reviewed a copy of that deposition
16  notice?
17      A.   Yes, ma'am.
18      Q.   'Kay.  I will . . . mark this as Exhibit 1.
19           (Exhibit 1 marked for identification.)
20      Q.   Here you are.
21           Is this the notice of deposition that
22  you've received in this case?
23      A.   Yes, ma'am.
24      Q.   When did you receive this notice of deposition?
25      A.   I don't know the exact day.
```



STRINGER: SHERI GIPSON

---

Page 134

1    A.   Mm-hmm.
2    Q.   Does it have information about any other CSR
3    involved in the transaction?
4    A.   Right now it -- I believe it goes into the
5    audit trails.  But we can't see it . . . on the screens.
6    Q.   How many Driver License records are in DLS now,
7    approximately?
8    A.   There is a total -- not a total.  There's over
9    26 million records, including driver license,
10   identification cards, and unlicensed records.
11   Q.   Are those all associated with individuals?  So
12   there would be 26 million individuals?
13   A.   No.  For the most part it is.  But we still
14   have some records from individuals -- the -- the -- the
15   best way to describe this is before the Driver License
16   System, our system was a card-driven.  So you would
17   have -- like, if you had a driver's license and an ID,
18   you would have two separate records in the system.
19              With Driver License System, we have what's
20   called a person record.
21   Q.   Mm-hmm.
22   A.   So it joins those things together.
23        But we have individuals who either updated
24   a name or an address or somethin' on one card and not
25   the other, so when the d- -- data was migrated, it

---

Page 135

1    does -- it did not combine those records.  So we have
2    some out there, you know.  A-- and there's -- there's
3    no way for us to know an exact number.  But it's not --
4    you know, it's not, like, millions --
5    Q.   Okay.
6    A.   -- that are duplicate records.
7    Q.   Okay.  But that would be the case if someone --
8    A.   Right.
9    Q.   -- had two different types --
10   A.   Right.
11   Q.   -- of -- of. . . .
12   A.   If they both -- if they had both an ID and a
13   DL.  Right.
14   Q.   Got it.
15   A.   And so when you're lookin' at just those,
16   you're lookin' at about 22 million.  We have about 4
17   million of unlicensed records.  And that's individuals
18   where they didn't have a driver license or an ID and
19   they got a ticket for DWI or somethin' like that, and we
20   created an un- -- unlicensed record for them.
21   Q.   When DLS was rolled out starting in 2009, and
22   going through the field offices through May of 2010, was
23   that the same time that Texas.gov was rolled out?
24   A.   No.  Texas.gov was in existence prior to that.
25   Q.   Was that when DLS started offering online

---

Page 136

1    change-of-address and driver-license renewals on
2    Texas.gov?
3    A.   That would have been prior to DLS.
4    Q.   Once DLS became operational, how did
5    information collected on the online change-of-address
6    and renewal form . . . get transmitted to DLS?
7    A.   So there is a nightly file that they transmit
8    the data from those application- -- completed
9    applications to DLS.
10   Q.   For those completed applications, we've already
11   discussed that the answer to the voter-registration
12   question, that is not included in that nightly file;
13   correct?
14   A.   That's correct.
15   Q.   Are there any other questions that applicants
16   are required to answer on the online change-of-address
17   or renewal form that is not transferred in the nightly
18   file to DPS?  I'm sorry.  To -- to the DLS?
19   A.   No.
20   Q.   Why does DPS require customers to answer that
21   question if they don't even retain the answer?
22   A.   The -- because we need to offer them the
23   availability of the application.  And so if they f- --
24   in order for us -- for Texas.gov, the way that's
25   programmed, is if they enter "yes," it presents the

---

Page 137

1    link; if they enter "no," it does not.
2    Q.   Why do they need to -- why does DPS need to
3    offer or make available an application?
4    A.   Because it's part of an application process.
5    So we're giving -- we're making that available to the
6    customer so that they can update or get their
7    voter-registration application submitted.
8    Q.   But -- but pursuant to what is that something
9    that D -- DPS is required to do?
10             MS. MACKIN:  Objection:  Form.
11             THE WITNESS:  Yeah, I'm not sure I
12   understand.  I mean --
13   Q.   (BY MS. SILHAN)  So --
14   A.   -- it's -- it's part of -- i- -- it's
15   considered an application, so we're -- are -- are making
16   that customer -- we're providing that ability for them
17   to submit that regis- -- that voter-registration
18   application as part of that process.
19   Q.   Well, it's a separate -- so it's separate,
20   though; right?  So --
21   A.   It is separate.
22   Q.   Okay.  But for other applications, like
23   in-person applications, it's combined; it's not a
24   separate process.
25             MS. MACKIN:  Objection:  Form.

---



STRINGER: SHERI GIPSON

Page 234

```
1   certify that the information is true and correct?
2       A.   They're . . . well, the only thing that they're
3   changing is their address.  But they're -- they're
4   verifying who they are through the authentication
5   process that occurs up front by providing key pieces of
6   data, which is their f- -- their name, the
7   driver-license number, date of birth, the audit number
8   that's on the card they currently hold, and the last
9   four of their Social.
10              (Brief pause.)
11      Q.   Aside from the physical ink signatures and the
12  electronic keypad signatures, are there any other types
13  of signatures DPS collects from customers?
14      A.   No, ma'am.
15      Q.   Does anyone compare the signatures collected by
16  DPS?
17      A.   Compare. . . .
18      Q.   So a customer is going to be submitting to DPS,
19  no matter what, two signatures; correct?
20      A.   Correct.
21      Q.   Even in the first application, they're
22  submitting an ink signature physically on a piece of
23  paper, as well as an electronic signature on a keypad.
24      A.   Correct.
25      Q.   Does anyone go through and compare those two?
```

Page 235

```
1       A.   Not typically, no.
2       Q.   Under what circumstance would they compare
3   them?
4       A.   If there was somethin' that identified that
5   there was potential fraud, or an issue that arose that
6   was, you know, for potential fraud or identity theft,
7   then we would have somebody pull and -- and analyze
8   those signatures.
9       Q.   How are those issues flagged?
10      A.   What do you mean --
11      Q.   How --
12      A.   -- "how are they flagged"?
13      Q.   How does the system identify potential identity
14  fraud or theft?
15      A.   So the system itself does not identif- -- or
16  done -- identify fraud, per se.  We do have an IVS
17  system which does facial recognition on the original
18  applicants.  And so each morning we have individuals
19  that review those files that come up as potential
20  matches, and then they determine -- if there's potential
21  fraud, if there is, then they refer it to our Criminal
22  Investigations Division.
23              The other way that it would be noted is if
24  the Criminal Investigation Division or Highway Patrol,
25  or another law enforcement agency, determined that there
```

Page 236

```
1   was potential fraud, then they would -- they would
2   request that information.
3       Q.   For signatures -- ink signatures on mail-in
4   changes of address, for example, are those ever compared
5   with either the f- -- previous physical signature or the
6   electronic signature on file?
7       A.   Not on a routine basis, no.
8       Q.   Under what circumstance would they be compared?
9       A.   Again, only if somebody came in and said
10  "Fraud."  They wouldn't be as part of the application
11  process.
12      Q.   Okay.  But there wouldn't be another picture to
13  do another facial recognition; right?
14      A.   No.  Not at that point.
15      Q.   'Kay.  So when else -- what other circumstance
16  for a mail-in form would -- would flag that form for
17  signature comparison?
18      A.   There's not any.
19      Q.   Okay.  So then the mail-in signatures are never
20  compared.
21      A.   Typically no.
22      Q.   Okay.  So I'm just . . . I'm just trying to
23  understand.  When you say --
24      A.   Yeah.
25      Q.   -- "typically no" --
```

Page 237

```
1       A.   Well --
2       Q.   -- why -- why can't you say "no"?
3       A.   So no.  During the routine process, it would
4   never be compared.
5       Q.   But. . . .
6       A.   When I say "routine process," what I'm talking
7   about is the individual that's processing that mail
8   renewal application, they would never compare that
9   signature.  If after the fact we received a contact from
10  Criminal Investigations Division or another low en- --
11  law-enforcement co- -- office contact CID, they may pull
12  those signatures and look at 'em.  But as a routine part
13  of the function of updating mail and -- 'scuse
14  me [coughed] -- mail-in address changes, we do not
15  review the signatures.
16      Q.   How does DPS go about verifying the information
17  submitted online for the online change of address or
18  renewal form?
19      A.   Again, the only verification that's done there
20  is their log-in credentials.
21      Q.   But those log-in credentials, is that
22  information different than what would be entered on a
23  physical mail-in change-of-address form?
24      A.   The difference is the Social Security Number.
25  The last four digits of the Social Security.  And
```



Page 254

1   actually refer to the -- electronic signature captured
2   on the keypad?
3       A.   Yes, it does.
4       Q.   So DPS was never actually scanning physical ink
5   signatures from paper and then transmitting them to
6   SOS . . . during this time.
7       A.   No, we were not.
8            (Brief pause.)
9       Q.   Looking at the next page.  Page three of nine.
10  Under the heading "May 15th, 2009," it says, "A report
11  to categorize the following.
12           Do you see that?
13      A.   Yes.
14           MS. MACKIN:  May 15th, 2009?
15           MS. SILHAN:  Yes.
16      Q.   (BY MS. SILHAN)  And this report would
17  categorize a number of things, including the number of
18  DPS applications received?  Correct?
19      A.   Mm-hmm.
20      Q.   The number of DPS applications approved as new
21  voter.  Number of DPS applications approved as change to
22  existing voter.
23           Are you familiar with whether these
24  reports were created?
25      A.   No, I'm not.

Page 255

1       Q.   Just under that it says, "A second report
2   providing applicant/voter detail of the pending records
3   should be developed.  We have scoped an implementation
4   time frame of January 1st, 2010."
5            Are you familiar with this second report?
6       A.   No, I'm not.
7       Q.   Does it currently exist?
8       A.   I do not believe it does.
9       Q.   And just below that it says "May 27th, 2009,"
10  and in parentheses it says "Email from Karen Richards."
11           Who's Karen Richards?
12      A.   She was with the Secretary of State's Office.
13      Q.   'Kay.  And it says, "The Secretary of State's
14  Office is currently working with DPS on several issues
15  involving the deployment of the new DPS Digital
16  Signature Application."
17           What's that?
18      A.   The DPS Digital Signature Application is the
19  new capture ability of the fingerprint, portrait, and
20  signature.  File.  In the new format.
21      Q.   And that was deployed . . . in 2009?
22      A.   Correct.
23      Q.   And it's still used today?
24      A.   Correct.
25      Q.   The following sentence describes an issue with

Page 256

1   isolated electronic files missing.  Can you review that
2   and -- and help me understand -- understand this?
3       A.   So it -- it -- it appears that there -- they
4   identified an error with the file production; that it
5   was not picking up all of the files.  And so they
6   notified IT, and they were working on the issues.
7            So in other words, it would have been a --
8   a code fix.  Because somethin' was causing it to only
9   pick up those that were identified as new.  Because when
10  they . . . do . . . when they select "yes," then there's
11  a -- a secondary field that they enter whether it's a
12  new or an update to existing.  And it appears here that
13  there was a file issue and it was not picking up the
14  updates.
15      Q.   Okay.
16      A.   In the daily file.
17      Q.   And to be clear, two things.  We're talking
18  about the daily file sent to SOS with voter-registration
19  information.
20      A.   Correct.
21      Q.   And when you say . . . update or new, you're
22  referring to voter-registration applications.
23      A.   Correct.
24      Q.   And so you said that . . . aside from an answer
25  to the voter-registration question, there's a second set

Page 257

1   of information that -- that says whether it's an update
2   or a new?
3       A.   Mm-hmm.
4       Q.   Is that in DLS?
5       A.   It is within DLS.  So it indicates -- when they
6   check -- when you're within DLS, once they check "yes,"
7   then they indicate whether it's a new or an update, and
8   then the election-judge information comes up yes or no.
9   So there's, I guess the best way to describe it, is
10  subfields.  So when you're looking at DLS, it doesn't
11  say anything other than U.S. -- I mean "Photo
12  registration:  Yes or no."  But within the application
13  process, it asks the additional questions.
14           So if the -- if the vote -- if the
15  applicant indicated they'd never registered to vote
16  and it was an original, it would have been selected as
17  "new."  And then if they say "I'm already registered,
18  but I'm changin' my address," then it would be sent as
19  an update.
20      Q.   And that's something that's on the paper
21  applications?
22      A.   At this point I would have to go back and look
23  at it.  I -- I don't feel comfortable saying yes or no.
24      Q.   Okay.  Irrespective of whether it's something
25  on the applications, that's something that's in DLS?



Page 310

1  concludes the deposi- -- deposition of Sheri Gipson,
2  consisting of four video disks.  We are off the record
3  at 6:00 [sic] p.m.
4          (Deposition suspended at 5:59 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 312

1  THE STATE OF _____)
2  COUNTY OF _____)
3
4      Before me, _____, on this day
5  personally appeared SHERI GIPSON, known to me or proved
6  to me on the oath of _____ or through
7  _____ [description of identity
8  card or other document] to be the person whose name is
9  subscribed to the foregoing instrument and acknowledged
10  to me that he/she executed the same for the purpose and
11  consideration therein expressed.
12      Given under my hand and seal of office this
13  _____ day of_____, _____.
14
15
16      _____
17      NOTARY PUBLIC IN AND FOR
17      THE STATE OF _____
18      My Commission Expires:_____
19
20
21
22
23
24
25

Page 311

1              CHANGES AND SIGNATURE
2  PAGE LINE  CHANGE                   REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21      I, SHERI GIPSON, have read the foregoing
22  deposition and hereby affix my signature that same is
23  true and correct, except as noted above.
24
25      _____
          SHERI GIPSON
          SHERI GIPSON

Page 313

1          UNITED STATES DISTRICT COURT
2          WESTERN DISTRICT OF TEXAS
2          SAN ANTONIO DIVISION
3  JARROD STRINGER, et al.,        )
                                    )
4          Plaintiffs,             )
   vs.                             ) C.A. 5:16-cv-00257-OLG
5                                  )
   ROLANDO B. PABLOS, IN HIS       )
6  OFFICIAL CAPACITY AS THE TEXAS  )
   SECRETARY OF STATE; AND STEVEN  )
7  C. MCCRAW, IN HIS OFFICIAL      )
   CAPACITY AS THE DIRECTOR OF THE )
8  TEXAS DEPARTMENT OF PUBLIC      )
   SAFETY,                         )
9                                  )
           Defendants.             )
10                                 )
11  ORAL VIDEOTAPED DEPOSITION OF SHERI GIPSON
12      TUESDAY, JANUARY 31, 2017
13      I, RABIN' MONROE, Certified Shorthand Reporter
14  in and for the State of Texas, hereby certify to the
15  following:
16      That the witness, SHERI GIPSON, was duly sworn
17  by the officer and that the transcript of the deposition
18  is a true record of the testimony given by the witness;
19      That the deposition transcript was submitted
20  on _____ _____, 2017, to the witness, or
21  to the attorney for the witness, for examination,
22  signature, and return to _____;
23      That $_____ is the deposition
24  officer's charges to the Plaintiffs for preparing the
25  original deposition and any copies of exhibits;



STRINGER: SHERI GIPSON

Page 314

```
 1          That pursuant to information given to the
 2  deposition officer at the time said testimony was taken,
 3  the following includes all parties of record, along with
 4  the amount of time used by each party at the time of the
 5  deposition:
 6       MS. CAITLYN ELIZABETH SILHAN
         Counsel for Plaintiffs
 7       TIME USED:  6 Hours, 15 Minutes
 8       MS. MIMI MURRAY DIGBY MARZIANI
         Counsel for Plaintiffs
 9       TIME USED:  6 Minutes
10       MS. ANNE MARIE "ANNA" MACKIN
         Counsel for Defendants
11       TIME USED:  17 Minutes
12       MS. KATHLEEN THERESA MURPHY
         Counsel for Defendants
13       TIME USED:  (No time used.)
14          I further certify that I am neither counsel
15  for, related to, nor employed by any of the parties in
16  the action in which this proceeding was taken, and
17  further, that I am not financially or otherwise
18  interested in the outcome of this action.
19          Certified to by me on FEBRUARY 12, 2017.
20
21          _____
            RABIN' MONROE, RDR, CRR, CRC
22          Texas CSR# 9049
            Expiration:  December 31, 2018
23          HG LITIGATION
            Firm Registration No. 69
24          2501 Oak Lawn Avenue, Suite 600
            Dallas, Texas  75219
25          1-888-656-DEPO
            1-888-656-3275 TOLL FREE FAX
            1-888-656-3275 TOLL FREE FAX
```



# EXHIBIT 12

STRINGER: JOHN CRAWFORD

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3    JARROD STRINGER, et al.,        §
                                      §
 4           Plaintiffs,              §
                                      §
 5    v.                              §   Civil Action
                                      §   No. 5:16-cv-00257-OLG
 6    ROLANDO B. PABLOS, IN HIS       §
      OFFICIAL CAPACITY AS THE        §
 7    SECRETARY OF STATE and STEVEN   §
      C. McCRAW, IN HIS OFFICIAL      §
 8    CAPACITY AS THE DIRECTOR OF     §
      THE TEXAS DEPARTMENT OF PUBLIC  §
 9    SAFETY,                         §
                                      §
10           Defendants.             §

11

12    ************************************************
                ORAL AND VIDEOTAPED DEPOSITION OF
13                      JOHN CRAWFORD
                     FEBRUARY 17, 2017
14                        VOLUME 1
      ************************************************

15

16     ORAL AND VIDEOTAPED DEPOSITION OF JOHN CRAWFORD,

17   produced as a witness at the instance of the Plaintiffs,

18   and duly sworn, was taken in the above-styled and

19   numbered cause on the 17th day of February, 2017, from

20   10:06 a.m. to 4:35 p.m., before STEVEN STOGEL, CSR in

21   and for the State of Texas, reported by machine

22   shorthand, at the office of the Attorney General, 300

23   West 15th Street, Suite 1100, Austin, Texas, pursuant to

24   the Federal Rules of Civil Procedure and the provisions

25   stated on the record or attached hereto.
```

**CERTIFIED TRANSCRIPT**

hglitigation.com

**hg**

STRINGER: JOHN CRAWFORD

Page 2

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4       MS. CASSANDRA CHAMPION
         MS. BETH STEVENS
 5       TEXAS CIVIL RIGHTS PROJECT
         1405 Montopolis Drive
 6       Austin, Texas 78741
         Phone:  512.474.5073
 7
 8   FOR THE DEFENDANTS:
 9       MS. ANNE MARIE MACKIN
         OFFICE OF THE ATTORNEY GENERAL
10       General Litigation Division
         P.O. Box 12548, Capitol Station
11       Austin, Texas 78711-2548
         Phone:  512.463.2120
12
     FOR THE TEXAS DEPARTMENT OF PUBLIC SAFETY:
13
         MS. KATHLEEN T. MURPHY-DARVEAU
14       TEXAS DEPARTMENT OF PUBLIC SAFETY
         Senior Assistant General Counsel
15       Office of General Counsel
         5805 N. Lamar Boulevard
16       P.O. Box 4087
         Austin, Texas 78752
17       Phone:  512.424.2420
18
     ALSO PRESENT:
19
         MR. ALEX STAMM
20       MR. AARON HAGEL, Videographer
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2                                              PAGE
 3   Appearances....................................    2
 4   WITNESS: JOHN CRAWFORD
 5   Examination by Ms. Champion....................    6
 6   Examination by Ms. Stevens..................... 126
 7   Reporter's Certificate......................... 152
 8
 9              EXHIBITS
10   EXHIBIT NAME  DESCRIPTION                       PAGE
11   Exhibit 1.    Notice of Deposition              24
12   Exhibit 2.    12/22/14 Texas DPS DLS - Use Case  54
                   Specification:  Create Daily Update
13                 File for SOS - Version 1.9
14   Exhibit 3.    12/29/14 Texas DPS DLS - Use Case  54
                   Specification:  Create Voter
15                 Registration Extract File -
                   Version 6.9
16
     Exhibit 4.    DPS Overview                       65
17
     Exhibit 5.    Form DL-14A (Rev. 6/14)            70
18                 Application for Texas Driver
                   License or Identification Card
19
     Exhibit 6.    Form DL-64 (Rev. 3/16)             77
20                 Application for Change of Address
                   on Valid Texas Driver License (DL)
21                 & Identification Card (ID)
22   Exhibit 7.    Form DL-64 (Rev. 9/13)             77
                   Application for Change of Address
23                 on Valid Texas Driver License (DL)
                   & Identification Card (ID)
24
25
```

Page 4

```
 1                  EXHIBITS
 2   EXHIBIT NAME  DESCRIPTION                       PAGE
 3   Exhibit 8.    Screenshot - Texas DPS - Driver    85
                   License Renewal and Change of
 4                 Address Page
 5   Exhibit 9.    PowerPoint Entitled "The National 100
                   Voter Registration Act and Voter
 6                 Registration Applications ... an
                   Overview"
 7
     Exhibit 10.   12/4/15 Email from Lauren Petty   107
 8
     Exhibit 11.   6/8/16 Email String                13
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1          P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  All right.  This
 3   begins the videotaped deposition of Mr. John Crawford in
 4   the matter of Jarrod Stringer, et al., versus Rolando B.
 5   Pablos, in his official capacity as the Texas Secretary
 6   of State, and Steven C. McCraw, in his official capacity
 7   as the Director of the Texas Department of Public
 8   Safety, now pending in the United States District Court
 9   for the Western District of Texas, San Antonio Division,
10   Civil Action No. 5:16-cv-00257-OLG.
11          This deposition is being held at 300 West
12   15th in Austin, Travis County, Texas.  Today is Friday,
13   February 17th, 2017.  The time is now 10:06 a.m.
14          My name is Aaron Hagel, your
15   videographer, retained by Legal Eyes, Incorporated.  Our
16   court reporter is Steve Stogel.
17          Would counsel and all parties present
18   please introduce yourselves for the record, and then
19   would the court reporter then swear in the witness?
20          MS. CHAMPION:  Yes.  My name is Cassandra
21   Champion.  I'm here on behalf of the plaintiff, Jarrod
22   Stringer.
23          MS. STEVENS:  Beth Stevens on behalf of
24   Benjamin Hernandez.
25          MR. STAMM:  Alex Stamm here on behalf of
```



Page 6

1  the plaintiff, Jarrod Stringer.
2       MS. MURPHY:  Kathleen Murphy, General
3  Counsel's Office, Texas Department of Public Safety.
4       MS. MACKIN:  Anne Marie Mackin, Texas
5  Attorney General's Office, here on behalf of all
6  defendants.
7       THE WITNESS:  John Crawford, Texas
8  Department of Public Safety.
9            JOHN CRAWFORD,
10  having been first duly sworn, testified as follows:
11            EXAMINATION
12  BY MS. CHAMPION:
13       Q.   Thank you.  Mr. Crawford, could you state and
14  spell your full name for the record, please?
15       A.   It's John William Crawford.  J-O-H-N; William,
16  W-I-L-L-I-A-M; and Crawford is C-R-A-W-F-O-R-D.
17       Q.   Thank you.  Have you ever been deposed before?
18       A.   Yes, I have.
19       Q.   We will come back to that to learn a little
20  bit more, but first, even though you've been deposed,
21  I'll just give you a refresher of the rules, if you
22  don't mind.
23            So only one of us can talk at a time.
24  That is for the benefit of the court reporter, to keep
25  our record very clear.  So I'll endeavor to let you

Page 7

1  finish every answer if you will kindly let me finish
2  every question.
3            Can you please give verbal answers, such
4  as "yes" and "no," rather than "uh-huh" or "huh-uh,"
5  because those are harder to read?
6       A.   Yes.
7       Q.   And if you don't understand a question, will
8  you let me know you don't understand, because if you do
9  not let me know, then I will presume that you understood
10  and that the answer was the answer you meant to give.
11  Is that okay?
12       A.   Yes.
13       Q.   Are you currently sick or taking any
14  medication today?
15       A.   No.
16       Q.   Is there any other reason your testimony today
17  might be impaired?
18       A.   No.
19       Q.   Okay.  Let's go back to the depositions you
20  may have been involved with in the past.  How many times
21  have you been deposed?
22       A.   Two.
23       Q.   And for the first one, why -- what case or
24  matter were you deposed for?
25       A.   It -- there were two contractors that were

Page 8

1  employed by the department.  One had a case against the
2  other, and one reported to me, and so I was deposed in
3  that matter.
4       Q.   Do you remember when that was?
5       A.   I believe it was 2010.
6       Q.   Do you happen to know the name of the case?
7       A.   I don't.  I'm sorry.  I don't remember.
8       Q.   That's okay.  How about the second time?
9       A.   The second time was the voter ID case, when I
10  testified for the department.
11       Q.   And when was that?
12       A.   That was in 2014.  I believe it was in the
13  spring.  I don't remember the exact month.
14       Q.   And when you say "department," do you mean the
15  Department --
16       A.   Department of Public Safety, yes.
17       Q.   Did you testify for the Department of Public
18  Safety in the first case as well?
19       A.   No.  That was private -- a private matter.
20       Q.   Thank you.  Are you currently employed by the
21  Texas Department of Public Safety?
22       A.   Yes.
23       Q.   Can we call that DPS today?
24       A.   Yes.
25       Q.   What is your job title?

Page 9

1       A.   I am manager of licensing services
2  applications.
3       Q.   Is that in a particular division?
4       A.   It's in the information technology division.
5       Q.   And what do you do in that position?
6       A.   I'm responsible for a team of software
7  developers who support the applications that are used by
8  the driver license division and the regulatory services
9  division of DPS.
10       Q.   How big is that team?
11       A.   I have 15 people.
12       Q.   And who do you report directly to?
13       A.   I report to Shannon Wallace, who is the
14  interim assistant deputy director in -- for
15  applications.
16       Q.   You said "interim."  Was there someone that
17  had that position before Shannon Wallace?
18       A.   Yes.  The previous holder of the position was
19  Bryan Lane, and he's now the chief information officer
20  for the information technology division.
21       Q.   We'll go over the hierarchy a little bit in
22  one moment, but how long have you held that position?
23       A.   Since December of 2012.
24       Q.   When did you first start working for DPS?
25       A.   In September 2008.



Page 70

1  Exhibit 5?
2          (Exhibit No. 5 marked)
3      Q.  (By Ms. Champion)  This form, Exhibit 5, at
4  the top says "Application for Texas Driver License or
5  Identification Card."  Is that correct?
6      A.  Yes.
7      Q.  And it has many fields on the front page of
8  the form.  Would you agree?
9      A.  Yes.
10     Q.  Do each of these fields reflect a
11  corresponding field within the DLS?
12     A.  Yes.
13     Q.  For Question 2, which reads, "If you are a
14  U.S. citizen, would you like to register to vote?  If
15  registered, would you like to update your voter
16  information?"
17         Is there a field for that in DLS?
18     A.  Yes.
19     Q.  And what does it look like on your end?  Does
20  it have that exact language?  Can you explain the field?
21     A.  It would have -- on the screen in the driver
22  license application, it would have a tag that says
23  "voter registration," and an entry would be "yes" or
24  "no."
25         So I don't believe that it has the entire

Page 71

1  question on the driver license screen.  There are many
2  screens, so I'd have to go look at it specifically, but
3  I don't believe the full question is there.
4      Q.  Can that field be left blank?
5      A.  No.
6      Q.  Can the -- can there be both a "yes" and a
7  "no" entry simultaneously?
8      A.  No.
9      Q.  Are you familiar with the term "hard stop"?
10     A.  Yes.
11     Q.  Does that mean that that field has to be
12  filled out before another field can be filled out?
13     A.  Yes.
14     Q.  Do you know if it was always the case that
15  that field had to be filled out for the No. 2 voter
16  registration question?
17     A.  It was not.
18     Q.  And when did that change?
19     A.  I -- I don't recall the exact date.  I'd have
20  to look at records to find out.  It's -- it was not part
21  of the original driver license application.  The change
22  was made at a later date.
23     Q.  Were you part of making that change?
24     A.  My team would have been, yes.
25     Q.  What was the process -- the technical process

Page 72

1  that had to occur when the change was made from the
2  field not having to have an answer to the field now
3  having to have an answer?  So how was the hard stop
4  created, I suppose?
5      A.  It would have followed the regular process of
6  a formal request being entered and verified.  But in --
7  within the programming itself, the programmer -- the
8  software developer controls how a cursor flows through
9  fields on the screen.  If you hit return, you can either
10  bypass a field or not, and you make a software change
11  that doesn't allow that cursor to pass a field until you
12  have entered one of the valid values in that field.
13         So if it's -- a valid value's not
14  entered, you can't go any farther.  So that's what "hard
15  stop" means.  It forces you to make a valid entry before
16  you can go to the next piece of information.
17     Q.  And so when the decision was made to implement
18  this hard stop, who would have given that assignment?
19     A.  Who would have given the assignment to
20  actually do the code?
21     Q.  Yes.
22     A.  My lead, Jeff Peschka, would have assigned the
23  person to do the actual coding itself.  The request
24  would have come from the driver license division, then
25  we would have -- we would have assigned the tasks based

Page 73

1  on their prioritizations.  Ultimately it's my
2  responsibility for work assignment.
3      Q.  Do you know who at the driver's license
4  division would have made the request?
5      A.  I don't know who made that request, no.
6      Q.  Do you look how we can find out?
7      A.  It would be in the JIRA ticket.
8      Q.  We talked about all of the information from
9  Exhibit 5 being input into DLS.  Do you know if every
10  form that a customer fills out in person at a DPS office
11  is the same in that it would have multiple fields that
12  would all go into -- into the DLS?
13     A.  I'm not familiar with every form that would be
14  available in a driver license office, and I can't -- I
15  couldn't confirm for certain that every one would be
16  included.
17     Q.  Does the DLS only store electronic signatures?
18     A.  Yes.
19     Q.  But there --
20     A.  Well, I'm not sure what -- could you -- could
21  you clarify that a little bit, please?
22     Q.  Sure.  Does the DLS only store signatures
23  which are input using the keypad?
24     A.  The DLS database itself, yes, it only stores
25  signatures that are collected on those electronic pads.



STRINGER: JOHN CRAWFORD

Page 74

1    Q.    Would there ever be a situation where there's
2  a file within DLS that is an image of a scanned
3  signature?
4    A.    Customer service representatives do scan
5  documents that have physical signatures.  Those are
6  stored by a vendor.  They're not stored in the driver
7  license database.
8    Q.    What vendor is that?
9    A.    It's a company called CBM Archive.
10   Q.    So images of scanned documents, including
11 signatures, are they kept within DLS?  Are they stored
12 within DLS?
13   A.    No.  They're stored by CBM Archive in their
14 environment.
15   Q.    I think you've used the phrase "in their
16 environment" to refer to not only CBM but also DPS.  Can
17 you explain what that means?
18   A.    CBM Archive has their own computer equipment,
19 and that's where this information is stored, on their
20 computer equipment.
21   Q.    Is that what you mean by "the environment"?
22   A.    Yes.
23   Q.    Can a DPS employee look up a scanned document
24 in DLS?
25   A.    They can look up a scanned document through

Page 75

1  the DLS application.  They're looking at it in the
2  CBM Archive database.
3    Q.    So does a CBM system then have to somehow
4  communicate with DLS?
5    A.    Yes.  The DLS application knows for a
6  particular customer that scanned documents are stored,
7  and an authorized driver license person can look at
8  those documents.
9    Q.    Does DPS have any signature recognition
10 software?
11   A.    Not that I'm aware of.
12   Q.    Each time a customer comes into a DPS office
13 to complete a transaction, is a record in DLS updated
14 every time?
15   A.    Yes.  If the customer actually executes a
16 transaction, yes.
17   Q.    Is a new signature file created each time a
18 customer completes a transaction?
19   A.    That's really a business question.  I don't
20 know what their process -- I don't know what the
21 business process is for requiring a signature.
22            THE REPORTER:  Did you say requiring or
23 acquiring?
24            THE WITNESS:  Requiring.
25            THE REPORTER:  Thank you.

Page 76

1    Q.    (By Ms. Champion)  When you look at a file in
2  DLS, can you tell when a signature file has been
3  created?
4    A.    Yes.
5    Q.    How can you tell?
6    A.    It'll have a date and time stamp associated
7  with that record.
8    Q.    Can you see a history for each time a
9  signature file has been changed?
10   A.    Yes.  A signature file is not changed.  A new
11 signature would be captured.  So we would -- we would
12 have the old signature -- the previous signature, but
13 you don't change a signature.  You capture a new
14 signature.
15   Q.    What would happen to the old signature?
16   A.    It remains on file.
17   Q.    So would a person record then have multiple
18 signatures associated with that file?
19   A.    It could, yes.
20   Q.    Are signature files ever removed from DLS?
21   A.    No.
22   Q.    What is the DPS digital signature application?
23   A.    I'm not familiar with that term.
24   Q.    Okay.  So when a customer service
25 representative is using DLS, could that employee compare

Page 77

1  two signatures?  Could they pull them both up on the
2  system at the same time?
3    A.    I don't know if a customer service
4  representative has that level of authority.  That would
5  be a business authorization.
6    Q.    If a person record has more than one signature
7  associated with that record, which signature would be
8  batched and sent to the Secretary of State with the
9  voter extract?
10   A.    The most --
11   Q.    -- file?
12   A.    The most recently captured one.
13   Q.    And the system knows which one to send based
14 on the time and date stamp associated with each
15 signature?
16   A.    Yes.
17   Q.    I'm going to hand over two documents.  One
18 will be Exhibit 6 and one will be Exhibit 7.
19            (Exhibit Nos. 6 and 7 marked)
20   Q.    (By Ms. Champion)  Okay.  Looking at
21 Exhibit 6, the top it says "Application for Change of
22 Address on Valid Texas Driver's License (DL) &
23 Identification Card (ID)."
24            Do each of these fields get filled out
25 when a form like this is mailed in to DPS?



STRINGER: JOHN CRAWFORD

Page 138

1  sent to the Secretary of State that night with the voter
2  registration batch.  Correct?
3      A.   Yes.
4      Q.   And with the renewal and the change of
5  address, the electronic signature's also going to the
6  Secretary of State?
7      A.   Yes.
8      Q.   And I think you answered this with
9  Ms. Champion, but if someone's provided multiple
10  electronic signatures, it's the most recent signature
11  that goes with the batch.  Is that right?
12      A.   Yes, that's correct.
13      Q.   And the second batch -- the kind of catchall
14  batch in my mind -- that doesn't have any signatures.
15  Is that correct?
16      A.   I don't recall.  It does not.
17      Q.   Would you turn to Page 4 on the Batch 2 case
18  use, the non-voter registration one?
19      A.   The daily update?
20      Q.   Yes, sir.  Page 4 at the top that has 1.1.6.2.
21      A.   Yes.
22      Q.   And then in parentheses, it has A-2, and it
23  says, "Purge status."
24      A.   Yes.
25      Q.   Can you explain that a little bit more to me?

Page 139

1  What -- what is purge status?
2      A.   I'm sorry.  I don't know.  I would have to --
3  I'd have to research that.  I don't know what that
4  designator is.
5      Q.   Is it fair to say that somebody on your team,
6  the people that you manage, would be able to answer that
7  question?
8      A.   Either someone from my team or someone from
9  the business would be able to answer that question, yes.
10      Q.   I'm going to turn your attention back to the
11  mail-in change of address, the current one -- so I think
12  that's Exhibit 6.
13           With regard to the batch that's sent to
14  the Secretary of State at night for the voter
15  registration, if the person answers "yes" on their
16  change of address that's mailed in and that's input into
17  DLS, it's the electronic signature that was previously
18  provided the last time that person went in person.
19  That's the signature that goes to the Secretary of
20  State.  Is that right?
21      A.   Yes, that's correct.
22      Q.   There's not -- I've not a scan of the
23  signature that is required on Exhibit 6?
24      A.   It is not.  That's correct.
25      Q.   Okay.  The information -- when someone calls

Page 140

1  in to DPS to update or renew, the information that gets
2  captured in DLS -- if the voter registration question
3  is, in fact, asked and captured in DLS, that information
4  would also go to Secretary of State at the same time
5  during that batch?
6      A.   That's correct.
7      Q.   And if they answered "yes" to that question
8  and it goes to the Secretary of State, their previously
9  provided electronic signature is what would be sent to
10  the Secretary of State as well?
11      A.   Yes.
12      Q.   So I'll turn your attention to the online
13  transaction with Texas.gov and the interaction with DLS.
14  Okay?
15      A.   Okay.
16      Q.   When DLS receives the information from
17  Texas.gov, the DLS system can tell, can it not, whether
18  it is a renewal or a change of address?
19      A.   Yes.
20      Q.   Thank you.  And do I have it right that you
21  can't go get a new driver's license online?  Is that
22  correct?
23      A.   An initial driver license, that is correct.
24      Q.   Right.  So if I just turned -- how old do you
25  have to be to drive -- 16, 17 -- I can't have my first

Page 141

1  interaction with DPS be online.  I have to go in person?
2      A.   That is correct.  You must go into an office.
3      Q.   Okay.  And, likewise, I can't do it via the
4  mail for the first time either?
5      A.   That's also correct, right.  Mail is only
6  renewals or change of address.
7      Q.   Okay.  I think you addressed this with
8  Ms. Champion, but I just want to make sure I understand.
9  The information that is transferred from Texas.gov to
10  DLS, the sort of fields that come out of Texas.gov, the
11  website, and get projected out to DLS or whatever the
12  mechanism is, that would be a case use -- a use case
13  from Texas.gov.  Is that correct?
14      A.   Yes.
15      Q.   That would dictate what gets sent to DLS?
16      A.   What -- yes, that's correct.
17      Q.   Okay.  And currently we know at the very least
18  the updated address information does get sent to DLS.
19  Is that correct?
20      A.   Yes.
21      Q.   And we know that the two -- well, first of
22  all, the question about "Do you want to donate a dollar
23  to this charity?" that question and answer gets sent to
24  you.  Correct?
25      A.   Yes, it does.



STRINGER: JOHN CRAWFORD

Page 142

1    Q.    To DLS?
2    A.    Yes.
3    Q.    And the answer to the question "Do you want to
4    be an organ donor?" that question gets sent to DLS?
5    A.    Yes, that's correct.
6    Q.    Okay.  And DLS is fully capable of receiving
7    the answer to the question do you want to register to
8    vote -- capable of receiving it from Texas.gov.  Is that
9    correct?
10   A.    Not currently.
11   Q.    It's programmable such that DLS could receive
12   the answer to the question do you want to register to
13   vote from Texas.gov?
14   A.    Yes.
15   Q.    And like you pointed out with Ms. Champion,
16   that data field already exists, do you want to register
17   to vote.  Is that correct?
18   A.    There is a data field that exists, yes.
19   Q.    So the program would need to be rewritten such
20   that the information from Texas.gov changes the answer
21   to that question within DLS.  Is that right?
22   A.    I can't tell you exactly how the process would
23   work without analysis.
24   Q.    Okay.
25   A.    That would require analysis in a use case to

Page 143

1    determine if that was the right process.
2    Q.    Have you ever done that analysis?
3    A.    No.
4    Q.    Would you have to get that request from
5    someone with DLD to do that analysis?
6    A.    Yes.
7    Q.    And DLD is the driver's license department.
8    Correct?
9    A.    Driver license division.
10   Q.    Division.
11   A.    Yes.
12   Q.    Excuse me.  Thank you.  Just to clarify, the
13   system, DLS itself, is capable of having the
14   information -- of obtaining the information should
15   Texas.gov send it to you.  Is that fair?
16   A.    Yes.
17   Q.    Do I have it right that if someone goes online
18   to either change their address or, within a renewal,
19   they do something to change -- change their address,
20   change their name, something like that -- that
21   information all is going from DLS, once they receive
22   it -- once it receives it -- to the Secretary of State
23   in that second batch we've been talking about?
24   A.    Yes.
25   Q.    Okay.  So, hypothetically, if DLS did what you

Page 144

1    said -- you needed to do the analysis and see how
2    exactly it would need to communicate with Texas.gov to
3    start tracking the answer "yes" or "no," "Do you want to
4    register to vote?" -- hypothetically, they've done that
5    and the answer is "yes."  Okay?
6    A.    Okay.
7    Q.    Okay?  Are you with me so far?
8    A.    Okay.
9    Q.    Okay.  DLS is also capable of sending that
10   information on to the Secretary of State's Office.
11   Correct?
12        MS. MACKIN:  Objection; form.  You can
13   answer.
14   A.    Technically, yes.
15   Q.    (By Ms. Stevens)  It's capable of doing it?
16   A.    From an IT perspective, yes.
17   Q.    Okay.  And if it were to do that, it could
18   also send the previously provided electronic signature
19   from that customer, just like it does with a mail-in
20   change of address.
21   A.    Yes.
22   Q.    Okay.  And I just want to go back to -- you
23   said technically it can do what I just asked you two
24   questions ago.  Are you hesitating because someone needs
25   to actually have you put that in place in the system?

Page 145

1    A.    Someone has to -- yeah, the driver license
2    division would have to request it, and there's a process
3    to go through.  It has to be legal, for example.
4    Their -- their request must come from the driver license
5    division, and we're -- we don't work on things unless
6    that request comes from the driver license division.
7    Q.    Sure.  That makes -- someone needs to put a
8    ticket into JIRA and then do the whole analysis, like
9    you explained earlier?
10   A.    That's right.
11   Q.    Okay.
12   A.    That's right.
13   Q.    If Texas.gov implemented a system by which it
14   captured an electronic signature -- aside from the
15   electronic pad signature that someone gives in person.
16   Okay?  Does this make sense --
17   A.    Okay.
18   Q.    -- so far?
19   A.    Okay.
20   Q.    Okay.  So Texas.gov in this hypothetical
21   captures an electronic signature that someone provides
22   to it online.  Is DLS capable of holding that
23   information should Texas.gov send it?
24   A.    It would depend on how it's captured and what
25   the format is, so not necessarily.



STRINGER: JOHN CRAWFORD

---

Page 150

CHANGES AND SIGNATURE

```
 1
 2   PAGE  LINE        CHANGE                REASON
 3   _____
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

---

Page 151

1     I, JOHN CRAWFORD, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5                          _____
                           JOHN CRAWFORD
6
7  THE STATE OF _____)
8  COUNTY OF _____)
9
10     Before me, _____, on this day
11  personally appeared JOHN CRAWFORD, known to me (or
12  proved to me under oath or through _____)
13  (description of identity card or other document) to be
14  the person whose name is subscribed to the foregoing
15  instrument and acknowledged to me that they executed the
16  same for the purposes and consideration therein
17  expressed.
18     Given under my hand and seal of office this the
19  _____ day of _____, 2017.
20
21
22                          _____
                           NOTARY PUBLIC IN AND FOR
                           THE STATE OF _____
23
24
25

---

Page 152

1              IN THE UNITED STATES DISTRICT COURT
2                   WESTERN DISTRICT OF TEXAS
                      SAN ANTONIO DIVISION
3  JARROD STRINGER, et al.,          §
                                     §
4          Plaintiffs,               §
                                     §
5  v.                                §  Civil Action
                                     §  No. 5:16-cv-00257-OLG
6  ROLANDO B. PABLOS, IN HIS         §
   OFFICIAL CAPACITY AS THE          §
7  SECRETARY OF STATE and STEVEN     §
   C. McCRAW, IN HIS OFFICIAL        §
8  CAPACITY AS THE DIRECTOR OF       §
   THE TEXAS DEPARTMENT OF PUBLIC    §
9  SAFETY,                           §
                                     §
10         Defendants.               §
11
                   REPORTER'S CERTIFICATION
12               DEPOSITION OF JOHN CRAWFORD
                     February 17, 2017
13
14     I, Steven Stogel, Certified Shorthand Reporter in
15  and for the State of Texas, hereby certify to the
16  following:
17     That the witness, JOHN CRAWFORD, was duly sworn by
18  the officer and that the transcript of the oral
19  deposition is a true record of the testimony given by
20  the witness;
21     That the original deposition was delivered to
22  MR. PETER A. KRAUS.
23     That a copy of this certificate was served on all
24  parties and/or the witness shown herein on
25  _____, 2017.

---

Page 153

1     I further certify pursuant to FRCP Rule 30(f)(1)
2  that the signature of the deponent:
3     _X_ was requested by the deponent or a party
4  before the completion of the deposition and that the
5  signature is to be before any notary public and returned
6  within 30 days (or ____ days per agreement of counsel)
7  from date of receipt of the transcript.  If returned,
8  the attached Changes and Signature Page contains any
9  changes and the reasons therefore:
10     ____ was not requested by the deponent or a
11  party before the completion of the deposition.
12     That the amount of time used by each party at the
13  deposition is as follows:
14     MS. CASSANDRA CHAMPION...............4:09
15     MS. BETH STEVENS.....................0:31
16     That pursuant to information given to the
17  deposition officer at the time said testimony was taken,
18  the following includes counsel for all parties of
19  record:
20     FOR THE PLAINTIFFS:  MS. CASSANDRA CHAMPION
21     FOR THE DEFENDANTS:  MS. ANNE MARIE MACKIN
22     FOR TEXAS DPS:  MS. KATHLEEN T. MURPHY-DARVEAU
23     That $_____ is the deposition officer's charges
24  to the Plaintiffs for preparing the original deposition
25  transcript and any copies of exhibits;

---



STRINGER: JOHN CRAWFORD

Page 154

1      I further certify that I am neither counsel for,
2   related to, nor employed by any of the parties or
3   attorneys to the action in which this testimony was
4   taken, and further that I am not financially or
5   otherwise interested in the outcome of this action.
6      Certified to by me this the __23rd__ day of
7   __February__, 2017.
8
9
10   _____
     Steven Stogel
11   CSR 6174
     Expiration Date:  December 31, 2018
12   HG Litigation Services
     Firm No. 69
13   2777 N. Stemmons Freeway, Suite 1025
     Dallas, Texas 75207
14   1-888-656-DEPO
15
16
17
18
19
20
21
22
23
24
25



# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JARROD STRINGER, ET AL, | § | |
|     *Plaintiffs,* | § | |
| | § | |
| V. | § | NO. 5:16-CV-00257 |
| | § | |
| CARLOS H. CASCOS, IN HIS OFFICIAL CAPACITY | § | |
| AS THE TEXAS SECRETARY OF STATE AND | § | |
| STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY | § | |
| AS THE DIRECTOR OF THE TEXAS DEPARTMENT OF | § | |
| PUBLIC SAFETY, | § | |
|     *Defendants.* | § | |

## DEFENDANT CARLOS H. CASCOS' FIRST SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS

TO:    Plaintiffs Jarrod Stringer, Benjamin Hernandez, Totysa Watkins, and John Woods

through their attorney of record, by and through their attorney of record, Caitlyn Silhan, WATERS

& KRAUS, LLP, 3141 Hood Street, Suite 700, Dallas, Texas 75219.

**Dated: January 20, 2017.**

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO
Chief, General Litigation Division

1

APPENDIX 94

/s/Anne Marie Mackin
ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 475-4074
(512) 320-0667 FAX
anna.mackin@oag.texas.gov

ATTORNEYS FOR DEFENDANTS

## RESPONSES TO JARROD STRINGER'S REQUESTS FOR ADMISSIONS

Request No. 1: Admit that as Secretary of State, Defendant Carlos H. Cascos serves as Texas' Chief Election Officer.

Response: Admits that, under Texas Election Code §31.001(a), the Secretary of State serves as the State's Chief Election Officer, but note that Rolando B. Pablos has succeeded Carlos H. Cascos as Texas's Secretary of State.

Request No. 2: Admit that Mr. Cascos is responsible for ensuring Texas' compliance with the National Voter Registration Act ("NVRA").

Response: Denies.

Request No. 3: Admit that during a transaction on the DPS website in August or September 2014, Mr. Stringer updated his driver's license address online.

Response: Denies that this transaction took place on the DPS website. In all other respects, admits.

Request No. 4: Admit that when Mr. Stringer updated his driver's license address online in August or September 2014, he checked "yes" in response to the statement, "I want to register to vote."

Response: After making a reasonable inquiry into this request, defendant lacks sufficient information to truthfully admit or deny it, because defendant does not maintain records of this information.

Request No. 5: Admit that when Mr. Stringer attempted to vote early in the 2014 general election, his name was not on the rolls in Bexar County.

Response: After making a reasonable inquiry into this request, Defendant lacks sufficient information to truthfully admit or deny, because Defendant does not have access to Bexar County's 2014 rolls. Defendant maintains a statewide voter registration list.

2

Request No. 6:  Admit that Mr. Stringer called Bexar County elections officials in 2014 to inquire about his voter registration status.

Response:  After making a reasonable inquiry into this request, defendant lacks sufficient information to truthfully admit or deny, because Defendant does maintain records of calls to Bexar County election officials inquiring about voter registration status.

Request No. 7:  Admit that in the 2014 general election, Mr. Stringer could only vote a limited ballot with state-wide candidates because he was still registered at his address in Tarrant County.

Response:  After making a reasonable inquiry into this request, Defendant states that Mr. Stringer has two addresses in the statewide voter registration system in Tarrant County (1) one with a start date of May 28, 2014, and an end date of May 12, 2015; and (2) one with a start date of October 22, 2009 and an end date of May 28, 2014.  Mr. Stringer's voting history in the statewide voter registration database as to 2014 only indicates that he cast a regular ballot in Tarrant County on May 22, 2014; there is no voting history for him for the November 2014 election.  Mr. Stringer has an address in Bexar County for his registration in Bexar County with an effective date of May 23, 2015 in the statewide voter registration database.  Accordingly Defendant cannot admit or deny what type of ballot Mr. Stringer cast, if any, in November 2014; and, to the extent the request asks hypothetically what type of ballot he could cast, Defendant objects to the request as hypothetical and calling for a legal conclusion.

Request No. 8:  Admit that, in order for an eligible voter who completes a valid driver's license transaction on the DPS website to register to vote or update voter registration information, , he or she must separately visit the Secretary of State's website and either: (a) print out the physical voter registration form, fill out the form, and mail or personally deliver the form to the appropriate county registrar before the voter registration deadline, or (b) request that a form be mailed, receive the form, fill out the form, and mail or personally deliver it to the appropriate county registrar before the voter registration deadline.

Response:  Admits that an eligible voter who changes the address on her non-commercial Texas driver license online must submit a signed voter registration application in person or by mail in order for his voter registration information to be updated. The DPS and Texas.gov online interface links such voters to an application they may print out, sign, and mail, and also gives such voters the option to request that a voter registration application be mailed to them, postage paid, and contains language indicating that the separate form must be filled out in order to complete the voter's registration.. Denies to the extent the request indicates that the voter registration application must be mailed or personally delivered to the "appropriate county registrar" by the voter, and denies in all other respects.

Request No. 9:  Admit that if a registered voter moves to a new address within the same county where he or she is already registered to vote, he or she can update the address on his or her driver's license online through the DPS website without a hard application or wet signature.

Response:  Defendant objects that this request is hypothetical and calls for speculation.

3

<u>Request No. 10:</u>   Admit that an eligible voter who moves within a Texas county can update his or her voter registration record on the Secretary of State's website.

<u>Response:</u>  Admits that there is a link on VoteTexas.gov, under http://www.votetexas.gov/faq/, to a page where a voter can update his or her voter registration address within a county, https://txapps.texas.gov/tolapp/sos/SOSACManager.[1]  Denies that any such update itself occurs on the SOS's web domains (i.e., www.sos.state.tx.us or www.votetexas.gov). Admits that on the Texas.gov website, https://txapps.texas.gov/tolapp/sos/SOSACManager, subject to the requirements listed on that page, an eligible voter who moves within a Texas county is able to update their address.[2]

<u>Request No. 11:</u>   Admit that if a registered voter is moving to a new address within the same county where he or she is already registered to vote and changes his or her address online through the DPS website, the eligible voter cannot subsequently use the Secretary of State's website to update his or her address for voter registration purposes.

<u>Response:</u> Admits to the extent that it is not the Secretary of State's website on which an eligible voter updates his or her address for voter registration purposes within a county. In all other respects, denies.

---

[1] The specific FAQ accessed via this link provides, among other things:

<u>I am registered to vote, but I moved this past year. Is there anything I need to do to make sure that I won't have a problem voting in November?</u>

If you moved within the same county where you are currently registered, you must file the new address information in writing with your voter registrar OR you may submit the "in county" change online. The last day to make a change of address that will be effective for the November 8, 2016 Election is October 11, 2016. If you missed this deadline, you may return to your old precinct to vote, if you still live in the political subdivision holding the election. If you moved within the county, you will have to go back to the precinct in which you are currently registered (your "old" precinct), and, at that location, you will be required to complete a "statement of residence" confirming your new address. This will act to update your registration information for the future. You will then be allowed to vote a regular ballot as long as you are otherwise eligible. If you moved to a "new county," you must re-register in your new county of residence by October 11, 2016, to be eligible to vote in the November 8, 2016 Election (unless you are eligible to vote a "limited ballot," see below).

Addresses and phone numbers of Voter Registrars

LIMITED BALLOT OPTION: If you have moved to a new county and have not re-registered in the new county by the October 11, 2016 deadline, you may be eligible to vote a limited ballot in your new county. A limited ballot means that you would be allowed to vote on any candidates and measures in common between your former and new county. This procedure is only available during the early voting period at the main early voting polling place; you may NOT vote a limited ballot on election day. You must be a current registered voter in your former county in order to qualify OR you must have been registered in your old county at the time you submitted a voter registration application in your new county, if you have done so. For full information on this procedure (including the by-mail option, if qualified to vote by mail), go to Special Forms of Early Voting (PDF). If you feel you qualify to vote a limited ballot, we recommend that you contact the office of the Early Voting Clerk in your new county.

[2] The page provides, among other things, "To use this service, you need your: Current Driver License or ID Card Social Security Number Voter Registration Card VUID (Voter Unique Identifier) Number may be obtained from your County Voter Registrar."

Request No. 12:    Admit that when a registered voter updates his or her address through the DPS website as described above, DPS transmits the voter registration to the Secretary of State's office electronically, without a hard application or wet signature.

Response: Denies. Information voters submit to the DPS change of address online portal relating to voter registration is not transmitted to SOS.

Request No. 13:    Admit that when the Secretary of State's office receives voter registration information transmitted from DPS, it transmits the information to the county where each prospective voter resides.

Response: Admits that information received from persons conducting in-person or by mail transactions with DPS is transmitted from SOS to the county voter registrar in the county in which the voter indicates their "residence address" is located.

Request No. 14:    Admit that in 2013, the State created a web portal where county voter registrars can place information from voters who tell the county that they attempted to register to vote at DPS.

Response: Admits that, in 2013, SOS and DPS established a portal to allow counties to submit inquiries and verify if an individual has registered to vote through DPS, when a voter registrar is not able to locate a copy of the record. Denies that the portal is limited to "information from voters who tell the county that they attempted to register to vote at DPS," to the extent that the "county" is not a person.

Request No. 15:    Admit that the information voter registrars place information into the web portal may include any information the voter provided about attempting to register to vote at DPS along with the other information the voter included on the provisional ballot envelope.

Response: Defendant objects that this request is hypothetical and calls for speculation, and is unintelligible.

Request No. 16:    Admit that DPS will then research the information provided by the voter to determine whether the voter indicated their desire to register to vote and/or update their voter registration when registering with DPS in-person or by mail.

Response: Defendant objects that this request is hypothetical and calls for speculation.

Request No. 17:    Admit that if the voter did indicate their desire to register to vote and/or update their voter registration when registering with DPS in-person or by mail, then the voter's registration is considered to be "submitted to the registrar" for purposes of Texas Election Code

Response: Defendant objects that this request is hypothetical and calls for speculation, and is unintelligible.

Request No. 18:   Admit that if an eligible voter requested voter registration during an in-person transaction with DPS, but the record of his or her transaction was not transmitted by the DPS employee to SOS, the registration is nonetheless considered effective on the date that the eligible voter indicated to DPS he or she wanted to register to vote, whether in-person or by mail.

Response: Defendant objects that this request is hypothetical and calls for speculation.

Request No. 19:   Admit that the date of submission of a change of address to a DPS employee in-person is considered to be the date of submission to the voter registrar for the purpose of determining the effective date of registration.

Response: Defendant objects that this request is hypothetical and calls for speculation.

Request No. 20:   Admit that the date of submission of a driver's license renewal application to a DPS employee in-person is considered to be the date of submission to the voter registrar for the purpose of determining the effective date of registration.

Response: Defendant objects that this request is hypothetical and calls for speculation.

Request No. 21:   Admit that the DPS web portal was created to allow the counties to submit inquiries and verify if an individual has registered to vote through DPS, when a voter registrar is not able to locate a copy of the record.

Response:   Admits. *See* SOS Election Advisory No. 2015-08.

Request No. 22:   Admit that at least since the web portal was implemented in 2013, SOS has kept records of each voter who has been submitted into the system, as well as the outcome of the investigation DPS conducts for each individual whose name has been run through the portal system.

Response: Admits that since the web portal was implemented in 2013, SOS has kept records of information entered into the web portal, which includes information entered by county personnel and DPS. Denies to the extent "records of each voter" includes information other than what was entered into the portal for "each voter".

Request No. 23:   Admit that from May 27, 2015, when Plaintiffs sent their first notice letter to the State, to November 30, 2015 when Plaintiffs sent their last notice letter to the State, the parties engaged in negotiations and communications, resulting in the State agreeing to a number of reforms.

Response: Admits that counsel for Defendants met with counsel for Plaintiffs on July 20, 2015. Admits that counsel for Plaintiffs and counsel for Defendants exchanged several letters between May 27, 2015 and November 30, 2015. Admits that, in a good faith effort to work with Plaintiffs, Defendants made voluntary revisions to certain voter registration policies and procedures.

Request No. 24:   Admit that the letter Plaintiffs sent to the State on November 30, 2015 summarized the reforms to the voter registration process the State agreed to implement.

Response: Denies.

Request No. 25:   Admit that according to the Election Advisory issued by the Secretary of State's office on September 10, 2015, when a voter appears to vote but is not on the rolls, county election officials must: (a) offer that voter a provisional ballot; and (b) ask the voter whether he or she attempted to register at DPS and, if so, when.

Response: Defendant objects that this request is hypothetical and calls for speculation.

Request No. 26:   Admit that after county election officials ask the two questions in the RFA above, officials must then use the DPS web portal to notify DPS representatives, who will review the voter's original file.

Response: While Defendant cannot say with absolute certainty what occurs in each particular factual scenario, Defendant admits that this request is true as a matter of general practice, as outlined in Election Advisory No. 2015-08, issued September 10, 2015.

Request No. 27:   Admit that the outcome of the investigation can include the following results: (a) the voter marked both the "yes" and the "no" boxes and thus they were not registered to vote; (b) the voter did not mark either the "yes" or "no" box and thus they were not registered to vote; (c) the voter marked no that they did not want to register and thus they were not registered to vote; (d) the voter requested voter registration and the clerk at DPS did not transmit the information; (e) the voter updated their information online with DPS and did not complete the process to be registered to vote; (f) the DPS was unable to locate a record for that voter in their files.

Response: Defendant objects that this request is hypothetical and calls for speculation.

### RESPONSE TO BENJAMIN HERNANDEZ'S REQUEST FOR ADMISSIONS

Request No. 1:  Admit that during a transaction on the DPS website in February 2013, Mr. Hernandez updated his driver's license address online.

Response: Denies.

Request No. 2:  Admit that when Mr. Hernandez updated his driver's license address online in February 2013, he checked "yes" in response to the statement, "I want to register to vote."

Response: Denies

Request No. 3:  Admit that when Mr. Hernandez attempted to vote on Election Day 2014, his name was not on the rolls in Dallas County.

Response:   After making a reasonable inquiry into this request, Defendant lacks sufficient information to truthfully admit or deny, because Defendant does not have access to Dallas County's 2014 rolls.

Request No. 4:  Admit that on Election Day 2014, Mr. Hernandez was still registered in Ector County.

Response: After making a reasonable inquiry into this request, Defendant lacks sufficient information to truthfully admit or deny, because Defendant does not have access to Ector County's 2014 rolls.

Request No. 5:  Admit that on Election Day 2014, Mr. Hernandez cast a provisional ballot.

Response: After making a reasonable inquiry into this request, Defendant admits that Mr. Hernandez was registered to vote in Dallas County with an effective date of registration of December 4, 2014, date the application was submitted to the registrar of November 4, 2014, and the source code for the registration application was provisional ballot.  Defendant notes however, that, there is no other voting history for Mr, Hernandez in the statewide voter registration system in 2014.

Request No. 6:  Admit that the Secretary of State issued a notice to Mr. Hernandez that his vote on Election Day 2014 was not counted.

Response: Denies.

Request No. 7:  Admit that if an applicant for a driver's license indicates he or she wants to register to vote and correctly completes a voter registration form, it is not the responsibility of DPS employees to confirm that the applicant meets all of the eligibility requirements to register to vote.

Response: Defendant objects that this request is hypothetical, calls for speculation, and calls for a legal conclusion, not an admission of fact or an application of law to fact.

Request No. 8:  Admit that when a completed voter registration form is submitted to the Secretary of State, it is the responsibility of election officials to confirm that an applicant meets all of the eligibility requirements to vote.

Response: Defendant objects that this request is hypothetical, calls for speculation, and calls for a legal conclusion, not an admission of fact or an application of law to fact.

## RESPONSE TO TOTYSA WATKINS' REQUEST FOR ADMISSIONS

Request No. 1:  Admit that during a transaction on the DPS website in 2011, Ms. Watkins updated her driver's license address online.

Response: Denies.

8

Request No. 2:  Admit that when Ms. Watkins updated her driver's license address online in 2011, she checked "yes" in response to the statement, "I want to register to vote."

Response:  Denies.

Request No. 3:  Admit that during a transaction on the DPS website in 2013, Ms. Watkins updated her driver's license address online.

Response: Denies that this transaction took place on the DPS website. In all other respects, admits.

Request No. 4:  Admit that when Ms. Watkins updated her driver's license address online in 2013, she checked "yes" in response to the statement, "I want to register to vote."

Response:  After making a reasonable inquiry into this request, defendant lacks sufficient information to truthfully admit or deny it, because Defendant does not maintain records of this information.

Request No. 5:  Admit that when Ms. Watkins attempted to vote on Election Day 2014, her name was not on the rolls in Dallas County.

Response:  After making a reasonable inquiry into this request, Defendant lacks sufficient information to truthfully admit or deny, because Defendant does not have access to Dallas County's 2014 rolls.

Request No. 6:  Admit that on Election Day 2014, Ms. Watkins was still registered in Denton County.

Response:  After making a reasonable inquiry into this request, Defendant lacks sufficient information to truthfully admit or deny, because Defendant does not have access to Denton County's 2014 rolls.

Request No. 7:  Admit that on Election Day 2014, Ms. Watkins cast a provisional ballot.

Response:  After making a reasonable inquiry into this request, Defendant lacks knowledge sufficient to truthfully admit or deny it. Defendant notes that there is no voting history for Ms. Watkins in the statewide voter registration system in 2014. The effective date of Ms. Watkins' voter registration in Dallas County is December 4, 2014; however, the source code associated with Ms. Watkins' registration is not the provisional ballot source code and thus Defendant cannot infer that it was necessarily done via provisional ballot.

Request No. 8:  Admit that the Secretary of State issued a notice to Ms. Watkins that her vote on Election Day 2014 was not counted.

Response: Denies.

## RESPONSE TO JOHN WOODS' REQUEST FOR ADMISSIONS

Request No. 1:  Admit that during a transaction on the DPS website in September 2015, Dr. Woods updated his driver's license address online.

Response:  Denies that this transaction took place on the DPS website. In all other respects, admits.

Request No. 2:  Admit that when Dr. Woods updated his driver's license address online in 2015, he checked "yes" in response to the statement, "I want to register to vote."

Response:  After making a reasonable inquiry into this request, defendant lacks sufficient information to truthfully admit or deny it, because defendant does not maintain records of this information.

Request No. 3:  Admit that when Dr. Woods attempted to vote on Election Day 2015, his name was not on the rolls in Harris County.

Response:  After making a reasonable inquiry into this request, Defendant lacks sufficient information to truthfully admit or deny it, because Defendant does not have access to Harris County's 2015 rolls.

Request No. 4:  Admit that on Election Day 2015, Dr. Woods was still registered in Travis County.

Response:  After making a reasonable inquiry into this request, Defendant lacks sufficient information to truthfully admit or deny it, because Defendant does not have access to Travis County's 2015 rolls.

Request No. 5:  Admit that on Election Day 2015, Dr. Woods cast a provisional ballot in Harris County.

Response: After making a reasonable inquiry into this request, Defendant admits that there was a voter application date for a John Oates Oates for Harris County, with Dr. Woods' driver license number, dated November 3, 2015, with a provisional ballot source code, in the state's voter registration database. Defendant admits that there is a transfer of a John Oates Woods on November 9, 2015, as a new voter registration application for Harris County, with the same driver license number.  The effective date of Dr. Woods' registration in Harris is December 3, 2015. Defendant notes, however, that there is no voting history for Dr. Woods in the statewide voter registration system in 2015.

Request No. 6:  Admit that on March 2, 2015, the Secretary of State's office responded to a public information act request from Mimi Marziani attaching a list of 4,608 voters who reported a problem with their voter registration records that implicated voter registration practices at DPS between January 1, 2012 and March 2, 2015.

Response: Denies that the individuals on this list reported a "problem with their voter registration records that implicated voter registration practices at DPS," and denies that any list provided by

the Secretary of State's office on March 2, 2015 was current through March 2, 2015; it was current through February 27, 2015. In all other respects, admits.

Request No. 7:  Admit that on May 26, 2015, the Secretary of State's office responded to a public information act request from Mimi Marziani attaching a list of 332 voters who reported a problem with their voter registration records that implicated voter registration practices at DPS between February 27, 2015 and May 13, 2015.

Response: Denies that the individuals on this list reported a "problem with their voter registration records that implicated voter registration practices at DPS." In all other respects, admits.

Request No. 8:  Admit that between September 2013 and May 26, 2015, the State recorded, and local election workers investigated, complaints from approximately 1,947 voters who completed an online transaction with DPS and, through that transaction, checked "yes…. I want to register to vote", but were subsequently denied a regular ballot when they attempted to vote.

Response:  After making a reasonable inquiry into this request, Defendant lacks sufficient information to truthfully admit or deny it, because Defendant does not maintain records of voters who check "yes…I want to register to vote" *and* are "subsequently denied a regular ballot when they attempt to vote", nor do Defendants track who is "subsequently denied a regular ballot when they attempt to vote" to the extent they would have knowledge of every such voter.

Request No. 9:  Admit that on May 27, 2015, Peter Kraus and Mimi Marziani sent the Secretary of State a letter giving him notice that eligible voters Benjamin Hernandez and Totysa Watkins had claims against the State for violations of the NVRA.

Response:  Objects that this request calls for a legal conclusion regarding whether notice was legally sufficient under the NVRA to waive the Defendant's Eleventh Amendment immunity.

Request No. 10:   Admit that on October 23, 2015, Peter Kraus and Mimi Marziani sent the Secretary of State a second letter, supplementing the May 27th Notice Letter giving him notice that Jarrod Stringer had claims against the State for violations of the NVRA.

Response:  Objects that this request calls for a legal conclusion regarding whether notice was legally sufficient under the NVRA to waive the Defendant's Eleventh Amendment immunity.

Request No. 11:   Admit that on November 18, 2015, Peter Kraus and Mimi Marziani sent the Secretary of State a third letter, supplementing the May 27th Notice Letter giving him notice that John Woods had claims against the State for violations of the NVRA.

Response:  Objects that this request calls for a legal conclusion regarding whether notice was legally sufficient under the NVRA to waive the Defendant's Eleventh Amendment immunity.

Request No. 12:   Admit that over 1,800 of the reports from voters related to problems with voter registration records that implicated voter registration practices at DPS were from voters who thought they had successfully registered online through the DPS website.

<u>Response</u>: Defendant objects that this request as vague and ambiguous as to "problems with voter registration records that implicated voter registration practices at DPS."

<u>Request No. 13</u>:    Admit that over 1,700 of the reports from voters related to problems with voter registration records that implicated voter registration practices at DPS were from voters who visited a DPS office in-person and checked yes in response to the question of whether they wanted to vote.

<u>Response</u>: Defendant objects to this request as vague and ambiguous as to "problems with voter registration records that implicated voter registration practices at DPS."

<u>Request No. 14</u>:    Admit that after Carlos Cascos took office as Texas Secretary of State, he had actual knowledge that there were a significant number of reports from voters regarding problems with online DPS transactions since at least 2012.

<u>Response</u>: Denies.

<u>Request No. 15</u>:    Admit that after Keith Ingram began working in the Texas Secretary of State's office, he had actual knowledge that there were a significant number of reports from voters regarding problems with online DPS transactions since at least 2012.

<u>Response</u>: Denies.

<u>Request No. 16</u>:    Admit that after Carlos Cascos took office as Texas Secretary of State, he had actual knowledge that there were a significant number of reports from voters regarding problems with in-person DPS transactions since at least 2012.

<u>Response</u>: Denies.

<u>Request No. 17</u>:    Admit that after Keith Ingram began working in the Texas Secretary of State's office, he had actual knowledge that there were a significant number of reports from voters regarding problems with in-person DPS transactions since at least 2012.

<u>Response</u>: Denies.

<u>Request No. 18</u>:    Admit that after Betsy Schonhoff began working in the Texas Secretary of State's office, she had actual knowledge of the number of reports from voters regarding problems with online DPS transactions since at least 2012.

<u>Response</u>: Denies.

<u>Request No. 19</u>:    Admit that after Beva Kellison began working in the Texas Secretary of State's office, she had actual knowledge of the number of reports from voters regarding problems with online DPS transactions since at least 2012.

APPENDIX 105

<u>Response:</u> Denies.

<u>Request No. 20:</u>   Admit that after Betsy Schonhoff began working in the Texas Secretary of State's office, she had actual knowledge of the number of reports from voters regarding problems with in-person DPS transactions since at least 2012.

<u>Response:</u> Denies.

<u>Request No. 21:</u>   Admit that after Beva Kellison began working in the Texas Secretary of State's office, she had actual knowledge of the number of reports from voters regarding problems with in-person DPS transactions since at least 2012.

<u>Response:</u> Denies.

APPENDIX 106

# EXHIBIT 14



# Voter Registration 102



APPENDIX 109

P_003982

# Active Application Files

## How do we handle DPS Applications since we do not receive a physical hard copy?

- For those counties using TEAM, you should print the voter application screen before selecting approve when processing a DPS application.

  - **Note:** if you do not approve the application through your task summary, then you will be unable to access the accompanying signature under the notes tab.

- Once the voter's application has been approved, you should also print a copy of the signature.  This becomes the application that should be retained in your file system.

- If you retain your files electronically, then you can print these to a PDF or scan them for storage in your file system.

APPENDIX 110

P_003995

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JARROD STRINGER, ET AL, | § | |
|     *Plaintiffs,* | § | |
| | § | |
| V. | § | NO. 5:16-CV-00257 |
| | § | |
| CARLOS H. CASCOS, IN HIS OFFICIAL CAPACITY | § | |
| AS THE TEXAS SECRETARY OF STATE AND | § | |
| STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY | § | |
| AS THE DIRECTOR OF THE TEXAS DEPARTMENT OF | § | |
| PUBLIC SAFETY, | § | |
|     *Defendants.* | § | |

---

**DEFENDANT STEVEN C. MCCRAW'S FIRST SUPPLEMENTAL RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS**

---

TO:    Plaintiffs Jarrod Stringer, Benjamin Hernandez, Totysa Watkins, and John Woods

through their attorney of record, by and through their attorney of record, Caitlyn Silhan, WATERS

& KRAUS, LLP, 3141 Hood Street, Suite 700, Dallas, Texas 75219.

**Dated: January 20, 2017.**

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO
Chief, General Litigation Division

1

<u>/s/Anne Marie Mackin</u>
ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 475-4074
(512) 320-0667 FAX
anna.mackin@oag.texas.gov

ATTORNEYS FOR DEFENDANTS

## **RESPONSES TO JARROD STRINGER'S REQUEST FOR ADMISSIONS**

<u>Request No. 1:</u>  Admit that Defendant Steven C. McCraw is the Director of the Texas Department of Public Safety ("DPS").

<u>Response:</u> Admits.

<u>Request No. 2:</u>  Admit that DPS operates offices around the state and issues Texas driver's licenses.

<u>Response:</u> Admits.

<u>Request No. 3:</u>  Admit that each Texas motor vehicle driver's license application submitted to DPS shall serve as an application for voter registration with respect to elections for Federal office.

<u>Response:</u> Admits, insofar as such driver license application is submitted to the appropriate State motor vehicle authority under State law, is signed by the applicant, and is otherwise consistent with all applicable State and federal law. 52 U.S.C. §20504(a)(1). In all other respects, deny.

<u>Request No. 4:</u>  Admit that DPS shall include a voter registration application for  elections for Federal office as part of an application for a Texas driver's license. Admit that DPS is responsible for transmitting completed voter registration portions of an application for a Texas driver license to the Secretary of State.

<u>Response:</u> Admits that DPS shall include an opportunity to register to vote in elections for Federal office in all driver license applications and renewal applications, and admits that DPS is responsible for transmitting information about voter registration applicants to SOS. In all other respects, denies.

<u>Request No. 5:</u>  Admit that when an applicant visits a DPS office in-person to apply for a new driver's license, he or she must fill out a form called "DL-14A."

<div align="center">2</div>

Response: Admits that, when an applicant visits a DPS office in-person to apply for an original, non-commercial driver license, he or she must fill out a form called DL-14A *or DL-14As*.

Request No. 6:  Admit that question 2 on form DL-14A asks a DPS applicant to check "Yes" or "No" in response to the question, "If you are a US citizen, would you like to register to vote? If registered, would you like to update your voter information?"

Response: Admits.

Request No. 7:  Admit that when an applicant visits a DPS office in-person and fills out form DL-14A, a DPS employee manually inputs all of the responses into the DLS via computer, including the response to question 2.

Response: Admits that that when an applicant visits a DPS office in-person and fills out form DL-14A, a DPS employee manually inputs required field information provided on the form into the DLS via computer. Not all information provided on the form is entered into DLS.  The information entered can include the response to question 2. In all other respects, denies.

Request No. 8:  Admit that if an eligible voter checks "Yes" in response to question 2 on form DL-14A, the DPS employee will click on the voter registration box in the Voter Field in the "driver license system," referred to as "DLS."

Response: Admits that if an applicant checks "Yes" in response to question 2 on form DL-14A *or DL-14As*, the DPS employee will click on the voter registration box in the Voter Registration Information Field in the "driver license system," referred to as "DLS."

Request No. 9:  Admit that in the Voter Field, the DPS employee is prompted in the DLS to select from a choice of options in a drop-down menu including: (a) Select "Change" for name or address change; (b) Select "New" for first time Texas voter; or (c) Select "Replacement" if replacing a voter registration card.

Response: Admits that in the Voter Registration *Information* Field, the DPS employee is prompted in the DLS to select from a choice of options in a drop-down menu including: (a) Select "Change" for name or address change; (b) Select "New" for first time Texas voter or (c) Select "Replacement" if replacing a voter registration card.

Request No. 10:   Admit that at least prior to May 27, 2015, if a DPS applicant did not check "Yes" in response to question 2 on form DL-14A, the DPS employee would not click on the voter registration box in the Voter Field, and would leave it blank.

Response: After making a reasonable inquiry into this request, Defendant lacks sufficient information to truthfully admit or deny it because Defendant cannot say with certainty what each DPS employee has done in each particular factual scenario.

Request No. 11:   Admit that when an applicant visits a DPS office in-person to renew or replace his or her driver's license, he or she must fill out a form called "DL-43."

3

**Response:** Admits that when an applicant visits a DPS office in-person to renew, replace *or change* his or her non-commercial driver license, he or she must fill out a form called "DL-43."

**Request No. 12:**    Admit that question 2 on form DL-43 asks an applicant to check "Yes" or "No" in response to the question, "If you are a US citizen, would you like to register to vote? If registered, would you like to update your voter information?"

**Response:** Admits, although there is additional language in question 2 that is omitted from this request for admission.

**Request No. 13:**    Admit that when an applicant visits a DPS office in-person and fills out form DL-43, a DPS employee manually inputs all of the responses into the DLS via computer, including the response to question 2.

**Response:** Admits that that when an applicant visits a DPS office in-person and fills out form DL-43, a DPS employee manually inputs *required* field information provided on the form into the DLS via computer. Denies that all information provided on the form is manually entered into DLS.

**Request No. 14:**    Admit that if an eligible voter checks "Yes" in response to question 2 on form DL-43, the DPS employee will click on the voter registration box in the Voter Field in the DLS.

**Response:** Admits that if an *applicant* checks "Yes" in response to question 2 on form DL-43, the DPS employee will click on the voter registration box in the Voter *Registration Information* Field in the "driver license system," referred to as "DLS."

**Request No. 15:**    Admit that in the Voter Field in the DLS, the DPS employee is prompted to select from a choice of options in a drop-down menu including: (a) Select "Change" for name or address change; (b) Select "New" for first time Texas voter; or (c) Select "Replacement" if replacing a voter registration card.

**Response:** Admits that in the Voter *Registration Information* Field, the DPS employee is prompted in the DLS to select from a choice of options in a drop-down menu including: (a) Select "Change" for name or address change; (b) Select "New" for first time Texas voter; or (c) Select "Replacement" if replacing a voter registration card.

**Request No. 16:**    Admit that at least prior to May 27, 2015, if an applicant did not check "Yes" in response to question 2 on form DL-43, the DPS employee would not click on the voter registration box in the Voter Field in DLS, and would leave it blank.

**Response:** After making a reasonable inquiry into this request, Defendant lacks sufficient information to truthfully admit or deny it because Defendant cannot say with certainty what each DPS employee has done in each particular factual scenario.

**Request No. 17:**    Admit that when an applicant visits a DPS office in-person to update his or her address on a driver's license, he or she must fill out a form called "DL-64."

<center>4</center>

Response:  Denies.

Request No. 18:    Admit that one question on form DL-64 asks an applicant to check "Yes" or "No" in response to the question, "If you are a US citizen, would you like to register to vote? If registered, would you like to update your voter information?"

Response: Admits.

Request No. 19:    Admit that when an applicant visits a DPS office in-person and fills out form DL-64, a DPS employee manually inputs all of the responses into the DLS via computer, including the response to the question of whether he or she would like to register to vote.

Response: Denies, form DL-64 is not used for in-person address changes.

Request No. 20:    Admit that if an eligible voter checks "Yes" in response to question 2 on form DL-64, the DPS employee will click on the voter registration box in the Voter Field in the DLS.

Response: Denies, form DL-64 is not used for in-person address changes.

Request No. 21:    Admit that at least prior to May 2015, form DL-64 did not include any question about whether the applicant wanted to register to vote.

Response: Admits.

Request No. 22:    Admit that if the eligible voter indicates they are already a registered voter and require no address change, the DPS employee will leave the Voter Field in DLS blank.

Response: After making a reasonable inquiry into this request, Defendant lacks sufficient information to truthfully admit or deny it because Defendant cannot say with certainty what each DPS employee has done in each particular factual scenario.

Request No. 23:    Admit that DPS employees provide a receipt to every applicant who completes an in-person transaction at DPS.

Response: Admits.

Request No. 24:    Admit that voter registration information is printed on the receipt that a voter receives after the in-person transaction is completed.

Response: Admits that the receipt issued at the completion of an in-person transaction notes whether the individual answered the voter registration question "Y" or "N."

Request No. 25:    Admit that all of the information inputted by DPS employees for in-person transactions is saved electronically in the DLS, including the voter registration information.

Response: Admits.

Request No. 26:    Admit that the electronic file for each prospective voter that is transferred to the Secretary of State's office includes a digital image of that voter's signature.

Response: Admits that the *information* DPS transmits to SOS about each applicant for voter registration includes a digital image of the *applicant's* signature.

## RESPONSES TO BENJAMIN HERNANDEZ'S REQUEST FOR ADMISSIONS

Request No. 1:  Admit that the State of Texas permits certain Texas driver's license holders to renew their driver's license and/or update the address on their licenses online on DPS' website at www.txdps.state.tx.us.

Response: Admits that certain Texas driver license holders may initiate renewal of their driver licenses or updates to the address on those licenses on the DPS website. Denies that these transactions are completed on the DPS website.

Request No. 2:  Admit that all Texas driver's license holders are able to update the address information associated with their driver's license online through a portion of the DPS website entitled "Driver License Renewal and Change of Address," available at https://txapps.texas.gov/tolapp/txdl/ at any time.

Response: Denies.

Request No. 3:  Admit that some Texas driver's license holders are able to renew their license online through a portion of the DPS website entitled "Driver License Renewal and Change of Address," available at https://txapps.texas.gov/tolapp/txdl/.

Response: Denies that these transactions are completed on the DPS website. In all other respects, admits.

Request No. 4:  Admit that website users will be informed after logging into the website whether they are eligible to renew their license online.

Response: Admits.

Request No. 5:  Admit that the DPS Driver License Renewal and Change of Address website page provides a single online process for qualified applicants to renew their driver's license, update the address listed on their driver's license, or complete both processes in a single online transaction.

Response: Denies that these transactions are completed on the DPS website. In all other respects, admits.

6

Request No. 6:  Admit that the online process involves eight "Steps to Complete," including the following steps: Welcome, Login, Select Services, Enter Address, Select Options, Review Order, Submit Payment, and Receipt.

Response: Admits.

Request No. 7:  Admit that, until recently, when applicants reached Step 5 of this online process, they were asked to check "yes" or "no" in response to the statement, "I want to register to vote."

Response: Denies that this is a complete statement. Admits that, until February 27, 2016, Step 5 of this online process required the licensee to select "yes" or "no" beneath the statement "I want to register to vote. Selecting 'yes' **does not** register you to vote. A link to the [SOS] voter website (where a voter application may be downloaded or requested) will be available on your receipt page." (emphasis original).

Request No. 8:  Admit that the now when applicants reach Step 5 of the online process, they are asked "Do you want to request a voter application?"

Response: Denies that this is a complete statement. Admits that when applicants reach Step 5 of the online process, they are asked "Do you want to request a voter application? You'll receive a link to a voter application on your receipt page."

Request No. 9:  Admit that DPS changed the language in Step 5 after the Complaint was filed in this lawsuit.

Response: Denies.

Request No. 10:   Admit that, previously, if an eligible voter checked "yes" under the statement "I want to register to vote," DPS did not register that individual to vote.

Response: Denies that this is a complete statement. Admits, insofar as DPS does not register any individuals to vote. Admits that individuals are not registered to vote in connection with their interactions with DPS unless they submit an image of their signature, either by submitting a signed application by mail, or providing an electronic image of their physical signature in person at a DPS location.

Request No. 11:   Admit that, currently, if an eligible voter checks "yes" under the question, "Do you want to request a voter application?" they are not registered to vote.

Response: Admits that DPS does not register any individuals to vote. Admits that individuals are not registered to vote in connection with their interactions with DPS unless they submit an image of their signature, either by submitting a signed application by mail, or providing an electronic image of their physical signature in person at a DPS location.

Request No. 12:   Admit that if an eligible voter checks "yes" under the statement "I want to register to vote," DPS does not update that applicant's voter registration records.

<u>Response:</u> Admits that DPS does not update any individuals' voter registration records.

<u>Request No. 13:</u>   Admit that if an eligible voter checks "yes" under the statement "Request a voter registration application," DPS does not update that applicant's voter registration records.

<u>Response:</u> Admits that DPS does not update any individuals' voter registration records.

<u>Request No. 14:</u>   Admit that if a correct driver's license number or if correct residence address or mailing address information is missing from a registration application received by DPS in-person, DPS employees have a legal obligation to correct the customer's application by entering that information on the application.

<u>Response:</u> Admits that, under Texas Election Code §20.063(d), "[i]f a completed voter registration application submitted to a department employee does not include the applicant's correct driver's license number or personal identification card number, a department employee shall enter the appropriate information on the application. If a completed application does not include the applicant's correct residence address or mailing address, a department employee shall obtain the appropriate information from the applicant and enter the information on the application." Otherwise, denies.

<u>Request No. 15:</u>   Admit that individuals who receive an invitation to renew their driver's license by mail can renew by mail by filling out form DL-43 and mailing it back to DPS.

<u>Response:</u> Denies.

<u>Request No. 16:</u>   Admit that when DPS processes a request to renew a driver's license by mail, DPS mails a voter registration application form to any requestor who checks "yes" in response to Question 2 on form DL-43.

<u>Response:</u> Denies.

<u>Request No. 17:</u>   Admit that individuals can change their driver's license address by mail by completing form DL-64 and mailing it to DPS along with the required fee.

<u>Response:</u> Admits.

<u>Request No. 18:</u>   Admit that when DPS receives a form DL-64 in the mail which indicates the requestor wants to register to vote, DPS mails a voter registration form to the requestor.

<u>Response:</u> Denies.

<u>Request No. 19:</u>   Admit that a change of address that relates to a driver's license that is submitted to DPS by mail serves as a change of address for voter registration unless the licensee indicates that the change is not for voter registration purposes.

<div align="center">8</div>

Response: Denies that this is a complete statement. Admits that information regarding a change of address submitted by an applicant to DPS by mail is provided to the SOS in the daily update file.

Request No. 20:    Admit that if a correct driver's license number, residence address, or mailing address information is missing from a renewal or change of address application received by DPS by mail, DPS employees have a legal obligation to correct the individual's application by entering the information on the application.

Response: Admits that, if a person sends DPS an incomplete form by mail, DPS returns the form to the applicant for the applicant to correct and return to DPS. In all other respects, denies.

Request No. 21:    Admit that the date of submission of a change of address to a DPS employee by mail is considered to be the date of submission to the voter registrar for the purpose of determining the effective date of registration.

Response: Admits that the date of submission DPS provides to SOS is the date of the processing of the form received at DPS by mail. *See* TEX. ELEC. CODE §20.063(c).

Request No. 22:    Admit that the date of submission of a driver's license renewal application to a DPS employee by mail is considered to be the date of submission to the voter registrar for the purpose of determining the effective date of registration.

Response: Admits that the date of submission DPS provides to SOS is the date of the processing of the form received at DPS by mail. *See* TEX. ELEC. CODE §20.063(c).

Request No. 23:    Admit that when a DPS employee receives a request to renew a driver's license by mail, a DPS employee manually inputs all of the responses into the DLS via computer, including the response to the question of whether he or she would like to register to vote.

Response: Denies.

Request No. 24:    Admit that when a DPS employee receives a request to change the address on a driver's license by mail, a DPS employee manually inputs all of the responses into the DLS via computer, including the response to the question of whether the individual would like to register to vote.

Response: Admits.

Request No. 25:    Admit that no payment receipt is sent to an applicant who changes his or her driver's license address by mail.

Response: Admits.

## RESPONSES TO TOTYSA WATKIN'S REQUEST FOR ADMISSIONS

APPENDIX 120

<u>Request No. 1:</u>  Admit that all of the information inputted by DPS employees for transactions by mail is saved electronically in the DLS, including voter registration information.

<u>Response:</u> Admits that the voter registration information from form DL-64 address changes by mail is input and saved electronically in the DLS. In all other respects, denies.

<u>Request No. 2:</u>  Admit that voter registration information is electronically transmitted from DPS to the SOS each night from Monday through Friday.

<u>Response:</u> Admits that voter registration information is electronically transmitted from DPS to the SOS seven days per week.

<u>Request No. 3:</u>  Admit that voter registration information is electronically transmitted from DPS to the SOS in a single computer file.

<u>Response:</u> Denies.

<u>Request No. 4:</u>  Admit that voter registration information is electronically transmitted from DPS to the SOS in a "batch file," and includes commands that can be processed by the SOS data system.

<u>Response:</u> Admits that voter registration information is electronically transmitted from DPS to the SOS in a "batch file." Otherwise, denies.

<u>Request No. 5:</u>  Admit that each day, the files of applicants where "Yes" has been entered as a response in the Voter Field are combined in a single file.

<u>Response:</u> Admits.

<u>Request No. 6:</u>  Admit that each day, the files of applicants where "Yes" has been entered as a response in the Voter Field following an in-person transaction are combined in a single file.

<u>Response:</u> Admits.

<u>Request No. 7:</u>  Admit that each day, the files of applicants where "Yes" has been entered as a response in the Voter Field following a transaction by mail are combined in a single file.

<u>Response:</u> Admits.

<u>Request No. 8:</u>  Admit that each day, the files of applicants where "Yes" has been entered as a response in the Voter Field are combined in a single file, regardless of whether any individual applicant completed an in-person or mail transaction.

<u>Response:</u> Admits.

<u>Request No. 9:</u>  Admit that "Yes" is never entered as a response in the Voter Field following an online transaction.

10

<u>Response:</u> Admits that, when an individual updates his or her driver license online, the voter field is not accessed, as a signature is not provided.

<u>Request No. 10:</u>   Admit that for files of applicants where "Yes" has been entered as a response in the Voter Field, the Voter Registration Status is set to "Ready for SOS Batch File."

<u>Response:</u> Admits.

<u>Request No. 11:</u>   Admit that for any DLS file on which an eligible voter has indicated he or she wants to register to vote, the Voter Registration Status is set to "Ready for SOS Batch File."

<u>Response:</u> Denies.

<u>Request No. 12:</u>   Admit that, prior to transmission to SOS, the DPS computer system locates records that meet the following criteria: (i) Voter Registration Status is set to "Ready for SOS Batch File" AND (ii) Administrative Status is not "Reported Deceased" AND (iii) Voter Registration = "Yes" OR (i) Card type = EC AND (ii) Voter Registration Status is set to "Ready for SOS Batch File" AND (iii) Voter Registration = "Yes."

<u>Response:</u> Subject to the protective order entered in this cause, admits.

<u>Request No. 13:</u>   Admit that the DPS computer system writes the following information to the batch file for each record: Last Name, First Name, Middle Name, Suffix, Date of Birth, Physical Address, Mailing Address, Physical County, Card Information including Card Type of Driver's License or Identification Card, the Driver's License or Identification card number, the application date, the Social Security Number, the AKA Name, Voter Status, Election Judge Information, Signature Image, and Sex.

<u>Response:</u> Subject to the protective order entered in this cause, admits that the DPS computer system writes the following information to the daily voter registration batch file for each record: Last Name, First Name, Middle Name, Suffix, Date of Birth, Physical Address, Mailing Address, Physical County, Card Information including Card Type of Driver's License or Identification Card, the Driver's License or Identification card number, the application date, the Social Security Number, the AKA Name, Voter Status, Election Judge Information, Signature Image, and Sex.

<u>Request No. 14:</u>   Admit that the system updates the Voter Registration Status to "Record Sent to SOS" for each record included in the file transmitted to SOS.

<u>Response:</u> Admits that the system updates the Voter Registration Status to "Record Sent to SOS" for each record included in the daily voter registration file transmitted to SOS. In all other respects, denies.

<u>Request No. 15:</u>   Admit that the system records an audit transaction with the following information: Date, Batch Type = Extract, Batch Name = Voter Registration, Error Code, Process Area = License Issuance, Records Count, Start Time, and End Time.

11

Response: Admits.

Request No. 16:    Admit that Ms. Watkins updated her driver's license address online through the DPS website in 2011.

Response: Denies.

Request No. 17:    Admit that during the transaction on the DPS website, Ms. Watkins checked "yes" in response to the statement, "I want to register to vote."

Response: Denies.

Request No. 18:    Admit that Ms. Watkins updated her driver's license address online through the DPS website in 2013.

Response: Denies that this transaction took place on the DPS website. In all other respects, admits.

Request No. 19:    Admit that during that second transaction on the DPS website in 2013, Ms. Watkins checked "yes" in response to the statement, "I want to register to vote."

Response: After making a reasonable inquiry into this request, Defendant lacks sufficient information to truthfully admit or deny it because Defendant has no record of this information.

Request No. 20:    Admit that when an eligible voter who updated his or her driver's license information on the DPS website before this lawsuit was filed responded "yes" to the statement, "I want to register to vote," or under the statement "Request a voter registration application," DPS did not transfer his or her data to the Texas Secretary of State.

Response: Admits, only those voters who submitted a voter registration application in accordance with State law would have had their voter registration information updated. Defendant further notes that online driver license address changes are initiated on the DPS website, but processed on Texas.gov.

Request No. 21:    Admit that when an eligible voter who updates his or her driver's license information on the current DPS website responds "yes" under the statement "Request a voter registration application," DPS does not transfer his or her data to the Texas Secretary of State

Response: Admits, only those voters who submit a voter registration application in accordance with state law will have their voter registration information updated.

Request No. 22:    Admit that when an eligible voter who updated his or her driver's license information on the DPS website before this lawsuit was filed responded "yes" to the statement, "I want to register to vote," DPS did not transfer his or her data to local election officials.

12

<u>Response:</u> Admits, only those voters who submitted a voter registration application in accordance with State law would have had their voter registration information updated.  Defendant also notes that online driver license address changes are initiated on the DPS website, but processed on Texas.gov.

<u>Request No. 23:</u>   Admit that when an eligible voter who updates his or her driver's license information on the current DPS website responds "yes" under the statement "Request a voter registration application," DPS does not transfer his or her data to local election officials.

<u>Response:</u> Admits, only those voters who submit a voter registration application in accordance with state law will have their voter registration information updated. Defendant also notes that online driver license address changes are initiated on the DPS website, but processed on Texas.gov.

<u>Request No. 24:</u>   Admit that when an eligible voter who renewed his or her driver's license on the DPS website before this lawsuit was filed responded "yes" to the statement, "I want to register to vote" DPS did not transfer his or her data to the Texas Secretary of State.

<u>Response:</u> Admits, only those voters who submitted a voter registration application in accordance with State law would have had their voter registration information updated. Defendant also notes that online driver license address changes are initiated on the DPS website, but processed on Texas.gov.

<u>Request No. 25:</u>   Admit that when an eligible voter who renews his or her driver's license on the current DPS website responds "yes" under the statement "Request a voter registration application," DPS does not transfer his or her data to local election officials.

<u>Response:</u> Admits, only those voters who submit a voter registration application in accordance with state law will have their voter registration information updated. Defendant also notes that online driver license address changes are initiated on the DPS website, but processed on Texas.gov.

<u>Request No. 26:</u>   Admit that previously on the DPS website before the language on Step 5 was changed, above the previous prompt, "I want to register to vote," the website displayed the statement, "Selecting 'Yes' does not register you to vote, but instead a link to the Secretary of State Voter website (where a voter application may be downloaded or requested) will be available on your receipt page."

<u>Response:</u> Admits that, until February 27, 2016, Step 5 of this online process required the licensee to select "yes" or "no" beneath the statement "I want to register to vote. Selecting 'yes' **does not** register you to vote. A link to the [SOS] voter website (where a voter application may be downloaded or requested) will be available on your receipt page." (emphasis original).

<u>Request No. 27:</u>   Admit that currently on the DPS website since the language on Step 5 has changed, next to the prompt, "Do you want to request a voter application," the website displays the statement, "You will receive a link to a voter application on your receipt page."

<u>Response:</u> Admits, but notes that Step 5 takes place on Texas.gov, not the DPS website.

Request No. 28:   Admit that currently on the DPS website since the language on Step 5 has changed, below to the prompt, "Do you want to request a voter application," the website displays language next to the check box for "Yes" which states "(This does not register you to vote.)"

Response: Admits, but note that Step 5 takes place on Texas.gov, not the DPS website.

Request No. 29:   Admit that before this lawsuit was filed, an eligible voter who selected "yes" in response to the prompt, "I want to register to vote," when updating information through DPS online renewal, was told to visit the Secretary of State's website to view instructions for how to register to vote.

Response: Denies.

## RESPONSES TO JOHN WOOD'S REQUEST FOR ADMISSIONS

Request No. 1:  Admit that on Step 3 in the Answer to FAQ No. 17 on the DPS website, the only reference to registering to vote simply lists "2. Register to vote" without any further explanation.

Response: Defendant objects that this request is unintelligible.

Request No. 2:  Admit that the information an eligible voter submits electronically through the DPS website may be used to *cancel* a voter's prior registration record in his or her prior county of residence pursuant to state law.

Response: Defendant objects that this request is hypothetical, calls for speculation, and calls for a legal conclusion, rather than an application of law to fact. Defendant can neither admit nor deny what any other entities do regarding voter registration status.

Request No. 3:  Admit that the DPS website does not explain that completing DPS' online change-of-address form may jeopardize a voter's registration status at his or her former residence.

Response: Defendant objects that this request is unintelligible.

Request No. 4:  Admit that DPS transmits information about customer change-of-address transactions to counties for the purpose of removing individuals from the rolls.

Response: Denies.

Request No. 5:  Admit that when DPS receives a communication through the web portal, DPS employees research the voter's information and return information to election officials.

Response: Denies.

Request No. 6:  Admit that DPS has designated two individuals who coordinate the agency's voter registration program, and SOS is aware of these designations.

14

**Response**: Admits that DPS previously had two individuals who were identified to SOS as having roles in coordinating the agency's voter registration. Admits that DPS currently has one such individual.

**Request No. 7:**  Admit that currently, one individual who coordinates the DPS voter registration program is Tony Rodriguez, Senior Manager, Customer Operations.

**Response**: Denies.

**Request No. 8:**  Admit that currently, one individual who coordinates the DPS voter registration program is Bob Myers, Training Specialist, Customer Support.

**Response**: Denies.

**Request No. 9:**  Admit that Mr. Myers is responsible for the training of Driver License Division employees in voter registration procedures and policy.

**Response**: Denies.

**Request No. 10:**   Admit that Mr. Rodriguez oversees the program in our driver license offices statewide.

**Response**: Defendant objects to this request as unintelligible.

**Request No. 11:**   Admit that DPS has a "DPS Voter Registration Plan" dated September 9, 2015.

**Response**: Admits.

**Request No. 12:**   Admit that as set forth in the DPS Voter Registration Plan, all DPS forms have been reviewed to ensure that voter registration questions are included where required.

**Response**: Admits.

**Request No. 13:**   Admit that pursuant to an agreement with the named Plaintiffs, the State implemented a new "hard stop" feature to its DLS system earlier this year.

**Response**: Admits.

**Request No. 14:**   Admit that as of March 31, 2016, the DLS now requires DPS employees to provide an answer in the voter registration field before they are permitted to proceed to the next screen when helping an eligible voter who visits a DPS office in-person.

**Response**: Admits.

<u>Request No. 15:</u>   Admit that DPS employees must provide a receipt to each applicant and verify that all information is correct, including the applicant's answer to the voter registration question, before any driver's license transaction is finalized when an eligible voter who visits a DPS office in-person.

<u>Response</u>: Admits.

<u>Request No. 16:</u>   Admit that when an eligible voter visits a DPS office in-person, DPS has implemented a policy whereby whenever "any applicant who is a U.S. citizen… checks the 'yes' and 'no' boxes this will be considered an affirmative response, and the DPS employee will enter a 'yes' into the system thereby triggering the submission of the applicant's information to the SOS."

<u>Response</u>: Admits.

<u>Request No. 17:</u>   Admit that when an eligible voter indicates on form DL-14A that he or she wants to register to vote, no hard copy of any document containing the voter's wet signature is ever sent to the Secretary of State's Office.

<u>Response</u>: Admits, DPS uses point-of-sale-style signature pads to collect images of physical signatures from individuals who indicate that they wish to register to vote. Defendant understands this request to refer to "wet signature" as a pen on paper, as opposed to an electronic image of a signature collected using a point-of-sale style electronic signature pad and a stylus.

<u>Request No. 18:</u>   Admit that when an eligible voter indicates on form DL-43 that he or she wants to register to vote, no hard copy of any document containing the voter's wet signature is ever sent to the Secretary of State's Office.

<u>Response</u>: Admits, DPS uses point-of-sale-style signature pads to collect images of physical signatures from individuals who indicate that they wish to register to vote. Defendant understands this request to refer to "wet signature" as a pen on paper, as opposed to an electronic image of a signature collected using a point-of-sale style electronic signature pad and a stylus.

<u>Request No. 19:</u>   Admit that when an eligible voter indicates on form DL-64 that he or she wants to register to vote, no hard copy of any document containing the voter's wet signature is ever sent to the Secretary of State's Office.

<u>Response</u>: Denies.

<u>Request No. 20:</u>   Admit that when DPS sends information to SOS regarding eligible voters, the method by which they transmit information is through the web portal, rather than by sending hard copies of signed documents.

<u>Response</u>: Denies that DPS uses the "web portal" to transmit information to SOS. Admits that DPS sends voter registration information, including electronic images of applicants' signatures, to SOS electronically, rather than by sending hard copies of signed documents.

<u>Request No. 21:</u>    Admit that DPS customer service representatives are subjected to at least two "performance observations" annually to ensure that these employees are performing their basic tasks.

<u>Response</u>: Admits.

<u>Request No. 22:</u>    Admit that after DPS sends voter information to the SOS each night, DPS is not responsible for further reviewing voter registration data for eligibility purposes.

<u>Response</u>: Admits.

<u>Request No. 23:</u>    Admit that DPS currently provides voter registration training during new employee orientation, as well as additional training as needed.

<u>Response</u>: Admits.

# EXHIBIT 16



Texas Department of Public Safety
Driver License Division

# Driver License Renewal and Change of Address

## Address Change

Name:
Date of Birth:

### Home Address

Please enter your home address. This address will appear on your new driver license/ID card.

Mailing Address Line 1:
Required.

Mailing Address Line 2:
Use this line only if you run out of space in Line 1.

City:
Required.

State:
Required.
[ Select a state ▾ ]

ZIP:
Required.

County:
[ ▾ ]

Country:
Required.
[ Select a Country ▾ ]

### Mailing Address

Your new driver license/ID card will be mailed to this address.

Is your Mailing Address the same as your Home Address?

○ Yes
⦿ No

Mailing Address Line 1:
Required.

Mailing Address Line 2:
Use this line only if you run out of space in Line 1.

City:
Required.

State:
Required.
[ Select a state ▾ ]

ZIP:
Required.

County:
[ ▾ ]

Country:
Required.
[ Select a Country ▾ ]

[ Continue ]

## Information

**Steps to Complete**

1. Welcome
2. Login
3. Select Services
4. Enter Address
5. Select Options
6. Review Order
7. Submit Payment
8. Receipt

Frequently Asked Questions

Log Out

For technical assistance with this application, please call 1-877-452-9060 or send an email to Texas.gov

APPENDIX 130

Texas.gov Policies | © 2011 Texas.gov

D_00021840

# EXHIBIT 17



D_00015308



D_00015309

# EXHIBIT 18

https://webservices.sos.**state.tx.us**/vrapp/index.asp        Voter Registration Appl... ✕

File   Edit   View   Favorites   Tools   Help

## TEXAS SECRETARY OF STATE

### ROLANDO PABLOS

| Main Site | News | Site Index | Help | Contacts |

## Voter Registration Application

**Note:** This service is best viewed and printed using Internet Explorer 7 and higher or Firefox.

**Important: Please confirm your county of residence before filling out this form.**

Find out if you are already registered

**Are you a United States Citizen?**
◉ Yes      ○ No

**Application Type:**
○ New      ○ Change   ○ Replacement

**Are you interested in serving as an election worker?**
○ Yes      ○ No

**Applicant Information**

First Name:                Middle Name:              Last Name:                Former Name:

Date of Birth: (mm/dd/yyyy)    Gender (optional)       Telephone Number, Include Area Code: (Optional)
                               Select... ▾

TX Driver's License No. or Personal I.D. No. (Issued by the Department of Public Safety):

If no TX Driver's License or Personal Identification, give last 4 digits of your Social Security Number:

XXX-XX-

☐ I have not been issued a Texas Driver's License/Personal Identification Number or Social Security Number

**Residence Address**

County:              Address:                          City:
Select...  ▾

State:               Zip:
TX

**Mailing Address (If different from Residential Address)**

Address:                          City:              State:   Zip:

**Please verify your data is correct before you "Submit."**

[ Submit ]

Hitting the submit button will load your information into the proper form for you to print, sign, and mail. Do not mail this screen.

Main Site | Texas.gov | Trail | Texas Homeland Security

Compact With Texans | Open Records Policy | Privacy Policy | Accessibility Policy | Link Policy | Disclaimer

Send comments and questions about the web site to: webmaster@sos.state.tx.us

# EXHIBIT 19





NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES



## BUSINESS REPLY MAIL
FIRST-CLASS MAIL    PERMIT NO. 4511    AUSTIN, TX

POSTAGE WILL BE PAID BY ADDRESSEE

**SECRETARY OF STATE**
**ELECTIONS DIVISION**
**PO BOX 12887**
**AUSTIN TX 78711-9972**

*Fold on line and seal before mailing*

### Qualifications

- You must register to vote in the county in which you reside.
- You must be a citizen of the United States.
- You must be at least 17 years and 10 months old to register, and you must be 18 years of age by Election Day.
- You must not be finally convicted of a felony, or if you are a felon, you must have completed all of your punishment, including any term of incarceration, parole, supervision, period of probation, or you must have received a pardon.
- You must not have been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.

### Filling out the Application

- Review the application carefully, fill it out, sign and date it and mail it to the voter registrar in your county or drop it by the Voter Registrar's office.

- All voters who register to vote in Texas must provide a Texas driver's license number or personal identification number issued by the Texas Department of Public Safety. If you don't have such a number, simply provide the last four digits of your social security number. If you don't have a social security number, you need to state that fact.
- Your voter registration will become effective 30 days after it is received or on your 18th birthday, whichever is later. Your registration must be effective on or before an election day in order to vote in that election.
- If you move to another county, you must re-register in the county of your new residence.

Please visit the Texas Secretary of State website, **www.sos.state.tx.us**, and for additional election information visit **www.votetexas.gov**.

Este formulario está disponible en español. Favor de llamar a su registrador de votantes local para conseguir una versión en español.

APPENDIX 137

REMOVE TO EXPOSE ADHESIVE
REMOVE TO EXPOSE ADHESIVE
REMOVE TO EXPOSE ADHESIVE
REMOVE TO EXPOSE ADHESIVE

## Texas Voter Registration Application

Prescribed by the Office of the Secretary of State          VR64.2016(E.J3)

**For Official Use Only**

Please complete sections by printing LEGIBLY. If you have any questions about how to fill out this application, please call your local voter registrar.

**1** **These Questions Must Be Completed Before Proceeding. Check One.**

☐ New Application   ☐ Change of Address, Name, or Other Information   ☐ Request for a Replacement Card

**Are you a United States Citizen?**          ☐ Yes          ☐ No

**Will you be 18 years of age on or before election day?**          ☐ Yes          ☐ No

If you checked 'No' in response to either of the above, do not complete this form.

**Are you interested in serving as an election worker?**          ☐ Yes          ☐ No

**2** **Last Name** Include Suffix if any (Jr, Sr, III) | **First Name** | **Middle Name** (if any) | **Former Name** (if any)

**3** **Residence Address:** Street Address and Apartment Number. If none, describe where you live. (Do not include P.O. Box, Rural Rt. or Business Address) | **City** | **TEXAS**
| **County** | **Zip Code**

**4** **Mailing Address:** Street Address and Apartment Number. (If mail cannot be delivered to your residence address.) | **City** | **State**
| | **Zip Code**

**5** **City and County of Former Residence in Texas**

**6** **Date of Birth:** (mm/dd/yyyy)          **7** **Gender** (Optional)  ☐ Male  ☐ Female          **8** **Telephone Number** (Optional) Include Area Code

**9** **Texas Driver's License No. or Texas Personal I.D. No.** (Issued by the Department of Public Safety)          If no Texas Driver's License or Personal Identification, give last 4 digits of your Social Security Number

XXX-XX-

☐ I have not been issued a Texas Driver's License/Personal Identification Number or Social Security Number.

**10** I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to 180 days, a fine up to $2,000, or both. Please read all <u>three</u> statements to affirm before signing.

- I am a resident of this county and a U.S. citizen;
- I have not been finally convicted of a felony, or if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned; and
- I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.

**X**          Date ___ / ___ / ___

Signature of Applicant or Agent and Relationship to Applicant or Printed Name of Applicant if Signed by Witness and Date.

APPENDIX 138

# EXHIBIT 20



THE OFFICIAL WEBSITE OF THE STATE OF TEXAS

**Texas Department of Public Safety**
**Driver License Division**
**Driver License Renewal and Change of Address**

## Welcome

Welcome to the Texas Driver License Renewal and Change of Address system

### Services

- Renew your driver license and/or identification (ID) card
- Change the address on your driver license and/or ID card

### What You Need

- A printer to print your temporary driver license or ID, which is valid for 45 days. If you do not have a printer, you can renew by phone: 1-866-DL-RENEW (1-866-357-3639)
- A valid credit card (Visa, MasterCard, Discover, or American Express)
- Your current Texas driver license or ID card
- Your Social Security number

### Fees

- Renewal of driver license (with or without changing address)  $25
- Renewal of ID (with or without changing address)  $16
- Renewal of driver license with motorcycle (with or without changing address)  $33
- Change of address only for driver license or ID  $11

This online service is provided by Texas.gov, the official website of Texas. The price of this service includes funds that support the ongoing operations and enhancements of Texas.gov, which is provided by a third party in partnership with the State.

[Continue]

### Information

**Steps to Complete**
1  Welcome
2  Login
3  Select Services
4  Enter Address
5  Select Options
6  Review Order
7  Submit Payment
8  Receipt

Frequently Asked Questions
Eligibility
Where's My License or ID?
En Español

---

**Help**
For technical assistance with this application, please call 1-877-452-9060 or send an email to Texas.gov Help ✉

**Resources**
- Texas Department of Public Safety

**Texas.gov**
Texas.gov Policies
© 2012 Texas.gov

DGAA   CLEAR MARK

texas.gov
Take it online, Texas.

38540762 RENEW-DL TEST



EXHIBIT
3T

APPENDIX 140



SELECTED TO DO BOTH-RENEW AND CHANGE ADDRESS



CLICKED CONTINUE

APPENDIX 142



SELECTED YES TO REQUEST VOTER APPLICATION

INFORMATION "?" SHOWS:



THE OFFICIAL WEBSITE OF THE STATE OF TEXAS



**Texas Department of Public Safety**
**Driver License Division**
**Driver License Renewal and Change of Address**

## Review

Name: TEST RENEW-DL

Your DL Number: 38540762

Your DL Class: C

Texas.gov Price: $26.00

What is the Texas.gov price?

Review your order. Select 'Edit' to make changes in the appropriate section. Select 'Continue' to proceed

### Selected Services

Driver License Renewal: $24.00

Driver License Address Change: $0.00

Edit

### Optional Donations

BEST donation (driver license): $1.00

Glenda Dawson-Donate Life Texas Registry donation (driver license): $1.00

Fund for Veterans' Assistance (FVA) donation: $1.00

Edit

### Options

I want to request a voter registration application: Yes

I want to be an organ donor: Yes

Edit

### Home Address:

Street Address: 123 ANYWHERE ST

City: ANYWHERE CITY

State: TEXAS

ZIP: 77777-7777

County: TRAVIS

Country: UNITED STATES

Edit

### Mailing Address:

Mailing address same as Residential address

Edit

Continue

### Information

**Steps to Complete**
1. Welcome
2. Login
3. Select Services
4. Enter Address
5. Select Options
6. Review Order
7. Submit Payment
8. Receipt

Frequently Asked Questions

Where's My License or ID?

Log Out

---

**Help**
For technical assistance with this application, please call 1-877-452-9060 or send an email to Texas.gov Help [-]

**Resources**
· Texas Department of Public Safety

**Texas.gov**
Texas.gov Policies
© 2012 Texas.gov

**Help**
For technical assistance with this application, please call 1-877-452-9060 or send an email to Texas.gov Help [-]

**Resources**
· Texas Department of Public Safety

**Texas.gov**
Texas.gov Policies
© 2012 Texas.gov

texas.gov
Take it online, Texas.

5

THE OFFICIAL WEBSITE OF THE STATE OF TEXAS



Texas Department of Public Safety
Driver License Division
**Driver License Renewal and Change of Address**

## Submit Payment

Name: TEST RENEW-DL

Your DL Number: 38540782

Your DL Class  C

| | |
|---|---|
| Driver License Renewal: | $24.00 |
| Driver License Address Change: | $0.00 |
| BEST donation (driver license) | $1.00 |
| Glenda Dawson-Donate Life Texas Registry donation (driver license): | $1.00 |
| Fund for Veterans' Assistance (FVA) donation: | $1.00 |
| **Texas.gov Price** | **$28.00** |
| What is the Texas.gov price? | |

Enter your payment information below and select 'Submit Payment'

When you complete this transaction, Texas.gov will remit the amount paid to the agency on your behalf.

### Payment Information

Cardholder Name
Required
`RENEW-DL TEST`

Credit Card Type:
Required.
`MasterCard` ∨

Credit Card Number:
Required
`5459090123456781`

Credit Card CVV:
Required
`123`
View Sample Credit Card to locate your credit card verification code.

Credit Card Expiration Month:
Required.
`May` ∨

Credit Card Expiration Year:
Required
`2020` ∨

### Billing Address

House Number:
`123`

Street Name:
Required
`ANYWHERE ST`

City:
Required
`ANYWHERE CITY`

State
Required
`TEXAS` ∨

ZIP Code:
Required
`77777-7777`  ×

[ Submit Payment ]

### Information

**Steps to Complete**
1. Welcome
2. Login
3. Select Services
4. Enter Address
5. Select Options
6. Review Order
7. Submit Payment
8. Receipt

Frequently Asked Questions
Where's My License or ID?
Log Out

---

**Help**
For technical assistance with this application, please call
1-877-452-9060 or send an email to Texas.gov Help [↗].

**Resources**
· Texas Department of Public
  Safety

**Texas.gov**
Texas.gov Policies
© 2012 Texas.gov

texas.gov
Take it online, Texas.



SELECTED "YES"



# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JARROD STRINGER, ET AL.,          )
                                  )
          Plaintiffs,             )
                                  )
VS.                               )
                                  )
ROLANDO PABLOS, IN HIS            )   Civil No. 5:16-CV-00257
OFFICIAL CAPACITY AS THE          )
TEXAS SECRETARY OF STATE AND      )
STEVEN C. MCCRAW, IN HIS          )
OFFICIAL CAPACITY AS THE          )
DIRECTOR OF THE Texas             )
Department of Public Safety,      )
                                  )
          Defendants.             )

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

BENJAMIN HERNANDEZ

MAY 18, 2017

VOLUME 1

-----------------------------------

    ORAL AND VIDEOTAPED DEPOSITION OF BENJAMIN HERNANDEZ,

produced as a witness at the instance of the DEFENDANT, and

duly sworn, was taken in the above-styled and numbered cause on

May 18, 2017, from 10:28 a.m. to 11:54 a.m., before Arden

Bolak, CSR in and for the State of Texas, reported by machine

shorthand, at the law offices of Waters & Kraus, LLP, 3141 Hood

Street, Suite 700, Dallas, Texas 75219, pursuant to the Texas

Rules of Civil Procedure and the provisions stated on the

record or attached hereto.

2

```
 1                  A P P E A R A N C E S

 2

 3   FOR THE WITNESS:

 4        Caitlyn Silhan
          WATERS & KRAUS, LLP
 5        3141 Hood Street
          Suite 700
 6        Dallas, Texas 75219
          214.357.6244
 7        Csilhan@waterskraus.com

 8
     FOR THE PLAINTIFFS:
 9        Hani Mirza
          ATTORNEY AT LAW
10        501 Elm Street
          Suite 450
11        Dallas, Texas 75202
          972.333.9200
12        Hani@texascivilrightsproject.org

13
     FOR THE DEFENDANTS:
14
          Anna M. Mackin
15        ASSISTANT ATTORNEY GENERAL
          GENERAL LITIGATION DIVISION
16        P.O. Box 12548
          Austin, Texas 78711
17        512.463.2120
          Anna.mackin@oag.texas.gov
18

19
     ALSO PRESENT:
20        Arden Bolak, The Court Reporter
          Kevin Schaefer, The Videographer
21

22

23

24

25
```

Benjamin Hernandez - 5/18/2017

3

1                              INDEX

2                                                 PAGE

3

4  Appearances                                    2

5  BENJAMIN HERNANDEZ
        Examination by Ms. Mackin                 4
6       Examination by Ms. Silhan                 42
        Examination by Ms. Mackin                 43
7

8  Signature and Changes                          44

9  Reporter's Certificate                         47

10

11                           EXHIBITS

12  NO.  DESCRIPTION                              PAGE

13  1    Defendant's Notice of Deposition    Off Record.

14  2    Plaintiff's Original Complaint          17

15  3    Application for Renewal of TX DL
         RE: 12/20/2012                          21
16
    4    Application for Renewal of TX DL
17       RE: 02/05/2008                          23

18  5    Application for Renewal of TX DL
         RE: 09/11/2003                          24
19
    6    Application for Renewal of TX DL
20       RE: 12/19/2001                          26

21  7    Online Application                      30

22  8    Letter To Honorable Carlos H. Cascos    35

23

24

25

4

1                    P R O C E E D I N G S

2              THE COURT:   We are on record at 10:28 a.m., May

3   18, 2017, start of DVD number 1.  You may swear in the witness.

4                    BENJAMIN HERNANDEZ,

5   having been first duly sworn, testified as follows:

6                         EXAMINATION

7       Q.   (BY MS. MACKIN) Good morning Mr. Hernandez, my name

8   is Anna Mackin, we met just a moment ago; correct?

9       A.   Yes.

10      Q.   Okay.

11              MS. MACKIN:  Can I have the plaintiff's counsel

12  introduce themselves on the record, please?

13              MS. SILHAN:  Sure.  Caitlyn Silhan from Waters &

14  Kraus on behalf of the Plaintiff, Benjamin Hernandez.

15              MR. MIRZA:   Hani Mirza with the Texas Civil

16  Rights Project, on behalf of the plaintiff Benjamin Hernandez.

17      Q.   (BY MS. MACKIN)  Mr. Hernandez, could you please

18  speak and spell your name for the record?

19      A.   My name is Benjamin Hernandez; B-E-N-J-A-M-I-N,

20  H-E-R-N-A-N-D-E-Z.

21      Q.   So I'm an attorney with the Texas Attorney General's

22  Office and I represent the defendants in this case, the

23  Secretary of State and the Director of the Department of Public

24  Safety.  I'd like to review some logistical matters before we

25  get into the substantive questions; is that all right?

18

1  That month he updated his driver's license address online and

2  believed that his voter registration records were updated as

3  well.

4          Did I read that correctly?

5      A.   Yes.

6      Q.   Okay.  Why did you believe that your voter

7  registration records were updated?

8      A.   Well, because when I updated my -- my address on --

9  on the website, I believe there was a little section that asked

10 if I wanted to register to vote also at the address I was

11 changing to.  And I did make a notice on it and I thought

12 that's all you had to do.

13     Q.   Okay.  Now, paragraph 47 mentioned someone named

14 Jared Stringer.  Do you know Mr. Stringer?

15     A.   No, I don't.

16     Q.   Okay.  Paragraph 48 mentions a woman named

17 T-O-T-Y-S-A Watkins.  Do you know Ms. Watkins?

18     A.   No.

19     Q.   And in paragraph 49 mentions an individual named John

20 Wood, do you know Mr. Wood?

21     A.   No.

22     Q.   Okay.  All right.  Thank you.  You can set Exhibit 2

23 aside.  We might come back to it a little bit later, but just

24 keep it handy.  So now I'm going to ask you some questions

25 about voting, and voter registration, and your experience with

1  those things.

2          What's the last time that you recall updating or

3  attempting to update your voter registration information?

4      A.   I've never had to update it.  I registered to vote

5  when I was 18 years old in Ector County.  And that's the only

6  time I actually registered to vote.  And I've been a residence

7  of Ector County since then so I never had to change.  And I

8  don't remember how I registered.  So...

9      Q.   Okay.  That's fine.  That was such a good answer.

10  You already answered -- I had this long list of questions and

11  you already took care of them.  What if -- and of course I'm

12  not asking how you voted or anything like that, but what's the

13  last election that you recall voting in?

14      A.   The last election?

15      Q.   Uh-huh.  The last time.

16      A.   The general election, 2016.

17      Q.   The federal general election?

18      A.   The federal general, yes.

19      Q.   What's the last time you remember voting before that?

20      A.   It was probably the federal general election of 2008.

21      Q.   Do you -- would you say that you vote regularly?

22      A.   Every general election, at least.

23      Q.   Do you consider yourself politically active?

24      A.   Well, I vote.

25      Q.   Sure.

Benjamin Hernandez - 5/18/2017

27

1    A.   Yes, it is.

2    Q.   Okay.  And can you please read question two into the

3  record?

4    A.   It says, If you are a U.S. citizen and eligible to

5  vote, would you like to apply to register to vote?

6    Q.   And how did you answer question two?

7    A.   It is marked, No.

8    Q.   And I presume you would have marked no for the same

9  reasons that you marked no on your previous?

10   A.   Yes.

11   Q.   Okay.  All right.  I'm handing you -- actually, not

12  quite yet.

13           All right.  I'm not handing you anything yet.

14  More to come.  I'd like to ask you some questions about the

15  change of address that you've sued my clients about when you

16  moved from Ector County to Dallas County.  Okay?

17   A.   Okay.

18   Q.   Why did you move from Ector County to Dallas County?

19   A.   I retired from the city of Odessa in February, 2013

20  and I moved up here to -- to Irving.

21   Q.   What made you choose Irving?

22   A.   My family was already here.

23   Q.   And tell me about when you updated the address on

24  your driver's license.

25           MS. SILHAN:  Objection.

28

1      Q.   (BY MS. MACKIN)   In 2013, after you moved.

2      A.   I just got online and decided change my address

3  online, because I knew I had to.

4      Q.   **Why did you choose to do it online rather than going**

5  **into a DPS office?**

6      A.   Convenience.

7      Q.   **Yeah.  And so we touched on this briefly a little**

8  **while ago, but you mentioned seeing some mention of voter**

9  **registration when you were online; is that right?**

10     A.   Yes.

11     Q.   **What do you recall seeing?**

12     A.   There was a portion where I remember seeing if I --

13  or asking the question if I wanted to register to vote.  And I

14  knew I need to register to vote in Dallas County, because of my

15  move.

16     Q.   **When you went online in 2013 and changed your address**

17  **from Ector County to Dallas County, did you sign anything?**

18     A.   I typed my name into the computer, basically.  If

19  that counts as a signature.

20     Q.   **So you didn't write anything down, it was all -- so**

21  **it was all on the computer; is that right?**

22     A.   Yes.

23     Q.   **Okay.  You've stated in your responses to some**

24  **written discovery in this lawsuit that you believed that this**

25  **online change of address updated your voter registration info,**

29

1 right?

2      A.   Yes.

3      Q.   And I'm sorry if this is repetitive, I just want to

4 make sure I have everything.  What made you think that?

5             MS. SILHAN:   Objection.

6      A.   It was a question on the -- on the website.  And

7 that's what I wanted to do.  That's what I needed to do.

8      Q.   (BY MS. MACKIN)  Do you recall whether you received

9 an updated voter registration card in the mail with your Irving

10 address, after you changed your address online?

11     A.   No, I did not.

12     Q.   You've also stated in response to written discovery

13 in this case that based on your receipt of an updated driver's

14 license, with your signature on it, you believed that your

15 online change of address, and I'm quoting from the written

16 responses here, quote "Caused your electronic signature to be

17 reused by DPS."

18             What do you mean by that?

19     A.   Could you ask that question again?

20     Q.   Sure.  So in response to some of our written

21 questions, you've indicated that you believed your online

22 change of address, quote "Caused your electronic signature to

23 be reused by DPS."  Close quote.

24             I'm trying to get a sense of what you mean by

25 that.

32

1   pencil.

2       Q.   Do you know how DPS got the signature that was on the

3   updated driver's license that was mailed to you after your 2013

4   online change of address?

5       A.   I'm not sure, but I'm sure they reproduced it from my

6   previous signature.

7       Q.   Would you have provided that signature in the

8   driver's license field office?

9       A.   Yes.

10      Q.   Okay.  All right.  Now I have a couple of questions

11  about -- we don't have too much more.  About when you first

12  became aware that you were not registered to vote in Dallas

13  County; okay?

14      A.   Okay.

15      Q.   So let's turn back to Exhibit 2, please.  And

16  paragraph 46, on page 11, all right.  So the third sentence

17  says, On Election Day 2014, Mr. Hernandez attempted to vote in

18  Dallas County but was told his name was not on the role in

19  Dallas County.  Benjamin Hernandez cast a provisional ballot

20  but later received notice his vote was not counted.

21              Did I read that properly?

22      A.   Yes.

23      Q.   Okay.  So tell me about Election Day 2014.  Did you

24  go to a polling station?

25      A.   Yes, I did.

Benjamin Hernandez - 5/18/2017

33

1    Q.    Do you remember which one?

2    A.    It was the library, public library on McArthur in

3 Valley Ranch, North Irving.

4    Q.    And how did you determine that that's where you would

5 go to cast your ballot?

6    A.    I think there was information in the newspaper.

7    Q.    And so what happened?

8    A.    On election day, I went to the library and stood in

9 line --

10    Q.    Did you have to wait long?

11    A.    I don't remember waiting very long time.  And I

12 handed the -- the poll vote volunteer my driver's license and

13 they tried to look up my -- my name on the roles and they

14 couldn't find it.  And -- which I thought was kind of odd.

15             And so they called the supervisor there, the

16 poll supervisor, I talked to her and told her that I thought I

17 had register, you know, online through DPS.  And she tried to

18 verify, or find my name.  She couldn't find it either.  And so

19 she let me cast a provisional ballot.  And she told me that --

20    Q.    Let me stop you for a second, I'm sorry.  Do you know

21 what this woman you were talking about who tried to find you on

22 the roles, do you know what she did?  Do you know if she called

23 anybody or checked with anybody?

24    A.    She made a phone call, I don't know who she talked

25 to.

34

1    Q.   Okay.  Okay.  I'm sorry.

2    A.   And then she allowed me to make a provisional ballot,

3  handwritten ballot, and she told me that they would have to

4  research it a little bit or -- check -- do a little more

5  checking and they would let me know by mail to see if -- my

6  vote was -- was going to be counted, if I was actually on the

7  roles.

8           I said, okay.  So I went home.  I completed the

9  provisional ballot, I went home.  And then I got a letter in

10  the mail from Dallas County saying that they couldn't find my

11  names on the role and that my vote couldn't be counted.  So...

12    Q.   Do you remember if you had to sign the provisional

13  ballot?

14    A.   I'm sure I did.

15    Q.   Did they tell you anything else at the polling

16  station on Election Day 2014?

17    A.   Not that I remember right off.  Nothing.

18    Q.   All right.

19    A.   Other than what I explained.

20    Q.   Sure.  And let's go back to where -- where you said

21  you received notice that your vote was not counted.  Tell me

22  about that.

23    A.   It was just the letter I received from Dallas County.

24  And it just informed me that my vote would not be counted

25  because I wasn't a register voter in Dallas County.

1      Q.    Okay.  Can you please read that paragraph into the

2   record and verify whether everything is true and correct?

3      A.    Mr. Hernandez moved to Dallas County from Ector

4   County in February 2013.  That month he changed his address and

5   attempted to update his voter registration online through DPS's

6   website.  Mr. Hernandez received a new driver's license in the

7   mail, but did not receive a voter registration card.

8               On Election Day 2014, Mr. Hernandez attempted to

9   vote in Dallas County, but was told his name was not on the

10  roles.  He cast a provisional ballot but later received notice

11  that his vote was not counted.

12     Q.    And is that all true and correct?

13     A.    Yes.

14     Q.    Okay.  Thank you.  All right.  I just have a few more

15  questions about your claims here.  Oh, and I'm sorry, I

16  unintentionally misled you earlier, we are not done with

17  Exhibit 2.  So let's pull that back out, please.  And I'd like

18  to direct your attention to paragraph 25, which is on page 7.

19  I'm sorry, I don't want to direct your attention to

20  paragraph 25.  There's a different paragraph.

21               MS. SILHAN:  Would now be a good time for a

22  quick break?

23               MS. MACKIN:  Sure, that's fine.  I'm sorry.  I

24  can't find.

25               MS. SILHAN:  How about 5 minutes?

39

1  don't -- there's no way I can point to numbers.  But if it can

2  happen to me it could happen to somebody else.  Of course,

3  that's reasonable thinking.

4      **Q.   (BY MS. MACKIN)  Mr. Hernandez, are you currently**

5  **registered to vote at the address where you reside?**

6      A.   Yes.

7      **Q.   How do you know?**

8      A.   I have my voter registration card now.  And I was

9  able to vote last November.

10     **Q.   If you move in the future, how do you think you would**

11 **update your voter registration information?**

12     A.   Manually.

13     **Q.   What do you mean by manually?**

14     A.   I can go to the post office, the courthouse, or

15 wherever you go, write it down.

16     **Q.   All right.  Just a couple more questions to wrap up.**

17 **How did you meet your lawyers in this case?  I'm not asking for**

18 **any legal advice or anything like that.  Any legal strategy.**

19 **Just, how you met them?**

20     A.   What I recall, I received a letter in the mail -- I'm

21 not sure how they got my name, and they -- the letter stated

22 something they were aware of the situation.  And I just called

23 somebody.

24     **Q.   Do you remember who you called?**

25     A.   I can't remember exactly who it was that I talked to

42

1          THE VIDEOGRAPHER:  Back on record 11:52.

2                          EXAMINATION

3      Q.   (BY MS. SILHAN)   Okay.  Mr. Hernandez, I just have a

4  few follow-up questions and then we will be done.  Before I get

5  to those, I want to request an opportunity for Mr. Hernandez to

6  be able to read and sign the transcript.  Make sure that's on

7  the record.

8               Okay.  Ms. Mackin asked you about your voting

9  history in the past and I believe you previously testified that

10  you voted in 2008; is that correct?

11     A.   Yes.

12     Q.   Did you vote in any other elections after 2008?

13     A.   Yes, 2012 and 2016.

14     Q.   Okay.  Did you attempt to vote in 2014?

15     A.   Yes, in the -- I think it was for the governor in

16  November 2014.

17     Q.   And I believe Ms. Mackin asked you questions about

18  the process of attempting to vote when you did attempt to vote

19  in 2014.  Do you remember that?

20     A.   Yes.

21     Q.   And in that process involved showing your driver's

22  license and the poll volunteer checking the roles; is that

23  correct?

24     A.   Yes.

25     Q.   Was that process -- did that work the same way in

43

1  Ector County when you voted in previous elections?

2       A.   Yes.

3       Q.   So you show them your -- your driver's license and

4  they checked that you were on the roles and you were able to

5  vote; is that correct?

6       A.   Yes, the process was basically similar.

7       Q.   Okay.  When you moved from Ector County to Dallas

8  County, that was in February 2013; is that correct?

9       A.   Yes.

10      Q.   And you -- you changed your address with DPS in June

11 of 2013; is that correct?

12      A.   Yes.

13      Q.   Okay.

14           MS. SILHAN:  No further questions from us at

15 this time.  We'll reserve for trial.

16           MS. MACKIN:  And I just have one last thing.

17                   EXAMINATION

18      Q.   (BY MS. MACKIN)  Mr. Hernandez, have I treated you

19 professionally and with courtesy today?

20      A.   Yes.

21           MS. MACKIN:  Nothing further.

22           THE VIDEOGRAPHER:  Off record 11:54.

23           (End of Proceedings.)

24

25

47

```
 1                    R E P O R T E R

 2                 C E R T I F I C A T I O N

 3

 4              I, ARDEN BOLAK, a Shorthand Reporter,

 5   within and for the State of Texas, do hereby certify:

 6

 7              That BENJAMIN HERNANDEZ, the witness whose

 8   examination is hereinbefore set forth, was first duly sworn by

 9   me and that this transcript of said testimony is a true record

10   of the testimony given by said witness.

11

12              I further certify that I am not related to

13   any of the parties to this action by blood or marriage, and

14   that I am in no way interested in the outcome of this matter.

15

16              IN WITNESS WHEREOF, I have hereunto set my

17   hand to this _____ day of _____, 2017.

18

19                         _____
                           ARDEN BOLAK, CSR
20                         Integrity Legal Support Solutions
                           3100 W. Slaughter Ln. Suite A-101
21                         Austin, Texas 78748
                           (512) 320-8690
22                         (512) 320-8692 (Fax)

23

24

25
```

# EXHIBIT 22

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
                    SAN ANTONIO DIVISION

JARROD STRINGER, et al.,  )
                          )
     Plaintiffs,          )
                          )
vs.                       )CIVIL NO. 5:16-cv-00257
                          )
ROLANDO PABLOS, IN HIS    )
OFFICIAL CAPACITY AS THE  )
TEXAS SECRETARY OF STATE, )
AND STEVEN C. McCRAW,     )
HIS OFFICIAL CAPACITY AS  )
THE DIRECTOR OF THE TEXAS )
DEPARTMENT OF PUBLIC      )
SAFETY,                   )
                          )
     Defendants.          )


            *******************************

               ORAL VIDEOTAPED DEPOSITION

                     JARROD STRINGER

                      May 3, 2017

            *******************************
```

     ORAL VIDEOTAPED DEPOSITION OF JARROD STRINGER,

produced as a witness at the instance of the Defendants

and duly sworn, was taken in the above-styled and

numbered cause on the 3rd day of May, 2017, from

10:33 a.m. to 11:48 a.m., before April Balcombe,

Certified Shorthand Reporter and Certified Realtime

Reporter, in and for the State of Texas, reported by

computerized stenotype machine at the offices of the

Office of the Attorney General Consumer Protection

1  Division, San Antonio Regional Office, 115 East Travis

2  Street, Suite 925, San Antonio, Texas 78205-1605,

3  pursuant to the Federal Rules of Civil Procedure and the

4  provisions stated on the record or attached hereto.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                          APPEARANCES

 2

 3   FOR PLAINTIFFS:

 4        MS. BETH STEVENS
          MS. CASSANDRA CHAMPION
 5        Civil Rights Project
          1405 Montopolis Drive
 6        Austin, Texas 78741-3438
          Telephone: 512.474.5073
 7        Email: beth@texascivilrightsproject.org
          Email: champion@texascivilrightsproject.org
 8
     - and -
 9

10        MS. CAITLYN SILHAN
          Waters & Kraus, LLP
11        3141 Hood Street, Suite 700
          Dallas, Texas 75219
12        Telephone: 214.357.6244
          Email: csilhan@waterskraus.com
13

14   FOR DEFENDANTS:

15        MS. ANNE MARIE MACKIN
          Assistant Attorney General
16        General Litigation Division
          Post Office Box 12548
17        Austin, Texas 78711-2548
          Telephone: 512.463.2120
18        Fax:  512.320.0667
          Email: anna.mackin@oag.texas.gov
19

20   ALSO PRESENT:

21        Mr. Jarrod Stringer,
          the Witness; and
22        Mr. Celso Cavaso,
          the Videographer; and
23        Ms. April Balcombe,
          the Court Reporter.
24

25
```

APPENDIX 169

4

1                          INDEX

2                                          PAGE

3  JARROD STRINGER

4  Examination by Ms. Mackin ........................6

5  Continued Examination by Ms. Mackin .............51

6  Signature Page  .................................52

7  Court Reporter's Certificate ....................54

8

9                         EXHIBITS

10

11  EXHIBIT              DESCRIPTION              PAGE

12  Exhibit 1      Defendants' Notice of          18
                   Deposition of Jarrod Stringer
13
    Exhibit 2      Plaintiffs' Original Complaint 18
14
    Exhibit 3      Texas Driver License &         25
15                 Identification Renewal
                   Application
16
    Exhibit 4      Information Form               27
17
    Exhibit 5      Texas DPS Driver License       33
18                 Renewal and Change of Address

19  Exhibit 6      Notice to Confirm Voter        39
                   Registration Address
20
    Exhibit 7      Copy of Envelope               43
21
    Exhibit 8      Letter from Waters & Kraus     44
22                 dated October 23, 2015 to
                   Ms. Mackin
23

24

25

```
 1                 P-R-O-C-E-E-D-I-N-G-S

 2                 THE VIDEOGRAPHER:  We are on the record.

 3  Today's date is May the 3rd, 2017.  The time is 10:33.

 4  This is tape number one of the deposition of Jarrod

 5  Stringer taken in the United District -- in the United

 6  States District Court for the Western District of Texas,

 7  San Antonio Division, in the matter of Jarrod Stringer

 8  versus Rolando Pablos, et al.  Case Number is

 9  5-16-CV-00257.  This deposition is being held in

10  San Antonio, Texas.  My name is Celso Cavaso, the

11  videographer.

12                 Will counsel please introduce themselves

13  for the record?

14                 MS. MACKIN:  Anne Marie Mackin with the

15  Texas Attorney General's Office on behalf of all

16  defendants.

17                 MS. STEVENS:  Beth Stevens from the Texas

18  Civil Rights Project on behalf of Mr. Stringer.

19                 MS. SILHAN:  Caitlyn Silhan from Waters &

20  Kraus on behalf of Mr. Stringer.

21                 MS. CHAMPION:  Sandra Champion of the

22  Texas Civil Rights Project on behalf of Mr. Stringer.

23                      (Witness sworn).

24                 MS. STEVENS:  Just to get on the record,

25  we would like to read and sign.
```

6

1                    JARROD STRINGER,

2  having been first duly sworn, testified as follows:

3                      EXAMINATION

4  QUESTIONS BY MS. MACKIN:

5      Q.   Good morning, Mr. Stringer.

6      A.   Good morning.

7      Q.   Can you please speak and spell your name for

8  the record?

9      A.   Jarrod Stringer, J-A-R-R-O-D S-T-R-I-N-G-E-R.

10     Q.   And we met just a few moments ago, right?

11     A.   Yes.

12     Q.   Well, my name is Anna Mackin.  I am an attorney

13  with the Texas Attorney General's Office, and I

14  represent the defendants in this lawsuit, the Secretary

15  of State, Rolando Pablos, and the Director of the Texas

16  Department of Public Safety, Steven McCraw.

17              I am going to review some logistical

18  matters before we start into the substantive questions.

19              Have you ever been deposed before?

20     A.   No.

21     Q.   Have you ever testified in court before?

22     A.   No.

23     Q.   Okay.  So just a few things so that we can get

24  an accurate record of everything that is said here

25  today.

 1   the other plaintiffs have filed this lawsuit?

 2                   MS. STEVENS:  Objection.  Form.

 3       A.    Could you rephrase the question?

 4       Q.    (BY MS. MACKIN) Sure.  Sure.  And I am not

 5   trying to be tricky or get you to say like a legal

 6   conclusion or anything.

 7       A.    Sure.

 8       Q.    I am just curious, if you were describing this

 9   lawsuit to a friend over dinner, how would you describe

10   it?

11       A.    I would say that this is about going online to

12   change my address after a move, learning that I could

13   also change my voter registration at the same time, and

14   then finding out later that I really wasn't registered

15   as I thought I was.

16       Q.    Now, you just said learning that you could also

17   change your voter registration at the same time.  Where

18   did you learn that information?

19       A.    On the DPS website.

20       Q.    Do you remember anything more specific about

21   that?

22       A.    In the process of changing my address, it asks

23   me, would you like to register to vote with this change

24   of address, or some version of that.

25       Q.    Okay.  And, again, just generally speaking --

1      A.    Uh-huh.

2      **Q.    -- as if you were talking to a friend, and it's**

3  **not going to hurt my feelings, what -- what do you think**

4  **that my clients did wrong in this case?**

5              MS. STEVENS:  Objection.  Form.

6      A.    Could you rephrase the question, please?

7      **Q.    (BY MS. MACKIN) Sure.**

8              **So there is two defendants in this**

9  **lawsuit.  One of them is associated with the Secretary**

10 **of State.  He is the Secretary of State.**

11     A.    Uh-huh.

12     **Q.    And the other is Director of the Department of**

13 **Public Safety, and so they're -- they kind of represent**

14 **those two agencies.**

15              **So maybe a better question would be:**

16 **What -- what do you think that the Department of Public**

17 **Safety did wrong?**

18              MS. STEVENS:  Objection.  Form.

19     A.    Well, I -- I guess what I would say is that

20 when I went online and registered, in that process, it

21 appeared as if I had done the necessary steps to become

22 a registered voter in Bexar County.

23              When I went to vote, I found out that I

24 wasn't.  And so when I called the county courthouse to

25 find out what the situation was and they looked it up,

1  they said, well, you are not registered, but you can --

2  you can vote for state elections.

3          And they said they had heard that other

4  people who had tried to register the same way I had had

5  had problems through DPS.

6      Q.   (BY MS. MACKIN) And we'll -- I will ask you a

7  little bit more about some of those details later on so

8  we will come back to that.

9      A.   Okay.

10     Q.   How did you meet your lawyers in this case?

11     A.   By phone.

12     Q.   Who -- and I am not asking for any legal advice

13  that they have given you.

14     A.   Uh-huh.

15     Q.   Who did you -- what attorney did you speak to

16  first about this lawsuit?

17     A.   I don't remember the order.

18     Q.   Okay.

19     A.   Yeah.

20     Q.   Do -- do you remember whether you contacted

21  your attorneys or whether they contacted you?

22     A.   They contacted me.

23     Q.   And about when was that?

24     A.   I don't remember.

25     Q.   Okay.  Had you ever met any of your lawyers

1    Q.    Okay.  Now I want to talk about the voter

2  registration issue that you sued my clients about when

3  you moved from Arlington to San Antonio.

4                  Why did you move?

5    A.    My wife got into law school at St. Mary's.

6    Q.    And do you remember the approximate date that

7  you moved?

8    A.    We moved on August the 1st.

9    Q.    And at that point you decided to update the

10  address on your driver license?

11    A.    Yes.

12    Q.    Okay.  Tell me about that.

13    A.    Well, we moved here in Austin, and shortly

14  thereafter, I -- as you can see from my history, I've

15  moved several times.  I am getting more accustomed to

16  trying to do that more quickly.  So I -- we had to get

17  wi-fi first.  But I forgot wi-fi now, so I went online

18  in my office and filled out the form.

19    Q.    Is there a reason you chose to do it online?

20    A.    Convenience.

21    Q.    Do you recall anything about voter

22  registration?

23    A.    I remember there being a box I could check if I

24  wanted to get registered.

25    Q.    Do you recall anything else?

1    Q.    Okay.  Now I want to talk about the voter

2  registration issue that you sued my clients about when

3  you moved from Arlington to San Antonio.

4                Why did you move?

5    A.    My wife got into law school at St. Mary's.

6    Q.    And do you remember the approximate date that

7  you moved?

8    A.    We moved on August the 1st.

9    Q.    And at that point you decided to update the

10  address on your driver license?

11    A.    Yes.

12    Q.    Okay.  Tell me about that.

13    A.    Well, we moved here in Austin, and shortly

14  thereafter, I -- as you can see from my history, I've

15  moved several times.  I am getting more accustomed to

16  trying to do that more quickly.  So I -- we had to get

17  wi-fi first.  But I forgot wi-fi now, so I went online

18  in my office and filled out the form.

19    Q.    Is there a reason you chose to do it online?

20    A.    Convenience.

21    Q.    Do you recall anything about voter

22  registration?

23    A.    I remember there being a box I could check if I

24  wanted to get registered.

25    Q.    Do you recall anything else?

1      A.    No.

2      Q.    **That day that you went online to change your**

3   **address, did you sign anything?**

4      A.    No.

5      Q.    **Did you write anything down?**

6      A.    Can you --

7      Q.    **Sure.**

8              **In connection with the change that you**

9   **made to your address --**

10     A.    Uh-huh.

11     Q.    **-- did you write anything down?**

12     A.    Write anything down where?

13     Q.    **Anywhere.**

14     A.    I am not sure I understand.

15     Q.    **When you asked -- well, you didn't ask.**

16              **When you told DPS that you had moved using**

17   **the online interface, did you write anything down, or**

18   **was it all done by computer?**

19     A.    It was all online.

20     Q.    **And then you said that you believed this**

21   **updated your voter registration information as well?**

22     A.    Correct.

23     Q.    **And you believed that because -- well, I don't**

24   **want to testify for you.  Why did you believe that?**

25     A.    It asked me if I would like to register to

 1  vote, and I said yes.

 2      Q.   Okay.

 3           MS. MACKIN:  We're on 5?

 4           MS. STEVENS:  (Nodding head).

 5           (Exhibit 5 marked).

 6      Q.   (BY MS. MACKIN) I am handing you what I am

 7  marking as Exhibit 5.  Please take all the time you need

 8  to review it and let me know when you are ready to

 9  discuss it.

10           MS. STEVENS:  For the record, there is a

11  front and a back page.

12      A.   (Witness reviews document.)

13           Okay.

14      Q.   (BY MS. MACKIN) All right.  I'd like to direct

15  your attention to page 2.

16           Well, first of all, do you recognize this

17  document?

18      A.   No.

19      Q.   Okay.  I am going to represent to you that this

20  was filed as an exhibit to the complaint that your

21  attorneys filed on your behalf in this lawsuit.  Does

22  that sound right, given that you reviewed the complaint

23  before it was filed?

24           MS. STEVENS:  Objection.  Form.

25      A.   I didn't know anything about it.

1     Q.   Okay.  I am going to represent to you that it

2   is a letter that your attorneys sent to me in connection

3   with this lawsuit.  And the second paragraph appears to

4   describe your experience with the voter registration

5   process in 2014.  Is that a fair characterization?

6     A.   Yes.

7     Q.   Okay.  So in the second sentence of that

8   paragraph, it says that you attempted to vote early in

9   November 2014 but were told by poll workers at UTSA that

10  your name were not -- was not on the rolls.

11            Can you tell me a little bit more about

12  that?

13     A.   Sure.

14            Arrived to early voting.  There was a

15  short line.  As I was waiting in line, I noticed that

16  there were people in front of me who the -- the

17  volunteers or the voter -- the voting booths kept making

18  phone calls, and I was like, Oh, I wonder what that is.

19            And so I got up front and they asked me

20  for my license, typed me into the computer that they

21  have.  When they didn't get, I guess whatever results

22  they were expecting, they -- they did for me what they

23  had done for other people; they had called to confirm, I

24  guess, with some office that I was or wasn't enrolled.

25     Q.   Do you know who they called?

1    A.   I don't know.

2    Q.   **That's okay.**

3    A.   Yeah.  I don't know.

4         And then they said, Well, we are sorry,

5    you are not registered at this time.

6    Q.   **In Bexar County?**

7    A.   I don't know if they said that.  I am assuming.

8    I mean, I couldn't even vote for federal early, so I

9    don't know what their exact language was.

10   Q.   **Okay.  So other than telling you that you could**

11   **only vote in the statewide election that day --**

12   A.   They didn't tell me that that day.

13   Q.   **Oh, I see.  When did you learn that?**

14   A.   When I called the Bexar County Courthouse.

15   Q.   **And when you called the Bexar County**

16   **Courthouse, did they tell you anything else?**

17   A.   They told me that they -- I could only vote on

18   the day -- on that Tuesday or whatever it was, the day

19   of the election, right; that I couldn't vote any other

20   time; that I could only vote downtown at the downtown

21   location; and that they had other people who had had

22   problems registering to vote through DPS.

23   Q.   **And so just -- I just want to be clear, poll**

24   **workers at UTSA and the person you spoke with at Bexar**

25   **County mentioned problems at DPS, or was it --**

1      A.    No, no.  The -- the -- at UTSA, they only told

2  me I wasn't able to vote that day.  That's all they --

3  the information they gave me.

4      Q.    **So the call they made was just to check your**

5  **status?**

6      A.    Yes, yes.

7      Q.    **Okay.**

8      A.    And so the -- when I called Bexar County, they

9  were the ones that told me there had been other

10  problem -- people who had problems through DPS

11  registering.

12      Q.    **Okay.  Okay.  Did they tell you when you called**

13  **Bexar County anything else about any -- anything else**

14  **that you recall?**

15      A.    The only thing I remember is -- were the DPS

16  and that I could vote on the day of the election and

17  only for statewide elections.

18      Q.    **Okay.  Did they tell you anything about any**

19  **other county?**

20      A.    No, not that I recall.

21      Q.    **Let's jump back to UTSA for a second.**

22      A.    Sure.

23      Q.    **Did any individuals there mention anything to**

24  **you about a web portal or submitting any kind of inquiry**

25  **on your behalf that you recall?**

54

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3  JARROD STRINGER, et al.,   )
                               )
 4       Plaintiffs,           )
                               )
 5  vs.                        )CIVIL NO. 5:16-cv-00257
                               )
 6  ROLANDO PABLOS, IN HIS     )
    OFFICIAL CAPACITY AS THE   )
 7  TEXAS SECRETARY OF STATE,  )
    AND STEVEN C. McCRAW, IN   )
 8  HIS OFFICIAL CAPACITY AS   )
    THE DIRECTOR OF THE TEXAS  )
 9  DEPARTMENT OF PUBLIC       )
    SAFETY,                    )
10                             )
         Defendants.           )
11

12

13            ********************************

14                 REPORTER'S CERTIFICATE

15      ORAL VIDEOTAPED DEPOSITION OF JARROD STRINGER

16                     May 3, 2017

17            ********************************

18      I, April Balcombe, Certified Shorthand Reporter in

19  and for the State of Texas, hereby certify to the

20  following:

21      That the witness, JARROD STRINGER, was duly sworn

22  and that the transcript of the deposition is a true

23  record of the testimony given by the witness;

24      That the original deposition was delivered to Ms.

25  Mackin, Custodial Attorney;
```

Jarrod Stringer - 5/3/2017

55

1    That a copy of this certificate was served on all

2  parties and/or the witness shown herein on

3  _____ , 2016.

4    I further certify pursuant to FRCP Rule 30(f)(1)

5  that the signature of the deponent:

6    ___ was requested by the deponent or a party before

7  the completion of the deposition and that the signature

8  is to be before any notary public and returned within 30

9  days (or ___ days per agreement of counsel) from the

10 date of receipt of the transcript.

11    If returned, the attached Changes and Signature

12 Page contains any changes and the reasons therefore:

13    ___ was not requested by the deponent or a party

14 before the completion of the deposition.

15    That the amount of time used by each party at the

16 time of the deposition is as follows:

17

   Ms. Mackin (1h3m)

18

19      Attorney for Defendants

20

21    That pursuant to information given to the

22 deposition officer at the time said testimony was taken,

23 the following includes counsel for all parties of

24 record:

25

```
 1  FOR PLAINTIFFS:

 2       MS. BETH STEVENS
         MS. CASSANDRA CHAMPION
 3       Civil Rights Project
         1405 Montopolis Drive
 4       Austin, Texas 78741-3438
         Telephone: 512.474.5073
 5       Email: beth@texascivilrightsproject.org
         Email: champion@texascivilrightsproject.org
 6
    - and -
 7
         MS. CAITLYN SILHAN
 8       Waters & Kraus, LLP
         3141 Hood Street, Suite 700
 9       Dallas, Texas 75219
         Telephone: 214.357.6244
10       Email: csilhan@waterskraus.com

11
    FOR DEFENDANTS:
12
         MS. ANNE MARIE MACKIN
13       Assistant Attorney General
         General Litigation Division
14       Post Office Box 12548
         Austin, Texas 78711-2548
15       Telephone: 512.463.2120
         Fax:  512.320.0667
16       Email: anna.mackin@oag.texas.gov

17

18       That $_____ is the deposition officer's charges

19  to the Defendants for preparing the original deposition

20  and any copies of exhibits;

21       I further certify that I am neither counsel for,

22  related to, nor employed by any of the parties in the

23  action in which this proceeding was taken, and further

24  that I am not financially or otherwise interested in the

25  outcome of this action.
```

1       Certified to by me on this _____ day of

2  _____, _____.

6  _____

7       April Balcombe, CSR, CRR, CRC
        Integrity Legal Support Solutions
8       3100 W. Slaughter Lane, Suite A-101
        Austin, Texas 78748
9       (512) 320-8690
        (512) 320-8692 (fax)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 23

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JARROD STRINGER, ET AL.,    )
    Plaintiffs,          )
                  )
vs.                         )  CIVIL NO. 5:16-cv-00257
                  )
ROLANDO PABLOS, IN HIS      )
OFFICIAL CAPACITY AS THE    )
TEXAS SECRETARY OF STATE    )
AND STEVEN C. MCCRAW, IN    )
HIS OFFICIAL CAPACITY AS    )
THE DIRECTOR OF THE TEXAS   )
DEPARTMENT OF PUBLIC        )
SAFETY,                     )
    Defendants.          )


ORAL VIDEOTAPED DEPOSITION
JOHN WOODS
MAY 5, 2017


    ORAL VIDEOTAPED DEPOSITION OF JOHN WOODS, produced

as a witness at the instance of the Defendants and duly

sworn, was taken in the above-styled and numbered cause

on the 5th day of May, 2017, from 10:26 a.m. to

12:54 p.m., before Dana Richardson, Certified Shorthand

Reporter in and for the State of Texas, reported by

computerized stenotype machine at the Office of Attorney

General Consumer Protection Division Houston Regional

Office, 808 Travis, Suite 1520, Houston, Texas

77002-1702, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

2

```
 1                       APPEARANCES

 2   FOR PLAINTIFFS:

 3        Ms. Beth Stevens
          TEXAS CIVIL RIGHTS PROJECT
 4        1405 Montopolis Drive
          Austin, Texas 78741
 5        Telephone: (512) 474-5073
          E-mail: beth@texascivilrightsproject.org
 6
                        - and -
 7
          Ms. Caitlyn Silhan
 8        WATERS & KRAUS, LLP
          3141 Hood Street, Suite 700
 9        Dallas, Texas 75219
          Telephone: (214) 357-6244
10        Fax:  (214) 357-7252
          E-mail: csilhan@waterskraus.com
11
     FOR DEFENDANTS:
12
          Ms. Anne Marie Mackin
13        ATTORNEY GENERAL'S OFFICE
          P.O. Box 12548, Capitol Station
14        Austin, Texas 78711-2548
          Telephone: (512) 475-4074
15        Fax:  (512) 320-0667
          E-mail: anna.mackin@oag.texas.gov
16


17
     ALSO PRESENT:
18
          Ms. Myra Thetford, Videographer
19

20

21

22

23

24

25
```

3

1                          EXHIBITS

2

3    EXHIBIT              DESCRIPTION                PAGE

4

5    Exhibit 1      Defendants' Notice of              5
                    Deposition of John Woods
6
     Exhibit 2      Plaintiff's Original Complaint    24
7
     Exhibit 3      Application for                    36
8                   Renewal/Replacement/Change of a
                    Texas Driver License or
9                   Identification Card, John
                    Woods, 1/30/2017
10
     Exhibit 4      Application for                    39
11                  Renewal/Replacement/Change of a
                    Texas Driver License or
12                  Identification Card, John
                    Woods, 12/13/13
13
     Exhibit 5      Information Form, DL-43,           42
14                  7/28/09

15   Exhibit 6      Application for Texas Driver       44
                    License or Identification Card,
16                  John Woods, August 22, 2007

17   Exhibit 7      Texas Department of Public         47
                    Safety, Receipt of Surrendered
18                  License, August 22, 2007

19   Exhibit 8      Driver License Renewal and         50
                    Change of Address, printed from
20                  Texas.gov

21   Exhibit 9      November 18, 2015, letter from     60
                    Peter A. Kraus to Anne Marie
22                  Mackin

23   Exhibit 10     E-mail string with top e-mail      68
                    dated April 6, 2017, from John
24                  Woods to Beth Stevens

25

1                        EXHIBITS (cont.)

2   EXHIBIT                  DESCRIPTION                    PAGE

3
    Exhibit 11      May 26, 2015, letter from Beth       70
4                   Fischer to Dr. John Woods

5   Exhibit 12      Printout from Facebook               76

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  (Exhibit 1 marked)

 2                  THE VIDEOGRAPHER:  This is the videotaped

 3   deposition of John Woods taken on behalf of the

 4   plaintiff -- I'm sorry, taken on behalf of the defendant

 5   in the matter of Jarrod Stringer, et al., versus Rolando

 6   Pablos, et al., Civil Action No. 5:16-cv-00257, for the

 7   United States District Court, Western District of Texas,

 8   San Antonio Division, held in the offices of the

 9   Attorney General's Houston Regional Office at

10   808 Travis, Suite 1520, in Houston, Texas 77002.

11                  The videographer's name is Myra Thetford.

12   The court reporter's name is Dana Richardson.

13                  This is beginning of Tape No. 1.  Today's

14   date is May 5th, 2017.  We are on the record at

15   10:26 a.m.

16                  Would counsel please introduce themselves

17   for the record.

18                  MS. MACKIN:  Anna Mackin with the Attorney

19   General's Office on behalf of all defendants.

20                  MS. STEVENS:  Beth Stevens from the Texas

21   Civil Rights Project on behalf of Plaintiff John Woods.

22                  MS. SILHAN:  Caitlyn Silhan from Waters &

23   Kraus on behalf of Plaintiff John Woods.

24                            ***

25                            ***
```

6

1                          JOHN WOODS,

2      having been first duly sworn, testified as follows:

3                          EXAMINATION

4      **BY MS. MACKIN:**

5          Q.    **Good morning, Mr. Woods.**

6          A.    Good morning.

7          Q.    **If you wouldn't mind please speaking and**

8      **spelling your name for the record.**

9          A.    Yes.  It's John Woods.  J-o-h-n.  W-o-o-d-s.

10         Q.    **Thank you.**

11               **My name is Anna Mackin, and I am an**

12     **attorney with the Texas Attorney General's Office.  I**

13     **represent the defendants in this case, the Secretary of**

14     **State of Texas, Rolando Pablos, and the director of the**

15     **Department of Public Safety, Steven McCraw.**

16               **I'm going to review some logistical**

17     **matters before we get started on the questions.  Have**

18     **you ever been deposed before?**

19         A.    No.

20         Q.    **Okay.  Have you ever testified in court before?**

21         A.    No.

22         Q.    **So just a couple of things to help the court**

23     **reporter get an accurate record of everything that's**

24     **being said here today.  If you could try to give a**

25     **verbal answer to my questions as opposed to nodding or**

1 places, just -- it's about how it's --

2    A.   That's my understanding.

3    **Q.   Okay.  And so, again, I'm not asking for, like,**

4 **a legal conclusion or anything like that and you're not**

5 **going to hurt my feelings, but what do you think that my**

6 **client, the Department of Public Safety, did wrong in**

7 **this case?**

8    A.   I think that DPS gave me the impression that in

9 updating my driver's license address online and checking

10 that box I was changing my voter registration address,

11 when, in fact, I needed to do some separate set of steps

12 in order to actually change my voter registration

13 address as well.

14    **Q.   Okay.  And then as far as the Texas Secretary**

15 **of State, my other client, what did they do wrong in**

16 **this case?**

17           MS. STEVENS:  Objection, form.

18    **Q.   (BY MS. MACKIN)  Just your understanding, not a**

19 **legal conclusion.**

20    A.   Can you explain a little bit more, also going

21 back to the previous question, what you mean by "wrong"?

22    **Q.   Yeah.  So you sued --**

23    A.   Uh-huh.

24    **Q.   -- the lead officers of the Department of**

25 **Public Safety --**

 1  gentleman named Jarrod Stringer.  Do you know

 2  Mr. Stringer?

 3      A.   No.

 4      Q.   Okay.  48 mentions a woman, Ms. Watkins.  Her

 5  first name is spelled T-o-t-y-s-a.  I'm not sure how to

 6  pronounce it.

 7      A.   I think I'd remember somebody with that name.

 8      Q.   So you don't know her?

 9      A.   Correct.

10      Q.   Okay.  And then Paragraph 49 mentions John

11  Woods.  That's you?

12      A.   Yes.

13      Q.   Okay.  In the second sentence of

14  Paragraph 49 --

15      A.   Uh-huh.

16      Q.   -- it says:  "In September 2015, Dr. Woods

17  changed his driver's license address online, and

18  believed that his voter registration records were

19  updated as well."

20              Did I read that right?

21      A.   Yes.

22      Q.   And why did you believe that your voter

23  registration records were updated in September of 2015?

24      A.   Because I knew from experience -- or thought I

25  knew from experience that when you change your driver's

1   license address online you can also check a box that

2   will change your voter registration address.  That

3   experience comes both from Virginia, where that is the

4   case, and Texas, where it seems not to be the case,

5   but --

6       Q.   Tell me what you remember about Virginia.

7       A.   Can you be more specific?

8       Q.   Sure.  You said that your experience in

9   Virginia was part of the reason that you believed that

10  your voter registration records were updated after

11  changing your driver's license address online --

12      A.   Yes.

13      Q.   -- in Texas.

14      A.   Uh-huh.

15      Q.   So I'm asking what you remember about Virginia

16  that informed your beliefs about Texas.

17      A.   Yeah.  So my experience in Virginia was that

18  they made it pretty difficult for you to vote in the

19  town where you attended college.

20      Q.   Who is "they"?

21      A.   The state, commonwealth.  And -- and so at some

22  point, I changed my driver's license address to my

23  university address so that -- and also with my voter

24  registration address so that I could vote locally.  And

25  upon changing my driver's license address, I was, in

34

1  questions.

2      A.   Yes.

3      Q.   I'm not -- I'm not trying to trick you.  I'm

4  just trying to get a list.

5      A.   Yeah, sure, sure, uh-huh.

6      Q.   When you moved to Austin, where did you first

7  attempt to register or believe that you had registered

8  to vote in Texas?

9      A.   Yeah, that would be the -- the DPS office, I

10 think, on Burnett.

11     Q.   Okay.

12     A.   Is it on Burnett?  It's either Burnett or the

13 road next to it.

14     Q.   Uh-huh.  The one up by, like, 45, kind of?

15     A.   I think it's, like, 51st or something.

16     Q.   Yeah, yeah.

17     A.   It's like 5050 or something like that.

18     Q.   Yeah.  But that was in person at that office

19 that you first registered and --

20     A.   Yes.

21     Q.   -- or first believed you registered in Texas?

22     A.   Yes.

23     Q.   Okay.  And subsequent to that, were you ever

24 able to vote in Texas?

25     A.   Yes.

 1  when changing his address online at

 2  www.txdps.state.tx.us.

 3            That attempt to update voter registration

 4  information, what is that referring to?

 5     A.   To update my voter address from Travis County

 6  to Harris County.

 7     Q.   Okay.  And the next paragraph, I just want to

 8  go through this bit by bit to get a little bit more

 9  information about the -- the facts in here.

10     A.   Okay.

11     Q.   So the first sentence:  "Mr. Woods moved from

12  Travis County to Harris County in June 2015."

13            That's actually, though, referring to --

14  you physically moved from Morgantown, but you -- your

15  address registered on your driver license was from

16  Travis to Harris, even though your person was from West

17  Virginia to Harris; is that right?

18     A.   Yes.

19     Q.   Okay.

20     A.   I mean, I spent a lot of time in Austin --

21     Q.   Yeah.  And I'm not --

22     A.   -- even when I was in Morgantown.

23     Q.   I'm not saying that you were, like, lying or

24  trying to trick anybody.  I just want it to be clear in

25  the record because I was a little bit confused when I

 1  saw the letter to you in West Virginia and about just

 2  where everything was.  So not a problem.

 3              The second sentence:  "In September 2015,

 4  Mr. Woods changed his driver's license address online,

 5  and believed that his voter registration records were

 6  updated as well."

 7              Is that referring to the transaction that

 8  we've spent a lot of today talking about?

 9      A.   Yes.

10      Q.   Okay.  And then it says:  "Shortly thereafter,

11  Mr. Woods went to a local library, where he was offered

12  an opportunity to register to vote.  He declined that

13  opportunity, however, because he believed that his voter

14  registration records had already been updated."

15              Can you tell me a little bit more about

16  your visit to the library that's referenced in this

17  sentence?

18      A.   Sure.  I went with my friend Deb.  She was, I

19  think, dropping some -- she's also my roommate.  She was

20  dropping some stuff off, picking some stuff up.  I think

21  I checked out a book.  In the process of checking out a

22  book, the librarian said, "Would you like to register to

23  vote?"

24              And I said, "No, I did it when I changed

25  my driver's license address."

1    Q.   And then the next sentence:  "Mr. Woods called

2  Harris County on Election Day 2015, trying to identify

3  his polling location."

4              Do you remember what date Election Day

5  2015 was?

6    A.   November -- first Tuesday of November.

7    Q.   How did you know who to call to identify your

8  polling location?

9    A.   I think that information is available on the

10  internet.

11    Q.   So that's probably --

12    A.   I probably Googled it.

13    Q.   And then the next sentence says that you were

14  informed that you were not registered in Harris County

15  but were still registered in Travis County and that any

16  provisional ballot cast in Harris County would likely

17  not be counted.

18              Did they tell you anything else or --

19  I'm -- I'm sorry.  I made an assumption.  It says that

20  you were informed.

21    A.   Yeah, I don't know that it was during that

22  phone call that I was informed.  I think I -- I think

23  they told me I was not registered in Harris County

24  during that phone call.  And I said, "Can I fill out a

25  provisional ballot?"

1          And they said, "Yes, but it probably won't

2    be counted."

3          And then I went to the polling place,

4    and -- and -- and they verified there that I was not

5    registered in Harris County.  They may or may not have

6    looked up my registration and told me it was Travis

7    County, but I think at that point I inferred that my

8    address and my registration had not be changed and so it

9    was in Travis County.

10        **Q.   Do you remember what the local polling location**

11   **that you visited that day was?**

12        A.   Not the exact address --

13        **Q.   Sure.**

14        A.   -- but it is in Third Ward or near Third Ward.

15        **Q.   And if you were describing where that's located**

16   **to someone who's not familiar with Houston, how would**

17   **you describe it?**

18        A.   Near Texas Southern University.  So not far

19   from downtown, to the south, southwest of downtown.

20        **Q.   And you identified that as your polling**

21   **location based on the address where you resided at the**

22   **time?**

23        A.   Yes.

24        **Q.   Okay.**

25        A.   And it would have been the same polling place

 1  between my Ruth Street address and -- oh, yeah, yeah.

 2  So that -- that was also my -- that should also be my

 3  polling place now --

 4      **Q.    Okay.**

 5      A.    -- my current address.

 6      **Q.    And then it says here:  "On November 17th,**

 7  **Mr. Woods was informed by the county clerk that his**

 8  **provision ballot was not counted."**

 9           **How did the clerk inform you of this**

10  **information?**

11      A.    I received a letter in the mail.

12      **Q.    And specific -- oh, sorry, it says "by the**

13  **county clerk."**

14           **And that address was sent to -- sorry,**

15  **that letter was sent to the address where you were**

16  **residing at the time?**

17      A.    I don't recall.  I -- I -- I think so.  I don't

18  even remember the date of that.  I just remember getting

19  a letter in the mail.

20      **Q.    Okay.  And then what did you do?**

21      A.    By then I had already, I think, done most of

22  the things that are consequential.

23      **Q.    What do you mean when you say "the things that**

24  **are consequential"?**

25      A.    Yeah, I mean, so when I went to the polling

1  place and I cast a provisional ballot, probably the very

2  next thing I did was go on Facebook and vent about not

3  being able to vote for a second time, at which point a

4  friend put me in touch with -- with my attorneys.

5      Q.   **Okay.  So correct me if I'm mischaracterizing**

6  **this because I'm not trying to.  I'm just trying to get**

7  **everything clear.**

8      A.   Okay.

9      Q.   **When you went to your local polling location**

10 **and cast a provisional ballot, did you believe that it**

11 **likely would or likely would not be counted?**

12     A.   I was told by the person at the polling place

13 that it was unlikely that it would be counted.

14     Q.   **Did the person at the polling place tell you**

15 **anything else about that?**

16     A.   That the act of filling out a provisional

17 ballot would update my voter registration address

18 finally.

19     Q.   **After you filled out the provisional ballot, do**

20 **you recall if you received a new voter registration card**

21 **within 60 days after that?**

22     A.   I don't recall.

23     Q.   **Do you remember if you received an updated**

24 **voter registration card after that?**

25     A.   I have gotten one since then at some point

```
 1   STATE OF TEXAS
     COUNTY OF HARRIS
 2                     REPORTER'S CERTIFICATE

 3       I, Dana Richardson, a Certified Shorthand Reporter

 4   in and for the State of Texas, do certify that this

 5   deposition transcript is a true record of the testimony

 6   given by the witness named herein, after said witness

 7   was duly sworn by me.  The witness was requested to

 8   review the deposition.

 9       I further certify that I am neither attorney or

10   counsel for, related to, nor employed by any parties to

11   the action in which this testimony is taken and,

12   further, that I am not a relative or employee of any

13   counsel employed by the parties hereto or financially

14   interested in the action.

15       I further certify that the amount of time used by
     each party at the deposition is as follows:
16
             Ms. Anne Marie Mackin - 02:05
17           Ms. Beth Stevens - 00:00

18       SUBSCRIBED AND SWORN TO under my hand and seal of
     office on this the 19th day of May, 2017
19

20   _____

21           Dana Richardson, RPR, TX CSR
             Integrity Legal Support Solutions
22           3100 W. Slaughter Lane, Suite A-101
             Austin, Texas 78748
23           (512) 320-8690
             (512) 320-8692 (fax)
24

25
```

# Exhibit B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

MAY 10 2018

CLERK, U.S. DISTRICT COURT.
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

JARROD STRINGER, et. al.　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　　)　　CIVIL NO. SA-16-CA-257-OG
　　　　　　　　　　　　　　　　　　　　)
ROLANDO PABLOS, in his official　　　　　)
capacity as Texas Secretary of State　　　　)
and STEVEN C. McCRAW, in his official　　)
capacity as Director of the Texas Department　)
of Public Safety　　　　　　　　　　　　　)

# O R D E R

Pending before the Court is Plaintiffs' Motion for Summary Judgment (docket no. 77) and also Defendants' Motion for Summary Judgment (docket no. 82). The parties have filed responses (docket nos. 85, 88) and replies (docket nos. 87, 89). The Court has reviewed the record and the applicable law, and finds that Plaintiffs' motion should be granted and Defendants' motion should be denied.

## I.

### Statement of the case

This case concerns Texas's compliance with the National Voter Registration Act (NVRA) (also known as the "motor voter law"), 52 U.S.C. § 20501, et. seq., which was enacted in 1993 under the Elections Clause to make the voter registration process easier and more convenient, thus increasing voter registration and participation.[1] The only six states exempt from

---

[1] *See* 52 U.S.C. § 20501(b)(1) ("to establish procedures that will increase the number of eligible citizens who register to vote").

1

its requirements are those that have no voter registration or allow election day voter registration at the polls.[2] Texas is not one of them.[3]

<div align="center">II.</div>

<div align="center">Applicable standard</div>

Summary judgment is proper when the evidence shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails . . . to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The Court must draw reasonable inferences and construe evidence in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Although the evidence is viewed in the light most favorable to the nonmoving party, a nonmovant may not rely on "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence" to create a genuine issue of material fact sufficient to survive summary judgment. *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004).

<div align="center">III.</div>

<div align="center">The claims, defenses, and underlying facts</div>

Plaintiffs are eligible Texas voters who engaged in NVRA-covered online driver's license transactions but were denied simultaneous voter registration applications and thereafter

---

[2] 52 U.S.C. § 20503(b)

[3] *See* https://www.justice.gov/crt/national-voter-registration-act-1993-nvra

<div align="center">2</div>

disenfranchised. They assert that the State of Texas, by and through the Department of Public

Safety and the Secretary of State, engages in a practice that deprives Texans of their federal right

to register to vote or update their voter registration simultaneously with their online driver's

license renewal and change of address transactions. Plaintiffs allege that this practice, dating

back several years, violates the NVRA and Equal Protection clause. Although advised of the

violation, and admittedly able to change its practice and procedure, the State of Texas has refused

to integrate voter registration into its online driver's license renewal and change of address

process to ensure compliance with federal law.

Plaintiffs seek summary judgment on their claims that Defendants' online process

violates the NVRA and Equal Protection clause. They also seek summary judgment on

Defendants' affirmative defenses, including immunity, standing, and mootness.

Defendants admit that the key facts of this case are undisputed[4] and essentially argue that

state law prevents them from complying with federal law. Defendants seek summary judgment

on the following grounds: Article III standing, statutory standing, mootness, and on the merits –

based on their interpretation of the NVRA, state election law, and the Equal Protection clause.

The parties have stipulated to the following facts:

1.    Defendant Rolando Pablos is the Texas Secretary of State ("SOS") and, under Texas

      Election Code §31.001(a), serves as the State's Chief Election Officer.

---

[4]The Court has taken judicial notice of the evidence attached to Plaintiffs' Request for
Judicial Notice (docket no. 93). Defendants did not oppose the Court taking judicial notice of the
official government web pages cited in the order. Defendants did question the relevancy of
exhibit A-6, which is simply a hard copy of screen shots that may be found on the official
government website in question. The Court considered the screen shots in exhibit A-6 that are
relevant to the issues herein and consistent with the undisputed evidence in the record. Many of
the documents attached to Plaintiffs' Request for Judicial Notice are in other parts of the record
with no objection thereto.

2.     Defendant Steven C. McCraw is the Director of the Texas Department of Public Safety ("DPS"). DPS operates offices around the State and issues Texas driver's licenses. All references to "driver's licenses" herein refer to Texas driver's licenses issued by DPS.

3.     DPS is responsible for transmitting information to SOS about eligible driver's license applicants who – during covered driver's license transactions with DPS – indicate they wish to (1) register to vote, or (2) update their voter registration information. This information is transmitted by DPS to SOS in the voter registration extract file.

4.     Plaintiffs Jarrod Stringer, Benjamin Hernandez, and John O. Woods, III (collectively, "Plaintiffs") changed their addresses on their DPS-issued driver's licenses through online transactions on Texas.gov.

5.     Plaintiffs' counsel sent the Secretary of State letters dated May 27, 2015, October 23, 2015, and November 18, 2015, describing the change of address transactions in paragraph 4, and stating their allegation that DPS's and SOS's handling of these transactions violated the National Voter Registration Act.

6.     Among other requirements, an applicant must be a U.S. citizen to be eligible to renew his driver's license or change the address on his driver's license online.

7.     An applicant completing an online transaction to renew his driver's license must enter his driver's license number, date of birth, the last four digits of his social security number, and the audit number on his driver's license.

8.     An applicant completing an online transaction to change the address on his driver's license – or an applicant who changes the address on his driver's license when renewing it online – must enter his driver's license number, date of birth, the last four digits of his social security number, the audit number on his driver's license, his home address (street,

4

city,    state, zip code, and county) and, if different than his home address, his mailing

address (street, city, state, zip code, county, and country).

9.    The voter registration application on the SOS voter website is found here:

https://webservices.sos.state.tx.us/vrapp/index.asp

10.    Between April 2013 and February 26, 2016, Step 5 of the online renewal and change of

address interface prompted the applicant to select "yes" or "no" beneath the statement "I

want to register to vote. Selecting 'yes' **does not** register you to vote. A link to the [SOS]

voter website (where a voter application may be downloaded or requested) will be

available on your receipt page." (emphasis original)

11.    The signature that appears on the license generated as a result of a customer's online

driver's license renewal or change of address transaction is an image of the applicant's

physical signature, electronically captured during the applicant's most recent in-person

transaction in a DPS field office. (On the DL-14A and DL-43 forms this is referred to as

the applicant's "electronic signature").

12.    Plaintiffs did not submit a change of address that relates to a Texas driver's license in

person during the change of address transactions that form the basis of Plaintiffs' claims

in this lawsuit.

13.    Plaintiffs did not submit a change of address that relates to a Texas driver's license by

mail during the change of address transactions that form the basis of Plaintiffs' claims in

this lawsuit.

14.    Plaintiffs did not complete a voter registration application on the Secretary of State's

website through the link provided on the receipt page at the end of the change of address

transactions that form the basis of Plaintiffs' claims in this lawsuit.

5

15.     After receiving the letters described in Stipulation 5, Defendants offered, through

Plaintiffs' attorneys, to confirm Plaintiffs' voter registration status and provide assistance

in updating their voter registration if they desired.

16.     Plaintiffs did not attempt to renew their Texas driver's license online during the change of

address transactions that form the basis of Plaintiffs' claims in this lawsuit.

17.     Plaintiffs are currently registered to vote in the counties where in the letters referenced in

Stipulation 5 each Plaintiff indicated they wished to be registered.

18.     Plaintiff Jarrod Stringer did not attempt to cast a ballot in the federal general election in

2012.

19.     Plaintiff Jarrod Stringer was able to cast a ballot in the 2016 federal general election.

20.     Plaintiff John Woods was able to cast a ballot in the 2012 and 2016 federal general

elections.

21.     Plaintiff Benjamin Hernandez was able to cast a ballot in the 2012 and 2016 federal

general elections.

22.     There were no special federal elections in Texas in 2013 and 2015.

(Docket no. 94, Exh. A).

The record reflects the following additional facts. Although these facts are not stipulated,

they are generally undisputed:

Each named Plaintiff moved within Texas, changed his driver's license address using the

online driver's license renewal and change-of-address website,[5] indicated "yes" in response to the

_____

[5]The official website for the State of Texas, referred to as Texas.gov, was established for DPS and other state agencies to "put their services online" and provides "easy access to government information and . . . secure online services . . . through a public-private partnership between the State of Texas and Texas NICUSA, . . . the nation's leading provider of official government portals, online services, and secure payment processing solutions." Docket no. 93-6, p. 11.

APPENDIX 211

prompt "I want to register to vote," but was not registered to vote. Each Plaintiff was prevented from fully exercising his fundamental right to vote in a subsequent election due to his outdated voter registration record.

Benjamin Hernandez had been a registered voter in Ector County, Texas since the age of 18. He retired from his job with the City of Odessa in February 2013 and moved to Dallas County. He went online to change his driver's license address. After inputting his information, Mr. Hernandez checked "yes" to the voter registration question and believed his voter registration would be updated and he would thereafter be registered to vote in Dallas County. On election day in 2014, Mr. Hernandez attempted to vote but was told his name was not on the rolls in Dallas County. He was allowed to cast a provisional ballot but later received notice that his vote was not counted because he was not registered to vote in Dallas County. *See* docket no. 94-4, deposition of B. Hernandez, at 16:11-17, 21-24; 18:6-12; 19:2-8, 21-22; 27:18-20; 28:2-6, 16-25; 29:1-2, 8-11; 32:2-6, 17-22; 34:8-11, 23-25; 37:1-13. *See also* docket no. 77, appx.149-165.

Dr. John Woods III changed his residence from Travis County to Harris County in June 2015. He went online to change his driver's license address. After inputting his identifying information, he checked the box to register to vote. By checking "yes," Dr. Woods believed his voter registration had been updated with the new address. But that did not happen. On election day in 2015, Dr. Woods called Harris County to identify his polling location. He was told that he was still registered in Travis County, rather than Harris County, and any provisional ballot cast in Harris County would likely not be counted. Dr. Woods went to the polling location anyway, cast his vote, and was later informed in writing that his provisional ballot was not counted. *See* docket no. 94-6, deposition of John Woods, at 22:8-13; 25:16-25; 26:1-5; 52:7-25; 53:1-6; 62:3-6; 63:3-25; 64:1-15; 65:1-9; 66:6-11. *See also* docket no. 77, appx. 188-204.

<div align="center">7</div>

Jarrod Stringer moved from Tarrant to Bexar County and sought to change his address for driver's license and voter registration purposes. He thought that the DPS website would enable him to change his voter registration at the same time he changed his driver's license. Mr. Stringer went online and input all the requested information. There was a box he could check if he wanted to register to vote and he did so. Mr. Stringer believed he had "done the necessary steps to become a registered voter in Bexar County." He then attempted to vote in November 2014 and was told by poll workers that his name was not on the rolls. Mr. Stringer called Bexar County and was told he could vote only for statewide elections because he wasn't registered to vote in Bexar County. *See* docket no. 94-5, deposition of J. Stringer, at 15:8-24; 16:16-25; 17:1-5; 31:1-5, 19-24; 32:16-33:1; 45:7-46:22; 47:8-17. *See also* docket no. 77, appx. 167-186.

Plaintiffs' testimony regarding their personal experiences with DPS's online process is consistent with the testimony of State officials and employees with knowledge of how the process worked in the past and how it currently works. DPS operates offices around the State and issues driver's licenses and other state identification cards. DPS is also a designated voter registration agency, pursuant to 52 U.S.C. § 20506. DPS's in-person driver's license applications (DL-14A),[6] in-person renewal/replacement/change of address forms (DL-43),[7] and mail-in change of address forms (DL-64)[8] currently serve as simultaneous voter registration applications as required under the NVRA.[9] However, DPS has not integrated voter registration into its online process for driver's license renewal and change of address; thus, the driver's license application

---

[6] Docket no. 93, exh. A-7.

[7] Docket no. 93, exh. A-8.

[8] Docket no. 93, exh. A-9.

[9] Until May 2015, DL-64 did not include any question about whether the applicant wanted to register to vote. Docket no. 77, appx. 116 (admission no. 21).

8

and voter registration application remain separate processes rather than one simultaneous transaction.[10]

Texas has an NVRA implementation plan which explains: "The Department will [provide to each person who applies in person] a form and procedure that *combines* the department's application form for a license, identification card or EIC with an officially prescribed voter registration application form . . . The form will also inform the applicant that the applicant's *electronic signature* provided to the department will be used for submitting the applicant's voter registration application." Docket no. 77, appx. 30 (emphasis added).[11] The implementation plan further states that the "department will use a change of address form and procedure that *combines* department and voter registration functions. The change of address form submitted in person will allow a licensee or cardholder to indicate whether the change of address is also to be used for registration purposes." *Id.* (emphasis added). On "[e]ach weekday the Department is regularly open for business, the Department will *electronically* transfer to the Secretary of State (SOS) the name and relevant data regarding each applicant who is of voting age and a United States citizen who affirmatively answered the voter registration question." Docket no. 77, appx. 31 (emphasis added). This plan was implemented after the enactment of the NVRA and confirms Texas's

---

[10]The process for driver's license change of address and renewal is "combined online – it's one system interface." Docket no. 94-12, deposition of S. Gipson, at 37:10-16; docket no. 77, appx. 117, admission no. 5 ("the [Texas.gov] website provides a single online process for qualified applicants to renew their driver's license, update the address listed on their driver's license, or complete both processes in a single online transaction"). But voter registration is a completely separate transaction that must be done through SOS. Docket no. 94-12, deposition of S. Gipson, at 78:1-9; 94:1-4; *see also* docket no. 77, appx. 118 (admission nos. 10, 11).

[11]The form states: "By providing my electronic signature, I understand the personal information on my application form and my electronic signature will be used for submitting my voter's registration application to the Texas Secretary of State's office. Wanting to register to vote, I authorize the Department of Public Safety to transfer this information to the Texas Secretary of State." Docket no. 77, appx. 40, deposition of K. Ingram (SOS) at 62:18-63:1.

APPENDIX 214

understanding that the driver's license/voter registration process must be "combined" in one simultaneous transaction and that electronic signatures would be used for voter registration purposes.

When a "motor voter" applies for a Texas driver's license the first time, he must appear in person. During the transaction he signs a key pad which captures his electronic signature.[12] After a driver's license is issued, subsequent transactions (for renewal, replacement, or change of address) may be handled by mail, online, or even by phone. For voter registration purposes, the change of address forms submitted by mail have been handled in the same manner as renewal/change of address forms submitted in person. In both form DL-43 (the in-person application for renewal/replacement/change of address) and form DL-64 (the mail-in application for change of address) the driver's license and voter registration applications have been integrated or combined into one simultaneous transaction so that a customer need only check a single box indicating that he/she would like to register or update his/her voter information. After checking the box during the transaction, no further steps are necessary.[13] DPS receives the information and the motor voter's previously stored electronic signature, along with all other identifying data, is electronically submitted to SOS to be used for voter registration purposes.[14] Upon receipt, the SOS then transmits the data to local registrars for completion of the voter

---

[12]See docket no. 94-8, deposition of S. Gipson (DPS), at 234:11-24.

[13]In other words, there is no need to go to SOS to obtain, print, complete, sign, and mail a separate voter registration application.

[14]Docket no. 94-7, deposition of Betsy Schonhoff, SOS voter registration manager, at 28:3-4 ("We get application files from them on a daily basis for voter registration"); docket no. 77, appx. 117, RFA 26 ("Admits that the information DPS transmits to SOS about each applicant for voter registration includes a digital image of the applicant's signature").

registration process.[15] Although the in-person and mail-in renewal/change of address forms

contain a blank for a signature, neither DPS nor SOS use the signature on paper.[16] Instead, DPS

and SOS use the previously stored electronic signature.[17] In fact, SOS admits that it never uses

paper signatures obtained through DPS transactions – it uses only previously imaged electronic

---

[15]As B. Schonhoff further explained:

Q: So DLS is the diver's license system, correct?

A: That's what I understand, right.

Q: And how does that system function within that process, the transfer process?

A: It's my understanding that when the operator enters an application into the DLS system and indicates that a person wants to be a registered voter, that information is then warehoused, if you will, at the State, and every night the State groups up those applications and send them – well, we get them as a single file. So depending on – for the DPS applications, I think we actually go pull – they produce the file, and then we go pull it and process it through our system on a daily basis.

Q: What do you mean by "our system"?

A: I'm sorry, the voter registration system, the team database system where we actually part the addresses and give that information out to the voter registrars of the county.

(Docket no. 94-7, deposition of B. Schonhoff, at 68:1-20).

[16]See docket no. 94-8, deposition of S. Gipson (DPS), at 254:4-7 (Q: So DPS was never actually scanning physical ink signatures from paper and then transmitting them to SOS . . . A: No, we were not). See also docket no. 94-10, deposition of J. Crawford (DPS), at 73:17-25 (Q: Does the DLS only store electronic signatures? A: Yes. . . . Q: Sure. Does the DLS only store signatures which are input using the keypad? A: The DLS database itself, yes, it only stores signatures that are collected on those electronic pads); 76:20-21 (Q: Are signature files ever removed from DLS? A: No.); 77:6-16 (Q: If a person's record has more than one signature associated with that record, which signature would be batched and sent to the Secretary of State with the voter extract . . . file? A: The most recently captured one).

[17]See docket no. 94-10, deposition of J. Crawford, at 139:10-21 (Q: [T]he mail-in change of address, the current one . . . [w]ith regard to the batch that's sent to the Secretary of State at night for the voter registration, if the person answers "yes" on their change of address that's mailed in and that's input into DLS, it's the electronic signature that was previously provided the last time that person went in person. That's the signature that goes to the Secretary of State. Is that right? A: Yes, that's correct).

signatures for voter registration purposes.[18] As Keith Ingram, the SOS 30(b)(6) representative, testified:

> Q: So you identified for me or explained to me why – what the electronic signature or the keypad signature at DPS is used for. It's used for the signature that's required in the Texas Election Code. You read me the section. Is that right?
>
> A: That's right.
>
> Q: What's the ink signature on the DPS's physical forms used for as far as voter registration?
>
> A: I don't know. I don't know if it's used for anything. Once they've applied in person at the office, they've signed it electronically.
>
> * * *
>
> Q: On the . . . driver's license forms . . . it says, "By providing my electronic signature, I understand the personal information on my application form and my electronic signature will be used for submitting my voter registration application to the Secretary of State's Office." Correct?
>
> A: That's what it says.
>
> Q. Okay. And so that's indicating to the prospective voter that the electronic signature is what's used as the signature that's compliant with the Texas Election Code?
>
> A: The physical signature that's electronically captured, yes.

---

[18]*See* docket no. 77, appx. 117, admission no. 26 (Defendants admit "that the *information* DPS transmits to SOS about each applicant for voter registration includes a *digital image of the applicant's signature*"); appx. 118, admission nos. 10, 11 (Defendants admit "that individuals are not registered to vote in connection with their interactions with DPS unless they submit an *image of their signature*, either by submitting a signed application by mail, or providing an *electronic image* of their physical signature in person at a DPS location") (emphasis added).

12

Q: Okay. Back to your point about the online transactions not containing a signature, the DPS does use the prior provided electronic signature that – for the driver's license that they – the customer used – provided the last time they were in person. Correct?

A: Presumably, yes.

Q: The same goes for the mail-in change of address transaction – are you looking at your driver's license there?

A: Yeah. Because this one was renewed online, and so I guess that I wrote that signature at their signature capture device quite a while ago. . . .

Q: For the mail-in change of address form that . . . DPS receives that has the voter registration question, there is not an electronic signature or a – use your phrase – the physical signature provided on a keypad provided for that change of address interaction. Correct?

A: No. There's a physical signature on the – on the address change application.

Q: Right. But the information that gets sent on to the voter registrars through the Secretary of State's Office is the data that's pulled from that form and then the electronic signature that was previously provided by the customer in person at a DPS office?

A: That's my understanding, yes.

Q: Well, is that the Secretary of State's understanding?

A: That is the Secretary of State's understanding. You bet.

Docket no. 94-11, appx. 39, 42, deposition of K. Ingram, at 50:1-11; 95:14-97:14.

Sheri Gipson with DPS also testified:

Q: So the signature that is sent for an in-person transaction where someone answers "yes" to the voter registration question and – and similarly when someone changes their address

13

– excuse me – address via the mail, the signature that's sent for both of those voter

registration applications, that's the electronic signature; is that right?

A: That is correct.

Q: And that's sent to the Secretary of State?

A: That is correct.

Q: Okay. The ink signature is never sent to the Secretary of State, correct?

A: That is correct.

\* \* \*

Q: Does anyone go through and compare these two?

A: Not typically, no. . . .

\* \* \*

Q: Okay. So then the mail-in signatures are never compared [with the stored electronic

signatures]. . . .

A: During the routine process, it would never be compared . . . . When I say "routine

process," what I'm talking about is the individual that's processing that mail renewal

application, they would never compare that signature.

Docket no. 77, appx. 69, deposition of S. Gipson, at 203:19-204:7; appx. 79 at 234:25-235:1;

236:19-237:9.

Because preexisting electronic signatures, rather than signatures on paper, are used for

paper (in-person and mail-in) renewal and change of address transactions, it would seem logical

that preexisting electronic signatures would be used for paperless (online) transactions. Yet

Defendants claim that, under Texas law, renewal and change of address transactions performed

online require a signature on paper for voter registration purposes. As Mr. Ingram testified:

14

Q: So in that same way, the online transaction could utilize the previously provided

electronic signature that was provided in person by the customer for the voter registration

application form that gets to the voter registrar in the same way that the change of address

mail-in occurs?

A: It could if the law allowed it, but the law doesn't allow it, so it can't.

Q: What portion of the [Texas] law doesn't allow it?

A: 13.002(b).

Docket no. 94-11, deposition of K. Ingram, at 97:15-24; docket no. 77, appx. 42.

Because Defendants assert that Texas law requires a signature on paper, and a signature on paper

during a paperless transaction is not possible, Defendants essentially claim they should be

excused from compliance with the NVRA when it comes to online renewal and change of

address transactions.[19]

Prior to 2013, a motor voter who engaged in an online/paperless transaction for a driver's

license renewal or change of address would provide the same in-depth identifying information

required for an in-person or mail-in transaction, but when reaching the question of whether he

would like to register to vote or update his voter information, checking the "yes" box would

automatically default to "no." Thus, while the user may have been led to believe that his "yes"

answer would result in updating his voter information, and there was the appearance of

compliance with the NVRA, there was never an intent on the part of DPS or SOS to actually

update the voter registration information. Thus, the answer to the question regarding voter

---

[19]As Ms. Gipson explained, for online transactions, Texas has decided that a previously captured electronic signature is sufficient for driver's license purposes, but they've refused to accept the same electronic signature for voter registration purposes. Docket no. 77, appx. 70, deposition of S. Gipson, at 215:21-216:7.

registration was completely meaningless. SOS was aware of the NVRA requirements. SOS was

also aware that the online voter registration question, programmed to automatically default to

"no," was completely meaningless.[20] As Mr. Ingram testified:

Q: Why is there a voter registration question on the online DPS transaction – application?

Excuse me.

A: Well, I imagine it's because of Section 5 of the National Voter Registration Act of

1993.

Q: Could you elaborate on that a little bit?

A: Sure. The National Voter Registration Act of 1993 required that motor vehicle

agencies, in our case the DPS, whenever a person has a driver's license transaction –

driver's license transaction, that they should simultaneously offer the right – the ability to

update their voter registration or register to vote for the first time. That's why the NVRA

is called the Motor Voter law.

\* \* \*

Q: Okay. So in – back in 2012, the Secretary of State's office was aware that the answer

to the "do you want to register to vote" question online was defaulting to no. Is that

correct?

A: Right.

Q: Was there any – any discussion at that point with the Department of Public Safety to –

to make that change?

---

[20]Or worse, it could have led to voter registration data being purged. Legislative history
suggests that a key concern when enacting the NVRA was abuse of the purging efforts, so
Congress specifically prevented states from removing voters from the rolls for failure to vote or
failure to respond to a change-of-address notification. *See* H.R. Rep. No. 103-9, at 16 (1993),
reprinted in 1993 U.S.C.C.A.N. 105, 120.

16

A: Not that I recall.

Docket no. 77, appx. 40-41, deposition of K. Ingram at 62:4-17; 84:24-85:8.

As explained in Mr. Ingram's deposition, the automatic default to "no" for voter registration was the subject of a 2012 complaint by an unidentified motor voter. Docket no. 77, appx. 41, deposition of K. Ingram at 83:15-85:3. SOS responded: "That is something we can discuss with DPS in the future." Docket no. 77, appx. 41, deposition of K. Ingram at 84:16-18. Mr. Ingram did not recall any subsequent discussions. After some passage of time, DPS did remove the automatic default to "no." Docket no. 77, appx. 41, deposition of K. Ingram at 82:7-13.

Thereafter, until February 27, 2016, Step 5 of the online renewal and change of address interface was changed to prompt the applicant to select "yes" or "no" beneath the statement "I want to register to vote." It no longer defaulted to "no," but selecting "yes" did not provide a simultaneous voter application. Instead, it gave the user a link to the SOS voter registration website for a completely separate application process. Docket no. 77, appx. 118, admission no. 7.

After February 27, 2016, Step 5 of the online renewal and change of address interface was changed to prompt the applicant to select "yes" or "no" to answer the question "Do you want to request a voter application?" Docket no. 77, appx. 118, admission 8, 9. While the online process currently accepts a "yes" answer to the voter application question, the transaction still ends there. The user is still not provided a simultaneous application for voter registration purposes. Instead, when a user responds with a "yes" answer to the voter application question, the user is simply given a website link to the SOS office.[21] *See* Stipulation no. 10, p. 5, *supra*. If the user goes to the

---

[21]*See* Docket no. 77, appx. 45, deposition of K. Ingram at 182:5-10 ("When they select yes to voter reg online, they are merely presented with a link and has no indication of whether or not they actually registered to vote").

17

SOS website, he must request and fill out a completely separate voter registration application as

if there had been no DPS transaction at all.[22] For an in-county change of address, SOS will

handle the transaction but it's still a completely separate process from the DPS transaction. For

an out-of-county change of address, the application must be retrieved, printed, filled out, and

mailed or delivered in person to the county registrar in order to update the voter registration. The

application seeks the same information required by DPS for an online driver's license change of

address but the motor voter must go through a completely different governmental entity (SOS)

with a completely separate application process.[23] Thus, it is indisputable that the online DPS

renewal/change of address transaction and SOS voter registration transaction are not

simultaneous, but rather entirely separate application procedures conducted through separate

agencies.[24] If the motor voter does not take these extra steps – go to the SOS website, request an

---

[22]*See* docket no. 77, appx. 78, deposition of S. Gipson at 136:20-137:21 (the voter registration process "is separate").

[23]*See* Docket no. 94-7, deposition of B. Schonhoff (SOS), at 157:19-158:18 (they would have to fill the same information out twice).

[24]*See* Docket no. 94-7, deposition of B. Schonhoff (SOS), at 159:23-160:11:

Q: Does SOS track information about whether a DPS customer clicks "yes" to the voter registration question on the online application?
A: For the DPS application?
Q: Yes.
A: No, not to my knowledge.
Q: Okay. Does SOS track information about whether a DPS customer using an online diver's license – or filling out an online diver's license application, whether that person clicks through to the SOS website?
A: No to my knowledge.
Q: And why not?
A: It's not our application. It's not our software. It's not our website.

18

application, print out the application, fill out and sign the application, and then mail or hand deliver it to the country registrar – he will not be registered to vote.

Both DPS and SOS claim they cannot comply with the NVRA and integrate DPS online renewal/change of address with SOS voter registration to provide a simultaneous application because the Texas Election Code requires a signature. Docket no. 94-7, deposition of B. Schonhoff, at 195:11-17; *see also* docket no. 94-11 and docket no. 77, appx. 42, deposition of K. Ingram, at 97:15-24. Yet SOS admits that it uses previously stored electronic signatures for *all* voter registration applications that originate with DPS regardless of whether those applications are paper transactions. As Betsy Schonhoff testified:

Q: The signature that Secretary of State is currently using for voter registration applications is an electronic signature that is provided when a person goes in person to a DPS office; is that right?

A: When they are – when they are in the application file, you mean?

Q: Yes, the voter registration application.

A: Yes, It's what they have signed on that signature pad. That's my understanding.

Q: Turning your attention to the mail-in change of address. You acknowledge that the Secretary of State does receive voter registration applications from change of address mail-ins that DPS processes; is that correct?

A: That's correct.

Q: Yes.

A: It is my understanding they treat in-person just like – mail just the same as in person.

Q: But the mail-in – correct me if I am wrong – the mail-in address to the application for update with DPS, the signature that's on that form is not extracted and somehow the

19

Secretary of State gets access to it; is that correct?

A: That's my understanding.

Q: . . . It is your understanding that the current law requires a signature for the voter

registration application.  Do I have that right?

A: Yes.

Q: The mail-in forms that you all are getting information from, from DPS, uses the prior

provided electronic signature from that customer; is that right?

A: That's my understanding.

Docket no. 94-7, deposition of B. Schonhoff, at 195:18-196:25.

Defendants also stipulate that DPS uses electronic signatures for *all* online driver's

license renewal or change of address transactions. Docket no. 94, Stipulation 11 ("The signature

that appears on the license generated as a result of a customer's online driver's license renewal or

change of address transaction is an image of the applicant's physical signature, electronically

captured during the applicant's most recent in-person transaction in a DPS field office (On the

DL-14A and DL-43 forms this is referred to as the applicant's 'electronic signature')").

Defendants admit that they even use electronic signatures for driver's license transactions

conducted over the telephone. *See* docket no. 94-12, deposition of S. Gipson, at 175:2-23

("Telephone transactions are handled in the same manner as an online transaction . . . Q: So

when a customer renews a driver's license on – over the telephone, does DPS use the signature

that was previously on file to – to put on the customer's renewed driver's license? A: Yes.").

Defendants admit that the personal information required for authenticating online

transactions is equal to or even more rigorous than the identifying information used for in-person

20

and mail-in transactions.[25] They also admit there are no technological barriers to simultaneous online transactions. Again, Ms. Schonhoff testified:

> Q: . . . If they send – DPS collects and sends to you, the Secretary of State's office, all of
>
> the information they currently send to you for in-person transactions where the individual
>
> checks "yes," I want to register to vote, they send you all of that same information, the
>
> same data points, the same electronic signature, the TEAM system on your end could
>
> process it in the same way that it currently processes the information that comes for in-
>
> person transactions at DPS?
>
> A: From a technical standpoint?
>
> Q: Yes.
>
> A: That's correct.

Docket no. 94-7, deposition of B. Schonhoff, at 222:9-22.

> And Mr. Ingram also testified:
>
> Q. Well . . . going back to the mail-in change of address with DPS, that information goes
>
> on to the Secretary of State. If someone chooses to register to vote, that signature is
>
> retrieved from DLS and sent on to the Secretary of State. Right?

---

[25]*See* docket nos. 94-8 and 94-12, deposition of S. Gipson (DPS), at 237:16-20 (Q: How does DPS go about verifying the information submitted online for the online change of address or renewal form? A: Again, the only verification that's done there is their log-in credentials); 234:2-9 ("They're ... well, the only thing that they're changing is their address. But they're – they're verifying who they are through the authentication process that occurs up front by providing key pieces of data, which is their . . . name, the driver-license number, date of birth, *the audit number* that's on the card they currently hold, and the last four of their Social.") (emphasis added); 224:12-14 (Q: What about an audit number, is that requested on paper forms? A: No, it's not.). *See also* docket no. 94-9, deposition of E. Hutchins, at 28:4-25; 30:4-31:16; 33:8-34:1 (authentication of users on DPS's online process for driver's license renewal and change of address is done in real-time). *Compare* docket no. 93-8 (in-person); 93-9 (mail-in); and 93-10 (online).

A: It's retrieved from wherever they keep it, yes.

Q: Okay. And, presumably, that same signature could be sent on if the person answered

yes to the voter registration question online?

A: If it was legal to do so. I've already told you I think that's technically possible. You

bet.

Q: Okay. And –

A: And I don't think it would cost a lot of money.

\* \* \*

Q: But the Secretary of State does know that DPS is able to pull the proper signature to

send on for voter registration purposes to the Secretary of State for mail-in change of

address forms?

A: I'm not arguing with you that this is not possible. That is not my argument at all. My

argument is exactly to the contrary. This is a very possible thing to do what you're saying

if it was legal, and it's not legal . . . So I'm not contesting the logistics of it. We can agree

that it's a possible thing to do.

Docket no. 77, appx. 45, deposition of K. Ingram at 184:12-185:1; 186:5-16. *See also* docket no.

94-9, deposition of E. Hutchins, at 99:22-100:2; docket no. 94-10, deposition of J. Crawford, at

142:6-18; 143:12-144:21 (DLS could send all the information it currently obtains to the Secretary

of State's office, and "it could also send the previously provided electronic signature from that

customer, just like it does with a mail-in change of address").[26] While feasible, Defendants refuse

---

[26]When motor voters submit a mail-in a change of address form, a DPS employee
manually inputs all of the responses into the DLS via computer, including the response to the
question of whether he or she would like to register to vote (docket no. 77, appx. 120, RFA 23)
and the stored electronic signature is used. Thus, there is no real distinction in processing of
online transactions and mail-in transactions other than the physical signature on the mail-in form,

22

to use the voter information and technology currently available because they claim the Texas Election Code does not allow the use of previously captured electronic signatures for online transactions – even though they already use them for mail-in and in-person transactions. Plaintiffs disagree with Defendants' legal argument and assert that because SOS uses previously captured electronic signatures for voter registration purposes in all other instances, there is no reason why Defendants cannot use those same electronic signatures for online transactions.

## IV.

### Overview of the NVRA

The NVRA was enacted in 1993 pursuant to Congress's constitutional authority under the Elections clause to "make or alter regulations" which have an effect upon federal elections. U.S. CONST. art. 1, § 4, cl. 1. Specifically, Congress found that –

(1) the right of citizens of the United States to vote is a fundamental right;

(2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

(3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

52 U.S.C. § 20501(a)(1)-(3).

The stated purposes of the Act are –

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

---

which is not compared with the electronic signature, not used for DPS purposes, and not forwarded to SOS for voter registration purposes.

23

(2) to make it possible for Federal, State, and local governments to implement this

chapter in a manner that enhances the participation of eligible citizens as voters in

elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b)(1)-(4).

Based on these findings and for these stated purposes, Congress imposed national

procedures for voter registration for elections for federal office as follows:

(a) In general

Except as provided in subsection (b), notwithstanding any other Federal or State law, in

addition to any other method of voter registration provided for under State law, each State

shall establish procedures to register to vote in elections for Federal office –

(1) by application made *simultaneously* with an application for a motor vehicle driver's

license pursuant to section 20504 of this title;

(2) by mail application pursuant to section 20505 of this title; and

(3) by application in person –

(A) at the appropriate registration site designated with respect to the residence of the

applicant in accordance with State law; and

(B) at a Federal, State, or nongovernmental office designated under section 20506 of this

title.

52 U.S.C. § 20503 (emphasis added).

Section 20504 specifically describes the requirements for a simultaneous application for

voter registration and motor vehicle driver's license:

(a) In general

(1) Each State motor vehicle driver's license application (*including any renewal application*) submitted to the appropriate State motor vehicle authority under State law *shall serve as an application for voter registration* with respect to elections for Federal office unless the applicant fails to sign the voter registration application.

(2) An application for voter registration submitted under paragraph (1) shall be considered as updating any previous voter registration by the applicant.

*   *   *

(c) Forms and procedures

(1) Each State shall include a voter registration application form for elections for Federal office *as part of* an application for a State motor vehicle driver's license –

(2) The voter registration application *portion* of an application for a State motor vehicle driver's license –

(A) *may not require any information that duplicates information required in the driver's license portion of the form* (other than a second signature or other information necessary under subparagraph (C));

(B) may require only the minimum amount of information necessary to –

(i) prevent duplicate voter registrations; and

(ii) enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(C) shall include a statement that –

(i) states each eligibility requirement (including citizenship);

(ii) contains an attestation that the applicant meets each such requirement; and

25

APPENDIX 230

(iii) requires the signature of the applicant, under penalty of perjury;

\* \* \*

(d) Change of address

Any change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license *shall serve as notification of change of address for voter registration* with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes.

52 U.S.C. § 20504 (emphasis added).

Section 20506(a)(5)(C) further states that "A person who provides service . . . shall not . . . "take any action the purpose or effect of which is to discourage the applicant from registering to vote."

And finally, Section 20510 provides civil enforcement by the Attorney General and a private right of action for any person "who is aggrieved by a violation of this chapter," 52 U.S.C. § 20510(a)-(b), and the "rights and remedies . . . are in addition to all other rights and remedies provided by law," 52 U.S.C. § 20510(d).

The notice provision in § 20510(b) further states:

(1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election officials of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect

26

to the violation.

(3) If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

52 U.S.C. § 20510(b)(2)-(3).

V.

Analysis

The Court will first address the issues that Defendants have raised in their defense, and will then address the merits of Plaintiffs' case.

A.    Statutory standing/notice

Defendants claim that Plaintiffs lack statutory standing for failure to comply with the notice provision in the NVRA, 52 U.S.C. § 20510. On May 27, 2015, Plaintiffs' counsel sent a notice letter on behalf of Benjamin Hernandez and others explaining in detail the applicable law, the NVRA violation made the basis of this lawsuit, and why the complainants believed their rights were being violated. Docket no. 77, appx. 2. On October 23, 2015, Plaintiffs' counsel sent a supplemental notice letter on behalf of Jarrod Stringer, explaining how the continuing violation affected him and urging correction and compliance. Docket no. 77, appx. 23. On November 18, 2015, a second supplemental notice letter was sent on behalf of Dr. Woods, explaining his experience and urging compliance with NVRA mandates and correction of the continuing violations with online transactions. Docket no. 77, appx. 26. Defendants refer to the letters as "purported notice" and claim that Plaintiffs "have not complied with the NVRA's mandatory notice provision." Docket no. 82, pp. 2, 11. But Defendants do not explain why the letters should be considered ineffective for notice purposes. The statute merely requires that "a person who is

27

aggrieved by a violation of this chapter may provide written notice of the violation." 52 U.S.C. § 20510(b)(1). This requirement has been satisfied.

In response to the notice letters, the parties exchanged several written communications over a six month period, met in person, and attempted to work out the non-compliance issues raised in the notice letters.[27] Plaintiffs did ultimately get registered to vote, but Defendants disagreed with Plaintiffs about what the NVRA requires and refused to take the steps that Plaintiffs contend are required by the NVRA to cure the underlying violations. Plaintiffs filed this lawsuit on March 14, 2016, more than 90 days after receipt of notice and an opportunity to correct the violations. Docket no. 1.[28]

Defendants rely on *Scott v. Schedler*, 771 F.3d 831 (5th Cir. 2014), for the proposition that they cannot be sued if the aggrieved person is registered to vote within 90 days after notice of a violation.[29] Neither the NVRA nor the holding in *Scott* supports this broad proposition, and Defendants' argument ignores the underlying violations that occurred when Plaintiffs were not provided simultaneous voter registration applications as required by the NVRA. In the *Scott* case, the individual plaintiff, Luther Scott, Jr., never sent a notice letter. The NAACP sent a notice letter to the Louisiana SOS, but never mentioned Scott. On appeal, Scott admitted that he himself did not provide notice but claimed notice was not required from him personally because the NAACP provided notice. Without reaching the merits of Scott's claim, the Fifth Circuit held that

[27]Docket no. 77, appx. 99; admission no. 23.

[28]More than two years has now passed. The online process has still not changed and Defendants have indicated a refusal to make any changes.

[29]Docket no. 82, p. 2 ("Plaintiffs lack statutory standing because it is undisputed that – following their purported 'notice' letters to the State – Defendants offered their assistance in confirming each Plaintiffs' voter registration and assisting any Plaintiff that wanted to update his information.").

"Scott's failure to provide notice is fatal to his suit." *Scott*, 771 F.3d at 836.

Plaintiffs in this case did not fail to provide notice and Defendants have not corrected the violations made the basis of Plaintiffs' complaint. Defendants' broad assertion – that offering registration assistance after receiving notice excuses the prior/ongoing violation, strips the plaintiff of standing, and precludes suit regardless of the nature of the violation – ignores the mandates of the NVRA, the facts and holding in the *Scott* case, and the facts and underlying violations in this case.[30] Plaintiffs have complied with the statutory notice requirements and have standing to pursue their claims under the NVRA.[31]

---

[30]In the *Scott* case, the individual plaintiff (who was intermittently homeless) complained that he was not given a voter registration form when he visited the Louisiana Department of Children and Family Services (LCFS) in person. 771 F.3d at 833. Scott did not give written notice and his claim was dismissed on that basis alone. *Id.* ("We dismiss Scott's claim on standing and notice grounds."). The LCFS did try to provide Mr. Scott with voter registration forms in an attempt to cure the alleged violation which the Fifth Circuit noted, in *dicta*, was the sort of response that pre-litigation notice was meant to encourage. *Id.* at 836. At the same time, the Fifth Circuit considered the NAACP's claims which alleged violations far broader than the narrow focus of Scott's individual claim and which the defendants had failed to cure after receiving notice. In this case, Plaintiffs have complained that they were deprived of their statutory right to a *simultaneous* voter registration application during their online transactions with Texas DPS. In other words, Defendants failed to treat their online driver's license applications as simultaneous voter registration applications and required them to subsequently submit duplicate information for voter registration that was separate and apart from information submitted during their driver's license transactions. *See* docket no. 1. Defendants were given pre-litigation notice, but the violations in issue – which are rooted in the failure to provide *simultaneous* voter registration applications during online transactions – have not been cured and Defendants have not demonstrated a willingness to cure the violations. *See Scott*, 771 F.3d at 836 (discussing futility argument when there is no demonstrated desire to comply with the NVRA).

[31]Defendants also cite *Georgia State Conference v. Kemp*, 841 F. Supp. 2d 1320 (N.D. Ga. 2012) for the proposition that "attempt[ing] to comply" with the relevant NVRA provisions after receiving notice, if "more than an empty gesture," precludes litigation. Docket no. 88, pp. 6-7. The violation in *Kemp* was the systemic failure to provide voter registration to persons seeking public assistance. Simultaneous voter registration was honored for persons obtaining a hunting, fishing, or trapping license, but not for persons seeking public assistance benefits. The court found that the plaintiffs had stated a viable claim. Moreover, the court found all plaintiffs – with the exception of Mr. Murphy – had complied with the notice provision. "Murphy's particular situation was not made known to the defendants until they were served with the amended

29

## B.    Article III standing/mootness

To establish Article III standing, a plaintiff must show an "injury in fact" that is concrete, particularized, and actual or imminent, not conjectural or hypothetical; that the injury is "fairly traceable" to the challenged conduct of the defendant; and that it is likely, not merely speculative, that the injury can be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 180-81 (2000). Here, Plaintiffs were deprived of their individual right to simultaneous voter registration applications at the time they engaged in the online DPS transactions to change their driver's licenses. Plaintiffs would have been properly registered to vote in time for the following election if Defendants had complied with the NVRA. The violation itself and the resulting disenfranchisement is fairly traceable to Defendants' noncompliance with the NVRA. Plaintiffs have articulated and shown an individualized dispute, rather than a generalized complaint. Court-ordered compliance with the NVRA would prevent repetition of the same injury to Plaintiffs and others.

Defendants claim that their offer of assistance in updating Plaintiffs' voter information

---

complaint." 841 F. Supp. 2d at 1335. Thus, Murphy did not have standing. The court did note that Georgia attempted to comply "with regard to Mr. Murphy" but that was not the basis for dismissal. Instead, Mr. Murphy's claim was dismissed for failing to comply with the notice requirement. *Id.* at 1335-36. The court refused to dismiss the remaining claims because the other plaintiffs did provide notice, their claims were much broader, and Georgia's "efforts" to change its practices were insufficient to render the controversy moot. *Id.* at 1338-39. In this case, Plaintiffs have satisfied the notice requirement and Defendants have refused to modify their practices. The NVRA plainly states that a violation must be "corrected," not just attempted. 52 U.S.C. § 20510(b)(2). In this case, Plaintiffs were *subsequently* provided voter registration applications, but they were not provided *simultaneous* applications as required by the NVRA. The failure to provide Texans with simultaneous applications during online DPS transactions still persists. The State has refused to correct the violations made the basis of Plaintiffs' complaint and, based on the deposition testimony of SOS and DPS officials, they have no plans to correct the violations being asserted herein.

and/or confirming their registration status after the violation renders this controversy moot. But Defendants were simply providing the assistance that they are required by law to provide to voters. *See* 52 U.S.C. § 20506 (a)(4)(A),(6)(C) (A voter registration agency shall provide assistance to each applicant in completing voter registration forms unless the applicant refuses such assistance). And compliance with one provision of the law does not render moot violations of other provisions of the law. The underlying violations that form the basis of Plaintiffs' complaint have not been corrected and continue unabated. The DPS online renewal and change of address transactions do not serve as "simultaneous" applications for voter registration, in violation of 52 U.S.C. §§ 20503(a)(1), 20504(a)(1); the separate SOS voter registration process is not "part of" the DPS online driver's license transaction, as required by 52 U.S.C. § 20504(c)(1); information required by SOS for a separate voter registration transaction "duplicates" the information required by DPS for an online renewal or change of address transaction, in violation of 52 U.S.C. § 20504(c)(2)(A); and the online change of address transaction does not "serve as notification of change of address for voter registration," as required by 52 U.S.C. § 20504(d). These are the violations that form the basis of Plaintiffs' complaint and these violations have not been corrected despite notice and the ability to do so.

Defendants' mootness argument also overlooks the two-fold nature of Plaintiffs' cause of action. Plaintiffs contend that the State's online process itself is unlawful under the NVRA; thus, they allege not only disenfranchisement, but also a violation of the statutory right to a simultaneous application for both voter registration and driver's license renewal and change of address. Defendants' assertion – that post-notice voter registration assistance effectively cures any NVRA violation – ignores the clear mandates of the NVRA. The lack of voter registration and resulting disenfranchisement were merely the symptoms of the underlying violation, and

31

treating the symptoms does not cure the underlying violation. Thus, the controversy is not moot just because Plaintiffs were ultimately registered to vote.

Defendants also argue that Plaintiffs' injuries are not redressable and their claims are moot because they were disenfranchised only in past elections and the "capable of repetition" exception to mootness does not apply because there is not a reasonable expectation that Plaintiffs will be disenfranchised in this manner in the future. Voting-related lawsuits do not become moot just because an election has passed. *Ctr. for Indiv. Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006) ("Controversy surrounding elections laws . . . is one of the paradigmatic circumstances in which the Supreme Court has found that full litigation can never be completed before the precise controversy (a particular election) has run its course."). Because this controversy is not moot, the case does not necessarily turn on the "capable of repetition" exception to mootness. But this is exactly the type of violation that is capable of repetition yet evading review. *See Spencer v. Kemna*, 523 U.S. 1, 17-18 (1998) (the doctrine applies when the challenged action is in its duration too short to be fully litigated prior to cessation or expiration and there is a reasonable expectation that the same complaining party will be subject to the same action again). Defendants have refused to change their online process to allow simultaneous voter registration applications. Thus, if these Plaintiffs (or others) were to relocate tomorrow, and engage in an online DPS transaction to change their address, they would be deprived of their right to simultaneously change their voter registration information. And unless these Plaintiffs (or others) took further steps on their own, which the NVRA protects *against*, they would be disenfranchised.[32] Thus, whether the focus is on these particular Plaintiffs or others, the same

---

[32]The mandates of the NVRA dictate exactly the opposite of what Defendants want Texans to do to personally ensure they are registered to vote: engage in a second transaction that requires a separate application with duplicate information and the burden of downloading, printing, and mailing or personal delivery. Congress lifted these burdens to make voter

32

injury is likely to occur again. *See Carmouche*, 449 F.3d at 662 (citing *Storer v. Brown*, 417 U.S. 926 (1974) and *Dunn v. Blumstein*, 403 U.S. 330 (1972) for the proposition that a case is not moot if other individuals will be affected by the action being challenged). When a controversy is truly moot, there is nothing left to remedy. In this case, Defendants' noncompliance with the NVRA has continued unabated, and although resulting disenfranchisement may cease prior to a remedy, the challenged action continues.

Defendants further argue that Plaintiffs have failed to establish Article III standing because their injuries stem from their own failure to take the extra steps to print, complete, and mail paper voter registration forms through SOS as instructed in their online driver's license transactions with DPS. The irony of this argument does not go unnoticed. In sum, Defendants claim that Plaintiffs and others should never have Article III standing to sue for the State's noncompliance with the NVRA if they do not follow the State registration process that allegedly violates the NVRA. As Plaintiffs explained in their deposition testimony, they believed their change of address transaction for driver's license purposes also served to update their voter registration. They showed up at the polls to vote in the following election only to discover that their registration had not been updated. Even if they did not complete the SOS registration process (which they believed they had done), the failure to complete the extra steps put in place by the State does not strip them of Article III standing to pursue a claim under federal law. Nothing in the NVRA requires Plaintiffs or others to exhaust a state process before pursuing a federal claim – especially when the state process itself is alleged to violate the federal law being enforced.

---

registration easier, yet Defendants ignore the NVRA mandate and impose requirements which result in disenfranchisement if voters do not jump through all the hoops.

APPENDIX 238

Defendants rely upon the holding of the Fifth Circuit in *Westfall v. Miller*, 77 F.3d 868 (5th Cir. 1996). In that case, the court found a lack of standing because the plaintiff was challenging a federal requirement that he obtain law enforcement certification before being permitted to purchase a machine gun and he unsuccessfully sought certification from some, but not all, of the officials who could provide it. *Id.* at 871. *Westfall* is distinguishable because the plaintiff therein was challenging a federal regulation that required a specific process. In this case, Plaintiffs are not challenging the NVRA; they are seeking to enforce it. And the state process that Plaintiffs are challenging is not a federal process that the NVRA requires. Instead, the NVRA mandates *against* the state process. Again, Defendants' argument that Plaintiffs are responsible for their own injury because they failed to complete the State's registration process overlooks Plaintiffs' claim that the State's registration process is itself unlawful, and thus they allege not only disenfranchisement, but also a violation of their federal right to "[s]imultaneous application for voter registration and . . . driver's license[.]" 52 U.S.C. § 20504. This statutory injury remains cognizable regardless of whether Plaintiffs completed the state registration process that they challenge under federal law. *See Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1549 (2016), *as revised* (May 24, 2016) ("Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before."); *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 552 (5th Cir. 2016) ("[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing."); *ACORN v. Fowler*, 178 F.3d 350, 363 (5th Cir. 1999) (the NVRA's private right of action "extend[s] standing under the Act to the maximum allowable under the Constitution"); *Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) ("Even though they were ultimately not prevented from voting, an injury like theirs [being erroneously identified as a non-citizen and removed from the voter rolls] is sufficient to confer standing.");

*Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) ("A plaintiff need not have the franchise wholly denied to suffer injury.").

C.      Dr. Woods' standing

Defendants also claim that Dr. Woods does not have standing individually to pursue a claim under the NVRA because he was disenfranchised only in the 2015 election and the ballot did not include any federal contests.[33] This standing argument against Dr. Woods individually may present a closer question than the standing challenges against Plaintiffs collectively. In *Broyles v. Texas*, 618 F. Supp. 2d 661, 690-92 (S.D. Tex. 2009) the district court found the NVRA inapplicable because the plaintiffs therein complained about irregularities in a municipal special purpose election. The plaintiffs in *Broyles* did not allege or present "any evidence of registration problems that affected their right to vote in a federal election or on any issue beyond the [municipal] incorporation issue." *Id.* Although the *Broyles* court found that the NVRA did not apply, it did explain that even if the NVRA did apply to municipal registration issues, the plaintiffs therein did not satisfy the prerequisite notice requirement. *Id.* at 691. They waited until after the municipal incorporation vote and then simply filed suit. 618 F. Supp. 2d 691 ("the 'notice' came in the form of a Summons and Original Complaint").

The Court believes that deciding this issue based on whether a subsequent election is state or federal and whether the plaintiff was disenfranchised in whole or in part is inconsistent with traditional notions of standing. First, the NVRA's private right of action "extend[s] standing under the Act to the maximum allowable under the Constitution." *ACORN v. Fowler*, 178 F.3d at 363. Second, the presence of one party with standing is sufficient to satisfy Article III. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n. 2 (2006); *Texas v. U.S.*,

---

[33]It is undisputed that both Stringer and Hernandez were disenfranchised in 2014, a federal election year. Thus, although Defendants repeatedly refer to "Plaintiffs" in making this argument, it applies only to Dr. Woods.

APPENDIX 240

787 F.3d 733, 747 (5th Cir. 2015). Third, a threat of impending injury is sufficient to satisfy Article III standing. *See Wendt,* 821 F.3d at 552 ("[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing"). Here, Plaintiffs have presented undisputed evidence of violations and immediate injury (a failure to provide *simultaneous* applications for voter registration) that occurred *at the time* of their online DPS transactions. They complied with the NVRA pre-litigation notice requirements but Defendants failed to take the necessary steps to cure the statutory violation and come into compliance. The threat of injury to Plaintiffs and others continues because Defendants have refused to alter their practices.

The statutory violation and requisite injury occurred at the moment Dr. Woods was denied a simultaneous voter registration application. This should be sufficient to confer standing. Later disenfranchisement (regardless of the nature of the election) furthered the injury, but the violation and immediate injury had already occurred during the online transaction with DPS. NVRA expressly reminds us that "it is the duty of the Federal, State, and local governments to promote the exercise of [the fundamental right to vote]." 52 U.S.C. § 20501(a)(2). And it is the duty of "Federal, State, and local governments to implement this chapter . . .". 52 U.S.C. § 20501(b)(2). The State of Texas has combined state and federal voter registration; thus, the ability to vote in state and local elections will be affected by any federal violation in the registration process. *See ACORN v. Miller*, 129 F.3d 833, 837 (6th Cir. 1997) (explaining that NVRA registration requirements will affect state and local elections). More importantly, there is nothing in the NVRA stating that a voter must be disenfranchised in a federal election before they can bring an enforcement action. In fact, nothing in the NVRA states that a voter must be disenfranchised at all. *See* 52 U.S.C. § 20510 (b)(1) ("A person who is aggrieved *by a violation of this chapter* . . ."). The courts have recognized organizational plaintiffs' standing under the

APPENDIX 241

NVRA to sue states with unlawful registration procedures and they do not require the organizational members to be disenfranchised. *See, e.g., Scott*, 771 F.3d at 837 (standing conferred because organization expended resources on voter register drives outside public assistance agencies); *Fowler*, 178 F.3d at 360-61 (same). To require more from an individual voter like Dr. Woods who personally went through the process is inconsistent with the plain language of the statute and basic principles of standing.

      D.     Waiver of immunity

      Defendants also assert that Plaintiffs have failed to validly invoke the NVRA's limited waiver of immunity and are not entitled to bring an action under the *Ex parte Young* exception to immunity.

      The NVRA imposed voter registration requirements on the states to ensure that all practical barriers that make voter registration more restrictive or inconvenient are removed. More than thirty years later, there are states that still refuse to comply with its mandates. Congress's abrogation of immunity under the NVRA is clear and unequivocal. When a state fails to comply with the Act, the Act authorizes judicial intervention. The Attorney General can seek declaratory or injunctive relief, and the Act establishes a private right of action for individuals aggrieved by a violation who meet the Act's notice requirement. 52 U.S.C. § 20510(a),(b). Defendants admit that they "each play a part in implementing the NVRA in Texas." Docket no. 82, p. 4. SOS is chief election officer, and DPS is a voter registration agency. *Id.* As such, they may be sued in any enforcement action arising from violations. The evidence in this record clearly shows that Plaintiffs met the Act's notice requirement and gave Defendants an opportunity to cure. This private enforcement action is now appropriately before the Court. Moreover, the Supreme Court has long recognized Equal Protection claims of this nature against state officials tasked with carrying out laws that affect the rights of voters. *Crawford v. Marion*

*County*, 553 U.S. 181 (2008) (Equal Protection claim against the Indiana Secretary of State and others challenging state voter ID law); *Burdick v. Takishi*, 504 U.S. 428 (1992) (voter's Equal Protection claim against Hawaii Director of Elections and others challenging state write-in voting prohibition).

      E.      Renewal v. change of address

Defendants also allege that Plaintiffs' challenge should be restricted to online change of address transactions, not online renewal transactions, because Plaintiffs' transactions were for a change of address rather than renewal. However, this argument seems to go to the underlying reason for the transaction, rather than the lawfulness of the process being challenged. Regardless of whether a Texan seeks to change his address or renew his driver's license online, the process is the same and the outcome is the same. DPS uses the same website (Texas.gov) and the same "Driver's License Renewal and Change of Address" system, which authenticates users, detects eligibility, and processes data in the same manner for both renewals and changes of address. Docket no. 94-9, deposition of E. Hutchins, at 30:4-31:16; 33:8-34:1; docket no. 94-12, deposition of S. Gipson, at 37:10-16 (the process is combined online, "it's one system interface"); docket no. 93, website links and exh. A-1, A-2, A-10 (DPS/Driver's License Division online process for driver's license renewal and/or change of address). Neither type of transaction, using the same online process, allows simultaneous applications for voter registration as required by the NVRA. Docket no. 94-12, deposition of S. Gipson, at 37:10-40:5. Given that Defendants have chosen to combine the online process and use the same system for both change of address and renewal transactions, a change in programming to allow online simultaneous voter registration would mean a change for both types of transactions. Likewise, an NVRA violation in online change of address transactions imputes a violation in online renewal transactions because Defendants admit that the online process (which encompasses both) does

38

not allow simultaneous voter registration. Having combined the online process for both types of transactions, both types of transactions fall within the same mandates under 52 U.S.C. §§ 20503(a)(1) and 20504 and will be affected by any relief granted herein. *Accord Miller*, 129 F.3d at 837 (the State chose, as a matter of convenience, to implement one voter registration process for federal, state, and local elections; thus, the registration obligations imposed by the Act affect registration procedures associated with state and local elections). For these reasons, the issue to be examined is whether DPS's online process for driver's license renewal and change of address violates the NVRA by failing to allow simultaneous applications for voter registration.

In sum, the jurisdictional challenges and defenses raised in Defendants' motion for summary judgment are virtually identical to those raised in their motion to dismiss, which the Court previously denied. Docket no. 52. Nothing in the law or the record compels a different conclusion at this stage of the proceedings.

F.      Merits of the NVRA claims

First, Plaintiffs contend Defendants have violated and continue to violate the NVRA by failing to provide simultaneous applications for voter registration during online driver's license transactions. Second, Plaintiffs contend Defendants have violated and continue to violate the NVRA by requiring motor voters who use the online process to take additional steps to update their voter registration and separately submit information through a different transaction with a different agency that duplicates information required in the driver's license transaction. And third, Plaintiffs allege that Defendants have violated the NVRA by failing to ensure eligible applicants are registered to vote and to transmit voter registration information submitted online to the appropriate State election official within the statutorily required timeframe. Docket no. 1, pp. 15-17.

APPENDIX 244

1.      Statutory interpretation

Because the parties disagree on the meaning of some of the applicable provisions in the

NVRA, the Court is guided by the governing principles of statutory construction. The first step is

to determine whether the statutory text, when considered in context, is plain and unambiguous. If

the statutory language is plain, the Court must enforce it according to its terms. *King v. Burwell*,

135 S.Ct. 2480, 2489 (2015) (citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251

(2010)). "[O]ftentimes the "meaning – or ambiguity – of certain words may only become evident

when placed in context." *Id.* (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120,

132 (2000)). "So when deciding whether the language is plain, we must read the words 'in their

context and with a view to their place in the overall statutory scheme.'" *Id.* (quoting, in part,

*Brown & Williamson*, 529 U.S. at 133). "Our duty, after all, is 'to construe statutes, not isolated

provisions.'" *Id.* (quoting, in part, *Graham County Soil and Water Conservation Dist. v. United

States ex rel. Wilson*, 559 U.S. 280, 290 (2010)). "A provision that may seem ambiguous in

isolation is often clarified by the remainder of the statutory scheme . . . because only one of the

permissible meanings produces a substantive effect that is compatible with the rest of the law."

*King v. Burwell*, 135 S.Ct. at 2492 (quoting *United Sav. Assn. of Tex v. Timbers of Inwood

Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988)). The Court cannot interpret a federal statute in

a manner that negates its own stated purpose. *See id.* at 2495; *see also New York State Dept. of

Social Servs. v. Dublino*, 413 U.S. 405, 419-20 (1973).

2.      The NVRA applies to motor voter transactions conducted online

The requirements in the NVRA clearly apply to online transactions (also known as

electronic, remote, or internet transactions). There is nothing in the statute that expressly or

impliedly excludes online transactions; instead, the plain language of the NVRA indicates that it

applies to all transactions. *See* 52 U.S.C. §§ 20504 (a)(1) ("*Each* State motor vehicle driver's

license application . . .") and (d) ("*any* change of address form . . .") (emphasis added). Numerous courts have determined that the NVRA applies to online or remote transactions with the same force as it applies to in person and mail transactions. *See, e.g.*, *Action NC v. Strach*, 216 F.Supp. 3d 597, 622-23 (M.D.N.C. 2016) ("[the] words 'each' and 'any' as used in NVRA provision requiring that each state motor vehicle driver's license application serve as application for voter registration and that any change of address form submitted shall serve as notification of change of address for voter registration were unambiguous and reflected Congress' intent to make the NVRA applicable to 'each' and 'every' covered transaction, irrespective of whether the transaction occurred remotely or in person"); *Kemp*, 841 F. Supp. 2d at 1331-32 (explaining that the NVRA cannot be read to cover only in-person transactions and Georgia's limited interpretation and implementation that excluded internet transactions conflicted with its acknowledgment that noncompliance likely led to decline in voter registration as more applicants prefer to apply remotely).

Defendants have not argued that the NVRA does not apply to online or remote transactions. In fact, they have admitted that compliance with the NVRA is required for online transactions. *See* docket no. 77, appx. 65, deposition of S. Gipson (DPS), at 94:5-12 (Q: Why does DPS include a voter registration question during the online renewal and change of address portion? A: So it is part of the plan between the Secretary of State and Department of Public Safety in compliance with the voter registration question being combined as part of the application process for a diver license or ID"); 95:5-15 (Q: What requires you to do that? A: ... basically the NVRA and Chapter 20 of the Election Code and Texas Statute.); docket no. 94-8, deposition of S. Gipson at 136:20-23 (Q: Why does DPS require customers to answer that question if they don't even retain the answer? A: The – because we need to offer them the availability of the application); docket no. 94-11, deposition of K. Ingram (SOS), at 62:4-8 (Q:

APPENDIX 246

Why is there a voter registration question on the online DPS transaction – application? . . . A:

Well, I imagine it's because of Section 5 of the National Voter Registration Act of 1993. Q:

Could you elaborate on that a little bit? A: Sure. The National Voter Registration Act of 1993

required that motor vehicle agencies, in our case the DPS, whenever a person has a driver's

license transaction – driver's license transaction, that they should be simultaneously offered the

right – the ability to update their voter registration or register to vote for the first time. That's

why the NVRA is called the Motor Voter law."). Yet Defendants' compliance with the NVRA

falls short when it comes to online transactions. Texans have repeatedly complained about DPS's

failure to process voter registration information through its online system, but Defendants still

refuse to correct the deficiencies. Thus, rather than furthering the purpose of the NVRA by

"establish[ing] procedures that will increase the number of eligible citizens who register to

vote,"[34] the State is thwarting the efforts of Texans who wish to register to vote.

    3.      The "simultaneous application" requirement

    Congress was not subtle about requiring DPS, a voter registration agency, to provide a

simultaneous application for voter registration. The terms are used more than once in the statute,

and its plain meaning is clear and unambiguous. Section 20503, titled "National procedures for

voter registration for elections for Federal office," directs that "each State shall establish

procedures to register to vote . . . by application made *simultaneously* with an application for a

motor vehicle driver's license." 52 U.S.C. § 20503(a)(1). Defendants do not dispute the meaning

---

[34]52 U.S.C. § 20501(b)(1)

42

of "simultaneous," which is defined as "existing or occurring at the same time; exactly coincident,"[35] or "happening or existing at exactly the same time,"[36] or "occurring, operating, or done at the same time."[37]

Section 20504, titled "*Simultaneous* application for voter registration and application for motor vehicle driver's license" explains this requirement as one simultaneous application form that serves dual purposes – driver's license and voter registration. This section, when read in context, not only requires that the applications be simultaneous, but discusses them in terms of a single transaction. Under subsection (a), each State motor vehicle driver's license application "(*including any renewal application*) . . . *shall serve as an application for voter registration*" and "[a]n application for voter registration . . . *shall be considered as updating any previous voter registration by the applicant*." Under subsection (c), "[e]ach State shall include a voter registration application form . . . *as part of* an application for a State motor vehicle driver's license," and the "voter registration application *portion* of an application for a State motor vehicle driver's license . . . may not require any information that duplicates information required in the driver's license *portion* of the form*.* " 52 U.S.C. § 20504(a),(c). Under subsection (d), "[a]ny change of address form" . . . for purposes of a State motor vehicle driver's license *shall serve as notification of change of address for voter registration* . . . unless the registrant states on the form that the change of address is not for voter registration purposes." 52 U.S.C. § 20504(d).

Defendants seem to have a clear understanding of what the statute requires, yet they distort the statutory language in the interpretations they propose. For example, Mr. Ingram with SOS testified that "the NVRA requires a simultaneous opportunity to register to vote." *See*

---

[35]https://www.merriam-webster.com/dictionary/simultaneous

[36]https://dictionary.cambridge.org/us/dictionary/english/simultaneous

[37]https://en.oxforddictionaries.com/definition/simultaneous

APPENDIX 248

docket no. 77, appx. 40, deposition of K. Ingram, at 63:15-16; 64:24-25; *see also* appx. 113, RFA no. 4 (inserted the word "opportunity" when asked to admit their legal obligations under the NVRA). Defense counsel uses the same "simultaneous opportunity" argument in their briefs. But the NVRA plainly and unequivocally requires DPS, a voter registration agency, to provide a simultaneous application – not merely a "simultaneous opportunity" to go through a second duplicate application process with SOS. "Opportunity" could mean many things, but we do not need to speculate about what it means because the NVRA does not use that term. Likewise, Ms. Gipson testified that DPS "need[s] to offer them the availability of the application." Docket no. 94-8, deposition of S. Gipson, at 136:20-23. But the NVRA requires more than simply making voter registration applications "available." Again, making applications "available" could mean many things but the NVRA does not use that term. The operative terms in the NVRA are much more commanding and specific: it clearly and unequivocally requires a "simultaneous application" with DPS (the voter registration agency), not a mere "opportunity" to go through a wholly separate, non-simultaneous application process with SOS. If the Court were to accept the argument that DPS can simply direct Texans to SOS to obtain, fill out, sign, and mail in or deliver in person a wholly separate voter registration form, the language in the NVRA would be rendered meaningless. Plaintiffs are correct in their assertion that the central fact of this case has never been disputed: when eligible Texans update their driver's licenses online with DPS, they are not provided a simultaneous application to register to vote or update their voter registration information. The NVRA's requirement that DPS, a voter registration agency, provide a simultaneous application for both driver's license and voter registration purposes is plain and unambiguous and the facts in the record confirm that Texans are being deprived of this statutory right. Docket no. 77, appx. 118, admission no. 8 (Defendants admit that now when applicants reach Step 5 of the online process, they are asked "Do you want to request a voter application?");

admission no. 11 (Defendants admit that if an eligible voter checks "yes" under the question "Do you want to request a voter application?," they are not registered to vote . . . unless they submit an image of their signature, either by submitting a signed application *by mail*, or providing an electronic image of their physical signature *in person* at a DPS location) (emphasis added); appx. 121, admission no. 9 (Defendants admit that a "Yes" answer during an online transaction is never entered as a response in the Voter Field for purposes of forwarding the information to SOS); appx. 123, admission nos. 21, 23 (Defendants admit that when an eligible voter who updates his or her driver's license information on the current DPS website responds "yes" under the statement "Request a voter registration application," DPS does not transfer his or her data to SOS); appx. 96, admission no. 8 (Defendants admit that an eligible voter who changes the address on her non-commercial Texas driver's license online must submit a signed voter registration application *in person or by mail* in order for his voter registration information to be updated. The DPS and Texas.gov online interface links such voters to an application they may *print out, sign, and mail*, and also gives such voters the *option to request that a voter registration application be mailed to them*, postage paid, and contains language indicating that the *separate form* must be filled out in order to complete the voter's registration) (emphasis added); appx. 98, admission no. 12 (information voters submit to the DPS change of address online portal relating to voter registration is not transmitted to SOS); *see also* docket no. 77, appx. 33, DPS Voter Inquiry Web Portal (informing the public that online registration is not possible, and persons seeking voter registration must print, sign, and deliver the application to the voter registrar in their county); appx. 133, driver's license renewal and change of address receipt (showing that a separate voter registration application may be requested). Thus, it is clear that Defendants are violating 52 U.S.C. §§ 20503 and 20504 by failing to comply with the simultaneous application requirement.

4.    The duplicate information prohibition

To further the simultaneous application requirement, Congress saw fit to prohibit the states from requiring duplicate information. The prohibition against duplicate information is plain and unambiguous, leaving no room for argument as to its meaning. Section 20504(c)(2)(A) clearly states that "[t]he voter registration application portion of an application for a State motor vehicle driver's license may not require any information that duplicates information required in the driver's license portion of the form." This prohibition reinforces the simultaneous application requirement because an application that is truly simultaneous does not require duplication. On the other hand, any process that requires duplication of information is an indication that the voter registration "portion" of an application for a State motor vehicle driver's license is not truly simultaneous. The NVRA does permit states to seek a "minimum amount" of additional information that may be necessary for "State election officials to assess the eligibility of the applicant" for voter registration purposes. 52 § 20504 (c)(2)(B),(C). But the minimum information necessary to verify voter registration eligibility cannot duplicate the information already provided for driver's license purposes. For example, some states do not require citizenship to obtain a driver's license, so those states could include a citizenship question in the voter registration portion of the application without violating the duplicate information prohibition. But Texas DPS requires an applicant to answer a citizenship question for driver's license purposes; thus, another duplicate question about citizenship for voter registration purposes would violate this prohibition.

Defendants' violation of the duplicate information prohibition is indisputable, and has continued unabated. Defendants admit that none of the information in the online application for driver's license renewal or change of address is used for voter registration purposes. At the end of the DPS transaction, a "yes" answer does not mean that the information already provided will

46

be used for voter registration purposes pursuant to the NVRA. Instead, the DPS transaction ends, none of the information already provided is forwarded to SOS, and the user is directed to SOS for an entirely separate voter registration application that requires the same information already provided to DPS in the driver's license transaction. It is a separate and distinct transaction with a separate office (SOS) which requires a separate and distinct application with duplicate information. Docket no. 77, appx. 96, admission no. 8 (Defendants admit that upon completion of the DPS transaction, a voter must follow the link to SOS and then "request that a voter registration be mailed to them . . . and [the portal] contains language indicating that the separate form must be filled out in order to complete the voter's registration"); appx. 132 (change of address transaction informs users that their DPS transaction does not register them to vote and they must follow link to SOS website where a separate voter application form can be downloaded or requested); appx. 134 (separate voter registration application provided by SOS that must be printed, signed, and mailed); docket no. 93, exh. A-3 (same); exh. A-4 (SOS information page explaining: a) voter registration application forms can be accessed online through SOS (not DPS, the voter registration agency); b) the application can be filled out on the computer, printed, and mailed to the voter registrar in the voter's county of residence; and c) informing voters that they will not be registered until all steps are completed); docket no. 94-12, deposition of S. Gipson, at 218:2-219:16 (explaining that at end of DPS transaction, the customer is directed to SOS if he wants to register to vote or update his voter registration information).

In Texas, DPS requires applicants seeking a renewal and/or change of address to provide several pieces of information, including their name, address, driver's license number, date of birth, and the last four digits of their Social Security number. Docket no. 94-8, deposition of S. Gipson, at 234:2-9; docket no. 94-9, deposition of E. Hutchins, at 25:11-22; docket no. 77, appx. 130. When customers finish their transaction with DPS and then go to SOS to fill out a

completely separate application for voter registration purposes, they must provide the same information : name, address, driver's license number, date of birth, and the last four digits of their Social Security number. Docket no. 77, appx. 134 (voter registration application); docket no. 94-7, deposition of B. Schonhoff, at 157:19-158:18 (both the DPS change of address form and SOS voter registration form ask the person's name, date of birth, and address; applicants would have to fill this information out twice). Requiring motor voters to go to a different agency (SOS) to obtain and fill out a separate application that requires the same information violates the prohibition against duplicate information set forth in 52 U.S.C. § 20504(c).

5.    The timely submission requirement

The NVRA also requires that "a completed voter registration portion of an application for a State motor vehicle driver's license accepted at a State motor vehicle authority shall be transmitted to the appropriate State elections official not later than 10 days after the date of acceptance." 52 U.S.C. § 20504(e)(1). The deadline for transmittal is shorter (five days) if the voter registration application is accepted within five days before the last day for registration to vote in an election. 52 U.S.C. § 20504(e)(2). Because the evidence in the record shows that DPS does not provide simultaneous voter registration as part of the online driver's license renewal and change of address process, DPS does not transmit to SOS any voter registration information in connection with such transactions. In fact, it is undisputed that DPS does not even record, and therefore cannot transmit, motor voters' responses to the voter registration question in the online driver's license renewal and change of address application. Docket no. 94-8, deposition of S. Gipson at 136:10-19; docket no. 77, appx. 67, deposition of S. Gipson at 102:10-19:103:16-25; docket no. 94-7, deposition of B. Schonhoff at 159:23-160:3; 220:18-23.

As a voter registration agency, DPS has a statutory duty to provide motor voters with simultaneous voter registration applications *and* transmit the applications to SOS within 10 days after acceptance. DPS admits it does not submit voter registration information to SOS for online transactions conducted by motor voters "[b]ecause [they] have not been advised by the Secretary of State that providing that through the online process is permissible at this point." Docket no. 77, appx. 67, deposition of S. Gipson at 103:16-25. The NVRA's timely submission requirement continues to be violated in every online renewal and change of address transaction.

6.    State law must yield to federal law

The facts in the record lead to only one conclusion: DPS, a voter registration agency, does not provide a simultaneous voter registration application to motor voters who engage in online driver's license transactions. Instead, motor voters are simply directed to SOS, which requires them to fill out a completely separate voter registration application with duplicate information, and then print, mail, and/or hand deliver it to the voter registrar. But Defendants have refused to change their practice, claiming that Texas election law does not allow the procedure dictated by the NVRA. This argument is fatally flawed.

Defendants claim that the NVRA incorporates Texas election law, making it subject to state law, and rely on the following provisions:

(a)    In general

(1)    *Each State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration . . .*

\* \* \*

49

(d)     Change of address

*Any change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license* shall serve as notification of change of address for voter registration . . .

52 U.S.C. § 20504(a)(1), (d).

These provisions neither incorporate Texas election law nor make it subject thereto. Instead, the plain language of these provisions, when considered in context and with a view to their place in the overall statutory scheme, simply mean that driver's license applications submitted in accordance with state driver's license laws (i.e., the Texas Transportation Code), shall also serve as applications for voter registration purposes. The reference to state law in these provisions cannot be interpreted to mean the NVRA is dictated by the election laws of 50 different states, as it would be contrary to the plain language of the statute, require the Court to take it out of context, and render the NVRA entirely meaningless. The NVRA was enacted under the Elections clause, U.S. Const. Art. I § 4, cl. 1, which gives Congress the broad power to preempt, alter, and supplant state law when it comes to federal voter registration practices. *Arizona v. InterTribal County of Arizona, Inc.*, 570 U.S. 1, 133 S. Ct. 2247, 2253-57 (2013). ("The Clause's substantive scope is broad" and "Elections Clause legislation, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them"). To the extent state voter registration procedures are inconsistent with the NVRA, they are superseded. *Id.* at 2253-54 ("the state law, so far as the conflict extends, ceases to be operative"). On the other hand, the NVRA does not supplant state driver's license laws. Thus, interpreting the provisions in 52 U.S.C. § 20504(a)(1) and (d) to mean that driver's license applications submitted in accordance

with the Texas Transportation Code shall also serve as applications for voter registration purposes is consistent with the purpose of the Act and the entire statutory scheme.

Defendants have consistently argued that DPS, the voter registration agency tasked with carrying out the mandates of the NVRA, cannot provide motor voters with simultaneous driver's license - voter registration applications because Texas election law requires a physical signature. In other words, Defendants claim that a physical signature written by hand is necessary to comply with Texas election law; therefore, although online driver's license transactions are legally valid, a simultaneous voter registration application would be legally invalid. Again, this argument is flawed for several reasons.

First, Texas law cannot be used as an excuse for failing to comply with the NVRA. To the extent it is inconsistent with the NVRA, the Texas Election Code must yield to the NVRA. Moreover, Defendants have simply cherry-picked the provisions they believe justify their continued noncompliance. Defendants believe sections 13.002(b) and 15.021(a) of the Texas Election Code (requiring an application to be "signed") support their position,[38] but they ignore section 20.062 (requiring DPS to use a form and procedure that combines driver's license/ renewal/change of address with voter registration), which does not support their position.[39] Defendants' reliance on Texas election law as an excuse for federal noncompliance is misplaced because it is preempted, altered, and supplanted by the mandates in the NVRA. But even if Texas

---

[38]Docket no. 94-11, deposition of K. Ingram, at 97:15-24; docket no. 77, appx. 42 (Q: What portion of the law doesn't allow it? A: 13.002(b)).

[39]Section 20.062(a) states: The Department of Public Safety shall prescribe and use a form and procedure that combines the department's application form for a license or card with an officially prescribed voter registration application form. Section 20.062(b) states: The department shall prescribe and use a change of address form and procedure that combines department and voter registration functions. The form must allow a licensee or cardholder to indicate whether the change of address is also to be used for voter registration purposes.

APPENDIX 256

election law was not preempted, there is nothing in the law that precludes the use of electronic signatures.

Second, the NVRA does state that a simultaneous driver's license-voter registration application and any renewal application "requires the signature of the applicant." *See* 52 U.S.C. § 20504(a)(1), (c)(2)(C)(iii). The NVRA's change of address provision is separate, and does not state that a signature is necessary for a simultaneous driver's license-voter registration change of address. 52 U.S.C. § 20504(d). But even in renewal transactions that require a signature, neither the NVRA nor Texas election law defines or limits the type of signature that is required for voter registration renewal or change of address applications, and Defendants cite no authority for the proposition that it must be a physical ink signature written on paper by hand. With twenty-first century technology and legislation such as the Global and National Commerce Act (E-Sign Act) and Uniform Electronic Transactions Act (UETA), electronic signatures are legally recognized and widely used. 15 U.S.C. § 7001 et. seq.; Unif. Electronic Transactions Act, U.L.A. (1999). Under the Uniform Electronic Transactions Act, which has been adopted by Texas and 46 other states, the medium in which a signature is created, presented or retained does not affect its legal significance. *See* UETA § 7; Tex. Bus. & Com. Code Ann. § 322.007(a),(c),(d) (Vernon 2015) (TUETA). As these provisions explain:

(a)     A record or signature may not be denied legal effect or enforceability solely because it is in electronic form.

(c)     If a law requires a record to be <u>in writing</u>, an electronic record satisfies the law.

(d)     If a law requires <u>a signature,</u> an electronic signature satisfies the law.

Interpreting the signature requirement in the NVRA to include electronic signatures is consistent with the purpose of the Act and the overall statutory scheme. *Accord Kemp*, 208 F. Supp. 3d at

1335-36 (Georgia SOS argued that the "records" requirement in the NVRA was limited to physical records; the court determined that the requirement includes electronic records). Mr. Ingram, the 30(b)(6) representative for SOS, admits that an electronic signature complies with the signatures requirements under the NVRA. Docket no. 77, appx. 40, deposition of K. Ingram at 62:18-63:1 ("DPS's compliance with [the NVRA] for in-person transactions is [satisfied by] the question . . . on the DPS forms, 'Do you want to register to vote? I've agreed to provide my electronic signature, and it can be sent to the Secretary of State's Office.'"). If an electronic signature is legally sufficient under the NVRA for paper transactions, it is legally sufficient for online transactions. The NVRA established procedures to remove barriers to voter registration, to make the process easier and more convenient, and to increase voter participation. Interpreting the "signature" requirement to allow only physical, manual, or wet ink signatures written by hand on paper would be inconsistent with the plain language of the NVRA and the entire statutory scheme. And while Defendants continue to rely on Texas election law as a excuse for noncompliance with the NVRA, there is nothing in Texas law that precludes the use of electronic records and electronic signatures. On the contrary, Texas law permits SOS and DPS to accept electronic records and electronic signatures. *See* Tex. Bus. & Com. Code § 322.017 (each state agency has the option to accept electronic records and electronic signatures);[40] Tex. Bus. & Com. Code § 322.007 ("If a law requires a signature, an electronic signature satisfies the law.").[41] And

---

[40]As Eiten Hersh noted, the refusal to accept electronic signatures appears to have been a state policy decision. *See* docket no. 94-13, deposition of E. Hersh, at 121:23-122:25. But state policy – like state law – must yield to the mandatory requirements under the NVRA.

[41]*See also* Tex. Bus. & Com. Code § 322.008(a) ("If parties have agreed to conduct a transaction by electronic means and a law requires a person to provide, send, or deliver information in writing to another person, the requirement is satisfied if the information is provided, sent, or delivered, as the case may be, in an electronic record . . ."); Tex. Bus. & Com. Code § 322.012 ("if a law requires that a record be retained, the requirement is satisfied by retaining an electronic record"); Tex. Govt Code § 2054.060 ("digital signature may be used to authenticate a written electronic communication sent to a state agency"); 1 Tex. Admin. Code §

it is undisputed that Texas is already using voter registration signatures in electronic form. *See* Tex. Election Code § 20.066 (for in person and mail transactions, the information provided is input "into the department's electronic data system"; the applicant is informed "that the applicant's electronic signature" will be used; and the department "electronically transfer[s] the applicant's voter registration data, including the applicant's [electronic] signature, to the secretary of state"); 1 Tex. Admin. Code § 81.58 (allowing a voter's signature to be captured by an electronic device for the signature roster). Defendants provide no legal justification for failing to comply with the NVRA when it comes to online renewal and change of address transactions.

Finally, Plaintiffs are not asserting that all signature requirements be tossed out or ignored. Instead, they are asserting that Defendants already retain electronic signatures for every licensed motor voter in Texas and currently use those electronic signatures for both driver's license and voter registration purposes; thus, there is no reason for refusing to use those same signatures for online renewal and change of address transactions. *See* docket no. 77, appx. 39, 42, deposition of K. Ingram at 50:1-11; 95:14-97:14; docket no. 77, appx. 69, 70, 79, deposition of S. Gipson at 203:19-204:7; 215:21-216:7; 234:21-235:1; 236:19-237:9. Even when a signature is required, that requirement may be satisfied with the electronic signature that is on file for every Texas motor voter.[42] There is no legal impediment to using electronic signatures, and there is no technological barrier to online transactions that allow simultaneous renewal and change of address for driver's license and voter registration. *See* docket no. 94-7, deposition of B. Schonhoff, at 222:9-22; docket no. 77, appx. 45, deposition of K. Ingram at 184:12-185:1; 186:5-203.24 (describing technology that may be acceptable for use by state agencies).

[42]Because every Texan must provide an electronic signature when they obtain their original driver's license, and the online process only involves the renewal of an existing driver's license or a change of address on an existing driver's license, it is undisputed that the State of Texas already has preexisting electronic signatures for every motor voter that uses the online system.

APPENDIX 259

16; docket no. 94-9, deposition of E. Hutchins at 99:22-100:2; docket no. 94-10, deposition of J. Crawford at 142:6-18; 143:12-144:21 (DLS could send all the information it currently obtains to the Secretary of State's office, and "it could also send the previously provided electronic signature from that customer, just like it does with a mail-in change of address"); docket no. 94-13, deposition of Eitan Hersh at 34:20-23 ("my opinion is that there are no obvious substantial technical reasons why Texas does not do that or financial situations why Texas does not do that"); 110:6-111:13 (. . . "it [could] transmit, just as it does now for mail and in-person transactions, the previously-recorded digital signature of the voter because everyone who is renewing or changing their address online has a digital signature stored at the DPS"); 115:15-25 (38 other states have an online process for voter registration).

G.    Merits of the Fourteenth Amendment claim

Plaintiffs also assert that Defendants' refusal to provide voter registration applications simultaneously with online driver's license renewal and change of address transactions constitutes a violation of their Equal Protection rights under the Fourteenth Amendment.[43] The right to vote is a fundamental right protected under the Equal Protection Clause of the Fourteenth Amendment. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966). "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam). The Equal Protection Clause applies when state procedures restrict voters' rights. *Bush v. Gore,* 531 U.S. at 103 (Supreme Court found that Florida's failure to institute reliable recount procedures violated the Equal Protection Clause); *Obama for Am. v. Husted*, 697 F.3d 423, 436-37 (6th Cir. 2012)

---

[43]"The rights and remedies established by [the NVRA] are in addition to all other rights and remedies provided by law." 52 U.S.C. § 20510(d)(1).

APPENDIX 260

(Circuit court found that Ohio law that prevented casting of early ballots by non-military voters violated the Equal Protection Clause).

1.      Applicable standard

The parties disagree on the applicable standard of review. Plaintiffs assert that the *Anderson-Burdick*[44] standard applies (docket no. 77, pp. 19-23; docket no. 85, pp. 16-17), while Defendants assert that an *Arlington Heights*[45] strict scrutiny analysis or *City of Cleburne*[46] heightened scrutiny analysis applies (docket no. 82, p. 24; docket no. 88, pp. 19-20). Because this case involves a challenge to a state voter registration procedure that is alleged to unfairly restrict the right to vote and harm voter participation, the more flexible *Anderson-Burdick* standard applies. *Burdick v. Tukushi*, 504 U.S. 428, 433 (1992) ("to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently").[47]   Under this standard, "[a] court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate against the precise interests

---

[44]*Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992).

[45]*Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977).

[46]*City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432 (1985).

[47]*See also Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) (Fifth Circuit applied *Anderson-Burdick* analysis in challenge to state law regulating volunteer deputy registrars); *Tex. Democratic Party v. Williams*, 285 Fed. Appx. 194, 195 (5th Cir. 2008) (per curiam) (noting that district court properly applied *Anderson-Burdick* balancing test to the constitutional claims challenging use of eSlate voting machines; *cert. denied*, 555 U.S. 1100 (2009); *Faas v. Cascos*, 225 F. Supp. 3d 604, 610 (S.D. Tex. 2016) (State election laws "could hardly serve their legitimate purposes if they were routinely subject to strict scrutiny . . . [thus], [t]he United States Supreme Court recognized the need for a more flexible analytical framework in two landmark cases: *Anderson* and *Burdick*").

put forward by the State as justification for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (internal quotes omitted). "However slight the burden [to the voters] may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Elec. Bd.*, 553 U.S. 181, 191 (2008).

2.       Analysis

"[V]oting is of the most fundamental significance under our constitutional structure," *Burdick*, 504 U.S. at 433, and unfair registration procedures can have a direct and damaging effect on voter participation. *See* 52 U.S.C. § 20501(a)(3) (Congressional findings). While the State can impose reasonable restrictions, those restrictions must be justified by specific interests that outweigh the burden on voters. The undisputed facts show that Defendants permit simultaneous voter applications for motor voters that renew or change their driver's license in person or by mail, but refuse simultaneous voter applications for motor voters that renew or change their driver's license online. Motor voters that renew or change their driver's license in person or by mail need only check a single box indicating that he would like to register or update his voter information. After checking the box on the driver's license form, no further steps are necessary. DPS sends the updated information to SOS in nightly batches, so the voter registration is updated timely and efficiently. However, motor voters that renew or change their driver's license online are denied the same process. Online motor voters must end their DPS driver's license transaction, and then go to SOS to obtain, print, and complete a separate voter registration application which requires duplicate information.[48] Once the additional application is complete, it

---

[48]*See generally* pp. 17-19, *supra.*

57

must be mailed or hand delivered.[49] DPS, a voter registration agency, maintains a procedure that accepts simultaneous voter registration applications for some, while rejecting them for others. This type of restriction on voter registration imposes a burden on the fundamental right to vote that warrants the demonstration of a corresponding interest sufficiently weighty to justify the limitation.

Defendants' only justification for the voter registration burden imposed on motors voters is the "signature" requirement under Texas election law. However, neither federal nor state law limits the signature requirement to physical hand written signatures on paper.[50] Electronic signatures and electronic records are legally recognized and widely used, and Defendants offer no reason for refusing to accept them for online motor voter transactions.[51] DPS already uses electronic records and previously imaged electronic signatures for every Texan that uses the online system for driver's license renewal or change of address.[52] SOS admits that electronic signatures comply with signature requirements under the NVRA and Texas Election Code.[53] SOS admits it never uses physical, manual, or wet ink handwritten signatures on paper for voter

---

[49]*See id.*

[50]*See* pp. 52-55, *supra.*

[51]*See id.*

[52]Docket no. 77, appx. 70, deposition of S. Gipson at 215:21-216:7 (for online transactions, Texas has decided that a previously captured electronic signature is sufficient for driver's license purposes, but they refuse to accept the same signature for voter registration purposes); Stipulation no. 11, p. 5, *supra* ("The signature that appears on the license generated as a result of a customer's online driver's license renewal or change of address transaction is an image of the applicant's physical signature, electronically captured during the applicant's most recent in-person transaction").

[53]Docket no. 77, appx. 39-40, 42, K. Ingram deposition at 50:1-6; 62:4-63:1; 97:4-14.

APPENDIX 263

registration purposes.[54] DPS already has, in its possession and control, an electronic signature of every motor voter that has been issued a license. With motor voters' electronic signatures already in the voter registration agency's possession, there is no reason why Defendants could not register them to vote in a simultaneous online transaction.

Neither the law nor the facts support Defendants' alleged justification for limiting simultaneous voter applications to in-person and mail motor voter transactions and refusing simultaneous voter applications for motor voters that renew or change their driver's license online. Because the alleged justification is not legitimate, there is no state interest that outweighs the burden imposed on voters. Defendants fail to demonstrate a corresponding interest sufficiently weighty to justify the limitation on voters' rights.

Not only have Defendants failed to justify their actions, but they also acknowledge that permitting simultaneous voter applications for motor voters that renew or change their driver's license online would be technologically very feasible and the cost would be minimal.[55] In fact, the undisputed testimony reflects that changing the online process to include simultaneous voter

---

[54]Docket no. 77, appx. 39, K. Ingram deposition at 50:7-11 (Q: What's the ink signature on the DPS's physical form used for as far as voter registration? A: I don't know. I don't know if it's used for anything. Once they've applied in person at the office, they've signed it electronically"); docket no. 77, appx. 117, RFA 26 ("Admits that the information DPS transmits to SOS about each applicant for voter registration includes a digital image of the applicant's signature"); docket no. 77, appx. 122, RFA 13 (Defendants admit that prior to transmission to SOS, the DPS computer system locates records that [include] a "Signature Image"); docket no. 77, appx. 118, RFA 10, 11 (Defendants admit that individuals are not registered to vote in connection with their interactions with DPS unless they submit an electronic image of their signature).

[55]*See* docket no. 77, appx. 45-46, deposition of K. Ingram at 184:19-185:2 (it's "technically possible" and "I don't think it would cost a lot of money"), 186:15-16 ("I'm not contesting the logistics of it"); docket no. 77, appx. 90, deposition of J. Crawford (from an IT perspective, DLS is currently capable of sending the voter data and electronic signature to SOS); *see also* docket no. 94-13, deposition of E. Hersh at 110:6-10 (it would be a "massive cost savings"); 111:10-13 (the savings would be statewide); report of E. Hersh at pp. 6, 12-15 (the technology clearly exists for state motor vehicle authorities that allow online transactions).

registration applications would very likely lead to greater efficiency for the State and increased

voter registration for Texans.[56] *See Anderson*, 460 U.S. at 806 (even if the State has legitimate

interests, if the State also has open to it a less drastic way of satisfying those interests it may not

choose a scheme that restricts the right to vote).

## VI.

### Conclusion

DPS encourages Texans to use its online services to renew their driver's license and

change their address because it is easier and more convenient.[57] It cannot, at the same time, deny

simultaneous voter registration applications when those online services are used. DPS is legally

obligated, as a designated voter registration agency under the NVRA, to permit a simultaneous

voter registration application with every transaction. Asking motor voters whether they are

interested in voter registration and sending them to SOS for an entirely separate application

process is not enough. The NVRA demands much more from voter registration agencies.

Defendants are violating §§ 20503(a)(1); 20504(a),(c),(d), and (e); 20506(4)(A)(iii), and (d); and

20507(a)(1)(A) of the NVRA and their excuse for noncompliance is not supported by the facts or

the law. Plaintiffs are also being denied equal protection under the law. Plaintiffs are entitled to

the relief they are seeking herein.

It is therefore ORDERED Plaintiffs' Motion for Summary Judgment (docket no. 77) is

GRANTED and Defendants' Motion for Summary Judgment (docket no. 82) is DENIED. Final

---

[56]*See* docket no. 94-13, deposition of E. Hersh at 114:8-10; 114:24-115:14 (having people filling out information by hand and then having state employees key that information in electronically leads to more errors); report of E. Hersh at p. 4 (in 11 of the 38 states with online registration, the policy was adopted without any legislation, but simply as a technological upgrade to an existing governmental function); docket no. 85, appx. 25 (potential number of motor voters affected in average week and month).

[57]Docket no. 94-9, deposition of E. Hutchins, at 38:18-23; 39:12-19.

judgment will be entered separately, with costs, fees, and expenses to be taxed against

Defendants. 52 U.S.C. § 20510(c). The parties shall submit a proposed form of judgment setting

forth the necessary declaratory and injunctive relief, consistent with the Court's findings, within

seven days from the date below.

SIGNED this 10 day of May, 2018.

_____
ORLANDO L. GARCIA
CHIEF U.S. DISTRICT JUDGE

61

# Exhibit C



FILED

DEC – 5 2019

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

Certified as a true copy and issued
is the mandate on Dec 05, 2019

No. 18-50428

November 13, 2019

Attest:
**Lyle W. Cayce**
Clerk, U.S. Court of Appeals, Fifth Circuit

D.C. Docket No. 5:16-CV-257-OLG

Lyle W. Cayce
Clerk

JARROD STRINGER; BENJAMIN HERNANDEZ; JOHN WOODS,

Plaintiffs - Appellees

v.

DAVID WHITLEY, In His Official Capacity as the Texas Secretary of State;
STEVEN C. MCCRAW, in His Official Capacity as the Director of the Texas
Department of Public Safety,

Defendants - Appellants

Appeal from the United States District Court for the
Western District of Texas

Before OWEN, Chief Judge, and CLEMENT and HO, Circuit Judges.

JUDGMENT

This cause was considered on the record on appeal and was argued by
counsel.

It is ordered and adjudged that the judgment of the District Court is
reversed, vacated and remanded to the District Court for further proceedings
in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that plaintiffs-appellees pay to defendants-
appellants the costs on appeal to be taxed by the Clerk of this Court.

JAMES C. HO, Circuit Judge, concurring.

FILED

DEC - 5 2019

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ____ United States Court of Appeals CLERK
Fifth Circuit

**FILED**

November 13, 2019

No. 18-50428

Lyle W. Cayce
Clerk

JARROD STRINGER; BENJAMIN HERNANDEZ; JOHN WOODS,

    Plaintiffs–Appellees,

v.

DAVID WHITLEY, in His Official Capacity as the Texas Secretary of State;
STEVEN C. MCCRAW, in His Official Capacity as the Director of the Texas
Department of Public Safety,

    Defendants–Appellants.

---

Appeal from the United States District Court
for the Western District of Texas
5:16-CV-257-OLG

---

Before OWEN, Chief Judge, and CLEMENT and HO, Circuit Judges.

PRISCILLA R. OWEN, Chief Judge:

    Texas's Secretary of State and Director of Public Safety appeal a district court judgment declaring them in violation of the Equal Protection Clause and the National Voter Registration Act of 1993 and granting injunctive relief. We reverse the judgment because Plaintiffs do not have standing to pursue their claims.

I

    Those who seek to renew their driver's license in Texas or to change the address associated with their driver's license can submit paper applications or

No. 18-50428

apply online using the Texas Department of Public Safety's (DPS) online system (DPS System). Paper applications ask the following voter registration questions: "If you are a US Citizen, would you like to register to vote? If registered, would you like to update your voter information?" Applicants answer by checking a box for "yes" or "no." DPS transfers the information provided by each applicant who answers "yes" to the Texas Secretary of State (the Secretary). The Secretary sends the applicant's information to local voter registrars, who use the data to complete the voter registration process.

Those using the online DPS System to renew their driver's license or to change the address associated with their driver's license are asked a different voter registration question: "Do you want to request a voter application? You will receive a link to a voter application on your receipt page." The DPS System receipt page states, "You are not registered to vote until you have filled out the online application, printed it, and mailed it to your local County Voter Registrar. Click here to Download a Voter Registration Application." DPS System users can access a voter registration application through the link on the receipt page. DPS does not send the Secretary the information provided by applicants who answer "yes" to the DPS System's voter registration question.

Plaintiffs Jarrod Stringer, Benjamin Hernandez, and John Woods each moved from a Texas county in which they were registered to vote to another Texas county between 2013 and 2015. Plaintiffs used the DPS System to change their driver's license addresses and selected "yes" in response to the voter registration question. Plaintiffs believed that they had updated their voter registration by doing so. Stringer and Hernandez discovered that they were not registered to vote in their new counties when they unsuccessfully attempted to vote in the 2014 federal election. Woods was informed that he was not registered to vote in his new county when he called a county authority

2

No. 18-50428

to confirm his polling location for the 2015 election.  Woods and Hernandez submitted provisional ballots, which ultimately were not counted.  All three plaintiffs were registered to vote in their new counties by the end of 2015.

Plaintiffs sued the Texas Secretary of State and the Director of the Texas Department of Public Safety, alleging that the DPS System violates the Equal Protection Clause and the National Voter Registration Act of 1993 (NVRA). Plaintiffs alleged that the DPS System violates a number of NVRA provisions, including 52 U.S.C. § 20504(d), which states "[a]ny change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration."[1]  Plaintiffs sought declaratory and injunctive relief, not damages.

Plaintiffs filed a motion for summary judgment.  Texas filed a cross-motion for summary judgment, contending, *inter alia*, that Plaintiffs do not have standing to bring their claims.  The district court granted summary judgment to Plaintiffs, holding that Plaintiffs have standing to bring their claims and that the DPS System violates the NVRA and the Equal Protection Clause.[2]  The district court entered a final judgment granting Plaintiffs wide-ranging declaratory and injunctive relief.  Texas appeals.

II

We review questions of standing de novo.[3]  To have Article III standing, a plaintiff must show an injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by the plaintiff's requested relief.[4]  Courts have divided this rule into three components: injury in fact,

---

[1] 52 U.S.C. § 20504(d).

[2] *Stringer v. Pablos*, 320 F. Supp. 3d 862 (W.D. Tex. 2018).

[3] *Bonds v. Tandy*, 457 F.3d 409, 411 (5th Cir. 2006).

[4] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted).

3

## No. 18-50428

causation, and redressability.[5]   The party seeking to invoke federal jurisdiction, in this case the Plaintiffs, bears the burden of establishing all three elements.[6]

Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements.   The redressability requirement limits the relief that a plaintiff may seek to that which is likely to remedy the plaintiff's alleged injuries.[7]   Because injunctive and declaratory relief "cannot conceivably remedy any past wrong,"[8] plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury.[9]   That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact.[10]   To be an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else;[11] (2) "concrete and particularized,"[12] not abstract;[13] and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'"[14]   The purpose of the requirement that the injury be "imminent" is "to ensure that the alleged injury is not too

---

[5] *See Lance v. Coffman*, 549 U.S. 437, 439 (2007) (referencing "the now-familiar elements of injury in fact, causation, and redressability").

[6] *Lance*, 549 U.S. at 439; *Lujan*, 504 U.S. at 561.

[7] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45-46 (1976)).

[8] *Id.* at 108.

[9] *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (stating that "Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers[,]" not whether he had previously been injured by the use of a chokehold).

[10] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

[11] *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972).

[12] *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

[13] *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) ("The abstract nature of the harm . . . prevents a plaintiff from obtaining what would, in effect, amount to an advisory opinion.").

[14] *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Lujan*, 504 U.S. at 560).

No. 18-50428

speculative for Article III purposes."[15] For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur.[16]

The district court did not apply this standard. The district court held that Plaintiffs had standing because they were "deprived of their individual right to simultaneous voter registration applications at the time they engaged in the online DPS transactions to change their driver's licenses," and "[c]ourt-ordered compliance with the NVRA would prevent repetition of the same injury to Plaintiffs and others."[17] The injury identified by the district court—the "depriv[ation] of [Plaintiffs'] individual right to simultaneous voter registration applications *at the time they engaged in the online DPS transactions*"[18]—was not a continuing or threatened future injury, but a past injury. To the extent that the district court identified a continuing or threatened future injury, it did so when it stated that "[c]ourt-ordered compliance with the NVRA would prevent repetition of the same injury to Plaintiffs and others."[19] However, whether compliance with the NVRA would prevent future injury to others is irrelevant; plaintiffs seeking injunctive relief must show a continuing or threatened future injury to themselves.[20] Standing also does not follow from the conclusion that the injunctive relief sought by a plaintiff would prevent the plaintiff from suffering the same injury in the future, which is always true when a plaintiff seeks an injunction prohibiting a defendant from repeating an action that injured the plaintiff in the past.

---

[15] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan*, 504 U.S. at 564 n.2).

[16] *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5).

[17] *Stringer v. Pablos*, 320 F. Supp. 3d 862, 883 (W.D. Tex. 2018).

[18] *Id.* (emphasis added).

[19] *Id.*

[20] *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972).

No. 18-50428

Plaintiffs must also show that there is a substantial risk that they will suffer the potential future injury absent their requested relief.[21] The district court did not address the probability of Plaintiffs being injured in the future absent their requested relief.

A

Plaintiffs contend that they have demonstrated a substantial risk that they will suffer a future injury as a result of the DPS System's noncompliance with the NVRA and Equal Protection Clause. As Plaintiffs concede, to do so, they must demonstrate "a sufficient probability that each Plaintiff will use the noncompliant driver's license services again." All three Plaintiffs declared that they "plan to continue transacting online with [DPS] in the future whenever [they are] required to renew or change the address on [their] driver's license and [are] eligible to do so." However, each Plaintiff will have the occasion to use the DPS System to update his voter registration only if (1) he moves within Texas, in which case he might wish use the DPS System to change his address on file with DPS and his county voter registrar, or (2) he becomes both unregistered to vote and eligible to renew his driver's license using the DPS System, in which case he might wish to use the DPS System to renew his driver's license and register to vote.

Plaintiffs rely on two types of evidence that they contend demonstrate a substantial risk that they will move again. The first is evidence of their prior moves—Hernandez and Woods have each moved once in the past five years, and Stringer has moved several times. However, evidence that a plaintiff has taken an action in the past does not, by itself, demonstrate a substantial risk that the plaintiff will take the action in the future; there must be some evidence

---

[21] *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5).

## No. 18-50428

that the plaintiff intends to take the action again.[22] Accordingly, evidence that Plaintiffs moved in the past does not establish a substantial risk that they will do so in the future. Notably, no Plaintiff has expressed any intention to move in the future.

The second type of evidence cited by Plaintiffs is data from the United States Census Bureau showing that Americans can expect to move 11.7 times in their lifetimes.[23] This general data also does not establish a substantial risk that Plaintiffs themselves will move again; Plaintiff-specific evidence is needed before Plaintiffs' claims can be properly characterized as an attempt to remedy an imminent injury to Plaintiffs instead of a generalized grievance available to all Texans.[24]

Plaintiffs also have not demonstrated a substantial risk that they will attempt to use the DPS System to renew their driver's licenses and simultaneously update their voter registrations. Plaintiffs contend that Texas's requirement that driver's licenses must be renewed every six years and the existence of Texas laws providing multiple avenues for the cancellation of a voter's registration create a "sufficient probability" that, at some point in the future, Plaintiffs will be both unregistered to vote and eligible to renew their driver's licenses using the DPS System. However, Plaintiffs do not point to

---

[22] *Deutsch v. Annis Enters., Inc.*, 882 F.3d 169, 174 (5th Cir. 2018) (holding that a disabled person did not have standing to bring an action seeking injunctive relief against a defendant hair salon that he had visited once before absent evidence that he intended to return to the salon); *Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015) (holding that a production company that had been denied a permit to produce the second installment in a film series did not have standing to seek an injunction because it failed to show any concrete or imminent plans to produce another film in the franchise).

[23] The court takes judicial notice of UNITED STATES CENSUS BUREAU, CALCULATING MIGRATION EXPECTANCY USING ACS DATA (2018), https://www.census.gov/topics/population/migration/guidance/calculating-migration-expectancy.html. *See Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571-72 (5th Cir. 2011) ("United States census data is an appropriate and frequent subject of judicial notice.").

[24] *See Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013) ("We have repeatedly held that such a 'generalized grievance,' no matter how sincere, is insufficient to confer standing.").

7

No. 18-50428

any Plaintiff-specific evidence suggesting that they will become unregistered and eligible to renew their driver's licenses using the DPS System.

In light of the absence of any Plaintiff-specific evidence, the evidence in the record does not demonstrate a substantial risk that Plaintiffs will become unregistered and eligible to renew their driver's licenses online. Plaintiffs cite Texas laws that provide for the cancellation of voter registration in four relatively uncommon situations: (1) when a voter's registration card is returned as undeliverable, the voter does not return a confirmation notice, and the voter does not vote in two consecutive general elections; (2) when a registrar finds a voter to be ineligible after an investigation; (3) when another voter from the same county successfully challenges a voter's registration; and (4) when a voter cancels his or her voter registration.[25] There is no evidence in the record that suggests that any Plaintiff is likely to fall within the ambit of these provisions. Furthermore, Texans are only required to renew their driver's licenses every eight years,[26] and every other renewal must be accomplished in person.[27] Chances are slim that Plaintiffs will become unregistered around the time that they need to renew their driver's licenses and are eligible to do so using the DPS System.

In sum, Plaintiffs have not established a substantial risk that they will attempt to update their voter registrations using the DPS System and be injured by their inability to do so. As a result, Plaintiffs have not established

---

[25] TEX. ELEC. CODE ANN. §§ 16.031-16.038, 16.091-16.095 (West 2010 and West Supp. 2017).

[26] Act of June 10, 2019, 86th Leg., R.S., ch. 595, § 7.001, 2019 Tex. Sess. Law Serv. 1726 (West) (codified at TEX. TRANSP. CODE ANN. § 521.271(a)(1)).

[27] 37 TEX. ADMIN. CODE § 15.59(c) (2018) (Tex. Dep't of Pub. Safety, Alternative Methods for Driver License Transactions).

No. 18-50428

an injury in fact sufficient to confer standing to pursue the declaratory and injunctive relief that they seek.[28]

## B

Plaintiffs contend that two Eleventh Circuit cases support the opposite conclusion. The first, *Charles H. Wesley Education Foundation, Inc. v. Cox*,[29] is distinguishable. *Cox* involved a charity that collected and submitted voter registration forms in Georgia.[30] Georgia rejected the forms submitted by the charity on state law grounds, including a form submitted on behalf of plaintiff Crawford, a registered voter who was attempting to change her address.[31] At the time the suit was filed, Georgia had not accepted the forms at issue.[32] Accordingly, Crawford had standing to sue for an injunction requiring Georgia to accept her form because doing so would remedy her alleged injury—the violation of her right under the NVRA to have her form accepted and her address changed.[33] In this case, on the other hand, Plaintiffs are not seeking an injunction requiring Texas to accept any form that they have previously submitted or to take any action regarding their individual registrations.

The second case, *Arcia v. Florida Secretary of State*,[34] also does not help Plaintiffs. *Arcia* arose out of two Florida programs designed to remove ineligible voters from the voter rolls.[35] The first identified possible non-citizens using state records.[36] The plaintiffs were identified as non-citizen candidates

---

[28] *See Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983) (holding that Lyons did not have standing to seek injunctive relief because "it is surely no more than speculation to assert . . . that Lyons . . . will be arrested in the future and provoke the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly force or serious bodily injury").

[29] 408 F.3d 1349 (11th Cir. 2005).

[30] *Id.* at 1351.

[31] *Id.*

[32] *Id.*

[33] *Id.* at 1352 n.3.

[34] 772 F.3d 1335 (11th Cir. 2014).

[35] *Id.* at 1339.

[36] *Id.*

9

No. 18-50428

for removal by the first program, but ultimately were not removed.[37] The second program identified candidates for removal using the federal "SAVE" database.[38] The Eleventh Circuit held that the plaintiffs had standing to "prospectively challenge" the second removal program because the evidence in the record demonstrated "a realistic probability that they would be misidentified due to unintentional mistakes."[39] Whether the evidence in the *Arcia* record demonstrated a "realistic possibility" that the *Arcia* plaintiffs would suffer a threatened future injury does not have any impact on whether the facts in this record demonstrate a "substantial risk" that Plaintiffs will suffer a threatened future injury. *Cox* and *Arcia* do not support the conclusion that Plaintiffs have standing.

## C

Plaintiffs also contend that they have standing because their claims are capable of repetition, yet evading review. The capable-of-repetition-yet-evading-review doctrine is an exception to the general rule that federal courts do not have jurisdiction over moot cases.[40] A case becomes moot when "[t]he requisite personal interest that must exist at the commencement of the litigation"[41] ceases to exist because "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."[42] The capable-of-repetition-yet-evading-review doctrine applies only to claims that are moot, *i.e.* presented a case or controversy when they were filed but ceased to do so at

---

[37] *Id.*

[38] *Id.*

[39] *Id.* at 1341.

[40] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).

[41] *Goldin v. Bartholow*, 166 F.3d 710, 717 (5th Cir. 1999) (citing *Arizonans For Official English v. Arizona*, 520 U.S. 43, 68 n. 22 (1997)).

[42] *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979).

10

No. 18-50428

a later time.[43] "Standing admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum."[44] Because Plaintiffs became registered *prior* to bringing this lawsuit, the fact that Plaintiffs were registered impacts whether they have standing to sue, not whether their claims are moot.[45] Accordingly, the capable-of-repetition-yet-evading-review doctrine is not implicated by Plaintiffs' claims.[46]

\* \* \*

Because Plaintiffs do not have standing, we REVERSE the judgment of the district court, VACATE the district court's injunction, and REMAND to the district court with instructions to dismiss Plaintiffs' claims for lack of standing.

---

[43] *Renne v. Geary*, 501 U.S. 312, 320 (1991) ("While the mootness exception for disputes capable of repetition yet evading review has been applied in the election context, that doctrine will not revive a dispute which became moot before the action commenced." (citation omitted)).

[44] *Laidlaw*, 528 U.S. at 191.

[45] *Renne*, 501 U.S. at 320.

[46] *Laidlaw*, 528 U.S. at 191.

11

No. 18-50428

JAMES C. HO, Circuit Judge, concurring:

The Chief Justice once wrote: "[T]hose who govern should be the *last* people to help decide who *should* govern." *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014) (plurality op.). This sentiment is deeply engrained in our nation's DNA. As Americans, we have never trusted the fox to guard the henhouse.

In *McCutcheon*, the Chief applied this skepticism in the context of campaign finance regulation. In sum, regulators say: I want to keep big money out of politics. And fair enough. Money can certainly corrupt. But money can also support speech. *See id.* at 191–92; *see also Buckley v. Valeo*, 424 U.S. 1, 288 (1976) (Marshall, J., concurring in part and dissenting in part) ("[A]ll Members of the Court agree . . . money is essential for effective communication in a political campaign."). Bribery is prohibited. But speech is protected. And in our legal system, we presume innocence—not corruption. So when regulators regulate too far, citizens may fear that the *real* purpose is to reduce speech.[1]

The case before us today involves voting, not speech. But that raises the question: Should the Chief's sentiments apply here as well? After all, citizens exercise "the right to participate in electing our political leaders . . . in a variety of ways"—they can "urge others to vote" by engaging in and funding political speech, but of course they can also "vote" themselves. *McCutcheon*, 572 U.S.

---

[1] For example, it's widely said that there's "little sense" in restricting campaign contributions unless we also restrict independent expenditures—either act can corrupt, so it's pointless to restrict one if you don't also restrict the other. *Buckley*, 424 U.S. at 261 (White, J., concurring in part and dissenting in part). *See also id.* at 290 (Blackmun, J., concurring in part and dissenting in part) (same); *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 518–521 (1985) (Marshall, J., dissenting) (same); *Randall v. Sorrell*, 548 U.S. 230, 276 (2006) (Stevens, J., dissenting) (same); *Zimmerman v. City of Austin*, 888 F.3d 163, 169 (5th Cir. 2018) (Ho, J., dissenting from denial of rehearing en banc) (same). Yet "[w]ell-established precedent makes clear that the expenditure limits violate the First Amendment." *Randall*, 548 U.S. at 236 (plurality op. of Breyer, J.). So if there's "little sense" in regulating contributions alone, citizens may worry that the *real* target is not corruption, but speech.

12

at 191. So wouldn't it be natural for citizens to harbor the same concerns here—that political interest will triumph over public spirit, whether intentionally or subconsciously, whenever public officials regulate *any* aspect of how we choose public officials? Whether it's regulating how citizens may vote, or how citizens may urge others to vote, shouldn't citizens insist that we need not simply trust—we must also verify?

One potential difference is that, when it comes to administering elections, *someone* obviously has to set ground rules to ensure the security and integrity of the ballot box. *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 191 (2008) (recognizing "the State's interest in protecting the integrity and reliability of the electoral process"). The Constitution expressly authorizes states to regulate elections. *See* U.S. Const. art. I, § 4 ("The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of choosing Senators."). And so "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quotations omitted).

But surely that does not mean citizens must ignore entirely the Chief Justice's admonitions, and blindly trust that regulators never miss their marks. At a minimum, citizens can verify that regulations are lawful and do not infringe on the right to vote.

In this case, Plaintiffs allege that the State of Texas violates voting rights in various ways. For example, the National Voter Registration Act of 1993 (also known as the Motor Voter Act) requires, *inter alia*, that "[a]ny

13

No. 18-50428

change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration." 52 U.S.C. § 20504(d).

On the plain text of the statute, the rule seems simple enough: If it's good enough for motorist licensing, then it ought to be good enough for voter registration. If the system is secure enough to ensure the integrity of the former, then it ought to be secure enough to ensure the integrity of the latter.

Plaintiffs contend that the State of Texas violates this rule. For example, Jarrod Stringer and Benjamin Hernandez alleged, and a respected district judge found, that they each submitted an address change for their driver's licenses—but were nevertheless unable to vote in their new locations during the 2014 federal election cycle.

The State responds, *inter alia*, that Congress enacted the National Voter Registration Act in 1993—well before the age of the Internet, the advent of online transactions and electronic signatures, and the bevy of security questions that cyber-activities inevitably present.

I agree with my colleagues that we are not at liberty to decide the merits in this case, because none of these Plaintiffs have standing to seek injunctive relief here. They all secured their right to vote by the 2016 election cycle. And they claim no future injury that we can redress today. I therefore join Judge Owen's opinion in full, reversing the judgment of the district court due to Plaintiffs' lack of standing.

But although we have no occasion to decide the merits of Plaintiffs' claims due to their lack of a future injury, that does not prevent us from acknowledging that Plaintiffs have indeed endured an injury in the past. They were unable to exercise their right to vote in past election cycles. And it is a right they will *never* be able to recover. As citizens, we can hope it is a

14

No. 18-50428

deprivation they will not experience again—even if the law does not afford them a remedy from this court at this time.

I concur.

15

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

MAY 1 8 2018

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | | |
|---|---|---|
| JARROD STRINGER, *et. al*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| ROLANDO PABLOS, IN HIS OFFICIAL | § | Civil Action No. 5:16-cv-00257-OLG |
| CAPACITY AS THE TEXAS SECRETARY | § | |
| OF STATE and STEVEN C. McCRAW, IN | § | |
| HIS OFFICIAL CAPACITY AS THE | § | |
| DIRECTOR OF THE TEXAS | § | |
| DEPARTMENT OF PUBLIC SAFETY | § | |
| | § | |
| Defendants. | § | |

### FINAL JUDGMENT

On May 10, 2018, the Court granted Plaintiffs' motion for summary judgment. *See* docket no. 105. In its order, the Court requested that the parties confer and submit a proposed form of judgment setting forth the necessary and appropriate declaratory and injunctive relief for the Court's consideration. Plaintiffs submitted a proposed judgment. Defendants submitted broad objections to the Court's prior rulings and Plaintiffs' proposed judgment but did not submit an alternative to Plaintiffs' proposed form of judgment. After reviewing same, and consistent with the Court's summary judgment findings, which are incorporated herein, the Court:

1.      DECLARES, pursuant to 28 U.S.C. § 2201 and 52 U.S.C. § 20510(b)(2), that Defendants have violated the NVRA, 52 U.S.C. §§ 20503(a)(1), 20504(a), (c), (d), and (e), and 20507(a)(1)(A), and the Equal Protection Clause, U.S. Const. amend. XIV, § 1, by failing to permit simultaneous voter registration with online driver's license renewal and change-of-address transactions;

1

2.  PERMANENTLY ENJOINS Defendants, their agents and successors in office, and all persons working in concert with them, from continuing to violate the NVRA and Equal Protection Clause by:

(a) failing to establish procedures to register to vote in elections for Federal office for driver's license customers who renew or change their address online;

(b) refusing to treat each online driver's license renewal or change-of-address application as a simultaneous application for voter registration with respect to elections for Federal office;

(c) refusing to include a voter registration application form for elections for Federal office as part of each online driver's license renewal or change-of-address application;

(d) requiring online driver's license renewal and change-of-address customers who wish to register to vote or update their voter registration to complete an entirely separate, duplicative voter registration application with the Secretary of State's office;

(e) refusing to make the voter registration portion of each online driver's license renewal or change-of-address application available to the Secretary of State's office;

(f) refusing to treat the customer's online driver's license change-of-address application as a notification of change of address for voter registration with respect to elections for Federal office, unless the customer indicates that the change of address is not for voter registration purposes;

(g) refusing to transmit voter registration information submitted in connection with online driver's license renewal and change-of-address transactions to the appropriate State election official within the statutorily required timeframe, 52 U.S.C. § 20504(e);

2

(h) refusing, in the case of registration with an online driver's license renewal or change-of-address application, to ensure that any eligible online driver's license customer is registered to vote in an election, if the valid voter registration form of the customer is submitted to the Department of Public Safety (DPS) not later than the lesser of 30 days, or the period provided by state law, before the date of the election;

(i) refusing to accept and use online driver's license customers' previously-captured electronic signatures for voter registration purposes; and

(j) failing to record and use an online driver's license renewal or change-of-address customer's response to the voter registration portion of the application.

3.        PERMANENTLY ENJOINS Defendants, their agents and successors in office, and all persons working in concert with them, from implementing practices and procedures that violate §§ 20503, 20504, and/or 20507 of the NVRA;

4.        DIRECTS Defendant DPS, no later than **45 days**[1] from the date of this Judgment, to:

(a) permit simultaneous voter registration with online driver's license renewal and change-of-address transactions so that in order to register to vote or update voter registration information, the online driver's license renewal or change-of-address customer only needs to respond to the following (or substantially similar) questions:

---

[1] This timeline for compliance is justified because: there is a federal election in November 2018; the NVRA mandates have been in existence for 25 years; the violations in issue have persisted for several years; Defendants were served with statutory notice of the instant violations more than two years ago; and the record reflects that implementation of corrective measures is not only technologically feasible but Defendants are currently capable of instituting such measures. (*See* docket no. 105). Defendants seek 90 days for corrective measures, and do not want to begin implementation until September 1, 2018. Thus, despite admitting that they are currently capable of making changes, they are seeking six months to make the changes. This timeframe for compliance does not take the upcoming election deadlines into consideration. Moreover, Defendants fail to explain why their current vendor (who is presumably more familiar with Texas.gov) cannot achieve compliance prior to September 1, while their new vendor (who is presumably less familiar with Texas.gov) could achieve compliance within 90 days after September 1.

**1. Would you like to register to vote?** No additional information is required.

    ○ **Yes, Register Me to Vote**

    ○ **No, Do Not Register Me to Vote**

**2. If you are <u>already registered</u>, this application will be used to update your voter registration address, <u>unless you opt out</u>. Would you like to <u>opt out</u> of updating your address for voter registration purposes?**

    ○ **Update My Voter Registration**

    ○ **Opt Out: DO NOT Update My Voter Registration** (Your new address will not be submitted to the Texas Secretary of State's office for voter registration purposes).

(hereinafter "the voter registration questions");

(b) register to vote or update voter registration information for online driver's license customers who select "Yes" in response to the question, "Would you like to register to vote?"

(c) register to vote or update voter registration information for online driver's license customers who select "Update My Voter Registration" in response to the question, "Would you like to opt out of updating your address for voter registration purposes?"

(d) register to vote or update voter registration information for online driver's license customers who select both "No" in response to the question, "Would you like to register to vote?" and "Update My Voter Registration" in response to the question, "Would you like to opt out of updating your address for voter registration purposes?"

(e) track, record, and retain each online driver's license renewal or change-of-address customer's response to the voter registration questions; and

(f) transmit the voter registration information for each online driver's license renewal or change-of-address customer to the Secretary of State's office, including the

4

customer's response to the voter registration questions and the customer's electronic

signature file collected during the customer's last in-person transaction;

5.  DIRECTS  Defendant the Secretary of State, upon receipt from DPS of each online driver's license renewal or change-of-address customer's voter registration information and signature file, to transmit this data in the normal course of business to local voter registrars who are responsible for completing the voter registration process, in a manner substantially similar to the process for transmitting voter registration information after an in-person transaction; and ensure that local voter registrars register to vote or update the voter registration information of these customers;

6.  DIRECTS Defendants, within **14 days** from the date of this Judgment, to submit to Plaintiffs' counsel a proposed public education plan that details the use of at least three media venues, including but not limited to television, radio, internet social media, Texas.gov, and/or the Secretary of State's website https://www.sos.state.tx.us, to inform and educate the public on how this Judgment changes the voter registration process for online driver's license renewal and change-of-address applications; include in this public education plan steps to incorporate for two years the promotion of voter registration through online driver's license renewal and change-of-address applications into the Texas.gov marketing program, the Texas.gov/driver marketing campaign, and all DPS, Secretary of State, and their vendors' marketing campaigns related to online driver's license renewal and change-of-address applications; and, once the public education plan is agreed to by all parties, implement such plan no later than **45 days** from the date of this Judgment.[2]

---

[2] Should the Parties be incapable of agreeing on an appropriate public education plan, the Parties will submit their proposals to the Court no later than 25 days from the date of this Judgment, and the Court will order the implementation of a plan that takes reasonable steps to inform the public about this Judgment as described in Paragraph 6.

7.    DIRECTS Defendants to:

(a) submit to this Court notice of compliance with this Judgment no later than **45 days** from the date of this Judgment, with affidavits from the Director of DPS and the Secretary of State attached confirming compliance with this Judgment;

(b) submit to Plaintiffs' counsel on or before January 15th of every year for the next three years through January 15, 2021, a report that includes, for the previous calendar year:

  (i)   a general summary of compliance efforts detailing all steps taken to implement each of the provisions and requirements of this Judgment, including any significant implementation problems, staff training needs, and recommendations for improvement;

  (ii) the number of online driver's license renewal and change-of-address applications and the number of voter registrations arising from these applications;

  (iii) copies of all NVRA procedures and educational and training materials related to online driver's license renewal or change-of-address transactions both used in the preceding year and expected to be used in the future;

  (iv) any investigations or corrective actions at DPS or the Secretary of State's office related to voter registrations through online driver's license renewal or change-of-address applications;

  (v) any implemented or revised policies or procedures at DPS or the Secretary of State's office related to voter registrations through online driver's license renewal or change-of-address applications; and

(vi) all customer complaints related to voter registration through an online driver's license renewal or change-of-address application, and all subsequent correspondence and action taken related to each customer complaint; and

(c) conduct monthly quality control tests until May 2019 to ensure that the online driver's license renewal and change-of-address process complies with this Judgment, and report to Plaintiffs' counsel every three months the results of completed quality control tests;

8.     RETAINS jurisdiction over this action until two years after the date of this Judgment to ensure that Defendants continue to comply with their obligations under the NVRA, the Equal Protection Clause, and this Judgment, and, if Defendants fail to comply with this Judgment at any time after the two-year deadline, permits Plaintiffs to initiate an enforcement action against Defendants in this Court;

9.     ORDERS that Defendants shall pay to Plaintiffs their reasonable attorney's fees, including litigation expenses, and costs as will be determined by the Court in a post-judgment Order upon submission by the Plaintiffs.

SIGNED this 18th day of May, 2018.


_____
ORLANDO L. GARCIA
CHIEF U.S. DISTRICT JUDGE

7

# Exhibit E

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| JARROD STRINGER, *et. al*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| CARLOS H. CASCOS, IN HIS OFFICIAL | § | |
| CAPACITY AS THE TEXAS SECRETARY OF | § | |
| STATE and STEVEN C. McCRAW, IN HIS | § | |
| OFFICIAL CAPACITY AS THE DIRECTOR OF | § | |
| THE TEXAS DEPARTMENT OF PUBLIC | § | |
| SAFETY | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

### NATURE OF THE ACTION

1.      This action seeks declaratory and injunctive relief to redress Defendants' systemic and ongoing violations of the "Motor Voter" provisions of the National Voter Registration Act of 1993 ("NVRA"), enacted as Public Law 103-31 and codified at 52 U.S.C. §§ 20501-20511. Defendants' conduct also violates the U.S. Constitution's guarantee of equal protection, preserved by Section 1 of the Fourteenth Amendment. As a result, Plaintiffs, who are eligible Texas voters, have been disenfranchised — just like the thousands of similarly situated voters who complained to election officials about these same problems when their ballots were not counted. Texas voters will continue to be shut out of the democratic process unless and until Defendants reform their registration practices.

2.      After finding that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation," and that state governments have a "duty" to promote voting and voter registration, Congress enacted the NVRA to "establish

1

procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501. Through its Motor Voter provisions, the NVRA imposes voter registration obligations upon state motor vehicle bureaus. Specifically, every time an eligible voter obtains, renews, or updates his or her driver's license with the Texas Department of Public Safety ("DPS"), the State must simultaneously offer to register that person to vote or to update the voter's registration record.

3.      The Motor Voter provisions require DPS to simultaneously treat: (a) "each . . . driver's license application (including any renewal application)" as an "application for voter registration," 52 U.S.C. § 20504(a)(1); and (d) "any change of address form" as a "notification of change of address for voter registration," 52 U.S.C. § 20504. Defendants have a legal duty to ensure that every eligible voter who submits a driver's license application or renewal, or updates his or her address with DPS, is duly registered to vote. 52 U.S.C. § 20507(a)(1)(A).

4.      The Motor Voter provisions apply to "each" renewal application and "any" change-of-address form submitted to DPS, unless the voter "fails to sign the voter registration application" or "states on the form that the change of address is not for voter registration purposes." 52 U.S.C. § 20504. Accordingly, outside of those two narrow exceptions, *all* driver's license transactions are covered by the Motor Voter law, regardless of the method by which a voter applies, renews or updates his or her driver's license — the NVRA does not discriminate against voters who choose one transaction method over another. Online renewals and change-of-address transactions are thus expressly covered by the NVRA's plain text.

5.      The State of Texas permits certain Texas driver's license holders to renew their license and/or update the address on their license online on DPS' website at www.txdps.state.tx.us. *See* Ex. A, at 1. During the online process, these individuals are asked to

2

check "yes" or "no" in response to the statement, "I want to register to vote." *See* Ex. A, at 2; Ex. C, at 19. It is undisputed that, even after an eligible voter checks "yes," Defendants fail to offer any means for simultaneous voter registration and fail to update the registration records of voters who change their address.

6.      Even though the State does not use information from online change-of-address transactions to properly register a voter at his or her new address, these transmissions may be used to *cancel* a voter's prior registration record. *See* Tex. Elec. Code § 16.031.

7.      In addition to violating the NVRA, Defendants' current practices treat similarly situated voters differently based solely on how those voters choose to transact with DPS. The NVRA, which makes no distinction between transaction methods, cannot be used to justify this arbitrary discrimination.

8.      As a result of Defendants' failure to comply with the NVRA, each Plaintiff in this action was not able to cast a regular ballot in a recent election. Each Plaintiff was thus denied the right to voter registration that is guaranteed by the NVRA and denied an equal opportunity to participate in a federal election — for no reason other than the method through which they transacted with DPS.

9.      Between September 2013 and May 26, 2015, the State recorded complaints from more than 1,800 voters who completed an online transaction with DPS and mistakenly believed that their registration records were updated too. *See* Ex. B. These voters certainly represent a mere fraction of the total number of Texas voters injured by Defendants' conduct.

10.      Defendants must not be permitted to ignore constitutional and federal law. We respectfully request that this Court enjoin Defendants from further violations of applicable law and grant Plaintiffs the relief set forth below.

## JURISDICTION AND VENUE

11.     This case arises under the U.S. Constitution and the NVRA, a law of the United States. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4).

12.     Defendants have received detailed notice of these violations of federal law and have failed to correct the violations alleged herein within 90 days. Plaintiffs therefore have a private right of action under 52 U.S.C. § 20510(b) to enforce the NVRA. Exhibit C contains the original notice provided to Defendants on May 27, 2015 and all correspondence between the parties thereafter.

13.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

14.     This Court has personal jurisdiction over Defendants because each is a citizen of the State of Texas.

15.     Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in this district, and each Defendant conducts business in this district. 28 U.S.C. § 1391(b).

## PARTIES

### *Plaintiffs*

16.     Plaintiffs —Benjamin Hernandez, Jarrod Stringer, Totysa Watkins, and John Woods — are eligible Texas voters who were directly and individually harmed by Defendants' conduct.

4

*Defendants*

17.     Defendants are the state officials charged with ensuring Texas' compliance with Sections 4 and 5 of the NVRA.

18.     Defendant Carlos H. Cascos ("Mr. Cascos") is the Texas Secretary of State, and is sued in his official capacity. As Secretary of State, Mr. Cascos serves as Texas' Chief Election Officer. Tex. Elec. Code § 31.001(a). Each state's chief election official is responsible for coordinating that state's compliance with the NVRA. 52 U.S.C. § 20509.

19.     Defendant Steven C. McCraw is the Director of DPS, and is sued in his official capacity. DPS is Texas' motor vehicle bureau. DPS operates offices around the state, issues driver's licenses and other state identification cards, and is responsible under state and federal law for providing voter registration services and transmitting voter registration information to the Texas Secretary of State. *See* 52 U.S.C. §§ 20503-20504; Tex. Elec. Code §§ 20.063, 20.066.

## APPLICABLE LAW

### *The Fourteenth Amendment*

20.     The Fourteenth Amendment's Equal Protection Clause is implicated any time a state subjects voters to disparate treatment or places arbitrary restrictions upon the right to vote. U.S. Const. amend. XIV, § 1.

21.     There is no "litmus test for measuring the severity of a burden that a state law imposes on . . . an individual voter, or a discrete class of voters. However slight that burden may appear, . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion County Election Board*, 553 U.S. 181, 191 (2008) (Stevens, J., announcing judgment of Court); *accord Obama for America v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) ("When a plaintiff alleges that a state has burdened voting rights

5

through the disparate treatment of voters, we review the claim using the flexible standard

outlined in *Anderson v. Celebrezze* . . . courts must weigh the burden on voters against the state's

asserted justifications and make the hard judgment that our adversary system demands." (internal

quotation marks and citations omitted)).

### National Voter Registration Act of 1993

22.     A "principal purpose" of the NVRA is to "increase the number of eligible citizens

who register to vote." 52 U.S.C. § 20501(b)(1); *Ferrand v. Schedler*, No. 11-926, 2012 WL

1570094 at *10 (E.D. La. May 3, 2012) (citing H.R. Rep. No. 103–66, at 19 (1993) (Conf. Rep.),

*reprinted in* 1993 U.S.C.C.A.N. 140, 144); *Ass'n of Cmty. Organizations for Reform Now v.

Fowler*, 178 F.3d 350, 354 (5th Cir. 1999). A Senate Report on the law "makes clear that, in

implementing the NVRA, the '[g]overnment should do all it can to make registration widely and

easily available.'" *Ferrand v. Schedler*, No. 11-926, 2012 WL 1570094 at *11 (E.D. La. May 3,

2012) (citing S. Rep. No. 103–6, at 14 (1993)).

23.     The NVRA's "Motor Voter" provisions were meant to streamline the federal

voter registration process and increase voter registration accessibility:

> [I]ncorporating voter registration into the drivers licensing process provides a
> secure and convenient method for registering voters; an effective means of
> reaching groups of individuals generally considered hard-to-reach for voting
> purposes . . .; and a procedure for keeping rolls current through contact with
> licensees who change addresses.

S. Rep. 103-6, at 5 (1993).

24.     Indeed, under the Motor Voter provisions, every time an eligible Texas voter

obtains, renews, or updates his or her driver's license with DPS, the State must simultaneously

register that person to vote or update that voter's registration records, unless the person fails to

6

sign the registration form or attests that the change-of-address information is not for voter registration purposes. 52 U.S.C. §§ 20503, 20504; 20507.

25.     In relevant part, 52 U.S.C § 20504 provides that:

Each State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application . . . any change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes.

26.     The State may not "require any information that duplicates information required in the driver's license portion of the form," other than extra information expressly enumerated by statute. *Id*. at § 20504(c)(2)(A). Instead, the NVRA demands that eligible voters shall be registered to vote "simultaneously" with the submission of any driver's license application, renewal or change-of-address form. *See id*. at § 20503(a)(1)(1).

27.     DPS must promptly transmit completed voter registration applications and change-of-address information to election officials; generally, transmission must occur no later than 10 days after receipt. *See id*. at § 20504(e).

### *Texas Election Code*

28.     Shortly after the NVRA was enacted in 1993, the State of Texas updated the Texas Election Code to reinforce the NVRA's Motor Voter mandates. *See generally* Tex. Elec. Code §§ 20.061-66.

29.     For instance, state law specifies that DPS must use "a form and procedure that combines the department's application form for a license or card with an officially prescribed voter registration application form." *Id*. at § 20.062(a).

30. DPS must also provide a "change of address form and procedure that combines department and voter registration functions," so that when a voter submits a change of address, that "serves as a change of address for voter registration" as well, unless the individual indicates otherwise. *Id*. at § 20.063(c); *id*. at § 20.062(a).

31. In addition, if a "correct driver's license number or personal identification card number" or if "correct residence address or mailing address" information is missing from a registration application, DPS employees have a duty to correct the voter's application by "enter[ing] the information on the application." *Id*. at § 20.063(d).

32. Finally, voter registration applications and change-of-address forms must be promptly delivered to election officials. Specifically, "[n]ot later than the fifth day after the date a person completes a voter registration application and provides an electronic signature to the department, [DPS] shall electronically transfer the applicant's voter registration data, including the applicant's signature, to the [Texas Secretary of State]." *Id*. at § 20.066; *see also id*. at § 20.065.

## FACTUAL ALLEGATIONS

33. Exhibit C contains the original notice provided to Defendants on May 27, 2015 and all correspondence between the parties thereafter. The factual allegations set forth in those letters are incorporated by reference in this Complaint.

### *DPS Does Not Provide Simultaneous Voter Registration with Online Transactions*

34. DPS encourages Texans to use a number of online services through its website, www.txdps.state.tx.us, an official governmental website for the State of Texas.

35. DPS invites many Texas driver's license holders to renew their license and/or update the address information associated with their license online through a portion of its

8

website entitled "Driver License Renewal and Change of Address," available at https://txapps.texas.gov/tolapp/txdl/.

36.     Defendants' Driver License Renewal and Change of Address website page provides a single online portal for qualified holders of a Texas driver's license to renew their driver's licenses, update the address listed on their driver's licenses, or both.

37.     The online process involves eight "Steps to Complete," including the following steps: Welcome, Login, Select Services, Enter Address, Select Options, Review Order, Submit Payment, and Receipt. *See* Ex. A, at 1; Ex. C, at 19.

38.     When users reach Step 5 of this online process, Defendants prompt the users to answer whether they want to register to vote. *See* Ex. A, at 2; Ex. C, at 19. If, however, an eligible voter checks "yes" under the statement "I want to register to vote," Defendants do not register that voter to vote and do not update that voter's registration records.

39.     Unlike Defendants' simultaneous voter registration services for license renewal or address update applications submitted in-person at a DPS office, Defendants do not provide for simultaneous voter registration as required by the NVRA at any point during the online license renewal or address update process. Rather than providing any simultaneous opportunity for voter registration, the DPS website directs voters to an entirely different website, where voters must "download[] or request[]" a physical voter registration form.[1]

40.     Specifically, Step 5 includes the following statement:

> Selecting "Yes" does not register you to vote. A link to the Secretary of State Voter website (where a voter application may be downloaded or requested) will be available on your receipt page.

---

[1] "Simultaneous" means "existing or occurring at the same time: exactly coincident." *Definition of Simultaneous by Merriam-Webster*, Merriam-Webster, http://www.merriam-webster.com/dictionary/simultaneous (last visited March 8, 2016).

Case 5:20-cv-00046-OLG Document 77-1 Filed 05/29/20 Page 312 of 797

41.     Then, in order to register to vote, or to update address information, following an online transaction, an eligible voter must complete a number of additional steps. He or she must complete a separate voter registration form, print it out (if using a PDF version), and mail the form to the appropriate county registrar (after looking up that address) before the voter registration deadline.

42.     Defendant Secretary of State's publication, *32nd Annual Election Law Seminar Handbook*[2] confirms that "[i]f the [DPS] transaction was made online, then the person is not registered to vote." According to this handbook, "[b]y selecting 'yes' when updating information through DPS online renewal [the voter] is merely requesting a link to a voter registration application on the individual's receipt page."

43.     This process stands in stark contrast to DPS' procedures for registering eligible Texas residents who renew a driver's license and/or update address information in person at a DPS office. As DPS recently confirmed, for in-person customers who wish to register to vote, DPS "electronically transfer[s] to the Secretary of State (SOS) the name and relevant data regarding each applicant who is of voting age and a United States citizen who affirmatively answered the voter registration question" at the end of each business day. Ex. C, at 134. However, when the exact same information is submitted online by an eligible voter who is identically situated but chose to use DPS' online system rather than visit the office in person, that voter's "name and relevant data" is never transferred to election officials.

44.     Even though Defendants refuse to use information from online change-of-address transactions to properly register voters at their new addresses, they are certainly capable of using this information to do so. In fact, Defendants may use the same online information to *cancel* a

---

[2] On file with Counsel for Plaintiffs.

APPENDIX 302

voter's prior registration record even though they fail to give voters any notice of this possibility. *See* Tex. Elec. Code § 16.031.

45.     Defendants further confuse voters like Plaintiffs with the portion of DPS' webpage that provides answers to frequent inquiries about the online renewal and change-of-address processes. Defendants fail to indicate here that voter registration files are not simultaneously updated. *See* Ex. E. DPS also fails to explain on its website that completing DPS' online change-of-address form may jeopardize a voter's registration status at his or her former residence. *Id*.

### Defendants' Conduct Injures Each Plaintiff

46.     **Benjamin Hernandez**: Mr. Hernandez moved to Dallas County from Ector County in February 2013. That month, he updated his driver's license address online, and believed that his voter registration records were updated as well. On Election Day 2014, Mr. Hernandez attempted to vote in Dallas County, but was told that his name was not on the rolls in Dallas County. Mr. Hernandez cast a provisional ballot, but later received notice that his vote was not counted.

47.     **Jarrod Stringer**: Mr. Stringer moved from Tarrant County to Bexar County on August 1, 2014. Within the same week, Mr. Stringer updated his driver's license address online, and believed that his voter registration records were updated as well. Mr. Stringer attempted to vote early in the 2014 general election, but was told that his name was not on the rolls in Bexar County. Mr. Stringer then called Bexar County election officials, and was told that he was not registered in Bexar and could only vote a limited ballot with state-wide candidates, because he was still registered at his former address. When Mr. Stringer explained that he had changed his

11

address through DPS' website, the election officials with whom he spoke told Mr. Stringer that the county was aware of "problems at DPS."

48. **Totysa Watkins**: Ms. Watkins moved from Denton County to Dallas County in 2011. After moving, she changed her driver's license address online, and believed that her voter registration records were updated as well. In September 2013, Ms. Watkins moved within Irving, which is in Dallas County, and once again changed her driver's license address and attempted to update her voter registration online through DPS' website. Ms. Watkins attempted to vote on Election Day 2014, but was told by an election worker that she was not registered in Dallas County. She cast a provisional ballot. A few weeks later, Ms. Watkins received a notice indicating that her vote was not counted and then received two new voter registration cards.

49. **John Woods**: Dr. Woods moved from Travis County to Harris County in June 2015. In September 2015, Dr. Woods changed his driver's license address online, and believed that his voter registration records were updated as well. Shortly thereafter, Dr. Woods went to a local library, where he was offered an opportunity to register to vote. He declined that opportunity, however, because he believed that his voter registration records had already been updated. Dr. Woods called Harris County on Election Day 2015, trying to identify his polling location. Dr. Woods was informed that he was not registered in Harris County, but was still registered in Travis County, and that any provisional ballot cast in Harris County would likely not be counted. Nonetheless, Dr. Woods went to his local polling location and cast a provisional ballot.

50. Each Plaintiff believed that he or she was properly registered because he or she completed an online transaction with DPS, attempted to update his or her registration records, and later received an updated driver's license in the mail.

51. Plaintiffs only learned of DPS' registration failures when they arrived at the polls and were denied a regular ballot.

52. No Plaintiff was informed that completing DPS' online change-of-address form could jeopardize his or her registration status at his or her former residence pursuant to current law.

53. The conduct that harmed Plaintiffs is ongoing. Moreover, Defendants have repeatedly maintained that they are unwilling to change the policies and practices that caused the injuries described herein. *See* Ex. C.

### *Defendants' Voter Registration Failures Harm Countless Texas Voters*

54. As a result of Defendants' failure to comply with the NVRA, countless eligible Texas residents have been denied the right to voter registration, which is guaranteed by the NVRA.

55. Indeed, according to its own data, between September 2013 and May 26, 2015, the State recorded complaints from more than 1,800 voters who completed an online transaction with DPS and mistakenly believed that their registration records were updated as well.

56. For all of the reasons laid out in Plaintiffs' May 27, 2015 notice letter, Exhibit C, at 2-21, the voters who complained almost certainly represent just a fraction of the total affected during that time frame. Indeed, the State's records capture only those voters who contacted election workers, specifically complained about registration problems at DPS, and had their files investigated — surely, not all affected voters complained; others may have reported problems but had their complaints disregarded by election workers. Further, the data provided by the State comes from just 123 of Texas' 254 counties, strongly suggesting that the data set itself is incomplete. *See* Ex. B; Ex. C, at 9.

13

57. Notably, numerous emails, obtained through public records requests, establish that DPS officials and high-ranking employees in the Secretary of State's office have had actual knowledge of the significant and widespread confusion caused by the State's treatment of online DPS transactions since at least 2012. *See* Ex. C, at 15; Ex. D. But, to date, Defendants have taken no significant steps to remedy these problems.

## CLAIMS FOR RELIEF

### *Count I*
### *Subjecting Plaintiffs to Arbitrary Treatment in Violation of the Right to Equal Protection*

58. Plaintiffs incorporate by reference the allegations contained in Paragraphs 33 through 57 as if fully set forth herein.

59. By arbitrarily subjecting Plaintiffs to disparate voter registration standards, Defendants have denied Plaintiffs an equal opportunity to participate in federal and state elections in violation of Section 1 of the Fourteenth Amendment. As a result of this disparate treatment, Plaintiffs were denied their right to vote.

### *Count II*
### *Failure to Treat Driver's License Renewal Transactions as Voter Registration Applications*

60. Plaintiffs incorporate by reference the allegations contained in Paragraphs 33 through 57 as if fully set forth herein.

61. Plaintiffs have a private right of action pursuant to 52 U.S.C. § 20510(b). Plaintiffs must "provide written notice of… violation[s] to the chief election official of the State involved." 52 U.S.C. § 20510(b)(1). Defendants received notice of these violations and failed to correct them within 90 days of receiving that notice. 52 U.S.C. § 20510; *see* Ex. C. Therefore, Plaintiffs may bring this suit.

14

62.     Defendants have violated and continue to violate 52 U.S.C.§ 20503(a)(1) by failing to establish procedures "to register to vote in elections for Federal office . . . by application made simultaneously with an application for a motor vehicle driver's license pursuant to section 20504."

63.     Defendants have violated and continue to violate 52 U.S.C.§ 20504(a)(1) by failing to operate a system in which online applications to renew a Texas driver's license also serve as simultaneous applications for voter registration.

64.     Defendants have violated and continue to violate 52 U.S.C. § 20504(a)(2) by failing to treat online driver's license renewal applications "as updating any previous voter registration by the applicant."

65.     Defendants have violated and continue to violate 52 U.S.C.§ 20504(c) by requiring eligible voters who use the DPS website to renew a driver's license and who wish to register to vote to separately submit "information that duplicates information required in the driver's license portion of the form."

66.     Defendants have violated and continue to violate 52 U.S.C. § 20504(e) by failing to transmit voter registration information submitted online to "the appropriate State election official" within the statutory period.

67.     Defendants have violated and continue to violate 52 U.S.C. § 20507(a)(1)(A) by failing to "ensure that any eligible applicant is registered to vote" if the "valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election."

### Count III
### *Failure to Treat Driver's License Change-of-Address Transactions as Updates for Voter Registration Purposes*

68.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 33 through 57 as if fully set forth herein.

69.     Plaintiffs have a private right of action pursuant to 52 U.S.C. § 20510(b). Plaintiffs must "provide written notice of… violation[s] to the chief election official of the State involved." 52 U.S.C. § 20510(b)(1). Defendants received notice of these violations and failed to correct them within 90 days of receiving that notice. 52 U.S.C. § 20510; *see* Ex. C. Therefore, Plaintiffs may bring this suit.

70.     Defendants have violated and continue to violate 52 U.S.C.§ 20503(a)(1) by failing to establish procedures "to register to vote in elections for Federal office . . . by application made simultaneously with an application for a motor vehicle driver's license pursuant to section 20504."

71.     Defendants have violated and continue to violate 52 U.S.C.§ 20504(c) by requiring eligible voters who use the DPS website to update a driver's license and who wish to register to vote to separately submit "information that duplicates information required in the driver's license portion of the form."

72.     Defendants have violated and continue to violate 52 U.S.C.§ 20504(d) by failing to operate a system in which "[a]ny change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license" serves "as notification of change of address for voter registration."

APPENDIX 308

73. Defendants have violated and continue to violate 52 U.S.C. § 20504(e) by failing to transmit voter registration information submitted online to "the appropriate State election official" within the statutory period.

74. Defendants have violated and continue to violate 52 U.S.C. § 20507(a)(1)(A) by failing to "ensure that any eligible applicant is registered to vote" if the "valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election."

<div align="center">

**REQUEST FOR RELIEF**

</div>

Plaintiffs respectfully request for the Court to enter an order:

i. Declaring, pursuant to 28 U.S.C. § 2201 and 52 U.S.C. § 20510(b)(2), that Defendants have violated the NVRA by failing to provide for simultaneous voter registration with online driver's license renewal;

ii. Declaring, pursuant to 28 U.S.C. § 2201 and 52 U.S.C. § 20510(b)(2), that Defendants have violated the NVRA by failing to provide for simultaneous voter registration with online change-of-address forms;

iii. Permanently enjoining Defendants, their agents and successors in office, and all persons working in concert with them, from implementing practices and procedures that likewise violate the NVRA;

iv. Directing Defendants, under a court-approved plan with appropriate reporting and monitoring requirements, to take all appropriate measures necessary to remedy the harm caused by their noncompliance, including, but not limited to providing for the electronic transfer of voter registration information collected through online transactions to the Secretary of State,

<div align="center">17</div>

similar to the existing system to transfer voter registration information collected through in-person transactions;

v.     Awarding Plaintiffs reasonable attorney fees, including litigation expenses, and costs, pursuant to 52 U.S.C. § 20510(c);

vi.     Retaining jurisdiction over this action to ensure that Defendants continue to comply with their obligations under the NVRA; and

vii.     Awarding such other equitable and further relief as the Court deems just and proper.

Dated: March 14, 2016                    Respectfully submitted,

Peter A. Kraus*
Texas State Bar No. 11712980
kraus@waterskraus.com
Charles S. Siegel
Texas State Bar No. 18341875
siegel@waterskraus.com

By: /s/ Caitlyn E. Silhan
Caitlyn E. Silhan
Texas State Bar No. 24072879
csilhan@waterskraus.com

*Peter A. Kraus' Motion for Admission Pro Hac Vice into the U.S. District Court of the Western District of Texas is currently pending.*

WATERS & KRAUS, LLP
3219 McKinney Avenue
Dallas, Texas 75204
214-357-6244 (Telephone)
214-871-2263 (Facsimile)

Mimi Marziani**
Texas Bar No. 24091906
mimi@texascivilrightsproject.org

18

Wayne Krause Yang
Texas Bar No. 24032644
wayne@texascivilrightsproject.org
Hani Mirza**
Texas Bar No. 24083512
hani@texascivilrightsproject.org

** *Mimi Marziani's and Hani Mirza's admission into the U.S. District Court of the Western District of Texas is currently pending.*

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, Texas 78741
Tel. (512) 474-5073
Fax (512) 474-0726


ATTORNEYS FOR PLAINTIFFS

# Exhibit F

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JARROD STRINGER, et al., | § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| v. | § | C.A. 5:16-cv-00257-OLG |
| | § | |
| ROLANDO PABLOS, in his official | § | |
| capacity as the Texas Secretary of State, and | § | |
| STEVEN C. McCRAW, in his official | § | |
| capacity as the Director of the Texas | § | |
| Department of Public Safety, | § | |
| | § | |
| *Defendants* | § | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**THE TEXAS CIVIL RIGHTS PROJECT**          **WATERS & KRAUS, LLP**
Mimi M.D. Marziani                                      Peter A. Kraus (*pro hac vice*)
Rebecca Harrison Stevens                           Charles S. Siegel
Hani Mirza                                                   Caitlyn E. Silhan
Cassandra Champion                                   Rachel A. Gross (*pro hac vice*)
1405 Montopolis Drive                               3141 Hood Street, Suite 700
Austin, Texas 78741                                    Dallas, Texas 75219
512-474-5073 (Telephone)                          214-357-6244 (Telephone)
512-474-0726 (Facsimile)                           214-871-2263 (Facsimile)

*ATTORNEYS FOR PLAINTIFFS*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................... 4

UNDISPUTED FACTS ......................................................................................................... 4

   A. DPS seamlessly integrates voter registration into its mail-in change-of-address and in-person driver's license applications. ................................................................ 5

   B. Defendants do not provide simultaneous voter registration applications with online transactions, but instead require additional steps and duplicative information before a customer can register or update their voter registration information. ........................................................................................................................ 7

   C. Plaintiffs moved from one Texas county to another, transacted with DPS online to update their driver's license information, and checked "yes" to the voter registration question, yet Defendants failed to update their voter registration information and Plaintiffs were denied the chance to cast a regular ballot in an election. ..................................................................................................................... 10

       *1. Benjamin Hernandez* ............................................................................... 10

       *2. Jarrod Stringer* ........................................................................................ 11

       *3. John Woods* .............................................................................................. 11

   D. DPS is technologically capable of providing voter-registration information from online transactions to SOS and doing so would not be cost prohibitive. ................... 12

LEGAL STANDARD ........................................................................................................... 13

ARGUMENT ........................................................................................................................ 13

   A. Texas' failure to treat online DPS transactions as voter registration applications violates the NVRA ............................................................................................................ 14

       *1. The plain language of the NVRA controls* ............................................. 14

       *2. Defendants fail to treat online driver's license renewal applications as "simultaneous" voter registration applications in violation of 52 U.S.C. §§ 20503(a)(1), 20504(a)(1), and 20504(a)(2).* ........................................ 15

       *3. Defendants fail to treat online driver's license change-of-address applications as notifications for voter registration in violation of 52 U.S.C. § 20504(d).* ............................................................................. 17

       *4. Defendants' requirement that applicants submit a separate voter registration application upon completion of online transactions violates the NVRA's prohibition against requiring duplicative information, 52 U.S.C. § 20504(c)(2).* ............................................................................. 17

       *5. Defendants' failure to transmit voter registration information submitted during online driver's license transactions violates 52 U.S.C. § 20504(e).* .......... 18

i

      6.     *SOS's failure to ensure that eligible applicants are registered to vote upon completion of the voter registration portion of online driver's license change-of-address and renewal applications violates 52 U.S.C. § 20507(a)(1)(A).* ....................................................................................................18

B.   Texas' failure to treat online DPS transactions as voter registration applications violates the Equal Protection Clause..............................................................................19

      1.     *The Equal Protection Clause protects against restrictions that place unreasonable burdens on the right to vote.* ...........................................................19

      2.     *Defendants' refusal to treat online driver's license transactions as voter registration applications unduly burdens Plaintiffs' right to vote*........................20

      3.     *Defendants' asserted interest in requiring handwritten signatures is insufficient to justify the burdens created by their treatment of online DPS transactions.*...........................................................................................................21

      4.     *DPS's signature requirement as to online transactions is unreasonable*.............22

C.   Defendants' Affirmative Defenses are Not Supported by Evidence...............................23

D.   Defendants should be required to correct their violations of the NVRA within three months of the Court's ruling. ...............................................................................24

CONCLUSION.....................................................................................................................25

APPENDIX 315

# TABLE OF AUTHORITIES

## Cases

*Action NC v. Strach*,
216 F. Supp. 3d 597 (M.D. N.C. 2016) ............................................................ 14, 15

*Anderson v. Celebrezze*,
460 U.S. 780 (1983) .............................................................................................. 19, 22

*Anderson v. Liberty Lobby, Inc.*,
447 U.S. 242 (1986) .................................................................................................... 13

*Arcia v. Florida Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) ................................................................................ 13

*Ass'n of Cmty. Organizations for Reform Now (ACORN) v. Edgar*,
56 F.3d 791 (7th Cir. 1995) ........................................................................................ 3

*Burdick v. Takushi*,
504 U.S. 428, 434 (1992) .............................................................................. 19, 20, 22

*Bush v. Gore*,
531 U.S. 98, 104 (2000) ............................................................................................. 19

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
408 F.3d 1349 (11th Cir. 2005) ................................................................................ 13

*Crawford v. Marion County Election Bd.*,
553 U.S. 181 (2008) .............................................................................................. 19, 20

*Crowe v. Henry*,
115 F.3d 294 (5th Cir. 1997) .................................................................................... 13

*Ferrand v. Schedler*,
2012 WL 1570094 (E.D. La. May 3, 2012) ............................................................ 14

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016) .................................................................................. 14

*Georgia State Conference of NAACP. v. Kemp*,
841 F. Supp. 2d 1320 (N.D. Ga. 2012) .............................................................. 14, 15

*Harper v. Va. State Bd. of Elections*,
383 U.S. 663 (1966) .................................................................................................... 19

*In re Dale*,
582 F.3d 568 (5th Cir. 2009) .................................................................................... 14

*Kusper v. Pontikes*,
414 U.S. 51 (1973) ...................................................................................................... 22

*Norman v. Reed*,
502 U.S. 279 (1992) .................................................................................................... 20

*Northeast Ohio Coalition for the Homeless v. Husted*,
  837 F.3d 612 (6th Cir. 2016), (cert. denied, 2017 WL 881266 (U.S. June 19, 2017) ............. 23

*Obama for America v. Husted*,
  697 F.3d 423 (6th Cir. 2012). ............................................................................................. 19

*Project Vote/Voting for Am., Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012) .............................................................................................. 15

*Reynolds v. Sims*,
  377 U.S. 533 (1964)............................................................................................................... 3

*Voting Rights Coal. v. Wilson*,
  60 F.3d 1411 (9th Cir. 1995) ................................................................................................. 3

## Statutes and Rules

28 U.S.C. § 2201......................................................................................................................... 25

37 Tex. Admin. Code § 15.59(c) ................................................................................................... 5

52 U.S.C. § 20503(a)(1) .............................................................................................................. 15

52 U.S.C. § 20504................................................................................................................... 2, 5

52 U.S.C. § 20504(a)(1) ........................................................................................................ 2, 15

52 U.S.C. § 20504(a)(2).............................................................................................................. 15

52 U.S.C. § 20504(c)(1) ........................................................................................................ 2, 15

52 U.S.C. § 20504(c)(2).............................................................................................................. 17

52 U.S.C. § 20504(d). ........................................................................................................... 2, 16

52 U.S.C. § 20504(e). ................................................................................................................. 18

52 U.S.C. § 20504(e)(1)-(2)........................................................................................................ 18

52 U.S.C. § 20507(a)(1)(A). ....................................................................................................... 18

52 U.S.C. § 20509....................................................................................................................... 5

52 U.S.C. § 20510(b)(1) ............................................................................................................. 23

52 U.S.C. § 20510(b)(2) ....................................................................................................... 23, 25

Fed. R. Civ. P. 56(a) ................................................................................................................... 13

Tex. Elec. Code § 31.001.............................................................................................................. 5

Tex. Elec. Code § 20.001(b) ......................................................................................................... 5

Tex. Elec. Code § 20.061-66 ........................................................................................................ 5

Tex. Gov't Code § 2054.252......................................................................................................... 8

Tex. Gov't Code § 2054.271......................................................................................................... 8

APPENDIX 317

Since before 2010, Texas has failed to comply with the National Voter Registration Act (NVRA) and violated the Equal Protection Clause of the Fourteenth Amendment, stripping from millions of Texans their right to register to vote during online driver's license renewal and change-of-address transactions. Plaintiffs are eligible Texas voters who were denied voter registration during NVRA-covered online driver's license transactions and, thereafter, disenfranchised. They respectfully ask the Court to render final summary judgment against Defendants and order the State of Texas to take immediate steps to adhere to the Constitution and federal law.

## PRELIMINARY STATEMENT

The central fact of this case has never been disputed: When eligible Texans update their driver's licenses online with the Department of Public Safety (DPS), they are not offered a simultaneous application to register to vote or update their voter registration information.[1] As this Court has already held, the NVRA requires that each driver's license application, including any renewal application, simultaneously serve as an application for voter registration, and that each change-of-address form be used to update the voter's registration records.

Texas's refusal to integrate voter registration into its online driver's license renewal and change-of-address process affects nearly 1.5 million Texans annually, including the Plaintiffs here. Each Plaintiff moved within Texas, changed his driver's license address using DPS's online driver license renewal and change-of-address website, indicated "Yes" in response to the prompt "I want to register to vote," but was not registered to vote. Each Plaintiff, although eligible to do so, was prevented from fully exercising his fundamental right to vote in a subsequent election due to his outdated registration record.

---

[1] As Defendants put it, "[t]he key facts of this case are not disputed." Defs.' Reply in Supp. of Mot. to Dismiss, Dkt. 12 at 6; *see also* Joint Report on Alternative Dispute Resolution, Dkt. 22 at 2 (stating that the parties agree "that their primary dispute is legal, rather than factual").

Texas has known for years that its online driver's license transaction practices disenfranchise large numbers of voters. Between September 2013 and February 2015, for instance, more than 1,800 Texans complained about Texas' failure to register individuals to vote through the DPS online driver's license application, according to the State's own records. Yet Texas took no meaningful steps to fix its process. Instead, adding insult to injury, DPS *encourages* the use of the online system over in-person transactions, resulting—predictably—in a dramatic uptick in online transactions and, by extension, injured prospective voters.

The State does not claim that NVRA compliance would be too expensive or burdensome. Instead, Texas seeks to contort the plain language of the law to justify its current processes. According to the Defendants, even though the NVRA provides "simultaneous application for voter registration" by requiring that "each . . . driver's license application . . . serve as an application for voter registration," 52 U.S.C. § 20504, what it means is something else entirely. The State asserts that it must offer nothing more than a simultaneous *opportunity* to register to vote during an online driver's license transaction, which can be satisfied by forcing online DPS customers to retrieve, print, complete, and mail an entirely separate and duplicative voter registration application after finishing their online transaction. This Court rightfully rejected that reading of the NVRA, holding that the law clearly prohibits Texas's procedure because the NVRA requires not only "that the applications be simultaneous, but discusses them in terms of a single transaction."[2] Accordingly, and as this Court found, Texas's refusal to treat online driver's license renewal and change-of-address forms as voter registration applications violates the NVRA.

No doubt recognizing the weakness of its "simultaneous opportunity" argument, the State makes another, even bolder argument—that the NVRA gives states the prerogative to legislate

---

[2] Order, Dkt. 52 at 11 (citing 52 U.S.C. §§ 20504(a)(1), 20504(c)(1), 20504(d)).

away the law's mandates if a state determines that the NVRA conflicts with state law. Since Texas law requires a voter's signature on a voter registration form, Defendants claim that the NVRA permits Texas to flout the statute's simultaneous-application requirement and require DPS customers to fill out and sign an *entirely separate* voter registration form after providing *identical* information to DPS during an NVRA-covered transaction. The NVRA, of course, permits no such thing. As a federal law, long upheld against constitutional challenge, it preempts any conflicting state requirements. *Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1415–16 (9th Cir. 1995); *Ass'n of Cmty. Organizations for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 794-795 (7th Cir. 1995).[3] Moreover, as this Court noted, this argument is a red herring: In fact, anyone using DPS's online driver license renewal and change-of-address system has *already provided* the state with his signature, which Texas *already uses* to update their voter registration files in some circumstances.[4]

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Too many Texas voters have been unlawfully denied voter registration, just like the Plaintiffs, because of the State's longstanding failure to comply with the NVRA. Another federal election cycle is fast approaching; the deadline to register to vote for the March primary election is a little more than seven months away.[5] Given that the fundamental right to vote is at stake for millions of Texas voters, the Court should order immediate compliance with the NVRA and the Constitution. The State should be

---

[3] *See also* Dkt. 52 at 14-16.
[4] *Id.* at 16-18.
[5] The deadline for the March 2018 primaries is February 5, 2018. *See* Important 2018 Election Dates, http://www.sos.state.tx.us/elections/voter/2018-important-election-dates.shtml (last visited June 28, 2017).

required to fully implement Plaintiffs' requested remedy within three months of the Court's order and no later than January 1, 2018.

## BACKGROUND

Between May and November 2015, Plaintiffs' counsel wrote to Defendants' counsel several times to notify Defendants about Plaintiffs' claims regarding violations of the NVRA.[6] Defendants did not make the changes Plaintiffs stated were necessary to correct the violations prior to Plaintiffs filing suit on March 14, 2016, nearly four months after the last notice letter. Plaintiffs thus brought this lawsuit to enforce the state's duties.

Defendants moved to dismiss, but the Court denied the motion, holding that "standing has been established and that Plaintiffs have stated claims upon which relief can be granted under both the NVRA and the Equal Protection Clause."[7]

Since August 3, 2016, when this Court entered its first Scheduling Order in this matter, Plaintiffs have conducted discovery in good faith and as expeditiously as possible. Defendants, on the other hand, purposely delayed responding to Plaintiffs' discovery requests for months after the documents were due, requiring Plaintiffs to obtain a Court Order compelling Defendants' responses—an Order Defendants were ultimately sanctioned for intentionally violating. Since their initial pre-litigation communications in May 2015, Plaintiffs have continued to emphasize the need to resolve this matter as soon as possible, well before the 2018 election, but Defendants have repeatedly, purposefully delayed.

## UNDISPUTED FACTS

DPS operates offices around the state and issues driver's licenses and other state identification cards. DPS's in-person application forms and mail-in change-of-address forms

---

[6] Dkt. 52 at 7-9; Appx. 2-21 (Ex. 1, May 27, 2015 Notice Letter, D_009849-64); Appx. 23-24 (Ex. 2, Oct. 23, 2015 Notice Letter); Appx. 26-27 (Ex. 3, Nov. 18, 2015 Notice Letter).
[7] Dkt. 52 at 21.

4

currently serve as simultaneous voter registration applications as required under the NVRA.[8] DPS's online renewal and change-of-address form does not, however, serve as a simultaneous voter registration application.[9]

Defendant Rolando Pablos is Secretary of State and serves as Texas's Chief Election Officer, responsible for coordinating Texas's compliance with the NVRA.[10] That office agrees that the NVRA applies to *all* driver's license application transactions, including online transactions.[11] DPS is responsible under state and federal law for providing voter registration services to customers and transmitting voter registration information to the SOS.[12]

### A. DPS seamlessly integrates voter registration into its mail-in change-of-address and in-person driver's license applications.

DPS's protocol for providing voter registration to customers who interact with DPS in person (for a new driver's license application, a renewal, or a change-of-address), and for customers who utilize DPS's mail-in change-of-address form, is in line with NVRA requirements. A DPS customer who decides to or is required to transact with DPS in person must fill out the relevant driver's license form with personal information in order to obtain, update, or renew his driver's license.[13] DPS uses different forms depending on the type of transaction: form DL-14A for an original (in-person) Application for Texas Driver License or Identification

---

[8] Appx. 31 (Ex. 4, Texas Department of Public Safety Implementation Plan, D_00021063 at D_00021065);

[9] Appx. 33 (Ex. 5, Excerpt, Texas Secretary of State Elections Division 34th Annual Election Law Seminar, "DPS Voter Inquiry Web Portal" 669, D_00014211 at slide 3).

[10] 52 U.S.C. § 20509, Tex. Elec. Code § 31.001

[11] Appx. 40 (Ex. 6, Excerpts of Mar. 22, 2017 30(b)(6) Deposition of Keith Ingram, SOS's designee ("Ingram 30(b)(6) Dep.") 62:04-17 ("whenever a person has a driver's license transaction . . . they should be simultaneously offered the right—the ability to update their voter registration or register to vote for the first time. That's why the NVRA is called the Motor Voter law.")).

[12] 52 U.S.C. § 20504, Tex. Elec. Code §§ 20.001(b), 20.061-66; Appx. 113 (Ex. 15, DPS's Suppl. Resps. to Jarrod Stringer's First Requests for Admission ("RFAs"), No. 4).

[13] DPS customers are required to renew their driver's license in-person every 12 years. 37 Tex. Admin. Code § 15.59(c).

Card,[14] form DL-43 for an in-person Application for Renewal/Replacement/Change of a Texas Driver License or Identification Card,[15] and form DL-64 for a mail-in Application for Change-of-address on Valid Texas Driver (DL) & Identification Card (ID).[16] For each, the driver's license and voter registration process has been combined into one seamless transaction so that—in order to register or update voter registration information—the customer need only take one additional step related to voter registration—check a single box *on these same forms*:

**DL-14A and DL-43, in-person driver's license forms**

**REQUIRED INFORMATION FROM ALL APPLICANTS**

|  | YES | NO |  |
|---|---|---|---|
| 1. | ☐ | ☐ | Are you a citizen of the United States? |
| 2. | ☐ | ☐ | If you are a US citizen, would you like to register to vote? If registered, would you like to update your voter information? |

By providing my electronic signature, I understand the personal information on my application form and my electronic signature will be used for submitting my voter's registration application to the Texas Secretary of State's office. Wanting to register to vote, I authorize the Department of Public Safety to transfer this information to the Texas Secretary of State.

**DL-64, mail-in change-of-address form**

If you are a US citizen, would you like to register to vote? If registered, would you like to update your voter information?

Yes ☐  No ☐

Except for this simple, integrated step of checking a box, the in-person and mail-in change-of-address customer does not have to take any further action to ensure he is registered to vote. The customer is not required to retrieve, complete, print, and mail a separate voter

---

[14] Appx. 50-51 (Ex. 7, DL-14A (Rev. 2-17)), *see also* Texas Department of Public Safety, Application for Texas Driver License or Identification Card, https://www.dps.texas.gov/internetforms/Forms/DL-14A.pdf (last visited June 18, 2017).

[15] Appx. 53-54 (Ex.8, DL-43 (Rev. 2-17)), Texas Department of Public Safety, Application for Renewal/Replacement/Change of Texas Driver License or Identification Card, http://www.dps.texas.gov/Internetforms/Forms/DL-43.pdf (last visited June 18, 2017).

[16] Appx. 56-57 (Ex.9, DL-64 (Rev. 2-17)) *see also* Texas Department of Public Safety, Application for Change-of-address on Valid Texas Driver License (DL) & Identification Card (ID), http://www.dps.texas.gov/Internetforms/Forms/DL-64.pdf (last visited June 18, 2017).

6

registration application; instead, DPS transmits the voter's file to SOS upon receipt of a completed mail-in change-of-address form or in-person driver's license applications.[17]

Upon receipt of DPS customers' voter registration information, SOS then transmits the data to local voter registrars who are responsible for completing the voter registration process.[18] Ultimately, within thirty days after checking "yes" on the relevant in-person or mail-in change-of-address form, the DPS customer should receive his new or updated voter registration card in the mail.[19] Notably, for all mail-in change-of-address transactions, it is the customer's previously-provided electronic signature—the one provided during the customer's last *in*-person transaction—that is used for voter registration purposes.[20] In fact, a customer's electronic signature is used for voter registration purposes for *all* voter registration applications originating at DPS.[21]

### B. Defendants do not provide simultaneous voter registration applications with online transactions, but instead require additional steps and duplicative information before a customer can register or update their voter registration information.

In stark contrast to the ease with which a customer may register to vote or update his voter registration information via in-person or mail-in change-of-address driver's license forms,

---

[17] Appx. 66-67 (Ex. 10, Excerpts of Mar. 7, 2017 30(b)(6) Deposition of Sheri Gipson, DPS's designee ("Gipson 30(b)(6) Dep.") 101:24-102:09).

[18] Appx. 98 (Ex. 13, SOS's Suppl. Resps. to Jarrod Stringer's First RFAs, No. 13); *See* Appx. 43 (Ex. 6, Ingram 30(b)(6) Dep. 173:9-10); Appx. 110 (Ex. 14, Excerpt from Secretary of State's 32nd Annual Election Law Seminar, Voter Registration 102 presentation, P003060, Voter Registration Presentation, slide 14, P003982 at P003995) (produced to Plaintiffs as bates D_00008318-8354 marked as "confidential" and so not attached here).

[19] *See* Appx. 43-44 (Ex. 6, Ingram 30(b)(6) Dep. 173:16-174:09).

[20] Appx. 89 (Ex. 12, Excerpts of Feb. 17, 2017 30(b)(6) Deposition of John Crawford ("Crawford 30(b)(6) Dep.") 139:10-21); *see also* Appx. 50-51 (Ex. 7, DL-14A); Appx. 53-54 (Ex.8, DL-43).

[21] Appx. 69 (Ex. 10, Gipson 30(b)(6) Dep. 203:19-204:-7.); Appx. 42 (Ex. 6, Ingram 30(b)(6) Dep. 97:04-14); Notably, although DPS obtains a handwritten signature on the in-person and mail change-of-address forms, those signatures are not transmitted to SOS for voter registration purposes, nor are they compared for identity-verification purposes except in the rare case of suspected fraud or theft. Appx. 79-80 (Ex. 11, Excerpts of Jan. 31, 2017 Deposition of Sheri Gipson ("Gipson Dep.") 234:11-237:15, 254:04-07); *see also* Appx. 87-88 (Ex. 12, Crawford 30(b)(6) Dep. 73:22-74:14), Appx. 39 (Ex. 6, Ingram 30(b)(6) Dep. 50:01-11).

a customer transacting with DPS online must retrieve, complete, print, and mail an entirely *separate* voter registration application—which requires that he again provide information already collected by DPS—in order to register or update his voter registration information.

DPS's Driver License Renewal and Change-of-address website page provides a single online portal for qualified holders of a Texas driver's license to renew their driver's license, update the address listed on their driver's license, or both.[22] For DPS purposes, updating or renewing a driver's license online comports with state law, and does not require a new signature.[23]

A customer wishing to renew or update his driver's license online must first provide his driver's license number, date of birth, driver's license audit number, and the last four digits of his social security number, which DPS's vendor uses to check against DPS's system in real time to verify the customer's eligibility to transact online with DPS.[24] If eligible, the customer must then enter additional personal information.[25]

From 2010 to February 2016, when users reached Step 5 of the online process, DPS prompted the customer to choose "yes" or "no" in response to the statement, "I want to register to vote."[26] Checking "yes" to the voter registration question at Step 5 does one thing only—it

---

[22] Appx. 117 (Ex. 15, DPS's Suppl. Resps. to Benjamin Hernandez's First RFAs, No. 5).

[23] Appx. 70 (Ex. 10, Gipson 30(b)(6) Dep. 215:21-216:7).

[24] Appx. 70-72 (*Id.* at 217:21-219:16, 223:17-224:05). These four data points required for online transactions with DPS are also required by the Texas Online Authentication System (TOAS), which is used by various state agencies to authenticate customers' identity, and "may be used by the state agency or local government as an alternative to requiring a notarized document, a document signed by a third party, or an original signature on a document." Tex. Gov't Code § 2054.271; *see also* Tex. Gov't Code § 2054.252.

[25] Appx. 130 (Ex. 16, Texas Department of Public Safety Driver License Renewal and Change-of-address webpage, D_00021840). Only United States citizens are allowed to renew or update their driver's licenses online. *See* Texas Department of Public Safety, Online Services Eligibility, https://txapps.texas.gov/tolapp/txdl/eligibility.dl?locale=en_US (last visited June 26, 2017).

[26] Appx. 118 (Ex. 15, DPS's Suppl. Resps. to Benjamin Hernandez's First RFAs, Nos. 7-8); *see also* Appx. 124-125 (Ex. 15, DPS's Suppl. Resps. to Totysa Watkins' First RFAs, Nos. 26-28). Shockingly, until September 2016, the "yes"/"no" radio buttons from which a customer had to

8

prompts the system to provide a link on the customer's receipt to an entirely different website, where voters must "download[] or request[]" a physical voter registration form.[27] To complete the voter registration process following an online DPS transaction, the customer must download a voter registration form, print the form, fill out the form, and mail it in.[28]

Much of the information on the voter registration form is duplicative of information the customer already provided during the online transaction with DPS. In fact, just as voter registration forms do, DPS's online change-of-address or combined change-of-address and renewal forms require the following: date of birth, Texas driver's license number, residence address, residence city, residence zip code, residence county and, if it differs from residence, mailing address, mailing city, and mailing zip code.[29] Although the customer provides *this exact same information* to DPS during his online driver's license transaction, DPS fails to transfer this voter registration data to the Secretary of State.[30] What is more, DPS does not even record the answer to the online voter registration question.[31] This means, in order for a Texan who renews or changes his address online with DPS to become registered to vote, he must, in addition to

---

choose automatically defaulted to "no." SOS knew of this problem as early as 2012 but allowed four years to pass before it was corrected. Appx. 41 (Ex. 6, Ingram 30(b)(6) Dep. 84:24-85:3). The screenshot of Step 5 of the DPS driver license renewal and change-of-address system attached to Plaintiffs' Complaint depicts this default selection. Dkt. 1-2 at 2; Dkt. 52 at 10.

[27] Appx. 63-65 (Ex. 10, Gipson 30(b)(6) Dep. 77:23-78:9 and 94:1-4); Appx. 132-133 (Ex. 17, Screenshot of "Driver License Renewal Receipt and Temporary License," D_00015308-09).

[28] Appx. 135 (Ex. 18, Screenshot of Voter Registration Application from https://webservices.sos.state.tx.us/vrapp/index.asp (last visited June 28, 2017)); Appx. 137-138 (Ex. 19, Texas Voter Registration Application, Produced as Ex. 3-L to Gipson 30(b)(6) Dep.). The customer may also request to receive a blank application in the mail; *see also* Appx. 140-147 (Ex. 20, Feb. 2016 Driver License Renewal and Change of Address screen shots, Produced as Ex. 3-T to Gipson 30(b)(6) Dep.). For an online renewal application only, the customer must provide his date of birth and Texas driver's license number, two of the same data points required for the voter registration form.

[29] Compare *Id.* to Appx. 72 (Ex. 10, Gipson 30(b)(6) Dep. 223:17-224:05) and Appx. 130 (Ex. 16, Texas Department of Public Safety Driver License Renewal and Change-of-address webpage, D_00021840-41).

[30] Appx. 69 (Ex. 10, Gipson 30(b)(6) Dep. 204:17-21)

[31] Appx. 78 (Ex. 11, Gipson Dep. 136:10-19).

9

providing at least six data points to DPS during the online transaction, *also* fill out a voter registration form and provide six of those *same* data points.

It is undisputed, then, that under Texas's current online driver's license renewal and change-of-address system, Defendants do not treat online driver's license renewals and change-of-address submissions as simultaneous voter registration applications.[32] Instead, eligible applicants who indicate they wish to register to vote or update their voter registration during an online transaction must take additional steps after submitting their information online; otherwise, Texas does not register them to vote.

### C. Plaintiffs moved from one Texas county to another, transacted with DPS online to update their driver's license information, and checked "yes" to the voter registration question, yet Defendants failed to update their voter registration information and Plaintiffs were denied the chance to cast a regular ballot in an election.

#### 1. Benjamin Hernandez

Plaintiff Benjamin Hernandez is a lifelong Texas resident who moved to Dallas County from Ector County in February 2013.[33] Prior to his move, Mr. Hernandez was registered to vote in Ector County, where he voted regularly since turning 18.[34] After his move, he updated his driver's license address online.[35] Wanting to update his voter registration information, Mr. Hernandez checked "yes" to the voter registration question during that online transaction and thereafter believed he was registered to vote in Dallas County.[36] On Election Day 2014, Mr.

---

[32] Appx. 118, 123-124 (Ex. 15, DPS's Suppl. Resps. to Hernandez's First RFAs. Nos. 10-11); Appx. 123-124 (Ex. 15, DPS's Suppl. Resps. to Watkins' First RFAs. Nos. 20-25).

[33] Answer, Dkt. 57 at ¶¶ 16, 46.; Appx. 155 and 164 (Ex. 21, Excerpts of May 18, 2017 Deposition of Benjamin Hernandez ("Hernandez Dep.") 27:14-22, 43:07-09).

[34] Appx. 154 and 163 (Ex. 16, Hernandez Dep. at 19:2-8, 19:21-22; 42:17-43:06).

[35] Appx. 155-156 and 163 (*Id.* at 27:23-28:06; 43:07-13).

[36] Appx. 153 and 155-157 (*Id.* at 18:6-12; 27:23-29:07).

Hernandez attempted to vote in Dallas County, but was told that his name was not on the rolls.[37]

Mr. Hernandez cast a provisional ballot, but later received notice that his vote was not counted.[38]

### 2. *Jarrod Stringer*

Plaintiff Jarrod Stringer moved from Tarrant County to Bexar County in August of 2014.[39] Prior to his move, Mr. Stringer was registered to vote in Tarrant County.[40] After moving, Mr. Stringer updated his driver's license address online, checking "yes" to the voter registration question and intending to update his voter registration.[41] Thereafter, he believed his voter registration records were updated.[42] Mr. Stringer attempted to vote early in the 2014 general election, but was told that he was not registered.[43] Mr. Stringer then called Bexar County election officials and was told that he was not registered in Bexar County and could only vote a limited ballot with statewide candidates.[44] When Mr. Stringer explained that he had changed his address through DPS's website, the election officials with whom he spoke told Mr. Stringer that the county was aware of "problems through DPS."[45]

### 3. *John Woods*

Plaintiff Dr. John O. Woods III changed his residence from Travis County to Harris County in June 2015.[46] Prior to this move, Dr. Woods was registered to vote in Travis County.[47]

---

[37] Appx. 161 and 158-159 (*Id.* at 37:8-13, 32:23-33:19).

[38] Appx. 159-160 (*Id.* at 33:20-34:11); Defs.' Dkt. 57 at ¶ 46. Mr. Hernandez was added to the voter registration rolls in Dallas County one month after he attempted to vote on Election Day 2014. *Id.*; Appx. 162 (Ex. 21, Hernandez Dep. at 39:04-09).

[39] Appx. 177 (Ex. 22, Excerpts of May 3, 2017 Deposition of Jarrod Stringer ("Stringer Dep.") at 31:01-08).

[40] Dkt. 57 at ¶ 47.

[41] Appx. 95 (Ex. 13, SOS's Suppl. Resps. to Jarrod Stringer's First RFAs, No. 3); Appx. 173 and 177-179 (Ex. 22, Stringer Dep. 15:08-24; 31:9-33-1).

[42] Appx. 173 and 178-179 (Ex. 22, Stringer Dep.15:08-24; 32:16-33:01).

[43] Appx. 180-181 (*Id.* 45:7-46:5).

[44] Appx. 174-175 and 181-182 (*Id.* 16:16-17:5, 46:15-47:17).

[45] Appx. 182 (*Id.* 47:8-11).

[46] Appx. 198 (Ex. 23, Excerpts from May 5, 2017 Deposition of John Woods ("Woods Dep.") 62:11-18).

In September 2015, Dr. Woods changed his driver's license address online and checked "yes" to the voter registration question.[48] He believed that his voter registration records were updated as a result.[49] Shortly thereafter, Dr. Woods went to a local library, where he was offered an opportunity to register to vote.[50] He declined that opportunity, however, because he believed that his voter registration records had already been updated.[51] Dr. Woods called Harris County on Election Day 2015 to confirm his polling location, and was informed that he was not registered in Harris County and that any provisional ballot he cast there would likely not be counted.[52] Nonetheless, Dr. Woods went to his local polling location and cast a provisional ballot.[53] He later received notice that his vote was not counted.[54] Defendants did not treat Dr. Woods's online driver's license application as a voter registration application.

### D. DPS is technologically capable of collecting and transmitting voter-registration information from online transactions to SOS and doing so would not be cost prohibitive.

The change Plaintiffs request—requiring DPS to record and transfer the registration information it already collects and confirms during online driver's license renewal or change-of-address to the SOS, along with the customer's previously-obtained electronic signature, and requiring SOS to transfer the voter registration information to local voter registrars—is possible and would not be overly burdensome.[55] Director of Elections Keith Ingram, SOS's 30(b)(6) designee, essentially drilling down to Defendants' core defense, testified, "This is a very possible

---

[47] Appx. 197 (Ex. 23, Woods Dep. 34:06-25).
[48] Appx. 195-196 (*Id.* 25:16-26:2).
[49] Appx. 194-196 (*Id.* 22:03-13; 25:22-26:5); Appx. 103 (Ex. 13, SOS's Suppl. Resps. to John Woods' First RFAs, No. 1).
[50] Appx. 199 (Ex. 23, Woods Dep. 63:10-25).
[51] Appx. 199 (*Id.* 63:10-25).
[52] Appx. 200-201 (*Id.* 64:1-65:9).
[53] Appx. 202-203 (*Id.* 66:25-67:18).
[54] Appx. 202 (*Id.* 66:6-11).
[55] Appx. 68 (Ex. 10, Gipson 30(b)(6) Dep. 175:24-176:8); Appx. 90 (Ex. 12, Crawford Dep. 143:25-144:21).

thing to do what you're saying if it was legal, and it's not legal."[56] In fact, DPS and SOS already do for in-person and mail-in change-of-address transactions exactly that which Plaintiffs request this Court order for online transactions. Moreover, implementing Plaintiffs' request would be even easier than the current process for in-person and mail-in change-of-address transactions because DPS *customers* would be entering their data into the system instead of DPS customer service representatives

Nor do Defendants claim that the cost of Plaintiffs' requested remedy would be prohibitive. Mr. Ingram opined that it would not cost a lot of money for DPS to send the previously obtained electronic signature to SOS, and further estimated that the cost of a fully online voter registration program, which goes beyond what Plaintiffs seek, would be $182,000.[57]

## LEGAL STANDARD

Summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[58] A dispute as to a material fact is genuine if the evidence is sufficient to permit a reasonable factfinder to return a verdict for the nonmoving party. *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997). A fact is material if its resolution could affect the outcome of the action under governing law, and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 248 (1986). Summary judgment is proper, then, if under governing law there is only one reasonable conclusion as to the verdict. *Id.* at 249.

## ARGUMENT

The right to vote is fundamental, and Texas's violations injured and will continue to injure Plaintiffs and many more eligible Texas voters. *Arcia v. Florida Sec'y of State*, 772 F.3d

---

[56] Appx. 46 (Ex. 6, Ingram 30(b)(6) Dep. 186:5-13).
[57] Appx. 45-46 (*Id.*184:12-185:5, 186:21-187:24).
[58] Fed. R. Civ. P. 56(a).

1335, 1341 (11th Cir. 2014) (finding that individual voters removed from rolls in violation of Section 8 of NVRA had standing to sue for prospective relief even after they were reinstated, because of "realistic probability" that ongoing violations could again affect their registration status); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) ("A plaintiff need not have the franchise wholly denied to suffer injury… [State resident's] alleged injuries flow directly from the denial of her registration form."); *Ferrand v. Schedler*, 2012 WL 1570094 *6 (E.D. La. May 3, 2012); *Georgia State Conference of NAACP. v. Kemp*, 841 F. Supp. 2d 1320, 1331 (N.D. Ga. 2012).

It is undisputed that (1) Plaintiffs are eligible Texas voters who changed their driver's license addresses online and checked "yes" in response to the question "I would like to register to vote," and (2) Defendants did not treat this transaction as a simultaneous voter registration application. The material facts are settled. Summary judgment is warranted here because these undisputed facts establish as a matter of law that Defendants violate the NVRA and the Equal Protection Clause by failing to treat online driver's license renewals or change-of-address applications as simultaneous applications to register to vote or update voter registration, in glaring contrast to the way that in-person and mail transactions are treated. For these reasons, Plaintiffs are entitled to summary judgment in their favor on all claims.

### A. Texas' failure to treat online DPS transactions as voter registration applications violates the NVRA

#### 1. The plain language of the NVRA controls

"Statutory construction, of course, begins with the plain language of statute." *In re Dale*, 582 F.3d 568, 573 (5th Cir. 2009). Where the plain language of the statute is clear, federal courts are compelled to apply the statute's mandate. Multiple courts have struck down state policies in violation of the plain language mandates of the NVRA. *Action NC v. Strach*, 216 F. Supp. 3d 597, 633-634 (M.D. N.C. 2016) (finding that a plain language interpretation of Section 5 of the

NVRA includes remote driver's license transactions); *Fish v. Kobach*, 840 F.3d 710, 732-740 (10th Cir. 2016) (upholding plain language interpretation of Section 5 of the NVRA to preempt state law requiring more than "minimum amount of information necessary" for voter registration); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012) (upholding plain language interpretation of Section 8 of the NVRA to allow for disclosure of voter registration applications); *Action NC v. Strach*, 216 F. Supp. 3d 597, 633-634 (M.D. N.C. 2016) (finding that a plain language interpretation of Section 5 of the NVRA includes remote driver's license transactions); *Ga. State Conference of N.A.A.C.P.*, 841 F. Supp. 2d at 1329, 1330, 1335 (finding, in part, that plain language interpretation of Section 7 of the NVRA requires an assistance office supplying an application for assistance to distribute voter registration and voter preference forms regardless of whether the application was made in person). In its Order denying Defendants' Motion to Dismiss, this Court found the state violates the plain language of the NVRA in failing to allow online DPS transactions to serve as voter registration applications.[59]

### 2. Defendants fail to treat online driver's license renewal applications as "simultaneous" voter registration applications in violation of 52 U.S.C. §§ 20503(a)(1), 20504(a)(1), and 20504(a)(2).

The NVRA requires that "each" driver's license application, including "any" renewal application, simultaneously serve as an application for voter registration.[60] Moreover, the NVRA mandates that each voter registration application submitted to the state motor vehicle authority as part of a driver's license application, including any renewal application, update any previous registration by the applicant.[61]

---

[59] Dkt. 52 at 14.
[60] 52 U.S.C. §§ 20503(a)(1), 20504(a)(1), 20504(c)(1); Dkt. 52 at 11, 18.
[61] 52 U.S.C. § 20504(a)(2).

As set out above, Defendants do not, and cannot, dispute that the NVRA applies to all driver's license application transactions, including online transactions. *Action NC v. Strach*, 216 F.Supp.3d at 622-23 (holding that "the words "each" and "any" in Section 5 require voter registration services to be provided with all covered transactions[,]" including remote application, renewal, and change-of-address transactions). Nor do they dispute that in Texas, driver's license renewal applications submitted to DPS online do not serve as simultaneous applications for voter registration, or that Defendants do not treat driver's license change-of-address applications submitted to DPS online as updating an applicant's previous voter registration. Instead, Defendants claim that the NVRA merely requires a "simultaneous *opportunity to apply* to register vote," contorting the plain language of the NVRA. Under Defendants' reading of the law, states are allowed to force voters to take additional steps to register to vote after completing their DPS transaction.

This Court considered and rejected Texas's argument, concluding that while a voter's registration need not be "effected simultaneously with their NVRA-covered driver's license transaction," the NVRA requires that the actual application for voter registration be simultaneous with the NVRA-covered driver's license application in "a single transaction."[62] Accordingly, "[w]here, as here, Defendants have chosen to offer an online forum for NVRA-covered driver's license transactions, the NVRA thus requires them to accept voter registration applications through that forum simultaneously with the NVRA-covered driver's license submissions that forum supports."[63]

---

[62] Dkt. 52 at 11.

[63] *Id.* at 20.

16

### 3. Defendants fail to treat online driver's license change-of-address applications as notifications for voter registration in violation of 52 U.S.C. § 20504(d).

Under the NVRA, all change-of-address forms submitted "in accordance with State law for purposes of a State motor vehicle driver's license" must also serve as a notification of change-of-address for voter registration purposes "unless the registrant states on the form that the change-of-address is not for voter registration purposes."[64] Driver's license "change-of-address forms must have equal effect as voter registration change-of-address forms[.]"[65] DPS concedes that a customer who has changed his driver's license address online—like each of the Plaintiffs here—has done so in accordance with state law, which does not impose a signature requirement on changes of address. It is undisputed that Defendants do not treat these online submissions to DPS as notifications of change-of-address for voter registration purposes. As this Court found, this "is inconsistent with the plain language of the NVRA."[66]

### 4. Defendants' requirement that applicants submit a separate voter registration application upon completion of online transactions violates the NVRA's prohibition against requiring duplicative information, 52 U.S.C. § 20504(c)(2).

The NVRA states that the voter-registration section of driver's license application forms "may not require any information that duplicates information required in the driver's license portion of the form[.]"[67] This Court held that Defendants' procedures violate the NVRA's limits on duplicative information requirements, as the separate voter registration form that DPS directs its customers to complete after an online transaction duplicates almost entirely the information required by DPS' online change-of-address form and combined change-of-address and renewal form.[68] "Indeed, it is the same form that prospective voters would use if they had not submitted an online change-of-address form at all, and merely applied to the Secretary of State for voter

---

[64] 52 U.S.C. § 20504(d); Dkt. 52 at 11.
[65] *Id.* at 14.
[66] *Id.*
[67] 52 U.S.C.§ 20504(c)(2); Dkt. 52 at 12.
[68] Dkt. 52 at 12.

registration in person or by mail in the first instance."[69] To comply with the NVRA, then, Defendants must allow customers who complete online change-of-address and license renewal forms to apply to register to vote as part of the *same application*.[70]

> **5. Defendants' failure to transmit voter registration information submitted during online driver's license transactions violates 52 U.S.C. § 20504(e).**

The NVRA mandates that states transmit completed voter-registration portions of driver's license applications "to the appropriate State election official not later than 10 days after the date of acceptance[,]" or, if the application is completed within 5 days before the last day of a registration period, "not later than 5 days after the date of acceptance."[71] It is undisputed that DPS does not even *record*—and therefore cannot *transmit*—applicants' responses to the voter registration question on the online driver's license renewal and change-of-address application. Further, despite collecting from each online customer the personal information necessary for voter registration, DPS does not transmit this information to SOS for those customers who wish to register or update their voter registration. Defendants' failure to do so violates the clear mandate of the NVRA.

> **6. SOS's failure to ensure that eligible applicants are registered to vote upon completion of the voter registration portion of online driver's license change-of-address and renewal applications violates 52 U.S.C. § 20507(a)(1)(A).**

Being responsible for Texas's compliance with the NVRA, SOS must ensure that eligible applicants are registered to vote in an election "if the valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election."[72] As set out above and in this Court's previous ruling, under the NVRA, online driver license renewal and change-of-address forms are valid voter registration applications. Thus, individuals who indicate that

---

[69] *Id.*

[70] *Id.*

[71] 52 U.S.C. §§ 20504(e)(1)-(2).

[72] 52 U.S.C. § 20507(a)(1)(A).

they want to register to vote during an online driver's license transaction should be registered to vote.

It is undisputed that Texas does not, in fact, register eligible customers who indicate they wish to register to vote or update their voter registration during an online driver's license renewal or change-of-address transaction. SOS's failure to ensure that Texas does so constitutes a plain violation of the NVRA.

### B. Texas' failure to treat online DPS transactions as voter registration applications violates the Equal Protection Clause

#### 1. *The Equal Protection Clause protects against restrictions that place unreasonable burdens on the right to vote.*

The right to vote is a fundamental right protected under the Equal Protection Clause of the Fourteenth Amendment. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966). "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000). Specifically, the "Equal Protection Clause applies when a state either classifies voters in disparate ways... or places restrictions on the right to vote." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012). When assessing an Equal Protection Clause challenge to a state restriction on the right to vote, courts use the standard laid out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Under the *Anderson-Burdick* standard, a court

> must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

In *Crawford v. Marion County Election Bd.*, the Supreme Court, applying the *Anderson-Burdick* standard, noted that "rather than applying any 'litmus test' that would neatly separate

valid from invalid restrictions, …a court must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the 'hard judgment' that our adversary system demands." 553 U.S. 181, 190 (2008). The Court further explained that, however slight a burden a state restriction on an individual voter may appear, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (citing *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)). A sufficiently weighty justification is the difference between a reasonable and an unreasonable restriction. *Crawford* at 190 (citing *Burdick*, 504 U.S. at 434).

Defendants fail to provide any rational reason—much less a "sufficiently weighty" justification—for the burden they impose on the right to vote in Texas. Therefore, Defendants' treatment of online DPS transactions violates the Equal Protection Clause.

### 2. Defendants' refusal to treat online driver's license transactions as voter registration applications unduly burdens Plaintiffs' right to vote.

Plaintiffs are eligible Texas voters who changed their driver's license address online, and those online transactions were not used to register Plaintiffs to vote. There is no dispute that Texas treats some driver's license applications as applications to register to vote, and also *does not* treat other driver's license applications (online) as applications to register to vote. And there is no dispute that Texas refuses to provide a simultaneous voter registration application for people who are similarly situated to in-person or mail-in applicants in every way but one—they completed their transactions online.

Instead of using the information customers already provide to DPS to register them to vote or update their voter registration information, Texas burdens customers who transact with DPS online with a requirement that they retrieve, complete, print, and mail an entirely separate voter registration form in order to register or update their voter registration information. This burden is borne by online customers; DPS customers who apply for or change their license

20

information in person, or change their address by mail, are not required to complete a separate, additional voter registration application in order to register or update their voter registration information. This burden is a restriction on the fundamental right to vote that warrants "the demonstration of a corresponding interest sufficiently weighty to justify the limitation." Defendants have no such justification.

### 3. Defendants' asserted interest in requiring handwritten signatures is insufficient to justify the burdens created by their treatment of online DPS transactions.

Defendants' only justification for this burden is that DPS's online customers cannot sign the online driver's license form, and they claim that such a handwritten signature is necessary to "later check that signature against the poll book." [73] The record, however, demonstrates that the state *does not even use* handwritten signatures for voter registration or voter verification purposes. Instead, DPS collects and SOS and counties use *electronic signatures* of voters. Indeed, even though a DPS customer who indicates he wishes to register to vote on a mail-in change-of-address form provides DPS with a handwritten signature on that mail-in form, the signature DPS sends to SOS for voter registration purposes—and the signature SOS transmits to county election officials for voter registration—is the *previously-provided electronic signature* collected during the customer's most recent in-person transaction.

Although the state has an interest in verifying voter identity *at the polls*, this interest has nothing to do with the handwritten signatures collected by DPS during driver's license transactions, since the state only collects uses *electronic* signatures on DPS customers' voter registration applications. This interest is therefore irrelevant to and insufficient to justify Defendants restriction on Plaintiffs registering to vote during an online driver's license transaction.

---

[73] Defs. Reply in Supp. of Mot. to Dismiss, Dkt. 12 pp 2-3.

Defendants also claim that they treat everyone equally because the signature requirement applies to everyone, and that everyone who fails to sign a change-of-address or renewal application is not registered to vote. Defendants fundamentally misunderstand the Equal Protection Clause's application to state-imposed burdens on the right to vote. *Crawford*, 553 U.S. at 190, 191. The Equal Protection Clause requires states to justify the burden they impose on the right to vote. *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). Defendants' handwritten signature argument is insufficient to justify the burden that the state applies to online DPS customers.

### 4. DPS's signature requirement as to online transactions is unreasonable.

As pointed out by the Court, Defendants have not explained, and cannot explain, how the handwritten signature requirement is necessary.[74] As the Court observed, because DPS collects electronic signatures during every in-person driver's license transaction—including customers' first applications for a Texas driver's license—DPS already has a signature on file for every person who subsequently renews or changes their driver's license address.[75] Indeed, Defendants admitted that the handwritten signature on DPS forms is scanned and stored in a third-party vendor's system for identity-verification use only when fraud is suspected. For DPS purposes and voter registration purposes, Defendants simply use and store the signature that was electronically captured in the most recent previous in-person transaction. Defendants cannot show why handwritten signatures are necessary to confirm voter identity at the polls when collected, stored, and easily-accessible electronically-captured signatures do the same thing just as well, if not more efficiently, and when Texas already uses these electronic signature for this purpose for in-person and mail-in DPS applications. *Anderson*, 460 U.S. at 806 (quoting *Kusper v. Pontikes*, 414 U.S. 51, 59 (1973) ("If the [s]tate has open to it a less drastic way of satisfying

---

[74] Dkt. 52 at 21.

[75] *Id.* at 17, 21.

its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties."); *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 633 (6th Cir. 2016), (cert. denied, 2017 WL 881266 (U.S. June 19, 2017) (restriction purportedly imposed to combat voter fraud was unjustified, in part, because the state already had a policy in place that sufficiently protected against voter fraud).

Moreover, as set out above, DPS's online system utilizes a four-point data verification process, which, as the Court points out, allows an online customer to verify his identity at login, instead of using a handwritten signature.[76] This verification process ensures that the individual transacting online is the person who previously provided an electronic signature during his last in-person transaction with DPS, and would likewise ensure that the electronic signature used for voter registration and voter verification belongs to the proper individual. With no sufficient justification for the state's restrictions on online transactions, the burden on Plaintiffs' right to vote is unreasonable.

### C. Defendants' Affirmative Defenses are Not Supported by Evidence

Defendants assert the following affirmative defenses: (1) failure to state a claim upon which relief can be granted, (2) Eleventh Amendment immunity and sovereign immunity, (3) statute of limitations, (4) all actions by Defendants relevant to the claims and causes of action by Plaintiffs were done in good faith and without malice, willfulness, or intent, (5) lack of standing and failure to demonstrate injury-in-fact, causation, or redressability necessary to establish standing, (6) Plaintiffs have not exhausted administrative requirements for filing suit, (7) failure to satisfy the conditions precedent required to invoke the Court's jurisdiction over their claims, including the pre-suit notice requirements of the NVRA, 52 U.S.C. § 20510(b)(1)-(2), (8)

---

[76] *Id.* at 18. Confusingly, the SOS allows voters to change their voter registration address online without a signature if they have moved within a county. The state only requires a signature when a voter moves from one county to another. Appx. 97 (Ex. 13, SOS's Suppl. Resps. to Stringer's First RFAs, No. 10).

misrepresentation, (9) Plaintiffs' claims are moot, (10) the Court lacks jurisdiction, and (11) Defendants' actions were reasonable and proper under the laws of the United States and the State of Texas. Defendants have put forth no evidence to support their affirmative defenses. In fact, some of the listed defenses bear no logical explanation for pleading (e.g., statute of limitations). Further, some of the claimed defenses were summarily rejected by this Court in its ruling on the Motion to Dismiss: the state's standing arguments,[77] the state's arguments regarding the NVRA's notice requirement,[78] and the state's "failure to state a claim" arguments.[79]

### D. Defendants should be required to correct their violations of the NVRA within three months of the Court's ruling.

The next federal voter registration deadline is February 5, 2018, in advance of the March primary elections—just over seven months from the date of this filing. For far too long, Defendants have defied the NVRA and denied millions of Texas the right to register or update their voter registration through an online transaction with DPS. Plaintiffs, and eligible Texas voters who are similarly situated, are entitled to immediate relief, before the start of another federal election cycle. Accordingly, the Court should require Defendants to update their systems to allow for compliance with the NVRA as to online driver's license transactions immediately, with full implementation within three months after the Court's ruling and no later than January 1, 2018.

Moreover, the public interest is served by requiring Defendants to immediately implement this plan. Namely, the almost 1.5 million customers who transact online with DPS each year will be irreparably injured if Defendants continue to defy federal law and the United States Constitution. The requested relief is the only way to correct Defendants' continued

---

[77] Dkt. 52 at 3-7.
[78] *Id.* at 7-9.
[79] *Id.* at 9-21.

violations of the NVRA and Equal Protection Clause with regard to these transactions. Monitoring to ensure compliance will be necessary.

## CONCLUSION

Plaintiffs respectfully request for the Court to enter an order:

1. Declaring, pursuant to 28 U.S.C. § 2201 and 52 U.S.C. § 20510(b)(2), that Defendants have violated the NVRA and the Equal Protection Clause by failing to provide for simultaneous voter registration application with online driver's license renewal;

2. Declaring, pursuant to 28 U.S.C. § 2201 and 52 U.S.C. § 20510(b)(2), that Defendants have violated the NVRA and the Equal Protection Clause by failing to provide for simultaneous voter registration application with online change-of-address forms;

3. Permanently enjoining Defendants, their agents and successors in office, and all customers working in concert with them, from implementing practices and procedures that likewise violate the NVRA;

4. Directing Defendants, under a plan with appropriate reporting and monitoring requirements, to take all appropriate measures necessary to remedy the harm caused by their noncompliance, including, but not limited to providing for the electronic transfer of voter registration information collected and confirmed through online transactions to the Secretary of State within three months of the Court's order and no later than January 1, 2018.

Dated: June 30, 2017.

Respectfully submitted,

By: /s/ Rebecca Harrison Stevens

Mimi M.D. Marziani
Texas Bar No. 24091906
mimi@texascivilrightsproject.org
Rebecca Harrison Stevens
Texas Bar No. 24065381
beth@texascivilrightsproject.org
Hani Mirza
Texas Bar No. 24083512
hani@texascivilrightsproject.org
Cassandra Champion
Texas Bar No. 24082799
champion@texascivilrightsproject.org

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, Texas 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)


Peter A. Kraus (*pro hac vice*)
Texas Bar No. 11712980
kraus@waterskraus.com
Charles S. Siegel
Texas Bar No. 18341875
siegel@waterskraus.com
Caitlyn E. Silhan
Texas Bar No. 24072879
csilhan@waterskraus.com
Rachel A. Gross *(pro hac vice)*
Texas Bar No. 24073608
rgross@waterskraus.com

WATERS & KRAUS, LLP
3141 Hood Street, Suite 700
Dallas, Texas 75219
214-357-6244 (Telephone)
214-871-2263 (Facsimile)


***ATTORNEYS FOR PLAINTIFFS***

26

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of June, 2017, a true and correct copy of the foregoing *Plaintiffs' Motion for Summary Judgment* was served upon counsel of record via the Court's ECF system.

/s/ Rebecca Harrison Stevens

# Exhibit G

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| JARROD STRINGER, *et al.*, <br><br> Plaintiffs, <br> v. <br><br> RUTH HUGHS, in her official capacity as the Texas Secretary of State; STEVEN C. MCCRAW, in his official capacity as the Director of the Texas Department of Public Safety; <br><br> Defendants. | Civ. Action Case No. 5:16-cv-0046-OLG |

**DECLARATION OF GLEN MAXEY IN SUPPORT OF IN SUPPORT OF INTERVENOR-PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Pursuant to 280 U.S.C. § 1746, I, Glen Maxey, hereby declare as follows:

1.      I am over 18 years of age, am competent to testify, and declare the following facts based on my own personal knowledge. I am currently employed by the Texas Democratic Party ("TDP") as the Primary Director.

2.      The TDP is the statewide organization representing Democratic candidates and voters throughout the State of Texas within the meaning of Section 117 of Texas's Election Code and all other applicable provisions of the election laws.

3.      The TDP's purpose is to elect Democratic Party candidates to public office throughout Texas. To accomplish its purpose, the TDP engages in vitally important activities, including supporting Democratic Party candidates in national, state, and local elections through fundraising and, organizing, and voter registration efforts; protecting the legal rights of voters; and ensuring that all voters have a meaningful ability to cast ballots in Texas. The TDP works closely with Democratic candidates, providing get-out-the-vote ("GOTV") assistance, and actively

1

supporting the development of programs benefiting Democratic Party candidates in Texas, including by running what is often referred to as the "coordinated campaign" to boost turnout for voters to support candidates from the top of the ticket, all the way down the Democratic ticket.

4.     The TDP has a State Executive Committee of five party officers (Chair, Vice Chair, Vice Chair for Finance, Secretary, and Treasurer), 62 district representatives, 26 representatives of 13 constituency organizations (Texas House Caucus, Texas Senate Caucus, Texas Democratic Veterans, Texas Democratic Women, Texas Asian American Democrats, Hispanic Caucus, Coalition of Black Democrats, Texas Democratic Women, Texas Environmental Democrats, Texas Young Democrats, Texas Democratic County Chairs Association, Democrats with Disabilities, and the Non-Urban and Rural Caucus), and 18 *ex officio* members who represent Texas on the Democratic National Committee. The Party leadership is elected at a biennial state convention by over 10,000 democratically selected delegates who meet in a state convention every even-numbered year.

5.     The TDP is composed of county party organizations representing each of the 254 counties of Texas. The county party organizations are governed by an elected county chair and county executive committees composed of precinct-level chairs from each voting precinct in Texas.

6.     These county party organizations hold Democratic primary elections in March of even-numbered years to elect Democratic nominees for offices including nominees for U.S. Senate and U.S. House of Representatives, statewide officials (Governor, Lieutenant Governor, Comptroller of Public Account, Attorney General, Land Commissioner, three Railroad Commissioners, and 15 members of the State Board of Education), 31 State Senators and 150 State Representatives, county officials (County Judge, four County Commissioners per county, County

Clerks, District Attorneys, and Tax Assessor/Collectors), and judicial nominees (nine statewide Supreme Court Justices, nine Court of Criminal Appeals judges, 14 Court of Appeals benches of various members, and hundreds of District Judges County Court at Law Judges, Justices of the Peace, and Constables).

7.      I have worked for the TDP as a senior advisor to Chairman Gilberto Hinojosa since 2013. Prior to 2013, I served as an employee of the TDP during coordinated campaigns going back to 1982. I was an elected member of the Texas House of Representatives from 1991 to 2002, serving for six terms. I was an unsuccessful candidate for Travis County Tax Assessor Collector in the 2008 Democratic Primary. Since 1970, I have worked as a volunteer, campaign staffer or manager, and party coordinated campaign chair or staff in over 150 campaigns at all levels, from local races to presidential campaigns, all in Texas. I have served as the Legislative Director of the TDP for the past four legislative sessions, specifically drafting and lobbying for passage of several hundred election code bills. My duties in these positions have required me to become knowledgeable about political strategy related to local, state, and federal elections in Texas.

8.      Millions of voters participate in our Democratic primary elections and support our Democratic nominees in general elections. Tens of thousands of individual donors support the TDP and our county-level Democratic Party organizations. Under Texas law, a voter who participates in the TDP's March primary affiliates with the Party and is defined as a member of the Party for the voting year. Therefore, the TDP's membership includes millions of Texans each election cycle.

9.      I personally interacted with at least one Democratic voter during the 2018 election cycle who had difficulty registering to vote due to Defendants' refusal to allow simultaneous voter registration for individuals who update driver's license information online. The TDP also receives

reports through our voter hotline and from county clerks and election officials of Democratic voters who believe they have registered to vote or updated their voter registration when changing their address online with DPS, who turns out were not in fact get registered due to Defendants' actions.

10.      The TDP's millions of members and constituents from across Texas include millions of Texans who affiliate with the Texas Democratic Party by voting in the biennial Democratic Primary, millions of Texans who are drivers who interact with DPS, and many other Texans who regularly support and vote for candidates affiliated with the Democratic Party.

11.      The TDP has historically raised and spent hundreds of thousands of dollars, if not millions of dollars, to further its mission in Texas. In 2014, the TDP raised and spent $1,999,198.27. In 2015, the TDP raised and spent $226,399.28. In 2016, the TDP raised and spent $642,522.29. In 2017, the TDP raised and spent 72,494.90. These funds were spent to further efforts to elect democratic candidates to offices throughout Texas.

12.      Defendants' conduct directly harms the TDP by imposing burdens and costs that limit the effectiveness of its voter registration program and make it more difficult for the TDP to reach its registration goals and accomplish its mission of electing Democrats in Texas. As a result, the TDP must divert resources to ensuring that eligible voters who may think they are registered due to their interactions with DPS, or who are discouraged from registering, will, in fact, register to vote for the upcoming elections. For example, eligible voters, including Mr. Stringer, often update their addresses, or renew or replace their driver's licenses, through DPS's online portal and believe that DPS is simultaneously transmitting that personal information to the Texas Secretary of State for purposes of voter registration. But the TDP understands that personal information has *not* been simultaneously transmitted to the Texas Secretary of State, and now the TDP must divert

APPENDIX 349

its resources to ensuring that eligible voters are aware of the additional steps they must take to register and must ensure that eligible voters are actually registered to vote.

13.     When the TDP diverts resources, it is diverting funds, personnel, and time away from other critical activities in Texas and to the issue of online registration. Specifically, the TDP must reallocate more money, restructure personnel and volunteers, and divert the time of employees and volunteers to voter education and voter registration efforts specifically tied to the issue in this case. But the TDP has finite resources, so the resources diverted to the issue in this case are taken from other activities, such as general GOTV activities and general activities related to educating voters about registration, candidates, and Texas-specific issues.

14.     The TDP's registration-focused efforts for 2020 are more robust than any previous efforts—in fact, this is the largest voter registration program in the history of Texas, *see* Exhibit 1—because the TDP has come to understand that Texas's voter registration laws have caused confusion and potential disenfranchisement, especially among Democratic voters. Because of Defendants' actions, the TDP must engage in far greater efforts and spend far more time to ensure that eligible voters understand how to properly register to vote and to ensure that eligible voters become registered to vote. As a result, the TDP has had to divert resources from other mission-critical efforts in order to fund a robust voter registration program. For example, as part of its vigorous registration program, the TDP will put 1,000 field staff and canvassers across the State, mail unregistered eligible voters a voter registration card, chase voter registration forms sent to eligible voters, and work alongside other Democratic organizations to ensure largescale voter registration.

15.     The TDP also recently launched a website, www.registertexas.com, which is an online system that allows voters to fill out their voter registration information, including their name

and address. Once voters submit this information, RegisterTexas.com will then mail them a pre-populated voter registration application with the information they have provided and also will include a postage-paid envelope addressed to their county elections office. RegisterTexas.com represents a significant investment of resources for the TDP, and one that would likely be unnecessary if Defendants were complying with federal law.

16.     In preparation for the 2020 elections, the TDP has invested significant resources in voter engagement efforts with the goal of registering approximately 2,600,000 unregistered, eligible, Democratic voters. In support of this mission, the TDP initiated a comprehensive organizing campaign that includes sending voter registration forms to new and unregistered Texas residents, following up with residents to encourage the completion and submission of voter registration forms, and partnering with organizations involved in high school and college campus organizing.

17.     In addition, the TDP participates in a "coordinated campaign," in which it works collaboratively with the national Democratic committees, specifically the DSCC and the DCCC, to elect Democrats up and down the ticket within the state. The national parties transfer thousands if not hundreds of thousands of dollars to the TDP in association with this campaign, and those funds are used for a variety of programs, including voter registration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 13, 2020.

DocuSigned by:

*Glen Maxey*

8346BE27DAF3433...

Glen Maxey
Primary Director
Texas Democratic Party

# Exhibit A

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| JARROD STRINGER, *et al*., | Civil Action |
| Plaintiffs, | |
| v. | Case No. 5:16-cv-00257-OLG |
| RUTH HUGHS, in her official capacity as the Texas Secretary of State; STEVEN C. MCCRAW, in his official capacity as the Director of the Texas Department of Public Safety; | |
| Defendants. | |

## DECLARATION OF GLEN MAXEY IN SUPPORT OF TEXAS DEMOCRATIC PARTY, DSCC, AND DCCC's MOTION FOR SUMMARY JUDGMENT

Pursuant to 280 U.S.C. § 1746, I, Glen Maxey, hereby declare as follows:

1.      I am over 18 years of age, am competent to testify, and declare the following facts based on my own personal knowledge. I am currently employed by the Texas Democratic Party ("TDP") as the Primary Director.

2.      The TDP is the statewide organization representing Democratic candidates and voters throughout the State of Texas within the meaning of Section 117 of Texas's Election Code and all other applicable provisions of the election laws.

3.      The TDP's purpose is to elect Democratic Party candidates to public office throughout Texas. To accomplish its purpose, the TDP engages in vitally important activities, including supporting Democratic Party candidates in national, state, and local elections through fundraising and, organizing, and voter registration efforts; protecting the legal rights of voters; and ensuring that all voters have a meaningful ability to cast ballots in Texas. The TDP works closely with Democratic candidates, providing get-out-the-vote assistance, and actively supporting the

1

development of programs benefiting Democratic Party candidates in Texas, including by running what is often referred to as the "coordinated campaign" to boost turnout for voters to support candidates from the top of the ticket, all the way down the Democratic ticket.

4.     The TDP has a State Executive Committee of five party officers (Chair, Vice Chair, Vice Chair for Finance, Secretary, and Treasurer), 62 district representatives, 26 representatives of 13 constituency organizations (Texas House Caucus, Texas Senate Caucus, Texas Democratic Veterans, Texas Democratic Women, Texas Asian American Democrats, Hispanic Caucus, Coalition of Black Democrats, Texas Democratic Women, Texas Environmental Democrats, Texas Young Democrats, Texas Democratic County Chairs Association, Democrats with Disabilities, and the Non-Urban and Rural Caucus), and 18 *ex officio* members who represent Texas on the Democratic National Committee. The Party leadership is elected at a biennial state convention by over 10,000 democratically selected delegates who meet in a state convention every even-numbered year.

5.     The TDP is composed of county party organizations representing each of the 254 counties of Texas. The county party organizations are governed by an elected county chair and county executive committees composed of precinct-level chairs from each voting precinct in Texas.

6.     These county party organizations hold Democratic primary elections in March of even-numbered years to elect Democratic nominees for offices including nominees for U.S. Senate and U.S. House of Representatives, statewide officials (Governor, Lieutenant Governor, Comptroller of Public Account, Attorney General, Land Commissioner, three Railroad Commissioners, and 15 members of the State Board of Education), 31 State Senators and 150 State Representatives, county officials (County Judge, four County Commissioners per county, County

2

Clerks, District Attorneys, and Tax Assessor/Collectors), and judicial nominees (nine statewide Supreme Court Justices, nine Court of Criminal Appeals judges, 14 Court of Appeals benches of various members, and hundreds of District Judges County Court at Law Judges, Justices of the Peace, and Constables).

7.      I have worked for the TDP as a senior advisor to Chairman Gilberto Hinojosa since 2013. Prior to 2013, I served as an employee of the TDP during coordinated campaigns going back to 1982. I was an elected member of the Texas House of Representatives from 1991 to 2002, serving for six terms. I was an unsuccessful candidate for Travis County Tax Assessor Collector in the 2008 Democratic Primary. Since 1970, I have worked as a volunteer, campaign staffer or manager, and party coordinated campaign chair or staff in over 150 campaigns at all levels, from local races to presidential campaigns, all in Texas. I have served as the Legislative Director of the TDP for the past four legislative sessions, specifically drafting and lobbying for passage of several hundred election code bills. My duties in these positions have required me to become knowledgeable about political strategy related to local, state, and federal elections in Texas.

8.      Millions of voters participate in our Democratic primary elections and support our Democratic nominees in general elections. Tens of thousands of individual donors support the TDP and our county-level Democratic Party organizations. Under Texas law, a voter who participates in the TDP's March primary affiliates with the Party and is defined as a member of the Party for the voting year. Therefore, the TDP's membership includes millions of Texans each election cycle.

9.      The TDP's millions of members and constituents from across Texas include millions of Texans who affiliate with the Texas Democratic Party by voting in the biennial

Democratic Primary, millions of Texans who are drivers who interact with DPS, and many other Texans who regularly support and vote for candidates affiliated with the Democratic Party.

10.     In preparation for the 2020 elections, the TDP has invested significant resources in voter engagement efforts with the goal of registering approximately 2,600,000 unregistered, eligible, Democratic voters. In support of this mission, the TDP initiated a comprehensive organizing campaign that includes sending voter registration forms to new and unregistered Texas residents, following up with residents to encourage the completion and submission of voter registration forms, and partnering with organizations involved in high school and college campus organizing.

11.     The TDP's registration-focused efforts for 2020 are more robust than any previous efforts—in fact, this is the largest voter registration program in the history of Texas, *see* Exhibit 1—because the TDP has come to understand that Texas's voter registration laws have caused confusion and potential disenfranchisement, especially among Democratic voters. Because of Defendants' actions, the TDP must engage in far greater efforts and spend far more time to ensure that eligible voters understand how to properly register to vote and to ensure that eligible voters become registered to vote. As a result, the TDP has had to divert resources from other mission-critical efforts in order to fund a robust voter registration program. For example, as part of its vigorous registration program, the TDP will put 1000 field staff and canvassers across the State, mail unregistered eligible voters a voter registration card, chase voter registration forms sent to eligible voters, and work alongside other Democratic organizations to ensure largescale voter registration.

12.     Defendants' conduct directly harms the TDP by imposing burdens and costs that limit the effectiveness of its voter registration program and make it more difficult for the TDP to

4

reach its registration goals and accomplish its mission of electing Democrats in Texas. As a result, the TDP must divert resources to ensuring that eligible voters who may think they are registered due to their interactions with DPS, or who are discouraged from registering, will register to vote for the upcoming elections. For example, eligible voters, including Mr. Stringer, often update their addresses, or renew or replace their driver's licenses, through DPS's online portal and believe that DPS is simultaneously transmitting that personal information to the Texas Secretary of State for purposes of voter registration. But the TDP understands that personal information has *not* been simultaneously transmitted to the Texas Secretary of State, and now the TDP must divert its resources to ensuring that eligible voters are aware of the additional steps they must take to register and must ensure that eligible voters are actually registered to vote.

13.     Defendants' continued violations injure the TDP not only through increased cost in registration efforts, but also because they hamper the TDP's efforts to elect Democrats throughout Texas. Indeed, fewer registered voters means fewer voters who can vote to support Democratic candidates for offices across Texas. By refusing to comply with federal law, Defendants harm the Democratic Party's election prospects, which frustrates the TDP's central mission.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 26, 2020.

/s/ _____
                    Glen Maxey
                    Primary Director
                    Texas Democratic Party

# Exhibit 1 to Massey Declaration

1/27/2020    RELEASE: Texas Democratic Party Announce Largest Voter Registration Program in Texas History | Texas Democratic Party

Case 5:20-cv-00046-OLG Document 77-1 Filed 05/29/20 Page 369 of 797



**For just $1, you could sponsor 2 voter registration cards for unregistered, likely Democratic voters.**

Texas Democrats have launched the most expansive voter registration program ever. Let's register more Democrats to vote.

| $25 |
| $50 |
| $100 |
| $250 |
| $500 |
| …or chip in another amount |

*If you've saved your information with ActBlue Express, your donation will go through immediately.

**TEXAS ✦ DEMOCRATS**

En español

JANUARY 13, 2020 / MEDIA, PRESS

# RELEASE: Texas Democratic Party Announce Largest Voter Registration Program in Texas History

Austin, TX — Today, the Texas Democratic Party announced its innovative 2020 voter registration program — the largest in Texas history.

*To read about the new, expansive program, click here.*

For our voter registration program, the Texas Democratic Party plans to put 1000 field staff and canvassers on the ground across the state, mail Texans who need to get registered a voter registration card, proactively chase voter registration forms sent to Texans, working alongside fellow Democratic organizations to ensure these young voters are pinpointed for voter registration and mobilization, and foster a culture of registration. The Texas Democratic Party has also launched a year-long voter protection hotline where voters can get the information they need to register to vote and cast their ballot.

**More highlights from the programs include:**

- We are going to have 1,000 field organizers and canvassers on the ground in 2020.
- The Texas Democratic Party is gearing up to mail hundreds of thousands of voter registration applications to unregistered voters across the state.
- We're launching a year-round voter assistance hotline.

SHARE




- We are building machine-learning-based models to quickly identify the partisanship-leaning of new and low propensity voters so that campaigns can mobilize Democratic voters.
- We are hiring dedicated staff to engage every part of our Democratic coalition — including our AAPI, African-American, Latinx, LGBTQ+, youth, and Disability communities — and to narrow the gap in rural committees.
- The Texas Democratic Party is working alongside fellow Democratic organizations to ensure these young voters are pinpointed for voter registration and mobilization.

**By the numbers:**

- We anticipate the voter rolls will swell to upwards of 18,000,000 registered voters in 2020.
- The Texas Democratic Party is focused on registering the estimated 2,600,000 Texans who are likely to vote Democratic if they register to vote.
- At the congressional level, we estimate there are 495,000 potential new Democrats in the eight DCCC-targeted districts.
- We estimate 210,000 potential new Democrats in the 12 state house districts that flipped in 2018. Additionally, there are 315,000 potential new Democrats in 18 targeted State House districts for 2020.

**Texas Democratic Party Deputy Executive Director Cliff Walker issued the following statement:**

"Texas is the biggest battleground state in the country. We know that our democracy works better when more people vote, not less. The rapidly emerging Democratic coalition in Texas has set the stage for historic Democratic gains at the ballot box. That's why the Texas Democratic Party is proud to be launching our most expansive voter registration program yet.

"We are committing our resources to register and engage a new electorate that is more progressive and represents the diversity of our great state. Shifting the electorate in Texas is our top priority. We will win the White House, take out John Cornyn, send more Texas Democrats to Congress, break the supermajority in the Texas Senate, flip the Texas House, and elect hundreds of local Democrats across the state."

*For more reading, check out ABC's exclusive story here.*

### ###

f    twitter    email

< **Back to news**

< Previous Post

### RELEASE: Trump and Cornyn Continue to Lie About Protecting Pre-Existing Conditions

APPENDIX 360

# Exhibit H

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| JARROD STRINGER, et al. | |
| Plaintiffs, | |
| v. | |
| RUTH HUGHS, in her official capacity as Texas Secretary of State and STEVEN C. MCCRAW, in his official capacity as Director of the Texas Department of Public Safety | Civil Action Case No. 5:20-cv-00046-OLG |
| Defendants. | |

## DECLARATION OF ALEXANDER EDELMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to 20 U.S.C. § 1746 I, Alexander Edelman, testify that:

1.       I am over the age of 18, have personal knowledge of the facts below, and can competently testify to their truth.

2.       I currently serve as the National Field Director for DCCC, also known as the Democratic Congressional Campaign Committee. I have held this position since February 2019.

3.       The mission of DCCC is to elect Democratic candidates to the U.S. House of Representatives. DCCC works to accomplish this mission by, among other things, funding voter registration drives to register new voters who may support and vote for Democratic candidates across the country.

4.       For the 2020 election cycle, DCCC has identified at least eight congressional districts in Texas (Congressional Districts 2, 7, 10, 21, 22, 23, 24, 31, and 32) as targeted races, in which it will expend resources to support the Democratic candidate

5.       As the National Field Director, I am responsible for the planning and execution of DCCC's National Field Program, which includes the supervision of field staff in congressional

districts where DCCC is actively working to elect Democratic candidates to the U.S. House of Representatives. DCCC plans to spend even more on voter activities in Texas for the 2020 election, including on GOTV, voter education, and voter registration.

6.     DCCC has already invested hundreds of thousands of dollars dedicated to specifically registering voters in Texas. DCCC recently spent nearly $400,000 to compensate a consultant, Sisneros Strategies, for providing voter registration services in Texas Congressional District 23. This is a specific example of one of many voter registration expenditures DCCC expects to incur to register voters in Texas for the 2020 election.

7.     DCCC plans to ultimately invest millions of dollars into registering and mobilizing voters in Texas in advance of the 2020 election. DCCC uses voter registration not only to expand the pool of individuals who are eligible to vote for Democratic candidates, but also to have important conversations with people about the importance of voting and about important causes to the Democratic Party.

8.     DCCC supports and participates in what is commonly referred to as the "coordinated campaign," in which it works collaboratively with the state party committee and other national Democratic committees to elect Democrats up and down the ticket within the state. In advance of the 2020 general election, DCCC intends to give significant sums to the Texas Democratic Party to spend on its field program, which will necessarily involve, among many things, voter registration efforts, to help elect Democratic candidates from Texas to national office. DCCC has already transferred over $145,000 to the Texas Democratic Party this election cycle to support its registration efforts.

9.     In fact, the Texas Democratic Party recently announced plans to launch the largest voter registration effort in the state's history. *See* Exhibit A. DCCC plans to actively support this effort financially and with staffing resources.

10.     Defendants' continued refusal to follow federal and constitutional law by not allowing for automatic voter registration with online transactions makes DCCC's work in Texas significantly more costly. DCCC is aware of Defendants' continued violations and believes it must

register and turn out additional voters to account for voters who mistakenly believe they have updated their registration and as a result are unable to vote, as happened to the original plaintiffs in this action.

11.     In particular, Defendants' conduct forces DCCC to spend additional resources in Texas on get out the vote ("GOTV") and voter persuasion efforts, diverting those funds from other mission-critical efforts nationwide. DCCC has concentrated its limited resources on efforts in various battleground states, with remaining resources going toward non-battleground states. But now, DCCC must divert resources—including funds, personnel, and time—from GOTV, voter education, and voter registration efforts in other states, including important battleground states, to compensate for the issues caused by Defendants' conduct.

12.     Not only is DCCC diverting resources—including funds, personnel, and time— from its activities in other states, but it is forced to divert resources within Texas. For example, DCCC may have to divert resources from directly making contributions to campaigns in Texas to funding voter education and registration efforts in order to combat the effects of Texas' refusal to offer simultaneous voter registration to individuals who update their driver's license information online.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 14, 2020.

DocuSigned by:

E716049B4BB34AF...

Alexander Edelman
National Field Director
DCCC

# Exhibit I

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

JARROD STRINGER, et al.

                      Plaintiffs,

    v.

RUTH HUGHS, in her official capacity as Texas Secretary of State and STEVEN C. MCCRAW, in his official capacity as Director of the Texas Department of Public Safety

                     Defendants.

Civil Action Case No. 5:20-cv-00046-OLG

## DECLARATION OF SARA SCHAUMBURG IN SUPPORT OF INTERVENOR-PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Pursuant to 28 U.S.C. § 1746, I, Sara Schaumburg, testify that:

1.      I am over the age of 18, am competent to testify, and declare the following facts based on my own personal knowledge.

2.      I am currently employed as the Director of Voter Protection & Deputy Policy Director by the DSCC.

3.      As the national senatorial committee of the Democratic Party, DSCC has a vested interest in the registration of voters who can cast ballots to support Democratic candidates for U.S. Senate.

4.      In 2018, DSCC made contributions and expenditures in the tens of millions of dollars to persuade and mobilize voters to support Democratic Senate candidates. DSCC expects to invest millions in support of MJ Hegar in her campaign against Republican Senator John Cornyn through contributions to her campaign and to the Texas Democratic Party ("TDP"). To date, the DSCC has already spent at least $180,445.17 this year on efforts to elect Democratic candidates in Texas.

5.      Defendants' conduct forces DSCC to provide additional resources in Texas to be spent on get out the vote ("GOTV") and voter persuasion efforts, diverting those funds from other mission-critical efforts nationwide. DSCC has concentrated its limited resources on efforts in various battleground states. But now, DSCC must divert resources—including funds, personnel, and time—from efforts in other key battleground states to address the issues arising in this case, specifically to address the numerous burdens which Defendant Hughs places on voters wishing to register online in the state, and to attempt to get additional voters to turn out to compensate for the effects of these burdens. Among other burdens, these include both the issues detailed in this case as well as those which form the basis of the complaint in *Texas Democratic Party v. Hughs*, No. 20-cv-00008 (W.D. Tex. 2020).

6.      DSCC also anticipates transferring more money to the Texas Democratic Party ("TDP") to support the coordinated campaign, which is a program by which the DSCC works collaboratively with the state party committee and other national Democratic party committees to elect Democrats up and down the ticket within the state. In advance of the 2020 election, DSCC intends to transfer more funds than it previously planned to transfer to the TDP to spend on its field program in light of Defendants' illegal conduct. The field program will necessarily involve, among many things, voter registration efforts to help elect Democratic candidates from Texas to national office. Thus far this election cycle, DSCC has transferred $25,000 to the TDP.

7.      Defendants' conduct directly harms DSCC by frustrating its mission of, and efforts in, electing the Democratic Party candidate to the U.S. Senate by forcing DSCC to divert additional funds and resources to Texas to ensure that eligible citizens are not misled into believing that they have effectively registered to vote, and are in fact registered to vote and cast a ballot.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 14, 2020.

DocuSigned by:

*Sara Schaumburg*

37D0F3D6FE63468...

Sara Schaumburg
Director of Voter Protection & Deputy Policy
Director, DSCC

# Exhibit J

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JARROD STRINGER, et al.,          *
     Plaintiffs,              *
                                   *
v.                                *          No. SA-20-CV-46-OG
                                   *
RUTH R. HUGHS, et al.,            *
     Defendants.              *

VIDEOCONFERENCED DEPOSITION OF

THE CORPORATE REPRESENTATIVE OF

THE TEXAS DEMOCRATIC PARTY,

TOMMY GLEN MAXEY

Monday, April 27, 2020


VIDEOCONFERENCED DEPOSITION OF TOMMY GLEN

MAXEY, produced as a witness at the instance of the

Defendants, and duly sworn, was taken in the

above-styled and numbered cause on Monday, April 27,

2020, from 10:03 a.m. to 2:04 p.m., before Debbie D.

Cunningham, CSR, in and for the State of Texas, remotely

reported via Machine Shorthand, pursuant to the Federal

Rules of Civil Procedure.

--ooOoo--

                                                        2

1                       APPEARANCES

2

3   FOR PLAINTIFFS:

4        TEXAS CIVIL RIGHTS PROJECT
         1405 Montopolis Drive
5        Austin, Texas  78741
         (T) 512.474.5073
6
         By:  Joaquin Gonzalez, Esq.
7             joaquin@texascivilrightsproject.org

8
    FOR PLAINTIFF INTERVENOR:
9
         PERKINS COIE
10       700 13th Street, NW, Suite 800
         Washington, D.C.  20005-3960
11       (T) 202.654.6200

12       By:  John Geise, Esq.
              jgeise@perkinscoie.com
13                    AND
              Aria C. Branch, Esq.
14            abranch@perkinscoie.com
                      AND
15            Emily Brailey, Esq.
              ebrailey@perkinscoie.com
16

17  FOR DEFENDANTS:

18       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
         General Litigation Division
19       300 W. 15th Street
         Austin, Texas  78701
20       (T) 512.463.2120

21       By:  Anne Marie Mackin, Esq.
              anna.mackin@oag.texas.gov
22                    AND
              Christopher D. Hilton, Esq.
23            christopher.hilton@oag.texas.gov

24
    VIDEOGRAPHER:  Brian Christopher
25

3

1                          INDEX

2     APPEARANCES                              2

3

4    EXAMINATION OF TOMMY GLEN MAXEY:

5     BY MS. MACKIN                            6

6     BY MR. GEISE                            112

7     BY MS. MACKIN                           115

8

9

10    REPORTER'S CERTIFICATION               117

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          EXHIBIT INDEX

2

3    Exhibit Number        Description                    Page

4
     Exhibit 1        Defendants' Notice of Oral            9
5                     Deposition Pursuant to
                      Federal Rule of Procedure 30
6
     Exhibit 2        Plaintiffs' Production in            17
7                     Response to Subpoena

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                 (Monday, April 27, 2020, 10:03 a.m.)

 2                      P R O C E E D I N G S

 3                 THE REPORTER:  Today is April 27th, 2020.

 4  This is the deposition of the Texas Democratic Party

 5  Representative, Glen Maxey, in the matter of Jarrod

 6  Stringer, et al. versus Ruth R. Hughes, et al.  We are

 7  remotely situated due to COVID-19 and are appearing via

 8  Zoom conference.  We are now on the record at

 9  10:03 a.m., Central time.

10                 My name is Debbie Cunningham; and my

11  business address is P.O. Box 245, Manchaca, Texas.

12                 Would all persons present please

13  introduce themselves for the record?

14                 MS. MACKIN:  This is Anna Mackin with the

15  Texas Office of the Attorney General on behalf of the

16  Defendant.

17                 MR. GEISE:  This is John Geise from the

18  law firm of Perkins Coie, LLP, on behalf of Plaintiff

19  Intervenor Texas Democratic Party.

20                 MS. BRANCH:  This is Aria Branch from

21  Perkins Coie on behalf of the Plaintiff Intervenor,

22  Texas Democratic Party.

23                 MS. BRAILEY:  This is Emily Brailey also

24  from Perkins Coie on behalf of the Plaintiff Intervenor,

25  Texas Democratic Party.

1          THE WITNESS:  I'm Glen Maxey from the

2    Texas Democratic Party.

3          MR. GONZALES:  This is Joaquin Gonzales

4    on behalf of Plaintiffs, Jarrod Stringer, et al.

5          (Witness sworn by the reporter.)

6          MS. MACKIN:  And I'd just like to note on

7    the record that the parties have stipulated that that

8    oath can be taken remotely.

9                    GLEN MAXEY,

10   having taken an oath to tell the truth, the whole truth,

11   and nothing but the truth, was examined and testified as

12                     follows:

13                  EXAMINATION

14   BY MS. MACKIN:

15      Q.   All right.  Good morning, Mr. Maxey.

16      A.   Good morning.

17      Q.   Please speak and spell your name for the

18   record.

19      A.   Tommy Glen Maxey, T-O-M-M-Y G-L-E-N M-A-X-E-Y.

20      Q.   Thank you.

21          My name is Anna Mackin.  I represent the

22   Defendants in this case, and I'm going to be asking you

23   some questions today.  You have been deposed before; is

24   that right?

25      A.   That's correct.

1    Q.   Okay.  So you're probably familiar with what
2  we're about to cover; but I want to briefly go over some
3  ground rules, which are especially important given that
4  we're remotely situated and using this videoconference
5  technology to take your deposition today.
6            Please try to give a verbal answer to my
7  questions.  "Yes" or "no" works a lot better than
8  "uh-huh" or "huh-uh" because it makes sure that the
9  record is clear and Ms. Cunningham is writing down
10 everything that we say.  Okay?
11   A.   All right.
12   Q.   Okay.  And please try to let me finish a
13 question before you begin your answer.  I will also
14 endeavor to allow you to finish your answer before I
15 ask my next question.  This is, again, so that
16 Ms. Cunningham can get an accurate record of everything
17 that is said.  Okay?
18   A.   Okay.
19   Q.   And if you don't understand one of my
20 questions today, will you please tell me so that I can
21 rephrase it?
22   A.   Yes, ma'am.
23   Q.   Thank you.
24            And if you do answer, I will assume that
25 you have understood the question.  Is that fair?

1        A.    That's fair.

2        Q.    Okay.  A reminder:  You are under oath, sworn

3   to tell the truth as if testifying at a courthouse in

4   front of judge and a jury under penalty of perjury if

5   you do not tell the truth.  Do you understand that?

6        A.    I do.

7        Q.    Okay.  And this is not an endurance contest.

8   You are the talent here.  So if you ever need a break,

9   need to stretch your legs, use the restroom, please just

10  let me know; and we'll take a break.  I'll just ask that

11  you answer any question that is pending before we go on

12  break.  Okay?

13       A.    All right.

14       Q.    All right.  Is there any reason that you might

15  not be able to answer my questions honestly, completely,

16  and accurately today?

17       A.    Nothing at all.

18       Q.    Okay.  So during today's deposition I'm going

19  to show you some documents by publishing them on the

20  screen.  If you have trouble seeing a document, just let

21  me know.  I can zoom in or out, scroll up or down

22  however you need me to.  Just let me know that I need to

23  do that.  Okay?

24       A.    All right.  Let me just say that I learned

25  last time that with my progressive glasses, sometimes

1  I'm going to have to move the screen to see.  So I

2  might -- my picture might go out of the frame while I'm

3  tilting the computer.

4      Q.   Okay.  Understood.  And we also have a way to

5  send around a little link.  If it's not really working

6  for me to publish the document on the screen, I can

7  share a link in the chat box; and that will allow

8  everybody to download whatever document we're talking

9  about.  So we can explore what we need to do to make

10  sure that you're seeing the documents clearly.

11      A.   Thank you.

12      Q.   Of course.  So let's go ahead and practice

13  with what's going to be Exhibit 1 to this deposition.

14          MR. GEISE:  Can we actually just send

15  around the chat links as a matter of course so that

16  counsel can download them as well?

17          MS. MACKIN:  Sure, sure.  That's fine.

18  Let me stop this share, and I will circulate...

19          MR. GEISE:  Yeah, we've had these hiccups

20  before; and it just ended up being easier.

21          MS. MACKIN:  Not a problem.  We are all

22  learning on the job a little bit when it comes to these

23  depositions.

24          MR. GEISE:  I was in a deposition where

25  Debbie got cut out because she -- her house got struck

1  by lightening, so that was a particular --

2                 MS. MACKIN:  Oh my gosh.  Are you all

3  right?

4                 THE REPORTER:  Yes.

5                 MR. GEISE:  That was particularly

6  different.

7                 MS. MACKIN:  Yeah.

8                 All right.  So I've sent around the

9  document in the chat box.

10                 MR. GEISE:  Yeah, I got it.  It worked

11  for me.  Thank you.  Appreciate it.

12                 MS. MACKIN:  Sure.

13                 (Exhibit 1 marked.)

14      Q   (BY MS. MACKIN)  Mr. Maxey, are you able to

15  view that document?

16      A.   Yes.

17      Q.   Okay.  And have you seen this document before?

18      A.   Yes.

19      Q.   What is it?

20      A.   It's the Defendants' Notice of Oral Deposition

21  pursuant to Federal Rule of Civil Procedure 30, in

22  Jarrod Stringer versus Ruth Hughs.

23      Q.   And do you understand that you are here today

24  giving this deposition pursuant to this Notice of

25  Deposition?

1    A.    Yes.

2    Q.    And that your testimony today is on behalf of

3 the Texas Democratic Party, and your answers will bind

4 the Texas Democratic Party?

5    A.    That's correct.

6    Q.    Okay.  And throughout this conversation today

7 when I say "TDP," I'm going to be referring to the Texas

8 Democratic Party, just to be clear about that; and if

9 you say "TDP," I'll also understand you to be referring

10 to the Texas Democratic Party unless you tell me

11 otherwise.  Okay?

12    A.    All right.

13    Q.    All right.  So I'd like to -- before we jump

14 into the substance, I'd like to go over the seven topics

15 for this corporate representative deposition.  So if I

16 could have you please scroll down to page 5 of this

17 notice.

18    A.    All right.

19    Q.    So Topic 1 is your mission, "your" meaning

20 that of TDP.  Are you designated to testify on this

21 topic?

22    A.    Yes.

23    Q.    Okay.  And Topic 2, "Your organization,

24 including your organizational structure, employees,

25 physical assets, parent and sibling entities, tax

1  status, and history; the services that you provide and

2  the activities that you perform."  Are you designated to

3  testify on this topic?

4       A.   Yes.

5       Q.   And Topic 3, "Your funding sources, funding

6  amounts, operational expenses, operational budget, and

7  funding activities between January 1st, 2014 and the

8  present."  Are you designated to testify on this topic?

9       A.   Yes.

10       Q.   Topic 4, "All activities on which you have

11  spent funds or to which you have dedicated resources in

12  Texas between January 1st, 2014 and the present."  And

13  then it lists, "including," several subtopics.  Are you

14  designated to testify on Topic 4?

15       A.   To the level that they are not protected under

16  our organizational First Amendment rights.

17       Q.   And what do you mean by that?

18       A.   Well, it's my understanding that, as an

19  entity, that we have the ability to not disclose our

20  day-to-day operational things; but I can, to the level

21  my attorney tells me, answer this question -- these

22  questions in Number 4.

23       Q.   And there isn't another person who would be

24  designated to testify on Topic Number 4, is there?

25       A.   No.  I am it.

1      Q.   You are it.  All right.

2           Topic 5, "All activities on which you

3  plan to spend funds or to which you plan to dedicate

4  resources in Texas between the present and January 1st,"

5  2014 [sic]  Mr. Maxey, are you designated to testify on

6  this topic?

7      A.   Well, it's 2024, not 2014, but --

8      Q.   Correct.  Apologies.

9      A.   Yes, I am.

10     Q.   Thank you for keeping me honest.  I appreciate

11  it.

12          Topic 6, "The allegations in your

13  Complaint and the factual bases therefor."  Are you

14  designated to testify on this topic?

15     A.   I am.

16     Q.   And the word "Complaint" as used in Topic 6,

17  do you understand that to mean the Complaint that your

18  attorneys filed on behalf of the Texas Democratic Party,

19  the DSCC and the DCCC in this lawsuit?

20     A.   Yes.

21     Q.   Okay.  Thank you.

22          And then Topic 7, "Your members who are

23  eligible to use the DPS website for a driver license

24  renewal or change-of-address transaction and intend to

25  do so."  Are you designated to testify on this topic?

14

```
 1      A.   Yes.

 2      Q.   All right.  And, finally, Number 8, "The

 3  documents produced in response to the subpoena duces

 4  tecum," described and attached to the Deposition Notice.

 5  Are you designated to testify on this topic?

 6      A.   I have no idea what those words mean, but I

 7  suppose I am.

 8      Q.   Okay.  Is it your understanding that some

 9  documents have been produced to the Defendants by your

10  attorneys --

11      A.   Yes.

12      Q.   -- and that we can talk about them today?

13      A.   Absolutely.

14      Q.   All right.  Sounds good.

15           All right.  So how did you prepare for

16  today's deposition, Mr. Maxey?

17      A.   I reviewed all of the documents that were

18  shared to me by my attorney.  I had conversations with

19  my attorney about the general scope of what we would

20  discuss today.

21      Q.   And which documents did you review?

22           MR. GEISE:  Objection, attorney-client

23  privilege.  I think he said he reviewed documents

24  provided to him by counsel.  So I would instruct the

25  witness only to answer any documents that were not
```

1   provided by counsel.

2            MS. MACKIN:  Is it your position that

3   we're going --

4            (Simultaneous speakers.)

5            MS. MACKIN:  -- document is that that's

6   privileged because I'm not asking him about advice of

7   counsel.  I'm simply asking which documents he relied

8   upon to prepare to testify on the topics.

9            MR. GEISE:  I think that if he was

10  provided documents by counsel, then which documents he

11  was provided to review in preparation for the deposition

12  is attorney work product and goes to the mental

13  impressions of counsel.

14           So if you reviewed any documents outside

15  of those provided by counsel, I would -- you can answer

16  that.  If the only documents you reviewed were documents

17  which counsel provided you to review, I would instruct

18  you not to answer.

19           I think he's allowed to answer how many

20  documents he reviewed, but -- or the general topics of

21  documents he reviewed.

22           But I think that specific documents you

23  reviewed, I would instruct you not to answer.  So with

24  that instruction, you can answer the number of documents

25  you reviewed and the general scope of the documents you

1   reviewed.

2          MS. MACKIN:  I'd just like to note on the

3   record that I don't think that's correct.  Of course,

4   the witness is able to answer to the extent that he

5   feels is appropriate; but the mere fact of reviewing a

6   document and the nature of what the document is is not

7   protected.

8          MR. GEISE:  And, again, I would instruct

9   the witness that I believe that reviewing specific

10  documents selected by counsel goes to the mental

11  impressions and work product of counsel.  And I would

12  instruct the witness to answer a summary, a general

13  summary of the documents -- well, a general summary of

14  the documents you reviewed at a high level and the

15  number.  And that's what I would instruct the witness to

16  answer.

17      A.   So I reviewed approximately, I would say,

18  maybe about 50 documents that were sent to me by counsel

19  that all appeared to be the filings in this case alone.

20  I have not looked at any document, done any research

21  outside of my general knowledge about the Texas

22  Democratic Party in response to doing this deposition.

23  I have not looked at anything outside of what came that

24  appeared all to be things that have already been

25  produced into the record or will be produced into the

1   record in this lawsuit.

2        Q.   So you did not search any files for documents

3   in preparation for today's deposition?

4        A.   No.  My brain is it.

5        Q.   Did you bring any documents with you today?

6        A.   Nope.

7        Q.   Your attorneys have produced 55 PDF files to

8   us as a response to the subpoena attached to this

9   Notice.  I'm going to make all of those files Exhibit 2

10  to this deposition.

11            (Exhibit 2 marked.)

12       Q.   (BY MS. MACKIN)  We will pull up a few of them

13  later on to look at them, but the documents that were

14  produced to us all appear to be e-mails sent by the

15  Texas Democratic Party to, be it -- well, it was not

16  clear who they were sent to; but they appeared to be

17  externally- sent e-mails, not within the Party, but sent

18  outside of TDP.  Did you review any of those documents

19  in preparation for your deposition?

20       A.   I did.  I went through each one of them

21  opened.  There were some of them that were garbled that

22  I couldn't read, but they seemed to be in the same vein

23  as the previous ones; and historically every one of

24  those e-mails I also received in my inbox when they were

25  originally sent.

 1                    MS. MACKIN:  Okay.  And I'm just going to

 2   memorialize, again, on the record our objection to

 3   withholding documents that the witness reviewed in

 4   preparation for today's deposition, and we do request a

 5   supplementation of that production to ensure --

 6                    THE WITNESS:  I --

 7                    (Simultaneous speakers.)

 8                    MR. GEISE:  Well, Glen, you don't --

 9   Glen, you don't have to answer.

10                    We can discuss that after the deposition

11   or off the record of the deposition.  We are happy to

12   discuss our -- we maintain that the Texas Democratic

13   Party has publicly available financial records and that

14   anything that is an internal Party document is subject

15   to the First Amendment privilege, is not critical to the

16   needs of this case or critical to establishing the Texas

17   Democratic Party's standing and that --

18                    MS. MACKIN:  I think, Counsel, we can

19   discuss --

20                    MR. GEISE:  We can discuss that off the

21   record.  We don't need to have that discussion now.

22                    MS. MACKIN:  I'm just preserving our

23   objection on the record.

24                    MR. GEISE:  Yes, understood.  And I'm

25   preserving our response; but, yes, we can talk after.

```
 1       Q    (BY MS. MACKIN)  All right.  Mr. Maxey, did
 2   you meet with anyone at TDP to prepare for today's
 3   deposition?
 4       A.    No, ma'am.
 5       Q.    And how many times did you meet with counsel
 6   to prepare for today's deposition?
 7       A.    Once.
 8       Q.    And how long did you meet with counsel?
 9       A.    I think approximately an hour.
10       Q.    Okay.  And are you adequately familiarized
11   with the facts to testify as TDP's representative today?
12       A.    I believe so.
13       Q.    Okay.  Just a brief discussion of your
14   background, Mr. Maxey.  You are currently employed by
15   TDP; is that correct?
16       A.    That's correct.
17       Q.    What is your job title?
18       A.    Currently my job title is Primary Director.
19       Q.    How long have you held that position?
20       A.    Well, I work for the Texas Democratic Party
21   year round; and I use different titles depending on the
22   time of the election cycle.  For instance, during the
23   legislative session, I am the Legislative Director.  I
24   lobby for the Party and election issues before the Texas
25   Legislature.  So during the primary season, which begins
```

1   approximately September 1st of the odd year, through the

2   month after the runoff election, which is now going to

3   be August, I have the title of Primary Director because

4   we're in the period of having our Democratic primary and

5   primary runoff.

6         Q.   Do you report to anyone in your role with the

7   Texas Democratic Party?

8         A.   I report to the chairman of the Party,

9   Gilberto Hinjosa and Manny Garcia.

10        Q.   And does anyone report to you?

11        A.   I'm -- I do not have general employees

12   reporting to me.  I am a senior advisor.  So many of the

13   employees come to me for advice about election law, job

14   descriptions, things that I am knowledgeable of, since

15   I've been doing this over 50 years and most of them are,

16   you know, in their twenties.  And Luke Warford, who is

17   the Director of Voter Registration -- or Voter

18   Expansion, which is voter registration and vote by mail

19   and those kind of programs, reports directly to me.

20        Q.   Okay.  So Luke Warford is your direct report;

21   and then for others, you are a wealth of institutional

22   knowledge, so to speak?

23        A.   Yes.

24        Q.   Okay.  Who made the decision that the Texas

25   Democratic Party would join this lawsuit?

1           MR. GEISE:  Objection.  I think that that

2    goes to attorney-client privilege as well as the First

3    Amendment privilege.  I would instruct the witness not

4    to answer.

5           MS. MACKIN:  To be clear, I'm not asking

6    why the Texas Democratic Party decided to join this

7    lawsuit.  I'm simply, under the topic of the

8    organizational structure, seeking to understand those

9    lines of authority.

10          MR. GEISE:  I don't think that how the

11   Texas Democratic Party makes strategic litigation

12   decisions -- I think that's First Amendment privileged

13   and not relevant to this lawsuit.  I would instruct the

14   witness not to answer.

15          MS. MACKIN:  And I'll note again I didn't

16   ask how that decision was made.  I asked for the

17   identity of the individual with the decision rights to

18   make it.

19          MR. GEISE:  Understood.  I would still

20   instruct the witness not to answer.

21      A.   Therefore, I will not answer under the advice

22   of counsel.

23      Q.   (BY MS. MACKIN)  You're following the advice

24   of your counsel.  Okay.

25          All right.  I want to jump into Topic 1.

1   What is the mission of the Texas Democratic Party?

2         A.    The mission of the Texas Democratic Party is

3   to elect people who call themselves Democrats to public

4   office at all levels, from president to public offices,

5   such as city councils and school boards, that are

6   non-partisan.  But anybody who believes in the

7   Democratic philosophy, agrees with our platform.  We

8   educate voters.  We register voters so that they are

9   capable of casting a ballot.  We inform voters about

10  issues and candidates.  We run coordinated campaigns to

11  elect those Democrats.  There are literally thousands of

12  different pieces of all of that, but generically it's

13  electing Democrats to public office.

14        Q.    Okay.  Has the mission of the Texas Democratic

15  Party changed over time?

16        A.    No.  I mean, the fundamental mission, you

17  know, began when the Party was formed in the early 1800s

18  to be the mission of electing people of our Party, with

19  our general philosophy and support our platform, to

20  public office.  That's always been our mission.  I don't

21  think we've deviated very far with that.  How we do

22  that, methodologies, have changed radically over time;

23  and certainly radically just in the last decade,

24  radically in the last months because of the pandemic.

25  So methodologies have changed, but mission has not.

1      Q.   And when you say methodologies have changed,

2  how have those methodologies changed?

3      A.   Well, there was not a -- when I started in

4  this business doing Democratic Party work, there were

5  no computers.  I started out on a manual typewriter

6  without -- not even with white-out or a corrective

7  ribbon.  So the access to cellphones versus land lines

8  versus party lines over the 50 years I've been doing

9  this, access to whether you could do -- you know, I have

10 been from hand address the envelope, to stick on the

11 adhesive label, to laser printing at a mail shop over

12 the 50 years that I've been doing this.

13              So, I mean, all kinds of technology, all

14 kinds of communications, the fact that you can now talk

15 to tens of thousands of people simultaneously through

16 an e-mail is radically different than when we had to

17 phone each individual voter one by one when I started a

18 mere -- in the 1980s, you know.  So the methodologies of

19 communicating and the fact that we have a voter

20 registration system where a person has to fill out the

21 paper form and put a wet signature on it that has

22 changed over the years to the ability of people who can

23 be registered to vote when they get their driver's

24 license renewed or registered or get a driver's license

25 for the first time, which brings us all the way to this

1  lawsuit.  The State of Texas is refusing to follow

2  federal law in registering a person to vote when they

3  change their driver's license address.

4          MS. MACKIN:  I'm going to object to the

5  last sentence as nonresponsive to the question.

6      Q.  (BY MS. MACKIN)  I would like to ask you,

7  Mr. Maxey, you mentioned that in the past few months,

8  even, methodologies have changed in light of the

9  pandemic.  Can you tell me a little bit about how that

10  has changed?

11      A.  Well, I would have had right now literally

12  dozens upon dozens of TDP employees knocking on doors

13  and being in the living rooms of voters or on their

14  porch having conversations about registering to vote.

15  Because of the COVID-19 those person-to-person

16  interactions are not happening.  So now we're having to

17  do things in a different way of e-mail and phone calling

18  and other kinds of things, sort of a throwback to what

19  we did 50 years ago.  So person-to-person communications

20  are not possible in social-distancing situations or at

21  least not advisable.  We're not putting people at risk

22  to even put people in the situation that they have to be

23  6 foot apart.  We don't want anybody to -- until the

24  governor and the president say it's all clear, we won't

25  be doing that kind of door-to-door campaigning.

1    Q.   Okay.  I want to talk about TDP's

2  organizational structure.  Can you explain to me how TDP

3  is structured?

4    A.   How it's structured governance-wise?

5    Q.   Yes, sir.

6    A.   The Texas Democratic Party has an Executive

7  Committee that's elected at our quadrennial state

8  conventions by delegates that are elected that consist

9  of a chairman and a vice chair and then 62 people, 31 --

10  two from each of the 31 state Senate districts, a man

11  and a woman.  So it's a 64-member Executive Committee

12  that's outlined in the Texas Election Code statutorily,

13  membership of that committee.  They make the policy.

14  The Executive Director hires -- I mean, the State Chair

15  hires an Executive Director.  The Executive Director

16  hires a staff.  The staff reports to the Executive

17  Director.  The Executive Director reports to the State

18  Chair.

19    Q.   And within that structure, would you fall

20  under the staff category?

21    A.   Yes.

22    Q.   Okay.  And how many other staff members does

23  TDP have right now?

24    A.   As reported in our staff meeting last week, we

25  had 61 staffers.

1    Q.   And how are TDP staff members paid?  I'm not

2   asking how much, just where the funds come from.

3    A.   They come from donations that are made legally

4   and through federal and state law from donors,

5   individuals, organizations, political action committees.

6    Q.   Okay.  I'm going to jump ahead to Topic 4.

7   And as you were alluding to earlier, Mr. Maxey, I

8   understand that there are various permutations of how

9   TDP furthers its mission and sort of engages in its

10  activities; but I would like to understand kind of the

11  main buckets of activity, the main categories of

12  activity, that TDP is engaged in.

13           From what you said earlier, I wrote down:

14  Elect Democrats, educate voters, and register voters.

15  But I don't want to sort of pin you to that if there's

16  kind of a better way to describe the main categories of

17  activity that TDP engages in.

18    A.   Sure.  Let me just run down sort of job titles

19  of the 61 people, and that will give you an idea.

20    Q.   Cool.  Perfect.

21    A.   We have a comptroller who receives and expends

22  the funds, who makes all the reports to the Federal

23  Election Committee and Texas Election Committee.  She

24  has two assistants that also deal with HR and hiring and

25  doing Human Relations kind of hiring and removing

1  employees.

2              We have a data team that works on the

3  voter files, targeting, preparing lists for phone

4  banking, voter contact all through technology systems.

5  It's basically data work.

6              We have a fundraising team that consists

7  of four people that raise money from individual donors

8  and major donors and organizations.

9              As I said, we have an Executive Director.

10  We have an Assistant Executive Director who also does

11  sort of the political work of the organization.

12              We have a political team that has two

13  people that work directly with candidate services, two

14  people who work directly with volunteers for the

15  candidates, two people who work directly with the county

16  parties, with their plans, funding plans, coordinated

17  plans, training county chairs and county executive

18  committees and volunteers at the county level.

19              I'm sort of going around my office.

20              We have a five-member voter protection

21  team that deal with voter laws and educating people to

22  comply with all election laws and assist where we find

23  voters who have had problems casting their ballot or

24  getting registered, to make sure that everybody is

25  legally able to participate.

1              There's the voter expansion team, Luke

2    Warford, who does voter registration, vote by mail.  I

3    work a lot in that program.

4              We have a communications staff, typical

5    communication directors, research director, digital

6    team, people who do all of our online, whether it's

7    e-mails, Instagram, Facebook, Twitter, all of those kind

8    of programatic things.

9              And we have an organizing team that works

10   in the field.  We have constituency organizers for

11   allied groups within the Party, African-Americans,

12   Hispanic, disability community, LGBT community, the

13   women's community, Asian Pacific Islanders community.  I

14   might be missing one of those groups, but there's a

15   staffer there.

16             And then there are literally -- there

17   will be by November approximately a thousand people in

18   the field talking to voters all over the state of Texas.

19             And that's how we do it.

20      Q.   That's how the sausage is made.

21             Okay.  So I appreciate that rundown.  And

22   it sounds, from what you've said, like some of those

23   apparatuses are necessary to engage in a variety of

24   activities, like, it's not like you just have a -- like,

25   for example, your comptroller, that's sort of

1    infrastructure that's, like, necessary for the whole

2    organization to run, right?

3        A.   Well --

4              MR. GEISE:  I'm just going -- I think

5    it's -- I'm just going to object to preserve the First

6    Amendment objection and just instruct the witness.  I

7    think this is all fine.  You can continue to answer at a

8    high level.  I just -- you know, if we start getting

9    into more and more detail, I just wanted to preserve

10   that objection for the record.

11             THE WITNESS:  I understand.

12       A.   So let me just say that nothing's siloed.

13   Everybody on our staff is trained to register a voter.

14   Everybody on our staff is trained to answer a voter's

15   questions so that no matter where -- what department

16   you're in, we're all supportive; and we're cross-

17   trained.  Nothing is -- I mean, there are some people

18   who do just the same thing every day; but I work in

19   pretty much all of those areas.

20             I'm the author of many of the

21   communication e-mails we send out, perhaps, on voter

22   registration.  And I think that's the whole nut of where

23   we're going with this is that we are having to move

24   money from all of those departments to deal with voter

25   registration because the State, in this case, is not

 1  doing its work in registering people appropriately.

 2      Q.   (BY MS. MACKIN)  Okay.  And so I'm trying to

 3  get a list of the main activities of the Texas

 4  Democratic Party.  And so based on what you've said, it

 5  sounds like there is fundraising.  There is candidate

 6  services.  There is county services, voter protection,

 7  voter expansion, and maybe organizing.  I mean, if you

 8  had to break it down into categories of activity, how

 9  would you do that, because I appreciate the explanation

10  of kind of the departments and the structure?

11      A.   Every day we communicate with voters.  We

12  educate voters.  We help Texans who are not registered

13  get them registered in myriads of ways to make sure that

14  we expand the voting pool.  We educate them how to cast

15  a vote, when to cast a vote, where to cast a vote, and

16  who to cast a vote for, pure and simple.

17           Our main goal right now is to register

18  approximately 2.6 million people to vote, which we're

19  spending lots of money on doing because the State of

20  Texas is not following the federal law in registering

21  people when they change their driver's license.

22      Q.   And just to be clear on the record, Mr. Maxey,

23  are you an attorney?

24      A.   No, and I never claimed to be one.

25      Q.   Okay.  And --

1    A.    But let me just say this, though:  I'm not an

2  attorney, but I was a legislator for 12 years.  I have

3  drafted in the last four election cycles more than 150

4  pieces of election law.  I have gotten legislators to

5  file them.  I have testified on behalf of those bills,

6  and I have rewritten major sections of the Election Code

7  through things that I have drafted.  So I am not an

8  attorney, but I understand the law.

9    Q.    Okay.  And I appreciate that.

10         I want to come back to what I'm trying

11  to understand with this question about TDP's activities.

12  So TDP engages in communications, right?  You

13  mentioned -- when I just tried to get a list the last

14  time, you said communication, education, and voter

15  registration; but that doesn't seem to capture

16  everything that you talked about.

17    A.    Please ask something specifically about what

18  you want to know, and I'll answer it.

19    Q.    Sure.  So what are the main categories of

20  activities that TDP is engaged in?  And I think I did

21  ask that already, but I'll ask it again.

22         MR. GEISE:  Objection to the form.

23         You can answer.

24    A.    I'll answer it yet again.  Our mission is to

25  educate voters to vote for Democratic candidates.  In

1   order to do that, we must register them to vote.  We

2   must educate them when, where, and how to vote.  That's,

3   pure and simple, everything that we do.  Candidates,

4   training, it's all about getting them elected.  We train

5   them how to campaign, but our overarching goal is to

6   have more votes for Democrats than for Republicans,

7   Green Parties or Libertarian candidates or Write-in

8   candidates.  That's our goal, pure and simple:  Elect

9   Democrats.  Number 1 on that is to have more Democrats

10  registered to vote, and that's the problem we're having

11  here is that we have impediments to doing that.  We're

12  having to move funds into --

13      Q.   (BY MS. MACKIN)  Okay.  But I'm not hearing an

14  answer to my question.

15      A.   Sorry.  Don't interrupt me.  You told me I

16  could answer a question before you would interrupt.

17           So our goal is to register voters to

18  vote, and there is an impediment by the State of Texas

19  not registering voters when they update their driver's

20  license.

21           MS. MACKIN:  Okay.  Objection,

22  nonresponsive.

23      Q    (BY MS. MACKIN)  Mr. Maxey, what are the main

24  categories of activities that TDP is engaged in?

25           MR. GEISE:  Objection, asked and

1  answered.

2            MS. MACKIN:  I didn't hear an answer to

3  my question.

4       A.   The main activities are voter registration,

5  voter education, candidate recruitment, candidate

6  education, and telling people when, where, and how to

7  cast a ballot.  That's it in a nutshell.  Whether we

8  raise money, whether we do data work, whether we do

9  communication, it's all about registering people to

10  vote, getting them to go vote for Democratic candidates.

11  Answered.

12       Q.   (BY MS. MACKIN)  And so is there a difference

13  between -- I just want to make sure I have the list

14  correct.  I have as the main activities:  Communication,

15  voter education, voter registration, candidate

16  recruitment, and candidate education.  Do I have that

17  right?

18       A.   Well, I don't know if it's limited to that.

19  I've been talking for 15 minutes here about the mission

20  of the Party and what we do and named every staffer with

21  a job description title.  I think any logic is that all

22  of those things go back to having an educated electorate

23  of Democrats who know when an election is, where to go

24  vote, how to cast a ballot, how to do it legally, how to

25  do it, whether in person or by mail.  All of that stuff

34

1  is our mission to get to the goal of electing Democrats

2  to office, pure and simple.

3           Please be specific because I've answered

4  that five times now.

5      Q.   The thing that I'm struggling with, though --

6      A.   You want me to give you a tick-tock of hours

7  from 8:00 to 5:00 every day of what I do?  Is that what

8  you --

9      Q.   No, sir.

10     A.   Okay.  Then think of a question other than the

11  one you've asked five times now, that I've answered.

12     Q.   But respectfully, sir, it's a fair question;

13  and I'm just trying to make sure that I have the answer

14  clear because I'm a little bit confused by the way that

15  it's being answered.

16           So the list I have of the main activities

17  that TDP is engaged in, the list that I have of the main

18  activities -- I understand your mission is to elect

19  Democratic candidates, pure and simple.  I've heard

20  that.  I appreciate that.  In terms of the specific

21  activities in which TDP is engaged, the main

22  activities -- I'm not asking for each granular thing;

23  but if you kind of divide it up, the work that TDP does,

24  I have five categories based on what you've said.  And I

25  want to make sure that I understand that right and that

1  I have everything down as a list.  So the list that I

2  have --

3       A.   (Inaudible.)

4       Q.   Go ahead.

5       A.   I'm not -- you've not asked a question.  Ask a

6  question.

7       Q.   Okay.  You started speaking, so I wanted to

8  give you an opportunity to do so.

9            The list that I have for the main

10  activities that TDP is engaged in includes:

11  Communication, voter education, voter registration,

12  candidate recruitment, and candidate education.  Is that

13  an accurate and complete list of the main categories of

14  activities that TDP is engaged in?

15            MR. GEISE:  Objection, mischaracterizes

16  the testimony.

17            But you can answer.

18       A.   I don't think -- when you say is it a complete

19  list -- because I don't want to -- you know, it sounds

20  like a trick question here.  If you want me to add on to

21  it, we raise money to do those activities.  We do data

22  work to do those activities.  We do work with county

23  parties and candidates and volunteers and activists and

24  voters to do those activities.  It seems like I'm in a

25  circular question here.

Texas Democratic Party - 4/27/2020

36

```
1      Q.   I'm not trying to --

2      A.   We want voters to cast ballots.  The main --

3  the only mission we have is for voters to vote for

4  Democratic candidates and for those Democratic

5  candidates to win.  Anything more than that is getting

6  into granular things of how we do that.  And I can talk

7  for hours if we want to do that; but you keep saying, "I

8  want to just go at the top level of stuff."  So let's

9  stay at the top level.  We educate voters.  We register

10 them to vote.  We educate them again about when the

11 election is, how to vote, where to vote to cast a vote

12 for a Democrat.  That is the mission of TDP, pure and

13 simple; and that is it.

14           You might have five things on your list.

15 There's one thing on the list:  Educate voters, register

16 voters, turn them out to vote.  And I don't know what

17 else you're trying to get to.  Be more specific.

18     Q.   So does TDP participate in any activities that

19 don't fall into either communication, voter education,

20 voter registration, candidate recruitment, candidate

21 education, or fundraising?

22           MR. GEISE:  I'm going to object, asked

23 and answered.

24           But you can answer.

25     A.   Sure.  We just had a staff party.  None of
```

1  that was about voter education or voter registration or

2  turning out a vote.

3           I mean, we're a big institution.  We do a

4  lot of things.  I don't think any activities that are

5  officially done in a job description of an employee of

6  the Texas Democratic Party is outside of the goals of

7  educating voters, registering voters, and getting them

8  to cast a ballot for Democratic candidates.  So, no, I

9  don't think we do anything outside of that mission.

10      Q.   (BY MS. MACKIN)  Educating, registering,

11  getting them to cast a ballot for Democratic candidates?

12      A.   If you know something you only answer "yes" or

13  "no" when you do it, please ask me; but I can't think of

14  anything that's outside of that mission that the

15  employees of the Texas Democratic Party or its Executive

16  Committee or Chair does.

17      Q.   Okay.  Thank you.

18           All right.  How would you describe TDP's

19  efforts to educate voters?

20      A.   We communicate by e-mail, by text message, by

21  Twitter, by direct mail, by speeches by various

22  candidates, party officers, staffers.  We go door to

23  door.  We make phone calls.  Any kind of communications

24  that humans possibly have, we do to talk about

25  Democratic values, registering to vote, how to get

 1    registered to vote, when to go vote, and how to vote for

 2    Democrats.  So we communicate in all of those ways.

 3         Q.   And have you produced documents that reflect

 4    those communications?

 5         A.   There are documents of e-mails that we have

 6    sent to voters that were produced.

 7         Q.   Is there documentation of those other types of

 8    communications that you mentioned?

 9              MR. GEISE:  Objection on the basis of the

10    First Amendment privilege.

11              I think you can answer "yes" or "no"

12    whether other types of communication with voters exist;

13    but other than that, I'm going to object on the basis of

14    the First Amendment privilege and instruct you not to

15    answer other than whether or not other types of

16    communications exist.

17              MS. MACKIN:  And just to be clear, have

18    you-all produced a privilege log of documents responsive

19    to the subpoena that are being withheld?

20              MR. GEISE:  Not -- well, no.  I don't

21    think that a privilege log would need to hold every

22    communication that the Texas Democratic Party has with

23    voters because that would be millions, and that wasn't

24    what the subpoena requested.  But, again, I don't think

25    that that needs to be a discussion for this deposition.

1              I would instruct the witness:  You can

2    answer "yes" or "no" whether there are communications

3    outside of e-mails that the Texas Democratic Party has

4    with voters.

5              MS. MACKIN:  And we can talk offline

6    about the scope of the objection; but based upon what

7    we've heard so far today, it appears that the response

8    to the subpoena's incomplete and that we have some

9    issues to resolve with respect to that.

10             MR. GEISE:  Well, I don't know that

11   that's a topic for the witness; but you can answer "yes"

12   or "no" --

13             MS. MACKIN:  I --

14             MR. GEISE:  All right.  So you can answer

15   "yes" or "no" whether or not there are communications

16   other than e-mails that the Texas Democratic Party has

17   with voters.

18        A.   Can you be more specific what you mean by

19   that?

20        Q    (BY MS. MACKIN)  The question I asked --

21             MS. MACKIN:  Ms. Cunningham, would you

22   mind reading back my last question?

23             THE REPORTER:  Okay.

24             MS. MACKIN:  Thank you.

25             (The requested material was read as

1    follows:

2                "QUESTION:  Is there documentation of

3    those other types of communications that you

4    mentioned?")

5        A.   Generically in my answer I was talking -- you

6    said what kind of communications do we have with voters,

7    I think was the original question; and I said we have

8    direct mail.  That would be the glossy kind of mail that

9    you send a candidate -- to voters about issues or

10   candidates and giving voter information.  I suppose we

11   have those laying around from the past election cycle.

12   We've not done those this election cycle yet.

13              But there's -- if we're asking if there's

14   communication about this case, no, I don't know of

15   anything that we have.  I have no knowledge of anything

16   like that being in existence.

17              I was talking about generically what a

18   volunteer -- an organizer would -- how they would

19   communicate -- you asked how do we communicate, and so

20   that's what I was saying.  The LGBT organizers talking

21   to LGBT voters could be passing out literature or hand

22   them a palm card or something that says about getting

23   ready to vote or passing out voter registration cards.

24   That's the kind of communication I was talking about.

25              You seem to be talking about

1    communications about this lawsuit; and, no, I don't have

2    any of those, never have seen any of those.

3        Q.   (BY MS. MACKIN)  Okay.  How much did TDP spend

4    on voter education in 2014?

5        A.   You know, I don't know that I can break out

6    voter education.  I mean, the staff salaries for all of

7    the people we had in 2014, whether they're the data

8    person or the fundraising person or the comptroller's

9    salary or the executive director's salary or my salary,

10   I know that generically in 2014, we spent around

11   $2 million, raised and spent.

12       Q.   Total?

13       A.   Total.

14       Q.   So not limited to voter education, but

15   overall?

16       A.   Well, there's -- I don't have any knowledge

17   about how to pull that out of my brain about what was

18   voter education and what was just institutional

19   organizational payroll and things.  We could ferret out

20   that the comptroller is doing voter education if she's

21   processing the money that we pay for voter education.

22   So I don't know how you find -- I don't know the details

23   of how much was voter education versus any other

24   mission -- part of the mission.  Approximately

25   $2 million -- all of this is public record at the FEC

 1  and TEC.

 2        Q.   So you couldn't tell me --

 3        A.   What we spent I cannot tell you, no, not

 4  today, not from my memory how much of the $2 million was

 5  specific on voter communication, however nebulous that

 6  is.

 7        Q.   How about voter registration efforts in 2014,

 8  could you tell me how much TDP spent on voter

 9  registration efforts in 2014?

10        A.   No, ma'am.

11        Q.   Okay.  What about in 2015?

12        A.   No.  I mean, because --

13        Q.   What about in 2016?

14        A.   You're asking me --

15              MR. GEISE:  Objection, asked and

16  answered.  I think the witness has answered that it

17  would be impossible to calculate those numbers.

18              But you can answer to the extent of your

19  ability.

20        A.   Well, I will just say that, you know, we

21  passed out a lot of voter registration applications,

22  most of those provided to us by the Secretary of State

23  at no cost.  We did online voter registration.  There's

24  a cost to maintaining that and staffing that.  We mailed

25  out voter registration applications when people

 1   requested them.  We did rallies with voter registrars,

 2   volunteer voter registrars.  So to ferret out exactly

 3   how much generally educating a volunteer how to do voter

 4   registration and how much that time of training cost

 5   down to the cent, I can't do.  I cannot ferret it out.

 6   It's impossible for us to even do that.

 7              So part of -- part of our budget went to

 8   voter registration; but figuring it out to the penny or

 9   even a gross amount -- because, like I said, everybody

10   on our staff in almost every department, whether the

11   digital people are sending out links to go fill out a

12   voter registration application, whether an organizer's

13   standing at a door, whether an organizer is door

14   hanging, whether a college student is tabling on the

15   university campus, all of which are things that we

16   organize and train volunteers to do, the cost of that is

17   impossible to ferret out because everybody in our

18   department is somehow touching that.  So I can't tell

19   you a number.  It's impossible.

20       Q.   (BY MS. MACKIN)  And is that true for every

21   year between 2014 and 2020?

22       A.   Yes.

23       Q.   Okay.

24       A.   Now, if you asked -- you know, at some point

25   in time, a person -- if we had done a mailing and I had

1   time to go research it, I could probably find out some

2   things; but I don't know that -- anything from memory

3   that I could pull out and give you a cost on.

4        Q.   But you were designated to testify on Topic

5   4(d) in the Deposition Notice, were you not?

6        A.   Yes, ma'am.

7        Q.   Okay.

8        A.   And I did not go and do ten years of stuff and

9   have it in my brain for this deposition this morning.

10  So, no, I don't know the details.

11             MS. MACKIN:  So to that extent, then,

12  we're going to have to object to the preparedness of the

13  witness.

14             MR. GEISE:  I think the witness -- I

15  think the witness said that it would be -- and I can

16  clean this up with some questions after; that's fine.

17  I'll wait to do that.  But I think the witness testified

18  that it would be impossible to determine those numbers,

19  and he gave a top-line number for the question you

20  asked.  So he can testify top line how much was spent.

21  He's indicated that all of the Texas Democratic Party's

22  spending is publicly available on both the FEC and the

23  Texas Ethics Communication website and is happy to

24  testify about any specifics of those that you want to

25  provide him for and ask him about.

1            And I don't think that the witness needs

2    to be prepared to do something which is impossible.

3    He's testified that he can give top-level amounts.  He's

4    prepared to talk about programatic aspects of every one

5    of those years, the programs they did; and I think that

6    top-line amounts and programs is, from the witness'

7    testimony, the only level of detail that would be

8    possible for anyone to testify to.  So I don't know how

9    we would prepare anyone to do more than that.  Having

10   said that --

11            MS. MACKIN:  I think that this --

12            MR. GEISE:  Again, this is a discussion I

13   suppose should be offline.

14      Q.   (BY MS. MACKIN)  Just to make sure everything

15   is perfectly clear, all activities on which TDP has

16   spent funds or to which TDP has dedicated resources in

17   Texas between January 1st, 2014 and the present

18   including, total funds spent on voter registration

19   efforts, that number is not -- is it your testimony,

20   Mr. Maxey, that that number is not knowable?

21      A.   It is not knowable.

22      Q.   Okay.  How does the Texas Democratic Party

23   track the success of its voter education efforts -- or

24   let me ask that better.

25            Does the Texas Democratic Party track the

1  success of its voter education efforts?

2      A.  I think that's a broad question.  We do

3  metrics, you know.  We know when we send an e-mail how

4  many people open the e-mail.  We don't know if they read

5  it or not.  We know that they opened it.

6          We know that -- studies are done over

7  time that there are areas of Texas where we do door-

8  to-door activities or have done series of mailings to

9  voters to persuade them or educate them; and after an

10 election, we do analysis of are the turnout patterns

11 bigger where we did those efforts or didn't.

12         We make a phone call to a voter.  We tell

13 them to go vote.  We then look at daily, during early

14 vote, whether that voter has cast a ballot or not.  If

15 we had done a million of those calls and nobody that we

16 called voted, we would probably stop making the phone

17 calls.

18         So, yes, we track all of this stuff to

19 the best of our abilities using technology, pen and

20 paper, you know, marks on a walk sheet about who we

21 talked to, whether that person then went to vote.  And

22 whether in those precincts where we have done activities

23 we won the precinct or didn't win the precinct tells us

24 a lot about activities.  So yes, yes, we do.

25     Q.  And so does TDP adjust -- I mean, I think you

1   said this; but I want to make sure it's clear.  Does TDP

2   adjust its activities based on the success rate?

3        A.   Sure.  I mean, let me just say that, you know,

4   in my world of asking the Legislature to do things, I've

5   asked the Legislature to pass bills allowing people to

6   go online and register to vote.  If that were the case

7   in Texas, we would not be spending the time and effort

8   to go door to door, to table, to mail out voter

9   registration applications to newly -- new arrivals in

10  Texas or people who moved in.  We wouldn't be doing all

11  that activity, expending that money, expending that

12  staff time if we had more accessible voter registration

13  in Texas.  So, yes, we are changing our programatic

14  stuff in response to the voter suppression in Texas day

15  by day.

16            So that is our mission is to educate

17  voters.  We have big impediments in Texas for voter

18  registration, the most restrictive state in the nation

19  for registering people to vote.  And so we spend a

20  myriad amount of money and adjust our budget accordingly

21  to all of the impediments that are put in front of us.

22            MS. MACKIN:  Objection, nonresponsive.

23        Q.   (BY MS. MACKIN)  I don't think my question was

24  very clear.  I apologize.

25            We've talked about registering voters.

48

1  Are TDP's voter registration efforts focused on

2  targeting Democratic voters?

3            MR. GEISE:  I'm just going to object on

4  the basis of the First Amendment privilege.  I think the

5  question is fine.

6            But I would instruct the witness again

7  that based on the First Amendment privilege, all these

8  things going into specific strategy of the Texas

9  Democratic Party, I would instruct the witness you can

10 answer at a high level.

11           So I think that specific question is

12 fine, but I just want to continue to note that objection

13 for the record.

14           MS. MACKIN:  If we could please limit the

15 speaking objections, to keep objections to the rules and

16 an instruction not to answer, I would appreciate it.

17      A.   Yes.

18      Q    (BY MS. MACKIN)  Okay.  The Texas Democratic

19 Party began a new voter registration campaign in January

20 of 2020; is that correct?

21      A.   That's correct.

22      Q.   Okay.  I am going to show you some

23 documents -- actually, rather than show you, I will send

24 around a link so that you can view them.  And these

25 documents were produced by your counsel in response to

 1  the subpoena duces tecum related to this deposition.

 2              If you received that file, if you would,

 3  please pull it up for me, Mr. Maxey; and let me know

 4  when you're ready to discuss it.

 5      A.   I got it.

 6      Q.   Okay.  And do you recognize this document?

 7      A.   Yes, it's an e-mail that was sent out by our

 8  digital department from me to people on our e-mail list,

 9  asking for donations to do voter registration and vote

10  by mail.  I guess this one is a vote-by-mail thing.

11      Q.   And how does the Texas Democratic Party --

12  well, strike that.

13              You mentioned your e-mail list.  Who

14  would be on that e-mail list?

15      A.   Anybody who has requested to be on the list.

16  People who give us an e-mail at events, at our

17  convention, asking to be on our list.

18      Q.   And a little ways down on this e-mail it talks

19  about a contribution to our vote-by-mail fund.  Do you

20  see that?

21      A.   Yes.

22      Q.   What is the vote-by-mail fund?

23              MR. GEISE:  I'm going to object on the

24  basis of the First Amendment.

25              You can talk generally -- actually, no.

1    You can answer that question.  To the extent it doesn't

2    implicate internal strategic matters of the Democratic

3    Party, you can answer that question at a high level.

4         A.   It's a euphemism for money we would like

5    people to give to us that we might use for sending out

6    applications for seniors, disabled, and people out of

7    the county to vote by mail.

8         Q.   (BY MS. MACKIN)  And do you know if the funds

9    that were raised in response to this e-mail went

10   directly to the vote-by-mail fund?

11             MR. GEISE:  I'm going to object on the

12   basis of the First Amendment privilege.  I think that

13   the internal financial matters of a political

14   organization are core First Amendment protected.  And I

15   would instruct the witness not to answer.  I think he's

16   answered at the level that is adequate under a First

17   Amendment privilege.

18             MS. MACKIN:  The Protective Order entered

19   in this case allows you to designate any portion of this

20   transcript as confidential if you wish, so --

21             MR. GEISE:  There's case law on a

22   privilege -- on a Protective Order still not infringing

23   or not requiring the infringement of the First Amendment

24   privilege.  So I would still instruct the witness not to

25   answer on the basis of the First Amendment privilege

1  that the internal financial matters of a political

2  organization are core First Amendment protected.  I

3  would instruct the witness not to answer.

4          MS. MACKIN:  I'm not asking about

5  internal financial matters.  I'm asking a question that

6  appears on the face of this document which was produced

7  to us.

8          MR. GEISE:  He answered what the

9  vote-by-mail fund was.  I think that asking the next

10 question, which is what I objected to -- I think that

11 asking the next question beyond that about internal

12 financial decisions of the Texas Democratic Party is

13 core First Amendment protected.  I would instruct the

14 witness not to answer.

15         MS. MACKIN:  I'm not inquiring into

16 internal financial decisions of the Texas Democratic

17 Party.  The issue of spending -- okay.

18    Q   (BY MS. MACKIN)  Are you going to decline to

19 answer my question on the advice of your counsel,

20 Mr. Maxey?

21    A.  I do.

22    Q.  Okay.  So down here it also says, "Can you

23 make a $7 contribution to our vote-by-mail fund so we

24 can send 21 Texans their application?"  Did I read that

25 correctly?

1      A.   That's what it says.

2      Q.   And so how much does it cost to send one Texan

3  a vote-by-mail application?

4      A.   Do you want to know the postage?

5      Q.   I want to know how much it costs the Texas

6  Democratic Party.

7      A.   Well, approximately -- I mean, if you're doing

8  the math here, you can divide $7 by 21; and you'll sort

9  of get what the cost is.   There is the actual postage.

10 There's the printing.   There's the lasering.   There's

11 paying of the mail house.   There is the cost of the

12 paper.   There is all of that.   I would have to have a

13 calculator to do the math here, but I'm thinking it's

14 around about 30 to 33 cents.

15         It's different in each county, depending

16 on whether I am sending a hundred thousand into a postal

17 zone or whether I'm sending fifty, because it's a

18 different postage rate.   So I cannot tell you

19 definitively the cost of a single piece.   On average

20 they're probably about 32 cents.

21     Q.   Are you aware that Texans can request a

22 vote-by-mail application be mailed to them for free on

23 the Texas Secretary of State's website?

24     A.   Do what?

25     Q.   Are you aware that on the Texas Secretary of

1    State's website Texans have an ability to request that a

2    vote-by-mail application form be mailed to them for

3    free?

4         A.   Yes.

5         Q.   I'm going to show you another document which

6    is part of Exhibit 2 and begins at TDP 33.

7                   THE REPORTER:  Excuse me, Ms. Mackin.

8    I'm sorry.

9                   MS. MACKIN:  Yes.

10                  THE REPORTER:  That last document that

11   you displayed, did you want that marked as an exhibit?

12                  MS. MACKIN:  So all of these documents

13   that begin with the TDP preface, they're all going to be

14   Exhibit 2.

15                  THE REPORTER:  Okay.  Thank you.

16                  MR. GEISE:  Is now a good -- I know we've

17   been going for a little over an hour.  Is now a good

18   time for a break?

19                  Glen, I don't know if you want one.  I

20   could use a five-minute break.

21                  THE WITNESS:  I need to use the restroom.

22                  MS. MACKIN:  Sure.

23                  MR. GEISE:  I figured.  All right.

24                  MS. MACKIN:  Come back at 11:25.

25                  MR. GEISE:  Great.

54

1           THE REPORTER:  We're going off the record

2    at 11:18 a.m.

3           (Off the record from 11:18 to 11:27 a.m.)

4           THE REPORTER:  We are back on the record

5    at 11:27 a.m.

6           MR. GEISE:  We can't see you, Glen.  I

7    don't know if you can bring us back up.

8           There you go.

9           THE WITNESS:  The technician must have

10   turned my camera off.

11          MR. GEISE:  Yeah.  Just fire that guy.

12          MS. MACKIN:  All right.

13          THE WITNESS:  Are we talking about a

14   document?

15          MS. MACKIN:  TDP 33.

16          THE WITNESS:  Okay.  Got it.

17          MR. GEISE:  Sorry.  Did you -- is it in

18   the -- it's not in the -- oh, there it is.  It just came

19   up for me.

20       Q   (BY MS. MACKIN)  Do you recognize this

21   document, Mr. Maxey?

22       A.  It's an e-mail sent by the Texas Democratic

23   Party, yes.

24       Q.  And it looks to me that there's a box that

25   says, "What we did this year," colon, and that there is

 1  no text underneath that.  Do you know if that's how the

 2  e-mail went out to your Listserv?

 3       A.   I expect that this is a technical thing of it

 4  not showing on this thing.  I'm sure it had things that

 5  we had did -- we had done that year.

 6       Q.   Okay.

 7            MS. MACKIN:  And I guess we'll just

 8  request a supplementation with a legible copy.

 9            MR. GEISE:  Yes, I will make a note of

10  that.

11            MS. MACKIN:  And I don't think I need to

12  show it to the witness.  I'll just let you know,

13  Counsel, the same issue was present in TDP 37 as well.

14            MR. GEISE:  Okay.  Okay.

15       Q    (BY MS. MACKIN)  Okay.  I'm going to circulate

16  the document marked TDP 43.  Mr. Maxey, please take a

17  look at that and let me know when you're ready to

18  discuss it.

19       A.   All right.

20       Q.   Do you recognize TDP 43?

21       A.   It's an e-mail from Cliff Walker that went out

22  to our e-mail list.

23       Q.   Okay.  And it looks like it's a forward of an

24  e-mail from Representative Gina Calanni; is that right?

25       A.   Yes.

1      Q.   And down on the page marked TDP 44, about

2  25 percent of the way down the page --

3      A.   Uh-huh.

4      Q.   -- it says, "Texas Democrats' vote-by-mail

5  program made the difference between my victory and my

6  defeat.  Without their vote-by-mail initiative, I

7  wouldn't be where I am today."  Did I read that

8  correctly?

9      A.   Yes.

10     Q.   And how did TDP know that

11  Representative Calanni's 113-vote margin of victory was

12  attributable to Texas Democrats' ballot-by-mail program?

13     A.   I mean, this is like everything in an

14  election.  If you win by a small margin, most any

15  program you did is that margin.  We do know in this

16  district -- I don't know the numbers offhand -- but we

17  do know that several thousand seniors voted by mail as a

18  result of the application we mailed them because we

19  track the senior getting the application through the

20  mail and mailing it back to their clerk.  So because we

21  did a vote-by-mail program, several thousand seniors

22  voted in her district; and that number of voters is more

23  than her margin of victory by a long shot.

24     Q.   How do you know that all those voters voted

25  Democrat -- well, specifically, how do you know that all

1 those voted for Representative Calanni?

2      A.   We don't.  But I'll elaborate:  The chances

3 are that if you send an application to a person who's

4 voted in multiple Democratic primaries and then they

5 vote in a general election, they -- more than likely,

6 there is probably a high percentage -- in the 85

7 percentile or above -- that they voted for a Democrat.

8           Parties don't send stuff to opposing

9 voters.  We target and, therefore, the people we sent

10 the application to almost entirely are people who voted

11 in the Democratic primaries.

12      Q.   And then down at the bottom, the last sentence

13 says, "Can you make a $7 contribution to the Texas

14 Democratic Party so we can send 21 Texans their

15 application?"  Were all of the funds generated by this

16 e-mail used to send Texans applications to vote a ballot

17 by mail?

18           MR. GEISE:  I'm going to, again, object

19 on the internal use of fundraising of a political party

20 as core First Amendment protected and instruct the

21 witness not to answer on the internal use of funds on

22 the basis of the First Amendment.

23      A.   I decline to answer on advice of counsel.

24           MS. MACKIN:  Okay.  And so to the extent

25 that I have anymore questions about the e-mails that

1   were produced that were asking for contributions and

2   then what those contributions were ultimately used

3   for --

4               MR. GEISE:  Yeah, we're -- the witness is

5   going to -- I mean, I'm going to instruct the witness

6   not to answer on the internal financial decisions of the

7   Texas Democratic Party on the basis of the First

8   Amendment privilege as going to the core of the First

9   Amendment.

10              He can talk generally -- the witness --

11  just so we're clear, I think that if you ask general

12  questions about how the Texas Democratic Party makes

13  funding decisions, how they decide where to allocate

14  funds, the witness can answer at a high level, that that

15  does not go into specific internal strategy or a

16  specific use of specific funds.

17              I think the First Amendment protects the

18  core; but if you want to ask the witness high level, how

19  does the Texas Democratic Party decide to allocate

20  funds, how do they decide to allocate funds, even in a

21  specific year, at a high level, I think that you're

22  entitled to inquire into that.  It's just I think the

23  specific use of specific funds is core First Amendment

24  protected by numerous decisions, and I would instruct

25  the witness not to answer.

1          MS. MACKIN:  And is it your position that

2    the e-mails that were produced which make a specific ask

3    for a contribution fall within that category?

4          MR. GEISE:  Well, I don't think -- I

5    think that asking once someone sent the Texas Democratic

6    Party specific funds in response to a specific e-mail,

7    where did those funds go is core First Amendment

8    protected by numerous decisions that would go to -- and

9    even with a Protective Order, a Protective Order in

10   multiple cases does not entitle you -- it's the same way

11   it doesn't inquire [sic] you to entitle [sic] into the

12   attorney-client privilege.  It doesn't entitle inquiry

13   into things that are protected by the core of the First

14   Amendment.  So I would instruct the witness not to

15   answer.

16       A.   Let me answer a general answer so that we're

17   clear.  All fundraising that the Texas Democratic Party

18   asks donors to make is done in the context of --

19   typically of:  Help us pay for a program, which is what

20   this is.  Help us send out vote-by-mail applications.

21   By law we cannot dedicate -- if a donor gives us a

22   hundred dollars and says spend this only on vote by

23   mail, a donor may not do that.  We cannot target their

24   donation.  The Party must and does make decisions on all

25   of its funds coming in on how to spend.  It cannot be

```
 1   directed by the donor to go for a specific candidate or
 2   a specific program.  They can donate toward it, and we
 3   can then choose to use it for that program or not.
 4              In this particular issue on the specific
 5   question you asked about the $7 for 21 applications, in
 6   all of these vote-by-mail programs, the cost of the
 7   program is considerably larger than what the individual
 8   donors donate.  And it comes from county parties.  They
 9   come from candidates.  It's come from major donors to
10   perhaps raise, you know, a quarter million dollars to do
11   a program like this.  The individual $7 somebody spent
12   may or may not be used exclusively in that program.
13   Typically, because it's less than the program, you could
14   say you give it towards the program; we used it there.
15   But the donor is not ultimately -- the money is not
16   directly for mail-outs.
17              MS. MACKIN:  Okay.  Thank you for that
18   explanation.
19              Just to make sure that we are clear, to
20   the extent that I would inquire about other e-mails
21   produced and about what the funds generated in response
22   to that e-mail were used for, you would object and
23   instruct the witness not to answer, Counsel; is that
24   right?
25              MR. GEISE:  Yes.  And I would instruct
```

1  him to answer in the manner that he just did, which is,

2  I think, that the funds can't be -- even if the donor

3  wanted to, funds are not, by law, allowed to be put to

4  X, Y, or Z, which I think he's answered.  So I think

5  he's provided an answer to the question at the level

6  that we believe Counsel is entitled to inquire into.

7      Q.  (BY MS. MACKIN)  And, Mr. Maxey, again, just

8  to be clear, if I were to inquire into the use of funds

9  in response to a specific e-mail produced today, you

10  would follow your attorney's instruction not to answer

11  such questions; is that right?

12      A.  That is correct.

13      Q.  Okay.  Thank you.

14      A.  My answer about targeting funds would apply.

15          MS. MACKIN:  Okay.  I'm going to share

16  a document with everyone on the chat function marked

17  TDP 63.

18      Q.  (BY MS. MACKIN)  Mr. Maxey, please let me know

19  when you've had a chance to open up that document and

20  are ready to discuss it.

21      A.  All right.

22      Q.  Do you recognize this document?

23      A.  It's an e-mail from Manny Garcia to our e-mail

24  list.

25      Q.  And this e-mail discusses -- the second

1   sentence of the e-mail reads, "There are about

2   2.6 million unregistered voters in Texas who are likely

3   to vote Democratic if registered."  Did I read that

4   correctly?

5       A.   That's correct.

6       Q.   And what is the source of that statistic?

7       A.   There are many groups that do analytics on the

8   population of the state of Texas.  The Texas Legislative

9   Council does such work, how many people are in Texas,

10  how many are registered to vote, how many are voting age

11  population or not.  So you take the number, which is

12  around, I think -- well, I don't know it off the top of

13  my head -- but there is a bigger number than 2.6 million

14  people who are unregistered in Texas who are legal

15  citizens who could register.  You can apply a simple

16  algorithm to it of how many people in the general

17  population did have similar characteristics of income,

18  geography, ethnicity, age, those kinds of analytics to

19  come up with that there's 2.6 million unregistered

20  Texans who are likely to vote Democratic.

21      Q.   And so did TDP come up with this 2.6-million

22  figure?

23           MR. GEISE:  I'm going to object and

24  instruct the witness to not answer to the extent it's

25  internal strategic information.  I think the witness has

1  provided a broad overview of how that number could be

2  arrived at -- well, I guess the witness -- you can

3  answer "yes" or "no."  But I think any inquiry other

4  than that would be prohibited by the First Amendment.

5       Q.   (BY MS. MACKIN)  To be clear, I'm just trying

6  to determine the source of this statistic that is

7  provided in this e-mail.  I'm not asking how it was

8  calculated.

9       A.   To my knowledge, this is a number that's come

10 from a source outside of TDP's staff.  We did not crunch

11 the numbers to get here.  This was something that's been

12 published along the way, and I don't have memory of

13 where it was published.

14      Q.   Fair enough.

15      A.   If the Legislative Council comes up with a

16 number of unregistered Texans and then we -- our data

17 team could come up with a demographic about what

18 percentage of those people were likely to be Democrats,

19 I would expect; but I'm not fully aware.

20      Q.   Okay.  So this e-mail describes -- well, the

21 third sentence says, "That's why we're launching a voter

22 registration program unlike any other in Texas history

23 by" and then it lists -- there's five bullets underneath

24 that.  The first one says, "Investing in cutting-edge

25 data programs to turn out new voters."  Can you tell me

64

1  at a high level about those programs, not going into

2  anything --

3       A.   Sure.

4       Q.   -- internally sensitive or First Amendment

5  protected?

6       A.   For instance, there's approx- -- there are

7  tens of thousands of new people moving into Texas every

8  day from around the country.  We know by data source of

9  where they were registered to vote before they got here,

10  what their demographics of being a Democrat were, their

11  sort of data score being Democratic.  And so we know

12  they're in Texas.  We know their name and their address

13  from the post office.  And so using cutting-edge data,

14  we can figure out approximately 30,000 Democrats move to

15  Texas each month that we need to get registered to vote.

16  That's one example of using cutting-edge data to target

17  people who are likely to be Democrats who are

18  unregistered who need to be registered.

19            We have the same kind of technology to

20  figure out that when somebody moves from Dallas to

21  Houston, they are no longer able to vote in general

22  elections unless they get registered in Harris County

23  unless they vote a limited ballot, which is highly

24  difficult to do; and then they won't be able to vote in

25  down-ballot races.  So we use cutting-edge data programs

1  to identify those improperly registered Texans, to get

2  them registered in their appropriate county.

3            That's it.

4       Q.   Okay.  Thank you for that.

5            And then the second bullet point says,

6  "Deploying 1,000 field organizers and canvassers on the

7  ground to register voters in person."  I think we've

8  talked about this.  I think that seems pretty clear on

9  its face what that is.

10           The third bullet, "Adopting a digital

11 approach to voter registration through our online hub

12 MyTexasVotes.com."  What is MyTexasVotes.com?

13      A.   It's a website maintained by the Texas

14 Democratic Party that gives basic voting information.

15 You can look up your precinct on the early vote

16 locations nearest you, find your voting center or

17 precinct for election day, get a map to that location,

18 find out the hours of early voting or hours of voting on

19 election day.  You can check your voter registration.

20 You can request a mail ballot application.  You can

21 request a voter registration application, or you can

22 fill out an application online and print it out through

23 the system that is provided.  It's a voter education --

24 it's an activation website.

25      Q.   And where does the data on MyTexasVotes.com

1   come from?

2        A.   The Texas Secretary of State, local county

3   elected officials of polling places.

4        Q.   And are you aware that an individual can

5   request a postage-paid voter registration application be

6   mailed to them on the Texas Secretary of State's

7   website?

8        A.   When the website works.

9        Q.   So are you aware that an individual can --

10       A.   Yes, but we are making it -- this is making it

11   convenient to our voters.  A person in Texas can

12   register to vote by handwriting it out on a napkin and

13   putting it in an envelope and mailing it in.  You don't

14   have to use the Texas Secretary of State's website.

15            So, yes, you can do it on the Secretary

16   of State's website.  You can do it at MyTexasVotes.com.

17   You can do it at Vote.org, Register2Vote.com [sic.]

18   There's lots of places you can register to vote.

19       Q.   And you mentioned that MyTexasVotes.com makes

20   it more convenient or -- I don't remember specifically

21   what your words were -- but that it can make it more

22   convenient for some folks.  Can you explain that to me a

23   little more?  How does it make it more convenient?

24       A.   Well, every -- during an election season,

25   every piece of e-mail, every mail-a-candidate-across-

1  Texas, a thousand Democratic candidates, everything on

2  it says, "For voter information, go to MyTexasVotes."

3              So they go there.  They find everything

4  they might need to know in one location.  They're not

5  searching a very unfriendly website at the Secretary of

6  State or in -- let's just say -- I passed legislation

7  this last session -- I got legislation passed, drafted

8  and then lobbied it, to require election clerks to

9  actually have a website with their voting locations

10  because approximately a third of the counties in Texas

11  didn't post that information.

12              So MyTexasVotes is a way for us to tell

13  anybody that we come in contact with during an election

14  season, "If you need any of this information, where to

15  vote, when to vote, click on MyTexasVotes; and you can

16  find it there."

17      Q.    Okay.  And then the fourth bullet says,

18  "Mailing hundreds of thousands of voter registration

19  cards."  What do you mean -- what does the phrase "voter

20  registration cards" mean in this context?

21      A.    Voter applications.  A hard-copy piece of

22  paper that a person signs, puts in a postage-paid

23  envelope, and sends to their voter registrar.

24      Q.    And how does the Texas Democratic Party

25  determine whom to mail a voter registration application

1  to?

2      A.   People who we believe are not registered at

3  their current address.

4      Q.   Based on your data analytics?

5      A.   Yes.

6      Q.   And why not just go on the Secretary of

7  State's website and request that the State send a voter

8  registration application to their -- to those folks?

9      A.   Obviously, because, A, the voter would have to

10  find that SOS link, print out the paper -- and many

11  voters don't own a printer or print --

12      Q.   No, no, no, no.  I'm talking about the link on

13  the Secretary of State's website where one can request

14  that a postage-paid application be mailed --

15      A.   A, have the computer to do that.  But when you

16  get there, you can ask them, yes, to send you a form.

17  It is a laborious process.  It takes a week or more for

18  people to get that piece of paper.  Then they have to

19  fill it out and mail it in.

20           Often, we -- most people register -- I

21  mean, a considerable amount of people register in the

22  last weeks before the registration deadline.  And asking

23  the Secretary of State to send a blank piece of paper to

24  you for you to fill out and then send back in, to get it

25  in before that deadline often causes, let's say, tens of

1    thousands of people not to make the deadline.

2              So we make a decision of sending a

3    registration card in August to people that we know are

4    not registered to vote already, for them to have

5    convenience to fill it out.  That's what you call "how

6    you win an election."  We don't wait for people to

7    figure it out.  We make it available to them so that

8    they can take advantage of it by just filling in their

9    personal data, signing it, putting it in a postage-paid

10   envelope coming with the application.

11             In other words, we're not waiting for

12   people to ask.  We are sending people who are unaware

13   that they need to register to vote because they have not

14   been educated.  Remember that voter education project?

15   "Hey, you have to get on a registration list.  We're not

16   a state with automatic voter registration.  I'm sure you

17   vote -- you moved here from Washington, but you're not

18   going to automatically be on the voter registration

19   roles.  So you need to fill out a piece of paper."

20             That's why we mail it to them and not

21   just wait for people.  If we waited for people, then the

22   voter registration would be sorely lacking in Texas.

23   Q.   So --

24   A.   And, frankly, the majority of people in Texas,

25   just so I can say this again, register when they get

1  their driver's license.  That is the Number 1 place that

2  people register to vote for the first time; and they

3  could update their registration if the State of Texas

4  was following the federal law.

5      Q.   How do you know that the majority of people

6  register for the first time in connection with getting a

7  driver's license?

8      A.   The Texas Secretary of State announced that.

9      Q.   You mentioned a moment ago something about how

10  tens or hundreds of thousands of people would miss the

11  voter registration deadline by attempting to request a

12  form be mailed to them from the Secretary of State's

13  office.  Did I understand your testimony correctly?

14      A.   The deadline is 30 days before an election,

15  and we are depending on people to ask the Secretary of

16  State to send them by bulk e-mail a voter registration

17  paper form.  And a person asks for that a week before

18  the deadline.  The Secretary of State takes

19  approximately a week to mail that application to them.

20  They get it.  If they fill it out and drop it in the

21  mail, it will be after the deadline.  And across the

22  state of Texas in every general election, there are

23  thousands upon thousands of people whose application

24  comes in on the 29th, the 28th, the 27th, the 26th day

25  before an election.  They all get a letter saying,

1    "Sorry.  You're not registered to vote because you

2    didn't hit the magic 30-day deadline."

3         Q.   And how do you know that?

4         A.   How do I know that?

5         Q.   Yes.

6         A.   Because the election -- every -- I hear

7    anecdotally, as somebody who deals with voter protection

8    on our hotline, we have hundreds of people calling us

9    and say, "Well, I mailed my application."

10              And we investigate with the registrar,

11   "Did you receive an application from Joe Smith?"

12              And they say, "Yes, we received it 28

13   days before the election.  It was after the deadline."

14              So I've been doing this for 50 years.

15   Every election cycle there are people who are rejected

16   because their application comes in too late.

17              It is a known fact.  Any election

18   administrator talks about this problem.  If we had

19   automatic voter registration and online voter

20   registration, we wouldn't have this problem; but, you

21   know, that's an argument that we've made to the

22   Legislature and others about depending on people mailing

23   a signed piece of paper.

24        Q.   Is it your testimony that if Texas had online

25   voter registration, people would not submit their voter

1  registration applications after the deadline?

2      A.   No.  I'm going to say that the problem of the

3  U.S. Post Office delaying delivering an application

4  would go away.

5      Q.   How does the U.S. Post Office delay delivery

6  of a voter registration application?

7      A.   Because it takes -- it's not instantaneous.

8  If you could register online, when you hit submit, you'd

9  be registered to vote.  If I have to take a piece of

10  paper on three days before the deadline and drop it in

11  the mail -- and in rural Texas, it typically takes

12  something that's mailed in Taylor, Texas to go to

13  Georgetown, 5 miles away or 8 miles away, it has to go

14  first to Dallas and back to Georgetown; and it takes

15  three days.  So that person mailing it two days before

16  the deadline won't get registered because the post

17  office process of delivering mail takes more than

18  instantaneous.  Online voter registration is

19  instantaneous.  People --

20      Q.   Where?

21      A.   Huh?

22      Q.   Where?

23      A.   Thirty-eight states where people register

24  online.

25      Q.   It's instantaneous?

1      A.   As soon as you fill it in and hit "submit,"

2  you are registered to vote -- well, I mean, let me be

3  technical.  As soon as you do it, your application has

4  met the deadline.  The clerk then makes sure that you

5  are who you say you are and does all of the required

6  stuff, but you have met the 30-day deadline when you

7  submit it.

8      Q.   Do all of those states have a 30-day deadline?

9      A.   No, some of them have automatic registration.

10  You're on the list when you submit it to vote.  Texas is

11  the most archaic voter registration state in the United

12  States.  It has more impediments than any other state

13  imposed by Republicans for voter suppression.

14      Q.   What is the basis for that statement?

15      A.   Fifty years of personal knowledge.  Going back

16  to almost 50 years ago when I was turned away from being

17  a deputy voter registrar because I was a college

18  student, a federal lawsuit was filed by university

19  students at Prairie View.  I was at Sam Houston State.

20  I go back 50 years knowing about the problems of voter

21  registration in Texas that people in the other -- at

22  least another 40 states don't have, including --

23      Q.   This is based on your anecdotal experience in

24  the state of Texas, right?

25      A.   My personal.  Not anecdotal, my personal

Texas Democratic Party - 4/27/2020

74

1    experience.

2         Q.    Sure.

3         A.    You don't have to be deputized to register

4    someone to vote in almost any state in the country other

5    than Texas.  I've trained thousands of people to be

6    deputy voter --

7         Q.    Okay.  Mr. Maxey, I appreciate it.  I haven't

8    asked a question.  So if you could please just let me

9    ask a question and then answer, I would appreciate that.

10        A.    Glad to.

11        Q.    Thank you.

12              MS. MACKIN:  All right.  I am going to

13   share with everyone TDP 73.

14        Q.    (BY MS. MACKIN)  And please take the time you

15   need to review it and let me know when you're ready to

16   discuss it.

17        A.    Okay.

18        Q.    Do you recognize this document?

19        A.    An e-mail from me to our e-mail list.

20        Q.    Okay.  Dated February 7th, 2020?

21        A.    Yes.

22        Q.    Okay.  And this e-mail says, "We kicked off

23   our Voter Protection Fund so we can expand Texas voters

24   access to the ballot box."  Can you please tell me at a

25   high level what the Texas Democratic Party's Voter

1  Protection Fund is?

2      A.   It is a generic way to -- euphemistic way to

3  talk about money that we expend to do what is commonly

4  called "voter protection" being done by campaigns and

5  candidates and parties everywhere.  Voter protection

6  includes having things like a hotline where a voter can

7  call in and say, "I'm not on the voter registration

8  list.  Can you help me figure out why I'm not registered

9  to vote?"  And we then do the investigation and assist

10  that voter.

11           And so voters call in.  They call in and

12  ask about where their polling place is, hours of voting.

13  All of the information that we have on MyTexasVotes we

14  answer orally by phone call.

15           We have lawyers stationed around Texas

16  during voting periods that can go in person to a polling

17  place or to a clerk's office and assist a voter in

18  making sure their right to vote is not infringed upon.

19           We train volunteers in every county to

20  talk to voters, perhaps standing outside of polling

21  places, even, to give people information; or if they're

22  having problems, make sure that we rectify those

23  problems while the polls are still open.

24           All those things are generically called

25  voter protection; and that's why we raise money, to have

1  a staff of people.

2      Q.   Okay.  Thank you.  That's all I have on that

3  document.  I'm going to close out of that.

4          MS. MACKIN:  And then I'm going to share

5  with everyone the document marked TDP 139, still a part

6  of Exhibit 2, just as all of these documents are.

7  Actually you know what?  Rather than -- there we go.

8      Q.   (BY MS. MACKIN)  Mr. Maxey, please feel free

9  to take your time to review the document and let me know

10  when you're ready to discuss it.

11      A.   It's taking forever to load.

12      Q.   It's a bigger one than some of the previous

13  ones.

14      A.   It's about halfway.

15          Okay.

16      Q.   All right.  And if I can direct your attention

17  to the page marked TDP 140, there's a bit of white text

18  that's offset by a shadow of a ballot box behind it that

19  says, "Looking forward to 2020.  There remains 2.6 [sic]

20  unregistered voters in Texas who are likely to vote

21  Democrat if registered."  Just to clarify, that's based

22  on the same information as the e-mail we talked about

23  earlier that provided that 2.6-million figure?

24      A.   Yes.

25      Q.   Okay.  And then a little ways down the page,

1  right under that graphic, actually, it says, "During the

2  2018 midterm elections, thanks to our voter registration

3  initiatives, we helped 133,000 Democratic Texans

4  register shortly before the registration deadline and

5  120,000 of those who registered voted."  Did I read that

6  correctly?

7       A.   You did.

8       Q.   How did the Texas Democratic Party help

9  133,000 Democratic Texans register shortly before the

10  registration deadline in the 2018 midterms?

11       A.   We mailed out approximately a half million

12  voter registration applications to unregistered Texans

13  and tracked that 133,000 of those people returned those

14  applications to their voter registration clerk.  And

15  after the election, we checked the voter rolls to see

16  how many of the 133 people voted; and 120,000 of them

17  actually cast a ballot.

18       Q.   And in order to track who returned an app- --

19  well, how does the Texas Democratic Party track which

20  voters returned an application that the TDP sent the

21  voter to the county registrar?

22       A.   We use a program called Intelligent, I think,

23  of the U.S. Postal Service, by putting a bar code on the

24  application.  And the Post Office tells us when the

25  voter has mailed that application to their clerk.  It's

78

1  a business application that almost any direct mail

2  company -- I mean, direct mail that a business does uses

3  to track whether somebody has returned a payment or, in

4  our case, returned a voter registration application.

5      Q.   And so I know that after the election, it's

6  publicly available to find out whether somebody voted in

7  that election.  Is there a way to determine -- TDP can

8  determine that the application they sent was then sent

9  on to the county registrar.  Can they determine whether

10  or not the registrar accepted the application and

11  registered the voter?

12     A.   Yes.  We can -- we get a list of newly

13  registered voters.

14     Q.   Okay.

15     A.   And those that have been processed, we buy

16  those weekly -- or pay the fee to get them from the

17  Secretary of State weekly, put them in our file so we

18  can know that they're on the list.  If they're not on

19  the list, we inquire -- if there's time left.  Typically

20  this is happening right at the election.  But if we're

21  doing this long term, if the registration application,

22  we have tracked that it was returned but they don't show

23  up on the roll, then we can inquire with the voter

24  and/or the registrar the reason the application was

25  rejected and get that person re-registered correctly.

1    Q.   And I apologize if we've already covered this.

2    I just want to make sure I understand.  And it's getting

3    a little close to lunch, so my blood sugar is a little

4    lower; but before you send out the voter registration

5    applications, how do you determine whether an individual

6    is already registered?  Where does that information come

7    from?

8    A.   It's simple data analytics.  You take the list

9    you're going to mail to and you plop it against the

10   people who are on the list; and if they're on the list,

11   you remove them.  And the people left are the people

12   that are not registered.

13   Q.   Okay.  Thank you.

14              All right.  Let's scroll down to the next

15   page, TDP 141.

16   A.   Okay.

17   Q.   So this mentions, at the very top, that an

18   estimated 2.6 million Texans are likely to vote

19   Democratic if they are registered.  How does the Texas

20   Democratic Party intend to try to register those folks?

21              MR. GEISE:  And, again, I'm just going to

22   instruct the witness to answer at a high level without

23   infringing on anything that's First Amendment protected.

24   A.   We will (inaudible.)

25              (Reporter requests repeat.)

1          THE WITNESS:   Sorry.   I had a pillow on

2   my lap, and it probably covered up the...

3       A.   We will train tens of thousands of deputy --

4   or get trained through their clerk tens of thousands of

5   deputy registrars who will register people in their

6   communities.   We will have tabling on college campuses.

7   We do a program right on the deadline tabling in

8   probably 5- or 6,000 locations around Texas all day

9   long.   We will mail probably during this cycle close to

10  a million voter registration cards or applications out

11  to people we perceive that are unregistered in the

12  program we just talked about.   We will direct people

13  through social media, online digital ads to

14  RegisterTexas.com, a voter registration app that we

15  have.

16          We will have people phoning -- or

17  organizers going where -- you know, our LGBT organizer

18  will go to LGBT events; our Muslim organizer will go to

19  Muslim events and ask people to register to vote.

20          So there are literally dozens upon dozens

21  of voter contact ways.   Any and everything that we do,

22  there will be a voter registration component to it

23  between now and the 30-day deadline before the November

24  election.

25      Q.   What is RegisterTexas.com?   You mentioned it's

1  a voter registration application, but can you tell me a

2  little bit more about it?

3      A.    It's an online system where a person goes and

4  fills out their voter registration information, their

5  name, their address; and it will then -- when they

6  submit it, we will mail them a pre-populated voter

7  registration application with the information they have

8  given us.  When they get it, they sign it, put it in a

9  postage-paid envelope and drop it in the mail.  It's

10  already addressed to their voter registrar.

11              It's a shortcut for those people who

12  don't either own a printer, an envelope, or a stamp

13  because the biggest impediment for people to registering

14  on their own without a postage-paid envelope is the

15  inability to have a postage stamp.  People just don't

16  regularly have those in this day and age or have an

17  envelope, even, in this day and age, especially younger

18  voters.  So this is a way to:  Give us your information.

19  We will send you the application filled out.  You just

20  have to add in the personal information, like your

21  driver's license number that we don't have, those kinds

22  of things, IDing things, sign it, date it, put in the

23  postage-paid envelope.

24      Q.    About how long does that process take?  Like,

25  if I went on RegisterTexas.com and filled it out, how

82

1  long, approximately, would it be until I got my

2  application in the mail to sign and then forward along

3  in the postage-paid envelope?

4      A.   We're mailing them out weekly.  We will do

5  that all the way up until a week before the election.

6      Q.   Okay.

7      A.   And most of this we wouldn't have to do if

8  people could update their registration when people got

9  their driver's license updated.

10              MS. MACKIN:  I'm going to object to the

11  last sentence as nonresponsive to a question that I've

12  asked.

13      Q    (BY MS. MACKIN)  Lower down on page TDP 141 --

14              MR. GEISE:  Does it make sense to take a

15  break after we're done with this document?

16              MS. MACKIN:  Sure, yes.

17              MR. GEISE:  Okay.

18              MS. MACKIN:  Good idea.  And I've only

19  got ten minutes, maximum, left on it, maybe less.

20              MR. GEISE:  Okay.

21      Q    (BY MS. MACKIN)  So it mentions that -- sorry.

22              MS. MACKIN:  I'm used to doing this on

23  paper, and the computer is an adjustment.  I know I'm

24  making this, like, inquisitive face into the camera.

25              MR. GEISE:  It's a whole different

83

1  process.  I got you.

2      Q.  (BY MS. MACKIN)  It's this first full

3  paragraph.  It says, "Through the shifting demographics

4  in Texas, amplified by Texas Democrats' aggressive voter

5  registration initiative, we anticipate the voter rolls

6  will swell to upwards of 18 million registered voters in

7  2020."  And without inquiring into any internal

8  proprietary information, can you tell me the source of

9  that projection?

10     A.  I think it's -- if you read down this page,

11 there's references to TargetSmart, which is an analytics

12 firm --

13     Q.  I see.

14     A.  -- that does data around registration.  You

15 know, they later say that 2.6 [sic] people registered

16 since 2016.  And you can do analysis on how many people

17 were registered at the beginning of this election cycle,

18 how many people are registering per month with the

19 Secretary of State, how many potential people are moving

20 in the state, the growth of population, the number of

21 18-year-old -- people coming onto the rolls who are 18,

22 the number of people who are dying off the roles.  You

23 do all that analysis, and you come up with an estimate

24 that we will move from the approximately 16 million that

25 were registered in 2018 to 18 million by 2020.

84

```
 1       Q.   All right.

 2       A.   The hard part of that will be the efforts of

 3   the Democratic Party and the Republican Party to add new

 4   people to the program, the kind of programs that we run

 5   and they run.  Plus, as I said before, the number of

 6   people moving into the state or changing address being

 7   registered through the DPS.

 8       Q.   All right.  I'd like to move down to TDP 142,

 9   just the next page.

10       A.   Uh-huh.

11       Q.   What does this show, Mr. Maxey?

12       A.   It's an analysis of legislative districts and

13   those we -- let me make sure I'm doing this -- it's sort

14   of the Democratic voting strength by legislative

15   district and showing that there are 18 districts that

16   have -- potentially can flip to be Democratic districts

17   in the 2020 election if the registration trends and

18   voter turnout (inaudible.)

19                (Reporter requests repeat.)

20                THE WITNESS:  Voter turnout trends are

21   what we hope they are.

22       Q.   (BY MS. MACKIN)  And just to be clear, this

23   refers to State House Districts?

24       A.   Yes.

25       Q.   Okay.  And then scrolling down to the next
```

85

1  page, TDP 143, what does this page show?

2      A.   The same kind of analysis, potential new

3  Democrats by Congressional Districts.

4      Q.   All right.  And then down to page 1 -- well,

5  actually -- page TDP 147, the second-to-last paragraph.

6      A.   The one, "That's why we're coming together"?

7      Q.   It begins, In January 2020."

8      A.   Okay.  I was on 148.  All right.

9      Q.   So it talks about a lawsuit challenging an

10  unconstitutional electronic signature ban spearheaded by

11  the Texas Secretary of State.  Do you know what that is

12  a reference to?

13      A.   Yes.

14      Q.   And what is that a reference to?

15      A.   The Secretary of State has made a ruling that

16  a person who signs a voter registration application and

17  then scans it and mails it -- e-mails it in has to be

18  rejected (inaudible.)

19              (Reporter requests repeat.)

20              THE WITNESS:  Because it's not wet ink.

21      Q.   (BY MS. MACKIN)  And what ruling is that?  You

22  referenced a ruling by the Secretary of State.

23              MR. GEISE:  And I'm just going to object

24  because it calls for a legal conclusion, but you can

25  answer.

 1      A.    In 2018 an organization called Vote.org

 2   suggested to Texas voters that they could fill out an

 3   application, take a picture of their signature, place

 4   that picture on the application, attach it to the

 5   application, and e-mail it in, which complied with all

 6   state law, as I understood it at this time, that it was

 7   an application with a signature on it.  And the

 8   Secretary of State issued a ruling at that point in time

 9   or told Vote.org or election administrators not to

10   accept those apps -- voter registrars not to accept

11   applications because there was not wet ink on the paper.

12      Q.    Okay.

13            MS. MACKIN:  All right.  That's all I

14   have on this document.  So if we want to break for

15   lunch, how long do folks need?  I can be flexible.  I

16   think maybe somewhere between one and two hours left for

17   me today on this depo.

18            MR. GEISE:  Okay.  Glen, how long do you

19   want for lunch?  I mean, I can be pretty -- an hour,

20   half an hour, 45?  It's up to you.

21            THE WITNESS:  I can eat a sandwich in 20.

22            MR. GEISE:  So let's do -- half an hour's

23   fine by me if it's fine by everyone else.

24            MS. BRANCH:  Yep, half an hour sounds

25   good.  Is that okay with you, Anna?

87

```
 1              MS. MACKIN:  Can I add, like, five
 2  minutes and we come back at 1:00, just so we make it a
 3  round number?
 4              MR. GEISE:  Yeah, that's perfect.
 5              MS. MACKIN:  I'm ordering my Uber Eats
 6  right now.
 7              MR. GEISE:  Well, if you need more
 8  time -- I mean, if you need more time, that's totally --
 9  we can do 45 or whatever you want to do.  1:15?
10              MS. MACKIN:  How about we plan on 1:15
11  just to be safe?
12              MR. GEISE:  Yeah, that works.
13              MS. MACKIN:  Appreciate it.
14              MR. GEISE:  Yeah.
15              THE REPORTER:  We're going off the record
16  at 12:25 p.m.
17              (Off the record from 12:25 to 1:18 p.m.)
18              THE REPORTER:  Going back on the record
19  at 1:18 p.m.
20              MS. MACKIN:  All right.  I'm going to
21  share a document with everyone in the chat box, marked
22  TDP 92.
23     Q    (BY MS. MACKIN) Mr. Maxey, please let me know
24  when you've had a chance to pull up that document and
25  take a look at it.
```

1     A.    All right.

2     Q.    Do you recognize this document?

3     A.    It's an e-mail sent by Manny Garcia to the TDP

4  e-mail list.

5     Q.    On December 31st, 2019, correct?

6     A.    Correct.

7     Q.    All right.  And down about halfway through the

8  e-mail, underneath Protecting & Expanding the Vote, the

9  last sentence says, "We aren't done yet, but we have big

10 voting rights news to announce soon."  Did I read that

11 correctly?

12    A.    You did.

13    Q.    Okay.  Has that big voting rights news been

14 announced yet?

15    A.    Yes.

16    Q.    And what was that voting rights news?

17    A.    That news was that FairFight.org would be

18 giving the Texas Democratic Party a major grant to hire

19 voter protection staffers.

20    Q.    And what are those voter protection staffers

21 that are funded by the FairFight.org grant working on?

22    A.    All of the voter protection things that we've

23 already put in the record that we do.

24    Q.    And so those would be the hotline?

25    A.    Hotline, poll watchers, working with the

89

1   county clerks and election administrator on election

2   procedures.  That department is working with election

3   administrators and folks all over the state right now in

4   how to handle the Democratic primary election that I

5   run, but they are working on the logistics to make

6   polling places vote-by-mail accessible during the

7   COVID-19 crisis, those kinds of activities.

8        Q.   All right.  Thank you.  That's all I have on

9   that document.

10             MS. MACKIN:  I'm now going to share a

11   link in the chat box to a document marked TDP 129.

12       Q.   (BY MS. MACKIN)  Please let me know when

13   you've had a chance to pull that up and are ready to

14   discuss it.

15       A.   Okay.

16       Q.   And this is an e-mail dated September --

17             MR. GEISE:  It took me a second to do it,

18   too.

19             MS. MACKIN:  Counting on my fingers.

20       Q.   -- September 24th, 2019 from Kassandra Aleman

21   sent out to the TDP Listserv; is that right?

22       A.   Correct.

23       Q.   Okay.  Down under that signature block, it

24   says in bold text, "Don't forget to register to vote or

25   share this e-mail with friends and family to help them

90

1   register.  Click here to update your registration today.

2   It only takes two minutes."  Do you know what that

3   "click here" language linked to?

4       A.   I'm going to surmise because I can't click the

5   link to figure that out, but I imagine it goes to our

6   website that links to Register2Vote.org, which is the

7   same kind of system as our RegisterTexas.org -- or dot

8   com that we just talked about where people can fill out

9   an application, print it out, and mail it in.

10              MR. GEISE:  And, Counsel, we can check.

11  I don't know if it's still live or if I could look and

12  see if there's a way to get back to you on what that

13  was, after.

14              MS. MACKIN:  Okay.  We'd appreciate that.

15  Thank you.

16      A.   The only thing that we would have had live in

17  September of 2019 is the Register2Vote.org site that's

18  branded to the TDP through an agreement.  And that's

19  where they fill in their information, Register2Vote.org

20  mails them an application, which they sign and put in

21  their personal ID information, put it in a postage-paid

22  envelope and send to the clerk to register.

23      Q.   (BY MS. MACKIN)  And how is Register2Vote.org

24  different from the other site that we were discussing

25  before lunch?  I'm blanking on the URL.  I think it was

91

1  RegisterMe.com or something like that.

2      A.   Register, the number 2, vote dot org.

3      Q.   Okay.

4      A.   It's an organization that does voter

5  registration kind of work.  We have a contractual

6  agreement as a vendor with them.  So they have a site

7  where people can do this, register.  Anybody can

8  register to vote, Democrats or Republicans.  And we've

9  contracted to have a version of that branded through the

10 Texas Democratic Party through a contractual agreement.

11     Q.   And what is the purpose of having both of

12 these systems?

13     A.   The first one was one we just branded and we

14 wanted to make it something that looked more specific to

15 the Texas Democratic Party and also that we would be

16 able to see the data of who registered through the data

17 agreement and contractual stuff.  So it's a new

18 iteration of the old system that's probably

19 discontinued.

20     Q.   Okay.  And are both systems still in operation

21 today, or is it just Register2Vote.org?

22     A.   Both are in operation today.

23     Q.   And the Texas Democratic --

24     A.   We're pointing people to the new system.  In

25 the past it was going there, and we didn't know who was

1   registering because it was a tool of Register2Vote.org

2   that we were just pushing people to.  Now, they're going

3   through our system; and we have a data-sharing agreement

4   by contract to know who has filled in the applications.

5       Q.   And what information does the Texas Democratic

6   Party receive about who has filled in those

7   applications?

8              MR. GEISE:  I'm just going to -- on the

9   First Amendment -- I mean -- yeah, I guess -- I think

10  you can answer broadly.

11             I'll withdraw the objection.  That's

12  fine.

13      A.   It's the information that's legally available

14  if I were to go to the Secretary of State and ask for a

15  list of voter registrars, the information they could

16  give us, their name, their address, their date of birth.

17  That's about it on the voter registration.

18      Q.   (BY MS. MACKIN)  That's it, first and last

19  name, address, and date of birth?

20      A.   Yeah.  I mean, the Secretary of State does not

21  give us, you know, the driver's license, the last four

22  of Social.  Any of that personal ID is prohibited by law

23  to be shared, so we never collect it.  We are very

24  careful not to ever collect things that would be

25  prohibited if we asked the Secretary of State to give

93

1   stuff off of the system.

2        Q.   And so just so I'm clear, under the data-

3   sharing agreement with Register2Vote.org, y'all collect

4   first and last name, address, and date of birth on the

5   individuals and no other information?

6        A.   No.  We get their phone number and e-mail, but

7   that is done prior to the person asking to fill out the

8   form.  We ask, "What's your e-mail?  What's your phone

9   number?"  And then we -- the question is, "Would you

10  like to register to vote?"  So if it had been asked in

11  a different manner, the e-mail and phone number -- or

12  the phone number because the e-mails are not on the

13  registration applications -- I guess phone numbers

14  aren't, either -- they may be; I can't remember.  But if

15  we were getting them after they registered and signed

16  it, then that would be illegal; but we ask up front

17  before they fill it out.

18       Q.   That's all I have on that document.  Thank

19  you, Mr. Maxey.

20            MS. MACKIN:  I am going to share with

21  everyone a file marked TDP 157.

22       Q.   (BY MS. MACKIN)  And, if you could, please let

23  me know when you have been able to pull up that document

24  and are ready to discuss it.

25       A.   Okay.  All right.

94

1      Q.   Do you recognize this document?

2                  MR. GEISE:  I'm sorry, Counsel.  This was

3   meant to -- sorry.  I realize that this document -- we

4   can produce a better version of this, but we can talk

5   about that later.

6                  MS. MACKIN:  Thank you.  I wasn't --

7      A.   I recognize it.  It's a screenshot of

8   something that pops up when you go to the page on our

9   website about Democratic leaders.  It's what's called a

10  pop-up.  Its asks people to give some money.

11     Q    (BY MS. MACKIN)  And do the identities of the

12  Democratic leaders appear on this copy?

13     A.   No, because it's a screenshot.  These are all

14  links to our website.

15     Q.   Okay.

16                 MR. GEISE:  And I think for maybe three

17  of them -- we can talk after.  I think for three of

18  these we are providing in response to requests things

19  that were meant to be screenshots of the website; and

20  maybe if we provide the address, you guys would know

21  that address and go to it and that will -- rather than

22  trying to figure out a technical way to produce it so it

23  shows, we can just give that to you.  But I have a list

24  of those, and we can figure that out after.

25                 MS. MACKIN:  Okay.  Thank you.  I

1    appreciate that.

2              All right.  I'm sharing with everyone a

3    file titled TDP 164.

4       Q    (BY MS. MACKIN) And, Mr. Maxey, please let me

5    know when you have that up on the screen and are ready

6    to discuss it.

7       A.   A very slow download.

8       Q.   It's a lengthier one of the files.

9       A.   I got it.

10      Q.   All right.  Do you recognize this document,

11   Mr. Maxey?

12      A.   A screenshot of our website on the section

13   dealing with our platform.  It has the platform spelled

14   out.

15      Q.   Okay.  Is this the current version of the

16   Texas Democratic Party platform?

17      A.   The version -- the platform adopted at the

18   2018 Democratic State Convention.  We'll adopt a new one

19   in June of this year in our virtual state convention.

20      Q.   You will adopt a new one in June of this year,

21   you said?

22      A.   Every (inaudible.)

23              (Reporter requests repeat.)

24              THE WITNESS:  Every two years at our

25   biennial state convention, we update our platform.

1      Q.   (BY MS. MACKIN)  And so is TDP 164 an accurate

2  reflection of the current Texas Democratic Party

3  platform?

4      A.   (Inaudible.)

5      Q.   I'm sorry.  Did you -- you broke up a little

6  bit.

7              MR. GEISE:  I think he said "verbatim."

8              THE WITNESS:  Verbatim.

9              MS. MACKIN:  Thank you.

10      Q.   (BY MS. MACKIN)  And so it would be a fair and

11  accurate representation of TDP's positions on issues?

12      A.   Our values and positions on legislative and

13  policy issues, yes.

14      Q.   Okay.  Thank you for that.  That's all I have

15  on that document.

16              MS. MACKIN:  I am sharing with everyone

17  TDP 256.

18      Q.   (BY MS. MACKIN)  And please let me know when

19  you have that pulled up and are ready to discuss it.

20      A.   I've got it.

21      Q.   Do you recognize this document?

22      A.   It's an e-mail from Cliff Walker, our Deputy

23  Section Director, to our e-mail list.

24      Q.   And how would you describe this e-mail?  What

25  type of activity by the Texas Democratic Party would you

97

1   say that this falls under?

2        A.   Organizing.  This is going out from -- to our

3   list about our organizing efforts in the -- when

4   COVID-19 hit, our organizers who were doing door-to-door

5   stuff were sort of sidelined and we've gone into more of

6   an e-mail online organizing, asking people to go into

7   what we call Connect Texas, where there are local people

8   who are working in their communities -- volunteering to

9   work in their communities around educating people about

10  public health, who are doing wellness checks of senior

11  citizens who are Democratic voters and talking to them,

12  all in the mode of checking on them, getting them

13  COVID-19 information, where appropriate, and asking if

14  they're registered to vote or they need a vote-by-mail

15  application, and other kinds of things that we can do in

16  the age of COVID-19, Connect Texas.

17       Q.   Thank you for that.  I think that's all I have

18  on documents.

19            I want to follow up on a couple of more

20  points.  Is TDP a membership organization?

21       A.   Yes.

22            MR. GEISE:  I'm just going to object to

23  legal conclusion.  You can answer.

24       Q.   (BY MS. MACKIN)  And who are TDP's members?

25            MR. GEISE:  Same objection.  You can

1   answer.

2                THE WITNESS:  And so you say objection; I

3   can't answer?

4                MR. GEISE:  No, I said you can answer.  I

5   said same objection to a legal conclusion, but you can

6   answer.

7        A.   The Texas Election Code states that members of

8   a political party are the voters who cast a ballot in

9   their primary election or sign an Affidavit of

10  Affiliation with a Party -- it's spelled out in the

11  Election Code -- with a Party officer.  And so our

12  members, in a legal sense, are approximately 2,084,000

13  Texans who voted in the March 3rd Democratic primary.

14       Q.   (BY MS. MACKIN)  Does TDP maintain a list of

15  those members?

16       A.   They are in our voter file as having cast a

17  ballot.  They are -- we don't deal with them as a

18  membership list on a regular basis.  They are legally

19  members.

20                MR. GEISE:  And I think the question

21  asked whether or not there's a membership list.  I think

22  any further inquiry into membership is core First

23  Amendment protected under a number of the cases.

24  (Inaudible.)

25                THE WITNESS:  Can I just say that there's

1   feedback when Mr. Geise is speaking?  Are y'all hearing

2   it?

3                MS. MACKIN:  I was hearing it.

4                THE REPORTER:  I'm sorry, Mr. Geise.  I

5   can't hear you now.

6                MR. GEISE:  Can you hear me?

7                THE REPORTER:  It's still very staticky.

8                MS. BRANCH:  Can you try it -- we can't

9   hear you.  Can you try it without the headphones?  Will

10  that help?

11               For what it's worth, I think there was an

12  objection to form, legal conclusion, and --

13               MR. GEISE:  I think I fixed it now.

14               THE WITNESS:  Yeah.

15               MR. GEISE:  You can hear me?

16               THE WITNESS:  Yes.

17               MR. GEISE:  (Inaudible.)  You can't hear

18  me?

19               THE REPORTER:  It's still very staticky

20  on my end.

21               MR. GEISE:  Does this work better?

22               MS. MACKIN:  I'm getting a lot of static,

23  still, as well.

24               MR. GEISE:  Okay.  Well, I can try to

25  change it to --

1              MS. MACKIN:  Well, wait.  That just got a

2    little better.

3              MR. GEISE:  Yeah.  Okay.

4              THE VIDEOGRAPHER:  It's still there in

5    the background.

6              MR. GEISE:  I mean, I can try to use my

7    laptop microphone and see if that would improve it.  Let

8    me try switching to that.

9              Is this better?

10             THE WITNESS:  Yes.

11             MR. GEISE:  Okay.  Well, I will listen in

12   on the headset unless, you know, it kind of breaks up;

13   and I will talk through my PC microphone.  So hopefully

14   you don't hear my cat in the background too much.

15             MS. MACKIN:  That's much better.  You

16   just -- if you could -- I can still hear you, but it's a

17   lot quieter.  So if you want to make a forceful

18   objection, you might speak up a little bit more.

19             MR. GEISE:  All right.  I'll try to --

20   okay.  Well, I will awkwardly be close to the

21   microphone.

22             MS. MACKIN:  There is nothing about this

23   process that is not awkward, so.

24             MR. GEISE:  So, anyways, I'm sorry.

25   Sorry for that interruption.

1      Q    (BY MS. MACKIN)  All right.  Mr. Maxey, can

2  the Texas Democratic Party apportion a specific cost to

3  each new voter that it registers?

4      A.   I think that's an impossibility because it's

5  wrapped up in multiple levels of employee salaries,

6  whether that message went through the technology, the

7  data targeting, who we talked to, the communication

8  method that happened -- it could have been through a

9  text message.  It could have been through a piece of

10  mail.  It could have been through -- you know, so

11  pulling all that apart is just an impossibility.  I

12  mean, to allocate some of my salary, just as Luke

13  Warford, as the voter expansion, the data team's salary,

14  the communications salary, the end cost to mail

15  something, the postage cost if we mailed it.  You know,

16  I guess you could go through and figure out the cost of

17  a particular mailing, but not the overall cost by voter.

18      Q.   When the Texas Democratic Party reaches out to

19  someone to attempt to register them to vote, do you

20  check whether that individual has engaged in an online

21  transaction with DPS?

22      A.   No, we would not know that.

23      Q.   Does the Texas Democratic Party believe that

24  any increase in voter registrations will benefit

25  Democrats?

1      A.    I think that's pretty much a given that the

2   more people that vote, the more likelihood -- I mean,

3   this is my opinion now, if that's what you're asking.

4   If you look at the demographics of the people that we

5   believe are unregistered in Texas, they are

6   overwhelmingly African-American, Hispanic, and Asian.

7   They are overwhelmingly under the age of 35, and they

8   are overwhelmingly in Democratic areas of Texas -- or

9   communities that vote overwhelmingly for Democrats.  So,

10  yes, we believe that gross amount of registration inures

11  to our benefit a lot.

12      Q.    Okay.  I'd just like to go through -- turning

13  back to Exhibit 1, the Notice of the Deposition -- I

14  think if we scroll up to the chat box, it's still

15  available there.

16      A.    Sorry.  I'm readjusting my water cup.

17      Q.    No problem.

18             And once you are there, please join me on

19  page 7.

20      A.    Of what?

21      Q.    Of the Deposition Notice.

22      A.    Are you sharing it with me?

23      Q.    Oh, it's -- I can share it again; but if you

24  go to the group chat and go all the way to the top, it

25  will be the first document that we're sharing.

1      A.   You're right.  Okay.

2      Q.   All right.  On page 7 this is a list of the

3   categories of documents that Defendants have requested

4   TDP to produce, and I'm just going to go through each

5   one with you.  Category 1 says, "Documents sufficient to

6   substantiate the factual allegations in Paragraphs 11

7   and 29 through 35 of your Complaint."  I'd be happy to

8   pull up the Complaint if that's helpful, but my question

9   is whether you've produced documents responsive to this

10  category.

11            MR. GEISE:  And I'm just going to object.

12  And you can answer any of this other than if -- I mean,

13  you can answer to the extent any of this doesn't

14  implicate conversations or documents that you produced

15  that -- I mean, to the extent it doesn't implicate

16  conversations with counsel, you can answer this; but if

17  your only answer is that you produced documents in

18  consultation with counsel, I think that's the extent of

19  that inquiry.

20            MS. MACKIN:  We are entitled to inquire

21  into compliance with the subpoena.

22            MR. GEISE:  Well, but you can ask -- I

23  mean, yes; and you can ask him if they produced

24  documents, I mean.

25            MS. MACKIN:  And that's what I'm asking.

1                    MR. GEISE:  All right.

2        A.   Well, I believe that we have produced

3   documents sufficient to substantiate the allegations.

4        Q.   (BY MS. MACKIN)  Okay.

5                    MR. GEISE:  And I'm also going to then

6   object that that calls for a legal conclusion, but you

7   can continue.  Sorry.  I just wanted to get that on

8   record.

9        Q.   (BY MS. MACKIN)  Are there any other documents

10  that I would need to look at to substantiate the factual

11  allegations that TDP is making in this lawsuit?

12       A.   Not that I'm --

13                   MR. GEISE:  Objection, calls for a legal

14  conclusion.

15                   But you can answer.

16       Q.   (BY MS. MACKIN)  All right.  Moving on to

17  Category 2, "All communications between you, TDP, and

18  any person to assist them in registering to vote or

19  updating their voter registration information after a

20  driver's license renewal or change of address

21  transaction on the DPS website."  Did you produce

22  documents responsive to this category?

23       A.   I'm unaware of any documents that we have in

24  our possession or have ever even created that is a

25  conversation between TDP staffers and voters after

1   they've completed this transaction as far as a document.

2   I mean, most -- everything we know about this process is

3   anecdotal or people reporting us -- to us through oral

4   conversations on our hotline or clerks telling us of

5   these problems of people getting registered after going

6   to the DPS.  We get many, many reports from county

7   clerks and election officials of people who believe they

8   have registered with DPS or when they changed their

9   address, but it didn't happen.  And we've relied on

10  reports from some studies from Battleground Texas about

11  that process.  But us reaching out and finding a voter

12  one by one as they've used DPS -- because we have no

13  knowledge personally of that unless that voter calls us

14  and tells us that they used DPS and didn't get

15  registered to vote.

16       Q.   So is it your understanding that TDP doesn't

17  have anything responsive to this category?

18       A.   Nothing that's e-mail or writing.  Almost all

19  of this conversation -- is conversations between voters

20  and our hotline people or voter protection people or us

21  talking about the problem of it, not with the voter but

22  with the clerks or election administrators.

23       Q.   And would there be any documentation of those

24  conversations that you mentioned?

25       A.   Not that I'm aware of.

1      Q.   All right.  Moving on to Category 3,

2  "Documents sufficient to show all information described

3  and/or requested in Deposition Topic Numbers 2, 3, 4, 5,

4  and 7, as described in Attachment A."  Please join me on

5  the previous page if it's helpful.  Did you produce

6  documents responsive to this category with respect to

7  30(b)(6) Topic 2?

8                MR. GEISE:  And -- well, I guess,

9  Mr. Maxey, you can answer that to the extent you're

10  aware and whether or not you're aware of whether or

11  not Counsel has provided the State with publicly

12  available -- with the locations of publicly available

13  information other than the documents produced.

14      A.   I'm sorry.  Are we talking about Number 2,

15  "Your organization, including your organizational

16  structure, employees, physical assets..."?

17      Q.   (BY MS. MACKIN)  Yes, sir.  I am asking

18  whether you produced documents sufficient to show TDP's

19  "organization, including organizational structure,

20  employees, physical assets, parent and sibling entities,

21  tax status, and history, the services that you provide,

22  and the activities you perform."

23                MR. GEISE:  And I will instruct the

24  witness that you can answer to the extent of your

25  knowledge of whether or not non-privileged, non-First

1  Amendment privileged documents were produced in response

2  to that request.

3      A.   I believe they have been.  I don't know if

4  there were any questions or documents about our tax

5  status.  So I can answer that if you want to know our

6  tax status, but I don't know if there's a document

7  anywhere in this about that.

8      Q.   What is your tax status?  Sure, go ahead and

9  provide that.

10     A.   Political parties are an IRS 527, created by

11 the IRS Code; and we are legally established through the

12 Texas Legislature.

13     Q.   All right.  Moving on to 30(b)(6) Topic 4,

14 have you produced documents sufficient to show the

15 activities on which TDP has spent funds or to which it

16 has dedicated resources in Texas between January 1st,

17 2014 and the present?

18          MR. GEISE:  I'm going to just, again,

19 object.  It calls for a legal conclusion.

20          And you can answer to the extent that you

21 believe that non-privileged documents have been produced

22 or indicated to Defendants where they are publicly

23 available.

24     A.   Well, I think all our non-privileged documents

25 have been produced; and all this information is publicly

1  available on the Texas Ethics Commission and the Federal

2  Election Commission websites.

3      Q.   Okay.  Did you -- moving on to Deposition

4  Topic Number 5, did you produce documents sufficient to

5  show the activities on which TDP plans to spend funds or

6  to which it plans to dedicate resources between the

7  present and January 1st, 2024?

8            MR. GEISE:  And, again, I would instruct

9  the witness that you can answer to the extent you are

10  aware of non-privileged, non-public documents regarding

11  Request Number 5.

12      A.   I mean, this whole Number 5, everything would

13  be privileged under our First Amendment.  And I will

14  tell you that we will spend all the money we raise.

15      Q.   But you have not produced documents responsive

16  to -- you have not produced documents sufficient to show

17  the information in Topic 5 on advice of Counsel?

18      A.   I am saying exactly that.  There is nothing on

19  this list that's not protected under our First Amendment

20  organizing rights.

21      Q.   Okay.  And then have you produced -- jumping

22  down to Topic 7, have produced documents sufficient to

23  show your members who are eligible to use the DPS

24  website for a driver's license renewal or change of

25  address transaction and intends to do so?

1           MR. GEISE:  I'm just going to object,

2    asked and answered, to the earlier conversation about

3    whether or not such documents exist.  So to the extent

4    you're aware of whether or not such documents exist, you

5    can answer.

6         A.   We have no such document to produce.  It's

7    just common knowledge that every Texan who's over the

8    age of 16 who might want to get a driver's license or

9    change their address may use the DPS system.  So it is

10   pretty much all of our members and those that have some

11   kind of disability that they cannot drive a car, such as

12   a blind person.

13        Q.   But you haven't identified any specific

14   individual member, have you?

15        A.   Well, there are named Plaintiffs in this

16   lawsuit.  I think that almost all of our members are

17   similarly situated that at some point every six years

18   they will have to go to a DPS office and renew their

19   driver's license unless they use the online system to

20   change their address in between those six-year periods,

21   which doesn't get them registered to vote.  So, no, we

22   don't have a list because it's everybody.

23        Q.   All right.  Back to the categories of

24   documents, Number 4 requests "Documents sufficient to

25   show your organizational structure and employee -- and

110

1   internal employee hierarchy, including an organizational

2   chart and job description of all employees."  Have you

3   produced documents responsive to this category?

4               MR. GEISE:  The same instruction.  You

5   can answer to the extent you're aware of non-privileged

6   responsive documents or to the extent that you don't

7   believe you've testified to this matter.

8               MS. MACKIN:  I don't think it's a valid

9   objection.

10              MR. GEISE:  All right.  You can answer to

11  the extent you are aware of non-privileged responsive

12  documents.

13      A.   I'm aware of not -- I'm not aware of any

14  non-privileged responsive documents to that question.

15  It's all internal to our First Amendment rights.

16      Q.   (BY MS. MACKIN)  And so just to make it

17  perfectly clear --

18      A.   Who our employees are and what we pay them is

19  on the TEC or FEC websites.

20      Q.   And this does not request what your employees

21  are paid.  It requests organizational structure,

22  including an organizational chart and job descriptions.

23  And as I understand your counsel, is it TDP's position

24  that that information is protected under the First

25  Amendment?

1          MR. GEISE:  Yes.  Although, I believe

2  that Mr. Maxey has testified to the public nature of

3  that information.  If you're aware that any -- and that

4  we provided the publicly available organizational chart,

5  which I understand did not come through correctly; and

6  we will supplement the production in that manner with

7  that website.  But I believe that anything other than

8  that is privileged.

9       A.    All of our staff and their job titles, at

10  least, is posted on our website; and the links were in

11  the document that we produced.

12       Q.    All right.  And then the final category, "To

13  the extent not already produced in response to Items 1

14  through 4 above, all documents reviewed in preparation

15  for your deposition."  Have you produced documents

16  responsive to this category?

17          MR. GEISE:  I'm just going to object.  I

18  mean, you are able to answer that question "yes" or

19  "no."  But I believe that any specific documents you

20  reviewed are subject to the attorney-client privilege.

21  You can answer "yes" or "no" whether all documents you

22  reviewed in preparation for this deposition have either

23  been produced or Counsel has been -- or, to your

24  knowledge, whether or not Counsel has been directed to

25  the appropriate publicly available websites.

1      A.   So my answer is:  Every document I reviewed in

2  response to this has been produced or I have told you

3  where to find it on a publicly available website.

4      Q.   Okay.

5           MS. MACKIN:  We'll request

6  supplementation, as was discussed with my colleague,

7  Chris, earlier and was discussed today; and we will hold

8  this deposition open to ask any questions about

9  documents that have been supplemented.  But subject to

10  that, we pass the witness.

11           MR. GEISE:  All right.  And we'll --

12  well, I just have a couple of questions, Mr. Maxey.

13                       EXAMINATION

14  BY MR. GEISE:

15      Q.   Now, Mr. Maxey, without reviewing or

16  discussing any specific documents you reviewed in

17  preparation for this deposition, did you review or come

18  to understand the total expenditures spent by the Texas

19  Democratic Party for every year from 2014 through 2019?

20      A.   Yes, I looked at the documents or the FEC and

21  TEC to get a general understanding of about how much we

22  spent each calendar year during that period.

23      Q.   And now, Counsel asked you about -- and the

24  Deposition Notice provides specific certain breakdowns

25  of those funds, including voter persuasion, Get Out the

1  Vote, voter registration, funds spent on supporting

2  Democratic candidates through fundraising, funds spent

3  on supporting Democratic candidates through organizing.

4  And I believe your testimony -- and correct me if I'm

5  wrong -- was that such numbers are unknowable.  And

6  could you briefly explain why that is?

7       A.   As I stated early on, every employee that

8  comes to the TDP is asked to become a deputy voter

9  registrar.  Every employee has -- every department has

10  some level of educating voters or candidates or

11  activists on how to register somebody or how to get

12  registered for the target registration.  And so every

13  staffer we have at some point during their time with us

14  does voter registration.  I can recall when our

15  comptroller sat at a table registering people to vote at

16  a music festival.  So we are all doing that.

17           The cost of all our technology, our data

18  systems, is done for targeting and voter registration

19  and vote by mail and Get Out the Vote; and so you can't

20  just pull out which -- how much of that -- those

21  computers, those data files, those employees are doing

22  voter registration.

23           The same thing with communication.

24  You're talking about all kinds of topics.  On a regular

25  basis they talk about voter registration.  Pulling out

1   the cost of their technology, their subscriptions, their

2   access to Twitter or Instagram, Facebook, other digital

3   platforms, and e-mail communications, you can't pull out

4   an exact cost of those programs that was used just for

5   voter registration.  It would be impossible to do

6   because it's all in the same -- sort of the same pot.

7                  Everybody's doing voter registration

8   activities.  You know, the closest I could ever get is

9   if somebody wanted to see the cost of a specific

10  mailing; and that is publicly available on the FEC or

11  TEC because it would have been a bill paid to a vendor.

12                 You know, it's the cost of -- I process

13  about -- right now about, through volunteers, about 300

14  vote-by-mail applications and dozens of voter

15  registration applications each week.  They go through a

16  postage meter, and we do not determine which postage

17  stamp went on a voter registration application being

18  mailed out versus a vote by mail versus a Get Out the

19  Vote or a thank you note for fundraising.  It's all in

20  the same pot.  So you can't ferret out these costs.

21                 The same thing with copy machines, making

22  copies of voter registration applications to mail to

23  somebody who asks for one.

24                 You know, hand addressing an envelope.

25  The cost of envelopes, we buy them by the case.  We

1    don't say, "Oh, these five were voter registration."

2                     So you cannot ferret it out and cannot

3    give a specific answer.

4                     MR. GEISE:  Thank you.

5                     No further questions for me.

6                     MS. MACKIN:  And I just have one follow-

7    up.

8                          FURTHER EXAMINATION

9    BY MS. MACKIN:

10        Q.    Mr. Maxey, you just talked about how you did

11   review documents to ascertain the Texas Democratic

12   Party's total expenditures for the years 2014 through

13   2020; is that right?

14        A.    I did.

15        Q.    But that those aren't able to be broken down

16   into discreet activities, correct?

17        A.    I looked at the FEC totals and the TEC totals

18   because that was on that list.

19        Q.    On which list?

20        A.    On your list of Depo Notice things that you're

21   going to ask about, total expenditures.  So I looked at

22   FEC and TEC and I jotted those down on a piece of paper,

23   that I'm not reviewing now, because I didn't memorize

24   them totally.  But I did not then scroll through the

25   tens of thousands of entries to see if I could find

1    anything that said "voter registration" because I would

2    have been doing that for the past week.

3            So does that answer the question?  I've

4    sort of forgotten it.

5        Q.   I just wanted to make sure that if I looked at

6    the publicly available filings --

7        A.   You're going to see them.

8        Q.   Okay.  Thank you.

9            And then, yeah, subject to additional

10   document production and the witness being unprepared or

11   improperly instructed to answer, we're holding the

12   deposition open.

13           But I pass the witness at this time.

14           MR. GEISE:  We have no further questions.

15           THE REPORTER:  Going off the record at

16   2:04 p.m.

17           (Deposition recessed at 2:04 p.m.)

18           (Signature was not request on the

19   record.)

20                   --ooOoo--

21

22

23

24

25

117

1  STATE OF TEXAS)

2

3              REPORTER'S CERTIFICATION

4

5              I, DEBBIE D. CUNNINGHAM, CSR, hereby

6  certify that the witness was duly sworn and that this

7  transcript is a true record of the testimony given by

8  the witness.

9              I further certify that I am neither

10 counsel for, related to, nor employed by any of the

11 parties or attorneys in the action in which this

12 proceeding was taken.  Further, I am not a relative or

13 employee of any attorney of record in this cause, nor am

14 I financially or otherwise interested in the outcome of

15 the action.

16             Subscribed and sworn to by me this day,

17 May 3, 2020.

18

19

20

21             _____
                Debbie D. Cunningham
22             Certified Shorthand Reporter
                CSR No. 2065 - Expires 6/30/21
23             INTEGRITY LEGAL SUPPORT SOLUTIONS
                P.O. Box 245
24             Manchaca, Texas 78652
                www.integrity-texas.com
25             512-320-8690; FIRM # 528

# Exhibit K

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JARROD STRINGER, et al.,        *
     Plaintiffs,              *
                           *
v.                              *  No. SA-20-CV-46-OG
                           *
RUTH HUGHS, et al.,             *
     Defendant.               *

VIDEOTAPED VIDEOCONFERENCED

ORAL DEPOSITION

OF

THE DEMOCRATIC CONGRESSIONAL

CAMPAIGN COMMITTEE REPRESENTATIVE,

JACQUELINE NEWMAN

Tuesday, April 28, 2020


VIDEOTAPED VIDEOCONFERENCED DEPOSITION OF

JACQUELINE NEWMAN, produced as a witness at the instance

of the Defendant, and duly sworn, was taken in the

above-styled and numbered cause on Tuesday, April 28,

2020, from 10:09 a.m. to 2:05 p.m. Central Time, before

Debbie D. Cunningham, CSR, in and for the State of

Texas, remotely reported via Machine Shorthand, pursuant

to the Federal Rules of Civil Procedure.

--ooOoo--

2

1                        APPEARANCES

2

3   FOR PLAINTIFF INTERVENORS:

4         PERKINS COIE
          700 13th St NW
5         Washington, DC 20005
          (T) 202.654.6200
6
          By:  Aria Branch, Esq.
7              abranch@perkinscoie.com
                        AND
8              Emily Brailey, Esq.
                        AND
9              Rachel Jacobs, Esq.

10

    FOR DEFENDANT THE TEXAS SECRETARY OF STATE:
11
          OFFICE OF THE ATTORNEY GENERAL OF TEXAS
12        Special Counsel for Civil Litigation
          300 W. 15th Street
13        Austin, Texas  78701
          (T) 512.463.4139
14
          By:  Christopher D. Hilton, Esq.
15             christopher.hilton@oag.texas.gov

16

17  VIDEOGRAPHER:

18        Amanda Christopher
          Brian Christopher
19
                        --ooOoo--
20

21

22

23

24

25

3

1                          INDEX

2    APPEARANCES                                    2

3

4   EXAMINATION OF JACQUELINE NEWMAN:

5    BY MR. HILTON                                  6

6

7

8    CHANGES AND SIGNATURE                        131

9    REPORTER'S CERTIFICATION                     133

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                            4

1                          EXHIBIT INDEX

2    Exhibit Number        Description                      Page

3

4      Exhibit 1      Defendants' Notice of Oral            24
                      Deposition Pursuant to Federal
5                     Rule of Civil Procedure 30

6      Exhibit 2      Intervenor-Plaintiffs Texas           25
                      Democratic Party, DSCC, and
7                     DCCC's Complaint for Declaratory
                      and Injunctive Relief
8
       Exhibit 3      Alexander Edelman Declaration         26
9
       Exhibit 4      DCCC's Production in Response         29
10                    Subpoena Duces Tecum

11     Exhibit 5      Jacqueline Newman LinkedIn page       14

12     Exhibit 6      FEC Form 1, Statement of              43
                      Organization for DCCC
13
       Exhibit 7      DCCC Amended Year-End                 56
14                    Report Summary

15     Exhibit 8      Excel spreadsheet                     45

16

17

18

19

20

21

22

23

24

25

```
 1                (Tuesday, April 28, 2020, 10:10 a.m.)

 2                     P R O C E E D I N G S

 3                THE REPORTER:  Today is April 28th, 2020.

 4   This is the deposition of the Corporate Representative

 5   of DCCC, Jacqueline Newman, in the matter of Jarrod

 6   Stringer, et al. versus Ruth R. Hughs, et al.  We are

 7   situated remotely and are on the record at 10:09 a.m.,

 8   Central Standard Time.

 9                My name is Debbie Cunningham, and my

10   business address is P.O. Box, Manchaca, Texas 78652.

11                Would all persons present please

12   introduce themselves for the record?

13                MR. HILTON:  Chris Hilton for the

14   Defendants.

15                MS. BRANCH:  Aria Branch for the

16   Plaintiff Intervenor DCCC.  That's "D" and then three

17   "Cs."

18                MS. BRAILEY:  Emily Brailey, also for the

19   Plaintiff Intervenor, DCCC.

20                THE WITNESS:  Jacqueline Newman with the

21   DCCC.

22                              *

23                              *

24                              *

25                     JACQUELINE NEWMAN,
```

1  having taken an oath to tell the truth, the whole truth,

2  and nothing but the truth, was examined and testified as

3  follows:

4                           EXAMINATION

5  BY MR. HILTON:

6       Q.   **Good morning, Ms. Newman.**

7       A.   Hi.

8       Q.   **Could you please state and spell your name one**

9  **more time for the record?**

10      A.   Sure.  It's Jacqueline Newman,

11  J-A-C-Q-U-E-L-I-N-E N-E-W-M-A-N.

12      Q.   **And you're here on behalf of DCCC to testify**

13 **as their representative today, right?**

14      A.   I am.

15      Q.   **Before starting to prepare for this, I**

16 **truthfully didn't know a whole lot about the DCCC and**

17 **what it does.  I think I'm still pretty murky on the**

18 **details, and I'm hoping you can explain for me so I can**

19 **kind of understand more today.  Can you just start me**

20 **off with kind of an overview about what the DCCC is,**

21 **what its purpose is, what it does?**

22      A.   Sure.  The DCCC is the national party tasked

23 with electing Democrats to the U.S. House of

24 Representatives.

25      Q.   **You said it's a party?**

1      A.   Yes.

2      Q.   **Is it separate from, like, the Democratic**

3  **Party; or how does that work?**

4      A.   Yes.  I mean, we are part of the Democratic

5  Party.  We are separate from the Democratic National

6  Committee, which is often what people think of when they

7  think of the National Democratic Party.

8      Q.   **So you're separate from the Democratic**

9  **National Committee.  Is it a subordinate role, is it a**

10  **partnership; or what's the relationship there?**

11      A.   I would say we're affiliated, but we are

12  not -- we are not interlinked in any way.  And we are

13  also not their subordinate.

14      Q.   **Okay.  And, I mean, I just didn't know.  Do**

15  **you have a separate Party platform, or how does that**

16  **work?**

17      A.   Yes, I mean, we don't necessarily have a

18  platform as the DCCC.

19      Q.   **Okay.  And why is that?**

20      A.   That's just not something we set out to do.

21      Q.   **So what do you set out to do?  I mean, is it**

22  **primarily fundraising; or just what is, you know?**

23      A.   We -- again, we're trying to elect Democrats

24  to the U.S. House of Representatives; and so we support

25  campaigns in a variety of ways and functions.

8

1    Q.   Okay.  Well, we'll go through some of the

2   details of some of that later.  I guess I would like to

3   start, also, with understanding a little bit more about

4   you and your background.  So you're currently employed

5   by the DCCC; is that right?

6    A.   I am.

7    Q.   And what's your role?

8    A.   I'm the Deputy Executive Director and Chief

9   Operating Officer.

10    Q.   Okay.  And what are the responsibilities for

11   those roles?

12    A.   I oversee all the administrative and

13   operations functions for the building -- or for the

14   committee, that includes the building itself, our Human

15   Resources functions, our budgets, our legal activity,

16   just making sure everything is functioning as it should.

17    Q.   How many employees does DCCC have?

18    A.   Right now we are roughly at about 265

19   employees.

20    Q.   So these are folks that receive a paycheck

21   from DCCC?

22    A.   Yes.

23    Q.   And where are they located, and what kind of

24   work do they engage in?  I'm trying to get a sense of,

25   you know, who's out there.

1      A.    Sure.   They -- our employees are located

2  across the country.   The majority are based in DC.   We

3  have several employees that are on the ground in Texas

4  as it relates to this case.

5      **Q.    Uh-huh.   And as far as your job, Deputy**

6  **Executive Director -- did I get that right?**

7      A.    Yes.

8      **Q.    How long have you had that role?**

9      A.    I think I've had this title since September.

10 I've been with the committee in some fashion since 2014,

11 and I was previously with the committee in 2012.

12     **Q.    And what about the COO title, how long have**

13 **you had that?**

14     A.    About two and a half years.

15     **Q.    Okay.   Who -- what's the reporting -- what's,**

16 **I guess, the leadership structure?   You're the Deputy**

17 **Executive Director, so I assume you report to an**

18 **Executive Director.   Is there anyone else you report to,**

19 **other folks that report to you?   Can you give me a sense**

20 **of that?**

21     A.    Yes, you're right.   There's an Executive

22 Director who oversees all the day-to-day functions of

23 the committee; and then we also have a Chair of the

24 committee, Congresswoman Cheri Bustos.

25     **Q.    Anyone else that you report to?**

```
 1        A.   No.

 2        Q.   And then who reports to you?

 3        A.   I have a team below me, a Chief Administrative

 4   Officer, IT Director.

 5        Q.   Is that it, there's two people that report to

 6   you?

 7        A.   Oh, I'm sorry.  Then there's some junior-level

 8   staffers below them who are kind of the senior team and

 9   then HR and Administration Manager.

10        Q.   Okay.  How many people would you say report to

11   you directly?

12        A.   I think it's about eight or nine people.

13        Q.   Okay.  Are there any other deputy executive

14   directors, or are you the only one?  Like, a lot of

15   agencies have, like, multiple deputy commissioners in

16   charge of certain things.

17        A.   Sure.  There are two other deputy executive

18   directors.

19        Q.   What are their names, and what are their

20   responsibilities?

21        A.   One is Ryan Hedgepeth, and he is our Deputy

22   Executive Director for Member Engagement.  He works

23   directly with members of our caucus, members of

24   Congress.  And Mike Smith is also a Deputy Executive

25   Director, and he oversees our fundraising operations.
```

1      Q.   Has there been any change to that structure in
2   the time that you've been with the DCCC?

3      A.   The Deputy Executive Director structure?

4      Q.   Yes, yeah.

5      A.   Yes, there has.

6      Q.   So what were the changes and when did they
7   occur, again, just kind of focusing on this top-level
8   structure?

9      A.   Sure.  So I'm sorry.  Could you -- did you say
10  this year or during my entire time at the DCCC?

11     Q.   Just since you've been at DCCC.

12     A.   Sure.  So each cycle, which is a two-year
13  election period, the DCCC goes through the process of --
14  at one point it was appointing and now it's electing a
15  Chair of the committee.  And each Chair that comes in is
16  able to kind of re-image the structure as they see
17  necessary in order to carry out their goals for the
18  cycle.  And so with that, I would say each cycle there
19  has been a slightly different leadership structure.

20     Q.   Can you give me some examples, maybe?  Maybe
21  if it changes every two years regularly, we don't have
22  to go through every one; but if you could, kind of give
23  me a sense of what type of changes that there are.

24     A.   Sure.  So usually -- I think in the past few
25  cycles there has been a Deputy Executive Director, at

12

 1  least one or a few.  And last cycle there was one Deputy

 2  Executive Director, and they reported to the Executive

 3  Director.  In other cycles there have been a few deputy

 4  executive directors that kind of oversee a few key

 5  functions of the building and then report back to the

 6  Executive Director.  Again, it just kind of depends on

 7  the Executive Director and the Chair at the time.

 8      **Q.   How are the Executive Director and the Chair**

 9  **chosen?**

10      A.   Currently -- and this is a somewhat recent

11  change -- the Chair of the committee is elected by the

12  Democratic Caucus, and the Executive Director is hired

13  by the Chair.

14      **Q.   Okay.  And so you've been with DCCC since 2014**

15  **and then another stint before then.  Is it typical to**

16  **have a long tenure, you know, for employees to be**

17  **tenured that length of time; or is there a lot of**

18  **turnover with these two-year cycles?**

19      A.   Yeah, it's definitely more common that people

20  work a cycle and then they move on to another

21  opportunity.  There's a lot of turnover usually.

22      **Q.   Is some of that top down?  I mean, does the**

23  **Executive Director bring in their own people every year**

24  **or...**

25      A.   No.  I think it's more just the nature of

13

1  campaigns that every two years people are moving on to

2  something else.  I think you would see -- and this

3  partially explains why I've been here longer than most

4  people, but the administrative functions are the people

5  who tend to stay cycle to cycle.  And the people who

6  work kind of in different parts of the committee are

7  often moving on to other campaigns or other

8  organizations.

9      Q.   So that would be more typical of the folks who

10  do the fundraising or the -- I forget how you put it --

11  the direct interfacing with the caucus members?

12      A.   Yes.

13      Q.   Okay.  You've been here, you know, at DCCC

14  quite a while.  I take it you enjoy your job?

15      A.   I do.

16      Q.   What do you enjoy about your job?

17      A.   I think the work we do is important, and I

18  like the values we represent.

19      Q.   Okay.  What values?

20      A.   I think electing Democrats to the U.S. House

21  of Representatives -- you know, the House, I think,

22  impacts a lot of change within this country; and it's

23  important that we expand and protect our majority.

24      Q.   You've mentioned that a couple of times

25  already and we're going to talk -- you know, one of the

1   missions of DCCC and we're going to talk more about that

2   throughout; but is that the best statement of the

3   mission, to elect Democrats?

4       A.   Definitely.

5       Q.   Is there any other component of that, or is

6   that really what it's all about?

7       A.   I think everything ties back to electing

8   Democrats.

9       Q.   Okay.

10          MR. HILTON:   I'm going to send out

11  through the chat what's actually -- I'm going a little

12  out of order.   I kind of prenumbered some of these.   So

13  I'm going to send out Exhibit 5 now, and then we'll come

14  back to the other ones.

15          (Exhibit 5 discussed.)

16      Q    (BY MR. HILTON)   So let me know if you're able

17  to access Exhibit 5; and once you've had a chance to

18  pull it up and review it, let me know.

19      A.   Okay.   I have it open.

20      Q.   Is that your LinkedIn page, at least part of

21  it?

22      A.   Yes.

23      Q.   And I should say -- I forgot to mention this

24  before -- other than the documents that I send you and

25  then the Bates numbered documents that your counsel

1 provided to you that were the DCCC's production, do you

2 have any other documents in front of you, with you?  Are

3 you referring to any other documents?

4       A.   No, I don't.

5       Q.   Okay.  I'll ask for you to continue not to do

6 that; and if you do refer to another document, please

7 let me know.  And I think the same thing goes with

8 talking to other people, including by e-mail, text, you

9 know, anything like that.  Please refrain from doing

10 that, you know, until the deposition is over.  And if

11 you do do that, I'd ask that you please, you know, let

12 me know.

13            All right.  So turning to Exhibit 5,

14 which is at least a portion of your LinkedIn page, it

15 has employment history for you going back to May 2008.

16 I was kind of hoping you could walk me through each of

17 these positions, starting with May 2008, and explain to

18 me -- obviously, we don't have to go into a huge amount

19 of detail for all of these; but if you could, explain to

20 me just kind of generally what the company was or what

21 the organization was, what your role was, and kind of

22 give me a sense of the evolution of your career.  That's

23 my goal here.

24            So if you could just kind of start from

25 GIS Specialist at the Timmons Group and work your way

DCCC - 4/28/2020

16

 1  **through, I think that's the most efficient way to go**

 2  **about it.**

 3      A.   Okay.   Sure.   So in 2008 I worked with the

 4  Timmons Group, which is an engineering firm.   I was a

 5  GIS Specialist at the time, Geographic Information

 6  Systems.

 7      **Q.   What is a Geographic Information System?**

 8      A.   It's like a lot of building kind of digital

 9  maps.   That's what I did, usually, for local governments

10  that were hoping to convert to a modern era, if you

11  will.

12      **Q.   In what sense?**

13      A.   Like, the work I did was taking, like, paper

14  documents, land parcels, and I was digitizing them.

15      **Q.   Oh, I see.   So any kind of, you know, records**

16  **or whatever, just trying to make it into a modern**

17  **electronically-accessible system?**

18      A.   Yeah, yeah, basically.

19      **Q.   Got it.   Any particular projects that stand**

20  **out from that time?   I don't mean to make you go all the**

21  **way back through your career.**

22      A.   Oh, sure.   No, no.   So most of the work I

23  specialized in, we worked with a lot of rural, I guess,

24  counties and locations; and they were in the process of

25  trying to basically get up and running a system that --

17

1  where people in their location can call 9-1-1 and it

2  would be linked to their home, which I think is

3  something that, especially in urban and suburban areas,

4  people take for granted that you call 9-1-1 and they

5  know where you're calling from.  So that required

6  digitizing all of the maps and then linking each, like,

7  land parcel to the phone information we had for people

8  living there.  That was the majority of the work I did

9  at Timmons.

10       **Q.   Okay.  And I'm sorry to dwell on this, but it**

11  **looks like your career kind of takes a more political --**

12  **or politically-oriented turn from here.  Did you do any**

13  **political type work or redistricting or anything like**

14  **that when you were with Timmons Group?**

15       A.   I didn't do any political work with Timmons.

16  I was involved through my school; and while I was

17  working at Timmons, I took on a side project, which is a

18  strong majority the role I did above it.  And so I was

19  kind of doing that in my spare time.

20       **Q.   All right.  Well, I know I asked you to just**

21  **kind of walk me through this and let you explain it; and**

22  **then I immediately interrupted you.  So sorry about**

23  **that, but maybe you can pick it up from there and**

24  **continue to walk me through the rest of your career.**

25       A.   Sure.  So for a strong majority, I was their

18

1   Compliance Director.  I basically oversaw their

2   bookkeeping and was responsible for accounting and

3   reporting through the Virginia State Board of Elections,

4   just maintaining their compliance.

5             And then I found myself in Indiana, where

6   I was hired as the Deputy Director of Compliance and

7   Operations; and in that role -- you will sense a theme

8   here -- but I oversaw the HR, the operations and the

9   bookkeeping budgets and compliance for the Indiana

10  Democratic Party.

11       Q.   And I'm sorry to interrupt you one more time,

12  at least.  I should have started with this, but I

13  forgot.  What was your -- what education did you have

14  that led you into all these roles?  Like, I think you

15  mentioned you were still in school when you started with

16  Timmons.  Now, what were you in school for?  What

17  degree, if any, did you attain?

18       A.   Sure.  I went to school, and I received a

19  bachelor's degree in geography.

20       Q.   And I know as a component of that, there's a

21  lot of, you know, technical and software and all sorts

22  of stuff like that that kind of led you to be able to do

23  the more technical side of things that you're doing?

24       A.   Yes.

25       Q.   Okay.  All right.  I interrupted you again.

1    I'm sorry.  Let's try it again.

2         A.   No problem.  So I was in Indiana briefly.  I

3    stayed through the end of the election cycle and moved

4    back to Virginia.  In April of 2011 I started with

5    Protect Your Care and Know Your Care as their Director

6    of Operations.  Again, I kind of oversaw the budget

7    aspects, the compliance, HR.  After --

8         Q.   I'm sorry.  What is that group?

9         A.   It was a 501(c)(3) and (c)(4) organized around

10   educating people on Obamacare --

11        Q.   Okay.

12        A.   -- and the Affordable Care Act.

13        Q.   Okay.

14        A.   In 2012 I took a job with the DCCC as their

15   Director of Operations on their 2012 Independent

16   Expenditure Program; and in that role, I managed the

17   administrative functions for the IE, which is a large

18   paid media campaign.

19        Q.   And when you say a paid media campaign, can

20   you elaborate a little bit on that?

21        A.   Sure.  It's mostly a bunch of TV ads that the

22   DCCC puts out.

23        Q.   And what was the nature of the ads?  What was

24   the purpose?

25        A.   To elect Democrats to the U.S. House.

1    Q.   Anywhere in particular?  Any particular type

2  of ad; or was it just, you know, all House members?

3    A.   It was certainly focused in our targeted

4  races.  I don't know how much that was off the top of my

5  head; but I would say, ballpark, it probably covered

6  about 30 races across the country.

7    Q.   And -- okay.  I think that's enough for now.

8  I'll let you continue.

9    A.   Following 2012 I took a job with Terry

10 McAuliffe's campaign for governor in Virginia; and I

11 operated largely in the same capacity for that roll,

12 overseeing all the operations functions, HR, budgets,

13 legal.

14   Q.   Was that a successful campaign?

15   A.   It was a successful campaign.

16   Q.   He's still governor, right?  Did he get re-

17 elected since then or...

18   A.   He is not still governor --

19   Q.   Oh, okay.

20   A.   -- but he is always around.

21   Q.   Okay.

22   A.   So you feel like he's still governor.

23        And then, following his successful

24 campaign, after his inauguration I returned to the DCCC

25 as Deputy Chief Operating Officer and over the years

21

1  have slowly progressed.

2      Q.   You've stayed around and stayed in a couple

3  different roles, and I know how it goes when you stay at

4  a place for a long time.

5           I guess the only other one I wanted to

6  ask you about specifically was Interim Executive

7  Director from July of 2019 to September 2019.  How did

8  you come to have that role, and the way you're

9  describing -- I guess my other question is, as your

10 primary viewpoint, you know, if it goes in two-year

11 election cycles, is that a down period since the 2018

12 election had just been over?

13          What was -- I guess I was saying all of

14 that to say -- I'll give you an actual question that you

15 can answer.  How did you come to get that role, what did

16 you do during that period, and how did that relate to

17 the cyclical nature of DCCC's work?

18     A.   Sure.  So we had a leadership transition in

19 the middle of our cycle this year, which actually isn't

20 common.  Usually an Executive Director would be hired in

21 December or January and stay for two years or longer in

22 some cases.  So there was a leadership transition.  In

23 that moment I stepped up to be the Interim Executive

24 Director, and largely I ran the entire process to find a

25 permanent Executive Director.

1     Q.   And you say there was a leadership transition.

2  I'm assuming that someone had signed up to do the role

3  and then moved on to take another opportunity

4  unexpectedly?

5     A.   Yes.

6     Q.   Okay.  And you may have mentioned this.  I

7  just don't recall.  Where did you say you went to, got

8  your bachelor's?

9     A.   I went to the University of Mary Washington in

10  Fredericksburg, Virginia.

11     Q.   Well, I appreciate all that.  It's always

12  helpful to know.  Even though you're a representative on

13  DCCC's behalf, it's extremely helpful to know your

14  perspective, your background, and your expertise.  So I

15  appreciate you walking me through that.  I know talking

16  about the full length of one's career is not necessarily

17  the most exciting, but I appreciate it.

18            I would like to turn now to talk a little

19  bit about how you -- you know, about the depo itself and

20  how you prepared for this deposition today.  So I guess

21  start there.  What did you do to prepare for the

22  deposition today?

23     A.   Sure.  Well, I discussed with my counsel.  I

24  reviewed the Complaint that we had filed and reviewed

25  the Deposition Notice topics.  I also reviewed a

23

1  declaration that a member of my team had submitted in

2  response to this.

3       Q.   Any other documents?

4       A.   I gathered information related to the

5  deposition topics, but that was it.

6       Q.   How did you gather information?

7       A.   I guess searching through DCCC documents.

8       Q.   Okay.  Did you search through e-mails or some

9  other source of documents?

10      A.   I think mostly just documents that are on our

11 drive, like on --

12      Q.   Did you use search terms, or did you just

13 browse through them?

14           MS. BRANCH:  I want to just object to the

15 extent that it calls for attorney-client privileged

16 information.

17           But you can answer as long as you're not

18 revealing any of the content of our conversations.

19      Q.   (BY MR. HILTON)  Yeah.  And particularly in

20 this prep area it gets kind of close to that.  I am not

21 asking you for content of any conversations with your

22 attorneys.  So please do not provide that information.

23 I don't want it.  It is privileged, so.

24           All right.  So you said that you were

25 just browsing through files, I guess, based on your

24

1  knowledge and familiarity with the files of the

2  organization?

3       A.   Yes, that's correct.

4       Q.   Did you speak to anyone other than your

5  attorneys?

6       A.   Just our -- yes, with our attorneys.

7       Q.   But no other employees of DCCC or anyone else

8  other than your attorneys?

9       A.   Right.

10            (Exhibit 1 discussed.)

11       Q.   (BY MR. HILTON)  Okay.  I'd like to turn to

12  Exhibit 1, which I had sent out previously via the Zoom

13  chat.  And do you recognize Exhibit 1?

14       A.   Yes.

15       Q.   And what is it?

16       A.   These are the deposition topics you sent in a

17  Notice for this role.

18       Q.   Right.  And so let's turn to page 5 of

19  Exhibit 1.  The heading is 30(b)(6) Corporate

20  Representative Deposition Topics?

21       A.   Yes.

22       Q.   Are you prepared to testify as to all these

23  topics today?

24       A.   I am.

25       Q.   And then I'd like to go to page 6.  The

25

1   heading is Attachment B.   These are the document

2   requests that we sent in connection with this Notice; is

3   that right?

4       A.   Yes.

5       Q.   And it sounds like you searched for documents

6   that were responsive to these requests?

7       A.   I worked with my counsel on this.

8       Q.   Okay.   Did DCCC produce documents responsive

9   to these requests?

10      A.   Yes.

11      Q.   So did DCCC comply with these requests?

12      A.   Yes.

13               (Exhibit 2 discussed.)

14      Q.   (BY MR. HILTON)   Okay.   The next one is going

15  to be Exhibit 2, which, hopefully, is the Complaint in

16  this matter.

17      A.   Yes.

18      Q.   So you have Exhibit 2 in front of you?

19      A.   I do.

20      Q.   And have you seen this document before?

21      A.   I have.

22      Q.   Did you review it before it was filed?

23      A.   Yes.

24      Q.   How much time did you spend reviewing it,

25  before it was filed, I mean?

DCCC - 4/28/2020

26

```
 1       A.   Before it was filed?

 2       Q.   Yes.

 3       A.   Probably -- to be clear, you mean the

 4  Complaint itself or in preparation for the Complaint?

 5       Q.   I'm breaking it into two parts.  So the first

 6  part is:  How much time did you spend reviewing the

 7  Complaint before it was filed?  And then the next part

 8  will be:  Did you review it again for this deposition,

 9  and how much time did you spend reviewing it?

10       A.   I probably spent about 30 minutes reviewing

11  the Complaint before it was filed.

12       Q.   Okay.  And you said you reviewed it again to

13  prepare for the deposition today.  How much time did you

14  spend then?

15       A.   Probably about an hour.

16       Q.   Okay.  I'm going to send out the next exhibit,

17  Exhibit 3, hopefully.

18                 (Exhibit 3 discussed.)

19       A.   Okay.

20       Q    (BY MR. HILTON)  Do you recognize what I'm

21  marking as Exhibit 3 to the deposition?  It says

22  Exhibit B on the first page of it, but I'm going to

23  refer to it as Exhibit 3.

24       A.   Yes.

25       Q.   Okay.  And what is Exhibit 3?
```

DCCC - 4/28/2020

27

1    A.   This is a Declaration from Alexander Edelman

2 in support of the Plaintiff's motion.

3    **Q.   Who is he?**

4    A.   He's DCCC's National Field Director.

5    **Q.   Do you know Mr. Edelman?**

6    A.   I do.

7    **Q.   And how do you know him?**

8    A.   He's my colleague at the DCCC.

9    **Q.   And can you describe exactly what a National**

10 **Field Director does?**

11   A.   Sure.  The National Field Director oversees

12 the entire field program for the DCCC.

13   **Q.   What is a field program?**

14        MS. BRANCH:  I'm going to object to the

15 extent that this calls for information that would be

16 protected by the First Amendment.

17        But you may answer at a high level.

18   A.   Sure.  Our field program is geared at

19 mobilizing and persuading voters, usually directly on

20 the ground in our targeted districts.

21   **Q.   (BY MR. HILTON)  And how does the field**

22 **program go about accomplishing that?**

23   A.   We usually work with coordinated campaigns,

24 which is a collaboration between national parties and

25 state parties to elect Democrats up and down the ballot.

1  So in Texas we work with the Texas Democratic Party,

2  along with the other national party committees and, you

3  know, each state sometimes looks a little bit different;

4  but usually we are running Get-Out-the-Vote programs,

5  voter registration programs, engaging our voters

6  directly on the ground through canvasses.

7      Q.   And how does the DCCC's support for that kind

8  of program play out in practice?  I mean, I guess, is it

9  just providing funding?  Do you provide manpower as

10 well, or what other resources do you provide?

11     A.   Yeah, so it's all of the above.  We provide

12 funding.  We transfer money to the State Party to be

13 used for the Coordinated Campaign.  We also have our own

14 direct investments in people on the ground in some

15 cases.  In Texas, for example, we have four offices

16 opened; and we have staff in those offices.

17     Q.   All right.  Well, I'm getting a little ahead

18 of myself.  We'll get into more details of that later,

19 but I realize I forgot to ask:  You said -- you

20 mentioned you reviewed a declaration in connection with

21 this matter to prepare for the deposition today.  Was

22 this the declaration you were referring to?

23     A.   Yes, it was.

24     Q.   All right.  So we'll leave that to the side

25 for now and come back to it.

```
 1                    (Exhibit 4 discussed.)

 2      Q.   (BY MR. HILTON)  The next group of documents

 3  that I'm going to designate as Exhibit 4 to the

 4  deposition is going to be the DCCC's production in

 5  response to our subpoena duces tecum.  So that's Bates

 6  Numbers DCCC 000001 through 805.  Do you have those

 7  documents available to you?

 8      A.   Yes, I do.

 9      Q.   And are you familiar with those documents?

10      A.   I am.

11      Q.   Okay.  Did you review all of them before the

12  deposition today?

13      A.   Yes.

14      Q.   How much time did you spend reviewing them?

15      A.   Probably about an hour.

16      Q.   Who gathered these documents?

17           MS. BRANCH:  I'm going to object to the

18  extent that this calls for conversations between

19  attorney and client or attorney work product.

20           MR. HILTON:  It does not.  I'm asking for

21  an identity of the person who collected the documents.

22           MS. BRANCH:  You can answer that, Jacqui.

23      A.   This specific group of documents?

24      Q    (BY MR. HILTON)  Yeah, Bates Number 1 through

25  805, the entire production.
```

30

 1      A.    These came from my counsel.

 2      Q.    **But who collected them?**

 3      A.    Initially in this process?

 4      Q.    **Yeah, who at DCCC gathered the documents for**

 5  **production?**

 6      A.    Staff.  And, I mean, I think several people

 7  collected documents related to this production based

 8  on -- based on the request and the search terms guided

 9  by our counsel.

10      Q.    **What were the search terms?**

11            MS. BRANCH:  Objection, attorney-client

12  privilege.

13      Q.    **(BY MR. HILTON)  You can answer.**

14            MS. BRANCH:  I'm instructing you not to

15  answer that.

16            It's clearly search terms that we worked

17  with them and communicated with them to find the

18  documents.  If there's specific documents you want to

19  ask about, I think we can do that; but...

20            MR. HILTON:  I would like to know the

21  search terms.  Will you provide them to me, Aria?

22            MS. BRANCH:  We can talk off the record

23  about that.

24            MR. HILTON:  I would like an answer now

25  because I feel like I'm entitled to what the search

1  terms are.

2          MS. BRANCH:  I don't have them in front

3  of me, but we can discuss that.  They are search terms

4  that were created based on the subpoena.

5          MR. HILTON:  I just want to know if

6  you'll give me the search terms later.

7          MS. BRANCH:  And I'm happy to discuss

8  that.

9      Q.  (BY MR. HILTON)  I'm sorry.  I feel like I

10  have to ask my question again, Ms. Newman.  What were

11  the search terms that were used?

12          MS. BRANCH:  And I'm going to assert the

13  same objection and instruct the witness not to answer.

14      Q   (BY MR. HILTON)  Are you going to abide by

15  that instruction?

16      A.  Yes, I am.

17      Q.  Do you know what the search terms are?

18      A.  Not off the top of my head.

19      Q.  Did you at one point know what they were?

20      A.  Yes.

21      Q.  Did you refer to something else and refresh

22  your memory as to what the search terms are?

23      A.  I could refer to my conversations with my

24  counsel.

25      Q.  So you could give me the search terms if you

32

 1  were required to do so?

 2              MS. BRANCH:  They're privileged.

 3              MR. HILTON:  I understand that that's

 4  your assertion.  I disagree with that assertion.  And

 5  I'm trying to question the witness, and you cannot

 6  answer for the witness.

 7       Q.   (BY MR. HILTON) So, Ms. Newman, if you were

 8  required to tell me what the search terms are by a Court

 9  or someone else, would you be able to do so?

10       A.   I believe I could.

11       Q.   Okay.  Who ran the search terms?

12       A.   A combination of our staff and our IT

13  Director.

14       Q.   And you mentioned earlier as well that several

15  people assisted in gathering the documents.  Did I

16  understand your testimony correctly?

17       A.   Yes.

18       Q.   What are the names of each person who assisted

19  in gathering these documents?

20       A.   I don't know that information.  I would have

21  to check.

22              MR. HILTON:  Aria, will you provide me

23  that information?

24              MS. BRANCH:  Again, I think this calls

25  for privileged information and that these are

1  discussions that we, the attorneys, had with staff at

2  the DCCC to advise them on how to respond to the

3  subpoena.

4              MR. HILTON:  I'm not asking about the

5  discussions.  I'm asking for the identity of the

6  individuals who ran the search terms and collected the

7  documents.  I believe your document production is

8  insufficient.  I'm entitled to understand what you did

9  to produce these documents, and I'm entitled to this

10  which is not privileged.  So I'm going to ask --

11             MS. BRANCH:  I think we can have that

12  conversation.  I don't think that Jacqui knows; and I

13  also think that it infringes on the privilege, so.

14      Q    (BY MR. HILTON)  Well, Ms. Newman, do you know

15  the identities of the individuals who ran these search

16  terms?

17      A.   It's a wide group, I think.

18      Q.   Okay.  Do you know the identity of those

19  individuals in that wide group?

20      A.   I have it somewhere.  I do not know right now.

21      Q.   But you could get me that information if you

22  were required to do is?

23      A.   I believe so.

24      Q.   And you mentioned that several people helped

25  gather the documents.  Were you referring to just

1  running the search terms, or was there some other way in

2  which documents were gathered?

3          MS. BRANCH:  Again, I think this calls

4  for attorney-client privileged information in that it

5  goes to the communications we had on how to formulate

6  the search for documents.

7      Q.  (BY MR. HILTON)  I am not asking about the

8  content of any communication that you or anyone at DCCC

9  had with your counsel, Ms. Newman.  I want to be very

10 clear about that.  But I would like to know the method

11 by which these documents were gathered, and I want

12 clarity on your earlier testimony.  Earlier you said

13 that several people helped gather the documents.  Do I

14 have that correct?

15     A.  Yes.

16     Q.  And you also mentioned that there was a wide

17 group of people who ran search terms.  Do I have that

18 correct?

19     A.  I believe so.  Like I said, I would have to

20 check.

21     Q.  Okay.  And I want to know:  Is that the same

22 group you were referring to, or are there two different

23 groups of individuals that you're referring to in your

24 testimony?

25          MS. BRANCH:  Same objection.  I think

1   asked and answered.  She's answered the question.

2              MR. HILTON:  With respect, Aria, it has

3   not been answered.  I want to understand who searched

4   for what and how, and I'm entitled to that information.

5       **Q.   (BY MR. HILTON)  So Ms. Newman, who -- was**

6   **there another method of gathering documents other than**

7   **running search terms?**

8              MS. BRANCH:  Again, it's privileged.  I

9   mean, these -- what you're asking -- I understand where

10  you're coming from, but what you're asking is asking for

11  the content of the communications we had with them in

12  terms of how to comply with the subpoena.

13             MR. HILTON:  Can you read back my

14  question?

15             MS. BRANCH:  I'm going to instruct the

16  witness not to answer, and I'm hopeful that we can maybe

17  move on to another topic.

18             MR. HILTON:  Can you read back the

19  question, Debbie, that I asked?  I'd like you to read

20  the question.

21             THE REPORTER:  Yes.

22             (The requested material was read as

23  follows:

24             "QUESTION:  Okay.  And I want to know:

25  Is that the same group you were referring to, or are

1  there two different groups of individuals that you are

2  referring to in your testimony?")

3          MS. BRANCH:  Objection, vague.

4          You may answer if you are able to.

5      A.   I don't really understand the question.

6      Q.   **(BY MR. HILTON)  Well, I don't really**

7  **understand your testimony.  You said earlier that there**

8  **was a group of -- that there were several people who**

9  **gathered documents, correct?  That's what you first**

10 **said?**

11     A.   Well -- and I would like to clarify.  We might

12 have asked several people.  That does not mean several

13 people had documents to gather, and I do not know that

14 information right now.

15     Q.   **All right.  I'm going to ask you one more**

16 **time:  Who collected the documents for DCCC?**

17          MS. BRANCH:  Objection, asked and

18 answered.

19          You can repeat the same answer.

20          MR. HILTON:  I would appreciate it, Aria,

21 if you didn't instruct your witness how to answer my

22 questions.  Okay?  That's a speaking objection.  It's

23 not permitted.  You can state the basis of your

24 objection, and you can either instruct her to answer or

25 not.

37

1            MS. BRANCH:  I think I've done that now.

2            MR. HILTON:  Debbie, can you please read

3 back my question?

4               (The requested material was read as

5 follows:

6               "QUESTION:  I'm going to ask you one more

7 time:  Who collected the documents for DCCC?")

8    A.  We would have requested documents from a group

9 of staff and our IT Director.

10    **Q**  **(BY MR. HILTON)  What's the name of your IT**

11 **Director?**

12            MS. BRANCH:  Objection.

13            MR. HILTON:  What is the basis of your

14 objection?

15            MS. BRANCH:  I think this is -- we're

16 getting into attorney-client privileged discussions in

17 terms of preparing for the -- for this.

18    **Q**  **(BY MR. HILTON)  Ms. Newman, my question is:**

19 **What is the name of DCCC's IT Director?**

20    A.  David Winston.

21            MR. HILTON:  I just want to, again, make

22 clear on the record that I think this document

23 production is insufficient.  We're going to reserve all

24 rights to pursue whatever remedies we think we need to.

25            I'm asking questions that clearly are not

38

1  calling for any privileged information, and you're

2  instructing the witness not to answer.  That's improper.

3  I believe I'm entitled to the answers to these questions

4  to understand whether this document collection effort

5  was sufficient.  Clearly it was not.

6      **Q   (BY MR. HILTON)  Ms. Newman, I apologize.**

7  **I've gotten a little heated during this part of the**

8  **questioning.  I want you to understand I have no quarrel**

9  **with you whatsoever.  I'm just trying to get the**

10  **information that I need to represent my clients.  And so**

11  **I'm trying --**

12          MS. BRANCH:  And I'm happy -- sorry.  I

13  didn't mean to cut you off.

14          MR. HILTON:  Go ahead.

15          MS. BRANCH:  Well, I'm happy to have, you

16  know, a further conversation about the document

17  production.  I do think that several of the requests

18  infringe upon the First Amendment privilege.  We've

19  produced documents responsive to the requests to the

20  extent they're not privileged.  And the client has

21  stated that they undertook efforts to respond to the

22  subpoena.

23          If you want to meet and confer, have a

24  separate conversation about that, we can off the record.

25  It's probably not as fruitful to do with Ms. Newman,

1  given that she doesn't have vision over the entire

2  process.  And I do think that some of the questions,

3  when you're talking about search terms, do infringe upon

4  communications that we've had with our client.

5            MR. HILTON:  Sorry.  Well, if you can

6  find a case that says the search terms are going to be

7  privileged in this context, I'd love to see it.

8            And I think Ms. Newman testified that she

9  could answer all these questions if you had properly

10 prepared her; and clearly, you didn't.  So, anyway...

11      Q.   (BY MR. HILTON)  And, again, Ms. Newman,

12 that's no point against you.  I just think your

13 counsel's not done what they should have done with

14 respect to the document production, but we'll move on.

15           MS. BRANCH:  I think that she's prepared

16 for this deposition.  She's prepared on the topics; and,

17 you know, we've produced her here to answer the

18 questions on the topics.  And we produced documents

19 responsive to the extent that they were not privileged.

20      Q    (BY MR. HILTON)  Did you review any other

21 documents other than the ones that we've already

22 discussed today in preparation for your deposition,

23 Ms. Newman?

24      A.   I don't believe so.

25      Q.   Okay.  You mentioned that you met with counsel

40

1  to prepare for this deposition, correct?

2       A.   Yes.

3       Q.   When?

4            MS. BRANCH:   Just -- I'm going to just

5  assert the objection.

6            This particular question is not

7  privileged; but I just want to be clear, Jacqui, that

8  you don't have to disclose anything that we discussed.

9  But you may answer the question.

10           MR. HILTON:   Ms. Branch, again, please

11 refrain from speaking objections.  You just spoke

12 without an objection, and that's improper.

13      Q.   (BY MR. HILTON)  Ms. Newman, when did you meet

14 with your attorneys?

15           MS. BRANCH:   The objection, just for the

16 record, is attorney-client privilege.

17           But you may answer to the extent that

18 you're not disclosing our communications.

19      A.   I met with counsel regarding this deposition

20 yesterday and last week.

21      Q.   (BY MR. HILTON)  So on two occasions?

22      A.   Yes.

23      Q.   How long were those meetings, again, without

24 disclosing the content?

25      A.   I think roughly about an hour each.

41

1    Q.    Who was in attendance at those meetings?

2    A.    My counsel, Aria and Rachel.

3    Q.    And yourself.  Anyone else?

4    A.    Yeah, myself.  We met with another member of

5    my team, too, Alex Edelman.

6    Q.    That's the same person who signed that

7    Declaration that's Exhibit 3?

8    A.    Yes.

9    Q.    Okay.

10             MR. HILTON:  All right.  I'd like to take

11   a short break if that's all right.  I will need about

12   five minutes; but if y'all want to take a longer break,

13   that's fine.

14             THE WITNESS:  Can we have ten minutes?

15             MR. HILTON:  Sure.

16             THE WITNESS:  Thank you.

17             THE REPORTER:  Going off the record at

18   11:02 a.m.

19             (Off the record from 11:02 to 11:14 a.m.)

20             THE REPORTER:  We're back on the record

21   at 11:14 a.m.

22             MR. HILTON:  And as we've done in the

23   other depositions, I'm fine waiving the additional read-

24   on every time we go back on, as long as y'all are fine

25   with that.

42

1          MS. BRANCH:  I'm good.  Thank you.

2     Q.   (BY MR. HILTON)  Ms. Newman, I, again, just

3  wanted to, you know, apologize that you had to get

4  dragged into that discussion between counsel and I.  I

5  hate to do that kind of stuff in depositions; sometimes

6  it happens.  But just, you know, I'm going to try and

7  move on and get through the substance of what I have to

8  ask you about kind of as painlessly as possible as I

9  can.

10          You know, I just want to, again, make

11  clear that I'm not asking for you to reveal any

12  privileged information with any of my questions.  Of

13  course, your counsel will instruct you or object, you

14  know, as necessary.  But I just want to make that clear.

15  I'm not intending to ask for privileged information.

16          So I want to turn back to the DCCC and

17  just talking about the organization's background and

18  activities and that kind of thing.  And I can't remember

19  if I asked you this or not before:  When was the DCCC

20  first established?

21     A.   It was established over 150 years ago.  I

22  think it's 1866.

23     Q.   Wow.  And has its mission changed over time?

24     A.   I don't believe so.

25     Q.   But electing Democrats is the name of the game

43

 1  since 1866?

 2        A.    I think that's about right.

 3        Q.    We talked a little bit earlier about the

 4  relationship between DCCC and the DNC, and I kind of

 5  want to explore similar issues in relation to an exhibit

 6  that I just sent out in the Zoom chat.  This is

 7  something I found on the FEC's website.  That's the

 8  Federal Election Commission.  Are you familiar with the

 9  FEC?

10        A.    Yes, I am.

11        Q.    I would imagine that you would be.

12              (Exhibit 6 discussed.)

13        Q.    (BY MR. HILTON)  Do you have Exhibit 6 in

14  front of you?

15        A.    Yes, I do.

16        Q.    And do you recognize Exhibit 6?

17        A.    Yes, I do.

18        Q.    And what is it?

19        A.    This is a Statement of Organization filed with

20  the FEC.

21        Q.    And I guess before we dig into it, I'm

22  curious:  Are you responsible for, you know, making sure

23  that the FEC filings get done?

24        A.    I am not responsible for those.

25        Q.    Who has that responsibility?

44

```
 1        A.   Our Chief Financial Officer.

 2        Q.   And who is that?

 3        A.   Jackie Forte-Mackay.

 4        Q.   Yeah, her name pops up on some of this stuff,

 5   I think.  She's on this one.

 6             Are you familiar with FEC filings for the

 7   DCCC?

 8        A.   Yes, I am.

 9        Q.   Do you review them before they get filed?

10        A.   I do not.

11        Q.   How are you familiar with them, then?

12        A.   I have an awareness -- a top-line awareness of

13   our filings before they are filed; and if there's any

14   questions or concerns, sometimes I am a part of those

15   conversations.

16        Q.   So just in the course of your job, you have

17   occasion to refer to them and work with them?

18        A.   Yes.

19        Q.   Did you review any FEC filings before the

20   deposition today?

21        A.   I reviewed some of our FEC filings that show

22   our work in Texas.

23        Q.   Which filings?

24        A.   I believe Aria shared these with you; but,

25   basically, the money that we sent to the Texas
```

DCCC - 4/28/2020

45

1  Democratic Party.

2       Q.   Well, let's skip ahead so I don't lose the

3  thread of this.  I'm going to send out what I'm marking

4  as Exhibit 8 to the deposition.  This is an Excel

5  spreadsheet.

6                 (Exhibit 8 discussed.)

7       Q    (BY MR. HILTON)  And this was, you know, my

8  attempt to export the data from the FEC link that your

9  counsel provided.  So let me know once you have the

10  spreadsheet open.

11       A.   Okay.  I have this open.

12       Q.   I hesitate to ask:  Do you recognize what you

13  are looking at here in Exhibit 8?

14       A.   Yes, I do.

15       Q.   Okay.  And what is this?

16       A.   This appears to be a document showing

17  transfers from the Democratic -- or from the DCCC to the

18  Texas Democratic Party, dating back to 2014.

19       Q.   Is this the FEC filings that you were

20  referring to when you said you reviewed some FEC

21  information prior to the deposition?

22       A.   Yes, this looks like it.

23       Q.   There's another version on the web page that

24  looks a little better.  I prefer to use this version if

25  you can manage to work with it because this is the

1  version that you get when you export the data from the

2  FEC; but if it just becomes unworkable, we have that as

3  an option.  And I can try to do a little screen share.

4  But, again, this is the data from the link that your

5  counsel provided to me last night; and is that what it

6  appears to be to you as well?

7      A.   Yes.

8      Q.   Okay.  I think you already said that, but I

9  just wanted to make that clear.

10          Since we're here, I might as well ask you

11  the questions I have on this document.  What information

12  can I glean about what the purpose of these funds was

13  from Exhibit 8?

14          MS. BRANCH:  Objection, vague.

15          You may answer the question.

16      A.   You can learn how much money we transferred to

17  the Texas Democratic Party and on what dates.

18      Q.   (BY MR. HILTON)  Can I learn what the funds

19  were for?

20      A.   No.

21      Q.   I can't learn which activities they supported?

22          MS. BRANCH:  Objection.

23      A.   No.

24      Q   (BY MR. HILTON)  Is there another document

25  that I could refer to that would allow me to determine

47

1   what these fund transfers were used for?

2       A.   No.

3       Q.   So no document exists that would allow me to

4   determine what any of these fund transfers were used for

5   in the possession of DCCC?

6       A.   I mean, our internal budgets and plans may

7   share information -- or have information related to

8   these transfers.

9       Q.   And were those documents produced?

10           MS. BRANCH:  Objection.  This is

11  attorney-client privilege, and you're asking questions

12  that call for information protected by the First

13  Amendment privilege.

14      Q.   (BY MR. HILTON)  I'm not intending to call for

15  privileged information.  I just want to understand if

16  the documents that you were just referring to,

17  Ms. Newman, were included in the production which I've

18  marked as Exhibit 4 to this deposition, Bates Number

19  DCCC 1 through 805.

20           MS. BRANCH:  And I think those documents

21  were privileged.  So whatever she's referring to, that

22  would be the reason why they were not produced.

23           MR. HILTON:  Ms. Branch, I'm sorry.  I'd

24  like to hear the answer from the witness.

25      Q.   (BY MR. HILTON)  Ms. Newman, were those

48

1   documents that you were just referring to included in

2   Bates Number DCCC 1 through 805?

3        A.   I'm not sure.

4        Q.   Well, you have those documents in front of

5   you.  If you want to look through that and see if

6   they're in there, you can do that.

7        A.   Oh, sorry.  They are not in Exhibit 4.

8        Q.   Okay.  So those documents that would show me

9   what activities these funds were spent on, those have

10   not been produced?

11       A.   That's my understanding.

12       Q.   Okay.  And, again, I want you to be sure.  You

13   have all the documents that were produced in front of

14   you.  So I would kind of like a definitive answer to

15   that.

16            MS. BRANCH:  Objection, asked and

17   answered.

18       A.   I don't believe that they are included in that

19   document.  They are strategic information and documents

20   related to our work.

21       Q   (BY MR. HILTON)  Okay.  So they were not

22   produced?

23       A.   Right.

24       Q.   All right.  I think we are done with

25   Exhibit 8.

49

1          Can we turn back to Exhibit 6, which is

2  where I think this digression started?  Do you still

3  have that in front of you, Ms. Newman?

4       A.   Yes, I do.

5       Q.   Had you seen Exhibit -- when was the last time

6  you've seen Exhibit 6, or have you seen Exhibit 6

7  before?

8       A.   Yes.  It's probably been several months since

9  I've seen this.

10       Q.   Okay.  So you didn't review it to prepare for

11  the deposition?

12       A.   I did not.

13       Q.   And it has a list of what I'll refer to as

14  affiliated committees/organizations.  And each of those

15  appear to have an affiliated relationship code that

16  describes them as a joint fundraising representative.

17  Do I have that about right?

18       A.   Yes.

19       Q.   And so can you explain to me what an

20  affiliated relationship code is and what a joint

21  fundraising representative is?

22       A.   Again, I don't file these reports.  So I'm not

23  deeply familiar, but I believe an affiliated

24  relationship code is an FEC term to qualify the

25  relationship here.  And a joint -- and these are all

50

1  committees that we have joint fundraising committees

2  with.

3      Q.   Is that what joint fundraising representative

4  means?  It means you do joint fundraising activities?

5      A.   Yes.

6      Q.   Which of these listed groups relates to

7  activities in Texas?

8      A.   The Blue Texas Fund is related to Texas.  It

9  is possible the New Wave Women's Fund -- I believe that

10 also has a Texas connection.

11     Q.   Any others?

12     A.   I believe that's it.  There's also a chance

13 the Red to Blue Victory Fund may have a connection to

14 Texas, but I'm not aware of that at this time.

15     Q.   Okay.  So sitting here today, you don't know

16 for sure whether Red to Blue Victory Fund has a Texas

17 connection?

18     A.   Correct.

19     Q.   But Blue Texas Fund, I assume, does.  And New

20 Wave Women, you also think has a Texas connection.  Do I

21 have that about right?

22     A.   Yes.

23     Q.   Okay.  Let's start with Blue Texas Fund.  What

24 is it?

25     A.   This is a joint fundraising agreement with

DCCC - 4/28/2020

51

```
 1  campaigns in Texas.
 2       Q.   Any campaigns in particular?
 3       A.   I believe the Fletcher campaign in Texas 7 and
 4  the Allred campaign in Texas 32.
 5       Q.   Any others?
 6       A.   I would need to confirm.
 7       Q.   Do you know if that information is reflected
 8  in any of the documents that were produced to us?
 9       A.   Yes, I believe it is.
10       Q.   All right.  I think -- I think that we will
11  get there later.  So I think we can leave that for now.
12            But what activities does the Blue Texas
13  Fund engage in specifically?
14       A.   Fundraising.
15       Q.   And how is that conducted?
16       A.   I'm sorry.  Could you repeat the question?
17       Q.   You said Blue Texas Fund, the only activity
18  you said was fundraising; is that right?
19       A.   Yes.
20       Q.   Okay.  No other purpose for Blue Texas Fund?
21  Nothing else that it does?
22       A.   Correct.
23       Q.   And so how does Blue Texas Fund go about its
24  fundraising activities?
25                 MS. BRANCH:  And I'm just going to object
```

1    to the extent that this calls for a legal conclusion

2    based on how joint fundraising works.

3              But you may answer to the extent that you

4    know.

5        A.   It's mostly a direct mail fundraising

6    campaign.

7        Q.   (BY MR. HILTON)  So sending mail solicitations

8    to people for donations?

9        A.   Yes.

10       Q.   And you said "mostly."  Are you aware of any

11   other fundraising activities that the Blue Texas Fund

12   engages in?

13       A.   No.  I believe it's direct mail.

14       Q.   And what's DCCC's involvement in those

15   activities?

16       A.   We help facilitate the direct mail, the copy,

17   getting it out.

18       Q.   I don't think I understand what you mean by

19   facilitate and help getting it out.  Can you describe

20   that a little more specifically?

21       A.   Sure.

22              MS. BRANCH:  I'm going to object to the

23   extent that is calls for information privileged by the

24   First Amendment.

25              You may answer at a high level.

DCCC - 4/28/2020

53

```
 1                 THE WITNESS:  Sure.

 2        A.    We -- we work with, you know, whoever else is

 3   in the fund and work on the creative printing and direct

 4   mailing of the mail solicitations.

 5        Q.    (BY MR. HILTON)  And when you say "work on,"

 6   do you mean -- does that just mean you're providing

 7   funds; or do you also provide actual, you know,

 8   manpower, labor?

 9        A.    Actual manpower.

10        Q.    I'm sorry.  Go ahead.

11        A.    Oh, no.

12        Q.    And you said you worked with whoever else is

13   in the fund.  Is that the two campaigns you referred to

14   earlier?

15        A.    Yes.

16        Q.    And then whoever else you can't recall, but

17   it's in the documents?

18        A.    Yes.

19        Q.    And the direct mail Blue Texas Fund engages

20   in, is that purely a solicitation for donations; or is

21   there anything else that these, you know, mailers are

22   trying to accomplish?

23        A.    It's just for fundraising.

24        Q.    Okay.  Does Blue Texas Fund engage in any

25   voter registration efforts?
```

DCCC - 4/28/2020

54

```
 1        A.   No.

 2        Q.   And how about New Wave Women, what is -- you

 3   know, what is that?

 4        A.   It's very similar to the Blue Texas Fund

 5   except it is a joint fundraising agreement highlighting

 6   our frontline women candidates.

 7        Q.   And who is that fundraising agreement with?

 8   Is it also with campaigns in Texas?

 9        A.   Again, I would need to check on who that

10   agreement is with.  I believe it's broader than Texas.

11        Q.   Understood.  You did say that earlier.  You're

12   right.

13             Do you know who the participants from

14   Texas in the New Wave Women group are?

15        A.   Again, I would need to check.

16        Q.   Is that in the document that was produced?

17        A.   If it is related to Texas, I think it would be

18   in the production.

19        Q.   I'm going to pull up a document that I had

20   prepared to talk about with you, and I want to see if

21   this is going to show me the information that we're kind

22   of circling around here.  So I'm going to send it out

23   again through the group chat.  This is a portion of

24   Exhibit 4, which is the document production that was

25   given to us.  This is a file labeled DCCC 661.  That's
```

55

1   the beginning Bates number.  It's a two-page document.

2   Let me know when you have that in front of you.

3        A.   Okay.  I have it open.

4        Q.   What is this document?

5        A.   This is a release of our House Majority

6   Battlefield and the first twelve candidates named to the

7   DCCC's Red to Blue program.

8        Q.   Does this document show the participants in

9   the Blue Texas Fund or New Wave Women?

10       A.   No, it does not.

11       Q.   Okay.  Well, maybe let's do this, because I

12  would like to know who in Texas is involved with those

13  funds.  I'd like to understand the relationships that

14  DCCC has with affiliates who work in Texas.  And so

15  maybe the next time that we take a break would be an

16  appropriate time for you to look through Exhibit 4 and

17  find those documents that you're referring to.

18       A.   Okay.

19            MS. BRANCH:  Yes, I think we did produce

20  information on the Blue Texas Fund.  So we can pull up

21  those documents after the break for sure.

22            MR. HILTON:  Yeah.  Let's -- if that's

23  all right with y'all, let's just do that on the next

24  break.  I'm going to make a note real quick to come back

25  to that.

1    Q.   (BY MR. HILTON)  And, Ms. Newman, if you

2    happen to, you know, as we're going through other

3    stuff -- if you happen to come across these documents as

4    we're going through stuff, you know, holler at me; and

5    we can take care of it right then so we don't have to

6    come back to it.

7    A.   Will do.

8    Q.   I think that's all I have for Exhibit 6.

9         I'm going to move now to Exhibit 7.

10        (Exhibit 7 discussed.)

11    Q   (BY MR. HILTON)  I've just sent it out via

12    Zoom chat.  I gave this a file name that I thought it

13    was, but I actually really don't know what I'm looking

14    at here.  So please let me know once you have this in

15    front of you.  And once you do, if you know, if you

16    could, tell me what is that we're looking at here.

17    A.   Sure.  This appears to be the summary page for

18    an amended year-end report from the DCCC.

19    Q.   And are you familiar with these year-end

20    reports?

21    A.   Yes.

22    Q.   Did you review any year-end reports in

23    preparation for your deposition?

24    A.   I did not.

25    Q.   What is your familiarity with these reports?

57

1  Is it similar to the first one we looked at where it

2  just comes up in the course of your work?

3       A.   Yes, it is.

4       Q.   And I don't mean to speak for you, but any

5  other differences compared to what we looked at before?

6  Anything else I should know about your familiarity with

7  this report?

8       A.   No.  I mean, we talked about it from a high

9  level; but I do not review the reports.

10       Q.   Got it.  And you said this is just a summary

11  page.  Do you know what other information is included

12  with these forms, these reports?

13       A.   Yes.  So this is the summary, the overview of

14  mostly cash on hand, total money in, and total money

15  out.  And then on the FEC website itself, you would be

16  able to click through these filings and see all of the

17  receipts and disbursements itemized.  And at least with

18  the disbursements, that also shows, like, the vendor and

19  a purpose.

20       Q.   So on page 1 of Exhibit 7, there are some

21  links there.  It says, "Summary Page, Detailed Summary

22  Page."  And then describes Schedule A, B, and D filings.

23  Are those the attachments to the schedules that you're

24  referring to?

25       A.   Yes.

58

1      Q.   And I did not include those in Exhibit 7.

2  That's not my normal practice; but when I tried to

3  download them all, it was something like almost 50,000

4  pages.  So I don't intend to go through 50,000 pages

5  with you today; but, you know, what I'm -- I'm hoping

6  maybe you can tell me if I were to look at the itemized

7  disbursements in Schedule B, you mentioned that it

8  included the description of the purpose for the

9  disbursement.  Did I hear you correctly?

10     A.   Yes.

11     Q.   And what -- can you give me an example of what

12  that might look like?

13     A.   Yes.  So for all the disbursements, it usually

14  shows who the expense is disbursed to, what the vendor

15  name is, the date of the disbursement; and then there is

16  an amount related to that expense, as well as a

17  description for the expense itself.

18     Q.   Well, what kind of information will be

19  contained in the description field or maybe --

20          MS. BRANCH:  I'm going to object on the

21  basis that this is all public, and the documents speak

22  for themselves.

23          You may answer to the extent that you can

24  describe this.

25     A.   Sure.  I mean, it depends on the expense; but

DCCC - 4/28/2020

59

1  it's usually a general descriptor.  So if it's office

2  space, it might say "rent."  If it's, you know,

3  staples.com, it would say "office supplies."

4      Q.  (BY MR. HILTON)  But -- okay.  That's helpful.

5  That's what I assumed that it was going to be, kind of a

6  high level of detail; and that's what it sounds like

7  you're describing.  It sounds like if I look at those

8  Schedule B filings, it will not tell me, you know,

9  "Funds spent in Bexar County related to voter

10  registration efforts in Precinct 3"?  It won't be that

11  level of detail; is that right?

12          MS. BRANCH:  Objection, public

13  information.  The document speaks for itself.

14          You may answer.

15      A.  Yes, I would agree with that.

16      Q   (BY MR. HILTON)  Okay.  I'd like to focus

17  on -- turn back to Exhibit 7.  I'd like to focus on

18  page 2 in the disbursements section.

19      A.  Yes.

20      Q.  What I was hoping you could do for me is

21  explain to me what each of these types of disbursements

22  are.  It sounds like, you know, dealing with these

23  filings and putting them together is not your primary

24  job duty.  So, you know, to the extent that you can, if

25  you have an understanding of any of these categories,

DCCC - 4/28/2020

60

1  I'd like to know what your understanding is.

2         MS. BRANCH:  And I'm just going to object

3  to the extent that this calls for a legal conclusion

4  since some of these are legal terms.

5         Jacqui, you may answer.

6         MR. HILTON:  And, again, I think it's

7  going to go smoother if you could just limit the

8  speaking objections.  I'd appreciate it.

9     A.   Yeah, I'm happy to share my non-expert opinion

10  on these.  So each line item the FEC calls for relates

11  to a slightly different kind of expenditure.  Line 21 is

12  our operating expenditures; 22 are transfers to

13  affiliated or other party committees.  So, actually,

14  what you see in Column A, the 45,360 number, that is

15  money that we transferred to Texas at the end of the

16  year, to the Texas Democratic Party.  And any money we

17  transfer to party committees would show up on that line

18  item.  Twenty-three is contributions to federal

19  candidates or other party -- or other political --

20     Q.   (BY MR. HILTON)  I'm sorry.  I had a question

21  for you on 22 there.

22     A.   Sure.

23     Q.   I'm looking at Column A.  It's 45,360.  You

24  said that represented funds transferred to the Texas

25  Democratic Party?

1    A.    Yes.

2        Q.    And how do you know that?

3    A.    Well, it's -- usually, we don't transfer a lot

4    of money in the off year.  And so I'm aware that we had

5    transferred money to Texas in December, and I also came

6    across that again in preparation for that -- for this

7    deposition.

8        Q.    Okay.  And so there are two columns here.  One

9    of them says, "Column A, This Period."  And that's where

10   the 45,360 appears.  There's also Column B that says,

11   "Calendar Year."  And that number's quite a bit higher,

12   885,821.16.  Do you see that?

13   A.    Yes.

14       Q.    What's the difference between those two

15   numbers?

16   A.    Column B refers to amounts that were filed in

17   previous reports.  So it's the total amount that we

18   transferred that calendar -- in 2019.  And we had

19   transferred the 45,360, I believe, in December, which

20   was the report filing in question for this time.

21       Q.    Oh, okay.  So this is -- what I've given you,

22   I think, is the second amended year-end report.  I

23   guess -- tell me if I have this correctly -- Column B

24   would be the total of transfers to affiliated or other

25   party committees that appear on all of the year-end

62

1 reports then?

2     A.   Yes.  It's the total we transferred to other

3 party committees in the year 2019.

4     Q.   Okay.  Okay.  And you just happen to know that

5 this 45,360 was the Texas Democratic Party because of

6 the timing, and you just happen to know?

7          MS. BRANCH:  Objection.  This is all

8 public.

9     A.   Yes.  And in Exhibit 8 that you shared

10 earlier, you can see that transfer as well.

11     Q.   (BY MR. HILTON)  Okay.  Great.  That's

12 helpful.

13          But I wouldn't be able to tell that from

14 the face of Exhibit 7?

15     A.   No.

16          MS. BRANCH:  Objection.  Vague.

17     Q    (BY MR. HILTON)  Let's go down to -- all

18 right.  Well, let's -- sorry to interrupt you again

19 there; but that was helpful to help me understand the

20 difference between Column A and Column B here.

21          Can you -- I guess we were on Line 23

22 then; and maybe you could pick back up with, you know,

23 explaining to me what these -- your categories of

24 disbursement are.

25     A.   So Line 23 is contributions to federal

63

1  candidates or other political committees.

2          Twenty-four would show any disbursements

3  we made that are considered to be independent

4  expenditures.

5      **Q.  And what does that mean?**

6      A.   An independent expenditure is an expenditure

7  that's made kind of without any coordination.  So those

8  are expenses that would not be working directly with a

9  campaign or another party.

10     **Q.  Could it be an expenditure related to a**

11  **campaign?**

12     A.   Yes.

13          MS. BRANCH:  Objection to the extent

14  these questions call for legal conclusions.

15          But, Jacqui, you may answer based on your

16  knowledge.

17     **Q   (BY MR. HILTON)  So if you -- this is a**

18  **hypothetical example; I don't know whether it's**

19  **happened -- but if DCCC wanted to run ads in support of,**

20  **you know, Wendy Davis in her campaign and didn't**

21  **coordinate with that campaign prior to running the ads,**

22  **just kind of did it on its own, would that be an**

23  **independent expenditure?**

24          MS. BRANCH:  Objection to the extent that

25  this calls for a legal conclusion.

```
 1              But you may answer.

 2      A.   In a very simple view, yes.  It's a little bit

 3  more complicated than that because it requires us to

 4  meet certain standards to prove that we haven't

 5  coordinated with the campaign.  We're not using any

 6  campaign information.

 7      Q   (BY MR. HILTON)  Yeah, understood.  When

 8  lawyers are involved, it's never going to be that

 9  simple.  So I get that.  But that's helpful to help me

10  kind of understand what we're looking at.

11              All right.  So that was 24, independent

12  expenditures.  How about 25?

13      A.   This is coordinated expenditures made by a

14  party committee, so that's almost the opposite of an

15  independent expenditure.

16      Q.   Sure.

17      A.   Twenty-six is loan repayments made.

18  Twenty-seven is --

19      Q.   Is that 16 million on loan repayments made?

20      A.   Yes.

21      Q.   And what was that payment?

22              MS. BRANCH:  Objection to the extent that

23  this calls for information privileged by the First

24  Amendment.

25              But if you can answer that without
```

1  revealing strategic information, you may do so.

2       A.   As you can see in the publicly available

3  findings -- or filings, the DCCC took a line of credit

4  for $16 million.

5       Q.   **From who?**

6       A.   Bank of America.

7       Q.   **And what were those funds used for?**

8            MS. BRANCH:  Objection, same one.

9            You can answer at a high level.

10      A.   Our expenditures.

11      Q    **(BY MR. HILTON)   Which expenditures?**

12      A.   Just generally.

13      Q.   **Can you give me an example?**

14      A.   Well, this loan was taken in the 2018 cycle,

15  so it was for expenditures that occurred in 2018.

16      Q.   **So, like what?**

17           MS. BRANCH:  Objection to the extent that

18  this calls for strategic information.  I don't know the

19  relevance.  Is there a specific relation to this case on

20  this question?

21           MR. HILTON:  I would like to know an

22  example of what this money was spent on in the 2018

23  campaign.

24           MS. BRANCH:  Okay.  I think the fact that

25  they took out a loan is public, but I instruct the

66

1  witness not to answer specific information about what

2  the loan was used for.

3                  MR. HILTON:  On what basis?

4                  MS. BRANCH:  The First Amendment.

5                  MR. HILTON:  I'm not asking for any

6  strategic information.

7                  MS. BRANCH:  I think you can answer at a

8  high level, Jacqui.

9                  I think she's already done that, but...

10      **Q    (BY MR. HILTON)  I just want to know an**

11  **example of an expenditure that came from the $16 million**

12  **during the 2018 campaign.**

13      A.   Yeah, we -- I definitely can't point to, like,

14  "This expense was paid for by this loan."  It's kind of

15  all of our activities and expenditures grouped together.

16      **Q.   I don't understand.**

17                  MS. BRANCH:  Is there a question?

18      **Q.   (BY MR. HILTON)  Can you please elaborate on**

19  **your answer because I don't understand?**

20      A.   I would just say the loan generally applied to

21  our activities in the 2018 cycle.

22      **Q.   So --**

23      A.   There's not a specific expense.

24      **Q.   So it was a 16-million-dollar line of credit,**

25  **you said?**

67

1        A.   Yes.

2        Q.   And my understanding of how lines of credit

3   work -- maybe this one is different -- is that you have

4   to make the decision to draw down on that line of

5   credit, correct?

6        A.   Yes.

7        Q.   It's not like Bank of America just handed you

8   a check for $16 million; and it got thrown into a common

9   account, correct?

10       A.   Correct.

11       Q.   Okay.  So can you give me an example of when

12  the DCCC -- let's do it this way:  How about an example

13  from an expenditure that was made in Texas from this

14  line of credit?

15            MS. BRANCH:  Again, same objection on the

16  First Amendment.

17            But, Jacqui, you can talk about the 2018

18  spending in Texas at a high level.

19       A.   Sure.  Well, we, the DCCC, invested over

20  $6.7 million in Texas in the 2018 cycle.  Again, I can't

21  point to any expense that this loan went directly to

22  fund other than to say it allowed us to complete all of

23  our activities in 2018.

24       Q.   (BY MR. HILTON)  Who would know how this line

25  of credit was used?

68

```
 1                    MS. BRANCH:  Objection, First Amendment.

 2                    Do not answer is my instruction.

 3           Q.   (BY MR. HILTON)  Are you going to abide by

 4      that instruction?

 5           A.   Yes, I am.

 6           Q.   You mentioned DCCC has a CFO?

 7           A.   Yes.

 8           Q.   What's that person's name?

 9                    MS. BRANCH:  Objection, First Amendment.

10      This is -- some of this is public information, but I'm

11      just not sure what the purpose of this line of

12      questioning is.

13                    MR. HILTON:  Ms. Branch, please limit

14      your speaking objections.

15           Q.   (BY MR. HILTON)  I would like to know the name

16      of the CFO of the DCCC.

17           A.   Jackie Forte-Mackay.

18           Q.   Would she know how this expenditure was used,

19      how this line of credit was used?

20                    MS. BRANCH:  Objection, First Amendment.

21      Vague.  I'm going to instruct the witness not to answer.

22      Again, the strategic decisionmaking of the DCCC and use

23      of that loan is protected by the First Amendment; and

24      the witness is not going to answer further questions on

25      that.
```

1            So we can keep objecting and you can take

2    offense to my speaking objections, but I'm going to put

3    that on the record and I want that to be clear.  I also

4    want to make clear on the record that your tone earlier

5    with respect to my objection and then cutting me off has

6    been hostile.  So I want that to be reflected.

7            But, again, I'm going to continue to make

8    that objection; and we can kind of do that all day.  I

9    don't think it's directly relevant to the DCCC's

10   standing, but we can proceed.

11           MR. HILTON:  Well, I disagree with your

12   characterization of my tone; and I disagree that this

13   information is privileged.

14       Q.   (BY MR. HILTON)  Ms. Newman, are you going to

15   **follow your counsel's instructions not to answer?**

16       A.   I am.

17       Q.   **Okay.**

18           MR. HILTON:  And, Ms. Branch, again, I'm

19   not offended by your speaking objections; but they're

20   not permissible under the rules.  And so I'd just ask

21   you to limit them.

22           MS. BRANCH:  I'm trying to limit them as

23   much as possible, and I understand.  I don't want to

24   testify.  Jacqui's here to testify.

25           MR. HILTON:  Thank you.

1      Q    (BY MR. HILTON)  How much money did you say

2 was spent in Texas in the 2018 election cycle?

3      A.   Over 6.7 million.

4      Q.   Is that reflected on Exhibit 7?

5      A.   No.  No, because Exhibit 7 is showing our 2019

6 year-end report.

7      Q.   If we were to look at the same form for 2018,

8 the year-end, you know, report, would that show the

9 expenditures in Texas?

10              MS. BRANCH:  Objection.  Public.

11              But you can answer to the extent that you

12 know.  It's all published information.

13      A.   It would show all of the money that we

14 transferred to State Party committees and other

15 expenditures made at a general level.

16      Q.   (BY MR. HILTON)  Would I have to look at the

17 Schedule B to that 2018 year-end report to find the

18 disbursements related to Texas?

19      A.   Yes, and you would have to look at all of the

20 reports, probably.

21      Q.   Okay.  Did you look at any of those reports in

22 preparation for your deposition?

23      A.   I did not.

24      Q.   And I'm so sorry.  This is like the fourth

25 time I've asked you:  What was that number, again, that

 1   was spent in the 2018 election cycle in Texas?

 2                  MS. BRANCH:  Objection, asked and

 3   answered.

 4                  You may answer.

 5       A.   It was over 6.7 million.

 6       Q.   (BY MR. HILTON)  And what was that money used

 7   for?

 8       A.   It was used for persuasion and mobilization of

 9   voters in support of our campaigns in Texas.

10       Q.   Voter persuasion and mobilization of

11   campaigns?

12                  MS. BRANCH:  Objection, mischaracterizes

13   the testimony.

14                  You may answer.

15       Q.   (BY MR. HILTON)  Voter persuasion and

16   mobilization of voters?

17       A.   Yes.

18       Q.   Is that what you said?

19       A.   Yes.

20       Q.   Is that what you said?  I just didn't hear it.

21       A.   Yes.

22       Q.   Anything else that it was used for?

23       A.   I think that encompasses a lot of activities,

24   but...

25       Q.   Are there any other types of activities that

1  that doesn't encompass?

2       MS. BRANCH:  Objection, vague.

3       You may answer.

4       A.   You know, again, I think everything is --

5  everything we do is to an end of mobilizing and

6  persuading voters.

7       Q    (BY MR. HILTON)  I'm going to ask you to pull

8  up Exhibit 1, which was sent out earlier.  It's the

9  Deposition Notice, and I'd like to turn to page 5 of the

10 Notice.

11      A.   Okay.

12      Q.   And I'm looking at Topic 4, section --

13 subsection (b).  And starting with the year 2014, what

14 were the total funds spent on voter persuasion efforts

15 in Texas during the year 2014?

16      A.   So I looked into our spending in the past

17 cycles and I can share with you what we've spent in

18 Texas, but this doesn't necessarily align with how we

19 track or know our spending.

20      Q.   How do you track your spending?

21      A.   It's more general than this because, again,

22 we're kind of thinking of everything in terms of

23 everything is a voter persuasion effort or GOTV effort.

24      Q.   So the entirety of the 6.8 million, or

25 whatever the number was that you spent in Texas in 2018,

73

1  for example, that was all spent on voter persuasion and

2  Get Out the Vote?

3       A.   Yes.

4       Q.   What about voter registration efforts, can you

5  break that out?

6       A.   For past cycles I cannot.

7       Q.   That relates to 2014 through 2019, I suppose?

8       A.   Through 2018.  I can speak to our voter

9  registration efforts this cycle.

10      Q.   Well, let's leave this cycle aside for a

11  second; and let's stick on the past ones then.  So what

12  were the total funds spent on all activities in Texas in

13  the year 2014?

14      A.   It was just over $3.1 million.

15      Q.   And that was all spent on voter persuasion and

16  Get-Out-the-Vote efforts?

17      A.   Yes.

18      Q.   And you can't tell me what portion was spent

19  on voter registration efforts?

20      A.   Correct.

21           MS. BRANCH:  Objection.  She's asked and

22  answered.  To the extent that these questions call for

23  strategic information, I'm going to object on the basis

24  of the First Amendment.

25           But you may answer at a high level.

1       Q.   (BY MR. HILTON)  Are there any activities

2   other than voter persuasion, Get Out the Vote, or voter

3   registration activities on which DCCC spent money in

4   2014?

5       A.   In Texas?

6       Q.   In Texas.

7       A.   Not to my knowledge.

8       Q.   How about the year 2015, what was the total

9   amount of funds spent on all activities in Texas?

10              MS. BRANCH:  Same objection.

11              But you may answer at a high level.

12              First Amendment.

13              MR. HILTON:  I'm sorry.  What's the

14   objection?

15              MS. BRANCH:  First Amendment.

16              You may answer at a high level.

17              I think the witness --

18       Q.   (BY MR. HILTON)  The question is the total

19   funds spent on all activities in Texas in the year 2015.

20       A.   So we -- and I apologize if I didn't mention

21   this earlier.  We look at all of our spending on a

22   cyclical basis.  So the years 2015 and 2016 would be

23   grouped together.  So I don't know exactly how much we

24   spent in 2015.  I would actually guess it's little to

25   nothing, just because it's the off year; and most of our

1  spending is in the on year.  But I can tell you in 2016

2  the DCCC spent just over $6 million in Texas.

3      **Q.  And you did mention the two-year cyclical**

4  **nature earlier, and now it's starting to make a little**

5  **more sense.  What kind of activities and expenditures do**

6  **occur in the off year?**

7              MS. BRANCH:  Objection to the extent it

8  calls for First Amendment privileged information.

9              You may answer at a high level.

10     A.   It's generally limited; but if coordinated

11 campaigns are beginning to get set up, there might be

12 Coordinated Campaign expenses we're transferring to the

13 Party.  Voter registration may begin in an off year.

14 That is usually it.  The bulk of our spending takes

15 place in the on year, usually, as we get closer in to

16 the election.

17     **Q.  (BY MR. HILTON)  Are you withholding**

18 **information in your answer based on your instruction**

19 **from counsel?**

20             MS. BRANCH:  Objection.

21             You may answer.

22             MR. HILTON:  What's the basis?

23             MS. BRANCH:  Attorney-client privilege.

24 I mean, she answered on the record.  You asked her

25 earlier.

1    Q.   (BY MR. HILTON)  Let me explain my question a

2  little more.  Your counsel instructed you -- objected on

3  the basis of a First Amendment privilege and stated that

4  you could answer to the extent it doesn't reveal

5  privileged information and that you could answer at a

6  high level.

7              MR. HILTON:  Is that a fair

8  characterization of your objection, Ms. Branch?

9              MS. BRANCH:  It is.

10    Q.   (BY MR. HILTON)  Okay.  You heard that

11  objection, Ms. Newman?

12    A.   I did.

13    Q.   And did your answer change on the basis of

14  that objection?

15    A.   It did not.

16    Q.   So you would have given me the same answer

17  regardless of whether your counsel objected?

18    A.   Yes.

19    Q.   Okay.  That's all I'm asking.  I just want to

20  know if there actually is something being withheld when

21  your counsel makes these objections, or not.  So that's

22  all I was trying to ask.  Thank you for clarifying that.

23              All right.  So let's go back to the

24  questions from the topics, and we're dealing with this

25  is in the two-year cycles; that's how y'all account for

1  it.  And so in the 2016 election cycle, you spent just

2  over 6 million on all activities in Texas.  Do I

3  remember that correctly?

4      A.   Yes, that's correct.

5      Q.   What was the total amount spent on voter

6  persuasion efforts in that election cycle?

7      A.   Similar to what I said before.  It is all kind

8  of part of the same bucket of voter persuasion/GOTV

9  efforts.

10     Q.   And how much was spent on voter registration

11 efforts?

12     A.   I can't speak to that.

13     Q.   Is that because you don't know?

14     A.   Yes.

15     Q.   And that's because DCCC doesn't track that

16 information?

17     A.   Yes, it has not been tracked like this in the

18 past.

19     Q.   Are there any other, you know, broad

20 categories or buckets of activities other than voter

21 persuasion, Get Out the Vote, and voter registration

22 efforts on which DCCC spent money in the 2016 election

23 cycle?

24     A.   Spent money in general or spent money in

25 Texas?

1          Q.    I'm sorry.  In Texas.

2          A.    No, it's just this.

3          Q.    Okay.  How about the 2018 election cycle?  So

4    I understand that to mean from the -- you know, the

5    presidential election in 2016 to the presidential

6    election in or -- I'm sorry -- for the federal election,

7    the congressional election in 2016, to the congressional

8    election in 2018.  That's how I'm thinking of the

9    two-year cycle.  Is that how y'all measure it as well?

10         A.    Yeah, more or less.  I mean, we kind of

11   started at January 1st.

12         Q.    Okay.  So it would be -- it's really the

13   calendar years 2017 and 2018?

14         A.    Yeah.

15         Q.    Okay.  So for that period, 2017 to 2018, or

16   the 2018 election cycle, what was the total amount spent

17   on all activities in Texas?

18         A.    It was over $6.7 million.

19         Q.    And how much of that was spent on voter

20   persuasion efforts?

21         A.    Again, it's -- that 6.7 covers all of our

22   voter persuasion and GOTV efforts in the 2018 cycle.

23         Q.    And how much of that just over 6.7 million, I

24   think you said, was spent on voter registration efforts?

25         A.    I don't know.

1      Q.   And that's because DCCC doesn't have that

2    information?

3      A.   Yeah.  And I'm not being deliberately vague

4    here.  It's most likely -- you know, we kind of see it

5    all as one bucket of money that is going towards this

6    cause; and we are, as mentioned before, transferring

7    money to the Texas Democratic Party for the Coordinated

8    Campaign where a lot of those voter registration efforts

9    are taking place.

10      Q.   And I'm not making a judgment as to whether

11   you should or should not have this information or how

12   you track it.  I understand, you know, how y'all view

13   it.  It seems like it's all one bucket of activity that

14   goes towards electing Democrats for the House, right?

15               MS. BRANCH:  Objection, mischaracterizes

16   the testimony.  I think you should let the witness

17   testify, so.

18      Q.   (BY MR. HILTON)  Is that a fair

19   characterization of your testimony?

20      A.   Yes, I think generally that's it.

21      Q.   Okay.  So I think we've finished 2018.

22             How about the current election cycle,

23   what's the total amount that's been spent so far in the

24   current election cycle?

25      A.   So, so far this cycle, we've spent -- and you

1  can see this in -- I think, it's Exhibit 8, our

2  transfers to the Texas Democratic Party.  We've

3  transferred over $145,000 to the Texas Democratic Party.

4  The DCCC has spent directly in Texas over $1.1 million,

5  and I believe over $550,000 of that is directly related

6  to voter registration in Texas.

7      Q.   **$550,000 of what has been spent so far is**

8  **related to voter registration?**

9      A.   Yes.

10     Q.   **And how do you know that?**

11     A.   Because we have been working with the Texas

12 Democratic Party on voter registration, and we have --

13 directly, the DCCC has engaged in voter registration on

14 the ground.  And I believe there -- I believe we have

15 produced documents showing that commitment, but...

16     Q.   **So I guess my question is:  In previous**

17 **election cycles, DCCC can't separate out exactly what**

18 **was spent on voter registration; but for the current**

19 **election cycle, you can.  And I'm trying to understand**

20 **why that's the case.**

21     A.   Sure.  Well, I mean, one, I think there is a

22 large voter registration effort in Texas right now in

23 particular; and so it's easy for us to identify that.

24 You know, as I mentioned earlier, we have a lot of

25 turnover each cycle; and so a lot of the people behind

1  spending decisions from past cycles aren't here to speak

2  to how we spent money in the past.  And, you know, I've

3  directly been involved with some of these transactions

4  and expenses, so I can speak to them.

5       Q.   And how are you able to get such a precise

6  number for this year's expenditures on voter

7  registration efforts?

8       A.   On the voter registration efforts?

9       Q.   Yes.

10      A.   Well, the 145K that we have transferred to the

11  Texas Democratic Party to date, that has all been to the

12  Coordinated Campaign to support voter registration and

13  then what we -- what I know we have spent on voter

14  registration.

15      Q.   Do you make any other transfers to any

16  other -- does DCCC make any other transfers to any other

17  groups for voter registration activities?

18      A.   To other state parties?

19      Q.   Any other groups in Texas.  I'm sorry.  And

20  I'm doing a poor job of clarifying that, so I appreciate

21  you noting that.  I'm trying to ask about activities in

22  Texas.

23      A.   To my knowledge, we have transferred the money

24  to the Texas Democratic Party's Coordinated Campaign for

25  voter registration and, again, we have engaged a vendor

82

1   ourselves to do voter registration efforts on the ground

2   in Texas.

3       Q.   I think that was mentioned in your colleague's

4   Declaration, the vendor, if I remember that correctly.

5   That's Exhibit 3.

6       A.   Yes.

7       Q.   And it looks like that's Paragraph 7 of the

8   Declaration in Exhibit 3?

9       A.   Yes.

10      Q.   Agreement for nearly $400,000 for a consultant

11  to provide voter registration services in Texas

12  Congressional District 23.  That's what you're referring

13  to?

14      A.   Yes.

15      Q.   And so what services is that consultant going

16  to provide?

17          MS. BRANCH:  Objection to the extent that

18  this calls for strategic party information.

19          You may answer at a high level.

20      A.   They help us go through our process of

21  training staff on the ground to try to learn how to

22  register people to vote in Texas.

23      Q.   (BY MR. HILTON)  And what does that training

24  look like?

25      A.   I am not very familiar on the details, but I

DCCC - 4/28/2020

83

1  know that all -- anyone who is registering voters in

2  Texas needs to be trained and deputized in order to do

3  so.

4      Q.   And who are the staff that you are training,

5  like staff of whom?

6      A.   So it depends, I think.  You know, we hired a

7  consultant who ran some of these efforts that's laid out

8  in Exhibit 3.  In that case the consultant has employees

9  who are helping this effort in Texas.

10         We have -- with the money that we have

11  sent to the Texas Democratic Party, I believe at least

12  two people have been hired with the express purpose of

13  assisting voter registration efforts.

14         And then we also have staff on the ground

15  who work directly for the DCCC whose roles involve a lot

16  of community engagement and help with voter

17  registration.

18     Q.   Do you know what -- so community engagement

19  and voter registration, are those two different things?

20     A.   I think so.  I think maybe community

21  engagement is an overarching bucket that could involve

22  voter registration.

23     Q.   What are the other types of buckets of

24  activities that your direct staff in Texas are engaging

25  in this cycle?

1      A.    They're organizing events.  They are meeting

2   with our constituents in the districts.  They are

3   following events of our challengers, as well, and

4   reporting back to the team on what's happening on the

5   ground in Texas.

6      Q.    Anything else?

7      A.    I think that's the bulk of it.

8      Q.    Do you know what percentage of their time is

9   devoted to voter registration efforts?

10     A.    I don't.

11     Q.    Does anyone at DCCC?

12     A.    I think our field team would.  I also think it

13  probably shifts throughout the cycle.  You know, early

14  on, when there is time to register voters, that is a

15  bigger focus.  I also think that we would be doing a lot

16  of voter registration right now if we were not in the

17  current situation we are in, speaking from our homes.

18     Q.    Yeah.  Yeah, I can only imagine how much that

19  has kind of thrown a wrench in everything.  And so,

20  yeah.

21           Well, let me ask you this:  Turning back

22  to Exhibit 3, Paragraph 6, the last sentence of that,

23  the second sentence of that paragraph, it says, "DCCC

24  uses voter registration not only to expand the pool of

25  individuals who are eligible to vote for Democratic

1    candidates but also to have important conversations with

2    people about the importance of voting and important

3    causes to the Democratic Party."  Did I read that

4    correctly?

5        A.   Yes.

6        Q.   Can you explain what is meant by this?

7        A.   Sure.  I think in the process of registering

8    people to vote, people who are not currently registered

9    or participating in the voting process, it allows you to

10   start a dialogue about why it's important for people to

11   register and to show up and make a plan about voting on

12   Election Day, which is what getting out the vote is all

13   about.

14       Q.   And how about important causes to the

15   Democratic Party?  How does that piece of it play into

16   these voter registration efforts?

17       A.   I think that usually the important causes tie

18   back to what somebody's motivation might be to vote.

19       Q.   How do all of these purposes get accomplished

20   when you're engaging in efforts to register voters?

21       A.   I'm sorry.  Could you clarify the question?

22       Q.   Well, it seems to me there's a few different

23   purposes to DCCC's voter registration efforts, as

24   explained in Paragraph 6 of Exhibit 3.  And as you're

25   explaining to me now, it's to expand the pool of

1  **individuals, to have important conversations with people**

2  **about the importance of voting, and conversations about**

3  **important causes to the Democratic Party.  I'm trying to**

4  **understand how all of those purposes are accomplished.**

5  **So how do the voter registration activities address all**

6  **of those purposes?  What do you do to achieve those**

7  **purposes in the context of your voter registration**

8  **efforts?**

9       A.   I think that this is all part of one

10  conversation that naturally flows together where, you

11  know, it might look something like, "Hey, are you

12  registered to vote?  Would you like to register to vote?

13  And do you know there's an election coming in November?

14  If you register to vote now, you can participate in that

15  or if there's a primary coming up, you can participate

16  in that" and why it might be important to a voter to

17  participate in that election and register at this time.

18  I really think of it as all one conversation, not

19  necessarily three different or a few different goals.

20       Q.   Okay.  So this is -- all of these things are

21  **part of every conversation with someone who you're**

22  **trying to engage with; is that what you're saying?**

23       A.   Yes.

24       Q.   Okay.  That is helpful.  Thank you for

25  clarifying that.

 1              Is there -- sorry.  I have a few

 2   follow-up questions on this, so I was trying to organize

 3   my thoughts.  How does DCCC track the success of these

 4   kinds of voter registration efforts?

 5              MS. BRANCH:  Object to the extent this

 6   calls for strategic information.

 7              But you may answer at a high level.

 8       A.   We certainly want to know how many voters

 9   we've registered.

10       Q    (BY MR. HILTON)  So number of voters who get

11   registered, how is that tracked?

12       A.   I am not familiar with the specifics, but

13   usually the people who are tasked with registering

14   voters report back the top-line numbers.

15       Q.   The top-line number being the total number of

16   people who are registered?

17       A.   Yes.

18       Q.   Is that tracked for the whole cycle or by

19   activity or by location?  What are some of the ways in

20   which that's broken down?

21       A.   Yeah --

22              MS. BRANCH:  Again, I'm going to assert

23   the same objection on First Amendment grounds.

24              You can answer at a high level.

25       A.   I think it depends based on who's in charge of

88

 1  the program, but it could be any of those things.  It

 2  could be just number of people or by the specific

 3  activity, like, "This is how many people got registered

 4  today at this event" or in a place.

 5       Q   (BY MR. HILTON)  Are there any other ways in

 6  which it's tracked?

 7       A.   Not that I can think of.

 8       Q.   Can DCCC apportion a cost to register each new

 9  voter?

10       A.   I guess it's possible.

11       Q.   Is that something that DCCC has already done?

12       A.   No.

13       Q.   That's not data that DCCC has?

14       A.   Correct.

15       Q.   And when you said it was possible, what did

16  you mean by that?

17       A.   I mean, I think you could come up with some

18  metric of how much money we are spending as it relates

19  to how many people we are able to register to vote.

20       Q.   But DCCC does not have any such metric

21  currently?

22            MS. BRANCH:  Objection, asked and

23  answered.

24       A.   No, not to my knowledge.

25       Q   (BY MR. HILTON)  Has DCCC had a metric like

1   that at any time from the beginning of 2014 to the

2   present?

3        A.   Not to my knowledge.

4        Q.   How does the DCCC decide which voters to

5   target?

6             MS. BRANCH:   Objection, First Amendment

7   privilege.

8             You can answer at a high level to the

9   extent you can.   We can't disclose targeting and

10  strategic information.

11       A.   There are ways that we're able to identify

12  voters who are likely to support Democratic candidates

13  or vote for Democrats.

14       Q.   (BY MR. HILTON)   So that's the target group,

15  is folks you expect to vote Democratic?

16       A.   Yes.

17       Q.   How does DCCC decide which types of voter

18  registration efforts to pursue?

19             MS. BRANCH:   Again, same objection.

20             You can answer at a high level.

21             And that's to First Amendment, to

22  clarify.

23       A.   I think it's probably a variety of factors

24  based on where our targeted races are as far as priority

25  districts for the DCCC and where we are able to make an

1  effort and a successful activity out of registering

2  voters.

3      Q.   (BY MR. HILTON)  Does DCCC adjust its

4  activities based on a success rate?

5      A.   Yeah.  I want to be clear that I don't know if

6  there's necessarily, like, a success rate or a

7  definition; but, you know, we certainly aren't going to

8  engage in efforts where -- in voter registration efforts

9  where it's not possible because of, like, geographic or

10  logistics.

11      Q.   Who makes those kinds of decisions?

12          MS. BRANCH:  Objection, First Amendment

13  privilege.  I'm going to instruct the witness not to

14  answer that.

15          MR. HILTON:  And so to be clear, my

16  question is:  Who at the DCCC decides whether to adjust

17  voter registration activities and how they do that.  And

18  you're instructing the witness not to answer?

19          MS. BRANCH:  I mean, I think that you

20  have that information.  If you want to pursue a high-

21  level line of questioning, I'm okay with that; but my --

22  what I think we're doing is going into the strategy of

23  how the D-Trip targets voters for voter registration.

24  And that is protected by the First Amendment.

25          So, Jacqui, if you want to answer that

1   question, that's fine.

2            And maybe we can have the court reporter

3   read that back; but beyond that, I'm going to object.

4            MR. HILTON:  I'll restate my question.

5       **Q.   (BY MR. HILTON) Who at DCCC adjusts which**

6   **voter registration efforts that the group is going to**

7   **engage in?**

8       A.   I think that a lot of that responsibility

9   falls on the National Field Director.

10      **Q.   And how are those decisions made?**

11           MS. BRANCH:  Objection.  I'm going to

12  instruct the witness not to answer.

13           Is now maybe a good time to break for

14  lunch?  I don't mean to interrupt.

15           MR. HILTON:  Well, I think now is a good

16  time to take a break.  I need, like, ten minutes; but if

17  y'all want to take longer, that's fine, whatever y'all

18  want to do.

19           MS. BRANCH:  Can we do -- well, can I ask

20  you how long you may have after lunch, if you have a

21  rough estimate?

22           MR. HILTON:  I don't know.  I need the

23  ten minutes to figure out what I'm going to do next.

24           MS. BRANCH:  Okay.  Well, I think we

25  need -- Jacqui, is 30, 45 minutes good for a you?

DCCC - 4/28/2020

92

1                    THE WITNESS:  Yeah, 30 minutes should be

2    fine for me.

3                    MS. BRANCH:  Okay.  That will be 1:50.

4                    MR. HILTON:  All right.  We can go off

5    the record.

6                    THE REPORTER:  Going off the record at

7    12:29 p.m.

8                    (Off the record from 12:30 to 1:05 p.m.)

9                    THE REPORTER:  We're back on the record

10   at 1:05 p.m.

11       Q    (BY MR. HILTON)  All right.  Ms. Newman,

12   before we broke we were talking about voter registration

13   activities and expenditures.  And we, I think, had

14   covered most of what I wanted to cover; but I just have

15   a few -- couple of things to make sure I'm tying up all

16   that that I want to discuss with you today.

17                    So for the 2018 cycle, which is the cycle

18   where DCCC has some more insight into specific

19   expenditures on voter registration, I just want to make

20   sure that I have everything that you've told me so far

21   correct.  You've given money to -- DCCC has given money

22   to the Texas Democratic Party that's earmarked for voter

23   registration.  DCCC has hired a vendor to help with

24   voter registration efforts, which we discussed earlier

25   in connection with the Declaration, which I think is

 1  **Exhibit 3.   Is there -- has anything else been spent**

 2  **that's been earmarked for voter registration efforts for**

 3  **the 2018 election?**

 4      A.   Sorry.  To be clear, I think -- I think the

 5  money we are talking about right now is for the current

 6  cycle, the 2020 cycle.

 7      **Q.   Sorry.  Yes, I misspoke.  For the current**

 8  **cycle, the 2020 cycle.  So the TDP money that is**

 9  **earmarked and then the vendor for the 2020 cycle.   Is**

10  **there anything else at this time?**

11      A.   Specifically on voter registration at this

12  time, I don't believe there is more money I can

13  identify.   I mean, I think I mentioned earlier we've

14  spent up to -- or a little bit over 1.1 million in Texas

15  alone; and that includes our offices and our staff on

16  the ground.   And, of course, you know, our staff is

17  engaging in this, you know, community engagement; and

18  they are out talking to voters and possibly registering

19  voters as part of their daily activities.   And that is,

20  you know, like, wrapped up in their salary.   It's not

21  necessarily identified in the other money I identified

22  for voter registration.

23            And I -- you know, I would say that we

24  are still several months out from the election; and we

25  will continue to make spending decisions as things

1   develop and get closer and that some of the difficulties

2   we face just around, you know, confusion that Texas

3   voters might have around changing their address or

4   renewing their information online and not being able to

5   simultaneously register to vote will inevitably lead us

6   to have to spend more money on voter registration and

7   more time making sure we are educating voters, that they

8   know that they might not have been registered to vote or

9   had their address updated if they changed any

10  information online through the DPS website.

11      Q.   (Inaudible.)

12              THE REPORTER:  I'm sorry.  Something's

13  happened to your audio.

14              MR. HILTON:  (Inaudible.)  Better?

15              THE REPORTER:  Not really.

16              THE VIDEOGRAPHER:  Something has gone

17  wrong with your audio.

18              MR. HILTON:  (Inaudible.)

19              THE VIDEOGRAPHER:  It's a bandwidth

20  issue.  Yeah, it sounds like you're having bandwidth

21  issues.  The audio seems to be cutting out, Chris.

22              MR. HILTON:  Yeah, I don't know.  Nothing

23  has changed on my end (echoing audio.)

24              THE VIDEOGRAPHER:  We had the same

25  problem the other day with Mr. Geise.  Are you using a

DCCC - 4/28/2020

95

 1  headset?

 2               MR. HILTON:  I am not (echoing audio.)

 3               THE VIDEOGRAPHER:  So you're just using

 4  your laptop audio?

 5               MR. HILTON:  Yes, sir.  Should I drop off

 6  and reconnect (echoing audio)?

 7               THE VIDEOGRAPHER:  Let's try that, yeah,

 8  just kind of an if you restarted your computer type of

 9  situation.  Just log out and then log back in and see if

10  that doesn't correct the issue.

11               THE REPORTER:  I'm going to take us off

12  the record at 1:10 p.m.

13               (Off the record from 1:10 to 1:12 p.m.)

14               THE REPORTER:  We are back on the record

15  at 1:12 p.m.

16      **Q    (BY MR. HILTON)  Ms. Newman, how much more**

17  **time and money will you have to spend?**

18      A.   I think it's hard to say at this point as,

19  again, we're several months out from the election.  I

20  also think, you know, the current COVID-19 crisis we're

21  in may have an outside impact on this because fewer

22  people will be able to go into DPS in person and change

23  their information and update their voter registration.

24               So I think it's too far out to put a

25  number on it; but given that we've already invested, you

1  know, over a half a million dollars to date, you know, I

2  do not think that it is a small -- small investment.

3      Q.    **How much more do you plan to spend on voter**

4  **registration efforts in Texas?**

5              MS. BRANCH:  Objection to the extent that

6  this calls for strategic information.

7              If you know, you can answer.

8      A.    I -- you know, again, I don't know if that has

9  been decided yet.  I think it will depend as things

10  shape up with the current environment; and as we get

11  closer to the election, those expenditures are usually

12  decided.

13      Q.    **(BY MR. HILTON)  How much money did DCCC spend**

14  **on voter registration efforts in Texas for this election**

15  **cycle prior to January 21st, 2020?**

16      A.    At least 40, $45,000.  $45,630.

17      Q.    **That was the transfer to TDP that we looked at**

18  **earlier on one of the exhibits?**

19      A.    Yes.  And, you know, I would ad that we've had

20  our staff on the ground in Texas in 2019.  So they were

21  beginning to engage in these activities.

22      Q.    **And I appreciate you mentioning that when I**

23  **was trying to get my arms around all the voter**

24  **registration activities for the staff.  And we talked**

25  **about earlier you couldn't really break down what**

 1  percentage of their duties were related to voter

 2  registration.  Am I remembering that correctly?

 3      A.   Yes, that's correct.

 4      Q.   Okay.  Are there any other activities for

 5  this -- or expenditures of funds for the 2020 election

 6  cycle that we haven't touched on yet?

 7              MS. BRANCH:  Objection, vague.  Is that

 8  related to voter registration or just expenditures

 9  generally?

10              MR. HILTON:  I'm sorry.  I thought I said

11  voter registration.

12      A.   No, I think we've basically covered it.

13      Q.   (BY MR. HILTON)  How much of that money has

14  gone to try to register voters who change their address

15  or renew their driver's license online with DPS?

16      A.   I don't know if there's a specific dollar

17  amount associated with that.  I think that's just part

18  of our ongoing voter education effort to make sure when

19  we're talking to voters, "Are you registered to vote?"

20  Making sure they are aware that if they've moved

21  recently, depending on how they conducted that

22  transaction online, that if it was online versus in

23  person, that their information is treated differently

24  than going in person to change that and that they might

25  not, in fact, be registered to vote at their current

98

1  address.

2      Q.   Does DCCC keep track of the number of people

3  who it talks to who change their address or renew their

4  driver's license online with DPS?

5           MS. BRANCH:  Objection to the extent that

6  this calls for strategic information.

7           But you may answer.

8      A.   Not that I'm aware of.

9      Q   (BY MR. HILTON)  Do you have any -- does DCCC

10  have any training materials that reflect those kinds of

11  conversations that you were just referring to?

12           MS. BRANCH:  Objection, vague, First

13  Amendment privilege.

14      A.   Not that I'm aware of.  I think, you know, the

15  information required is part of the reason why we engage

16  a consultant on the ground to run some of this.  You

17  know, it's difficult to register voters in Texas; and it

18  requires a high level of expertise.  I think a lot of

19  these activities also go through the Texas Democratic

20  Party for these reasons.

21      Q.   (BY MR. HILTON)  Okay.  So leaving aside what

22  the Texas Democratic Party might have, DCCC doesn't have

23  any training materials reflecting how to have these

24  conversations beyond what a vendor might have?

25           MS. BRANCH:  Objection.  I think that's

1  been asked and answered.  I also think that it calls for

2  internal materials in the content of what's reflected in

3  those.  So I'm going to instruct the witness not to

4  answer that question.

5       Q.  (BY MR. HILTON)  So my question is:  Does DCCC

6  **have any materials that reflect training with respect to**

7  **how to have these kinds of conversations for voter**

8  **registration efforts?**

9       A.  I don't believe we have any public materials.

10      Q.  **Do you have any non-public materials?**

11           MS. BRANCH:  Again, I maintain the

12  objection and instruct the witness not to answer.

13           MR. HILTON:  Okay.  So you won't allow

14  the witness to answer as to the existence of such

15  materials?

16           MS. BRANCH:  She's already answered the

17  question.

18      Q.  (BY MR. HILTON)  **Do such materials exist,**

19  **Ms. Newman?**

20      A.  I'm not going to answer.

21      Q.  **And is that at counsel's instruction?**

22      A.  Yes.

23      Q.  **Okay.  And no such materials were produced to**

24  **us?**

25      A.  Correct.

1      Q.   Why is registering voters in Texas important?

2      A.   Voter registration is important in Texas

3  because we have several priority targeted races.  We

4  have two -- we call them frontline districts, as well as

5  a handful of red-to-blue districts, that signify

6  priority within the DCCC.  And registering voters makes

7  sure that we are broadening the people who are turning

8  out to vote for these candidates and members of

9  Congress.

10            MR. HILTON:  All right.  Maybe now is a

11  good time to switch over and talk about -- we had a

12  discussion earlier about the Blue Texas Fund and

13  documents showing DCCC's, you know, relationship

14  involved with something related to the Blue Texas Fund.

15  And, Ms. Branch, I believe you had a Bates number that

16  we could refer to?

17            MS. BRANCH:  Yes.  Let me just pull that

18  up.

19      Q.   (BY MR. HILTON)  And -- I'm sorry -- one more

20  question I had on the -- going back to the vendor that

21  y'all hired in Texas.

22      A.   Yes.

23      Q.   Did you produce any documents related to what

24  that vendor is going to do for the DCCC?

25            MS. BRANCH:  Objection, those documents

 1  are privileged.  This calls for attorney-client

 2  privileged conversations regarding our discussions on

 3  what we produced in response to the subpoena.

 4      Q.   (BY MR. HILTON)  Okay.  I'm not intending to

 5  ask for any conversations between you and your counsel,

 6  Ms. Newman.  I just want to know if any such documents

 7  have been produced.  You have the entire production

 8  there in front of you, and you testified earlier that

 9  you're familiar with it.  So that's why I asked you.

10      A.   And can you repeat the original question?

11      Q.   Are there any documents that will show what

12  this vendor that you've engaged in Texas is going to do

13  for the DCCC in the production?

14      A.   I don't believe so, other than maybe a press

15  release sharing that we're engaging in voter

16  registration.

17      Q.   Okay.  And can DCCC identify any voters who

18  have been registered to vote after -- by the DCCC, after

19  they changed their address or renewed their driver's

20  license online with DPS?

21      A.   No, not that I'm aware of.

22      Q.   Okay.

23           MR. HILTON:  All right.  And going back

24  to this Blue Texas Fund issue.

25           MS. BRANCH:  So it's Bates Number 665 is

1   one of the Blue Texas Fund mail pieces, and it shows a

2   paid-for-by disclaimer.

3                    MR. HILTON:  665, you said?

4                    MS. BRANCH:  Correct.

5                    MR. HILTON:  Okay.  Great.  Bear with me

6   one second while I pull it up.

7        Q.   (BY MR. HILTON)  Oh, and, I guess, Ms. Newman,

8   the same question:  Could your vendor identify any such

9   voters?

10                   MS. BRANCH:  Objection, First Amendment

11  privilege.  I'm going to instruct the witness not to

12  answer.

13       Q.   (BY MR. HILTON)  Are you going to follow your

14  counsel's instruction, Ms. Newman?

15       A.   Yes.

16                   MR. HILTON:  Where am I going to find

17  this document?

18                   Gosh, that was on the record, wasn't it?

19  I'm so used to talking to myself while I putz around my

20  computer that it's really gotten me in trouble on this

21  Zoom depo stuff.  Sorry you have to watch my face while

22  I confusedly look through my files here.

23                   All right.  And it was -- I'm sorry --

24  665?

25                   MS. BRANCH:  665 is the page -- one of

103

1  the pages that contains the disclaimer.

2     Q   (BY MR. HILTON)  All right.  Ms. Newman, can

3  you pull up page 665?

4     A.   Yes.

5     Q.   Let me know once you're there.

6     A.   I'm there.

7     Q.   All right.  What is this -- what is this

8  document?

9     A.   This is a mailing from the Blue Texas Fund;

10  and I guess to confirm what we discussed earlier, this

11  is a joint fundraising committee that is with Colin

12  Allred for Congress, Elizabeth Pannill Fletcher, for

13  Congress, and the DCCC.

14     Q.   Okay.  So those are all the folks who are part

15  of this joint fundraising committee?

16     A.   Yes.

17     Q.   Okay.  I appreciate that.  And I see here

18  there are a couple of other kind of targeted races, I

19  guess, listed in this mailing; but those campaigns are

20  not part of the Blue Texas Fund?

21     A.   Correct.

22     Q.   So the Blue Texas Fund is raising money on

23  their behalf, or what's the relationship to these other

24  campaigns?

25     A.   The Blue Texas Fund currently raises money for

1  just the committees that are listed in the disclaimer.

2      Q.   Okay.

3      A.   And, you know, again, these are two of our

4  members of Congress who won in the 2018 election in

5  Texas; and they are part of our highest priority races

6  across the country and in Texas.

7      Q.   Okay.  I'd like to turn to another page from,

8  I think, what we marked as Exhibit 4.  It's the

9  production from DCCC.  It's a two-page document starting

10  at Bates DCCC 661.  Please let me know when you have

11  that pulled up.

12          MS. BRANCH:  You say Exhibit 4?

13          MR. HILTON:  Yeah, the entire DCCC

14  production is designated as Exhibit 4 for the purposes

15  of the deposition.  So I'm just referring to particular

16  pages out of that.

17      A.   I have this pulled up.

18      Q   (BY MR. HILTON)  All right.  661, we had

19  looked at that earlier; it wasn't what I thought it was.

20  So maybe you can kind of explain to me what I'm looking

21  at here.  It's a map of the United States, obviously.

22  And it has a bunch of races listed, and there's a key

23  for certain symbols.  So maybe you can kind of break

24  this down for me.

25      A.   Sure.  This is our House battlefield that

1    highlights our frontline candidates.  These are our, you

2    know, kind of our targeted members who are running for

3    re-election.  And you'll see, again, that includes

4    Lizzie Fletcher and Colin Allred in Texas.

5         **Q.   And so what are each of the categories listed**

6    **here?  Like, it says, Frontline Candidates, Red to Blue,**

7    **Offensive Battlefield Districts, Expanded Battlefield**

8    **Districts, and a bunch of different campaigns or states**

9    **listed under each category.**

10             **Could you go through each of these**

11   **categories and explain to me what they are and how they**

12   **differ from each other?  I understand you're saying**

13   **they're all targeted in some way, but maybe you could**

14   **explain why they're broken out separately on this**

15   **document.**

16        A.   Sure.  So our frontlines are incumbent members

17   of Congress.  Red to Blue are the first tier of targeted

18   challenger races.  So these are people who are hoping to

19   unseat a Republican member of Congress.  And this

20   document actually might be slightly out of date because

21   we have Texas 21 and Texas 23 listed here as red-to-blue

22   districts, but we've also recently added Texas 22 to

23   this list.

24        **Q.   I see -- I'm sorry to interrupt.  I see a date**

25   **at the bottom that's March 5th, 2020.  Would this list**

1  be accurate as of that date?

2       A.   Yes.  Yes, it is.

3       Q.   Okay.  You can continue from there.  I

4  appreciate that.

5       A.   Well, I think coming out of the recent Texas

6  primary, we were able to add an additional district to

7  this.  And then we have our Offensive Battlefield

8  Districts; and, you know, this is almost like -- if Red

9  to Blue was our top priority, then this is the next

10  priority.

11      Q.   It looks like you're trying to unseat a

12  Republican incumbent or claim an open seat that was

13  previously held by a Republican?

14      A.   Yes, exactly.  And then our Expanded

15  Battlefield Districts.  It is also a version of that,

16  kind of showing the priority.

17           And then there's just some helpful other

18  information here that may or may not be relevant to

19  Texas, remaining districts that were won by Hillary

20  Clinton but still held by Republicans.  Democrats

21  running in districts that Trump won.  Districts that

22  have Republican retirements this year or this cycle.

23  And then where we have battle stations, which are

24  offices -- that's what we like to call them -- and field

25  managers on the ground.

1    Q.   Okay.  Politics is a full-contact sport.  So

2  you've got to get into the mindset.  I get it.

3            It sounds like these categories are

4  listed in rough order of priority, seem to be.  That was

5  my impression from how you were describing them.  Is

6  that fair?

7    A.   Yeah.  I think, you know, kind of through the

8  expanded battlefield districts; and then those remaining

9  sections are more just information points.

10   Q.   Got it.

11           And I think I have one more document that

12  I wanted to review with you, and that's DCCC 455.  And

13  this is part of Exhibit 4, which is DCCC's document

14  production.  And just let me know when you have that up.

15   A.   455?

16   Q.   Yes.

17   A.   Okay.  I have that up.

18   Q.   All right.  And 455 is the first page of a

19  two-page document.  Can you tell me what this document

20  is, please?

21   A.   Sure.  This is, I guess, a two-page memo, not

22  necessarily a one-pager, that overviews our member

23  programs, our member dues program, in particular.  And

24  this is shared with members within our caucus and speaks

25  to how we recognize members who participate through

1  paying dues to the DCCC.

2      Q.   **Who are the members of the DCCC?**

3              MS. BRANCH:  Objection to the extent that

4  this calls for a legal conclusion.

5              But you may answer the question.

6      A.   Yeah.  I realize now that there's a very legal

7  definition for the term "member" that I can't

8  necessarily speak to; but in the DCCC's mind, our

9  members are members of -- Democratic members of Congress

10 that are in our caucus.

11             I think that "member" in kind of a

12 broader term, we also think about Democratic voters as a

13 whole who participate in any of our activities, whether

14 it's donating to us or volunteering or supporting and

15 voting Democratic.  You know, those people who we see as

16 our constituents because we represent them also kind of

17 sometimes get thrown around as, like, a member; but,

18 really, it's our members of Congress.

19     Q.   (BY MR. HILTON)  Okay.  And I'm not asking for

20 a legal definition.  I understand you're not an

21 attorney.  I'm trying to understand how DCCC uses that

22 term, I guess.  And I understand that it's the members

23 of Congress and then, in a broader sense, the

24 constituents who are members of the Party.  Which of --

25 which people would participate in the member dues

1   program?

2        A.   The majority of our members participate in

3   this.

4        Q.   And by that, you mean the Democratic --

5        A.   Members of Congress.

6        Q.   And then it has, I guess -- this document

7   describes -- like, is this tiers of membership or

8   different types of membership?  Can you explain to me

9   what the DCCC Gavel Society, the Leadership Circle, and

10  Point Guards are?

11            MS. BRANCH:  Objection to the extent that

12  it calls for privileged information.

13            But you can describe at a high level, and

14  you can certainly speak to what the document states.

15            MR. HILTON:  And that's my question.

16       A.   Yeah.  What's laid out here is -- it is

17  basically levels of recognition for participating in

18  this program, yeah.

19       Q.   (BY MR. HILTON)  And how is it -- how do

20  you -- how does a member qualify for the Gavel Society

21  or the Leadership Circle or as a Point Guard?

22       A.   That's a discussion with our member dues team.

23       Q.   Is it based on, like, the amount of

24  fundraising that they contribute?

25            MS. BRANCH:  Objection, First Amendment

1  privilege.

2            Jacqui, if this is something that's

3  publicly available or not internal to the D-Trip, you

4  can answer it.

5            But, otherwise, I'm going to instruct the

6  witness not to answer.

7       A.   It has been publicly reported that members

8  generally can earn -- and this is kind of laid out in

9  the Point Guard section -- earn points for participating

10 in activities with the DCCC or through paying dues and

11 raising money for the committee.

12      Q.   (BY MR. HILTON)  Are you withholding

13 information on the basis of your counsel's objection?

14      A.   No.  That is basically it.

15      Q.   Okay.  I appreciate that.

16            Is there any other way to get a DCCC

17 coffee mug, or do you have to get 150 points in the

18 Point Guard program?

19      A.   Sometimes asking nicely does end in a coffee

20 mug.

21      Q.   I'll keep that in mind.  Do you have a coffee

22 mug?

23      A.   I do.

24      Q.   Do you have it handy?  I'm kind of curious as

25 to what it looks like.

1      A.    I don't have it handy.  I keep it at work

2   because it's, like, 24 ounces.

3      Q.    Oh, I gotcha.  Lots of late nights, I suppose,

4   at the DCCC, where you need a lot of coffee.

5            All right.  Bear with me just one second.

6   Let me look at my notes here.  I think this is about all

7   I have.

8            I appreciate your patience with the

9   technological issues, with going through these

10  documents, with kind of the mechanical nature of my

11  questions, and, you know, again, your patience with your

12  counsel and I while we discussed our disagreements.

13           I hope I've otherwise been professional

14  to you as we've gone through this.

15           And that reminds me, I should have asked:

16  On the two breaks that we took today -- I think it was

17  two, maybe three -- did you discuss the substance of

18  your testimony with anyone during those breaks?

19           MS. BRANCH:  Objection to the extent that

20  this calls for attorney-client privileged information.

21           You can answer as to whether or not you

22  spoke with anyone, but you can't discuss the content of

23  the conversations.

24     A.    I did check in with my counsel on the breaks.

25     Q     (BY MR. HILTON)  And did you discuss the

1  substance of your testimony?

2            MS. BRANCH:  Objection, and I'm going to

3  instruct the witness not to answer.

4            MR. HILTON:  Okay.  I'll just note for

5  the record that I believe I'm entitled to that

6  information since the witness has been under oath all

7  this time.

8      Q.  (BY MR. HILTON)  All right.  So I think the

9  last thing we need to do is turn back to Exhibit 1,

10  which is the Deposition Notice.

11     A.  Okay.

12     Q.  And I'd like to go to the last page of

13  Exhibit 1.  That's the document request.

14     A.  Okay.

15     Q.  And I'd like to just kind of go through each

16  of these and make sure I understand -- or just have you

17  confirm again that we've gotten a full production.

18            So Document Request Number 1, did the

19  DCCC produce documents responsive to this request?

20            MS. BRANCH:  Objection to the extent that

21  this calls for attorney-client and attorney work

22  product.

23            But, Jacqui, if you are able to answer,

24  you may.

25     A.  Yes, I believe we've turned over everything

1  that we could here.

2       Q.   (BY MR. HILTON)  Okay.  And when you say "we

3  could," I assume you're referring to your counsel's

4  privilege -- her objection related to privilege?

5            MS. BRANCH:  Objection, attorney work

6  product, attorney-client privilege.  I think the record

7  speaks for itself on that.

8            You're inquiring about whether we

9  instructed -- or, you know, how we put together the

10  production and our discussions about asserting the First

11  Amendment privilege, which I think is a conversation

12  itself that is privileged.

13            MR. HILTON:  I'm sorry.  Let me clarify

14  my question.

15       Q.   (BY MR. HILTON)  Ms. Newman, you said that you

16  thought you'd turned over all the documents that you

17  could; and I'm trying to understand what you meant by

18  "you could."  And I'm assuming that it's related to the

19  privilege objection; and if so, I think that's the end

20  of my questioning.  But if there's something else that

21  you're referring to, that's what I was trying to find

22  out.

23            MS. BRANCH:  You may answer that

24  question, Jacqui.

25       A.   Yeah.  Yes.

1    Q.   (BY MR. HILTON)  So when you said you turned

2  over all the documents you could, that was in reference

3  to the privilege issues?

4    A.   Yes.

5    Q.   Okay.  That's all I was trying to ask.  And,

6  again, I am not trying to ask for attorney-client

7  privileged information.

8              Were documents withheld that would

9  otherwise be responsive to this request?

10             MS. BRANCH:  Again, I'm going to object

11 on the basis of attorney work product and attorney-

12 client privilege; and I'm going to instruct the witness

13 not to answer that.

14    Q.   (BY MR. HILTON)  Do any other documents exist

15 in the possession of DCCC that would substantiate the

16 factual allegations of Paragraphs 13 and 29 to 35 of

17 your Complaint?

18             MS. BRANCH:  You can answer that,

19 Ms. Newman.

20    A.   Hold on.  I just want to look at the

21 Complaint.

22    Q.   (BY MR. HILTON)  Yeah, of course.  Please take

23 your time.  Of course.

24    A.   Can you remind me which --

25    Q.   Exhibit 2.

1      A.    Thank you.  You said Paragraphs 13 to...

2      Q.    13 and 29 through 35.  That's what's in the

3  document request.  And so I'm just trying to understand

4  from you whether there are any documents that exist that

5  would substantiate the factual allegations in these

6  paragraphs that have not been produced to us.  I'm just

7  asking about the existence of such documents.

8      A.    I believe we've turned over all the documents

9  we could produce here.

10      Q.    Okay.  Great.

11            Number 2.  Number 2 on Exhibit 1, on the

12  last page, the second document request, did DCCC produce

13  documents responsive to this request?

14      A.    Yes.

15      Q.    Okay.  Are any -- do any documents exist that

16  would be responsive to this request that were not

17  produced?

18      A.    I'm sorry.  What number are we looking at now?

19      Q.    This is Document Request Number 2, which is on

20  the last page of Exhibit 1, which is the Deposition

21  Notice.

22            I'm sorry.  I haven't found a better way

23  to do this in my career; and it's hard and kind of

24  mechanical, but I just need to wrap -- you know, put a

25  bow on the document.

DCCC - 4/28/2020

116

 1      A.   To my knowledge, we did not withhold anything

 2   related to this.  I believe we've turned over everything

 3   we could.  It might shock you to learn that the majority

 4   of our conversations are just sending press clips back

 5   and forth to one another.

 6      **Q.   That was a little surprising, actually,**

 7   **because that was the bulk of the production.  I'm not**

 8   **trying to ask for anything privileged or strategic, but**

 9   **I'm just kind of curious as to why that is.  I mean,**

10   **it's just such a foreign kind of work flow to me.  I'm**

11   **curious as to why that constitutes most of your**

12   **communications.**

13      A.   I think that is -- you know, press clips are

14   really the best way to guide what our strategy is and

15   what's happening on the ground in all of these

16   districts.  You know, keep in mind, we're kind of

17   looking at a 30,000-foot view of, you know, 30 to 50

18   districts across the country; and so we're constantly up

19   to date on what's happening there, what issues are

20   arising in the districts, and how they might relate to

21   the Congressional campaigns in those districts.

22      **Q.   Okay.  I appreciate that.  It's always**

23   **interesting.  That's one of the things I like about my**

24   **job is I get insight into how other people do their**

25   **jobs.  I appreciate that.**

```
 1              So if I understand you correctly, you

 2   have produced documents responsive to Request Number 2

 3   and that no other documents exist that would otherwise

 4   be responsive?

 5              MS. BRANCH:  I'm going to object just on

 6   the -- you know, the use of the term "responsive" and

 7   the legal conclusions and legal background associated

 8   with that term.

 9              But, Jacqui, to the extent that you can

10   answer based on your knowledge, you may.

11       A.   Yes, I believe so.

12       Q    (BY MR. HILTON)  Number 3.  Has DCCC produced

13   all the documents responsive to Number 3?

14       A.   I believe we've produced documents that speak

15   to these topics as long as they don't conflict with our

16   strategy and attorney-client privilege.

17       Q.   So that was my next question, privilege

18   assertions...

19              MS. BRANCH:  Same objection, attorney

20   work product, attorney-client privilege.  The decision

21   on --

22              THE WITNESS:  Did we just lose him?

23              MS. BRANCH:  Oh, I think we did.

24              THE VIDEOGRAPHER:  It appears that he did

25   drop out of the meeting.
```

1              THE REPORTER:  We're going off the record

2    at 1:48 p.m.

3              (Off the record from 1:48 to 1:48 p.m.)

4              THE REPORTER:  We're back on the record

5    at 1:48 p.m.

6              MR. HILTON:  All right.  I'm sorry about

7    that.  Literally my last handful of questions, and my

8    Internet connection's going out on me here.

9      **Q    (BY MR. HILTON)  So I think my question was,**

10   **for Number 3, whether documents have been withheld on**

11   **the basis of privilege assertion.**

12             MS. BRANCH:  And I have an objection on

13   that because the decision to withhold is attorney work

14   product, and it was made by us.  So I'm going to

15   instruct the witness not to answer that.

16             MR. HILTON:  Okay.  So I just want to

17   know whether any documents at all have been withheld,

18   and you're instructing Ms. Newman not to answer that

19   question?

20             MS. BRANCH:  Yes.  I think she's also

21   testified to this multiple times throughout the

22   deposition.

23             MR. HILTON:  Be that as it may, with

24   respect to Number 3, you're instructing her not to

25   answer whether any documents are being withheld?

```
 1                 MS. BRANCH:  Correct.

 2                 MR. HILTON:  Okay.

 3        Q.   (BY MR. HILTON)  With respect to Request

 4   Number 3, other than what's been included in the

 5   production, do any other documents exist that would show

 6   the information described or requested in the listed

 7   deposition topic numbers?

 8                 MS. BRANCH:  Objection, attorney work

 9   product, attorney-client privilege.

10                 You may answer the question if you know

11   the answer.

12        A.   Yes.

13        Q.   (BY MR. HILTON)  And some documents exist that

14   would otherwise be response to Number 3 that have not

15   been produced to us?

16                 MS. BRANCH:  Objection.  Same objection.

17   I'm going to instruct the witness not to answer.  I

18   think this is the same question, just kind of in a

19   different phrase.

20                 MR. HILTON:  I'm sorry.  I thought it

21   was -- I'm trying to -- I mean, with respect,

22   Ms. Branch, I think that I have the right to know

23   whether documents have been withheld.

24                 I'm not, even at this point, asking for a

25   privilege log, which I also think I'm entitled to.  I
```

1  just want to know if other documents exist because if

2  they don't, then I don't think we have anything to

3  quarrel about.

4            So you're instructing the witness not to

5  answer the question of whether documents exist that have

6  not been produced?

7            MS. BRANCH:  So I think that that's a

8  conversation that you and I can have; but I think that

9  whether not documents exist on these topics, like, that

10  reflects -- the answer that she's going to give is going

11  to reflect our conversations.  And so that is my basis

12  for the objection.

13            MR. HILTON:  I'm sorry.  I just don't

14  understand.

15      **Q.   (BY MR. HILTON)  I just want to know if**

16  **documents exist that would be responsive to Number 3.**

17            MR. HILTON:  And I'm asking Ms. Newman.

18  And if you're going to let her answer, I'd like to know

19  the answer; and if not, then we move on.

20            MS. BRANCH:  I am going to instruct the

21  witness not to answer.

22      **Q.   (BY MR. HILTON)  Are you going to follow that**

23  **instruction, Ms. Newman?**

24      A.   Yes.

25      **Q.   With respect to Document Request Number 4, did**

1    DCCC produce documents responsive to this request?

2         A.   I believe we did.

3         Q.   Okay.  You can refer to Exhibit 4 and double-

4    check if you are uncertain.

5         A.   I don't know, then.

6         Q.   So you don't know whether documents responsive

7    to Request Number 4 have been produced?

8         A.   I mean, this -- a lot of this is public

9    information that I think you've shown or gone over in

10   other parts of this discussion.

11        Q.   Okay.

12             MR. HILTON:  I'm going to object to that

13   answer as nonresponsive.

14        Q.   (BY MR. HILTON)  I just want to know if it's

15   included in DCCC's production.

16             MR. HILTON:  I'm sorry.  It looks like

17   I'm having a technical issue again.  Was there an

18   answer?

19             THE REPORTER:  There wasn't an answer

20   that I heard.

21        A.   I mean, we've produced what we have.

22        Q.   (BY MR. HILTON)  That's responsive to

23   Number 4?

24        A.   Yes.

25        Q.   Okay.  So no other documents exist that would

1  **be responsive to Number 4 other than what we've**

2  **discussed today and that's included in the production?**

3              MS. BRANCH:  Same objection.  And I just

4  want to note, Chris -- and this might be a discussion

5  for offline -- but the subpoena clearly states that it

6  seeks only the minimum number of documents sufficient to

7  show the information.  So the fact that things are being

8  withheld is in compliance with the subpoena.  Whether or

9  not they're being held on the basis of the First

10  Amendment privilege, though, is an attorney work product

11  and a privileged conversation.  So that's my objection

12  to the line of questioning.

13              MR. HILTON:  I appreciate that.  I am

14  trying to ask both things.  Okay?  I'm trying to

15  understand whether documents have been withheld on the

16  basis of privilege and I'm trying to understand whether

17  other documents exist that would otherwise be responsive

18  but have not been produced because they were not

19  necessary to be produced because of how we drafted our

20  subpoena.

21              MS. BRANCH:  I think all of that is

22  attorney work product and strategic decisionmaking on

23  the part of Ms. Newman's attorneys, and I'm going to

24  instruct the witness not to answer.

25              MR. HILTON:  Okay.  And, Ms. Branch, in

1   case I'm being unclear, I'm not asking for the substance

2   of any communication.  I'm not asking for the substance

3   of any documents.  I'm not even asking for how many

4   documents at this point.  I'm just asking whether such

5   documents exist, and you're claiming that's privileged

6   information?

7                    MS. BRANCH:  I think she can answer the

8   question as to whether additional documents exist, but

9   the basis upon which they were withheld is attorney work

10  product.  That reflects our strategic decisionmaking.

11  So I don't -- I mean, I don't think that was the

12  question on the table.  If the question is, "Are there

13  additional documents that exist within the DCCC on this

14  topic," she can answer that.  But we can't -- she can't

15  answer why they were or were not produced.

16                    MR. HILTON:  Debbie, can you read back my

17  last question?

18                    THE REPORTER:  Okay.

19                    (The requested material was read as

20  follows:

21                    "QUESTION:  So no other documents exist

22  that would be responsive to Number 4 other than what

23  we've discussed today and in the production?")

24                    THE REPORTER:  Is that the question you

25  were looking for?

124

1             MR. HILTON:  That's exactly it.

2             MS. BRANCH:  And that's with respect to

3    Number 4?

4             MR. HILTON:  I think that's what Debbie

5    just read back, yes.

6             MS. BRANCH:  You can answer that, Jacqui.

7        A.   Yes, I think other documents exist; but we've

8    produced what we've needed to to answer this request.

9        Q.   (BY MR. HILTON)  Let me ask you about that,

10   actually.  Currently on the DCCC's website there are a

11   number of job openings posted; is that right?

12       A.   Yes.

13       Q.   And it's dccc.org/jobs, and it has a bunch of

14   jobs listed.  And if you click those jobs, it brings you

15   to a job description.  Are you familiar with what I'm

16   talking about?

17       A.   Yes.

18       Q.   And did you produce job descriptions for

19   current employees?

20       A.   I don't believe so.

21       Q.   Okay.  Do job descriptions for current

22   positions in DCCC exist?

23       A.   Mostly.

24            I'm sorry.  If you were talking, I just

25   heard nothing.

DCCC - 4/28/2020

125

1      Q.   I'm sorry.  Did you produce all documents that

2  you reviewed in preparation for your deposition?

3      A.   I'm sorry.  Can you ask that again?

4      Q.   Did DCCC produce all documents that you

5  reviewed in preparation for this deposition?

6      A.   I believe so.

7      Q.   Would you like to check the production?

8      A.   I mean, I think there are some documents in

9  here that come from...

10            Yes, I believe we did.

11            MR. HILTON:  And, Ms. Branch, you're not

12  going to allow the witness to answer whether documents

13  were withheld on the basis of privilege with respect to

14  any of these requests?

15            MS. BRANCH:  No.  I think that that is a

16  conversation that reflects our privileged discussions;

17  and, frankly, I don't know that she knows.  She's not a

18  lawyer.

19            MR. HILTON:  Well, if that's her answer,

20  then I don't really know why we're fighting about it.

21            MS. BRANCH:  Can we have a discussion

22  about this separately?  I think that Jacqui, Ms. Newman,

23  has answered a lot of the questions related to the

24  production to the best extent of her knowledge; but I

25  don't want to get into a situation where she's talking

126

1  about strategic decisions that attorneys made.  And she

2  honestly probably can't testify to those, anyway; but

3  they would reflect our conversations, which I think we

4  both agree are privileged.

5          MR. HILTON:  Okay.  I'm not asking about

6  privileged conversations.  I'm not asking about any

7  strategic determinations.  You've put forth Ms. Newman

8  as a 30(b)(6) representative for the DCCC to speak on

9  behalf of the documents produced in response to the

10  subpoena.  And so, you know, I'm just not asking for

11  privileged information.  And she has a duty to be

12  prepared as to these topics.

13          Ms. Newman, this is not a reflection on

14  you at all.

15          But I'm going to object to this witness

16  being insufficiently and inadequately prepared for this

17  deposition today as to a number of topics.  I'm also

18  going to object to insufficient document production.

19  You're not even letting me explore the ways in which it

20  was insufficient, so I don't even know the depth of the

21  insufficiency.

22          I'm going to object to your failure to

23  provide a privilege log, your failure to disclose

24  whether documents have even been withheld on the basis

25  of a privilege.

1          And I'm going to object to your improper
2  instructions not to answer and your improper objections
3  throughout this deposition.

4          On the basis of that, we're going to hold
5  this deposition open.  We reserve the right to seek
6  whatever relief is appropriate.

7          And I truly hope we can work something
8  out offline with each other because I don't think this
9  should be that difficult.  I'm truthfully not trying to
10 get privileged information.  I have no interest in
11 attorney-client privileged information.  And to the full
12 extent that you have a privilege, an associational
13 privilege, you know, you have a privilege; but you're
14 not even giving me the basic information to begin to
15 evaluate it.  And so I just -- I think this entire
16 deposition could have been a lot smoother.

17         And I'm sorry, Ms. Newman, that it was so
18 difficult in spots.

19         But there's a lot of information here
20 that I believe I'm entitled to that you're not allowing
21 the witness to testify to.  So on that basis --

22         MS. BRANCH:  I did want --

23         (Simultaneous speakers.)

24         MR. HILTON:  You can respond; but I'd
25 like to finish, please.

1          On that basis, we're going to hold the

2    deposition open.

3          Ms. Newman, I don't have anything else

4    for you.

5          And I pass the witness.

6          MS. BRANCH:  I do want to just respond on

7    the record to counsel's objections.  We have covered

8    each of the 30(b)(6) deposition topics that were Noticed

9    here; and Ms. Newman, I believe, has testified to each

10   one of them.  She was prepared for the deposition.

11          In response to the document request, the

12   subpoena specifically states that it seeks only the

13   documents necessary to substantiate the allegations or

14   to provide the minimum number of documents sufficient to

15   show information responsive to each of the requests; and

16   the DCCC's production has satisfied that.

17          We've also tried to point you to public

18   information related to each of these topics.  Because

19   the DCCC is a national party committee, for instance,

20   they are required to publicly report all of their

21   funding sources, which is -- that was requested in Topic

22   Number 3; and there's a request related to that.  If the

23   DCCC were to produce every single document related to

24   all its funding sources, we would have given you, like,

25   mountains and mountains of paper.

 1              So I think that our document production
 2   responded to the topics in accordance with the subpoena
 3   instructions which asked for the minimum number of
 4   documents.  I am happy to discuss whether there are more
 5   documents that, you know, we could try to negotiate
 6   over; but I'm not going to -- I do not agree with the
 7   objection that the witness was inadequately prepared or
 8   that the subpoena -- the production in response to the
 9   subpoena was inadequate.  I'm happy to meet and confer
10   about that.
11              I've tried to be as open as possible
12   about it; but, you know, you're recognizing the
13   associational privilege that the DCCC has; and we have
14   asserted that.  We've also produced the minimum number
15   of documents on each of the topics that are not
16   privileged.
17              And the witness doesn't know which
18   documents are privileged and which are not.  So I don't
19   think that's an appropriate line of questioning.  My
20   objections were not to block the witness -- or block you
21   from getting information from the witness, but rather,
22   to protect the privilege.
23              MR. HILTON:  I disagree with all your
24   characterizations.  I think we understand each other's
25   positions.  Hopefully, we can work it out; and if not,

1  we'll see what the Court has to say about it.  But my

2  objection stands.

3             And, again, Ms. Newman, this is not a

4  reflection on you.  And I appreciate your time today

5  answering my questions.

6             THE REPORTER:  Ms. Branch, do you have

7  any questions of the witness?

8             MS. BRANCH:  I do not.

9             THE REPORTER:  Are you ordering a copy of

10  the transcript?

11             MS. BRANCH:  Yes.

12             THE REPORTER:  All right.  Thank you.

13  We're going off the record at --

14             MS. BRANCH:  And we'd --

15             THE REPORTER:  -- 2:05 p.m.

16             MS. BRANCH:  -- like to read and sign as

17  well.

18             (Deposition recessed at 2:05 p.m.)

19                   --ooOoo--

20

21

22

23

24

25

1                    CHANGES AND SIGNATURE

2    WITNESS NAME:              DATE OF DEPOSITION:

3    JACQUELINE NEWMAN          April 28, 2020

4    PAGE/LINE      CHANGE              REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

DCCC - 4/28/2020

132

```
 1              I, JACQUELINE NEWMAN, have read the

 2   foregoing deposition and hereby affix my signature that

 3   same is true and correct, except as noted herein.

 4

 5              _____

 6              JACQUELINE NEWMAN

 7

 8   THE STATE OF _____   )

 9              Before me, _____, on

10   this day personally appeared JACQUELINE NEWMAN, known to

11   me (or proved to me under oath or through

12   _____) (description of identity card or other

13   document) to be the person whose name is subscribed to

14   the foregoing instrument and acknowledged to me that

15   they executed same for the purposes and consideration

16   therein expressed.

17              Given under my hand and seal of office on

18   this _____ day of _____, _____.

19

20

21              _____

22              NOTARY PUBLIC IN AND FOR

23              THE STATE OF _____

24              My Commission Expires:_____

25
```

DCCC - 4/28/2020

133

1  STATE OF TEXAS      )

2                      REPORTER'S CERTIFICATION

3               I, DEBBIE D. CUNNINGHAM, CSR, hereby

4  certify that the witness was duly sworn and that this

5  transcript is a true record of the testimony given by

6  the witness.

7               I further certify that I am neither

8  counsel for, related to, nor employed by any of the

9  parties or attorneys in the action in which this

10 proceeding was taken.  Further, I am not a relative or

11 employee of any attorney of record in this cause, nor am

12 I financially or otherwise interested in the outcome of

13 the action.

14               Subscribed and sworn to by me this day,

15 May 11, 2020.

16

17

18

19               _____
                 Debbie D. Cunningham,
20               Texas CSR 2065
                 Expiration:  6/30/2021
21               INTEGRITY LEGAL SUPPORT SOLUTIONS
                 P.O. Box 245
22               Manchaca, Texas 78652
                 www.integrity-texas.com
23               512-320-8690; FIRM # 528

24

25

# Exhibit L

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JARROD STRINGER, et al.,      *
    Plaintiffs,              *
                             *
v.                            *   No. SA-20-CV-46-OG
                             *
RUTH HUGHS, et al.,           *
    Defendant.               *


VIDEOTAPED VIDEOCONFERENCED

ORAL DEPOSITION

OF

THE DEMOCRATIC SENATORIAL

CAMPAIGN COMMITTEE REPRESENTATIVE,

SARA SCHAUMBURG

Thursday, April 30, 2020


       VIDEOTAPED VIDEOCONFERENCED DEPOSITION OF SARA

SCHAUMBURG, produced as a witness at the instance of the

Defendant, and duly sworn, was taken in the above-styled

and numbered cause on Thursday, April 30, 2020, from

10:15 a.m. to 12:04 p.m. Central Time, before Debbie D.

Cunningham, CSR, in and for the State of Texas, remotely

reported via Machine Shorthand, pursuant to the Federal

Rules of Civil Procedure.

                --ooOoo--

2

1                    APPEARANCES

2

3  FOR PLAINTIFF INTERVENORS:

4       PERKINS COIE
        700 13th St NW
5       Washington, DC 20005
        (T) 202.654.6200
6
        By:  Emily Brailey, Esq.
7            ebrailey@perkinscoie.com
                     AND
8            Aria Branch, Esq.
                     AND
9            Jackie Lopez, Esq.

10
   FOR DEFENDANT THE TEXAS SECRETARY OF STATE:
11
        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
12      Special Counsel for Civil Litigation
        300 W. 15th Street
13      Austin, Texas  78701
        (T) 512.463.4139
14
        By:  Anne Marie Mackin, Esq.
15           anna.mackin@oag.texas.gov

16

17  VIDEOGRAPHER:

18      Brian Christopher

19                    --ooOoo--

20

21

22

23

24

25

3

```
 1                        INDEX

 2    APPEARANCES                              2

 3

 4   EXAMINATION OF SARA SCHAUMBURG:

 5    BY MS. MACKIN                            6

 6    BY MS. BRAILEY                          57

 7

 8

 9    CHANGES AND SIGNATURE                   60

10    REPORTER'S CERTIFICATION                62

11

12                   --ooOoo--

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                        EXHIBIT INDEX

2   Exhibit Number        Description               Page

3     Exhibit 1      Intervenor-Plaintiffs Texas      9
                     Democratic Party, DSCC, and
4                    DCCC's Complaint for Declaratory
                     and Injunctive Relief
5
      Exhibit 2      Defendants' Notice of Oral       10
6                    Deposition Pursuant to Federal
                     Rule of Civil Procedure 30
7
      Exhibit 3      2/3/2020 DSCC press release      15
8
      Exhibit 4      DSCC FEC Form 1                  46
9                    Statement of Organization

10    Exhibit 5      DSCC Disbursements to TDP        49
                     printout, dated January through
11                   March 2020

12
                        --ooOoo--
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 (Thursday, April 30, 2020, 10:15 a.m.)

 2                      P R O C E E D I N G S

 3                 THE REPORTER:  Today is Thursday,

 4  April 30, 2020.  This is the videoconferenced deposition

 5  of the DSCC's Corporate Representative, Sarah

 6  Schaumburg, in the matter of Jarrod Stringer, et al.

 7  versus Ruth Hughs, et al.  Due to the COVID-19 pandemic,

 8  we are remotely situated, and we are on the record at

 9  10:15 a.m., Central Standard Time.

10                 My name is Debbie Cunningham, and my

11  business address is P.O. Box, Manchaca, Texas 78652.

12                 Would all persons present please

13  introduce themselves for the record?

14                 MS. MACKIN:  This is Anna Mackin with the

15  Texas Attorney General's office on behalf of the

16  Defendants.

17                 MS. BRAILEY:  This is Emily Brailey with

18  Perkins Coie on behalf of the Plaintiff Intervenors.

19                 MS. BRANCH:  Aria Branch with Perkins

20  Coie on behalf of the Plaintiff Intervenors.

21                 THE REPORTER:  Is anyone else making

22  announcements?

23                 (No audible response.)

24                 (Witness sworn by the reporter.)

25                 MS. SCHAUMBURG:  I apologize.
```

DSCC - 4/30/2020

1              (Brief interruption.)

2                    SARA SCHAUMBURG,

3    having taken an oath to tell the truth, the whole truth,

4    and nothing but the truth, was examined and testified as

5    follows:

6                         EXAMINATION

7    BY MS. MACKIN:

8         Q.   Good morning, Ms. Schaumburg.  If you wouldn't

9    mind, just please speak and spell your name one more

10   time for the record.

11        A.   Sure.  It's Sara Schaumburg, S-A-R-A

12   S-C-H-A-U-M-B-U-R-G.

13        Q.   Thank you.

14             My name is Anna Mackin.  I'm an attorney

15   with the Texas AG's Office, and I represent the

16   Defendants in the case.  I'm going to be taking your

17   deposition today.  Have you been deposed before?

18        A.   Yes.

19        Q.   Okay.  So you're probably familiar with the

20   basic ground rules, but I want to touch on a couple of

21   high points before we get into the meat of the

22   questions.  Since we are using this remote means, please

23   try to give a verbal answer to my questions, a "yes" or

24   a "no," as opposed to "uh-huh" or "huh-uh."  That's

25   because Debbie is writing down everything we say, and so

DSCC - 4/30/2020

7

1   that way we can get a clear and accurate record.  Okay?

2       A.   Yes.

3       Q.   Okay.  And please let me finish my question

4   before you answer.  I will also endeavor to let you

5   finish your answer before I ask my next question.

6   Again, this is especially important that we avoid

7   speaking over today to give the court reporter time to

8   get everything down.

9           If you don't understand one of my

10  questions, will you agree to tell me so that I can

11  rephrase it?

12      A.   Yes.

13      Q.   Thank you.

14          And this is not an endurance contest.

15  You are the talent.  If you need a break to use the

16  restroom, stretch your legs at any time, just let me

17  know.  I'll have you answer any question that is pending

18  at the time; but then you can go ahead and take that

19  break.  Okay?

20          Any reason that you might not be able to

21  answer my questions honestly, completely, and accurately

22  today?

23      A.   No.

24      Q.   And now that the deposition is underway,

25  please tell me if you communicate via text, e-mail, or

1   any other means about [sic] your counsel about the

2   substance of your testimony between now and when I

3   conclude the deposition.  Okay?

4        A.   Yes.

5        Q.   Do you have any documents in front of you?

6        A.   No.

7        Q.   Okay.  I'm going to be showing you some

8   documents today; but since we're situated remotely, if

9   you refer to any document or any website to aid you in

10  answering my questions, please let me know that.  Okay?

11       A.   And just to -- sorry.  I do have a hard copy

12  of the Complaint.

13       Q.   Okay.

14       A.   And the -- and my declaration.

15       Q.   Okay.  Thank you for that.

16            Also during our conversation today, when

17  I say DSCC, I will be referring to the Democratic

18  Senatorial Campaign Committee; and when you say DSCC, I

19  will also understand you to be referring to the

20  Democratic Senatorial Campaign Committee.  Is that fair?

21       A.   Yes.

22       Q.   Okay.  So during today's deposition, I'm going

23  to be showing you some documents.  We can do this one of

24  two ways.  I can share documents on my screen, or I can

25  send a link in the chat box to allow you to click and

9

 1   download the document.  Do you have a preference?  Would

 2   one of those be easier for you?

 3        A.   Probably the link.

 4        Q.   Okay.  Let's go ahead, then, and practice with

 5   what's going to be Exhibit 1.

 6                  (Exhibit 1 marked.)

 7        Q    (BY MS. MACKIN)  So I'm placing a document in

 8   the chat box.  Did that go through okay?

 9        A.   It did.

10        Q.   Okay.  And if you wouldn't mind opening that

11   up, take a look at it and let me know when you are ready

12   to discuss it.

13        A.   Okay.

14        Q.   Have you seen this document before,

15   Ms. Schaumburg?

16        A.   Yes.  My only hesitation is just the date is

17   different than the one that I was familiar with.  I

18   thought one -- I'm looking at one, so I'm just -- or the

19   one that I have is from December.  This one is from

20   January, but I think I am generally familiar with this

21   document.

22        Q.   Okay.  And what is it?

23        A.   This is our Complaint in this case.

24        Q.   Okay.  And did you review the document before

25   it was filed?

1      A.   Yes.

2      Q.   **Okay.  How much time would you say that DSCC**

3  **staff spent reviewing this document before it was filed?**

4      A.   Personally, I probably spent about an hour or

5  two looking over it before it was filed.  I can't speak

6  to others.

7      Q.   **Do you know if anyone else with DSCC reviewed**

8  **it before it was filed?**

9      A.   I believe so, but I don't know for sure.

10     Q.   **Okay.  That's all that I have on that**

11  **document.**

12          MS. MACKIN:  I'm going to share another

13  document in the chat box.

14          (Exhibit 2 marked.)

15     Q.   **(BY MS. MACKIN)  Please let me know if that's**

16  **come through okay, and let me know when you're ready to**

17  **discuss it.  And, obviously, take all the time you need**

18  **to look it over.**

19     A.   Okay.

20     Q.   **All right.  Have you seen this document**

21  **before?**

22     A.   Yes.

23     Q.   **And what is it?**

24     A.   This is the Notice of my deposition and the

25  deposition topics.

1      Q.   Okay.  And so you understand that you are here

2  today pursuant to this Deposition Notice?

3      A.   Yes.

4      Q.   And you understand that this document says

5  that DSCC is directed to designate one or more persons

6  to testify on its behalf on the topics of this Notice?

7      A.   Yes.

8      Q.   And so do you understand that your testimony

9  today is on behalf of DSCC, and your answers will bind

10  DSCC?

11      A.   Yes.

12      Q.   Okay.  And, again, taking all the time you

13  need to review the topics listed in the Notice, have you

14  been designated as DSCC's representative on each topic

15  in Exhibit 2?

16      A.   That's my understanding, yes.

17      Q.   Okay.  How did you prepare for today's

18  deposition?

19           MS. BRAILEY:  I'm going to object on the

20  attorney-client privilege.

21           Sara, you can answer as long as you don't

22  reveal any conversation with me on that.

23      A.   I've had two sessions with counsel.  I spoke

24  with some other employees at the DSCC about our

25  involvement in Texas, and I reviewed some of the filings

1  in the case and the documents that the DSCC has produced

2  in the case.

3      Q.   Who did you meet with at DSCC to prepare for

4  today's deposition?

5      A.   I spoke briefly with Allison Wright and Ben

6  Walden.

7      Q.   And what is Ms. Wright's position with DSCC?

8          MS. BRAILEY:  I'm going to object on the

9  First Amendment to the extent that any of your answers

10  would include strategic information.

11          But you can answer at a high level.

12      A.   She handles our compliance.

13      Q.   (BY MS. MACKIN)  So, like, one of her job

14  duties is filing your filings with the FEC, for example?

15      A.   That, I don't know.

16      Q.   Oh, okay.  No problem.

17          And then what is Mr. Walden's role with

18  DSCC?

19          MS. BRAILEY:  The same objection.  I'm

20  going to just object on the First Amendment.

21          You can answer at a high level as long as

22  you don't reveal strategic information.

23      A.   He's the director of Candidate Services.

24      Q.   (BY MS. MACKIN)  So did you meet with anyone

25  else at DSCC to prepare for today's deposition besides

1 Ms. Wright and Mr. Walden?

2     A.   No.

3     Q.   Okay.  And why did you meet with Ms. Wright to

4 prepare for today's deposition?

5     A.   To make sure I had a complete understanding of

6 our investments and involvement in Texas in the Texas

7 Senate race.

8     Q.   And how about Mr. Walden, why did you meet

9 with him?

10     A.   I'm sorry.  I said for the same reason as

11 Ms. Wright.

12     Q.   Okay.  Thank you for that.

13          And you mentioned that you met with your

14 counsel twice?

15     A.   Correct.

16     Q.   Okay.  And, again, I'm not asking for the

17 substance of those communications or what you discussed,

18 nothing privileged, just kind of the nuts and bolts of

19 how long were each of those meetings?

20     A.   A couple of hours.

21     Q.   All right.  And so are you adequately

22 familiarized with the facts to testify as DSCC's

23 representative on the topics in the Notice?

24     A.   Yes.

25     Q.   Okay.  Did you review -- well, let's see.  You

1  mentioned that you reviewed the filings in this lawsuit,

2  not all of them, some of them, and the documents that

3  DSCC has produced to us.  Did you review any other

4  documents to prepare for today's deposition?

5            MS. BRAILEY:  I'm just going to object to

6  preserve the attorney-client privilege.

7            You can answer as long as none of this

8  involves our conversations.

9       A.   No.

10       Q    (BY MS. MACKIN)  So your counsel has provided

11  some documents to us that are Bates numbered DSCC 1

12  through DSCC 906.  Are you aware of that?

13            MS. BRAILEY:  Objection.

14            Anna, just so you know, it goes to 911 is

15  the final Bates number.

16            MS. MACKIN:  I apologize.  911.  I guess

17  the last document is titled 906, but it's several pages.

18            MS. BRAILEY:  Right.

19            MS. MACKIN:  I appreciate that.  Thank

20  you, Emily.

21       Q    (BY MS. MACKIN)  And so are you familiar with

22  the fact that those documents have been provided to us,

23  Ms. Schaumburg?

24       A.   I understand that counsel produced this set of

25  documents in advance of this.

 1      Q.   And is it your understanding that the
 2   documents were provided as DSCC's response to the
 3   subpoena on page 6 of Exhibit 2?
 4      A.   Yes.
 5      Q.   Okay.
 6            MS. MACKIN:   And I'm going to attach a
 7   copy of that production to this deposition as Exhibit 3.
 8            (Exhibit 3 marked.)
 9            MS. MACKIN:   I can try to share it in the
10   chat box.  Let me see if it will go through.  No, it's
11   not letting me do that; but I'll provide them to all
12   parties after the deposition.  Plaintiffs are welcome --
13   sorry.  Intervenors are welcome to verify that it is, in
14   fact, the production.
15            MS. BRAILEY:   And, Anna, if you're going
16   to use specific ones, will you puts those specific pages
17   in the chat.
18            MS. MACKIN:   Yes, yes.
19            MS. BRAILEY:   Okay.
20      Q    (BY MS. MACKIN)   And, Ms. Schaumburg, did you
21   review the documents that were produced to us before
22   they were produced?
23      A.   I believe so.
24      Q.   Okay.  And do you know the names of the DSCC
25   staff members who searched for documents to respond to

 1  the subpoena?

 2               MS. BRAILEY:  I'm going to object on both

 3  attorney-client privilege because of our conversations

 4  and also on the First Amendment to the strategic

 5  information.

 6               You can answer to the extent that you

 7  know and don't reveal strategic or privileged

 8  communications.

 9       A.   No, I don't know.

10       Q    (BY MS. MACKIN)  Okay.  All right.  So I'd

11  just like to briefly go through the list on page 6 of

12  Exhibit 2.  The first category of documents, did DSCC

13  provide documents in response to this request?

14       A.   So I was not involved in putting together the

15  production, but it's -- just looking at it, it's my

16  understanding that the DSCC searched for and produced

17  documents in consultation with counsel and that those

18  documents satisfied the request.

19       Q.   Okay.  And would that be your answer with

20  respect to all five categories of documents listed on

21  page 6 of Exhibit 2?

22       A.   Yes.

23       Q.   Okay.  In preparation for today's deposition,

24  did you review any documents that have not been produced

25  to us?

1          MS. BRAILEY:  I'm going to object on

2   attorney-client privilege.

3          You can answer to the extent that you

4   don't reveal privileged conversations.

5      A.   Did I review any -- other than the filings

6   that I mentioned, no.

7      Q.   (BY MS. MACKIN)  Okay.  And so you are

8   currently employed by DSCC; is that right?

9      A.   Yes.

10      Q.   And that is a national party committee of the

11   Democratic Party?

12      A.   That's correct.

13      Q.   Okay.  What is your job title?

14      A.   I'm the Director of Voter Protection and the

15   Deputy Policy Director.

16      Q.   And how long have you held that position?

17      A.   Since early November of 2019.

18      Q.   And before that, what was your job?

19      A.   I was a litigation associate at WilmerHale.

20      Q.   I cannot believe you got out of the game.

21          So what are your job duties in your

22   current role at DSCC?

23      A.   So on the voter protection side, I work to

24   manage and oversee the DSCC's voter protection efforts.

25   A lot of that entails working with the state voter

1 | protection directors in the Senate battleground states

2 | to advise and provide guidance on their voter protection

3 | programs and helping them identify issues as they come

4 | up, identify opportunities to expand voting access, and

5 | eliminate barriers and obstacles to voting.

6 |            And on the policy side, a lot of it

7 | involves tracking federal legislation, what's going on

8 | on the Senate floor, and helping our campaigns and

9 | candidates understand and follow that process and

10 | develop their policy platforms.

11 |      **Q.   You mentioned sort of liaising with state**

12 | **voter protection directors.  Is there a voter protection**

13 | **director for the state of Texas?**

14 |      A.   Yes.

15 |      **Q.   And what is that person's name?**

16 |      A.   Rose Clouson.

17 |            (Reporter requests spelling.)

18 |            THE WITNESS:  C-L-O-U-S-O-N.

19 |      **Q   (BY MS. MACKIN)  And who do you report to**

20 | **within the DSCC organizational structure?**

21 |      A.   In the voter protection role, I would report

22 | to our executive director.

23 |      **Q.   What is the executive director's name?**

24 |      A.   Scott Fairchild.

25 |      **Q.   Okay.  And then in the policy role?**

1      A.   I would report to the policy director.

2      Q.   **And what is that person's name?**

3      A.   Hazeen Ashby.  I spell that.  H-A-Z-E-E-N.

4  The last name is Ashby, A-S-H-B-Y.

5      Q.   **Does anyone report to you?**

6      A.   No.

7      Q.   **Okay.  Do you enjoy your job?**

8      A.   Yes, I do.

9      Q.   **Good.**

10              **And I just briefly want to cover your**

11  **educational background, starting with the most advanced**

12  **degree obtained.  I assume you went to law school?**

13     A.   I did.

14     Q.   **And where did you go to law school?**

15     A.   I graduated from Harvard Law School.

16     Q.   **In what year?**

17     A.   2016.

18     Q.   **And then how about undergraduate?  Where did**

19  **you go to undergraduate?**

20     A.   University of Pennsylvania.

21     Q.   **And what did you study?**

22     A.   Political science.

23     Q.   **And what year did you graduate?**

24     A.   2007.

25     Q.   **Okay.  What did you do in between college and**

1 law school?

2     A.   So in 2006 I took time off of college and

3 worked on a House race in Pennsylvania.  I continued to

4 work on that after graduation in the '08 and 2010

5 cycles.  Although in 2009, in January 2009, I went to

6 the official side for a while; and I was a Congressional

7 staffer, a legislative aide, focused primarily on

8 healthcare policy.  And then towards the end of the

9 campaign cycle, I went back to the campaign side as the

10 communications director.

11          After 2010 -- we lost that race -- I went

12 to work for another congressman, then Congressman Ed

13 Markey, from Massachusetts.  I was with him through June

14 2013.  And then went to law school in that fall.

15     Q.   And so you mentioned working for Congressman

16 Markey; and then, before that, you talked about a couple

17 of roles with campaigns and then on the official side.

18 Was that all for the same person?

19     A.   Yes.

20     Q.   And who was that?

21     A.   Patrick Murphy.

22     Q.   All right.

23     A.   I should say on the campaign side, I served as

24 a field organizer and also was the deputy finance

25 director for a cycle; and then my final role was as the

DSCC - 4/30/2020

21

1  comms director.

2      Q.   I worked on a couple of campaigns.  I know

3  that sometimes you can wear many hats.

4              All right.  So jumping over to the topics

5  in the Notice, I'm just going to start with Topic 1.

6  What is DSCC's mission?

7      A.   So the DSCC is the National Senatorial

8  Committee of the Democratic Party's organization that's

9  responsible for the day-to-day operations of the Party

10  at a national level, and its mission is just to elect

11  Democrats, Democratic candidates to the United States

12  Senate, including candidates from Texas.

13      Q.   And has that mission changed over time?

14      A.   Not that I know of.

15      Q.   Okay.  When was DSCC first established?  And

16  I'll say I understand that from the FEC filings, some of

17  them say Democratic Senatorial Campaign Committee; and

18  some of them just say DSCC.  I'm referring to the same

19  organization.

20      A.   I would have to check.

21      Q.   Okay.  What percentage of DSCC's activities,

22  just approximately, would you say are focused on voter

23  registration?

24              MS. BRAILEY:  I'm going to object on the

25  First Amendment.

1            You can answer at a high level.

2       A.   So I don't think I could give that a

3  percentage.  It doesn't exactly -- that's not how we

4  would break down our operations.  I mean, the core of

5  what the DSCC does is working with campaigns and state

6  parties to support a range of different activities,

7  including field; and that would, you know, be voter

8  registration, voter turnout, GOTV.  So it's definitely a

9  core part of the GOTV's mission and activities, but

10  it's -- I cannot put a percentage on it.

11            I can't -- I don't know if something

12  happened with the sound.

13       **Q.   Can you hear me?**

14       A.   I can now.

15       **Q.   Okay.  I didn't really say anything.  I said,**

16  **"Fair enough" but kind of to myself.**

17       A.   I saw the mouth moving, but I couldn't hear

18  you.

19       **Q.   Sorry.**

20            **Would you say at a high level that DSCC's**

21  **focus on voter registration activities has been the same**

22  **over time, or has it changed?**

23            MS. BRAILEY:  Again -- I know you said

24  "high level," but just to preserve it, object on the

25  First Amendment.

1            You can answer to the extent you don't

2    reveal internal strategic decisions.

3        A.    I think it's definitely been a focus of the

4    DSCC's mission.  I think, you know, our focus depends --

5    like, it will vary.  Depending on the cycle, depending

6    on the state and what race you're talking about, there's

7    different -- you know, each state is different and

8    presents different challenges.

9            You know, in a situation where we're

10    dealing with a state that has put in place a lot of

11    obstacles to voter registration, like in Texas, then it

12    will be an even greater focus for the DSCC if there's --

13    you know, if you have a situation like we have here,

14    where the State's not allowing simultaneous online

15    registration, then we know that voter registration's

16    going to have to be a higher priority than it might be

17    in another state where it's easier to register folks.

18        Q.    And would you say that -- well, strike that.

19            Okay.  Moving on to Topic 2, DSCC's

20    organizational structure, how many employees does DSCC

21    have?

22        A.    (Inaudible.)

23        Q.    Okay.

24            (Reporter requests repeat.)

25            THE WITNESS:  Roughly, a rough

DSCC - 4/30/2020

24

1 approximation, 50; but I don't have an exact number.

2     **Q.   (BY MS. MACKIN)   Does DSCC have any parent or**

3 **sibling entities?**

4          MS. BRAILEY:  I'm just going to object on

5 First Amendment.

6          But, obviously, you know, answer to the

7 extent that you know it at a high level.

8     A.   I'm not sure what you mean by -- what did you

9 say, sister?

10     **Q.   (BY MS. MACKIN)   Sibling.**

11     A.   What do you mean by that?

12     **Q.   Well, I think we can actually explore that**

13 **with an exhibit later on.  So we can move along from**

14 **that.**

15          **DSCC is a 501(c)(4), though, correct?**

16          MS. BRAILEY:  I'm going to object on a

17 legal conclusion.

18          You can answer to the extent that you

19 know.

20     A.   I believe that's correct.

21     **Q   (BY MS. MACKIN)   Okay.  All right.  I want to**

22 **jump down to Topic 4 and talk about DSCC's activities in**

23 **Texas.  I'd like to get a sense of the general**

24 **categories, types of activities that DSCC is engaged in.**

25 **So I know that it can change from cycle to cycle; and**

1    **I'm not trying to get overly granular, just kind of --**

2    **one of the things you mentioned earlier was candidate**

3    **services might be, like, one bucket of activity.  How**

4    **would you kind of describe the main categories of**

5    **activities that DSCC conducts in Texas?**

6         A.   So the DSCC engages in a range of activities;

7    and, again, it will depend on the particular state and

8    particular race.  But we advise candidates and state

9    parties to support their programs and operations.

10             We raise and spend tens of millions of

11   dollars that we use to support individual Senate

12   campaigns, either via direct contributions or by making

13   investments on behalf of the campaigns, a lot to the

14   limit.

15             We transfer down funding to state parties

16   that's used part of the coordinated campaign to hire key

17   staffers, invest in field and turnout operations.  So

18   that would include voter registration, persuasion, GOTV.

19             And we invest in communications tools

20   that would make it easier for campaigns and -- for

21   campaigns to contact voters, like texting, dialing, that

22   would help our candidates expand their voter

23   registration and turnout efforts.

24        Q.   Okay.  So, again, with the understanding that,

25   **you know, I'm not expecting you to list every discreet**

26

1   activity but just to get a sense of, like, the broad

2   categories, what I have, based on your answer, seems to

3   fall into -- and correct me if I'm wrong; I'm just

4   trying to make a list -- state party support, candidate

5   support, the coordinated campaign, and investments in

6   communication tools.  Did I miss something,

7   mischaracterize it?

8       A.  When you say the state party -- I mean, the

9   transfers down are used to support the coordinated, so.

10      Q.  Okay.  So that's kind of like one bucket,

11  like, state party support, the coordinated campaign

12  would fall within that?

13      A.  Sure.

14      Q.  Okay.  And so what types of -- and I know you

15  gave some examples; but now I do want to dive a little

16  deeper, again, with the understanding that I'm not

17  expecting, you know, like, "We ran this ad on March 1st"

18  or whatever.  But what types of activities does the DSCC

19  engage in that you would characterize as state party

20  support?

21          MS. BRAILEY:  And I'll object on the

22  First Amendment.

23          You can answer at a high level.

24      A.  So we transferred down funding to the state

25  parties; and, again, that's used to support and finance

1   activities that are part of a coordinated campaign which

2   supports Democratic candidates up and down the ballot.

3   And so that's the things I've listed before.  It would

4   include hiring staff, supporting field and turnout,

5   things like that.

6       **Q.   And would you categorize voter-registration**

7   **efforts as falling under that state party support**

8   **umbrella?**

9       A.   In part at least.

10      **Q.   And what else might voter-registration**

11  **efforts -- well, you said voter-registration efforts**

12  **could, in part, be characterized as state party support.**

13  **How else could they be characterized?**

14      A.   I mean, again, the communication tools that we

15  invest in help candidates expand their voter-contact

16  efforts, to include voter registration.

17      **Q.   And so what types of voter-registration**

18  **efforts does the DSCC engage in?**

19              MS. BRAILEY:  I'll object on the First

20  Amendment.

21              You can answer at a high level.

22      A.   Sorry.  I'm just trying to distinguish from

23  what I've -- what you've already asked.  I mean, we

24  provide support for state parties, which is the

25  coordinated, and comms tools.  I think that is primarily

1  how we would support voter registration.

2      Q    (BY MS. MACKIN)  So it would be like -- oh, I

3  see.  So, like, the support that you provide to the

4  state party, some of that is used by the state party for

5  voter-registration efforts?  Is that what you're saying?

6      A.    As part of a coordinated campaign.

7      Q.    Okay.  And then you also make investments in

8  these tools that you make available to state parties and

9  the tools can assist the state parties with voter

10  registration; is that right?

11      A.    My understanding is that the communications

12  tools are something we provide to individual campaigns.

13  I'm not sure if we provide that to the state party.

14      Q.    So I'm getting a sense that the ways that DSCC

15  support voter-registration efforts are, Number 1, by

16  providing funds to state parties, which then use those

17  funds for voter-registration efforts.  And, Number 2, by

18  providing communications tools to campaigns, which the

19  campaigns can then use for voter-registration efforts;

20  is that right?

21      A.    It also provides funding to individual

22  campaigns that might use that for voter registration.

23      Q.    Okay.  And when you provide funds to a state

24  party, do you -- I want to say earmark; but I know that

25  has, like, a legal connotation in a campaign finance

29

```
 1  context.  So that's not really what I mean.  Like, when
 2  you provide funds to state parties, do you specify, "Use
 3  these funds for voter registration"; or is up to the
 4  party to take the funds that it receives from DSCC and
 5  then decide to use them for voter registration?
 6              MS. BRAILEY:  I'm going to object on the
 7  First Amendment.
 8              You can answer at high level.
 9              But I'm also going to object on form that
10  it's vague and compound.
11      A.   Yeah.  Can I -- sorry.  Can I ask you to
12  rephrase?
13      Q    (BY MS. MACKIN)  Sure.  So -- actually, I kind
14  of forgot my question.
15              MS. MACKIN:  Debbie, would you mind
16  reading it back, just to remind me; and then I will
17  rephrase it.
18              THE REPORTER:  Okay.
19              MS. MACKIN:  Thank you.
20              (The requested material was read as
21  follows:
22              "QUESTION:  And when you provide funds to
23  a state party...")
24              THE REPORTER:  Oh, do you want me to
25  continue?
```

1          MS. MACKIN:   Now I remember.

2     **Q    (BY MS. MACKIN)  So when the DSCC provides**

3  **funds to a state party, will it ever specify that those**

4  **funds are to be used for voter registration?**

5          MS. BRAILEY:  Objection on the First

6  Amendment.

7          You can answer at a high level.

8     A.   Specify in what way?

9     **Q    (BY MS. MACKIN)  In any way.**

10    A.   My understanding is that we would not.  And I

11  don't -- you know, that we provide funding to the state

12  party; but it's not designated for particular specific

13  purposes.

14    **Q.   Okay.**

15    A.   I think the -- you know, in deciding -- well,

16  I'll leave it at that.

17    **Q.   Okay.   Thank you.**

18          **And then when DSCC provides support to**

19  **campaigns, will it ever designate the funds it provides**

20  **for voter registration activities?**

21          MS. BRAILEY:  Objection on the First

22  Amendment.

23          You can answer at a high level.

24          And, also, an objection to a legal

25  conclusion.

1           So just answer to the extent that you

2    know in your experience.

3         A.   Not to my knowledge.

4         Q    (BY MS. MACKIN)   Okay.  And when the DSCC

5    makes communication tools available to campaigns, will

6    it ever designate those tools to be used specifically

7    for voter registration purposes?

8              MS. BRAILEY:  Same objection, First

9    Amendment.

10              You can answer at a high level.

11              And legal conclusion.

12              If you know what it means in your

13    experience.

14         A.   I'm not really sure -- I'm not sure I totally

15    understand the question.  I mean, there are

16    communication tools which are, by definition, meant to

17    communicate with voters for doing -- for voter-contact

18    activities which would include voter registration.  So I

19    think it's sort of inherent to the nature of the tool.

20         Q.   (BY MS. MACKIN)   But the tool can be used for

21    multiple purposes, right?

22         A.   It's for voter contact.

23         Q.   Okay.  And just to make sure I'm clear, does

24    DSCC itself conduct voter registration activities in

25    Texas?

1          MS. BRAILEY:  Objection on the First

2   Amendment.

3                Answer at a high level.

4      A.   Other than what I've described?

5      Q    (BY MS. MACKIN)  Other than by providing

6   support to candidates and campaigns who can then conduct

7   voter-registration activities.

8      A.   I mean, I think that there could be instances

9   where DSCC staff advise, whether by training or other

10  guidance, on voter-registration activities, in addition

11  to everything that we've already talked about.

12     Q.   Okay.  Anything else?

13     A.   On?  I'm sorry.  Anything else...

14     Q.   Does DSCC conduct any other voter-registration

15  activities in Texas besides the support it provides to

16  state parties, the support it provides to campaigns; and

17  then you mentioned the possibility of DSCC staff

18  providing guidance or training on voter registration?

19     A.   That's all I can think of.

20     Q.   Okay.  How often would you say DSCC's staff

21  has provided guidance on voter registration in Texas?

22     A.   How often?

23     Q.   Uh-huh.

24     A.   What do you mean by, like --

25     Q.   Well, you mentioned that it might happen.  And

1   so I'm just trying to get a sense of whether that has,

2   in fact, happened or it's more of a hypothetical

3   possibility.

4        A.   I mean, it has certainly happened.  It's

5   hard -- I'm not sure how -- how often.  You know, like I

6   said, they would advise as needed.  It depends, again,

7   on the other needs of the campaign and what's going on

8   in a particular state.

9        Q.   Okay.

10       A.   But we certainly do provide guidance and

11  training and, you know, expertise on all things field

12  and voter contact; and voter registration is a big part

13  of that.

14       Q.   Any other voter-registration activities that

15  DSCC has engaged in in Texas?

16       A.   Again, that's all I can think of.

17       Q.   Okay.  How much did DSCC spend on voter

18  registration in Texas in 2014?

19            MS. BRAILEY:  Objection on the First

20  Amendment.

21            Just answer at a high level.

22       A.   It's not like there's a line item for

23  voter-registration efforts, so it's hard for me to

24  answer that.

25       Q    (BY MS. MACKIN)  And would your answer be the

1   **same for the years 2015, 2016, 2017, 2018, and 2019?**

2        A.   My answer to the question of how much did the

3   DSCC spend on voter registration?  Yes.

4        **Q.   And would that also be your answer for how**

5   **much the DSCC spent on voter registration in 2020?**

6        A.   I mean, again, there's no line item for voter

7   registration.  So in 2020 we've made investments in

8   Texas and we expect to make significantly more, given

9   the state of that race; but there's not a particular --

10  there's not a specific, like, line item for voter

11  registration in the budget or something like that.

12       **Q.   Okay.  What investments have you made in**

13  **Texas?**

14            MS. BRAILEY:  Again, I'll object to the

15  First Amendment.

16            But you can answer at a high level.

17       A.   What time period are you talking about?

18       **Q    (BY MS. MACKIN)  In 2020.**

19       A.   Like, in the 2020 cycle?

20       **Q.   Well, sure.**

21       A.   Okay.  Because that would be 2019, too.

22       **Q.   Okay.  Fair enough.**

23       A.   So for this cycle, it's my understanding that

24  we have invested nearly $200,000 in Texas in various

25  ways.  I know we've max'ed out to the MJ for Senate

DSCC - 4/30/2020

35

```
 1  Campaign.  We've done $25,000 in transfer downs and
 2  roughly a hundred thousand in polling.
 3      Q.  And do you know if any of those investments
 4  have been used for voter-registration activities?
 5      A.  So I do know that TDP is -- as you might be
 6  aware, is undertaking the biggest voter registration
 7  initiative in the history of the state party.  And so
 8  it's my understanding that, again, the funding that we
 9  provide to the state party is used for coordinated
10  campaign expenses; and so that would all be part of
11  those efforts.
12      Q.  All right.  Other than the funds that DSCC
13  transferred down to TDP, do you know if any of its other
14  investments in the 2019-2020 cycle in Texas have been
15  used for voter registration?
16      A.  So I don't know specifically; but I do want to
17  make two points, just to make sure this is clear so --
18  as far as the funding goes, because you're asking about
19  what we've done so far.  As far as transfer down
20  funding, it's very early in the cycle to be assessing
21  the level of transfer down funding.  You know, a lot of
22  those investments are things you wouldn't expect to see
23  until later in the cycle, with early voting not starting
24  for six months.
25              So we've done, you know, what we've done
```

1   so far; but on a related note, you know, we intend to

2   spend significantly more in Texas than what we've seen

3   already, easily into the millions, given the

4   competitiveness of the race and the fact that the DSCC

5   is aware of several obstacles that Texas has put in

6   place to turning out voters, including the failure to

7   allow for simultaneous online registration.  So I just

8   wanted to make sure that was clear.

9        Q.   Okay.  Thank you for that.

10            But so far in the 2019-2020 cycle, you

11   mentioned that the DSCC has transferred money to the TDP

12   that might be used for voter registration.  Other than

13   that, has the DSCC made any other investments in the

14   2019-2020 cycle that can be used for voter registration?

15       A.   So I listed all of the investments that we've

16   made in Texas that I'm aware of; and, again, we'll just

17   stress that the DSCC intends to make significantly more

18   investments as the cycle progresses.

19       Q.   Sure.  Fair enough.  But to date.

20            MS. BRAILEY:  I'm going to object on the

21   form.

22            You can answer if you understand.

23       A.   So I think I've answered it.  I've listed the

24   investments in Texas in this cycle that I'm aware of.

25       Q.   (BY MS. MACKIN)  Right.  And I'm sorry if my

37

1  question wasn't clear.  I was asking which of those

2  investments have been used for voter registration.

3          MS. BRAILEY:  I'm going to object on form

4  again.

5      A.  So we contributed to the MJ for Senate.  I'm

6  not -- I can't -- I don't know what exactly that is

7  being used for; but we have provided the maximum amount

8  that we are able to, to her campaign directly, which I

9  think could be used for voter registration.

10          We've given 25,000 to the coordinated,

11  which engages in voter-registration efforts and intend

12  to do more -- anticipate doing more through the

13  coordinated.

14      Q.  (BY MS. MACKIN)  Okay.  And do you know how

15  much of that 25,000 to the coordinated has been used for

16  voter registration?

17      A.  Sitting here, I couldn't give you a specific

18  amount.  Again, I don't -- I can't speak to TDP's, you

19  know, recordkeeping; but, like, the DS, as I said

20  before, it's not like there's a line item for voter

21  registration.  But I do know that TDP is undertaking a

22  huge voter-registration effort, in part, to compensate

23  for some of the unique challenges that it faces in the

24  state.

25      Q.  Okay.  So now I'm a little bit confused.  In

1   terms of the funds that you've invested in Texas in the

2   2019-2020 cycle, I have funds to TDP, funds to MJ for

3   Senate, and then funds to the coordinated campaign?

4          A.   No, to the -- sorry.

5          Q.   No, please go ahead.  I'm trying to

6   understand, so correct me.

7          A.   The funding to the state party is -- when I

8   say "transfer down," that's funding that we transfer

9   down from the DSCC to the state party that is used for

10  the coordinated campaign expenses.

11         Q.   Okay.  So I've got funds to TDP and funds to

12  MJ for Senate; is that -- is that right?  Sorry.  That's

13  a terrible question.

14              For your investments in Texas in the

15  2019-2020, I've got funds to TDP and funds to MJ for

16  Senate.  Is there anything else?

17         A.   I also mentioned the polling.

18         Q.   Polling.  Okay.  Tell me about that.

19              MS. BRAILEY:  Objection, vague.

20         A.   Can you clarify?

21         Q.   (BY MS. MACKIN)  What do you mean by

22  "polling"?  I don't --

23         A.   Like, what is polling?

24         Q.   Like, you say you have invested in polling.

25  Do you know if any of your investments in -- so if you

 1   invested in polling, those funds would not be used for

 2   voter registration, right?  They'd be used for polling?

 3       A.   Yes.

 4       Q.   Okay.  And then, so other than the funds to

 5   TDP, the funds to MJ for Senate, and the investments in

 6   polling, have you made any other investments in Texas in

 7   the 2019 to 2020 cycle so far?

 8              MS. BRAILEY:  Objection in that it

 9   mischaracterizes the testimony.

10       Q.   (BY MS. MACKIN)  And if I've got it wrong,

11   please tell me.  I'm just trying to get the list.

12       A.   Can you repeat the question?

13       Q.   Sure.  So in the 2019 to 2020 cycle, DSCC has

14   invested in Texas in the following ways:  Funds to TDP,

15   fund to MJ for Senate, and investments in polling.  Is

16   there anything else so far?

17       A.   It this --

18              THE WITNESS:  I'm sorry.  Emily, did

19   you...

20       A.   At this stage of the cycle, that's my

21   understanding of our investments in the state.

22       Q.   (BY MS. MACKIN)  Thank you for that.

23              All right.  And jumping back to the

24   previous cycle, 2017 to 2018, did DSCC make any

25   investments in voter registration in Texas in the 2017-

 1  **2018 cycle?**

 2       A.   So I don't -- I mean, as far as expenditures

 3  that the DSCC made to Texas in the 2018 cycle, I'm aware

 4  that I believe we spent, like, $35,000 on polling.  I'm

 5  not aware of specific, like, itemized expenditures.

 6  That's not to say that -- like, there could have been

 7  staff time spent on supporting voter-registration

 8  efforts, but not that I'm aware of.

 9       **Q.   Okay.  In the 2015 to 2016 cycle, are you**

10  **aware of DSCC making any investments in voter**

11  **registration in Texas?**

12       A.   When you say "investments," can you -- like,

13  what are you...

14       **Q.   I'm tracking the language in your Complaint.**

15  **So if there's a better way to describe it, please let me**

16  **know.**

17       A.   So I'm not aware of expenditures that the DSCC

18  made to Texas in the 2016 cycle.

19       **Q.   So there weren't any that you're aware of?**

20            MS. BRAILEY:  Objection, mischaracterizes

21  the testimony.

22       A.   I'm not aware of expenditures that the DSCC

23  made in Texas in 2016.

24       **Q    (BY MS. MACKIN)  And what about 2015?**

25            MS. BRAILEY:  Objection on form.

41

1        A.    If you're asking -- 2015 would be part of the

2    2016 cycle, so --

3        Q.    Okay.

4        A.    -- my answer was to the 2016 cycle.

5        **Q.    Okay.  And so that includes 2015 as well?**

6        A.    Calendar year 2015 would be part of the 2016

7    election cycle.

8        **Q.    Okay.  And then, are you aware of the DSCC**

9    **making any expenditures for voter registration in Texas**

10   **in the 2014 cycle?**

11       A.    As with the 2016 cycle, I'm not aware of DSCC

12   expenditures in Texas in the 2014 cycle.

13       **Q.    Okay.**

14             MS. BRAILEY:  Anna, are we getting to a

15   point where we might be able to take a break?  We're

16   about at the hour.

17             MS. MACKIN:  Yeah, that's fine.  We can

18   take a quick break now.  How long --

19             Let's go off the record.

20             THE REPORTER:  Going off the record at

21   11:11 a.m.

22             (Off the record from 11:11 to 11:26 a.m.)

23             THE REPORTER:  Going back on the record

24   at 11:26 a.m.

25             MS. MACKIN:  I'm sharing a document in

42

 1  the chat box -- two documents, actually; and they are

 2  Bates numbered -- the first one begins at DSCC 796 and

 3  goes through 797; and the second one begins at DSCC 798

 4  and goes through 799.

 5       Q.   (BY MS. MACKIN)  Please take a look at those

 6  documents and let me know when you're ready to discuss

 7  them.

 8       A.   Okay.

 9       Q.   So the page labeled DSCC 796 through 797, do

10  you recognize this document?

11       A.   I think it was -- I recognize it as -- I

12  believe as part of the production.

13       Q.   Okay.  Have you seen it before?

14       A.   Before right now?

15       Q.   Yes.

16       A.   Again, I reviewed the production before it

17  went out.  So I think -- I believe this is part of

18  production, so I would have seen it then.

19       Q.   Okay.  Do you recall whether you saw it before

20  reviewing the production?

21       A.   I don't.

22       Q.   Okay.  Based on your experience with the DSCC,

23  what does this e-mail appear to be?

24       A.   It appears to be an e-mail asking a survey

25  question.

1    Q.    And do you know whether the document that

2  begins at 798 reflects a question that was asked on the

3  survey linked in the e-mail, labeled 796?

4    A.    I wouldn't be able to tell you.

5    Q.    Okay.  At a high level, what is the purpose of

6  sending out a survey to -- here it says, "The audience

7  of highly reliable Democrats"?

8              MS. BRAILEY:  Objection on the First

9  Amendment.

10             You can answer at a high level to the

11 extent you don't reveal internal strategic decisions.

12   A.    Generally speaking, the DSCC wants to hear

13 from Democratic voters around the country, understand

14 what their priorities are, what folks' concerns are, and

15 just get a sense of that.  And so I think that outreach

16 like this would be an attempt to obtain that insight.

17   Q.    (BY MS. MACKIN)  Do you know approximately how

18 often DSCC conducts surveys like this?

19   A.    I don't.  I mean, I would say it's not

20 infrequently; but it's hard for me to be more specific.

21   Q.    And then, turning to the page -- well,

22 actually, that's all I have on those.

23             MS. MACKIN:  All right.  I am pulling

24 up -- well, I'm sharing in the chat box an exhibit -- a

25 document, rather; and it will be a page from Exhibit 3,

44

1   the document marked DSCC 800.

2       Q.   (BY MS. MACKIN)  Please take a look at that

3   document, and let me know when you are ready to discuss

4   it.

5       A.   Okay.

6       Q.   This is an e-mail dated April 18th, 2020 that

7   appears to have been sent from info@DSCC.org, with the

8   name Chuck Schumer; is that right?

9       A.   Yes.

10      Q.   Okay.  And at a high level, what is the

11  purpose of an e-mail like this?

12              MS. BRAILEY:  Objection on the First

13  Amendment.

14              You can answer to the extent it doesn't

15  reveal internal strategic decisions.

16      A.   This is a fundraising e-mail.

17      Q.   (BY MS. MACKIN)  Okay.  And about halfway down

18  the page there's a paragraph that begins, "We're already

19  putting your funds to work making crucial investments

20  that will make the difference on Election Day.  Your

21  support is funding things like advertising to boost our

22  Democratic Senate candidates and registering a record

23  number of new voters in swing states."  Did I read that

24  correctly?

25      A.   Yes.

DSCC - 4/30/2020

45

1      Q.    And this mention of registering a record

2   number of new voters in swing states, does that include

3   the -- well, is that a reference to any activities in

4   Texas?

5      A.    I'm not sure what the drafter of this e-mail

6   is specifically referring to, but certainly we have

7   made investments in Texas that will further voter-

8   registration efforts.  And so -- I'll leave it at that.

9              But I can't -- I don't know what the

10  person who drafted this was specifically referring to,

11  if they had Texas in mind.

12     Q.    And so it also mentions a record number of new

13  voters.  I guess I'm -- can you help me understand what

14  is meant by "a record number" in this context?

15     A.    So, again, I didn't draft this; and I don't

16  know exactly what the drafter meant.  But, generally, a

17  record number means more than have been registered

18  through our efforts before.

19     Q.    Okay.

20     A.    And as I said earlier, again, TDP is in the

21  midst of a massive voter registration campaign that

22  transfer down funding from the DS would help to support,

23  so.

24     Q.    All right.  Thank you.

25              All right.  That's all I have on that.

46

1          MS. MACKIN:  I'm going to share a

2   document in the chat box that will be Exhibit 4 to this

3   deposition.

4          (Exhibit 4 marked.)

5      Q    (BY MS. MACKIN)  Please take a look at it and

6   let me know when you're ready to discuss it.

7      A.   Okay.

8      Q.   All right.  Do you recognize this document?

9      A.   I don't believe I've seen this document

10  before.

11     Q.   Okay.  Based on looking at it, what does it

12  appear to be?

13     A.   The title of the document is Statement of

14  Organization.

15     Q.   And it is a Federal Election Commission form

16  that appears to have been submitted by the DSCC to the

17  Federal Election Commission?

18     A.   That seems right.

19     Q.   Okay.  And scrolling down to page 3 of this

20  document, there is a box for "Name of Any Connected

21  Organization, Affiliated Committee, Joint Fundraising

22  Representative or Leadership PAC Sponsor."  And beneath

23  that it says, "Colorado Senate Victory 2016."  Are you

24  familiar with Colorado Senate Victory 2016?

25     A.   No.

1     Q.   Okay.  Do you know if it is active in Texas?

2              MS. BRAILEY:  Objection that this calls

3     for a legal conclusion and is outside of the scope of

4     the Deposition Notice.

5              But you can answer to the extent that you

6     know.

7              MS. MACKIN:  And I'll just note that the

8     Notice does include all activities in Texas.  And so if

9     this entity has acted in Texas, I think it would fall

10    within the scope of the Notice.

11             MS. BRAILEY:  Same objection.

12             But you can answer.

13    A.   I'm not aware.  I'm not familiar with the

14    entity.

15    Q.   (BY MS. MACKIN)  And so scrolling down to page

16    5 of 14, there's an entry that says, "Colorado Senate

17    Victory 2020."  Are you familiar with Colorado Senate

18    Victory 2020?

19             MS. BRAILEY:  Same objection to the

20    extent it calls for a legal conclusion and is outside

21    the scope of the Notice.

22             You can answer to the extent that you

23    know.

24    A.   I'm not familiar with it, no.

25    Q.   (BY MS. MACKIN)  And then scrolling down to

48

1   page 6 there's an entry for "Illinois Senate Victory

2   2020."  Are you familiar with Illinois Senate Victory

3   2020?

4            MS. BRAILEY:  I will make the same

5   objection, object to legal conclusion and outside the

6   scope.

7            You can answer.

8        A.   No.

9        Q    (BY MS. MACKIN)  All right.  Scrolling down to

10  page 7 there's an entry for "Pennsylvania Senate 2016."

11  It's listed as a Joint Fundraising Representative by the

12  box indicated on the form.  Are you familiar with

13  Pennsylvania Senate 2016?

14           MS. BRAILEY:  I'm going to raise the same

15  objection, legal conclusion and outside the scope.

16           But you can answer.

17       A.   No.

18       Q    (BY MS. MACKIN)  All right.  Scrolling down to

19  page 8 there's an entry on this form for "Michigan

20  Senate Victory 2020," and the box ticketed says, "Joint

21  Fundraising Representative."  Are you familiar with

22  Michigan Senate Victory 2020?

23           MS. BRAILEY:  I'm going to make the same

24  objection.  So if we're going to go page by page, can I

25  say that I'm going to make the same objection to these

1  pages so that I don't interrupt you; or I can just keep

2  making the same objection?

3              MS. MACKIN:  I'm fine with that.

4              MS. BRAILEY:  So for the record, I'll

5  make the same objection, legal conclusion and outside

6  the scope for each of the pages 8 through 14 on

7  Exhibit 4.

8              You can answer.

9      A.   No.  And I'll have the same answer for the

10 rest of the pages.

11     Q    (BY MS. MACKIN)  So you've reviewed this

12 entire document; and you're not familiar with any of the

13 entities listed under -- and I'm reading from the form

14 here -- "Name of Any Connected Organization, Affiliated

15 Committee, Joint Fundraising Representative, or

16 Leadership PAC Sponsor?

17     A.   No.  I mean, we can go through it but...

18     Q.   I mean, we don't have to.  If you're not

19 familiar, I don't need to burn anybody's time.

20              All right.  We will X out of that one.

21              MS. MACKIN:  Okay.  I am sharing a

22 document in the chat box that will be Exhibit 5 to this

23 deposition.

24              (Exhibit 5 marked.)

25     Q    (BY MS. MACKIN)  And your counsel provided

50

 1  this to us via a link.  Please go ahead and open up that

 2  document, and let me know when you are ready to discuss

 3  it.

 4      A.   Okay.

 5      Q.   Your counsel has represented to us this list

 6  reflects all of the transfers DSCC has made to the Texas

 7  Democratic Party between 2014 and the present; is that

 8  accurate?

 9      A.   I'm sorry.  What date was this sent?

10      Q.   Yesterday, so --

11      A.   It's my understanding that, like, maybe

12  yesterday or the day before, I think there was an

13  additional transfer.

14      Q.   Okay.

15      A.   But it's all public.  So if you go on FEC's

16  website and you look up DSCC's disbursements to the

17  Texas Democratic Party, you can find it.

18      Q.   Okay.  And does it appear that the criteria

19  that were used to pull this report would pull all the

20  transfers DSCC has made to the Texas Democratic Party

21  between 2014 and the date that the report is run?

22              MS. BRAILEY:  Objection to form.

23      A.   Yeah.  Sorry.  You say criteria?

24      Q.   (BY MS. MACKIN)  So at the top -- sure.  It

25  says, "Disbursements."  And then it says, "Viewing

1   filtered results."  And underneath, there are some what

2   appear to be filters that were input into the FEC

3   website to pull this data.  So if I were to enter these

4   filters and run this report, let's say, today, as long

5   as an additional disbursement had been processed, it

6   would appear on that report, right?

7               MS. BRAILEY:  Objection to form.

8       A.   If you searched for the spender as the DSCC

9   and the recipient as the Texas Democratic Party, that's

10  all public.  Everything that the DSCC brings in and

11  every penny that the DSCC spends is public, and that's

12  what the FEC filings would reflect.

13      Q    (BY MS. MACKIN)  Okay.  Thank you.

14               Does DSCC have members who are eligible

15  to vote in Texas?

16               MS. BRAILEY:  Objection, that it calls

17  for a legal conclusion.

18               You can answer to the extent that you

19  know.

20      A.   What do you mean by members?

21      Q.   (BY MS. MACKIN)  Well, does DSCC have members?

22               MS. BRAILEY:  Again, objection to a legal

23  conclusion.

24               You can answer.

25      A.   What do you mean by members?

1      Q    (BY MS. MACKIN)  I guess whatever that means

2  to you.  I mean, is DSCC a -- is DSCC comprised of --

3  does it represent the Democratic members of the Senate?

4  Would those folks be regarded by DSCC as its members?

5              MS. BRAILEY:  Objection to a legal

6  conclusion.

7              But you can answer.

8      A.   I don't know what our corporate filings would

9  say about members.  I mean, to the extent that you're

10  asking how does DSCC interact with or associate with

11  Democratic voters around the country, I mean, we have

12  folks who sign up for our Listserv.  We have people who

13  donate to the DSCC.  You know, I don't know that we have

14  a set term for them.  I think we call them "people on

15  the Listserv" or "donors" or "supporters."

16      Q.   Okay.

17              MS. MACKIN:  I think that this is

18  probably all I have; but do you mind if we go off the

19  record for, like, five minutes for me to just take a

20  look at my notes and make sure that I've covered

21  everything?

22              MS. BRAILEY:  Yeah, absolutely.

23              THE REPORTER:  Going off the record at

24  11:48 a.m.

25              (Off the record from 11:48 to 11:58 a.m.)

1          THE REPORTER:  Going back on the record

2    at 11:58 a.m.

3        Q   (BY MS. MACKIN)  All right.  Just a few more

4    questions, Ms. Schaumburg.

5              Has the DSCC developed any voter

6    registration training materials?

7              MS. BRAILEY:  Objection on the First

8    Amendment.

9              You can answer at a high level.

10       A.   What do you mean by "training materials"?

11       Q   (BY MS. MACKIN)  Sure.  Any documents that you

12   might provide to campaigns or DSCC staff to assist in

13   voter-registration efforts.

14       A.   So sitting here, I can't tell you.  I'd have

15   to check.

16       Q.   Does the DSCC ever communicate with individual

17   voters to assist them with voter registration?

18       A.   Generally, the DSCC supports voter-

19   registration efforts in states through the means that

20   we've talked about, less on an individual basis, not

21   that it wouldn't happen; but we provide support,

22   funding, resources to state parties, to the campaigns

23   for their grounding.

24       Q.   Rather than DSCC actually communicating with

25   the individual voter?

1      A.   Not that we couldn't.

2      Q.   **Are you aware of it ever happening?**

3      A.   Of -- sorry.  Am I aware of...

4      Q.   **Are you aware of the DSCC ever communicating**

5  **directly with an individual voter to assist them with**

6  **their voter registration in Texas?**

7      A.   So in a sense that, yeah, I mean, the DSCC had

8  staff on the ground.  Again, like, DSCC funded

9  positions.  You know, those staffers could be in charge

10 of working on voter registration.  So in that sense,

11 sure.

12     Q.   **Okay.  But what I'm trying to get at is a DSCC**

13 **employee specifically.  Are you aware of a DSCC employee**

14 **ever communicating with a Texas voter to assist them**

15 **with their voter registration?**

16          MS. BRAILEY:  Objection.  I think that

17 was just asked and answered from her last answer.

18     Q.   **(BY MS. MACKIN)  I was just hoping for a "yes"**

19 **or "no," like a clear answer.**

20     A.   So I think your first question was about Texas

21 specifically.  So can you rephrase your question?

22     Q.   **It was, but I'll ask it again.  Are you aware**

23 **of any DSCC employee directly communicating with a Texas**

24 **voter to assist them with their voter registration?**

25     A.   So I think generally the DSCC supports voter-

55

1  registration activities by the things we've talked

2  about.

3      Q.   And would that be a "no"?

4      A.   It's possible that they have.

5      Q.   Are you aware of any specific instance?

6      A.   Sitting here today, can I name a specific

7  instance, like, a date and time?  Not to that level of

8  specificity.  But the DSCC provides voter registration

9  guidance, and it's -- you know, we do interact with

10 individual voters in certain situations.  So it's

11 just...

12     Q.   So I guess I'm still just looking for, like, a

13 "yes" or a "no."

14          MS. BRAILEY:  I'm going to object, again,

15 on form.

16     Q    (BY MS. MACKIN)  So would it be fair to say to

17 that you are not aware of any DSCC employee directly

18 communicating with an individual Texas voter to assist

19 them with their voter registration?

20          MS. BRAILEY:  Objection.

21     A.   I would --

22          MS. BRAILEY:  Objection, mischaracterizes

23 the witness.

24     A.   I would have to check.  I mean, we have field

25 folks.  We have a field team.  So I haven't reviewed

1  with them, like, their specific conversations or every

2  interaction that they've had with individual voters; but

3  I would have to ask.

4      Q    (BY MS. MACKIN)  Okay.  I want to jump back to

5  Exhibit 2, page 6.  Just going over the subpoena duces

6  tecum, the documents that were subpoenaed for today's

7  deposition, Category 1, which requests documents

8  sufficient to substantiate certain factual allegations

9  in your Complaint, do you know whether any documents

10  were withheld in responding to this request on the basis

11  of privilege?

12            MS. BRAILEY:  Objection on the -- based

13  on the attorney-client privilege.

14      Q.   (BY MS. MACKIN)  And just to be clear, I'm not

15  asking whether -- what documents -- if the answer is

16  "yes," I'm not inquiring into the substance of those

17  documents sitting here today; but since we haven't

18  received a privilege log, I'm inquiring into whether

19  documents exist, just a "yes," "no," not seeking a

20  description of the document or even at this point the

21  privilege asserted, simply whether documents exist that

22  were withheld on the basis of privilege.

23            MS. BRAILEY:  Again, I'll make the same

24  objection to preserve it.

25            But, Sara, you can answer as long as you

57

1  don't reveal our conversations.

2      A.   Sitting here right now, I couldn't tell you.

3  I'd have to check with counsel.

4      **Q.   (BY MS. MACKIN)  Okay.  Do you know with --**

5  **would that be your answer with respect to all five**

6  **categories of documents that were requested?**

7           MS. BRAILEY:  It would be my objection to

8  all five categories.

9           You can answer.

10          Same objection.

11     A.   That would be my answer to all five categories

12  or to all categories regarding documents.

13          MS. MACKIN:  All right, Ms. Schaumburg.

14  Thank you for your time today.

15          I'll pass the witness.

16          MS. BRAILEY:  Great.  I just have a few

17  questions.

18                    EXAMINATION

19  BY MS. BRAILEY:

20     **Q.   Ms. Schaumburg, earlier today counsel asked**

21  **you about money that the DSCC transferred to the Texas**

22  **Democratic Party.  Do you remember that?**

23     **A.   Yes.**

24     **Q.   And then I believe she also asked you**

25  **questions about money that the DSCC transferred to the**

1  Texas Democratic Party specifically this cycle.  Do you

2  remember that?

3      A.   Yes.

4      Q.   Okay.  For that money that was transferred to

5  TDP for this cycle, did T -- was that money used by TDP

6  for voter-persuasion efforts?

7      A.   That's my understanding.

8      Q.   And was is it used for voter-registration

9  efforts?

10      A.   That's my understanding, yes.

11      Q.   And was it used for Get-Out-the-Vote efforts?

12      A.   So it's my understanding that it will be used

13  for Get-Out-the-Vote efforts.  It's, you know, a program

14  that would ramp up closer to election day.

15      Q.   And how do you know that the money transferred

16  to TDP in this cycle from DSCC is used in these ways?

17      A.   I mean, we -- we work closely with the state

18  parties in our -- in the Senate states, including with

19  the Texas Democratic Party, on programming, on advising

20  them on various aspects of their campaign.  And so, you

21  know, we share our -- the DS and its employees share

22  their insight and their expertise on how to manage a

23  campaign, what the priorities should look like.  And

24  certainly voter registration is one of those top

25  priorities and, you know, that the TDP's budget, what

1   they prioritize, the more funding that they have from

2   whatever sources, the more they can invest in those

3   activities.   And so, you know, I think by providing,

4   we've conveyed that voter registration is one of our

5   priorities; and, you know, the more budget that TDP has

6   to spend, the more they can invest in activities around

7   that.

8        **Q.   Great.   Thank you.**

9             MS. BRAILEY:   Those are all my questions.

10  I'll pass the witness.

11            MS. MACKIN:   All right.   And I'd just

12  like to note that we are going to hold this deposition

13  open to the extent that there is any subsequent

14  delinquent production of documents; and once we have an

15  opportunity to evaluate the claims of privilege.   But

16  that's all that I have for today.

17            MS. BRAILEY:   Okay.   Great.

18            And, Debbie, can I get on the record that

19  I'd like to read and sign and get a copy of the

20  transcript.

21            THE REPORTER:   Going off the record at

22  12:09 p.m.

23            (Deposition recessed at 12:09 p.m.)

24                   --ooOoo--

25

60

1                    CHANGES AND SIGNATURE

2  WITNESS NAME:              DATE OF DEPOSITION:

3  SARA SCHAUMBURG              April 30, 2020

4  PAGE/LINE    CHANGE              REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

61

```
 1            I, SARA SCHAUMBURG, have read the

 2   foregoing deposition and hereby affix my signature that

 3   same is true and correct, except as noted herein.

 4

 5            _____

 6            SARA SCHAUMBURG

 7

 8   THE STATE OF _____  )

 9            Before me, _____, on

10   this day personally appeared SARA SCHAUMBURG, known to

11   me (or proved to me under oath or through

12   _____) (description of identity card or other

13   document) to be the person whose name is subscribed to

14   the foregoing instrument and acknowledged to me that

15   they executed same for the purposes and consideration

16   therein expressed.

17            Given under my hand and seal of office on

18   this _____ day of _____, _____.

19

20

21            _____

22            NOTARY PUBLIC IN AND FOR

23            THE STATE OF _____

24            My Commission Expires:_____

25
```

62

1  STATE OF TEXAS     )

2

3              REPORTER'S CERTIFICATION

4

5          I, DEBBIE D. CUNNINGHAM, CSR, hereby

6  certify that the witness was duly sworn and that this

7  transcript is a true record of the testimony given by

8  the witness.

9          I further certify that I am neither

10 counsel for, related to, nor employed by any of the

11 parties or attorneys in the action in which this

12 proceeding was taken.  Further, I am not a relative or

13 employee of any attorney of record in this cause, nor am

14 I financially or otherwise interested in the outcome of

15 the action.

16          Subscribed and sworn to by me this day,

17 May 8, 2020.

18

19

20

21          _____

           Debbie D. Cunningham, CSR

22         Texas CSR 2065

           Expiration:  6/30/2021

23         INTEGRITY LEGAL SUPPORT SOLUTIONS

           P.O. Box 245

24         Manchaca, Texas 78652

           www.integrity-texas.com

25         512-320-8690; FIRM # 528

# Exhibit M

```
 1                UNITED STATES DISTRICT COURT

 2                 WESTERN DISTRICT OF TEXAS

 3                   SAN ANTONIO DIVISION

 4   JARROD STRINGER, et al.        §
                                    §
 5                                  §
     v.                             § CIVIL NO. SA-16-CV-257-OG
 6                                  §
     ROLANDO PABLOS,in his official §
 7   capacity as Texas Secretary    §
     of State and STEVEN C. McCRAW, §
 8   in his official capacity       §
     as Director of the Texas       §
 9   Department of Public Safety    §

10   _____

11   JARROD STRINGER, et al.        §
                                    §
12   v.                             § CIVIL NO. SA-20-CV-46-0G
                                    §
13   RUTH HUGHS, in her official    §
     capacity as Texas Secretary    §
14   of State and STEVEN C. McCRAW, §
     in his official capacity as    §
15   Director of the Texas          §
     Department of Public Safety    §

16
            TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
17          BEFORE THE HONORABLE ORLANDO L. GARCIA
                  CHIEF DISTRICT COURT JUDGE
18
     APPEARANCES:
19
     For the Plaintiffs:    REBECCA E. HARRISON STEVENS
20                          Texas Civil Rights Project
                            1405 Montopolis Drive
21                          Austin, TX 78741

22                          MIMI M.D. MARZIANI
                            Texas Civil Rights Project
23                          1405 Montopolis Drive
                            Austin, TX 78741

24

25
```

APPEARANCES CONTINUED:

For the Plaintiffs: HANI MIRZA
Texas Civil Rights Project
1412 Main Street
Suite 608
Dallas, TX 75202

CAITLYN E. SILHAN
Waters and Kraus, LLP
3141 Hood St.
Suite 700
Dallas, TX 75219

JOAQUIN GONZALEZ
Voting Rights Attorney
Texas Civil Rights Project

FOR THE INTERVENORS: ARIA C. BRANCH
Perkins Coie LLP
700 13th Street, NW
Washington, DC 20005

For the Defendants: CHRISTOPHER D. HILTON
Office of the Attorney General of Texas
P O Box 12548
Capital Station
Austin, TX 78701

Produced by mechanical stenography; computer-aided transcription

```
1   (In open court)
2           THE COURT:  All right.  Good afternoon, everyone.  You
3   may be seated, and let's proceed.  I'll call Cause Number 16 --
4   rather, yeah, 16-Civil-257.  George Stringer, Nayeli Gomez,
5   John Harms, Move Texas Civil Fund, League of Women Voters, the
6   Texas Democrat Party, Intervenor-Plaintiffs v. Ruth Hughs, the
7   Texas Secretary of State Steven McCraw, the Director of DPS and
8   the State of Texas.
9           I'll have some announcements from the plaintiffs.
10          MS. STEVENS:  Yes, Your Honor.  Beth Stevens on behalf
11  of the plaintiffs.
12          THE COURT:  And your name again, ma'am.
13          MS. STEVENS:  Beth Stevens.
14          THE COURT:  Stevens.
15          MS. STEVENS:  Stevens.  Yes, Your Honor.
16          THE COURT:  All right.
17          MS. MARZIANI:  Your Honor, Mimi Marziani on behalf of
18  the Stringer plaintiffs.
19          THE COURT:  Which one?
20          MS. MARZIANI:  The Stringer plaintiffs.
21          THE COURT:  Stringer.
22          MS. MARZIANI:  Yes.
23          THE COURT:  Okay.
24          MS. BRANCH:  Good afternoon, Your Honor.  Araia Branch
25  on behalf of the Intervenors, the Texas Democrat Party.
```

```
 1            THE COURT:  All right.  And your name again, ma'am,
 2   again?
 3            MS. BRANCH:  Araia Branch.
 4            THE COURT:  All right.  Anyone else back here?
 5            MR. MIRZA:  Hani Mirza on behalf of the Jerry Stringer
 6   plaintiffs.
 7            THE COURT:  Okay.
 8            MS. SILHAN:  Caitlyn Silhan on behalf of the Stringer
 9   plaintiffs.
10            THE COURT:  You'll have to speak louder than that.
11            MS. SILHAN:  Caitlyn Silhan on behalf of the Stringer
12   plaintiffs.
13            THE COURT:  All right.
14            MR. GONZALEZ:  And Joaquin Gonzalez on behalf of the
15   Stringer plaintiffs.
16            THE COURT:  Okay.  So I gather Mr. Stringer needs four
17   lawyers.  Okay.  And from the State of Texas.
18            MR. HILTON:  Chris Hilton, Your Honor, for the State.
19            THE COURT:  From the Attorney General's Office?
20            MR. HILTON:  Yes, sir.
21            THE COURT:  All right.  And your last name again, sir,
22   was?
23            MR. HILTON:  Hilton, H-I-L-T-O-N.
24            THE COURT:  Okay.
25            MR. HILTON:  And the representative from the Secretary
```

1    of the State and DPS as well.

2              THE COURT:  All right.  Thank you, counselor.

3              There was a motion filed I believe by plaintiffs.  I

4    thought I had that in my hands.  That's the request that

5    several websites be part of the record.  That's your --

6              MS. STEVENS:  That's correct, Your Honor.

7              THE COURT:  Okay.  Any position by the State of Texas

8    on that?

9         MR. HILTON:  Your Honor, are you referring to the

10   motion for a traditional notice that they filed, we have no

11   objection.

12             THE COURT:  Okay.  That's in then.  All right.  We're

13   gathered today for a preliminary injunction.  And I will let

14   the plaintiffs begin to present their case.  But before we get

15   there, let me ask the State of Texas.  So we have this process

16   to where a person can go to DPS, rather not go to DPS, go

17   online.  He or she wants to either renew a license or update

18   change of address.  Can he or she today online register to

19   vote?

20        MR. HILTON:  Your Honor, I don't think that the facts

21   have changed materially or relevantly since Stringer One, and I

22   think as they've laid them out, overall we don't have an

23   objection to their characterization of the process.  The way

24   the process works for that voter, or that customer of DPS --

25   and I'll ask the folks to correct me if I'm wrong.  But if

```
 1    they've moved within the same county and therefore they are

 2    subject to the jurisdiction of the same county voter registrar.

 3              THE COURT:  M-hm.

 4              MR. HILTON:  That transaction with DPS, that will be

 5    effective to change their address.  If they moved between

 6    counties--

 7              THE COURT:  M-hm.

 8              MR. HILTON:  -- they're not under the jurisdiction of

 9    a new voter registrar.  That voter registrar has to register

10    them on that county's voter rolls.

11              THE COURT:  M-hm.

12              MR. HILTON:  That requires a new registration

13    application.  And so the current process on the website and the

14    way that it's been since before Stringer One was filed, is that

15    the person on the DPS website is told that they're not

16    automatically being registered.  That they have to download the

17    form and send that in.

18              THE COURT:  I understand all that.

19              MR. HILTON:  Yeah.

20              THE COURT:  But my question was:  If I'm online.  If I

21    want to go online right now, and let's pretend for a moment

22    that my address has changed, can I go online either right here

23    or in my office, and I want to update my address with DPS and

24    it's at a new address in the county.

25              MR. HILTON:  M-hm.
```

```
 1              THE COURT:  Can I register to vote doing that?

 2              MR. HILTON:  Yes, Your Honor.  You can change your

 3    address today online.

 4              THE COURT:  I understand that I can change my address.

 5    My question is:  Can I register to vote?

 6              MR. HILTON:  So in that situation, you hadn't been

 7    previously registered.

 8              THE COURT:  Okay.  Let me change.

 9              MR. HILTON:  So in that situation you hadn't been

10    previously registered.

11              THE COURT:  Okay, let me change --

12              MR. HILTON:  I'm sorry, I just want to make sure I

13    understand.  I'm sorry.

14              THE COURT:  Let's make this simple.  Let's say I just

15    graduated from high school last May, and I want to register to

16    vote, and coincidentally for whatever reason I didn't get a

17    driver's license at age 15, 16, 17.  I'm getting one now, and I

18    need to update an address, and I want to register for the very

19    first time in my life to begin this process of voting.

20              Can I go online to the DPS website and register to

21    vote?

22              MR. HILTON:  I understand the question, Your Honor.

23    Let me confer real quick to make sure I give you the right

24    answer.

25              THE COURT:  Sure.
```

1          (Brief pause)

2          MR. HILTON:  Thank you, Your Honor.  For a first-time

3     applicant, that person would have to follow the process of, you

4     know, downloading the application and mailing it to the voter

5     registrar.

6          THE COURT:  Why?  Why is that?  Is that part of the

7     statute, this National Voter Registration Act.

8          MR. HILTON:  State law requires that a voter

9     registration application be in writing and signed by the

10    registrant.

11         THE COURT:  Okay.  Let's suppose then -- somehow or

12    another I'm going to get to the example that I want to get to.

13    Let's suppose I registered.  Now I'm off going to UT Austin,

14    which I did like 40, 50 years ago, and I was registered back

15    home.  But now I got to update my license.  I'm in Austin.  Can

16    I go online and change my address from my back home on my

17    license, and I don't want to vote back home.  I want to vote

18    over here in Austin.  Now can I do that online?

19         MR. HILTON:  You can change your driver's license

20    address online.  You would have to register to vote in the new

21    county that you have moved to so you would have to go through

22    the process of --

23         THE COURT:  What is the process?

24         MR. HILTON:  So as you're going through the DPS

25    website, you will get to a screen, I think it's step five or

1    whatever number it is.  Your Honor asked a question about it

2    where it asks if you want to register to vote.  If you say yes

3    it tells you, you're not being automatically registered.  You

4    have to download the form, fill it out, and send it in to the

5    voter registrar.  There are other options available to you as

6    well but that's one.

7         THE COURT:  Let me ask it another way.  I think that's

8    why they give judges life tenure.  If it takes a lifetime to

9    get this answer, we'll stay here a lifetime.

10        MR. HILTON:  I'm not trying to make it more difficult,

11   Your Honor.

12        THE COURT:  No, I understand.  Or till God decides

13   otherwise or I suppose the U.S. senate.  Let me ask you this:

14   Do you know of any person that has been registered to vote

15   going through the Texas Department of Public Safety website?

16        MR. HILTON:  Other than the circumstance of -- well,

17   no, Your Honor.  State law requires the registration through

18   DPS to be in person or by mail.

19        THE COURT:  Okay.  So then this National Voter

20   Registration Act is not applicable in Texas.  Is that what

21   you're telling me?

22        MR. HILTON:  It's applicable, Your Honor.  And Texas

23   law complies with the NVRA.  That's our position.  And NVRA

24   requires a process by which you can become registered to vote.

25   It does not override all State requirements with respect to

1    voter registrations.

2            THE COURT:  So the answer to my question is then you

3    cannot register to vote by merely going to the DPS website.  In

4    other words, if I want to do that, I can't complete the process

5    online, and then I cannot think because it would be

6    incorrect -- I cannot think that I've now been registered to

7    vote by simply going through to the DPS website.

8            Is that a correct statement?

9            MR. HILTON:  That's correct, Your Honor.  The NVRA

10   does not require online voter registration nor does the

11   constitution.  Nothing requires online voter registration in

12   the State of Texas.

13           THE COURT:  Then what purpose does the Act then serve,

14   the National Voter Registration Act?

15           MR. HILTON:  The stated purpose of the act is to

16   encourage voting to increase the number of voters.  And, you

17   know, it encourages and requires states to make that easier by

18   combining -- by combining transactions.

19           THE COURT:  Okay.

20           MR. HILTON:  For the Motor Vehicle.

21           THE COURT:  And how is Texas making it easier?  You

22   just said the whole purpose is to make transactions, to make it

23   easier to combine multiple functions to achieve multiple

24   purposes.  In this case, get DPS to know where my new address

25   is and to get the county voter registrar to know I've now

1   moved, and I want to be registered in a new polling site.  So

2   what is Texas doing to make it easier?

3         MR. HILTON:  For in-person and mail transactions,

4   there's nothing additional that the voter needs to do other

5   than to say, yes, and to sign the application.  And by mail

6   you're signing the application.

7         THE COURT:  What do you mean by in person?

8         MR. HILTON:  In person at a DPS office, I'm sorry,

9   Your Honor.  That person will sign on -- they'll give a

10  physical signature that's electronically captured.

11        THE COURT:  M-hm.

12        MR. HILTON:  And that signature will be collected by

13  DPS.  That will be sent to the Secretary of State.

14        THE COURT:  And you know for a fact that that is being

15  done?

16        MR. HILTON:  For in person, yeah.  Yes, Your Honor.

17        THE COURT:  Okay.  All right.  What about online?

18        MR. HILTON:  For online, you know, if I'm sitting at

19  home doing an online transaction with the DPS, I can't sign

20  anything because I'm at a computer.  I don't have a physical

21  application to sign.  I don't have the special electronic pad

22  to sign at the DPS office.  So the signature requirement for

23  State voter registration requires that person to download the

24  voter registration form and send it in.

25        THE COURT:  So what you are in effect are saying is

1  the DPS website cannot make a transaction allowing a person to

2  register to vote.

3        MR. HILTON:  Yeah, correct, Your Honor.  I think I'm

4  understanding you correctly.  It does not do it automatically.

5  And the person is notified of that.  They're told exactly what

6  they need to do in order to register to vote.  And to the

7  extent that the website can facilitate that by providing a

8  registration application, the website does that.

9        THE COURT:  Now let me ask you something, since a

10  record has previously been made in the first go-around, is

11  there any law that says we cannot use that record as part of

12  this record?

13        MR. HILTON:  For the purposes of the preliminary

14  injunction hearing today, Your Honor, we don't have any

15  objection to any of the evidence they attached to their motion,

16  much of which was from the Stringer One case.  We've submitted

17  some deposition excerpts from that case as well.  So for the

18  purposes of today, we don't have any objection to that.

19        THE COURT:  Okay.

20        MR. HILTON:  I would object, Your Honor, if I may just

21  briefly, they filed a reply brief with these exhibits attached

22  to it while I was sitting here in the courtroom.

23        THE COURT:  M-hm.

24        MR. HILTON:  They provided me the exhibit copies.  I

25  haven't seen the brief.

1          THE COURT:  Okay.

2          MR. HILTON:  And so to the extent that I have had no

3    notice of these exhibits, no ability to prepare for them.

4          THE COURT:  Yes.

5          MR. HILTON:  I think I have to object to the

6    submission of those.

7          THE COURT:  Sure.  And don't feel bad.  They filed

8    stuff right here also.  I haven't looked at it.  Okay.  Let's

9    go.  Let's bring up your witnesses.

10          MS. STEVENS:  Your Honor, if I might correct a --

11    well, actually, take up a couple of preliminary issues.  One is

12    to correct a mischaracterization of the online change of

13    address within a county as it currently happens on DPS's

14    website.  So say I live in Travis County.  I move from one

15    address to another address.  If I go on DPS's website online to

16    tell DPS that I need to change my address for the driver's

17    license, that does not -- there's no way to automatically

18    through that system update my voter registration for change of

19    address.

20          THE COURT:  And why not?

21          MS. STEVENS:  Because the State does not provide the

22    ability to do that.

23          THE COURT:  But he just told me something about an

24    electronic.  They can't do the electronic signature; is that

25    correct or not or that's not needed.

```
 1              MS. STEVENS:  There's two issues here.  One, we submit
 2    that the State can in fact create a system to have an
 3    electronic signature.  It does it for other transactions.  But
 4    putting that aside, they do not use a written, handwritten
 5    signature for voter registration purposes for in-person DPS
 6    transactions that result in voter registration and for mail in
 7    DPS transactions that result in voter registration.  They use
 8    an electronic signature that is submitted by the voter at their
 9    last in-person transaction.
10              THE COURT:  Okay.  Go ahead.
11              MS. STEVENS:  Okay.
12              MR. HILTON:  I'm sorry, Your Honor, may I respond just
13    briefly to two points?
14              THE COURT:  Sure.
15              MR. HILTON:  One, is I believe I misspoke earlier, and
16    I was just corrected.  When you move within a county, you can
17    change your voter registration address online through
18    votetexas.gov or through your county voter registrar, not from
19    the DPS website.
20              THE COURT:  And why is that?  And why is that?
21              MR. HILTON:  It has to be done through the voter
22    registrar.  The voter registrar -- the county voter registrar
23    maintains the voter rules for the State of Texas.  And so
24    that's the process that's available.  It's not through the DPS
25    website.  The other point I just wanted to briefly make, Your
```

1    Honor, with respect to the handwritten signature, I just want

2    to be clear, the signature that's captured at an in-person DPS

3    transaction, that's not an electronic signature in the way that

4    I might sign a brief to the court where it just says slash-S

5    and it's a typed version of my name.  The person's hand is

6    using a pen to write their signature.  It's just not done with

7    ink.  It's done on an electronic pad, so an image of that

8    handwritten signature is captured.  I just want to make that

9    distinction to the court.

10          THE COURT:  Okay.  All right.  If you'll begin.

11          MS. STEVENS:  Thank you, Your Honor.  I'm handing a

12   copy of our courtesy copy of our reply to opposing counsel.

13          THE COURT:  Okay.

14          MS. STEVENS:  All right.  The other preliminary matter

15   I want to take up, Your Honor, is I'd like to direct the

16   court's attention to Page 2 of our reply.  That's the document

17   that was filed very recently.

18          THE COURT:  Okay.

19          MS. STEVENS:  Where we make clear that plaintiff John

20   Harms, one of our individual plaintiffs, is only seeking a

21   preliminary injunction based on his constitutional claims and

22   not on his NVRA claims, whereas the remaining plaintiffs seek

23   the preliminary injunction on both, both sets of claims.

24          THE COURT:  All right.  Go ahead.

25          MS. STEVENS:  All right.  I'd like to take 20 minutes

```
 1    for argument and then reserve 10 minutes for rebuttal, if I
 2    might.
 3              THE COURT:  Okay.  Do you have any witnesses?
 4              MS. STEVENS:  We intend to use documentary evidence,
 5    Your Honor.
 6              THE COURT:  Okay.
 7              MS. STEVENS:  And, actually, let's take that if we
 8    might -- may I offer the volume one and volume two of our
 9    exhibits, which includes a jump drive that has been provided to
10    both the court and opposing counsel.
11              THE COURT:  All right.
12              MS. STEVENS:  So we'd offer those exhibits at this
13    time.
14              MR. HILTON:  The objection I explained to you earlier,
15    Your Honor.
16              THE COURT:  Well, okay.  Go ahead.
17              MS. STEVENS:  Thank you, Your Honor.
18              May it please the court, counsel.  Since 2013 the
19    State of Texas has violated the U.S. Constitution and the clear
20    language of the National Voter Registration Act by refusing to
21    treat online driver's license applications as voter
22    registration applications.  The State has been on notice of its
23    failures since 2015 but has refused to fix the problem.  As a
24    result, in the last five years --
25              THE COURT:  Let me ask the State, is that correct?
```

1  The State has not fixed the problem since 2015 or is it the

2  State's position there's no problem to fix.

3          MR. HILTON:  It's the State's position, Your Honor,

4  that the State process and State law complies with NVRA and

5  with the U.S. Constitution.  The process has been the same

6  since 2015.

7          THE COURT:  Okay.  All right.  Go ahead.

8          MS. STEVENS:  Thank you.  As a result, in the last

9  five years, the voting rights of an estimated 6 million Texans,

10  including our clients, have been burdened by the State's

11  ongoing violations.  Additionally, our organizational

12  plaintiffs are forced to divert significant resources to

13  counteract the state's violations.  As the court is well aware,

14  we are in a unique posture at this hearing.  The case we've

15  been consolidated with, Stringer One, was filed in 2016.  And

16  in 2018, Your Honor ruled in favor of the Stringer One

17  plaintiffs.  The State appealed, and on November 13th, 2019,

18  the Court of Appeals reversed based entirely on standing.

19          In its concurrence, Judge Ho observed that on the

20  plain text of the statute the rule seemed simple enough.  If

21  it's good enough for motorist licensing, then it ought to be

22  good for voter registration.

23          Judge Ho also acknowledged that plaintiffs have indeed

24  endured an injury and it is a right they will never be able to

25  recover.  As citizens, we can hope it is a deprivation they

 1   will not experience again and yet it has happened again.  It

 2   has happened to Jarrod Stringer again, and it will happen to

 3   him at least once more in the future.  And it has happened to

 4   our other individual clients and to thousands of other Texans.

 5           THE COURT:  Let me ask the State, does Mr. Stringer

 6   now have standing?

 7           MR. HILTON:  Your Honor, we wouldn't concede that at

 8   this point.

 9           THE COURT:  Well, at what point in time will

10   Mr. Stringer have standing?

11           MR. HILTON:  Well, Your Honor, I think that's a fair

12   question.  I think that's a factually intensive question.

13           THE COURT:  All my questions generally rise to the

14   level of being fair.  But in any event, when if ever is

15   Mr. Stringer going to have standing?  He didn't the first time,

16   and then Judge Ho said he didn't have -- that he was injured,

17   but he didn't have standing.  Well, I don't know if

18   Mr. Stringer needs to use another computer or something else,

19   but it happened again.  So does he have standing now?

20           MR. HILTON:  Your Honor, the Fifth Circuit explained

21   that a past injury that is concluded with no substantial

22   likelihood of suffering that injury again.

23           THE COURT:  But he did.

24           MR. HILTON:  But he did not prove that in Stringer One

25   though.

1      THE COURT:  Well, I think he's likely to prove it

2  again but -- okay.  I get the drift.

3      MR. HILTON:  He's had another injury, Your Honor, or

4  he at least alleges that he had.  He still has not alleged and

5  it remains to be seen whether he can prove that he still has

6  that substantial likelihood going forward.

7      THE COURT:  Okay.  Go ahead.

8      MS. STEVENS:  Thank you, Your Honor.

9      In both cases, Stringer One and Stringer two, the

10  State has made its position quite clear.  It will refuse to

11  comply with federal law until this court orders it to do so.

12  Texas voters be damned.

13      Each day the State refuses to change its practices,

14  thousands of Texans are denied their right to voter

15  registration application with an online driver's license

16  transaction.  This burden is especially acute now as we

17  approach the primary election voter registration deadline next

18  week and the primary runoff registration deadline on

19  April 27th.

20      A week before last, plaintiffs in this case filed

21  their complaint and their emergency application for preliminary

22  injunction.  Given the unique nature of this case and the

23  consolidation of Stringer One and Stringer two, the court knows

24  well how DPS and SOS handle invariant driver's license

25  transactions.  Those conducted in person, those conducted

1   through the mail, and those conducted online.  For the

2   transactions conducted online, which of course in Texas do not

3   operate as a voter registration application, the record

4   demonstrates that the State's policies fail to comply with the

5   NVRA and the First and Fourteenth Amendments.

6           Although the court is already familiar with the

7   relevant facts and law, due to the complicated posture of the

8   present case, we respectfully ask the court to make an

9   independent ruling as to the likelihood of success on the

10  merits as it pertains to the instant plaintiffs.  We

11  additionally request the court to make its preliminary findings

12  based solely on the record before it in this matter.

13          In Friday's order, Your Honor asked plaintiffs to

14  address several issues.  First, plaintiffs do agree that only

15  one plaintiff needs standing for the court to enjoin the State

16  from violating the NVRA and the constitution.  However, as to

17  the additional individual relief that our individual plaintiffs

18  seek, namely to be registered to vote in time for the March 3rd

19  primary election, they each must establish his or her own

20  standing.

21          THE COURT:  Okay.

22          MS. STEVENS:  Pardon?

23          THE COURT:  Okay.  Go ahead.

24          MS. STEVENS:  Second, the court asked whether standing

25  to assert the new claims is the only new issue.  Plaintiffs

1    believe the only new issue is the current plaintiff standing.

2    But of course given the posture of the case and the hearing

3    we're in, we must also show that the Stringer Two plaintiffs

4    meet the factors for a preliminary injunction.  And, finally,

5    the court asked Plaintiffs to explain the scope of the

6    preliminary injunction we seek.  We included a detailed

7    explanation of the relief sought in the reply that was filed

8    recently and in our amended proposed order.  But to be clear,

9    plaintiffs seek the following two forms of preliminary

10   injunction:  One, by the end of the day on Friday January 31st,

11   so this Friday, defendants register to vote the three

12   individual plaintiffs based on the information provided in

13   their last online DPS transaction.

14        And two:  By Saturday March 28th, which is 60 days

15   from today's date, every person who checks yes in response to

16   the voter registration question that is currently posed by DPS

17   during an online driver's license transaction is promptly

18   mailed a pre-filled voter registration form with postage

19   prepaid for the voter to sign and send back to the Secretary of

20   State for mailing to the appropriate county voter registrar so

21   that those individuals can then be registered to vote.

22        THE COURT:  Okay.

23        MS. STEVENS:  This is of course not as extensive as

24   the ultimate remedy we hope to achieve.  But we have carefully

25   crafted this proposed preliminary relief taking into account

```
 1   the State's response, our clients own ongoing injuries and the
 2   upcoming election deadlines.  We shared our proposed
 3   preliminary request for relief with the State last night but
 4   have not reached any agreement obviously as the time of this
 5   hearing.  I'll focus the remainder of my argument on
 6   plaintiff's standing and the factors for a preliminary
 7   injunction.
 8              THE COURT:  All right.
 9              MS. STEVENS:  So turning first to standing.  Each
10   plaintiff suffers a continuing injury directly traceable to the
11   State's failures to comply with the NVRA and the U.S.
12   Constitution.  And those injuries will be redressed by the
13   remedy sought.  As the Fifth Circuit has made clear, for
14   declaratory and injunctive relief, the injury in fact must be a
15   continuing or future injury rather than a past injury.  So I'll
16   go through the injury for each plaintiff group.
17              THE COURT:  Please.
18              MS. STEVENS:  For the individual plaintiffs:  Here all
19   three individual plaintiffs injuries are still ongoing.
20   They're all currently improperly registered to vote at their
21   prior addresses because of the State's refusal to accept their
22   online driver's license change of address application as a
23   change of address for voter registration purposes.  This is not
24   a past harm but rather an ongoing and continuing harm.
25              Also, plaintiff Stringer will suffer an additional
```

1  concrete harm in the future if the State continues to refuse to

2  comply with the NVRA and the U.S. Constitution.  Mr. Stringer's

3  rights will be violated again when no later than August 25th of

4  this year he moves residences again.  He is currently in a

5  rental home and is going to buy a home prior to his lease

6  expiring on August 25th, and he will subsequently use the DPS

7  system to change his driver's license address, unless the State

8  is forced to change their practices, he will again not be

9  offered voter registration change of address.

10        For the organizational plaintiffs.  The relevant

11 inquiry here is whether the organization has to divert

12 resources to counteract defendant's conduct and that the

13 defendant's conduct is in conflict with the organization's core

14 mission.  As the Fifth Circuit has said, the injury alleged in

15 Article III injury in fact need not be substantial.  It need

16 not measure more than an identifiable trifle.  This is because

17 the injury in fact requirement under Article III is qualitative

18 not quantitative in nature.  Both organizational plaintiffs

19 here, Move Texas and the League of Women Voters of Texas,

20 suffered two distinct injuries in fact, one related to voter

21 registration and one related to voter education.

22        First, they're forced to expend significant resources

23 to counteract the State's violations by registering voters

24 whose online DPS transactions should have acted as simultaneous

25 voter registration applications.  Plaintiffs have identified

1   concrete ways they do this.  They conduct voter registration

2   drives in a variety of public forums, registering tens of

3   thousands of voters over the course of the year.  In

4   particular, they frequently register voters who move from one

5   Texas county to another.  Lead member Phyllis Fenimore, for

6   example, is active in the Wimberly area and regularly registers

7   individuals who transacted with DPS online because they've

8   recently moved to the Texas Hill Country but whose online

9   transactions were not simultaneous voter registration

10  applications.

11          Both the League and Move deputy registrars are active

12  on college campuses in major metro areas where they register

13  students who recently moved to the area and were unable to

14  apply to register through DPS online.  Second, plaintiffs

15  divert resources to educate voters who mistakenly thought they

16  were registered to vote through DPS online.  It is a virtually

17  universal experience that deputy voter registrars for these

18  organizations come across people who mistakenly thought they

19  applied to register or updated their voter registration when

20  transacting with DPS online.

21          THE COURT:  How did they learn they were -- how does

22  the registrar, that deputy registrar learn that the person

23  actually was not registered?  Is it on occasion when the

24  registrar tells this prospective voter, may I register you or

25  however that conversation goes.  And then that voter says, oh,

1  I did that online with DPS about three months ago.  Is that

2  when the deputy registrar then says, oh, if you did it online

3  with DPS you in fact are not registered.

4          MS. STEVENS:  That is often how it happens, Your

5  Honor.  Yes.

6          THE COURT:  So you're saying your organization is

7  injured in what matter?  That now you have to spend time

8  registering that person that otherwise would have been

9  registered versus going and talking to someone else?

10          MS. STEVENS:  Precisely.  So they have to divert

11  resources in two ways.  They have to educate voters and the

12  League of Women Voters educates the public on the fact that DPS

13  online transactions do not act as voter registration

14  applications, so there's an education component here.  You may

15  also divert resources to register the people who should have

16  been registered through DPS's online system and were not.  So

17  they are two distinct diversion of resources.

18          THE COURT:  Okay.

19          MS. STEVENS:  And since they have to divert those

20  resources, they're unable spend as much time and energy on

21  other voter registration and voter education efforts as well as

22  their get out the vote and election protection efforts that

23  surround federal, state, and local elections across Texas.

24          THE COURT:  Okay.  All right.

25          MS. STEVENS:  As reply -- the League, independently of

1    their organizational standing, also has associational standing

2    on behalf on its members.

3          THE COURT:  Okay.

4          MS. STEVENS:  So now turning to the preliminary

5    injunction factors, the court should grant a preliminary

6    injunction immediately particularly in light of next week's

7    voter registration deadline for the primary election and the

8    swiftly approaching voter registration deadline for the primary

9    runoff election.  All factors are in plaintiff's favor.  First,

10   a likelihood of success on the merits.  This has been fully

11   briefed in the application for preliminary injunction which

12   demonstrates there's a strong likelihood of success on the

13   merits for both the NVRA and the constitutional claims.

14   Although this court is already familiar with the relevant facts

15   and law, again, to avoid procedural complications, we

16   respectfully ask the court to make an independent ruling as to

17   the likelihood of success on the merits as it pertains to the

18   instant plaintiffs.

19          Second, irreparable harm to each plaintiff group.  By

20   definition, an irreparable injury is one that cannot be undone

21   by monetary damages.  In our reply, we highlight multiple ways

22   in which all plaintiffs are irreparably harmed and emphasize

23   the acute nature of these harms due to the impending voter

24   registration deadlines and voting periods for the primary

25   election and the primary runoff election.

1          Irreparable harm to the individual plaintiffs:  The
2   individual plaintiffs in this case face irreparable harm next
3   Monday, February 3rd, 2020, when they will be forced to either
4   give up their legal right to register to vote under federal law
5   or they'll face disenfranchisement in the March 3rd primary
6   election.  Jarrod Stringer will additionally face irreparable
7   harm in the 2020 general election after he moves again at the
8   latest in August of this year.
9          THE COURT:  M-hm.
10          MS. STEVENS:  And will be required to change his
11   driver's license address, which he plans to do online.
12   Irreparable harm to the organizational plaintiffs.  I
13   previously highlighted the ways that Move and the League divert
14   their resources to counteract the State's violations for the
15   purposes of standing.  These injuries are not only sufficient
16   for standing but are irreparable because every minute they
17   spend counteracting the State's failures is a minute they can
18   never get back.  The fact that the League is an all volunteer
19   organization only highlights the non-compensable nature of the
20   harm caused by defendants.  Also, both organizations contact
21   voters through a variety of mediums and countless voters are
22   educated by their efforts and are inspired to go vote.  So on
23   top of the diversion of resources, to register and educate
24   voters, irreparable harm occurs when individuals whom the
25   League and Move educate and inspire to go vote are unable to do

1  so because they mistakenly thought they registered through

2  DPS's online system and are disenfranchised at the polls as a

3  result.

4          Finally, we know that irreparable harm of

5  disenfranchisement happens to many Texans.  We know from the

6  organizational plaintiffs own encounters.  And we estimate that

7  in 2018 alone, 735 voters across the State were disenfranchised

8  because of the State's violations in this case.

9          THE COURT:  How many people?

10         MS. STEVENS:  735 at least.

11         THE COURT:  Okay.

12         MS. STEVENS:  We explained fully in our reply,

13  attached to our reply is Joaquin Gonzalez' declaration and

14  explained fully in there the math for how we get to that

15  number, Your Honor.

16         Irreparable harm to the League as an associational

17  plaintiff, the League is a membership organization --

18  organization whose members are individually irreparable harmed

19  every day the State continues to thwart federal law.  With

20  approximately 3,000 members across the State, League members

21  regularly transact with DPS online to renew driver's licenses

22  or change their addresses.  DPS's own employee testified in

23  Stringer One that approximately 1.7 million -- excuse me --

24  1.5 million Texans or 5.5 percent of Texans transact with DPS

25  online each year.  This equates roughly 166-League members

1    transacting online with DPS each year or roughly one every

2    other day.  This includes Emily Ebby, a member of the League

3    who in November of 2019 moved from Travis County to Harris

4    County.  Updated her driver's license through the online DPS

5    system.  But her driver's license of course did not act as a

6    change of address for her voter registration.  And thus she is

7    currently improperly registered to vote in her old county at

8    her old address.

9              THE COURT:  M-hm.

10             MS. STEVENS:  Third, any harm to the defendants is

11   outweighed by irreparable harm to the plaintiffs.  As the court

12   can see in the reply that we filed, the harmed defendants claim

13   they will suffer if a preliminary injunction is issued is

14   negligible.  Based on the defendant's own submissions, the

15   preliminary relief requested should pose at most a routine

16   administrative burden on the State.  The case law makes clear

17   that administrative burdens of this nature are outweighed by

18   their irreparable harm posed to the plaintiffs.

19             First, defendants already do some of what we're asking

20   for mail-in renewal notifications wherein they send voter

21   registration forms to DPS customers through the mail and those

22   forms are then sent back by DPS customers to the Secretary of

23   State for mailing on to the proper voter registrar.

24             And, again, individual plaintiffs will suffer when

25   they're forced next Monday to give up their legal right to

1   register to vote through a DPS online transaction or to face

2   disenfranchisement in the March election.

3           The organizational plaintiffs are also suffering

4   irreparable harm as the State's unlawful practices hamper their

5   voter education, get out the vote, and election protection

6   efforts in this critical time leading up to the voter

7   registration deadlines and voting periods.

8           Lastly.

9           THE COURT:  M-hm.

10          MS. STEVENS:  An injunction serves the public

11  interest.  Congress clearly expressed where the public interest

12  lies in the actual text of the NVRA stating:  The right of

13  citizens of the United States to vote is a fundamental right.

14  It is the duty of the federal, state, and local governments to

15  promote the exercise of that right.  And the purpose of the

16  NVRA is to establish procedures that will increase the number

17  of eligible citizens who register to vote in elections for

18  federal office.  And courts consistently agree that public

19  interest lies in greater civic participation.  Recognizing, for

20  example, that by definition, the public interest favors

21  permitting as many qualified voters to vote as possible.

22          Thus, we respectfully request the court to as fast as

23  possible, given the quickly approaching voter registration

24  deadline, enter a preliminary injunction.

25          THE COURT:  Let me ask you.  In other states, in other

1    states, voters can register online with their motor vehicle,

2    whatever their DPS agency is?

3            MS. STEVENS:  Yes, Your Honor.

4            THE COURT:  Is that true in all 49 other states?

5            MS. STEVENS:  I think it's -- I'm trying to recall

6    from the deposition testimony that's been attached to our

7    reply.  I think it's something like either 28 or 38 states.

8    38 -- excuse me, Your Honor.

9            THE COURT:  So it's your position that a person in

10   Texas who wants to go online to change his or her address with

11   DPS for their license, for purposes of their license, and

12   there's a question I guess that comes up and says, do you want

13   to register to vote, right, or something like that.

14           MS. STEVENS:  Close.  Close to that, Your Honor.  It

15   says, do you want to download a voter registration form.

16           THE COURT:  Do you want to what?

17           MS. STEVENS:  Download a voter registration form.

18           THE COURT:  Walk me through the process.

19           MS. STEVENS:  Sure.  So a potential voter who is

20   transacting online at DPS for a renewal or a change of address,

21   logs on, inputs some information to establish that they are who

22   they say they are.  And then they have to enter certain

23   information for that transaction as it relates to the driver's

24   license information.

25           THE COURT:  Right.

1          MS. STEVENS:  And then I think counsel for the State

2    is right, that at step five you answer a question about voter

3    registration.  And that question of course changed.

4          THE COURT:  And what's the question.

5          MS. STEVENS:  Now it says -- it's something like:  Do

6    you want to download a voter registration form.

7          THE COURT:  Okay.  And let's say the person clicks,

8    says yes.

9          MS. STEVENS:  The person says yes.  Then on the last

10   page it's called the receipt page.  There is a link to the

11   Secretary of State's website, so a wholly different website.

12         THE COURT:  Okay.

13         MS. STEVENS:  Where the person can go and has to

14   download, print, fill out, sign, and mail in a form.  Notably,

15   anyone can access the system that is linked in the DPS system.

16   It is not special for DPS customers.

17         THE COURT:  Okay.  So where do you claim the State is

18   not compliant?  You mean, thus far what you have told me, if

19   the person says, yes, I want this -- a downloaded ballot.  Not

20   a ballot.  A registration form.  You go through that process,

21   and I print it.  Where in the process like Mr. Stringer, where

22   did the system fail him?

23         MS. STEVENS:  The question.

24         THE COURT:  If it failed him.

25         MS. STEVENS:  It absolutely failed him.  The question

```
 1   should say something like:  Do you want to register to vote.
 2   The way that it does for in-person driver's license
 3   transactions and mail-in driver's license transactions right
 4   now, it should have a similar question on the online system.
 5   The person checks yes.  And then their information that is
 6   already provided for purposes of driver's license.
 7              THE COURT:  Right.
 8              MS. STEVENS:  Should go through the way it does
 9   already for driver's license information to DPS to their
10   system.  Once it gets to that system, if they checked yes to
11   the voter registration question, all of the appropriate
12   information should then go on to the Secretary of State's
13   office and down to the proper voter registrar.  The exact same
14   way they do this for in-person driver's license transactions
15   and mail-in transactions.
16              THE COURT:  So your claim is that a person like
17   Mr. Stringer or someone in his position isn't given that
18   opportunity to merely press a button or whatever and his
19   information goes directly to the Secretary of State.
20              MS. STEVENS:  That's right.  The NVRA --
21              THE COURT:  Your claim is that the -- this National
22   Registration Act requires the State of Texas to provide that
23   service?
24              MS. STEVENS:  Yes, Your Honor.
25              THE COURT:  In that manner.
```

1    MS. STEVENS:  In that manner.  The NVRA requires the

2 Voter Registration Application to be simultaneous with the

3 driver's license application.

4    THE COURT:  Okay.

5    MS. STEVENS:  And in fact says that the State cannot

6 require duplicate information for each of these forms, and so

7 we know the system that the State currently has set up, a

8 person who goes through the process they have set up have to

9 fill out duplicate information, if they fill out that voter

10 registration form.  Their name again, their address, their

11 driver's license number and on.

12    THE COURT:  Okay.  Now going back to question number

13 five.

14    MS. STEVENS:  Yes, sir.

15    THE COURT:  Let's say, Is that process only available

16 for people who want to change voter registration information or

17 can a new time -- first-time voter make an application through

18 the DPS website?

19    MS. STEVENS:  Do you mean what -- how should it be or

20 how is it currently?

21    THE COURT:  How is it currently?

22    MS. STEVENS:  Currently, anyone who uses the DPS

23 system for mail-in renewal and whether they've been registered

24 to vote previously or not can access -- assuming they check

25 yes.

1          THE COURT:  I see.

2          MS. STEVENS:  -- can access this form.

3          THE COURT:  All right.  So now do you have the number

4     of transactions -- the number of people, let's say last year in

5     2019 or 2018.

6          MS. STEVENS:  M-hm.

7          THE COURT:  -- who went to the DPS website and made a

8     simple transaction of just notifying -- either trying to renew

9     a license or change of address.  I'm not talking about voting.

10    I'm just talking the number of people that renewed online or

11    changed their address online.  Do you have the numbers of that?

12         MS. STEVENS:  The State has the most up-to-date

13    numbers.  We have the estimation from 2016 so we imagine it

14    went up from there at about 1.5 million Texans.

15         THE COURT:  Okay.  Now, we really know based on

16    experience that not all 1.5 people are registered, right?

17    There's a lot of folks that are driving.  Hey, I just want my

18    license.  I don't want to be involved in anything else.  And

19    nothing as radical as voting, right.  So how many people of the

20    1.5 million do we know are registered to vote?

21         MS. STEVENS:  We do not know the answer to that

22    question, Your Honor, because the answer to that question is

23    the only information that DPS does not track in that

24    transaction.

25         THE COURT:  Okay.  All right.  Good enough.  Thank

1    you.

2            MS. STEVENS:  Thank you, Your Honor.  Oh, I'm going to

3    hand it over to Intervenor-Plaintiffs.

4            THE COURT:  Oh, I'm sorry, go ahead.

5            MR. HILTON:  And, Your Honor, I need to note a couple

6    of objections with respect to the Intervenors.  First, we filed

7    a motion to sever, which I know the court will consider in due

8    course so we object to the cases being joined to them being

9    part of the case.  Also --

10           THE COURT:  And why do you object?

11           MR. HILTON:  The case in which they intervene which we

12   oppose, was a case over which Your Honor had no jurisdiction to

13   do anything other than dismiss the claims.  And our position is

14   that by allowing them to intervene, you exceeded the scope of

15   the Fifth Circuit's mandate, so they've intervened into a case

16   which should not be an open case.

17           THE COURT:  Okay.

18           MR. HILTON:  We also object to their participation in

19   this preliminary injunction hearing.  They have not intervened

20   into this case, Stringer Two.  They're not a party to this

21   case.  They haven't asked to join in Stringer Two.

22           THE COURT:  Okay.

23           MR. HILTON:  So they shouldn't be participating.

24           THE COURT:  All right.

25           MR. HILTON:  And finally, Your Honor, everything that

1   they filed this morning, their summary judgment motion, their

2   motion to join, they haven't provided me copies with any of

3   that.

4          THE COURT:  Okay.

5          MR. HILTON:  I was on the road, not able to see any of

6   that.  I think there's just a process issue with me not being

7   able to respond to what they're arguing today. I'll just note

8   that.

9          THE COURT:  If you'll address all those matters plus

10  whatever you were going to say.

11         MS. BRANCH:  Yes, Your Honor.

12         THE COURT:  Go ahead.

13         MS. BRANCH:  May it please the Court.  My name is

14  Araia Branch for the intervenors.  With respect to the

15  severance motion, we obviously haven't responded to that yet.

16  But we oppose the motion to sever.  Your Honor, has already

17  ruled that the cases are properly consolidated for purposes of

18  judicial economy.  And we think that issue is settled.  Even if

19  the cases are severed, we move to intervene in Stringer One in

20  which case we would be properly before the court in Stringer

21  One.

22         THE COURT:  All right.

23         MS. BRANCH:  We have not asked to join Stringer Two

24  because Your Honor consolidated the two actions.

25         THE COURT:  All right.  Go ahead.

1          MS. BRANCH:  We filed a motion to -- and Your Honor

2     granted our motion to join the Stringer plaintiffs motion for

3     preliminary injunction.  Ms. Stevens has already provided the

4     argument and we join that argument.  I just wanted to make a

5     few points specifically about intervenor's standing as

6     requested by the court's order.

7          THE COURT:  Okay.

8          MS. BRANCH:  And I'll just respond to the first

9     question, which is whether standing is the only new issue since

10    Stringer One was first decided.  We agree with the Stringer

11    plaintiffs, standing remains the only issue.  The law and the

12    facts have not changed, and I think the state's attorney has

13    made that clear both in briefing and in argument thus far

14    today.  As stated in our motion for summary judgment, which I

15    understand we're not here to discuss today, we've requested a

16    separate hearing on that.  The Texas Democratic Party, the DCCC

17    and DSCC each have organizational and associational standing.

18    As Ms. Stevens stated, the law is clear that diversion of

19    resources confirms organizational standing on particular

20    plaintiffs.  And really I think the controlling case here is

21    Crawford v. Marion County with respect to political parties

22    where the seventh circuit held that the democratic party of

23    Indiana had standing to challenge the state's voter ID law

24    because it was forced to divert resources from its other duties

25    in order to educate voters and to counteract against the harm

1    of that law.

2          THE COURT:  Okay.

3          MS. BRANCH:  The Supreme Court in footnote seven of

4    the appeal of Crawford stated again, it affirmed the Seventh

5    Circuit that the democrat party of Indiana had standing and

6    that it was not required to address the standing of the other

7    petitioners because in direct response to Your Honor's

8    question, only one petitioner is required to have standing in

9    order for a matter to proceed.

10          The Texas Democrat Party, the DCCC, and the DSCC have

11    already suffered and will continue to suffer from having to

12    divert resources to counteract defendant's unconstitutional

13    conduct in terms of their voter registration practices from

14    their other activities.  Each of these parties missions is to

15    elect democrat candidates in Texas.  As a result of defendant's

16    conduct, they are having to engage in larger voter registration

17    efforts and they're having to divert resources, time, talent,

18    and other financial obligations away from their obligations

19    to -- and their activities to work to elect democrat

20    candidates.  For example, in the declaration that we provided,

21    Mr. Maxey, who is the primary director of the Texas Democrat

22    Party states that the party has now created the largest voter

23    registration program in Texas history in part to counteract the

24    harm that is caused by defendant's practices.  And,

25    specifically, the parties joined the Stringer plaintiffs motion

1   for a PI with respect to the equal protection claims not with
2   respect to the NVRA claims.  And specifically the harm here is
3   that the State does not permit simultaneous voter registration
4   for individuals who interact with DPS online even though they
5   permit simultaneous voter registration for individuals who
6   interact with DPS by mail and in person.
7          Similarly, the DCCC is having to engage in an
8   expansive effort to increase voter registration in order to
9   counteract defendant's conduct that will result in voters being
10  disenfranchised including Mr. Stringer, as Your Honor has
11  already discussed.  The DSCC similarly is spending additional
12  money on get out the vote efforts and voter persuasion efforts
13  in order to compensate for voters who won't be able to vote as
14  a result of the state's illegal voter registration practices.
15         The parties each also have associational standing on
16  behalf of their members, and I think the controlling case there
17  again is Hunt and also Crawford from the Supreme Court.  That's
18  basically all I was going to address.  I just wanted to make
19  clear that the Intervenors do have standing, and we join the
20  Stringer plaintiffs motion for preliminary injunction with
21  respect to the equal protection claims.  Thank you, Your Honor.
22         THE COURT:  All right.  Anyone else on the plaintiff's
23  side?
24         MS. STEVENS:  No, Your Honor.
25         THE COURT:  No.  Go ahead counsel.  I tell you what,

```
 1   let's take a brief recess.

 2              (Brief recess)

 3              THE COURT SECURITY OFFICER:  All rise.

 4              THE COURT:  All right.  Okay.  You may begin,

 5   counselor.

 6              MR. HILTON:  Chris Hilton for the State.  Plaintiff's

 7   counsel said that this case is about folks needing to give up

 8   the right to register to vote or be disenfranchised.  But any

 9   eligible Texan --

10              THE COURT:  If they go through the DPS route, they

11   will be, right?

12              MR. HILTON:  I'm sorry.

13              THE COURT:  If they go the DPS route, they will.  Is

14   that correct?

15              MR. HILTON:  No, Your Honor.

16              THE COURT:  Okay.

17              MR. HILTON:  Any eligible Texan who wants to vote in

18   the March election, can register to do so regardless of what

19   the court decides on plaintiff's motion.

20              THE COURT:  And they can do so by going through the

21   DPS website?

22              MR. HILTON:  They can do so -- they can do so -- yes.

23   If a Texan decides they want to register to vote while they're

24   renewing their driver license online or changing their address

25   with DPS, defendants have a process in place for them to do
```

1    that.  Voters can also register in person.  They can register by

2    mail.

3          THE COURT:  So are the plaintiffs wrong?  See, there's

4    a disconnect here.  They say it's not being done, and you're

5    saying it can be done.  So when they say a person cannot

6    register to vote simply by going to the DPS website, you're

7    saying they're wrong.

8          MR. HILTON:  What I understand their argument to be is

9    that someone can't register in the manner in which they would

10   prefer it to work.  The NVRA requires defendants -- requires

11   the State to have a process by which someone who is interacting

12   with DPS can also get together a voter registration

13   application.  The State has a process in place.  It's one the

14   plaintiffs don't like but we have a process in place.

15         THE COURT:  And your process, see if I understand this

16   correctly.  I'm not trying to argue with you.

17         MR. HILTON:  I understand.

18         THE COURT:  I'm trying to understand where the

19   confusion or source of the problem is.  You're telling me I go

20   to DPS, I can print an application or something but they're

21   suggesting that the law requires that you have a system to

22   where I can just take care of it online and DPS transmits that

23   information to the Secretary of State.  Are you saying that

24   does not -- that is not required by the law?

25         MR. HILTON:  That's our position, Your Honor.  That's

1   our disagreement on the merits.  Yes, sir.

2          THE COURT:  Okay.  And why is the State correct?  Tell

3   me -- your way is do it this way.  You can you print a deal off

4   and send it over to the voter registrar.  That's what you're

5   saying is the process now?

6          MR. HILTON:  Yes, Your Honor.

7          THE COURT:  Okay.  Go ahead.

8          MR. HILTON:  Your Honor, as I was saying, any Texan

9   who wants to vote in the upcoming elections, which plaintiffs

10  have repeatedly stressed is their motivation for their motion

11  today, can register to vote regardless of what the court

12  decides on plaintiff's motion.  Voters can register in person.

13  By mail.  They can download a voter registration form.  They

14  can pick one up from libraries, high schools, or government

15  offices.  They can ask their county voter registrar to mail

16  them a registration form, at least in some counties like Bexar

17  County.  If they've moved within the same county, they can

18  update their registration online right now today on

19  votetexas.gov.  If they need help, they can contact their

20  county voter registrar or the Secretary of State.  And, yes,

21  they also have this DPS process available to them.

22          THE COURT:  M-hm.

23          MR. HILTON:  All these methods of voter registration

24  are lawful, most if not all have been in place for many years.

25  Contrary to what plaintiffs would have this court believe, the

1    right to vote in Texas does not depend on the court granting

2    plaintiff's motion.  Likewise, this case is not merely a

3    continuation of the 2016 claims like plaintiff Stringer, though

4    there's some overlap.  As this court has already and correctly

5    recognized, we all must begin anew with the new claims of the

6    new parties.  The sole question before the court today is

7    whether plaintiffs have proven that they are entitled to one of

8    the most extraordinary remedies that this court has the power

9    to grant.  The decision to grant any preliminary injunction is

10   the exception and not the rule.  Plaintiffs' burden is even

11   higher where as here they're asking the court's -- the court to

12   force defendants to act rather than simply maintaining the

13   status quo that's been in place for years.  And plaintiffs'

14   burden is higher still where the defendants are State actors

15   because of the respect afforded to State governments in our

16   federal system.

17          Your Honor, defendants submit that plaintiffs cannot

18   turn their loss at the end of the previous case into a complete

19   win at the very outset of this litigation.  They should not be

20   permitted to shortcut the judicial process.  They have not

21   sustained their heavy burden and their motion should be denied.

22          And, Your Honor, before I talk about the preliminary

23   injunction factors, there's something that I feel like I have

24   to address.

25          THE COURT:  Sure.

1          MR. HILTON:  One of the things that plaintiff's

2    counsel said in her presentation was that it was the position

3    of the State and the defendants that this is the process.

4    Texas voters be damned.  That's what she said.  And I don't

5    want a Secretary of State elections division employee to read

6    that and think that I didn't stand up for them.  They've

7    dedicated their careers to serving the voters of the State of

8    Texas, and so I take exception to that remark.

9          THE COURT:  All right.

10         MR. HILTON:  Your Honor, I'll begin with irreparable

11   harm.  Plaintiff's counsel said that any nonmonetary harm is

12   irreparable harm and that's not true.  That's not the standard.

13   That's part of it.  But it has to be a harm that's going to be

14   suffered and cannot be avoided absent intervention by the

15   court.  The question before the court with respect to

16   irreparable harm is, Do you have to act in order to avoid this

17   injustice or is there anything else that can be done to avoid

18   it.  Here, Your Honor, there's no question that something else

19   can happen to avoid that harm.  As I described at the

20   beginning, there are many means that are completely lawful and

21   have been in place for years for any eligible Texan to register

22   to vote in time for the upcoming elections.  Your Honor,

23   another thing that plaintiff's counsel said is that every

24   minute counts, particularly with respect to the organizational

25   plaintiffs.  And that's an area where we agree.  And it's

1  because the organizational plaintiffs have delayed for years in

2  bringing this now supposed emergency.  They go -- they have

3  repeatedly said that this process has been in place since at

4  least 2015, even before then.  Nothing new about this process

5  has caused all of a sudden an emergency to arise other than

6  plaintiff deciding to bring an emergency motion.  And, Your

7  Honor, the law is well established that delay alone can

8  undermine an assertion of irreparable harm.  If defendants, and

9  particularly the organizational -- if plaintiffs and

10  particularly the organizational plaintiffs, were truly being

11  irreparably harmed, you would expect them to act with urgency.

12  And that lack of urgency here, waiting for years before

13  bringing an emergency motion, completely undermines their

14  assertion that they've been irreparably harmed.

15          THE COURT:  Well, they could have been waiting for the

16  outcome of the last case, right.

17          MR. HILTON:  Your Honor, I'm glad you asked that.  The

18  last case did not involve these organizational claims.

19          THE COURT:  I understand.  But they could have been

20  hoping for a different outcome.

21          MR. HILTON:  All the while suffering what they allege

22  is an irreparable harm.  If it was truly irreparable --

23          THE COURT:  M-hm.

24          MR. HILTON:  -- such that they couldn't afford to wait

25  for the outcome because they're suffering harm that can't be

1    undone--

2           THE COURT:  Right.

3           MR. HILTON:  -- which is what they've argued to you,

4    they should have acted sooner, and they didn't.  They waited

5    for years.  Courts have found that substantially shorter

6    periods of delay have undone the urgency that is required to

7    justify granting preliminary injunctive relief.  Periods as

8    short as three months, ten weeks, six months have been found to

9    undermine an assertion of irreparable harm.  Even counting the

10   date of the Fifth Circuit's decision, that's, you know, that

11   was back in November.  We're still months away from that.  And

12   instead they waited.

13          Move Texas has been in existence since 2013.  So as

14   long as Move Texas has been around, this has been the process.

15   The League of Women Voters of Texas has been around since 1919,

16   long before the internet, the NVRA, any of these processes have

17   been around.  And they've been doing this work for as long as

18   these processes have been in place.  Your Honor, they say that

19   every minute counts, and I agree.  Every minute that they spent

20   waiting proves to Your Honor that the harm that they contend

21   they're suffering is not an emergency.  It's not irreparable

22   harm that justifies the extraordinary relief they've asked for.

23          Your Honor, I also want to talk about the individual

24   plaintiffs.  For the reasons I explained earlier, the harm that

25   they potentially face in connection with these upcoming

1    elections is not irreparable.  They do not need this court to

2    act in order for them to be able to register to vote or to

3    update their change of address.  One of the plaintiffs, I think

4    it's Ms. Gomez, alleges that she moved within the same county,

5    within Bexar County I believe.  She can go online right now to

6    Move Texas -- or votetexas.gov and update her voter

7    registration address.  She does not need Your Honor's help to

8    do that.  You do not need to enter an injunction in order to

9    protect the voting rights of any Texan who wants to

10   participate.  And the question of whether eligible voters

11   should have to engage in one of these other methods of voting,

12   that's a question for the merits of the dispute.  We disagree

13   about that.  The question on harm for Your Honor is whether you

14   need to act in order to avoid the harm.  You don't.  Any voter

15   who wants to participate in these elections can do so if they

16   choose, and there's still plenty of time left for them to do

17   that.

18            THE COURT:  So I guess what you're saying is there's

19   an existing remedy.

20            MR. HILTON:  That's right.  And it's one that you

21   don't need to impose.  It's a remedy of the voter can go

22   register.  They can go in person.  I explained all this in the

23   beginning --

24            THE COURT:  There's other manners of doing it.

25            MR. HILTON:  Exactly right, Your Honor.

1          THE COURT:  All right.  Go ahead.

2          MR. HILTON:  So they will not suffer the harm absent

3     an injunction by this court.  That's the standard.

4          THE COURT:  All right.

5          MR. HILTON:  Your Honor, I also want to move next to

6     the harm to defendants and the public interest where as here

7     the defendants are State agencies.  These factors tend to

8     merge, so I'm going to discuss them together.  The harm to

9     defendants here is that the plaintiffs have asked for an

10    injunction that we cannot possibly comply with.  Now,

11    fortunately for me, they filed their amended proposed order as

12    I was leaving the office and someone was able to get it in my

13    hands so I could read it.  The proposed order that they filed

14    with their motion absolutely was insufficient, and that is

15    reason enough alone to deny their motion.  I briefed that, Your

16    Honor, and now that they have the amended order, I'm not going

17    to belabor the point.  But, Your Honor, this to a certain

18    extent is about fairness.  It's about process.  It's about the

19    ability of defendants to know what it is they're defending

20    against.  I could not adequately analyze the harm to defendants

21    and the public interest based on this order that I read for the

22    first time sitting over at the coffee shop right before I came

23    into the courthouse.  Neither could defendants.  We couldn't

24    understand what it was they were asking for.  And we tried our

25    best to tell Your Honor what would be entailed for the kinds of

1  changes that they might be asking for.  We did our best.  And

2  the State agencies that looked at this and who would

3  potentially be involved with these changes, none of them could

4  complete their work in time for the March election or for the

5  primary runoff.  None of them could complete their work in time

6  for the 60-day arbitrary deadline that they have now asked for.

7            THE COURT:  Okay.

8            MR. HILTON:  The DIR, which is the Texas Department of

9  Informational Resources maintains the Texas.gov website for

10 driver's license transactions.  It would take them -- they

11 estimate it would be take them 90 days to complete that work.

12 DPS estimates that its work -- and, again, for the most

13 barebone type of change would take seven to 11 weeks.  And the

14 Secretary of State's office could take at least 60 days, if not

15 more, again, for the smallest possible easiest to implement

16 kind of change.  So those periods may overlap somewhat, and it

17 will take close coordination between all those agencies.  But,

18 you know, under these scenarios, even with a much more limited

19 injunction, there's no way that we could comply in time for

20 these elections.

21            Now, Your Honor, with this amended order, what they're

22 asking here is not a matter of weeks.  It's a matter of months,

23 if not a year, if not more.  They're asking for something that

24 does not exist.  It's an entirely new application, an entirely

25 new piece of software, an entirely new structure that would

 1   have to be built from the ground up.  It would take close

 2   coordination with all three of those agencies, other vendors.

 3   It would be a massive undertaking and certainly not one that

 4   could be completed within 60 days.

 5           And I might as well talk about the rest of the amended

 6   order now.  They've asked that the Secretary of State to ensure

 7   that the individual plaintiffs will be registered to vote no

 8   later than this Friday at 6:00 p.m.  The Secretary of State has

 9   absolutely no authority to do that.  The Secretary of State is

10   not the voter registrar in the State of Texas.  The county

11   voter registrars are the ones who maintain the voter rolls so

12   the Secretary of State, the defendants here can't give the

13   relief that they're asking for.

14           And now with respect to this more systemic change that

15   they've asked for, you know, part of it, you know, I think that

16   we know what some of it means.  I think I know what a

17   pre-populated voter registration application is.  And I have to

18   respond to one thing.  They said that they shared the relief

19   with me last night.  They gave me a preview.  They did not give

20   me this proposed order.

21           THE COURT:  All right.

22           MR. HILTON:  And the expense involved with this would

23   certainly be very significant to the State.  And without

24   knowing that, I can't tell Your Honor exactly what the harm to

25   defendants would be.  But to even analyze this would take

1  significant time for us, and we'll certainly do so as quickly

2  as we can, if the court would like us to do so.  But this is

3  just not an injunction that we can comply with.

4          Your Honor, plaintiffs also, yeah, they characterize

5  that as a mere, mere administrative burden.  It couldn't be

6  further from that.  It is a massive undertaking.  It is a huge

7  project what they've asked for.

8          THE COURT:  Okay.

9          MR. HILTON:  Your Honor, plaintiffs also failed to

10 account for the uncertainty, the confusion, the harm to the

11 public that would occur if this court were to enter a sweeping

12 injunction that create a systemic change to the voter

13 registration processes on the eve of an election at the 11th

14 hour.  They seem to think that somehow that would solve the

15 public's problems, and we would get fewer complaints.  They

16 can't justify that.  We know from experience, the defendants

17 know from experience, when changes are made to voter

18 registration processes, to any election process, there is a

19 certain amount of friction that comes with that.  There will be

20 uncertainty and additional burdens to the defendants, and it

21 will cause harm to the public because folks won't necessarily

22 know, am I registered to vote.  Did this DPS transaction count?

23 Will the future one count?  Again, at the 11th hour of an

24 election, that's not the appropriate time to implement that

25 kind systemic change on an impossibly short timeline.

1          And, Your Honor, there's also the -- part of the

2     problem also with what they've asked for, it's harm to the

3     defendants and it's harm to the public interest, is that

4     they're asking this court to override the duly enacted laws of

5     the State of Texas.  It's not enough that they've just alleged

6     a constitutional injury.  We disagree on the merits of that.

7     And the Fifth Circuit has never ruled on that.  In the Fifth

8     Circuit's opinion, it ruled only on standing.  And Judge Ho's

9     concurrence, not with standing, they did not reach the merits.

10    So we don't have a ruling from the merits on the Fifth Circuit.

11    And there is case law that I signed in our opposition, that any

12    time that the laws of a State are overridden, that constitutes

13    an irreparable harm to the State and to its people.  The duly

14    enacted laws of the State of Texas are the expressed will of

15    the people.  And the court should not lightly overrule them,

16    particularly where as here they haven't made the showing as to

17    harm.

18          Your Honor, excuse me, I want to touch on the

19    likelihood of success, Your Honor.  I don't want to spend a

20    great deal of time on it because from the experience of

21    Stringer One, Your Honor is certainly familiar with the issues,

22    at least some of the issues in this case.

23          THE COURT:  M-hm.

24          MR. HILTON:  But their success on the merits here is

25    not automatic.  As Your Honor has noted, we are beginning anew

1    with these new claims and these new parties.

2          THE COURT:  M-hm.

3          MR. HILTON:  With respect to standing, in particular,

4    Your Honor, you know, we have not responded to the merits of

5    these complaints.  We haven't filed a responsive pleading yet.

6          THE COURT:  Right.

7          MR. HILTON:  For the Stringer Two plaintiffs, we don't

8    have to do so until March.  And so we're still evaluating our

9    arguments, and we will present any issues we have with standing

10   in due course.  But to at least preview for Your Honor, and,

11   you know, Your Honor is right to be concerned about standing

12   here because the Fifth Circuit made clear that what they have

13   to show as far as likelihood of repeating injury in the future,

14   it's a tricky burden for them to meet.

15         For purposes of today -- I'm sorry, excuse me, so I

16   want to begin with the Intervenors and the organizational

17   plaintiffs.  You know, with respect with the Intervenors, as I

18   mentioned before, we respectfully disagree with the court's

19   decision to allow them to intervene, so there's that standing

20   jurisdictional issue.  With respect to associational standing,

21   which is one of the arguments they make, they can't show that

22   in this case.  This type of standing requires three elements.

23   It requires that the organization's members would otherwise

24   have standing to sue in their own right.  It requires that the

25   interests the organization seeks to protect are germane to the

1   organization's purpose.  And it requires that neither the claim

2   asserted nor the relief requested requires participation of the

3   individual members.  And that's *United Food and Commercial*

4   *Workers Union Local 751 v. Brown Group.  517 U.S. 544, 553*.  At

5   least the first and third of those elements are clearly

6   problematic for the plaintiffs.  The first element that the

7   members would have standing to sue in their own right -- the

8   standing of individuals here is tricky.  The Fifth Circuit made

9   that clear.  And so none of these organizations can assert with

10  a broadbrush that all of their members would have standing.

11        Now, with respect to participation, clearly that's not

12  met here either because this is a highly individualized tricky

13  factual question with respect to individuals have standing for

14  this type of claim.

15        THE COURT:  M-hm.

16        MR. HILTON:  And so they absolutely would have to

17  participate.  And the organizations cannot tell you that across

18  the board all their members have standing.  Organizational

19  standing is also potentially problematic for the plaintiffs.

20  They're pursuing a diversion of resources area that's clear

21  from their filings, and it's clear today.  But not every

22  diversion of resources to counteract a defendant's conduct

23  establishes an injury in fact.  That's the Fifth Circuit.

24  NAACP v. City of Kyle 626 Fd.3d 233, 238.  Activities which

25  basically boil down to examining and communicating about

developments in the law and do not differ from routine
activities of the organization do not confer standing.  That's
the same case.  That's the same cite.  That sounds a lot like
they described here today.  It's the routine activities of
these organization to educate voters about developments in the
law, and these are their routine activities that they would be
doing no matter the standard of law with respect to this issue.

They have to show a concrete and demonstrable injury
with a consequent drain on resources constituting far more than
simply a setback to the abstract social interests of the
organization.  That's from *Havens Realty Corp. v. Coleman 455
U.S. 363, 379*.  Clearly, the organizational plaintiffs have a
steep burden here, and it's one they may not be able to
overcome.  They have made vague assertions about their voter
education efforts.  They have not attempted to quantify the
extent of the impact.  And they've argued that it's a
qualitative rather than a quantitative injury.  Well, they have
to show a concrete and demonstrable injury.  And they have not
done that.

We also have concerns about the standing of the
individual plaintiffs.  With respect to Ms. Gomez, I mentioned
her earlier.  She has alleged that she moved within Bexar
County.  She can update her voter registration address today
online.  Her standing must at least seriously be questioned.
Mr. Harms appears to have the same problem that Mr. Stringer

1    did in the first case.  He complains only of a past harm and

2    he's not alleged any substantial risk that he will suffer a

3    potential future injury absent the requested relief.  That's

4    from the Fifth Circuit Stringer case at 721.

5          Mr. Stringer here has at least added the allegation

6    that he intends to move later this year but that alone doesn't

7    solve his standing problem.  If he moves within the same

8    county, he'll be in the same position as Ms. Gomez, and he can

9    register -- change his voter registration address online.

10   Moreover, standing is not created by a declaration in court

11   pleadings.  That's *Mississippi State Democrat Party v. Barber*

12   *529 Fd.3d 538 at 545.*  That's all he has done so far is

13   declared in court pleadings.  As Your Honor knows, if this

14   proceeds to discovery, it could unearth very different facts

15   from what's been alleged.  So, as I said, we will raise and

16   pursue our arguments on standing in due course.  There may be

17   others we haven't touched on here.

18         THE COURT:  Right.

19         MR. HILTON:  We may not assert all these in the

20   motions to dismiss but that's -- the court is right to be

21   concerned about standing.

22         And the last point -- so to bring it back to the

23   preliminary injunction factors, the last point I want to make

24   on the likelihood of success is that this is only one factor.

25   The plaintiff's bear the burden -- they bear the burden to

1    prove all four factors.  If they prove likelihood of success

2    today, that doesn't mean that they win.  It is not a substitute

3    for these other factors.  They can't collapse the other factors

4    into likelihood of success, as Your Honor well knows.

5            Your Honor, I think that's everything I have with

6    respect to the preliminary injunction motion itself.

7            THE COURT:  Okay.

8            MR. HILTON:  Your Honor, has also ordered -- I

9    apologize.  Let me get organized here.  The order from last

10   Friday had a long list of questions, and I would like to

11   address those.

12           THE COURT:  Go ahead.  And you got time.  Go ahead.

13           MR. HILTON:  I appreciate it, Your Honor.  Just one

14   moment while I reorganize myself here.

15           THE COURT:  Question Number 5A:  If defendant's

16   practices have changed, and I suppose your response to that is

17   nothing has changed, correct?  So that part you don't need to

18   address.

19           MR. HILTON:  Correct, Your Honor.  There have been no

20   material changes with our practices with respect to online

21   driver's license renewal and DPS --

22           THE COURT:  Right.  And therefore B is not relevant if

23   no change has not been made.

24           MR. HILTON:  Correct, Your Honor.  With respect to

25   number one -- I was just going to go in order here.

 1            THE COURT:  Go ahead.

 2            MR. HILTON:  I know Your Honor mentioned Number 5.

 3    With respect to number one, I think 5A and one overlap a little

 4    bit.  So with respect to one, I think the only thing that, you

 5    know, for the most part we agree.  The practices and law hasn't

 6    changed.  But I think we would say that, you know, as the court

 7    has recognized, we're beginning anew because this matter

 8    involves new parties bringing distinct claims.  Nothing is

 9    known about any of the plaintiffs, other than Mr. Stringer,

10    beyond what's been alleged.  So our position I think is the

11    same as the court's, which is that, you know, we're starting

12    from scratch in this case.  There certainly will be -- I'm sure

13    will be efficiencies that we can have given that Stringer One

14    in this case substantially overlap.  But our position is that

15    we're entitled to a full opportunity to have our arguments

16    considered with a fresh look and, you know, hopefully we can be

17    more convincing to the court this time around, at least in that

18    sense.  Because defendants should have the opportunity to fully

19    litigate again, we would say that in that sense all issues are

20    new.

21            So number two, I think I've already covered number two

22    was Your Honor's concerns about standing.

23            With respect to number three, whether only one

24    plaintiff or movant needs standing to proceed.  We agree with

25    that subject to what I think is an important qualification.

1    And I think plaintiff's counsel touched on this as well.  The

2    court's determination as to who has standing for a preliminary

3    injunction will have a significant impact on the scope of the

4    relief that it should entertain.  If the court were to find

5    only one individual plaintiff has standing to proceed, that

6    individual would be permitted to seek a preliminary injunction.

7    But the appropriate scope of relief on that motion brought by a

8    single individual would be very different from a kind of

9    sweeping systemic change if there were more plaintiffs or if

10   there were organizations involved.  Of course we don't think

11   any kind of preliminary injunction is warranted, but I think

12   that's our position with respect to number three.

13         Number four:  The facts already developed, I think

14   we've already covered.  At least for the purposes of today, we

15   don't oppose--

16         THE COURT:  Right.

17         MR. HILTON:  -- that with the exception of the

18   objections I had to the Intervenor's exhibits and with the

19   late-filed exhibits that we had no notice of and weren't able

20   to review.

21         So moving on to number five which from defendant's

22   perspective at least was kind of the meat of Your Honor's

23   order.  You know, 5A I think we've covered the changes.  5B was

24   about this step five of the online process plaintiff's describe

25   it more or less accurately in their injunction and Your Honor

1    has asked questions about it today.  I think that's the crucial

2    step where the parties start to disagree in this case.  We've

3    submitted to Your Honor deposition excerpts from Stringer One

4    that I think have the best explanation.  And with respect to

5    the difference of the forms, I'm hopeful this is helpful to

6    Your Honor, I'm not sure that it will be.  But those

7    differences are attributable to the different process that is

8    used for in-person and mail transactions versus online,

9    transactions.  We've talked about some of those differences

10   today.  And we contend that all those processes are lawful but

11   they're not identical in the ways that we've covered today.

12        Now with respect to C, D, and E, Your Honor has asked

13   for the total number of persons in various categories.  We

14   explain this in the submission this morning, Your Honor.  The

15   court is asking for data that defendants simply don't have.

16   That yes or no answer that's the crucial component of each of

17   these requests is not -- you know, it's not kept in the online

18   process that we have, so we just can't simply answer the

19   question.

20        THE COURT:  All right.

21        MR. HILTON:  We've attested to that.  Apologies to the

22   court.  We just don't have the data.  With respect to F, Your

23   Honor asked about continuing violation or continuing injury.

24   You know, of course we dispute there was any injury at all.

25   But, you know, if that -- if the continuing violation or

1  continuing injury doctrine has application here, it would be up

2  to the plaintiffs to explain and argue how that helps their

3  claims.  And the Fifth Circuit has been reluctant to expand the

4  reach of that doctrine.  There's a case *McGregor v. LSU Board*

5  *of Supervisors 3 Fd.3d 850.*  And I have a quote from 866

6  Footnote 27:  The Fifth Circuit has said, Courts including this

7  one are wary to use this doctrine to save claims outside the

8  area of Title 7 discrimination cases.

9        If there is, you know, -- so its applicability is in

10  doubt here at the very least.  If there is any wrongful conduct

11  in this case, it occurs at the time of the defendant's alleged

12  actions or in this case the alleged inaction of treating the

13  DPS interaction as a voter registration.  Defendants don't take

14  any further action after that with respect to any of those

15  individuals after that transaction is completed.  So because

16  the alleged violation is a discrete occurrence, it's not a

17  continuing violation.  Once the actions of the defendants have

18  stopped, that ends the violation.  There's a difference, and

19  the Fifth Circuit has said from the McGregor case as well:  We

20  must be careful not to confuse continuous violations with a

21  single violation followed by continuing consequences.  Only

22  continuous unlawful acts can form the basis of a continuous

23  violation.  I think for that reason, Your Honor, we would say

24  that doctrine doesn't have any applicability here.  But, again,

25  it would be plaintiff's burden I think to explain how that

1    would help their claims.

2         Now, with respect to 5G, Your Honor, this is an area

3    where we weren't able to get the court the exact number that

4    you asked for but we were able to get a number that may be

5    helpful, and we wanted to at least provide that since we were

6    able to.

7         THE COURT:  Okay.

8         MR. HILTON:  We were able to put together the number

9    of in-person and mail transactions combined, and so the

10   important clarifications here are that this is only the number

11   of transactions.  It's not the number of people.  So, you know,

12   if someone transacted multiple times, they would be double

13   counted so we would expect the number of people to be lower.

14   We don't now how much lower.  It may be substantially.  We just

15   don't know.

16        THE COURT:  Right.

17        MR. HILTON:  And we can't separate out in-person

18   versus mail transactions.  It's just all of those combined

19   together.

20        THE COURT:  All right.

21        MR. HILTON:  And we explained a little bit about how

22   we put that together.  I can answer questions for Your Honor,

23   if you'd like.  But the bottom line is that number of

24   transactions since November 2016 is a little over 6 million

25   transactions in person or by mail where DPS then eventually

1  sent some data to the Secretary of State.  And so that means

2  for those 6 million transactions the customer would have said,

3  yes, I want to register to vote.

4      The other limitation to that number that I want to

5  stress for the court is that, you know, we can tell whether DPS

6  sent the data to the Secretary of State, and the Secretary of

7  State could find for the court the total number of

8  registrations that came from DPS over a particular time period,

9  but we can't answer the question as Your Honor has asked

10  because the Secretary of State doesn't track or differentiate

11  what kind of DPS transaction generated the data.  So we

12  wouldn't be able to separate out in-person, mail, online.  We

13  just know the number of --

14      THE COURT:  Okay.

15      MR. HILTON:  -- data entries we've gotten from DPS.

16  So, unfortunately, just because of that system limitation, I

17  don't know that the Secretary of State has any additional

18  details on these questions that they can provide.

19      With respect to age, Your Honor you asked the number

20  of times the Secretary of State has rejected electronic

21  signatures.  I explained to Your Honor earlier that what is

22  meant here by electronic signature.  The response to this was

23  also stated in our notice.  The Secretary of State doesn't have

24  the authority to reject the electronic images of signatures

25  from DPS for any reason, fraud included.  That information is,

1    you know, the voter registrar may -- the county voter registrar

2    may be able to do some something with that but it wouldn't be,

3    you know -- well, I'll stop there just simply because the

4    Secretary of State doesn't have the ability to answer that

5    question for you.

6           THE COURT:  All right.

7           MR. HILTON:  And doesn't have the authority to reject

8    any electronic images of signatures from DPS.

9           With respect to five:  I -- we answered that I believe

10   in the attachments to our opposition to the preliminary

11   injunction motion to the extent we were able to.  And with

12   respect to six, I think I've shared with Your Honor what I was

13   able to come up with, with respect to their new proposed order.

14   So I think that's everything that I have.  I would be happy to

15   answer any more questions Your Honor has.

16          THE COURT:  That's fine.  Okay.  Thank you.  Go ahead.

17          MS. STEVENS:  Your Honor, might we have another short

18   break just to gather.

19          THE COURT:  Yes, of course.  All right.  Thank you.

20          (Break)

21          THE COURT SECURITY OFFICER:  All rise.

22          THE COURT:  All right.  You may be seated.  Thank you.

23   Okay.  Let's continue.  Go ahead.

24          MS. STEVENS:  Thank you, Your Honor.  I'd like to turn

25   first to the plaintiff's standing.  For the individual

1    plaintiff standing, I'd like the highlight the differences

2    between the individual plaintiffs in Stringer One and the

3    individual plaintiffs in the current lawsuit in Stringer Two.

4    In Stringer One, all three individual plaintiffs transacted

5    with DPS online, were not provided the opportunity to register

6    to vote.  But before we filed our lawsuit, they all got

7    registered to vote in a different manner.

8            THE COURT:  You mean the plaintiffs in Stringer One.

9            MS. STEVENS:  That's correct, Your Honor.

10           THE COURT:  Right -- and who -- how did they get

11   registered?

12           MS. STEVENS:  Two of them were registered through the

13   provisional ballot process so they cast a provisional ballot,

14   and it automatically registers you to vote.

15           THE COURT:  Right.

16           MS. STEVENS:  And then Mr. Stringer himself registered

17   at an on-campus voter registration drive.

18           THE COURT:  Okay.

19           MS. STEVENS:  But the Fifth Circuit pointed directly

20   to fact that they had been registered to vote before we filed

21   that lawsuit in holding that they did not have standing.  In

22   contrast to that, the three individual plaintiffs in this case

23   are still -- do not have updated voter registration.  So they

24   are still registered to vote at their prior addresses, and that

25   was true last week when we filed the lawsuit.  It's true today.

1          THE COURT:  And now they can't vote at their prior
2    address.  Is that correct?
3          MS. STEVENS:  That's correct.  So the -- under the
4    NVRA, they're entitled to receive voter registration through
5    this driver's license transaction.  They did not get it.  That
6    harm is ongoing even as we stand here today.
7          THE COURT:  Okay.
8          MS. STEVENS:  For the organizational plaintiffs, we
9    briefed substantially the diversion of resources that they --
10   that they -- the resources they divert to counteract the
11   defendant's conduct in this case.
12         THE COURT:  Okay.
13         MS. STEVENS:  And that's the voter registration of
14   people who should have been registered and its education.
15         THE COURT:  M-hm.
16         MS. STEVENS:  Turning to the likelihood of success on
17   the merits.  There was some statements about what the NVRA
18   requires that I would like the clear up for the court.  The
19   NVRA requires that each driver's license application including
20   any renewal application serve as a simultaneous application for
21   voter registration.  And the NVRA states that the voter
22   registration section of the driver's license -- driver's
23   license's application forms, quote, may not require any
24   information that duplicates information required in the
25   driver's license portion of the form.

1        The State cannot dispute that its process is not a

2   simultaneous application and it does require duplicate

3   information.  There's no way that they can dispute that, and

4   they did not do so in Stringer One.

5        THE COURT:  M-hm.

6        MS. STEVENS:  Turning to irreparable harm.  The

7   definition of irreparable harm is that it cannot be

8   compensated.  And the cite for that is 542 F-Appendix 329 at

9   335.  It's a Fifth Circuit case.  Also, the State relies on

10  seven cases in their response all of which are inapposite to

11  the situation here.

12       THE COURT:  Well, what's the response to, if I

13  understood counselor correctly for the State, all of these

14  people can in fact register, you know, go down to their county

15  registrar or go online to I guess directly to the Secretary of

16  State website or whatever website it is.

17       MS. STEVENS:  M-hm.

18       THE COURT:  Isn't he correct about that, that before,

19  you know, this imminent harm that's going to occur prior to

20  February 3rd or will occur on the 3rd, can not each of them do

21  that and avoid the harm?

22       MS. STEVENS:  No, Your Honor.  Without citing any case

23  law, the State suggests, like you say, that the individual

24  plaintiffs could be made whole by simply abandoning their

25  statutory and constitutional right to simultaneous voter

 1   registration application with their driver's license

 2   transaction and find another way to register before Monday's

 3   deadline.  That position overlooks extensive precedent

 4   confirming that quote.  Any restriction on the fundamental

 5   right to vote constitutes an irreparable injury including --

 6   and this is not in quotes.  Including unlawful burdens on the

 7   manner of registration or voting that will not necessarily

 8   cause disenfranchisement.  So the State is completely incorrect

 9   in this regard.  The fact that the plaintiffs will have to give

10   up their right under federal law is the harm, and coming up

11   with some other way that they can register to vote does not

12   solve the problem.

13          THE COURT:  Does not solve the problem.

14          MS. STEVENS:  Correct.

15          THE COURT:  Okay.  All right.

16          MS. STEVENS:  As to the allegation that the

17   organizational clients improperly somehow delayed in filing

18   their lawsuits.  First of all, that is different from saying

19   that the organizational plaintiffs are not irreparably injured.

20   The State relies on seven cases for this proposition all of

21   which are inapposite.  Indeed, five are trademark or patent

22   cases and involve the very different situation of a plaintiff

23   seeking to enjoin the business practices of a competitor on the

24   grounds that such practices are hurting the plaintiff's

25   business.  Under those very different fact patterns, which did

1  not involve constitutionally protected rights, courts explain

2  that a delay in bringing suit after the discovery of the

3  alleged violation undercut the claim that monetary damages were

4  insufficient.  Federal courts have repeatedly granted, and we

5  cite these in our reply.  We cite at least three cases in our

6  reply, and we're happy to do further briefing on this, Your

7  Honor.  Federal courts repeatedly grant preliminary relief

8  against longstanding State election laws.

9        Turning then to the remedy.  It is not credible that

10 the State can come in here and say they have no idea how long

11 it will take to give us a full fix, an entire fix of the

12 situation.

13       THE COURT:  Why is that not credible to believe?

14       MS. STEVENS:  Because the relief we -- the ultimate

15 relief we seek, not what we're asking the court for today in

16 the preliminary injunction, but the ultimate relief we seek has

17 been the same relief sought since they were put on notice of

18 these violations in 2015.  They were sued for in early 2016.

19 We had discovery on in 2017 etc. etc.

20       THE COURT:  M-hm.

21       MS. STEVENS:  But --

22       THE COURT:  But that's not to suggest that even if

23 that's true, you're saying they've had this knowledge since

24 2015, let's assume that.  It may require a lot of extensive

25 time, effort, and money to cure by the proposed deadline that

 1  you're seeking.

 2          MS. STEVENS:  Your Honor, that's actually counter to

 3  the testimony that was provided in Stringer One where it was

 4  described by DPS employees, described by Secretary of State

 5  employees as not being the difficult fix they claim it to be

 6  now.

 7          THE COURT:  Okay.

 8          MS. STEVENS:  Additionally, in the declarations

 9  provided -- I think they were filed yesterday, they, for

10  example, I think the DIR declarant listed out various things

11  for their normal process.  You know, you submit a request for a

12  change.  The change goes through this next step, then someone

13  else considers it.  Those are all their normal processes.

14          THE COURT:  Okay.

15          MS. STEVENS:  If a court were to order them to jump

16  through those faster than their normal course, they could do

17  that.  And they've not said they can't.

18          THE COURT:  All right.

19          MS. STEVENS:  But notably for this hearing right now,

20  the preliminary injunction we seek is not that full fix.

21          THE COURT:  M-hm.  Okay.

22          MS. STEVENS:  We, again, reviewed the state's response

23  yesterday and have narrowed our requested preliminary relief.

24          THE COURT:  Okay.  And what specifically is that?

25          MS. STEVENS:  Yes, Your Honor.

1          THE COURT:  Give me the precise interim relief you're

2     asking for.

3          MS. STEVENS:  Yes, Your Honor.  As to the individual

4     plaintiffs, we are asking for the defendants to register them

5     to vote with the information that they previously provided

6     during their last online driver's license transaction.

7          THE COURT:  You mean, you're saying for the State of

8     Texas to get whatever they filed with DPS already and get them

9     registered?

10          MS. STEVENS:  That's correct, Your Honor.

11          THE COURT:  All right.

12          MS. STEVENS:  And we're asking the court to order that

13     they do that by the end of the day on Friday January 31st.

14          THE COURT:  But I believe counselor's response to that

15     was, well, the Secretary of State doesn't do that.  Each

16     individual county registrar does that.  Is he correct on that?

17          MS. STEVENS:  The voter registrars are responsible for

18     voter registration in their county.  But the Secretary of State

19     is claiming a hands-off that they don't actually have under

20     State and federal law.  In fact, under the NVRA itself, the

21     Secretary of State is the State election officer and is tasked

22     with making sure that the State complies with the NVRA.

23          THE COURT:  That's in the statute.

24          MS. STEVENS:  That's correct, Your Honor.

25          THE COURT:  So what you're telling me, the statute

1    provides that a Secretary of State can do this.

2          MS. STEVENS:  It provides that the Secretary of State

3    can ensure that it's done, and particularly Section 8 of the

4    NVRA says:  Each state -- and so, again, Secretary of State is

5    tasked with making sure the State is in compliance.

6          THE COURT:  Okay.

7          MS. STEVENS:  Each state shall ensure that any

8    eligible applicant is registered to vote in an election.

9          THE COURT:  Okay.

10          MS. STEVENS:  Pardon me, Your Honor.  And, in fact,

11    counsel told you just moments ago that the Secretary of State

12    made sure that the 6 million people who transacted with DPS in

13    person and through the mail and checked the yes box to the

14    voter registration, were transmitted from the Secretary of

15    State -- excuse me, from DPS to Secretary of State and on to

16    the voter registrars and that those people were then -- were

17    then registered.

18          THE COURT:  All right.

19          MS. STEVENS:  So as to the more interim systemic

20    relief.  What plaintiffs are requesting are within 30 days --

21    and I am actually looking at the proposed order, Your Honor.

22          THE COURT:  Okay.

23          MS. STEVENS:  Within 30 -- excuse me -- 60 days from

24    today's date.  That's March 28th, if this order is signed

25    today, the defendant DPS must have an operational system to

1    promptly mail a pre-populated voter registration application to

2    every applicant who checks yes in response to the voter

3    registration application question currently posed by defendant

4    DPS during an online transaction.

5            THE COURT:  That's the question number five on the

6    online.

7            MS. STEVENS:  Oh, yes, Your Honor.  Yes.  Sorry.

8            THE COURT:  Okay.

9            MS. STEVENS:  I'd like to note for Your Honor that

10   this -- the DPS already sends in the mail voter registration

11   forms of the type that we're describing that are -- that are

12   granted not pre-populated to DPS customers already with mail-in

13   renewal notifications.  So that's distinct from mail and change

14   of address.

15           Next on the relief.  Within 60 days from today's date,

16   again, March 28th, defendant DPS must have an operational

17   system to update the individual driver's license records of

18   applicants who check yes in response to the voter registration

19   application question currently posed by defendant DPS during an

20   online driver's license transaction to reflect that the

21   applicant checked yes in response to that question.

22           Next:  The pre-populated voter registration

23   application must be addressed to defendant SOS and include

24   prepaid postage so that an applicant can complete the voter

25   registration application and mail it to defendant SOS.

1          Now, this is this specific piece of the proposed

2     order, Your Honor.  Right before State's counsel sat down, he

3     said that we were asking this court for the preliminary relief

4     of enjoining a state law.  And the state law that they're

5     referring to is the alleged signature requirement under state

6     law for voter registration purposes.  This interim relief

7     allows for the individual voter themselves to sign, physically

8     sign on this voter registration form that we propose they be

9     sent, their name and date and send it back in.  And so that

10    completely cuts out the argument that the State is making that

11    we are asking this court to enjoin current state law.

12          THE COURT:  Okay.

13          MS. STEVENS:  Next, defendant DPS must include with

14    the voter registration application described above a brief

15    letter explaining that the individual is receiving a voter

16    registration application because they selected yes in response

17    to the voter registration question when they completed their

18    online driver's license transaction.

19          And, finally, if defendants will be unable to comply

20    with the timeline set forth in paragraph four of the order,

21    defendants DPS and SOS must provide specific compelling

22    evidence demonstrating why they need additional time to comply

23    and move the court for an amended order no later than seven

24    days after -- from today's date, from the date the court signs

25    the order.

```
1              THE COURT:  All right.  Anything else?

2              MS. STEVENS:  Just a moment, Your Honor.

3              Your Honor, I would like to note for the court that

4    attached to our reply, one of the exhibits to our reply is the

5    mail-in form, the form that gets mailed to the Secretary of

6    State already under that process I described.  And attached is

7    30B6 testimony from the Secretary of State and DPS about the

8    system that they already use, this mail-in voter registration

9    form four.

10             THE COURT:  Okay.  All right.  Anything else?

11             MS. STEVENS:  No, Your Honor.

12             THE COURT:  Counselor.

13             MS. BRANCH:  Your Honor, if I could just respond.

14             THE COURT:  Okay, yes.  Go ahead.

15             MS. BRANCH:  Thank you, Your Honor.  Intervenors adopt

16   the argument that's been set forth here today.  I did want to

17   just take one moment to address counsel's argument regarding

18   our participation in Stringer Two, just two points I want to

19   make on that.

20             THE COURT:  Hold on a second.  Let him confer because

21   I want to make sure he hears.

22             Okay.  Go ahead.

23             MR. HILTON:  I'm sorry, Your Honor.  I apologize.

24             THE COURT:  No, no.  You're okay.  Do you need a

25   break?
```

```
1              MR. HILTON:  No, I'm fine.

2              THE COURT:  Okay.  Go ahead.

3              MS. BRANCH:  Thank you.  I just want to the address

4    two points about our participation in Stringer Two:  The first

5    is that the court did not exceed the Fifth Circuit's mandate by

6    allowing our intervention in Stringer One.  The mandate stated

7    that plaintiffs needed to be dismissed for lack of standing.

8    It said nothing about dismissing the entire suit nor did it say

9    anything about intervenor's standing.  And the only thing that

10   has changed here is that Intervenors do have standing in this

11   case.

12             THE COURT:  All right.

13             MS. BRANCH:  Moreover, there are exceptions to the

14   mandate rule, one of which is that where evidence has

15   substantially changed, the mandate can be exceeded and here

16   there's a change and that change is that Intervenors have

17   standing.  Even if Your Honor were to sever the two cases, we

18   were still granted intervention in Stringer One, and we could

19   incorporate the record in that case pursuant to Federal Rule of

20   Civil Procedure 10C.

21             On organizational standing, I just want to make one

22   quick point.  Again, as was -- the point was made earlier, the

23   bar is not high to establish organizational standing.

24   Courts -- the Supreme Court and the Fifth Circuit have held

25   that diversion of resources even if only slight is sufficient
```

1    to confer standing, and I would point Your Honor to OCA Greater

2    Houston v. Texas for additional law on that point.  Here

3    there's been a clear diversion of resources for each of the

4    organizational plaintiffs.  For example, the DCCC has entered

5    into a contract to spend $400,000 to engage in voter

6    registration in one congressional district in Texas.  And part

7    of the reason why they're doing that and have done that is

8    because they have to counteract defendant's unconstitutional

9    practices and the harms that are caused to voters in Texas as a

10   result of those practices.

11          I would also state that declarations are sufficient to

12   establish standing, and I would point Your Honor to *Lujan and*

13   *Direct TV v. Button*, which is a Fifth Circuit case on that

14   point.  Thank you.

15          THE COURT:  All right.  Counselor, so you've heard the

16   precise interim relief the plaintiff is seeking, and have you

17   considered that and discussed that with your clients?

18          MR. HILTON:  I have.  Well, to the extent that I have

19   been able to, Your Honor.  As I mentioned to you earlier, I got

20   that on the way out of the door, and I wasn't able to even read

21   it until I got down here at the coffee shop.

22          THE COURT:  Okay.

23          MR. HILTON:  So we have not been able to do a full

24   analysis of this relief.

25          THE COURT:  Okay.  How much time, if any -- rather,

1    how much time would you need for you to confer with your

2    clients to review whether you would agree or oppose the interim

3    relief?

4              MR. HILTON:  Well, we oppose the relief.

5              THE COURT:  Okay.

6              MR. HILTON:  We oppose the relief that they asked for

7    today.

8              THE COURT:  Okay.

9              MR. HILTON:  And I wanted to talk a little bit about

10   the relief.  I think I was accused of making some sort of

11   misrepresentation to Your Honor.  I certainly have been in the

12   courtroom enough to know hopefully Your Honor doesn't think

13   I've done that.

14             THE COURT:  No.  Go ahead.

15             MR. HILTON:  And her presentation with respect to

16   relief was so confusing to me because she talked about many

17   different proposed relief, the final relief from the last case

18   that I couldn't keep it straight.

19             THE COURT:  M-hm.

20             MR. HILTON:  So the relief that I understand to be

21   before the court, there are two proposed orders before the

22   court on this preliminary injunction motion.

23             THE COURT:  Okay.

24             MR. HILTON:  The first proposed order was inadequate.

25   It was so inadequate that it's grounds to deny their motion and

1    we briefed that.  The new proposed order that we got this

2    morning, this is an entirely new proposal that we did not know

3    about until before, just before coming into this courtroom.

4              THE COURT:  Okay.

5              MR. HILTON:  We know that it is not a quick fix

6    because what they're asking for in creating this pre-populated

7    forms that have been mailed does not exist.  That has to be

8    built from scratch.  And our understanding is that based on

9    similar projects where you have to build a complete application

10   from the ground up, that is a process of months, possibly years

11   depending on what the specifications are.  It cannot be done in

12   60 days.  It cannot.  And I don't know what evidence they think

13   they have on this but it wasn't on this proposed solution.  It

14   wasn't.  It was on something else.

15             THE COURT:  Okay.

16             MR. HILTON:  So, you know, if we were to have a

17   different kind of fix, you know, we tried to give Your Honor

18   our best estimate as to what would happen for the smallest,

19   most narrow fastest fix, and those are the declarations that

20   we filed yesterday.  But with respect to this new relief this

21   morning, Your Honor, it cannot be done in 60 days.  And I'm

22   certain, I mean, this was never -- so I'm certain none of the

23   evidence they cite is talking about this proposal.

24             And counsel reminded me -- and I wanted to mention

25   this and forgot earlier, the last paragraph, paragraph E, about

1    putting the burden on defendants to modify the injunction after

2    it's been entered, I don't understand where that standard comes

3    from, what basis there is for flipping the burden to defendants

4    to modify an injunction.  That's improper out of the gate.  I

5    don't know what evidence they have to support the need for

6    that.  So this proposed injunction this morning, Your Honor, if

7    we have anything to add beyond what I have said today, we'll

8    file some sort of notice or supplemental brief with the court

9    to let you know.

10              THE COURT:  Okay.  All right.

11              MR. HILTON:  But we cannot comply with that order.

12              THE COURT:  Let me ask you something.

13              MR. HILTON:  Yes, Your Honor.

14              THE COURT:  Would there be any useful purpose in

15   having y'all meet tomorrow perhaps somewhere, here, if

16   necessary, and confer about this?  Would anything be gained

17   from that?

18              MR. HILTON:  Your Honor, if the court asked us to do

19   that, I'd be willing to.  Certainly.

20              THE COURT:  Not only with you but with your clients.

21              MR. HILTON:  Of course, Your Honor.  You know, I think

22   if the court asked us that, we would find a way to do that.

23   I'm pessimistic that we would be able to reach a resolution.

24              THE COURT:  And why is that?

25              MR. HILTON:  Because the requirements of state law are

1  very clear about what the Secretary of State has the authority

2  to accept and can or cannot do.  And that's another point that

3  I wanted --

4          THE COURT:  And the requirements of the National Act

5  are very clear likewise.

6          MR. HILTON:  Right.  Well, that's what I wanted to

7  mention.  The National -- the NVRA does not confer authority on

8  the Secretary of State to register someone to vote.  That's not

9  in the Act.  Yes, the Secretary of State is the state election

10 officer.  But that doesn't mean that they have the authority to

11 register anyone anywhere in the state.  The NVRA does not

12 invalidate, and plaintiffs have not challenged the system of

13 local control and the structure of the election system in the

14 State of Texas.

15         THE COURT:  Yeah.

16         MR. HILTON:  There is a structure of local control

17 over elections with county-level voter registrars who control

18 their own county's rolls.  They haven't challenged that.  The

19 NVRA doesn't disturb that.

20         THE COURT:  Okay.

21         MR. HILTON:  And the last point, Your Honor, is they

22 made some mention of the 6-million number that we gave.  They

23 were transmitted pursuant to state law.  Those registrations

24 are authorized by state law.  The county voter registrar, when

25 they have a registration that's valid under state law, they

 1   have a duty to register that voter.

 2          THE COURT:  M-hm.

 3          MR. HILTON:  What they're talking about is not

 4   authorized by state law.  It would require something that goes

 5   well beyond anything that state law requires.  And as counsel

 6   mentioned, it would override the in-writing with the signature

 7   requirement among many other issues.  So it's just not true

 8   that that 6 million has anything to do with the proposed relief

 9   we're talking about today.

10          THE COURT:  Okay.  Let me ask you, you know, on the --

11   I think you said the State doesn't retain the responses, the

12   yes responses to question I think five.  Is that what you said?

13          MR. HILTON:  That's correct, Your Honor.  That data is

14   not kept.  It's not tracked.

15          THE COURT:  And why not?

16          MR. HILTON:  I think that's an interesting question.

17   There's no purpose that it serves under state law is my

18   understanding.  It's just never been anything that I think has

19   been asked.  Let me confer with my client.

20          THE COURT:  Okay.

21          (brief pause)

22          MR. HILTON:  Your Honor, I think for a full answer to

23   that question, that's just not something the defendants could

24   provide because that website is maintained by DIR.

25          THE COURT:  Okay.

1          MR. HILTON:  So as far as exactly why it's designed

2     that way or not, that question is a flag to tell DIR whether to

3     send that data to DPS.

4          THE COURT:  Okay.  Do you have anything on that?

5          MS. STEVENS:  On that, Your Honor, yes.  There is

6     deposition testimony that is in the record provided by DPS and

7     the Secretary of State's office from Stringer One on the answer

8     to this question.  There are kind of technical requirements for

9     how this information gets transferred from the website to DPS's

10    system.  Suffice it to say that the way that they decide what

11    gets moved is through what's called a use case.  And there's

12    testimony in the record that says back when they were creating

13    this online system, the original use case was going to track

14    the answer to that question, and then they decided to take out

15    the answer to that question, so it's not that it's impossible

16    or, you know, that the State couldn't ask the vendor who is

17    working on the website not to do it.

18          THE COURT:  All right.  Anything else?  Anything else?

19          MS. STEVENS:  No, Your Honor.

20          MR. HILTON:  I just want to say, that's correct, Your

21    Honor.  I think we could make that change.  I think that kind

22    of change is what we contemplated for the declarations filed

23    yesterday.  But that's not something we have now, so we can't

24    answer the court's data questions directly.

25          THE COURT:  Right.  Okay.  All right.  Then I'll

```
 1   review the matter and take it under advisement and issue an
 2   order.   Thank you.   You're excused.
 3              THE COURT SECURITY OFFICER:  All rise.
 4              (Adjournment)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1   UNITED STATES DISTRICT COURT   )

2   WESTERN DISTRICT OF TEXAS      )

3           I certify that the foregoing is a correct

4   transcript from the record of proceedings in the

5   above-entitled matter.

6           I further certify that the transcript fees and format

7   comply with those prescribed by the Court and the Judicial

8   Conference of the United States.

9   Date signed:    January 30, 2020.

10

11                              /s/Leticia Lucia Ornelas

12                              **LETICIA L. ORNELAS**
                                United States Court Reporter
13                              655 East Cesar E. Chavez Blvd.,
                                Room 319A
14                              San Antonio, Texas 78206
                                (210) 244-5039
15

16

17

18

19

20

21

22

23

24

25

# Exhibit N

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| JARROD STRINGER, et al. | Civil Action Case No. 5:16-cv-00257-OLG |
| Plaintiffs, | |
| v. | |
| ROLANDO PABLOS, in his official capacity as Texas Secretary of State and STEVEN C. MCCRAW, in his official capacity as Director of the Texas Department of Public Safety | CONSOLIDATED WITH |
| | |
| JARROD STRINGER, et al. | |
| Plaintiffs, | Civil Action Case No. 5:20-cv-00046-OLG |
| v. | |
| RUTH HUGHS, in her official capacity as Texas Secretary of State and STEVEN C. MCCRAW, in his official capacity as Director of the Texas Department of Public Safety | |
| | |
| Defendants. | |

## FINAL JUDGMENT

Intervenors have moved for leave of the Court to file for summary judgment pursuant to Fed. R. Civ. P. 56(b), and have moved for summary judgment pursuant to Fed. R. Civ. P. 56(a). On May 10, 2018, the Court granted Plaintiffs' motion for summary judgment.  *See* docket no. 105.  In its order, the Court requested that the parties confer and submit a proposed form of judgment setting forth the necessary and appropriate declaratory and injunctive relief for the Court's consideration.  Plaintiffs submitted a proposed judgment.  Defendants submitted broad objections to the Court's prior rulings

and Plaintiffs' proposed judgment but did not submit an alternative to Plaintiffs' proposed form of judgment.  After reviewing same, and This Court has granted Intervenors' leave to file a motion for summary judgment and has granted Intervenors' motion for summary judgment. Consistent with the Court's previous summary judgment findings, *see* ECF No. 105, which are incorporated herein, the Court:

1.    DECLARES, pursuant to 28 U.S.C. § 2201 and 52 U.S.C. § 20510(b)(2), that Defendants have violated the NVRA, 52 U.S.C. §§ 20503(a)(l), 20504(a), (c), (d), and (e), and 20507(a)(l)(A), and the Equal Protection Clause, U.S. Const. amend. XIV, § 1, by failing to permit simultaneous voter registration with online driver's license renewal and change-of-address transactions;

2.    PERMANENTLY ENJOINS Defendants, their agents and successors in office, and all persons working in concert with them, from continuing to violate the NVRA and Equal Protection Clause by:

    (a)    failing to establish procedures to register to vote in elections for Federal office for driver's license customers who renew or change their address online;

    (b)    refusing to treat each online driver's license renewal or change-of-address application as a simultaneous application for voter registration with respect to elections for Federal office;

    (c)    refusing to include a voter registration application form for elections for Federal office as part of each online driver's license renewal or change-of-address application;

    (d)    requiring online driver's license renewal and change-of-address customers who wish to register to vote or update their voter registration to complete an entirely

- 2 -

separate duplicative voter registration application with the Secretary of State's office;

(e)    refusing to make the voter registration portion of each online driver's license renewal or change-of-address application available to the Secretary of State's office;

(f)    refusing to treat the customer's online driver's license change-of-address application as a notification of change of address for voter registration with respect to elections for Federal office, unless the customer indicates that the change of address is not for voter registration purposes;

(g)    refusing to transmit voter registration information submitted in connection with online driver's license renewal and change-of-address transactions to the appropriate State election official within the statutorily required timeframe, 52 U.S.C. § 20504(e);

(h)    refusing, in the case of registration with an online driver's license renewal or change of-address application, to ensure that any eligible online driver's license customer is registered to vote in an election, if the valid voter registration form of the customer is submitted to the Department of Public Safety (DPS) not later than the lesser of 30 days, or the period provided by state law, before the date of the election;

(i)    refusing to accept and use online driver's license customers' previously-captured electronic signatures for voter registration purposes; and

(j)    failing to record and use an online driver's license renewal or change-of-address customer's response to the voter registration portion of the application.

- 3 -

~~3.      PERMANENTLY ENJOINS Defendants, their agents and successors in office and all persons working in concert with them, from implementing practices and procedures that violate §§ 20503, 20504, and/or 20507 of the NVRA;~~

~~4.~~3.     DIRECTS Defendant DPS, no later than **45 days**[1] from the date of this Judgment, to:

(a)     permit simultaneous voter registration with online driver's license renewal and change-of-address transactions so that in order to register to vote or update voter registration information, the online driver's license renewal or change-of-address customer only needs to respond to the following (or substantially similar) questions:

1.  **Would you like to register to vote?**  No additional information is required.

    o       **Yes, Register Me to Vote**

    o       **No, Do Not Register Me to Vote**

2. **If you are already registered, this application will be used to update your voter registration address, unless you opt out.  Would you like to opt out of updating your address for voter registration purposes?**

    o       **Update My Voter Registration**

    o       **Opt Out:  DO NOT Update My Voter Registration** (Your new address will not be submitted to the Texas Secretary of State's office for voter registration purposes).

---

[1] This timeline for compliance is justified because: there is a federal election in November ~~2018~~2020; the NVRA mandates have been in existence for 25 years; the violations in issue have persisted for several years; Defendants were served with statutory notice of the instant violations ~~more than two~~nearly four years ago; and the record reflects that implementation of corrective measures is not only technologically feasible but Defendants are currently capable of instituting such measures. (*See* docket no. 105). ~~Defendants seek 90 days for corrective measures, and do not want to begin implementation until September 1, 2018.  Thus, despite admitting that they are currently capable of making changes, they are seeking six months to make the changes.  This timeframe for compliance does not take the upcoming election deadlines into consideration.  Moreover, Defendants fail to explain why their current vendor (who is presumably more familiar with Texas.gov) cannot achieve compliance prior to September 1, while their new vendor (who is presumably less familiar with Texas.gov) could achieve compliance within 90 days after September 1.~~

(hereinafter "the voter registration questions");

>
> (b)      register to vote or update voter registration information for online driver's license customers who select "Yes" in response to the question, "Would you like  to register to vote?"
>
> (c)      register to vote or update voter registration information for online driver's license customers who select "Update My Voter Registration" in response to the question, "Would you like to opt out of updating your address for voter registration purposes?"
>
> (d)      register to vote or update voter registration information for online driver's license customers who select both "No" in response to the question, "Would you like to register to vote?" and "Update My Voter Registration" in response to the question, "Would you like to opt out of updating your address for voter registration purposes?"
>
> (e)      track, record, and retain each online driver's license renewal or change-of-address customer's response to the voter registration questions; and
>
> (f)      transmit the voter registration information for each online driver's license renewal or change-of-address customer to the Secretary of State's office, including the customer's response to the voter registration questions and the customer's electronic signature file collected during the customer's last in-person transaction;

5.4.    DIRECTS Defendant of Secretary of State, upon receipt from DPS of each online driver's license renewal or change-of-address customer's voter registration information and signature file to transmit this data in the normal course of business  to local  voter registrar who are responsible for completing the voter registration process, in a manner substantially similar to

the process for transmitting voter registration information after an in-person transaction; and ensure that local voter registrars register to vote or update the voter registration information of these customers;

6.5.    DIRECTS Defendants, within **14 days** from the date of this Judgment, to submit to Plaintiffs' Intervenors' counsel a proposed  public education  plan that details the use of at least three media venues, including but not limited to television, radio, internet social media, Texas.gov, and/or the Secretary of State's website https://www.sos.state.tx.us, to inform and educate the public on how this Judgment changes the voter registration process for online driver's  license  renewal  and change-of-address applications; include in this public education plan steps to incorporate for two years the promotion  of voter registration  through online driver's license renewal and change-of-address applications into the Texas.gov marketing program, the Texas.gov/driver marketing campaign, and all DPS, Secretary of State, and their vendors' marketing campaigns related to online  driver's license renewal and change-of-address applications; and, once the public education plan is agreed to by all parties, implement such plan no later than **45 days** from the date of this Judgment.[2]

---

[2] Should the Parties be incapable of agreeing on an appropriate pubic education plan, the Parties will submit their proposals to the Court no later than 25 days from the date of this Judgment, and the Court will order the implementation of a plan that takes reasonable steps to inform the public about this Judgment as described in Paragraph 6.

7.6.   DIRECTS Defendants to:

(a)     submit to this Court notice of compliance with this Judgment no later than **45 days** from the date of this Judgment, with affidavits from the Director of DPS and the Secretary of State attached confirming compliance with this Judgment;

(b)     submit to Plaintiffs' Intervenors' counsel on or before January 15th of every year for the next three years through January 15, 20212023, a report that includes, for the previous calendar year:

   (i)     a general summary of compliance efforts detailing all steps taken to implement each of the provisions and requirements of this Judgment, including any significant implementation problems, staff training needs, and recommendations for improvement;

   (ii)    the number of online driver's license renewal and change-of-address applications and the number of voter registrations arising from these applications;

   (iii)   copies of all NVRA procedures and educational and training materials related to online driver's license renewal or change-of-address transactions both used in the preceding year and expected to be used in the future;

   (iv)    any investigations or corrective actions at DPS or the Secretary of State's office related to voter registrations through online driver's license renewal or change-of-address applications;

   (v)     any implemented or revised policies or procedures at DPS or the Secretary of State's office related to voter registrations through online driver's license renewal or change-of-address applications; and

(vi)     all customer complaints related to voter registration through an online

driver) license renewal or change-of-address application, and all

subsequent correspondence and action taken related to each customer

complaint; and

(c)     conduct monthly quality control tests until May 202119 to ensure that the online

driver's license renewal and change-of-address process complies with this

Judgment, and report to Plaintiffs' counsel every three months the results of

completed quality control tests;

8.7.     RETAINS jurisdiction over this action until two years after the date of this

Judgment to ensure that Defendants continue to comply with their obligations under the NVRA,

the Equal Protection Clause, and this Judgment, and, if Defendants fail to comply with this

Judgment at any time after the two-year deadline, permits Plaintiffs Intervenors to initiate an

enforcement action against Defendants in this Court;

9.8.     ORDERS that Defendants shall pay to Plaintiffs Intervenors their reasonable

attorney's fees, including litigation expenses, and costs as will be determined by the Court in a

post-judgment Order upon submission by the PlaintiffsIntervenors.

SIGNED this 18th _____ day of _____ May, 202018.

_____

ORLANDO L. GARCIA
CHIEF U.S. DISTRICT JUDGE

# Exhibit O

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| JARROD STRINGER, et al. | Civil Action Case No. 5:16-cv-00257-OLG |
| Plaintiffs, | |
| v. | |
| ROLANDO PABLOS, in his official capacity as Texas Secretary of State and STEVEN C. MCCRAW, in his official capacity as Director of the Texas Department of Public Safety | CONSOLIDATED WITH |
| | |
| JARROD STRINGER, et al. | Civil Action Case No. 5:20-cv-00046-OLG |
| Plaintiffs, | |
| v. | |
| RUTH HUGHS, in her official capacity as Texas Secretary of State and STEVEN C. MCCRAW, in his official capacity as Director of the Texas Department of Public Safety | |
| Defendants. | |

**FINAL JUDGMENT**

Intervenors have moved for leave of the Court to file for summary judgment pursuant to Fed. R. Civ. P. 56(b), and have moved for summary judgment pursuant to Fed. R. Civ. P. 56(a). This Court has granted Intervenors' leave to file a motion for summary judgment and has granted Intervenors' motion for summary judgment. Consistent with the Court's previous summary judgment findings, *see* ECF No. 105, which are incorporated herein, the Court:

1.      DECLARES, pursuant to 28 U.S.C. § 2201, that Defendants have violated the

Equal Protection Clause, U.S. Const. amend. XIV, § 1, by failing to permit simultaneous voter

registration with online driver's license renewal and change-of- address transactions;

2.      PERMANENTLY ENJOINS Defendants, their agents and successors in office,

and all persons working in concert with them, from continuing to violate the Equal Protection

Clause by:

    (a)    failing to establish procedures to register to vote in elections for Federal office for driver's license customers who renew or change their address online;

    (b)    refusing to treat each online driver's license renewal or change-of-address application as a simultaneous application for voter registration with respect to elections for Federal office;

    (c)    refusing to include a voter registration application form for elections for Federal office as part of each online driver's license renewal or change-of-address application;

    (d)    requiring online driver's license renewal and change-of-address customers who wish to register to vote or update their voter registration to complete an entirely separate duplicative voter registration application with the Secretary of State's office;

    (e)    refusing to make the voter registration portion of each online driver's license renewal or change-of-address application available to the Secretary of State's office;

    (f)    refusing to treat the customer's online driver's license change-of-address application as a notification of change of address for voter registration with

respect to elections for Federal office, unless the customer indicates that the change of address is not for voter registration purposes;

(g)     refusing to transmit voter registration information submitted in connection with online driver's license renewal and change-of-address transactions to the appropriate State election official within the statutorily required timeframe, 52 U.S.C. § 20504(e);

(h)     refusing, in the case of registration with an online driver's license renewal or change of-address application, to ensure that any eligible online driver's license customer is registered to vote in an election, if the valid voter registration form of the customer is submitted to the Department of Public Safety (DPS) not later than the lesser of 30 days, or the period provided by state law, before the date of the election;

(i)     refusing to accept and use online driver's license customers' previously-captured electronic signatures for voter registration purposes; and

(j)     failing to record and use an online driver's license renewal or change-of-address customer's response to the voter registration portion of the application.

3.     DIRECTS Defendant DPS, no later than **45 days**[1] from the date of this Judgment, to:

(a)     permit simultaneous voter registration with online driver's license renewal and change-of-address transactions so that in order to register to vote or update voter

---

[1] This timeline for compliance is justified because: there is a federal election in November 2020; the NVRA mandates have been in existence for 25 years; the violations in issue have persisted for several years; Defendants were served with statutory notice of the instant violations nearly four years ago; and the record reflects that implementation of corrective measures is not only technologically feasible but Defendants are currently capable of instituting such measures. (*See* docket no. 105).

registration information, the online driver's license renewal or change-of-address

customer only needs to respond to the following (or substantially similar)

questions:

1. **Would you like to register to vote?**  No additional information is required.

   o      **Yes, Register Me to Vote**

   o      **No, Do Not Register Me to Vote**

**2.  If you are already registered, this application will be used to update your voter registration address, unless you opt out.  Would you like to opt out of updating your address for voter registration purposes?**

   o      **Update My Voter Registration**

   o      **Opt Out:  DO NOT Update My Voter Registration** (Your new address will not be submitted to the Texas Secretary of State's office for voter registration purposes).

(hereinafter "the voter registration questions");

(b)      register to vote or update voter registration information for online driver's license

customers who select "Yes" in response to the question, "Would you like  to

register to vote?"

(c)      register to vote or update voter registration information for online driver's license

customers who select "Update My Voter Registration" in response to the

question, "Would you like to opt out of updating your address for voter

registration purposes?"

(d)      register to vote or update voter registration information for online driver's license

customers who select both "No" in response to the question, "Would you like to

register to vote?" and "Update My Voter Registration" in response to the

question, "Would you like to opt out of updating your address for voter

registration purposes?"

- 4 -

(e)     track, record, and retain each online driver's license renewal or change-of-address customer's response to the voter registration questions; and

(f)     transmit the voter registration information for each online driver's license renewal or change-of-address customer to the Secretary of State's office, including the customer's response to the voter registration questions and the customer's electronic signature file collected during the customer's last in-person transaction;

4.     DIRECTS Defendant of Secretary of State, upon receipt from DPS of each online driver's license renewal or change-of-address customer's voter registration information and signature file to transmit this data in the normal course of business  to local  voter registrar who are responsible for completing the voter registration process, in a manner substantially similar to the process for transmitting voter registration information after an in-person transaction; and ensure that local voter registrars register to vote or update the voter registration information of these customers;

5.     DIRECTS Defendants, within **14 days** from the date of this Judgment, to submit to Intervenors' counsel a proposed  public education  plan that details the use of at least three media venues, including but not limited to television, radio, internet social media, Texas.gov, and/or the Secretary of State's website https://www.sos.state.tx.us, to inform and educate the public on how this Judgment changes the voter registration process for online  driver's  license renewal  and change-of-address applications; include in this public education plan steps to incorporate for two years the promotion  of voter registration  through online driver's license renewal and change-of-address applications into the Texas.gov marketing program, the Texas.gov/driver marketing campaign, and all DPS, Secretary of State, and their vendors' marketing campaigns related to online  driver's license renewal and change-of-address

applications; and, once the public education plan is agreed to by all parties, implement such plan no later than **45 days** from the date of this Judgment.[2]

    6.    DIRECTS Defendants to:

    (a)    submit to this Court notice of compliance with this Judgment no later than **45 days** from the date of this Judgment, with affidavits from the Director of DPS and the Secretary of State attached confirming compliance with this Judgment;

    (b)    submit to Intervenors' counsel on or before January 15th of every year for the next three years through January 15, 2023, a report that includes, for the previous calendar year:

    (i)    a general summary of compliance efforts detailing all steps taken to implement each of the provisions and requirements of this Judgment, including any significant implementation problems, staff training needs, and recommendations for improvement;

    (ii)    the number of online driver's license renewal and change-of-address applications and the number of voter registrations arising from these applications;

    (iii)    copies of all procedures and educational and training materials related to online driver's license renewal or change-of-address transactions both used in the preceding year and expected to be used in the future;

---

[2] Should the Parties be incapable of agreeing on an appropriate pubic education plan, the Parties will submit their proposals to the Court no later than 25 days from the date of this Judgment, and the Court will order the implementation of a plan that takes reasonable steps to inform the public about this Judgment as described in Paragraph 6.

      (iv)    any investigations or corrective actions at DPS or the Secretary of State's office related to voter registrations through online driver's license renewal or change-of-address applications;

      (v)    any implemented or revised policies or procedures at DPS or the Secretary of State's office related to voter registrations through online driver's license renewal or change-of-address applications; and

      (vi)    all customer complaints related to voter registration through an online driver) license renewal or change-of-address application, and all subsequent correspondence and action taken related to each customer complaint; and

    (c)    conduct monthly quality control tests until May 2021 to ensure that the online driver's license renewal and change-of-address process complies with this Judgment, and report to Plaintiffs' counsel every three months the results of completed quality control tests;

    7.    RETAINS jurisdiction over this action until two years after the date of this Judgment to ensure that Defendants continue to comply with their obligations under the Equal Protection Clause, and this Judgment, and, if Defendants fail to comply with this Judgment at any time after the two-year deadline, permits Intervenors to initiate an enforcement action against Defendants in this Court;

    8.    ORDERS that Defendants shall pay to Intervenors their reasonable attorney's fees, including litigation expenses, and costs as will be determined by the Court in a post-judgment Order upon submission by the Intervenors.

SIGNED this _____ day of _____, 2020.

_____
ORLANDO L. GARCIA
CHIEF U.S. DISTRICT JUDGE

APPENDIX 787