IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JARROD STRINGER, et al., | § | |
|     *Plaintiffs,* | § | |
| | § | |
| v. | § | No. SA-20-CV-46-OG |
| | § | |
| RUTH R. HUGHS, et al., | § | |
|     *Defendants.* | § | |

### DEFENDANTS' RESPONSE IN OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT AND COUNTER-MOTION FOR SUMMARY JUDGMENT DISMISSING INTERVENORS

Intervenors[1] lack standing and their sole claim is meritless. Their Motion for Summary Judgment, Dkt. 77—which presents no new facts or authority to alter this conclusion—should be denied, and the Court should enter summary judgment dismissing Intervenors from this case.

### FACTUAL BACKGROUND

### I.  Texas Voter Registration

Voter registration in Texas is governed by a carefully considered statutory framework. Importantly here, "[a] registration application must be in writing and signed by the applicant." TEX. ELEC. CODE § 13.002(b); *see also id.* § 65.056(a) (allowing the affidavit on a provisional ballot to serve as a voter-registration application if it contains the necessary information). Likewise, any request to change voter-registration information must also be in writing and signed. *Id.* § 15.021(a). The signatures may then be used for, *inter alia*, investigations of fraud or identity theft, consideration of absentee ballots, or if there are any problems with electronically captured signatures. *Stringer I*, No. 5:16-cv-00257 (W.D. Tex.) ("*Stringer I*"), Dkt. 77-1 at 82; 80-1 at 61, 71-72.[2]

---

[1] "Plaintiff-Intervenors" or "Intervenors" refers to the Democratic Senatorial Campaign Committee ("DSCC"), Democratic Congressional Campaign Committee ("DCCC"), and Texas Democratic Party ("TDP").

[2] *See also, e.g.,* TEX. ELEC. CODE §§ 87.041(e), (f); 87.027(i) (providing for use of voter-registration signatures to verify authenticity of signatures provided with mail-in-ballots).

The only exception to the signature requirement is when a voter moves within a single county, in which case Texas law provides for the voter to change his voter-registration address online. TEX. ELEC. CODE § 15.021(d). If, however, a voter moves between counties, he must fill out a voter-registration form, sign it, and submit it to his new county of registration. *Id.* § 15.021(a); *see also Stringer I*, Dkt. 105 at 17-18. This is because Texas uses a county-based voter-registration system: the voter registrar in each county is the county tax assessor-collector, county elections administrator, or county clerk. TEX. ELEC. CODE § 12.001. Each registrar is tasked with accepting and rejecting voter-registration applications and maintaining files of voter-registration applications. *Id.* § 13.071, .101.

Texans have multiple options for registering to vote and updating existing registrations, including by having a postage-paid voter-registration form mailed to them at no cost.[3], Texans can also register to vote and update existing registrations while applying for, renewing, or changing the address on a driver license with the Department of Public Safety ("DPS"). Paper applications for new licenses, renewals, or changes of address contain boxes allowing the individual to check "Yes" or "No" regarding whether he wants to register to vote or change his registration address, and require the signature of the applicant. *Stringer I*, Dkt. 77-1 at 53-60; *see also* TEX. ELEC. CODE § 20.062.

An original application for a Texas driver license must be made in person, TEX. TRANSP. CODE § 521.142, and the applicant must provide his signature on the paper application, 37 TEX. ADMIN. CODE § 15.21. The applicant must also provide a written signature on a device that electronically captures the image of that signature. *Stringer I,* Dkt. 80-1 at 74-75. Texas law authorizes this electronically captured signature to be sent to the Secretary of State ("SOS"), which provides it to the appropriate county for voter-registration purposes. TEX. ELEC. CODE § 20.066(a); *Stringer I*, Dkt. 77-

---

[3] *See* "Request for Postage-Paid Voter Registration Form," Texas Secretary of State, https://webservices.sos.state.tx.us/vrrequest/index.asp (last visited June 12, 2020).

1 at 53-57. The previously captured signature is also sent to SOS when an individual later registers to vote when renewing his license or changes his address by mail. *Id.*, Dkt. 105 at 13-14.

Each weekday, DPS electronically transfers to SOS information about each applicant who is of voting age, a United States citizen, and affirmatively answers the voter-registration question through an in-person or mail-in driver license transaction. *Id.*, Dkt. 105 at 4, 9. The signature that is transferred to SOS is the electronic signature captured during the individual's last in-person transaction in a driver-license office. *Id.*, Dkt. 94-8 at 12; 94-10 at 9.

