IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JARROD STRINGER, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. SA-20-CV-46-OG |
| | § | |
| RUTH R. HUGHS, et al., | § | |
| Defendants. | § | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY
JUDGMENT AND COUNTER-MOTION FOR SUMMARY JUDGMENT DISMISSING INTERVENORS**

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

```
JARROD STRINGER, et al.,      *
      Plaintiffs,             *
                              *
v.                            *   No. SA-20-CV-46-OG
                              *
RUTH HUGHS, et al.,           *
      Defendant.              *
```

VIDEOTAPED VIDEOCONFERENCED

ORAL DEPOSITION

OF

THE DEMOCRATIC CONGRESSIONAL

CAMPAIGN COMMITTEE REPRESENTATIVE,

JACQUELINE NEWMAN

Tuesday, April 28, 2020


VIDEOTAPED VIDEOCONFERENCED DEPOSITION OF

JACQUELINE NEWMAN, produced as a witness at the instance

of the Defendant, and duly sworn, was taken in the

above-styled and numbered cause on Tuesday, April 28,

2020, from 10:09 a.m. to 2:05 p.m. Central Time, before

Debbie D. Cunningham, CSR, in and for the State of

Texas, remotely reported via Machine Shorthand, pursuant

to the Federal Rules of Civil Procedure.

--ooOoo--

2

1                    APPEARANCES

2

3  FOR PLAINTIFF INTERVENORS:

4       PERKINS COIE
        700 13th St NW
5       Washington, DC 20005
        (T) 202.654.6200

6
        By:  Aria Branch, Esq.
7            abranch@perkinscoie.com
                    AND
8            Emily Brailey, Esq.
                    AND
9            Rachel Jacobs, Esq.

10
   FOR DEFENDANT THE TEXAS SECRETARY OF STATE:
11
        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
12      Special Counsel for Civil Litigation
        300 W. 15th Street
13      Austin, Texas  78701
        (T) 512.463.4139
14
        By:  Christopher D. Hilton, Esq.
15           christopher.hilton@oag.texas.gov

16

17 VIDEOGRAPHER:

18      Amanda Christopher
        Brian Christopher
19
                    --ooOoo--
20

21

22

23

24

25

3

1                          INDEX

2    APPEARANCES                               2

3

4  EXAMINATION OF JACQUELINE NEWMAN:

5    BY MR. HILTON                             6

6

7

8    CHANGES AND SIGNATURE                   131

9    REPORTER'S CERTIFICATION                133

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                        EXHIBIT INDEX

2    Exhibit Number        Description                    Page

3

4    Exhibit 1     Defendants' Notice of Oral          24
                   Deposition Pursuant to Federal
5                  Rule of Civil Procedure 30

6    Exhibit 2     Intervenor-Plaintiffs Texas         25
                   Democratic Party, DSCC, and
7                  DCCC's Complaint for Declaratory
                   and Injunctive Relief
8
     Exhibit 3     Alexander Edelman Declaration       26
9
     Exhibit 4     DCCC's Production in Response        29
10                 Subpoena Duces Tecum

11   Exhibit 5     Jacqueline Newman LinkedIn page     14

12   Exhibit 6     FEC Form 1, Statement of            43
                   Organization for DCCC
13
     Exhibit 7     DCCC Amended Year-End               56
14                 Report Summary

15   Exhibit 8     Excel spreadsheet                   45

16

17

18

19

20

21

22

23

24

25

5

```
 1                (Tuesday, April 28, 2020, 10:10 a.m.)

 2                     P R O C E E D I N G S

 3                THE REPORTER:  Today is April 28th, 2020.

 4  This is the deposition of the Corporate Representative

 5  of DCCC, Jacqueline Newman, in the matter of Jarrod

 6  Stringer, et al. versus Ruth R. Hughs, et al.  We are

 7  situated remotely and are on the record at 10:09 a.m.,

 8  Central Standard Time.

 9                My name is Debbie Cunningham, and my

10  business address is P.O. Box, Manchaca, Texas 78652.

11                Would all persons present please

12  introduce themselves for the record?

13                MR. HILTON:  Chris Hilton for the

14  Defendants.

15                MS. BRANCH:  Aria Branch for the

16  Plaintiff Intervenor DCCC.  That's "D" and then three

17  "Cs."

18                MS. BRAILEY:  Emily Brailey, also for the

19  Plaintiff Intervenor, DCCC.

20                THE WITNESS:  Jacqueline Newman with the

21  DCCC.

22                              *

23                              *

24                              *

25                JACQUELINE NEWMAN,
```

6

1  having taken an oath to tell the truth, the whole truth,

2  and nothing but the truth, was examined and testified as

3  follows:

4                           EXAMINATION

5  BY MR. HILTON:

6       Q.   **Good morning, Ms. Newman.**

7       A.   Hi.

8       Q.   **Could you please state and spell your name one**

9  **more time for the record?**

10      A.   Sure.  It's Jacqueline Newman,

11  J-A-C-Q-U-E-L-I-N-E N-E-W-M-A-N.

12      Q.   **And you're here on behalf of DCCC to testify**

13  **as their representative today, right?**

14      A.   I am.

15      Q.   **Before starting to prepare for this, I**

16  **truthfully didn't know a whole lot about the DCCC and**

17  **what it does.  I think I'm still pretty murky on the**

18  **details, and I'm hoping you can explain for me so I can**

19  **kind of understand more today.  Can you just start me**

20  **off with kind of an overview about what the DCCC is,**

21  **what its purpose is, what it does?**

22      A.   Sure.  The DCCC is the national party tasked

23  with electing Democrats to the U.S. House of

24  Representatives.

25      Q.   **You said it's a party?**

```
 1        A.   Yes.

 2        Q.   Is it separate from, like, the Democratic

 3   Party; or how does that work?

 4        A.   Yes.  I mean, we are part of the Democratic

 5   Party.  We are separate from the Democratic National

 6   Committee, which is often what people think of when they

 7   think of the National Democratic Party.

 8        Q.   So you're separate from the Democratic

 9   National Committee.  Is it a subordinate role, is it a

10   partnership; or what's the relationship there?

11        A.   I would say we're affiliated, but we are

12   not -- we are not interlinked in any way.  And we are

13   also not their subordinate.

14        Q.   Okay.  And, I mean, I just didn't know.  Do

15   you have a separate Party platform, or how does that

16   work?

17        A.   Yes, I mean, we don't necessarily have a

18   platform as the DCCC.

19        Q.   Okay.  And why is that?

20        A.   That's just not something we set out to do.

21        Q.   So what do you set out to do?  I mean, is it

22   primarily fundraising; or just what is, you know?

23        A.   We -- again, we're trying to elect Democrats

24   to the U.S. House of Representatives; and so we support

25   campaigns in a variety of ways and functions.
```

1    Q.   Okay.  Well, we'll go through some of the

2    details of some of that later.  I guess I would like to

3    start, also, with understanding a little bit more about

4    you and your background.  So you're currently employed

5    by the DCCC; is that right?

6    A.   I am.

7    Q.   And what's your role?

8    A.   I'm the Deputy Executive Director and Chief

9    Operating Officer.

10    Q.   Okay.  And what are the responsibilities for

11    those roles?

12    A.   I oversee all the administrative and

13    operations functions for the building -- or for the

14    committee, that includes the building itself, our Human

15    Resources functions, our budgets, our legal activity,

16    just making sure everything is functioning as it should.

17    Q.   How many employees does DCCC have?

18    A.   Right now we are roughly at about 265

19    employees.

20    Q.   So these are folks that receive a paycheck

21    from DCCC?

22    A.   Yes.

23    Q.   And where are they located, and what kind of

24    work do they engage in?  I'm trying to get a sense of,

25    you know, who's out there.

1      A.   Sure.   They -- our employees are located

2  across the country.  The majority are based in DC.  We

3  have several employees that are on the ground in Texas

4  as it relates to this case.

5      **Q.   Uh-huh.  And as far as your job, Deputy**

6  **Executive Director -- did I get that right?**

7      A.   Yes.

8      **Q.   How long have you had that role?**

9      A.   I think I've had this title since September.

10  I've been with the committee in some fashion since 2014,

11  and I was previously with the committee in 2012.

12      **Q.   And what about the COO title, how long have**

13  **you had that?**

14      A.   About two and a half years.

15      **Q.   Okay.  Who -- what's the reporting -- what's,**

16  **I guess, the leadership structure?  You're the Deputy**

17  **Executive Director, so I assume you report to an**

18  **Executive Director.  Is there anyone else you report to,**

19  **other folks that report to you?  Can you give me a sense**

20  **of that?**

21      A.   Yes, you're right.  There's an Executive

22  Director who oversees all the day-to-day functions of

23  the committee; and then we also have a Chair of the

24  committee, Congresswoman Cheri Bustos.

25      **Q.   Anyone else that you report to?**

1      A.   No.

2      Q.   **And then who reports to you?**

3      A.   I have a team below me, a Chief Administrative

4 Officer, IT Director.

5      Q.   **Is that it, there's two people that report to**

6 **you?**

7      A.   Oh, I'm sorry.  Then there's some junior-level

8 staffers below them who are kind of the senior team and

9 then HR and Administration Manager.

10      Q.   **Okay.  How many people would you say report to**

11 **you directly?**

12      A.   I think it's about eight or nine people.

13      Q.   **Okay.  Are there any other deputy executive**

14 **directors, or are you the only one?  Like, a lot of**

15 **agencies have, like, multiple deputy commissioners in**

16 **charge of certain things.**

17      A.   Sure.  There are two other deputy executive

18 directors.

19      Q.   **What are their names, and what are their**

20 **responsibilities?**

21      A.   One is Ryan Hedgepeth, and he is our Deputy

22 Executive Director for Member Engagement.  He works

23 directly with members of our caucus, members of

24 Congress.  And Mike Smith is also a Deputy Executive

25 Director, and he oversees our fundraising operations.

1      Q.   Has there been any change to that structure in

2  the time that you've been with the DCCC?

3      A.   The Deputy Executive Director structure?

4      Q.   Yes, yeah.

5      A.   Yes, there has.

6      Q.   So what were the changes and when did they

7  occur, again, just kind of focusing on this top-level

8  structure?

9      A.   Sure.  So I'm sorry.  Could you -- did you say

10  this year or during my entire time at the DCCC?

11      Q.   Just since you've been at DCCC.

12      A.   Sure.  So each cycle, which is a two-year

13  election period, the DCCC goes through the process of --

14  at one point it was appointing and now it's electing a

15  Chair of the committee.  And each Chair that comes in is

16  able to kind of re-image the structure as they see

17  necessary in order to carry out their goals for the

18  cycle.  And so with that, I would say each cycle there

19  has been a slightly different leadership structure.

20      Q.   Can you give me some examples, maybe?  Maybe

21  if it changes every two years regularly, we don't have

22  to go through every one; but if you could, kind of give

23  me a sense of what type of changes that there are.

24      A.   Sure.  So usually -- I think in the past few

25  cycles there has been a Deputy Executive Director, at

1   least one or a few.  And last cycle there was one Deputy

2   Executive Director, and they reported to the Executive

3   Director.  In other cycles there have been a few deputy

4   executive directors that kind of oversee a few key

5   functions of the building and then report back to the

6   Executive Director.  Again, it just kind of depends on

7   the Executive Director and the Chair at the time.

8        **Q.   How are the Executive Director and the Chair**

9   **chosen?**

10       A.   Currently -- and this is a somewhat recent

11  change -- the Chair of the committee is elected by the

12  Democratic Caucus, and the Executive Director is hired

13  by the Chair.

14       **Q.   Okay.  And so you've been with DCCC since 2014**

15  **and then another stint before then.  Is it typical to**

16  **have a long tenure, you know, for employees to be**

17  **tenured that length of time; or is there a lot of**

18  **turnover with these two-year cycles?**

19       A.   Yeah, it's definitely more common that people

20  work a cycle and then they move on to another

21  opportunity.  There's a lot of turnover usually.

22       **Q.   Is some of that top down?  I mean, does the**

23  **Executive Director bring in their own people every year**

24  **or...**

25       A.   No.  I think it's more just the nature of

1  campaigns that every two years people are moving on to

2  something else.  I think you would see -- and this

3  partially explains why I've been here longer than most

4  people, but the administrative functions are the people

5  who tend to stay cycle to cycle.  And the people who

6  work kind of in different parts of the committee are

7  often moving on to other campaigns or other

8  organizations.

9       Q.   So that would be more typical of the folks who

10  do the fundraising or the -- I forget how you put it --

11  the direct interfacing with the caucus members?

12       A.   Yes.

13       Q.   Okay.  You've been here, you know, at DCCC

14  quite a while.  I take it you enjoy your job?

15       A.   I do.

16       Q.   What do you enjoy about your job?

17       A.   I think the work we do is important, and I

18  like the values we represent.

19       Q.   Okay.  What values?

20       A.   I think electing Democrats to the U.S. House

21  of Representatives -- you know, the House, I think,

22  impacts a lot of change within this country; and it's

23  important that we expand and protect our majority.

