# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

|  |  |
|---|---|
| JARROD STRINGER, et al.<br><br>               Plaintiffs,<br><br>v.<br><br>RUTH HUGHS, in her official capacity as Texas Secretary of State and STEVEN C. MCCRAW, in his official capacity as Director of the Texas Department of Public Safety,<br><br><br><br>               Defendants. | Civil Action Case No. 5:20-cv-00046-OLG<br><br>**ORAL ARGUMENT REQUESTED** |

## TEXAS DEMOCRATIC PARTY, DSCC, AND DCCC'S CONSOLIDATED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ............................................................................................................................. 2

II.      STANDARD OF REVIEW ........................................................................................ 2

III.     INTERVENORS HAVE STANDING. ...................................................................... 3

        A.     Intervenors must divert resources to counteract Defendants' conduct. ............... 3

        B.     The harm to Intervenors measures more than an "identifiable trifle." ................ 8

        C.     Intervenors engaged in voter registration activities prior to intervening in this lawsuit. ....................................................................................................... 11

        D.     Defendants' conduct injures Intervenors' members. .......................................... 11

        E.     Defendants' conduct harms the electoral prospects of Intervenors' candidates. ........................................................................................................ 16

        F.     Defendants' conduct caused Intervenors' injuries. ........................................... 18

        G.     Intervenors have statutory standing. ................................................................. 19

IV.     The Doctrine Of Collateral Estoppel Precludes Defendants From Relitigating The Merits Of This Case. ........................................................................................ 19

V.      Intervenors Are Entitled To Summary Judgment For The Reasons Detailed In Plaintiffs' Motion For Summary Judgment In *Stringer I*. ................................... 21

        A.     The *Anderson/Burdick* test applies to the equal protection claims here, and does not require evidence of intentional discrimination. ..................................... 21

        B.     Defendants cannot satisfy the *Anderson-Burdick* test. ...................................... 22

VI.    THE RELIEF REQUESTED BY INTERVENORS IS WORKABLE. ......................... 25

CONCLUSION ........................................................................................................................ 25

## TABLE OF AUTHORITIES

CASES                                                          PAGE(S)

*ACORN v. Fowler,*
   178 F.3d 350 (5th Cir. 1999) ................................................................7

*Allee v. Medrano,*
   416 U.S. 802 (1974)................................................................................19

*Anderson v. Celebrezze,*
   460 U.S. 780 (1983)..........................................................................21, 22

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
   627 F.3d 547 (5th Cir. 2010) ..............................................................19

*Bennett v. Spear,*
   520 U.S. 154 (1997)................................................................................18

*Burdick v. Takushi,*
   504 U.S. 428 (1992)..........................................................................21, 22

*California Democratic Party v. Jones,*
   530 U.S. 567 (2000)................................................................................16

*Church of Scientology of Cal. v. Cazares,*
   638 F.2d 1272 (5th Cir. 1981) ..............................................................19

*Cramer v. Skinner,*
   931 F.2d 1020 (5th Cir. 1991) ..........................................................3, 15

*Crawford v. Marion Cty. Election Bd.,*
   472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) ................8, 14

*DeLeon v. Lloyd's London, Certain Underwriters,*
   259 F.3d 344 (5th Cir. 2001) ..............................................................20

*Democratic Nat'l Comm. v. Bostelmann,*
   No. 20-CV-249-WMC, 2020 WL 1320819 (W.D. Wis. Mar. 20, 2020) ..............................14

*Democratic Nat'l Comm. v. Hobbs,*
   948 F.3d 989 (9th Cir. 2020) (en banc) ..............................................24

*Democratic Nat'l Comm. v. Reagan,*
   329 F. Supp. 3d 824 (D. Ariz. 2018), *aff'd*, 904 F.3d 686 (9th Cir. 2018),
   *reh'g en banc granted*, 911 F.3d 942 (9th Cir. 2019)..................4, 12, 14

*Democratic Party of Ga., Inc. v. Crittenden,*
   347 F. Supp. 3d 1324 (N.D. Ga. 2018) ................................................4

## TABLE OF AUTHORITIES

CASES                                                                          PAGE(S)

*Fulani v. Krivanek*,
   973 F.2d 1539 (11th Cir. 1992) ................................................................22

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ..........................................................................18

*Greater New Orleans Fair Hous. Action Ctr. v. Kelly*,
   364 F. Supp. 3d 635 (E.D. La. 2019) ........................................................9

*Green Party of Tenn. v. Hargett*,
   767 F.3d 533 (6th Cir. 2014) ..................................................................17

*Harper v. Va. State Bd. of Elections*,
   383 U.S. 663 (1966)................................................................................22

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)..................................................................................8

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977)..........................................................................12, 13

*Jacobson v. Fla Sec'y of State*,
   957 F.3d 1193 (11th Cir. 2020) ..............................................................18

*Jornaleros de Las Palmas v. City of League City*,
   945 F. Supp. 2d 779 (S.D. Tex. 2013) ....................................................19

*LaRoque v. Holder*,
   650 F.3d 777 (D.C. Cir. 2011).................................................................17

*Lee v. Va. State Bd. of Elections*,
   188 F. Supp. 3d 577 (E.D. Va. 2016), *aff'd*, 843 F.3d 592 (4th Cir. 2016)............................4

*Mecinas v. Hobbs*,
   No. 2:19-cv-5547-DJH (D. Ariz. June 25, 2020) ............................12, 13

*Nat'l Council of La Raza v. Cegavske*,
   800 F.3d 1032 (9th Cir. 2015) ................................................................16

*Northshore Dev., Inc. v. Lee*,
   835 F.2d 580 (5th Cir. 1988) ..................................................................23

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) ..................................................................22

## TABLE OF AUTHORITIES

CASES                                                                                PAGE(S)

*OCA-Greater Houston v. Texas*,
   No. 1:15-CV-00679-RP, 2016 WL 9651777 (W.D. Tex. Aug. 12, 2016), *aff'd*,
   867 F.3d 604 (5th Cir. 2017) .......................................................................................8

*Ohio Org. Collaborative v. Husted*,
   189 F. Supp. 3d 708 (S.D. Ohio 2016), *rev'd sub nom. on other grounds*, *Ohio
   Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016) .............................................4, 14

*Owen v. Mulligan*,
   640 F.2d 1130 (9th Cir. 1981) ............................................................................17

*Pavek v. Simon*,
   No. 19-cv-3000, 2020 WL 3183249 .................................................................10, 18

*People First of Ala. v. Sec'y of State*,
   No. 20-12184, slip op. (11th Cir. June 25, 2020) .......................................4, 9, 24

*Republican Party of Ark. v. Faulkner Co.*,
   49 F.3d 1289 (8th Cir. 1995) ...............................................................................21

*Rogers v. Corbett*,
   468 F.3d 188 (3rd Cir. 2006) ..............................................................................21

*Rosen v. Brown*,
   970 F.2d 169 (6th Cir. 1992) ...............................................................................22

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
   547 U.S. 47 (2006) ................................................................................................3

*Sanchez v. R.G.L.*,
   761 F.3d 495 (5th Cir. 2014) ...............................................................................19

