IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JARROD STRINGER, et al.,<br>  *Plaintiffs,* | §<br>§<br>§ | |
| v. | § | No. SA-20-CV-46-OG |
| RUTH R. HUGHS, et al.,<br>  *Defendants.* | §<br>§<br>§ | |

**DEFENDANTS' REPLY TO TEXAS DEMOCRATIC PARTY, DSCC, AND DCCC'S CONSOLIDATED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff-Intervenors[1] fail in their final attempt to demonstrate standing because they cannot overcome the facts: they have not suffered any legally cognizable injury and they have not proven they have members who would have standing to bring this claim. Rather than demonstrate to the Court specifically how Defendants' practices have affected them or describe the particular measures that they have taken to counteract those effects, Intervenors are content simply to recount their normal voter registration efforts. But this is insufficient for them to prove their standing. Likewise, Intervenors make little effort to demonstrate their membership structure beyond providing self-serving and uncorroborated declarations. But Intervenors have not proven that they have membership that meets Article III requirements or that any purported member has standing.

Even if Intervenors did have standing (they do not), their Equal Protection claim still fails. The weighty State interests in maintaining the integrity of elections and the voter rolls defeat Intervenors' claim. Accordingly, the Court should deny Plaintiff-Intervenors' Motion for Summary Judgment, grant Defendants' Counter-Motion for Summary Judgment, and dismiss Plaintiff-Intervenors' claims.

---

[1] "Plaintiff-Intervenors" or "Intervenors" refers to the Democratic Senatorial Campaign Committee ("DSCC"), Democratic Congressional Campaign Committee ("DCCC"), and Texas Democratic Party ("TDP").

### I.     Plaintiff-Intervenors' Improper Declarations Should Be Disregarded

Intervenors flout the Court's orders and their discovery obligations by submitting improper declarations at the eleventh hour in a vain effort to salvage their claims. But this evidence is too little and too late, and the Court should disregard Intervenors' declarations.

The Court ordered an expedited discovery period that ended on April 30, 2020, which allowed Defendants to explore Plaintiff-Intervenors' standing. *See, e.g.*, Dkt. No. 61. Each of the Intervenors was served with substantially identical discovery that requested them to produce all evidence supporting "[t]he allegations in their Complaint and the factual bases therefor," among many other detailed requests. *See* Dkt. No. 78-1 at 118-124; Dkt. No. 85-1 at 35-40; Dkt. No. 86 at 76-81. Intervenors did not produce the documents that they now attach as exhibits to their late-filed declarations, and Intervenors did not testify to the facts that they now explain via declaration. Plaintiff-Intervenors then filed their motion for summary judgment, to which they attached none of the evidence that they now submit. Despite this gamesmanship, Plaintiff-Intervenors make no attempt to explain or justify their failure to produce this evidence during discovery.

The Court should not countenance Intervenors' disregard for their obligation to provide complete discovery responses, and it should not reward their behavior by considering this improper, eleventh-hour evidence that Defendants were denied the opportunity to test during discovery. These declarations contradict Intervenors' deposition testimony,[2] improperly expand their discovery responses,[3] and weaponize Intervenors' vague privilege objections by attempting to use the First Amendment and the attorney-client relationship as both a shield and a sword.[4] Yet Intervenors make

---

[2] For example, TDP testified that the donations they received could not be earmarked for specific purposes, *see, e.g.*, TDP Depo. at 59:21-60:3 (Dkt. No. 78-1), yet they now have produced evidence suggesting that this was inaccurate, *see, e.g.*, Dkt. No. 90-2 at 7-30.

[3] For example, Intervenors did not produce any evidence from Jada Thompson or Alicia Sisneros, nor did they even disclose their identities. *Compare* Dkt Nos. 90-1, 90-4 *with* Dkt. Nos. 78-1, 85, 86, 87.

[4] Intervenors hid behind vague and spurious privilege objections throughout all their depositions, including, for example, a refusal to answer even basic questions about the work being performed by the very consultant

no attempt to justify their earlier non-disclosure. *See, e.g.*, Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information [during discovery], the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial . . . ."); *In re Itron, Inc.*, 883 F.3d 553, 558 (5th Cir. 2018) ("[P]rivilege cannot 'be used as both sword and shield.'"). Accordingly, Defendants submit that the Court should not give these declarations any weight whatsoever.

But even if the Court does consider this evidence—which it should not—Intervenors have still failed to demonstrate standing, as discussed below.

## II. Plaintiff-Intervenors Cannot Demonstrate Standing

### A. There Is No Organizational Injury-in-Fact

Plaintiff-Intervenors have no standing to sue in their own right because they have not suffered a cognizable injury-in-fact. Under any theory that they have put forward, Intervenors' assertion of standing falls short.

