

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JARROD STRINGER, NAYELI GOMEZ, JOHN HARMS, MOVE TEXAS CIVIC FUND, and LEAGUE OF WOMEN VOTERS OF TEXAS | ) ) ) ) | |
| Plaintiffs | ) ) | |
| and | ) | CIVIL NO. SA-20-CV-46-OG |
| | ) | |
| TEXAS DEMOCRATIC PARTY, DCCC, and DSCC | ) ) ) | |
| | ) | |
| Intervenor-Plaintiffs | ) ) | |
| | ) | CIVIL NO. SA-16-CV-257-OG |
| v. | ) | [Related] |
| | ) | |
| RUTH HUGHS, in her official capacity as Texas Secretary of State and STEVEN C. McCRAW, in his official capacity as Director of the Texas Department of Public Safety | ) ) ) ) ) ) | |
| | ) | |
| Defendants | ) | |

## SECOND ORDER GRANTING MOTION
## FOR PRELIMINARY INJUNCTION

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction, in which

Intervenor-Plaintiffs have joined. Docket nos. 5-7, 40, 44, 69, 70, 75, 76, 91, 96. Defendants

have responded. Docket nos. 36, 74. On January 28, 2020, the Court held a hearing and offered

both sides the opportunity to present oral argument and live witnesses. Docket nos. 31, 45, 57.

Both sides declined to call live witnesses but did offer evidence by submission and neither side

challenged the admissibility of the evidence. Based on the undisputed facts, the Court granted the

1

motion in part, ordered partial injunctive relief, and took the rest under advisement pending

discovery and a review of the record. *Stringer v. Pablos*, 2020 WL 532937 (W.D. Tex. Jan. 30,

2020); docket no. 46 (the "first order"). On February 2, 2020, Defendants advised the Court that

they had complied with the injunctive relief set forth in the Court's first order. Docket no. 48.

After giving the parties an opportunity to conduct discovery and supplement the record, and upon

further review, the Court finds that the remainder of the request for preliminary injunctive relief

should be granted for the reasons that follow.

I.

Statement of the case

This is the second of two related cases concerning Texas's compliance with the National

Voter Registration Act (NVRA) (also known as the "motor voter law"), 52 U.S.C. § 20501, *et.*

*seq.*, which was enacted in 1993 under the Elections Clause to make the voter registration

process easier and more convenient, thus increasing voter registration and participation. *See* 52

U.S.C. § 20501(b)(1) ("to establish procedures that will increase the number of eligible citizens

who register to vote").[1] This Court resolved the first case on the merits, based on largely

uncontested facts, but the Fifth Circuit found that the individual plaintiffs lacked standing and

never reached the merits. *See Stringer v. Pablos*, 320 F. Supp. 3d 862 (W.D. Tex. 2018), rev'd

and remanded, *Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019) (Stringer I). In this case, the

same underlying facts are still uncontested and remain unchanged. Thus, while the Court has

considered new evidence on standing, which the Fifth Circuit found to be lacking in the first

case, it has relied on the facts in the Stringer I record to determine a likelihood of success on the

---

[1]The only six states exempt from the NVRA's requirements are those that have no voter registration or allow election day voter registration at the polls. 52 U.S.C. § 20503(b). Texas is not one of them. *See* https://www.justice.gov/crt/national-voter-registration-act-1993-nvra.

merits.

Again, due to the timing of this case (which has been litigated under the constraints of a pandemic) and the deadlines faced in the current election cycle, this is the second order addressing Plaintiffs' motion for preliminary injunctive relief. *See* docket no. 46. The first order granted Plaintiffs' motion in part to ensure that the individual plaintiffs were registered to vote prior to the deadline for the primary election. This second order is entered prior to the voter registration deadline for the general election to avoid further injury as a result of continuing noncompliance with the NVRA.

II.

Background of litigation

A.      Stringer I

Jarrod Stringer, Benjamin Hernandez, and John Woods ("Stringer I plaintiffs") were eligible Texas voters who engaged in NVRA-covered online driver's license transactions but were denied simultaneous voter registration applications and thereafter disenfranchised. They brought suit in 2016 asserting that the State of Texas, by and through the Department of Public Safety and the Secretary of State, engages in a practice that deprives Texans of their federal right to register to vote or update their voter registration simultaneously with their online driver's license renewal and change of address transactions. The plaintiffs alleged that this practice, dating back several years, violates the NVRA and Equal Protection clause. Although advised of the violation, and admittedly able to change its practice and procedure, the State of Texas refused to integrate voter registration into its online driver's license renewal and change of address process to ensure compliance with federal law.

3

The Stringer I plaintiffs sought summary judgment on their claims that Defendants' online process violates the NVRA and Equal Protection clause. They also sought summary judgment on Defendants' affirmative defenses, including immunity, standing, and mootness. Defendants admitted that the key facts of the case were undisputed and argued that state law prevented them from complying with federal law. Defendants sought summary judgment on standing, mootness, and on the merits – based on their interpretation of the NVRA, state election law, and the Equal Protection clause.

In May 2018, this Court granted declaratory and injunctive relief in favor of the Stringer I plaintiffs. The Court found, based on largely uncontested facts, that Defendants violated the National Voter Registration Act, 52 U.S.C. §§ 20503(a)(1), 20504(a), (c), (d), and (e), and 20507(a)(1)(A), and the Equal Protection Clause, U.S. Const. amend. XIV, § 1, by failing to permit simultaneous voter registration with online driver's license renewal and change-of-address transactions. The Court permanently enjoined Defendants from continuing to violate the NVRA and Equal Protection Clause and ordered them to establish procedures that treat each online driver's license renewal or change-of-address application as a simultaneous application for voter registration which must then be submitted to the Secretary of State. Defendants appealed to the Fifth Circuit, which held that the plaintiffs did not have standing to seek prospective injunctive relief because they had not shown a *continuing or threatened future injury* to their constitutional right to vote. Chief Judge Owen wrote:

> Plaintiffs contend that they have demonstrated a substantial risk that they will suffer a future injury as a result of the DPS System's noncompliance with the NVRA and Equal Protection Clause. As Plaintiffs concede, to do so, they must demonstrate "a sufficient probability that each Plaintiff will use the noncompliant driver's license services again." All three Plaintiffs declared that they "plan to continue transacting online with [DPS] in the future whenever [they are] required to renew or change the address on [their] driver's license and [are] eligible to do so." However, each Plaintiff will have the occasion to use

4

the DPS System to update his voter registration only if (1) he moves within Texas, in which case he might wish use the DPS System to change his address on file with DPS and his county voter registrar, or (2) he becomes both unregistered to vote and eligible to renew his driver's license using the DPS System, in which case he might wish to use the DPS System to renew his driver's license and register to vote.

Plaintiffs rely on two types of evidence that they contend demonstrate a substantial risk that they will move again. The first is evidence of their prior moves—Hernandez and Woods have each moved once in the past five years, and Stringer has moved several times. However, evidence that a plaintiff has taken an action in the past does not, by itself, demonstrate a substantial risk that the plaintiff will take the action in the future; there must be some evidence that the plaintiff intends to take the action again. Accordingly, evidence that Plaintiffs moved in the past does not establish a substantial risk that they will do so in the future. *Notably, no Plaintiff has expressed any intention to move in the future.*

The second type of evidence cited by Plaintiffs is data from the United States Census Bureau showing that Americans can expect to move 11.7 times in their lifetimes. This general data also does not establish a substantial risk that Plaintiffs themselves will move again; Plaintiff-specific evidence is needed before Plaintiffs' claims can be properly characterized as an attempt to remedy an imminent injury to Plaintiffs instead of a generalized grievance available to all Texans.

Plaintiffs also have not demonstrated a substantial risk that they will attempt to use the DPS System to renew their driver's licenses and simultaneously update their voter registrations. Plaintiffs contend that Texas's requirement that driver's license must be renewed every six years and the existence of Texas laws providing multiple avenues for the cancellation of a voter's registration create a "sufficient probability" that, at some point in the future, Plaintiffs will be both unregistered to vote and eligible to renew their driver's licenses using the DPS System. However, Plaintiffs do not point to any Plaintiff-specific evidence suggesting that they will become unregistered and eligible to renew their driver's licenses using the DPS System.

In light of the absence of any Plaintiff-specific evidence, the evidence in the record does not demonstrate a substantial risk that Plaintiffs will become unregistered and eligible to renew their driver's licenses online. Plaintiffs cite Texas laws that provide for the cancellation of voter registration in four relatively uncommon situations: (1) when a voter's registration card is returned as undeliverable, the voter does not return a confirmation notice, and the voter does not vote in two consecutive general elections; (2) when a registrar finds a voter to be ineligible after an investigation; (3) when another voter from the same county successfully challenges a voter's registration; and (4) when a voter cancels his or her voter registration. There is no evidence in the record that suggests that any Plaintiff is likely to fall within the ambit of these provisions. Furthermore, Texans are only required to renew their driver's licenses every eight years, and every other renewal must be accomplished in person. Chances are slim that Plaintiffs will become unregistered around the time that they need to renew their driver's licenses and are eligible to do so using the DPS System.

5

In sum, Plaintiffs have not established a substantial risk that they will attempt to update their voter registrations using the DPS System and be injured by their inability to do so. As a result, Plaintiffs have not established an injury in fact sufficient to confer standing to pursue the declaratory and injunctive relief that they seek.

*Stringer v. Whitley*, 942 F.3d at 721–23 (emphasis added).

Judge Ho, concurring, stated:

I agree with my colleagues that we are not at liberty to decide the merits in this case, because none of these Plaintiffs have standing to seek injunctive relief here. They all secured their right to vote by the 2016 election cycle. And they claim no future injury that we can redress today. . . . But although we have no occasion to decide the merits of Plaintiffs' claim due to their lack of a future injury, that does not prevent us from acknowledging that Plaintiffs have indeed endured an injury in the past. They were unable to exercise their right to vote in past election cycles. And it is a right they will *never* be able to recover. As citizens, we can hope it is a deprivation they will not experience again – even if the law does not afford them a remedy from this court at this time.

*Stringer v. Whitley*, 942 F.3d at 726 (emphasis in original).

B.     Stringer II

Although the Fifth Circuit found, based on the facts in the record at that time, that Mr. Stringer had not proven he would likely sustain another injury in the future, it did happen again. Before November 23, 2019, Mr. Stringer moved from a residence in Bexar County to a new residence in Harris County. On November 23, 2019, Mr. Stringer had his wife visit the DPS website to change the address on his driver's license. He would have also had his wife update his voter registration online when updating his driver's license, but was not given the option. Thus, he remained registered at his old address in Bexar County when this lawsuit was filed.

Co-plaintiff John Harms, who was not a plaintiff in Stringer I, was a resident of Bastrop County prior to July 2019. At that time, he was registered to vote and did vote in Bastrop County. In mid July 2019, Mr. Harms moved from Bastrop County to Travis County, where he signed a one-year lease on a house. On or about October 8, 2019, he visited the DPS online system and

6

completed the process to change the address on his driver's license to his new residence in Travis County. If he had been provided the option to simultaneously update his voter registration, he would have done so. He was not provided that option, and he remained unregistered to vote in Travis County when this lawsuit was filed.

Co-plaintiff Nayeli Gomez, who was not a plaintiff in Stringer I, moved from one residence in Bexar County to a new residence in Bexar County in the Summer of 2019. On December 9, 2019, she visited the DPS online system to change the address on her driver's license to her new address but she was unable to simultaneously update her voter registration. She would have simultaneously updated her voter registration if she had been given the option, but she was not given that option. She remained registered at her old address when this lawsuit was filed.

In Stringer II, current and former plaintiff Jarrod Stringer, along with current co-plaintiffs Nayeli Gomez, John Harms, MOVE Texas Civil Fund, and League of Women Voters of Texas and Intervenor-plaintiffs Texas Democratic Party, DCCC, and DSCC, assert the same causes of action litigated in Stringer I because the Defendants have not changed their practices and new violations are occurring and resulting in a continuing injury and/or threatened future injury. Docket no. 1.

At the time Plaintiffs filed this lawsuit, and at the time of the preliminary injunction hearing in January 2020, the following was clear: First, Mr. Stringer was suffering a second injury as the result of Defendants' noncompliance with the NVRA. If Mr. Stringer's voter registration was not updated before February 3, 2020, he would not be able to vote in the March 2020 primary election in the county and precinct where he resided. Mr. Stringer also showed, in his uncontested sworn declaration, that he had plans to move residences again in August 2020.

7

Specifically, he and his wife planned to move out of their rental apartment and into a new

residence by August 25, 2020 at the latest. Docket no. 5-1, Appx. 178-180. Thus, not only was

Mr. Stringer's second injury occurring when suit was filed, but there remained a substantial risk

of a third injury when Mr. Stringer moved again and would not be registered to vote pursuant to

the NVRA before the voter registration deadline for the 2020 general election. Second, Mr.

Harms was suffering an injury as a result of Defendants' conduct that would result in

disenfranchisement if his voter registration was not updated before February 3, 2020 because he

would not be able to vote in the March 2020 primary election. Mr. Harms' sworn declaration was

also uncontested. Docket no. 5-1, Appx. 182-183. And third, Ms. Gomez was suffering an injury

as a result of Defendants' noncompliance that would ultimately result in disenfranchisement

because she would not be able to vote in her home precinct in the March 2020 primary election if

her registration was not updated before February 3, 2020. Docket no. 5-1, Appx. 185-186.

At the same time, Defendants admitted that their practices had not changed. *See* docket

no. 57 Tr. at 5:20-23 ("I don't think that the facts have changed materially or relevantly since

Stringer one and I think a[s] they've laid them out overall we don't have an objection to their

characterization of the process."); 58:19-21 ("There have been no material changes with our

practices with respect to online driver's license renewal and DPS."); 59:5-6 ("The practices and

law hasn't changed."). Moreover, despite any repeated or recurring injury to Plaintiffs,

Defendants have insisted, at various stages of this litigation, that changes to come into

compliance with the NVRA would take too long. Thus, according to Defendants, Plaintiffs

would just need to figure out another way to get registered to vote. *See* docket no 46, pp. 9-10.