Though original license applications must be submitted in person, Texans who meet statutory eligibility criteria have the option to renew or change the address on their driver license online through the DPS website. *Id.*, Dkt. 77-1 at 143.[4] Individuals who conduct an online transaction also have an opportunity to register to vote or update an existing registration. The online interface asks the individual "Do you want to request a voter application?" *Id.*, Dkt. 77-1 at 146. Next to the box marked "Yes," it states, "This does not register you to vote." *Id.* Instead, the website explains, "You will receive a link to a voter application on your receipt page." *Id.* When the individual completes his online transaction, a notice in red appears at the top of the page stating, "You are not registered to vote until you have filled out the online application, printed it, and mailed it to your local County Voter Registrar." *Id.*, Dkt. 77-1 at 149. The notice also contains a link to download, complete, and mail a voter-registration application. *Id.*

## II.     The Intervenors

Defendants' Motion to Dismiss, Dkt. 73, incorporated by reference as if fully set forth herein, sets out evidence regarding Intervenors. Defendants summarize but do not belabor that evidence here.

---

[4] For brevity, online driver license renewals and changes of address are hereinafter referred to as "online transactions."

3

TDP is a partisan political organization whose singular mission is to elect Democrats to public office. TDP Dep. 22:1-13 (attached hereto as Exhibit A). In the course of its efforts to elect Democrats, TDP works to register voters who TDP thinks—based on sophisticated, proprietary data analytics—will vote for Democrats. *Id.* 48:1-2 & 17, 57:2-11, 64:6-18. TDP undertakes these efforts not to register voters who have transacted with DPS online, but to "win an election" by targeting Democratic voters. *Id.* 69:2-6; *see also id.* 48:1-2 & 17, 57:2-11, 64:6-18, 69:2-6. TDP has no evidence that it has registered even a single voter after a DPS online transaction. *Id.* 101:18-22.

TDP also cannot identify any specific activity it would pursue if it did not work to register Democratic voters, and it is impossible for TDP to determine the resources expended on these efforts. *Id.* 45:14-21, 101:1-4. No TDP donor has contributed funds specified for voter-registration efforts— nor could they. *Id.* 59:21-60:3. And even if TDP could be regarded as a "membership" organization (it cannot, *see infra*, I(C)), it cannot identify a single member who plans to renew or change the address on their driver license through an online transaction (or has done so in the past). *Id.* 108:21-109:6.

DCCC is a national organization whose purpose is to elect Democrats to the U.S. House of Representatives. DCCC Dep. 6:19-24, 42:16-43:2 (attached hereto as Exhibit B). DCCC claims to have supported voter-registration activities but cannot identify any resources used for such activities in past election cycles. *Id.* 77:10-18, 78:23-79:20. For this election cycle, DCCC speculates that funds it provided to TDP and to a vendor for consulting and training services could have supported voter-registration efforts. *Id.* 81:5-14, 82:10-22. But DCCC's sole targets for voter registration are "voters who are likely to support Democratic candidates or vote for Democrats." *Id.* 89:4-16. DCCC has no evidence that, in the course of pursuing its mission to elect Democrats to Congress, it has registered even a single voter who completed a DPS online transaction. *Id.* 98:2-8, 101:17-21.

DCCC does not know what percentage of its staff's time is spent on voter-registration efforts, which are commingled with other organizational objectives targeted to elect Democratic congressional

candidates, such as voter persuasion. *Id.* 84:8-10, 85:22-86:23. Nor can DCCC identify the cost of registering any new voter. *Id.* 88:8-24. DCCC considers its members to be the Democratic members of Congress, *id.* 108:2-109:5, and it has produced no evidence that any of those members are eligible and intend to conduct online transactions with DPS.

DSCC's sole mission is to elect Democratic candidates to the U.S. Senate. DSCC Dep. 21:6-14 (attached hereto as Exhibit C). DSCC accomplishes this mission by, among other things, transferring funds to state-level Democratic Party organizations, which may use that money however they wish. *Id.* 30:2-13. DSCC did not transfer any funds to TDP in past election cycles. *Id.* 39:23-40:8. And it provided no evidence that any funds invested in Texas in past election cycles were used for voter-registration efforts. *Id.* 39:23-40:8, 41:8-12.