24       Q.   You've mentioned that a couple of times

25  already and we're going to talk -- you know, one of the

```
 1   missions of DCCC and we're going to talk more about that
 2   throughout; but is that the best statement of the
 3   mission, to elect Democrats?
 4       A.   Definitely.
 5       Q.   Is there any other component of that, or is
 6   that really what it's all about?
 7       A.   I think everything ties back to electing
 8   Democrats.
 9       Q.   Okay.
10            MR. HILTON:  I'm going to send out
11   through the chat what's actually -- I'm going a little
12   out of order.  I kind of prenumbered some of these.  So
13   I'm going to send out Exhibit 5 now, and then we'll come
14   back to the other ones.
15            (Exhibit 5 discussed.)
16       Q   (BY MR. HILTON)  So let me know if you're able
17   to access Exhibit 5; and once you've had a chance to
18   pull it up and review it, let me know.
19       A.   Okay.  I have it open.
20       Q.   Is that your LinkedIn page, at least part of
21   it?
22       A.   Yes.
23       Q.   And I should say -- I forgot to mention this
24   before -- other than the documents that I send you and
25   then the Bates numbered documents that your counsel
```

1   provided to you that were the DCCC's production, do you

2   have any other documents in front of you, with you?  Are

3   you referring to any other documents?

4       A.   No, I don't.

5       Q.   Okay.  I'll ask for you to continue not to do

6   that; and if you do refer to another document, please

7   let me know.  And I think the same thing goes with

8   talking to other people, including by e-mail, text, you

9   know, anything like that.  Please refrain from doing

10  that, you know, until the deposition is over.  And if

11  you do do that, I'd ask that you please, you know, let

12  me know.

13           All right.  So turning to Exhibit 5,

14  which is at least a portion of your LinkedIn page, it

15  has employment history for you going back to May 2008.

16  I was kind of hoping you could walk me through each of

17  these positions, starting with May 2008, and explain to

18  me -- obviously, we don't have to go into a huge amount

19  of detail for all of these; but if you could, explain to

20  me just kind of generally what the company was or what

21  the organization was, what your role was, and kind of

22  give me a sense of the evolution of your career.  That's

23  my goal here.

24           So if you could just kind of start from

25  GIS Specialist at the Timmons Group and work your way

1  through, I think that's the most efficient way to go

2  about it.

3      A.   Okay.  Sure.  So in 2008 I worked with the

4  Timmons Group, which is an engineering firm.  I was a

5  GIS Specialist at the time, Geographic Information

6  Systems.

7      Q.   What is a Geographic Information System?

8      A.   It's like a lot of building kind of digital

9  maps.  That's what I did, usually, for local governments

10 that were hoping to convert to a modern era, if you

11 will.

12     Q.   In what sense?

13     A.   Like, the work I did was taking, like, paper

14 documents, land parcels, and I was digitizing them.

15     Q.   Oh, I see.  So any kind of, you know, records

16 or whatever, just trying to make it into a modern

17 electronically-accessible system?

18     A.   Yeah, yeah, basically.

19     Q.   Got it.  Any particular projects that stand

20 out from that time?  I don't mean to make you go all the

21 way back through your career.

22     A.   Oh, sure.  No, no.  So most of the work I

23 specialized in, we worked with a lot of rural, I guess,

24 counties and locations; and they were in the process of

25 trying to basically get up and running a system that --

1  where people in their location can call 9-1-1 and it

2  would be linked to their home, which I think is

3  something that, especially in urban and suburban areas,

4  people take for granted that you call 9-1-1 and they

5  know where you're calling from.  So that required

6  digitizing all of the maps and then linking each, like,

7  land parcel to the phone information we had for people

8  living there.  That was the majority of the work I did

9  at Timmons.

10      **Q.   Okay.  And I'm sorry to dwell on this, but it**

11  **looks like your career kind of takes a more political --**

12  **or politically-oriented turn from here.  Did you do any**

13  **political type work or redistricting or anything like**

14  **that when you were with Timmons Group?**

15      A.   I didn't do any political work with Timmons.

16  I was involved through my school; and while I was

17  working at Timmons, I took on a side project, which is a

18  strong majority the role I did above it.  And so I was

19  kind of doing that in my spare time.

20      **Q.   All right.  Well, I know I asked you to just**

21  **kind of walk me through this and let you explain it; and**

22  **then I immediately interrupted you.  So sorry about**

23  **that, but maybe you can pick it up from there and**

24  **continue to walk me through the rest of your career.**

25      A.   Sure.  So for a strong majority, I was their

1  Compliance Director.  I basically oversaw their

2  bookkeeping and was responsible for accounting and

3  reporting through the Virginia State Board of Elections,

4  just maintaining their compliance.

5            And then I found myself in Indiana, where

6  I was hired as the Deputy Director of Compliance and

7  Operations; and in that role -- you will sense a theme

8  here -- but I oversaw the HR, the operations and the

9  bookkeeping budgets and compliance for the Indiana

10  Democratic Party.

11       Q.   And I'm sorry to interrupt you one more time,

12  at least.  I should have started with this, but I

13  forgot.  What was your -- what education did you have

14  that led you into all these roles?  Like, I think you

15  mentioned you were still in school when you started with

16  Timmons.  Now, what were you in school for?  What

17  degree, if any, did you attain?

18       A.   Sure.  I went to school, and I received a

19  bachelor's degree in geography.

20       Q.   And I know as a component of that, there's a

21  lot of, you know, technical and software and all sorts

22  of stuff like that that kind of led you to be able to do

23  the more technical side of things that you're doing?

24       A.   Yes.

25       Q.   Okay.  All right.  I interrupted you again.

1   I'm sorry.  Let's try it again.

2        A.   No problem.  So I was in Indiana briefly.  I

3   stayed through the end of the election cycle and moved

4   back to Virginia.  In April of 2011 I started with

5   Protect Your Care and Know Your Care as their Director

6   of Operations.  Again, I kind of oversaw the budget

7   aspects, the compliance, HR.  After --

8        Q.   I'm sorry.  What is that group?

9        A.   It was a 501(c)(3) and (c)(4) organized around

10  educating people on Obamacare --

11       Q.   Okay.

12       A.   -- and the Affordable Care Act.

13       Q.   Okay.

14       A.   In 2012 I took a job with the DCCC as their

15  Director of Operations on their 2012 Independent

16  Expenditure Program; and in that role, I managed the

17  administrative functions for the IE, which is a large

18  paid media campaign.

19       Q.   And when you say a paid media campaign, can

20  you elaborate a little bit on that?

21       A.   Sure.  It's mostly a bunch of TV ads that the

22  DCCC puts out.

23       Q.   And what was the nature of the ads?  What was

24  the purpose?

25       A.   To elect Democrats to the U.S. House.

1    Q.    Anywhere in particular?  Any particular type

2 of ad; or was it just, you know, all House members?

3    A.    It was certainly focused in our targeted

4 races.  I don't know how much that was off the top of my

5 head; but I would say, ballpark, it probably covered

6 about 30 races across the country.

7    Q.    And -- okay.  I think that's enough for now.

8 I'll let you continue.

9    A.    Following 2012 I took a job with Terry

10 McAuliffe's campaign for governor in Virginia; and I

11 operated largely in the same capacity for that roll,

12 overseeing all the operations functions, HR, budgets,

13 legal.

14    Q.    Was that a successful campaign?

15    A.    It was a successful campaign.

16    Q.    He's still governor, right?  Did he get re-

17 elected since then or...

18    A.    He is not still governor --

19    Q.    Oh, okay.

20    A.    -- but he is always around.

21    Q.    Okay.

22    A.    So you feel like he's still governor.

23          And then, following his successful

24 campaign, after his inauguration I returned to the DCCC

25 as Deputy Chief Operating Officer and over the years

1  have slowly progressed.

2       Q.   You've stayed around and stayed in a couple

3  different roles, and I know how it goes when you stay at

4  a place for a long time.

5            I guess the only other one I wanted to

6  ask you about specifically was Interim Executive

7  Director from July of 2019 to September 2019.  How did

8  you come to have that role, and the way you're

9  describing -- I guess my other question is, as your

10 primary viewpoint, you know, if it goes in two-year

11 election cycles, is that a down period since the 2018

12 election had just been over?

13           What was -- I guess I was saying all of

14 that to say -- I'll give you an actual question that you

15 can answer.  How did you come to get that role, what did

16 you do during that period, and how did that relate to

17 the cyclical nature of DCCC's work?

18      A.   Sure.  So we had a leadership transition in

19 the middle of our cycle this year, which actually isn't

20 common.  Usually an Executive Director would be hired in

21 December or January and stay for two years or longer in

22 some cases.  So there was a leadership transition.  In

23 that moment I stepped up to be the Interim Executive

24 Director, and largely I ran the entire process to find a

25 permanent Executive Director.

1    Q.   And you say there was a leadership transition.

2  I'm assuming that someone had signed up to do the role

3  and then moved on to take another opportunity

4  unexpectedly?

5    A.   Yes.

6    Q.   Okay.  And you may have mentioned this.  I

7  just don't recall.  Where did you say you went to, got

8  your bachelor's?

9    A.   I went to the University of Mary Washington in

10 Fredericksburg, Virginia.

11   Q.   Well, I appreciate all that.  It's always

12 helpful to know.  Even though you're a representative on

13 DCCC's behalf, it's extremely helpful to know your

14 perspective, your background, and your expertise.  So I

15 appreciate you walking me through that.  I know talking

16 about the full length of one's career is not necessarily

17 the most exciting, but I appreciate it.

18              I would like to turn now to talk a little

19 bit about how you -- you know, about the depo itself and

20 how you prepared for this deposition today.  So I guess

21 start there.  What did you do to prepare for the

22 deposition today?

23   A.   Sure.  Well, I discussed with my counsel.  I

24 reviewed the Complaint that we had filed and reviewed

25 the Deposition Notice topics.  I also reviewed a

23

1 declaration that a member of my team had submitted in

2 response to this.

3     **Q.  Any other documents?**

4     A.  I gathered information related to the

5 deposition topics, but that was it.

6     **Q.  How did you gather information?**

7     A.  I guess searching through DCCC documents.

8     **Q.  Okay.  Did you search through e-mails or some**

9 **other source of documents?**

10     A.  I think mostly just documents that are on our

11 drive, like on --

12     **Q.  Did you use search terms, or did you just**

13 **browse through them?**

14         MS. BRANCH:  I want to just object to the

15 extent that it calls for attorney-client privileged

16 information.

17         But you can answer as long as you're not

18 revealing any of the content of our conversations.

19     **Q.  (BY MR. HILTON)  Yeah.  And particularly in**

20 **this prep area it gets kind of close to that.  I am not**

21 **asking you for content of any conversations with your**

22 **attorneys.  So please do not provide that information.**

23 **I don't want it.  It is privileged, so.**

24     **All right.  So you said that you were**

25 **just browsing through files, I guess, based on your**

1  knowledge and familiarity with the files of the

2  organization?

3      A.   Yes, that's correct.

4      Q.   Did you speak to anyone other than your

5  attorneys?

6      A.   Just our -- yes, with our attorneys.

7      Q.   But no other employees of DCCC or anyone else

8  other than your attorneys?

9      A.   Right.

10              (Exhibit 1 discussed.)

11      Q.   (BY MR. HILTON)  Okay.  I'd like to turn to

12  Exhibit 1, which I had sent out previously via the Zoom

13  chat.  And do you recognize Exhibit 1?

14      A.   Yes.

15      Q.   And what is it?

16      A.   These are the deposition topics you sent in a

17  Notice for this role.

18      Q.   Right.  And so let's turn to page 5 of

19  Exhibit 1.  The heading is 30(b)(6) Corporate

20  Representative Deposition Topics?

21      A.   Yes.

22      Q.   Are you prepared to testify as to all these

23  topics today?

24      A.   I am.

25      Q.   And then I'd like to go to page 6.  The

1   heading is Attachment B.  These are the document

2   requests that we sent in connection with this Notice; is

3   that right?

4        A.   Yes.

5        Q.   And it sounds like you searched for documents

6   that were responsive to these requests?

7        A.   I worked with my counsel on this.

8        Q.   Okay.  Did DCCC produce documents responsive

9   to these requests?

10       A.   Yes.

11       Q.   So did DCCC comply with these requests?

12       A.   Yes.

13              (Exhibit 2 discussed.)

14       Q.   (BY MR. HILTON)  Okay.  The next one is going

15   to be Exhibit 2, which, hopefully, is the Complaint in

16   this matter.

17       A.   Yes.

18       Q.   So you have Exhibit 2 in front of you?

19       A.   I do.

20       Q.   And have you seen this document before?

21       A.   I have.

22       Q.   Did you review it before it was filed?

23       A.   Yes.

24       Q.   How much time did you spend reviewing it,

25   before it was filed, I mean?