*Sandusky Cty. Democratic Party v. Blackwell*,
   387 F.3d 565 (6th Cir. 2004) ...............................................................................14

*Schulz v. Williams*,
   44 F.3d 48 (2d Cir. 1994) ....................................................................................17

*Smith v. Boyle*,
   144 F.3d 1060 (7th Cir. 1998) ............................................................................17

*Stringer v. Pablos*,
   320 F. Supp. 3d 862 (W.D. Tex. 2018).......................................................... passim

*Stringer v. Whitley*,
   942 F.3d 715 (5th Cir. 2019) (Ho, J., concurring) ..............................................23

# TABLE OF AUTHORITIES

**CASES**                                                                                                          **PAGE(S)**

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)........................................................................................................11

*Tashjian v. Republican Party of Conn.*,
    479 U.S. 208 (1986)........................................................................................................16

*Tex. Democratic Party v. Benkiser*,
    459 F.3d 582 (5th Cir. 2006) ........................................................................................16

*Texas v. United States*,
    945 F.3d 355 (5th Cir. 2019) ..........................................................................................3

*The Wis. Assembly Democratic Campaign Comm. v. Gill*,
    No. 3:18-cv-763-JPD (W.D. Wis. Sept. 14, 2018) ..................................................18

*United States v. Shanbaum*,
    10 F.3d 305 (5th Cir. 1994) ..........................................................................................21

*United States v. Students Challenging Regulatory Agency Procedures*,
    412 U.S. 669 (1973).........................................................................................................9

*Zimmerman v. City of Austin, Tex.*,
    881 F.3d 378 (5th Cir. 2018) ..........................................................................................7

**STATUTES & OTHER AUTHORITIES**

Fed R. Evid. 801(2)........................................................................................................24

Fed. R. Civ. P. 56(a) ........................................................................................................2

Tex. Elec. Code § 162.003............................................................................................13

## INTRODUCTION

The Texas Secretary of State (the "Secretary") and Department of Public Safety ("DPS") (collectively, "Defendants"), continue to flout the law by failing to offer voters the opportunity to simultaneously update their voter registration when they update their driver's license information online. By contrast, voters who update driver's license information in person or by mail are offered simultaneous voter registration. In the 2018 election, an untold number of Texas voters were denied the right to vote as a result of Defendants' conduct, including the individual plaintiffs. The Texas Democratic Party ("TDP"), DCCC, and DSCC (collectively, "Intervenors"), intervened in this lawsuit to stop Defendants from disenfranchising more voters in the 2020 elections.

Defendants claim their differential treatment is rooted in Texas law, because they claim the Texas Election Code requires a handwritten signature for voter registration applications, and thus, the use of previously captured electronic signatures for online transactions is prohibited. In fact, however, the Secretary processes thousands of in-person and mail voter registration applications each year using previously captured electronic signatures, and there is no valid reason why online voter registration applications must be treated any differently.

Now forced to answer for their actions a second time, Defendants make several meritless arguments contending that they cannot be mandated by this Court to comply with the law because *neither the five plaintiffs nor the three intervenors* in this lawsuit have standing. *See* ECF No. 78 at 6-14. Under Defendants' unsupported and extreme theory of standing, the individual voters in this lawsuit essentially cannot bring their claims unless they remain unregistered to vote at their new addresses and suffer the ultimate harm of disenfranchisement. And organizations like Intervenors—who divert resources from other activities to counteract the harm caused by Defendants; who represent the interests of and associate with individual voters who have been

disenfranchised as a result of Defendants' conduct; and who suffer harm to their candidates' electoral prospects because Defendants' conduct causes the disenfranchisement of their voter members who would vote for Democratic candidates at the polls but for Defendants' conduct—lack standing because they already engage in voter registration activities and generally target their efforts at registering Democratic voters. Finally, according to Defendants, even if Intervenors did have standing, the harm suffered by Intervenors could not be attributed to Defendants, because the disenfranchisement of Intervenors' voters is actually the voters' fault. *Id.* at 11.

Fortunately, the wheels of justice do not operate this way. As discussed herein and in previous briefing, the record reflects that Intervenors have standing on numerous independent bases. Moreover, Defendants' conduct—which this Court previously found violates equal protection—is admittedly unchanged. Defendants offer no new reasons why this Court should suddenly reverse course and find their conduct constitutional. This Court should deny Defendants' Cross Motion for Summary Judgment and grant Intervenors' Motion for Summary Judgment.

## ARGUMENT

### I.      Standard of Review

The record is replete with evidence demonstrating Intervenors' standing and entitling them to summary judgment. As noted below, *infra* Sections III and IV, Defendants do not dispute that the facts are unchanged from this Court's decision in *Stringer v. Pablos*, 320 F. Supp. 3d 862 (W.D. Tex. 2018) ("*Stringer I*"), so it is unclear how there can be a *dispute* of material fact related to their violation of the Equal Protection Clause. *See* Fed. R. Civ. P. 56(a) (stating summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"). As to standing, Intervenors have previously demonstrated that they have standing to pursue this action, but in response to Defendants' newest attempt in their motion for summary judgment to draw Intervenors' standing

into question, Intervenors supplement the already extensive record in this regard with additional affidavits to provide further support for their standing. *See Cramer v. Skinner*, 931 F.2d 1020, 1025 (5th Cir. 1991) ("When the defendant moves for summary judgment because of lack of standing, however, the plaintiff must submit affidavits and comparable evidence that indicate that a genuine issue of fact exists on the standing issue."). It is, of course, axiomatic that "one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc*., 547 U.S. 47, 52 n.2 (2006); *Texas v. United States*, 945 F.3d 355, 377–78 (5th Cir. 2019) (internal quotation and citation omitted).

As set forth in their Motion for Summary Judgment, each Intervenor possesses standing based on three separate and distinct types of injury-in-fact, including (1) diversion of organizational resources to counteract Defendants' conduct; (2) harm (often in the form of total disenfranchisement) to the individual voters each organization represents; and (3) harm to the electoral prospects of Intervenors' candidates. *See* ECF No. 77 at 7-14. Throughout their briefing, Defendants blatantly mischaracterize and misrepresent the record, and assert supposed deficiencies about Intervenors' evidence that have no legal bearing on their standing. Intervenors summarize the legal arguments and evidence that demonstrates their standing below.