#### 1. Alleged Diversion of Resources

To the extent that Plaintiff-Intervenors rely on a diversion-of-resources theory, Intervenors' voter registration efforts are not, and have never been, designed to counteract the practices at issue here, and they have never targeted a voter with their registration efforts because that voter transacted online regarding their driver license. Intervenors' improper affidavits and soaring prose boil down to the same unavailing argument that because some people who have transacted online regarding their driver license may be swept up in Intervenors' voter registration efforts, they have standing to challenge the laws and practices at issue. But Intervenors have never sought to target such voters and would engage in the same conduct regardless of Defendants' practices. *See, e.g.*, Dkt. No. 90-2 ¶ 4 ("Registering new voters is one of the TDP's principal purposes.").

---

whose declaration they now submit. *See, e.g.*, DCCC Depo. at 82:15-19, 98:21-99:22, 100:19-101:6, 102:7-15 (Dkt. No. 85); *see also* Dkt. No. 43-2 ¶ 7.

This is a dispositive distinction according to the Fifth Circuit, *see ACORN v. Fowler*, 178 F.3d 350 (5th Cir. 1999), yet Intervenors make no serious effort to engage with it. Instead, they merely seek to substitute a different kind of voter. For the first time, Intervenors argue that they "seek to register voters who have recently moved," Dkt. No. 89 at 4, and that TDP is "seeking to register every voter who lives in an apartment complex," including by placing "voter registration applications and instructions on the doors of 65,000 apartments in Travis County in January 2020." Dkt. No. 89 at 5. They further argue that TDP's deputy registrars educate voters about "how online driver license transactions interact with voter registration," and that DCCC's consultant spends time to "train its deputy registrars to inform voters that online DPS transactions do not update a voter's registration." Dkt. No. 89 at 5. But the online transaction itself informs a voter of this. *See, e.g.*, Dkt. No. 1-4 at 5, 10-11, 16. And it is not an injury to instruct volunteers about particular means of voter registration when they are being trained in voter registration procedures already. *See, e.g.*, *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459-60 (6th Cir. 2014) ("[I]t is not an injury to instruct election volunteers about absentee voting procedures when the volunteers are being trained in voting procedures already.").

Intervenors argue that they need not quantify the resources diverted for such diversion to confer standing. But even if that is so, the diversion still must be "identifiable." *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017). Intervenors still point only to their expenditures on voter registration generally, without identifying resources dedicated specifically to voters who have transacted with DPS online. *See* Dkt. No. 89 at 14-17. Simply put, Intervenors' voter registration efforts constitute their "daily operations." *OCA-Greater Hous.*, 867 F.3d at 612. And they have done nothing to target those activities specifically toward remedying the alleged wrong, which is fatal to their assertion of injury based on a diversion-of-resources theory. *See Fowler*, 178 F.3d at 359.

2. Purported Harm to Electoral Prospects

Plaintiff-Intervenors' attempt to predicate injury on an alleged harm to electoral prospects similarly fails. Intervenors rely on only two things to support this theory: Ms. Thompson's declaration expressing an unfulfilled desire to vote for Beto O'Rourke in a 2018 election, and the 1.6 percent margin of victory by which Senator Ted Cruz defeated Congressman O'Rourke therein. *See* Dkt. No. 89 at 23. This is entitled to no weight because Ms. Thompson's declaration was disclosed far too late to be considered, and Intervenors never produced or indicated they were relying on the third-party website that they now cite at the eleventh hour. Moreover, even if properly before the Court, this would prove nothing about any harm to any future electoral prospects. There is nothing to suggest that the *particular* practices Intervenors challenge had any significant impact on any past election. And more importantly, Intervenors have no evidence that these particular practices will harm any future election, which is the relevant inquiry for the prospective injunctive relief that they seek.

In the absence of any factual record to support their electoral-prospects theory, Intervenors instead rely on distinguishable and non-binding authority. *See* Dkt. No. 89 at 22-24. Intervenors' sole Fifth Circuit case, *Texas Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006), is wholly inapposite because it addressed the removal and replacement of one of TDP's opponents on the eve of an election, supported by specific witness testimony about that particular contest. *See id.* at 586-87. Conversely, Intervenors' alleged harm here is based on the diffuse and unproven effects of their voter registration efforts—none of which have been targeted at voters transacting online regarding their driver license—and in the absence of any specificity regarding the voters, resources, or election contests that may be harmed. Intervenors' other authorities are similarly unavailing.[5] The most that