After reviewing the evidence, the Court entered its first order granting emergency relief to

the individual plaintiffs, and abated the rest, to ensure that Stringer, Harms, and Gomez would be

8

registered to vote by the deadline and would not be disenfranchised in the upcoming primary

election. However, relying on defense counsel's representations about the length of time it would

take to implement corrective measures, the Court fashioned an interim remedy to address the

most immediate harm. As the Court explained:

> The temporary relief being ordered herein is narrowly tailored, and the Court orders no
> more than what the law clearly and unequivocally requires of Defendants. There is an
> expectation, under the notice provisions of the NVRA, that if a designated voter
> registration agency such as DPS violates the NVRA, the chief election official of the
> State – upon notification – will correct the violation. That is all the Court is ordering
> herein. Compliance with this order will ensure that the individual plaintiffs herein will
> not be forced to suffer a continuing or threatened future injury.
>
> For the reasons stated herein, which are based on a preliminary review, the Court
> ORDERS that pursuant to 52 U.S.C. § 20504(d), the last change of address forms
> submitted by the individual plaintiffs for purposes of updating the address on their
> driver's license "shall serve as notification of change of address for voter registration with
> respect to elections for Federal office for the registrant involved." Defendant DPS must
> immediately submit the information contained in the previously completed forms, along
> with the individual plaintiffs' stored electronic signatures, as necessary, to the Texas
> Secretary of State. The Secretary of State will then immediately submit the same
> information to the correct county voter registrars, along with a copy of this injunction
> order and written instructions to immediately register these individual plaintiffs to vote.
> The Secretary of State must confirm that all three individual plaintiffs are registered to
> vote before the deadline to register to vote so they may participate in the upcoming
> primary elections. When that confirmation is received, Defendants must file a written
> advisory with the Court no later than 2:00 p.m. on February 3 confirming that all three
> individual plaintiffs are timely registered to vote in the county and precinct in which they
> reside. If Defendants must designate one or more employees, agents, or representatives to
> carry out this order, they are expected to do so.

Docket no. 46, pp. 16-17. Defendants complied with the court-ordered relief, reporting back to

the Court as follows:

> Defendants received the Court's order on the afternoon of January 30, 2020. DPS
> immediately began taking steps to ensure compliance. DPS collected the information
> contained in the individual plaintiffs' driver record from their previously completed
> change-of-address transactions, and such information was delivered to SOS on the
> morning of January 31, 2020. Likewise, upon receipt of the Court's order, SOS
> immediately began taking steps to ensure compliance. The information received from
> DPS was submitted to the correct county voter registrars, along with a copy of the Court's
> injunction order and written instructions to immediately register the individual plaintiffs

to vote, as specified in the order. On January 31, 2020, the county voter registrars
confirmed to SOS that the individual plaintiffs had been registered to vote before the
deadline to register to vote so they may participate in the upcoming primary elections.
Additionally, on February 2, 2020, SOS verified in the State's voter registration system
that the individual voters were actively registered to vote at their new addresses.
Accordingly, Defendants advise the Court that all three individual plaintiffs are timely
registered to vote in the county and precinct in which they reside.

Docket no. 48. Defendants did not seek an interlocutory appeal of the first order, which fell short

of ordering full compliance with the NVRA due to time restraints but ensured that the individual

plaintiffs would not be disenfranchised. After giving the parties additional time to conduct

discovery and submit supplemental briefing, the Court now addresses the remainder of the

pending motion for preliminary injunction.[2]

III.

Standard and process of review

To obtain a preliminary injunction, movants must establish each of the following four

factors:

(1) a substantial likelihood of success on the merits;

(2) a substantial threat of irreparable injury if the injunction is not issued;

(3) the threatened injury if the injunction is denied outweighs any harm that will result if

the injunction is granted; and

(4) granting an injunction will not disserve the public interest.

*Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015). In many cases, a preliminary

injunction serves to preserve the relative positions of the parties until a trial on the merits can be

held. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Preliminary injunctions that would

---

[2]Because the DPS Sytem has not changed since Stringer I, the recent discovery focused on
standing and the length of time it would take for Defendants to make the necessary changes to come into
compliance with the NVRA.

change, rather than maintain, the status quo are generally disfavored and should not issue unless the facts and law clearly favor the moving party. *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). On the other hand, "[a] fundamental principle of preliminary injunctions [is that] [a]n injunction is of no help if one must wait to suffer injury before the court grants it." *Texas v. U.S.*, 809 F.3d at 173 n. 137 (citing *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001)). Denying injunctive relief and maintaining the status quo at this juncture of these proceedings would mean that Mr. Stringer would remain unregistered and ineligible to vote in the precinct where he resides while violations of the NVRA continue unabated.[3] The Court need not wait for Mr. Stringer to suffer further injury before considering preliminary injunctive relief. *Id.* Given the limited purpose of a preliminary injunction, and given the haste that is often necessary in considering the relief being sought, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395. Ultimately, the decision to grant preliminary injunctive relief rests in the sound discretion of the district court, and is "often dependent as much on the equities of [the] case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, __ U.S. __, __, 137 S.Ct. 2080, 2087 (2017).

IV.

Article III standing

Again, as they have claimed at every stage of the proceedings in both Stringer I and Stringer II, Defendants claim none of the Plaintiffs or Intervenor-Plaintiffs have standing to seek

---

[3]As explained *infra*, the Court's focuses on Mr. Stringer's injuries because it has not yet determined the standing of all Plaintiffs and Intervenor-Plaintiffs and Mr. Stringer's standing to seek preliminary injunctive relief is indisputable.

injunctive relief.[4]

In a lawsuit for injunctive relief, the presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement. *Rumsfield v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n. 2 (2006); *Texas v. United States*, 945 F.3d 355, 377-378 (5th Cir. 2020). Moreover, "the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle,' . . . [t]his is because the [requirement] under Article III is qualitative, not quantitative, in nature." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (citing *Ass'n of Cmty Orgs. For Reform Now v. Flowler*, 178 F.3d 350, 358 (5th Cir. 1999)).

To establish standing under Article III, a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief. *Thole v. U.S. Bank N.A.*, __ U.S. __, 140 S.Ct. 1615, 1618 (2020); *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 180-81 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130 (1992). Standing is to be determined as of the commencement of suit. *Lujan*, 504 U.S. at 570 n. 5. In this case, the Court has already determined that the individual plaintiffs have Article III standing, as reflected in its order entered January 30th granting partial preliminary injunctive relief (docket no. 46). As the Court explained:

> It is undisputed that Plaintiffs Stringer, Gomez, and Harms were not simultaneously registered to vote (i.e., their voter registration was not updated) at the time of their online transactions with DPS, a designated voter registration agency. It is undisputed that they are still unregistered to vote and will be disenfranchised on March 3 if they are not registered to vote by the deadline – February 3. This continuing injury (lack of voter

---

[4]Unlike Stringer I, Defendants have not raised immunity and mootness defenses. They only challenge Article III standing.

registration as a result of Defendants' unlawful procedure) and threatened future injury (disenfranchisement) more than satisfies the standing necessary for injunctive relief. *See Stringer v. Whitley*, 942 F.3d at 720 ("plaintiffs seeking injunctive [ ] relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury."). The Plaintiffs' continuing and threatened future injury will be (1) potentially suffered by these plaintiffs, not someone else; (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 720-21. With the deadline for voter registration in just a few days, and the primary election thirty days thereafter, there is a "substantial risk" that the individual plaintiffs will be disenfranchised if they are not registered to vote; thus, threatened future injury is indisputably "imminent." Moreover, Plaintiffs' continuing and future threatened injury is "fairly traceable" to the challenged action of Defendants. But for Defendants failure to comply with the NVRA, and the unjustified burden on Plaintiffs' constitutional rights, Plaintiffs would already be registered to vote in the county and precinct where they reside.

The future injury – disenfranchisement – is irreparable. The right to vote is a fundamental right, and the deprivation of such right is something Plaintiffs "will never be able to recover." *Stringer v. Whitley*, 942 F.3d at 726. (Ho, J., concurring). But the injury that will occur between now and March 3 is still redressable with immediate, temporary injunctive relief. These individual plaintiffs should not be forced to wait and suffer a constitutional deprivation when it can be avoided by granting temporary injunctive relief. *Texas v. U.S.*, 809 F.3d at 173 n. 137 (citing *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001)).

Docket no. 46, pp. 14-15.

Thus, the question becomes whether anything has changed. After determining that the individual plaintiffs had standing, the Court ordered the Secretary to register the individual plaintiffs to vote to avoid disenfranchisement in the primary election. Docket no. 46. The Secretary complied with the court-ordered temporary relief and as a result "all three individual plaintiffs [were] timely registered to vote in the county and precinct in which they reside." Docket no. 48. Ironically, the individual plaintiffs were registered to vote *solely as a result of a court order*, rather than any voluntary action by the Secretary, yet Defendant now claims the individual plaintiffs lack standing *because they are registered to vote*. Docket no. 74, p. 5 ("all three Individual Plaintiffs are now registered to vote. Accordingly, each Individual Plaintiff should be dismissed from this litigation for lack of standing."). Even more ironically, the court-

13

ordered voter registration was a temporary measure *out of deference to Defendants* who represented to the Court at the time of the injunction hearing that full compliance with the NVRA would be impossible to achieve before the voter registration deadline on February 3, 2020. *See* docket nos. 36, 46, 47.

There are notable deficiencies with Defendants' challenge to the individual plaintiffs' standing at this stage of the proceedings. First, Defendants cite no authority for the proposition that plaintiffs who have standing when a lawsuit is initiated *and* at the time of court-ordered interim relief are thereafter divested of standing as a result of court-ordered interim relief.[5] In voting rights cases, interim injunctive relief is often necessary because litigation may last longer than an election cycle. But interim relief is not final relief, and if interim relief divested plaintiffs of standing, many voting rights cases would abruptly end before the Court could ever reach the merits or consider the ultimate relief being sought. In this case, compliance with the NVRA and the Equal Protection clause is the ultimate relief being sought. The court-ordered interim relief in January merely accomplished the manual task of getting the individual plaintiffs registered to vote by alternative means. But getting the individual plaintiffs registered to vote to avoid imminent disenfranchisement by no means addressed the ultimate relief being sought in this lawsuit.

Second, Defendants seem to conflate standing with mootness, but they make no argument that the court-ordered interim relief rendered all of the individual plaintiffs' claims moot. Even voluntary cessation of a challenged conduct does not ordinarily render a case or controversy moot

---

[5] Almost the entire focus of Defendants' post-discovery brief (docket no. 74) is on standing. Defendants have never disputed the facts. Approximately one page in Defendants' brief is devoted to the standing of the individual plaintiffs, and the only authority cited is Stringer I. But the Stringer I plaintiffs' lack of standing, as determined by the Fifth Circuit, does not dictate the standing of the individual plaintiffs in this case, which must be based on current facts and circumstances.

and there has been no voluntary cessation in this case as Defendants have failed to come into compliance with the NVRA. As this Court noted in Stringer I, voting-related lawsuits do not become moot just because an election has passed. *Ctr. for Indiv. Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006) ("Controversy surrounding elections laws . . . is one of the paradigmatic circumstances in which the Supreme Court has found that full litigation can never be completed before the precise controversy (a particular election) has run its course."). Although the Fifth Circuit touched on the issue of mootness in Stringer I, the issue was never reached because the Court determined that the Stringer I plaintiffs lacked standing at the time the lawsuit was initiated. *Stringer v. Whitley*, 942 F.3d at 724. The circumstances for all three individual Stringer II plaintiffs are different because they did have standing when this lawsuit was initiated and they had standing when the Court issued its first order granting injunctive relief. Even if mootness is now implicated for the claims of Mr. Harms and Ms. Gomez, Mr. Stringer's circumstances have shown that this is exactly the type of violation that is capable of repetition yet evading review. *See Spencer v. Kemna*, 523 U.S. 1, 17-18 (1998) (the doctrine applies when the challenged action is in its duration too short to be fully litigated prior to cessation or expiration and there is a reasonable expectation that the same complaining party will be subject to the same action again). Defendants have thus far refused to change their online process to allow simultaneous voter registration applications. And now, the same injury is likely to occur again. When a controversy is truly moot, there is nothing left to remedy. In this case, Defendants' noncompliance with the NVRA has continued unabated, and the challenged action continues.

Although they do not couch their argument in terms of mootness, Defendants claim that because they complied with the Court's January order and registered the individual plaintiffs to vote, none of the individual plaintiffs have a claim and their lawsuit should be dismissed. But

Defendants were simply being ordered by the Court to carry out the duties that federal law requires of them. *See* 52 U.S.C. § 20506 (a)(4)(A),(6)(C) (A voter registration agency shall provide assistance to each applicant in completing voter registration forms unless the applicant refuses such assistance). Again, the underlying violations that form the basis of the complaint have not been corrected and continue unabated. The DPS online renewal and change of address transactions do not serve as "simultaneous" applications for voter registration, in violation of 52 U.S.C. §§ 20503(a)(1), 20504(a)(1); the separate SOS voter registration process is not "part of" the DPS online driver's license transaction, as required by 52 U.S.C. § 20504(c)(1); information required by SOS for a separate voter registration transaction "duplicates" the information required by DPS for an online renewal or change of address transaction, in violation of 52 U.S.C. § 20504(c)(2)(A); and the online change of address transaction does not "serve as notification of change of address for voter registration," as required by 52 U.S.C. § 20504(d).[6]

Defendants' argument also overlooks the true nature of the Plaintiffs' cause of action. Plaintiffs are claiming that the State's process is itself unlawful and violates their federal right to "[s]imultaneous application for voter registration and . . . driver's license[.]" 52 U.S.C. § 20504. This cause of action remains cognizable regardless of whether the individual plaintiffs have been registered to vote by alternative means and pursuant to court order. *See Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1549 (2016), *as revised* (May 24, 2016) ("Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none

---

[6]The mandates of the NVRA dictate exactly the opposite of what Defendants want Texans to do to personally ensure they are registered to vote: engage in a second transaction that requires a separate application with duplicate information and the burden of downloading, printing, and mailing or personal delivery. Congress lifted these burdens to make voter registration easier, yet Defendants have ignored the NVRA mandate and impose requirements which result in disenfranchisement if voters do not jump through all the hoops.

existed before."); *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 552 (5th Cir. 2016) ("[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing."); *ACORN v. Fowler*, 178 F.3d 350, 363 (5th Cir. 1999) (the NVRA's private right of action "extend[s] standing under the Act to the maximum allowable under the Constitution"); *Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) ("Even though they were ultimately not prevented from voting, an injury like theirs [being erroneously identified as a non-citizen and removed from the voter rolls] is sufficient to confer standing."); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) ("A plaintiff need not have the franchise wholly denied to suffer injury.").