DSCC has made three investments in Texas this election cycle, but there is no evidence that any of those funds were used for voter registration. *Id.* 39:13-21. Instead, DSCC supported polling efforts unrelated to voter registration, *id.* 38:24-39:3, and contributed the maximum amount to the MJ Hegar campaign, to be used at the campaign's discretion, *id.* 30:17-31:3. It did not contribute anything to TDP until after filing this lawsuit, *id.* Ex. 5, and it cannot show that any of those funds were used to register voters (let alone how much, or whether any funds were used to register voters who had interacted with DPS online), *id.* 30:2-13. Moreover, DSCC produced no evidence regarding whether it has any members at all, and certainly has not identified any members who are eligible and intend to engage in an online transaction with DPS.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A movant who would not bear the burden of proof at trial need not present evidence to put the plaintiff's claims in issue. *Id.* at 325. Rather, a defendant need only "point[ ] out…that there is an absence of evidence

to support the nonmoving party's case." *Id.* Once the defendant meets this obligation, the burden

shifts to the plaintiff to produce competent evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–

57 (1986). To survive summary judgment, a plaintiff must demonstrate a genuine issue of material fact

as to each element of every disputed claim. *Id.* at 247–48. A genuine issue of material fact exists "if

the evidence is such that a reasonable jury could enter a verdict for the nonmoving party." *Id.*

To meet her summary judgment burden, a plaintiff cannot rely on unsupported or conclusory

assertions, speculation, or subjective belief. *Lawrence v. Fed. Home Loan Mortg. Corp.*, 808 F.3d 670, 673

(5th Cir. 2015); *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 403 (5th Cir. 2001). Rather, she

"must go beyond the pleadings and come forward with specific facts" demonstrating a genuine issue

for trial —and the evidence must be admissible. *Brandon v. Sage Corp.*, 808 F.3d 266, 270 (5th Cir. 2015)

(citation and quotation marks omitted); *Mersch v. City of Dall., Tex.*, 207 F.3d 732, 734–35 (5th Cir.

2000). "Where critical evidence is so weak or tenuous on an essential fact that it could not support a

judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in

favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 199

(5th Cir. 1999). Summary judgment also is proper when a plaintiff's evidence is "merely colorable" or

is not "significantly probative." *Anderson*, 477 U.S. at 249–50.

## ARGUMENT AND AUTHORITY

### I.   Intervenors Lack Standing.

Jurisdiction is "a threshold issue that must be resolved before any federal court reaches the

merits of the case before it." *Perez v. U.S.*, 312 F.3d 191, 194 (5th Cir. 2002); *Steel Co. v. Citizens for a

Better Env't*, 523 U.S. 83, 94–95 (1998). "[S]tanding is perhaps the most important of the jurisdictional

doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotation omitted). To

establish standing, a plaintiff must show: (1) an actual or imminent, concrete and particularized

"injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant (causation); and

6

(3) that is likely to be redressed by a favorable decision (redressability). *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 180–81 (2000). Each element is "an indispensable part of the plaintiff's case" which plaintiff bears the burden to establish; otherwise, the plaintiff is dismissed from the case without regard to the merits. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

### A.   Intervenors Lack Statutory Standing.

Intervenors' sole claim—violation of the Equal Protection Clause with respect to voting—is one they lack statutory standing to maintain. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) (explaining statutory standing). Section 1983 provides a cause of action only where a plaintiff suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the violation of a third party's rights. *See, e.g.*, *Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights.").

Thus, under § 1983, a plaintiff "must assert [her] own legal rights and interests, and cannot rest [her] claim to relief on the legal rights or interests of third parties." *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory standing, regardless of Article III standing. *Id.; see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999) (holding that lawyer "clearly had no standing" to bring § 1983 claim for injury suffered as a result of "the alleged infringement of the rights of his client" because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").

As artificial entities, TDP, DCCC, and DSCC do not have voting rights. "It goes without saying that political parties, although the principal players in the political process, do not have the right to vote." *Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D. Pa. 2002); *see also Concerned Home Care*

7

*Providers, Inc. v. Cuomo*, 783 F.3d 77, 91 (2d Cir. 2015) ("But Plaintiffs—five corporations and a not-for-profit trade organization—are not entitled to vote and have no right to equal representation in the legislature.") Since Intervenors are asserting third parties' rights, they lack standing under § 1983.

### B.    Intervenors Lack Organizational Standing.

That an organization has an "interest in a problem . . . is not sufficient" for standing, "no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). Rather, an organization has standing only if it satisfies the same Article III requirements of injury-in-fact, causation, and redressability applicable to individuals. *NAACP v. City of Kyle, Texas*, 626 F.3d 233, 237 (5th Cir. 2010) (citing *Lujan*, 504 U.S. at 560–61). And each plaintiff must have standing not only throughout the life of the litigation, but at the time they filed suit. *Pluet v. Frasier*, 355 F.3d 381, 386 (5th Cir. 2004); *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1288 (5th Cir. 1992).[5] Intervenors fail this analysis on at least two factors.[6]

### i.    Injury-in-fact

Intervenors allege injury on the theories of (1) injury to the "electoral prospects of their candidates," and (2) "diversion of [Intervenors'] resources." Both fail. As to the first theory, Intervenors offer no evidence of any impact whatsoever on the electoral prospects of any Democratic candidate. But even if they had, an interest in increasing turnout for particular groups is akin to a "generalized partisan preference[]," which the Supreme Court held insufficient to establish Article III standing. *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018). Rather, "[a]n organization's general interest in its preferred candidates winning as many elections as possible is still a 'generalized partisan preference[]' that federal courts are 'not responsible for vindicating.'" *Jacobson v. Fla. Sec'y of State*, 957

---

[5] *See also, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. at 191 (recognizing that, unlike mootness, "[s]tanding admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum.").