1    A.    Before it was filed?

2    Q.    **Yes.**

3    A.    Probably -- to be clear, you mean the

4  Complaint itself or in preparation for the Complaint?

5    Q.    **I'm breaking it into two parts.  So the first**

6  **part is:  How much time did you spend reviewing the**

7  **Complaint before it was filed?  And then the next part**

8  **will be:  Did you review it again for this deposition,**

9  **and how much time did you spend reviewing it?**

10    A.    I probably spent about 30 minutes reviewing

11  the Complaint before it was filed.

12    Q.    **Okay.  And you said you reviewed it again to**

13  **prepare for the deposition today.  How much time did you**

14  **spend then?**

15    A.    Probably about an hour.

16    Q.    **Okay.  I'm going to send out the next exhibit,**

17  **Exhibit 3, hopefully.**

18            (Exhibit 3 discussed.)

19    A.    Okay.

20    Q    **(BY MR. HILTON)  Do you recognize what I'm**

21  **marking as Exhibit 3 to the deposition?  It says**

22  **Exhibit B on the first page of it, but I'm going to**

23  **refer to it as Exhibit 3.**

24    A.    Yes.

25    Q.    **Okay.  And what is Exhibit 3?**

1      A.   This is a Declaration from Alexander Edelman

2  in support of the Plaintiff's motion.

3      **Q.   Who is he?**

4      A.   He's DCCC's National Field Director.

5      **Q.   Do you know Mr. Edelman?**

6      A.   I do.

7      **Q.   And how do you know him?**

8      A.   He's my colleague at the DCCC.

9      **Q.   And can you describe exactly what a National**

10 **Field Director does?**

11     A.   Sure.  The National Field Director oversees

12 the entire field program for the DCCC.

13     **Q.   What is a field program?**

14          MS. BRANCH:  I'm going to object to the

15 extent that this calls for information that would be

16 protected by the First Amendment.

17          But you may answer at a high level.

18     A.   Sure.  Our field program is geared at

19 mobilizing and persuading voters, usually directly on

20 the ground in our targeted districts.

21     **Q.   (BY MR. HILTON)  And how does the field**

22 **program go about accomplishing that?**

23     A.   We usually work with coordinated campaigns,

24 which is a collaboration between national parties and

25 state parties to elect Democrats up and down the ballot.

1  So in Texas we work with the Texas Democratic Party,

2  along with the other national party committees and, you

3  know, each state sometimes looks a little bit different;

4  but usually we are running Get-Out-the-Vote programs,

5  voter registration programs, engaging our voters

6  directly on the ground through canvasses.

7      **Q.   And how does the DCCC's support for that kind**

8  **of program play out in practice?  I mean, I guess, is it**

9  **just providing funding?  Do you provide manpower as**

10  **well, or what other resources do you provide?**

11      A.   Yeah, so it's all of the above.  We provide

12  funding.  We transfer money to the State Party to be

13  used for the Coordinated Campaign.  We also have our own

14  direct investments in people on the ground in some

15  cases.  In Texas, for example, we have four offices

16  opened; and we have staff in those offices.

17      **Q.   All right.  Well, I'm getting a little ahead**

18  **of myself.  We'll get into more details of that later,**

19  **but I realize I forgot to ask:  You said -- you**

20  **mentioned you reviewed a declaration in connection with**

21  **this matter to prepare for the deposition today.  Was**

22  **this the declaration you were referring to?**

23      A.   Yes, it was.

24      **Q.   All right.  So we'll leave that to the side**

25  **for now and come back to it.**

1                    (Exhibit 4 discussed.)

2        Q.   (BY MR. HILTON)  The next group of documents

3    that I'm going to designate as Exhibit 4 to the

4    deposition is going to be the DCCC's production in

5    response to our subpoena duces tecum.  So that's Bates

6    Numbers DCCC 000001 through 805.  Do you have those

7    documents available to you?

8        A.   Yes, I do.

9        Q.   And are you familiar with those documents?

10       A.   I am.

11       Q.   Okay.  Did you review all of them before the

12   deposition today?

13       A.   Yes.

14       Q.   How much time did you spend reviewing them?

15       A.   Probably about an hour.

16       Q.   Who gathered these documents?

17                 MS. BRANCH:  I'm going to object to the

18   extent that this calls for conversations between

19   attorney and client or attorney work product.

20                 MR. HILTON:  It does not.  I'm asking for

21   an identity of the person who collected the documents.

22                 MS. BRANCH:  You can answer that, Jacqui.

23       A.   This specific group of documents?

24       Q    (BY MR. HILTON)  Yeah, Bates Number 1 through

25   805, the entire production.

1     A.    These came from my counsel.

2     **Q.    But who collected them?**

3     A.    Initially in this process?

4     **Q.    Yeah, who at DCCC gathered the documents for**

5 **production?**

6     A.    Staff.  And, I mean, I think several people

7 collected documents related to this production based

8 on -- based on the request and the search terms guided

9 by our counsel.

10     **Q.    What were the search terms?**

11          MS. BRANCH:  Objection, attorney-client

12 privilege.

13     **Q.    (BY MR. HILTON)  You can answer.**

14          MS. BRANCH:  I'm instructing you not to

15 answer that.

16          It's clearly search terms that we worked

17 with them and communicated with them to find the

18 documents.  If there's specific documents you want to

19 ask about, I think we can do that; but...

20          MR. HILTON:  I would like to know the

21 search terms.  Will you provide them to me, Aria?

22          MS. BRANCH:  We can talk off the record

23 about that.

24          MR. HILTON:  I would like an answer now

25 because I feel like I'm entitled to what the search

31

1  terms are.

2          MS. BRANCH:  I don't have them in front

3  of me, but we can discuss that.  They are search terms

4  that were created based on the subpoena.

5          MR. HILTON:  I just want to know if

6  you'll give me the search terms later.

7          MS. BRANCH:  And I'm happy to discuss

8  that.

9      **Q.   (BY MR. HILTON)  I'm sorry.  I feel like I**

10 **have to ask my question again, Ms. Newman.  What were**

11 **the search terms that were used?**

12         MS. BRANCH:  And I'm going to assert the

13 same objection and instruct the witness not to answer.

14     **Q    (BY MR. HILTON)  Are you going to abide by**

15 **that instruction?**

16     A.   Yes, I am.

17     **Q.   Do you know what the search terms are?**

18     A.   Not off the top of my head.

19     **Q.   Did you at one point know what they were?**

20     A.   Yes.

21     **Q.   Did you refer to something else and refresh**

22 **your memory as to what the search terms are?**

23     A.   I could refer to my conversations with my

24 counsel.

25     **Q.   So you could give me the search terms if you**

1  were required to do so?

2          MS. BRANCH:  They're privileged.

3          MR. HILTON:  I understand that that's

4  your assertion.  I disagree with that assertion.  And

5  I'm trying to question the witness, and you cannot

6  answer for the witness.

7      Q.  (BY MR. HILTON) So, Ms. Newman, if you were

8  required to tell me what the search terms are by a Court

9  or someone else, would you be able to do so?

10     A.  I believe I could.

11     Q.  Okay.  Who ran the search terms?

12     A.  A combination of our staff and our IT

13 Director.

14     Q.  And you mentioned earlier as well that several

15 people assisted in gathering the documents.  Did I

16 understand your testimony correctly?

17     A.  Yes.

18     Q.  What are the names of each person who assisted

19 in gathering these documents?

20     A.  I don't know that information.  I would have

21 to check.

22         MR. HILTON:  Aria, will you provide me

23 that information?

24         MS. BRANCH:  Again, I think this calls

25 for privileged information and that these are

1  discussions that we, the attorneys, had with staff at

2  the DCCC to advise them on how to respond to the

3  subpoena.

4            MR. HILTON:  I'm not asking about the

5  discussions.  I'm asking for the identity of the

6  individuals who ran the search terms and collected the

7  documents.  I believe your document production is

8  insufficient.  I'm entitled to understand what you did

9  to produce these documents, and I'm entitled to this

10  which is not privileged.  So I'm going to ask --

11            MS. BRANCH:  I think we can have that

12  conversation.  I don't think that Jacqui knows; and I

13  also think that it infringes on the privilege, so.

14       Q    (BY MR. HILTON)  Well, Ms. Newman, do you know

15  the identities of the individuals who ran these search

16  terms?

17       A    It's a wide group, I think.

18       Q    Okay.  Do you know the identity of those

19  individuals in that wide group?

20       A    I have it somewhere.  I do not know right now.

21       Q    But you could get me that information if you

22  were required to do is?

23       A    I believe so.

24       Q    And you mentioned that several people helped

25  gather the documents.  Were you referring to just

1  running the search terms, or was there some other way in

2  which documents were gathered?

3          MS. BRANCH:  Again, I think this calls

4  for attorney-client privileged information in that it

5  goes to the communications we had on how to formulate

6  the search for documents.

7      Q.  (BY MR. HILTON)  I am not asking about the

8  content of any communication that you or anyone at DCCC

9  had with your counsel, Ms. Newman.  I want to be very

10 clear about that.  But I would like to know the method

11 by which these documents were gathered, and I want

12 clarity on your earlier testimony.  Earlier you said

13 that several people helped gather the documents.  Do I

14 have that correct?

15     A.  Yes.

16     Q.  And you also mentioned that there was a wide

17 group of people who ran search terms.  Do I have that

18 correct?

19     A.  I believe so.  Like I said, I would have to

20 check.

21     Q.  Okay.  And I want to know:  Is that the same

22 group you were referring to, or are there two different

23 groups of individuals that you're referring to in your

24 testimony?

25          MS. BRANCH:  Same objection.  I think

35

1  asked and answered.  She's answered the question.

2              MR. HILTON:  With respect, Aria, it has

3  not been answered.  I want to understand who searched

4  for what and how, and I'm entitled to that information.

5      **Q.  (BY MR. HILTON)  So Ms. Newman, who -- was**

6  **there another method of gathering documents other than**

7  **running search terms?**

8              MS. BRANCH:  Again, it's privileged.  I

9  mean, these -- what you're asking -- I understand where

10 you're coming from, but what you're asking is asking for

11 the content of the communications we had with them in

12 terms of how to comply with the subpoena.

13             MR. HILTON:  Can you read back my

14 question?

15             MS. BRANCH:  I'm going to instruct the

16 witness not to answer, and I'm hopeful that we can maybe

17 move on to another topic.

18             MR. HILTON:  Can you read back the

19 question, Debbie, that I asked?  I'd like you to read

20 the question.

21             THE REPORTER:  Yes.

22             (The requested material was read as

23 follows:

24             "QUESTION:  Okay.  And I want to know:

25 Is that the same group you were referring to, or are

1  there two different groups of individuals that you are

2  referring to in your testimony?")

3              MS. BRANCH:  Objection, vague.

4              You may answer if you are able to.

5      A.   I don't really understand the question.

6      **Q    (BY MR. HILTON)  Well, I don't really**

7  **understand your testimony.  You said earlier that there**

8  **was a group of -- that there were several people who**

9  **gathered documents, correct?  That's what you first**

10 **said?**

11     A.   Well -- and I would like to clarify.  We might

12 have asked several people.  That does not mean several

13 people had documents to gather, and I do not know that

14 information right now.

15     **Q.   All right.  I'm going to ask you one more**

16 **time:  Who collected the documents for DCCC?**

17             MS. BRANCH:  Objection, asked and

18 answered.

19             You can repeat the same answer.

20             MR. HILTON:  I would appreciate it, Aria,

21 if you didn't instruct your witness how to answer my

22 questions.  Okay?  That's a speaking objection.  It's

23 not permitted.  You can state the basis of your

24 objection, and you can either instruct her to answer or

25 not.

1          MS. BRANCH:  I think I've done that now.

2          MR. HILTON:  Debbie, can you please read

3  back my question?

4               (The requested material was read as

5  follows:

6               "QUESTION:  I'm going to ask you one more

7  time:  Who collected the documents for DCCC?")

8      A.   We would have requested documents from a group

9  of staff and our IT Director.

10     **Q    (BY MR. HILTON)  What's the name of your IT**

11 **Director?**

12         MS. BRANCH:  Objection.

13         MR. HILTON:  What is the basis of your

14 objection?

15         MS. BRANCH:  I think this is -- we're

16 getting into attorney-client privileged discussions in

17 terms of preparing for the -- for this.

18     **Q    (BY MR. HILTON)  Ms. Newman, my question is:**

19 **What is the name of DCCC's IT Director?**

20     A.   David Winston.

21         MR. HILTON:  I just want to, again, make

22 clear on the record that I think this document

23 production is insufficient.  We're going to reserve all

24 rights to pursue whatever remedies we think we need to.

25               I'm asking questions that clearly are not

1  calling for any privileged information, and you're

2  instructing the witness not to answer.  That's improper.

3  I believe I'm entitled to the answers to these questions

4  to understand whether this document collection effort

5  was sufficient.  Clearly it was not.

6       **Q    (BY MR. HILTON)  Ms. Newman, I apologize.**

7  **I've gotten a little heated during this part of the**

8  **questioning.  I want you to understand I have no quarrel**

9  **with you whatsoever.  I'm just trying to get the**

10  **information that I need to represent my clients.  And so**

11  **I'm trying --**

12            MS. BRANCH:  And I'm happy -- sorry.  I

13  didn't mean to cut you off.