## II.   Intervenors have standing.

### A.   Intervenors must divert resources to counteract Defendants' conduct.

Defendants argue that because Intervenors' voter registration activities are often targeted at Democratic voters, they lack standing. Respectfully, this argument is nonsensical, and it contradicts the reality that courts across the country have held that political parties suffer organizational harm when they divert resources to counteract a state's unlawful voting practices. *See, e.g.*, *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018), *aff'd*,

904 F.3d 686 (9th Cir. 2018), *reh'g en banc granted*, 911 F.3d 942 (9th Cir. 2019) (finding plaintiffs DNC, DSCC, and Arizona Democratic Party have direct organizational standing to challenge certain election laws because those laws will require them "to retool their GOTV strategies and divert more resources to ensure that low-efficacy voters are returning their early mail ballots . . . [and] to educate their voters" on those laws); *Lee v. Va. State Bd. of Elections*, 188 F. Supp. 3d 577, 584 (E.D. Va. 2016), *aff'd*, 843 F.3d 592 (4th Cir. 2016) (finding Democratic Party of Virginia "has shown sufficient injury primarily in the form of diversion of time, talent, and resources to educate their voters and implement the requirements of the Virginia voter identification law"); *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1337 (N.D. Ga. 2018) (holding Democratic Party of Georgia's "diversion of resources from preparation for the upcoming runoff elections to assisting individuals impacted by the handling of absentee and provisional ballots is all the injury needed to meet the injury-in-fact requirement"); *Ohio Org. Collaborative v. Husted*, 189 F. Supp. 3d 708, 726 (S.D. Ohio 2016), *rev'd sub nom. on other grounds*, *Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016) (holding Ohio Democratic Party had shown injury-in-fact because "the challenged provisions will force [it] to divert resources from ensuring their members and constituents vote to counteracting the negative effects of the challenged provisions."). The fact that Democratic political party committees focus primarily on registering Democratic voters should surprise no one. But Democratic voters are not immune to the State's unconstitutional conduct. And activities undertaken by Intervenors to register Democrats and to counteract Defendants' conduct are not mutually exclusive.

Intervenors have diverted resources to counteract Defendants' conduct in a multitude of ways. *See* ECF No. 77 at 7-12. *First*, Intervenors seek to register voters who have recently moved to Texas or moved between counties in Texas, because Intervenors know that those voters are

unlikely to be registered at their current address and may mistakenly think they were registered to vote as a result of updating their driver's license address online. *See, e.g.*, June 26, 2020 Decl. of Glen Maxey ("Maxey Decl.") ¶¶ 6-8; Decl. of Jacqui Newman ("Newman Decl.") ¶¶ 4-6; Decl. of Alicia Sisneros ("Sisneros Decl.") ¶¶ 3-5. The TDP, for example, is engaged in a massive voter registration program in urban areas across Texas targeting voters who have recently moved by seeking to register every voter who lives in an apartment complex. Maxey Decl. ¶ 7. As part of this effort TDP placed voter registration applications and instructions on the doors of 65,000 apartments in Travis County in January 2020. *Id.* ¶ 8. In another example, DCCC has targeted many of its voter registration activities at registering college students, an important DCCC constituency. Newman Decl. ¶¶ 6, 10. DCCC recognizes that college students, especially those new to a college campus, may mistakenly think they are registered to vote as a result of updating their driver's license address online, and DCCC undertakes efforts to register these voters.

*Second*, Intervenors are forced to spend time, staffing, and financial resources educating voters that engaging in an online driver's license transaction does not simultaneously update voter registration. For example, TDP's deputy registrars spend time and effort explaining to voters how online driver's license transactions interact with voter registration. Maxey Decl. ¶ 9. DCCC's consultant, Sisneros Strategies, hired by DCCC in November 2019,[1] expended resources to specifically train its deputy registrars to inform voters that online DPS transactions do not update a voter's registration. Sisneros Decl. ¶ 7; *see also* ECF 73-2 at 94 (DCCC representative stating Defendants' conduct leads DCCC "to have to spend more money on voter registration and more

---

[1] Defendants' assertion that this contract became effective after the commencement of this lawsuit, ECF No. 11 at 11, is both incorrect and legally irrelevant. Indeed, DCCC made its first payment to Sisneros Strategies on November 21, 2019 in the amount of $146,900.00. *See* Newman Decl. Attachment A.

time making sure we are educating voters" on this issue). Similarly, when voters inform TDP that they registered to vote through a transaction with DPS, TDP deputy registrars are trained to encourage them to register (presumably a second time) with TDP because of the significant risk that voters mistakenly believe they are registered to vote as a result of an online DPS transaction. Maxey Decl. ¶ 9. This is not speculation, as Defendants argue; it is fact supported by evidence.

*Third*, TDP expends resources to maintain a voter protection hotline that assists voters with issues related to voter registration caused by Defendants' unconstitutional conduct. Glen Maxey, Primary Director of TDP, has testified that TDP's voter protection hotline staff and volunteers have assisted voters with issues and questions related to Defendants' failure to provide simultaneous voter registration for online DPS transactions in previous election cycles. App. 472:23-473:15.[2] For example, in 2018, TDP provided assistance through the voter protection hotline to Jada Thompson, a 23-year old Democratic voter who was disenfranchised by Defendants' conduct while she was in college. Decl. of Jada Thompson ("Thompson Decl.") ¶¶ 4, 8. As detailed in her declaration, Ms. Thompson called TDP's hotline in October 2018, after she realized that she was not registered to vote as a result of changing her driver's license address online. *Id.* ¶ 8. Ms. Thompson was forced to vote a provisional ballot that was ultimately not counted in the 2018 election because she was not registered at her new address. *Id.* ¶¶ 9-10. DSCC and DCCC transfer funds to TDP to support its voter registration programs, including TDP's voter protection hotline, and other efforts that counteract Defendants' conduct. Newman Decl. ¶¶ 12-15; June 26, 2020 Declaration of Sara Schaumburg ("Schaumburg Decl.") ¶¶ 4-5.

Defendants are wrong to assert that Intervenors would engage in these activities regardless

---

[2] Citations to "App." or "Appendix" refer to the Appendix in Support of TDP, DSCC, and DCCC's Motion for Summary Judgment, ECF No. 77-1.

of Defendants' conduct. Certainly, as political parties, Intervenors would still seek to register voters. But if Defendants followed the Constitution and provided simultaneous voter registration applications to online DPS customers during driver's license transactions, Intervenors would not need to expend additional resources educating voters about this issue or registering voters who should have already been properly registered. *See ACORN v. Fowler*, 178 F.3d 350, 361 (5th Cir. 1999) ("A portion of the resources ACORN has spent and currently spends on voter registration drives counteracts Louisiana's alleged failure to implement the Act. It is these wasted resources, which ACORN could have put to use registering voters that the NVRA, even properly implemented, would not have reached (or which ACORN could have put toward any other use it wished), that provided ACORN with standing. . . ."). Intervenors could focus their efforts on registering other unregistered voters, as opposed to revisiting voters who they would not have to educate and assist in re-registering but for Defendants' conduct. They could also spend their resources assisting voters with issues unrelated to Defendants' refusal to comply with the law.