---

[5] For example, in *Pavek v. Simon*, No. 19-CV-3000 (SRN/DTS), 2020 WL 3183249, (D. Minn. June 15, 2020), a challenge to a ballot-order statute, there was "undisputed expert evidence [] that the primacy effect exists and has benefitted every major political party in Minnesota over the last 36 years," and there was also "undisputed expert evidence [] that the primacy effect 'almost always' occurs for the first-listed candidate solely as a result

can be said, then, is that Intervenors' have an "interest in a problem" and a "generalized partisan preference" that is not sufficient to demonstrate standing. *See Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018); *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

### B. Plaintiff-Intervenors Cannot Assert Associational Standing on Behalf of Any Member

Because Intervenors cannot demonstrate that they have standing to proceed as organizations, they must show that an identified member would have standing to proceed in their own right and on whose behalf Intervenors can bring a claim. It is unsurprising that Intervenors complain about being accountable to the requirements of Article III standing as "exalt[ing] form over substance," *see* Dkt. No. 89 at 18, because they have failed to demonstrate that an identifiable member of their organizations would have standing to sue in their own right. Instead Intervenors point to provisions of the Texas Election Code that have nothing to do with Article III standing, *cf.* Tex. Elec. Code § 162.001 (describing the effects of affiliation), and they discuss at length who they "consider" to be their members,[6] *see* Dkt. No. 89 at 17-22. But Intervenors do not point to any authority suggesting that either of these bases is sufficient to satisfy Article III's standing requirements. Indeed, the Supreme Court has expressly rejected the contention that standing can be established by "'accepting the organization's self-description of the activities of its members' and determining that 'there is a statistical probability that some of those members are threatened with concrete injury.'" *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 343-44 (5th Cir. 2012) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009)). And the mere fact that individuals may donate to the Intervenors is insufficient. *See Hunt v. Washington St. Apple Advert. Comm'n*, 432 U.S. 333, 343-44 (1977).

---

of their first-listed position." *Id.* at *14. Intervenors' ability to provide the caliber of evidence that was before the Minnesota district court only highlights the inexcusable inadequacy of their factual showing in this litigation.
[6] These late assertions about whom Intervenors consider their members—which should be disregarded entirely, for the reasons stated above—either directly contradict the deposition testimony or are entirely without support in the record, at least with respect to DCCC and DSCC. *See, e.g.*, DCCC Depo. at 108:2-109:5 (Dkt. No. 85).

Even if any of the individuals that Intervenors point to could be construed as Intervenors' members, none of them has standing to sue in their own right. Defendants have repeatedly briefed for this Court the reasons why the Individual Plaintiffs in this litigation do not have standing, and therefore will not repeat those arguments here. *See, e.g.*, Dkt. Nos. 60, 74. With respect to Ms. Thompson, as discussed above, her declaration and all of the other evidence about her was not produced during the Court-ordered expedited discovery period, despite its obvious responsiveness to several of Defendants' discovery requests and deposition questions, and therefore any evidence related to her should not be considered. But even if the Court did consider Ms. Thompson's declaration, and even if the Court found that she was a member of any of the Intervenor organizations, she would not have standing under the clear standard set forth by the Fifth Circuit in *Stringer I*. *See Stringer v. Whitley* (*Stringer I*), 942 F.3d 715 (5th Cir. 2019). Ms. Thompson is registered to vote at her current address with no present intention to change residence, *see* Dkt. No. 90-1 ¶¶ 13-14, and therefore Intervenors have not demonstrated "a substantial risk that [she] will attempt to update [her] voter registration[] using the DPS System and be injured by [her] inability to do so." *Stringer I*, 942 F.3d at 723. Because none of the Intervenors have identified a member who would have standing to bring Intervenors' claims, they cannot proceed on behalf of any of their members.

Finally, as Intervenors' own briefing demonstrates, they also fail to establish associational standing because their standing to bring any claim cannot be litigated without participation of the individual members themselves. *See Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Case Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (citing *Hunt*, 432 U.S. at 343; *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 827-28 (5th Cir. 1997)). Intervenors rely on declarations by the people who Intervenors hold out as members, and testing each of those individuals' assertions of standing is a fact-intensive inquiry that requires discovery into their individual circumstances. Because of the standard described by the Fifth Circuit in *Stringer I*, 942 F.3d at 723, individual participation is required

to litigate Intervenors' claims, thereby defeating any assertion of associational standing based on membership.