Finally, and perhaps most importantly, even if Mr. Harms and Ms. Gomez received all the relief to which they were entitled in this Court's interim order (because they were registered to vote) and, as Defendants suggest, they were subsequently "divested of standing" to pursue any further relief (compliance with the NVRA and the Equal Protection clause), only one plaintiff must have Article III standing for the Court to consider injunctive relief. The record clearly indicates that Mr. Stringer had standing when this lawsuit was initiated; he had standing at the time the Court entered interim relief in January; and Mr. Stringer continues to have standing today.

In Stringer I, the Fifth Circuit determined that Mr. Stringer lacked standing because although he was not registered to vote when he used the noncompliant driver's license services, he "became registered *prior to* bringing [the] lawsuit" and he failed to show that his injury was continuing or that he faced a threat of future injury. *Stringer v. Whitley*, 942 F.3d at 724. To show a threat of future injury, the Court explained, Stringer must demonstrate "a sufficient probability that [he] will use the noncompliant driver's license services again." *Id.* at 722. For example,

Stringer "will have the occasion to use the DPS System to update his voter registration . . . if he moves within Texas, in which case he might wish [to] use the DPS System to change his address on file with DPS and his county voter registrar . . .". *Id.*

Although the Fifth Circuit found that Mr. Stringer had not shown he would move again and use the DPS System to change his address and update his voter registration again, the evidence now shows that *it did happen again.* In late 2019, Mr. Stringer moved from his residence in Bexar County to a new residence in Harris County. On November 23, 2019, he used the DPS System to change the address on his driver's license. He would have simultaneously updated his voter registration, but was not given the option. Thus, unlike the circumstances in Stringer I, Mr. Stringer was *unregistered* to vote in Harris County *when this lawsuit was filed.* He clearly had standing when suit was initiated. Docket no. 1; Docket no. 5-1, appx. 178-180.

Soon after suit was filed, Plaintiffs again sought preliminary injunctive relief. Docket no. 5. Because  Mr. Stringer was suffering a second injury as the result of Defendants' noncompliance with the NVRA, and he would not be able to vote in the March 2020 primary election in the county and precinct where he resided, the Court ordered that Mr. Stringer's voter registration be updated before February 3, 2020. Docket no. 46. Defendants complied with the Court's order and manually updated Mr. Stringer's voter registration so he could vote in the primary election. Docket no. 48. However, the court-ordered voter registration did not "divest" Mr. Stringer of standing to pursue future injunctive relief, or render his claims moot, because he had concrete plans to move again in August 2020 and would once again use the DPS System to change his address and update his voter registration. Docket no. 5-1, appx. 178-180; docket no. 69-1, pp. 72, 74 (Deposition of J. Stringer at 35:6-15, 37:1-4); docket no. 91, exh. A.

Those plans have now come to fruition. Mr. Stringer moved to a new residence on August 15, 2020, and he fully intends to use the DPS System to again change his address and simultaneously update his voter registration. Docket no. 96. Thus, absent injunctive relief, Mr. Stringer will have his rights violated a third time. Applying the standard set forth in Stringer I, the uncontested facts in the record clearly demonstrate "a sufficient probability that [Mr. Stringer] will use the noncompliant driver's license services again" and there is a "substantial risk" that he will be injured by his inability to simultaneously register to vote as required by the NVRA. There is also a "substantial risk" that Mr. Stringer will be disenfranchised in the general election if injunctive relief is not ordered.[7]

Again, the NVRA's private right of action "extend[s] standing under the Act to the maximum allowable under the Constitution." *ACORN v. Fowler*, 178 F.3d at 363. The presence of one party with standing is sufficient to satisfy Article III. *Rumsfeld v. Forum for Academic & Institutional Rights,* 547 U.S. at 52 n. 2; *Texas v. U.S.*, 787 F.3d at 747. And a threat of impending injury is sufficient to satisfy Article III standing. *See Wendt,* 821 F.3d at 552 ("[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing"). Here, Mr. Stringer has presented undisputed evidence of not only past violations but an imminent threat of future injury. Despite the NVRA being in existence for almost thirty years, and Defendants' knowledge that they are not in compliance with the NVRA, Defendants have failed to take the necessary steps to cure ongoing statutory violations and come into compliance. The immediate threat of additional injury to Mr. Stringer continues because Defendants have not altered their practices.

---

[7] As Mr. Stringer has noted in his recent sworn declaration, he currently resides in a different congressional district than the district in which he resided when this lawsuit was initiated. Docket no. 96.

Because the Court finds that Mr. Stringer has standing to seek injunctive relief, and the injunctive relief he seeks is the same relief sought by the organizational plaintiffs and intervenor-plaintiffs, the Court finds it unnecessary at this juncture to determine the standing of each organization to seek injunctive relief.[8]

<div align="center">V.</div>

<div align="center">Substantial likelihood of success on the merits</div>

The Court has twice addressed the merits of the claims, and incorporates those findings herein. At the risk of repetition, the Court restates the facts, which are based on the Stringer I record as well as the record submitted by the parties herein.

A.      How the DPS System works

As previously explained, each of Mr. Stringer's personal experiences with DPS's online process are consistent with the testimony of State officials and employees with knowledge of how the process worked in the past and how it currently works. DPS operates offices around the State and issues driver's licenses and other state identification cards. DPS is also a designated voter registration agency, pursuant to 52 U.S.C. § 20506. DPS's in-person driver's license applications (DL-14A),[9] in-person renewal/replacement/change of address forms (DL-43),[10] and mail-in change of address forms (DL-64)[11] currently serve as simultaneous voter registration

---

[8]If the Court did not face time restraints, it would address the standing of each organization. However, given the calendar days remaining before the voter registration deadline, it is in the best interest of the parties to simply address the standing of Mr. Stringer at this juncture.

[9]Stringer I docket no. 93, exh. A-7.

[10]Stringer I docket no. 93, exh. A-8.

[11]Stringer I docket no. 93, exh. A-9.

applications as required under the NVRA.[12] However, DPS has not integrated voter registration into its online process for driver's license renewal and change of address; thus, the driver's license application and voter registration application remain separate processes rather than one simultaneous transaction.[13]

Texas has an NVRA implementation plan which explains: "The Department will [provide to each person who applies in person] a form and procedure that *combines* the department's application form for a license, identification card or EIC with an officially prescribed voter registration application form . . . The form will also inform the applicant that the applicant's *electronic signature* provided to the department will be used for submitting the applicant's voter registration application." Stringer I docket no. 77, appx. 30 (emphasis added).[14] The implementation plan further states that the "department will use a change of address form and procedure that *combines* department and voter registration functions. The change of address form submitted in person will allow a licensee or cardholder to indicate whether the change of address is also to be used for registration purposes." *Id.* (emphasis added). On "[e]ach weekday the Department is regularly open for business, the Department will *electronically* transfer to the Secretary of State (SOS) the name and relevant data regarding each applicant who is of voting

---

[12]Until May 2015, DL-64 did not include any question about whether the applicant wanted to register to vote. Stringer I docket no. 77, appx. 116 (admission no. 21).

[13]The process for driver's license change of address and renewal is "combined online – it's one system interface." Stringer I docket no. 94-12, deposition of S. Gipson, at 37:10-16; docket no. 77, appx. 117, admission no. 5 ("the [Texas.gov] website provides a single online process for qualified applicants to renew their driver's license, update the address listed on their driver's license, or complete both processes in a single online transaction"). But voter registration is a completely separate transaction that must be done through SOS. Stringer I docket no. 94-12, deposition of S. Gipson, at 78:1-9; 94:1-4; *see also* Stringer I docket no. 77, appx. 118 (admission nos. 10, 11).

[14]The form states: "By providing my electronic signature, I understand the personal information on my application form and my electronic signature will be used for submitting my voter's registration application to the Texas Secretary of State's office. Wanting to register to vote, I authorize the Department of Public Safety to transfer this information to the Texas Secretary of State." Stringer I docket no. 77, appx. 40, deposition of K. Ingram (SOS) at 62:18-63:1.

age and a United States citizen who affirmatively answered the voter registration question." Stringer I docket no. 77, appx. 31 (emphasis added). This plan was implemented after the enactment of the NVRA and confirms Texas's understanding that the driver's license/voter registration process must be "combined" in one simultaneous transaction and that electronic signatures would be used for voter registration purposes.

When an individual applies for a Texas driver's license the first time, he must appear in person. During the transaction he signs a key pad which captures his electronic signature.[15] After a driver's license is issued, subsequent transactions (for renewal, replacement, or change of address) may be handled by mail, online, or even by phone. For voter registration purposes, the change of address forms submitted by mail have been handled in the same manner as renewal/change of address forms submitted in person. In both form DL-43 (the in-person application for renewal/replacement/change of address) and form DL-64 (the mail-in application for change of address) the driver's license and voter registration applications have been integrated or combined into one simultaneous transaction so that a customer need only check a single box indicating that he/she would like to register or update his/her voter information. After checking the box during the transaction, no further steps are necessary.[16] DPS receives the information and the individual's previously stored electronic signature, along with all other identifying data, is electronically submitted to SOS to be used for voter registration purposes.[17]

---

[15]*See* Stringer I docket no. 94-8, deposition of S. Gipson (DPS), at 234:11-24.

[16]In other words, there is no need to go to SOS to obtain, print, complete, sign, and mail a separate voter registration application.

[17]Stringer I docket no. 94-7, deposition of Betsy Schonhoff, SOS voter registration manager, at 28:3-4 ("We get application files from them on a daily basis for voter registration"); Stringer I docket no. 77, appx. 117, RFA 26 ("Admits that the information DPS transmits to SOS about each applicant for voter registration includes a digital image of the applicant's signature").

Upon receipt, the SOS then transmits the data to local registrars for completion of the voter registration process.[18] Although the in-person and mail-in renewal/change of address forms contain a blank for a signature, neither DPS nor SOS use the signature on paper.[19] Instead, DPS and SOS use the previously stored electronic signature.[20] In fact, SOS admits that it never uses paper signatures obtained through DPS transactions – it uses only previously imaged electronic signatures for voter registration purposes.[21] As Keith Ingram, the SOS 30(b)(6) representative,

---

[18]As B. Schonhoff further explained:
Q: So DLS is the diver's license system, correct?
A: That's what I understand, right.
Q: And how does that system function within that process, the transfer process?
A: It's my understanding that when the operator enters an application into the DLS system and indicates that a person wants to be a registered voter, that information is then warehoused, if you will, at the State, and every night the State groups up those applications and send them – well, we get them as a single file. So depending on – for the DPS applications, I think we actually go pull – they produce the file, and then we go pull it and process it through our system on a daily basis.
Q: What do you mean by "our system"?
A: I'm sorry, the voter registration system, the team database system where we actually part the addresses and give that information out to the voter registrars of the county.
(Stringer I docket no. 94-7, deposition of B. Schonhoff, at 68:1-20).

[19]*See* Stringer I docket no. 94-8, deposition of S. Gipson (DPS), at 254:4-7 (Q: So DPS was never actually scanning physical ink signatures from paper and then transmitting them to SOS . . . A: No, we were not). *See also* Stringer I docket no. 94-10, deposition of J. Crawford (DPS), at 73:17-25 (Q: Does the DLS only store electronic signatures? A: Yes. . . . Q: Sure. Does the DLS only store signatures which are input using the keypad? A: The DLS database itself, yes, it only stores signatures that are collected on those electronic pads); 76:20-21 (Q: Are signature files ever removed from DLS? A: No.); 77:6-16 (Q: If a person's record has more than one signature associated with that record, which signature would be batched and sent to the Secretary of State with the voter extract . . . file? A: The most recently captured one).

[20]*See* Stringer I docket no. 94-10, deposition of J. Crawford, at 139:10-21 (Q: [T]he mail-in change of address, the current one . . . [w]ith regard to the batch that's sent to the Secretary of State at night for the voter registration, if the person answers "yes" on their change of address that's mailed in and that's input into DLS, it's the electronic signature that was previously provided the last time that person went in person. That's the signature that goes to the Secretary of State. Is that right? A: Yes, that's correct).

[21]*See* Stringer I docket no. 77, appx. 117, admission no. 26 (Defendants admit "that the *information* DPS transmits to SOS about each applicant for voter registration includes a *digital image of the applicant's signature*"); appx. 118, admission nos. 10, 11 (Defendants admit "that individuals are not registered to vote in connection with their interactions with DPS unless they submit an *image of their signature*, either by submitting a signed application by mail, or providing an *electronic image* of their physical signature in person at a DPS location") (emphasis added).

testified:

> Q: So you identified for me or explained to me why – what the electronic signature or the keypad signature at DPS is used for. It's used for the signature that's required in the Texas Election Code. You read me the section. Is that right?
>
> A: That's right.
>
> Q: What's the ink signature on the DPS's physical forms used for as far as voter registration?
>
> A: I don't know. I don't know if it's used for anything. Once they've applied in person at the office, they've signed it electronically.
>
> \* \* \*
>
> Q: On the . . . driver's license forms . . . it says, "By providing my electronic signature, I understand the personal information on my application form and my electronic signature will be used for submitting my voter registration application to the Secretary of State's Office." Correct?
>
> A: That's what it says.
>
> Q. Okay. And so that's indicating to the prospective voter that the electronic signature is what's used as the signature that's compliant with the Texas Election Code?
>
> A: The physical signature that's electronically captured, yes.
>
> Q: Okay. Back to your point about the online transactions not containing a signature, the DPS does use the prior provided electronic signature that – for the driver's license that they – the customer used – provided the last time they were in person. Correct?
>
> A: Presumably, yes.
>
> Q: The same goes for the mail-in change of address transaction – are you looking at your driver's license there?