[6] Defendants do not concede that Intervenors have established redressability and reserve all rights to test Intervenors' evidence regarding this factor.

F.3d 1193, 1206 (11th Cir. 2020) (quoting *Gill*, 138 S. Ct. at 1933). Thus, Intervenors' allegation about impact on the "electoral prospects" of unspecified candidates would not establish Article III injury, even if there were any evidence to support it.

Second, Intervenors allege injury based upon resources they expend to register voters who Intervenors predict will vote for Democrats. Dkt. 77 at 13-14.[7] "[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to" conduct its routine "'activities—with the consequent drain on the organization's resources [that] constitutes far more than simply a setback to the organization's abstract social interests.'" *City of Kyle*, 626 F.3d at 238 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). To constitute injury-in-fact, an organization's "diversion of resources" must be directed "to counteract [a] defendant's conduct," *id.* at 238, and must be "diverted" to activities that are in some way "different from the plaintiffs' daily operations," *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (citing *City of Kyle*, 626 F.3d 233). Mere "[f]rustration of an organization's objectives is the type of abstract concern that does not impart standing." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161-62 (D.C. Cir. 2005) (quotation omitted). Organizations cannot assert "standing based solely on the baseline work they are already doing," and cannot "convert ordinary program costs into an injury in fact." *Common Cause Indiana v. Lawson*, 937 F.3d 944, 955 (7th Cir. 2019) (punctuation marks omitted).

Thus, to establish organizational standing, the organization must show an explicit connection between a defendant's challenged conduct and its alleged injury. The Fifth Circuit has made clear that in the voting context, if an organization's regular activities merely have some connection to the alleged harm, this is insufficient; rather, the organization's activities must be specifically directed at addressing

---

[7] *See also* TDP Dep. 22:1-13; DCCC Dep. 6:19-24, 42:16-43:2; DSCC Dep. 21:6-14.

the alleged wrong and reaching the allegedly affected voters. *See ACORN v. Fowler*, 178 F.3d 350, 359 (5th Cir. 1999); *see also* Dkt. 73 at 6-7 (discussing *Fowler*). In other words, an organization's expenditures must be "caused by an[] action by" the defendant that the organization "claims is illegal, as opposed to part of the normal, day-to-day operations of the group," to confer standing. *See Fowler*, 178 F.3d at 358 (citing *Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78 & n.5 (3d Cir. 1998)). Moreover, a plaintiff "cannot manufacture standing by choosing to make expenditures based on" an alleged harm that is not itself an injury-in-fact. *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 402 (2013). A diversion of resources is not a cognizable injury in fact unless the plaintiff "would have suffered some other injury if it had not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).

Intervenors cannot meet this standard. Instead, the evidence shows that Intervenors dedicate resources to identifying and registering people likely to support Democrats when they believe that doing so will help elect Democrats to office—and that they would engage in the exact same activities regardless of how Defendants handle online driver license transactions.[8]

Intervenors simply target Democratic voters, with no knowledge of whether they have transacted with DPS online.[9] There is no competent evidence that they have undertaken any activity specifically because of the Defendants' challenged conduct. They have not proven that they have had to forgo any specific activities because of the challenged conduct, and they have not proven they would act any differently at all if they were successful in this litigation. Thus, to the extent that the Intervenors engage in voter-registration activities, those activities are wholly untethered to Defendants' allegedly unlawful practices. Intervenors have therefore failed to show that they "diverted significant resources to counteract the [Defendants'] conduct" such that "the [Defendants'] conduct

---

[8] *See, e.g.,* TDP Dep. 22:2-13; DCCC Dep.14:2-8; DSCC Dep. 41:8-12.
[9] TDP Dep. 101:18-22; 108:21-109:6; DCCC Dep. 89:4-16, 98:2-8, 101:17-21; DSCC Dep. 39:13-21, 30:2-13, Ex. 5.

significantly and 'perceptibly impaired' the organization's ability to" engage in its "routine activities," as required to show organizational standing. *City of Kyle*, 626 F.3d at 238. Quite the contrary—voter registration targeted to help Democratic candidates is already central to these organizations' "routine activities."[10] Intervenors have not suffered any "concrete and demonstrable" injury. *Havens Realty Corp. v. Coleman*, 455 U.S. at 379; *City of Kyle*, 626 F.3d at 238.