14            MR. HILTON:  Go ahead.

15            MS. BRANCH:  Well, I'm happy to have, you

16  know, a further conversation about the document

17  production.  I do think that several of the requests

18  infringe upon the First Amendment privilege.  We've

19  produced documents responsive to the requests to the

20  extent they're not privileged.  And the client has

21  stated that they undertook efforts to respond to the

22  subpoena.

23            If you want to meet and confer, have a

24  separate conversation about that, we can off the record.

25  It's probably not as fruitful to do with Ms. Newman,

1  given that she doesn't have vision over the entire

2  process.  And I do think that some of the questions,

3  when you're talking about search terms, do infringe upon

4  communications that we've had with our client.

5        MR. HILTON:  Sorry.  Well, if you can

6  find a case that says the search terms are going to be

7  privileged in this context, I'd love to see it.

8        And I think Ms. Newman testified that she

9  could answer all these questions if you had properly

10 prepared her; and clearly, you didn't.  So, anyway...

11       **Q.  (BY MR. HILTON)  And, again, Ms. Newman,**

12 **that's no point against you.  I just think your**

13 **counsel's not done what they should have done with**

14 **respect to the document production, but we'll move on.**

15       MS. BRANCH:  I think that she's prepared

16 for this deposition.  She's prepared on the topics; and,

17 you know, we've produced her here to answer the

18 questions on the topics.  And we produced documents

19 responsive to the extent that they were not privileged.

20       **Q   (BY MR. HILTON)  Did you review any other**

21 **documents other than the ones that we've already**

22 **discussed today in preparation for your deposition,**

23 **Ms. Newman?**

24       A.   I don't believe so.

25       **Q.   Okay.  You mentioned that you met with counsel**

1 to prepare for this deposition, correct?

2     A.   Yes.

3     Q.   When?

4          MS. BRANCH:   Just -- I'm going to just

5 assert the objection.

6          This particular question is not

7 privileged; but I just want to be clear, Jacqui, that

8 you don't have to disclose anything that we discussed.

9 But you may answer the question.

10          MR. HILTON:   Ms. Branch, again, please

11 refrain from speaking objections.  You just spoke

12 without an objection, and that's improper.

13     Q    (BY MR. HILTON)  Ms. Newman, when did you meet

14 with your attorneys?

15          MS. BRANCH:   The objection, just for the

16 record, is attorney-client privilege.

17          But you may answer to the extent that

18 you're not disclosing our communications.

19     A.   I met with counsel regarding this deposition

20 yesterday and last week.

21     Q.   (BY MR. HILTON)  So on two occasions?

22     A.   Yes.

23     Q.   How long were those meetings, again, without

24 disclosing the content?

25     A.   I think roughly about an hour each.

1    Q.    Who was in attendance at those meetings?

2    A.    My counsel, Aria and Rachel.

3    Q.    And yourself.  Anyone else?

4    A.    Yeah, myself.  We met with another member of

5    my team, too, Alex Edelman.

6    Q.    That's the same person who signed that

7    Declaration that's Exhibit 3?

8    A.    Yes.

9    Q.    Okay.

10              MR. HILTON:  All right.  I'd like to take

11   a short break if that's all right.  I will need about

12   five minutes; but if y'all want to take a longer break,

13   that's fine.

14              THE WITNESS:  Can we have ten minutes?

15              MR. HILTON:  Sure.

16              THE WITNESS:  Thank you.

17              THE REPORTER:  Going off the record at

18   11:02 a.m.

19              (Off the record from 11:02 to 11:14 a.m.)

20              THE REPORTER:  We're back on the record

21   at 11:14 a.m.

22              MR. HILTON:  And as we've done in the

23   other depositions, I'm fine waiving the additional read-

24   on every time we go back on, as long as y'all are fine

25   with that.

1        MS. BRANCH:  I'm good.  Thank you.

2     Q.   (BY MR. HILTON)  Ms. Newman, I, again, just

3  wanted to, you know, apologize that you had to get

4  dragged into that discussion between counsel and I.  I

5  hate to do that kind of stuff in depositions; sometimes

6  it happens.  But just, you know, I'm going to try and

7  move on and get through the substance of what I have to

8  ask you about kind of as painlessly as possible as I

9  can.

10          You know, I just want to, again, make

11  clear that I'm not asking for you to reveal any

12  privileged information with any of my questions.  Of

13  course, your counsel will instruct you or object, you

14  know, as necessary.  But I just want to make that clear.

15  I'm not intending to ask for privileged information.

16          So I want to turn back to the DCCC and

17  just talking about the organization's background and

18  activities and that kind of thing.  And I can't remember

19  if I asked you this or not before:  When was the DCCC

20  first established?

21     A.   It was established over 150 years ago.  I

22  think it's 1866.

23     Q.   Wow.  And has its mission changed over time?

24     A.   I don't believe so.

25     Q.   But electing Democrats is the name of the game

1  since 1866?

2       A.    I think that's about right.

3       Q.    We talked a little bit earlier about the

4  relationship between DCCC and the DNC, and I kind of

5  want to explore similar issues in relation to an exhibit

6  that I just sent out in the Zoom chat.  This is

7  something I found on the FEC's website.  That's the

8  Federal Election Commission.  Are you familiar with the

9  FEC?

10      A.    Yes, I am.

11      Q.    I would imagine that you would be.

12            (Exhibit 6 discussed.)

13      Q.    (BY MR. HILTON)  Do you have Exhibit 6 in

14 front of you?

15      A.    Yes, I do.

16      Q.    And do you recognize Exhibit 6?

17      A.    Yes, I do.

18      Q.    And what is it?

19      A.    This is a Statement of Organization filed with

20 the FEC.

21      Q.    And I guess before we dig into it, I'm

22 curious:  Are you responsible for, you know, making sure

23 that the FEC filings get done?

24      A.    I am not responsible for those.

25      Q.    Who has that responsibility?

```
 1      A.    Our Chief Financial Officer.

 2      Q.    And who is that?

 3      A.    Jackie Forte-Mackay.

 4      Q.    Yeah, her name pops up on some of this stuff,

 5   I think.   She's on this one.

 6            Are you familiar with FEC filings for the

 7   DCCC?

 8      A.    Yes, I am.

 9      Q.    Do you review them before they get filed?

10      A.    I do not.

11      Q.    How are you familiar with them, then?

12      A.    I have an awareness -- a top-line awareness of

13   our filings before they are filed; and if there's any

14   questions or concerns, sometimes I am a part of those

15   conversations.

16      Q.    So just in the course of your job, you have

17   occasion to refer to them and work with them?

18      A.    Yes.

19      Q.    Did you review any FEC filings before the

20   deposition today?

21      A.    I reviewed some of our FEC filings that show

22   our work in Texas.

23      Q.    Which filings?

24      A.    I believe Aria shared these with you; but,

25   basically, the money that we sent to the Texas
```

DCCC - 4/28/2020

45

1 Democratic Party.

2     Q.   Well, let's skip ahead so I don't lose the

3 thread of this.  I'm going to send out what I'm marking

4 as Exhibit 8 to the deposition.  This is an Excel

5 spreadsheet.

6              (Exhibit 8 discussed.)

7     Q    (BY MR. HILTON)  And this was, you know, my

8 attempt to export the data from the FEC link that your

9 counsel provided.  So let me know once you have the

10 spreadsheet open.

11     A.   Okay.  I have this open.

12     Q.   I hesitate to ask:  Do you recognize what you

13 are looking at here in Exhibit 8?

14     A.   Yes, I do.

15     Q.   Okay.  And what is this?

16     A.   This appears to be a document showing

17 transfers from the Democratic -- or from the DCCC to the

18 Texas Democratic Party, dating back to 2014.

19     Q.   Is this the FEC filings that you were

20 referring to when you said you reviewed some FEC

21 information prior to the deposition?

22     A.   Yes, this looks like it.

23     Q.   There's another version on the web page that

24 looks a little better.  I prefer to use this version if

25 you can manage to work with it because this is the

 1  version that you get when you export the data from the

 2  FEC; but if it just becomes unworkable, we have that as

 3  an option.  And I can try to do a little screen share.

 4  But, again, this is the data from the link that your

 5  counsel provided to me last night; and is that what it

 6  appears to be to you as well?

 7      A.   Yes.

 8      Q.   Okay.  I think you already said that, but I

 9  just wanted to make that clear.

10           Since we're here, I might as well ask you

11  the questions I have on this document.  What information

12  can I glean about what the purpose of these funds was

13  from Exhibit 8?

14           MS. BRANCH:  Objection, vague.

15           You may answer the question.

16      A.   You can learn how much money we transferred to

17  the Texas Democratic Party and on what dates.

18      Q.   (BY MR. HILTON)  Can I learn what the funds

19  were for?

20      A.   No.

21      Q.   I can't learn which activities they supported?

22           MS. BRANCH:  Objection.

23      A.   No.

24      Q    (BY MR. HILTON)  Is there another document

25  that I could refer to that would allow me to determine

47

1  what these fund transfers were used for?

2      A.    No.

3      Q.    So no document exists that would allow me to

4  determine what any of these fund transfers were used for

5  in the possession of DCCC?

6      A.    I mean, our internal budgets and plans may

7  share information -- or have information related to

8  these transfers.

9      Q.    And were those documents produced?

10             MS. BRANCH:  Objection.  This is

11  attorney-client privilege, and you're asking questions

12  that call for information protected by the First

13  Amendment privilege.

14      Q.    (BY MR. HILTON)  I'm not intending to call for

15  privileged information.  I just want to understand if

16  the documents that you were just referring to,

17  Ms. Newman, were included in the production which I've

18  marked as Exhibit 4 to this deposition, Bates Number

19  DCCC 1 through 805.

20             MS. BRANCH:  And I think those documents

21  were privileged.  So whatever she's referring to, that

22  would be the reason why they were not produced.

23             MR. HILTON:  Ms. Branch, I'm sorry.  I'd

24  like to hear the answer from the witness.

25      Q.    (BY MR. HILTON)  Ms. Newman, were those

48

1   documents that you were just referring to included in

2   Bates Number DCCC 1 through 805?

3        A.   I'm not sure.

4        Q.   Well, you have those documents in front of

5   you.  If you want to look through that and see if

6   they're in there, you can do that.

7        A.   Oh, sorry.  They are not in Exhibit 4.

8        Q.   Okay.  So those documents that would show me

9   what activities these funds were spent on, those have

10  not been produced?

11       A.   That's my understanding.

12       Q.   Okay.  And, again, I want you to be sure.  You

13  have all the documents that were produced in front of

14  you.  So I would kind of like a definitive answer to

15  that.

16            MS. BRANCH:  Objection, asked and

17  answered.

18       A.   I don't believe that they are included in that

19  document.  They are strategic information and documents

20  related to our work.

21       Q    (BY MR. HILTON)  Okay.  So they were not

22  produced?

23       A.   Right.

24       Q.   All right.  I think we are done with

25  Exhibit 8.

```
 1                  Can we turn back to Exhibit 6, which is
 2   where I think this digression started?  Do you still
 3   have that in front of you, Ms. Newman?
 4         A.   Yes, I do.
 5         Q.   Had you seen Exhibit -- when was the last time
 6   you've seen Exhibit 6, or have you seen Exhibit 6
 7   before?
 8         A.   Yes.  It's probably been several months since
 9   I've seen this.
10         Q.   Okay.  So you didn't review it to prepare for
11   the deposition?
12         A.   I did not.
13         Q.   And it has a list of what I'll refer to as
14   affiliated committees/organizations.  And each of those
15   appear to have an affiliated relationship code that
16   describes them as a joint fundraising representative.
17   Do I have that about right?
18         A.   Yes.
19         Q.   And so can you explain to me what an
20   affiliated relationship code is and what a joint
21   fundraising representative is?
22         A.   Again, I don't file these reports.  So I'm not
23   deeply familiar, but I believe an affiliated
24   relationship code is an FEC term to qualify the
25   relationship here.  And a joint -- and these are all
```

1  committees that we have joint fundraising committees

2  with.

3      Q.   Is that what joint fundraising representative

4  means?  It means you do joint fundraising activities?

5      A.   Yes.

6      Q.   Which of these listed groups relates to

7  activities in Texas?

8      A.   The Blue Texas Fund is related to Texas.  It

9  is possible the New Wave Women's Fund -- I believe that

10  also has a Texas connection.

11      Q.   Any others?

12      A.   I believe that's it.  There's also a chance

13  the Red to Blue Victory Fund may have a connection to

14  Texas, but I'm not aware of that at this time.

15      Q.   Okay.  So sitting here today, you don't know

16  for sure whether Red to Blue Victory Fund has a Texas

17  connection?

18      A.   Correct.

19      Q.   But Blue Texas Fund, I assume, does.  And New

20  Wave Women, you also think has a Texas connection.  Do I

21  have that about right?

22      A.   Yes.

23      Q.   Okay.  Let's start with Blue Texas Fund.  What

24  is it?