Defendants' argument that Intervenors would engage in voter registration activities regardless of Intervenors' conduct means that they lack standing, ECF No. 78 at 10, also ignores that Intervenors are spending more money than ever before on voter registration and get-out-the-vote ("GOTV") efforts in Texas, specifically in order to counteract the difficulties imposed by Defendants' failure to automatically register individuals who update their driver's license information online. *See* ECF Nos. 71-2, 71-3, 71-4; *see also Zimmerman v. City of Austin, Tex.*, 881 F.3d 378, 390 (5th Cir. 2018) (finding change in a plaintiff's "campaign plans or strategies in response to an allegedly injurious law" can itself confer an injury-in-fact so long as the change is "in response to a reasonably certain injury imposed by the challenged law"). Taken to its logical conclusion, Defendants' argument is that any organization that has previously engaged in or is

already engaged in voter registration activities does not have standing to challenge Defendants' illegal practices. That is not the law. Organizations like Intervenors that are engaged in voter registration and GOTV activities despite the burdens imposed by Defendants' illegal conduct are *precisely* the types of organizations that have standing to challenge Defendants' illegal conduct, because Defendants' refusal to comply with the law makes it more difficult and costly for Intervenors to achieve their goals and missions and causes them to shift resources around. *See*, *e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding organizational plaintiff already engaged in efforts to provide equal access to housing through counseling and other referral services suffered an injury-in-fact because the defendant's racial steering practices made it more difficult for the organization to do its work and achieve its mission).

### B.   The harm to Intervenors measures more than an "identifiable trifle."

Defendants erroneously argue that Intervenors lack standing because they have not pointed to specific, quantifiable resources they have invested or diverted due to Defendants' unconstitutional conduct. ECF No. 78 at 10-11. Beyond the fact that, as described below, this assertion is simply false, the level of quantifiable specificity which Defendants demand finds no support in case law, because a diversion of resources need not be quantified at all to meet Article III's requirements. *See OCA-Greater Houston v. Texas,* No. 1:15-CV-00679-RP, 2016 WL 9651777, at *7 (W.D. Tex. Aug. 12, 2016) ("Article III injury need not be quantified by a dollar figure . . . ." and "it need not measure more than an 'identifiable trifle'"), *aff'd*, 867 F.3d 604 (5th Cir. 2017) (citation omitted); *see also Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) ("The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury."). In fact, the resources dedicated to counteracting Defendants' conduct need not be significant to

provide Intervenors with Article III standing. *See United States v. Students Challenging Regulatory Agency Procedures* (SCRAP), 412 U.S. 669, 689 n.14 (1973) ("We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, a $5 fine and costs, and a $1.50 poll tax.") (citations omitted). Intervenors are not required to identify a specific line item attributable to countering Defendants' conduct.

In any event, Intervenors have proven a far more significant diversion of resources due to Defendants' unconstitutional conduct than is necessary to clear this modest hurdle. Intervenors extensively laid out the various resource allocation decisions Defendants' unconstitutional conduct has forced upon them in their Motion for Summary Judgment, ECF No. 77 at 7-12, and will not restate the multitude of evidence here, but a few points bear reiterating given Defendants' unsupported assertions. *First*, Intervenors have in many cases been able to quantify how much they are spending on voter registration to register more voters to compensate for the voters who will inevitably be disenfranchised as a result of Defendants' unconstitutional practices. For example, DCCC spent nearly $400,000 to compensate a consultant that both directly registered voters in Texas Congressional District 23, and trained DCCC staff on how to register voters in Texas, accounting for Defendants' unconstitutional practices as part of their general practice. *See also* ECF No. 85 at 80:4-6 ("The DCCC has spent directly in Texas over $1.1 million, and I believe over $550,000 of that is directly related to voter registration in Texas").

*Second*, Defendants' myopic focus on funds is misplaced, as funds spent are not the only resource Intervenors have diverted due to Defendants' unconstitutional conduct, nor are they the only resource whose draining can satisfy Article III standing. *See, e.g.*, *Greater New Orleans Fair Hous. Action Ctr. v. Kelly*, 364 F. Supp. 3d 635, 646 (E.D. La. 2019) (finding drain on staff time sufficient for Article III standing). As discussed in Section II.A, Intervenors have diverted staff

and volunteer time combating Defendants' illegal practices through their voter registration activities. These efforts include, among others, the time TDP volunteers and staff have diverted to explaining and helping voters address this issue on the voter protection hotline, Maxey Decl. ¶¶ 10-13, as well as the additional staff time DCCC must spend on voter registration to educate voters and counteract Defendants' ongoing unconstitutional conduct. Newman Decl. ¶ 14. Indeed, some of the money DCCC has transferred to TDP thus far this election cycle has been used for the express purpose of hiring two staff members dedicated solely to assisting with voter registration efforts. ECF No. 85 at 83:10-13. If Defendants complied with the law, TDP could spend less time on voter registration, and those staffers could focus their efforts elsewhere. *See* ECF No. 78-1 at 47:11-13.

*Finally*, Defendants state that Intervenors have not changed their resource allocation decisions due to Defendants' conduct, ECF No. 78 at 10, but that is entirely inconsistent with the evidence in the record. *See*, *e.g.*, ECF No. 78-1 at 47:10-13 (TDP stating "[w]e wouldn't be doing all that activity, expending that money, expending that staff time if we had more accessible voter registration in Texas."); *id.* at 82:7-9 ("And most of this we wouldn't have to do if people could update their registration when people got their driver's license updated."). Defendants' conduct forces DSCC and DCCC to divert more of their financial resources within Texas to voter registration than they would have to otherwise—taking away those resources from other important efforts to support Democrats within the state. And, as national organizations with limited resources, any additional funds the DCCC and DSCC must allocate to Texas for voter registration must, of necessity, be diverted from their potential uses other states. *See* App. 364 ¶ 11; *see also Pavek v. Simon*, No. 19-cv-3000, 2020 WL 3183249, at *11 (finding DCCC and DSCC established standing based on diversion of resources in case challenging ballot order statute that favored

candidates in rival political parties, requiring plaintiffs "to divert resources into Minnesota that would normally be spent in other states around the country").

## C.   Intervenors engaged in voter registration activities prior to intervening in this lawsuit.

Defendants' assertion that any voter registration activities on which Intervenors expend resources post-date this lawsuit, *See* ECF No. 78 at 11, is a gross distortion of the evidence. Both DSCC and DCCC provided resources to the TDP which went towards voter registration efforts prior to the commencement of this lawsuit. *See* Schaumburg Decl. ¶¶ 4-5; Newman Decl. ¶¶ 4, 12-15. DCCC itself separately initiated a nearly $400,000 contract for voter registration efforts in Texas (and began expending funds under the contract) prior to the commencement of this lawsuit, Newman Decl. ¶ 5, and TDP has been engaging in voter registration efforts and been forced to divert financial and personnel resources due to Defendants' continued unconstitutional conduct for years. Maxey Decl. ¶¶ 3-4.

In addition to having no basis in fact, Defendants' argument is also legally irrelevant, as injury following the commencement of the lawsuit alone—indeed, even only a threatened injury— is sufficient to provide standing. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (holding "future" pecuniary injury suffices for standing so long as there is a "substantial risk that the harm will occur"). Intervenors easily satisfy this standard. For example, DSCC has articulated that its budget for the 2020 elections is constantly in flux, and it anticipates spending "significantly more in Texas than what we've seen already, easily into the millions," and part of this spending will be to help combat "several obstacles that Texas has put in place to turning out voters, including the failure to allow for simultaneous online registration." ECF No. 86 at 36:2-7.