### III. Plaintiff-Intervenors' Constitutional Claim is Meritless

Although the Court should not reach the substance of Plaintiff-Intervenors' allegations because they lack standing, Intervenors' Equal Protection claim is meritless.[7]

Applying the correct standard of review is not a "distraction." Dkt. No. 89 at 29. Intervenors' derision of the Fifth Circuit opinion in *Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020), is understandable given that it is fatal to their claims. Intervenors are simply wrong when they assert that Defendants' alleged conduct here disenfranchises any voter. All eligible voter registration applicants are subject to the same rules, and there is no ambiguity as to what a voter must do in order to register to vote. There are many different ways in which a voter can register, and all Texans must exercise one of those options before they may exercise the franchise. This is not a "blame the voter" argument, as Intervenors may claim, *cf.* Dkt. No. 89 at 24, but rather a recognition that requirements that are on par with "the usual burdens of voting" do not impose an unconstitutional burden on the right to vote. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008). And where, as here, "the right to vote is not 'at stake,'" rational basis review applies. *Texas Democratic Party v. Abbott*, 961 F.3d at 404.

Plaintiff-Intervenors' attacks on the State interest in having voter registration applications signed by the applicant are unavailing. Whether Defendants have a previous version of a voter's signature—collected at a different time and for a different purpose—simply has no bearing whatsoever on whether the State is constitutionally permitted to require a signature on a voter registration application. Submitting a voter registration application is itself a legally significant act that

---

[7] Defendants have nothing further to add to their prior briefing regarding collateral estoppel except to note Intervenors' continued refusal to acknowledge the dispositive fact that the *Stringer I* opinion was vacated in entirety, meaning that it cannot have any preclusive effect. *See Langley v. Price*, 926 F.3d 145, 164 (5th Cir. 2019) (holding that a judgment reversed on appeal "retains *zero* preclusive effect").

Texas may lawfully require voters to undertake under signature. *See, e.g.*, Dkt. No. 87 at 2 (noting on the voter registration section of a driver license application that "giving false information to procure a voter registration is perjury, and a crime under state and federal law"). Yet Intervenors insist that it is unconstitutional to require that signature for voters if they choose to transact with DPS online. Their claim is simply incorrect and fails under rational basis review.

But even if a more stringent standard applies, Plaintiff-Intervenors' constitutional claim still fails. Intervenors maintain that voter fraud is a "fiction" and combating it is an illegitimate state interest, *see, e.g.*, Dkt. No. 89 at 29 n.7, but they fail to address the substantial weight of authority against them. *See, e.g.*, *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 394 (5th Cir. 2013) ("Any corruption in voter registration affects a state's paramount obligation to ensure the integrity of the voting process and threatens the public's right to democratic government. . . . Texas need not show specific local evidence of fraud in order to justify preventive measures."); *see also, e.g.*, *O'Brien v. Skinner*, 414 U.S. 524, 534 (1974) (Marshall, J., concurring) ("[P]rotection of the integrity of the ballot box is surely a legitimate state concern."); *Texas Democratic Party v. Abbott*, 961 F.3d at 413 (Ho, J., concurring) ("There should be 'no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters.'") (quoting *Crawford*, 553 U.S. at 196). The State's interests here outweigh whatever burden is imposed by allowing voters to register via one of the many methods that Texans have been using for years. Accordingly, although the Court should not reach the substance of Intervenors' claim because they lack standing, Intervenors' constitutional claim also fails on its merits.

## IV.     Plaintiff-Intervenors Are Not Entitled to Their Requested Relief

Though no relief is warranted for the reasons explained above, even if Intervenors' claims had merit, they have not proven that their proposed injunction should be entered. Intervenors glibly dismiss Defendants' concerns in ensuring that any relief that the Court may impose takes account of the important State interests of the continued feasibility of its election-administration and driver-

9

licensing machinery. Intervenors wrongly characterize Defendants' testimony regarding the costs and timing of certain specific, targeted changes as a carte blanche for the imposition of any modifications that they desire. *Cf.* Dkt. No. 89 at 31. But Intervenors ignore that the relief they have requested goes well beyond anything that was discussed during any deposition in this litigation or that would be required to address the purported harms. *See, e.g.*, Dkt. No. 77-1 at 793 ¶ 3(a) (requiring website changes); *id.* at 794 ¶ 5 (requiring a public education campaign). Even if the Court were to find in Intervenors' favor, which it should not, Intervenors have not proven that their requested relief is warranted or feasible. Accordingly, Plaintiff-Intervenors are not entitled to their proposed injunction.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff-Intervenors' Motion for Summary Judgment, grant Defendants' Counter-Motion for Summary Judgment, and dismiss Plaintiff-Intervenors' claims.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Christopher D. Hilton*
ANNE MARIE MACKIN
Texas Bar No. 24078898
CHRISTOPHER D. HILTON
Texas Bar. No. 24087727
Assistant Attorneys General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov
christopher.hilton@oag.texas.gov

**ATTORNEYS FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that on July 3, 2020, the foregoing instrument was filed electronically via the Court's CM/ECF system causing electronic service upon all counsel of record.

*/s/ Christopher D. Hilton*
CHRISTOPHER D. HILTON
Assistant Attorney General