A: Yeah. Because this one was renewed online, and so I guess that I wrote that signature at their signature capture device quite a while ago. . . .

Q: For the mail-in change of address form that . . . DPS receives that has the voter registration question, there is not an electronic signature or a – use your phrase – the physical signature provided on a keypad provided for that change of address interaction. Correct?

A: No. There's a physical signature on the – on the address change application.

Q: Right. But the information that gets sent on to the voter registrars through the Secretary of State's Office is the data that's pulled from that form and then the electronic signature that was previously provided by the customer in person at a DPS office?

A: That's my understanding, yes.

Q: Well, is that the Secretary of State's understanding?

A: That is the Secretary of State's understanding. You bet.

Stringer I docket no. 94-11, appx. 39, 42, deposition of K. Ingram, at 50:1-11; 95:14-97:14.

Sheri Gipson with DPS also testified:

Q: So the signature that is sent for an in-person transaction where someone answers "yes" to the voter registration question and – and similarly when someone changes their address – excuse me – address via the mail, the signature that's sent for both of those voter registration applications, that's the electronic signature; is that right?

A: That is correct.

Q: And that's sent to the Secretary of State?

A: That is correct.

Q: Okay. The ink signature is never sent to the Secretary of State, correct?

A: That is correct.

* * *

Q: Does anyone go through and compare these two?

A: Not typically, no. . . .

* * *

Q: Okay. So then the mail-in signatures are never compared [with the stored electronic

signatures]. . . .

A: During the routine process, it would never be compared . . . . When I say "routine

process," what I'm talking about is the individual that's processing that mail renewal

application, they would never compare that signature.

Stringer I docket no. 77, appx. 69, deposition of S. Gipson, at 203:19-204:7; appx. 79 at 234:25-

235:1; 236:19-237:9.

Because preexisting electronic signatures, rather than signatures on paper, are used for

paper (in-person and mail-in) renewal and change of address transactions, it would seem logical

that preexisting electronic signatures would be used for paperless (online) transactions. Yet

Defendants claim that, under Texas law, renewal and change of address transactions performed

online require a signature on paper for voter registration purposes. As Mr. Ingram testified:

Q: So in that same way, the online transaction could utilize the previously provided

electronic signature that was provided in person by the customer for the voter registration

application form that gets to the voter registrar in the same way that the change of address

mail-in occurs?

A: It could if the law allowed it, but the law doesn't allow it, so it can't.

Q: What portion of the [Texas] law doesn't allow it?

A: 13.002(b).

Stringer I docket no. 94-11, deposition of K. Ingram, at 97:15-24; Stringer I docket no. 77, appx.

42. Because Defendants assert that Texas law requires a signature on paper, and a signature on paper during a paperless transaction is not possible, Defendants essentially claim they should be excused from compliance with the NVRA when it comes to online renewal and change of address transactions.[22]

Prior to 2013, a person who engaged in an online/paperless transaction for a driver's license renewal or change of address would provide the same in-depth identifying information required for an in-person or mail-in transaction, but when reaching the question of whether he would like to register to vote or update his voter information, checking the "yes" box would automatically default to "no." Thus, while the user may have been led to believe that his "yes" answer would result in updating his voter information, and there was the appearance of compliance with the NVRA, there was never an intent on the part of DPS or SOS to actually update the voter registration information. Thus, the answer to the question regarding voter registration was completely meaningless. SOS was aware of the NVRA requirements. SOS was also aware that the online voter registration question, programmed to automatically default to "no," was completely meaningless.[23] As Mr. Ingram testified:

Q: Why is there a voter registration question on the online DPS transaction – application? Excuse me.

A: Well, I imagine it's because of Section 5 of the National Voter Registration Act of 1993.

---

[22]As Ms. Gipson explained, for online transactions, Texas has decided that a previously captured electronic signature is sufficient for driver's license purposes, but they've refused to accept the same electronic signature for voter registration purposes. Stringer I docket no. 77, appx. 70, deposition of S. Gipson, at 215:21-216:7.

[23]Or worse, it could have led to voter registration data being purged. Legislative history suggests that a key concern when enacting the NVRA was abuse of the purging efforts, so Congress specifically prevented states from removing voters from the rolls for failure to vote or failure to respond to a change-of-address notification. *See* H.R. Rep. No. 103-9, at 16 (1993), reprinted in 1993 U.S.C.C.A.N. 105, 120.

Q: Could you elaborate on that a little bit?

A: Sure. The National Voter Registration Act of 1993 required that motor vehicle agencies, in our case the DPS, whenever a person has a driver's license transaction – driver's license transaction, that they should simultaneously offer the right – the ability to update their voter registration or register to vote for the first time. That's why the NVRA is called the Motor Voter law.

\* \* \*

Q: Okay. So in – back in 2012, the Secretary of State's office was aware that the answer to the "do you want to register to vote" question online was defaulting to no. Is that correct?

A: Right.

Q: Was there any – any discussion at that point with the Department of Public Safety to – to make that change?

A: Not that I recall.

Stringer I docket no. 77, appx. 40-41, deposition of K. Ingram at 62:4-17; 84:24-85:8.

As explained in Mr. Ingram's deposition, the automatic default to "no" for voter registration was the subject of a 2012 complaint by an unidentified motor voter. Stringer I docket no. 77, appx. 41, deposition of K. Ingram at 83:15-85:3. SOS responded: "That is something we can discuss with DPS in the future." Stringer I docket no. 77, appx. 41, deposition of K. Ingram at 84:16-18. Mr. Ingram did not recall any subsequent discussions. After some passage of time, DPS did remove the automatic default to "no." Stringer I docket no. 77, appx. 41, deposition of K. Ingram at 82:7-13.

Thereafter, until February 27, 2016, Step 5 of the online renewal and change of address interface was changed to prompt the applicant to select "yes" or "no" beneath the statement "I

want to register to vote." It no longer defaulted to "no," but selecting "yes" did not provide a simultaneous voter application. Instead, it gave the user a link to the SOS voter registration website for a completely separate application process. Stringer I docket no. 77, appx. 118, admission no. 7.

After February 27, 2016, Step 5 of the online renewal and change of address interface was changed to prompt the applicant to select "yes" or "no" to answer the question "Do you want to request a voter application?" Stringer I docket no. 77, appx. 118, admission 8, 9. While the online process currently accepts a "yes" answer to the voter application question, the transaction still ends there. The user is still not provided a simultaneous application for voter registration purposes. Instead, when a user responds with a "yes" answer to the voter application question, the user is simply given a website link to the SOS office.[24] *See* Stringer I Stipulation no. 10. If the user goes to the SOS website, he must request and fill out a completely separate voter registration application as if there had been no DPS transaction at all.[25] For an in-county change of address, SOS will handle the transaction but it is still a completely separate process from the DPS transaction. For an out-of-county change of address, the application must be retrieved, printed, filled out, and mailed or delivered in person to the county registrar in order to update the voter registration. The application seeks the same information required by DPS for an online driver's license change of address but the applicant must go through a completely different governmental entity (SOS) with a completely separate application process.[26] Thus, it is indisputable that the

---

[24]*See* Stringer I docket no. 77, appx. 45, deposition of K. Ingram at 182:5-10 ("When they select yes to voter reg online, they are merely presented with a link and has no indication of whether or not they actually registered to vote").

[25]*See* Stringer I docket no. 77, appx. 78, deposition of S. Gipson at 136:20-137:21 (the voter registration process "is separate").

[26]*See* Stringer I docket no. 94-7, deposition of B. Schonhoff (SOS), at 157:19-158:18 (they would have to fill the same information out twice).

online DPS renewal/change of address transaction and SOS voter registration transaction are not simultaneous, but rather entirely separate application procedures conducted through separate agencies.[27] If an individual does not take these extra steps – go to the SOS website, request an application, print out the application, fill out and sign the application, and then mail or hand deliver it to the country registrar – he will not be registered to vote.

Both DPS and SOS claim they cannot comply with the NVRA and integrate DPS online renewal/change of address with SOS voter registration to provide a simultaneous application because the Texas Election Code requires a signature. Stringer I docket no. 94-7, deposition of B. Schonhoff, at 195:11-17; *see also* Stringer I docket no. 94-11 and Stringer I docket no. 77, appx. 42, deposition of K. Ingram, at 97:15-24. Yet SOS admits that it uses previously stored electronic signatures for *all* voter registration applications that originate with DPS regardless of whether those applications are paper transactions. As Betsy Schonhoff testified:

Q: The signature that Secretary of State is currently using for voter registration applications is an electronic signature that is provided when a person goes in person to a DPS office; is that right?

A: When they are – when they are in the application file, you mean?

---

[27]*See* Stringer I docket no. 94-7, deposition of B. Schonhoff (SOS), at 159:23-160:11:
Q: Does SOS track information about whether a DPS customer clicks "yes" to the voter registration question on the online application?
A: For the DPS application?
Q: Yes.
A: No, not to my knowledge.
Q: Okay. Does SOS track information about whether a DPS customer using an online diver's license – or filling out an online diver's license application, whether that person clicks through to the SOS website?
A: No to my knowledge.
Q: And why not?
A: It's not our application. It's not our software. It's not our website.

Q: Yes, the voter registration application.

A: Yes, It's what they have signed on that signature pad. That's my understanding.

Q: Turning your attention to the mail-in change of address. You acknowledge that the Secretary of State does receive voter registration applications from change of address mail-ins that DPS processes; is that correct?

A: That's correct.

Q: Yes.

A: It is my understanding they treat in-person just like – mail just the same as in person.

Q: But the mail-in – correct me if I am wrong – the mail-in address to the application for update with DPS, the signature that's on that form is not extracted and somehow the Secretary of State gets access to it; is that correct?

A: That's my understanding.

Q: . . . It is your understanding that the current law requires a signature for the voter registration application.  Do I have that right?

A: Yes.

Q: The mail-in forms that you all are getting information from, from DPS, uses the prior provided electronic signature from that customer; is that right?

A: That's my understanding.

Stringer I docket no. 94-7, deposition of B. Schonhoff, at 195:18-196:25.

Defendants also stipulate that DPS uses electronic signatures for *all* online driver's license renewal or change of address transactions. Stringer I docket no. 94, Stipulation 11 ("The signature that appears on the license generated as a result of a customer's online driver's license renewal or change of address transaction is an image of the applicant's physical signature, electronically captured during the applicant's most recent in-person transaction in a DPS field

office (On the DL-14A and DL-43 forms this is referred to as the applicant's 'electronic signature')"). Defendants admit that they even use electronic signatures for driver's license transactions conducted over the telephone. *See* Stringer I docket no. 94-12, deposition of S. Gipson, at 175:2-23 ("Telephone transactions are handled in the same manner as an online transaction . . . Q: So when a customer renews a driver's license on – over the telephone, does DPS use the signature that was previously on file to – to put on the customer's renewed driver's license? A: Yes.").

Defendants admit that the personal information required for authenticating online transactions is equal to or even more rigorous than the identifying information used for in-person and mail-in transactions.[28] They also admit there are no technological barriers to simultaneous online transactions. Again, Ms. Schonhoff testified:

Q: . . . If they send – DPS collects and sends to you, the Secretary of State's office, all of the information they currently send to you for in-person transactions where the individual checks "yes," I want to register to vote, they send you all of that same information, the same data points, the same electronic signature, the TEAM system on your end could process it in the same way that it currently processes the information that comes for in-person transactions at DPS?

---

[28] *See* Stringer I docket nos. 94-8 and 94-12, deposition of S. Gipson (DPS), at 237:16-20 (Q: How does DPS go about verifying the information submitted online for the online change of address or renewal form? A: Again, the only verification that's done there is their log-in credentials); 234:2-9 ("They're ... well, the only thing that they're changing is their address. But they're – they're verifying who they are through the authentication process that occurs up front by providing key pieces of data, which is their . . . name, the driver-license number, date of birth, *the audit number* that's on the card they currently hold, and the last four of their Social.") (emphasis added); 224:12-14 (Q: What about an audit number, is that requested on paper forms? A: No, it's not.). *See also* Stringer I docket no. 94-9, deposition of E. Hutchins, at 28:4-25; 30:4-31:16; 33:8-34:1 (authentication of users on DPS's online process for driver's license renewal and change of address is done in real-time). *Compare* Stringer I docket nos. 93-8 (in-person); 93-9 (mail-in); and 93-10 (online).

A: From a technical standpoint?

Q: Yes.

A: That's correct.

Stringer I docket no. 94-7, deposition of B. Schonhoff, at 222:9-22.

And Mr. Ingram also testified:

Q. Well . . . going back to the mail-in change of address with DPS, that information goes

on to the Secretary of State. If someone chooses to register to vote, that signature is

retrieved from DLS and sent on to the Secretary of State. Right?

A: It's retrieved from wherever they keep it, yes.

Q: Okay. And, presumably, that same signature could be sent on if the person answered

yes to the voter registration question online?

A: If it was legal to do so. I've already told you I think that's technically possible. You

bet.

Q: Okay. And –

A: And I don't think it would cost a lot of money.

                                       * * *

Q: But the Secretary of State does know that DPS is able to pull the proper signature to

send on for voter registration purposes to the Secretary of State for mail-in change of

address forms?