Moreover, to the extent that the record reflects that Intervenors expended any specific resources on voter registration in Texas, there is no evidence that they did so until *after* joining this lawsuit.[11] The fact that the sole activities Intervenors rely upon to support their standing *post-date* their involvement in this lawsuit provides an additional and independent basis why they lack standing. *See, e.g., Pluet v. Frasier*, 355 F.3d at 386; *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d at 1288.

### ii. Causation

Intervenors also lack standing because they cannot establish causation as to either of their alleged injuries. Whether or not a voter completes the steps Texas law sets out to register to vote or update an existing registration depends on that voter. Thus, even if Intervenors presented evidence of an impact on their electoral prospects or a diversion of resources away from their routine activities (they have not), Defendants' conduct cannot have been the cause. Rather, any such outcome is the result of independent action by individual Texas voters, and does not satisfy the causation element necessary to establish Article III standing. *See Lujan*, 504 U.S. at 560 (for an injury-in-fact to be fairly traceable to the challenged action of the defendant, "there must be a causal connection between the injury and the conduct complained of."); *Westfall v. Miller*, 77 F.3d 868, 871-73 (5th Cir. 1996) (injury stemming from plaintiff's own inaction severs causal link between that injury and any conduct of

---

[10] TDP Dep. 22:2-13; DCCC Dep.14:2-8; DSCC Dep. 41:8-12.

[11] *See, e.g.,* DSCC Dep. Ex. 5 (reflecting that DSCC's first transfer to TDP took place on January 10, 2020); DCCC Dep. Ex. 3 (affidavit filed January 28, 2020, referring to a "recent" contract to pay a consultant for voter-outreach activities in Congressional District 23); TDP Dep. Ex. 2 at TDP_000063 (January 15, 2020 email noting future plans to launch a voter-registration program.).

defendant). This Court should "decline to abandon [the] usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors," and should conclude that Intervenors lack standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. at 414.

Moreover, Intervenors concede that it is impossible for them to trace what resources were expended on voting efforts.[12] Thus, it strains credulity to assert that—even if this amounts to injury—it can be "fairly traced" to anything in particular, much less Texas law. *See, e.g.*, *id.* at 413-14 (discussing traceability requirement for causation).

### C.   Intervenors Lack Associational Standing.

Intervenors' assertion of associational standing, Dkt. 77 at 19-21, also fails. An association has standing to sue on its members' behalf when: (1) its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Case Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (citing *Hunt v. Washington St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 827–28 (5th Cir. 1997)). Intervenors argue that they have standing to sue "on behalf of Democratic Texas voters (their members and constituents) who are not able to register to vote when they update their addresses or renew their licenses with DPS," including individual plaintiff "John Harms, who voted in the March [2020] Democratic primary." Dkt. 77 at 20. This does not meet Intervenors' burden to show associational standing for at least three reasons.

First, there is no evidence that any Intervenor has members within the meaning of the associational standing test. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. at 344 (requiring "indicia of membership"). To meet this standard, an organization must have members who "elect

---

[12] TDP Dep. 45:14-21, 101:1-4; DCCC Dep. 84:8-10, 85:22-86:23; DSCC Dep. 30:2-13.

leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs." *Tex. Indigenous Council v. Simpkins*, No. 5:11-cv-315, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014); *see also Hunt*, 432 U.S. at 344-45 (describing indicia of membership). Intervenors' own summary judgment evidence shows only that TDP regards "approximately 2,084,000 Texans who voted in the March 3rd Democratic primary" as its members; that DSCC's members are the Democrats elected to Congress; and that DCCC does not regard Democratic voters as their members. Dkt. 77 at 19 (citing Dkt. 77-1 at Appx. 466, 594, 672). This falls far short of demonstrating the "indicia of membership" required for an association to establish standing as such. *Cf. Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994) (finding that an organization is not a "membership" group eligible to assert associational standing under *Hunt* unless its members "participate in and guide the organization's efforts.")