25      A.   This is a joint fundraising agreement with

1  campaigns in Texas.

2      Q.   Any campaigns in particular?

3      A.   I believe the Fletcher campaign in Texas 7 and

4  the Allred campaign in Texas 32.

5      Q.   Any others?

6      A.   I would need to confirm.

7      Q.   Do you know if that information is reflected

8  in any of the documents that were produced to us?

9      A.   Yes, I believe it is.

10      Q.   All right.  I think -- I think that we will

11  get there later.  So I think we can leave that for now.

12           But what activities does the Blue Texas

13  Fund engage in specifically?

14      A.   Fundraising.

15      Q.   And how is that conducted?

16      A.   I'm sorry.  Could you repeat the question?

17      Q.   You said Blue Texas Fund, the only activity

18  you said was fundraising; is that right?

19      A.   Yes.

20      Q.   Okay.  No other purpose for Blue Texas Fund?

21  Nothing else that it does?

22      A.   Correct.

23      Q.   And so how does Blue Texas Fund go about its

24  fundraising activities?

25           MS. BRANCH:  And I'm just going to object

1 to the extent that this calls for a legal conclusion

2 based on how joint fundraising works.

3                 But you may answer to the extent that you

4 know.

5         A.   It's mostly a direct mail fundraising

6 campaign.

7         Q.   **(BY MR. HILTON)  So sending mail solicitations**

8 **to people for donations?**

9         A.   Yes.

10         Q.   **And you said "mostly."  Are you aware of any**

11 **other fundraising activities that the Blue Texas Fund**

12 **engages in?**

13         A.   No.  I believe it's direct mail.

14         Q.   **And what's DCCC's involvement in those**

15 **activities?**

16         A.   We help facilitate the direct mail, the copy,

17 getting it out.

18         Q.   **I don't think I understand what you mean by**

19 **facilitate and help getting it out.  Can you describe**

20 **that a little more specifically?**

21         A.   Sure.

22                 MS. BRANCH:  I'm going to object to the

23 extent that is calls for information privileged by the

24 First Amendment.

25                 You may answer at a high level.

1           THE WITNESS:  Sure.

2       A.   We -- we work with, you know, whoever else is

3   in the fund and work on the creative printing and direct

4   mailing of the mail solicitations.

5       Q.   (BY MR. HILTON)  And when you say "work on,"

6   do you mean -- does that just mean you're providing

7   funds; or do you also provide actual, you know,

8   manpower, labor?

9       A.   Actual manpower.

10      Q.   I'm sorry.  Go ahead.

11      A.   Oh, no.

12      Q.   And you said you worked with whoever else is

13  in the fund.  Is that the two campaigns you referred to

14  earlier?

15      A.   Yes.

16      Q.   And then whoever else you can't recall, but

17  it's in the documents?

18      A.   Yes.

19      Q.   And the direct mail Blue Texas Fund engages

20  in, is that purely a solicitation for donations; or is

21  there anything else that these, you know, mailers are

22  trying to accomplish?

23      A.   It's just for fundraising.

24      Q.   Okay.  Does Blue Texas Fund engage in any

25  voter registration efforts?

1    A.   No.

2         Q.   And how about New Wave Women, what is -- you

3    know, what is that?

4         A.   It's very similar to the Blue Texas Fund

5    except it is a joint fundraising agreement highlighting

6    our frontline women candidates.

7         Q.   And who is that fundraising agreement with?

8    Is it also with campaigns in Texas?

9         A.   Again, I would need to check on who that

10   agreement is with.  I believe it's broader than Texas.

11        Q.   Understood.  You did say that earlier.  You're

12   right.

13             Do you know who the participants from

14   Texas in the New Wave Women group are?

15        A.   Again, I would need to check.

16        Q.   Is that in the document that was produced?

17        A.   If it is related to Texas, I think it would be

18   in the production.

19        Q.   I'm going to pull up a document that I had

20   prepared to talk about with you, and I want to see if

21   this is going to show me the information that we're kind

22   of circling around here.  So I'm going to send it out

23   again through the group chat.  This is a portion of

24   Exhibit 4, which is the document production that was

25   given to us.  This is a file labeled DCCC 661.  That's

1   the beginning Bates number.  It's a two-page document.

2   Let me know when you have that in front of you.

3       A.   Okay.  I have it open.

4       Q.   What is this document?

5       A.   This is a release of our House Majority

6   Battlefield and the first twelve candidates named to the

7   DCCC's Red to Blue program.

8       Q.   Does this document show the participants in

9   the Blue Texas Fund or New Wave Women?

10      A.   No, it does not.

11      Q.   Okay.  Well, maybe let's do this, because I

12  would like to know who in Texas is involved with those

13  funds.  I'd like to understand the relationships that

14  DCCC has with affiliates who work in Texas.  And so

15  maybe the next time that we take a break would be an

16  appropriate time for you to look through Exhibit 4 and

17  find those documents that you're referring to.

18      A.   Okay.

19          MS. BRANCH:  Yes, I think we did produce

20  information on the Blue Texas Fund.  So we can pull up

21  those documents after the break for sure.

22          MR. HILTON:  Yeah.  Let's -- if that's

23  all right with y'all, let's just do that on the next

24  break.  I'm going to make a note real quick to come back

25  to that.

1      Q.   (BY MR. HILTON)  And, Ms. Newman, if you

2   happen to, you know, as we're going through other

3   stuff -- if you happen to come across these documents as

4   we're going through stuff, you know, holler at me; and

5   we can take care of it right then so we don't have to

6   come back to it.

7      A.   Will do.

8      Q.   I think that's all I have for Exhibit 6.

9              I'm going to move now to Exhibit 7.

10             (Exhibit 7 discussed.)

11     Q    (BY MR. HILTON)  I've just sent it out via

12  Zoom chat.  I gave this a file name that I thought it

13  was, but I actually really don't know what I'm looking

14  at here.  So please let me know once you have this in

15  front of you.  And once you do, if you know, if you

16  could, tell me what is that we're looking at here.

17     A.   Sure.  This appears to be the summary page for

18  an amended year-end report from the DCCC.

19     Q.   And are you familiar with these year-end

20  reports?

21     A.   Yes.

22     Q.   Did you review any year-end reports in

23  preparation for your deposition?

24     A.   I did not.

25     Q.   What is your familiarity with these reports?

1   Is it similar to the first one we looked at where it

2   just comes up in the course of your work?

3        A.   Yes, it is.

4        Q.   And I don't mean to speak for you, but any

5   other differences compared to what we looked at before?

6   Anything else I should know about your familiarity with

7   this report?

8        A.   No.  I mean, we talked about it from a high

9   level; but I do not review the reports.

10       Q.   Got it.  And you said this is just a summary

11  page.  Do you know what other information is included

12  with these forms, these reports?

13       A.   Yes.  So this is the summary, the overview of

14  mostly cash on hand, total money in, and total money

15  out.  And then on the FEC website itself, you would be

16  able to click through these filings and see all of the

17  receipts and disbursements itemized.  And at least with

18  the disbursements, that also shows, like, the vendor and

19  a purpose.

20       Q.   So on page 1 of Exhibit 7, there are some

21  links there.  It says, "Summary Page, Detailed Summary

22  Page."  And then describes Schedule A, B, and D filings.

23  Are those the attachments to the schedules that you're

24  referring to?

25       A.   Yes.

1     Q.   And I did not include those in Exhibit 7.

2     That's not my normal practice; but when I tried to

3     download them all, it was something like almost 50,000

4     pages.  So I don't intend to go through 50,000 pages

5     with you today; but, you know, what I'm -- I'm hoping

6     maybe you can tell me if I were to look at the itemized

7     disbursements in Schedule B, you mentioned that it

8     included the description of the purpose for the

9     disbursement.  Did I hear you correctly?

10    A.   Yes.

11    Q.   And what -- can you give me an example of what

12    that might look like?

13    A.   Yes.  So for all the disbursements, it usually

14    shows who the expense is disbursed to, what the vendor

15    name is, the date of the disbursement; and then there is

16    an amount related to that expense, as well as a

17    description for the expense itself.

18    Q.   Well, what kind of information will be

19    contained in the description field or maybe --

20        MS. BRANCH:  I'm going to object on the

21    basis that this is all public, and the documents speak

22    for themselves.

23        You may answer to the extent that you can

24    describe this.

25    A.   Sure.  I mean, it depends on the expense; but

1  it's usually a general descriptor.  So if it's office

2  space, it might say "rent."  If it's, you know,

3  staples.com, it would say "office supplies."

4      Q.  (BY MR. HILTON)  But -- okay.  That's helpful.

5  That's what I assumed that it was going to be, kind of a

6  high level of detail; and that's what it sounds like

7  you're describing.  It sounds like if I look at those

8  Schedule B filings, it will not tell me, you know,

9  "Funds spent in Bexar County related to voter

10  registration efforts in Precinct 3"?  It won't be that

11  level of detail; is that right?

12          MS. BRANCH:  Objection, public

13  information.  The document speaks for itself.

14          You may answer.

15      A.  Yes, I would agree with that.

16      Q   (BY MR. HILTON)  Okay.  I'd like to focus

17  on -- turn back to Exhibit 7.  I'd like to focus on

18  page 2 in the disbursements section.

19      A.  Yes.

20      Q.  What I was hoping you could do for me is

21  explain to me what each of these types of disbursements

22  are.  It sounds like, you know, dealing with these

23  filings and putting them together is not your primary

24  job duty.  So, you know, to the extent that you can, if

25  you have an understanding of any of these categories,

1  **I'd like to know what your understanding is.**

2  MS. BRANCH:  And I'm just going to object

3  to the extent that this calls for a legal conclusion

4  since some of these are legal terms.

5  Jacqui, you may answer.

6  MR. HILTON:  And, again, I think it's

7  going to go smoother if you could just limit the

8  speaking objections.  I'd appreciate it.

9  A.   Yeah, I'm happy to share my non-expert opinion

10  on these.  So each line item the FEC calls for relates

11  to a slightly different kind of expenditure.  Line 21 is

12  our operating expenditures; 22 are transfers to

13  affiliated or other party committees.  So, actually,

14  what you see in Column A, the 45,360 number, that is

15  money that we transferred to Texas at the end of the

16  year, to the Texas Democratic Party.  And any money we

17  transfer to party committees would show up on that line

18  item.  Twenty-three is contributions to federal

19  candidates or other party -- or other political --

20  **Q.   (BY MR. HILTON)  I'm sorry.  I had a question**

21  **for you on 22 there.**

22  A.   Sure.

23  **Q.   I'm looking at Column A.  It's 45,360.  You**

24  **said that represented funds transferred to the Texas**

25  **Democratic Party?**

1      A.    Yes.

2      Q.    **And how do you know that?**

3      A.    Well, it's -- usually, we don't transfer a lot

4  of money in the off year.  And so I'm aware that we had

5  transferred money to Texas in December, and I also came

6  across that again in preparation for that -- for this

7  deposition.

8      Q.    **Okay.  And so there are two columns here.  One**

9  **of them says, "Column A, This Period."  And that's where**

10 **the 45,360 appears.  There's also Column B that says,**

11 **"Calendar Year."  And that number's quite a bit higher,**

12 **885,821.16.  Do you see that?**

13     A.    Yes.

14     Q.    **What's the difference between those two**

15 **numbers?**

16     A.    Column B refers to amounts that were filed in

17 previous reports.  So it's the total amount that we

18 transferred that calendar -- in 2019.  And we had

19 transferred the 45,360, I believe, in December, which

20 was the report filing in question for this time.

21     Q.    **Oh, okay.  So this is -- what I've given you,**

22 **I think, is the second amended year-end report.  I**

23 **guess -- tell me if I have this correctly -- Column B**

24 **would be the total of transfers to affiliated or other**

25 **party committees that appear on all of the year-end**

62

1   reports then?

2        A.   Yes.  It's the total we transferred to other

3   party committees in the year 2019.

4        Q.   Okay.  Okay.  And you just happen to know that

5   this 45,360 was the Texas Democratic Party because of

6   the timing, and you just happen to know?

7             MS. BRANCH:  Objection.  This is all

8   public.

9        A.   Yes.  And in Exhibit 8 that you shared

10  earlier, you can see that transfer as well.

11       Q.   (BY MR. HILTON)  Okay.  Great.  That's

12  helpful.

13             But I wouldn't be able to tell that from

14  the face of Exhibit 7?

15       A.   No.

16             MS. BRANCH:  Objection.  Vague.

17       Q    (BY MR. HILTON)  Let's go down to -- all

18  right.  Well, let's -- sorry to interrupt you again

19  there; but that was helpful to help me understand the

20  difference between Column A and Column B here.

21             Can you -- I guess we were on Line 23

22  then; and maybe you could pick back up with, you know,

23  explaining to me what these -- your categories of

24  disbursement are.

25       A.   So Line 23 is contributions to federal

1 candidates or other political committees.

2            Twenty-four would show any disbursements

3 we made that are considered to be independent

4 expenditures.