## D.   Defendants' conduct injures Intervenors' members.

The evidence demonstrates that Intervenors also have associational standing based on the

harm Defendants' conduct causes to their members and constituents—Democratic voters and supporters. *See* ECF No. 77 at 13-15; ECF No. 28 at ¶¶ 11-13; ECF No. 77-1 at 466, 594, 672. Defendants' misbegotten notion that Intervenors—a state political party and two national committees of the Democratic Party—lack members defies both logic and law. *See* ECF No. 78 at 12-13. As a factual matter, a political party is, at its core, a group of individuals joined together as a group to advance their political interests. Indeed, membership and, more importantly, increasing membership, is the *sine qua non* of a political party. And, as a legal matter, the Supreme Court has held that an organization need not be a "traditional membership organization" with card-carrying members to establish associational standing. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 345 (1977) (finding apple growers association "all of the indicia of membership in an organization," including (1) power to elect members of the Commission, (2) power to serve on the Commission, and (3) financing of the Commission's activities). Rather, where an organization represents individuals "and provides the means by which they express their collective views and protect their collective interests," *id.*, "it would exalt form over substance" to deny that organization representational standing. *Id.*

Defendants do precisely what the Supreme Court cautioned against—exalt form over substance—when they argue that Intervenors lack members.[3] A comparison of the relationship

---

[3] Courts rarely fall prey to Defendants' trap, improperly elevating form over substance. *See Mecinas v. Hobbs*, No. 2:19-cv-5547-DJH (D. Ariz. June 25, 2020) (holding DNC and DSCC lacked associational standing). *Mecinas* is inapposite here for a host of reasons. First, a holding that DSCC lacks associational standing is contrary to binding Ninth Circuit precedent, so *Mecinas* holding on DSCC's standing is incorrect. *See Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 831 (D. Ariz. 2018), *aff'd*, 904 F.3d 686 (9th Cir. 2018), *reh'g en banc granted*, 911 F.3d 942 (9th Cir. 2019), *rev'd on other grounds and remanded sub nom. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) (en banc) (finding plaintiffs, including DSCC and Arizona Democratic Party, had representational standing to challenge claims on behalf of Arizona Democratic voters impacted by ballot collection law). Second, *Mecinas* involved a challenge to a ballot ordering law where the Court determined no voter would have standing (only candidates),

between Democratic voters in Texas and the apple growers in *Hunt* is instructive: like the apple growers in *Hunt*, Democratic voters in Texas "express their collective views and protect their collective interests" through the Intervenor party committees. Similarly, the Intervenor party committees are funded by contributions from Democratic voters,[4] and their executive ranks are comprised of state and federal representatives, and officials elected to positions within the party organizations by the representatives of Democratic voters. Indeed, while Texas is an open primary state as Defendants point out, Texas law provides that a voter who participates in the Democratic primary affiliates with the Party, and the TDP considers that voter to be a member for the voting year. Tex. Elec. Code § 162.003. Moreover, the publicly available charters of both the Democratic Party of the United States and the TDP provide unequivocally that anyone who considers themselves a Democrat may participate in the parties' affairs. *See* Democratic Party of the United States, *The Charter & The Bylaws of the Democratic Party of the United States*, art. 8 § 1 ("The Democratic Party of the United States shall be open to all who desire to support the Party and who wish to be known as Democrats."), *available at* https://democrats.org/wp-content/uploads/2018/10/DNC-Charter-Bylaws-8.25.18-with-Amendments.pdf; TDP, *The Rules of the Texas Democratic Party*, art. II(B)(1) ("Any qualified Texas voter 18 years of age or older unless otherwise spelled out in these rules who supports the foregoing 'Statement of Principles' of the Democratic Party may participate fully in any Party meetings and may be elected to any Party

---

*Mecinas*, slip op. at 9-14, and the issue of whether the parties here have standing for candidates is not relevant. Third, the Court noted that the Democratic Party may have standing, *id.* at 15, but the Arizona Democratic Party was not a party in *Mecinas*. Here, by contrast, the TDP is a party, and the TDP has a defined membership by both state law and by its own bylaws. *See infra* at 13-14. *Mecinas* has no relevance to this Court's inquiry.

[4] Indeed, publicly available records on the FEC's website show that Plaintiff Jarrod Stringer has donated repeatedly to both TDP and DSCC. Maxey Decl. ¶ 24; Schaumburg Decl. ¶ 11.

Office, except where specifically prohibited by law or by Party Rules."), *available at* https://www.texasdemocrats.org/wp-content/uploads/2020/04/TDP-Rules-4_15_2020.pdf.

It is for these reasons that, contrary to Defendants' assertions, federal courts nationwide have held that Intervenor party committees, as well as other party committees, have standing to represent the interests of their voters. *See, e.g.*, *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1320819, at *3 (W.D. Wis. Mar. 20, 2020) (finding Democratic Party of Wisconsin was a membership organization and had standing to sue on behalf of members who would face undue burdens on their right to vote); *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d at 831; *Ohio Org. Collaborative v. Husted*, 189 F. Supp. 3d 708, 725 (S.D. Ohio), *rev'd sub nom. on other grounds Ohio Democratic Party v. Husted*, 834 F.3d 620, 725 (6th Cir. 2016) (finding Ohio Democratic Party established representational standing to bring suit on behalf of African-American members); *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (holding "[t]he [Indiana] Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new law"), *aff'd* 553 U.S. 181, 189 n.7 (2008) ("We also agree with the unanimous view of those judges that the Democrats have standing to challenge the validity of SEA 483 and that there is no need to decide whether the other petitioners also have standing."); *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 573-74 (6th Cir. 2004) (holding Ohio Democratic Party had standing to sue on behalf of members who would vote in the upcoming election and whose provisional ballots may be rejected).

Defendants also contend that Intervenors have not identified a specific member who plans to renew or change the address on their driver's license through an online transaction, or has done so in the past. ECF No. 78 at 13-14. That is unequivocally false. Ironically, while Intervenors have no way of knowing of answering this Court's question regarding the precise number of voters who

have indicated they wish to apply to register to vote while transacting with DPS online, DPS is able to ascertain that information. *See* ECF No. 69 at 5. But Intervenors *are* aware that numerous Democratic voters have been injured by Defendants' conduct, and have identified several of them. ECF No. 78 at 13-14. Intervenors have maintained throughout this action that they consider the individual plaintiffs in this action to be members. *See* ECF No. 41-1 at 10; ECF No. 77 at 14; App. 477 at 15-16 (TDP corporate representative identifying in his deposition the "named Plaintiffs in this lawsuit" as individuals harmed by Defendants' conduct). However, given that Defendants make this argument again in their motion for summary judgment, Intervenors have attached declarations stating that they consider each of the individual plaintiffs to be Democratic voters and members. *See* Schaumburg Decl. ¶¶ 11-12; Newman Decl. ¶¶ 20-21; Maxey Decl. ¶¶ 20, 23-25; *see also Cramer*, 931 F.2d at 1025. Consistent with Texas law and the Party charters described above, *supra* at 13-14, Intervenors consider Mr. Harms to be a member and constituent because he has voted in at least three previous Democratic primary elections, including the most recent March primary. Maxey Decl. ¶ 23; Schaumburg Decl. ¶ 11; Newman Decl. ¶ 20; Dep. of John Harms at 35:6-9. Intervenors consider Mr. Stringer to be a member and constituent because he voted in the March 2020 primary and at least two previous Democratic primary elections; he made eight contributions to the TDP and three contributions to the DSCC during the 2018 election cycle; and he has made contributions to other Democratic candidates and committees. Maxey Decl. ¶ 23; Schaumburg Decl. ¶ 11; Newman Decl. ¶ 20. Intervenors consider Ms. Gomez to be a member and constituent because she voted in the March 2020 primary and at least three previous Democratic primary elections. Maxey Decl. ¶ 25; Schaumburg Decl. ¶ 11; Newman Declaration ¶ 20. Ms. Gomez also testified that she was previously employed as the Data Director for TDP. Dep. of Nayeli Gomez at 12:2-5. Furthermore, Intervenors consider Ms. Thompson, who was