A: I'm not arguing with you that this is not possible. That is not my argument at all. My

argument is exactly to the contrary. This is a very possible thing to do what you're saying

if it was legal, and it's not legal . . . So I'm not contesting the logistics of it. We can agree

that it's a possible thing to do.

Stringer I docket no. 77, appx. 45, deposition of K. Ingram at 184:12-185:1; 186:5-16. *See also*

Stringer I docket no. 94-9, deposition of E. Hutchins, at 99:22-100:2; Stringer I docket no. 94-10, deposition of J. Crawford, at 142:6-18; 143:12-144:21 (DLS could send all the information it currently obtains to the Secretary of State's office, and "it could also send the previously provided electronic signature from that customer, just like it does with a mail-in change of address").[29] While feasible, Defendants refuse to use the voter information and technology currently available because they claim the Texas Election Code does not allow the use of previously captured electronic signatures for online transactions – even though they already use them for mail-in and in-person transactions. Plaintiffs disagree with Defendants' legal argument and assert that because SOS uses previously captured electronic signatures for voter registration purposes in all other instances, there is no reason why Defendants cannot use those same electronic signatures for online transactions.

B.    The NVRA

The NVRA was enacted in 1993 pursuant to Congress's constitutional authority under the Elections clause to "make or alter regulations" which have an effect upon federal elections. U.S. CONST. art. 1, § 4, cl. 1. Specifically, Congress found that –

(1)  the right of citizens of the United States to vote is a fundamental right;

(2)  it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

(3)  discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and

---

[29]When individuals submit a mail-in a change of address form, a DPS employee manually inputs all of the responses into the DLS via computer, including the response to the question of whether he or she would like to register to vote (Stringer I docket no. 77, appx. 120, RFA 23) and the stored electronic signature is used. Thus, there is no real distinction in processing of online transactions and mail-in transactions other than the physical signature on the mail-in form, which is not compared with the electronic signature, not used for DPS purposes, and not forwarded to SOS for voter registration purposes.

disproportionately harm voter participation by various groups, including racial minorities.
52 U.S.C. § 20501(a)(1)-(3).

The stated purposes of the Act are –

(1) to establish procedures that will increase the number of eligible citizens who register

to vote in elections for Federal office;

(2) to make it possible for Federal, State, and local governments to implement this

chapter in a manner that enhances the participation of eligible citizens as voters in

elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b)(1)-(4).

Based on these findings and for these stated purposes, Congress imposed national

procedures for voter registration for elections for federal office as follows:

(a) In general

Except as provided in subsection (b), notwithstanding any other Federal or State law, in

addition to any other method of voter registration provided for under State law, each State

shall establish procedures to register to vote in elections for Federal office –

(1) by application made *simultaneously* with an application for a motor vehicle driver's

license pursuant to section 20504 of this title;

(2) by mail application pursuant to section 20505 of this title; and

(3) by application in person –

(A) at the appropriate registration site designated with respect to the residence of the

applicant in accordance with State law; and

(B) at a Federal, State, or nongovernmental office designated under section 20506 of this

title.

52 U.S.C. § 20503 (emphasis added).

Section 20504 specifically describes the requirements for a simultaneous application for voter registration and motor vehicle driver's license:

(a) In general

(1) Each State motor vehicle driver's license application (*including any renewal application*) submitted to the appropriate State motor vehicle authority under State law *shall serve as an application for voter registration* with respect to elections for Federal office unless the applicant fails to sign the voter registration application.

(2) An application for voter registration submitted under paragraph (1) shall be considered as updating any previous voter registration by the applicant.

* * *

(c) Forms and procedures

(1) Each State shall include a voter registration application form for elections for Federal office *as part of* an application for a State motor vehicle driver's license –

(2) The voter registration application *portion* of an application for a State motor vehicle driver's license –

(A) *may not require any information that duplicates information required in the driver's license portion of the form* (other than a second signature or other information necessary under subparagraph (C));

(B) may require only the minimum amount of information necessary to –

(i) prevent duplicate voter registrations; and

(ii) enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(C) shall include a statement that –

(i) states each eligibility requirement (including citizenship);

(ii) contains an attestation that the applicant meets each such requirement; and

(iii) requires the signature of the applicant, under penalty of perjury;

\*   \*   \*

(d) Change of address

Any change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license *shall serve as notification of change of address for voter registration* with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes.

52 U.S.C. § 20504 (emphasis added).

Section 20506(a)(5)(C) further states that "A person who provides service . . . shall not . . . "take any action the purpose or effect of which is to discourage the applicant from registering to vote."

And finally, Section 20510 provides civil enforcement by the Attorney General and a private right of action for any person "who is aggrieved by a violation of this chapter," 52 U.S.C. § 20510(a)-(b), and the "rights and remedies . . . are in addition to all other rights and remedies provided by law," 52 U.S.C. § 20510(d).

The notice provision in § 20510(b) further states:

(1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election officials of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within

120 before the date of an election for Federal office, the aggrieved person may bring a

civil action in an appropriate district court for declaratory or injunctive relief with respect

to the violation.

(3) If the violation occurred within 30 days before the date of an election for Federal

office, the aggrieved person need not provide notice to the chief election official of the

State under paragraph (1) before bringing a civil action under paragraph (2).

52 U.S.C. § 20510(b)(2)-(3).

The NVRA expressly reminds us that "it is the duty of the Federal, State, and local

governments to promote the exercise of [the fundamental right to vote]." 52 U.S.C. §

20501(a)(2). And it is the duty of "Federal, State, and local governments to implement this

chapter . . .". 52 U.S.C. § 20501(b)(2). The State of Texas has combined state and federal voter

registration; thus, the ability to vote in state and local elections will be affected by any federal

violation in the registration process. *See ACORN v. Miller*, 129 F.3d 833, 837 (6th Cir. 1997)

(explaining that NVRA registration requirements will affect state and local elections). More

importantly, there is nothing in the NVRA stating that a voter must be disenfranchised in a

federal election before they can bring an enforcement action. In fact, nothing in the NVRA states

that a voter must be disenfranchised at all. *See* 52 U.S.C. § 20510 (b)(1) ("A person who is

aggrieved *by a violation of this chapter . . .*").

C.      Past arguments not raised herein

        1.      Sovereign immunity

        In Stringer I, Defendants asserted that Plaintiffs failed to validly invoke the NVRA's

limited waiver of immunity and were not entitled to bring an action under the *Ex parte Young*

exception to immunity. Defendants have not invoked sovereign immunity in Stringer II, but the

Court addresses the issue in the event it is raised again at some juncture. The NVRA imposed

38

voter registration requirements on the states to ensure that all practical barriers that make voter registration more restrictive or inconvenient are removed. More than thirty years later, there are states like Texas that still refuse to comply with its mandates. Congress's abrogation of immunity under the NVRA is clear and unequivocal. When a state fails to comply with the Act, the Act authorizes judicial intervention. The Attorney General can seek declaratory or injunctive relief, and the Act establishes a private right of action for individuals aggrieved by a violation under the Act. 52 U.S.C. § 20510(a)-(b), (d). Defendants have admitted that they "each play a part in implementing the NVRA in Texas." Stringer I docket no. 82, p. 4. The Secretary of State is chief election officer, and DPS is a voter registration agency. *Id.* As such, they may be sued in any enforcement action arising from violations. The evidence clearly shows that Defendants have had ample notice and opportunity to cure and come into compliance. Moreover, the Supreme Court has long recognized Equal Protection claims of this nature against state officials tasked with carrying out laws that affect the rights of voters. *Crawford v. Marion County*, 553 U.S. 181 (2008) (Equal Protection claim against the Indiana Secretary of State and others challenging state voter ID law); *Burdick v. Takishi*, 504 U.S. 428 (1992) (voter's Equal Protection claim against Hawaii Director of Elections and others challenging state write-in voting prohibition). Thus, sovereign immunity is not an issue herein.

      2.     Renewal v. change of address

      In Stringer I, Defendants also alleged that Plaintiffs' challenge should be restricted to online change of address transactions, not online renewal transactions, because Plaintiffs' transactions were for a change of address rather than renewal. Again, this argument has not been raised in Stringer II. As noted previously, however, this argument seems to go to the underlying reason for the transaction, rather than the lawfulness of the process being challenged. Regardless of whether a Texan seeks to change his address or renew his driver's license online, the process

is the same and the outcome is the same. DPS uses the same website (Texas.gov) and the same "Driver's License Renewal and Change of Address" system, which authenticates users, detects eligibility, and processes data in the same manner for both renewals and changes of address. Stringer I docket no. 94-9, deposition of E. Hutchins, at 30:4-31:16; 33:8-34:1; Stringer I docket no. 94-12, deposition of S. Gipson, at 37:10-16 (the process is combined online, "it's one system interface"); Stringer I docket no. 93, website links and exh. A-1, A-2, A-10 (DPS/Driver's License Division online process for driver's license renewal and/or change of address). Neither type of transaction, using the same online process, allows simultaneous applications for voter registration as required by the NVRA. Stringer I docket no. 94-12, deposition of S. Gipson, at 37:10-40:5. Given that Defendants have chosen to combine the online process and use the same system for both change of address and renewal transactions, a change in programming to allow online simultaneous voter registration would mean a change for both types of transactions. Likewise, an NVRA violation in online change of address transactions imputes a violation in online renewal transactions because Defendants admit that the online process (which encompasses both) does not allow simultaneous voter registration. Having combined the online process for both types of transactions, both types of transactions fall within the same mandates under 52 U.S.C. §§ 20503(a)(1) and 20504 and will be affected by any relief granted herein. *Accord Miller*, 129 F.3d at 837 (the State chose, as a matter of convenience, to implement one voter registration process for federal, state, and local elections; thus, the registration obligations imposed by the Act affect registration procedures associated with state and local elections). For these reasons, the real issue is whether DPS's online process for driver's license renewal and change of address violates the NVRA by failing to allow simultaneous applications for voter registration.

D.    Plaintiffs are likely to succeed on the merits of their NVRA claims

Plaintiffs' NVRA claims have not changed since Stringer I. First, Plaintiffs contend
Defendants have violated and continue to violate the NVRA by failing to provide simultaneous
applications for voter registration during online driver's license transactions. Second, Plaintiffs
contend Defendants have violated and continue to violate the NVRA by requiring persons who
use the online process to take additional steps to update their voter registration and separately
submit information through a different transaction with a different agency that duplicates
information required in the driver's license transaction. And third, Plaintiffs allege that
Defendants have violated the NVRA by failing to ensure eligible applicants are registered to vote
and to transmit voter registration information submitted online to the appropriate State election
official within the statutorily required time frame.

1.    Statutory interpretation

In Stringer I, the parties disagreed on the meaning of some of the applicable provisions in
the NVRA. Assuming their positions remain unchanged, the Court reviews the governing
principles of statutory construction. The first step is to determine whether the statutory text, when
considered in context, is plain and unambiguous. If the statutory language is plain, the Court
must enforce it according to its terms. *King v. Burwell*, 135 S.Ct. 2480, 2489 (2015) (citing
*Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010)). "[O]ftentimes the "meaning
– or ambiguity – of certain words may only become evident when placed in context." *Id.* (citing
*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)). "So when deciding
whether the language is plain, we must read the words 'in their context and with a view to their
place in the overall statutory scheme.'" *Id.* (quoting, in part, *Brown & Williamson*, 529 U.S. at
133). "Our duty, after all, is 'to construe statutes, not isolated provisions.'" *Id.* (quoting, in part,
*Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280,

290 (2010)). "A provision that may seem ambiguous in isolation is often clarified by the

remainder of the statutory scheme . . . because only one of the permissible meanings produces a

substantive effect that is compatible with the rest of the law." *King v. Burwell*, 135 S.Ct. at 2492

(quoting *United Sav. Assn. of Tex v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365,

371 (1988)). The Court cannot interpret a federal statute in a manner that negates its own stated

purpose. *See id.* at 2495; *see also New York State Dept. of Social Servs. v. Dublino*, 413 U.S.

405, 419-20 (1973).

      2.     The NVRA applies to motor voter transactions conducted online

      The requirements in the NVRA clearly apply to online transactions (also known as

electronic, remote, or internet transactions). There is nothing in the statute that expressly or

impliedly excludes online transactions; instead, the plain language of the NVRA indicates that it

applies to all transactions. *See* 52 U.S.C. §§ 20504 (a)(1) ("*Each* State motor vehicle driver's

license application . . .") and (d) ("*any* change of address form . . .") (emphasis added).

Numerous courts have determined that the NVRA applies to online or remote transactions with

the same force as it applies to in person and mail transactions. *See, e.g.*, *Action NC v. Strach*, 216

F.Supp. 3d 597, 622-23 (M.D.N.C. 2016) ("[the] words 'each' and 'any' as used in NVRA

provision requiring that each state motor vehicle driver's license application serve as application

for voter registration and that any change of address form submitted shall serve as notification of

change of address for voter registration were unambiguous and reflected Congress' intent to

make the NVRA applicable to 'each' and 'every' covered transaction, irrespective of whether the

transaction occurred remotely or in person"); *Kemp*, 841 F. Supp. 2d at 1331-32 (explaining that

the NVRA cannot be read to cover only in-person transactions and Georgia's limited

interpretation and implementation that excluded internet transactions conflicted with its

acknowledgment that noncompliance likely led to decline in voter registration as more applicants

prefer to apply remotely).