Second, even if any Intervenor were a "membership" organization for purposes of associational standing, they still must identify at least one specific member of the organization with standing in their own right. *See City of Kyle*, 626 F.3d at 238-39. The only individual voter Intervenors even mention is John Harms, who testified that he voted in the 2020 Democratic primary. Dkt. 77 at 20 (citing Dkt. 77-1, Interv. MSJ App.466). As Defendants have already briefed, Mr. Harms himself lacks standing to maintain his claims in this case. *See* Dkt. 60 at 7-8. But even if Mr. Harms did have standing, no Intervenor could ride his coattails to Article III jurisdiction. Indeed, Texas is an open-primary state, meaning that any eligible voter may participate in the primary election of either major party. Intervenors offer no evidence that Mr. Harms is, in fact, a member of TDP, DSCC, or DCCC— or even that he is a Democrat. Mr. Harms has not alleged as much, either. *See* Dkt. 1. And Intervenors certainly make no effort to demonstrate that Mr. Harms is a member within the meaning of *Hunt*—

there is no evidence he participates in electing the organization's members, serving in the organization, and financing its activities. *Cf. Hunt*, 432 U.S. at 344-45.

Third, even under Intervenors' expansive definition of a membership organization, there is no evidence that any of their purported "members" has standing to sue. This requires evidence "establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (citations omitted); *see also Funeral Consumers All. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 (5th Cir. 2012). The Fifth Circuit has carefully and particularly described the standing burden that a plaintiff must carry in this litigation. *See Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019). Intervenors have not even attempted to do so. Thus, they lack associational standing.

## II.    Collateral Estoppel is Inapposite.

Intervenors assert that "Defendants are precluded from relitigating the equal protection claim under the doctrine of collateral estoppel, which promotes judicial economy by preventing 'needless litigation,'" Dkt. 77 at 22 (citation omitted).  In support, they rely solely upon *Stringer I*—a case that did not involve them—asserting in essence that Defendants are not entitled to mount a defense to Intervenor's lawsuit. Dkt. 77 at 22-24. They also ignore that *Stringer I* did not involve any organizational plaintiffs at all, but solely dealt with individual rights under the NVRA. Far from being "needless," this is Defendants' first opportunity to test Intervenors' claim and theories—including their boundless, overreaching, and erroneous conceptions of standing and equal protection. The notion that collateral estoppel would apply to Intervenors' claim defies common sense.

Intervenors' legal analysis of collateral estoppel (or "issue preclusion") also egregiously misstates this foundational doctrine. *Id.* Intervenors first cite *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 396 (5th Cir. 1998), which held that a litigant was *not* entitled to use collateral estoppel offensively to bar relitigation of an issue in the removal context. This has nothing to do with the facts here. Second, they cite *Langley v. Price*, 926 F.3d 145 (5th Cir. 2019), which noted the rather

14

unremarkable proposition that, "[w]hen a judgment is partially reversed on appeal, '[t]here is no preclusion as to the matters vacated or reversed." Dkt. 77 at 18 (quoting *Langley*, 926 F.3d at 167).

Indeed. "[A] civil judgment generates issue preclusion only when it's 'valid and final.'" *Langley*, 926 F.3d at 164 (quoting Restatement (Second) of Judgments § 27 (Am. Law Inst. 1982)). "[O]nce a civil judgment is reversed on appeal, it's obviously no longer 'valid' and retains *zero* preclusive effect." *Id.* The Fifth Circuit reversed and vacated the judgment in *Stringer I* in its entirety because the plaintiffs who brought that case lacked standing; no part of that order survived. *See Stringer v. Whitley* (*Stringer I*), 942 F.3d 715 (5th Cir. 2019). Accordingly, that prior judgment "retains *zero* preclusive effect." *Langley*, 926 F.3d at 164. Collateral estoppel has nothing to do with this case.

## III.   Defendants are Entitled to Summary Judgment Dismissing Intervenors' Claim.

Intervenors' merits argument on summary judgment, remarkably, relies solely upon citations to *Stringer I* and a smattering of cursory references to *Anderson-Burdick*. Dkt. 77 at 18-20. This will not do. *See, e.g., Lawrence v. Fed. Home Loan Mortg. Corp.*, 808 F.3d at 673 (to meet summary judgment burden, plaintiff cannot rely on unsupported or conclusory assertions, speculation, or subjective belief but must instead put forward specific facts). Instead, the evidence shows that Intervenors suffer no equal protection violation. Thus, if the Court determines that it has jurisdiction over Intervenors' claim at all, it should enter summary judgment dismissing that claim because Intervenors have not even stated—let alone proven—a violation of the Equal Protection Clause.

### A.   Intervenors Have Not Stated a Violation of the Equal Protection Clause.

To maintain an equal protection claim, a political party must allege "intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 955 (4th Cir. 1992) (citation omitted); *see also, e.g., Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (en banc) (stating that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause") (quoting *Village of Arlington*

*Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). Intervenors do not even allege purposeful discrimination in which any class—let alone a political one—is favored over another.