5      Q.   And what does that mean?

6      A.   An independent expenditure is an expenditure

7 that's made kind of without any coordination.  So those

8 are expenses that would not be working directly with a

9 campaign or another party.

10      Q.   Could it be an expenditure related to a

11 campaign?

12      A.   Yes.

13            MS. BRANCH:  Objection to the extent

14 these questions call for legal conclusions.

15            But, Jacqui, you may answer based on your

16 knowledge.

17      Q    (BY MR. HILTON)  So if you -- this is a

18 hypothetical example; I don't know whether it's

19 happened -- but if DCCC wanted to run ads in support of,

20 you know, Wendy Davis in her campaign and didn't

21 coordinate with that campaign prior to running the ads,

22 just kind of did it on its own, would that be an

23 independent expenditure?

24            MS. BRANCH:  Objection to the extent that

25 this calls for a legal conclusion.

1              But you may answer.

2      A.    In a very simple view, yes.  It's a little bit

3  more complicated than that because it requires us to

4  meet certain standards to prove that we haven't

5  coordinated with the campaign.  We're not using any

6  campaign information.

7      **Q    (BY MR. HILTON)  Yeah, understood.  When**

8  **lawyers are involved, it's never going to be that**

9  **simple.  So I get that.  But that's helpful to help me**

10  **kind of understand what we're looking at.**

11              **All right.  So that was 24, independent**

12  **expenditures.  How about 25?**

13      A.    This is coordinated expenditures made by a

14  party committee, so that's almost the opposite of an

15  independent expenditure.

16      **Q.    Sure.**

17      A.    Twenty-six is loan repayments made.

18  Twenty-seven is --

19      **Q.    Is that 16 million on loan repayments made?**

20      A.    Yes.

21      **Q.    And what was that payment?**

22              MS. BRANCH:  Objection to the extent that

23  this calls for information privileged by the First

24  Amendment.

25              But if you can answer that without

1  revealing strategic information, you may do so.

2      A.   As you can see in the publicly available

3  findings -- or filings, the DCCC took a line of credit

4  for $16 million.

5      **Q.   From who?**

6      A.   Bank of America.

7      **Q.   And what were those funds used for?**

8           MS. BRANCH:  Objection, same one.

9           You can answer at a high level.

10     A.   Our expenditures.

11     **Q   (BY MR. HILTON)  Which expenditures?**

12     A.   Just generally.

13     **Q.   Can you give me an example?**

14     A.   Well, this loan was taken in the 2018 cycle,

15  so it was for expenditures that occurred in 2018.

16     **Q.   So, like what?**

17          MS. BRANCH:  Objection to the extent that

18  this calls for strategic information.  I don't know the

19  relevance.  Is there a specific relation to this case on

20  this question?

21          MR. HILTON:  I would like to know an

22  example of what this money was spent on in the 2018

23  campaign.

24          MS. BRANCH:  Okay.  I think the fact that

25  they took out a loan is public, but I instruct the

1  witness not to answer specific information about what

2  the loan was used for.

3          MR. HILTON:  On what basis?

4          MS. BRANCH:  The First Amendment.

5          MR. HILTON:  I'm not asking for any

6  strategic information.

7          MS. BRANCH:  I think you can answer at a

8  high level, Jacqui.

9          I think she's already done that, but...

10     **Q   (BY MR. HILTON)  I just want to know an**

11 **example of an expenditure that came from the $16 million**

12 **during the 2018 campaign.**

13     A.  Yeah, we -- I definitely can't point to, like,

14 "This expense was paid for by this loan."  It's kind of

15 all of our activities and expenditures grouped together.

16     **Q.  I don't understand.**

17          MS. BRANCH:  Is there a question?

18     **Q.  (BY MR. HILTON)  Can you please elaborate on**

19 **your answer because I don't understand?**

20     A.  I would just say the loan generally applied to

21 our activities in the 2018 cycle.

22     **Q.  So --**

23     A.  There's not a specific expense.

24     **Q.  So it was a 16-million-dollar line of credit,**

25 **you said?**

1    A.   Yes.

2    Q.   And my understanding of how lines of credit

3  work -- maybe this one is different -- is that you have

4  to make the decision to draw down on that line of

5  credit, correct?

6    A.   Yes.

7    Q.   It's not like Bank of America just handed you

8  a check for $16 million; and it got thrown into a common

9  account, correct?

10    A.   Correct.

11    Q.   Okay.  So can you give me an example of when

12  the DCCC -- let's do it this way:  How about an example

13  from an expenditure that was made in Texas from this

14  line of credit?

15                MS. BRANCH:  Again, same objection on the

16  First Amendment.

17                But, Jacqui, you can talk about the 2018

18  spending in Texas at a high level.

19    A.   Sure.  Well, we, the DCCC, invested over

20  $6.7 million in Texas in the 2018 cycle.  Again, I can't

21  point to any expense that this loan went directly to

22  fund other than to say it allowed us to complete all of

23  our activities in 2018.

24    Q.   (BY MR. HILTON)  Who would know how this line

25  of credit was used?

1              MS. BRANCH:  Objection, First Amendment.

2              Do not answer is my instruction.

3       **Q.   (BY MR. HILTON)  Are you going to abide by**

4  **that instruction?**

5       A.   Yes, I am.

6       **Q.   You mentioned DCCC has a CFO?**

7       A.   Yes.

8       **Q.   What's that person's name?**

9              MS. BRANCH:  Objection, First Amendment.

10  This is -- some of this is public information, but I'm

11  just not sure what the purpose of this line of

12  questioning is.

13             MR. HILTON:  Ms. Branch, please limit

14  your speaking objections.

15      **Q.   (BY MR. HILTON)  I would like to know the name**

16  **of the CFO of the DCCC.**

17      A.   Jackie Forte-Mackay.

18      **Q.   Would she know how this expenditure was used,**

19  **how this line of credit was used?**

20             MS. BRANCH:  Objection, First Amendment.

21  Vague.  I'm going to instruct the witness not to answer.

22  Again, the strategic decisionmaking of the DCCC and use

23  of that loan is protected by the First Amendment; and

24  the witness is not going to answer further questions on

25  that.

1          So we can keep objecting and you can take

2    offense to my speaking objections, but I'm going to put

3    that on the record and I want that to be clear.  I also

4    want to make clear on the record that your tone earlier

5    with respect to my objection and then cutting me off has

6    been hostile.  So I want that to be reflected.

7          But, again, I'm going to continue to make

8    that objection; and we can kind of do that all day.  I

9    don't think it's directly relevant to the DCCC's

10   standing, but we can proceed.

11        MR. HILTON:  Well, I disagree with your

12   characterization of my tone; and I disagree that this

13   information is privileged.

14   **Q.   (BY MR. HILTON)  Ms. Newman, are you going to**

15   **follow your counsel's instructions not to answer?**

16   A.   I am.

17   **Q.   Okay.**

18        MR. HILTON:  And, Ms. Branch, again, I'm

19   not offended by your speaking objections; but they're

20   not permissible under the rules.  And so I'd just ask

21   you to limit them.

22        MS. BRANCH:  I'm trying to limit them as

23   much as possible, and I understand.  I don't want to

24   testify.  Jacqui's here to testify.

25        MR. HILTON:  Thank you.

1    Q    (BY MR. HILTON)  How much money did you say

2  was spent in Texas in the 2018 election cycle?

3    A.   Over 6.7 million.

4    Q.   Is that reflected on Exhibit 7?

5    A.   No.  No, because Exhibit 7 is showing our 2019

6  year-end report.

7    Q.   If we were to look at the same form for 2018,

8  the year-end, you know, report, would that show the

9  expenditures in Texas?

10          MS. BRANCH:  Objection.  Public.

11          But you can answer to the extent that you

12  know.  It's all published information.

13    A.   It would show all of the money that we

14  transferred to State Party committees and other

15  expenditures made at a general level.

16    Q.   (BY MR. HILTON)  Would I have to look at the

17  Schedule B to that 2018 year-end report to find the

18  disbursements related to Texas?

19    A.   Yes, and you would have to look at all of the

20  reports, probably.

21    Q.   Okay.  Did you look at any of those reports in

22  preparation for your deposition?

23    A.   I did not.

24    Q.   And I'm so sorry.  This is like the fourth

25  time I've asked you:  What was that number, again, that

1   was spent in the 2018 election cycle in Texas?

2          MS. BRANCH:  Objection, asked and

3   answered.

4          You may answer.

5      A.   It was over 6.7 million.

6      Q.   (BY MR. HILTON)  And what was that money used

7   for?

8      A.   It was used for persuasion and mobilization of

9   voters in support of our campaigns in Texas.

10     Q.   Voter persuasion and mobilization of

11  campaigns?

12          MS. BRANCH:  Objection, mischaracterizes

13  the testimony.

14          You may answer.

15     Q.   (BY MR. HILTON)  Voter persuasion and

16  mobilization of voters?

17     A.   Yes.

18     Q.   Is that what you said?

19     A.   Yes.

20     Q.   Is that what you said?  I just didn't hear it.

21     A.   Yes.

22     Q.   Anything else that it was used for?

23     A.   I think that encompasses a lot of activities,

24  but...

25     Q.   Are there any other types of activities that

1  that doesn't encompass?

2         MS. BRANCH:  Objection, vague.

3         You may answer.

4      A.   You know, again, I think everything is --

5  everything we do is to an end of mobilizing and

6  persuading voters.

7      Q    (BY MR. HILTON)  I'm going to ask you to pull

8  up Exhibit 1, which was sent out earlier.  It's the

9  Deposition Notice, and I'd like to turn to page 5 of the

10 Notice.

11     A.   Okay.

12     Q.   And I'm looking at Topic 4, section --

13 subsection (b).  And starting with the year 2014, what

14 were the total funds spent on voter persuasion efforts

15 in Texas during the year 2014?

16     A.   So I looked into our spending in the past

17 cycles and I can share with you what we've spent in

18 Texas, but this doesn't necessarily align with how we

19 track or know our spending.

20     Q.   How do you track your spending?

21     A.   It's more general than this because, again,

22 we're kind of thinking of everything in terms of

23 everything is a voter persuasion effort or GOTV effort.

24     Q.   So the entirety of the 6.8 million, or

25 whatever the number was that you spent in Texas in 2018,

DCCC - 4/28/2020

73

1   for example, that was all spent on voter persuasion and

2   Get Out the Vote?

3       A.   Yes.

4       Q.   What about voter registration efforts, can you

5   break that out?

6       A.   For past cycles I cannot.

7       Q.   That relates to 2014 through 2019, I suppose?

8       A.   Through 2018.  I can speak to our voter

9   registration efforts this cycle.

10      Q.   Well, let's leave this cycle aside for a

11  second; and let's stick on the past ones then.  So what

12  were the total funds spent on all activities in Texas in

13  the year 2014?

14      A.   It was just over $3.1 million.

15      Q.   And that was all spent on voter persuasion and

16  Get-Out-the-Vote efforts?

17      A.   Yes.

18      Q.   And you can't tell me what portion was spent

19  on voter registration efforts?

20      A.   Correct.

21           MS. BRANCH:  Objection.  She's asked and

22  answered.  To the extent that these questions call for

23  strategic information, I'm going to object on the basis

24  of the First Amendment.

25           But you may answer at a high level.

1      Q.   (BY MR. HILTON)  Are there any activities

2  other than voter persuasion, Get Out the Vote, or voter

3  registration activities on which DCCC spent money in

4  2014?

5      A.   In Texas?

6      Q.   In Texas.

7      A.   Not to my knowledge.

8      Q.   How about the year 2015, what was the total

9  amount of funds spent on all activities in Texas?

10              MS. BRANCH:  Same objection.

11              But you may answer at a high level.

12              First Amendment.

13              MR. HILTON:  I'm sorry.  What's the

14  objection?

15              MS. BRANCH:  First Amendment.

16              You may answer at a high level.

17              I think the witness --

18      Q.   (BY MR. HILTON)  The question is the total

19  funds spent on all activities in Texas in the year 2015.

20      A.   So we -- and I apologize if I didn't mention

21  this earlier.  We look at all of our spending on a

22  cyclical basis.  So the years 2015 and 2016 would be

23  grouped together.  So I don't know exactly how much we

24  spent in 2015.  I would actually guess it's little to

25  nothing, just because it's the off year; and most of our

1  spending is in the on year.  But I can tell you in 2016

2  the DCCC spent just over $6 million in Texas.

3      **Q.  And you did mention the two-year cyclical**

4  **nature earlier, and now it's starting to make a little**

5  **more sense.  What kind of activities and expenditures do**

6  **occur in the off year?**

7              MS. BRANCH:  Objection to the extent it

8  calls for First Amendment privileged information.

9              You may answer at a high level.

10     A.   It's generally limited; but if coordinated

11  campaigns are beginning to get set up, there might be

12  Coordinated Campaign expenses we're transferring to the

13  Party.  Voter registration may begin in an off year.

14  That is usually it.  The bulk of our spending takes

15  place in the on year, usually, as we get closer in to

16  the election.