disenfranchised by Defendants' conduct in 2018 and who was not registered to vote at her current address until March 2020—well after the date this lawsuit was filed and the date on which Intervenors were granted intervention—to be a member. Maxey Decl. ¶ 20; Schaumburg Decl. ¶ 12; Newman Decl. ¶ 21. *See also California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) (holding the First Amendment protects the right of people to associate with a political party, which "necessarily presupposes the freedom to identify the people who constitute the association"); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 215 & n.5 (1986) (recognizing "broad spectrum of roles" that individuals play in a political party, from those who publicly declare their membership and take on public duties to those who "limit their participation to casting their votes for some or all of the Party's candidates," and noting that, with political groups in particular). Each of these voters have standing to sue in their own right, and their injuries are not speculative; they were denied the right to vote as a result of Defendants' conduct.[5]

### E. Defendants' conduct harms the electoral prospects of Intervenors' candidates.

Defendants' primary counter to Intervenors' standing based on harm to their candidates' electoral prospects is that Intervenors have not produced evidence of any such harm. It is worth noting at the outset that the law of seven Circuit Courts of Appeals—including the Fifth Circuit— have uniformly held that harm to electoral prospects constitutes an injury sufficient for Article III standing and does not require the high burden of proof Defendants impose on Intervenors. *See Tex. Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006); *see also Green Party of Tenn. v.*

---

[5] *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) (noting the *Summers* Court refused to find standing based only on speculation that unidentified members would be injured by a proposed action, but that where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, there is purpose to be served by requiring an organization to identify by name the member or members injured).

*Hargett*, 767 F.3d 533, 543-44 (6th Cir. 2014); *LaRoque v. Holder*, 650 F.3d 777, 786 (D.C. Cir. 2011); *Smith v. Boyle*, 144 F.3d 1060, 1061–63 (7th Cir. 1998); *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994); *Owen v. Mulligan*, 640 F.2d 1130, 1132–33 (9th Cir. 1981).

That said, Defendants again misstate the record. *See* ECF No. 78 at 8. Far from a "generalized grievance," Defendants' conduct makes it more difficult for Intervenors' members to register to vote at best, and completely disenfranchises them at worse. When Democratic voters like Ms. Thompson or the individual plaintiffs in this action are disenfranchised as a result of Defendants' conduct, they cannot vote for Intervenors' candidates. For example, Ms. Thompson intended to vote for Beto O'Rourke, the 2018 Democratic candidate for U.S. Senate. As a result of Defendants' unconstitutional actions, Ms. Thompson was unable to vote for Mr. O'Rourke, harming his electoral prospects. Notably, Senator Ted Cruz defeated Mr. O'Rourke by a margin of 50.9 to 48.3 percent in the closest U.S. Senate race in Texas since 1978. Jeremy Wallace, *Ted Cruz's margin of victory over Beto O'Rourke was even slimmer than we thought*, HOUSTON CHRONICLE (Dec. 6, 2018), *available at* https://www.chron.com/politics/texas/article/Ted-Cruz-s-margin-of-victory-over-Beto-13448275.php.

Defendants' fallback argument is also unconvincing. Defendants ineffectively argue that even if Intervenors have produced evidence of electoral harm to their candidates, such harm is a generalized grievance insufficient for Article III standing. As discussed above, Defendants' position is directly contrary to law. Further, the cases cited by Defendants on this point are inapposite. *See* ECF No. 78 at 8-9 (*citing Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018), and *Jacobson v. Fla Sec'y of State*, 957 F.3d 1193, 1206 (11th Cir. 2020)); *see also* ECF No. 76 at 3 (Intervenors' Reply to Defendants' Supplemental Brief in Opposition to Intervenors' Application for Temporary Injunction). *Gill* found the partisan preferences of a single voter insufficient to grant

standing and never addressed the myriad bases for standing of political parties whose entire *raison d'etre* is to win elections. In fact, on remand to the district court, the *Gill* plaintiffs sought to cure their standing issue by filing a new action that included a Democratic Party entity as a plaintiff. *See* Compl., *The Wis. Assembly Democratic Campaign Comm. v. Gill*, No. 3:18-cv-763-JPD (W.D. Wis. Sept. 14, 2018). As to *Jacobson*, the Eleventh Circuit expressly declined to address injury in the form of harm to electoral prospects, *see* 957 F.3d at 1206 (declining to decide whether a political party has standing to challenge an electoral practice that harmed one of its candidate's electoral prospects in a particular election), as a district court considering this issue recently acknowledged when finding the DSCC and DCCC had Article III standing based on harm to their electoral prospects. *See Pavek v. Simon*, No. 19-cv-3000, 2020 WL 3183249 at *14 n.13.

### F.   Defendants' conduct caused Intervenors' injuries.

Defendants' "blame the voter" argument on standing—that they are not the cause of Intervenors' injuries for the purposes of Article III—is remarkable and entirely misstates the law of Article III standing. The causation necessary for Article III standing does not require a showing of proximate cause or that "the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Rather, causation for purposes of Article III standing can be demonstrated where it is shown that Defendants' conduct has a "determinative or coercive effect upon the action of someone else." *Id*. Defendants' continued violations have already caused the disenfranchisement of the plaintiffs in *Stringer I* as well as Ms. Thompson. Defendants' conduct is certain to cause further disenfranchisement in upcoming elections if Defendants are not forced to comply with the law. Intervenors have satisfied Article III's causation element.[6]

---

[6] An injunction requiring Defendants to comply with the Equal Protection Clause would easily satisfy the low standard for redressability under Article III. To satisfy redressability a plaintiff "need only show that a favorable ruling could potentially lessen its injury; it need not definitively

### G.   Intervenors have statutory standing.

Intervenors have already described the numerous problems with Defendants' baseless statutory standing argument in their Opposition to Defendants' Motion to Dismiss, ECF No. 71 at 14-15, and incorporate those arguments herein by reference. Since Defendants' statutory standing arguments are identical to those made in their Motion to Dismiss, and are not based on the evidence, Intervenors do not brief the issue again here except to note that the Fifth Circuit has expressly interpreted Section 1983 to allow suits by organizations that have established associational standing. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 551 (5th Cir. 2010) (nonprofit had standing to assert § 1983 claims on behalf of members in seeking prospective declaratory and injunctive relief); *see also Church of Scientology of Cal. v. Cazares*, 638 F.2d 1272, 1278 (5th Cir. 1981); *Allee v. Medrano*, 416 U.S. 802, 819 n.13 (1974); *Jornaleros de Las Palmas v. City of League City*, 945 F. Supp. 2d 779, 800 (S.D. Tex. 2013). Defendants rely on cases that merely illustrate the general prohibition on individual, third-party standing, but they are inapposite because they do not involve organizations that assert associational standing. As explained above, *see supra* Section II.C, Intervenors have demonstrated associational standing, which forecloses the Secretary's "statutory standing" defense, and easily distinguishes this case from the authorities Defendants cite.