Defendants have not argued that the NVRA does not apply to online or remote transactions. In fact, they have admitted that compliance with the NVRA is required for online transactions. *See* Stringer I docket no. 77, appx. 65, deposition of S. Gipson (DPS), at 94:5-12 (Q: Why does DPS include a voter registration question during the online renewal and change of address portion? A: So it is part of the plan between the Secretary of State and Department of Public Safety in compliance with the voter registration question being combined as part of the application process for a diver license or ID"); 95:5-15 (Q: What requires you to do that? A: ... basically the NVRA and Chapter 20 of the Election Code and Texas Statute.); Stringer I docket no. 94-8, deposition of S. Gipson at 136:20-23 (Q: Why does DPS require customers to answer that question if they don't even retain the answer? A: The – because we need to offer them the availability of the application); Stringer I docket no. 94-11, deposition of K. Ingram (SOS), at 62:4-8 (Q: Why is there a voter registration question on the online DPS transaction – application? . . . A: Well, I imagine it's because of Section 5 of the National Voter Registration Act of 1993. Q: Could you elaborate on that a little bit? A: Sure. The National Voter Registration Act of 1993 required that motor vehicle agencies, in our case the DPS, whenever a person has a driver's license transaction – driver's license transaction, that they should be simultaneously offered the right – the ability to update their voter registration or register to vote for the first time. That's why the NVRA is called the Motor Voter law."). Yet Defendants' compliance with the NVRA falls short when it comes to online transactions. Texans have repeatedly complained about DPS's failure to process voter registration information through its online system, but Defendants have refused to correct the deficiencies. Thus, rather than furthering the purpose of the NVRA by "establish[ing] procedures that will increase the number of eligible citizens who

43

register to vote,"[30] the State is thwarting the efforts of Texans who wish to register to vote.

      3.      The "simultaneous application" requirement

Congress was not subtle about requiring DPS, a voter registration agency, to provide a simultaneous application for voter registration. The terms are used more than once in the statute, and its plain meaning is clear and unambiguous. Section 20503, titled "National procedures for voter registration for elections for Federal office," directs that "each State shall establish procedures to register to vote . . . by application made *simultaneously* with an application for a motor vehicle driver's license." 52 U.S.C. § 20503(a)(1). Defendants do not dispute the meaning of "simultaneous," which is defined as "existing or occurring at the same time; exactly coincident,"[31] or "happening or being done at exactly the same time,"[32] or "occurring, operating, or done at the same time."[33]

Section 20504, titled "*Simultaneous* application for voter registration and application for motor vehicle driver's license" explains this requirement as one simultaneous application form that serves dual purposes – driver's license and voter registration. This section, when read in context, not only requires that the applications be simultaneous, but discusses them in terms of a single transaction. Under subsection (a), each State motor vehicle driver's license application "(*including any renewal application*) . . . *shall serve as an application for voter registration*" and "[a]n application for voter registration . . . *shall be considered as updating any previous voter registration by the applicant*." Under subsection (c), "[e]ach State shall include a voter

---

[30] 52 U.S.C. § 20501(b)(1)

[31] https://www.merriam-webster.com/dictionary/simultaneous

[32] https://dictionary.cambridge.org/us/dictionary/english/simultaneous

[33] https://en.oxforddictionaries.com/definition/simultaneous

registration application form . . . *as part of* an application for a State motor vehicle driver's license," and the "voter registration application *portion* of an application for a State motor vehicle driver's license . . . may not require any information that duplicates information required in the driver's license *portion* of the form. " 52 U.S.C. § 20504(a),(c). Under subsection (d), "[a]ny change of address form" . . . for purposes of a State motor vehicle driver's license *shall serve as notification of change of address for voter registration* . . . unless the registrant states on the form that the change of address is not for voter registration purposes." 52 U.S.C. § 20504(d).

In Stringer I, Defendants seemed to have a clear understanding of what the statute requires, yet they distorted the statutory language in the interpretations they proposed. For example, Mr. Ingram with SOS testified that "the NVRA requires a simultaneous opportunity to register to vote." *See* Stringer I docket no. 77, appx. 40, deposition of K. Ingram, at 63:15-16; 64:24-25; *see also* appx. 113, RFA no. 4 (inserted the word "opportunity" when asked to admit their legal obligations under the NVRA). In Stringer I, defense counsel used the same "simultaneous opportunity" argument in their briefs. But the NVRA plainly and unequivocally requires DPS, a voter registration agency, to provide a simultaneous application – not merely a "simultaneous opportunity" to go through a second duplicate application process with SOS. "Opportunity" could mean many things, but we do not need to speculate about what it means because the NVRA does not use that term. Likewise, Ms. Gipson testified that DPS "need[s] to offer them the availability of the application." Stringer I docket no. 94-8, deposition of S. Gipson, at 136:20-23. But the NVRA requires more than simply making voter registration applications "available." Again, making applications "available" could mean many things but the NVRA does not use that term. The operative terms in the NVRA are much more commanding and specific: it clearly and unequivocally requires a "simultaneous application" with DPS (the voter registration agency), not a mere "opportunity" to go through a wholly separate, non-

45

simultaneous application process with SOS. If the Court were to accept the argument that DPS

can simply direct Texans to SOS to obtain, fill out, sign, and mail in or deliver in person a wholly

separate voter registration form, the language in the NVRA would be rendered meaningless.

Plaintiffs have been correct in their assertion that this central fact has never been disputed: when

eligible Texans update their driver's licenses online with DPS, they are not provided a

simultaneous application to register to vote or update their voter registration information. The

NVRA's requirement that DPS, a voter registration agency, provide a simultaneous application

for both driver's license and voter registration purposes is plain and unambiguous and the facts in

the record confirm that Texans are being deprived of this statutory right. Stringer I docket no. 77,

appx. 118, admission no. 8 (Defendants admit that now when applicants reach Step 5 of the

online process, they are asked "Do you want to request a voter application?"); admission no. 11

(Defendants admit that if an eligible voter checks "yes" under the question "Do you want to

request a voter application?," they are not registered to vote . . . unless they submit an image of

their signature, either by submitting a signed application *by mail*, or providing an electronic

image of their physical signature *in person* at a DPS location) (emphasis added); appx. 121,

admission no. 9 (Defendants admit that a "Yes" answer during an online transaction is never

entered as a response in the Voter Field for purposes of forwarding the information to SOS);

appx. 123, admission nos. 21, 23 (Defendants admit that when an eligible voter who updates his

or her driver's license information on the current DPS website responds "yes" under the

statement "Request a voter registration application," DPS does not transfer his or her data to

SOS); appx. 96, admission no. 8 (Defendants admit that an eligible voter who changes the

address on her non-commercial Texas driver's license online must submit a signed voter

registration application *in person or by mail* in order for his voter registration information to be

updated. The DPS and Texas.gov online interface links such voters to an application they may

print out, sign, and mail, and also gives such voters the *option to request that a voter registration application be mailed to them*, postage paid, and contains language indicating that the *separate form* must be filled out in order to complete the voter's registration) (emphasis added); appx. 98, admission no. 12 (information voters submit to the DPS change of address online portal relating to voter registration is not transmitted to SOS); *see also* Stringer I docket no. 77, appx. 33, DPS Voter Inquiry Web Portal (informing the public that online registration is not possible, and persons seeking voter registration must print, sign, and deliver the application to the voter registrar in their county); appx. 133, driver's license renewal and change of address receipt (showing that a separate voter registration application may be requested). Thus, it is clear that Defendants are violating 52 U.S.C. §§ 20503 and 20504 by failing to comply with the simultaneous application requirement.

4.      The duplicate information prohibition

To further the simultaneous application requirement, Congress saw fit to prohibit the states from requiring duplicate information. The prohibition against duplicate information is plain and unambiguous, leaving no room for argument as to its meaning. Section 20504(c)(2)(A) clearly states that "[t]he voter registration application portion of an application for a State motor vehicle driver's license may not require any information that duplicates information required in the driver's license portion of the form." This prohibition reinforces the simultaneous application requirement because an application that is truly simultaneous does not require duplication. On the other hand, any process that requires duplication of information is an indication that the voter registration "portion" of an application for a State motor vehicle driver's license is not truly simultaneous. The NVRA does permit states to seek a "minimum amount" of additional information that may be necessary for "State election officials to assess the eligibility of the applicant" for voter registration purposes. 52 § 20504 (c)(2)(B),(C). But the minimum

information necessary to verify voter registration eligibility cannot duplicate the information already provided for driver's license purposes. For example, some states do not require citizenship to obtain a driver's license, so those states could include a citizenship question in the voter registration portion of the application without violating the duplicate information prohibition. But Texas DPS requires an applicant to answer a citizenship question for driver's license purposes; thus, another duplicate question about citizenship for voter registration purposes would violate this prohibition.

Defendants' violation of the duplicate information prohibition is indisputable, and has continued unabated. Defendants admit that none of the information in the online application for driver's license renewal or change of address is used for voter registration purposes. At the end of the DPS transaction, a "yes" answer does not mean that the information already provided will be used for voter registration purposes pursuant to the NVRA. Instead, the DPS transaction ends, none of the information already provided is forwarded to SOS, and the user is directed to SOS for an entirely separate voter registration application that requires the same information already provided to DPS in the driver's license transaction. It is a separate and distinct transaction with a separate office (SOS) which requires a separate and distinct application with duplicate information. Stringer I docket no. 77, appx. 96, admission no. 8 (Defendants admit that upon completion of the DPS transaction, a voter must follow the link to SOS and then "request that a voter registration be mailed to them . . . and [the portal] contains language indicating that the separate form must be filled out in order to complete the voter's registration"); appx. 132 (change of address transaction informs users that their DPS transaction does not register them to vote and they must follow link to SOS website where a separate voter application form can be downloaded or requested); appx. 134 (separate voter registration application provided by SOS that must be printed, signed, and mailed); Stringer I docket no. 93, exh. A-3 (same); exh. A-4 (SOS

48

information page explaining: a) voter registration application forms can be accessed online through SOS (not DPS, the voter registration agency); b) the application can be filled out on the computer, printed, and mailed to the voter registrar in the voter's county of residence; and c) informing voters that they will not be registered until all steps are completed); Stringer I docket no. 94-12, deposition of S. Gipson, at 218:2-219:16 (explaining that at end of DPS transaction, the customer is directed to SOS if he wants to register to vote or update his voter registration information).

In Texas, DPS requires applicants seeking a renewal and/or change of address to provide several pieces of information, including their name, address, driver's license number, date of birth, and the last four digits of their Social Security number. Stringer I docket no. 94-8, deposition of S. Gipson, at 234:2-9; Stringer I docket no. 94-9, deposition of E. Hutchins, at 25:11-22; Stringer I docket no. 77, appx. 130. When customers finish their transaction with DPS and then go to SOS to fill out a completely separate application for voter registration purposes, they must provide the same information : name, address, driver's license number, date of birth, and the last four digits of their Social Security number. Stringer I docket no. 77, appx. 134 (voter registration application); Stringer I docket no. 94-7, deposition of B. Schonhoff, at 157:19-158:18 (both the DPS change of address form and SOS voter registration form ask the person's name, date of birth, and address; applicants would have to fill this information out twice). Requiring motor voters to go to a different agency (SOS) to obtain and fill out a separate application that requires the same information violates the prohibition against duplicate information set forth in 52 U.S.C. § 20504(c).

5.      The timely submission requirement

The NVRA also requires that "a completed voter registration portion of an application for

a State motor vehicle driver's license accepted at a State motor vehicle authority shall be transmitted to the appropriate State elections official not later than 10 days after the date of acceptance." 52 U.S.C. § 20504(e)(1). The deadline for transmittal is shorter (five days) if the voter registration application is accepted within five days before the last day for registration to vote in an election. 52 U.S.C. § 20504(e)(2). Because the evidence in the record shows that DPS does not provide simultaneous voter registration as part of the online driver's license renewal and change of address process, DPS does not transmit to SOS any voter registration information in connection with such transactions. In fact, it is undisputed that DPS does not even record, and therefore cannot transmit, responses to the voter registration question in the online driver's license renewal and change of address application. Stringer I docket no. 94-8, deposition of S. Gipson at 136:10-19; Stringer I docket no. 77, appx. 67, deposition of S. Gipson at 102:10-19:103:16-25; Stringer I docket no. 94-7, deposition of B. Schonhoff at 159:23-160:3; 220:18-23.

As a voter registration agency, DPS has a statutory duty to provide motor voters with simultaneous voter registration applications *and* transmit the applications to SOS within 10 days after acceptance. DPS admits it does not submit voter registration information to SOS for online transactions conducted by motor voters "[b]ecause [they] have not been advised by the Secretary of State that providing that through the online process is permissible at this point." Stringer I docket no. 77, appx. 67, deposition of S. Gipson at 103:16-25. The NVRA's timely submission requirement continues to be violated in every online renewal and change of address transaction.

6. State law must yield to federal law

The uncontested facts in the record lead to only one conclusion: DPS, a voter registration agency, does not provide a simultaneous voter registration application to individuals who engage in online driver's license transactions. Instead, motor voters are simply directed to SOS, which

requires them to fill out a completely separate voter registration application with duplicate information, and then print, mail, and/or hand deliver it to the voter registrar. But Defendants have refused to change their practice, claiming that Texas election law does not allow the procedure dictated by the NVRA. This argument is fatally flawed.

Defendants have claimed that the NVRA incorporates Texas election law, making it subject to state law, and rely on the following provisions:

(a)     In general

(1)     *Each State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law* shall serve as an application for voter registration . . .

\* \* \*

(d)     Change of address

*Any change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license* shall serve as notification of change of address for voter registration . . .

52 U.S.C. § 20504(a)(1), (d).

These provisions neither incorporate Texas election law nor make it subject thereto. Instead, the plain language of these provisions, when considered in context and with a view to their place in the overall statutory scheme, simply mean that driver's license applications submitted in accordance with state driver's license laws, i.e., the Texas Transportation Code, shall also serve as applications for voter registration purposes. The reference to state law in these provisions cannot be interpreted to mean the NVRA is dictated by the election laws of 50

51

different states, as it would be contrary to the plain language of the statute, require the Court to take it out of context, and render the NVRA entirely meaningless. The NVRA was enacted under the Elections clause, U.S. Const. Art. I § 4, cl. 1, which gives Congress the broad power to preempt, alter, and supplant state law when it comes to federal voter registration practices. *Arizona v. InterTribal County of Arizona, Inc.*, 570 U.S. 1, 133 S. Ct. 2247, 2253-57 (2013). ("The Clause's substantive scope is broad" and "Elections Clause legislation, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them"). To the extent state voter registration procedures are inconsistent with the NVRA, they are superseded. *Id.* at 2253-54 ("the state law, so far as the conflict extends, ceases to be operative"). On the other hand, the NVRA does not supplant state driver's license laws. Thus, interpreting the provisions in 52 U.S.C. § 20504(a)(1) and (d) to mean that driver's license applications submitted in accordance with the Texas Transportation Code shall also serve as applications for voter registration purposes is consistent with the purpose of the Act and the entire statutory scheme.