Statutes providing neutral rules, which might benefit any political party, are not rendered discriminatory by the fact that they benefit one party when applied in particular circumstances. S*ee Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 10 n.10 (1982) (holding that "a statute providing that all such vacancies [in the legislature] be filled by appointment does not have a special impact on any discrete group of voters or candidates" and thus is not discriminatory for equal-protection purposes). Intervenors offer no argument that Defendants' handling of online transactions disproportionately impacts them. And they certainly do not allege that it is the result of "intentional discrimination" against Democrats. *Cf. Republican Party of N.C. v. Martin*, 980 F.2d at 955.

Because Intervenors have not even met this threshold pleading standard, Defendants re-urge and incorporate by reference their argument that this claim should be dismissed on its face without reference to the record. *See, e.g.,* Dkt. 56. But the record readily confirms this result.

### B.    Intervenors Have Not Proven an Equal Protection Violation.

#### i.    The Legal Standard

"[T]he Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). "It does not follow, however, that the right to vote in any manner . . . [is] absolute." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). To that end, *Anderson-Burdick*'s "flexible standard" generally governs First and Fourteenth Amendment challenges predicated on voting rights. *Burdick*, 504 U.S. at 434; *see also Anderson v. Celebrezze*, 460 U.S. 780 (1983). Under that standard, courts "weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996) (citing *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789).

"The rigorousness of the inquiry into the propriety of the state election law depends upon the extent to which the challenged regulation burdens First and Fourteenth Amendment rights." *Id.* (citing *Burdick*, 504 U.S. at 434). Strict scrutiny applies only when the right to vote is "subjected to 'severe' restrictions." *Burdick*, 504 U.S. at 434. Where a law "imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.; see also Anderson*, 460 U.S. at 788. Courts consider a state's election regime in its entirety, including aspects which mitigate the burdens of any challenged provision. *See, e.g., Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 199 (2008); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627-28 (6th Cir. 2016) (noting that numerous opportunities available to cast a ballot mitigate burden of early voting requirements).

Last week, the Fifth Circuit addressed the standard for voting-related equal protection claims: unless plaintiffs "'are in fact absolutely prohibited from voting by the State,'" it held, "the right to vote is not 'at stake,' and rational-basis review follows." *Texas Democratic Party v. Abbott*, No. 20-50407, 2020 WL 2982937, at *10 (5th Cir. June 4, 2020) (applying rational basis review to statute allowing voters 65 or older to vote by mail without extending that opportunity to voters under 65) (quoting *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 808 n.7, 807, 807–11 (1969)).[13] Accordingly, under the flexible standard that applies to Intervenors' claim, as stated by the Fifth Circuit, Defendants need only pass a rational basis review. But even if a higher standard applies, Intervenors' claim still fails.

### ii.   Texas's written signature requirement survives rational basis review.

Because "the right to vote is not 'at stake,'" rational basis review applies. *Texas Democratic Party v. Abbott*, 2020 WL 2982937, at *10. Under this standard, "statutory classifications will be set aside only if no grounds can be conceived to justify them," and "[t]he law need only 'bear some rational

---

[13] *See also, e.g., Biener v. Calio*, 361 F.3d 206, 214 (3d Cir. 2004) (ballot access restriction); *Michigan State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 350 (6th Cir. 2018) (straight-ticket voting).

relationship to a legitimate state end.'" *Id.* (citations omitted). In other words, "a court must uphold the law if there is any conceivable basis for it." *Id.* (*citing Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1782 (2019) (per curiam)). It cannot be debated that States have an interest in requiring a signature from voters—the NVRA itself recognizes that voter-registration applications must be signed under penalty of perjury. 52 U.S.C. § 20504(c). This provides ample justification for Texas's statutory requirement that "[a] registration application must be in writing and signed by the applicant." Tex. Elec. Code § 13.002(b).

### iii. Even under a more stringent standard, Texas's written signature requirement does not violate the Equal Protection Clause.

Under *Anderson-Burdick*, we turn first to the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" at issue. Intervenors assert (by reference to the plaintiffs' filings in *Stringer I*) that Texans who choose online transactions are burdened because—unlike those who choose to visit DPS in person or mail a voter-registration application to their county—online users cannot simply check a box to become registered to vote or change their registration address. Instead, individuals who engage in an online transaction must print out a voter-registration form, fill it out, sign it, and mail it, which satisfies Texas's written-signature requirement. But neither Intervenors nor the Plaintiffs whose arguments they rely upon explain how being treated like everyone else—supplying a written signature in order to register or update an existing registration—is a burden on their equal-protection rights. If a Texan desires the simplicity of checking a single box, she may fill out a paper registration form. Put differently, providing multiple options for individuals to register to vote is not a violation of the Equal Protection Clause even if Intervenors consider some options more convenient than others.