17     **Q.  (BY MR. HILTON)  Are you withholding**

18  **information in your answer based on your instruction**

19  **from counsel?**

20             MS. BRANCH:  Objection.

21             You may answer.

22             MR. HILTON:  What's the basis?

23             MS. BRANCH:  Attorney-client privilege.

24  I mean, she answered on the record.  You asked her

25  earlier.

DCCC - 4/28/2020

1    Q.   (BY MR. HILTON)  Let me explain my question a

2    little more.  Your counsel instructed you -- objected on

3    the basis of a First Amendment privilege and stated that

4    you could answer to the extent it doesn't reveal

5    privileged information and that you could answer at a

6    high level.

7               MR. HILTON:  Is that a fair

8    characterization of your objection, Ms. Branch?

9               MS. BRANCH:  It is.

10   Q.   (BY MR. HILTON)  Okay.  You heard that

11   objection, Ms. Newman?

12   A.   I did.

13   Q.   And did your answer change on the basis of

14   that objection?

15   A.   It did not.

16   Q.   So you would have given me the same answer

17   regardless of whether your counsel objected?

18   A.   Yes.

19   Q.   Okay.  That's all I'm asking.  I just want to

20   know if there actually is something being withheld when

21   your counsel makes these objections, or not.  So that's

22   all I was trying to ask.  Thank you for clarifying that.

23               All right.  So let's go back to the

24   questions from the topics, and we're dealing with this

25   is in the two-year cycles; that's how y'all account for

1  it.  And so in the 2016 election cycle, you spent just

2  over 6 million on all activities in Texas.  Do I

3  remember that correctly?

4       A.   Yes, that's correct.

5       Q.   What was the total amount spent on voter

6  persuasion efforts in that election cycle?

7       A.   Similar to what I said before.  It is all kind

8  of part of the same bucket of voter persuasion/GOTV

9  efforts.

10      Q.   And how much was spent on voter registration

11 efforts?

12      A.   I can't speak to that.

13      Q.   Is that because you don't know?

14      A.   Yes.

15      Q.   And that's because DCCC doesn't track that

16 information?

17      A.   Yes, it has not been tracked like this in the

18 past.

19      Q.   Are there any other, you know, broad

20 categories or buckets of activities other than voter

21 persuasion, Get Out the Vote, and voter registration

22 efforts on which DCCC spent money in the 2016 election

23 cycle?

24      A.   Spent money in general or spent money in

25 Texas?

1      Q.   I'm sorry.  In Texas.

2      A.   No, it's just this.

3      Q.   Okay.  How about the 2018 election cycle?  So

4  I understand that to mean from the -- you know, the

5  presidential election in 2016 to the presidential

6  election in or -- I'm sorry -- for the federal election,

7  the congressional election in 2016, to the congressional

8  election in 2018.  That's how I'm thinking of the

9  two-year cycle.  Is that how y'all measure it as well?

10     A.   Yeah, more or less.  I mean, we kind of

11 started at January 1st.

12     Q.   Okay.  So it would be -- it's really the

13 calendar years 2017 and 2018?

14     A.   Yeah.

15     Q.   Okay.  So for that period, 2017 to 2018, or

16 the 2018 election cycle, what was the total amount spent

17 on all activities in Texas?

18     A.   It was over $6.7 million.

19     Q.   And how much of that was spent on voter

20 persuasion efforts?

21     A.   Again, it's -- that 6.7 covers all of our

22 voter persuasion and GOTV efforts in the 2018 cycle.

23     Q.   And how much of that just over 6.7 million, I

24 think you said, was spent on voter registration efforts?

25     A.   I don't know.

1    Q.    And that's because DCCC doesn't have that
2  information?
3    A.    Yeah.  And I'm not being deliberately vague
4  here.  It's most likely -- you know, we kind of see it
5  all as one bucket of money that is going towards this
6  cause; and we are, as mentioned before, transferring
7  money to the Texas Democratic Party for the Coordinated
8  Campaign where a lot of those voter registration efforts
9  are taking place.
10    Q.    And I'm not making a judgment as to whether
11  you should or should not have this information or how
12  you track it.  I understand, you know, how y'all view
13  it.  It seems like it's all one bucket of activity that
14  goes towards electing Democrats for the House, right?
15              MS. BRANCH:  Objection, mischaracterizes
16  the testimony.  I think you should let the witness
17  testify, so.
18    Q.    (BY MR. HILTON)  Is that a fair
19  characterization of your testimony?
20    A.    Yes, I think generally that's it.
21    Q.    Okay.  So I think we've finished 2018.
22              How about the current election cycle,
23  what's the total amount that's been spent so far in the
24  current election cycle?
25    A.    So, so far this cycle, we've spent -- and you

 1  can see this in -- I think, it's Exhibit 8, our

 2  transfers to the Texas Democratic Party.  We've

 3  transferred over $145,000 to the Texas Democratic Party.

 4  The DCCC has spent directly in Texas over $1.1 million,

 5  and I believe over $550,000 of that is directly related

 6  to voter registration in Texas.

 7      **Q.   $550,000 of what has been spent so far is**

 8  **related to voter registration?**

 9      A.   Yes.

10      **Q.   And how do you know that?**

11      A.   Because we have been working with the Texas

12  Democratic Party on voter registration, and we have --

13  directly, the DCCC has engaged in voter registration on

14  the ground.  And I believe there -- I believe we have

15  produced documents showing that commitment, but...

16      **Q.   So I guess my question is:  In previous**

17  **election cycles, DCCC can't separate out exactly what**

18  **was spent on voter registration; but for the current**

19  **election cycle, you can.  And I'm trying to understand**

20  **why that's the case.**

21      A.   Sure.  Well, I mean, one, I think there is a

22  large voter registration effort in Texas right now in

23  particular; and so it's easy for us to identify that.

24  You know, as I mentioned earlier, we have a lot of

25  turnover each cycle; and so a lot of the people behind

1  spending decisions from past cycles aren't here to speak

2  to how we spent money in the past.  And, you know, I've

3  directly been involved with some of these transactions

4  and expenses, so I can speak to them.

5      Q.   And how are you able to get such a precise

6  number for this year's expenditures on voter

7  registration efforts?

8      A.   On the voter registration efforts?

9      Q.   Yes.

10     A.   Well, the 145K that we have transferred to the

11 Texas Democratic Party to date, that has all been to the

12 Coordinated Campaign to support voter registration and

13 then what we -- what I know we have spent on voter

14 registration.

15     Q.   Do you make any other transfers to any

16 other -- does DCCC make any other transfers to any other

17 groups for voter registration activities?

18     A.   To other state parties?

19     Q.   Any other groups in Texas.  I'm sorry.  And

20 I'm doing a poor job of clarifying that, so I appreciate

21 you noting that.  I'm trying to ask about activities in

22 Texas.

23     A.   To my knowledge, we have transferred the money

24 to the Texas Democratic Party's Coordinated Campaign for

25 voter registration and, again, we have engaged a vendor

1  ourselves to do voter registration efforts on the ground

2  in Texas.

3      Q.   I think that was mentioned in your colleague's

4  Declaration, the vendor, if I remember that correctly.

5  That's Exhibit 3.

6      A.   Yes.

7      Q.   And it looks like that's Paragraph 7 of the

8  Declaration in Exhibit 3?

9      A.   Yes.

10     Q.   Agreement for nearly $400,000 for a consultant

11  to provide voter registration services in Texas

12  Congressional District 23.   That's what you're referring

13  to?

14     A.   Yes.

15     Q.   And so what services is that consultant going

16  to provide?

17              MS. BRANCH:   Objection to the extent that

18  this calls for strategic party information.

19              You may answer at a high level.

20     A.   They help us go through our process of

21  training staff on the ground to try to learn how to

22  register people to vote in Texas.

23     Q.   (BY MR. HILTON)  And what does that training

24  look like?

25     A.   I am not very familiar on the details, but I

1    know that all -- anyone who is registering voters in

2    Texas needs to be trained and deputized in order to do

3    so.

4        **Q.   And who are the staff that you are training,**

5    **like staff of whom?**

6        A.   So it depends, I think.  You know, we hired a

7    consultant who ran some of these efforts that's laid out

8    in Exhibit 3.  In that case the consultant has employees

9    who are helping this effort in Texas.

10             We have -- with the money that we have

11   sent to the Texas Democratic Party, I believe at least

12   two people have been hired with the express purpose of

13   assisting voter registration efforts.

14             And then we also have staff on the ground

15   who work directly for the DCCC whose roles involve a lot

16   of community engagement and help with voter

17   registration.

18       **Q.   Do you know what -- so community engagement**

19   **and voter registration, are those two different things?**

20       A.   I think so.  I think maybe community

21   engagement is an overarching bucket that could involve

22   voter registration.

23       **Q.   What are the other types of buckets of**

24   **activities that your direct staff in Texas are engaging**

25   **in this cycle?**

DCCC - 4/28/2020

84

 1      A.   They're organizing events.  They are meeting

 2  with our constituents in the districts.  They are

 3  following events of our challengers, as well, and

 4  reporting back to the team on what's happening on the

 5  ground in Texas.

 6      Q.   Anything else?

 7      A.   I think that's the bulk of it.

 8      Q.   Do you know what percentage of their time is

 9  devoted to voter registration efforts?

10      A.   I don't.

11      Q.   Does anyone at DCCC?

12      A.   I think our field team would.  I also think it

13  probably shifts throughout the cycle.  You know, early

14  on, when there is time to register voters, that is a

15  bigger focus.  I also think that we would be doing a lot

16  of voter registration right now if we were not in the

17  current situation we are in, speaking from our homes.

18      Q.   Yeah.  Yeah, I can only imagine how much that

19  has kind of thrown a wrench in everything.  And so,

20  yeah.

21           Well, let me ask you this:  Turning back

22  to Exhibit 3, Paragraph 6, the last sentence of that,

23  the second sentence of that paragraph, it says, "DCCC

24  uses voter registration not only to expand the pool of

25  individuals who are eligible to vote for Democratic

 1  **candidates but also to have important conversations with**

 2  **people about the importance of voting and important**

 3  **causes to the Democratic Party." Did I read that**

 4  **correctly?**

 5      A.   Yes.

 6      **Q.   Can you explain what is meant by this?**

 7      A.   Sure.  I think in the process of registering

 8  people to vote, people who are not currently registered

 9  or participating in the voting process, it allows you to

10  start a dialogue about why it's important for people to

11  register and to show up and make a plan about voting on

12  Election Day, which is what getting out the vote is all

13  about.

14      **Q.   And how about important causes to the**

15  **Democratic Party?  How does that piece of it play into**

16  **these voter registration efforts?**

17      A.   I think that usually the important causes tie

18  back to what somebody's motivation might be to vote.

19      **Q.   How do all of these purposes get accomplished**

20  **when you're engaging in efforts to register voters?**

21      A.   I'm sorry.  Could you clarify the question?

22      **Q.   Well, it seems to me there's a few different**

23  **purposes to DCCC's voter registration efforts, as**

24  **explained in Paragraph 6 of Exhibit 3.  And as you're**

25  **explaining to me now, it's to expand the pool of**

1   individuals, to have important conversations with people

2   about the importance of voting, and conversations about

3   important causes to the Democratic Party.  I'm trying to

4   understand how all of those purposes are accomplished.

5   So how do the voter registration activities address all

6   of those purposes?  What do you do to achieve those

7   purposes in the context of your voter registration

8   efforts?

9        A.   I think that this is all part of one

10  conversation that naturally flows together where, you

11  know, it might look something like, "Hey, are you

12  registered to vote?  Would you like to register to vote?

13  And do you know there's an election coming in November?

14  If you register to vote now, you can participate in that

15  or if there's a primary coming up, you can participate

16  in that" and why it might be important to a voter to

17  participate in that election and register at this time.

18  I really think of it as all one conversation, not

19  necessarily three different or a few different goals.

20       Q.   Okay.  So this is -- all of these things are

21  part of every conversation with someone who you're

22  trying to engage with; is that what you're saying?

23       A.   Yes.

24       Q.   Okay.  That is helpful.  Thank you for

25  clarifying that.

1          **Is there -- sorry.  I have a few**
2  **follow-up questions on this, so I was trying to organize**
3  **my thoughts.  How does DCCC track the success of these**
4  **kinds of voter registration efforts?**
5          MS. BRANCH:  Object to the extent this
6  calls for strategic information.
7          But you may answer at a high level.
8      A.   We certainly want to know how many voters
9  we've registered.
10     **Q    (BY MR. HILTON)  So number of voters who get**
11 **registered, how is that tracked?**
12     A.   I am not familiar with the specifics, but
13 usually the people who are tasked with registering
14 voters report back the top-line numbers.
15     **Q.   The top-line number being the total number of**
16 **people who are registered?**
17     A.   Yes.
18     **Q.   Is that tracked for the whole cycle or by**
19 **activity or by location?  What are some of the ways in**
20 **which that's broken down?**
21     A.   Yeah --
22          MS. BRANCH:  Again, I'm going to assert
23 the same objection on First Amendment grounds.
24          You can answer at a high level.
25     A.   I think it depends based on who's in charge of

1  the program, but it could be any of those things.  It

2  could be just number of people or by the specific

3  activity, like, "This is how many people got registered

4  today at this event" or in a place.