### III.   The doctrine of collateral estoppel precludes Defendants from relitigating the merits of this case.

Defendants' argument that nonmutual offensive collateral estoppel is inapplicable to this litigation falls flat. While it is true that Intervenors were not a party to Stringer I, *see* ECF No. 78

---

demonstrate that a victory would completely remedy the harm." *Sanchez v. R.G.L.,* 761 F.3d 495, 506 (5th Cir. 2014). As Intervenors previously noted, this Court's Final Order in *Stringer I* would more than adequately address their injuries. *See Stringer I*, ECF No. 109. Accordingly, Intervenors also satisfy Article III's redressability requirement.

at 14, participation in the prior action is irrelevant; *Defendants'* participation in the previous litigation is what matters, and they had a full and fair opportunity to litigate the equal protection claim. *See, e.g.*, *DeLeon v. Lloyd's London, Certain Underwriters*, 259 F.3d 344, 348 (5th Cir. 2001) ("Although DeLeon was not a party in *Tamez*, she may still assert offensive, non-mutual collateral estoppel."). *Second*, Defendants point out that Intervenors are organizations, not individuals, and are thus distinct from the plaintiffs in *Stringer I.* ECF No. 78 at 14. While that may be relevant to Intervenors' standing—which Defendants have now had a full and fair opportunity to litigate, *see generally* ECF Nos. 58, 78—it does not alter the equal protection analysis in any way. Thus, if anything, the idea that Defendants would have the opportunity to relitigate that their conduct—which they have admitted is entirely unchanged—does not violate equal protection is what truly "defies common sense." ECF No. 78 at 14; *see* Tr. of Hr'g on Prelim. Inj., ECF No. 57 at 5:20-23 (Jan. 28, 2020) ("Your Honor, I don't think that the facts have changed materially or relevantly since Stringer One, and I think as [Plaintiffs] laid them out, overall we don't have an objection to their characterization of the process."); *id.* at 58:19-21 ("There have been no material changes with our practices with respect to online driver's license renewal and DPS."); *id.* at 59:5-6 ("The practices and law hasn't changed.").

Defendants' argument that they should get a second bite of the apple to relitigate this case is also legally deficient. Defendants seek to distinguish the cases Intervenors rely on, but fail to address or discuss the factors that this Court must consider when determining whether offensive nonmutual collateral should apply, which include: (1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine. *United States v. Shanbaum*, 10 F.3d

305, 311 (5th Cir. 1994). Every single factor favors invoking collateral estoppel here.

**IV.    Intervenors are entitled to summary judgment for the reasons detailed in Plaintiffs' motion for summary judgment in *Stringer I*.**

Even if the Court declines to apply the doctrine of collateral estoppel, Intervenors are nonetheless entitled to summary judgment for the reasons detailed in Plaintiffs' Motion for Summary Judgment in *Stringer I*, and Defendants provide no sound argument to the contrary. There is simply no reason for the Court to waste its resources reconsidering a ruling it has already made based on facts that are entirely unchanged.

     **A.    The *Anderson/Burdick* test applies to the equal protection claims here, and does not require evidence of intentional discrimination.**

If the Court were to consider, once again, Defendants' arguments on the merits, Intervenors' equal protection claim is properly evaluated under the legal test derived from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). Defendants contend that the Intervenor political parties are required to prove intentional discrimination and disproportionate impact on Democrats in order to allege a violation of equal protection. ECF No. 78 at 15-16. This is a misstatement of the law. A claim alleging a violation of equal protection in the voting context is properly evaluated under *Anderson-Burdick*. *See*, *e.g*., *Rogers v. Corbett*, 468 F.3d 188, 193-94 (3rd Cir. 2006) ("[T]he *Anderson* test is the proper method for analyzing such equal protection claims due to their relationship to the associational rights found in the First Amendment"); *Republican Party of Ark. v. Faulkner Co*., 49 F.3d 1289, 1293 n. 2 (8th Cir. 1995) (holding *Anderson* sets out proper method for balancing both associational and equal protection concerns because "[i]n election cases, equal protection challenges essentially constitute a branch of the associational rights tree"); *Fulani v. Krivanek*, 973 F.2d 1539, 1543 (11th Cir. 1992) ("In this circuit, however, equal protection challenges to state ballot-access laws are

considered under the *Anderson* test."); *Rosen v. Brown*, 970 F.2d 169, 178 (6th Cir. 1992) ("utilizing the *Anderson* balancing test" in a challenge based on claims of free association and equal protection). The *Anderson-Burdick* test requires courts to weigh "the character and magnitude" of the alleged burden, against the "precise interests put forward by the State." *Burdick*, 504 U.S. at 434. It does not require proof of intentional discrimination.

### B.   Defendants cannot satisfy the *Anderson-Burdick* test.

In the hopes of surviving *Anderson-Burdick* by securing lower scrutiny for their unconstitutional actions, Defendants wrongly argue that a recent Fifth Circuit decision staying a preliminary injunction commands district courts to subject every voting restriction that does not result in total disenfranchisement to rational basis review. ECF No. 78 at 17. Defendants' proposal is wholly inconsistent with the *Anderson-Burdick* framework, which requires the application of a fact-specific balancing test that subjects state action to strict scrutiny when it "subjects the voters' rights to 'severe' restrictions." *Burdick*, 504 U.S. at 428 (citation omitted). Disenfranchisement is not the only "severe restriction" entitled to a higher level of scrutiny, and under the *Anderson-Burdick* sliding standard, courts have deemed unconstitutional burdens falling short of a complete denial of the right to vote. *See*, *e.g.*, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966); *Obama for Am. v. Husted*, 697 F.3d 423, 425 (6th Cir. 2012). Rational basis review is only appropriate when a state election law provision imposes "reasonable, nondiscriminatory restrictions" upon the right to vote. *Burdick*, 504 U.S. at 434. Defendants' conduct here is far from reasonable.

Defendants also fail to acknowledge that the authority they cite for this standard created out of whole cloth, was the decision of a motions panel, which the Fifth Circuit has repeatedly stated is not "binding precedent." *Northshore Dev., Inc. v. Lee*, 835 F.2d 580, 583 (5th Cir. 1988)

(citing *Fischer v. United States*, 759 F.2d 461, 463 (5th Cir. 1985), and *E.E.O.C. v. Neches Butane Prods. Co.*, 704 F.2d 144 (5th Cir. 1983)). And even if Defendants were correct that any state restriction on voting short of total disenfranchisement is entitled to rational basis review—and they are not—the conduct challenged in this lawsuit *has* caused the disenfranchisement of Texas voters in the past, and Defendants have made it clear that they are willing to disenfranchise voters in the 2020 elections unless this Court steps in to stop them. *See* Thompson Decl. ¶ 10; *see also Stringer v. Whitley*, 942 F.3d 715, 726 (5th Cir. 2019) (Ho, J., concurring) (finding Defendants' conduct took away from plaintiffs "a right they will *never* be able to recover"). Thus, even under their own proposed standard, Defendants' conduct would be subject to strict scrutiny.