Defendants have consistently argued that DPS, the voter registration agency tasked with carrying out the mandates of the NVRA, cannot provide individuals with simultaneous driver's license - voter registration applications because Texas election law requires a physical signature or "wet signature." In other words, Defendants claim that a physical signature written by hand is necessary to comply with Texas election law; therefore, although online driver's license transactions are legally valid, a simultaneous voter registration application would be legally invalid. Again, this argument is flawed for several reasons.

First, Texas law cannot be used as an excuse for failing to comply with the NVRA. To the extent it is inconsistent with the NVRA, the Texas Election Code must yield to the NVRA. Moreover, Defendants have simply cherry-picked the provisions they believe justify their

continued noncompliance. Defendants believe sections 13.002(b) and 15.021(a) of the Texas Election Code (requiring an application to be "signed") support their position,[34] but they ignore section 20.062 (requiring DPS to use a form and procedure that combines driver's license/renewal/change of address with voter registration), which does not support their position.[35] Defendants' reliance on Texas election law as an excuse for federal noncompliance is misplaced because it is preempted, altered, and supplanted by the mandates in the NVRA. But even if Texas election law was not preempted, there is nothing in the law that precludes the use of electronic signatures.

Second, the NVRA does state that a simultaneous driver's license-voter registration application and any renewal application "requires the signature of the applicant." *See* 52 U.S.C. § 20504(a)(1), (c)(2)(C)(iii). The NVRA's change of address provision is separate, and does not state that a signature is necessary for a simultaneous driver's license-voter registration change of address. 52 U.S.C. § 20504(d). But even in renewal transactions that require a signature, neither the NVRA nor Texas election law defines or limits the type of signature that is required for voter registration renewal or change of address applications, and Defendants cite no authority for the proposition that it must be a physical ink or wet signature written on paper by hand. With twenty-first century technology and legislation such as the Global and National Commerce Act (E-Sign Act) and Uniform Electronic Transactions Act (UETA), electronic signatures are legally

---

[34]Stringer I docket no. 94-11, deposition of K. Ingram, at 97:15-24; docket no. 77, appx. 42 (Q: What portion of the law doesn't allow it? A: 13.002(b)).

[35]Section 20.062(a) states: The Department of Public Safety shall prescribe and use a form and procedure that combines the department's application form for a license or card with an officially prescribed voter registration application form. Section 20.062(b) states: The department shall prescribe and use a change of address form and procedure that combines department and voter registration functions. The form must allow a licensee or cardholder to indicate whether the change of address is also to be used for voter registration purposes.

recognized and widely used. 15 U.S.C. § 7001 et. seq.; Unif. Electronic Transactions Act, U.L.A.

(1999). Under the Uniform Electronic Transactions Act, which has been adopted by Texas and

46 other states, the medium in which a signature is created, presented or retained does not affect

its legal significance. *See* UETA § 7; Tex. Bus. & Com. Code Ann. § 322.007(a),(c),(d) (Vernon

2015) (TUETA). As these provisions explain:

> (a)     A record or signature may not be denied legal effect or enforceability solely
>
>          because it is in electronic form.
>
> (c)     If a law requires a record to be in writing, an electronic record satisfies the law.
>
> (d)     If a law requires a signature, an electronic signature satisfies the law.

Interpreting the signature requirement in the NVRA to include electronic signatures is consistent

with the purpose of the Act and the overall statutory scheme. *Accord Kemp*, 208 F. Supp. 3d at

1335-36 (Georgia SOS argued that the "records" requirement in the NVRA was limited to

physical records; the court determined that the requirement includes electronic records). Mr.

Ingram, the 30(b)(6) representative for SOS, admits that an electronic signature complies with

the signatures requirements under the NVRA. Stringer I docket no. 77, appx. 40, deposition of K.

Ingram at 62:18-63:1 ("DPS's compliance with [the NVRA] for in-person transactions is

[satisfied by] the question . . . on the DPS forms, 'Do you want to register to vote? I've agreed to

provide my electronic signature, and it can be sent to the Secretary of State's Office.'"). If an

electronic signature is legally sufficient under the NVRA for paper transactions, it is legally

sufficient for online transactions. The NVRA established procedures to remove barriers to voter

registration, to make the process easier and more convenient, and to increase voter participation.

Interpreting the "signature" requirement to allow only physical, manual, or wet ink signatures

written by hand on paper would be inconsistent with the plain language of the NVRA and the

entire statutory scheme. And while Defendants continue to rely on Texas election law as a excuse for noncompliance with the NVRA, there is nothing in Texas law that precludes the use of electronic records and electronic signatures. On the contrary, Texas law permits SOS and DPS to accept electronic records and electronic signatures. *See* Tex. Bus. & Com. Code § 322.017 (each state agency has the option to accept electronic records and electronic signatures);[36] Tex. Bus. & Com. Code § 322.007 ("If a law requires a signature, an electronic signature satisfies the law.").[37] And it is undisputed that Texas is already using voter registration signatures in electronic form. *See* Tex. Election Code § 20.066 (for in person and mail transactions, the information provided is input "into the department's electronic data system"; the applicant is informed "that the applicant's electronic signature" will be used; and the department "electronically transfer[s] the applicant's voter registration data, including the applicant's [electronic] signature, to the secretary of state"); 1 Tex. Admin. Code § 81.58 (allowing a voter's signature to be captured by an electronic device for the signature roster). Defendants provide no legal justification for failing to comply with the NVRA when it comes to online renewal and change of address transactions.

Finally, Plaintiffs are not asserting that all signature requirements be tossed out or ignored. Instead, they are asserting that Defendants already retain electronic signatures for every

---

[36] As Eiten Hersh (an expert in Stringer I) noted, the refusal to accept electronic signatures appears to have been a state policy decision. *See* Stringer I docket no. 94-13, deposition of E. Hersh, at 121:23-122:25. But state policy – like state law – must yield to the mandatory requirements under the NVRA.

[37] *See also* Tex. Bus. & Com. Code § 322.008(a) ("If parties have agreed to conduct a transaction by electronic means and a law requires a person to provide, send, or deliver information in writing to another person, the requirement is satisfied if the information is provided, sent, or delivered, as the case may be, in an electronic record . . ."); Tex. Bus. & Com. Code § 322.012 ("if a law requires that a record be retained, the requirement is satisfied by retaining an electronic record"); Tex. Govt Code § 2054.060 ("digital signature may be used to authenticate a written electronic communication sent to a state agency"); 1 Tex. Admin. Code § 203.24 (describing technology that may be acceptable for use by state agencies).

licensed motor voter in Texas and currently use those electronic signatures for both driver's license and voter registration purposes; thus, there is no reason for refusing to use those same signatures for online renewal and change of address transactions. *See* Stringer I docket no. 77, appx. 39, 42, deposition of K. Ingram at 50:1-11; 95:14-97:14; Stringer I docket no. 77, appx. 69, 70, 79, deposition of S. Gipson at 203:19-204:7; 215:21-216:7; 234:21-235:1; 236:19-237:9. Even when a signature is required, that requirement may be satisfied with the electronic signature that is on file for every Texas motor voter.[38] There is no legal impediment to using electronic signatures, and there is no technological barrier to online transactions that allow simultaneous renewal and change of address for driver's license and voter registration. *See* Stringer I docket no. 94-7, deposition of B. Schonhoff, at 222:9-22; Stringer I docket no. 77, appx. 45, deposition of K. Ingram at 184:12-185:1; 186:5-16; Stringer I docket no. 94-9, deposition of E. Hutchins at 99:22-100:2; Stringer I docket no. 94-10, deposition of J. Crawford at 142:6-18; 143:12-144:21 (DLS could send all the information it currently obtains to the Secretary of State's office, and "it could also send the previously provided electronic signature from that customer, just like it does with a mail-in change of address"); Stringer I docket no. 94-13, deposition of Eitan Hersh at 34:20-23 ("my opinion is that there are no obvious substantial technical reasons why Texas does not do that or financial situations why Texas does not do that"); 110:6-111:13 (. . . "it [could] transmit, just as it does now for mail and in-person transactions, the previously-recorded digital signature of the voter because everyone who is renewing or changing their address online has a digital signature stored at the DPS"); 115:15-25 (38 other states have an online process for voter registration).

---

[38]Because every Texan must provide an electronic signature when they obtain their original driver's license, and the online process only involves the renewal of an existing driver's license or a change of address on an existing driver's license, it is undisputed that the State of Texas already has preexisting electronic signatures for every individual that uses the online system.

E.      Plaintiffs are likely to succeed on the merits of the Fourteenth Amendment claim

        Plaintiffs also assert that Defendants' refusal to provide voter registration applications

simultaneously with online driver's license renewal and change of address transactions

constitutes a violation of their Equal Protection rights under the Fourteenth Amendment.[39] The

right to vote is a fundamental right protected under the Equal Protection Clause of the Fourteenth

Amendment. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966). "The right to vote

is protected in more than the initial allocation of the franchise. Equal protection applies as well to

the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam). The Equal

Protection Clause applies when state procedures restrict voters' rights. *Bush v. Gore,* 531 U.S. at

103 (Supreme Court found that Florida's failure to institute reliable recount procedures violated

the Equal Protection Clause); *Obama for Am. v. Husted*, 697 F.3d 423, 436-37 (6th Cir. 2012)

(Circuit court found that Ohio law that prevented casting of early ballots by non-military voters

violated the Equal Protection Clause).

        1.      Applicable standard

        Although Defendants have not disputed the applicable standard in Stringer II, the Stringer

I parties did not agree on the applicable standard of review. The Court must review the merits in

determining preliminary injunctive relief, so it addresses the issue again. In Stringer I, the

plaintiffs asserted that the *Anderson-Burdick*[40] standard applies (Stringer I docket no. 77, pp. 19-

23; Stringer I docket no. 85, pp. 16-17), while Defendants asserted that an *Arlington Heights*[41]

---

        [39]"The rights and remedies established by [the NVRA] are in addition to all other rights and
remedies provided by law." 52 U.S.C. § 20510(d)(1).

        [40]*Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992).

        [41]*Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977).

strict scrutiny analysis or *City of Cleburne*[42] heightened scrutiny analysis applies (Stringer I docket no. 82, p. 24; Stringer I docket no. 88, pp. 19-20). Because this case involves a challenge to a state voter registration procedure that is alleged to unfairly restrict the right to vote and harm voter participation, the more flexible *Anderson-Burdick* standard applies. *Burdick v. Tukushi*, 504 U.S. 428, 433 (1992) ("to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently").[43]  Under this standard, "[a] court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate against the precise interests put forward by the State as justification for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (internal quotes omitted). "However slight the burden [to the voters] may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Elec. Bd.*, 553 U.S. 181, 191 (2008).

2.      Analysis

"[V]oting is of the most fundamental significance under our constitutional structure,"

---

[42]*City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432 (1985).

[43]*See also Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) (Fifth Circuit applied *Anderson-Burdick* analysis in challenge to state law regulating volunteer deputy registrars); *Tex. Democratic Party v. Williams*, 285 Fed. Appx. 194, 195 (5th Cir. 2008) (per curiam) (noting that district court properly applied *Anderson-Burdick* balancing test to the constitutional claims challenging use of eSlate voting machines), *cert. denied*, 555 U.S. 1100 (2009); *Faas v. Cascos*, 225 F. Supp. 3d 604, 610 (S.D. Tex. 2016) (State election laws "could hardly serve their legitimate purposes if they were routinely subject to strict scrutiny . . . [thus], [t]he United States Supreme Court recognized the need for a more flexible analytical framework in two landmark cases: *Anderson* and *Burdick*").

*Burdick*, 504 U.S. at 433, and unfair registration procedures can have a direct and damaging effect on voter participation. *See* 52 U.S.C. § 20501(a)(3) (Congressional findings). While the State can impose reasonable restrictions, those restrictions must be justified by specific interests that outweigh the burden on voters. It is undisputed that Defendants permit simultaneous voter applications for persons that renew or change their driver's license in person or by mail, but refuse simultaneous voter applications for persons that renew or change their driver's license online. Persons who renew or change their driver's license in person or by mail need only check a single box indicating that he would like to register or update his voter information. After checking the box on the driver's license form, no further steps are necessary. DPS sends the updated information to SOS in nightly batches, so the voter registration is updated timely and efficiently. However, persons who renew or change their driver's license online are denied the same process. They first go through the steps to renew or change the address on their license online, then must end their DPS driver's license transaction before going to SOS to obtain, print, and complete a separate voter registration application which requires duplicate information. Once the additional application is complete, it must be mailed or hand delivered. DPS, a voter registration agency, maintains a procedure that accepts simultaneous voter registration applications for some, while rejecting them for others. This type of restriction on voter registration imposes a burden on the fundamental right to vote that warrants the demonstration of a corresponding interest sufficiently weighty to justify the limitation.

Defendants' only justification for the voter registration burden imposed on motors voters is the "signature" requirement under Texas election law. However, neither federal nor state law limits the signature requirement to physical hand written signatures on paper (or "wet signatures"). Electronic signatures and electronic records are legally recognized and widely used,

*even by Defendants*, and Defendants offer no reason for refusing to accept them for online transactions. DPS already uses electronic records and previously imaged electronic signatures for every Texan that uses the online system for driver's license renewal or change of address.[44] And SOS already uses electronic records and previously imaged electronic signatures for voter registration purposes and admits that electronic signatures comply with signature requirements under the NVRA and Texas Election Code.[45] SOS admits it never uses physical, manual, or wet ink handwritten signatures on paper for voter registration purposes.[46] DPS already has, in its possession and control, an electronic signature of every motor voter that has been issued a license. With motor voters' electronic signatures already in the voter registration agency's possession, there is no reason why Defendants cannot use them in an online driver's license-voter registration transaction when it already uses them in mail and in-person transactions.