The precise interest of the State in requiring written signatures, which necessarily forecloses online voter registration in a new county, is in maintaining accurate voting rolls and combatting

fraud. And Texas can use the written signatures in cases of fraud, identity theft, consideration of absentee ballots, and when there are problems with electronically captured signatures. *See, e.g.*, *Stringer I*, Dkt. 77-1 at 82; 80-1 at 61, 71-72; *see also Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018) ("It has been estimated that 24 million voter registrations in the United States—about one in eight—are either invalid or significantly inaccurate. Pew Center on the States, Election Initiatives Issue Brief (Feb. 2012).").

This Fifth Circuit has also recognized that preventing voter-registration fraud is a permissible state interest that warrants some limits on voter registration. *Voting for Am.*, 732 F.3d at 394-95. It is not necessary for Defendants to produce specific evidence of fraud to justify preventative measures. *Id.* (citing *Crawford v. Marion Cty. Election Bd.*, 553 U.S. at 196 (plurality op.)); *see Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018) (finding "general interest in increasing voter turnout" sufficient to justify experimental use of mail-in ballots in specific counties); *Tripp v. Scholz*, 872 F.3d 857, 866 (7th Cir. 2017) (finding "speculative concern" sufficient to justify ballot-access limitation); *Ohio Democratic Party v. Husted*, 834 F.3d at 632 (holding that when a regulation is "not unduly burdensome," a State does not have to "prove" that evidence supports its interest; the court may defer to the legislature's findings); *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986) ("Legislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively . . . ."). A State may act to prevent potential fraud, as "[a]ny corruption in voter registration affects a state's paramount obligation to ensure the integrity of the voting process and threatens the public's right to democratic government." *Voting for Am.*, 732 F.3d at 394. "There should be 'no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters.'" *Tex. Democratic Party v. Abbott*, 2020 WL 2982937, at *18 (Ho, J., concurring) (quoting *Crawford*, 553 U.S. at 196).

As noted above, Intervenors have no equal protection right at stake here. But even if they could assert one, the State's interest would outweigh it. Texas provides multiple options to register to vote, some of which particular Texans might find more or less convenient, but all of which satisfy the State's written-signature requirement to register in a new county. Determining whether to permit online voter registration is a quintessentially state-law function, absent a preemptive federal law requiring it. U.S. CONST. art. I, § 4, cl. 1. Congress and the Texas Legislature have considered mandating online voter registration but, to date, neither legislative body has required it. *See, e.g.*, Voter Empowerment Act of 2015, H.R. 12, 114th Cong. (2015); Voter Empowerment Act of 2012, H.R. 5799/S. 3608, 112th Cong. (2012); Tex. H.B. 953, 84th Leg., R.S., (2015); Tex. S.B. 385, 84th Leg., R.S. (2015). The Equal Protection Clause does not require online voter registration either.

No person's right to vote is unconstitutionally burdened by Texas's written-signature requirement for voter registration. Consequently, Intervenors are not entitled to what they demand.

### iv.  Intervenors request unworkable relief.

Defendants re-urge that injunctive relief is not warranted here, but without conceding this option, note that any injunctive relief must, at the very least, minimize additional programming requirements and be consistent with the existing strictures of the DPS and SOS systems. Intervenors' proposed order is not. DPS's current in-office renewal or change-of-address form, the DL-14A, asks the applicant "If you are a U.S. citizen, would you like to register to vote? If registered, would you like to update your voter information?" Exhibit D. By contrast, Intervenors ask the Court to order DPS to ask customers who renew or change their address online—not simply the question on the DL-14A—but *different* questions. In particular, Intervenors' proposed order would require registered voters to "opt out" of updating their voter registration address. Dkt, 77-1, Interv. MSJ Appx. 774. By contrast, customers interacting with DPS in person are asked, "If you are a U.S. citizen, would you like to register to vote? If registered, would you like to update your voter information?" Exhibit D.

Requiring registered voters to "opt-out" rather than answer "yes" or "no" makes Intervenors' proposed new online process *different from* the in-office process they argue it must match. This would require additional programming, testing, and implementation time, none of which was explored or contemplated by any of the parties during discovery. Moreover, Intervenors offer no basis to conclude that this proposed opt-out process is required by the Equal Protection Clause.

CONCLUSION

This Court should dismiss Intervenors from this case with prejudice.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Texas Bar No. 24078898
CHRISTOPHER D. HILTON
Texas Bar. No. 24087727
Assistant Attorneys General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov
christopher.hilton@oag.texas.gov

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I certify that on June 12, 2020, the foregoing instrument was filed electronically via the Court's

CM/ECF system causing electronic service upon all counsel of record.

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Assistant Attorney General