5       Q    (BY MR. HILTON)  Are there any other ways in

6  which it's tracked?

7       A.   Not that I can think of.

8       Q.   Can DCCC apportion a cost to register each new

9  voter?

10      A.   I guess it's possible.

11      Q.   Is that something that DCCC has already done?

12      A.   No.

13      Q.   That's not data that DCCC has?

14      A.   Correct.

15      Q.   And when you said it was possible, what did

16  you mean by that?

17      A.   I mean, I think you could come up with some

18  metric of how much money we are spending as it relates

19  to how many people we are able to register to vote.

20      Q.   But DCCC does not have any such metric

21  currently?

22           MS. BRANCH:  Objection, asked and

23  answered.

24      A.   No, not to my knowledge.

25      Q    (BY MR. HILTON)  Has DCCC had a metric like

1  that at any time from the beginning of 2014 to the

2  present?

3      A.   Not to my knowledge.

4      Q.   How does the DCCC decide which voters to

5  target?

6              MS. BRANCH:   Objection, First Amendment

7  privilege.

8              You can answer at a high level to the

9  extent you can.   We can't disclose targeting and

10  strategic information.

11      A.   There are ways that we're able to identify

12  voters who are likely to support Democratic candidates

13  or vote for Democrats.

14      Q.   (BY MR. HILTON)   So that's the target group,

15  is folks you expect to vote Democratic?

16      A.   Yes.

17      Q.   How does DCCC decide which types of voter

18  registration efforts to pursue?

19              MS. BRANCH:   Again, same objection.

20              You can answer at a high level.

21              And that's to First Amendment, to

22  clarify.

23      A.   I think it's probably a variety of factors

24  based on where our targeted races are as far as priority

25  districts for the DCCC and where we are able to make an

1  effort and a successful activity out of registering

2  voters.

3      Q.   (BY MR. HILTON)  Does DCCC adjust its

4  activities based on a success rate?

5      A.   Yeah.  I want to be clear that I don't know if

6  there's necessarily, like, a success rate or a

7  definition; but, you know, we certainly aren't going to

8  engage in efforts where -- in voter registration efforts

9  where it's not possible because of, like, geographic or

10  logistics.

11      Q.   Who makes those kinds of decisions?

12          MS. BRANCH:  Objection, First Amendment

13  privilege.  I'm going to instruct the witness not to

14  answer that.

15          MR. HILTON:  And so to be clear, my

16  question is:  Who at the DCCC decides whether to adjust

17  voter registration activities and how they do that.  And

18  you're instructing the witness not to answer?

19          MS. BRANCH:  I mean, I think that you

20  have that information.  If you want to pursue a high-

21  level line of questioning, I'm okay with that; but my --

22  what I think we're doing is going into the strategy of

23  how the D-Trip targets voters for voter registration.

24  And that is protected by the First Amendment.

25          So, Jacqui, if you want to answer that

1   question, that's fine.

2              And maybe we can have the court reporter

3   read that back; but beyond that, I'm going to object.

4              MR. HILTON:  I'll restate my question.

5   **Q.   (BY MR. HILTON) Who at DCCC adjusts which**

6   **voter registration efforts that the group is going to**

7   **engage in?**

8      A.   I think that a lot of that responsibility

9   falls on the National Field Director.

10     **Q.   And how are those decisions made?**

11             MS. BRANCH:  Objection.  I'm going to

12  instruct the witness not to answer.

13             Is now maybe a good time to break for

14  lunch?  I don't mean to interrupt.

15             MR. HILTON:  Well, I think now is a good

16  time to take a break.  I need, like, ten minutes; but if

17  y'all want to take longer, that's fine, whatever y'all

18  want to do.

19             MS. BRANCH:  Can we do -- well, can I ask

20  you how long you may have after lunch, if you have a

21  rough estimate?

22             MR. HILTON:  I don't know.  I need the

23  ten minutes to figure out what I'm going to do next.

24             MS. BRANCH:  Okay.  Well, I think we

25  need -- Jacqui, is 30, 45 minutes good for a you?

```
1                    THE WITNESS:  Yeah, 30 minutes should be
2   fine for me.
3                    MS. BRANCH:  Okay.  That will be 1:50.
4                    MR. HILTON:  All right.  We can go off
5   the record.
6                    THE REPORTER:  Going off the record at
7   12:29 p.m.
8                    (Off the record from 12:30 to 1:05 p.m.)
9                    THE REPORTER:  We're back on the record
10  at 1:05 p.m.
11      Q    (BY MR. HILTON)  All right.  Ms. Newman,
12  before we broke we were talking about voter registration
13  activities and expenditures.  And we, I think, had
14  covered most of what I wanted to cover; but I just have
15  a few -- couple of things to make sure I'm tying up all
16  that that I want to discuss with you today.
17                   So for the 2018 cycle, which is the cycle
18  where DCCC has some more insight into specific
19  expenditures on voter registration, I just want to make
20  sure that I have everything that you've told me so far
21  correct.  You've given money to -- DCCC has given money
22  to the Texas Democratic Party that's earmarked for voter
23  registration.  DCCC has hired a vendor to help with
24  voter registration efforts, which we discussed earlier
25  in connection with the Declaration, which I think is
```

1  **Exhibit 3.  Is there -- has anything else been spent**

2  **that's been earmarked for voter registration efforts for**

3  **the 2018 election?**

4      A.  Sorry.  To be clear, I think -- I think the

5  money we are talking about right now is for the current

6  cycle, the 2020 cycle.

7      **Q.  Sorry.  Yes, I misspoke.  For the current**

8  **cycle, the 2020 cycle.  So the TDP money that is**

9  **earmarked and then the vendor for the 2020 cycle.  Is**

10  **there anything else at this time?**

11      A.  Specifically on voter registration at this

12  time, I don't believe there is more money I can

13  identify.  I mean, I think I mentioned earlier we've

14  spent up to -- or a little bit over 1.1 million in Texas

15  alone; and that includes our offices and our staff on

16  the ground.  And, of course, you know, our staff is

17  engaging in this, you know, community engagement; and

18  they are out talking to voters and possibly registering

19  voters as part of their daily activities.  And that is,

20  you know, like, wrapped up in their salary.  It's not

21  necessarily identified in the other money I identified

22  for voter registration.

23              And I -- you know, I would say that we

24  are still several months out from the election; and we

25  will continue to make spending decisions as things

1   develop and get closer and that some of the difficulties

2   we face just around, you know, confusion that Texas

3   voters might have around changing their address or

4   renewing their information online and not being able to

5   simultaneously register to vote will inevitably lead us

6   to have to spend more money on voter registration and

7   more time making sure we are educating voters, that they

8   know that they might not have been registered to vote or

9   had their address updated if they changed any

10  information online through the DPS website.

11       Q.   (Inaudible.)

12            THE REPORTER:  I'm sorry.  Something's

13  happened to your audio.

14            MR. HILTON:  (Inaudible.)  Better?

15            THE REPORTER:  Not really.

16            THE VIDEOGRAPHER:  Something has gone

17  wrong with your audio.

18            MR. HILTON:  (Inaudible.)

19            THE VIDEOGRAPHER:  It's a bandwidth

20  issue.  Yeah, it sounds like you're having bandwidth

21  issues.  The audio seems to be cutting out, Chris.

22            MR. HILTON:  Yeah, I don't know.  Nothing

23  has changed on my end (echoing audio.)

24            THE VIDEOGRAPHER:  We had the same

25  problem the other day with Mr. Geise.  Are you using a

1  headset?

2            MR. HILTON:  I am not (echoing audio.)

3            THE VIDEOGRAPHER:  So you're just using

4  your laptop audio?

5            MR. HILTON:  Yes, sir.  Should I drop off

6  and reconnect (echoing audio)?

7            THE VIDEOGRAPHER:  Let's try that, yeah,

8  just kind of an if you restarted your computer type of

9  situation.  Just log out and then log back in and see if

10  that doesn't correct the issue.

11            THE REPORTER:  I'm going to take us off

12  the record at 1:10 p.m.

13            (Off the record from 1:10 to 1:12 p.m.)

14            THE REPORTER:  We are back on the record

15  at 1:12 p.m.

16       **Q    (BY MR. HILTON)  Ms. Newman, how much more**

17  **time and money will you have to spend?**

18       A.  I think it's hard to say at this point as,

19  again, we're several months out from the election.  I

20  also think, you know, the current COVID-19 crisis we're

21  in may have an outside impact on this because fewer

22  people will be able to go into DPS in person and change

23  their information and update their voter registration.

24            So I think it's too far out to put a

25  number on it; but given that we've already invested, you

1  know, over a half a million dollars to date, you know, I

2  do not think that it is a small -- small investment.

3  **Q.   How much more do you plan to spend on voter**

4  **registration efforts in Texas?**

5       MS. BRANCH:  Objection to the extent that

6  this calls for strategic information.

7       If you know, you can answer.

8  A.   I -- you know, again, I don't know if that has

9  been decided yet.  I think it will depend as things

10  shape up with the current environment; and as we get

11  closer to the election, those expenditures are usually

12  decided.

13  **Q.   (BY MR. HILTON)  How much money did DCCC spend**

14  **on voter registration efforts in Texas for this election**

15  **cycle prior to January 21st, 2020?**

16  A.   At least 40, $45,000.  $45,630.

17  **Q.   That was the transfer to TDP that we looked at**

18  **earlier on one of the exhibits?**

19  A.   Yes.  And, you know, I would ad that we've had

20  our staff on the ground in Texas in 2019.  So they were

21  beginning to engage in these activities.

22  **Q.   And I appreciate you mentioning that when I**

23  **was trying to get my arms around all the voter**

24  **registration activities for the staff.  And we talked**

25  **about earlier you couldn't really break down what**

1  percentage of their duties were related to voter

2  registration.  Am I remembering that correctly?

3      A.   Yes, that's correct.

4      Q.   Okay.  Are there any other activities for

5  this -- or expenditures of funds for the 2020 election

6  cycle that we haven't touched on yet?

7           MS. BRANCH:  Objection, vague.  Is that

8  related to voter registration or just expenditures

9  generally?

10           MR. HILTON:  I'm sorry.  I thought I said

11  voter registration.

12      A.   No, I think we've basically covered it.

13      Q.   (BY MR. HILTON)  How much of that money has

14  gone to try to register voters who change their address

15  or renew their driver's license online with DPS?

16      A.   I don't know if there's a specific dollar

17  amount associated with that.  I think that's just part

18  of our ongoing voter education effort to make sure when

19  we're talking to voters, "Are you registered to vote?"

20  Making sure they are aware that if they've moved

21  recently, depending on how they conducted that

22  transaction online, that if it was online versus in

23  person, that their information is treated differently

24  than going in person to change that and that they might

25  not, in fact, be registered to vote at their current

1  address.

2      Q.   Does DCCC keep track of the number of people

3  who it talks to who change their address or renew their

4  driver's license online with DPS?

5              MS. BRANCH:  Objection to the extent that

6  this calls for strategic information.

7              But you may answer.

8      A.   Not that I'm aware of.

9      Q    (BY MR. HILTON)  Do you have any -- does DCCC

10  have any training materials that reflect those kinds of

11  conversations that you were just referring to?

12              MS. BRANCH:  Objection, vague, First

13  Amendment privilege.

14      A.   Not that I'm aware of.  I think, you know, the

15  information required is part of the reason why we engage

16  a consultant on the ground to run some of this.  You

17  know, it's difficult to register voters in Texas; and it

18  requires a high level of expertise.  I think a lot of

19  these activities also go through the Texas Democratic

20  Party for these reasons.

21      Q.   (BY MR. HILTON)  Okay.  So leaving aside what

22  the Texas Democratic Party might have, DCCC doesn't have

23  any training materials reflecting how to have these

24  conversations beyond what a vendor might have?

25              MS. BRANCH:  Objection.  I think that's

1    been asked and answered.  I also think that it calls for

2    internal materials in the content of what's reflected in

3    those.  So I'm going to instruct the witness not to

4    answer that question.

5        **Q.   (BY MR. HILTON)  So my question is:  Does DCCC**

6    **have any materials that reflect training with respect to**

7    **how to have these kinds of conversations for voter**

8    **registration efforts?**

9        A.   I don't believe we have any public materials.

10       **Q.   Do you have any non-public materials?**

11            MS. BRANCH:  Again, I maintain the

12   objection and instruct the witness not to answer.

13            MR. HILTON:  Okay.  So you won't allow

14   the witness to answer as to the existence of such

15   materials?

16            MS. BRANCH:  She's already answered the

17   question.

18       **Q.   (BY MR. HILTON)  Do such materials exist,**

19   **Ms. Newman?**

20       A.   I'm not going to answer.

21       **Q.   And is that at counsel's instruction?**

22       A.   Yes.

23       **Q.   Okay.  And no such materials were produced to**

24   **us?**

25       A.   Correct.