Defendants' argument about the applicable level of scrutiny is a distraction from their real problem: there is no state interest that justifies Defendants' conduct. Defendants obfuscate their complete lack of interest in their differential treatment by asserting interests that are unrelated to signatures on voter registration applications. The Secretary claims, for instance, that requiring a written signature on voter registration applications helps maintain accurate voter rolls and combat voter fraud, ECF No. 13 at 16, but has admitted that the State does not use the physical, wet-ink signatures for any purpose. *See Stringer I*, 320 F. Supp. 3d at 873-74, 895, 899. More specifically, the Secretary has admitted that election officials are not expected to, and typically do not, analyze or compare wet signatures. *Id.* Thus the notion that signatures are required on voter registration applications—as opposed to using electronic or imaged signatures—advance the State's interest in maintaining accurate voting rolls or preventing fraud is contrived entirely for this lawsuit.[7]

---

[7] Repeating the fiction of widespread voter fraud, even in a court of law, does not make it true—as evidenced by the courts that have rejected attempts to limit voting opportunities based on similarly speculative allegations of voter fraud. *See, e.g.*, *People First of Ala. v. Sec'y of State*, No. 20-12184, slip op. at 19 (11th Cir. June 25, 2020) (concluding that state's "interest for maintaining the photo ID and witness requirements do not outweigh" burdens on voters where evidence

Indeed, this Court's analysis in *Stringer I* provides a complete analysis and rejection of each of the contrived state interests Defendants continue to assert. While "Defendants permit simultaneous voter applications for motor voters that renew or change their driver's license in person or by mail," they "refuse simultaneous voter applications for motor voters that renew or change their driver's license online," *id.* at 899, and Defendants only justification for this difference continues to be Texas's signature requirement. ECF No. 78 at 18-19. However, as this Court determined previously, "neither federal nor state law limits the signature requirement to physical hand-written signatures on paper. Electronic signatures and electronic records are legally recognized and widely used, and Defendants offer no reason for refusing to accept them for online motor voter transactions." *Stringer I*, 320 F. Supp. at 899.

Defendants' previous admissions in *Stringer I* are admissible against them as admissions of a party opponent, *see* Fed R. Evid. 801(2), and Defendants do not and cannot argue that any of their procedures or facts have changed. *See supra* Section III. To reiterate what this Court already knows and has previously determined, "DPS already uses electronic records and previously imaged electronic signatures for every Texan that uses the online system for driver's license renewal or change of address," *Stringer I*, 320 F. Supp. at 899; "SOS admits that electronic signatures comply with signature requirements under the NVRA and Texas Election Code," *id.*; "SOS admits it never uses physical, manual, or wet ink handwritten signatures on paper for voter registration purposes," *id.*; "DPS already has, in its possession and control, an electronic signature of every motor voter that has been issued a license," *id.* at 899-900. Indeed, "with motor voters'

---

"suggests that Alabama has not found itself in recent years to have a significant absentee-ballot fraud problem"); *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1036 (9th Cir. 2020) (en banc) (rejecting fraud-based justification for ballot collection ban where "[t]here has never been a case of voter fraud associated with ballot collection charged in Arizona" (quoting *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 852 (D. Ariz. 2018))).

electronic signatures already in the voter registration agency's possession, there is no reason why Defendants could not register them to vote in a simultaneous online transaction." *Id.* at 900. This all remains just as true today as it was when this Court originally made these factual findings, and Defendants tellingly offer nothing to rebut this. *See* ECF No. 78 at 18-19.

**V.      The relief requested by Intervenors is workable.**

The expedited discovery in this case has made clear that Defendants can take the remaining necessary steps to provide a fully simultaneous, non-duplicative voter registration application to voters who update their driver's license information online in a matter of weeks. *See* ECF No. 69 at 4-7. And, the cost to Defendants to implement this system is negligible or non-existent. ECF No. 69-1 at 44-45, 53-54 (*Stringer II* Ingram Dep. at 71:25 – 72:3; 118:2 – 119:20 ("what I said is I don't think it's going to require a change [to the SOS electronic voter registration database]. . . . And [if a change is necessary,] the cost won't be very much, and it will only be a one-time cost, but I just don't know if it's even going to be necessary.")). It should be clear by this point that, whatever relief is requested, Defendants will claim it is unworkable. But the facts and the record developed in expedited relief show that Defendants could implement simultaneous voter registration quickly and inexpensively. Intervenors reasonably request that injunctive relief be granted here, and Defendants' continued efforts to place imaginary roadblocks in the way of their compliance with the law is tired and should be rejected.

## CONCLUSION

For the foregoing reasons, Intervenors respectfully ask the Court to grant their Motion for Summary Judgment and deny Defendants' cross-motion for summary judgment.

Dated: June 26, 2020.                           Respectfully submitted,

                                                */s/ John M. Geise*

                                                John Hardin
                                                TX State Bar No. 24012784
                                                PERKINS COIE LLP
                                                500 N. Akard St., Suite 3300
                                                Dallas, TX 75201
                                                Telephone: (214) 965-7743
                                                Facsimile: (214) 965-7793
                                                JohnHardin@perkinscoie.com

                                                Marc E. Elias*
                                                Aria Branch*
                                                John M. Geise*
                                                Emily Brailey*
                                                PERKINS COIE LLP
                                                700 Thirteenth St., N.W., Suite 600
                                                Washington, D.C. 20005-3960
                                                Telephone: (202) 654-6200
                                                Facsimile: (202) 654-9959
                                                melias@perkinscoie.com
                                                jgeise@perkinscoie.com
                                                ebrailey@perkinscoie.com

                                                *Counsel for the Intervenors*

                                                Chad W. Dunn
                                                TX State Bar No. 24036507
                                                Brazil & Dunn, LLP
                                                4407 Bee Caves Road, Suite 111
                                                Austin, Texas 78746
                                                Telephone: (512) 717-9822
                                                Facsimile: (512) 515-9355
                                                chad@brazilanddunn.com

                                                Robert Leslie Meyerhoff
                                                Texas Democratic Party
                                                314 E. Highland Mall Blvd. #508
                                                Austin, TX 78752
                                                Telephone: 512-478-9800
                                                rmeyerhoff@txdemocrats.org

                                                *Counsel for Intervenor Texas Democratic Party*

                                                *Admitted Pro Hac Vice*

26

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2020, I filed a copy of the foregoing Texas Democratic Party, DSCC, and DCCC's Consolidated Reply in Support of Motion for Summary Judgment and Response in Opposition to Defendants' Cross Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ John M. Geise*