Neither the law nor the facts support Defendants' alleged justification for limiting simultaneous voter applications to in-person and mail transactions and refusing simultaneous voter applications for persons that renew or change their driver's license online. Because the

---

[44]Stringer I docket no. 77, appx. 70, deposition of S. Gipson at 215:21-216:7 (for online transactions, Texas has decided that a previously captured electronic signature is sufficient for driver's license purposes, but they refuse to accept the same signature for voter registration purposes); Stringer I Stipulation no. 11 ("The signature that appears on the license generated as a result of a customer's online driver's license renewal or change of address transaction is an image of the applicant's physical signature, electronically captured during the applicant's most recent in-person transaction").

[45]Stringer I docket no. 77, appx. 39-40, 42, K. Ingram deposition at 50:1-6; 62:4-63:1; 97:4-14.

[46]Stringer I docket no. 77, appx. 39, K. Ingram deposition at 50:7-11 (Q: What's the ink signature on the DPS's physical form used for as far as voter registration? A: I don't know. I don't know if it's used for anything. Once they've applied in person at the office, they've signed it electronically"); Stringer I docket no. 77, appx. 117, RFA 26 ("Admits that the information DPS transmits to SOS about each applicant for voter registration includes a digital image of the applicant's signature"); Stringer I docket no. 77, appx. 122, RFA 13 (Defendants admit that prior to transmission to SOS, the DPS computer system locates records that [include] a "Signature Image"); Stringer I docket no. 77, appx. 118, RFA 10, 11 (Defendants admit that individuals are not registered to vote in connection with their interactions with DPS unless they submit an electronic image of their signature).

alleged justification is not legitimate, there is no state interest that outweighs the burden imposed on voters. Defendants fail to demonstrate a corresponding interest sufficiently weighty to justify the limitation on voters' rights.

Not only have Defendants failed to justify their actions, but they also acknowledge that permitting simultaneous voter applications for individuals that renew or change their driver's license online would be technologically very feasible and the cost would be minimal. *See* Stringer I docket no. 77, appx. 45-46, deposition of K. Ingram at 184:19-185:2 (it's "technically possible" and "I don't think it would cost a lot of money"), 186:15-16 ("I'm not contesting the logistics of it"); Stringer I docket no. 77, appx. 90, deposition of J. Crawford (from an IT perspective, DLS is currently capable of sending the voter data and electronic signature to SOS); *see also* Stringer I docket no. 94-13, deposition of E. Hersh at 110:6-10 (it would be a "massive cost savings"); 111:10-13 (the savings would be statewide); Stringer I report of E. Hersh at pp. 6, 12-15 (the technology clearly exists for state motor vehicle authorities that allow online transactions). In fact, the undisputed testimony reflects that changing the online process to include simultaneous voter registration applications would very likely lead to greater efficiency for the State and increased voter registration for Texans. *See* Stringer I docket no. 94-13, deposition of E. Hersh at 114:8-10; 114:24-115:14 (having people filling out information by hand and then having state employees key that information in electronically leads to more errors); Stringer I report of E. Hersh at p. 4 (in 11 of the 38 states with online registration, the policy was adopted without any legislation, but simply as a technological upgrade to an existing governmental function); Stringer I docket no. 85, appx. 25 (potential number of motor voters affected in average week and month). Even assuming the State had legitimate interests, which it has not shown, if the State also has open to it a less drastic way of satisfying those interests it

may not choose a scheme that restricts the right to vote. *Anderson*, 460 U.S. at 806.

Based on the facts before the Court, there is a substantial likelihood that Plaintiffs will succeed on the merits of their NVRA and Equal Protection claims.

VI.

Substantial threat of irreparable injury

It is undisputed that the individual plaintiffs were not simultaneously registered to vote at the time of their online transactions with DPS, a designated voter registration agency. It is undisputed that they remained unregistered to vote at the time this suit was filed, and they were only registered prior to the primary election as a result of court order. It is undisputed that as a result of Mr. Stringer's move to a new residence on August 15, 2020, he is again unregistered to vote in the precinct in which he resides. Mr. Stringer's declarations and deposition testimony, which are uncontested, demonstrate a substantial risk that Mr. Stringer will use the online DPS System prior to the October 5 voter registration deadline to change the address on his driver's license and update his voter registration. By Defendants' own admissions, their system does not provide simultaneous voter registration, and their failure to change the system to come into compliance unequivocally demonstrates a substantial risk that Mr. Stringer will be injured by his inability to simultaneously update his voter registration when he uses the DPS System to change the address on his driver's license. Mr. Stringer will remain unregistered to vote after using the DPS System, and he will remain unregistered after the October 5 voter registration deadline, which will result in disenfranchisement in the November 3 general election. This threatened future injury – lack of simultaneous voter registration as a result of Defendants' unlawful process and resulting disenfranchisement – more than satisfies the standing necessary for preliminary injunctive relief. *See Stringer v. Whitley*, 942 F.3d at 720 ("plaintiffs seeking injunctive [ ] relief

can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury."). Mr. Stringer's threatened future injury will be (1) potentially suffered by him, not someone else; (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.' " *Id.* at 720-21. With the deadline for voter registration on October 5, and the general election less than thirty days thereafter, there is a substantial risk that Mr. Stringer will be disenfranchised if he is not registered to vote; thus, the threatened future injury is indisputably "imminent." Moreover, Mr. Stringer's future threatened injury is "fairly traceable" to Defendants' continued failure to comply with the NVRA and the unjustified burden on Mr. Stringer's statutory and constitutional rights.

The future injury – disenfranchisement – is irreparable. The right to vote is a fundamental right, and the deprivation of such right is something Mr. Stringer "will *never* be able to recover." *Stringer v. Whitley*, 942 F.3d at 726. (Ho, J., concurring). But the injury that will occur between now and October 5, the voter registration deadline, is still redressable with immediate injunctive relief. Mr. Stringer has already been injured twice and he should not be forced to wait and suffer a third constitutional deprivation when it can be avoided by granting temporary injunctive relief. *Texas v. U.S.*, 809 F.3d at 173 n. 137 (citing *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001)).[47]

## VII.

## Balance of harm and public interest

The harm to Mr. Stringer – the inability to register to vote pursuant to the NVRA and being disenfranchised as a result – clearly outweighs the minimal burden that will be placed on

---

[47]As Judge Ho warned, "[a]s citizens, we can hope it is a deprivation they will not experience again . . .".). Defendants failed to heed Judge Ho's warning and it is happening again. At some point a known violation must be addressed.

Defendants by simply being ordered to comply with the NVRA, a federal law that has been in existence since 1993. Defendants have been on notice of their continuous violation of the NVRA since at least 2016 (the commencement of Stringer I), yet Defendants' practices have remained unchanged. The public clearly has a paramount interest in removing voter registration barriers and having procedures that encourage rather than discourage voter registration. Defendants have offered no factual or legal argument that would justify denying the simultaneous voter registration to which Mr. Stringer is legally entitled. As Defendants have admitted, there are no technological barriers to compliance and corrective measures would not be costly. Uncontested expert testimony shows that a compliant DPS system would very likely lead to great efficiency, less human error, a massive saving in costs, and increased voter registration.

## VIII.

### Injunctive relief is appropriate

Since 2016, and every time that injunctive relief has been considered, defense counsel has argued that compliance with the NVRA would take too long for the time frame in question – even though the time frame has been different every time. At this juncture, the evidence does not support such representations.

When permanent injunctive relief was being considered in Stringer I, Defendants alleged that corrective measures would take 90 days to implement. However, when this lawsuit was initiated, and it was apparent nothing had changed, the Court ordered the parties to meet and confer with persons who understand the technology and then conduct discovery on the feasability and time frame for implementation of corrective measures. The Court also ordered that Defendants track, retain, and preserve the following information: (1) since November 2016, the total number of persons who renewed or updated their driver's license online, answered "yes" to

the voter registration/application question or indicated that they wanted to register to vote or update their voter registration as part of the same transaction, and were not simultaneously permitted to register to vote or update their voter registration; and (2) since November 2016, the number of persons who renewed or updated their driver's license online, answered "yes" to the voter registration/application question or indicated that they wanted to register to vote or update their voter registration as part of the same transaction, were not simultaneously registered to vote or their voter registration was not updated, and *are still not registered to vote and/or their voter registration has not been updated as a result.*" Docket nos. 31, 47. Defendant began capturing and retaining such data on or about February 14, 2020.[48] DPS also planned to begin accepting online voter registration information from the online portal, processing the information into the Driver's License System database, updating the individuals' driver's license records with that information, and transmitting the data to SOS on May 17, 2020.[49] DPS worked with SOS on developing the format and transmission process for the voter registration data it will be sending, and SOS approved the plans.[50] This information will be transmitted to SOS in precisely the same format and layout that voter registration information is already sent from DPS to SOS for in-person and by-mail driver's license transactions, and will only include information for individuals who answer "yes" to the online voter registration application question.[51] These files will include the electronic signature image for each DPS customer in the same format and

---

[48]Docket no. 69, appx. 19, deposition of S. Gipson, at 67:19-21.

[49]Docket no. 69, appx. 17-18, 21-22, deposition of S. Gipson, at 40:22-41:6; 70:23-71:11.

[50]Docket no. 69, appx. 22-23, deposition of S. Gipson, at 71:12-72:8.

[51]Docket no. 69, appx. 12-14, deposition of S. Gipson, at 27:2-29:16.

process those images are sent for in-person and by-mail transactions.[52] The files also have fields for including answers to additional questions that are asked on paper voter registration forms (such as whether the individual would like to serve as an election judge), but the fields will presently be left blank pending further orders.[53] The only changes needed by DPS in order to finish a complete systemic fix are to implement simple front-end changes to the website to include additional language mirroring a paper voter registration application. This includes adding a question about serving as an election judge, what type of voter registration it is (a new registration or an update), and language, including attestation language, to make clear that the applicant is applying to register to vote.[54] Most of these changes have already been approved and mocked up and should only take one to two weeks to implement if and when directed to do so.[55] DPS is waiting further direction before proceedings with these changes.[56] Even if the front-end changes are not already entirely ready to roll out, these types of changes would take two or at most three weeks to implement.[57]

The evidence now suggests that the cost to SOS to begin processing such data is negligible or non-existent.[58] This is because SOS already receives nightly files from DPS that include the relevant information for processing a voter registration application for in-person DPS

---

[52]Docket no. 69, appx. 14, deposition of S. Gipson, at 29:18-24.

[53]Docket no. 69, appx. 15-17, deposition of S. Gipson, at 38:19-40:21.

[54]Docket no. 69, appx. 15-17, 30-32, deposition of S. Gipson, at 38:19-40:21; 93:21-95:5.

[55]Docket no. 69, appx. 24, deposition of G. Gipson, at 74:1-9.

[56]Docket no. 69, appx. 31, deposition of S. Gipson, at 94:2-8.

[57]Docket no. 69, appx. 25, deposition of S. Gipson, at 79:1-5.

[58]Docket no. 69, appx. 44-45, 53-54, deposition of K. Ingram, at 71:25-72:3; 118:2-119:20.

transactions, and when DPS has implemented the changes outlined herein, the information for individuals transacting with DPS online will reach SOS in the same format and be indistinguishable from in-person transactions. In fact, implementing a full fix to the online driver's license portal would save money for the Secretary of State. As a result of this process that has already been put into place – which the Court commends – the State would need approximately two weeks to complete the process and provide a fully simultaneous, non-duplicative voter registration application to online driver's license customers. This updated system would be the simplest and least burdensome form of relief, address the violations asserted herein, and provide a remedy for the imminent, irreparable harm to Mr. Stringer.

IX.

Conclusion

DPS encourages Texans to use its online services to renew their driver's license and change their address because it is easier and more convenient.[59] It cannot, at the same time, deny simultaneous voter registration applications when those online services are used. DPS is legally obligated, as a designated voter registration agency under the NVRA, to permit a simultaneous voter registration application with every transaction. Defendants are violating §§ 20503(a)(1); 20504(a),(c),(d), and (e); 20506(4)(A)(iii), and (d); and 20507(a)(1)(A) of the NVRA and their excuses for noncompliance are not supported by the facts or the law. Plaintiffs are also being denied equal protection under the law. Although the Court does not reach the issue of standing as to each plaintiff and intervenor-plaintiff, only one plaintiff must have Article III standing for the Court to consider injunctive relief. Mr. Stringer has shown he has standing to seek preliminary injunctive relief and he is entitled to the relief being sought herein.

---

[59]Stringer I docket no. 94-9, deposition of E. Hutchins, at 38:18-23; 39:12-19.

It is therefore ORDERED that Plaintiffs' Motion for Preliminary Injunction (Docket no. 5) is GRANTED. Defendants are ORDERED to immediately take all remaining steps necessary to come into compliance with the NVRA and the U.S. Constitution and establish a DPS System that treats each online driver's license renewal or change-of-address application as a simultaneous application for voter registration. Defendants must complete this process and the DPS system must be fully operable for public use on or before September 23, 2020. Mr. Stringer must be able to use the online DPS System to change the address on his driver's license and simultaneously update his voter registration no later than September 30, 2020 to ensure that his voter registration information is transmitted to the Secretary of State and he is registered in a timely manner. *See* 52 U.S.C. § 20504(e)(1),(2). The Secretary of State must file an advisory with this Court no later than October 2, 2020 confirming that it has fully complied with the Court's order and that Mr. Stringer has been registered to vote through the updated DPS System.

SIGNED this 28th day of August, 2020.

ORLANDO L. GARCIA
CHIEF U.S. DISTRICT JUDGE